**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) Case No. 22-90618 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO
(A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL,
(II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than 8:00 a.m. (prevailing Central Time) on September 8, 2022.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on September 8, 2022, at 8:00 a.m. (prevailing Central Time) in Courtroom 404, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Isgur's conference room number is 954554. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Isgur's homepage. The meeting code is "JudgeIsgur". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance"**

---

[1] Due to the large number of Debtors in these Chapter 11 Cases, for which joint administration has been granted, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/Cineworld. The location of the Debtors' service address for the purposes of these Chapter 11 Cases is: 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

> **link on Judge Isgur's homepage.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully submit this motion (this "Motion")[2] seeking approval of postpetition debtor in possession financing.  In support of this Motion, the Debtors submit:  (a) the *Declaration of Steven Zelin in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Zelin Declaration"), filed contemporaneously herewith; (b) the *Declaration of James Mesterharm in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief*, filed contemporaneously herewith (the "Mesterharm DIP Declaration," together with the Zelin Declaration, collectively, the "DIP Declarations");

---

[2]   The facts and circumstances supporting this Motion are set forth in (a) the *Declaration of Israel Greidinger, Deputy Chief Executive Officer of Cineworld Group plc, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "Greidinger First Day Declaration"), and (b) the *Declaration of James Mesterharm, Chief Restructuring Officer of Cineworld Group plc, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "Mesterharm First Day Declaration," and together with the Greidinger First Day Declaration, the "First Day Declarations"), each filed contemporaneously with the filing of this Motion and incorporated by reference herein.

and (c) the First Day Declarations.  In further support of this Motion, the Debtors respectfully state the following:[3]

## **Preliminary Statement**

1.     The Debtors own and operate the world's second-largest cinema chain by number of screens, offering customers a world-class movie-going experience at locations around the globe. While they have grown their businesses significantly since their founding, the Debtors, like their competitors, have not been immune to the massive industry-wide headwinds precipitated by the COVID-19 pandemic.  Indeed, as state and local governments around the world implemented shelter-in-place orders, cinemas were forced to shutter their doors.  As a result, industry-wide revenue cratered to lows not seen in forty years.

2.     The effect of the pandemic was particularly acute for Cineworld.  Movie ticket sales plummeted from 275 million in 2019 to 54.4 million in 2020—an 80.2 percent decrease.  Revenue likewise decreased by 80.5 percent over the same period—from $4.37 billion to $852.3 million—resulting in an adjusted EBITDA loss of $115.1 million.  This, on top of a highly leveraged capital structure with sizeable debt service obligations, led to a significant liquidity crunch, which necessitated swift action and a realignment of the Group's capital structure.  While the Group undertook various transactions that helped manage its funded and non-funded debt liabilities over the past two years, the Debtors found themselves with no other option but to commence these chapter 11 cases (these "Chapter 11 Cases").

3.     In light of the foregoing, the Debtors urgently require additional liquidity. As described in the Mesterharm DIP Declaration, the Debtors enter these Chapter 11 Cases with

---

[3]     Capitalized terms used but not immediately defined in this Motion shall have the meanings ascribed to them elsewhere in this Motion, in the First Day Declarations, in the DIP Facility Documents, or in the Interim Order (each as defined herein), as applicable.

less than $4 million cash on hand.  Mesterharm DIP Decl. ¶ 15.  Absent immediate financing, the Debtors risk liquidation or a significant curtailing of their operations.  Accordingly, in the lead up to the filing of these Chapter 11 Cases, the Debtors and their advisors worked diligently to identify potential sources of postpetition financing.  Through their proposed investment banker, PJT Partners LLP ("PJT"), the Debtors first reached out to an ad hoc group of existing first lien lenders that had organized with Arnold & Porter Kaye Scholer LLP as counsel and Houlihan Lokey, Inc. as financial advisor (the "Ad Hoc Group").  This initial outreach revealed that members of the Ad Hoc Group would be willing to provide postpetition financing to fund a comprehensive restructuring.

4.    Contemporaneously with such outreach, the Debtors, through PJT, contacted other stakeholders and third-parties outside of the Debtors' capital structure.  While the Debtors' diminishing liquidity position and the need to potentially restructure their balance sheet through a comprehensive deleveraging transaction were widely broadcast through the press and public statements made by the Group before the filing of these Chapter 11 Cases, the market's interest in providing the Group with financing was, nevertheless, minimal.  Zelin Decl. ¶ 20.  Obtaining postpetition financing was made harder by the fact that an overwhelming majority of the Debtors' assets are encumbered by valid and perfected first-priority liens, the majority of which are held by the Ad Hoc Group.  *Id.* at ¶ 23.  Furthermore, restrictive language in the Debtors' prepetition secured financing arrangements effectively provides the Ad Hoc Group with a blocking position over the Debtors' ability to raise significant postpetition financing and pursue a comprehensive restructuring.  *Id.* at ¶ 25.  And, through discussions with the Ad Hoc Group, it became clear that they would not consent to the Debtors' incurrence of postpetition priming financing by any other party.  *Id.* at ¶ 26.  Unsurprisingly, no third-party came forward with any actionable proposal for

a facility that would meet the Debtors' substantial liquidity needs and avoid a protracted, uncertain, and expensive priming dispute. *Id.* The Debtors therefore pursued debtor-in-possession financing to be provided by the Ad Hoc Group. Those negotiations successfully culminated in a comprehensive postpetition financing package on the terms set forth herein.

5.        Accordingly, to enable the Debtors to execute a value-maximizing restructuring, fund the administration of these Chapter 11 Cases, and satisfy their working capital needs, the Debtors request that the Court approve an $1.935 billion superpriority senior secured, multi-draw priming term loan facility (the "DIP Facility"). The DIP Facility will be fully backstopped by certain members of the Ad Hoc Group, while *all* Prepetition First Lien Lenders (as defined herein) will be offered the opportunity to participate in the syndication of the DIP Facility. If approved, the proposed DIP Facility will provide the Debtors with access to $664 million of incremental liquidity. These working capital loans are critical to, among other things, honor employee wages and benefits, procure goods and services, fund general and corporate operating needs and the administration of these Chapter 11 Cases, in each case in accordance with the Approved Budget (as defined in the Interim Order) agreed upon by the Debtors and the DIP Lenders, attached hereto as **Schedule 1** to the Interim Order. On top of significant new money commitments, approximately $1.0 billion of the proceeds of the DIP Facility will be allocated to refinancing the outstanding obligations under the Debtors' Prepetition Priming Facility (the "Priming Loan Refinancing") and approximately $271 million to consummate the RoW Loan Transaction (as defined and described further herein). After careful consideration and extensive negotiation, the Debtors, in a prudent exercise of their business judgment, determined that these transactions are necessary to procure the proposed DIP Facility, in the best interests of their estates, necessary to preserve the going-concern value of the enterprise, avoid unnecessary disputes and

additional significant costs to the estates, and do not unduly prejudice any other creditors.  Indeed, both transactions are critical elements of the Debtors' restructuring strategy and reflect the challenges posed by the unique structure of the Debtors' prepetition indebtedness, where valuable non-Debtor foreign affiliates are guarantors of a portion of such indebtedness.

6.      In connection with the DIP financing process, the Debtors and their advisors undertook an analysis to determine how much postpetition financing would be required to operate the Debtors' business and pay administrative costs during the chapter 11 process.  That analysis revealed that the Debtors would require in excess of $500 million in working capital loans.  Mesterharm DIP Decl. ¶ 11.  In addition, the Debtors and their advisors assessed options with respect to refinancing existing debt, including (a) the Group's RoW Credit Facility, which funds the "rest-of-world" segment of the business (*i.e.*, all regions outside of the U.S. and the U.K.) ("RoW"),[4] and (b) the Debtors' Prepetition Priming Facility, which helps fund the U.S. and U.K. segments of the enterprise.

7.      As set forth in the Zelin Declaration, failure to obtain DIP financing that provides for the paydown in full of the RoW Lenders' debt under the RoW Credit Facility would seriously jeopardize the Group's RoW operations.  Pursuant to the RoW Credit Agreement, a chapter 11 filing by Cineworld Group plc—a guarantor thereunder—triggers an event of default and entitles the RoW Lenders to exercise their contractually-provided rights and remedies.  Absent chapter 11 protection (or other foreign insolvency protection) for the RoW Obligors—non-Debtor affiliates in these Chapter 11 Cases (other than Debtor Cineworld Group plc)—or a waiver/forbearance from the requisite RoW Lenders relating to such default, the Group's valuable RoW operations would

---

[4]     All subsidiaries and affiliates of Cineworld Group that are part of the RoW segment of the Group are not Debtors in these Chapter 11 Cases.

be at risk.  Given that the RoW Obligors are incorporated in various foreign jurisdictions, filing such entities for chapter 11 and potentially ancillary proceedings in multiple foreign jurisdictions would involve significant cross-border complexities that would be extremely disruptive to day-to-day operations and likely result in significantly increased professional fees.  Additional entities filing for bankruptcy could also cause vendors and customers to lose confidence, employee loss, and increase demands on the management team.  In initial discussions, the RoW Lenders made it clear that they would need to be repaid.  Zelin Decl. at ¶ 15.  The Debtors negotiated separately with the DIP Lenders and the RoW Lenders to create a transaction that makes the RoW Lenders whole, while avoiding the value destructive path of commencing insolvency proceedings for the RoW Obligors.  Eventually, the Debtors reached agreement on the RoW Loan Transaction, which coalesces critical support from the RoW Lenders around the Debtors' restructuring while also maximizing value of the Debtors' business for the benefit of its stakeholders.  The RoW Loan Transaction protects the enterprise without prejudicing other creditors and the finality of the RoW Loan Transaction is critical to the restructuring.

8.     As described further herein, pursuant to the RoW Loan Transaction, a U.S. Debtor ("AssignCo") will use proceeds from the DIP Facility to acquire all of the RoW Lenders' rights, title, and interest in and to, among other things, the commitments, advances, and other rights of the RoW Lenders under the RoW Credit Facility (the "RoW Rights and Obligations," and such transaction, the "RoW Loan Transaction").  As security for the DIP Loans provided to it to consummate this transaction, AssignCo will guarantee the obligations under the DIP Facility and grant a lien to the DIP Lenders on all of its assets (which only include the RoW Rights and Obligations).  As additional security for consummation of the RoW Loan Transaction, (a) Crown UK HoldCo Limited will pledge the equity interests it holds in the DIP Borrower, and (b) the DIP

Borrower will pledge the equity interests it holds in Debtor AssignCo, to the DIP Agent for the benefit of the DIP Lenders. The RoW Loan Transaction is structured as a transfer of debt, rather than a refinancing, to avoid the timing and corporate governance challenges associated with securitizing the assets of the RoW Obligors in connection with the DIP Facility (as had been requested by the DIP Lenders during negotiations in the event of a refinancing). Through the RoW Loan Transaction, the RoW Credit Facility (and the related security) will remain in full force and effect.

9.      In addition to the RoW Loan Transaction, the Debtors intend to use the proceeds of the DIP Facility to refinance the Prepetition Priming Facility, a key component of the DIP Facility. The Prepetition Priming Facility was put in place in November 2020 and was designed specifically to provide the Group with incremental liquidity to stave off a premature chapter 11 filing. Although the Debtors failed to meet their operational performance goals since the facility was put in place, additional loans advanced thereunder by the Ad Hoc Group further extended the Group's runway to continue operating in the ordinary course during the COVID-19 pandemic. Since the Prepetition Priming Facility Lenders were cognizant of the potential for a chapter 11 filing during the time they provided the priming loans, their credit agreement coupled with the Prepetition Legacy Facility Agreement contains restrictive language limiting the Company's ability to incur additional priming financing (including DIP financing). By obtaining the support of the Prepetition Priming Facility Lenders for any priming financing, the Debtors would not only be able to raise significant postpetition financing, but they would also be assured that they have the requisite support from the junior secured lenders (*i.e.*, the legacy lenders) for any such financing. Indeed, as further described herein, pursuant to the Senior Intercreditor Agreement and the Pari Passu Intercreditor Agreement, the Prepetition Legacy Facility Agent and any holder of a claim

on account of the obligations thereunder may not object or otherwise contest the priming of their collateral by any DIP financing if the Prepetition Priming Agent has consented to such priming. Given the Ad Hoc Group holds the majority of the obligations under the Prepetition Priming Facility, the Debtors proposed the refinancing of the priming loans throughout negotiations with the Ad Hoc Group.  Following such negotiations, the Debtors agreed, in a prudent exercise of their business judgement, to move forward with the Priming Loan Refinancing, which is in the best interests of the estate and does not harm any other creditor.  Because the Prepetition Priming Facility Lenders are likely oversecured, the Priming Loan Refinancing will merely affect the timing, not the amount, of the recovery of the Prepetition Priming Facility Lenders.  Further, through the Priming Loan Refinancing, the Debtors will obtain the critical access to the use of the prepetition secured parties' cash collateral while avoiding what otherwise could be a protracted priming fight.

10.     To that end, by this Motion, the Debtors seek the Court's authorization to use Cash Collateral.  The nature of the Debtors' business requires the Debtors to have immediate use of Cash Collateral.  Without it, the Debtors would be unable to operate their business and administer their estates, which would immediately and irreparably harm their stakeholders.  With access to Cash Collateral, the Debtors will be able to continue their operations and preserve value for the benefit of their estates and stakeholders.  The Debtors' prepetition secured lenders have consented to the continued use of Cash Collateral under the terms included in the Interim Order (and as summarized in detail below).

11.     Overall, the DIP Facility is the culmination of extensive prepetition negotiations between the Debtors and the Ad Hoc Group, and is the only actionable proposal that the Debtors' received.  The DIP Facility is provided, and otherwise supported, by holders of nearly 58 percent

of the Group's entire capital structure.  Access to the proposed DIP Facility, supported by a majority of the Group's capital structure, will send a clear signal to the Debtors' stakeholders that the Debtors' business is on the path to improved operational results, encouraging them to work cooperatively with the Debtors through the restructuring.  This is especially true for the Debtors' RoW operations.  As set forth in the Mesterharm DIP Declaration, the Debtors and their estates would suffer immediate and irreparable harm if the Debtors were denied the financing needed to sustain on-going business operations during the critical first weeks of these Chapter 11 Cases.  Without access to the DIP Facility, the Debtors would likely need to commence additional cases for all non-Debtor affiliates and face potential near-term liquidation—all to the serious detriment of their stakeholders.  Doing nothing and living with the risk of remedies being exercised against the RoW Obligors is a highly untenable option.  The DIP Facility ensures that the Debtors (a) have sufficient funding to consummate a value-maximizing restructuring transaction and (b) can continue to operate uninterrupted in these Chapter 11 Cases.  Further, as set forth in the Zelin Declaration, the terms of the DIP Facility are reasonable under the circumstances, and were the product of good faith, arm's-length negotiations.  Zelin Decl. at ¶ 19-20.

12.     Accordingly, the relief requested by this Motion is necessary, both to preserve the Debtors' operations and provide a bridge to consummation of a comprehensive restructuring transaction.  For the reasons set forth in this Motion, the First Day Declarations, and the DIP Declarations, the Debtors firmly believe that the DIP Facility and continued use of Cash Collateral, on the terms set forth in the Interim Order, are necessary to avoid immediate and irreparable harm and are in the best interests of the Debtors, their estates, and all stakeholders.  The Debtors respectfully request that the Court enter the Interim Order.

**Jurisdiction and Venue**

13.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

14.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

15.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002 and 4001, and rules 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

16.     On September 7, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' Chapter 11 Cases are set forth in greater detail in the First Day Declarations.

**Relief Requested**

17.     The Debtors seek entry of an interim order, substantially in the form attached hereto (the "Interim Order"), and a final order (the "Final Order,"[5] respectively, and together, the "DIP Orders"):

        a.  authorizing Crown Finance US, Inc., in its capacity as borrower (the "DIP Borrower"), to obtain senior secured postpetition financing on a superiority basis,

---

[5]     The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

and for each of the other specified Debtors to guarantee unconditionally (the "DIP Guarantors"), on a joint and several basis, the Borrower's obligations in connection therewith, in the form of a multiple-draw term loan credit facility in the aggregate principal amount of up to $1.935 billion (all amounts extended under the DIP Facility, the "DIP Loans"), consisting of: (i) $664 million of working capital term loans (the "Working Capital DIP Commitments") including (A) an initial draw in the aggregate principal amount of $514 million available upon entry of the Interim Order, and (B) an additional draw of up to $150 million available upon entry of the Final Order, each the interim and final draws being subject to the terms set forth in the DIP Documents, including the Funding Account; (ii) $1.0 billion of DIP Loans available upon entry of the Interim Order to be used to refinance the Prepetition Priming Loans (including all accrued and unpaid interest thereon and any applicable prepayment premiums in respect of the Prepetition Priming Loans) (collectively, the "Priming Loan Refinancing"); (iii) $271 million of the DIP Loans available upon entry of the Interim Order to be used to effectuate the RoW Loan Transaction; and (iv) a portion of the DIP Loans for the issuance of letters of credit available upon entry of the Interim Order, all pursuant to the terms and conditions of that certain *Superpriority Secured Debtor-in-Possession Credit Agreement* (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), by and among the Borrower, Crown UK HoldCo Limited, as Holdings ("Holdings"), the guarantors from time to time party thereto (the "DIP Guarantors"), Barclays Bank PLC, as administrative and collateral agent (in such capacities, the "DIP Agent"), for and on behalf of itself and the other lenders from time to time party thereto (the "DIP Lenders," and collectively with the DIP Agent, the "DIP Secured Parties");

b. authorizing the Debtors to execute and deliver the DIP Credit Agreement, and any other agreements, instruments, pledge agreements, guarantees, control agreements, and other documents related thereto (as each of the foregoing may be amended, restated, supplemented, waived, and/or modified from time to time in accordance with the terms hereof and thereof, and collectively with the DIP Orders, the "DIP Documents") and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Documents;

c. authorizing the Debtors to use Prepetition Collateral, Cash Collateral, and the proceeds of the DIP Facility in accordance with the Interim Order, including the terms of the Funding Account, and the Approved Budget (as defined in the Interim Order);

d. authorizing the Debtors to, upon entry, and subject to the terms, of the Interim Order, use the DIP Loans to consummate the Priming Loan Refinancing and the RoW Loan Transaction;

e. authorizing the Debtors to provide adequate protection to the administrative and collateral agents under the Prepetition Legacy Credit Agreement and the Prepetition Priming Credit Agreement (such credit agreements, the "Prepetition First Lien

Credit Agreements," and the administrative and collateral agents thereunder, the "Prepetition First Lien Agents"), for the benefit of the holders and lenders under Prepetition Priming Credit Agreement (the "Prepetition Priming Facility Lenders") and the Prepetition Legacy Credit Agreement (the "Prepetition Legacy Facility Lenders," together with the Prepetition Priming Facility Lenders, collectively, the "Prepetition First Lien Lenders," and together with the Prepetition First Lien Agents, collectively, the "Prepetition Secured Parties") pursuant to sections 361 and 363(e) of the Bankruptcy Code for any diminution in value of their interests in the applicable Prepetition Collateral from and after the Petition Date;

f.   granting the DIP Facility and all obligations owing thereunder and under, or secured by, the DIP Documents to the DIP Agent and the DIP Lenders (collectively, and including all obligations as described in the DIP Credit Agreement, the "DIP Obligations") allowed superpriority administrative expense claim status in each of the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing;

g.   granting to each of the DIP Secured Parties under the applicable DIP Documents automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), which liens shall be subject to the terms, including Permitted Liens and the priorities, set forth in the Interim Order;

h.   approving the form of adequate protection to be granted to the Prepetition Secured Parties;

i.   modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the DIP Orders;

j.   scheduling a final hearing (the "Final Hearing"); and

k.   granting related relief.

**Concise Statement of the Material Terms of the Interim Order Pursuant to Bankruptcy Rule 4001 and the Procedures for Complex Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of Texas**

18.   The following chart contains a summary of the material terms of the proposed Interim Order, together with references to the applicable sections of the Interim Order and other relevant source documents, including the DIP Credit Agreement, as required by Bankruptcy Rules

4001(b)(1)(B) and 4001(c)(1)(B) and the *Procedures for Complex Chapter 11 Cases in the Southern District of Texas* (the "Complex Case Procedures").[6]

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **DIP Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Crown Finance US, Inc., a corporation organized under the laws of Delaware.<br><br>*See* DIP Credit Agreement, Recitals. |
| **DIP Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility shall be guaranteed by (a) Cineworld Group and (b) Holdings and each of its existing and future wholly-owned subsidiaries, but excluding in all respects (i) any Specified Immaterial Subsidiary and any Foreign Immaterial Subsidiary (each as defined in the Prepetition Priming Credit Agreement), (ii) the RoW Obligors, the Dutch TopCo, and the subsidiaries of Dutch TopCo (it being agreed in any event that all Persons that are obligors under the Prepetition Priming Credit Agreement will be a guarantor of the DIP Facility).<br><br>DIP Credit Agreement § 1.1. |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | The Backstop Parties and certain Prepetition Legacy Facility Lenders (other than the Backstop Parties) that, after the Closing Date, agree to participate in the DIP Facility.<br><br>*See* Interim Order, Recital (ii). |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Barclays Bank plc, as administrative agent.<br><br>*See* DIP Credit Agreement, Recitals. |
| **Term**<br>Bankruptcy Rule 4001(b)(1)(B)(iii), 4001(c)(1)(B) | The earliest of (a) the date falling twelve (12) months after the commencement of the Chapter 11 Cases, subject to no more than three (3) one (1) month extensions (each, an "Extension") at the sole discretion of the Majority Lenders, (b) the effective date of any chapter 11 plan of reorganization of the DIP Borrower or any other Debtor (such date, the "Plan Effective Date"), (c) the consummation of a sale or other disposition of all or substantially all of the equity or assets of the Debtors, (d) the date of prepayment in cash in full by the Debtors of all DIP Obligations and termination of all of the DIP Commitments in accordance with the terms of the DIP Facility, and (e) the date of termination of the DIP Commitments and/or acceleration of any outstanding extensions of credit following the occurrence and during the continuance of an event of default under the DIP Facility (such earliest date, the "Maturity Date").<br><br>*See* DIP Credit Agreement § 2.19. |
| **DIP Commitments**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility shall consist of a senior secured, superpriority priming U.S. dollar term loan facility in an aggregate principal amount of $1.935 billion, consisting of (x) $664 million which the Borrower shall be permitted to draw, in accordance with, and subject to the terms and conditions set forth in, this DIP Term Sheet, (y) $1.0 billion which shall be used to refinance in full the outstanding principal amount of the Prepetition Priming Loans and all accrued and unpaid interest thereon and to pay fees and expenses outstanding under the Prepetition Priming Credit Agreement and related documents (including the applicable prepayment premiums in respect of the Prepetition Priming |

---

[6]   The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Loans), and (z) $271 million which shall be used by AssignCo to purchase from the RoW Lenders the outstanding principal amount of the RoW Loans (including all accrued and unpaid interest thereon and any applicable prepayment premiums in respect of such RoW Loans).<br><br>*See* Interim Order, Recital (i). |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B) | The effectiveness of the DIP Facility on the Closing Date and the obligations of the DIP Lenders to make DIP Loans shall be subject to customary closing conditions, including, without limitation, the satisfaction of the following conditions precedent (the "Conditions Precedent") (unless waived in writing by the DIP Secured Parties):<br><br>(a)  all DIP Documents, other than those which the DIP Lenders and the Debtors agree shall constitute conditions subsequent, shall have been executed by the Borrower, the Guarantors, and the other parties thereto;<br><br>(b)  with respect to any borrowings to occur prior to the entry of the Final DIP Order, the Interim DIP Order, which shall be in form and substance acceptable to the DIP Lenders and, solely with respect to the rights, duties, obligations, benefits, privileges, protections, indemnities and immunities of the DIP Agent, the DIP Agent and reasonably acceptable to the DIP Borrower, shall have been entered by the Bankruptcy Court in the Chapter 11 Cases;<br><br>(c)  the Interim DIP Order shall be in full force and effect and shall not have been vacated, stayed, revised, modified, or amended without the prior written consent of the Majority Lenders (and with respect to any provisions that affect the rights, duties or obligations of the DIP Agent, the DIP Agent);<br><br>(d)  the Debtors shall have provided the DIP Lenders and the DIP Agent with (i) a schedule of all expected "first day" motions and proposed orders to be filed with the Bankruptcy Court in connection with commencement of the Chapter 11 Cases (the "First Day Pleadings"), and (ii) draft copies of each of the First Day Pleadings, in each case, at least two (2) business days prior to the filing thereof. All "first day" orders filed by the Debtors and entered by the Bankruptcy Court shall be reasonably satisfactory to the DIP Lenders and, solely with respect to the rights, duties, obligations, benefits, privileges, protections, indemnities and immunities of the DIP Agent, the DIP Agent;<br><br>(e)  with respect to any borrowings with respect to the DIP Commitments to occur after the initial borrowing on the Closing Date, the Final DIP Order shall have been entered by the Bankruptcy Court, which date shall be no later than thirty (30) days following the Petition Date, and the DIP Lenders and the DIP Agent shall have received a true and complete copy of such order. Such order shall be consistent with the DIP Term Sheet and otherwise in form and substance acceptable to the DIP Lenders and, solely with respect to the rights, duties, obligations, benefits, privileges, protections, indemnities and immunities of the DIP Agent, the DIP Agent and reasonably acceptable to the DIP Borrower. The Final DIP Order shall be in full force and effect, and shall not have been reversed, modified, stayed, vacated, or amended without the prior written consent of the Majority Lenders (and with respect to any provisions that affect the rights, duties, or obligations of the DIP Agent, the DIP Agent);<br><br>(f)  the representations and warranties of the Debtors contained in the DIP Documents shall be true and correct in all material respects on such date, except to the extent that such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | correct in all material respects as of such earlier date; *provided* that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such date (or such earlier date, as applicable); |
| | (g) except as disclosed to the DIP Lenders in writing, no change shall have occurred that has caused, taken as a whole (other than as a result of the events leading up to, or relating to or in connection with, the commencement of the Chapter 11 Cases and the continuation and prosecution thereof, including circumstances or conditions customarily resulting from such events, commencement, continuation, and prosecution), a material adverse effect (a "<u>Material Adverse Effect</u>"), since the Petition Date; |
| | (h) all fees, charges, and expenses (including fees, charges, and expenses of counsel and financial advisors as provided for herein) required to be paid to the DIP Agent and the DIP Lenders shall have been paid (or will be paid with the proceeds of the DIP Loans authorized under the Interim DIP Order or the Final DIP Order, as applicable); |
| | (i) the DIP Secured Parties shall have received a copy of the Initial Budget, which shall be in form and substance reasonably satisfactory to the Majority Lenders; |
| | (j) the DIP Agent and the DIP Lenders shall have received, by at least three (3) business days prior to the Closing Date, documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act; |
| | (k) upon the entry of the Interim DIP Order, the DIP Agent shall, for the benefit of the DIP Secured Parties, have valid, perfected, and enforceable first priority or superpriority priming, as applicable, Security Interests on the DIP Collateral to the extent set forth in the Interim DIP Order, subject only to liens and security interests permitted by the DIP Documents (including the Interim DIP Order), and all filing and recording fees and taxes with respect to such liens and security interests that are then due and payable shall have been duly paid; |
| | (l) no trustee, examiner, or receiver having expanded powers (beyond those set forth under section 1106(a)(3) and (4) of the Bankruptcy Code) shall have been appointed or designated with respect to any of the Debtors, their businesses, properties, or assets (other than with respect to Specified Immaterial Subsidiaries, and no receiver, administrative receiver, administrator, or liquidator shall have been appointed with respect to any UK DIP Obligor or their business, properties or assets and no corporate action, proceedings or step (or other analogous procedure) shall have been taken by any UK DIP Obligor or any third party creditor to make such appointment except in respect of Picturehouse Cinemas Limited and Cineworld Cinemas Limited or any other winding-up petition or corporate action by a third party which is frivolous or vexatious and being contested in good faith and in relation to any winding-up petition the DIP Agent is satisfied that it will be discharged, stayed or dismissed prior to being advertised and in any event within 14 days of commencement, or in respect of the applicable debt relating to which the Borrower confirms to the DIP Agent that it expects (acting reasonably) to satisfy following drawdown under the DIP Facility, provided that the Borrower consults with advisers to the Majority Lenders in respect thereof; |
| | (m) the Chapter 11 Cases of any of the Debtors shall have not been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code; |

16

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | (n) the Debtors shall have made no payments after the Petition Date on account of any Indebtedness or any other claim arising prior to the Petition Date unless such payment is made in compliance with the First Day Pleadings or any other order of the Bankruptcy Court;<br><br>(o) no default or events of default shall have occurred and be continuing under the DIP Documents;<br><br>(p) the DIP Agent shall have received customary certificates, resolutions, charter documents, good standing certificates, legal opinions and other closing documents customary for financings of this type and in form and substance reasonably satisfactory to the DIP Agent and the Majority Lenders;<br><br>(q) except for the Chapter 11 Cases, or as otherwise disclosed to the DIP Lenders, there shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Debtors) threatened in any court or before any arbitrator or governmental instrumentality (other than the Chapter 11 Cases) that would reasonably be expected to have a Material Adverse Effect (to be defined);<br><br>(r) Cineworld Group shall have appointed (and at all times thereafter maintain) a Chief Restructuring Officer, that shall be reasonably acceptable to the Majority Lenders and that shall (i) have final approval over the contents of the Budget, (ii) report directly to the restructuring subcommittee of the board, (iii) maintain oversight with respect to cash payments being made by the Debtors, and (iv) shall have final approval over any cash payment made by the Debtors in excess of $1,000,000 (excluding payroll and other payments that are auto-drawn (including, for the avoidance of doubt, any utility payments)); and<br><br>(s) the Debtors shall have entered into the RoW Forbearance Agreement.<br><br>*See* DIP Credit Agreement § 3.1. |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) | One (1) month SOFR (plus a SOFR adjustment of 0.10%) plus 10.00%, subject to a SOFR floor of 1.00%, payable monthly in arrears; *provided* that upon the occurrence of any event of default under the DIP Facility, such interest rate margin shall automatically increase by an additional 2.00%. A customary alternate base rate option will be available (or required, as applicable) as an alternative to SOFR.<br><br>*See* DIP Credit Agreement, § 1.1. |
| **Use of DIP Facility and Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(ii) | Subject to usual and customary provisions to be set forth in the DIP Orders, Borrower will use the proceeds of the DIP Facility to, among other things: (a) pay fees, interest, and expenses associated with the DIP Facility; (b) subject to entry of the Interim DIP Order, (i) repay the Prepetition Priming Loans and other obligations under the Prepetition Priming Credit Agreement, and (ii) consummate the RoW Loan Transaction; (c) provide for the ongoing working capital and capital expenditure needs of the Debtors during the pendency of the Chapter 11 Cases; (d) fund the First Lien Adequate Protection (as defined below); and (e) fund the costs of the administration of the Chapter 11 Cases (including the Carve-Out), in each case subject to the Budget and Variance Limit.<br><br>Proceeds of the DIP Facility and cash collateral shall not be used to permit any Debtor or any other party in interest or its representatives to challenge or otherwise contest or institute any proceeding to determine (i) the validity, perfection, or priority of security interests in favor of any of the DIP Lenders or the Prepetition First Lien Lenders, (ii) the enforceability of the obligations of any Debtor under either of the DIP Credit Agreement or the Prepetition First Lien Credit Agreements, or (iii) for any other prohibited purpose |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | described above under the section entitled "Use of Cash Collateral," except as provided in the DIP Order.<br><br>Notwithstanding the foregoing, advisors to the Committee, if one is appointed with regard to the Chapter 11 Cases, may investigate the liens granted pursuant to, or any claims under or causes of action with respect to, the Prepetition First Lien Credit Agreement at an aggregate expense for such investigation not to exceed $100,000.  Further, no portion of such amount may be used to prosecute or support any claims.<br><br>*See* Interim Order, ¶ 27. |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | The Prepetition First Lien Lenders and the DIP Agent.<br>*See* Interim Order, Recital H. |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Backstop Commitment Fee</u>: A fee in the amount of 4.00% of the aggregate principal amount of the Backstop Commitments shall be earned and payable in cash upon the Closing Date, paid ratably to all Backstop Parties based upon their respective Backstop Commitments.<br><br><u>Yield Payment</u>: On the Closing Date, the Borrower shall pay to the DIP Agent for the account of the DIP Lenders a fee of 2.00% on the aggregate principal amount of DIP Commitments, payable to each DIP Lender in cash ratably based on each DIP Lender's proportion to its share of the DIP Commitments.<br><br><u>Extension Fee</u>:  As a condition precedent to any Extension, the Borrower shall pay to the DIP Agent for the account of the DIP Lenders a fee of 1.00% on then aggregate outstanding principal amount of the DIP Loans and remaining outstanding DIP Commitments, payable to each DIP Lender in cash ratably based on each DIP Lender's proportion to its share of the then aggregate outstanding principal amount of the DIP Loans and remaining outstanding DIP Commitments.<br><br><u>Exit Fee</u>: A fee of 1.0% on the aggregate original principal amount of DIP Commitments shall be fully earned on the Closing Date and shall be payable to the DIP Lenders on the earlier of (x) the Maturity Date and (y) date on which the DIP Obligations are paid in full (whether through a refinancing, conversion of all or a portion of the DIP Obligations into an exit facility, or otherwise).<br><br>*See* DIP Credit Agreement, § 2.21(c). |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B) | Prior to the commencement of the Chapter 11 Cases, and as a condition precedent to the effectiveness of the DIP Facility, the Debtors shall have delivered to the DIP Lenders an initial 13-week budget commencing the week during which the Petition Date occurred, which 13-week budget shall be in form and substance reasonably satisfactory to the Majority Lenders (the "<u>Initial Budget</u>").  On Thursday (or, if such Thursday is not a business day, the immediately succeeding business day) of the fourth full calendar week following the week in which Petition Date occurs, and on each Thursday (or, if such Thursday is not a business day, the immediately succeeding business day) of each fourth calendar week thereafter (each, a "<u>Reporting Date</u>" and such four-week period, the "<u>Reporting Period</u>"), the Debtors will provide to the DIP Lenders, Houlihan Lokey, Inc., as advisor to the Majority Lenders ("<u>Houlihan</u>"), and DIP Agent a thirteen (13)-week cash flow forecast, containing line items of sufficient detail to reflect the Debtors' projected receipts and disbursements for such 13-week period, and all other information reasonably requested by the DIP Agent and/or the Majority Lenders, or Houlihan, on |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | behalf of the Majority Lenders, in each case, in form and substance reasonably satisfactory to the Majority Lenders (the "_Budget_"); *provided* that if the Majority Lenders, or Houlihan, acting on their behalf, do not object to the Budget within five (5) business days of delivery, the Budget delivered shall govern for such Reporting Period.<br><br>*See* DIP Credit Agreement, § 6.1(h)(i). |
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(l)(B) | By not later than 5:00 p.m. Eastern Time on the Thursday (or, if such Thursday is not a business day, the immediately succeeding business day) of the fourth full calendar week after the Petition Date, and thereafter by not later than 5:00 p.m. Eastern Time on the Thursday (or, if such Thursday is not a business day, the immediately succeeding business day) of every second week thereafter, the Debtors will provide to the DIP Agent a variance report for the immediately preceding four-week period then ended (each such period, a "_Testing Period_" and each such report, a "_Variance Testing Report_"), in form and substance reasonably satisfactory to the DIP Agent and the Majority Lenders, or Houlihan (on behalf of the Majority Lenders), detailing the following: (i) the aggregate disbursements of the Debtors and aggregate receipts during the applicable Testing Period; and (ii) any variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements made during such Testing Period by the Debtors against the aggregate disbursements for the Testing Period, as set forth in the applicable Budget (excluding disbursements in respect of professional fees incurred in the Chapter 11 Cases by the Debtors during such Testing Period).<br><br>Starting with the first full Testing Period, and for any Testing Period thereafter, the Debtors shall not allow the aggregate disbursements (excluding disbursements in respect of professional fees incurred in the Chapter 11 Cases by the Debtors as well as the Priming Loan Refinancing and the RoW Debt Purchase Price during such Testing Period) made by the Debtors during such Testing Period to be greater than 113.75% of the aggregate disbursements for the Debtors set forth in the Budget for such Testing Period (the "_Variance Limit_"); *provided* that the Debtors may carry forward budgeted but unused disbursements set forth in the Budget for a Testing Period for use during only the immediately succeeding Testing Period and, to the extent that the Majority Lenders do not approve the Budget, any subsequent Testing Period until the Budget has been approved. Additional variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the reasonable written consent of the Majority Lenders, or Houlihan (on behalf of the Majority Lenders); *provided* that if the Majority Lenders, or Houlihan (acting on their behalf), do not object to the proposed changes from the Budget within five (5) business days of delivery, the changes from the Budget delivered shall govern for such Reporting Period. For the avoidance of doubt, any reference to "written consent" hereunder shall include consent granted by email.<br><br>*See* Interim Order ¶ 14. |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Credit Agreement shall include usual and customary covenants for facilities of this type and in form and substance acceptable to the Debtors and the Majority Lenders, including, but not limited to (a) delivery by no later than 5:00 p.m. Eastern Time on the Thursday (or, if such Thursday is not a business day, the immediately succeeding business day) of the fourth full calendar week after the Petition Date, and thereafter by no later than 5:00 p.m. Eastern Time on the Thursday (or, if such Thursday is not a business day, the immediately succeeding business day) of every second week thereafter, (a) reports showing actual receipts and disbursements through the prior four week period in the format of the Budget and (b) a variance report for the immediately preceding four-week period then ended (each such period, a "_Variance Reporting Period_" and each such report, |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | a "Variance Report"), in form and substance reasonably satisfactory to the DIP Agent and the Majority Lenders, detailing the following: (i) the aggregate disbursements of the Debtors and aggregate receipts during the applicable Variance Reporting Period; (ii) any variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements made during such Variance Reporting Period by the Debtors against the aggregate disbursements for the Variance Reporting Period, as set forth in the applicable Budget; (iii) any variance (whether positive or negative, expressed as a percentage) between the aggregate receipts by the Debtors during such Variance Reporting Period against the aggregate receipts for the Variance Reporting Period, as set forth in the applicable Budget; and (iv) a report from the Debtors identifying and addressing any variance of actual performance to projected performance for the Variance Reporting Period;<br><br>*See* DIP Credit Agreement, § 6.1(h)(i). |
| **Chapter 11 Milestones**<br>Bankruptcy Rule 4001(c)(1)(B) | The Debtors shall comply with the following deadlines (each of which may be extended with the written consent (email being sufficient) of the Majority Lenders without further order of the Bankruptcy Court) (each, a "Milestone" and collectively, the "Milestones"):<br><br>(a)   The Debtors shall commence the Chapter 11 Cases by filing voluntary petitions under chapter 11 of the Bankruptcy Code with the Bankruptcy Court no later than September 7, 2022 (the "Petition Date").<br><br>(b)   The Bankruptcy Court shall have entered the Interim DIP Order by the date that is no later than September 9, 2022.<br><br>(c)   The Bankruptcy Court shall have entered the Final DIP Order by the date that is no later than October 6, 2022.<br><br>(d)   The Debtors will have delivered a lease optimization plan, and an owned real estate optimization plan each in form and substance acceptable to the Majority Lenders (an "Acceptable Real Estate Plan") by the date that is no later than October 15, 2022.<br><br>(e)   The Debtors shall have delivered proposed processes and parameters related to a customary (for Debtors' industry and companies of Debtors' size) proposed business plan (the "Business Plan") including, among other things, parameters related to lease agreements (the "Business Plan Parameters") to the DIP Lenders by the date that is no later than October 15, 2022.<br><br>(f)   The Debtors and the Majority Lenders shall have agreed on acceptable Business Plan Parameters by the date that is no later than October 20, 2022.<br><br>(g)   The Debtors shall have delivered a Business Plan (consistent with the agreed acceptable Business Plan Parameters) to the DIP Lenders by the date that is no later than November 8, 2022.<br><br>(h)   The Debtors and the Majority Lenders shall have agreed on an acceptable Business Plan by the date that is no later than November 14, 2022.<br><br>(i)   On or before November 21, 2022, the Debtors shall have filed with the Bankruptcy Court either (A) a sale motion and bidding procedures motion for an Acceptable 363 Sale (the "Sale and Bidding Procedures Motion") or (B) a chapter 11 plan, acceptable to the Majority Lenders, with respect to the Debtors (the "Acceptable Plan") and a disclosure statement, acceptable to the Majority Lenders, relating to the Acceptable Plan (the "Acceptable Disclosure Statement"). |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | (j)  Sale Motion/363 Sale |
| |  a.  If the Debtors file a Sale and Bidding Procedures Motion, a hearing to consider approval of the Bidding Procedures Motion shall be held not later than December 21, 2022. |
| |  b.  The deadline for bidding under the Bidding Procedures Order shall be a date not later than February 10, 2023. |
| |  c.  Any auction contemplated by the Bidding Procedures Order, if necessary, shall be conducted not later than February 17, 2023. |
| |  d.  The sale hearing shall be scheduled for February 22, 2023 (subject to Court's availability). |
| | (k)  Plan/Disclosure Statement |
| |  a.  If the Debtors file an Acceptable Plan and Acceptable Disclosure Statement, the hearing on the Acceptable Disclosure Statement shall occur by January 3, 2023 and an order approving the Acceptable Disclosure Statement shall be entered by January 5, 2023. |
| | (l)  The Bankruptcy Court shall have entered an order confirming the Acceptable Plan by the date that is no later than February 28, 2023. |
| | *See* DIP Credit Agreement § 7.20. |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i) | Subject to the "Carve-Out" and the Guaranty and Security Principles (as defined in the DIP Documents) (solely with respect to security granted by Non-U.S. DIP Obligors, in assets not located in the United States) (as defined below), the DIP Facility and all obligations of the Debtors to the DIP Lenders and the DIP Agent or their affiliates under the DIP Documents, including, without limitation, all principal and accrued interest, premiums, costs, fees, expenses and any other amounts due under the DIP Facility (including cash management and hedging obligations) (collectively, the "<u>DIP Obligations</u>") shall at all times be secured, subject to customary permitted liens to be agreed:<br><br>(a)  pursuant to section 364(c)(2) of the Bankruptcy Code, by valid, binding, continuing, enforceable, fully perfected first priority liens, mortgages, charges, pledges, assignments by way of security, encumbrances or other security interests (the "<u>Security Interests</u>") in all of the assets of the DIP Obligors that are not otherwise subject to valid, perfected, non-avoidable and enforceable security interests or liens in existence as of the Petition Date or valid security interests or liens granted prior to (but not perfected until after) the Petition Date (to the extent that such perfection in respect of a prepetition claim is expressly permitted under section 546(b) of the Bankruptcy Code), including, without limitation, (i) all assets of the DIP Obligors of the type securing the obligations under the Prepetition Priming Credit Agreement, (ii) all personal property of the DIP Obligors, and (iii) all deposit accounts, securities accounts, and commodity accounts of the DIP Obligors;<br><br>(b)  pursuant to section 364(d)(1) of the Bankruptcy Code, by valid, binding, continuing, enforceable, fully perfected super-priority priming Security Interests in all of the assets of the DIP Obligors that are subject to valid, perfected, and enforceable security interests or liens in existence as of the Petition Date or valid security interests or liens granted prior to (but not perfected until after) the Petition Date (to the extent that such perfection in respect of a prepetition claim |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | is expressly permitted under section 546(b) of the Bankruptcy Code), except as set forth in subclause (c) below; and<br><br>(c)  pursuant to section 364(c)(3) of the Bankruptcy Code, by valid, binding, continuing, enforceable, fully perfected junior-priority Security Interests on those assets securing obligations that are subject to Senior Permitted Liens (as defined herein);<br><br>(collectively, the "<u>DIP Collateral</u>" and, the Security Interests thereon and therein, the "<u>DIP Liens</u>").  For the avoidance of doubt, subject to the proviso at the end of this sentence, the DIP Collateral shall include all assets and properties of the Debtors (whether tangible, intangible, real, personal, or mixed), whether now owned or hereafter acquired and wherever located, before or after the Petition Date, including, without limitation, all cash, cash equivalents, accounts, inventory, equipment, equity interests or capital stock in domestic and foreign subsidiaries, investment property, instruments, chattel paper, real property, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, receivables (including those owed to the Debtors generated by intercompany transactions), all claims or causes of action (including, any commercial tort claims or causes of action, and subject to entry of the Final DIP Order, the proceeds of Avoidance Actions (to be defined in the DIP Credit Agreement)) and all products, offspring, profits, and proceeds thereof; *provided* that, and notwithstanding anything to the contrary herein, the Avoidance Actions themselves shall not be DIP Collateral.<br><br>All of the DIP Liens shall be created on terms, and pursuant to documentation, reasonably satisfactory to the DIP Agent and the DIP Lenders.  To the extent that security documentation is based on equivalent security documentation for the Prepetition Legacy Loans or the Prepetition Priming Loans, such security documentation shall be updated to reflect such terms as the DIP Agent and the DIP Lenders deem appropriate for a DIP financing, subject, in the case of certain non-U.S. security documentation, to a post-closing period to be agreed.  The security documentation entered into by UK DIP Obligors shall include qualifying floating charges entitling the holder to appoint an administrator pursuant to Paragraph 14 of Schedule B1 of the Insolvency Act 1986.<br><br>The DIP Liens shall (or, solely with respect to DIP Liens granted by non-U.S. DIP Obligors on assets located outside of the United States, shall to the maximum extent permitted by appliable law) be effective and perfected as of the entry of the Interim DIP Order and without requiring the execution, filing, or recording of mortgages, security agreements, pledge agreements, control agreements, financing statements, or other agreements or instruments, or the taking of any action to obtain possession or control of any collateral.<br><br>For the avoidance of doubt, DIP Collateral shall also include substantially all assets of each DIP Obligor, and all appropriate actions shall be taken under applicable law to perfect the Security Interests granted on such DIP Collateral.<br><br>*See* Interim Order, ¶ 7. |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders provide a "Carve Out" of certain statutory fees, allowed professional fees, and Carve Out Reserves, and the creation of a Funded Reserve Account all as detailed in the Interim Order. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | *See* Interim Order ¶ 25. |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B) | The challenge period shall be the earliest of (a) forty-five (45) days after entry of the Interim DIP Order, (b) in the case of any official committee appointed in these chapter 11 cases, sixty (60) days after such appointment, and (c) ten (10) days prior to the commencement of the hearing to confirm a chapter 11 plan in the Chapter 11 Cases.<br><br>*See* Interim Order ¶ 32(a). |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | The adequate protection provided to the Prepetition First Lien Agents and Prepetition First Lien Lenders shall be in accordance with the Interim Order.<br><br>*See* Interim Order ¶¶ 13, 17. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | Events of Default shall include, without limitation:<br><br>(a)  failure to pay principal on the DIP Loans when due;<br><br>(b)  failure to pay interest on the DIP Loans or any fees or other amounts under the DIP Facility when due, and such failure continues for three (3) business days;<br><br>(c)  failure to comply with the Budget, subject to the Variance Limit;<br><br>(d)  failure to meet any Milestone;<br><br>(e)  the DIP Agent shall cease to have a valid and perfected first-priority, or superpriority priming, as applicable, Security Interest in any DIP Collateral (subject, in the case of certain non-U.S. security, to the post-closing requirements set forth in the DIP Credit Agreement and the Guaranty and Security Principles, as defined in the DIP Documents);<br><br>(f)  any Debtor shall (i) contest, including by filing a motion or other pleading, the validity or enforceability of any DIP Document or deny that it has any further liability thereunder; (ii) contest, including by filing a motion or other pleading, the validity or perfection of the DIP Liens; or (iii) support any other party contesting the foregoing, unless to enforce the terms of the DIP Documents (including as it relates to the remedies provisions set forth herein and in the DIP Documents);<br><br>(g)  any attempt by any Debtor to invalidate or otherwise impair the DIP Loans or the DIP Liens granted to the DIP Lenders under the DIP Documents or otherwise with respect to the DIP Loans;<br><br>(h)  failure by any Debtor to comply in any material respect with the Interim DIP Order or Final DIP Order, as applicable;<br><br>(i)  the DIP Orders shall cease to be in full force and effect or the DIP Orders are revoked, remanded, amended, modified, vacated, reversed, stayed, or rescinded, without the consent of the Majority Lenders;<br><br>(j)  any Debtor seeks to obtain Bankruptcy Court approval of any sale or other disposition of all or substantially all of the DIP Collateral securing the DIP Loans pursuant to section 363 of the Bankruptcy Code without the consent of the Majority Lenders or otherwise if such sale or disposition does not contemplate satisfying the DIP Obligations in full, in cash, and other than as permitted by the DIP Orders or the Plan (or pursuant to a transaction that is permitted under the DIP Credit Agreement), or any Debtor proposes, supports, or fails to contest in good faith the entry of such an order; |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | (k) dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, or the filing of any motion by a Debtor to dismiss or convert, any of the Chapter 11 Cases or any equivalent change in any pending foreign proceedings not agreed to by the Majority Lenders (except as it relates to Specified Immaterial Subsidiaries or any other Debtor without assets or operations);<br><br>(l) except as otherwise permitted by the DIP Documents, any corporate action, proceeding, or step (or other analogous procedure) is taken by the Debtors (i) in relation to a moratorium of indebtedness (except pursuant to the Chapter 11 Cases), winding up, dissolution, administration or reorganization of any Debtor; or (ii) to appoint a trustee, examiner, receiver, administrative receiver, administrator, liquidator or other similar officer in respect of any of the Debtors or their assets, in each case, except (i) any Implementation Mechanism,[7] or (ii) otherwise approved by the Majority Lenders;<br><br>(m) the appointment of a Chapter 11 trustee or an examiner with enlarged powers without the prior written consent of the DIP Lenders in their sole discretion;<br><br>(n) the entry of an order or filing authorizing, approving, granting, or seeking additional postpetition financing not otherwise permitted by the DIP Documents or otherwise consented to by the Majority Lenders;<br><br>(o) other than with respect to the Carve Out, entry of an order allowing any claim under section 506(c) of the Bankruptcy Code surcharging any DIP Collateral without the prior written consent of the Majority Lenders;<br><br>(p) entry of an order terminating the Debtors' exclusive right to file a plan as set forth in section 1121 of the Bankruptcy Code;<br><br>(q) the marshaling of any of the DIP Collateral or Prepetition Collateral;<br><br>(r) the Bankruptcy Court shall enter an order granting, or there shall arise or otherwise be granted, any lien or claim (other than the Carve Out) that is *pari passu* with or senior to those of the DIP Secured Parties, except as otherwise provided in the DIP Documents with respect to royalty payments owing to film studios; |

---

[7]   "**Implementation Mechanism**" means one or more of the following implementation mechanisms for the purpose of implementing any restructuring transaction in a manner that conforms to and is consistent with, and gives effect to or facilitates the implementation of, the Chapter 11 Cases in the United Kingdom and (if and as applicable) other jurisdictions:  (a) a members' scheme of arrangement with respect to Cineworld Parent under Part 26 of the Companies Act 2006 (United Kingdom); (b) a restructuring plan under Part 26A of the Companies Act 2006 (United Kingdom); and/or (c) ancillary proceedings to the Chapter 11 Cases or any of the foregoing Implementation Mechanisms, including to implement or effect cross-border recognition of the Chapter 11 Cases, any restructuring transactions, and the Plan including proceedings under the UK Cross-Border Insolvency Regulations 2006, the appointment of administrators or equivalent officeholders (howsoever described) under applicable law, dissolution proceedings under applicable law, and joint provisional liquidations under the laws of any other relevant jurisdiction.

For the avoidance of doubt, the proceeds of the DIP Facility shall be available, and applicable covenants shall be subject to relevant carve-outs in order, to ensure the availability of funding an amount necessary to fund the activities, costs, and fees of an Approved Insolvency Practitioner appointed to the Debtors under the Insolvency Act 1986 of the United Kingdom (including by funding into a bank account held by such Approved Insolvency Practitioner such amounts required by such persons to undertake this role).

| Bankruptcy Code | Summary of Material Terms |
| --- | --- |
| | (s) entry of an order by the Bankruptcy Court denying or terminating use of cash collateral by the Debtors and the Debtors shall have not obtained use of cash collateral pursuant to an order consented to by, and in form and substance reasonably acceptable to, the Majority Lenders; |
| | (t) Cineworld Group or any of its Subsidiaries, or any person claiming by or through any of them, with Cineworld Group's or any of its subsidiary's consent, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against (A) the DIP Agent or any of the DIP Lenders relating to the DIP Facility or (B) the administrative agent or any lender relating to any Prepetition First Lien Credit Agreements, unless such suit or other proceeding is in connection with the enforcement of the DIP Documents or Prepetition First Lien Credit Agreements as provided in the applicable DIP Order (including with respect to any remedies provisions herein or in the DIP Documents); |
| | (u) the Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Debtors which have a value in excess of $5,000,000 in the aggregate or (ii) permit other actions that would have a material adverse effect on the Debtors or their estates (taken as a whole); |
| | (v) an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by the DIP Agent or any of the DIP Lenders of any amounts received in respect of the DIP Facility; |
| | (w) other than with respect to the Carve Out, (i) an order in the Chapter 11 Cases shall be entered charging any of the Collateral (as defined herein and in the Prepetition First Lien Credit Agreements) under section 506(c) of the Bankruptcy Code against the DIP Lenders or the lenders under any of the Prepetition First Lien Credit Agreements, or (ii) the commencement of any other actions, directly or indirectly, by the Debtors that challenges the rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition First Lien Agents, and the Prepetition First Lien Lenders under the DIP Documents or Prepetition First Lien Credit Agreements (other than as provided herein or in the DIP Documents) or (iii) the commencement of any other action or challenge, directly or indirectly, by the Debtors that is inconsistent with any of the DIP Documents, the Prepetition First Lien Credit Agreements, or this Interim DIP Order; |
| | (x) the Borrower or any Guarantor shall challenge, support or encourage a challenge of any payments made to the administrative agent or any lender under any of the Prepetition First Lien Credit Agreements with respect to the obligations thereunder; |
| | (y) without the consent of the Majority Lenders, the filing of any motion by the Debtors seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any prepetition agent, trustee, or lender that is inconsistent with the Interim DIP Order or the Final DIP Order; |
| | (z) the filing by any of the Debtors of a plan of reorganization under chapter 11 of the Bankruptcy Code 11 that does not provide for (a) the termination of the DIP Commitments and the payment in full in cash of all DIP Loans or (b) for a treatment consented to by the Majority Lenders (an "Acceptable Plan"); |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | (aa) the filing by any of the Debtors of any disclosure statement other than a disclosure statement relating to an Acceptable Plan and that is reasonably acceptable to the Majority Lenders (an "<u>Acceptable Disclosure Statement</u>");<br><br>(bb) the entry of an order approving a plan of reorganization under chapter 11 of the Bankruptcy Code in any of the Chapter 11 Cases other than an Acceptable Plan;<br><br>(cc) the entry of an order approving a disclosure statement related to a plan of reorganization under Chapter 11 of the Bankruptcy Code other than an Acceptable Disclosure Statement;<br><br>(dd) if any Debtor or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any part of the business affairs of the Debtors and their Subsidiaries, taken as a whole, which could reasonably be expected to have a Material Adverse Effect (to be defined); *provided* that the Debtors shall have thirty (30) Business Days after the entry of such an order to obtain a court order vacating, staying, or otherwise obtaining relief from the Bankruptcy Court or another court to address any such court order;<br><br>(ee) any contract or license with a film studio counterparty is terminated or materially changed in such a manner that such change constitutes a Material Adverse Effect;<br><br>(ff) prior to the consummation of the RoW Loan Transaction, the occurrence and continuance of any event of default under the RoW Credit Facility (as amended) unless, prior to the RoW Loan Transaction, the RoW Forbearance Agreement is in force and effect;<br><br>(gg) following the consummation of the RoW Loan Transaction, the occurrence and continuance of any event of default under the RoW Credit Facility (as amended) unless subject to a forbearance or waiver pursuant to the ROW Second Step Amendment, the ROW Third Step Amendment or otherwise;<br><br>(hh) a court in any jurisdiction enters an order granting any lien or claim ranking pari passu or senior to the Prepetition Liens; or<br><br>(ii) the voluntary commencement of any foreign insolvency, restructuring, foreclosure, or similar proceedings without the consent of the Majority Lenders, unless otherwise permitted under the DIP Documents, *provided* that where such consent is granted and any steps are subsequently taken by an administrator of a UK DIP Obligor which are not materially consistent with the Chapter 11 Cases, further payments to such UK DIP Obligor under the DIP Credit Facility shall be restricted.<br><br>Upon the occurrence of an Event of Default, and delivery of a written notice (with a copy filed with the Court) (a "<u>Default Notice</u>," and the date of delivery of such Default Notice, the "<u>DIP Termination Date</u>") by the DIP Agent (acting at the direction of the Majority Lenders) to the Debtors, any Committee, and the U.S. Trustee of on the occurrence of an Event of Default (the "<u>Event of Default Occurrence</u>"), the automatic stay shall terminate solely to the extent necessary for one or more (without limitation) of the following to occur to the extent elected by the DIP Agent (acting at the direction of the Majority Lenders): (a) the Debtors' authority to use Cash Collateral shall immediately terminate (subject only to the Carve-Out); (b) the DIP Obligations shall (subject only to the Carve-Out) be immediately accelerated and due and payable for all purposes, rights, and remedies, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtors; (c) the termination, reduction, or restriction of any further DIP Commitments to the extent any DIP Commitments remain outstanding, (d) |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | the DIP Facility shall be terminated with respect to any future liability or obligation of the DIP Secured Parties, but, for the avoidance of doubt, without affecting any of the DIP Liens, the DIP Superpriority Claims or the DIP Obligations, (e) any and all obligations of the DIP Lenders in connection with the DIP Facility and the Prepetition Secured Parties with respect to Cash Collateral under this Interim Order and the DIP Documents, as applicable, shall immediately terminate, (f) the application of the Carve-Out through the delivery of the Carve-Out Trigger Notice; and (g) the exercise of any other right or remedy with respect to the DIP Collateral or the DIP Liens permitted under the DIP Documents or the Prepetition Collateral or the Prepetition Liens permitted under the Prepetition Documents; provided, however that (i) in the case of the termination of the use of Cash Collateral pursuant to clause (a) above, unless, in the case of an Event of Default Occurrence, such Event of Default Occurrence is cured by the Debtors, as determined by the Majority Lenders, prior to the expiration of five (5) Business Days following the Termination Date (the "Default Notice Period"), and (ii) in the case of the enforcement of DIP Liens or the Prepetition Liens or other remedies with respect to the DIP Collateral or Prepetition Collateral pursuant to clauses (b) - (g) above, the DIP Agent (acting at the direction of the Majority Lenders) shall first file a motion (the "Stay Relief Motion") with the Court seeking emergency relief to exercise such remedies on at least five (5) Business Days' notice (the "Remedies Notice Period") seeking an emergency hearing before the Court (a "Stay Relief Hearing") and the Debtors agree not to object the shortening of notice of such Stay Relief Hearing. <br><br> *See* DIP Credit Agreement, §§ 9.1; 9.2 |
| **Waiver/Modification of the Automatic Stay** <br> Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to implement and effectuate the terms of the Interim Order and the DIP Documents. <br><br> *See* Interim Order, ¶ 15. |
| **Indemnification** <br> Bankruptcy Rule 4001(c)(1)(B)(ix) | Each Lender agrees to indemnify the Administrative Agent and each of its Affiliates, and each of their respective directors, officers, employees, agents and advisors (to the extent not reimbursed by the Borrower and without limiting their obligation to do so), from and against such Lender's aggregate Ratable Portion of the Facility against any and all liabilities, obligations, losses, damages, penalties, actions, judgments and suits (including the Cases), costs, expenses and disbursements (including reasonable fees, expenses and disbursements of financial and legal advisors) of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against, the Administrative Agent or any of its Affiliates, directors, officers, employees, agents and advisors in any way relating to or arising out of this Agreement or the other Loan Documents or in connection with the Cases or any action taken or omitted by the Administrative Agent under this Agreement or the other Loan Documents; *provided, however*, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's or its Affiliate's gross negligence or willful misconduct. Without limiting the foregoing, each Lender agrees to reimburse the Administrative Agent promptly upon demand for its ratable share of any out-of-pocket expenses (including reasonable fees, expenses and disbursements of financial and legal advisors) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of its rights or responsibilities under, this Agreement or the other Loan Documents, to the extent that the Administrative Agent is not reimbursed for such expenses by the Borrower or another Loan Party. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | *See* DIP Credit Agreement, § 10.6. |

## Statement Regarding Significant Provisions

19.   The DIP Orders contain certain of the provisions (the "Significant Provisions")[8]

identified in Section J, paragraph 26 of the Complex Case Procedures as summarized below.  The

Significant Provisions included in the DIP Orders are as follows:

a.   ***Plan Confirmation Milestone***.  The DIP Orders impose a milestone on the Debtors for obtaining confirmation of a chapter 11 plan of reorganization no later than 11:59 p.m. (prevailing Eastern Time) on February 28, 2023 (or such later date as the DIP Agent may agree in writing at the direction of the Required DIP Lenders) (*see* DIP Credit Agreement § 7.20.;

b.   ***No-Cross Collateralization***.  The DIP Orders do not authorize, and the DIP Facility does not provide for, any cross-collateralization of the Group's funded-debt.

c.   ***Requirement that Postpetition Loans Be Used to Repay Prepetition Debt***.  The Interim Order authorizes the Debtors to (i) refinance the Prepetition Priming Loans and (ii) effectuate the RoW Loan Transaction (*see* Interim Order ¶ 12(a));

d.   ***Liens on Proceeds of Avoidance Actions***.  The Final Order, but not the Interim Order, grants the DIP Secured Parties liens on claims and causes of action arising under chapter 5 of the Bankruptcy Code (the "Avoidance Action Proceeds"), excluding the actual claims or causes of action arising under chapter 5 of the Bankruptcy Code (collectively, "Avoidance Actions") (*see* Interim Order ¶ 13(a));

e.   ***Default Provisions and Remedies***.  Upon the occurrence of an Event of Default, and delivery of a written notice by the DIP Agent (acting at the direction of the Majority Lenders) to the Debtors, any Committee, and the U.S. Trustee of on the occurrence of an Event of Default, the automatic stay shall terminate solely to the extent necessary for one or more (without limitation) of the following to occur to the extent elected by the DIP Agent (acting at the direction of the Majority Lenders): (a) the Debtors' authority to use Cash Collateral shall immediately

---

[8]   Significant Provisions refer to those provisions that: (a) grant cross-collateralization protection (other than replacement liens or other adequate protection) to prepetition secured creditors; (b) deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552(b) of the Bankruptcy Code; (c) bind the bankruptcy estates or any parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or debt or the waiver of claims against the secured creditor; (d) waive or limit the estate's rights under section 506(c) of the bankruptcy code; (e) grant prepetition secured creditors liens on the debtor's claims and causes of action arising under chapter 5 of the Bankruptcy Code; (f) impose deadlines for the filing of a plan or disclosure statement; and (g) grant an administrative claim.

terminate (subject only to the Carve-Out); (b) the DIP Obligations shall (subject only to the Carve-Out) be immediately accelerated and due and payable for all purposes, rights, and remedies, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtors; (c) the termination, reduction, or restriction of any further DIP Commitments to the extent any DIP Commitments remain outstanding, (d) the DIP Facility shall be terminated with respect to any future liability or obligation of the DIP Secured Parties, but, for the avoidance of doubt, without affecting any of the DIP Liens, the DIP Superpriority Claims or the DIP Obligations, (e) any and all obligations of the DIP Lenders in connection with the DIP Facility and the Prepetition Secured Parties with respect to Cash Collateral under this Interim Order and the DIP Documents, as applicable, shall immediately terminate, (f) the application of the Carve-Out through the delivery of the Carve-Out Trigger Notice; and (g) the exercise of any other right or remedy with respect to the DIP Collateral or the DIP Liens permitted under the DIP Documents or the Prepetition Collateral or the Prepetition Liens permitted under the Prepetition Documents; provided, however that (i) in the case of the termination of the use of Cash Collateral pursuant to clause (a) above, unless, in the case of an Event of Default Occurrence, such Event of Default Occurrence is cured by the Debtors, as determined by the Majority Lenders, prior to the expiration of five (5) Business Days following the Termination Date (the "Default Notice Period"), and (ii) in the case of the enforcement of DIP Liens or the Prepetition Liens or other remedies with respect to the DIP Collateral or Prepetition Collateral pursuant to clauses (b) - (g) above, the DIP Agent (acting at the direction of the Majority Lenders) shall first file a motion with the Court seeking emergency relief to exercise such remedies on at least five (5) Business Days' notice seeking an emergency hearing before the Court and the Debtors agree not to object the shortening of notice of such Stay Relief Hearing. (*see* Interim Order ¶ 24(a));

f. ***Limitations on the Use of Cash Collateral Other than General "Carve-Outs" to Pay Approved Fees and Expenses of Advisors to Official Committees or Future Trustees***.  The Debtors shall be entitled to use cash collateral of the DIP Agent and the Prepetition First Lien Agents in accordance with the Budget (subject to the Variance Limit) and DIP Documents, and in any event subject to customary restrictions including, a prohibition on using the cash collateral to (i) finance in any way any adversary action, suit, arbitration, proceeding, application, motion, other litigation, claim, objection, challenge, examination or investigation of any type relating to or in connection with the DIP Facility, the credit facilities provided under the Prepetition First Lien Credit Agreements or any interim or final order with respect to the DIP Facility, including, any challenges to the DIP Obligations or obligations under the Prepetition First Lien Credit Agreements, or the validity, perfection, priority, or enforceability of any DIP Lien or adequate protection liens granted to the Prepetition First Lien Lenders securing such claims or any payment thereunder; (ii) finance in any way any action, suit, arbitration, proceeding, application, motion, other litigation, claim, objection, challenge, examination, or investigation of any type adverse to the interests of the DIP Secured Parties or Prepetition Secured Parties or their respective rights and remedies under the DIP Documents or the DIP Orders; (iii) finance any attempt to prevent, hinder, or

otherwise delay any of the DIP Lenders', DIP Agent's, or Prepetition First Lien Agent's or Prepetition First Lien Lenders' assertion, enforcement, or realization upon any Collateral in accordance with the DIP Documents once an event of default has occurred and any applicable remedy notice period expired; provided, however, that the Debtors shall not be precluded from using Cash Collateral and/or proceeds from DIP Loans to contest whether an event of default has occurred and is continuing and/or prepare for and participate at any hearing held by the Bankruptcy Court  regarding any exercise of rights or remedies under the DIP Documents; provided, further, that up to $100,000 shall be made available to the official committee of unsecured creditors (the "Creditors' Committee") (if any) for investigation costs to pursue any investigation rights provided under the DIP Documents; or (iv) for any purpose that is prohibited under the Bankruptcy Code or the Order, except as otherwise provided in the Interim Order (see Interim Order ¶ 27);

g. ***Priming Liens***.  The DIP Orders grant the DIP Agent, for the benefit of the DIP Lenders, fully perfected first priority priming liens on and security interests in all of the DIP Collateral, including all property constituting Cash Collateral (*see* Interim Order ¶ 3); and

h. ***No Limitation on the Ability of Estate Fiduciaries to Fulfill their Duties***.

    i. The DIP Orders bind the Debtors, and subject to certain challenge rights, all parties in interest, with respect to the validity, perfection, and amount of the liens and debt of the DIP Secured Parties and Prepetition Secured Parties, and the waiver of the Debtors' claims against the DIP Secured Parties and Prepetition Secured Parties (*see* Interim Order, ¶ 27)

    ii. The DIP Orders impose limitations on the use of Cash Collateral to, among other things, investigate or finance the prosecution of claims and causes of action against the DIP Secured Parties, the Prepetition Secured Parties (each in their capacities as such), and other related parties related to the DIP Obligations, the Prepetition Obligations, the DIP Liens, or the Prepetition Liens, *provided*, *however*, that such limitations shall not apply to investigations of the Creditors' Committee (if any), in an aggregate amount not to exceed $100,000 (*see* Interim Order ¶ 27).

20.     As required by Section J, paragraph 27 of the Complex Case Procedures, the inclusion of each of the applicable Significant Provisions in the DIP Facility is appropriate and necessary to permit the Debtors' access to the DIP Facility.  The terms and conditions of each of the Significant Provisions included in the DIP Orders are the result of arm's-length and hard-fought negotiations between the Debtors and the DIP Lenders.  The DIP Lenders are unwilling to

provide the DIP Facility absent the inclusion of these provisions and no other existing stakeholder or third party has presented a lower cost or otherwise better DIP financing proposal.  As set forth herein and in the DIP Declarations, granting the relief requested pursuant to the Interim Order is critical to the continued operation of the Debtors' businesses and will permit the Debtors to smoothly transition into these Chapter 11 Cases, preserving the value of the Debtors' estates for all parties in interest. The DIP Facility is critical to the Debtors' continuing operations.  In light of the foregoing, the Debtors submit that the Significant Provisions in the DIP Orders are appropriate and necessary under the facts and circumstances of these Chapter 11 Cases, and should be approved.

## The Debtors' Prepetition Capital Structure

21.     The following table summarizes the Debtors' prepetition capital structure:

| DEBTOR FINANCING FACILITIES | | |
|---|---|---|
| **Facility** | **Maturity** | **Outstanding Principal Amount** |
| *Secured Debt* | | |
| *Facilities Under Prepetition Priming Credit Agreement* | | |
| **Initial Priming Term B-1 Loan** | May 23, 2024 | $544,553,219.00 |
| **Initial Priming Term B-2 Loan** | May 23, 2024 | $110,800,000.00 |
| **Incremental Legacy Priming Term B-1 Loan** | May 23, 2024 | $200,000,000.00 |
| *Facilities Under Prepetition Legacy Credit Agreement* | | |
| **Legacy USD Term Loan** | Feb. 28, 2025 | $2,655,731,471.10 |
| **Legacy EUR Term Loan** | Feb. 28, 2025 | $195,285,555.50 |
| **Incremental Legacy USD Term Loan** | Sept. 30, 2026 | $633,601,236.90 |
| **Revolving Credit Facility** | Feb. 28, 2023 | $456,570,870.60 |
| *Other Secured Facility* | | |
| **Midwest City Facility** | July 1, 2041 | $11,900,000.00 |
| *Unsecured Debt* | | |
| *Unsecured Facilities* | | |
| **Settlement Facility** | September 30, 2022 | $56,843,757.50 |
| **Convertible Bonds** | April 16, 2025 | $213,000,000.00 |
| **Total Debtor Debt:** | | **$5,078,286,110.60** |
| **NON-DEBTOR FINANCING FACILITIES** | | |
| **Facility** | **Maturity** | **Outstanding Principal Amount** |
| **RoW Credit Facility** | Dec. 30, 2023 | $249,211,682.50 |
| **Israeli Loan** | June 30, 2025 | $2,700,000.00 |
| **Polish Bank Overdraft** | N/A | $10,500,000.00 |
| **Total Non-Debtor Debt:** | | **$262,411,682.50** |
| **Total Debtor and Non-Debtor Funded Debt:** | | **$5,340,697,793.10** |

## I.     Debtor Financings.

### A.     Secured Debt.

#### 1.     Prepetition Priming Facility.

22.     Crown Finance US ("Crown Finance US") as borrower, Crown UK HoldCo as holdings ("Crown UK HoldCo"), Barclays as administrative agent ("Barclays"), and each of the

lenders party thereto (the "Prepetition Priming Facility Lenders"), are each party to that certain credit agreement (the "Prepetition Priming Credit Agreement") dated November 23, 2020 (and the facilities thereunder, as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Priming Facility").  The Prepetition Priming Facility is guaranteed by the Legacy Facility Guarantors and are secured by a first priority lien on the Specified Priming Collateral, as well as first priority liens on substantially all of the assets of the Legacy Facility Obligors, ranking *pari passu* with the liens granted under the Prepetition Legacy Credit Facilities.

23.     The Prepetition Priming Facility is comprised of three tranches of term loans: (a) a term loan issued upon entry into the Prepetition Priming Legacy Facilities in the aggregate principal amount of $450 million (the "Initial Term B-1 Loan"); (b) a term loan issued pursuant to an amendment to the Prepetition Priming Facility in May 2020 in the aggregate principal amount of $110.8 million (the "Initial Term B-2 Loan"); and (c) an incremental term loan issued pursuant to a further amendment to the Prepetition Priming Facility in July 2021 in the aggregate principal amount of $200 million (the "Incremental Priming Term B-1 Loan").  The Initial Term B-2 Loans were provided to the Debtors as consideration in connection with the retirement of a then-existing revolving credit facility issued by the Prepetition Priming Term Loan Lenders.

24.     The Initial Term B-1 Loan bears interest at the rate of 7.00% payable in cash, plus 8.25% payable-in-kind by being capitalized and added to the principal balance of the loan.  As of the Petition Date, the outstanding principal amount of the Initial Term B-1 Loan is approximately $544.6 million.

25.     The Initial Term B-2 Loan bears interest at the rate of LIBOR plus 5.00%.  As of the Petition Date, the outstanding principal amount of the Initial Term B-2 Loan is approximately $110.8 million.

26.     As of the Petition Date, the outstanding principal amount of the Incremental Priming Term B-1 Loan is approximately $200.0 million.  The Incremental Priming B-1 Term Loan bears interest at the LIBOR base rate plus 8.25%.

27.     The Prepetition Priming Facility matures on May 23, 2024.

### 2.    Prepetition Legacy Credit Facilities.

28.     Crown Finance US, as U.S. term borrower, Crown UK HoldCo, as holdings, each of Crown Finance US and Crown UK HoldCo, as revolving credit borrowers, Barclays Bank PLC as administrative and collateral agent, and the lenders and issuers from time to time party thereto (such lenders having advanced term loans, the "Prepetition Legacy Term Lenders;" such lenders having advanced revolving loans, the "Prepetition Revolving Lenders") are party to that certain credit agreement, dated as of February 28, 2018 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Legacy Credit Agreement"), relating to (a) a term loan facility issued in the initial aggregate principal amount of $3.325 billion (the "Initial Legacy USD Term Loan"); (b) a Euro-denominated term loan facility issued in the initial aggregate principal amount of €607.6 million (the "Legacy Euro Term Loan"); (c) a fully-drawn revolving credit facility issued in the aggregate principal amount of $462.5 million (the "Revolving Credit Facility"); and (d) an incremental term loan facility in the aggregate principal amount of $650 million (the "Incremental Legacy USD Term Loan," and together with the Initial Legacy USD Term Loan and the Legacy Euro Term Loan, the "Prepetition Legacy Term Facilities," and together with the Revolving Credit Facility, the "Prepetition Legacy Credit Facilities").

29.     The Prepetition Legacy Credit Facilities are guaranteed by each of the Debtors (with the exception of (a) 1232743 B.C. Ltd., (b) Cineworld Group plc, (c) Cineworld Funding (Jersey) Limited, and (d) certain other Specified Immaterial Subsidiaries (as defined the Prepetition Legacy Credit Agreement) that are also Debtors) (collectively, the "Legacy Facility

Guarantors," and together with Crown Finance US and Crown UK HoldCo, the "Legacy Facility Obligors").[9]   The Prepetition Legacy Credit Facilities are secured by first priority liens on substantially all of the assets of the Legacy Facility Obligors and junior liens on certain Specified Priming Collateral.[10]   The Prepetition Legacy Facility Lenders issued the Prepetition Legacy Credit Facilities to help facilitate the Group's acquisition of Regal Cinemas in February 2018, as further discussed in the First Day Declaration.

30.    The Initial Legacy USD Term Loan bears interest at a rate of LIBOR plus 2.50 percent and matures on February 28, 2025.  As of the Petition Date, the outstanding principal amount of the Initial Legacy USD Term Loan is approximately $2.655 billion.

31.    The Legacy Euro Term Loan bears interest at a rate of LIBOR plus 2.63 percent and matures on February 28, 2025.  As of the Petition Date, the outstanding principal amount of the Legacy Euro Term Loan is approximately $195.3 million.

32.    The Revolving Credit Facility bears interest at the rate of LIBOR plus 3.00 percent and matures on February 28, 2023.  As of the Petition Date, the outstanding principal amount of the Revolving Credit Facility is approximately $456.6 million.

33.    The Incremental Legacy USD Term Loan bears interest at the rate of LIBOR plus 2.75 percent and matures on September, 2026.  As of the Petition Date, the outstanding principal amount of the Incremental Legacy USD Term Loan is approximately $633.6 million.

---

[9]    The Legacy Facility Guarantors are all direct and indirect wholly-owned subsidiaries of Crown UK HoldCo Limited, which sits directly below Cineworld Group plc, the Group's parent company.  For the avoidance of doubt, the Legacy Facility Guarantors do not include any of the RoW Entities.

[10]   "Specified Priming Collateral" means collateral arising out of, entered into, or acquired in connection with, in relation to or otherwise used or located in specified theaters of A3 Theatres of San Antonio, Ltd., Edward Theatres, Inc., RCI/RMS, LLC, R.C. Cobb, Inc. and Hollywood Theaters III, Inc. and substantially all other property and assets of such grantors.

### 3.    Midwest City Facility.

34.    Regal Entertainment Group, as borrower ("REG"),[11] and Arvest Bank, as lender, are party to that certain loan agreement, dated as of July 1, 2021 (the "Midwest City Loan Agreement").  Pursuant to the Midwest City Loan Agreement, REG issued a promissory note (the "Midwest City Note") to Arvest Bank in the principal face amount of approximately $12 million.  The Midwest City Note is secured by a first priority mortgage lien over the Debtors' real property located in Midwest City, Oklahoma (the "Midwest Property"), as well as a security interest in all of REG's and Regal Cinemas, Inc.'s assets and proceeds deriving from the Midwest Property.  The Midwest City Note bears interest at the Treasury Rate plus 3.00 percent and matures in 2041.  As of the Petition Date, the outstanding principal amount of the Midwest City Note is approximately $11.9 million.

### B.    Unsecured Debt.

### 1.    Settlement Facility.

35.    As further described in the Greidinger First Day Declaration, the Group reached a settlement (the "Regal Settlement Agreement") with respect to its litigation against the dissenting shareholders of Regal Entertainment Group arising out of the Group's acquisition of Regal Cinemas.  Pursuant to the Regal Settlement Agreement, the Debtors agreed to pay approximately $92 million to the dissenting shareholders.

36.    To finance the Debtors' obligations under the Regal Settlement Agreement, Crown UK HoldCo, as holdings, and Crown Finance U.S. as borrower, Wilmington Trust, National Association as administrative agent, and the lenders party thereto (the "Settlement

---

[11]    REG is a direct wholly owned subsidiary of Crown Intermediate Holdco, Inc., which is a direct wholly owned subsidiary of the DIP Borrower.

Lenders") entered into that certain credit agreement (the "<u>Settlement Credit Agreement</u>", and the term loan facility thereunder, as amended, restated, supplemented, or otherwise modified from time to time, the "<u>Settlement Facility</u>").  Pursuant to the Settlement Facility, the Settlement Lenders issued unsecured term loans in the aggregate principal amount of approximately $92 million bearing interest at the rate of 20.00% payable as payment-in-kind.  The Settlement Facility is guaranteed by the Legacy Guarantors and it matures on September 30, 2022.  As of the Petition Date, the outstanding principal amount of the Settlement Facility is approximately $56.8 million.

<b>2.      Convertible Bonds.</b>

37.     In March 2021, the Debtor Cineworld Funding (Jersey) Limited issued $213 million in aggregate principal amount of convertible bonds (the "<u>Convertible Bonds</u>") pursuant to that certain subscription agreement dated as of March 24, 2021 (the "<u>Convertible Bond Subscription Agreement</u>"), by and among Cineworld Funding (Jersey) Limited, as issuer (the "<u>Convertible Bonds Issuer</u>"), Cineworld Group plc, as guarantor (the "<u>Convertible Bonds Guarantor</u>"), and the various direct investors thereto.  The Convertible Bonds are constituted by a trust deed, dated as of April 16, 2021 (the "<u>Trust Deed</u>"), by and between the Convertible Bonds Issuer, the Convertible Bonds Guarantor, and BNY Mellon Corporate Trustee Services Limited, as trustee.  The Convertible Bonds bear interest at a rate of 7.50 percent per annum, payable semi-annually in arrears in equal installments on October 16 and April 16 of each year.  The Convertible Bonds mature on April 16, 2025.  The Convertible Bonds are unsecured obligations of the Convertible Bonds Issuer and the guarantee in respect thereof is an unsecured obligation of the Convertible Bonds Guarantor.

38.     As of the Petition Date, there is approximately $213.0 million in aggregate principal outstanding under the Convertible Bonds.

## II.      Non-Debtor Financings.

39.      As set forth below, certain of the Debtors' non-debtor affiliates are party to financing arrangements that are used to fund the operations of certain non-debtor entities.

### A.      RoW Credit Facility.

40.      Crown NL HoldCo B.V., as Topco thereunder, Cinema City Holding B.V., as parent, Cinema City Finance (2017) B.V., as borrower, Kroll Agency Services Limited, as agent, and the lenders from time to time thereto, are party to that certain facilities agreement, dated as of June 19, 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "RoW Credit Agreement," and the loans advanced thereunder, the "RoW Loans").  The RoW Credit Agreement provides, following an increase of commitments as part of an amednment and restatement of the RoW Credit Agreement with effect from 31 May 2022 (a) one Euro-denominated term loan facility issued in the aggregate principal amount of approximately €127.5 million; and (b) one USD-denominated term loan facility issued in the aggregate principal amount of approximately $116.7 million (collectively, the "RoW Credit Facility").  The RoW Credit Facility is guaranteed by Debtor Cineworld Group plc, non-Debtor Crown NL Holdco B.V ("Dutch TopCo") and certain of Dutch TopCo's non-Debtor direct and indirect subsidiaries (collectively, the "RoW Guarantors").[12]  The RoW Credit Facility is secured by, among other things: (a) a security pledge of Crown NL HoldCo B.V.'s equity interests in Cinema City Holding B.V.; (b) a receivables pledge granted by Dutch TopCo in respect of all present and future receivables owed to Dutch TopCo by other members of the Group (as defined in the RoW Credit Agreement); (c) a security pledge of Cinema City Holding B.V.'s equity interests in Cinema City

---

[12]    The RoW Guarantors are:  (a) Cineworld Group plc; (b) Cinema City Finance (2017) B.V.; (c) Cinema City Holding B.V.; (d) Crown NL Holdco B.V.; (e) IT Magyar Cinema K.F.T.; (f) New Age Cinema K.F.T; (g) Cinema City Czech s.r.o.; (h) Cinema City Poland Sp. z.o.o; and (i) Cinema City Romania S.r.l.

Finance (2017) (B.V.); (d) an omnibus pledge granted by Cinema City Holding B.V. and Cinema City Finance (2017) B.V. with respect to certain receivables owed thereto, and to certain specified bank accounts; and (e) various local law security granted by each of the RoW Guarantors (other than Debtor Cineworld Group plc).  The RoW Credit Facility bears interest at 11.00 percent per annum and matures on December 30, 2023.  As of the Petition Date, the outstanding principal amount of the RoW Credit Facility is approximately $249.2 million.

> **B.**     **Israeli Loan.**

41.     Cinema Theatres Ltd., as borrower, and Bank-Mizrahi Tefahot, as lender, are party to that certain unsecured credit agreement dated June 30, 2020 (as amended, restated, supplemented, or otherwise modified from time to time, the "Israeli Loan Agreement," and the loan advanced thereunder, the "Israeli Loan").  Pursuant to the Israeli Loan, Bank-Mizrahi Tefahot issued approximately 24 million Israeli new shekels in aggregate principal loans to Cinema Theatres Ltd., bearing interest at the Treasury Rate (as defined in the Israeli Loan Agreement) plus 2.00 percent.  The Israeli Loan matures on June 30, 2025.

**The DIP Facility**

**I.     The Debtors' Need for Immediate Access to the DIP Facility and Cash Collateral.**

42.     As described in the First Day Declarations and in the DIP Declarations, the Debtors require immediate access to the DIP Facility in addition to continued use of Cash Collateral to fund operations, capital expenditures, and the administrative costs of these Chapter 11 Cases.  As of the Petition Date, the Debtors' cash on hand was less than $4 million, which is insufficient to operate their enterprise and continue paying their obligations as they come due.  Mesterharm DIP Decl. at ¶ 15.  The Debtors' business is cash-intensive, with significant daily costs required to satisfy obligations to the Debtors' contract counterparties, landlords, vendors, workforce, and other stakeholders.

43.     Moreover, the impact of the COVID-19 pandemic and its attendant effect on the film industry has significantly impaired the Debtors' ability to generate cash in the ordinary course of business.  Mesterharm DIP Decl. at ¶ 13.  More specifically, the COVID-19 pandemic has prompted a significant decline in cinema attendance and a steep decline in the production of film content, and the resulting decrease in box office receipts has severely restricted the Debtors' liquidity.  The Debtors rely on the liquidity generated from their operations to, among other things, procure goods and services integral to the Debtors' ongoing business operations, fund operational expenses, and maintain favorable relationships with the film studios, as well as their vendors, suppliers, workforce, and customers.  *Id.* at ¶ 15.  Because the Debtors operate in a highly competitive industry, a seamless transition into chapter 11 and the ability to continue operations uninterrupted is imperative to preserve market share, the reputation of their businesses, and the loyalty and goodwill of their customers, vendors, and employees.

44.     As described in the Mesterharm DIP Declaration, the Debtors, in consultation with their proposed restructuring advisor, AlixPartners ("Alix"), reviewed and analyzed the Debtors' projected cash receipts and disbursements and prepared a budget outlining the Debtors' postpetition cash needs in the initial 13 weeks of the Chapter 11 Cases, a copy of which is attached as **Schedule 1** to the proposed Interim Order.  The Debtors relied on these forecasts to determine the amount of postpetition financing required to fund operations and administer these Chapter 11 Cases.  More specifically, the Debtors determined that they require immediate access to DIP financing to fund the costs of these Chapter 11 Cases and ongoing business operations.

45.     The Debtors believe that the DIP Facility provides the Debtors with sufficient liquidity to maintain their operations and fund the administration of these Chapter 11 Cases.  The DIP Facility will allow the Debtors to:  (a) continue satisfying obligations to the Debtors'

contract counterparties, including their key concession suppliers and the film studios; (b) provide the liquidity necessary to honor approximately $172 owed to critical vendors and to continue favorable trade terms with such vendors; (c) reassure other stakeholders, including landlords, customers and employees that the Debtors have sufficient funds to continue operating in the ordinary course; (d) fund the Debtors' payroll obligations; and (e) fund the administrative costs of these Chapter 11 Cases.  Mesterharm DIP Decl. at ¶ 18.

46.     Importantly, the Debtors' business require immediate liquidity to satisfy their obligations owed to film studios, concession providers, and their landlords, all of whom are critical to ensuring that the Debtors can continue providing a best-in-class movie-going experience for their worldwide customer base.  *Id.* at ¶ 16.  Absent such liquidity, the Debtors' business would suffer in the highly competitive cinema industry.  *Id.*  Furthermore, obtaining access to the DIP Facility will allow the Debtors to send a clear message to landlords, customers, and vendors— including, most critically, the Debtors' film studio contract counterparties—that the Debtors will continue to be a reliable partner.  *Id.* at ¶ 15.  During the pendency of these Chapter 11 Cases, the Debtors intend to use a portion of the proceeds from the DIP Facility to pay their vendor base and honor their postpetition obligations to their workforce and customers.  *Id.*  Accordingly, the proposed DIP Facility will provide much needed stabilization to the Debtors' business operations.  The DIP Facility will also provide the funding means to accomplish a comprehensive restructuring and ensure the Debtors' ability to operate as a going-concern, preserving value of the Debtors' estates for the benefit of all of their stakeholders.

47.     Absent funds available from the DIP Facility and access to Cash Collateral, the Debtors could face a value-destructive interruption to their business and lose support from important stakeholders on which the Debtors' business depends, including vendors, suppliers,

customers, landlords and employees.  This, in turn, would hinder the Debtors' ability to maximize the value of their estates, and the Debtors would be forced to curtail their operations significantly, to the detriment of all stakeholders.  *Id.* at ¶ 19.

## II.     The Debtors' Proposed Adequate Protection is Fair and Reasonable.

48.     The adequate protection provided in the Interim Order (the "Adequate Protection") is fair and reasonable under the circumstances.  The Adequate Protection package proposed for the Prepetition First Lien Lenders includes (a) First Lien AP Liens, (b) First Lien AP Superpriority Claims, and (c) First Lien Adequate Protection, each as defined in the Interim Order.  Taken together, the cumulative effect of all of these provisions is to provide reasonable and appropriate adequate protection for the Prepetition First Lien Secured Parties.  The proposed Adequate Protection is sufficient to protect the Prepetition First Lien Secured Parties from any diminution in value to the Prepetition Collateral, including Cash Collateral.  In light of the foregoing, the proposed Adequate Protection to be provided for the benefit of the Prepetition Secured Parties is appropriate.

49.     Access to the Prepetition Secured Parties' Cash Collateral will provide liquidity that is vital for the Debtors to maintain operations, pay employees, and fund these Chapter 11 Cases.  Thus, the Debtors' provision of the Adequate Protection is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these Chapter 11 Cases to ensure the Debtors are able to continue using Cash Collateral for the benefit of all parties in interest and their estates.

## III.    Alternative Sources of Financing Are Not Available on Better Terms.

50.     As set forth in the Zelin Declaration, in evaluating possible financing sources for the Debtors' postpetition financing, PJT determined that no third-party lender would likely be willing to provide DIP financing to the Debtors on terms more favorable than the DIP Facility.

*First*, no third-party provided an actionable proposal to lend on a junior basis to the Prepetition Collateral because the Debtors have insufficient unencumbered assets upon which to secure postpetition financing of the size needed to permit them to successfully operate their businesses throughout the pendency of these Chapter 11 Cases.  Zelin Decl. at ¶ 23.  The Group's only unencumbered assets capable providing material credit support are Holdings' equity interests in Dutch TopCo, which is the parent of the RoW segment of the business.  *Id.*  However, Dutch TopCo likely does not have sufficient equity value to secure postpetition financing in an amount sufficient to meet the working capital needs of the Debtors' business on a go-forward basis.  *Id.*  While the Debtors received limited inbound indications of interest from lenders other than the Ad Hoc Group with respect to a potential junior financing, none of these materialized into actionable alternatives.  *Id.*

51.     ***Second***, PJT determined that, because the Debtors would require the consent of the Ad Hoc Group to obtain sufficient DIP financing from another source, a third party would likely not propose satisfactory priming postpetition financing (as would be required here) given the contentious, costly, and uncertain litigation such a proposal would likely involve.  *Id.* at ¶ 26. Furthermore, as described in the Zelin Declaration, certain provisions in the Prepetition Priming Credit Agreement effectively grant members of the Ad Hoc Group a blocking position over the Debtors' ability to obtain enough DIP financing to meet their working capital needs.  *Id.* at ¶ 25. Indeed, the Ad Hoc Group made clear to the Debtors' advisors that they would not consent to the Debtors' incurrence of priming financing by any other party.  *Id.* at ¶ 26.  And, while the Debtors, through PJT and their other advisors, received a few indications of interest regarding postpetition financing and exchanged diligence with certain of these parties, the results of such engagement were conclusive:  no third-party presented an actionable proposal for a facility that, like the DIP

Facility, sufficiently meets the Debtors' liquidity needs and avoids a risky, protracted, and expensive priming dispute. *Id.* at ¶ 25. Even after the Debtors' diminishing liquidity and potential need to pursue a comprehensive deleveraging transaction were disclosed publicly in August 2022, no viable postpetition financing proposal arrived from any lender outside the Debtors' existing capital structure. *Id.* at ¶ 13.

52. Accordingly, it was clear to the Debtors and their advisors that their best path to financing these Chapter 11 Cases was through financing from the Ad Hoc Group, who had already organized with counsel and financial advisors. Through initial conversations, the Ad Hoc Group indicated that they would be willing to provide postpetition financing for a chapter 11 process. *Id.* at ¶ 12. Over the course of multiple weeks, the Debtors and their advisors engaged in extensive negotiations and discussions with the Ad Hoc Group to achieve the best possible terms for the DIP Facility. *Id.* at ¶ 19. Through these negotiations, the Debtors developed the terms of the DIP Facility, which are the best and only reasonable financing option currently available to the Debtors. *Id.* at ¶ 22. The DIP Facility is the only viable source of funding available to the Debtors, and no better alternative is available. *Id*.

53. Following arm's-length and good faith negotiations with the Ad Hoc Group, the Debtors reached agreement on the proposed $1.935 billion DIP Facility. The DIP Facility will be fully backstopped by certain members of the Ad Hoc Group, while all Prepetition Legacy Term Lenders will be offered the opportunity to participate in the syndication of the DIP Facility.

IV.   **The DIP Facility is Necessary to Preserve the Value of the Debtors' Estates.**

54. Absent the liquidity infusion to be provided by the DIP Facility, the Debtors will likely need to curtail their operations significantly. Mesterharm DIP Decl. ¶ 19. Even if the Debtors had the ability to access Cash Collateral, cash on hand and expected inflows would not be sufficient to fund their operations as a going concern in the near term. Without a new source of

liquidity, the Debtors' businesses may be irreparably harmed by their inability to exhibit hotly-anticipated motion pictures in the winter of 2022, leading into 2023.  Consequently, the DIP Facility is necessary to preserve the value of the Debtors' estates.

### Basis for Relief

I.   **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

   A.   **Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

55.   The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re N Bay Gen. Hosp., Inc.,* No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re Trans World Airlines, Inc.,* 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflected] sound and prudent business judgment"); *In re L.A. Dodgers LLC,* 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy

process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest").

56.    To determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.,* 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.,* 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

57.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.,* 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.),* 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

58.    The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following an arm's-length process and careful evaluation of available alternatives.  The Debtors require significant postpetition financing to support their working capital needs and to operate smoothly in chapter 11.  *Id.* at ¶ 14.  As discussed herein, the Debtors and their advisors determined that the DIP Facility is the only reasonable financing option available to the Debtors, and no alternative financing is available on more favorable economic

terms.  The Debtors and their advisors also determined that the DIP Facility provides certainty with respect to the capital necessary for the administration of these Chapter 11 Cases through emergence.  The fees, rates, and other economics provided for in the DIP Facility, taken as a whole, are in the Debtors' best interests and the DIP Facility is the best and only reasonable financing option currently available to the Debtors under the circumstances.  Zelin Decl. at ¶ 32.  The Debtors simply did not have any actionable alternatives.

59.     The Debtors negotiated the DIP Documents in good faith, at arm's length, and with the assistance of their advisors, and they have obtained the best financing available under the circumstances.  After extensive negotiations with the DIP Lenders and careful consideration of the alternatives, the Debtors determined that the proposed DIP Facility was the only viable alternative as it provided immediate liquidity and avoided a costly priming fight.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

**B.      The Priming Loan Refinancing and the RoW Loan Transaction Contemplated in the Interim Order Are Appropriate.**

60.     The proposed Priming Loan Refinancing and the consummation of the RoW Loan Transaction upon entry of the Interim Order are exercises of the Debtors' sound business judgment. Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.  *See, e.g., In re CoServ, L.L.C.,* 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.,* 258 B.R. 368, 369-70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business

of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation).  The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.,* 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

61.     Here, upon entry of the Interim Order, under the DIP Facility, the Prepetition Priming Facility will be repaid in full.  Such refinancing is necessary to allow the Debtors to take full advantage of the favorable economic terms offered by the DIP Facility, thereby maximizing value for all stakeholders.  The Priming Loan Refinancing is a critical component of the structure of the DIP Facility negotiated with the DIP Lenders, who insisted on such refinancing in their agreement to provide the Debtors with the DIP Facility.  Furthermore, where, as here, a prepetition secured creditor is likely secured up to the value of their collateral, repaying such creditor that stands to receive payment in full with postpetition loans will not harm the Debtors' estates and other creditors; rather, the DIP Facility proposed refinancing feature merely affects the timing, not the amount, of the recovery of the Prepetition Priming Facility Lenders.  Indeed, the Priming Loan Refinancing will merely accelerate the satisfaction of the prepetition obligations thereunder without affecting recovery to other creditors because the Debtors believe that these prepetition obligations are fully secured by first-priority liens on their prepetition collateral, with a value in excess of outstanding borrowings, and therefore would have received a full recovery upon emergence.

62.     The Priming Loan Refinancing is also appropriate and does not prejudice any creditors.  As discussed, to incur additional priming debt, the Debtors require the consent of the Prepetition Priming Facility Lenders.  Additionally, pursuant to (a) that certain Senior Intercreditor

Agreement, dated as November 23, 2020, by and between Barclays, in its capacity as the Prepetition Priming Facility Agent, and Barclays, in its capacity as the Prepetition Legacy Facility Agent (the "Prepetition Senior Intercreditor Agreement") and (b) that certain Pari Passu Intercreditor Agreement, dated as of November 23, 2020, by and among Barclays, in its capacity as the Prepetition Priming Facility Agent, Barclays, in its capacity as the Prepetition Legacy Facility Agent, and each additional representative collateral agent from time to time thereto, the Prepetition Legacy Facility Agent and any holder of a claim on account of the obligations thereunder may not object or otherwise contest the priming of their collateral by any DIP financing if the Prepetition Priming Agent has consented to such priming financing.  Zelin Decl. ¶ 18. Prior to these Chapter 11 Cases, the Ad Hoc Group, which holds a majority of the obligations under the Prepetition Priming Facility, directed the Prepetition Priming Agent to consent to the proposed DIP Facility.  *Id*.  Accordingly, by refinancing the priming loans now, the Debtors are assured that they have the required support under both the priming and legacy facilities to avoid could what otherwise could be a protracted priming fight.  *Id.*

63. Further, the Prepetition Priming Credit Agreement provides that the Debtors may not satisfy any obligations under the Prepetition Legacy Credit Facility while there remain outstanding obligations under the Prepetition Priming Facility.  As set forth in the Zelin Declaration, the Debtors anticipate that any confirmable chapter 11 plan filed in these chapter 11 cases will contemplate some degree of recovery for the Prepetition Legacy Facility Lenders. Accordingly, the Debtors will not be able to confirm a chapter 11 plan while the Prepetition Priming Facility remains in place.  Thus, the Debtors' decision to undertake the Priming Loan Refinancing is not only a sound exercise of their business judgment, but is in fact necessary to chart a viable path to a successful exit from these Chapter 11 Cases.

64.     Absent the DIP Facility, the Debtors' ability to continue operating as a going concern will be jeopardized to the detriment of all parties in interest.  In addition, by refinancing the Prepetition Priming Facility, the Debtors will be permitted to access the cash collateral of the prepetition secured lenders through the consensual DIP Facility.  Accordingly, the refinancing of the Prepetition Priming Facility from proceeds of the DIP Facility is within the Debtors' business judgment, reasonable, and should be approved.

65.     Furthermore, consummation of the RoW Loan Transaction provides the Debtors with certainty that adverse creditor action by the lenders thereunder will not be taken.  The filing of these Chapter 11 Cases in respect of Debtor Cineworld Group plc constitutes an event of default under the RoW Credit Agreement (leading to automatic acceleration of all amounts thereunder), which would, absent a forbearance or waiver, entitle the RoW Lenders to exercise rights and remedies provided under the RoW Credit Agreement, thereby jeopardizing the Group's valuable non-US and non-UK operations.  As a result, the Debtors would need to either obtain a waiver of such event of default from the requisite RoW Lenders or refinance the RoW Credit Facility. Absent such action, the RoW Obligors—non-Debtor affiliates in these Chapter 11 Cases—would likely be forced to seek chapter 11 protection or take other protective steps under foreign insolvency regimes to protect against adverse creditor action, which would likely be costly, value-destructive, and entail substantial operational complexity given cross-border considerations. Accordingly, in the lead up to the filing, and in parallel with the DIP financing process, the Debtors negotiated with the RoW Lenders with the aim of securing the relevant RoW Lender support to forbear from exercising any remedies against the Debtors on account of, any event of default caused by a chapter 11 filing; and, second, reaching agreement on a transaction that garners critical

support from the RoW Lenders for the Debtors' restructuring.  The RoW Forbearance Agreement (as defined in the Greidinger First Day Declaration) achieves just that.

66.    Like the Priming Loan Refinancing, the RoW Loan Transaction is a key component of the structure of the DIP Facility, as it reflects critical support from the RoW Lenders for the Debtors' restructuring and maximizes the value of the Debtors' enterprise for the benefit of its stakeholders.  Zelin Decl. at ¶ 17.

C.    **The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders.**

67.    The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lenders postpetition security interest in and liens on the DIP Collateral (as defined in the Interim Order) and Prepetition Collateral that are valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order.

68.    The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.,* 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.  the credit transaction is necessary to preserve the assets of the estate; and

c.  the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Group*, 71 B.R. at 549.

69.     The Debtors meet each part of this test.  As described above, no lenders were willing to provide sufficient postpetition financing on a junior lien or an unsecured or administrative priority basis.  *See* Zelin Decl. ¶ 23.  Indeed, given the restrictions set forth in the Prepetition Priming Facility, the Prepetition Priming Facility Lenders held a blocking position over any potential third-party financing, and no potential third-party financiers provided a reasonable alternative financing proposal that would be amenable to the Prepetition Priming Facility Lenders. *Id.*  The DIP Lenders will not fund the DIP Facility on any other terms, and no other existing stakeholder or third party has presented a higher or otherwise better debtor-in-possession financing proposal.  Absent the DIP Facility, which will provide certainty that the Debtors will have sufficient liquidity to administer these Chapter 11 Cases, and comfort to their employees and vendor constituencies that business will continue in the ordinary course, the value of the Debtors' estates would be impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Documents are fair, reasonable, and meet the standard for obtaining postpetition financing.

70.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b)

or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien." As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving (a) a superpriority claim in favor of the DIP Lenders, (b) liens in favor of the DIP Lenders on unencumbered property of the estate, and (c) junior liens in favor of the DIP Lenders on encumbered property of the estate is reasonable and appropriate.

71.     Section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). The Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Priming Facility Lenders have consented or (b) the Prepetition Priming Facility Lenders' interest in collateral are adequately protected. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

72.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the Prepetition Priming

Facility Lenders have consented or (b) the Prepetition Priming Facility Lenders' interests in collateral are adequately protected.

73.    Here, the Ad Hoc Group has affirmatively consented to the DIP Facility and actively participated in facilitating the proposed DIP Facility.  As set forth more fully herein and in the Interim Order, the Debtors propose to provide a variety of adequate protection to protect the interests of the Prepetition First Lien Secured Parties.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**D.    No Comparable Alternative to the DIP Facility Is Reasonably Available On More Favorable Overall Terms.**

74.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.,* 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.,* 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  In circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.,* 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.,* 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores,* 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

75. As noted above, the Debtors do not believe that any more favorable alternative DIP financing is reasonably available given the realities imposed by the Debtors' existing capital structure and the Debtors' solicitation of alternative financing proposals. Furthermore, as set forth in the Zelin Declaration, the Debtors engaged with certain stakeholders and third-parties regarding potential financing for a chapter 11 process, and entered into non-disclosure agreements with respect to potential financing for a chapter 11 process, but ultimately they did not receive any offer or combination of offers superior to the DIP Facility. Zelin Decl. ¶ 13. Simply put, the DIP Facility provides the Debtors with the liquidity they need at the lowest cost available while simultaneously placing the Debtors on an optimal path for a successful restructuring. Therefore, the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

## II.   The Debtors Should Be Authorized to Use Cash Collateral.

76. Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use cash collateral with the consent of the secured party. Here, the DIP Lenders and the Prepetition First Lien Lenders consent or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order. As described above and in the Zelin Declaration, access to Cash Collateral on an interim basis is essential to the continued operation of the Debtors' businesses and smooth entry into the Chapter 11 Cases. Use of Cash Collateral is in the best interests of the Debtors' estates and all of their stakeholders, including the Prepetition First Lien Lenders, and should be approved.

## III.   Adequate Protection Provided to the Prepetition Secured Parties Is Appropriate.

77. Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code

provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines,* 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See, e.g., In re Swedeland Dev. Grp., Inc.,* 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.,* No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.,* No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.,* Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) ("what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.,* 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01 [1] at 361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

78.    As described more fully herein, and as set forth in the Interim Order, the Debtors propose to provide the Prepetition Secured Parties with a variety of adequate protection to protect against the postpetition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay. The Adequate Protection package includes (a) the First Lien AP Liens, (b) the First Lien AP Superpriority Claims, and (c) the First Lien Adequate Protection (collectively, the "Adequate Protection Liens"). In light of the foregoing, the proposed Adequate Protection Liens to be provided for the benefit of

the Prepetition Secured Parties are appropriate.[13]   The Debtors' provision of the Adequate Protection Liens is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these Chapter 11 Cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

## IV.   The Scope of the Carve Out Is Appropriate

79.     The proposed adequate protection is subject to the Carve Out contained in the DIP Orders.  Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these Chapter 11 Cases would be restricted.   *See In re Ames Dep't Stores*, 115 B.R. at 40 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.") The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.   Additionally, the Carve Out protects against administrative insolvency during the course of the Chapter 11 Cases by ensuring that assets remain for the payment of the Clerk of the Court, U.S. Trustee fees, and professional fees of the Debtors and any statutory committee appointed under section 1102 of the Bankruptcy Code in these Chapter 11 Cases.

---

[13]   Pursuant to the DIP Orders, the Prepetition Secured Parties are permitted to seek additional adequate protection in accordance with the terms thereof.

**V.      The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders under the DIP Documents.**

80.      In connection with negotiating the DIP Facility, the Debtors have agreed, subject to Court approval, to pay certain fees and premiums to the DIP Agents and the DIP Lenders. In particular, as noted above, the Debtors have agreed to pay the fees consisting of the following:

a.      ***Interest Rates.***  One (1) month SOFR (plus a SOFR adjustment of 0.10%) plus 10.00%, subject to a SOFR floor of 1.00%, payable monthly in arrears; provided that upon the occurrence of any event of default under the DIP Facility, such interest rate margin shall automatically increase by an additional 2.00%.  A customary alternate base rate option will be available (or required, as applicable) as an alternative to SOFR.

b.      ***Backstop Commitment Fee.***  A fee in the amount of 4.00% of the aggregate principal amount of the Backstop Commitments shall be earned and payable in cash upon the Closing Date, paid ratably to all Backstop Parties based upon their respective Backstop Commitments.

c.      ***Yield Payment.***  On the Closing Date, the Borrower shall pay to the DIP Agent for the account of the DIP Lenders a fee of 2.00% on the aggregate principal amount of DIP Commitments, payable to each DIP Lender in cash ratably based on each DIP Lender's proportion to its share of the DIP Commitments.

d.      ***Extension Fee***.  As a condition precedent to any Extension, the Borrower shall pay to the DIP Agent for the account of the DIP Lenders a fee of 1.00% on then aggregate outstanding principal amount of the DIP Loans and remaining outstanding DIP Commitments, payable to each DIP Lender in cash ratably based on each DIP Lender's proportion to its share of the then aggregate outstanding principal amount of the DIP Loans and remaining outstanding DIP Commitments.

81.      As set forth in the Zelin Declaration, the interest and fees to be paid under the DIP Facility are consistent with the market and appropriate, particularly in light of the circumstances of these Chapter 11 Cases and the marketing process undertaken, and represent the only viable option presently available to the Debtors.  *See* Zelin Decl. ¶ 22.  The fees and rates to be paid under the proposed DIP Facility (a) were the subject of rigorous arm's-length negotiation between the Debtors and the DIP Lenders, and (b) are an integral component of the overall terms of the

proposed DIP Facility.  *Id.* at ¶¶ 30-32.  The Debtors considered the fees described above when determining in their sound business judgment that the DIP Facility is reasonable and constitutes the best terms on which the Debtors can obtain the postpetition financing necessary to continue their operations, prosecute their cases, and benefit the Debtors' estates.  Indeed, the Debtors negotiated reasonable, on-market fees despite the limited market interest in providing the Debtors with a sufficiently sized and appropriately-structured postpetition financing.  *Id.* at 32.  Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection with the DIP Facility.

## VI.     The DIP Agent and the DIP Lenders Should Be Afforded Good-Faith Protection under Section 364(e).

82.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

83.     As explained herein, the DIP Documents are the result of: (a) the Debtors' reasonable and informed determination that the DIP Lenders provided the best postpetition financing alternative available under the circumstances and (b) extended arm's-length, good-faith negotiations between the Debtors and the DIP Lenders.  The terms and conditions of the DIP Documents are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, the Debtors

market-tested the terms of the DIP Facility before determining that the DIP Facility provided the best terms available.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## VII.    The Automatic Stay Should Be Modified on a Limited Basis.

84.    The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order.  The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant liens to the DIP Lenders and the Prepetition Secured Parties and to incur all liabilities and obligations set forth in the Interim Order.  The automatic stay should be modified to allow the Debtors and the DIP Lenders to effectuate the terms of the Interim Order.

## VIII.    Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

85.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Bankruptcy Rule 4001(b)(2). Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will

prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3). Furthermore, the Complex Case Procedures provide that "on motion by the debtors, a hearing will routinely be conducted as a first day hearing to consider either cash collateral and/or interim debtor-in-possession financing." Complex Case Procedures, ¶ 23.

86.     As set forth in the Mesterharm DIP Declaration, the Debtors have an immediate postpetition need to use Cash Collateral, and access the liquidity provided by the DIP Facility. The Debtors cannot maintain the value of their estates during the pendency of these Chapter 11 Cases without access to cash.  Mesterharm DIP Decl. at ¶ 3.  The Debtors entered these Chapter 11 Cases with less than $4 million in cash on hand.  *Id.* at ¶ 15.  Without immediate financing, the Debtors project that they will be unable to pay essential costs required to continue operating as a going concern, resulting in immediate and irreparable harm to the Debtors' business.  *Id.*  In particular, the Debtors require immediate liquidity to satisfy their obligations to film studios, concession providers, and landlords, all of whom are critical to ensuring that the Debtors can continue operating as a going concern.  *Id.* at ¶ 16.  Absent funds available from the DIP Facility and access to cash collateral, the Debtors could face a value-destructive interruption to their business, proceedings under foreign insolvency law, and lose support from important stakeholders on which the Debtors' business depends, including film studios, landlords, employees, customers, vendors, and other contract counterparties.  *Id.*

87.     The Debtors will therefore be unable to operate their business or otherwise fund these chapter 11 Cases without access to Cash Collateral and the liquidity provided by the DIP Facility, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  *Id.* at ¶ 3.  In short, the Debtors' ability to administer these Chapter 11 Cases

through the use of Cash Collateral and the liquidity provided by the DIP Facility is vital to preserve and maximize the value of the Debtors' estates.

88.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility and to utilize Cash Collateral. The Debtors require the initial funding under the DIP Facility prior to the Final Hearing and entry of the Final Order to continue operating, pay their administrative expenses, and to implement the relief requested in the Debtors' other "first day" motions.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## Request for Final Hearing

89.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## Emergency Consideration

90.     The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm," and Bankruptcy Local Rule 9013-1(i).  An immediate and orderly transition into chapter 11 is critical to the viability of their operations and any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  The failure to receive the requested relief during the first 21 days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.  The Debtors

have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

91.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

92.     The Debtors have provided notice of this Motion to the following parties or their respective counsel: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agent under the Debtors' Prepetition Priming Facility, and counsel thereto; (d) the agent under the Debtors' Prepetition Legacy Term Facilities, and counsel thereto; (e) the agent under the Debtors' Revolving Credit Facility, and counsel thereto; (f) counsel to the ad hoc group of Prepetition Revolving Lenders; (g) counsel to the ad hoc group of Prepetition Legacy Term Lenders; (h) the agent under the Debtors' Facilities Agreement, and counsel thereto; (i) counsel to lenders under the Debtors' Facilities Agreement; (j) the trustee under the Debtors' Convertible Bonds, and counsel thereto; (k) counsel to the ad hoc group of holders of the Debtors' Convertible Bonds; (l) counsel to the lender under the Midwest City Facility; (m) the agent under the Debtors' debtor-in-possession facility, and counsel thereto; (n) the Office of the United States Attorney for the Southern District of Texas; (o) the state attorneys general for states in which the Debtors conduct business; (p) the Internal Revenue Service; (q) the Securities and Exchange Commission; (r) the Environmental Protection Agency; (s) other governmental agencies having a regulatory or statutory interest in these cases; and (t) any party that has requested notice pursuant to Bankruptcy

Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

The Debtors request that the Court enter the DIP Orders, granting the relief requested in this motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
Dated:  September 7, 2022

/s/  *Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (S.D. Bar No. 3394311)
Veronica A. Polnick (TX Bar No. 24079148)
Vienna Anaya (TX Bar No. 24091225)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:      (713) 752-4200
Facsimile:       (713) 752-4221
Email:            mcavenaugh@jw.com
                     rchaikin@jw.com
                     vpolnick@jw.com
                     vanaya@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Christopher Marcus, P.C. (*pro hac vice* pending)
Christine Okike, P.C. (*pro hac vice* pending)
Ciara Foster (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900
Email:            joshua.sussberg@kirkland.com
                     christopher.marcus@kirkland.com
                     christine.okike@kirkland.com
                     ciara.foster@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

## **Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

## **Certificate of Service**

I certify that on September 7, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh