**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) | Case No. 22-90168 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' <ins>EMERGENCY</ins> MOTION FOR
ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO PAY CERTAIN
PREPETITION CLAIMS OF (A) 503(B)(9) CLAIMANTS, (B) LIEN
CLAIMANTS, (C) FOREIGN CLAIMANTS, (D) CRITICAL VENDORS,
AND (E) HSE SUPPLIERS, (II) CONFIRMING ADMINISTRATIVE EXPENSE
PRIORITY OF OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF**

> **Emergency relief has been requested. Relief is requested not later than 8:00 a.m. (prevailing Central Time) on September 8, 2022.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on September 8, 2022, at 8:00 a.m. (prevailing Central Time) in Courtroom 404, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Isgur's conference room number is 954554. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Isgur's homepage. The meeting code is "JudgeIsgur". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Isgur's homepage. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

1   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/Cineworld. The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is: 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion (this "Motion"):[2]

## Relief Requested[3]

1.     The Debtors seek entry of interim and final orders, substantially in the forms attached hereto (respectively, the "Interim Order" and the "Final Order"):  (a) authorizing the Debtors to pay in the ordinary course of business certain prepetition amounts owing on account of (i) 503(b)(9) Claims, (ii) Lien Claims, (iii) Foreign Claims, (iv) Critical Vendor Claims, and (v) HSE Claims; (b) confirming the administrative expense priority status of Outstanding Orders and authorizing, but not directing, the payment of such obligations in the ordinary course of business; and (c) granting certain related relief.  The Debtors request that the Court schedule a final hearing within approximately 21 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

## Jurisdiction and Venue

2.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to the entry of a final order by the Court.

---

[2]   The facts and circumstances supporting this Motion are set forth in (a) the *Declaration of Israel Greidinger, Deputy Chief Executive Officer of Cineworld Group plc, in Support of the Debtors' Chapter 11 Petitions* (the "Greidinger First Day Declaration"), and (b) the *Declaration of James A. Mesterharm, Chief Restructuring Officer of Cineworld Group plc, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "Mesterharm First Day Declaration," and together with the Greidinger First Day Declaration, the "First Day Declarations"), each filed contemporaneously with the filing of this Motion and incorporated by reference herein. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in First Day Declarations.

[3]   Capitalized terms used but not otherwise defined in this paragraph have the meanings ascribed to them in this Motion.

3.       Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.       The bases for the relief requested herein are sections 105(a), 363, 503(b), 1107(a), 1108, and 1129 of title 11 of the United States Code 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 1075-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

5.       Cineworld Group plc (together with its Debtor and non-Debtor affiliates, "Cineworld" or the "Group") is unwavering in its vision to be "The Best Place to Watch a Movie."  As the second-largest cinema chain in the world by number of screens, Cineworld brings its vision to life each day in modern cinemas with cutting-edge technology.  Headquartered in Brentford, United Kingdom, the London Stock Exchange-listed company, operating under five major brands, employs a global workforce of approximately 30,000 employees and operates 747 locations with 9,139 screens in 10 countries.

6.       On September 7, 2022 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the Debtors, their businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases are set forth in greater detail in the First Day Declarations.

7.       The Debtors have filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

**<u>Overview of the Trade Claimants and the Trade Claims</u>**

8.　　As one of the largest cinema chains in the world, the Debtors' business relies on continuing access to, and relationships with, the Trade Claimants, which include various movie distributors and a network of other crucial vendors and service providers.  Any disruption in the Debtors' access to newly released movie titles and the provision of critical goods and services would have a far-reaching and adverse economic and operational impact on the Debtors' business.

9.　　The Debtors therefore request authorization to pay certain outstanding prepetition claims of the 503(b)(9) Claimants, the Lien Claimants, the Foreign Claimants, the Critical Vendors, and the HSE Suppliers (each as defined below, and collectively, the "<u>Trade Claimants</u>," and such claims, collectively, the "<u>Trade Claims</u>"),[4] subject to the limitations set forth in the Interim Order and the Final Order.  The following table summarizes the categories of Trade Claims that the Debtors request authority to pay pursuant to this Motion and the estimated prepetition amounts outstanding within each such category:

---

[4] For the avoidance of doubt, the Debtors do not seek authority to pay prepetition claims to any non-Debtor affiliates, any insiders (as such term is defined in section 101(31) of the Bankruptcy Code), or any affiliate of any insiders.

| Category | Description of Services Provided | Estimated Amount Due or Due to be Paid Within 21 Days (Interim Order) | Estimated Amount Outstanding as of Petition Date (Final Order) |
|---|---|---|---|
| 503(b)(9) Claimants[5] | Suppliers that provided goods to the Debtors that were received within twenty days before the Petition Date. | N/A | N/A |
| Lien Claimants | Suppliers of goods or services utilized by or provided to the Debtors that may assert mechanic's, possessory, or other similar liens. | $8 million | $42 million |
| Foreign Claimants | Suppliers of goods or services that are based outside of the United States. | $61 million | $102 million |
| Critical Vendors | Specialized suppliers of goods and services that are critical to maintain the Debtors' day-to-day operations, or which are sole or limited-source providers of the goods and services necessary for the uninterrupted operations of the Debtors' business. | $70 million | $71 million |
| HSE Suppliers | Suppliers of good or services that may be reasonably necessary to ensure the health, safety, regulatory, and environmental compliance of the Debtors' operations or are otherwise reasonably necessary to maintain the integrity of the Debtors' operations, but which are not Foreign Claimants, Lien Claimants, 503(b)(9) Claimants, Critical Vendors, or other suppliers. | $2 million | $7 million |
| **Total amount of Trade Claims:** | | $141 million | $222 million |
| **Total as percentage of total funded debt:** | | 3% | 4% |

---

[5]   The 503(b)(9) Claimants are also Lien Claimants, Foreign Claimants, Critical Vendors, or HSE Suppliers, and amounts owed on account of such claimants are captured in the other categories in this Motion. For the avoidance of doubt, the Debtors request authority to pay any 503(b)(9) Claims in the ordinary course of business and consistent with prepetition practices.

10.     The Debtors intend to apply their business judgment and discretion on a case-by-case basis and pay only those Trade Claims that are critical to maintaining the supply chain and provide the Debtors with favorable postpetition terms.

**I.      503(b)(9) Claimants.**

11.     The Debtors may have received certain inventory, goods, and/or materials from various vendors (the "503(b)(9) Claimants") within the twenty days immediately preceding the Petition Date, thereby giving rise to claims that are accorded administrative priority under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims").  Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Instead, the Debtors obtain much of their inventory, goods, and other materials from such claimants on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its 503(b)(9) Claims.   Such refusal could negatively affect the Debtors' estates as the Debtors' business depends on the steady flow of concessions and other related items to provide at their theaters.

12.     Certain of the 503(b)(9) Claimants supply goods or materials that are critical to the Debtors' ongoing operations.  Even though the manufacture of certain goods, such as concession products, may be completed, the 503(b)(9) Claimants may refuse to ship postpetition unless the Debtors pay some or all of the prepetition claims owing to such vendors.  Any interruption in the flow of these goods, particularly concessions, would be highly disruptive to the Debtors' operations and would be value-destructive for the Debtors' businesses.   In light of these consequences, the Debtors believe that payment of the 503(b)(9) Claimants is essential to avoid disruptions to the Debtors' operations.

13.     The Debtors believe that all of the 503(b)(9) Claims are also Lien Claims, Foreign Claims, Critical Vendors Claims, or HSE Claims (each as defined below) and have been characterized as such for purposes of this motion.  As such, the Debtors do not believe there exist any amounts due and owing on account of 503(b)(9) Claims that are separate and distinct from the Lien Claims, the Foreign Claims, the Critical Vendor Claims, or the HSE Claims.  However, out of abundance of caution, to the extent a 503(b)(9) Claim is not otherwise classified as a Lien Claim, Foreign Claim, Critical Vendor Claim, or HSE Claim, the Debtors seek authority to pay any undisputed Claims 503(b)(9) Claims.  The Debtors do not seek to accelerate or modify existing payment terms with respect to 503(b)(9) Claims (if any).  Rather, the Debtors will pay the applicable 503(b)(9) Claims (if any) as they come due and in the ordinary course of business.

## II.     Lien Claimants.

14.     The Debtors routinely do business with a number of third-party contractors that may be able to assert a variety of statutory, common law, or possessory liens against the Debtors and their property if the Debtors fail to pay for certain goods delivered or services rendered (the "Third-Party Contractors").  These Third-Party Contractors perform various services for the Debtors, including the installation and repair of certain equipment in the Debtors' theaters, maintenance and improvement of the Debtors' real property and facilities, manufacturing component parts necessary for the Debtors' operating equipment, and other repair, renovation, or construction of the facilities and property therein.

15.     The Debtors' theaters are operated with minimal in-house staffing capable of performing routine maintenance and are supplemented by specialized maintenance and repair services provided by third parties on a regular or *ad hoc* basis.  For example, in the ordinary course of business, the Debtors frequently engage third-party servicers to perform essential maintenance

7

and repairs to the Debtors' elevators, plumbing, and other infrastructure items, all of which are important to the normal operations of properties.  Repairing defects in the Debtors' projection and screening equipment, an essential part of the Debtors' operations, also requires the work of specialized third-party servicers.  Such specialized maintenance and repairs ensure the uninterrupted operations of the Debtors' facilities to the benefit of all parties in interest.

16.    The Debtors regularly undertake expansion, development, renovation, and maintenance opportunities across their cinema footprint.  Such projects typically involve the use of carpenters, mechanics, electricians, and other skilled labor.  Non-payment of Third-Party Contractors hired in connection therewith could lead to shortages of skilled labor, labor disputes, work stoppages, and disputes with contractors or subcontractors.  Any of these events would affect the Debtors' anticipated costs and timetables for such projects.  The cost of a project may vary significantly from initial expectations, and the Debtors may have a limited amount of capital resources to fund cost overruns which, in turn, would delay the completion of the project until adequate funding is available.  Such delay would be value destructive to the Debtors' estates.

17.    Further, the Debtors' businesses depend on both the uninterrupted flow of inventory and concessions through their supply chain and distribution network, including the purchase, importation, storage, and shipment of the Debtors' equipment, inventory, and other property.  This supply and distribution network is critical to the Debtors' operation and maintenance of their theaters and offices.  The supply chain depends on services provided by, among others, various freight forwarders, common carriers, and custom brokers (collectively, the "Shippers and Warehousemen").

18.    Under certain non-bankruptcy laws, the Third-Party Contractors, the Shippers and Warehousemen, and other claimants (the "Lien Claimants") may be able to assert liens on the

8

goods in their possession or on the property they improved (as applicable) to secure payment of the charges or expenses incurred in connection with these prepetition obligations (the "Lien Claims").  Accordingly, in the event these claims remain unpaid, the Lien Claimants could attempt to assert such liens and refuse to deliver or release goods in their possession or otherwise impede the Debtors' use of property until their claims are satisfied and their liens redeemed.  The Lien Claimants' possession (and retention) of the Debtors' goods and supplies or enforcement of a mechanic's lien would disrupt the Debtors' operations and affect the Debtors' ability to efficiently administer these chapter 11 cases.  The cost of such disruption to the Debtors' estates in many cases would likely be greater than the applicable Lien Claims.  Pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which would drain estate assets.

19.     For the twelve months before the Petition Date, on average, the Debtors paid the Lien Claimants, including the Third-Party Contractors and the Shippers and Warehousemen, approximately $10 million per month.  The Debtors estimate that, as of the Petition Date, approximately $42 million is outstanding on account of Lien Claims, approximately $8 million of which is due or will become due within the first twenty-one days of these chapter 11 cases.

20.     To continue using the Lien Claimants' goods and services, the Debtors request authority to pay the prepetition Lien Claims as they become due and payable and to continue paying the Lien Claims in the ordinary course of business.  For the avoidance of doubt, the Debtors seek authority to pay only those amounts of Lien Claims that the Debtors determine, in their sole discretion, to be necessary or appropriate to (a) obtain release of critical or valuable goods, (b) maintain reliable, efficient, and smooth distribution systems, and (c) induce the Third-Party

Contractors and other Lien Claimants to continue performing and otherwise supporting the Debtors' operations on a postpetition basis.

**III.    Foreign Claimants**

21.    A critical component of the Debtors' businesses, such as the Debtors' business activities in the United Kingdom, involves transacting with certain potential foreign claimants (the "Foreign Claimants").  The Foreign Claimants supply goods and services to the Debtors that are crucial to the Debtors' ongoing international operations and for the continuation of their businesses in the ordinary course during these chapter 11 cases.  Due to the broad international reach of the Debtors' businesses, it is often logistically impracticable—and significantly more cost prohibitive—for the Debtors to purchase goods and services from a U.S.-based vendor rather than Foreign Claimants.  Moreover, many of the Debtors' Foreign Claimants are irreplaceable due to the specialized and customized nature of their products and services specific to the Debtors' international operations.  By way of example, the Debtors' international concession operations depend upon key relationships with certain foreign concession providers.  Failure to pay prepetition claims held by certain Foreign Claimants and accrued in the ordinary course of business (the "Foreign Claims") could cause such Foreign Claimants to refuse to provide the goods and services necessary for the Debtors to continue business operations, including potentially forcing closure of operations at theater locations essential for preserving ongoing business.

22.    The Foreign Claims include approximately $3.4 million (subject to adjustment for interest and other costs) on account of a foreign judgment relating to a lease dispute under one of the Debtors' foreign leases.  Failure to pay such portion of the Foreign Claims bears the risk of liquidation for the two Debtors liable on the judgment—Picturehouse Cinemas Limited and Cineworld Cinemas Limited—as such failure could force (a) the appointment of a liquidator over

those Debtors, (b) such Debtors ceasing to trade, (c) such Debtors' assets to be realized, and (d) such Debtors to be eventually dissolved. Those consequences would inherently disrupt the Debtors' business by not only resulting in the closure of the Debtors' operations (x) in relation to these two Debtors at risk and (y) at certain of their chief theater locations, but also materially dismantling the Debtors' organizational structure as these two Debtors serve as the direct or indirect parent of several Debtors.

23.    Many of the Foreign Claimants lack meaningful, if any, contacts with the United States. Thus, the Foreign Claimants may consider themselves beyond the jurisdiction of the Court, and therefore, may disregard the automatic stay, notwithstanding the automatic stay's global effect. Lawsuits in non-U.S. courts and efforts to exercise other remedies in non-U.S. jurisdictions, including the assertion of liens by the Foreign Claimants, could result from a failure to make payment to such parties in the ordinary course, including on account of prepetition claims. It would be unduly time-consuming and burdensome for the Debtors to seek to enforce an order of the Court in the creditor's home country in many instances, thereby compounding the loss and disruption in services.

24.    For the twelve months before the Petition Date, on average, the Debtors paid the Foreign Claimants approximately $21 million per month. The Debtors estimate that, as of the Petition Date, approximately $102 million is outstanding on account of Foreign Claims, approximately $61 million of which is due or will become due within the first twenty-one days of these chapter 11 cases.

25.    To maintain access to the critical goods and services provided by the Foreign Claimants, the Debtors request authority to pay the prepetition Foreign Claims as they become due and payable and to continue paying the Foreign Claims in the ordinary course of business. For the

avoidance of doubt, the Debtors intend to pay prepetition Foreign Claims only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs.

**IV.    Critical Vendors.**

26.    The Debtors are in the highly competitive and already challenged business of providing cinematic entertainment to customers across the United States.  The Debtors' ability to continue generating revenue and operating their businesses, and thus the success of these chapter 11 cases, fundamentally depends upon the Debtors' access to the latest movie releases, high quality concessions, and other theater amenities, supporting products, and services—all provided by a variety of critical vendor business counterparties (the "Critical Vendors").

27.    In light of these concerns, the Debtors, with the assistance of their advisors, have spent significant time reviewing and analyzing their books and records, consulting operations managers and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable law, regulations, and historical practices to identify the Critical Vendors that supply the products and services most vital to the Debtors' go-forward operations (the "Critical Vendor Products and Services").  The Debtors identified the Critical Vendors pursuant to the following criteria:  (a) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue operations without disruption; (b) the Debtors' ability to find timely alternative sources of supply that can provide requisite volumes of similar goods or services on equal (or better) terms and in a reasonable time;  (c) the Debtors' ability to continue operating while transitioning business to an alternative supplier, if available, and how long such a transition would take; (d) the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition

claim; (e) which suppliers would be prohibitively expensive or practically difficult to replace; (f) which suppliers would present an unacceptable risk to the Debtors' operations given the volume of essential services or products that such suppliers provide; (g) whether the vendor is currently refusing to supply the Debtors with goods or services or is refusing to do so without cash up front; and (h) whether a Critical Vendor meeting the foregoing criteria is able or likely to refuse to provide product or services to the Debtors postpetition if its prepetition balances are not paid.

28.    The Critical Vendors generally fall into six categories: (a) film studios that license films for the Debtors to exhibit in theaters, pursuant to certain licensing arrangements; (b) concession vendors; (c) beer, wine, and liquor distributors and related vendors; (d) marketing and advertising vendors; (e) information technology and critical administrative services vendors; and (f) operations and maintenance vendors.

29.    ***Film License Agreement Critical Vendors.***  The Debtors are party to certain film licensing agreements (the "Film License Agreements") with many of the major film studios (the "Film Studios") that provide the terms pursuant to which the Debtors are permitted to exhibit films in their theaters.  The Film License Agreements generally require the Debtors to make periodic royalty payments, typically based on a percentage of the Debtors' gross film receipts, in exchange for the right to exhibit a film at specific theaters over a specified time period.  Crucially, nothing in the Film License Agreements requires the Film Studios to continue go-forward licensing after the expiration of their term.  If the Film Studios are not timely paid pursuant to the existing Film License Agreements, they may be reluctant to license future films to the Debtors, endangering the Debtors' ability to generate revenue from their core business and irrevocably damaging the Debtors' reputation with their patrons, who expect the Debtors to exhibit films similar to those shown by other premier cinema chains.  The film rentals provided pursuant to the Film License

Agreements form the foundation of the Debtors' business, and if access to these rentals were disrupted, even for a limited time, the Debtors could not continue to operate and would suffer irreparable harm.

30.     As of the Petition Date, the Debtors estimate that approximately $47 million is outstanding on account of obligations to the Film Studios.

31.     ***Concessions Critical Vendors.***  The Debtors depend on certain of the Critical Vendors to provide a reliable supply of food and beverage products and services necessary to the success of the Debtors' concessions business.  These Critical Vendors include, among others, suppliers of specialized brand-name soft drink syrups and bottled beverages, suppliers of carbon dioxide gas and other supplies necessary for the operation of the Debtors' fountain beverage systems, major primary concession distributors, and manufacturers of concession paper and plastic goods, such as cups, lids, and popcorn tubs.  If the Debtors' payments to these Critical Vendors are disrupted, including on account of prepetition claims, these Critical Vendors may refuse to provide concessions goods and services during the postpetition period.  Moreover, many of these Critical Vendors would be difficult, if not impossible, to replace in a timely fashion.  The Debtors' provision of concessions to theater patrons is a mainstay of their business.  A disruption in the Debtors' ability to operate a high-quality, well-supplied concession operation would irreparably harm a key business function and revenue stream.

32.     Certain Critical Vendors who provide the Debtors with fresh food products may assert claims under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a–499t ("PACA") and state statutes of similar effect.[6]  These statutes provide various

---

[6]     Some states have enacted statutes granting protection similar to that of PACA. *See, e.g.*, N.Y. AGRIC. & MKTS. LAW § 244, et seq. (1996).

protections to fresh fruit and vegetable sellers, including the establishment of a statutory trust (a "PACA Trust"), consisting of a purchaser's entire inventory of food or other derivatives of perishable agricultural commodities, the products derived therefrom, and the proceeds related to any sale of the commodities or products (collectively, the "PACA Trust Assets").  See 7 U.S.C. § 499e(c)(2).  PACA Trust Assets are not property of a debtor's estate.  *In re Delta Produce, L.P.*, 845 F.3d 609, 614 (5th Cir. 2016).  Moreover, beneficiaries of a PACA Trust that adhere to certain statutory notice requirements are entitled to prompt payment from the PACA Trust Assets ahead of secured and unsecured creditors of a debtor's estate.  *Id.* ("Sellers therefore have a 'superpriority' right that trumps the rights of the buyer's other secured and unsecured creditors.") (internal quotations and citations omitted).

33.    A portion of the goods that the Debtors purchase from certain of their Critical Vendors may qualify as "perishable agricultural commodities" under PACA.  As a result, insofar as those Critical Vendors abide by the notice requirements of PACA, they will be eligible to assert claims under PACA, potentially elevating their claims to administrative priority status ahead of all other secured and unsecured creditors in these chapter 11 cases.  Accordingly, payment to these Critical Vendors at this time will not prejudice or affect the amount available for distributions to other creditors of the Debtors.  To ensure that the supply of fresh produce continues unimpeded to operate their concessions business, it is imperative that the Debtors be authorized to pay these Critical Vendors in the ordinary course of business and consistent with their historical practices.

34.    As of the Petition Date, the Debtors estimate that approximately $17 million is outstanding on account of obligations related to the Debtors' concessions business (including obligations related to beer, wine, and liquor supply, as discussed below).

35.     ***Beer, Wine, and Liquor Critical Vendors.***  Through their concession operations, the Debtors also offer moviegoers of the appropriate age a variety of alcoholic beverages, such as beer, wine, and cocktails.  To provide patrons with these offerings, the Debtors maintain extensive business relationships with many alcohol distributors—relationships that may sour in the event of a significant payment delay.  More significantly, in certain jurisdictions, applicable law may prevent beer, wine, and liquor distributors from extending trade credit to the Debtors in the event of a delay in payment.  The Debtors' failure to timely pay a single beer, wine, or liquor distributor in these jurisdictions may cause the distributors to "post" the Debtors' account to an applicable regulatory agency, thereby requiring all other beer, wine, or liquor distributors in that jurisdiction to put the Debtors on immediate, cash-on-delivery terms.  *See, e.g.,* N.Y. Comp. Codes R. & Regs. tit. 9 § 68.6 ("Subsequent to the receipt of a notice of default from any wholesaler no retail licensee shall purchase or accept any delivery of alcoholic beverages except for cash until such time as he has received a release in writing from the Liquor Authority or his name is removed from the delinquent list.").

36.     ***Marketing and Advertising Critical Vendors.***  The Debtors' cinemas are just one entertainment option out of many competing for the attention of the Debtors' customer base. Consequently, the Debtors heavily depend upon various marketing and advertising Critical Vendors in order to remain globally competitive.  These Critical Vendors include, among others, social media platforms that provide unique access to millions of followers and cutting-edge advertising optimization strategies and Critical Vendors involved in the operation of the Debtors' customer programs and customer-facing mobile apps.  The post-pandemic world presents the Debtors' customers with many alternatives to the cinema experience, and the Debtors rely upon the marketing and advertising Critical Vendors to communicate to potential customers that

Cineworld theaters remain "The Best Place to Watch a Movie."   If the Debtors are unable to pay these Critical Vendors, the Debtors may lose access to irreplaceable market intelligence and uniquely effective communications platforms, and the Debtors' relationships with their existing patrons, and their ability to recruit new patrons, will drastically, and potentially irreparably, suffer. As of the Petition Date, the Debtors estimate that approximately $1 million is outstanding on account of obligations to marketing and advertising Critical Vendors.

37.    ***Information Technology and Administrative Services Critical Vendors.***    The Debtors also rely on Critical Vendors for the provision of business-critical information technology systems, products, and administrative services.  For example, some of these Critical Vendors provide the Debtors with development and servicing of the platform used to facilitate online ticket bookings on a day-to-day basis.  Others provide the Debtors with the specialized information technology infrastructure necessary to maintain the Debtors' customer-facing website, point-of-sale systems at the Debtors' theaters, primary data center access, or the software and hardware absolutely necessary to the administration of the Debtors' day-to-day operational activities, including certain payroll, finance department, real estate management, and customer support functions.  Most of these Critical Vendors are virtually irreplaceable due to the specialized nature of the products and services provided to the Debtors.  Even where alternative vendors may exist, the time and costs associated with switching from a Critical Vendor to a new provider would likely be significant and detrimental to the Debtors' estates due to the extensive development timeline required to produce replacement technologies.  Even a small interruption in the provision of any of these products or services could have potentially disastrous effects on the Debtors' business and daily operations, with compounding long-term effects on the Debtors' brand and reputation, and in turn, the success of these chapter 11 cases.

38.     As of the Petition Date, the Debtors estimate that approximately $1 million is outstanding on account of obligations to informational technology and administrative services Critical Vendors.

39.     ***Operations, Maintenance, and Equipment Critical Vendors.***  The Debtors also require daily access to Critical Vendors, which are not Lien Claimants, that provide key equipment and installation and repair services related thereto.  These Critical Vendors provide products and services including, among others, concession equipment and repairs, projection equipment, audio products, and electrical and lighting equipment.  The Debtors operate thousands of state-of-the-art screens across the world, and the delivery of a successful movie-going experience to each and every customer depends in large part on seamless access to these high-quality, specialist operations, maintenance, and supplier firms.  As of the Petition Date, the Debtors estimate that approximately $5 million is outstanding on account of obligations to these Critical Vendors.

40.     Ultimately, the Debtors believe that jeopardizing their relationships with any of the Critical Vendors and attempting to procure the Critical Vendor Products and Services from replacement vendors, even if possible, would impose a severe strain on the Debtors' business operations and would likely result in significant revenue loss.  Even a temporary interruption of the provision of Critical Vendor Products and Services would impede the Debtors' operations, and the cumulative impact of such events could have a catastrophic adverse effect on the Debtors' businesses and, in turn, these chapter 11 cases.

41.     For the twelve months before the Petition Date, on average, the Debtors' paid the Critical Vendors approximately $46 million per month.  The Debtors estimate that, as of the Petition Date, in the aggregate, approximately $71 million is outstanding on account of obligations

to the Critical Vendors (the "<u>Critical Vendor Claims</u>"), approximately $70 million of which is due or will become due within the first twenty-one days of these chapter 11 cases.

42.     The interruption of business with, or the absence of, the Critical Vendors would reduce the efficiency and success of the Debtors' operations.  Any material interruption in the provision of the Critical Vendor Products and Services—however brief—would disrupt the Debtors' operations and could cause irreparable harm to the Debtors' go-forward businesses, goodwill, employees, customer base, and market share.  Such harm would likely far outweigh the cost of payment of the Critical Vendor Claims.[7]  To maintain stability during this critical stage of these chapter 11 cases and to avoid jeopardizing the Debtors' sales and business operations going forward, the Debtors request authority to pay the Critical Vendor Claims as they become due and to continue paying the Critical Vendor Claims in the ordinary course of business, including on account of prepetition claims.  For the avoidance of doubt, the Debtors intend to pay the Critical Vendor Claims only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs.

**V.     HSE Suppliers.**

43.     In the ordinary course of business, the Debtors incur obligations to suppliers of services utilized in the Debtors' operations, the payment of which is reasonably necessary to ensure the health, safety, environmental, and regulatory compliance of the Debtors' operations or to otherwise maintain the integrity of the Debtors' operations (such suppliers, the "<u>HSE Suppliers</u>," and such obligations, the "<u>HSE Claims</u>").  The HSE Suppliers primarily provide security services (including arrangements with local police departments) to ensure compliance with various

---

[7]     Notwithstanding the relief requested herein, the Debtors reserve all of their rights and remedies under the Bankruptcy Code and other applicable law to pursue any cause of action against any Critical Vendor on account of, among other things, any violation of the automatic stay pursuant to section 362(a)(6) of the Bankruptcy Code.

applicable ordinances, janitorial services management, fire protection services, and other services and supplies to ensure the safety and wellbeing of the Debtors' theater patrons and the security of the Debtors' facilities.

44.     The Debtors need to satisfy the claims and invoices of the HSE Suppliers in the ordinary course to ensure the health, safety, environmental, and regulatory compliance of the Group's operations and/or to otherwise maintain the integrity of the Debtors' operations.

45.     For the twelve months before the Petition Date, on average, the Debtors' paid the HSE Suppliers approximately $3 million per month.  The Debtors estimate that, as of the Petition Date, approximately $7 million is outstanding on account of HSE Claims, approximately $2 million of which is due or will become due within the first twenty-one days of these chapter 11 cases.

46.     Any attempt by the HSE Suppliers to refuse delivery of goods or to refuse to provide services on account of nonpayment of prepetition HSE Claims could increase the risk of injury or accident at the Debtors' locations and result in significant liability or expense to the Debtors' estates.  Accordingly, the Debtors request authority to pay the HSE Claims as they become due and payable and to continue paying the HSE Claims in the ordinary course of business. The Debtors intend to pay prepetition HSE Claims only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs.

## VI.     Customary Trade Terms Condition.

47.     Subject to the Court's approval, the Debtors intend to pay the Trade Claims only to the extent necessary to preserve the value of their estates.  To that end, in return for paying a portion of the Trade Claims, the Debtors propose that they be authorized to require the Trade Claimants to provide favorable trade terms for the postpetition procurement of their goods and

services.  The Debtors seek authorization to condition payment of the Trade Claims upon each Trade Claimant's agreement to (a) continue—or recommence—providing goods and/or services to the Debtors in accordance with trade terms (including credit limits, pricing, timing of payments, availability, and other terms) at least as favorable to the Debtors as those in place during the twelve months prior to the Petition Date (the "Customary Trade Terms"), and (b) agree that they shall not be permitted to cancel any contract, agreement, or arrangement pursuant to which they provide such goods and/or services to the Debtors during the course of these chapter 11 cases.  The Debtors also seek authorization to require, at their discretion, certain Trade Claimants to enter into a contractual agreement evidencing such Customary Trade Terms, the form of which is attached to the Interim Order and the Final Order as Exhibit A thereto (the "Trade Agreement").  The Debtors reserve the right to require, at their discretion, that the Customary Trade Terms conditions to payment be made in writing, either by use of the Trade Agreement or e-mail.

48.    The Debtors request that if any party accepts payment pursuant to the relief requested by this Motion and thereafter ceases to provide goods and services in accordance with the Customary Trade Terms:  (a) the Debtors may take any and all appropriate steps to recover from such Trade Claimant any payments made to it on account of its prepetition claim to the extent that such payments exceed the postpetition amounts then owing to such party; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment on account thereof had not been made; and (c) if an outstanding postpetition balance is due from the Debtors to such party, (i) the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this Motion to such outstanding postpetition balance, and (ii) such party will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations

then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

## VII.   Payment of Outstanding Orders.

49.     Before the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (collectively, the "Outstanding Orders").   To avoid the risk of becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.   To prevent any disruption to the Debtors' business operations, and given that goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of goods subject to Outstanding Orders, and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

**Basis for Relief**

## I.     The Court Should Authorize the Payment of the Trade Claims.

50.     Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.   *See*, *e.g.*, *In re CoServ, L.L.C.,* 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) ("Cases cited by Debtors that refer to necessity of payment to preserve going concern value imply such a rule, and this Court is prepared to apply the Doctrine of Necessity to authorize payment of prepetition claims in appropriate cases."); *see also In re Scotia Dev., LLC,* No. 07-20027, 2007

WL 2788840, at *2 (Bankr. S.D. Tex. Sep. 21, 2007) (outlining the factors for when a critical vendor payment is necessary); *In re Ionosphere Clubs, Inc.,* 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."). In so doing, these courts acknowledge that several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

51. Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). Under section 1107(a) of the Bankruptcy Code, a debtor in possession is given the same rights and powers as a trustee appointed in a bankruptcy case, including the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ*, 273 B.R. at 497); *see also* 11 U.S.C. § 1108 ("[T]he trustee may operate the debtor's business.). Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *CoServ, L.L.C.*, 273 B.R. at 497 ("These are simply examples of claims that may require satisfaction for the debtor in possession to perform its fiduciary obligations. In such instances, it is only logical that the bankruptcy court be able to use Section 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate."); *CEI Roofing, Inc.*, 315 B.R. at 56 (citing *In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003)).

52.     No provision of the Bankruptcy Code expressly prohibits the postpetition payment of prepetition trade claims.  The above-referenced sections of the Bankruptcy Code authorize such payments when the payments are critical to preserving the going-concern value of a debtor's estate, as is the case here.

53.     There are instances in which debtors in possession can fulfill their fiduciary duties "only . . . by the preplan satisfaction of a prepetition claim."  *CoServ, L.L.C.*, 273 B.R. at 497.  The *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," and also when the payment was to "sole suppliers of a given product." *Id*. at 498.  Courts in the Fifth Circuit, including the Southern District of Texas, have followed *CoServ's* three-part test to determine whether a prepetition claim of a "critical vendor" may be paid outside of the plan process on a postpetition basis:

> First, it must be critical that the debtor deal with the claimant.  Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's pre-petition claim.  Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*CoServ*, 273 B.R. at 498.  *See also In re Scotia Dev., LLC*, No. 07-20027, 2007 WL 2788840, at *2; *Mirant Corp.*, 296 B.R. at 429–30.

54.     Allowing the Debtors to pay the Trade Claims is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving the going concern value for the Debtors' businesses and maximizing the value of property available to satisfy creditors.  *See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999) (describing a reconciliation of "the two recognized policies underlying Chapter 11 . . . preserving going concerns and maximizing

property available to satisfy creditors"). Reflecting the recognition that payment of prepetition claims of certain essential suppliers and vendors is, in fact, both critical to a debtor's ability to preserve going-concerns and maximize creditor recovery, courts regularly grant relief consistent with that which the Debtors are seeking in this Motion. *See CoServ, L.L.C.*, 273 B.R. at 497 (noting that "it is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate").

### A.  The Court Should Authorize the Payment of the 503(b)(9) Claims.

55.     Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within [twenty] days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business." The 503(b)(9) Claims must be paid in full for the Debtors to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(A). Payment of such claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan unless they consented otherwise. The timing of such payments also lies squarely within the Court's discretion. *See In re Global Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court"). The Debtors' ongoing ability to obtain inventory and other goods as provided herein is key to their survival and necessary to preserve the value of their estates. Absent payment of the 503(b)(9) Claims at the outset of these chapter 11 cases—which merely accelerates the timing of payment and not the ultimate treatment of such claims—the Debtors could be denied access to the inventory and other goods necessary to maintain the Debtors' business operations and maximize the value of the Debtors' estates.

**B.  The Court Should Authorize the Payment of the Lien Claims.**

56.     Certain Lien Claimants may be entitled under applicable non-bankruptcy law to assert certain possessory liens on the Debtors' goods or equipment in their possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim.  Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.  *See* 11 U.S.C. § 546(b)(1)(A) (providing that a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection").  The Debtors anticipate that certain of the Lien Claimants may assert or perfect liens, simply refuse to turn over goods in their possession, or stop performing their ongoing obligations.  Even absent a valid lien, to the extent certain Lien Claimants have possession of the Debtors' inventory, equipment, or products, mere possession or retention could disrupt the Debtors' operations.

57.     Paying the Lien Claims should not impair unsecured creditor recoveries in these chapter 11 cases.  In instances where the amount owed to a Lien Claimant is less than the value of the goods that could be held to secure a Lien Claimant's claim, such party may be a fully-secured creditor of the Debtors' estates.  In such instances, payment now only provides such party with what they might be entitled to receive under a plan of reorganization, without any interest costs that might otherwise accrue during these chapter 11 cases.  Conversely, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy and the ultimate delivery and sale of concessions in the Debtors' theaters.

**C.  The Court Should Authorize the Payment of the Foreign Claims.**

58.     Each of the Foreign Claimants are based outside the United States.  The Foreign Claimants may, and likely do, lack minimum contacts with the United States.  Thus, there is significant risk that the Foreign Claimants consider themselves beyond the jurisdiction of the Court and therefore may disregard the automatic stay, notwithstanding the automatic stay's global effect. Failure to make payment to such parties in the ordinary course could lead to a proliferation of lawsuits in foreign courts and efforts to exercise other detrimental remedies overseas.  In many instances, it would be unduly time-consuming and expensive to seek to enforce an order of the Court in the creditor's home country.

59.     Accordingly, non-payment of any claims owing to Foreign Claimants could lead to immediate and significant disruption to the Debtors' business that would heavily outweigh the cost of paying such parties in connection with their prepetition claims, and continuing to pay them on a postpetition basis, in the ordinary course of business.  The Debtors believe that paying prepetition claims of Foreign Claimants is necessary to protect the Debtors' business and ensure that the Debtors are able to maximize the value of their estates during these chapter 11 cases.

**D.  The Court Should Authorize the Payment of the Critical Vendor Claims and HSE Claims.**

60.     The Debtors require a steady provision of the Critical Vendor Products and Services and the services provided by the HSE Suppliers to maintain operational stability.  Without the Critical Vendor Products and Services and the services provided by the HSE Suppliers, the Debtors could be forced to unexpectedly halt operations while they search for substitute vendors and service providers and may have to forego existing favorable trade terms as a result in their haste to find new vendors, thereby preventing the Debtors from capturing revenue.  Importantly, any disruption to the Debtors' supply chain could result in a significant loss of operational efficiency,

27

decreasing the value of the Debtors' business, which could impair stakeholder value at the outset of these chapter 11 cases.

## II. The Court Should Confirm That Outstanding Orders Are Administrative Expense Priority Claims and That Payment of Such Claims Is Authorized.

61.     Pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are administrative expense priority claims because they benefit the Debtors' estates postpetition.  The granting of the relief sought herein with respect to the Outstanding Orders will not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted, and will not prejudice any other party in interest.

62.     Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide certain suppliers with assurance of such administrative priority status.  The disruption to the continuous and timely flow of critical goods and inventory to the Debtors would force the Debtors to potentially halt operations and production, damage the Debtors' business reputation, erode the Debtors' customer base, and ultimately lead to a loss of revenue, all to the detriment of the Debtors and their creditors.  Given the foregoing, the Court should confirm the administrative expense priority status of the Outstanding Orders and should authorize the Debtors to pay the Outstanding Orders in the ordinary course of business.

## III. Payment of the Trade Claims and the Relief Sought Herein is a Sound Exercise of the Debtors' Business Judgment and Necessary to Preserve the Value of the Estates.

63.     Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's

28

request to use property of the estate outside of the ordinary course of business pursuant to section

363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business

reasons. *See, e.g.*, *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("That is, for

the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors[,] and equity

holders, there must be some articulated business justification for using, selling, or leasing the

property outside the ordinary course of business." (citation omitted)); *see also In re Terrace*

*Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) ("In the words of the court in

*Continental*, 'there must be some articulated business justification for using, selling, or leasing the

property outside the ordinary course of business.'" (quoting *In re Cont'l Air Lines, Inc.*, 780 F.2d

at 1226)).

64.     Section 105(a) of the Bankruptcy Code provides that a court "may issue any order

process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy

Code.  11 U.S.C. § 105(a).  Courts apply section 105(a) pursuant to the "doctrine of necessity,"

which functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise

its equitable power to allow payment of critical prepetition claims not explicitly authorized by the

Bankruptcy Code and further supports the relief requested herein.  *See In re CoServ, L.L.C.*, 273

B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity").

65.     The doctrine of necessity is designed to foster a debtor's rehabilitation, which

courts have recognized is "the paramount policy and goal of Chapter 11."  *In re Ionosphere Clubs*,

98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396

(Bankr. N.D. Ohio 1991) ("The payment by a debtor-in-possession of pre-petition claims outside

of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a]

general practice has developed . . . where bankruptcy courts permit the payment of certain pre-

petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment.").

66.     As discussed above, every segment of the Debtors' supply chain is indispensable to the safe and economic operation of the Debtors' assets.  To ensure that the Debtors continue to maintain their historically excellent operational standards, it is imperative that the Debtors have the authority to pay all of the Trade Claimants if determined necessary to preserve the Debtors' operations, reputation, and the go-forward success of the Debtors' businesses.  The relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is there justified under sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code.

**Emergency Consideration**

67.     The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm," and Bankruptcy Local Rule 9013-1(i).  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations.  Failure to receive the requested relief during the first 21 days of these chapter 11 cases would imperil the Debtors' restructuring and cause irreparable harm.  The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

68.     The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations

and anticipated access to cash collateral and debtor in possession financing.  Under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein.  Checks or wire transfer requests that are not related to authorized payments will not be honored inadvertently. The Debtors request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested herein.

### **Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

69.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### **Reservation of Rights**

70.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any

other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended, and should not be construed as, an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**<u>Notice</u>**

71.    The Debtors have provided notice of this Motion to the following parties or their respective counsel: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agent under the Debtors' Prepetition Priming Facility, and counsel thereto; (d) the agent under the Debtors' Prepetition Legacy Term Facilities, and counsel thereto; (e) the agent under the Debtors' Revolving Credit Facility, and counsel thereto; (f) counsel to the ad hoc group of Prepetition Revolving Lenders; (g) counsel to the ad hoc group of Prepetition Legacy Term Lenders; (h) the agent under the Debtors' Facilities Agreement, and counsel thereto; (i) counsel to lenders under the Debtors' Facilities Agreement; (j) the trustee under the Debtors' Convertible Bonds, and counsel thereto; (k) counsel to the ad hoc group of Convertible Bondholders; (l) the agent under the Debtors' proposed debtor-in-possession facility, and counsel thereto; (m) the Office of the United States Attorney for the Southern District of Texas; (n) the state attorneys general for states in which the Debtors conduct business; (o) the Internal Revenue Service; (p) the Securities and Exchange Commission; (q) the Environmental Protection Agency; (r) other

governmental agencies having a regulatory or statutory interest in these cases; and (s) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors request that the Court enter the Interim Order and Final Order, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
Dated:  September 7, 2022

/s/  *Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (S.D. Bar No. 3394311)
Veronica A. Polnick (TX Bar No. 24079148)
Vienna Anaya (TX Bar No. 24091225)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:      (713) 752-4200
Facsimile:       (713) 752-4221
Email:            mcavenaugh@jw.com
                      rchaikin@jw.com
                      vpolnick@jw.com
                      vanaya@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Christopher Marcus, P.C. (*pro hac vice* pending)
Christine Okike, P.C. (*pro hac vice* pending)
Ciara Foster (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900
Email:            joshua.sussberg@kirkland.com
                      christopher.marcus@kirkland.com
                      christine.okike@kirkland.com
                      ciara.foster@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

## Certificate of Accuracy

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/ Matthew D. Cavenaugh
Matthew D. Cavenaugh

## Certificate of Service

I certify that on September 7, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Matthew D. Cavenaugh
Matthew D. Cavenaugh