United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 08, 2022

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) Case No. 22-90168 (MI) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) **Re: Docket No. 52** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO
(A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL,
(II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY,
(V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "Motion"),[2] of Cineworld Group plc and its affiliated debtors

in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), as debtors and

debtors in possession (collectively, the "Debtors") seeking entry of an interim order (this "Interim

Order") and a final order (the "Final Order", together with the Interim Order, the "DIP Orders")

pursuant to sections 105, 361, 362, 363, 364(c), 364(d), 364(e), 503, 507, and 552(b) of title 11 of

the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001,

6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

and Rules 2002-1, 4001-1(b), 4002-1, and 9013-1 of the Local Rules of the United States

Bankruptcy Court for the Southern District of Texas and the Southern District of Texas Complex

---

[1]   Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/cineworld/. The location of the Debtors' service address for the purposes of these chapter 11 cases is: 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the DIP Credit Agreement, as applicable.

Chapter 11 Case Procedures (together, the "Local Rules"), seeking, among other things, entry of an order:

> (i)     authorizing the Debtors to incur senior secured postpetition obligations on a superpriority basis in respect of a senior secured superpriority priming U.S. dollar term loan facility ("DIP Facility") in the aggregate principal amount, of $1,935,000,000 (the "DIP Commitments" and, all such loans, the "DIP Loans"), in accordance with, and subject to the terms and conditions set forth in, the DIP Credit Agreement; (a) $664 million in which the Borrower shall be permitted to draw, in accordance with, and subject to the terms and conditions set forth in the DIP Credit Agreement (as defined below) (the "Working Capital Commitments," and such loans, the "Working Capital Loans"); (b) $1,000,000,000 (such amount plus all amounts on account of Prepetition Priming Adequate Protection Payments (as defined herein) as and when they come due pursuant to this Interim Order shall mean, the "Priming Loan Refinancing Escrow Amount") of which shall be used to refinance, in full, (the "Priming Loan Refinancing") all outstanding obligations under that certain Credit Agreement, dated as of November 23, 2020 (including all documents, instruments, and agreements related thereto, all as supplemented, amended, restated, or otherwise modified, collectively, the "Prepetition Priming Credit Agreement" and loans made thereunder the "Prepetition Priming Loans," including and together with the applicable prepayment premiums in respect thereto, collectively, the "Prepetition Priming Loan Obligations") among Holdings (as defined below), Crown Finance US, Inc. ("Crown Finance"), the lenders party thereto (the "Prepetition Priming Facility Lenders"), and Barclays Bank PLC, as Administrative Agent (in such capacity, the "Prepetition Priming Facility Agent")(as amended on the record of the Interim Hearing and as set forth herein), and (c)$271,000,000 (the "RoW Debt Purchase Price") to effectuate a "take-out" of the outstanding principal amount of the EUR 122,910,521.14 and USD 112,500,000 Facilities Agreement, dated 19 June 2020, as amended by an amendment agreement dated 29 June 2020, and as further amended by an amendment agreement dated 7 August 2020 and as further amended by an amendment and restatement agreement dated 24 May 2022 by and among Crown NL Holdco B.V. ("Dutch TopCo"), as Topco, Cinema City Holding B.V., as Parent, Cinema City Finance (2017) B.V., as Borrower (the "RoW Borrower"), Kroll Agency Services Limited, as administrative and collateral agent (the "RoW Agent"), the obligors from time to time party thereto (the "RoW Obligors"), and the lenders from time to time party thereto (the "RoW Lenders") (as amended, the "RoW Credit Agreement"), pursuant to which an approximately EUR 123 million term loan facility and an approximately $112.5 million term loan facility were made available to RoW Borrower (collectively, the "RoW Credit Facility," and the loans advanced thereunder, the "RoW Loans," including and together with any makewhole payments, any accrued and unpaid interest thereon and any fees and expenses outstanding under the RoW Credit Agreement and related documents, the "RoW Loan Obligations") (such "take-out", the "RoW Loan Transaction") pursuant to the terms and conditions of that certain senior Superpriority Secured Debtor-in-

Possession Credit Agreement (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "DIP Credit Agreement"), by and among Crown Finance, as borrower (in such capacity, the "DIP Borrower"), Crown UK HoldCo Limited, as holdings ("Holdings"), the guarantors party thereto (any such guarantors, collectively, the "DIP Guarantors," and any other additional collateral party agreed to by the Debtors and the DIP Lenders, collectively, the "DIP Obligors" and together with the Borrower, the "DIP Loan Parties"), Barclays Bank PLC, as administrative agent and collateral agent (in such capacities, the "DIP Agent"), and certain of the Prepetition Legacy Facility Lenders (as defined below) that are members of the ad hoc group represented by Arnold & Porter Kaye Scholer LLP and Houlihan Lokey, Inc. (the "Ad Hoc Group") that execute a backstop commitment agreement, and their respective successors and assigns (collectively, the "Backstop Parties") and certain Prepetition Legacy Facility Lenders (as defined below and other than the Backstop Parties) that, after the Closing Date agree to participate in the DIP Facility (the "DIP Lenders" and together with the DIP Agent, the "DIP Secured Parties"), the terms and conditions as set forth in the DIP Credit Agreement;

(ii)    authorizing the Debtors to execute and deliver the DIP Credit Agreement and any other agreements, instruments, pledge agreements, intercreditor agreements, guarantees, fee letters, control agreements, and other ancillary documents related thereto (including any security agreements, intellectual property security agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time, collectively with the DIP Credit Agreement, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)    upon entry of the Interim Order, authorizing the Debtors to borrow up to $1,785,000,000 of DIP Loans (the "Interim Amount") consisting of (a) $514,000,000 of Working Capital Loans, (b) $1,000,000,000 of which shall be used to consummate the Priming Loan Refinancing (as amended on the record of the Interim Hearing and herein to provide for the establishment of a segregated escrow account held by or on behalf of the DIP Agent for purposes of holding the Priming Loan Refinancing Escrow Amount and Prepetition Priming Adequate Protection Payments (as defined herein) (the "Priming Loan Refinancing Escrow"), subject to the PTL Challenge Period (as defined herein) and (c) $271,000,000 of which shall be used to effectuate the RoW Loan Transaction;

(iv)    subject to the Carve-Out (as defined below), granting the DIP Facility and all obligations of the Borrower and Grantors owing thereunder and under, or secured by, the DIP Documents, to the DIP Secured Parties (collectively, and including all "Obligations" as described in the DIP Credit Agreement and, without limitation, all principal and accrued interest, premiums, costs, fees, expenses and any other amounts due under the DIP Facility, the "DIP Obligations") allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined herein) pursuant to section 364(c)(1) of the Bankruptcy

Code, having priority over all administrative expenses, including those of the kind specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), or 726 or any other provisions of the Bankruptcy Code, and having full recourse against all assets of the DIP Obligors, including, subject to entry of the Final Order, proceeds of Avoidance Actions (as defined below), subject only to the Carve-Out;

(v)     subject to the Carve-Out, granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, valid, enforceable, nonavoidable, automatically, and fully perfected security interests in and liens on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, including all property constituting Cash Collateral;

(vi)    authorizing and directing the Debtors to pay the principal, interest, premiums, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including the Yield Payment, commitment fees, closing fees, exit fees, audit fees, appraisal fees, valuation fees, liquidator fees, structuring fees, administrative agent's fees, the reasonable and documented fees and disbursements of the DIP Agent's and the other DIP Secured Parties' attorneys, advisors, accountants, and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(vii)   authorizing the Debtors to use the Prepetition Collateral (as defined below), including the Cash Collateral (as defined below) under the Prepetition First Lien Loan Documents (as defined below), and providing adequate protection to the Prepetition First Lien Secured Parties (as defined below) for, among other things, the diminution in value of their interests in the applicable Prepetition Collateral (including Cash Collateral) from and after the Petition Date to the fullest extent set forth in the Bankruptcy Code and other applicable law ("Diminution in Value") to the extent such Diminution in Value occurs on account of the Debtors' sale, lease, or use of the Prepetition Collateral (including Cash Collateral), the imposition and enforcement of the automatic stay pursuant to section 362 of the Bankruptcy Code, and the priming of the Prepetition Legacy Facility Secured Parties' respective interests in the Prepetition Collateral;

(viii)  subject to and effective upon entry of the Final Order with respect to the Prepetition Collateral and the DIP Collateral, in each case except to the extent of the Carve-Out, determining that the Debtors have waived any right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, and determining that (a) the equitable doctrine of marshaling and other similar doctrines, and (b) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply;

(ix)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order; and

(x)     scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion.

The Court having considered the Motion, the exhibits attached thereto, the *Declaration of Steven Zelin in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Zelin Declaration"), the *Declaration of James Mesterharm in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Mesterharm Declaration," together with the Zelin Declaration, collectively, the "DIP Declarations"), and the evidence submitted and arguments made at the interim hearing held on September 8, 2022 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court and to address statements made on the record by the Court concerning certain provisions of the DIP Facility, particularly with respect to the Priming Loan Refinancing; and the parties having consulted and agreed to revise the Priming Loan Refinancing as set forth on the record of the Interim Hearing and memorialized herein; and it appearing that approval of the interim relief requested in the Motion, as amended on the record, is necessary to avoid immediate and irreparable

harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties-in-interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Credit Agreement and the other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

A. **Petition Date**. On September 7, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

B. **Debtors in Possession**. The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C. **Jurisdiction and Venue**. This Court has subject matter jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for the Chapter 11 Cases and proceedings with respect to the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D. **Committee Formation**. As of the date hereof, the United States Trustee for the Southern District of Texas (the "U.S. Trustee") has not yet appointed an official committee of

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

unsecured creditors in the Chapter 11 Cases (a "Creditors' Committee") pursuant to section 1102 of the Bankruptcy Code.

E. **Notice**. Notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

F. **Debtors' Stipulations**. After consultation with their attorneys and financial advisors, and without prejudice to the rights of other parties in interest (other than the Debtors), including any Creditors' Committee, as set forth in paragraph 32 herein, the Debtors admit, stipulate, acknowledge, and agree (paragraphs F, G, and H shall be referred to herein collectively as the "Debtors' Stipulations and Releases") as follows:

### *Prepetition Legacy Facility*

(i) Pursuant to that certain Credit Agreement, dated as of February 28, 2018 (the "Prepetition Legacy Credit Agreement" and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Legacy Facility Loan Documents"), providing for (A) $3,325,000,000 in U.S. dollar-denominated term loans (the "Initial Legacy USD Term Loans"), (B) €607,643,200 of euro denominated term loans (the "Legacy Euro Term Loans"), (C) $350,700,000 in revolving credit commitments (the "Prepetition Legacy Revolving Credit Facility"), and (D) $650,000,000 in incremental U.S. dollar-denominated term loans (the "Incremental Legacy USD Term Loans," and together with the Initial Legacy USD Term Loans and the Legacy Euro Term Loans, the "Prepetition Legacy Term Facilities," and together with the Prepetition Legacy Revolving Credit

Facility, collectively, the "Prepetition Legacy Credit Facilities"), entered into by and among (a) Holdings, (b) Crown Finance, as Borrower, (c) the lenders party thereto (the "Prepetition Legacy Facility Lenders"), and (d) Barclays Bank PLC, as Administrative Agent (in such capacity, the "Prepetition Legacy Facility Agent" and together with the Prepetition Legacy Facility Lenders, the "Prepetition Legacy Facility Secured Parties"), the Prepetition Legacy Facility Secured Parties agreed to extend loans and other financial accommodations to, and issue letters of credit for the account of, the Borrower pursuant to the Prepetition Legacy Facility Loan Documents. All obligations of the applicable Debtors arising under the Prepetition Legacy Credit Agreement (including the "Obligations" as defined therein, whether or not arising under the Prepetition Legacy Facility Loan Documents) or the other Prepetition First Lien Loan Documents shall collectively be referred to herein as the "Prepetition Legacy Facility Obligations."

(ii)     **Prepetition Legacy Facility Collateral**. Pursuant to the Collateral Documents (as defined in the Prepetition Legacy Credit Agreement, and as such documents were amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Legacy Facility Collateral Documents"), by and among Crown Finance and its subsidiaries party thereto (collectively, the "Prepetition Legacy Facility Grantors," and each, a "Prepetition Legacy Facility Grantor") and the Prepetition Legacy Facility Agent, each Prepetition Legacy Facility Grantor granted to the Prepetition Legacy Facility Agent, for the benefit of the Prepetition Legacy Facility Agent and the other Prepetition Legacy Facility Secured Parties, to secure the Prepetition Legacy Facility Obligations, first priority security interests in and continuing Liens (the "Prepetition Legacy Facility Liens") on substantially all of such Prepetition Legacy Facility Grantors' assets and properties and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (other than "Excluded

Property," as such term is defined in the Prepetition Legacy Facility Loan Documents). All "Collateral" as defined in the Prepetition Legacy Credit Agreement granted or pledged by such Prepetition Legacy Facility Grantors pursuant to any Prepetition Legacy Facility Collateral Document or any other Prepetition Legacy Facility Loan Document shall collectively be referred to herein as the "<u>Prepetition Collateral</u>" and, the Security Interests (as defined below) thereon and therein, the "<u>Prepetition Liens.</u>"  As of the Petition Date, (a) the Prepetition Legacy Facility Liens (I) are legal, valid, binding, enforceable, unavoidable, and perfected Liens, (II) were granted to, or for the benefit of, the Prepetition Legacy Facility Secured Parties for fair consideration and reasonably equivalent value, (III) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (IV) are subject and subordinate only to (A) the DIP Liens (after giving effect to this Interim Order), (B) the Carve-Out (after giving effect to this Interim Order), and (C) the Prepetition Priming Facility Liens (prior to giving effect to this Interim Order); and (b) (I) the Prepetition Legacy Facility Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition Legacy Facility Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (II) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition Legacy Facility Obligations exist, (III) no portion of the Prepetition Legacy Facility Obligations or any payments made to any or all of the Prepetition Legacy Facility Secured Parties are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (IV) the obligations of the Guarantors (as defined in

the Prepetition Legacy Credit Agreement) under the Prepetition Legacy Facility Collateral Documents and the other Prepetition Legacy Facility Loan Documents shall continue in full force and effect to unconditionally guaranty the Prepetition Legacy Facility Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Secured Parties to the Debtors pursuant to the terms of this Interim Order or the DIP Documents.

        (iii)     **Amounts Owed under Prepetition Legacy Facility Loan Documents**. As of the Petition Date, the applicable Debtors owed the Prepetition Legacy Facility Secured Parties, pursuant to the Prepetition Legacy Facility Loan Documents, without defense, counterclaim, reduction, or offset of any kind, in respect of loans made and other financial accommodations made by the Prepetition Legacy Facility Secured Parties, an aggregate principal amount of approximately $3,939,248,972.20 plus all accrued and unpaid interest thereon and any additional fees, expenses (including any reasonable and documented attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Legacy Facility Loan Documents), and other amounts now or hereafter due under the Prepetition Legacy Facility Loan Documents.  Paragraphs (i) - (iii) above shall be referred to herein as the "Debtors' Legacy Facility Stipulations."

*__Prepetition Priming Facility__*

        (iv)     Pursuant to that certain Credit Agreement, dated as of November 23, 2020 (the "Prepetition Priming Credit Agreement" and (collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Priming Facility Loan Documents" and together with the Prepetition

Legacy Facility Loan Documents, the "Prepetition First Lien Loan Documents"), providing for (A) Initial Term B-1 Loans in the original principal amount of $450,000,000, (B) Initial Term B-2 Loans in the original principal amount of $110,000,000 and (C) 2021 Incremental Term B-1 Loans in the original principal amount of $200,000,000, entered into by and between (a) Holdings, (b) Crown Finance, as borrower, (c) the lenders party thereto (the "Prepetition Priming Facility Lenders" and the Prepetition Priming Facility Lenders together with the Prepetition Legacy Facility Lenders, the "Prepetition First Lien Lenders"), and (d) Barclays Bank PLC, as Administrative agent (in such capacity, the "Prepetition Priming Facility Agent" and the Prepetition Priming Facility Agent together with the Prepetition Priming Facility Lenders, the "Prepetition Priming Facility Secured Parties" and, together with the Prepetition Legacy Facility Agent, the "Prepetition First Lien Agents" and, together with the Prepetition First Lien Lenders and any other party to which Prepetition First Lien Obligations (as defined below) are owed, the "Prepetition First Lien Secured Parties"), the Prepetition Priming Facility Secured Parties agreed to extend loans and other financial accommodations to the Borrower pursuant to the Prepetition Priming Facility Loan Documents. All obligations of the applicable Debtors arising under the Prepetition Priming Credit Agreement (including the "Obligations" as defined therein, whether or not arising under the Prepetition Priming Facility Loan Documents) or the other Prepetition Priming Facility Loan Documents shall collectively be referred to herein as the "Prepetition Priming Facility Obligations", and together with the Prepetition Legacy Facility Obligations, the "Prepetition First Lien Secured Obligations").

(v) **Prepetition Priming Facility Collateral**. Pursuant to the Collateral Documents (as defined in the Prepetition Priming Credit Agreement, and as such documents were amended, restated, supplemented, or otherwise modified from time to time, the

"Prepetition Priming Facility Collateral Documents"), by and among Crown Finance and its subsidiaries party thereto (collectively, the "Prepetition Priming Facility Grantors" and each, a "Prepetition Priming Facility Grantor") and the Prepetition Priming Facility Agent, each Prepetition Priming Facility Grantor granted to the Prepetition Priming Facility Agent, for the benefit of the Prepetition Priming Facility Agent and the other Prepetition Priming Facility Secured Parties, to secure the Prepetition Priming Facility Obligations, first priority security interests in and continuing Liens (the "Prepetition Priming Facility Liens") on substantially all of such Prepetition Priming Facility Grantors' assets and properties and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (other than "Excluded Property," as such term is defined in the Prepetition Priming Facility Loan Documents). All "Collateral" as defined in the Prepetition Priming Credit Agreement granted or pledged by such Prepetition Priming Facility Grantors pursuant to any Prepetition Priming Facility Collateral Document or any other Prepetition Priming Facility Loan Documents shall collectively be referred to herein as the "Prepetition Priming Facility Collateral." As of the Petition Date, (a) the Prepetition Priming Facility Liens (I) are legal, valid, binding, enforceable, and perfected Liens, (II) were granted to, or for the benefit of, the Prepetition Priming Facility Secured Parties for fair consideration and reasonably equivalent value, (III) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (IV) are subject and subordinate only to valid, perfected, and unavoidable liens permitted under the Prepetition Priming Credit Agreement to the extent that such permitted liens are senior to or *pari passu* with the Prepetition Priming Facility Liens; and (b) (I) the Prepetition Priming Facility Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition

Priming Facility Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (II) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition Priming Facility Obligations exist, (III) no portion of the Prepetition Priming Facility Obligations or any payments made to any or all of the Prepetition Priming Facility Secured Parties are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (IV) the obligations of the Guarantors (as defined in the Prepetition Priming Credit Agreement) under the Prepetition Priming Facility Collateral Documents and the other Prepetition Priming Facility Loan Documents shall continue in full force and effect to unconditionally guaranty the Prepetition Priming Facility Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Secured Parties to the Debtors pursuant to the terms of this Interim Order or the DIP Documents.

(vi) **Amounts Owed under Prepetition Priming Facility Loan Documents**. As of the Petition Date, the applicable Debtors owed the Prepetition Priming Facility Secured Parties, pursuant to the Prepetition Priming Facility Loan Documents, without defense, counterclaim, reduction or offset of any kind, in respect of loans made and other financial accommodations made by the Prepetition Priming Facility Secured Parties, an aggregate principal amount of approximately $855,385,631.24  plus all accrued and unpaid interest thereon and any additional fees, expenses (including any reasonable and documented attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Priming Facility Loan Documents), and other amounts now or hereafter due under

the Prepetition Priming Facility Loan Documents. Paragraphs (iv) - (vi) above shall be referred to herein as the "Debtors' Priming Facility Stipulations."

      G.   **Release of Prepetition First Lien Secured Parties**. Subject to paragraph 32 hereof and entry of the Final Order, and in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Debtor shall be deemed to have forever waived, discharged, and released each of the Prepetition First Lien Secured Parties and their respective affiliates, assigns, or successors and the respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees, and other representatives (all of the foregoing, collectively, the "Prepetition First Lien Secured Party Releasees") from any and all obligations and liabilities to the Debtors (and their permitted successors and assigns) and from any and all "claims" (as defined in section 101(5) of the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights, and other rights of disgorgement or recovery against any and all of the Prepetition First Lien Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the Prepetition First Lien Secured Obligations, the Prepetition Legacy Facility Liens, or Prepetition Priming Facility Liens (as applicable), or the debtor-creditor relationship between any of the Prepetition First Lien Secured Parties, on the one hand, and any of the Debtors, on the other hand, arising prior to the date of entry of the Interim Order, including (a) any recharacterization, subordination, avoidance, disallowance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, municipal law, or foreign law and (b) any right or basis to challenge or object to the amount, validity, or enforceability of the Prepetition First Lien Secured Obligations or any payments or

other transfers made on account of the Prepetition First Lien Secured Obligations, or the validity, enforceability, priority, or non-avoidability of the Prepetition Legacy Facility Liens or the Prepetition Priming Facility Liens securing the applicable Prepetition First Lien Secured Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the Prepetition First Lien Secured Party Releasees.

H. **Cash Collateral**. All of the Debtors' cash, including cash and other amounts in deposit accounts, whether as original collateral or proceeds of the Prepetition Collateral, whether existing on the Petition Date or thereafter, constitutes the cash collateral (within the meaning of section 363(a) of the Bankruptcy Code) of the DIP Secured Parties or Prepetition First Lien Secured Parties (the "Cash Collateral").

I. **Findings Regarding Postpetition Financing and Use of Cash Collateral**.

(i) **Need for Postpetition Financing and Use of Cash Collateral**. The Debtors have a need to use Cash Collateral on an interim basis and obtain credit in an amount equal to the Interim Amount pursuant to the DIP Facility in order to, among other things, enable the orderly continuation of their operations, to administer and preserve the value of their estates, to establish Priming Loan Refinancing Escrow and consummate (A) subject to the PTL Challenge Period (as defined below), the Priming Loan Refinancing and (B) the RoW Loan Transaction. The ability of the Debtors to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and otherwise finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of which, on an interim basis as contemplated hereunder, would immediately and irreparably harm the Debtors, their estates, and parties-in-interest. The Debtors do not have sufficient available

sources of working capital and financing to operate their businesses, maintain their properties in the ordinary course of business, and fund the Chapter 11 Cases without the authorization to use Cash Collateral and to borrow the Interim Amount.

(ii)     **No Credit Available on More Favorable Terms**.   The Debtors have been and continue to be unable to obtain financing on more favorable terms from sources other than the DIP Secured Parties under the DIP Documents and this Interim Order.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured credit allowable only under sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code.   The Debtors are unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without (a) granting to the DIP Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Documents, including the DIP Liens and the DIP Superpriority Claims (defined below), (b) allowing the DIP Secured Parties to provide the loans, letters of credit, and other financial accommodations under the DIP Facilities on the terms set forth herein and in the DIP Documents, and (c) granting to the Prepetition First Lien Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Documents, including the First Lien AP Liens (the foregoing described in clauses (a), (b), and (c), collectively, the "DIP Protections").

(iii)     **Priming of the Prepetition Legacy Facility Liens**.  The priming of the Prepetition Legacy Loans under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Documents and as provided herein, will enable the Debtors to obtain the working capital of the DIP Facility and use Cash Collateral needed to continue to operate their business as a growing concern during the pendency of the Chapter 11 Cases in order to preserve and maximize the value of their estates for the benefit of their creditors.  The ability of the Debtors

to finance their operations, maintain business relationships with their vendors and suppliers, and pay their employees requires the availability of working capital from the DIP Facility and the use of Cash Collateral. The Debtors' inability to access the financing under the DIP Facility and use Cash Collateral will harm the Debtors, their estates, their creditors, and the Debtors' chances to successfully reorganize. The Prepetition Legacy Facility Secured Parties are entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, solely to the extent of any Diminution in Value of their respective interests in the Prepetition Legacy Facility Collateral (including Cash Collateral) as a result of the priming of the Prepetition Legacy Facility Liens. The Prepetition Legacy Facility Secured Parties have either (i) consented to the priming of the Prepetition Legacy Loans, (ii) not objected to the priming of the Prepetition Legacy Loans, or (iii) if any Prepetition Legacy Facility Secured Party has objected to the priming of the Prepetition Legacy Loans, any such objection has been withdrawn or overruled.

(iv)    **Use of Cash Collateral and Proceeds of the DIP Facility**. As a condition to entry into the DIP Credit Agreement, the extension of credit under the DIP Facility and the authorization to use the Prepetition Collateral, including Cash Collateral, the DIP Agent, the other DIP Secured Parties, and the Prepetition First Lien Secured Parties require, and the Debtors have agreed, that proceeds of the DIP Facility and the Prepetition First Lien Secured Parties' Cash Collateral shall be used solely and exclusively for the purposes set forth in, and in a manner consistent with, the terms and conditions of this Interim Order, the DIP Documents, and the budget (as the same may be modified from time to time consistent with the terms of the DIP Documents and subject to such exclusions as permitted in the DIP Documents, and as set forth in paragraph 14 hereof, the "Budget," (subject to the Variance Limit and the Financial Covenant (as

defined below)),[4] this Interim Order, and subject to the Carve-Out, solely for the purposes set forth in the DIP Documents and this Interim Order, and subject to the Carve-Out, including (a) the establishment of the Priming Loan Refinancing Escrow; (b) subject to the PTL Challenge Period, the Priming Loan Refinancing; (c) the RoW Loan Transaction; (d) ongoing working capital and other general corporate purposes of the Debtors; (e) permitted payment of costs of administration of the Chapter 11 Cases and any ancillary proceedings commenced in jurisdictions outside of the United States, including restructuring charges arising on account of the Chapter 11 Cases, including statutory fees of the U.S. Trustee and allowed professional fees and expenses of the Debtor Professionals (as defined below) and professionals retained by a Creditors' Committee (if any), subject to the Investigation Budget Amount (as defined herein); (e) payment of such prepetition expenses as consented to by the DIP Agent (at the direction of the DIP Lenders holding greater than 50.0% of the outstanding commitments and/or exposure under the DIP Loans (the "Majority Lenders")) or otherwise permitted under the DIP Documents; (f) payment of interest, premiums, fees, expenses, and other amounts (including, without limitation, legal and other professionals' fees and expenses of the DIP Agent and the other DIP Secured Parties, including for the avoidance of doubt, the fees and expenses of one primary counsel, one local counsel in each relevant jurisdiction, and non-legal advisors, for each of the DIP Agent and DIP Lenders (in each case, where representing the DIP Lenders, as selected by the Majority Lenders)) owed under the DIP Documents, including those incurred in connection with the preparation, negotiation, documentation, and Court approval of the DIP Facility, whether incurred before, on, or after the Petition Date; (g) payment of certain adequate protection amounts to the Prepetition First Lien Secured Parties, to the extent and subject to the

---

[4]     A copy of the initial Budget is attached hereto as **Schedule 1**.

limitations set forth herein; and (h) payment of obligations arising from or related to the Carve-Out.

(v)     **Refinancing of Prepetition Priming Facility.**  Based on the record presented to the Court, including the Zelin Declaration, refinancing of all outstanding Prepetition Priming Facility Obligations is necessary and beneficial to the Debtors and their estates. Moreover, the DIP Lenders were unable or unwilling to provide the DIP Facility absent the protections provided pursuant to the DIP Documents and this Interim Order, including, subject to the PTL Challenge Period, repayment of the Prepetition Priming Facility Obligations by the DIP Facility, as more fully set forth in the Zelin Declaration.

(vi)     **RoW Loan Transaction**. Based on the record presented to the Court, including the Zelin Declaration, consummation of the RoW Loan Transaction is necessary and beneficial to the Debtors and their estates.  Moreover, the DIP Lenders were unable or unwilling to provide the DIP Facility absent the protections provided pursuant to the DIP Documents and this Interim Order, including consummation of the RoW Loan Transaction, as more fully set forth in the Zelin Declaration

(vii)     **No Obligation to Monitor**. No DIP Lender or the DIP Agent shall have any obligation or responsibility to monitor any DIP Loan Party's use of the DIP Financing and each DIP Lender or the DIP Agent may rely upon each DIP Loan Party's representations that the amount of DIP Financing requested at any time and the use thereof are in accordance with the requirements of this Interim Order, the DIP Documents, and Bankruptcy Rule 4001(c)(2).

(viii)     **Application of Proceeds of DIP Collateral**.  As a condition to entry into the DIP Credit Agreement, the extension of credit under the DIP Facility and authorization to use Cash Collateral, the Debtors, the DIP Agent, the other DIP Secured Parties,

and the Prepetition First Lien Secured Parties have agreed that, as of and commencing on the date of the Interim Hearing, the Debtors shall utilize the proceeds of the DIP Collateral solely in accordance with this Interim Order, the DIP Documents, and the Budget.

        J.   **Adequate Protection**.  Each of the Prepetition First Lien Agents, for the benefit of the applicable Prepetition First Lien Lenders, is entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, solely to the extent there is a Diminution in Value of their respective interests in the Prepetition First Lien Collateral (including Cash Collateral) as a result of the Debtors' use of the Prepetition Collateral, including Cash Collateral, subject in all respects to the Carve-Out and subject to paragraph 32 of this Interim Order.  As adequate protection, the Prepetition First Lien Agents, for the benefit of the applicable the Prepetition First Lien Lenders, will receive (a) solely to the extent of any Diminution in Value of their respective interests in the applicable Prepetition Collateral, the First Lien AP Liens (as defined below) and First Lien AP Superpriority Claim (as defined below); (b) current payment of reasonable and documented fees and expenses and other disbursements as set forth in paragraph 12(d) herein, to the extent not duplicative of any other payments made by the Debtors; and (c) financial and other reporting, in each case, as set forth in paragraph 12(e) herein.

        K.   **Sections 506(c), 552(b) and Marshaling**.  In consideration of (i) the DIP Agent's and the DIP Secured Parties' agreement that their liens and superpriority claims shall be subject to the Carve-Out; (ii) the Prepetition First Lien Secured Parties' agreement that their respective Prepetition Liens and claims, including any First Lien AP Liens and claims, including the First Lien AP Superpriority Claim, shall be subject to the Carve-Out; and (iii) the DIP Agent's, the other DIP Secured Parties', and the Prepetition First Lien Secured Parties' agreement to the

payment (in a manner consistent with the Budget (subject to the Variance Limit and the Financial Covenant and subject to the terms and conditions of this Interim Order and the DIP Documents)) of certain expenses of administration of these Chapter 11 Cases: upon entry of a Final Order (a) the DIP Agent and the other DIP Secured Parties seek a determination that the provisions of section 506(c) of the Bankruptcy Code have been waived and that the equitable doctrine of marshaling and other similar doctrines shall not apply, in each case with respect to the DIP Agent, the DIP Secured Parties, and the DIP Collateral and (b) the Prepetition First Lien Agent and the Prepetition First Lien Secured Parties seek a determination that the provisions of section 506(c) of the Bankruptcy Code have been waived, any "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply, and the equitable doctrine of marshaling and other similar doctrines shall not apply, in each case with respect to the Prepetition First Lien Agents and the other Prepetition First Lien Secured Parties.

L. **No Control**. None of the DIP Secured Parties or Prepetition First Lien Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any of the Debtors' operations are conducted, or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Facility, the DIP Documents, and/or the Prepetition First Lien Loan Documents (including by permitting the Debtors to use the Prepetition Collateral (including the Cash Collateral) or in taking any other actions permitted by this Interim Order).

M. **Good Faith of the DIP Agent, the DIP Secured Parties, and the Prepetition First Lien Secured Parties**.

(i) Based upon the pleadings and proceedings of record in the Chapter 11 Cases, (a) the extensions of credit under the DIP Facility are fair and reasonable, are appropriate

for secured financing to debtors in possession, are the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (b) the terms and conditions of the DIP Facility and the use of the Cash Collateral have been negotiated in good faith and at arm's-length among the Debtors, the DIP Secured Parties, and the Prepetition First Lien Secured Parties with the assistance and counsel of their respective advisors; (c) the use of Cash Collateral, including, without limitation, pursuant to this Interim Order, has been allowed in "good faith" within the meaning of section 364(e) of the Bankruptcy Code; (d) any credit to be extended, loans to be made, and other financial accommodations to be extended to the Debtors by the DIP Secured Parties or the Prepetition First Lien Secured Parties, including, without limitation, pursuant to this Interim Order, have been allowed, advanced, extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code by the DIP Secured Parties and the Prepetition First Lien Secured Parties in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code; and (e) the DIP Facility, the DIP Liens (as defined below), the First Lien AP Liens, the First Lien AP Superpriority Claim, and the DIP Superpriority Claims (as defined below) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(ii)    Absent an order of this Court, the consent of the Prepetition First Lien Secured Parties is required for the Debtors' use of Cash Collateral and other Prepetition Collateral.  The Prepetition First Lien Secured Parties have consented, or are deemed pursuant to the Prepetition Documents to have consented, or have not objected, to the Debtors' use of Cash Collateral and other Prepetition Collateral or to the Debtors' entry into the DIP

Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

N. **Immediate Entry**. The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2), (c) and (d) and the Local Rules. Absent granting the interim relief sought by this Interim Order, the Debtors' estates could be immediately and irreparably harmed. Thus, sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2), (c) and (d).

O. **Interim Hearing**. Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier, or hand delivery to certain parties in interest, including the Notice Parties (as defined in the Motion). The Debtors have made reasonable efforts to afford the best notice possible under the circumstances, and no other notice is required in connection with the relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT**:

1. <u>DIP Facility Approved on Interim Basis</u>. The interim financing described herein is authorized and approved, to the extent set forth herein, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents and this Interim Order. All objections to this Interim Order, to the extent not withdrawn, waived, settled, or resolved, are hereby denied and overruled. This Interim Order shall become effective immediately upon its entry.

2.      <u>Authorization of the DIP Documents and the DIP Facility</u>.  The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents and to incur and to perform all of their obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments, certificates, agreements, and documents that may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens (as defined below). The Debtors shall pay, in accordance with this Interim Order, the principal, interest, fees, payments, expenses, and other amounts described in the DIP Documents as such amounts become due and without need to obtain further Court approval, including, without limitation, the Yield Payment, the establishment and funding of the Priming Loan Refinancing Escrow and, subject to the PTL Challenge Period, the Priming Loan Refinancing, amounts payable pursuant to the RoW Loan Transaction, all other fees and other amounts owed to the DIP Secured Parties, and the reasonable fees and disbursements of the DIP Secured Parties, including the reasonable and documented fees and disbursements of counsel and other professionals, in each case whether or not such fees or other amounts arose before, on, and after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and to take any other actions that may be necessary or appropriate, all as provided in this Interim Order or the DIP Documents and in accordance with this Interim Order or the DIP Documents; *provided* that, the payment of legal and other professionals' fees and expenses of the DIP Agent and the other DIP Secured Parties (other than legal and other professionals' fees and expenses incurred prior to the Closing Date) shall be subject to the requirements of paragraph 12 hereof.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim Order and

the DIP Documents.  Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.  Upon the Closing Date, (a) the Yield Payment shall be fully earned and non-refundable and shall be paid as specified in the DIP Documents, (b) the Priming Loan Refinancing Escrow shall be established, (c) the funding of the Priming Loan Refinancing Escrow with the Priming Loan Refinancing Amount, and (d) the RoW Loan Transaction shall be consummated (subject, however, to the terms and conditions set forth in the DIP Documents).

3.    Direction of the Prepetition Agents. Pursuant to the terms of this Interim Order, the Prepetition First Lien Agents are authorized and instructed to (i) file, execute, deliver, and perform under any documents in any jurisdiction (including in any foreign jurisdiction), including, without limitation, any intercreditor agreements, lien subordination agreements, security agreements, pledge agreements, amendments, waivers, consents, powers of attorney (solely with respect to foreign jurisdictions), or release agreements, in each case, which may be reasonably necessary to give effect to this Interim Order, the transactions contemplated herein, and the DIP Credit Agreement; (ii)  under local law, to give effect to the priming Liens in favor of the DIP Lenders under the DIP Facility, execute, file, amend, amend and restate, release or replace guarantee or collateral agreements or any other similar documents so that the DIP Agent can act as the collateral agent thereunder and permit the DIP Agent to hold collateral on behalf of the DIP Lenders and/or the Prepetition First Lien Lenders, in each case, solely to the extent required to reflect the lien priority expressly set forth in this Interim Order; and (iii) subject to this Interim Order, consent and take all reasonably necessary actions to give effect to the priming liens and security interests, use of Cash Collateral, adequate protection arrangements, intercreditor agreements and other documents, instruments and arrangements to give effect to this Interim Order

(clauses (i) – (iii) above, collectively, the "Direction"), in each case, subject to the payment of all fees, costs and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations in connection therewith. For purposes of the foregoing, no further consent, approval or direction of the Prepetition First Lien Lenders or this Court shall be required prior to the performance under or execution of such documents as contemplated in clauses (i) – (iii) above and any such documents necessary to effectuate the actions in clauses (i) – (iii) above shall be in a form acceptable to the Prepetition First Lien Agents.  The Prepetition First Lien Agents are fully protected in conclusively relying upon this Interim Order in connection with the Direction and carrying out any of the foregoing.

4.    Authorization to Borrow and Use Cash Collateral.  To prevent immediate and irreparable harm to the Debtors' estates and to enable the Debtors to continue to operate their business and preserve and maximize the value of their estates, from the entry of this Interim Order through and including the earliest to occur of (i) entry of the Final Order or (ii) the DIP Termination Declaration Date (as defined below), in each case unless extended by written agreement of the DIP Agent and each of the Prepetition First Lien Agents (the period from the entry of this Interim Order through and including such earliest date, the "Interim Period"), and subject to the terms, conditions, and limitations on availability set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to (i) use the Cash Collateral for the purposes described in this Interim Order; and (ii) borrow under the DIP Facility; *provided* that (a) during the Interim Period the aggregate outstanding amount for all such borrowings shall not exceed the Interim Amount; (b) $1,000,000,000 of the Interim Amount shall be used on the Closing Date to fund the Priming Loan Refinancing Escrow Amount;(c) $271,000,000 of the Interim Amount shall be used on the Closing Date (subject to satisfaction of any other terms and conditions set forth in the DIP

Documents) to consummate the RoW Loan Transaction[5] (subject to any terms and conditions set forth in the DIP Documents); and (d) any proposed use of the proceeds of DIP Loans or use of Cash Collateral shall be consistent with the terms and conditions of this Interim Order and the DIP Documents, including the Budget solely to the extent set forth in the Variance Limit (defined below). Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order (including with respect to the Carve-Out), the DIP Facility, or the DIP Documents.

5.     Amendment of the DIP Documents. No waiver, modification, or amendment of any of the provisions of the DIP Documents shall be effective unless set forth in writing, signed by or on behalf of the DIP Borrower and the applicable Debtors, and the DIP Agent (acting at the direction of the Majority Lenders except in the case of amendments, modifications, or waivers requiring consent from all DIP Lenders, all affected DIP Lenders, or the DIP Agent, as specified in the DIP Documents). The DIP Documents and the Budget may from time to time be amended, modified, waived, or supplemented by the parties thereto, in the case of the DIP Lenders, by the DIP Agent at the direction of the Majority Lenders, in accordance with the terms thereof (and this Interim Order) without further order of the Court if the amendment, modification, waiver, or

---

[5] Approval of the RoW Loan Transaction includes, without limitation, among other things, approval of transactions associated with the consummation of the RoW Loan Transaction that convert an amount from one currency to another currency (a foreign exchange or FX transaction). The DIP Agent or its affiliates, on behalf of the Debtors, is authorized to enter into such exchange transactions in connection with the RoW Loan Transaction, and any obligations or expenses owed by Debtors to the DIP Agent or its affiliates in connection with any such transaction shall constitute "Hedging Obligations" as described in the DIP Credit Agreement. The DIP Agent is authorized pursuant to sections 105 and 362(d)(1) of the Bankruptcy Code to net, setoff, settle or recoup any Hedging Obligations owing by the Debtors to the DIP Agent or its affiliates and to apply DIP Collateral to satisfy any obligations of the Debtors, in accordance with the terms of the applicable Hedging Contract, notwithstanding any limits otherwise imposed by section 553 of the Bankruptcy Code.

supplement is non-material and in accordance with the DIP Documents or the Budget or are necessary to conform the terms of the DIP Documents or the Budget to this Interim Order, or to agreements reflected on the record at the hearing. In the case of a material amendment, modification, waiver, or supplement to the DIP Documents, the Debtors shall provide notice (which may be provided through electronic mail or facsimile) to lead counsel to any Creditors' Committee (if appointed), counsel to the Ad Hoc Group, the U.S. Trustee, the DIP Agent, the other DIP Secured Parties, the Prepetition First Lien Agents, and the Prepetition First Lien Secured Parties, which parties shall have five (5) Business Days from the date of such notice within which to object, in writing, to such amendment, modification, waiver, or supplement. If any such party timely objects to such material amendment, modification, waiver, or supplement to the DIP Documents, such material amendment, modification, waiver, or supplement shall only be permitted pursuant to an order of the Court. The foregoing shall be without prejudice to the Debtors' right to seek approval from the Court of a material amendment, modification, waiver, or supplement on an expedited basis. For the avoidance of doubt, the extension of a Milestone (as defined in the DIP Credit Agreement) or waiver of the Variance Limit or Financial Covenant shall not constitute a material amendment, modification, waiver, or supplement to the DIP Documents.

6. <u>DIP Obligations</u>. The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the DIP Obligations, which shall be enforceable against each of the Debtors, their estates, and any successors thereto, including, without limitation, against any trustee or any other estate representative elected or appointed in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (collectively, the "<u>Successor Cases</u>" and each a "<u>Successor Case</u>"). Upon entry of this Interim Order, the DIP Obligations will include all

loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agent or any of the DIP Secured Parties, in each case, under the DIP Documents or this Interim Order or secured by the DIP Liens (as defined below), including, without limitation, all principal, accrued and unpaid interest, costs, fees, expenses, indemnities, and other amounts (including any reasonable and documented attorneys', accountants', financial advisors', and other fees, costs, and expenses that are chargeable or reimbursable under the DIP Documents and/or this Interim Order) owing under the DIP Documents. Subject to the exceptions specified in the DIP Documents, the DIP Obligors shall be jointly and severally liable for the DIP Obligations. No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens (as defined below) but excluding any adequate protection provided to the Prepetition First Lien Secured Parties hereunder) shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code, or any other provision with respect to avoidance actions under the Bankruptcy Code or applicable federal, state or foreign law equivalents) or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise, but other than to the Carve-Out), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

7. <u>DIP Liens</u>. Effective upon entry of this Interim Order, as security for the DIP Obligations (and subject in all respects to the Carve Out and Senior Permitted Liens (as defined herein), pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the other DIP Secured Parties is hereby granted

valid, binding, continuing, enforceable, non-avoidable, and automatically and properly perfected security interests and liens on the Priming Loan Refinancing Escrow (and all amounts on deposit therein), Priming Loan Refinancing Escrow Amount, and all assets and properties of the DIP Obligors (whether tangible, intangible, real, personal, or mixed), whether now owned or hereafter acquired and wherever located, before or after the Petition Date, including, without limitation, all cash, cash equivalents, accounts, inventory, equipment, equity interests or capital stock in domestic and foreign subsidiaries, including without limitation, Busby AssignCo, LLC, (except as otherwise provided in the DIP Documents), investment property, instruments, chattel paper, real property, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, receivables (including those owed to the DIP Obligors generated by intercompany transactions), all claims or causes of action (including, any commercial tort claims or causes of action, and all products, offspring, profits, and proceeds thereof, and subject to entry of the Final Order, the proceeds of Avoidance Actions (as defined in the DIP Credit Agreement) (all of the foregoing collateral, collectively, the "DIP Collateral, and, the Security Interests (as defined below) thereon and therein, the "DIP Liens"); *provided* that, and notwithstanding anything to the contrary herein, the DIP Collateral shall not include (i) Avoidance Actions themselves. For the avoidance of doubt, the DIP Collateral shall include the Prepetition Collateral as set forth in this Interim Order and the DIP Documents.

(a)  Notwithstanding anything to the contrary in this Interim Order, for purposes of this Interim Order, DIP Liens and any adequate protection liens (including any other liens granted in connection with the DIP Financing) shall not encumber and DIP Collateral shall not include (a) leasehold interests of non-residential real property that prohibit or restrict the granting of such liens in the applicable lease except as permitted pursuant to applicable non-

bankruptcy law (but shall include the proceeds of the sale or disposition of such leases) and (b) any security deposits (in possession of the landlord) or the Debtors' interests, if any, in pre-paid rent, unless liens on such security deposits or pre-paid rent are expressly permitted pursuant to the underlying lease documents; provided that, the DIP Liens and any adequate protection liens shall extend to any such security deposits or pre-paid rent upon reversion thereof to the Debtors, if at all.

(b)   Notwithstanding the foregoing, in connection with the Final Order, the DIP Secured Parties reserve the right to seek DIP Liens and adequate protection liens on all leases or other collateral, and/or any additional or related relief at the Final Hearing and in connection with the Final Order.  Any landlords reserve all rights with respect to any such relief sought in the Final Order.  For purposes of this Interim Order, and subject to the terms of the Final Order,  DIP Liens, adequate protection liens, and any other security interests in connection with the DIP Facility shall be junior in priority to any landlord's valid and perfected liens as of the Petition Date (or that were in existence immediately prior to the Petition Date and are properly perfected subsequent to the Petition Date or as permitted by section 546(b) of the Bankruptcy Code).

(c)   Further, notwithstanding anything to the contrary herein, the rights of the DIP Secured Parties and any prepetition agents and lenders under any of the prepetition credit documents to use or occupy any premises subject to a lease of non-residential real property shall be limited to (a) any such rights agreed to in writing by the applicable landlord, (b) any rights of the DIP Secured Parties that are valid and enforceable under applicable non-bankruptcy law, if any, or (c) further order of the Court following notice and a hearing appropriate under the circumstances.

8.     <u>DIP Lien Priority</u>.  The DIP Liens shall be, in all cases, subject to the Carve-Out and the liens permitted under section 8.2 of the Prepetition Legacy Credit Agreement solely to the extent any such liens were valid, non-avoidable, and are properly perfected as of the Petition Date (or were in existence immediately prior to the Petition Date and are properly perfected subsequent to the Petition Date or as permitted by section 546(b) of the Bankruptcy Code) and are senior in priority to the Prepetition Liens ("<u>Senior Permitted Liens</u>"), and have the priority set forth as follows:

(a)   pursuant to section 364(c)(2) of the Bankruptcy Code, by valid, binding, continuing, enforceable, fully perfected first priority liens, mortgages, charges, pledges, assignments by way of security, encumbrances or other security interests (the "<u>Security Interests</u>") in all of the assets of the DIP Obligors' that are not otherwise subject to valid, perfected, non-avoidable and enforceable security interests or liens in existence as of the Petition Date or valid security interests or liens granted prior to (but not perfected until after) the Petition Date (to the extent that such perfection in respect of a prepetition claim is expressly permitted under section 546(b) of the Bankruptcy Code);

(b)   pursuant to section 364(d)(1) of the Bankruptcy Code, by valid, binding, continuing, enforceable, fully perfected super-priority priming Security Interests in all of the assets of the DIP Obligors that are subject to valid, perfected, and enforceable security interests or liens in existence as of the Petition Date or valid security interests or liens granted prior to (but not perfected until after) the Petition Date (to the extent that such perfection in respect of a prepetition claim is expressly permitted under section 546(b) of the Bankruptcy Code), except as set forth in subclause (c) below; and

(c) pursuant to section 364(c)(3) of the Bankruptcy Code, by valid, binding, continuing, enforceable, fully perfected junior-priority Security Interests on those assets securing obligations that are subject to Senior Permitted Liens;

(d) other than as set forth herein (including with respect to the Carve-Out) or permitted under the DIP Documents, the DIP Liens shall not be made subject or subordinate to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to any Successor Case, and/or upon the dismissal or conversion of any of the Chapter 11 Cases or Successor Cases. The DIP Liens shall not be subject to any of sections 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

9. <u>Superpriority Claims</u>. In addition to the DIP Liens granted herein, effective immediately upon entry of this Interim Order, all of the DIP Obligations and all amounts owing by the Borrower and the Guarantors in respect thereof at all times, shall constitute allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject and subordinate only to the payment of the Carve-Out, over all administrative expense claims, adequate protection and other diminution claims, priority and other unsecured claims, and all other claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 503(a), 503(b), 506(c) (subject to the terms of this Interim Order), 507(a), 507(b), 546(c),

546(d), 726, 1113 or 1114 or any other provisions of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual lien, levy, or attachment (the "DIP Superpriority Claims").  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each DIP Obligor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the DIP Obligors and all proceeds thereof, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions.

          10.     <u>Priority of DIP Liens and DIP Superpriority Claims</u>.  Other than as set forth herein or permitted under the DIP Documents, the DIP Liens and the DIP Superpriority Claims: (i) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of this Interim Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552(b) of the Bankruptcy Code; (ii) shall not be subordinate to, or *pari passu* with, (A) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (B) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property; (iii) shall be valid and enforceable against any trustee or any other estate representative elected or appointed in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in a Successor Case, and/or upon the dismissal of any of the Cases; and (iv) notwithstanding anything to the contrary in any First Day Order of this Court in any of the Cases, shall be senior to any administrative claims arising under any such First Day Order; *provided*, however, that the DIP Liens shall be subordinate only to the Carve-Out and Senior Permitted Liens, and the DIP Superpriority Claims shall be subordinate only to the Carve-Out.

11.     No Obligation to Extend Credit.  The DIP Lenders shall have no obligation to make any loan under the DIP Documents unless (and subject to the occurrence of the Closing Date) all of the conditions precedent to the making of such extension of credit under the DIP Documents, this Interim Order and/or the Final Order, as applicable, have been satisfied in full or waived by the DIP Agent (at the direction of the Majority Lenders) in accordance with the terms of the DIP Credit Agreement.

12.     Use of Proceeds of the DIP Facility.

(a)   From and after the Petition Date, the Debtors shall use proceeds of borrowings under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Documents, including to (i) pay fees, interest, and expenses associated with the DIP Facility; (ii) (x) establish the Priming Loan Refinancing Escrow,  (y) fund the Priming Loan Refinancing Escrow Amount; and (z) subject to the PTL Challenge Period, consummate the Priming Loan Refinancing; (iii) consummate the RoW Loan Transactions; (iv) provide for the ongoing working capital and capital expenditure needs of the Debtors during the pendency of the Chapter 11 Cases; (v) fund the First Lien Adequate Protection (as defined below) (including the Prepetition Priming Adequate Protection Payments); and (vi) fund the costs of the administration of the Chapter 11 Cases (including the Carve-Out), in each case subject to the Budget and Variance Limit (as defined in the DIP Documents) and the terms and conditions in this Interim Order and the DIP Documents.

(b)   Except as otherwise specified in the DIP Documents, (i) the proceeds of the DIP Loans, other than with respect to the Priming Loan Refinancing Escrow Amount, when made shall be funded or credited to a non-interest bearing account in the name of the DIP Agent and subject to the sole control of the DIP Agent (the "Funding Account"); and

(ii) the proceeds of the DIP Loans in respect of the Priming Loan Refinancing Escrow Amount shall be funded to the Priming Loan Refinancing Escrow.

(c)    Upon entry of the Interim Order, and subject to satisfaction (or waiver) of the additional conditions precedent (as defined in the DIP Documents), the Interim Amount shall be funded into and credited to the Funding Account; *provided* that, notwithstanding the foregoing, (i) on the Closing Date, (A) $1,000,000,000 of the Interim Amount shall be used to fund the Priming Loan Refinancing Escrow Amount into the Priming Loan Refinancing Escrow, and (B) $271,000,000 of the Interim Amount shall, subject to the terms and conditions of the DIP Documents, be made available to the Debtors to consummate the RoW Loan Transaction, and (ii) up to $100,000,000 may be disbursed to account(s), other than the Funding Account, or directly to one or more payees, in accordance with the terms and conditions of the DIP Documents.

(d)    Upon entry of the Final Order, and subject to satisfaction (or waiver) of the additional conditions precedent (as defined in the DIP Documents) the remaining proceeds of the DIP Loans (the "Final Amount") shall be funded into and credited to the Funding Account (as defined below).

(e)    The Borrower may, subject to conditions set forth in the Interim Order and DIP Documents, withdraw or apply funds from the Funding Account to, as set forth in the DIP Documents, (i) pay one or more disbursements set forth as a line item in the then effective Budget (as defined below) in an amount not to exceed the amount for such line item set forth in the then effective Budget (subject to the Variance Limit), (ii) pay any fees and expenses due to the DIP Lenders or the DIP Agent, or any other professional fees in accordance with the terms of the DIP Documents, (iii) pay an amounts necessary to consummate, or in

connection with effectuating, the RoW Loan Transaction, (iv) to pay amounts necessary to consummate the Priming Loan Refinancing, subject to the PTL Challenge Period, (v) pay fees and expenses incurred by Debtor Professionals (as defined herein), (vi) to pay amounts necessary to establish the Priming Loan Refinancing Escrow or (vii) to pay such other amounts that are due and payable under the DIP Documents. For the avoidance of doubt, the DIP Loans shall be outstanding and accrue interest pursuant to the DIP Documents notwithstanding that the proceeds thereof may be held in the Funding Account

13.     Priming Loan Refinancing Escrow.  The Priming Loan Refinancing Escrow shall be established pursuant to the terms of this Interim Order and the DIP Documents.  The existing DIP Facility shall be amended to accommodate the Priming Loan Refinancing Escrow, subject to the extent the Priming Loan Refinancing Escrow is maintained at the DIP Agent, confirmation by the DIP Agent that as an operational, regulatory and legal matter, it is able to execute the transactions and payments contemplated by the Priming Loan Refinancing Escrow. The funds on the deposit in the Priming Loan Refinancing Escrow: (i) shall not be property of the estate; (ii) shall not be used to fund the Carve-Out or the Funded Reserve Account; (iii) shall be DIP Collateral; and (iv) shall be used only to (x) consummate the Priming Loan Refinancing or (y) repay DIP Obligations to the extent of a Successful Challenge or as ordered by the Court when there are no outstanding DIP Obligations.  On the Closing Date, the Funding Account shall be deemed the Priming Loan Refinancing Escrow (solely with respect to the amounts held therein in the amount of the Priming Loan Refinancing Escrow Amount) until a separate segregated escrow account is established to hold the Priming Loan Refinancing Escrow Amount.   The funds contained in the Priming Loan Refinancing Escrow (other than the Prepetition Adequate Protection Payments) shall constitute DIP Loans and bear interest as provided in the DIP Facility.   Notwithstanding anything to the contrary set forth in the DIP Facility or any related documentation, funds shall be released from the Priming

Loan Refinancing Escrow only following entry of an order of this Court directing such release (the "Release Order").

14. **Adequate Protection for the Prepetition First Lien Secured Parties.** The Prepetition First Lien Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition Collateral, including Cash Collateral, solely to the extent of any Diminution in Value of their interests in the Prepetition Collateral. As adequate protection, the Prepetition First Lien Secured Parties are hereby granted the following (the "First Lien Adequate Protection"):

(a) Prepetition First Lien Adequate Protection Liens. Subject to the Carve-Out, to the extent there is a Diminution in Value of the Prepetition Collateral (including Cash Collateral) from and after the Petition Date to the fullest extent set forth in the Bankruptcy Code and other applicable law ("Diminution in Prepetition First Lien Collateral Value"), the Prepetition First Lien Agents, for the benefit of all the Prepetition First Lien Secured Parties, is hereby granted subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens on and security interests in the DIP Collateral, including, subject to the entry of the Final Order, the proceeds of Avoidance Actions (such adequate protection replacement Liens, the "First Lien AP Liens"), which First Lien AP Liens on such DIP Collateral shall be junior and subordinate only to the Carve-Out, the DIP Liens, and the Senior Permitted Liens. The First Lien AP Liens shall otherwise be senior to all other security interests in or liens on any of the DIP Collateral, and continue to be subject to the prepetition intercreditor arrangements governing the relationship between the prepetition secured parties under the Prepetition Priming Credit Agreement and the Prepetition Legacy Credit Agreement (unless and until the Priming

Loan Refinancing has occurred on the Closing Date). The First Lien AP Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition First Lien Secured Parties and not in substitution therefor.

(b) Prepetition First Lien Adequate Protection Superpriority Claims. Subject only to the Carve-Out and the DIP Superpriority Claim, to the extent of Diminution in Prepetition First Lien Collateral Value, the Prepetition First Lien Secured Parties are hereby further granted an allowed superpriority administrative claim (such adequate protection superpriority claims, the "First Lien AP Superpriority Claim"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in paragraph 34 hereof), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114, or any other provision of the Bankruptcy Code or otherwise, junior only to the Carve-Out and the DIP Superpriority Claims to the extent provided herein and in the DIP Documents, and payable from and having recourse to all prepetition and postpetition property of the Prepetition First Lien Secured Parties and all proceeds thereof (including, subject to entry of the Final Order granting such relief, all proceeds of Avoidance Actions).

(c) Payment and Accrual of Adequate Protection Interest Payments. As additional adequate protection, on and after the Petition Date, (i) current interest (payable in cash and/or payable in cash or in-kind, as provided in the Prepetition Priming Credit Agreement), at the default rate on all Prepetition Priming Facility Obligations (including Prepetition Priming Facility Obligations constituting a make-whole payment), until full

discharge of all Prepetition Priming Facility Obligations (such payments, the "Prepetition Priming Adequate Protection Payments"), which shall be funded to the Priming Loan Refinancing Escrow (and shall constitute Priming Loan Refinancing Amounts), and (ii) interest accruing at the Default Rate (as defined in the Prepetition Legacy Credit Agreement) in accordance with the Prepetition Legacy Credit Agreement for the duration of the Chapter 11 Cases.

(d) <u>Adequate Protection Fees and Expenses</u>.  Following entry of this Interim Order, as adequate protection, the Prepetition Legacy Facility Agent and the Prepetition Priming Facility Agent shall be entitled to reimbursement of its reasonable and documented fees and expenses (including the fees and expenses of one primary counsel, one local counsel in each relevant jurisdiction, and non-legal advisors) regardless of whether such fees and expenses were incurred before or after the commencement of the Chapter 11 Cases, and, to the extent not otherwise paid, the Prepetition Legacy Facility Lenders and the Prepetition Priming Facility Lenders shall be entitled to reimbursement of their reasonable and documented fees and expenses (including the fees and expenses of one primary counsel, one local counsel in each relevant jurisdiction, and non-legal advisors) regardless of whether such fees and expenses were incurred before or after the commencement of the Chapter 11 Cases.

(e) <u>Information</u>.  The Debtors shall concurrently deliver to the Prepetition First Lien Secured Parties all information, reports, documents, and other materials that the Debtors provide to the DIP Agent and the DIP Lenders pursuant to the DIP Documents, this Interim Order, and the Final Order.

(f) <u>Adequate Protection Reservation</u>.  Subject to the Carve-Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the

event that the adequate protection provided to the Prepetition First Lien Secured Parties hereunder is insufficient to compensate for any Diminution in Prepetition First Lien Collateral Value during the Chapter 11 Cases or any Successor Cases. The receipt by the Prepetition First Lien Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition First Lien Secured Parties are adequately protected. Further, this Interim Order shall not prejudice or limit the rights of the Prepetition First Lien Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

(g) Nothing in this Interim Order or the other DIP Documents shall (i) be construed as the affirmative consent by any of the Prepetition First Lien Secured Parties to the use of Cash Collateral other than on the terms set forth in this Interim Order and solely in the context of the DIP Financing authorized by this Interim Order, (ii) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) other than as contemplated by this Interim Order, or (iii) prejudice, limit, or otherwise impair the rights of any of the Prepetition First Lien Secured Parties, upon a change in circumstances to seek new, different, or additional adequate protection or assert the interests of any of the Prepetition First Lien Secured Parties, and the rights of any other party in interest, including the DIP Loan Parties and the DIP Secured Parties, to object to such relief are hereby preserved.

15. Budget.

(a) The Debtors shall use the proceeds of all borrowings under the DIP Facility and Cash Collateral in a manner consistent with the Budget (subject to the Variance Limit and the Financial Covenant (both as defined below)), the DIP Documents and this Interim

Order. The Budget annexed hereto as **<u>Schedule 1</u>** shall constitute the initial Budget ("<u>Initial Budget</u>") that reflects on a line-item basis the Debtors' (i) weekly projected cash receipts (including from non-ordinary course assets sales) ("<u>Receipts</u>"), (ii) weekly projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses under the Cases (including the estimated fees and expenses of the advisors to any parties to the Cases paid by the Debtors), capital expenditures, issuances of any letter of credit, including the fees relating thereto, and any other fees and expenses relating to the DIP Facility) ("<u>Disbursements</u>"), and (iii) all other information reasonably requested by the DIP Agent and/or the DIP Lenders.

(b) Commencing on the fourth full calendar week following the week in which the Petition Date occurs and on each Thursday (or, if such Thursday is not a business day, the immediately succeeding business day) of each fourth calendar week thereafter (each, a "<u>Reporting Date</u>" and such four-week period, the "<u>Reporting Period</u>"), the Debtors will provide to the DIP Secured Parties and Houlihan Lokey, Inc. ("<u>Houlihan Lokey</u>"), as advisor to the Majority Lenders, a thirteen (13)-week cash flow forecast, containing line items of sufficient detail to reflect the Debtors' (i) Receipts; (ii) Disbursements; and (iii) all other information reasonably requested by the DIP Agent and/or the Majority Lenders, or Houlihan Lokey as advisor to the Majority Lenders, on their behalf, in each case, in form and substance reasonably satisfactory to the Majority Lenders (the "<u>Budget</u>"); *provided* that, if the Majority Lenders, or Houlihan Lokey, as advisor to the Majority Lenders, on their behalf do not object to the Budget within five (5) business days of delivery, the Budget delivered shall govern for the remainder of the 13-week period covered by such Budget.]

(c)    By not later than 5:00 p.m. Eastern Time on the Thursday (or, if such Thursday is not a business day, the immediately succeeding business day) of the fourth full calendar week after the Petition Date, and thereafter by not later than 5:00 p.m. Eastern Time on the Thursday (or, if such Thursday is not a business day, the immediately succeeding business day) of every second week thereafter, the Debtors will provide to the DIP Agent a variance report for the immediately preceding four-week period then ended (each such period, a "Testing Period" and each such report, a "Variance Testing Report"), in form and substance reasonably satisfactory to the DIP Agent and the Majority Lenders, detailing the following: (i) the aggregate disbursements of the Debtors and aggregate receipts during the applicable Testing Period; and (ii) any variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements made during such Testing Period by the Debtors against the aggregate disbursements for the Testing Period, as set forth in the applicable Budget (excluding disbursements in respect of professional fees incurred in the Chapter 11 Cases by the Debtors during such Testing Period).

(d)    Starting with the first full Testing Period, and for any Testing Period thereafter, the Debtors shall not allow the aggregate disbursements (excluding disbursements in respect of professional fees incurred in the Chapter 11 Cases by the Debtors, as well as the establishment of the Priming Loan Refinancing Escrow, Priming Loan Refinancing and the RoW Debt Purchase Price,  during such Testing Period) made by the Debtors during such Testing Period to be greater than 113.75% of the aggregate disbursements for the Debtors set forth in the Budget for such Testing Period (the "Variance Limit"); *provided*, that the Debtors may carry forward budgeted but unused disbursements set forth in the Budget for a Testing Period for use during only the immediately succeeding four calendar weeks and, to the extent

43

that the Majority Lenders do not approve the Budget, any subsequent weeks until the Budget has been approved. Additional variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the reasonable written consent of the Majority Lenders, or Houlihan Lokey as advisors and on behalf of the Majority Lenders; *provided*, that if the Majority Lenders, or Houlihan Lokey, Inc., as advisors to the Majority Lenders, on their behalf, do not object to the proposed changes from the Budget within five (5) business days of delivery, the changes from the Budget delivered shall govern for such Reporting Period. For the avoidance of doubt, any reference to "written consent" hereunder shall include consent granted by email.

(e) Until the DIP Obligations are Paid in Full, the Debtors shall strictly perform in accordance with the Budget, subject to the Variance Limit, and subject to the following covenant (the "Financial Covenant"):

> As of the last Business Day of each calendar week, the total amount of unrestricted cash held by the Debtors that are DIP Obligors (excluding, for the avoidance of doubt, any cash held by the obligors on the RoW Credit Facility) ("Liquidity") shall be at least $30 million (the "Liquidity Requirement"); it being agreed that (i) any cash that is used to the fund the Carve Out, the Funded Reserve Account, the Priming Loan Refinancing Escrow Amount, or the Priming Loan Refinancing Escrow shall not be included as Liquidity for purposes of any calculation of the Liquidity Requirement and (ii) all cash held in the Funding Account (other than the Priming Loan Refinancing Amount) shall be included as Liquidity for purposes of the Liquidity Requirement, except that until the later of (x) the date the Additional Final Amount Conditions are satisfied and (y) January 1, 2023, no portion of the Final Amount that is held in the Funding Account shall be included as Liquidity for purposes of the any calculation of the Liquidity Requirement.

Notwithstanding anything to the contrary in this Interim Order, the professional fees, costs, and expenses of the DIP Agent's advisors, the DIP Lender's advisors, the Prepetition Legacy Facility Agent's advisors, the Prepetition Legacy Facility Lender's advisors, the Prepetition Priming Facility Agent's advisors, and the Prepetition Priming Facility Lender's advisors shall be due, payable, and paid in accordance with the terms of this Interim Order notwithstanding any budgeted

amounts for such fees, costs, and expenses set forth in the Budget, and the Debtors shall not be deemed to have breached the terms of the Budget or the Financial Covenant to the extent the actual amount of such fees, costs, and expenses exceed the applicable budgeted amounts as set forth in the Budget.

16.     <u>Modification of Automatic Stay</u>.  The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (i) permit the Debtors to grant the DIP Liens, First Lien AP Liens, DIP Superpriority Claims, and First Lien AP Superpriority Claims; (ii) permit the Debtors to perform such acts as the DIP Agent, the other DIP Secured Parties, or the Prepetition First Lien Agents each may reasonably request to assure the perfection and priority of the liens granted herein; (iii) permit the Debtors to incur all liabilities and obligations to the DIP Agent, the other DIP Secured Parties, and the Prepetition First Lien Secured Parties under the DIP Documents, the DIP Facility and this Interim Order, as applicable; (iv) authorize the Debtors to pay, and the DIP Agent, the other DIP Secured Parties, and the Prepetition First Lien Secured Parties to retain, disburse and/or apply, payments made in accordance with the terms of this Interim Order; and (v) otherwise to the extent necessary to implement and effectuate the provisions of this Interim Order and the DIP Documents.

17.     <u>Cash Management</u>. No pledged bank account will be closed during the Chapter 11 Cases without the prior consent of the applicable secured parties and nothing in this Interim Order or the Final Order will alter or impair any security interest or perfection thereof that existed as of the Petition Date or that arises after the Petition Date.  The Debtors' cash management system, as approved by an interim or final order of this Court (such interim or final order of this Court (such interim or final order, as applicable, the "<u>Cash Management Orders</u>") shall at all times

be maintained (i) in accordance with the terms of the DIP Documents and the Cash Management Order and (ii) in a manner which in any event shall be reasonably satisfactory to the DIP Agent and the Required DIP Lenders. The Debtors shall not transfer any funds (including, without limitation, any proceeds of the DIP Facility, the DIP Collateral or any Cash Collateral) to any of the Debtors' non-Debtor affiliates during the Chapter 11 Cases, except as permitted under the DIP Credit Agreement and the terms of the Cash Management Order. The DIP Agent shall be deemed to have "control" over all cash management accounts for all purposes of perfection under the Uniform Commercial Code.

18.    Automatic Perfection of DIP Liens and Adequate Protection Liens.

(a)    This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens and the First Lien AP Liens without the necessity of (i) filing, execution, or recording any financing statement, deed of trust, mortgage, security agreement, pledge agreement, control agreement, or other instrument or document that may otherwise be required under the law of any jurisdiction, obtaining "control" (as defined in any applicable Uniform Commercial Code or other law) over any DIP Collateral, and the DIP Agent, shall be deemed, without any further action, to have control over all the DIP Obligors' deposit accounts, securities accounts, and commodities accounts (within the meaning of such Uniform Commercial Code and other law); (ii) taking any other action to validate or perfect the DIP Liens and the First Lien AP Liens or to entitle the DIP Liens and the First Lien AP Liens to the priorities granted herein; or (iii) the filing or recording any financing statement, deed of trust, mortgage, security agreement, pledge agreement, control agreement, or other instrument or document with  respect to security interests in any jurisdiction outside of the

46

United States in assets located in, titled or arising or protected under the laws of a jurisdiction outside of the United States.

(b) Notwithstanding the foregoing, each of the DIP Agent and Prepetition First Lien Agents (in the latter case, solely with respect to such First Lien AP Liens) may, each in their sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of Liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been entered into, filed, or recorded as of the Petition Date. The applicable Debtors shall execute and deliver to the DIP Agent's and/or the Prepetition First Lien Agents, as applicable, all such financing statements, mortgages, notices, and other documents as such parties may reasonably request to evidence and confirm the contemplated validity, perfection, and priority of the DIP Liens and the First Lien AP Liens, as applicable, granted pursuant hereto. Without limiting the foregoing, each of the DIP Agent's and each holder of First Lien AP Liens (in the latter case, solely with respect to such First Lien AP Liens) may, in its discretion, file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction (whether or not located in the United States) in which any Debtor has real or personal property. Subject to the entry of the Final Order, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of any fees or other monetary obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or

leasehold interest or the proceeds thereof or other DIP Collateral is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Secured Parties in accordance with the terms of the DIP Documents and this Interim Order or in favor of the Prepetition First Lien Secured Parties in accordance with this Interim Order. The rights of the Debtors' landlords to object to such relief in the Final Order are fully reserved. To the extent that the Prepetition First Lien Agents or any other Prepetition First Lien Secured Party is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, financing statement, or account control agreements, listed as loss payee or additional insured under any of the Debtors' insurance policies, or is the secured party under any of the Prepetition First Lien Loan Documents, the DIP Agent shall also be deemed to be the secured party under such account control agreements, loss payee or additional insured under the Debtors' insurance policies, and the secured party under each Prepetition First Lien Loan Document, shall have all rights and powers attendant to that position (including rights of enforcement); *provided, however*, that the relative rights, obligations, claims and liens of the DIP Secured Parties and the Prepetition First Lien Secured Parties with respect to the foregoing DIP Collateral and proceeds thereof shall be as set forth in the DIP Documents and such parties shall act in accordance therewith. The Prepetition First Lien Agents shall serve as agent for the DIP Agent for purposes of perfecting the applicable DIP Agent's Liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a Lien therein may be accomplished only by possession or control by a secured party.

(c)   Subject to the terms of the DIP Documents (including the Guaranty and Security Principles), the DIP Agent or the DIP Lenders may require the DIP Loan Parties to enter into non-U.S. security documentation with respect to such DIP Collateral owned by non-U.S. DIP Loan Parties or located in non-U.S. jurisdictions, and each DIP Loan Party and its respective officers are authorized and directed to execute, file and record any documents or instruments as the DIP Agent or the DIP Lenders may reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

19.   <u>Protections of Rights of DIP Agent and DIP Secured Parties.</u>

(a)   Unless the DIP Agent, at the direction of the Majority Lenders, shall have provided its prior written consent, or all DIP Obligations have been Paid in Full, it shall be an Event of Default if there shall be entered in any of these Chapter 11 Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation), or the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases seek entry of any order, that authorizes any of the following (unless such order provides for the DIP Obligations to simultaneously be Paid in Full): (i) the obtaining of credit or the incurring of indebtedness pursuant to sections 364(b), 364(c), 364(d) of the Bankruptcy Code that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or that is entitled to administrative priority status, in each such case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, and/or the other DIP Protections, except as expressly set forth in this Interim Order or the DIP Documents, (ii) the use of Cash Collateral for any purpose other than to fund the Carve-Out or in a manner

consistent with the Budget (subject to the Variance Limit), the DIP Documents and this Interim Order, or (iii) except as provided for herein, any modification of the DIP Agent's or any DIP Secured Party's rights under this Interim Order, or the DIP Documents with respect any DIP Obligations. In the event that credit is obtained or debt is incurred in accordance with the foregoing clause (i) and in violation of the DIP Documents or this Interim Order, all the cash proceeds derived from such credit or debt shall immediately be applied to repay Outstanding DIP Obligations and all outstanding DIP Commitments, if any, shall automatically terminate.

(b)   The Debtors will, whether or not the DIP Obligations have been Paid in Full, (i) maintain books, records, and accounts to the extent and as required by the DIP Documents and the Prepetition Documents; (ii) reasonably cooperate with, consult with, and provide to the DIP Agent and the other DIP Secured Parties all such information and documents that any or all of the Debtors are obligated (including upon reasonable request by any of the DIP Agent or any other DIP Secured Parties) to provide under the DIP Documents, the Prepetition First Lien Loan Documents, or the provisions of this Interim Order; (iii) upon reasonable request, authorize their independent certified public accountants, financial advisors, investment bankers, and consultants, to cooperate and consult with the DIP Agent or any other DIP Secured Parties and their advisors; (iv) upon reasonable advance notice, permit consultants, advisors, and other representatives (including third party representatives) of the DIP Agent or any other DIP Secured Parties reasonable access to any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional

50

advisors (other than legal counsel); and (v) upon reasonable advance notice and during normal business hours, permit the DIP Agent, DIP Lenders, or any of the advisors of the foregoing previously disclosed to the Debtors, to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations, and assets. Notwithstanding anything to the contrary contained herein, the Debtors do not, and shall not be required to, waive any right to attorney-client, work product, or similar privilege. The Debtors shall not be required to provide the DIP Agent or any other DIP Secured Parties or their respective counsel and financial advisors with any information subject to, or over which any Debtor in good faith asserts, attorney-client privilege or legal professional privilege or consisting of attorney work product.

20.    <u>Credit Bidding</u>.  In connection with any sale process authorized by the Court, whether effectuated through sections 363, 725 or 1123 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code, (i) subject to and upon entry of this Interim Order, the DIP Agent (at the direction of the Required DIP Lenders), for the benefit of the DIP Secured Parties, shall have the right to credit bid the full amount of the DIP Obligations, and (ii) subject to and upon entry of the Final Order, the Prepetition First Lien Agents, for the benefit of the First Lien Secured Parties, in each case, shall have the right to credit bid all or any portion of its claims and shall not be prohibited or limited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code.

21.    <u>Maintenance of DIP Collateral</u>.  Until the DIP Obligations are Paid in Full, the Debtors shall (a) insure the DIP Collateral as required under the DIP Documents and the applicable Prepetition First Lien Loan Documents; (b) maintain the cash management system in effect as of the Petition Date, as modified by the Cash Management Orders; and (c)(i) maintain

accurate records of all transfers (including intercompany transactions) within the cash management system so that all postpetition transfers and transactions shall be adequately and promptly documented in, and readily ascertainable from, their books and records, to the same extent maintained by the Debtors before the Petition Date, and (ii) provide reasonable access to such records to the DIP Agent, the other DIP Secured Parties, and their advisors.

22.     Disposition of DIP Collateral.  Except as otherwise provided for in the DIP Documents, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral other than in the ordinary course of business without the prior written consent of the DIP Agent (at the direction of the Majority Lenders) and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent or any other DIP Secured Parties.

23.     [Reserve]

24.     [Reserve]

25.    Rights and Remedies Upon Event of Default.

(a)    Without requiring further order from the Court and without the need for filing any motion (except as expressly required by this paragraph 24) for relief from the automatic stay or any other pleading, immediately upon the date of delivery of a written notice (with a copy filed with the Court) (a "Default Notice," and the date of delivery of such Default Notice, the "DIP Termination Date") by the DIP Agent (acting at the direction of the Majority Lenders) to the Debtors, any Creditors' Committee, and the U.S. Trustee on the occurrence of an Event of Default (the "Event of Default Occurrence"), the automatic stay shall terminate solely to the extent necessary for one or more (without limitation) of the following to occur to the extent elected by the DIP Agent (acting at the direction of the Majority Lenders): (a) the Debtors' authority to use Cash Collateral shall immediately terminate (subject only to the Carve-Out and except as set forth in this paragraph 24); (b) the DIP Obligations shall (subject only to the Carve-Out) be immediately accelerated and due and payable for all purposes, rights, and remedies, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtors; (c) the termination, reduction, or restriction of any further DIP Commitments to the extent any DIP Commitments remain outstanding; (d) the DIP Facility shall be terminated with respect to any future liability or obligation of the DIP Secured Parties, but, for the avoidance of doubt, without affecting any of the DIP Liens, the DIP Superpriority Claims or the DIP Obligations; (e) any and all obligations of the DIP Lenders in connection with the DIP Facility and the Prepetition Secured Parties with respect to Cash Collateral under this Interim Order and the DIP Documents, as applicable, shall immediately terminate, (f) the application of the Carve-Out through the delivery of the Carve-Out Trigger Notice; and (g) the exercise of any other right or remedy with respect to the DIP Collateral or the DIP Liens

permitted under the DIP Documents or the Prepetition Collateral or the Prepetition Liens permitted under the Prepetition Documents; *provided*, however that (i) in the case of the termination of the use of Cash Collateral pursuant to clause (a) above, unless, in the case of an Event of Default Occurrence is cured by the Debtors, as determined by the Majority Lenders, prior to the expiration of five (5) Business Days following the Termination Date (the "<u>Default Notice Period</u>"), and (ii) in the case of the enforcement of DIP Liens or Prepetition Liens or other remedies with respect to the DIP Collateral or Prepetition Collateral pursuant to clause (g) above, the DIP Agent (acting at the direction of the Majority Lenders), shall first file a motion (the "<u>Stay Relief Motion</u>") with the Court seeking emergency relief from the automatic stay to exercise such remedies on at least five (5) Business Days' written notice (the "<u>Remedies Notice Period</u>") to the Debtors, the Creditors' Committee, and the U.S. Trustee seeking an emergency hearing before the Court (a "<u>Stay Relief Hearing</u>") and the Debtors agree not to object to the shortening of notice of such Stay Relief Hearing.

(b)   At a Stay Relief Hearing the Court may consider whether an Event of Default Occurrence has occurred and any other appropriate relief and may fashion an appropriate remedy; *provided*, that the Debtors and the Committee (if any) may seek an emergency hearing before the Court, and must provide prompt notice of such hearing to primary counsel to each of the DIP Lenders, to contest whether an Event of Default has occurred and to seek non-consensual use of Cash Collateral; *provided*, *further*, that the Debtors shall be entitled to continue to use Cash Collateral in accordance with the terms of this Interim Order and the DIP Documents during any Default Notice Period or Remedies Notice Period only to make payroll and fund critical expenses necessary to preserve the Prepetition Collateral, in each case in accordance with the terms of the Budget and this Interim Order, but shall not be permitted to

use Cash Collateral following any Default Notice Period absent further order of the Court. Notwithstanding the foregoing, and irrespective of the Default Notice Period or Remedies Notice Period, the DIP Lenders shall not be obligated to provide any DIP Loans or advances at any time an Event of Default has occurred and is continuing. Notwithstanding the occurrence of an Event of Default and/or termination of the DIP Commitments, all of the rights, remedies, benefits, and protections provided to the DIP Agent, the DIP Lenders, and the Prepetition First Lien Secured Parties, as applicable, under the DIP Documents and this Interim Order shall survive.

26.   <u>Carve-Out</u>.

(i)   <u>Carve Out</u>.  As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $150,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate

amount not to exceed $12,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(ii)    Funded Reserve Account.  The Debtors shall establish and fund a segregated account (the "Funded Reserve Account") for purpose of holding funds in trust for the Professional Persons to the extent, and for the further payment, of such Professional Persons' Allowed Professional Fees and for the purposes of funding the Carve-Out.  The Funded Reserve Account will be funded first, from identifiable proceeds of any DIP Collateral, and, solely to the extent that the amount of the identifiable proceeds of any DIP Collateral is insufficient to fund the Funded Reserve Account, the proceeds of the DIP Loans transferred directly from the Funding Account (as defined in the DIP Credit Agreement), excluding, for the avoidance of doubt, any amounts held in the Priming Loan Refinancing Escrow.  Notwithstanding anything to the contrary in this Interim Order, the DIP Documents, or the Prepetition First Lien Credit Documents, in no circumstances (which, for the avoidance of doubt, includes, but is not limited to, an Event of Default or a termination of the DIP Credit Agreement or DIP Documents) shall the Debtors be prohibited in any way from accessing or drawing upon the Funding Account for the purpose of funding the Funded Reserve Account in accordance with this paragraph 25; *provided*, *however*,

that the funds remaining in the Funded Reserve Account after payment, in full, of all Allowed Professional Fees, shall be deemed DIP Collateral, subject to the Carve-Out (and, for the avoidance of doubt, may be used to fund the Carve-Out), *provided, however*, that the funds remaining in the Funded Reserve Account after payment, in full, of all Allowed Professional Fees, shall be deemed DIP Collateral, subject to the Carve-Out.

(iii)     Subject to entry of this Interim Order, commencing on October 1, 2022 (or the first business day thereafter), the Debtors shall deposit into the Funded Reserve Account an amount equal to the aggregate amount of accrued professional fees and expenses from the Petition Date through September 30, 2022 (the "Initial Period") that are projected to be Allowed Professional Fees (which shall exclude restructuring, sale, financing, or other success fees) (the "Initial Funded Reserve Amount").  Commencing on November 1, 2022 (or the first business day thereafter), and continuing on the first business day of each month thereafter, the Debtors shall deposit in the Funded Reserve Account an amount equal to the aggregate amount of accrued professional fees and expenses in the prior month that are projected to be Allowed Professional Fees (the "Monthly Funded Reserve Amount").  By no later than the 15th of each month, starting in October 2022 (or such other date that may be established in any order authorizing professional compensation procedures), each Professional Person shall deliver to the Debtors a notice  of the cumulative total amount of actual fees and expenses incurred in the preceding month ("Actual Accrued Prior Month's Fees and Expenses") (each such statement, a "Fee Statement") for which such Professional Person has or will seek payment as Allowed Professional Fees.  To the extent the amount of Actual Accrued Prior Month's Fees and Expenses exceeds the Initial Funded Reserve Amount (for the Initial Period) or the Monthly Funded Reserve Amount (for each month subsequent to the Initial Period), and such fees and expenses have

otherwise not been paid by the Debtors, the Debtors shall, within one (1) business day after receipt of any such Fee Statement, fund additional amounts into the Funded Reserve Account equal to the difference between the Initial Funded Reserve Amount or the Monthly Funded Reserve Amount, as applicable, and the Actual Accrued Prior Month's Fees and Expenses (each, a "Top Off Amount").  For any Professional Person, to the extent fees and expenses, projected to be Allowed Professional Fees, do not become Allowed Professional Fees, or the Monthly Funded Reserve Amount exceeds the Actual Accrued Prior Month's Fees and Expenses, such Professional Person's Monthly Funded Reserve Amount for the following month shall be reduced accordingly.

(iv)     The Funded Reserve Account shall be maintained, and the funds therein (the "Funded Reserve Amount") shall be held in trust, for the benefit of Professional Persons.  Any and all amounts in the Funded Reserve Account shall not be subject to any cash sweep and/or foreclosure provisions in the Prepetition First Lien Credit Documents or the DIP Documents, and neither the Prepetition Secured Parties nor the DIP Secured Parties shall be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary in the Prepetition First Lien Credit Documents or the DIP Documents.  Notwithstanding the foregoing, any and all payments to Professional Persons shall be paid first from the Funded Reserve Account.

(v)     Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date, including cash in the Funded Reserve Account but, for the avoidance of doubt, excluding all amounts held in the Priming  Loan Refinancing Escrow Amount, and any available cash thereafter held by any Debtor to fund a

reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap . The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been

terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in the DIP Documents, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 25, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 25, prior to making any payments to the DIP Agent or the Prepetition Secured Parties, as applicable. Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition Secured Parties shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or in any Prepetition Secured Facilities, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the 507(b) Claim, and any

and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Obligations.

(vi)     <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(vii)     <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(viii)     <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

(ix)     <u>Priming Loan Refinancing Escrow Amount</u>.  Notwithstanding anything herein to the contrary, no funds related to the Priming Loan Refinancing Escrow Amount shall be used to fund the Carve-Out or for any purpose other than the Priming Loan Refinancing

or repayment of DIP Obligations and payment of Prepetition Priming Adequate Protection Payments to the Prepetition Priming Facility Lenders.

        27.    <u>Limitations on Use of DIP Proceeds, Cash Collateral, and Carve-Out</u>.  No proceeds of the DIP Facility, the Carve-Out, or any Cash Collateral may be used by the DIP Loan Parties or any other party in interest, or their representatives, to (or support any other party to) (i) finance any investigation (including discovery proceedings), initiation or prosecution of any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the DIP Agent or the DIP Lenders, the Prepetition First Lien Agents or the Prepetition First Lien Lenders, or their respective rights and remedies under or in respect of the DIP Facility, the credit facilities provided under the Prepetition First Lien Credit Agreements or any interim or final order with respect to the DIP Facility and the adequate protection granted to the Prepetition First Lien Agent and Prepetition First Lien Lenders, except as otherwise provided in the DIP Documents, (ii) in connection with challenging, invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating (other than to the Carve-Out), in whole or in part, or taking or attempting to take any other action to render unenforceable, the liens, claims, interests and adequate protection of the DIP Agent and the DIP Lenders or the Prepetition First Lien Agent or Prepetition First Lien Lenders, including for the avoidance of doubt, (a) objecting to or contesting the validity, extent, amount, perfection, priority, or enforceability of the obligations under the DIP Facility or the Liens securing the obligations under the DIP Facility, or (b) objecting to or contesting the validity, extent, amount, perfection, priority, or enforceability of the obligations and liens under credit facilities provided under the Prepetition First Lien Credit Agreements, (iii) for any purpose that is prohibited under the Bankruptcy Code, the Interim Order, the Final Order, or the DIP Documents, and (iv) to make any payment in settlement of any claim, action or proceeding,

before any court, arbitrator or other governmental body, which payment is not provided for in the Budget, without the prior written consent of the Majority Lenders; *provided*, *however*, that the Debtors shall not be precluded from using Cash Collateral and/or proceeds from DIP Loans to contest whether an Event of Default has occurred and is continuing under the DIP Documents, and/or prepare for and participate at any hearing held by the Bankruptcy Court regarding any exercise of rights or remedies under the DIP Documents; *provided*, *further*, that up to $150,000 (the "Investigation Budget Amount") shall be made available to the Creditors' Committee (if any) solely for investigation costs to pursue any investigation rights during the Challenge Period. For the avoidance of doubt, and notwithstanding anything to the contrary contained herein, nothing in this Interim Order shall in any way prejudice the rights of professionals retained by the Committee to apply for and receive compensation pursuant to sections 327, 330, 331, 503, and 1103 of the Bankruptcy Code; *provided* that the Debtors and the DIP Secured Parties reserve any and all rights to object to fee applications filed by Committee Professionals. For the avoidance of doubt, and notwithstanding anything to the contrary contained herein, nothing in this Interim Order shall in any way prejudice the rights of professionals retained by the Committee to apply for and receive compensation pursuant to Sections 327, 330, 331, 503, and 1103 of the Bankruptcy Code.

28. Participation in DIP Term Facility. Each Prepetition Legacy Facility Lender will have the opportunity to participate in the DIP Facility on a *pro rata* basis (based on such Prepetition Legacy Facility Lender's amount of Prepetition Legacy Loans relative to the aggregate amount of all loans outstanding under the Prepetition Legacy Credit Agreement), following the Closing Date. The obligations with respect to the DIP Facility will be evidenced by and be subject to the DIP Credit Agreement and this Interim Order and the Final Order, as applicable. Each Prepetition Legacy Facility Lenders' ability to participate may be limited by and

is subject to applicable securities law and otherwise applicable law.  No material changes to the structure of the DIP Facility will be made to accommodate any Prepetition Legacy Facility Lenders.  Any Prepetition Legacy Facility Lender that, or has an affiliate or related fund that objects or has objected to all or any portion of the DIP Facility will not be entitled to participate in the DIP Facility.  If Prepetition Legacy Facility Lenders wish to participate in the DIP Term Facility, they must contact counsel to the DIP Lenders by the time subsequently ordered by the Court and shall be sent to the following e-mail address:  xCineworldDIP@arnoldporter.com.

29.  <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, waived, or vacated by a subsequent order of this Court or any other court of competent jurisdiction, each of the DIP Agent, the other DIP Secured Parties, and the Prepetition First Lien Secured Parties are entitled to the full protections provided in section 364(e) of the Bankruptcy Code.  Any such modification, amendment, waiver or vacatur shall not affect the validity and enforceability of any advances previously made, including advances made hereunder, or any lien, claim, or priority authorized or created hereby, unless such authorization and the incurring of such debt, or the granting of such priority lien, is stayed pending appeal and the DIP Secured Parties had actual knowledge of such stay.  Notwithstanding any such modification, amendment or vacatur, any claim granted to the DIP Secured Parties hereunder arising prior to the effective date of such modification, amendment or vacatur of any DIP Liens or of the DIP Superpriority Claims granted to or for the benefit of the DIP Secured Parties shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties shall be entitled to all of the rights,

remedies, privileges and benefits, including the DIP Liens and the DIP Superpriority Claims granted herein, with respect to any such claim. Because the DIP Loans are made in reliance on this Interim Order, the DIP Obligations incurred by the Debtors and any other DIP Loan Parties or owed to the DIP Secured Parties prior to the effective date of any stay, modification or vacatur of this Interim Order shall not, as a result of any subsequent order in the Chapter 11 Cases or in any Successor Case, be disallowed or subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Secured Parties under this Interim Order.

30.    <u>Payment of Fees and Expenses</u>.  The Debtors shall pay all reasonable and documented fees and out-of-pocket expenses of each of the DIP Agent and the other DIP Secured Parties, whether incurred before or after the Petition Date or in connection with the Chapter 11 Cases (in any capacity) and the DIP Facility, including the reasonable and documented out-of-pocket expenses of the DIP Agent and the other DIP Secured Parties associated with the DIP Facility, the Debtors, these Chapter 11 Cases and the transactions contemplated thereby and therein. Other than in connection with fees and expenses payable as a condition to the occurrence of the Closing Date, any time that professionals of any of the DIP Agent or the other DIP Secured Parties seek payment of fees and expenses from the Debtors, such professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work-product doctrine) by electronic mail to the U.S. Trustee and counsel to the Creditors' Committee

(if appointed) contemporaneously with the delivery of such fee and expense statements to the Debtors. The Debtors, any Creditors' Committee, or the U.S. Trustee may dispute the payment of any portion of such invoiced fees and expenses (the "Disputed Invoiced Fees") if a Debtor, any Creditors' Committee that may be appointed in these Chapter 11 Cases, or the U.S. Trustee notifies the submitting party in writing, within five (5) days of the receipt of such fee and expense statement or invoice, setting forth the specific objections to the Disputed Invoiced Fees (to be followed by the filing with the Court, if necessary, of a motion or other pleading, with at least twenty-one (21) days prior written notice to the submitting party of any hearing on such motion or other pleading). The Debtors shall promptly pay in full all such invoiced fees and expenses other than the Disputed Invoiced Fees. Notwithstanding the foregoing, the Debtors shall pay on or about the Closing Date all reasonable and documented fees, costs, and out-of-pocket expenses of each of the DIP Agent and the other DIP Secured Parties incurred on or prior to such date without the need for any professional engaged by any of the DIP Agent or the other DIP Secured Parties to first deliver a copy of its invoice as provided for herein (other than to the Debtors). No attorney or advisor to any of the DIP Agent or the other DIP Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court. Any and all fees, costs and expenses paid prior to the Petition Date by any of the Debtors to the DIP Agent or the other DIP Secured Parties in connection with the DIP Facility are hereby approved in full.

31.     Proofs of Claim. The DIP Agent, the other DIP Secured Parties, and the Prepetition First Lien Secured Parties will not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim allowed herein, including any claims arising under the Prepetition Documents. The Debtors' Stipulations and Releases shall be deemed to constitute a timely filed proof of claim for the DIP Agent, the other DIP Secured Parties, and the

Prepetition First Lien Secured Parties upon approval of this Interim Order, and the DIP Agent, the other DIP Secured Parties, and the Prepetition First Lien Secured Parties shall be treated under section 502(a) of the Bankruptcy Code as if they filed a proof of claim. However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce any unnecessary expense to the Debtors' estates, the Prepetition First Lien Agents are each authorized (but not directed), in their sole discretions, to file in the Debtors' lead Chapter 11 Case *In re Cineworld Group, plc*, Case No. 22-90168, a master proof of claim on behalf of their respective Prepetition First Lien Secured Parties on account of any and all of their respective claims arising under their Prepetition Documents and hereunder (as applicable) (each, a "Master Proof of Claim") against each of the applicable Debtors. Upon the filing of any such Master Proof of Claim, the Prepetition First Lien Agents (and Prepetition First Lien Secured Party, as applicable) shall be deemed to have filed a proof of claim in each of the Chapter 11 Cases of the applicable Prepetition Loan Parties. The Master Proofs of Claim shall not be required to attach any instruments, agreements, or other documents evidencing the obligations owing to the applicable Prepetition First Lien Secured Parties. Any proof of claim filed by any of the Prepetition First Lien Agents shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition First Lien Secured Parties. Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation administrative claims) in any of the Chapter 11 Cases or any Successor Cases shall not apply to (i) the DIP Agent or the other DIP Secured Parties, or (ii) the Prepetition First Lien Secured Parties with respect to any claims arising under the Prepetition First Lien Loan Documents.

32.     Effect of Stipulations on Third Parties.

(a)  *Generally*.  The Debtors' Stipulations and Releases, admissions, agreements, and releases contained in this Interim Order, including, without limitations paragraph F, G, and H hereof, shall be binding on the Debtors in all circumstances and for all purposes.  The Debtors' Stipulations and Releases shall be binding upon the Debtors' estates and each party in interest (other than the Debtors), including the Creditors' Committee (if any) and any chapter 11 trustee (or if the Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (defined below), the chapter 7 trustee in such Successor Case), except to the extent and only to the extent such party in interest with standing *first*, commences, in the case of such adversary proceeding or other contested matter filed by a party in interest with required standing (including the Creditors' Committee (if any)), by the date that shall be (i) except as to any official committee appointed in these chapter 11 cases, sixty (60) days after entry of the Interim Order, and (ii) in the case of any official committee appointed in these chapter 11 cases, sixty (60) days after such appointment; and (iii) in the event that (x) the cases convert to chapter 7, or (y) a chapter 11 trustee is appointed, in each case, prior to the expiration of the Challenge Period, then, in each such case, the Challenge Period shall be extended for a period of sixty (60) days solely with respect to any such trustee (such time period established by the earlier of clauses (i), (ii), and (iii) as applicable, the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (defined below) is raised during the Challenge Period or (ii) with respect only to those parties who file a Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "Challenge Period Termination Date"), a contested matter or adversary proceeding challenging or otherwise objecting to the admissions,

stipulations, findings, or releases included in the Debtors' Stipulations and Releases (collectively, the "Challenges" and, each individually, a "Challenge"), and *second*, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "Successful Challenge"); *provided*, that any pleadings filed in any Challenge proceeding shall set forth with specificity the basis for such Challenge (and any Challenges not so specified prior to the Challenge Period Termination Date shall be deemed forever, waived, released, and barred). Upon a Successful Challenge as against any party, including that an obligation to such party is unsecured or undersecured, the Court may fashion an appropriate remedy. Notwithstanding the foregoing, the Challenge Period to the Debtors' Stipulations and Releases related to the Debtors Priming Facility Stipulations and releases related thereto shall be October 31, 2022 or such earlier date as may be agreed to by the Creditors Committee (the "PTL Challenge Period" and the date that is the next calendar day after the termination of the PTL Challenge Period in the event that either (i) no Challenge (defined below) is raised during the PTL Challenge Period or (ii) with respect only to those parties who file a Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "PTL Challenge Period Termination Date").

(b)   Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date, or the PTL Challenge Period Termination Date (as applicable), and for all purposes in these Chapter 11 Cases and any Successor Cases (and after the dismissal of these Chapter 11 Cases or any Successor Cases), (i)  the Debtors' Stipulations and Releases shall be binding on all parties in interest, including, without limitation, the

Creditors' Committee (if any), (ii) the Prepetition Legacy Facility Liens, Prepetition Priming

Facility Liens, and any other prepetition claims and liens granted under or in connection with

the Prepetition First Lien Credit Agreements, shall be deemed, without further order of the

Court, to the extent not theretofore indefeasibly repaid, satisfied, or discharged, as applicable,

to be finally allowed for all purposes in the Chapter 11 cases and any subsequent chapter 7 cases

and shall not be subject to challenge or objection by any party in interest as to validity, extent,

amount, perfection, priority, or non-avoidability; (iii) the Prepetition Legacy Facility Liens and

Prepetition Priming Facility Liens on their respective Prepetition Collateral shall be deemed to

have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens,

not subject to recharacterization, subordination, avoidance or other defense but subject to the

priorities described herein; and (iv) Prepetition First Lien Secured Obligations and the

Prepetition Legacy Facility Liens and Prepetition Priming Facility Liens on their respective

Prepetition Collateral shall not be subject to any other or further claim or challenge by the

Creditors' Committee (if any), any non-statutory committees appointed or formed in the

Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors'

estates, including, without limitation, any successor thereto (including, without limitation, any

chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors)

and any defenses, claims, causes of action, counterclaims and offsets, whether arising under the

Bankruptcy Code or otherwise, against any of the Prepetition First Lien Secured Parties and

their representatives arising out of or relating to any of the Prepetition Loan Documents or this

Interim Order shall be deemed forever waived, released and barred.

(c)     Notwithstanding the foregoing, to the extent any Challenge is timely

asserted, the Debtors' Stipulations and Releases, and the other provisions in clauses (i) through

(iv) in paragraph 32(b) hereof shall nonetheless remain binding and preclusive on the Creditors' Committee (if any) and on any other party in interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations and Releases or the other provisions in clauses (i) through (iv) of paragraph 32(b) hereof were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge.

(d)   The Challenge Period may be extended only with the prior written consent of the Prepetition First Lien Agents in its sole discretion or by this Court, for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Period.

(e)   Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Creditors' Committee (if appointed) or any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect the Debtors' Stipulations and Releases.

(f)   For the avoidance of doubt, as to the Debtors, upon entry of this Interim Order, all Challenges, and any right to assert any Challenge, are hereby irrevocably waived and relinquished as of the Petition Date, and the Debtors' Stipulations and Releases shall be binding in all respects on the Debtors irrespective of the filing of any Challenge. Any successor to the Debtors (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors or any other estate representative appointed in the Chapter 11 Cases or any Successor Cases) shall be, subject to the expiration of any applicable challenge period, bound by the terms of the Interim Order and the Final Order to the same extent as the Debtors.

33.     <u>No Third-Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

34.     <u>Section 506(c) Claims</u>.  Subject  to and upon entry of the Final Order, except to the extent of the Carve-Out, the Debtors shall irrevocably waive and be prohibited from asserting any claim under section 506(c) of the Bankruptcy Code, and no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code shall be charged against or recovered from the DIP Collateral, the DIP Agent, or the DIP Lenders, the Prepetition Collateral, the Prepetition First Lien Agents and the Prepetition First Lien Lenders pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent (at the direction of the Majority Lenders) or the applicable Prepetition First Lien Agents, as may be applicable, and no such consent shall be implied from any action, inaction, or acquiescence by any party.

35.     <u>No Marshaling/Applications of Proceeds</u>.  Subject to and upon entry of the Final Order, except to the extent of the Carve-Out, in no event shall the DIP Agent, the other DIP Secured Parties, the Prepetition First Lien Agents or the other Prepetition First Lien Secured Parties, be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable.

36.     <u>Section 552(b)</u>.  Subject to and upon entry of the Final Order, except the extent of the Carve-Out, the DIP Agents, the other DIP Secured Parties, the Prepetition First Lien Agents or the other Prepetition First Lien Secured Parties, shall be entitled to all of the rights and

benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception thereunder shall not apply.

37.    <u>Releases and Stipulations</u>.  Each of the Debtors' Stipulations and Releases set forth in Paragraphs F, G, and H of this Interim Order are authorized and approved to the extent set forth herein.

38.    <u>Limits on Lender Liability</u>.  Nothing in this Interim Order, any of the DIP Documents, any of the Prepetition Documents, or any other documents related thereto, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the other DIP Secured Parties, or the Prepetition First Lien Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the administration of these Chapter 11 Cases or any Successor Cases.  The DIP Agent, the other DIP Secured Parties and the Prepetition First Lien Secured Parties shall not, solely by reason of having made loans under the DIP Facility or authorizing the use of Cash Collateral, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute). Nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, any of the DIP Secured Parties, or any of the Prepetition First Lien Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

39.    <u>Release of DIP Secured Party Claims</u>. Each Debtor shall forever waive, discharge, and release each of the DIP Secured Parties and their respective affiliates, assigns, or

successors and the respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees, and other representatives of the foregoing (all of the foregoing, collectively, the "<u>DIP Secured Party Releasees</u>") from any and all obligations and liabilities to the Debtors (and their permitted successors and assigns) and from any and all "claims" (as defined in section 101(5) of the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights, and other rights of disgorgement or recovery against any and all of the DIP Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the DIP Obligations, the DIP Liens, or the debtor–creditor relationship between any of the DIP Secured Parties, on the one hand, and any of the Debtors, on the other hand, arising prior to the date of entry of the Interim Order including (a) any recharacterization, subordination, avoidance, disallowance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, municipal law, or foreign law and (b) any right or basis to challenge or object to the amount, validity, or enforceability of the DIP Obligations or any payments or other transfers made on account of the DIP Obligations, or the validity, enforceability, priority, or non-avoidability of the DIP Liens securing the DIP Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the DIP Secured Party Releasees.

      40.   <u>Insurance Proceeds and Policies</u>.  Upon entry of this Interim Order, subject to the terms of the Debtors' leases for non-residential real property and otherwise to the fullest extent provided by applicable law, the DIP Agent (on behalf of itself and the other DIP Secured Parties) and the Prepetition First Lien Agents (on behalf of itself and for the benefit of the

applicable Prepetition First Secured Parties, as applicable), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral or any collateral subject to the First Lien AP Liens.

41.     <u>Joint and Several Liability</u>.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the DIP Obligors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Documents.

42.     <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Agent's, the other DIP Secured Parties' and the Prepetition First Lien Secured Parties' rights to seek any other or supplemental relief; (b) any of the rights of any of the DIP Agent, the other DIP Secured Parties and/or the Prepetition First Lien Secured Parties under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to request modification of the automatic stay imposed by section 362 of the Bankruptcy Code; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Agent, the other DIP Secured Parties or the Prepetition First Lien Secured Parties. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', a Creditors' Committee's (if appointed), or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order.

43.     <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Agent, the other DIP Secured Parties, or the Prepetition First Lien Secured Parties to seek relief or otherwise

exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, the other DIP Secured Parties, or the Prepetition First Lien Secured Parties.

44. <u>Binding Effect of Interim Order</u>. The provisions of this Interim Order shall be binding upon and inure to the benefit of the Debtors, the DIP Agent, the other DIP Secured Parties, the Prepetition First Lien Secured Parties, any Creditors' Committee appointed in these Chapter 11 Cases, all other creditors of any of the Debtors and all other parties in interest and, in each case, their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors).; *provided* that entry of this Interim Order shall only bind Successors upon entry of the Final Order. To the extent permitted by applicable law, this Interim Order shall bind any trustee, administrator, (whether under U.S. law or the laws of any other jurisdiction), or equivalent entity or person hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event of the conversion of any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case, to a liquidation under chapter 7 of the Bankruptcy Code. Such binding effect is an integral part of this Interim Order.

45. <u>No Modification of Interim Order</u>. Until the DIP Obligations have been paid in full, the Debtors shall be prohibited from seeking or consenting to, directly or indirectly, any modification, stay, vacatur, waiver, or amendment to this Interim Order or any provision hereof without the prior written consent of the DIP Agent (at the direction of the Majority Lenders) and

the Prepetition First Lien Agents (at the direction of the applicable Prepetition First Lien Secured Parties), and no such consent shall be implied by any action or inaction of the DIP Agent or the Prepetition First Lien Agents.

46.     Interim Order Controls.  In the event of any inconsistency between the terms and conditions of the DIP Documents and this Interim Order, the provisions of this Interim Order shall control.

47.     Discharge. Subject to the terms and conditions of the DIP Credit Agreement, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been Paid in Full on or before the effective date of such plan of reorganization or the DIP Agent (at the direction of the Majority Lenders has otherwise agreed in writing.

48.     Survival.  The provisions of this Interim Order and the DIP Documents, any actions taken pursuant hereto or thereto, and all of the protections, rights, remedies, liens, priorities, privileges, and benefits granted to any or all of the DIP Parties and Prepetition First Lien Secured Parties respectively, shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases, converting any of the Chapter 11 Cases to a chapter 7 case, dismissing any of the Chapter 11 Cases or any Successor Cases, withdrawing of the reference of any of these Chapter 11 Cases, any Successor Cases, or providing for abstention from handling or retaining of jurisdiction of any of these Chapter 11 Cases in this Court, or terminating the joint administration of these Chapter 11 Cases or by any other act or omission.  The terms and provisions of this Interim Order shall continue in the Chapter 11 Cases, in any Successor Cases, or following the dismissal of the Chapter

11 Cases or any Successor Cases, notwithstanding the entry of any such order, and such protections, rights, remedies, liens, priorities, privileges, and benefits shall continue in full force and effect in these proceedings and after dismissal of any thereof, and shall maintain their respective priorities as provided by this Interim Order and the DIP Documents, and to the maximum extent permitted by law, until all of the DIP Obligations are indefeasibly Paid in Full in cash and discharged.

49. <u>Replacement Agent</u>. Notwithstanding the resignation or replacement of any collateral agent or administrative agent, including the DIP Agent and the Prepetition First Lien Agents, the DIP Liens on the DIP Collateral, the Prepetition Liens on the Prepetition First Lien Collateral and the First Lien AP Liens shall remain continuously and properly perfected, notwithstanding the transfer of control, possession, or title of any Prepetition Collateral or DIP Collateral to a new collateral or administrative agent.

50. <u>National CineMedia, Inc. and National CineMedia, LLC</u>. Notwithstanding anything in this Interim Order, the rights of National CineMedia, Inc. and National CineMedia, LLC are expressly reserved with respect to the extent of the liens granted in the Interim Order on the Debtors' interest in National CineMedia, LLC.

51. <u>Governing Law</u>. The DIP Documents shall be governed by, and construed in accordance with, the laws of the State of New York and applicable United States federal law, without regard to the conflict of law principles.

52. <u>Headings</u>. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

53. <u>Final Hearing</u>. The Final Hearing shall be held on October 31, 2022 at 10:00 a.m. (Central Time), and any objections to the final relief sought in the Motion shall be filed with the Court no later than October 24, 2022 at 4:00 p.m. (Central Time).

54. <u>Retention of Jurisdiction</u>. This Court retains exclusive jurisdiction to resolve any dispute arising from or related to the interpretation or enforcement of this Interim Order.

55. <u>PTL Challenge</u>. On the PTL Challenge Termination Date, the Debtors are authorized to consummate the Priming Loan Refinancing. To the extent the Priming Loan Refinancing Escrow Amount (or any portion thereof) is greater than $0 on the day after entry of the Final Order, upon the PTL Challenge Termination Date, the Debtors shall be required to consummate the Priming Loan Refinancing (regardless of whether the DIP Obligations are outstanding as of such date).

Signed: September 08, 2022

                                        _____
                                             Marvin Isgur
                                        United States Bankruptcy Judge

## <u>Exhibit A</u>

### Credit

### Agreement

**The Credit Agreement will be filed of record by a Notice on the Docket Sheet. The Notice will be jointly signed by counsel to the Legacy Lender Group, counsel to Barclays as DIP Agent, and counsel to the Debtors. The Notice must be filed not later than 6:00 a.m. on September 9, 2022.**