## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) | Case No. 22-90168 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER
## (I) AUTHORIZING THE REJECTION OF A CERTAIN EXHIBITOR
## SERVICES AGREEMENT, AND (II) GRANTING RELATED RELIEF

> **If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this Motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this Motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion (this "Motion"):[2]

### Relief Requested

1.     The Debtors seek entry of an order, substantially in the form attached hereto (the "Order"):   (a) authorizing rejection of the exhibitor services agreement, dated as of February 13, 2007, by and between National CineMedia, LLC ("NCM LLC") and Regal Cinemas,

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/Cineworld. The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is: 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Declaration of Israel Greidinger, Deputy Chief Executive Officer of Cineworld Group plc, in Support of the Debtors' Chapter 11 Petitions* [Docket No. 19] (the "Greidinger First Day Declaration") and the *Declaration of James A. Mesterharm, Chief Restructuring Officer of Cineworld Group plc, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 80] (together with the Greidinger First Day Declaration, the "First Day Declarations").

Inc. ("RCI") (as amended and restated as of December 26, 2013, and as the same may have been amended, amended and restated, modified, or otherwise supplemented from time to time, the "NCM ESA"), identified on Exhibit 1 attached to the Order; and (b) granting related relief.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent to the entry of a final order by the Court.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules").

## Background

5.      Cineworld Group plc ("Cineworld," and together with its Debtor and non-Debtor affiliates, the "Group") is unwavering in its vision to be "The Best Place to Watch a Movie." As the second-largest cinema chain in the world by number of screens, the Group brings its vision to life each day in modern cinemas with cutting-edge technology. Headquartered in Brentford, United Kingdom, the London Stock Exchange-listed company, operating under five major brands, employs a global workforce of approximately 30,000 employees and operates 747 locations with 9,139 screens in 10 countries.

6.      On September 7, 2022 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description of the Debtors, their

businesses, and the facts and circumstances supporting the Debtors' chapter 11 cases are set forth in greater detail in the First Day Declarations.

7.      On the Petition Date, the Court entered an order authorizing the joint administration and procedural consolidation of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1 [Docket No. 32]. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On September 23, 2022, the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") [Docket No. 419]. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

**Summary**

8.      NCM LLC is a member-managed limited liability company formed by Debtor Regal CineMedia Holdings, LLC ("Regal CineMedia"), RCI, and other major cinema chains for the purpose of developing a nationwide advertising platform that could take advantage of each theater circuit's access to valuable audiences on a large scale. As described more fully below, soon after the formation of NCM LLC, the relationship with NCM LLC was expanded further through a series of transactions including the initial public offering of NCMI and RCI's entry into the NCM ESA.

9.      As described in the Greidinger First Day Declaration, Cineworld operates one of the largest theatrical entertainment businesses in the world with 9,139 screens across 747 locations in 10 countries. The Group's operations depend on revenue derived from, among other things, box office admissions, retail sales (*i.e.*, concessions and other food and beverage sales), and advertising. The advertising segment represents the third largest component of Cineworld's revenue after box office admissions and retail sales, respectively. *See* Greidinger Decl. ¶ 81.

3

Advertising revenue, which is impacted by admissions trends and the value of advertising sold, is critical to the Debtors' businesses as it allows cinemas to provide customers with a more affordable out-of-home entertainment option.

10. The Debtors' advertising revenue, which is predominantly generated by on screen advertisements during the period before the showing of a feature presentation, is currently facilitated by Digital Cinema Media Limited in the United Kingdom and Ireland, National CineMedia, Inc. ("NCMI"), the member manager of NCM LLC, in the United States, and directly by the Group in "rest of world" territories. The Debtors are therefore party to certain executory contracts that formalize the advertising arrangements between the Debtors and third parties. Among those contracts is an exhibitor services agreement with NCM LLC (*i.e.*, the NCM ESA). In addition to certain exhibitor services agreements, the Group maintains direct contracts with concessions vendors and distributors that supplement the Group's advertisement revenue.

11. In connection with the commencement of these chapter 11 cases, the Debtors, with the assistance of their advisors, analyzed their portfolio of executory contracts and unexpired leases to determine a path forward on each that is in the best interests of the Debtors' estates. That analysis remains ongoing, and it includes considering all advertising options to ensure that the Debtors fulfill their fiduciary duties to maximize value.[3] The Debtors and their advisors have formulated a revised, go-forward business plan that addresses the high costs and weakened revenue environment precipitated by the global pandemic and rapidly changing macro trends in the cinema industry. The business plan will be the subject of discussions with the secured lenders in the weeks to come, and, thereafter, with the Committee. Notably, the Debtors' analyses include a diagnostic of certain advertising contracts, chief among them is the NCM ESA.

---

[3] As discussed herein, no provision of the NCM ESA prohibits the Debtors from fulfilling their fiduciary duties.

12.     In the time since the Debtors entered into the NCM ESA in 2007, changes in technology have altered the cinema industry landscape.  The rise in direct-to-home entertainment, which has accelerated since the onset of the pandemic, has led to a reduction in cinema attendance, diverting revenue from the Debtors' top line.  The Debtors have been forced to adapt to changing macro trends in their industry, including by reimagining certain revenue streams.  Advertising has been one of them.  Through the Debtors' analysis of existing advertising relationships (including those in other jurisdictions) and the development of a revised business plan, the Debtors' management team determined that the NCM ESA, as currently structured, does not offer the Debtors sufficient flexibility to rationalize costs and maximize advertising revenue.  Absent a restructuring of the NCM ESA, the Debtors have determined that they will be better served transitioning such advertising to an alternative provider that would offer superior terms than the current NCM ESA, or otherwise bring such services in-house, as they do in their "rest of world" territories.

13.     The Debtors along with their advisors are engaged with NCMI and its advisors around the terms of a comprehensive restructuring of the parties' obligations under the NCM ESA.  The Debtors and NCMI have engaged in telephone conferences, email correspondences, and in-person meetings.   Both parties recently executed a non-disclosure agreement to facilitate the exchange of otherwise confidential information in connection with the commercial negotiations.  While the specifics of these negotiations remain confidential under rule 408 of the Federal Rules of Evidence,  NCMI has not moved as expeditiously as the Debtors would like in offering the Debtors an actionable proposal.  Moreover, the Debtors have significant concerns about NCMI's

balance sheet and current financial situation.[4]   Notwithstanding the filing of this Motion, the Debtors hope to continue to engage with NCMI and reach an acceptable arrangement.

14.     The Debtors have determined, in a prudent exercise of their business judgment, to file this Motion to set the table for the Debtors' rejection of the NCM ESA while negotiations remain ongoing.  Particularly in light of recent developments related to the financial condition and going-concern value of NCMI (as discussed below), the Debtors stand ready to set a hearing on, and ultimately crystallize, their rejection of the NCM ESA absent an agreement in the near term. Time is of the essence.

15.     It is simply uneconomic for the Debtors to continue under the current NCM ESA absent significant changes to key terms of that contract.  As explained in more detail herein, relative to the NCM ESA, the Debtors believe that they could obtain improved advertising services from a third party on superior terms, or alternatively arrange for advertising services in house.

**The NCM Relationship and Rejection of the NCM ESA**

16.     Over fifteen years ago, Debtor Regal CineMedia, American Multi-Cinema, Inc. ("AMC"), and Cinemark Media, Inc. ("Cinemark," together with AMC, RCI, and Regal CineMedia, the "Founding Members") formed a member-managed limited liability company— NCM LLC—for the purpose of developing a nationwide advertising platform that could take advantage of the Founding Members' theaters' access to valuable audiences on a large scale. Soon after the formation of NCM LLC, in February 2007, the Founding Members undertook a comprehensive financing transaction to scale up the advertising relationship, forming public company NCMI to serve as the member manager of NCM LLC.  NCMI currently functions as a

---

[4]    NCMI has missed a required $11 million coupon payment on certain of its secured notes, and has entered into a 30-day grace period. *See* Harvard Zhang, National Cinemedia Skips Coupon, Enters Grace Period Amid Lender Pushback on Liquidity Covenant Amendment, Reorg Research, October 17, 2022.

holding company with no business operations or material assets other than (a) its ownership interest of approximately 48.3 percent of NCM LLC, (b) cash generated from distributions from NCM LLC,[5] and (c) certain other management fees associated with NCM LLC. The Debtors own approximately 23.7 percent of NCM LLC.[6]

17. NCM's relationship with the Debtors and the other theater operators centers around individual exhibition services agreements ("ESAs") that set forth the terms under which advertising is displayed in movie theaters. Specifically, as part of the 2007 transaction, RCI entered into the NCM ESA with NCM LLC.[7] Pursuant to the NCM ESA, RCI grants NCM LLC exclusive access to RCI's audiences and screens for on-screen advertising. In exchange for such exclusive access, NCM LLC pays RCI monthly theater access fees and certain other payments.[8] These payments are calculated based on theater attendance, operating screens, certain revenue associated with sales of premium advertising spots, and other inputs. Additionally, the NCM ESA provides for "run-out" payments (based on the implied value of advertising exclusivity) from RCI

---

[5]  Historically, the Debtors received certain periodic distributions on account of their ownership interest in NCM LLC. However, these distributions have been suspended as of the date hereof, due to NCM LLC's deteriorating performance.

[6]  The remaining interests in NCM LLC are held by Cinemark and AMC. Although AMC's ownership interests in NCM LLC were reduced to zero in July 2018, AMC currently holds a 3.5 percent interest in NCM LLC as a result of a common unit adjustment pursuant to the Ancillary Agreements.

[7]  Pursuant to the 2007 transaction, RCI and Regal CineMedia, as applicable, and the other Founding Members entered into various agreements ancillary to the NCM ESA, including (a) that certain Third Amended and Restated Limited Liability Operating Agreement, (b) that certain Common Unit Adjustment Agreement, (c) that certain Tax Receivable Agreement, and (d) that certain Software License Agreement, each dated as of February 13, 2007, each as amended, amended and restated, modified, or otherwise supplemented from time to time (collectively, with any other related ancillary agreements, the "Ancillary Agreements"). The Debtors reserve all rights with respect to the Ancillary Agreements, including the right to assume or reject any Ancillary Agreement.

[8]  *See* NCM ESA § 2.05(b) "Fees: Theatre Access Fees, Post-Showtime Theatre Access Fees and Trailer Pod Fees" (generally providing for Theater Access Fee structure); Schedule 1 to NCM ESA (describing fee calculations).

to NCM LLC to the extent RCI is party to pre-existing advertising agreements with another provider.[9]

18.     The NCM ESA has been amended and/or restated several times, including most recently in September 2019, when RCI and NCM LLC agreed to a four year extension of the NCM ESA, new terms related to premium advertising spots as discussed herein, and incremental fees to RCI.[10]  The Debtors receive monthly fees from NCM LLC on account of the NCM ESA, which vary depending on inputs into fee calculations under the NCM LLC, such as theater admissions.

19.     As discussed herein, the Debtors have determined, in their business judgment, that it is in the best interests of their estates to reject the NCM ESA.  The Debtors believe they can realize a more effective and beneficial advertising structure relative to the NCM ESA.  The Debtors have assessed the NCM ESA holistically, but their determination chiefly follows from four critical issues with the NCM ESA and the NCM LLC and NCMI relationship:

20.     *First*, the Debtors have significant concerns regarding the viability of the advertising services model embodied in the NCM ESA.  The NCM ESA, as currently in effect, undervalues highly visible advertising space that the Debtors could better monetize through an alternative in-house or third-party arrangement and overvalues less visible advertising slots. Through the NCM ESA, NCM LLC obtains the right to sell advertising spots both before and after the posted showtime of a feature film.  Advertising space before the posted showtime includes space between content generated by NCM LLC and its partners, such as NCM LLC's Noovie-branded trivia, behind the scenes, and music content.  Pursuant to 2019 amendments to the NCM ESA, the Debtors provided NCM LLC with access to premium inventory including advertising

---

[9]     *See id.* § 4.08 "Regal Run-Out Obligations" (generally providing for run-out terms).

[10]    Absent termination according to its terms, the NCM ESA is effective through February 13, 2041.

space after the posted showtime, which space is generally higher value given audiences arriving for a feature presentation. Premium space includes "Platinum" space closer to the showtime presentation, as well as advertising space immediately before showtime reserved for beverage supplier advertising. An alternative arrangement to the NCM ESA would free the Debtors from requirements to undertake costly exhibition of pre-show advertising spots and enable more effective monetization of the post-showtime advertising inventory. The NCM ESA is also subject to an extensive term, expiring in 2041, and therefore prevents the Debtors from making any changes to their advertising strategy during a time of lightning-fast technological change.

21.     **Second**, rejection of the NCM ESA would free the Debtors from a burdensome contract structure that effectively requires the Debtors to share with NCM LLC a portion of revenues derived from the Debtors' profitable exclusive beverage supplier relationship with Pepsi-Cola. Under the NCM ESA, the Debtors must buy back from NCM LLC premium advertising space at a specified rate, based on theater attendees, in order to allocate those slots to Pepsi-Cola in accordance with their beverage supplier agreements.[11] This arrangement deprives the Debtors of benefits under the Pepsi-Cola arrangement, and is inconsistent with how the Debtors operate in territories apart from the U.S., including with DCM in the United Kingdom and in their "rest of world" territories where the Debtors provide advertising services in-house.

22.     **Third**, the Debtors have significant concern regarding the financial condition of NCMI and NCM LLC and their ability to perform under the NCM ESA. The Debtors understand that distributions from NCM LLC, which before the pandemic were a significant portion of the Debtors' revenues attributable to advertising, have been suspended, with no indication of when

---

[11]   *See, e.g.*, NCM ESA § 4.06(a) "Beverage Agreements." (as amended) (providing for payment by RCI to NCM LLC of "Beverage Agreement Advertising Rate").

they may resume.  Moreover, over the course of the last few years, including the year leading up to the Petition Date, NCM LLC has missed payment deadlines under the NCM ESA several times. Of more immediate concern, the Debtors are well aware of reports in trade publications that NCMI has missed a required $11 million coupon payment on certain of its secured notes, has entered into a 30-day grace period, and may not be able to comply with a liquidity covenant test to be performed at the end of the month.  *See* Harvard Zhang, National Cinemedia Skips Coupon, Enters Grace Period Amid Lender Pushback on Liquidity Covenant Amendment, *Reorg Research*, October 17, 2022.  NCMI's common stock has lost considerable value in recent weeks, with a market capitalization as of October 20, 2022 under $40 million, and its debt trading values are similarly depressed. The marketplace is sending clear signals regarding NCMI and the NCM LLC business model, and the Debtors are taking note.  Rejecting a contract with a financially unstable counterparty will allow the Debtors to find a reliable solution, ensuring smooth operations of the Debtors' go-forward advertising efforts.

23.     ***Fourth***, the Debtors believe that they are better positioned relative to NCM LLC to procure cost-effective advertising programming services for their theaters. In furtherance of their contract rejection analysis, the Debtors have engaged in discussions with both internal and external advertising programming providers to better understand the value proposition of an alternative advertising arrangement, and also to ensure that, in the event of rejection of the NCM ESA, any new provider – whether in-house or otherwise – will have the capability and knowledge necessary to provide such services with minimal disruption and at superior value. The Debtors estimate that rejection and subsequent replacement of NCM LLC with in-house advertising will result in millions of dollars of cost savings per annum (net of any costs associated with replacement arrangements).  The benefits associated with an in-house arrangement consist primarily of

enhanced access to advertising revenue relative to the Theater Access Fees, savings on labor and other operating costs related to burdensome obligations to provide pre-show advertisement showings, savings on any future "run-out" costs, and relief from the beverage supplier dynamic discussed above.[12]  The Debtors have substantial experience in running advertising services in-house, as evidenced by their proven success with their "rest of world" internal advertising arrangement, which compares favorably on multiple performance attributes to the NCM ESA structure.  The Debtors believe they could alternatively obtain replacement third-party advertising services that provide comparable benefits to their estates as an in-house arrangement.  The Debtors' investigation and analysis of the costs and benefits of rejecting the NCM ESA is consistent with the exercise of their fiduciary duties to maximize the value of their estates, as discussed in detail below.

24.    In sum, the Debtors, in consultation with their advisors, have determined in their business judgment that the NCM ESA is burdensome to the Debtors' estates and should be rejected.

## Basis for Relief

### I.    Rejection of the NCM ESA Constitutes a Sound Exercise of the Debtors' Reasonable Business Judgment.

25.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may . . . reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  "This provision allows a trustee to relieve the bankruptcy estate of burdensome agreements which have not been completely performed." *Stewart Title Guar. Co. v.*

---

[12]    The Debtors' standing up of an in-house advertising function to replace the NCM ESA is authorized by section 363(c) of the Bankruptcy Code, which allows the Debtors to use property of the Debtors' estates in the ordinary course of business without notice or a hearing.

*Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) (citing *In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62 (5th Cir. 1994)); *see also In re Orion Pictures Corp.*, 4 F.3d 1095, 1098 (2d Cir. 1993) (noting that the purpose of rejection of executory contracts is to permit the debtor-in-possession to renounce title to and abandon burdensome property).

26.     A debtor's rejection of an executory contract or unexpired lease is ordinarily governed by the "business judgment" standard. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) ("It is well established that 'the question whether a lease should be rejected . . . is one of business judgment." (quoting *Grp. of Institutional Inv'rs v. Chicago, M., St. P. & P. R. Co.*, 318 U.S. 523, 550 (1943))); *see also In re Texas Sheet Metals, Inc.*, 90 B.R. 260, 264 (Bankr. S.D. Tex. 1988) ("The traditional business judgment standard governs the rejection of ordinary executory contracts."). "A debtor's decision to reject [or not] an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice." *In re Klairmont Korners, LLC*, No. 2:21-CV-00139, 2022 WL 2136902, at *13 (S.D. Tex. 2022) (internal quotations and citations omitted).

27.     Rejection of an executory contract or an unexpired lease is appropriate where such rejection would benefit the estate. *See In re Pisces Energy, LLC*, No. 09-36591-H5-11, 2009 WL 7227880, at *6 (Bankr. S.D. Tex. Dec. 21, 2009) ("Courts apply the 'business judgment test,' which requires a showing that the proposed course of action will be advantageous to the estate and the decision be based on sound business judgment."); *see also Orion Pictures*, 4 F.3d at 1098–99 (stating that section 365 of the Bankruptcy Code permits a debtor in possession, subject to court approval, to decide which executory contracts would be beneficial to reject). Upon finding that a debtor exercised its sound business judgment in determining that rejection of certain contracts or leases is in the best interests of its creditors and all parties in interest, a court should approve the

rejection under section 365(a) of the Bankruptcy Code. *See In re Summit Land Co.*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

28.     Here, rejection of the NCM ESA is well within the Debtors' business judgment and is in the best interest of their estates. As set forth above, absent rejection, the NCM ESA locks the Debtors into a long-term, non-market arrangement with NCM LLC, depriving the Debtors and their estates of access to more favorable advertising arrangements worth millions of dollars in cost savings and advertising revenues. The Debtors have determined in their business judgment that continuing under the NCM ESA is an unnecessary and unproductive use of estate assets. By contrast, rejection of the NCM ESA will provide significant benefits to the Debtors' estates moving forward. Rejecting the NCM ESA is appropriate under the circumstances and reflects the Debtors' sound business judgment.

**II.     To Satisfy Their Fiduciary Duties and Comply With the Bankruptcy Code, the Debtors Must Be Permitted to Consider Alternatives to the NCM ESA, Regardless of Any of Its Provisions**

29.     In their Adequate Protection Motion, NCM LLC and NCMI suggest that the Debtors, in the course of analyzing their rejection decision and all available alternatives to the NCM ESA, have violated or will soon violate certain provisions of the NCM ESA. Specifically, NCM LLC points to terms prohibiting Regal from: (a) providing (through itself or through a third-party) "any of the services specifically set forth in the definition of 'Advertising Services'" under the NCM ESA (the "Exclusivity Provision");[13] (b) "compet[ing] with any business that [NCM LLC] is authorized to conduct in the Territory pursuant to the [NCM ESA]"

---

[13]     NCM ESA § 2.04.

(the "Non-Compete Provision");[14] and (c) "enter[ing] into or conduct[ing] any negotiations with any third party with respect to any service that may be competitive with the Advertising Services or any feature thereof" (the "No-Negotiate Provision"). *See* Adequate Protection Motion, ¶ 16. NCM LLC has also suggested each of these provisions is continually enforceable even following this Court's approval of the Debtors' rejection of the NCM ESA. *Id.* at ¶ 17.

30. NCM LLC is incorrect. These provisions are unenforceable and inconsistent with the Debtors' exercise of their fiduciary duties owed to their estates.

31. The Debtors owe a fiduciary duty to their bankruptcy estates to maximize value. *See, e.g.*, *In re VCR I, LLC*, 922 F.3d 323, 327 (5th Cir. 2019) ("A trustee has a duty to maximize the value of the estate"); *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (N.D. Tex. 2002) (remarking in the context of a request for authorization to pay prepetition vendor claims that "[i]mplicit in the duties of...a debtor in possession as set out in [section] 704 of the Bankruptcy Code is the duty of such a fiduciary to protect and preserve the estate, including an operating business's going concern value."); *In re Minges*, 602 F2d 38, 43 (2d Cir. 1979) (applying business judgment standard for lease assumption and rejection, reasoning "for in bankruptcy proceedings, the trustee, and ultimately the court, must exercise their discretion fairly in the interest of all who have had the misfortune of dealing with the debtor."); 11 U.S.C. § 1107(a) (providing that a debtor in possession "shall perform all the functions and duties...of a trustee"). Additionally, the decision to assume or reject an executory contract "is vital to the basic purpose of a [c]hapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984).

---

14   NCM ESA § 12.07.

32.     Contractual terms such as the Exclusivity Provision, Non-Compete Provision, and No-Negotiate Provision, each of which limits the Debtors' ability to consider key inputs into such a vital decision cannot be given effect inconsistent with the Debtors' bankruptcy fiduciary duties. *See In re Big Rivers Elec. Corp*, 233 B.R. 739, 751 (W.D. Ky. 1998) (finding no-shop clause in prepetition contract to be void as a violation of public policy, holding clause "interfered" with debtor's fiduciary duty to maximize value of the estate where provision "prohibit[ed the debtor] from initiating, soliciting, or negotiating offers and proposals for the sale or lease of its assets"). This is consistent with non-bankruptcy law, which limits the effect of contractual provisions purporting to bind fiduciaries to certain transactions to the extent inconsistent with their fiduciary duties. *See, e.g.*, *Paramount Communications Inc. v. QVC Network Inc.*, 637 A.2d 34, 51 ("To the extent that a contract, or a provision thereof, purports to require a board to act or not act in such a fashion as to limit the exercise of fiduciary duties, it is invalid and unenforceable); *see also* Restatement (Second) of Contracts § 193 (1981) ("A promise by a fiduciary to violate his duty as a fiduciary is unenforceable on grounds of public policy, as is a promise that tends to induce such a violation."). Here, the Debtors must be able to continually analyze the NCM ESA, consider alternative contractual arrangements, and interface with the marketplace to determine a value-maximizing path for their advertising activities.

33.     Further, the Exclusivity Provision, Non-Compete Provision, and No-Negotiate Provision would not be enforceable following a rejection of the NCM ESA. While rejection of an executory contract constitutes a breach of contract, not a termination, any rights NCM LLC has in the Exclusivity Provision, Non-Compete Provision, and No-Negotiate Provision would not survive rejection of the NCM ESA. The Supreme Court's holding in *Tempnology* is not to the contrary: upon rejection, NCM LLC would only enjoy such rights under the NCM ESA that do not depend

on the Debtors' continued future performance and use of advertising services under the NCM ESA. *Compare In re Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S.Ct 1652, 1657-58 (2019) (holding that "a rejection breaches [a] contract but does not rescind it...all the rights that would ordinarily survive a contract breach...remain in place.") *with In re Nine Point Energy Holdings, Inc.*, 633 B.R. 124, 135 (D. Del. 2021) ("[U]nlike the trademark licensee [in *Tempnology*] who could use the debtor's intellectual property without the involvement of the debtor, in this case [the non-debtor] has no right to use the [an exclusivity provision] *except* in its performance of the contracts, which can only occur after the Debtors perform[.]").

34.     Finally, permitting enforcement of these provisions of the NCM ESA against the Debtors would frustrate the purposes of section 365 and the Debtors' reorganization generally by preventing the Debtors from even considering millions of dollars of business benefits or costs of assumption or rejection of the NCM ESA.  If NCM LLC's view of contract enforcement in bankruptcy were to prevail, "any contract counterparty [could] inoculate itself from the effects of rejection by including an exclusivity provision in its contract. Such a broad and overarching result would fundamentally impair a debtor's ability to reorganize by forcing it to continue to perform under burdensome contracts, contrary to the purpose of § 365 of the Bankruptcy Code." *Nine Point*, 633 B.R. at 135.

**III.     NCM LLC Is Required to Perform Under the NCM ESA While the Court Considers the Motion**

35.     NCM LLC cannot be permitted to withhold payment under the NCM ESA while this Court considers the Motion.  It is hornbook bankruptcy law that a non-debtor executory contract counterparty may not take any action impairing a debtor's contract rights absent the bankruptcy court granting relief from the automatic stay. 3 Collier on Bankruptcy ¶ 362.03[05][a] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("Executory contracts...are considered a form

of property of the estate.  As property of the estate, the debtor's interests in such contracts or leases are protected against termination or other interference that would have the effect of removing or hindering the debtor's rights in violation of section 362(a)(3).").  "Even if a contract is not property of the estate until assumption, a debtor has rights under the contract which *are* property of the estate and so are protected by the automatic stay from actions of other parties."  *In re Mirant Corp.*, 303 B.R. 319, 328 (Bankr. N.D. Tex. 2003) (emphasis in original); *see also Lauter v. Citgo Petroleum Corp.*, No. H-17-2028, 2018 WL 801601, at *14 (S.D. Tex. 2018) ("[U]ntil the contract in question is rejected or validly terminated…, the [d]ebtor is entitled to compel specific performance and require the [creditor] to abide by the provisions of the contract[ ]." (quoting *In re Chick Smith Ford, Inc.*, 46 B.R. 515, 519 (Bankr. M.D. Fla. 1985)).

36.     An upcoming payment is due under the NCM ESA as soon as October 27, 2022, and while this Motion is pending, NCM LLC must continue to perform and render payments and services thereunder to the Debtors, in accordance with the NCM ESA's terms. The Debtors reserve all rights to seek to compel NCM LLC's continued performance under the NCM ESA.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

37.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

38.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any

particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code except as provided herein; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## Notice

39.     The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Committee; (d) the agent under the Prepetition Priming Facility, and counsel thereto; (e) the agent under the Prepetition Legacy Term Facilities, and counsel thereto; (f) the agent under the Revolving Credit Facility, and counsel thereto; (g) counsel to the ad hoc group of Prepetition Revolving Lenders; (h) counsel to the Ad Hoc Term Loan Group; (i) the agent under the Settlement Facility, and counsel thereto; (j) counsel to lenders under the Settlement Facility; (k) the trustee under the Convertible Bonds, and counsel thereto; (l) counsel to the ad hoc group of holders of Convertible Bonds; (m) the agent under the

18

DIP Facility and counsel thereto; (n) the Office of the United States Attorney for the Southern District of Texas; (o) the state attorneys general for states in which the Debtors conduct business; (p) the Internal Revenue Service; (q) the Securities and Exchange Commission; (r) the Environmental Protection Agency; (s) other governmental agencies having a regulatory or statutory interest in these cases; (t) NCM LLC and NCMI; and (u) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors request that the Court enter the Order, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
Dated: October 21, 2022

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (S.D. Bar No. 3394311)
Veronica A. Polnick (TX Bar No. 24079148)
Vienna Anaya (TX Bar No. 24091225)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                rchaikin@jw.com
                vpolnick@jw.com
                vanaya@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Christine Okike, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                christopher.marcus@kirkland.com
                christine.okike@kirkland.com
                ciara.foster@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on October 21, 2022, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh