United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 31, 2022

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) Case No. 22-90168 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) **Re: Docket No. 499** |

## ORDER AUTHORIZING
## THE RETENTION AND EMPLOYMENT OF
## ERNST & YOUNG LLP AS TAX SERVICES PROVIDER TO THE DEBTORS

Upon the application (the "Application")[2] of the above-captioned debtors and debtors in

possession (collectively, the "Debtors") for the entry of an order (this "Order"), pursuant to

sections 327(a) and 328(a) of title 11 of the United States Code (the "Bankruptcy Code"),

authorizing the retention and employment of Ernst & Young LLP ("EY LLP") as the Debtors' tax

services provider, on the terms and conditions set forth in the Engagement Letters, attached hereto

as **Exhibit A** and **Exhibit A-1** through **Exhibit A-3** (collectively, the "Engagement Letters"); and

upon the Ericson Declaration (the "Ericson Declaration"); and this Court having jurisdiction over

this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order

consistent with Article III of the United States Constitution; and this Court having found that venue

of this proceeding and the Application in this district is proper pursuant to 28 U.S.C. §§ 1408 and

1409; and this Court having found that the relief requested in the Application is in the best interests

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
      claims and noticing agent at https://cases.ra.kroll.com/cineworld.  The location of Debtor Cineworld Group plc's
      principal place of business and the Debtors' service address in these chapter 11 cases is:  8th Floor Vantage
      London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

[2]   Capitalized terms used but not defined herein have the meanings given to them in the Application.

of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Application and opportunity for a hearing on the Application were appropriate and no other notice need be provided; and this Court having reviewed the Application ; and this Court having determined that the legal and factual bases set forth in support of the Application establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      Pursuant to sections 327(a) and 328 of the Bankruptcy Code, the Debtors are hereby authorized to employ and retain EY LLP as tax services provider to the Debtors in these chapter 11 cases as of the Petition Date, on the terms and conditions set forth in the Engagement Letters, as modified by this Order.

2.      The terms of the Engagement Letters, including, without limitation, the compensation provisions, are reasonable terms and conditions of employment and are hereby approved as modified by this Order.

3.      Consistent with, and subject to, the terms of the Engagement Letters and this Order, EY LLP shall be authorized to perform the Services provided for in the Engagement Letters, as modified by this Order.

4.      EY LLP shall file fee applications for allowance of compensation and expenses with respect to services rendered in these chapter 11 cases with the Court in accordance with sections 330 and 331 of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, this Order, and such other procedures as may be fixed by order of this Court.

5.      EY LLP's fixed fees pursuant to the Engagement Letters (and any supplemental engagement agreements or statements of work subsequently approved in these cases) shall be subject to the standard of review set forth in section 330 of the Bankruptcy Code.  EY LLP shall keep reasonably detailed time records in half-hour increments and will submit, with any interim or final fee application, together with the time records, a narrative summary, by project category, of services rendered and will identify each professional rendering services, the category of services rendered, and the total amount of compensation requested by EY LLP.

6.      EY LLP's hourly fees pursuant to the Engagement Letters (and any supplemental engagement agreements or statements of work subsequently approved in these cases) shall be subject to the standard of review set forth in section 330 of the Bankruptcy Code.  With respect to the Advisory SOW, EY LLP shall keep reasonably detailed time records in one-tenth (1/10) hour increments and will submit with any fee application, together with the time records, a narrative summary (by project category) of services rendered and will identify each professional rendering services, the category of services rendered, and the total amount of compensation requested by EY LLP.  With respect to the Compliance SOWs, EY LLP will keep summary time records in half-hour increments describing the EY LLP's daily activities and the identity of persons who performed such tasks for Services performed under the Compliance SOWs.

7.      The Court may review, and the U.S. Trustee shall retain the right to object to, EY LLP's fees and expenses in these cases based on the reasonableness standard provided for in section 330 of the Bankruptcy Code.  This Order shall not prejudice or otherwise affect the rights of the U.S. Trustee to challenge the reasonableness of EY LLP's compensation and reimbursement requests in these cases under sections 330 and 331 of the Bankruptcy Code.

8.      In the event that, during the pendency of these cases, EY LLP seeks reimbursement for any attorneys' fees and/or expenses, the invoices and supporting time records from such attorneys shall be included in EY LLP's fee applications and such invoices and time records shall be in compliance with the Bankruptcy Local Rules, and shall be subject to the approval of the Court under the standards of sections 330 and 331 of the Bankruptcy Code, without regard to whether such attorney has been retained under section 327 of the Bankruptcy Code; *provided*, *however*, that EY LLP shall not seek reimbursement from the Debtors' estates for any fees incurred in defending any of EY LLP's fee applications in these bankruptcy cases.

9.      Notwithstanding anything in the Application or the Engagement Letters to the contrary, EY LLP shall:  (a) to the extent that EY LLP uses the services of independent contractors, subcontractors, or employees of foreign affiliates or subsidiaries (collectively, the "Contractors") in these cases, pass-through the cost of such Contractors to the applicable Debtors at the same rate that EY LLP pays the Contractors; and (b) seek reimbursement for actual costs only.  Contractors from whom EY LLP seeks to pass-through fees on an hourly basis to the applicable Debtors shall be subject to the same conflict checks as required for EY LLP, and such Contractors shall file with the Court such disclosures as required by Bankruptcy Rule 2014.

10.     The indemnification provisions included in the Engagement Letters are approved, subject to the following:

   (a)     EY LLP shall not be entitled to indemnification, contribution, or reimbursement for services other than those described in the Engagement Letters and the Application, unless such services and indemnification therefor are approved by the Court; *provided*, that to the extent additional engagement letter(s) are filed with the Court and no parties object to such engagement letter(s) in accordance with the procedures described in paragraph 6, such engagement letter(s) shall be deemed approved by the Court;

   (b)     The Debtors shall have no obligation to indemnify EY LLP, or provide contribution or reimbursement to EY LLP, for any claim or expense that is

either: (i) judicially determined (the determination having become final) to have arisen from EY LLP's actual fraud, bad faith, self-dealing, breach of fiduciary duty (if any such duty exists), gross negligence or wilful misconduct; (ii) judicially determined (the determination having become final), to be based on a breach of EY LLP's contractual obligations to the Debtors; or (iii) settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) immediately above, but determined by this Court, after notice and a hearing, to be a claim or expense for which EY LLP should not receive indemnity, contribution, or reimbursement under the terms of EY's retention by the Debtors pursuant to the terms of the Engagement Letters and Application, as modified by this Order; and

(c) If, before the earlier of: (i) the entry of an order confirming a chapter 11 plan in these cases (that order having become a final order no longer subject to appeal); and (ii) the entry of an order closing these chapter 11 cases, EY LLP believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution, and/or reimbursement obligations under the Engagement Letters (as modified by this Order) and Application, including without limitation the advancement of defense costs, EY LLP must file an application in this Court, and the Debtors may not pay any such amounts to EY LLP before the entry of an order by this Court approving the payment. This subparagraph (c) is intended only to specify the period of time under which the Court shall have jurisdiction over any request for fees and expenses by EY LLP for indemnification, contribution, and/or reimbursement, and not a provision limiting the duration of the Debtors' obligation to indemnify EY LLP. All parties in interest shall retain the right to object to any demand by EY LLP for indemnification, contribution, and/or reimbursement.

11. EY LLP shall provide ten business-days' notice to the Debtors, the U.S. Trustee, and counsel to the Committee before any increases in the rates set forth in the Application or the Engagement Letters are implemented and shall file such notice with the Court. The U.S. Trustee retains all rights to object to any rate increase on all grounds, including the reasonableness standard set forth in section 330 of the Bankruptcy Code, and the Court retains the right to review any rate increase pursuant to section 330 of the Bankruptcy Code.

12. EY LLP will review its files periodically during the pendency of these chapter 11 cases to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, EY LLP will use reasonable efforts to

identify such further developments and will promptly file a supplemental declaration with the Court, as required by Bankruptcy Rule 2014(a).

13.     To the extent the Debtors and EY LLP enter into any additional engagement letters, the Debtors shall file notices of such additional engagement letters with the Court, and serve any additional engagement letters on the applicable notice parties. To the extent any of such parties object, within fourteen days of such new engagement letters being served, to the additional services to be provided by EY LLP, the Debtors will promptly seek a hearing before the Court. All additional services will be subject to the provisions of this Order. To the extent no related timely objections are filed, such additional engagement letters shall be deemed approved pursuant to this Order.

14.     EY LLP will use its reasonable efforts to coordinate with the Debtors' other professionals in an effort to avoid unnecessary duplication of services in these chapter 11 cases.

15.     To the extent that the express provisions of this Order are inconsistent with the provisions of the Engagement Letters, the Application, the Ericson Declaration, and this Order, the express terms of this Order shall govern.

16.     Notice of the Application as provided therein shall be deemed good and sufficient notice of such Application, and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

17.     This Order is immediately effective and enforceable upon its entry.

18.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Application.

19.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed:  October 31, 2022

Marvin Isgur
United States Bankruptcy Judge

## Exhibit A

**Master Services Agreement**



**Building a better working world**

## MASTER SERVICES AGREEMENT

This Master Services Agreement (this "Agreement") is entered into between Ernst & Young LLP, a Delaware limited liability partnership ("EY") and Regal Cinemas, Inc. ("Client"), as of September 7, 2022.

### Structure

1. This Agreement sets out the contractual structure for the provision of services ("Services") by EY to Client subsequent to Client filing a petition under Chapter 11 ("Chapter 11") of the United States Bankruptcy Code ("Bankruptcy Code") on or about September 7, 2022, with the United States Bankruptcy Court for Southern District of Texas ("Bankruptcy Court"). EY's performance of Services is contingent upon the Bankruptcy Court's approval of EY's retention in accordance with the terms and conditions that are set forth in this Agreement. This Agreement shall be effective as of September 7, 2022 (the "Effective Date"). EY will perform the Services described in separate Statements of Work entered into between the parties that incorporate the terms of this Agreement as well as the terms of any applicable Module(s) to form a separate and independent contract ("Contract"), which shall be subject to approval of the Bankruptcy Court.

2. For the purposes of any Contract, (a) "Client" in such Contract (including in this Agreement and the applicable Module(s) as incorporated into such Contract) means the Client Entity that executes the applicable Statement of Work, and (b) "party" means either EY or such Client Entity.

3. If there is any inconsistency between provisions in different parts of a Contract, those parts shall have precedence as follows (unless expressly agreed otherwise): (a) the applicable Statement of Work and any annexes thereto, (b) any applicable Module, (c) this Agreement, and (d) other annexes to a Contract.

### Definitions

4. The following terms are defined as specified below:

   (a) "AICPA" means the American Institute of Certified Public Accountants.

   (b) "Client Affiliate" means an entity that controls, is controlled by, or is under common control with, Client.

   (c) "Client Entity" means Client or a Client Affiliate.

   (d) "Client Information" means information obtained by EY from Client or from a third party on Client's behalf.

   (e) "Deliverables" means any advice, communications, information, technology or other content that EY provides under this Agreement.

   (f) "EY Firm" means a member of the EY network and any entity operating under a common branding arrangement with a member of the EY network.

Confidential



**Building a better working world**

(g) "EY Persons" means EY's or any other EY Firm's subcontractors, members, shareholders, directors, officers, partners, principals or employees.

(h) "Internal Support Services" means internal support services utilized by EY, including but not limited to: (a) administrative support, (b) accounting and finance support, (c) network coordination, (d) IT functions including business applications, system management, and data security, storage and recovery, and (e) conflict checking, risk management and quality reviews.

(i) "Module" means a module, supplemental to this Agreement, entered into by the parties and containing further terms applicable to a particular type of Services.

(j) "Personal Data" means Client Information relating to identified or identifiable natural persons or that is otherwise considered to be "personal data," "personal information" or similar term under applicable data protection laws.

(k) "Report" means a Deliverable (or any portion of a Deliverable) issued on EY letterhead or under the EY brand or otherwise identifiable as being prepared by or in association with EY, any other EY Firm or EY Person.

(l) "Statement of Work" means a document, incorporating this Agreement and any applicable Module, entered into by the parties describing particular Services that EY will perform.

(m) "Support Providers" means external service providers of EY and other EY Firms and their respective subcontractors.

(n) "Tax Advice" means tax matters, including tax advice, tax opinions, tax returns or the tax treatment or tax structure of any transaction to which the Services relate.

## Provision of the Services

5. EY will provide the Services using reasonable skill and care in accordance with applicable professional standards, including those established by the AICPA.

6. Subject to Bankruptcy Court approval, EY may subcontract a portion of the Services to one or more EY Firms, as well as to other third parties, who may deal with Client directly. EY will remain solely responsible to Client for the performance of the Services. From time to time, non-CPA personnel may perform the Services.

7. EY will act as an independent contractor and not as Client's employee, agent or partner. Client will remain solely responsible for management decisions relating to the Services and for determining whether the Services are appropriate for its purposes. Client shall assign qualified personnel to oversee the Services, as well as the use and implementation of the Services and Deliverables.

8. Client agrees to promptly provide to EY (or cause others to so provide) Client Information, resources and assistance (including access to records, systems, premises and people) that EY reasonably requires to perform the Services.



**EY**

Building a better
working world

9.  Client Information will be accurate and complete in all material respects. EY will rely on Client Information and, unless EY expressly agrees otherwise in writing, EY will have no responsibility to verify it. The provision of Client Information (including Personal Data), resources and assistance to EY will be in accordance with applicable law and will not infringe any copyright or other third-party rights.

## Deliverables

10. All Deliverables are intended for Client's use in accordance with the Contract under which they are provided.

11. Client may not rely on any draft Deliverable. EY shall not be required to update any final Deliverable as a result of circumstances of which EY becomes aware, or events occurring, after its delivery.

12. Unless otherwise provided for in a Contract, Client may not disclose a Report (or any portion or summary of a Report), or refer to EY or to any other EY Firm or EY Person in connection with the Services, except:

(a) to a Client Affiliate (subject to these disclosure restrictions);

(b) to Client's lawyers (subject to these disclosure restrictions), who may review it only in connection with advice relating to the Services;

(c) to Client's independent auditors (subject to these disclosure restrictions) who may review it only in connection with their audit;

(d) to the extent, and for the purposes, required by applicable law (and Client will promptly notify EY of such legal requirement to the extent Client is permitted to do so);

(e) to other persons (with EY's prior written consent), who may use it only as specified in such consent; or

(f) to the extent it contains Tax Advice.

If Client discloses a Report (or a portion thereof), Client shall not alter, edit or modify it from the form provided by EY. Client shall inform those to whom it discloses a Report (other than disclosure of Tax Advice to tax authorities) that they may not rely on it for any purpose without EY's prior written consent. Subject to the foregoing, Client is not prohibited by this Section 12 from using Deliverables that do not qualify as Reports in communication with third parties provided that: (i) there is no reference to, or communication of, EY's or any other EY Firm's involvement in the development of such Deliverables, and (ii) Client assumes sole responsibility for such use and communication.

## Limitations

13. As part of the parties' arrangements, the parties have mutually agreed the following limitations of liability (which also apply to others for whom Services are provided under any Contract):



**Building a better working world**

(a) Neither party will be responsible, in contract or tort, under statute or otherwise, for any amount with respect to loss of profit, data or goodwill, or any other consequential, incidental, indirect, punitive or special damages in connection with claims arising out of a Contract or otherwise relating to the Services, whether or not the likelihood of such loss or damage was contemplated.

(b) Client (and any others for whom Services are provided) may not recover from EY, in contract or tort, under statute or otherwise, aggregate damages in excess of the fees actually paid for the Services that directly caused the loss under the respective Contract during the twelve (12) months preceding the date of the event giving rise to the loss. This cap is an aggregate cap across all claims under such Contract prior to such date.

(c) Client shall make any claim relating to the Services or otherwise under a Contract no later than one (1) year after Client became aware (or ought reasonably to have become aware) of the facts giving rise to any alleged such claim and in any event, no later than two (2) years after the completion of the particular Services.

14. The limitations set out in Sections 13(b) and (c) above will not apply to losses or damages caused by EY's fraud or willful misconduct or to the extent prohibited by applicable law or professional regulations.

15. Client (and any others for whom Services are provided under a Contract) may not make a claim or bring proceedings relating to the Services or otherwise under a Contract against any other EY Firm or EY Person. Client shall make any claim or bring proceedings only against EY.

**No Responsibility to Third Parties**

16. Unless specifically otherwise agreed with Client in writing, EY's responsibility for performance of the Services is to Client and Client alone. Should any Deliverable be disclosed, or otherwise made available, by or through Client (or at Client's request) to a third party (including but not limited to permitted disclosures to third parties under Section 12), Client agrees to indemnify EY, as well as the other EY Firms and the EY Persons, against all claims by third parties, and resulting liabilities, losses, damages, costs and expenses (including reasonable external and internal legal costs) arising out of such disclosure.

**Intellectual Property Rights**

17. Each party retains its rights in its pre-existing intellectual property. Except as set out in the applicable Contract, any intellectual property developed by EY, and any working papers compiled in connection with the Services (but not Client Information contained in them), shall be the property of EY.

18. Client's right to use Deliverables under a Contract arises following payment for the Services.

**Confidentiality, Data Protection & Security**

19. Except as otherwise permitted by a Contract, neither party may disclose to third parties any information (other than Tax Advice) provided by or on behalf of the other that ought reasonably to be treated as confidential (including, in the case of EY, Client Information). Either party may, however, disclose such information to the extent that it:



**Building a better working world**

(a) is or becomes public other than through a breach of a Contract;

(b) is subsequently received by the recipient from a third party who, to the recipient's knowledge, owes no obligation of confidentiality to the disclosing party with respect to that information;

(c) was known to the recipient at the time of disclosure or is thereafter created independently;

(d) is disclosed as necessary to enforce the recipient's rights under this Agreement; or

(e) must be disclosed under applicable law, legal process or professional regulations.

20. EY uses other EY Firms, EY Persons and Support Providers who may have access to Client Information in connection with delivery of Services as well as to provide Internal Support Services. EY shall be responsible for any use or disclosure of Client Information by other EY Firms, EY Persons or Support Providers to the same extent as if EY had engaged in the conduct itself.

21. Client agrees that Client Information, including Personal Data, may be processed by EY, other EY Firms, EY Persons and their Support Providers in various jurisdictions in which they operate (EY office locations are listed at www.ey.com). Client Information, including any Personal Data, will be processed in accordance with laws and professional regulations applicable to EY, and appropriate technical and organizational security measures designed to protect such information will be implemented. EY will also require any Support Provider that processes Personal Data on its behalf to provide at least the same level of protection for such Personal Data as is required by such legal and regulatory requirements. If Personal Data relating to a data subject in the UK, European Union or Switzerland (collectively, "European Personal Data") is required for EY to perform the Services, the parties agree to negotiate in good faith a data transfer addendum intended to validate the transfer of such European Personal Data by Client to EY prior to such transfer. Transfer of Personal Data among members of the EY network is subject to the EY Binding Corporate Rules Program available at www.ey.com/bcr. Further information about EY's processing of Personal Data is available at www.ey.com/privacy.

22. To the extent permitted by applicable law, regulation or governmental directive, EY will notify Client without undue delay in the event of loss, disclosure or unauthorized or unlawful processing of Personal Data and provide Client with relevant information about the nature and extent of the event.

23. In certain circumstances, individuals may have the right under applicable data protection law to access, correct, erase, port, restrict or object to the processing of their personal data. Such requests may be sent to privacy.office@ey.com. To the extent permitted by law, regulation or governmental directive, EY will notify Client without undue delay upon receipt of any verifiable request from a data subject or supervisory authority relating to a Personal Data right. If EY is required to provide Personal Data in response to such verifiable request, or to a request from Client, providing that data will be part of the Services and, to the extent permitted by applicable law, Client will be responsible for EY's reasonable charges incurred in doing so.

24. As a professional services firm, EY is required to exercise its own judgment in determining the purposes and means of processing any Personal Data when providing the Services. Accordingly, unless otherwise specified in a Contract, when processing Personal Data subject to the General Data Protection Regulation or other applicable data protection law (including, without limitation, state



**EY**
Building a better
working world

data protection (e.g., the California Consumer Privacy Act)), EY acts as an independent controller (or similar status that determines the purposes and means of processing), and not as a processor under Client's control (or similar status acting on behalf of Client) or as a joint controller with Client. For Services where EY acts as a processor processing Personal Data on Client's behalf, the parties will agree appropriate data processing terms in the applicable Statement of Work.

25. EY and other EY Firms may retain and use Client Information for benchmarking, analytics, research and development, thought leadership and related purposes, and to enhance their services, provided that any use does not externally identify, or make reference to, Client. In all such matters, EY and other EY Firms will comply with applicable law and professional obligations.

26. If Client requires EY to access or use Client or third-party systems or devices, EY shall have no responsibility for the confidentiality, security or data protection controls of such systems or devices, or for their performance or compliance with Client requirements or applicable law.

27. EY may provide Client access to use certain data, software, designs, utilities, tools, models, systems and other methodologies and know-how that EY owns or licenses for the purpose of Client's receipt of the Services or as otherwise expressly agreed in writing by EY ("EY Tools"). Client shall be responsible for compliance by all Client personnel and third parties acting on Client's behalf with the terms applicable to the use of such EY Tools. As between EY and Client, EY (or another EY Firm) owns all right, title, interest, and all intellectual property rights in and to the EY Tools, including any enhancements, modifications, and derivative work thereof.

*License to EY Tools During the Statement of Work Term:* To the extent that EY provides Client access to any EY Tools during the term of an applicable Statement of Work, EY hereby grants to Client a nonexclusive, paid-up, internal license, during the term of the applicable Statement of Work, to use, execute, and display the EY Tools, for the sole purpose of Client's receipt of the Services from EY under the applicable Statement of Work.

*License to EY Tools After the Statement of Work Term:* EY may allow Client to use certain EY Tools, after the term of an applicable Statement of Work, for the sole purpose of Client's use and receipt of the benefit of the Services provided by EY under such Statement of Work. Any EY Tools that EY allows Client to use after the term of such Statement of Work will be identified in the Statement of Work as a "Leave Behind EY Tool." With respect to such an identified Leave Behind EY Tool, to the extent permitted by applicable law and professional regulations, EY hereby grants to Client a nonexclusive, paid-up, internal license, to use, execute, and display the Leave Behind EY Tool, after the term of the Statement of Work, for the sole purpose of Client's use and receipt of the benefit of the Services provided by EY under the Statement of Work.

*EY Tools Disclaimers and Acknowledgments:* Client's use of any EY Tools may be subject to additional terms, which EY will provide to Client in writing. Client acknowledges that EY may at any time, modify, replace, direct Client to discontinue use of any EY Tools, or otherwise revoke, limit or condition Client's access and right to use any EY Tools. ALL EY TOOLS ARE PROVIDED "AS IS" AND WITHOUT ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF TITLE,



MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR USE, OR ANY WARRANTY THAT THE OPERATION OF EY TOOLS WILL BE UNINTERRUPTED, ERROR FREE OR THAT EY TOOLS WILL BE OR REMAIN COMPATIBLE WITH ANY OF CLIENT'S HARDWARE OR SOFTWARE. IN NO EVENT SHALL EY BE LIABLE FOR LOSS OF OR DAMAGE TO CLIENT'S DATA RESULTING FROM THE CLIENT'S USE OF THE EY TOOLS. Client shall not decompile, dissemble or otherwise reverse engineer the EY Tools, unless authorized by law or the relevant regulatory agency. Client shall not sell, lease, assign or otherwise transfer any portion of the EY Tools.

**Compliance**

28. In connection with the performance of its respective rights and obligations under a Contract, EY and Client each will comply with all laws and regulations of any jurisdiction applicable to it from time to time concerning or relating to bribery or corruption, including, without limitation, the U.S. Foreign Corrupt Practices Act ("FCPA").

**Fees and Expenses Generally**

29. Client shall pay EY's professional fees and specific expenses in connection with the Services as detailed in the applicable Contract. Client shall also reimburse EY for other reasonable expenses incurred in performing the Services. EY's fees are exclusive of taxes or similar charges, as well as customs, duties or tariffs imposed in respect of the Services, all of which Client shall pay (other than taxes imposed on EY's income generally). Unless otherwise set forth in the applicable Contract, payment is due within thirty (30) days following the date of each of EY's invoices.

30. Subject to Bankruptcy Court approval, if necessary, EY may charge additional professional fees if events beyond its control (including Client's acts or omissions) affect EY's ability to perform the Services as agreed in the applicable Contract, or if Client asks EY to perform additional tasks.

31. If EY is required by applicable law, legal process or government action to produce information or personnel as witnesses with respect to the Services or a Contract, Client shall reimburse EY for any professional time and expenses (including reasonable external and internal legal costs) incurred to respond to the request, unless EY is a party to the proceeding or the subject of the investigation.

**Force Majeure**

32. Neither party shall be liable for breach of a Contract (other than payment obligations) caused by circumstances beyond such party's reasonable control.

**Term and Termination**

33. A Contract applies to all Services associated with such Contract whenever performed after the date of Client's filling of a Chapter 11 petition (including before the date of the applicable Contract).

34. A Contract shall terminate on the completion of the Services associated with such Contract. This Agreement and/or any or all Contracts may be terminated at any time by Client or EY, but in any event this Agreement including all Statements of Work will expire upon the effective date of Client's


**Building a better
working world**

confirmed plan of reorganization, or liquidation of Client's assets under Chapter 11 or 7 of the Bankruptcy Code, or otherwise.

35. Client shall pay EY for all work-in-progress, Services already performed, and expenses incurred by EY up to and including the effective date of the termination or expiration of a Contract, as well as any applicable termination fees set forth in the applicable Contract. Payment is due within thirty (30) days following the date of the invoice for these amounts or as quickly as the Bankruptcy Code, Bankruptcy Rules, Local Rules and any relevant orders of the Bankruptcy Court allow.

36. The term of this Agreement will expire five (5) years following the Effective Date (the "Term"), unless the parties mutually agree to renew or extend it, provided Client continue to operate under Chapter 11 bankruptcy protection. For clarity, this Agreement shall survive with respect to any Contract entered into during the Term, even if such Contract remains in effect beyond the Term.

37. The provisions of this Agreement, including Section 12 and Section 38 otherwise with respect to Deliverables and Reports, that give either party rights or obligations beyond its termination shall continue indefinitely following the termination of this Agreement or applicable Contract and shall survive completion of the Client's bankruptcy whether through a confirmed plan of reorganization under Chapter 11, liquidation of the Client's assets under Chapter 7 of the Bankruptcy Code, or otherwise.

**Governing Law and Dispute Resolution**

38. This Agreement, any Contract under this Agreement, and any non-contractual matters or obligations arising out of a Contract or the Services, shall be governed by, and construed in accordance with, the laws of the state of New York applicable to agreements made, and fully to be performed, therein by residents thereof. Any controversy or claim with respect to, in connection with, arising out of, or in any way related to this Agreement or the services provided hereunder (including any such matter involving any parent, subsidiary, affiliate, successor in interest or agent of Client or its subsidiaries or of EY) shall be brought in the Bankruptcy Court or the applicable district court (if such district court withdraws the reference) and the parties to this Agreement, and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole and exclusive forum (unless such court does not have jurisdiction and venue of such claims or controversies) for the resolution of such claims, causes of action or lawsuits. The parties to this Agreement, and any and all successors and assigns thereof, hereby waive trial by jury, such waiver being informed and freely made. If the Bankruptcy Court, or the district court upon withdrawal of the reference, does not have or retain jurisdiction over the foregoing claims or controversies, the parties to this Agreement and any and all successors and assigns thereof, agree to submit first to nonbinding mediation; and, if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures as set forth in Appendix 1 to these Terms and Conditions. Judgment on any arbitration award may be entered in any court having proper jurisdiction. The foregoing is binding upon Client, EY and any all successors and assigns thereof.


**EY**
Building a better
working world

## United States Specific Terms

39. The U.S. Department of Labor (DOL) regulations, at 20 CFR § 655.734(a)(1)(ii)(A), require the posting of notice of a Labor Condition Application (LCA) in instances where individuals holding certain visas (e.g., H-1B) will be working onsite. Where applicable, EY and the Client will work together to develop an appropriate notice to enable compliance with this requirement.

## Miscellaneous

40. A Contract constitutes the entire agreement between the parties as to the Services and the other matters it covers, and supersedes all prior agreements, understandings and representations with respect thereto, including any previously agreed confidentiality agreements. Except as expressly provided otherwise herein, this Agreement does not modify the terms or provisions for other professional services executed prior to Client's filing of a Chapter 11 petition in the Bankruptcy Court.

41. Each party may execute this Agreement or a Contract, as well as any modifications to them, by electronic means, and each party may sign a different copy of the same document. Both parties must agree in writing to modify this Agreement or a Contract, subject to Bankruptcy approval, if necessary.

42. Client agrees that EY and the other EY Firms may, subject to professional obligations, act for other clients, including Client's competitors.

43. Neither party may assign any of its rights, obligations or claims under this Agreement or a Contract.

44. If any provision of this Agreement or a Contract (in whole or part) is held to be illegal, invalid or otherwise unenforceable, the other provisions shall remain in full force and effect.

45. Client acknowledges that the U.S. Securities and Exchange Commission regulations indicate that, where auditor independence is required, certain confidentiality restrictions related to tax structure may render the auditor to be deemed to be non-independent or may require specific tax disclosures. Accordingly, if and only to the extent that U.S. Securities and Exchange Commission auditor independence regulations apply to the relationship between Client or any of Client's associated entities and any EY Firm, with respect to the tax treatment or tax structure of any transaction to which the Services relate, Client represents, to the best of its knowledge, as of the date of a Contract, that neither Client nor any Client Affiliate has agreed, either orally or in writing, with any other advisor to restrict Client's ability to disclose to anyone such tax treatment or tax structure. Client agrees that the impact of any such agreement is its responsibility.

46. EY and Client acknowledge that Client or a Client Affiliate (the "Local Client") may seek to enter into an agreement with another EY Firm (the "Local EY Firm") for the provision of services in another country (the "Local Services"). The parties agree that the Local Client and the Local EY Firm may enter into a local country agreement (the "Local Agreement") for Local Services that incorporates the terms and conditions of this Agreement, subject to any modifications they deem appropriate under local law, regulation, professional standard, or local custom and practice. For clarity, in such event, (i) the Local Agreement shall govern all Local Services; and (ii) neither the Local Client nor the Local EY Firm will be deemed to be parties to this Agreement in connection with the Local Services.


**Building a better
working world**

47. Client represents that Client Affiliates for whom Services are performed by EY in connection with a Contract shall be bound by the terms of such Contract.

48. Neither party may use or reference the other's name, logos or trademarks without its prior written consent, provided that EY may use Client's name publicly to identify Client as a client in connection with specific Services or otherwise.

49. The limitations in Sections 13 and 15 and the provisions of Sections 16, 20, 22 and 37 are intended to benefit the other EY Firms and all EY Persons, who shall be entitled to enforce them.

50. By agreement to the provision of the Services, EY is not providing a guarantee to Client that EY's performance of those services pursuant to the terms and conditions set forth in this Agreement will guarantee Client's successful reorganization under Chapter 11.

**Additional Provisions**

51. EY will provide the Services as described in the applicable Statement of Work to Client, contingent upon the Bankruptcy Court's approval of EY's retention in accordance with the terms of this Agreement.

52. The Services may be modified from time to time by EY's mutual written agreement and approval of the Bankruptcy Court, if required.

53. Client acknowledges and agrees that, whether or not the Statement of Work has been approved by the Bankruptcy Court at the time any Deliverable is rendered, any such Deliverable rendered by EY prior to the delivery of its final Deliverable is preliminary in nature and cannot be relied upon for any purpose, including penalty protection.

54. Any activities not described in the applicable Statement of Work are not covered by the fees stated therein. These services will be considered outside the scope of such Statement of Work and are the responsibility of Client to perform on a timely basis unless otherwise agreed by the parties in writing (in an amendment or a separate Statement of Work) and approved by the Bankruptcy Court.

55. Each Statement of Work will identify the individuals who will lead the EY engagement team in providing the Services. If any of these individuals ceases to provide the Services to the Client pursuant to such Statement of Work, EY will so advise the Client and, if that person is replaced, provide the Client with the name of the professional's replacement. Other staff, not identified therein, may be utilized as required to conduct EY's work in an efficient manner.

56. EY will submit an itemized and detailed billing statement for each applicable Statement of Work, and EY will request payment of EY's fees and expenses, in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules for the Bankruptcy Court and any relevant administrative orders. EY will submit EY's invoices as the work progresses and payment of them will be made upon receipt, or as quickly as the Bankruptcy Code, the Bankruptcy Rules, Local Rules and any relevant administrative orders allow.

57. EY acknowledges that payment of EY's fees and expenses is subject to (i) the jurisdiction and approval of the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code, any order of



the Bankruptcy Court approving the retention of EY and the U.S. Trustee Guidelines, (ii) any applicable fee and expense guidelines and/or orders and (iii) any requirements governing interim and final fee applications.

**IN WITNESS WHEREOF,** EY and Client have each caused this Agreement to be signed and delivered by its duly authorized representative/s.

**ERNST & YOUNG LLP**

Signed:

Name: Molly Ericson

Title: Managing Director

**Regal Cinemas, Inc.**

Signed:

Name: Tal Soudry

Title: President



**Appendix 1**

**Dispute resolution procedures**

**Mediation**

A party shall submit a dispute to mediation by written notice to the other party or parties. The mediator shall be selected by the parties. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR") shall designate a mediator at the request of a party. Any mediator must be acceptable to all parties and must confirm in writing that the mediator is not, and will not become during the term of the mediation, an employee, partner, executive officer, director, of or beneficial owner with decision-making capacity over any EY Firm audit client.

The mediator shall conduct the mediation as the mediator determines, with the agreement of the parties. The parties shall discuss their differences in good faith and attempt, with the mediator's assistance, to reach an amicable resolution of the dispute. The mediation shall be treated as a settlement discussion and shall therefore be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. The mediation proceedings shall not be recorded or transcribed.

Each party shall bear its own costs in the mediation. The parties shall share equally the fees and expenses of the mediator.

If the parties have not resolved a dispute within 90 days after written notice beginning mediation (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute shall be settled by arbitration. In addition, if a party initiates litigation, arbitration, or other binding dispute resolution process without initiating mediation, or before the mediation process has terminated, an opposing party may deem the mediation requirement to have been waived and may proceed with arbitration.

**Arbitration**

The arbitration will be conducted in accordance with the procedures in this document and the CPR Rules for Non-Administered Arbitration ("Rules") as in effect on the date of the Agreement, or such other rules and procedures as the parties may agree. In the event of a conflict, the provisions of this document will control.

The arbitration will be conducted before a panel of three arbitrators, to be selected in accordance with the screened selection process provided in the Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators. No potential arbitrator may be appointed unless the arbitrator has agreed in writing to these procedures and has confirmed in writing that the arbitrator is not, and will not become during the term of the arbitration,



an employee, partner, executive officer, director, of or beneficial owner with decision-making capacity over any EY Firm audit client.

The arbitration panel shall have no power to award non-monetary or equitable relief of any sort or to make an award or impose a remedy that (i) is inconsistent with the agreement to which these procedures are attached or any other agreement relevant to the dispute, or (ii) could not be made or imposed by a court deciding the matter in the same jurisdiction. In deciding the dispute, the arbitration panel shall apply the limitations period that would be applied by a court deciding the matter in the same jurisdiction, and shall have no power to decide the dispute in any manner not consistent with such limitations period.

Discovery shall be permitted in connection with the arbitration only to the extent, if any, expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery.

All aspects of the arbitration shall be treated as confidential. The parties and the arbitration panel may disclose the existence, content or results of the arbitration only in accordance with the Rules or applicable professional standards. Before making any such disclosure, a party shall give written notice to all other parties and shall afford them a reasonable opportunity to protect their interests, except to the extent such disclosure is necessary to comply with applicable law, regulatory requirements or professional standards.

The result of the arbitration shall be binding on the parties, and judgment on the arbitration award may be entered in any court having jurisdiction.

**Exhibit A-1**

**Advisory SOW**



**EY**

Building a better
working world

Ernst & Young LLP
Suite 1000
55 Ivan Allen Jr. Boulevard
Atlanta, GA 30308

Tel: +1 404 874 8300
Fax: +1 404 817 5589
ey.com

Regal Cinemas, Inc.
Attention: Tal Soudry
Chief Financial Officer
101 E. Blount Avenue
Knoxville, TN 37920

## Statement of Work – Bankruptcy Tax Advisory Services

This Statement of Work, which is effective as of September 21, 2022 (this "SOW"), is made by Ernst & Young LLP ("EY") and Regal Cinemas, Inc. on behalf of itself and its affiliated entities ("Client"), pursuant to the Agreement, dated September 7, 2022 (the "Agreement"), between EY and Regal Cinemas, Inc., which was executed in connection with the Client filing a petition under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") on or about September 7, 2022, with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), and describes certain services that EY will perform for the Client during the Client's Chapter 11 proceedings. This SOW shall be effective as of September 7, 2022.

This SOW incorporates the Agreement by reference to form a contract. Capitalized terms used, but not otherwise defined, in this SOW shall have the meanings in the Agreement.

**Scope of Services**

EY will work with appropriate Client personnel and/or Client's outside counsel and other advisors in developing an understanding of the tax implications associated with the Client's Chapter 11 filing or restructuring or other plan. In addition, the Services may include the following:

- Advise Client personnel in developing an understanding of the tax issues and options related to Client's Chapter 11 filing, taking into account Client's specific facts and circumstances, for US federal and state and local tax purposes.

- Advise on the US federal and state & local income tax consequences of proposed plans of reorganization, including, if necessary, assisting in the preparation of IRS ruling requests regarding the tax consequences of alternative reorganization structures and tax opinions.

- Understand and advise on the US tax implications of reorganization and/or restructuring alternatives Client is evaluating with existing creditors that may result in a change in the equity, capitalization, and/or ownership of the shares of Client and its assets. As requested, prepare projections of future taxable income reflecting the restructuring alternatives.

- Gather information, prepare calculations ("Section 382 Calculations") and apply the appropriate federal and state & local tax law to historic information regarding changes in the ownership of Client's stock to calculate whether any of the shifts in stock ownership may have caused an

A member firm of Ernst & Young Global Limited



ownership change that will restrict the use of tax attributes (such as net operating loss, capital loss, credit carry forwards, and built in losses) and the amount of any such limitation.

- Prepare calculations and apply the appropriate US federal and state & local tax law to determine the amount of tax attribute reduction related to debt cancellation income and modeling of tax consequences of such reduction.

- Prepare tax basis balance sheets and computations of stock basis as of certain relevant dates for purposes of analyzing the tax consequences of alternative reorganization structures.

- Analyze US federal and state & local tax treatment of the costs and fees incurred by the Client in connection with the bankruptcy proceedings, including tax return disclosure and presentation.

- Analyze US federal and state & local tax treatment of interest and financing costs related to debt subject to automatic stay, and new debt incurred as the Client emerges from bankruptcy, including tax return disclosure and presentation.

- Analyze US federal and state & local tax consequences of restructuring and rationalization of inter-company accounts, and upon written request, we will analyze tax impacts of transfer pricing and related cash management.

- Analyze US federal and state & local tax consequences of restructuring in the US or internationally during bankruptcy, including tax return disclosure and presentation.

- Analyze US federal and state & local tax consequences of potential bad debt and worthless stock deductions, including tax return disclosure and presentation.

- Analyze US federal and state & local tax consequences of employee benefit plans, as requested in writing.

- Advise Client personnel on the bankruptcy tax process and procedure lifecycle, the typical tax issues, options, and opportunities related to a Chapter 11 filing, the typical tax impact of a Chapter 11 filing on a corporate tax department's operation, and leading practices for addressing such impact areas while operating in bankruptcy and the post-emergence period.

- As requested by Client, assist with various tax, compliance and audit issues arising in the ordinary course of business while in bankruptcy, including but not limited to: IRS and/or state and local income and indirect tax audit defense, and compliance questions, notices or issues related (but not limited) to: federal, state & local income/franchise tax, sales and use tax, property tax, employment tax, credit & incentive agreements, and unclaimed property.



**EY**

Building a better
working world

- If applicable, advise on potential alternatives and elections relative to the CARES Act and the Tax Cuts and Jobs Act.

- Advise and/or assist, as requested and as permissible, with determining the validity and amount of bankruptcy tax claims or assessments, including but not limited to the following types of taxes: income taxes, franchise taxes, sales taxes, use taxes, employment taxes, property taxes, severance taxes, excise taxes, credit & incentive agreements, other miscellaneous taxes or regulatory assessments and fees, and unclaimed property.

- As requested by Client, scope, assist and advise on the potential for seeking cash tax refunds, including but not limited to the following types of taxes: income taxes, franchise taxes, sales taxes, use taxes, employment taxes, property taxes, tax credit & incentive agreements and unclaimed property. Any findings-based fee Services to claim and secure tax refunds will be subject to a separate Statement of Work mutually agreed to by the parties.

- Provide documentation, as appropriate or necessary, of tax matters, of tax analysis, opinions, recommendations, conclusions and correspondence for any proposed restructuring alternative, bankruptcy tax issue, or other tax matter described above. The Client will be responsible for all accounting and management decisions.

- Assist with tax compliance issues arising in the ordinary course of business while in bankruptcy, including but limited to identifying proactive tax return disclosures and bankruptcy-specific cover letters or requests, and addressing notices received in a bankruptcy context.

- As requested, provide support and tax analysis with respect to other routine federal, state and local income tax and non-income matters related to the ongoing operations of the Company that are not covered by a separate SOW and do not involve any significant tax planning or transactions outside the transactions anticipated as part of the Bankruptcy.

The Services may be modified from time to time by our mutual written agreement and approval of the Bankruptcy Court, if required.

Client acknowledges and agrees that, whether or not this SOW has been approved by the Bankruptcy Court at the time any deliverable is rendered, any such deliverable rendered by EY prior to the delivery of its final deliverable is preliminary in nature and cannot be relied upon for any purpose, including penalty protection.

**Other Provisions**

Client shall assign a qualified person to oversee the Services. Client is responsible for all management decisions relating to the Services and for determining whether the Services are appropriate for its purposes.



**EY**

Building a better
working world

If the Services are subject to the audit committee pre-approval requirements of the SEC and/or the PCAOB, this SOW will not be effective until the later of (1) the execution of this SOW or (2) the approval of Client's Audit Committee (or a duly authorized representative of Client's Audit Committee).

Notwithstanding anything to the contrary in the Agreement or this SOW, EY does not assume any responsibility for any third-party products, programs or services selected by Client, their performance or compliance with Client's specifications or otherwise.

To the extent the Services involve a cross-border tax arrangement, for example involving the EU or Mexico, mandatory disclosure regime ("MDR") rules may apply to some or all of the Services. EY and any EY Firms and any other service providers to which EY subcontracts portions of the Services will determine at EY's and their sole discretion whether EY or they are required to disclose any such cross-border arrangements covered by the Services. EY will share with Client in advance wherever possible any disclosure that EY or EY's subcontractors have the obligation to make in respect of the Services and in any event provide Client with a copy of the disclosure submitted, at Client's request. Where an obligation to comply with MDR is identified, EY will discuss with Client at that time estimated fees for related additional time incurred for MDR evaluation and reporting, including on an hourly-basis if the fees for the Services are on a non-hourly basis.

EY may subcontract a portion of the Services to one or more EY Firms and to subcontractors working under EY's direction who may communicate directly with Client. EY, however, will remain solely responsible to Client for the performance of the Services. If EY has prepared or reviewed (or will prepare or review) Client's U.S. income tax returns, Client authorizes the EY Firms, including those located outside the United States, and EY's subcontractors to disclose information received or generated in connection with the preparation of any such U.S. income tax returns of the Client to and among each other for the purpose of rendering the Services and discussing and providing other services to Client. Client has the ability to request a more limited disclosure of tax return information than that described above.  If, at any time, Client would like EY to narrow the scope of the information to be disclosed, please contact EY in writing and EY will limit any disclosures that have not yet occurred. Client acknowledges that this consent will be valid for three years from the date this SOW is signed by Client below.

EY and other EY Firms may retain and use Client Information for benchmarking, analytics, research and development, thought leadership and related purposes, and to enhance their services, provided that any use does not externally identify, or make reference to, Client. In all such matters, EY and other EY Firms will comply with applicable law and professional obligations.

**Contacts and Engagement Team**

Client has identified Malek Ballan as Client's contact with whom EY should communicate about these Services. Client's contact at EY for these Services will be Molly Ericson (Managing Director). Molly Ericson will lead the EY team in providing the Services.



**Building a better working world**

**Fees**

Client shall pay fees for the Services based on the actual time that EY's professionals spend performing them, billed at the following hourly rates for each level while the Services under this SOW are being performed. Client shall also pay any potential value-added taxes (VAT), sales taxes, and other indirect taxes incurred in connection with the delivery of the Services, including any such taxes and related administrative costs that result from billing arrangements specifically requested by Client.

| Level | Rate per hour |
|---|---|
| Partner/Principal | $1,250 |
| Managing Director | $1,150 |
| Senior Manager | $950 |
| Manager | $850 |
| Senior | $600 |
| Staff | $400 |

EY will bill Client for EY's fees, expenses, and applicable taxes or other charges, if any, on a monthly basis. Payment is due upon receipt of EY's invoice.

In witness whereof, the parties have executed this SOW as of the date set forth below.

*Ernst + Young LLP*

Regal Cinemas, Inc., on behalf of itself and its affiliates.

By: _____
      Tal Soudry
      President, Regal Cinemas, Inc.

Date: _____

A member firm of Ernst & Young Global Limited

## <u>Exhibit A-2</u>

**First Tax Compliance SOW**



**EY**
Building a better
working world

Regal Cinemas, Inc.
Attention Tal Soudry
Chief Financial Officer
101 E. Blount Avenue
Knoxville, TN 37920

## Statement of Work – Tax Compliance Services #1

This Statement of Work, dated September 21, 2022 (this "SOW"), is made by Ernst & Young LLP
("EY") and Regal Cinemas, Inc. on behalf of itself and its affiliated entities ("Client"); pursuant to the
Agreement, dated September 7, 2022, (the "Agreement"), between EY and Regal Cinemas, Inc., which
was executed in connection with the Client filing a petition under Chapter 11 of the United States
Bankruptcy Code ("Chapter 11") on or about September 7, 2022 with the United States Bankruptcy
Court for the Southern District of Texas (the "Bankruptcy Court"), and describes certain services that
EY will perform for the Client during the Client's Chapter 11 proceedings. This SOW shall be effective
as of the date of the Client's filing a Chapter 11 petition with the Bankruptcy Court.

This SOW incorporates the Agreement by reference to form a contract. Capitalized terms used, but not
otherwise defined, in this SOW shall have the meanings in the Agreement.

**Scope of Services**

EY will provide the following Services (the "Services").

*Tax compliance services*

- Preparation of Amended U.S. Form 1120 (US Corporate Income Tax Return) for Crown
  Intermediate HoldCo and Subsidiaries for the tax year ended December 31, 2019

- Preparation of amended prior year corporate state tax returns listed in Appendix A.

EY may access tax information relating to Client that is posted by governmental entities, partnerships,
or others in order to provide tax services to Client, in cases where EY determines that it would be
efficient for EY to do so. However, Client remains responsible for making sure that Client has provided
EY with all relevant information to support EY's provision of tax services. If EY is preparing returns
for Client, this includes either providing EY with all required Forms 1099-G, Schedules K-1, and other
tax forms made available to Client, or informing EY specifically that such forms should be obtained
online. While EY may access such forms online for purposes of convenience, EY is not responsible for



**EY**
Building a better
working world

identifying such forms, nor is EY responsible for collecting any particular form on Client's behalf unless Client has specifically requested that EY does so and EY has agreed.

Treasury regulations require taxpayers to file disclosure statements relating to certain tax strategies/transactions that the Internal Revenue Service ("IRS") has identified as Listed Transactions or Transactions of Interest, any transaction that is substantially similar to a Listed Transaction or Transaction of Interest, and Other Reportable Transactions. The disclosure statements must be filed with the proper tax returns and also sent separately to the IRS. In addition, some states have enacted tax shelter legislation requiring taxpayers to file reportable transaction disclosure statements with the appropriate state income and franchise tax returns. Failure to disclose properly any of these transactions/strategies in which Client directly or indirectly participated may result in the imposition of penalties. During the process of gathering data to prepare Client's tax return(s), EY requires Client to complete the Reportable Transaction Questionnaire, which is provided with this SOW. If there is a particular person other than Client who should respond to such questionnaire on behalf of Client, please immediately provide to EY that person's name, position, email address and telephone number. EY shall not be liable for any penalties resulting from Client's failure to accurately and timely respond to the questionnaire or to timely file the required disclosure statements.

Unless Client indicates otherwise, EY will check the box on Client's returns, when the option is available, indicating that the taxing authorities can discuss the return directly with the EY preparer who signed it. These discussions are limited to certain issues related to the processing of the returns. Interactions with taxing authorities beyond the scope of processing issues may require a Power of Attorney that must be signed by Client. Any services that may be performed under this arrangement are subject to the terms and conditions of this SOW but are not considered covered under the fee quoted for the preparation of Client's return(s) and therefore will be billed separately. If Client prefers that this box not be checked, please contact Client's EY tax professional.

This engagement does not include (1) an analysis of any shift in ownership of Client stock, (2) the preparation of statements required by Internal Revenue Code §§382 and 383, or (3) a determination of whether such code sections limit the amount of taxable income or tax that can be offset by net operating loss carryforwards, certain recognized built-in losses, certain excess credits, or net capital loss carryovers. The limitations under these provisions may have a material adverse impact on Client's tax liability. EY will not prepare a return on which taxable income (or tax) is offset by such attributes unless an analysis is performed. If Client would like EY to perform such an analysis, those services would be covered under a separate SOW. Please contact Client's EY tax professional named below if Client would like to discuss additional services and fees associated with the analysis and reporting requirements under these rules.



**EY**
Building a better
working world

This engagement does not include any advice or determinations regarding what expenses may be qualified research expenses under Internal Revenue Code §41 or comparable state statutes.

The tax compliance services do not include responding or assisting Client in responding to notices from taxing jurisdictions, other than notices received during the term of this SOW relating to returns prepared by EY when such notices pertain to the compilation, assembly, or processing of the return. EY is prepared to assist Client in responding to other notices/communications from taxing authorities, however, such services are beyond the scope of the tax compliance services.

All Client copies of the tax return(s) will be presented to Client in an electronic format.

Upon written request, EY will assist Client with other tax compliance services, including preparation of additional returns for the current tax year, and extension requests and computation of estimated tax payments for subsequent tax years. However, these services are not covered under the fee quoted in this letter. EY will discuss with Client and provide fee estimates for such additional services, which would be invoiced separately and subject to all other terms and conditions of this SOW and the above-referenced Agreement.

**Other Provisions**

Client shall assign a qualified person to oversee the Services. Client is responsible for all management decisions relating to the Services and for determining whether the Services are appropriate for its purposes.

Notwithstanding anything to the contrary in the Agreement or this SOW, EY does not assume any responsibility for any third-party products, programs or services selected by Client, their performance or compliance with Client's specifications or otherwise.

To use EY Interact My Documents ("EYI MyDocs") for collaboration with Client, EY will create a client collaboration workspace with a sharing library to which Client's employees and external contractors using Client email addresses (collectively, "Client users") designated by Client and at least one member of the EY engagement team are provided access ("Client Library"). Client may use the Client Library to deposit information and retrieve EY deliverables. EY may establish a number of Client Libraries on the client collaboration workspace where Client and EY can exchange documents and information; everyone with access to a particular Client Library will have access to all documents stored in that Client Library. The client collaboration workspace should not be used as a repository by Client. Client is responsible for informing EY in writing of the names and email addresses of Client users who are to have access to each Client Library and for notifying EY in writing when access for any Client



**EY**
Building a better
working world

user is to be removed. Client will provide the name and email address of the Client representative who will inform EY which Client users are to have access.

Client authorizes EY, its affiliates, other members of the global Ernst & Young network, including those located outside the United States, and subcontractors providing services on EY's or their behalf, to disclose Client's tax return information received or generated in connection with the Services described in this SOW, prior-years' tax return information and information relating to the immediately succeeding tax year, to and among each other for the purpose of rendering the Services, discussing and providing other services to Client (including tax advisory services and bringing to Client's attention planning opportunities EY may identify based upon the preparation and/or review of Client's tax returns), and conducting quality reviews and reviews of compliance with EY policies and professional standards. Client has the ability to request a more limited disclosure of tax return information than that described above. If, at any time, Client would like EY to narrow the scope of the information to be disclosed, please contact EY in writing and EY will limit any disclosures that have not yet occurred. Client acknowledges that this consent will be valid for three years from the date this SOW is signed by Client below.

EY and other EY Firms may retain and use Client Information for benchmarking, analytics, research and development, thought leadership and related purposes, and to enhance their services, provided that any use does not externally identify, or make reference to, Client. In all such matters, EY and other EY Firms will comply with applicable law and professional obligations.

**EY Tools:** EY may provide Client access to use certain data, software, designs, utilities, tools, models, systems and other methodologies and know-how that EY owns or licenses for the purpose of Client's receipt of the Services or as otherwise expressly agreed in writing by EY ("**EY Tools**"). As between EY and Client, EY (or another EY Firm) owns all right, title, interest, and all intellectual property rights in and to the EY Tools, including any enhancements, modifications, and derivative work thereof.

**License to EY Tools During the SOW Term:** To the extent that EY provides Client access to any EY Tools during the term of this SOW, EY hereby grants to Client a nonexclusive, paid-up, internal license, during the term of this SOW, to use the EY Tools, for the sole purpose of Client's receipt of the Services from EY under this SOW.

**License to EY Tools After the SOW Term:** EY may allow Client to use certain EY Tools, after the term of this SOW ("Leave Behind EY Tool"), for the sole purpose of Client's use and receipt of the benefit of the Services provided by EY under this SOW. With respect to any such Leave Behind EY Tools, to the extent permitted by applicable law and professional regulations, EY hereby grants to Client a nonexclusive, paid-up, internal license, to use the Leave Behind EY Tool, after the term of this SOW, for the sole purpose of Client's use and receipt of the benefit of the Services provided by EY under this



**EY**
Building a better
working world

SOW.

**EY Tools Disclaimers and Acknowledgements:** Client's use of any EY Tools may be subject to additional terms, which EY will provide to Client in writing. Client acknowledges that EY may at any time, modify, replace, direct Client to discontinue use of any EY Tools, or otherwise revoke, limit or condition Client's access and right to use any EY Tools. ALL EY TOOLS ARE PROVIDED "AS IS" AND WITHOUT ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF TITLE, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR USE, OR ANY WARRANTY THAT THE OPERATION OF THE EY TOOL WILL BE UNINTERRUPTED, ERROR FREE OR THAT IT WILL BE OR REMAIN COMPATIBLE WITH ANY OF CLIENT'S HARDWARE OR SOFTWARE.

**Fees**

Client shall pay EY a fee of $75,000 for the tax compliance services.

Client shall also pay any potential value-added taxes (VAT), sales taxes, and other indirect taxes incurred in connection with the delivery of the Services, including any such taxes and related administrative costs that result from billing arrangements specifically requested by Client.

Invoices for the returns will be sent and payable as follows:

|  | Invoice Date | Payment Due | Amount |
|---|---|---|---|
| Final bill | October 1, 2022 | October 31, 2022 | $75,000 |

*Or upon delivery of final return

Any expenses, applicable taxes, or other charges will be billed separately as incurred.

Any legislative or regulatory change that significantly alters the scope of the Services, or the amount of time required to deliver the Services, will be considered an event for which EY may modify the fees. EY will communicate with Client regularly regarding any changes that may impact Client's scope and fees. Upon notice to Client, EY will bill for these items based on the rates for each level indicated above.

**Contacts and Engagement Team**



**Building a better working world**

Client has identified Tal Soudry as Client's contact with whom EY should communicate about these Services. Perry Blandford (Partner) and Drew Frisby (Senior Manager) will lead the EY team in providing these services.

In witness whereof, the parties have executed this SOW as of the date set forth below.

*Ernst + Young LLP*

AGREED:

Regal Cinemas, Inc.

By: _____

Tal Soudry, Chief Financial Officer

Date: _____09/30/2022_____

AGREED:

Regal Cinemas, Inc., on behalf of itself and its affiliates

By: _____

Tal Soudry, Chief Financial Officer

Date: _____09/20/2022_____



**EY**

Building a better
working world

## Appendix A

| Entity Name | Jurisdiction | Tax Form | Years |
|---|---|---|---|
| Crown Intermediate Holdco & Subs | AK Form 6000 | Alaska Corporate Income Tax Return | 2018 & 2019 |
| United Artists Theatre Circuit, Inc. | MS Form 83-105 | Mississippi Corporate Income and Franchise Tax Return | 2019 |
| Hollywood Theaters, Inc. | MO Form MO-1120 | Missouri Corporation Income Tax Return | 2019 |
| Regal Cinemas, Inc. | MO Form MO-1120 | Missouri Corporation Income Tax Return | 2018 & 2019 |
| Hollywood Theaters, Inc. | OK Form 512 | Oklahoma Income Tax Return | 2019 |



# Reportable Transaction Questionnaire (revised April 2020)

## Regal Cinemas, Inc.

**Purpose:**
Ernst & Young LLP (EY) uses this questionnaire to prepare your tax returns. US Treasury Department regulations require disclosure statements relating to certain transactions, plans and arrangements. These disclosure statements must be filed with the tax return and with a separate IRS office. Failure to make a proper disclosure may result in penalties. Some states have similar disclosure requirements. EY shall not be liable for any penalties resulting from your failure to accurately and timely respond to these questions or to timely file disclosure statements.

**Instructions:**
This questionnaire must be completed for each year for which EY prepares an income tax return. If you are completing this questionnaire for one or more individuals or legal entities, your response should take into account the activities of each. If this questionnaire is being completed in connection with a statement of work, it should address all of the taxpayer(s) and return(s) included in the scope of the engagement. Otherwise, we've included an attachment that lists the taxpayers and returns that you should consider as you complete the questionnaire. The terms "you," "your" and "taxpayer" refer collectively to all of these individuals and entities.

**Question:**

Please review the questions on the next two pages for each individual and entity covered by this engagement and check the box below that is applicable.

☐      My answer is no or N/A to all of the questions. (Please sign and date this questionnaire to complete it.)

☐      My answer is yes to one or more of the questions and/or I am unsure of my answer to one or more of the questions. (Please complete the box below before signing and dating this questionnaire.)

If your answer is yes or unsure with respect to one or more questions, list in the following box the applicable taxpayer and the question number(s) of the reportable transaction and/or, if applicable, the transaction number(s) of the listed transaction or transaction of interest to which the answer relates.



**EY**
Building a better
working world

**Disclosure in connection with a reportable transaction**

If you are completing this questionnaire only with respect to a Regulated Investment Company (RIC), start with question 4. If you are completing this questionnaire for any other taxpayer, start with question 1. Section references are to the Internal Revenue Code of 1986, unless otherwise indicated.

**Questions:**

1. **Loss transactions:** Have you directly or indirectly entered into a transaction that results in claiming a gross loss (no netting against gains) over the loss threshold amounts described below that is deductible pursuant to a provision of the tax code that treats the transaction as a sale or other disposition (for example, Section 741 or Section 988) or otherwise results in a deduction under Section 165?

   Note that this question does not include a loss from a casualty or involuntary conversion. Also, consider this question with regard to losses reported on your federal or California state tax returns for each of the categories of taxpayers described in the paragraphs that follow that applies to you (more than one, if applicable). If you are a US shareholder of a controlled foreign corporation ("CFC", as defined below) or a 10% shareholder of a qualified electing fund ("QEF", as defined below), include any loss that the foreign corporation would report if it were treated as a domestic corporation filing a US return and consider the activities of the CFC or QEF in connection with the other questions below.

   **Loss threshold amounts**

   Individuals and trusts: At least $2 million on this tax return (or $50,000 or greater in the case of a Section 988 foreign currency loss transaction), or at least $4 million when combining this tax return with other years' returns. Include transaction losses that flow through from a partnership or S corporation.

   Partnerships and S corporations: At least $2 million on this tax return, or at least $4 million when combining this tax return with other years' returns. This category includes partnerships with at least one partner that is not a C corporation (looking through any partners that are partnerships).

   Corporate entities: At least $10 million on this tax return, or at least $20 million when combining this tax return with other years' returns. This category includes:

   - C corporations
   - Tax-exempt entities (with respect to Unrelated Business Taxable losses)
   - Partnerships, if every partner is a C corporation (looking through any partners that are partnerships)
   - Controlled foreign corporations (CFCs) – a non-US corporation that has US shareholders (i.e., US persons who directly or indirectly own 10% or more of the combined voting



power, or, effective for taxable years of foreign corporations beginning after December 31, 2017, the value of all classes of stock of such non-US corporation) that own in the aggregate more than 50% of the total vote or value of such non-US corporation

- Qualified electing funds (QEFs) – a passive foreign investment company that meets the requirements of Section 1295 and the regulations thereunder, which include an annual taxpayer election

2. **Confidentiality agreement:** Have you entered into a transaction offered to you by a paid tax advisor who placed a limitation on your disclosure of the tax treatment or tax structure of the transaction?

3. **Contingent fees or other contractual protection:** Will your tax returns reflect the results of a transaction for which you (or a related party) paid fees to an advisor that were contingent on realizing federal, California or New York tax benefits, or for which you (or a related party) have the right to the refund of any fees if the federal, California or New York tax effects of the transaction are not sustained?

4. **Federal Listed Transactions and Transactions of Interest:** Have you participated in any transaction that is a Federal Listed Transaction or Federal Transaction of Interest or that might be considered the same as or substantially similar to any of the Federal Listed Transactions or Transactions of Interest and the tax benefits from your participation are expected to be reflected in the current or future year tax returns? The Federal Listed Transactions and Transactions of Interest are summarized in the attachment to this questionnaire. If the answer is "yes," please provide us with a copy of any previously filed Form 8886 disclosure.

5. **State Listed Transactions:** If you file a California, Colorado, New York, or Oregon state tax return, have you participated (i.e., in current or previous filing years) in any transaction that is an applicable State Listed Transaction or might be considered substantially similar to any of the applicable State Listed Transactions and the tax benefits from your participation are expected to be reflected in current or future year tax returns? The State Listed Transactions are summarized in the attachment to this questionnaire. If the answer is "yes," please provide us with a copy of any previously filed Form 8886 disclosure or equivalent state disclosure forms.



**Building a better working world**

Signature on behalf of the identified individuals and entities, including any applicable CFCs and QEFs:

_____     _____     _____

Signature                                    Title (if applicable)              Date


_____     _____     _____

Spouse's signature (if applicable)                                            Date


**After answering the questions above and signing this questionnaire:**

**Return it by:**

_____          _____

    Insert date                         Insert name

**At:**

_____



# Listed Transactions and Transactions of Interest (revised April 2020)

As of April 2020, below are the titles of the transactions identified as "Listed Transactions" and "Transactions of Interest" by the IRS and "Listed" transactions by State taxing authorities, along with the citation to the pronouncement describing the transaction in greater detail.

**Federal Listed Transactions**

1. Lease strips and other stripping transactions: Transactions that allow one participant to realize rental or other income from property or service contracts and another participant or the same participant in a different tax year reports deductions related to that income. Identified in IRS Notice 95-53 and IRS Notice 2003-55.

2. 401(k) accelerator: Transactions in which taxpayers claim deductions for contributions to a qualified cash or deferred arrangement or matching contributions to a defined contribution plan where the contributions are attributable to compensation earned by plan participants after the end of the taxable year. Identified in Rev. Rul. 90-105.

3. Multiple employer plans: Trust arrangements purported to qualify as multiple employer welfare benefit funds exempt from the limits of §§419 and 419A. Identified in IRS Notice 95-34. (See item #21 below regarding collectively bargained welfare benefit funds.)

4. Certain contingent installment sales by partnerships with tax-indifferent partners: Transactions involving contingent installment sales of securities by partnerships in order to accelerate and allocate income to a tax-indifferent partner, such as a tax-exempt entity or foreign person, and to allocate later losses to another partner. Identified as ACM Transactions. See IRS Notice 2009-59.

5. Distributions from charitable remainder trusts: Transactions involving distributions described in Treas. Reg. §1.643(a)-8 from charitable remainder trusts. This transaction uses a §664 charitable remainder trust to convert appreciated assets into cash, while avoiding the gain on the disposition of the assets. See IRS Notice 2009-59.

6. Lease-in, lease-out transactions (LILOs): Transactions in which a taxpayer purports to lease property and then purports to immediately sublease it back to the lessor (that is, lease-in/lease-out or LILO transactions). See IRS Notice 2009-59.

7. Distribution of encumbered property: Transactions involving the distribution of encumbered property in which taxpayers claim tax losses for capital outlays that they have in fact recovered. Identified in IRS Notice 99-59.



**EY**
Building a better
working world

8. Fast-pay arrangements with corporate stock: Transactions involving fast-pay arrangements as defined in Treas. Reg. §1.7701(l)-3(b) in which a corporation's outstanding stock is structured (in whole or in part) to return the stockholder's investment by distributions treated as dividends. Identified as Fast-pay Arrangements. See IRS Notice 2009-59.

9. Counterbalancing debt instruments: Transactions involving the acquisition of two debt instruments the values of which are expected to change significantly at about the same time in opposite directions. Identified in Rev. Rul. 2000-12.

10. Artificially inflated tax basis of partnership interests: Transactions generating losses resulting from artificially inflating the tax basis of partnership interests. Identified in IRS Notice 2000-44.

11. Employee stock transfer: Transactions involving the purchase of a parent corporation's stock by a subsidiary, a subsequent transfer of the purchased parent stock from the subsidiary to the parent's employees, and the eventual liquidation or sale of the subsidiary. Identified in Notice 2000-60.

12. Guamanian trusts: Transactions purporting to apply §935 to Guamanian trusts. Identified in IRS Notice 2000-61.

13. Intermediary ("Midco") transactions: A broad range of "routine" transactions that happen to include the acquisition, disposition, or movement of stock and assets. The typical Midco transaction is one in which a taxpayer desires to sell stock of a corporation and a buyer desires to purchase the assets. These parties conduct the transaction through an intermediary, with the taxpayer selling the stock to the intermediary and the buyer then purchasing the assets from it and claiming a fair market value basis. The intermediary, having enabled the target corporation to not pay tax on the built-in gain in its assets, usually receives compensation for participating in the transaction. See IRS Notice 2008-111 and IRS Notice 2001-16.

14. Contingent liability transactions: Transactions involving a loss on the sale of stock acquired in a purported §351 transfer of a high basis asset to a corporation and the corporation's assumption of a liability that the transferor has not yet taken into account for federal income tax purposes. Identified in IRS Notice 2001-17.

15. Basis shifting on stock redemptions not subject to US tax: Redemptions of stock in transactions not subject to US tax in which the basis of the redeemed stock is purported to shift to a US taxpayer. Identified in IRS Notice 2001-45.

16. Inflated tax basis: Transactions in which the taxpayer as part of an acquisition of assets also assumes debt exceeding their fair market value. The taxpayer claims a higher basis due to the debt assumption. Upon sale of the assets, the taxpayer claims a loss for basis in excess of the fair market value of the assets. Identified in IRS Notice 2002-21.



**Building a better working world**

17. Reporting payments made on notational principal contracts while disregarding offsetting future payments: Transactions using a notional principal contract to claim deductions for periodic payments made by the taxpayer while disregarding the accrual of a right to receive offsetting payments in the future. Identified in IRS Notice 2002-35.

18. Allocation of straddle gain or loss in a common trust fund or pass-through entity: Transactions involving the creation of straddles in a common trust fund or pass-thru entity (i.e., partnership, S corporation, or grantor trust), with the allocation of gain to one party and loss to another party. Identified in IRS Notice 2002-50, IRS Notice 2002-65 and IRS Notice 2003-54.

19. Prohibited ownership of S corporation securities by an employee stock ownership plan (ESOP): Transaction in which an S corporation and an associated employee stock ownership plan (ESOP), which was formed on or before March 14, 2001, is subsequently transferred and the ESOP claims the benefit of a delayed effective date under §409(p). As a result of the delayed effective date, the earnings of the S corporation are not currently taxed. Identified in IRS Rev. Rul. 2003-6. (See item 26 below regarding S corporation ESOPs involving synthetic equity.)

20. Offshore deferred compensation arrangements involving an offshore employment leasing company: Transactions involving an individual taxpayer who purportedly resigns from his or her current employer or professional corporation and enters an employment contract with an offshore employment leasing company. The offshore leasing company leases the individual's services back to the original employer, typically using one or more intermediaries. The participants claim tax benefits in the form of reduced or avoided individual and corporate income and employment taxes. Identified in IRS Notice 2003-22.

21. Collectively bargained welfare benefit funds: Trust arrangements purporting to qualify as collectively-bargained welfare benefit funds exempt from the limits of §§419 and 419A. Identified in IRS Notice 2003-24. (See item #3 above regarding multiple employer plans.)

22. Transfers of compensatory stock options to related persons: Transactions involving an individual, generally an employee, who has been granted a nonstatutory compensatory stock option, and transfers that option to a related person. The individual does not claim compensation income when the related person exercises the stock option or, in cases where the related person pays for the option with a note or other deferred payment, the individual does not claim compensation income until receiving the deferred payments. Identified in IRS Notice 2003-47.

23. Contested liability trusts: Transactions involving transfers to a trust to provide for the satisfaction of contested liabilities in an attempt to accelerate deductions for the contested liabilities under §461(f). Identified in IRS Notice 2003-77.

24. Offsetting foreign currency option contracts: Transactions in which a taxpayer claims a loss upon the assignment of a §1256 foreign currency option contract to a charity but fails to report the



**EY**
Building a better
working world

recognition of gain when the taxpayer's obligation under an offsetting non-section 1256 foreign currency option contract terminates. Identified in IRS Notice 2003-81.

25. Roth IRA contributions in transactions designed to avoid contribution limits: Transactions designed to avoid the statutory limits on contributions to a Roth IRA contained in §408A using a corporation, substantially all the shares of which are owned or acquired by the Roth IRA. Identified in IRS Notice 2004-8.

26. S corporation ESOP involving synthetic equity: Transaction involving an S corporation that is at least 50% owned by an employee stock ownership plan (ESOP,) designed to avoid current taxation of the S corporation's profits generated by the business activities of a specific individual or individuals. The profits are accumulated and held for the benefit of the individual(s) in a qualified subchapter S subsidiary (QSub) or similar entity (such as a limited liability company), the profits are not paid to the individual(s) as compensation within 2½ months after the end of the year in which earned, and the individual or individuals have rights to acquire stock or similar interests equal to 50% or more of the fair market value of the QSub. Identified in IRS Rev. Rul. 2004-4. (See item #19 above also involving S corporation ESOPs.)

27. Pension plans involving excessive life insurance: Transactions involving a qualified pension plan that includes life insurance contracts on the life of a participant in the plan with a face amount that exceeds the participant's death benefit under the plan by more than $100,000. Upon the death of the covered employee, the life insurance contract proceeds exceeding the death benefit are applied to the premiums under the plan for other participants. Identified in Rev. Rul. 2004-20.

28. Foreign tax credit intermediary transactions: Transactions in which, pursuant to a prearranged plan, a domestic corporation purports to acquire stock in a foreign target corporation and makes an election under §338 before selling all or substantially all of the target corporation's assets in a transaction that triggers foreign tax on built-in gains that are not subject to US tax. The domestic corporation claims foreign tax credits generated with respect to the foreign income tax imposed on the asset sale. Identified in IRS Notice 2004-20. IRS.  IRS Notice 2020-19 withdraws Notice 2004-20 effective for transactions entered into after April 6, 2020.

29. S corporation nonvoting stock issued to tax-exempt organization: Transactions in which S corporation shareholders attempt to transfer the incidence of taxation on S corporation income by donating S corporation nonvoting stock to an exempt organization, while retaining the economic benefits associated with that stock (through warrants issued to the S corporation shareholders that would dilute the shares of nonvoting stock held by the exempt organization or agreements to repurchase the nonvoting stock from the exempt organization at a value that is substantially reduced by reason of the warrants). Identified in IRS Notice 2004-30.

30. Intercompany financing through partnerships using guaranteed payments: Transactions in which a corporation that is exempt from US federal income tax, such as a foreign corporation, provides



**EY**
Building a better
working world

financing to a domestic subsidiary by investing in the preferred stock of the subsidiary through a partnership in an attempt to convert interest payments that would not be currently deductible under §163(j) into deductible payments. The foreign corporation's return on investment is structured as a guaranteed payment by the partnership, most of which is allocated to, and deducted by, another domestic subsidiary that is a partner in the partnership. In some cases, the guaranteed payments are made to a partner that is unrelated to the foreign corporation and the partnership's obligations to make the guaranteed payments are assured by the foreign corporation or a related party. Identified in IRS Notice 2004-31.

31. Sale-in, lease-out transaction (SILOs) with a tax-indifferent party: Transactions in which a taxpayer/lessor enters into a purported sale-leaseback arrangement with a tax-indifferent person (such as a foreign entity, a domestic tax exempt organization or government, or a company in a net operating loss position or other tax neutral situation) as lessee in which substantially all of the tax-indifferent person's future rental payment obligations and purchase option rights are economically defeased/nullified and the taxpayer's risk of loss from a decline, and opportunity for profit from an increase, in the value of the leased property are substantially limited, and there is an obligation on the lessee to provide to the lessor a service contract arrangement or contingent residual value insurance in the event that the lessee purchase option right is not exercised. These leases are frequently referred to as "lease-to-service contracts" or "QTE leases." Identified in IRS Notice 2005-13.

32. Loss importation transactions: Transactions in which a taxpayer acquires control of a foreign entity treated as a corporation for US tax purposes, and uses the foreign entity's offsetting positions with respect to foreign currency or other property for the purpose of importing losses, but not corresponding gains. Gain is not imported because the taxpayer causes the foreign entity to close out the gain position while the foreign entity is still treated as a foreign corporation. The taxpayer enters into a new offsetting position to lock in the unrealized loss on the loss position and eliminate further economic risk. The taxpayer then imports the unrealized loss into the US, typically by making a check-the-box election with respect to the foreign entity and then closing out the loss position. It may also import the assets of the foreign entity into the US in another type of carryover basis transaction such as a reorganization described in section 368(a). The taxpayer must make the check-the-box election or otherwise dispose of the stock of the foreign entity within 30 days of acquiring it, so that the foreign entity will not qualify as a CFC and the gain it recognizes will not be taxable under subpart F. Identified in IRS Notice 2007-57.

33. Welfare benefit funds utilizing cash value life insurance policies: Trust arrangements purporting to provide employees welfare benefits in the form of cash value life insurance policies. In these arrangements the employer claims deductions for its contributions to the trust per the premium amounts paid, but the employee/policy owners include little if any in corresponding income. These arrangements may involve either a taxable trust or a tax-exempt trust. Identified in IRS Notice 2007-83.



**Building a better working world**

34. Distressed asset trust: Distressed Asset Trust: Transactions in which trusts are used to shift built-in losses in distressed assets that have been transferred into such trusts by a tax-indifferent party to a beneficiary who is a US taxpayer. The distressed assets are then written off by the US taxpayer under §166 or sold with the US taxpayer claiming a deduction under §165, even though the US taxpayer has not incurred an economic loss. Identified in IRS Notice 2008-34.

35. Basket option contract transactions: Transactions in which a taxpayer enters into a contract, denominated as an option with a stated term exceeding one year, to receive a return based on the performance of a basket of assets that qualify as actively traded property. The taxpayer retains the right to change the assets in the basket or the trading algorithm that determines how the assets in the basket are traded. The taxpayer takes the position that any income from the performance of the assets in the basket is deferred until the contract terminates, and the entire amount of income is treated as long-term capital gain if the contract itself is held for more than one year. Identified in IRS Notice 2015-73.

36. Syndicated conservation easement transaction: Transactions in which an investor receives promotional materials, oral or written, that offer prospective investors in a pass-through entity the possibility of a charitable contribution deduction that equals or exceeds an amount that significantly exceeds the amount of the investor's investment. The investor purchases an interest, directly or indirectly (through one or more tiers of pass-through entities), in the pass-through entity that holds real property. The pass-through entity that holds the real property contributes a conservation easement encumbering the property to a tax-exempt entity and allocates, directly or through one or more tiers of pass-through entities, a charitable contribution deduction to the investor, which the investor reports on its federal income tax return. Identified in IRS Notice 2017-10.

## Federal Transactions of Interest

TOI1. Contribution of a successor member interest to a charity: A transaction in which a taxpayer acquires a successor interest in an LLC or similar entity that directly or indirectly holds real property, transfers the rights more than one year after the acquisition to a charity described in section 170(c), and claims a charitable contribution deduction that is significantly higher than the amount that the taxpayer paid to acquire the rights. Identified in IRS Notice 2007-72.

TOI2. Toggling grantor trusts: Transactions in which a grantor creates and funds a grantor trust with four options with values that are expected to move inversely in relation to at least one of the other options. The grantor then gives a unitrust interest to a beneficiary while retaining a noncontingent remainder interest and the power to reacquire trust property at a specified future date by substituting other property of equivalent value. Through a series of successive transactions involving the sale of the remainder interest to an unrelated buyer for an amount substantially equal to the fair market value of the options contributed to the trust, the "activation" of the substitution power on its effective date, the close-out of the "loss options," and the sale of the unitrust interest to the unrelated buyer, the grantor trust status of the trust is



purportedly "toggled off" and "toggled on." The grantor claims a tax loss attributable to the close-out of the loss options even though the grantor has not suffered an equivalent economic loss. A variation of the transaction described above involves an initial contribution of liquid assets instead of options, and a subsequent substitution of appreciated property for the liquid assets. This variation is designed to enable the grantor to avoid the recognition of gain upon the disposition of the appreciated assets. Identified in IRS Notice 2007-73.

**TOI3.** Potential for avoidance of tax through sale of charitable remainder trust interests: Transactions involving the sale or other disposition of all interests in a charitable remainder trust (subsequent to the contribution of appreciated assets to the trust but after their sale by the trust). The grantor or other noncharitable claims an increased basis in the annuity or unitrust interest sold based upon the tax basis of assets within the trust (rather than with reference to the tax basis of assets transferred to the trust) thereby recognizing little, if any, gain from such sale or other disposition of the unitrust or annuity interest. Identified in IRS Notice 2008-99.

**TOI4.** Use of domestic partnership with CFC partners to avoid taxable Subpart F inclusions: Transactions involving a US taxpayer owning at least one CFC which is a partner in a domestic partnership (the other partner(s) may or may not also be CFCs). The domestic partnership owns a CFC Opco that earns income of a type which is subpart F income. The US taxpayer claims that the subpart F income of the CFC Opco is not subpart F income in the hands of the CFC partner (or the partner's US owner) because of the interposition of the domestic partnership. Identified in IRS Notice 2009-7.

**TOI5.** Basket contract transactions: Basket Contract Transactions: Transactions in which a taxpayer enters into a contract to receive a return based on the performance of a basket of assets. The contract has a term of more than one year (or overlaps two of the taxpayer's taxable years). The assets in the basket may include securities, commodities, foreign currency, interests in entities that trade in such assets, or similar property. The taxpayer retains the right to change the assets in the basket, change the algorithm that determines the assets, or to request the counterparty to make either of these changes. On the termination of the contract, the taxpayer receives a settlement based on the performance of the assets in the basket. The taxpayer takes the position that any income from the performance of the assets in the basket is deferred until the contract terminates, and the entire amount of income is treated as long-term capital gain if the contract itself is held for more than a year. Identified in IRS Notice 2015-74.

**TOI6.** Micro-captive transactions: Transactions in which a person ("A"), directly or indirectly owns an interest in a trade or business ("Insured"), which purchases insurance from an entity ("Captive") or from an intermediary insurance company that initially accepts the risk and premium then subsequently transfers it to Captive, commonly referred to as a fronting company ("C"). Captive is broadly defined as an insurance company that is at least 20% owned in voting power or value by either A, Insured, or a related party within the meaning of § 267(b) or §707(b). Captive makes an election under section 831(b) to be taxed only on taxable investment income. During a specified "computation period," generally five years,



EY
Building a better
working world

either (i) Captive's liabilities for losses and claims administrative expenses are less than 70% of premiums less policyholder dividends, or (ii) a portion of the payment under the insurance contract is, or will, be made available to A, Insured, or any related party in a manner that does not result in taxable income or gain (e.g., loan). Participants to the transaction may include A, Insured, Captive, and C. Identified in <u>IRS Notice 2016-66 and IRS Notice 2017-08</u>.

## California Listed Transactions

**CA1.** Real estate investment trust (REIT) consent dividends: Transactions occurring after February 28, 2000, in which a REIT takes a deduction for a consent dividend but the REIT's owners do not report the consent dividend as income. Identified in <u>Cal. FTB Chief Counsel Notice 2003-1</u>.

**CA2.** Wholly owned or controlled regulated investment company (RIC): Transactions occurring after February 28, 2000, in which a corporation forms a wholly owned or controlled entity that registers as a RIC and the parent corporation transfers to the RIC some of its income producing assets. The RIC claims the dividends paid deduction under IRC §852 and the parent corporation claims an intercompany dividend received deduction under the California tax code. Thus, no California income or franchise tax is paid on the income earned by the income producing assets contributed to the RIC. Identified in <u>Cal. FTB Chief Counsel Notice 2003-1</u>.

**CA3.** Sales factor denominator inflation Intercompany transactions occurring after February 28, 2000, between unitary corporate taxpayers and partnerships to inflate the denominator of the California sales factor and thereby reduce the amount of income apportioned to California. The transactions involve the use of the special sales factor rules in California Regulation 25137-1(f)(3) to include intercompany sales in the denominator of the sales factor. The transactions typically involve a group of corporations filing a California combined report with at least one member (the partner-corporation) of the group owning or acquiring an interest in a partnership and with at least one other corporate member (the nonpartner-corporation) of the combined group not owning an interest in the partnership. The partnership's business is unitary with the combined group and its activities were, or could be, performed by a corporate member of the combined group. The partnership sells goods or services to the nonpartner corporation or the nonpartner corporation makes sales to the partnership. The sales are included in the sales factor denominator, but are generally excluded from the sales factor numerator of the unitary group. Identified in <u>Cal. FTB Notice 2011-01</u>.

**CA4.** Circular cash flow with sale of subsidiary: Transaction occurring after February 28, 2000, involving a parent corporation (Parent) that "artificially" increases its basis in the stock of its wholly-owned subsidiary (Subsidiary) through a circular flow of cash from Parent to Subsidiary and back to Parent prior to Parent selling the stock of Subsidiary to a third party. In order to minimize gain on the sale of Subsidiary, Parent contributes a promissory note or other instrument to Subsidiary in a transaction treated as a nontaxable contribution to capital. Parent's contribution to Subsidiary's capital is temporary and is intended to remain with



Subsidiary for a short period of time. Subsidiary then generates what it claims are earnings and profits through the sale or transfer of intangible property to a related entity in a manner that avoids the application of California intercompany transaction rules. Parent pays off the promissory note or instrument issued to Subsidiary. Shortly thereafter, Subsidiary distributes cash or other property back to Parent in a distribution claimed to be a nontaxable dividend not requiring Parent to reduce its basis in Subsidiary. As a result, Parent claims an increased basis in Subsidiary for its contribution of the promissory note or other instrument, but the note or instrument does not remain with Subsidiary. Identified in Cal. FTB Notice 2011-04.

## Colorado Listed Transactions

**CO1.**  Captive real estate investment trust (REIT): Transactions in any open tax year, between a captive REIT and its more than 50% beneficial owner if there is a Colorado tax benefit. A captive REIT is defined as a REIT in which shares or beneficial interests are not regularly traded on an established securities market and of which more than 50% of the voting power or value of the beneficial interest or shares are owned or controlled directly, indirectly, or constructively, by a single entity that is: (1) treated as an association taxable as a corporation under the Internal Revenue Code; and (2) not exempt from federal income tax under IRC §501(a). For these purposes, an "association taxable as a corporation" does not include any REIT other than a captive REIT, any qualified REIT subsidiary other than a qualified REIT subsidiary of a captive REIT, any listed Australian property trust, or a qualified foreign entity. Identified in Colorado Reg. 39-22-652.

**CO2.**  Captive regulated investment company (RIC): Transactions in any open tax year, between a captive RIC and its more than 50% beneficial owner if there is a Colorado tax benefit. A captive RIC is defined as a RIC in which shares or beneficial interests are not regularly traded on an established securities market and of which more than 50% of the voting power or value of the beneficial interest or shares are owned or controlled directly, indirectly, or constructively, by a single entity that is: (1) treated as an association taxable as a corporation under the IRC; and (2) not exempt from federal income tax under IRC section 501(a). Voting stock in a RIC that is held in a segregated asset account of a life insurance corporation (IRC §817) is not taken into account in determining whether the RIC is captive. Identified in Colorado Reg. 39-22-652.

## New York Listed Transaction

**NY1.**  Certain charitable contribution deductions involving remainder interests: A transaction occurring on or after January 1, 2006, involving the purchase of a remainder interest in real property by a newly formed pass-through entity, which after holding the remainder interest for one year, contributes it to an exempt organization thereby meeting the federal requirements for computing the charitable contribution deduction based on the fair market value of the remainder interest. The remainder interest is appraised using an income approach that takes



into consideration the amount of lease payments remaining on the long term lease resulting in a value of the remainder interest substantially higher than what the pass-through entity paid for it. Following the contribution, the pass-through entity is dissolved, allowing its members/partners to claim a pro-rata share of the charitable contribution deduction. Identified in New York State Department of Taxation and Finance-Office of Tax Policy Analysis Technical Service Division TSB-M-07.

## Oregon Listed Transactions

**OR1.** Certain real estate investment trust (REIT) transactions: Transactions occurring on or after January 1, 2007 that lack economic substance in which an Oregon taxable corporation that directly or indirectly owns a REIT: (1) transfers income-producing assets to the REIT; and, (2) claims a dividend-received deduction and the REIT claims a dividend-paid deduction. An "Oregon taxable corporation" is a corporation that does business in Oregon, is organized in Oregon, has income from Oregon sources, or is owned by an Oregon income or corporate excise taxpayer. A "transaction without economic substance" is a transaction for which the taxpayer cannot demonstrate a business purpose other than tax savings. See 2015 Oregon Revised Statute 314-307.

**OR2.** Certain regulated investment company (RIC) transactions: Transactions occurring on or after January 1, 2007 that lack economic substance in which an Oregon taxable corporation that directly or indirectly owns a RIC: (1) transfers income-producing assets to the RIC; and, (2) claims a dividend-received deduction and the RIC claims a dividend-paid deduction. An "Oregon taxable corporation" is a corporation that does business in Oregon, is organized in Oregon, has income from Oregon sources, or is owned by an Oregon income or corporate excise taxpayer. A "transaction without economic substance" is a transaction for which the taxpayer cannot demonstrate a business purpose other than tax savings. See 2015 Oregon Revised Statute 314-307.

## <u>Exhibit A-3</u>

**Second Tax Compliance SOW**



**EY**
Building a better
working world

Regal Cinemas, Inc.
Attention Tal Soudry
Chief Financial Officer
101 E. Blount Avenue
Knoxville, TN 37920

## Statement of Work – Tax Compliance Services #2

This Statement of Work, dated September 21, 2022 (this "SOW"), is made by Ernst & Young LLP ("EY") and Regal Cinemas, Inc. on behalf of itself and its affiliated entities ("Client"); pursuant to the Agreement, dated September 7, 2022, (the "Agreement"), between EY and Regal Cinemas, Inc., which was executed in connection with the Client filing a petition under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") on or about September 7, 2022 with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), and describes certain services that EY will perform for the Client during the Client's Chapter 11 proceedings. This SOW shall be effective as of the date of the Client's filing a Chapter 11 petition with the Bankruptcy Court.

This SOW incorporates the Agreement by reference to form a contract. Capitalized terms used, but not otherwise defined, in this SOW shall have the meanings in the Agreement.

### Scope of Services

EY will provide the following Services (the "Services").

*Tax compliance services*

- Preparation of U.S. Form 1120 (U.S. Corporate Income Tax Return) for Crown Finance US, Inc. and Subsidiaries for the tax year ended December 31, 2021.
- Preparation of U.S. Form 1120 (U.S. Corporate Income Tax Return) for R&S Theatres, Inc. for the tax year ended December 31, 2021.
- Preparation of territorial and state and local tax returns listed in Appendix A for the tax year ended December 31, 2021.

EY may access tax information relating to Client that is posted by governmental entities, partnerships, or others in order to provide tax services to Client, in cases where EY determines that it would be efficient for EY to do so. However, Client remains responsible for making sure that Client has provided EY with all relevant information to support EY's provision of tax services. If EY is preparing returns for Client, this includes either providing EY with all required Forms 1099-G, Schedules K-1, and other tax forms made available to Client, or informing EY specifically that such forms should be obtained



**EY**
Building a better
working world

online. While EY may access such forms online for purposes of convenience, EY is not responsible for identifying such forms, nor is EY responsible for collecting any particular form on Client's behalf unless Client has specifically requested that EY does so and EY has agreed.

Treasury regulations require taxpayers to file disclosure statements relating to certain tax strategies/transactions that the Internal Revenue Service ("IRS") has identified as Listed Transactions or Transactions of Interest, any transaction that is substantially similar to a Listed Transaction or Transaction of Interest, and Other Reportable Transactions. The disclosure statements must be filed with the proper tax returns and also sent separately to the IRS. In addition, some states have enacted tax shelter legislation requiring taxpayers to file reportable transaction disclosure statements with the appropriate state income and franchise tax returns. Failure to disclose properly any of these transactions/strategies in which Client directly or indirectly participated may result in the imposition of penalties. During the process of gathering data to prepare Client's tax return(s), EY requires Client to complete the Reportable Transaction Questionnaire, which is provided with this SOW. If there is a particular person other than Client who should respond to such questionnaire on behalf of Client, please immediately provide to EY that person's name, position, email address and telephone number.  EY shall not be liable for any penalties resulting from Client's failure to accurately and timely respond to the questionnaire or to timely file the required disclosure statements.

Unless Client indicates otherwise, EY will check the box on Client's returns, when the option is available, indicating that the taxing authorities can discuss the return directly with the EY preparer who signed it. These discussions are limited to certain issues related to the processing of the returns. Interactions with taxing authorities beyond the scope of processing issues may require a Power of Attorney that must be signed by Client. Any services that may be performed under this arrangement are subject to the terms and conditions of this SOW but are not considered covered under the fee quoted for the preparation of Client's return(s) and therefore will be billed separately. If Client prefers that this box not be checked, please contact Client's EY tax professional.

This engagement does not include (1) an analysis of any shift in ownership of Client stock, (2) the preparation of statements required by Internal Revenue Code §§382 and 383, or (3) a determination of whether such code sections limit the amount of taxable income or tax that can be offset by net operating loss carryforwards, certain recognized built-in losses, certain excess credits, or net capital loss carryovers. The limitations under these provisions may have a material adverse impact on Client's tax liability. EY will not prepare a return on which taxable income (or tax) is offset by such attributes unless an analysis is performed. If Client would like EY to perform such an analysis, those services would be covered under a separate SOW. Please contact Client's EY tax professional named below if Client would like to discuss additional services and fees associated with the analysis and reporting requirements under these rules.



**EY**
Building a better
working world

This engagement does not include any advice or determinations regarding what expenses may be qualified research expenses under Internal Revenue Code §41 or comparable state statutes.

The tax compliance services do not include responding or assisting Client in responding to notices from taxing jurisdictions, other than notices received during the term of this SOW relating to returns prepared by EY when such notices pertain to the compilation, assembly, or processing of the return. EY is prepared to assist Client in responding to other notices/communications from taxing authorities, however, such services are beyond the scope of the tax compliance services.

All Client copies of the tax return(s) will be presented to Client in an electronic format.

Upon written request, EY will assist Client with other tax compliance services, including preparation of additional returns for the current tax year, and extension requests and computation of estimated tax payments for subsequent tax years. However, these services are not covered under the fee quoted in this letter. EY will discuss with Client and provide fee estimates for such additional services, which would be invoiced separately and subject to all other terms and conditions of this SOW and the above-referenced Agreement.

**Other Provisions**

Client shall assign a qualified person to oversee the Services. Client is responsible for all management decisions relating to the Services and for determining whether the Services are appropriate for its purposes.

Notwithstanding anything to the contrary in the Agreement or this SOW, EY does not assume any responsibility for any third-party products, programs or services selected by Client, their performance or compliance with Client's specifications or otherwise.

To use EY Interact My Documents ("EYI MyDocs") for collaboration with Client, EY will create a client collaboration workspace with a sharing library to which Client's employees and external contractors using Client email addresses (collectively, "Client users") designated by Client and at least one member of the EY engagement team are provided access ("Client Library"). Client may use the Client Library to deposit information and retrieve EY deliverables. EY may establish a number of Client Libraries on the client collaboration workspace where Client and EY can exchange documents and information; everyone with access to a particular Client Library will have access to all documents stored in that Client Library. The client collaboration workspace should not be used as a repository by Client. Client is responsible for informing EY in writing of the names and email addresses of Client users who are to have access to each Client Library and for notifying EY in writing when access for any Client



**EY**
Building a better
working world

user is to be removed. Client will provide the name and email address of the Client representative who will inform EY which Client users are to have access.

Client authorizes EY, its affiliates, other members of the global Ernst & Young network, including those located outside the United States, and subcontractors providing services on EY's or their behalf, to disclose Client's tax return information received or generated in connection with the Services described in this SOW, prior-years' tax return information and information relating to the immediately succeeding tax year, to and among each other for the purpose of rendering the Services, discussing and providing other services to Client (including tax advisory services and bringing to Client's attention planning opportunities EY may identify based upon the preparation and/or review of Client's tax returns), and conducting quality reviews and reviews of compliance with EY policies and professional standards. Client has the ability to request a more limited disclosure of tax return information than that described above. If, at any time, Client would like EY to narrow the scope of the information to be disclosed, please contact EY in writing and EY will limit any disclosures that have not yet occurred. Client acknowledges that this consent will be valid for three years  from the date this SOW is signed by Client below.

EY and other EY Firms may retain and use Client Information for benchmarking, analytics, research and development, thought leadership and related purposes, and to enhance their services, provided that any use does not externally identify, or make reference to, Client. In all such matters, EY and other EY Firms will comply with applicable law and professional obligations.

**EY Tools:** EY may provide Client access to use certain data, software, designs, utilities, tools, models, systems and other methodologies and know-how that EY owns or licenses for the purpose of Client's receipt of the Services or as otherwise expressly agreed in writing by EY ("**EY Tools**"). As between EY and Client, EY (or another EY Firm) owns all right, title, interest, and all intellectual property rights in and to the EY Tools, including any enhancements, modifications, and derivative work thereof.

**License to EY Tools During the SOW Term:** To the extent that EY provides Client access to any EY Tools during the term of this SOW, EY hereby grants to Client a nonexclusive, paid-up, internal license, during the term of this SOW, to use the EY Tools, for the sole purpose of Client's receipt of the Services from EY under this SOW.

**License to EY Tools After the SOW Term:** EY may allow Client to use certain EY Tools, after the term of this SOW ("Leave Behind EY Tool"), for the sole purpose of Client's use and receipt of the benefit of the Services provided by EY under this SOW. With respect to any such Leave Behind EY Tools, to the extent permitted by applicable law and professional regulations, EY hereby grants to Client a nonexclusive, paid-up, internal license, to use the Leave Behind EY Tool, after the term of this SOW, for the sole purpose of Client's use and receipt of the benefit of the Services provided by EY under this


**EY**
Building a better
working world

SOW.

**EY Tools Disclaimers and Acknowledgements:** Client's use of any EY Tools may be subject to additional terms, which EY will provide to Client in writing. Client acknowledges that EY may at any time, modify, replace, direct Client to discontinue use of any EY Tools, or otherwise revoke, limit or condition Client's access and right to use any EY Tools. ALL EY TOOLS ARE PROVIDED "AS IS" AND WITHOUT ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF TITLE, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR USE, OR ANY WARRANTY THAT THE OPERATION OF THE EY TOOL WILL BE UNINTERRUPTED, ERROR FREE OR THAT IT WILL BE OR REMAIN COMPATIBLE WITH ANY OF CLIENT'S HARDWARE OR SOFTWARE.

**Fees**

Client shall pay EY a fee of $195,000 for the tax compliance services for the tax year ending December 31, 2021. Client shall also pay any potential value-added taxes (VAT), sales taxes, and other indirect taxes incurred in connection with the delivery of the Services, including any such taxes and related administrative costs that result from billing arrangements specifically requested by Client.

Invoices for the returns will be sent and payable as follows:

|            | Invoice Date    | Payment Due       | Total   |
|------------|-----------------|-------------------|---------|
| Final Bill | October 1, 2022 | November 15, 2022 | 195,000 |

EY will bill Client approximately 45 days before payment is due. Any expenses, applicable taxes, or other charges, if any, will be billed separately as incurred.

Any legislative or regulatory change that significantly alters the scope of the Services, or the amount of time required to deliver the Services, will be considered an event for which EY may modify the fees. EY will communicate with Client regularly regarding any changes that may impact Client's scope and fees. Upon notice to Client, EY will bill for these items based on the rates for each level indicated above.

**Contacts and Engagement Team**



**EY**

Building a better
working world

Client has identified Tal Soudry as Client's contact with whom EY should communicate about these Services. Perry Blandford (Partner) and Drew Frisby (Senior Manager) will lead the EY team in providing these services.

In witness whereof, the parties have executed this SOW as of the date set forth below.

*Ernst + Young LLP*

AGREED:

Regal Cinemas, Inc., on behalf of itself and its affiliates

By: _____

Tal Soudry, Chief Financial Officer

Date: ____09/30/2022____



**EY**
Building a better
working world

**Appendix A**

**Tax Year End:**        December 31, 2021

| **Entity Name** | **Jurisdiction/Form No.** | **Form Name** |
|---|---|---|
| Crown Finance US, Inc. & Subs | AK Form 6000 | Alaska Corporate Income Tax Return |
| Crown Finance US, Inc. & Subs | AZ Form 120 | Arizona Corporation Income Tax Return |
| Crown Finance US, Inc. & Subs | CA Form 100 | California Corporation Franchise or Income Tax Return |
| Crown Finance US, Inc. & Subs | CO Form 112 | Colorado C-Corporation Income Tax Return |
| Crown Finance US, Inc. & Subs | CT Form CT-1120CU | Connecticut Combined Unitary Corporation Business Tax Return |
| Crown Finance US, Inc. & Subs | DC Form D-20 | District of Columbia Corporation Franchise Tax Return |
| Crown Finance US, Inc. & Subs | HI Form N-30 | Hawaii Corporation Income Tax Return |
| Crown Finance US, Inc. & Subs | ID Form 41 | Idaho Corporation Income Tax Return |
| Crown Finance US, Inc. & Subs | IL Form IL-1120 | Illinois Corporation Income and Replacement Tax Return |
| Crown Finance US, Inc. & Subs | KS Form K-120 | Kansas Corporation Income Tax Return |
| Crown Finance US, Inc. & Subs | KY Form 720 | Kentucky Corporation Income and LLET Return |
| Crown Finance US, Inc. & Subs | MA Form 355U | Massachusetts Corporation Excise Combined Report |
| Crown Finance US, Inc. & Subs | ME Form 1120ME | Maine Corporate Income Tax Return |
| Crown Finance US, Inc. & Subs | MI Form 4891 | Michigan Corporate Income Tax Annual Return |
| Crown Finance US, Inc. & Subs | MN Form M4 | Minnesota Corporation Franchise Tax Return |
| Crown Finance US, Inc. & Subs | MT Form CIT | Montana Corporate Income Tax Return |
| Crown Finance US, Inc. & Subs | ND Form 40 | North Dakota Corporation Income Tax Return |
| Crown Finance US, Inc. & Subs | NE Form 1120N | Nebraska Corporation Income Tax Return |
| Crown Finance US, Inc. & Subs | NH Form NH-1120 | New Hampshire Business Profits Tax Return |


**EY**
Building a better
working world

| Crown Finance US, Inc. & Subs | NJ Form CBT-100U | New Jersey Corporation Business Tax Unitary Return |
| Crown Finance US, Inc. & Subs | NM Form CIT-1 | New Mexico Corporate Income and Franchise Tax Return |
| Crown Finance US, Inc. & Subs | NY Form CT-3-A | New York General Business Corporation Combined Franchise Tax Return |
| Crown Finance US, Inc. & Subs | NYC Form NYC-2A | New York City Combined Business Corporation Tax Return |
| Crown Finance US, Inc. & Subs | OR Form 20 | Oregon Corporation Excise Tax Return |
| Crown Finance US, Inc. & Subs | OR-Portland Form C-2020 | Portland Combined Tax Return for C Corporations |
| Crown Finance US, Inc. & Subs | RI Form RI-1120C | Rhode Island Business Corporation Tax Return |
| Crown Finance US, Inc. & Subs | TX 05-158 | Texas Franchise Tax Return |
| Crown Finance US, Inc. & Subs | UT Form TC-20 | Utah Corporation Franchise and Income Tax |
| Crown Finance US, Inc. & Subs | VT Form CO-411 | Vermont Corporate Income Tax Return |
| Crown Finance US, Inc. & Subs | WI Form 6 | Wisconsin Combined Corporation Franchise or Income Tax Return |
| Crown Finance US, Inc. & Subs | WV Form CIT-120 | West Virginia Corporation Net Income Tax Return |
| Crown Intermediate Holdco, Inc | TN FAE 170 | Tennessee Franchise, Excise Tax Return |
| Crown Theater Corp. | MO Form MO-1120 | Missouri Corporation Income Tax Return |
| Eastgate Theatres, Inc. | MO Form MO-1120 | Missouri Corporation Income Tax Return |
| Eastgate Theatres, Inc. | MO - Kansas City Form RD-108 | Kansas City Profits Return Earnings Tax |
| Eastgate Theatres, Inc. | NV Form TXR-030.01 | Nevada Commerce Tax Return |
| Fredericks Plaza Cinemas, Inc. | MD Form 500 | Maryland Corporation Income Tax Return |
| Hollywood Theaters, Inc. | AL Form 20C | Alabama Corporation Income Tax Return |
| Hollywood Theaters, Inc. | AL Form CPT | Alabama Business Privilege Tax Return and Annual Report |
| Hollywood Theaters, Inc. | FL Form F-1120 | Florida Corporate Income/Franchise Tax Return |
| Hollywood Theaters, Inc. | LA Form CIFT-620 | Louisiana Corporation Income Tax Return |
| Hollywood Theaters, Inc. | MO Form MO-1120 | Missouri Corporation Income Tax Return |
| Hollywood Theaters, Inc. | OK Form 200 | Oklahoma Franchise Tax Return |



| Hollywood Theaters, Inc. | OK Form 512 | Oklahoma Income Tax Return |
| Hollywood Theaters, Inc. | PA Form RCT-101 | Pennsylvania Corporate Net Income Tax Report |
| Hoyts Cinemas Corp. | MD Form 500 | Maryland Corporation Income Tax Return |
| Hoyts Cinemas Corp. | PA Form RCT-101 | Pennsylvania Corporate Net Income Tax Report |
| Hoyts Cinemas Corp. | VA Form 500 | Virginia Corporation Income Tax Return |
| Next Generation Network | FL Form F-1120 | Florida Corporate Income/Franchise Tax Return |
| Next Generation Network | MD Form 500 | Maryland Corporation Income Tax Return |
| Next Generation Network | PA Form RCT-101 | Pennsylvania Corporate Net Income Tax Report |
| Next Generation Network | PA - Philadelphia Form BIRT | Philadelphia Business Income and Receipts Tax Return |
| Next Generation Network | VA Form 500 | Virginia Corporation Income Tax Return |
| R & S Theatres, Inc. | MS Form 83-105 | Mississippi Corporate Income and Franchise Tax Return |
| R.C. Cobb, Inc. | AL Form 20C | Alabama Corporation Income Tax Return |
| R.C. Cobb, Inc. | AL Form CPT | Alabama Business Privilege Tax Return and Annual Report |
| R.C. Cobb, Inc. | AR Form 1100CT | Arkansas Corporation Income Tax Return |
| R.C. Cobb, Inc. | FL Form F-1120 | Florida Corporate Income/Franchise Tax Return |
| R.C. Cobb, Inc. | MS Form 83-105 | Mississippi Corporate Income and Franchise Tax Return |
| R.C. Cobb, Inc. | TN FAE 170 | Tennessee Franchise, Excise Tax Return |
| RCI/RMS, LLC | CA Form 568 | California LLC Return of Income |
| Regal - 18, LLC | CA Form 568 | California LLC Return of Income |
| Regal Cinemas Corporation & Subs | TN FAE 170 | Tennessee Franchise, Excise Tax Return |
| Regal Cinemas, Inc. | AL Form 20C | Alabama Corporation Income Tax Return |
| Regal Cinemas, Inc. | AL Form CPT | Alabama Business Privilege Tax Return and Annual Report |
| Regal Cinemas, Inc. | AR Form 1100CT | Arkansas Corporation Income Tax Return |
| Regal Cinemas, Inc. | DE Form 1100 | Delaware Corporate Income Tax Return |



| Regal Cinemas, Inc. | FL Form F-1120 | Florida Corporate Income/Franchise Tax Return |
| Regal Cinemas, Inc. | GA Form 600 | Georgia Corporation Income Tax Return |
| Regal Cinemas, Inc. | IA Form IA 1120 | Iowa Corporation Income Tax Return |
| Regal Cinemas, Inc. | IN Form IT-20 | Indiana Corporate Adjusted Gross Income Tax Return |
| Regal Cinemas, Inc. | KY - Bowling Green | Bowling Green Net Profit License Fee Return |
| Regal Cinemas, Inc. | KY - Campbell County Form CC-3 | Campbell County & Cities Occupational Tax & Business License Fee Annual Return |
| Regal Cinemas, Inc. | KY - Fayette County Public Schools Form 228-S | Fayette County Net Profits Occupational License Tax Return |
| Regal Cinemas, Inc. | KY - Lexington-Fayette Urban County Government Form 228 | Lexington-Fayette Net Profits License Fee Return |
| Regal Cinemas, Inc. | KY - Shelbyville | Shelbyville Net Profits License Fee Return |
| Regal Cinemas, Inc. | KY - Warren County Form WC OCC | Warren County Tax Net Profit Return |
| Regal Cinemas, Inc. | KY-Wilder | Wilder Gross Receipts Tax and Occupational License Renewal Fee |
| Regal Cinemas, Inc. | LA Form CIFT-620 | Louisiana Corporation Income Tax Return |
| Regal Cinemas, Inc. | MD Form 500 | Maryland Corporation Income Tax Return |
| Regal Cinemas, Inc. | MI - Grand Rapids Form GR-1120 | Grand Rapids Corporation Income Tax Return |
| Regal Cinemas, Inc. | MI - Lansing Form EL-1120 | East Lansing Corporation Income Tax Return |
| Regal Cinemas, Inc. | MO Form MO-1120 | Missouri Corporation Income Tax Return |
| Regal Cinemas, Inc. | MO - Kansas City Form RD-108 | Kansas City Profits Return Earnings Tax |
| Regal Cinemas, Inc. | MS Form 83-105 | Mississippi Corporate Income and Franchise Tax Return |
| Regal Cinemas, Inc. | NC Form CD-405 | North Carolina C Corporation Tax Return |
| Regal Cinemas, Inc. | NV Form TXR-030.01 | Nevada Commerce Tax Return |



| Regal Cinemas, Inc. | OH - Massillon | Massillon City Business Income Tax Form |
| Regal Cinemas, Inc. | OH-Akron Form BR | Akron Income Tax Business Return |
| Regal Cinemas, Inc. | OH - Columbus Form BR-25 | Columbus City Income Tax Return for Businesses |
| Regal Cinemas, Inc. | OH-Copley/Akron Form JR | Copley/Akron JEDD Income Tax Business Return |
| Regal Cinemas, Inc. | OH-Green | Green Income Tax Return |
| Regal Cinemas, Inc. | OH-RITA-Hudson | RITA Net Profit Tax Return |
| Regal Cinemas, Inc. | OH-RITA-Medina | RITA Net Profit Tax Return |
| Regal Cinemas, Inc. | OH-RITA-Middleburg Heights | RITA Net Profit Tax Return |
| Regal Cinemas, Inc. | OH-RITA-Niles | RITA Net Profit Tax Return |
| Regal Cinemas, Inc. | OH-RITA-North Olmstead | RITA Net Profit Tax Return |
| Regal Cinemas, Inc. | OH-RITA-Richmond Height | RITA Net Profit Tax Return |
| Regal Cinemas, Inc. | OH-RITA-Sheffield Village | RITA Net Profit Tax Return |
| Regal Cinemas, Inc. | OH-RITA-Westlake | RITA Net Profit Tax Return |
| Regal Cinemas, Inc. | OH-RITA-Willoughby | RITA Net Profit Tax Return |
| Regal Cinemas, Inc. | OK Form 200 | Oklahoma Franchise Tax Return |
| Regal Cinemas, Inc. | OK Form 512 | Oklahoma Income Tax Return |
| Regal Cinemas, Inc. | PA Form RCT-101 | Pennsylvania Corporate Net Income Tax Report |
| Regal Cinemas, Inc. | PA - Philadelphia Form BIRT | Philadelphia Business Income and Receipts Tax Return |
| Regal Cinemas, Inc. | SC Form SC 1120 | South Carolina C Corporation Income Tax Return |
| Regal Cinemas, Inc. | TN FAE 170 | Tennessee Franchise, Excise Tax Return |
| Regal Cinemas, Inc. | VA Form 500 | Virginia Corporation Income Tax Return |
| Regal Cinemedia Corp. | AL Form 20C | Alabama Corporation Income Tax Return |
| Regal Cinemedia Corp. | AL Form CPT | Alabama Business Privilege Tax Return and Annual Report |
| Regal Cinemedia Corp. | AR Form 1100CT | Arkansas Corporation Income Tax Return |
| Regal Cinemedia Corp. | DE Form 1100 | Delaware Corporate Income Tax Return |



| Regal Cinemedia Corp. | FL Form F-1120 | Florida Corporate Income/Franchise Tax Return |
| Regal Cinemedia Corp. | GA Form 600 | Georgia Corporation Income Tax Return |
| Regal Cinemedia Corp. | IA Form 1120 | Iowa Corporation Income Tax Return |
| Regal Cinemedia Corp. | IN Form IT-20 | Indiana Corporate Adjusted Gross Income Tax Return |
| Regal Cinemedia Corp. | LA Form CIFT-620 | Louisiana Corporation Income Tax Return |
| Regal Cinemedia Corp. | MD Form 500 | Maryland Corporation Income Tax Return |
| Regal Cinemedia Corp. | MI - Grand Rapids Form GR-1120 | Grand Rapids Corporation Income Tax Return |
| Regal Cinemedia Corp. | MI - Lansing Form EL-1120 | East Lansing Corporation Income Tax Return |
| Regal Cinemedia Corp. | MO Form MO-1120 | Missouri Corporation Income Tax Return |
| Regal Cinemedia Corp. | MS Form 83-105 | Mississippi Corporate Income and Franchise Tax Return |
| Regal Cinemedia Corp. | NC Form CD-405 | North Carolina C Corporation Tax Return |
| Regal Cinemedia Corp. | OK Form 200 | Oklahoma Franchise Tax Return |
| Regal Cinemedia Corp. | OK Form 512 | Oklahoma Income Tax Return |
| Regal Cinemedia Corp. | PA Form RCT-101 | Pennsylvania Corporate Net Income Tax Report |
| Regal Cinemedia Corp. | SC Form SC 1120 | South Carolina C Corporation Income Tax Return |
| Regal Cinemedia Corp. | TN FAE 170 | Tennessee Franchise, Excise Tax Return |
| Regal Cinemedia Corp. | VA Form 500 | Virginia Corporation Income Tax Return |
| Regal Entertainment Group | MD Form 500 | Maryland Corporation Income Tax Return |
| Regal Entertainment Group | TN FAE 170 | Tennessee Franchise, Excise Tax Return |
| Regal Investment Company | SC Form SC 1120 | South Carolina C Corporation Income Tax Return |
| Regal Realty – 17, LLC | CA Form 568 | California LLC Return of Income |
| Regal Stratford, Inc. | TN FAE 170 | Tennessee Franchise, Excise Tax Return |
| UA Shor, LLC | CA Form 568 | California LLC Return of Income |
| UA Swansea, LLC | TN FAE 170 | Tennessee Franchise, Excise Tax Return |
| United Artists Properties I, Corp. | FL Form F-1120 | Florida Corporate Income/Franchise Tax Return |
| United Artists Properties I, Corp. | GA Form 600 | Georgia Corporation Income Tax Return |



| United Artists Theatre Circuit, Inc. | AR Form 1100CT | Arkansas Corporation Income Tax Return |
| United Artists Theatre Circuit, Inc. | DE Form 1100 | Delaware Corporate Income Tax Return |
| United Artists Theatre Circuit, Inc. | FL Form F-1120 | Florida Corporate Income/Franchise Tax Return |
| United Artists Theatre Circuit, Inc. | GA Form 600 | Georgia Corporation Income Tax Return |
| United Artists Theatre Circuit, Inc. | IN Form IT-20 | Indiana Corporate Adjusted Gross Income Tax Return |
| United Artists Theatre Circuit, Inc. | LA Form CIFT-620 | Louisiana Corporation Income Tax Return |
| United Artists Theatre Circuit, Inc. | MD Form 500 | Maryland Corporation Income Tax Return |
| United Artists Theatre Circuit, Inc. | MS Form 83-105 | Mississippi Corporate Income and Franchise Tax Return |
| United Artists Theatre Circuit, Inc. | NC Form CD-405 | North Carolina C Corporation Tax Return |
| United Artists Theatre Circuit, Inc. | OK Form 200 | Oklahoma Franchise Tax Return |
| United Artists Theatre Circuit, Inc. | OK Form 512 | Oklahoma Income Tax Return |
| United Artists Theatre Circuit, Inc. | PA Form RCT-101 | Pennsylvania Corporate Net Income Tax Report |
| United Artists Theatre Circuit, Inc. | PA - Philadelphia Form BIRT | Philadelphia Business Income and Receipts Tax Return |
| United Artists Theatre Circuit, Inc. | SC Form SC 1120 | South Carolina C Corporation Income Tax Return |
| United Artists Theatre Circuit, Inc. | VA Form 500 | Virginia Corporation Income Tax Return |
| Wallace Theater Holdings, Inc. | AL Form 20C | Alabama Corporation Income Tax Return |
| Wallace Theaters – Guam | Guam Form 1120 | Guam Business Privilege Tax |
| Wallace Theaters – Saipan Inc. | Saipan Form 1120CM | Northern Marina Islands Corporate Income Tax Return |
| Warren Oklahoma Theatres, Inc. | OK Form 200 | Oklahoma Franchise Tax Return |
| Warren Oklahoma Theatres, Inc. | OK Form 512 | Oklahoma Income Tax Return |





**Building a better
working world**

# Reportable Transaction Questionnaire (revised April 2020)

## Regal Cinemas, Inc.

**Purpose**:
Ernst & Young LLP (EY) uses this questionnaire to prepare your tax returns. US Treasury Department regulations require disclosure statements relating to certain transactions, plans and arrangements. These disclosure statements must be filed with the tax return and with a separate IRS office. Failure to make a proper disclosure may result in penalties. Some states have similar disclosure requirements. EY shall not be liable for any penalties resulting from your failure to accurately and timely respond to these questions or to timely file disclosure statements.

**Instructions:**
This questionnaire must be completed for each year for which EY prepares an income tax return. If you are completing this questionnaire for one or more individuals or legal entities, your response should take into account the activities of each. If this questionnaire is being completed in connection with a statement of work, it should address all of the taxpayer(s) and return(s) included in the scope of the engagement. Otherwise, we've included an attachment that lists the taxpayers and returns that you should consider as you complete the questionnaire. The terms "you," "your" and "taxpayer" refer collectively to all of these individuals and entities.

**Question:**

Please review the questions on the next two pages for each individual and entity covered by this engagement and check the box below that is applicable.

☐    My answer is no or N/A to all of the questions. (Please sign and date this questionnaire to complete it.)

☐    My answer is yes to one or more of the questions and/or I am unsure of my answer to one or more of the questions. (Please complete the box below before signing and dating this questionnaire.)

If your answer is yes or unsure with respect to one or more questions, list in the following box the applicable taxpayer and the question number(s) of the reportable transaction and/or, if applicable, the transaction number(s) of the listed transaction or transaction of interest to which the answer relates.



**Disclosure in connection with a reportable transaction**

If you are completing this questionnaire only with respect to a Regulated Investment Company (RIC), start with question 4. If you are completing this questionnaire for any other taxpayer, start with question 1. Section references are to the Internal Revenue Code of 1986, unless otherwise indicated.

**Questions:**

1. **Loss transactions:** Have you directly or indirectly entered into a transaction that results in claiming a gross loss (no netting against gains) over the loss threshold amounts described below that is deductible pursuant to a provision of the tax code that treats the transaction as a sale or other disposition (for example, Section 741 or Section 988) or otherwise results in a deduction under Section 165?

   Note that this question does not include a loss from a casualty or involuntary conversion. Also, consider this question with regard to losses reported on your federal or California state tax returns for each of the categories of taxpayers described in the paragraphs that follow that applies to you (more than one, if applicable). If you are a US shareholder of a controlled foreign corporation ("CFC", as defined below) or a 10% shareholder of a qualified electing fund ("QEF", as defined below), include any loss that the foreign corporation would report if it were treated as a domestic corporation filing a US return and consider the activities of the CFC or QEF in connection with the other questions below.

   <u>Loss threshold amounts</u>

   Individuals and trusts: At least $2 million on this tax return (or $50,000 or greater in the case of a Section 988 foreign currency loss transaction), or at least $4 million when combining this tax return with other years' returns. Include transaction losses that flow through from a partnership or S corporation.

   Partnerships and S corporations: At least $2 million on this tax return, or at least $4 million when combining this tax return with other years' returns. This category includes partnerships with at least one partner that is not a C corporation (looking through any partners that are partnerships).

   Corporate entities: At least $10 million on this tax return, or at least $20 million when combining this tax return with other years' returns. This category includes:

   - C corporations
   - Tax-exempt entities (with respect to Unrelated Business Taxable losses)
   - Partnerships, if every partner is a C corporation (looking through any partners that are partnerships)
   - Controlled foreign corporations (CFCs) – a non-US corporation that has US shareholders (i.e., US persons who directly or indirectly own 10% or more of the combined voting



**Building a better working world**

power, or, effective for taxable years of foreign corporations beginning after December 31, 2017, the value of all classes of stock of such non-US corporation) that own in the aggregate more than 50% of the total vote or value of such non-US corporation

- Qualified electing funds (QEFs) – a passive foreign investment company that meets the requirements of Section 1295 and the regulations thereunder, which include an annual taxpayer election

2. **Confidentiality agreement:** Have you entered into a transaction offered to you by a paid tax advisor who placed a limitation on your disclosure of the tax treatment or tax structure of the transaction?

3. **Contingent fees or other contractual protection:** Will your tax returns reflect the results of a transaction for which you (or a related party) paid fees to an advisor that were contingent on realizing federal, California or New York tax benefits, or for which you (or a related party) have the right to the refund of any fees if the federal, California or New York tax effects of the transaction are not sustained?

4. **Federal Listed Transactions and Transactions of Interest:** Have you participated in any transaction that is a Federal Listed Transaction or Federal Transaction of Interest or that might be considered the same as or substantially similar to any of the Federal Listed Transactions or Transactions of Interest and the tax benefits from your participation are expected to be reflected in the current or future year tax returns? The Federal Listed Transactions and Transactions of Interest are summarized in the attachment to this questionnaire. If the answer is "yes," please provide us with a copy of any previously filed Form 8886 disclosure.

5. **State Listed Transactions:** If you file a California, Colorado, New York, or Oregon state tax return, have you participated (i.e., in current or previous filing years) in any transaction that is an applicable State Listed Transaction or might be considered substantially similar to any of the applicable State Listed Transactions and the tax benefits from your participation are expected to be reflected in current or future year tax returns? The State Listed Transactions are summarized in the attachment to this questionnaire. If the answer is "yes," please provide us with a copy of any previously filed Form 8886 disclosure or equivalent state disclosure forms.



Signature on behalf of the identified individuals and entities, including any applicable CFCs and QEFs:

| | | |
|---|---|---|
| Signature | Title (if applicable) | Date |

**After answering the questions above and signing this questionnaire, return to Drew Frisby at Drew.Frisby@ey.com.**



# Listed Transactions and Transactions of Interest (revised April 2020)

As of April 2020, below are the titles of the transactions identified as "Listed Transactions" and "Transactions of Interest" by the IRS and "Listed" transactions by State taxing authorities, along with the citation to the pronouncement describing the transaction in greater detail.

## Federal Listed Transactions

1. Lease strips and other stripping transactions: Transactions that allow one participant to realize rental or other income from property or service contracts and another participant or the same participant in a different tax year reports deductions related to that income. Identified in IRS Notice 95-53 and IRS Notice 2003-55.

2. 401(k) accelerator: Transactions in which taxpayers claim deductions for contributions to a qualified cash or deferred arrangement or matching contributions to a defined contribution plan where the contributions are attributable to compensation earned by plan participants after the end of the taxable year. Identified in Rev. Rul. 90-105.

3. Multiple employer plans: Trust arrangements purported to qualify as multiple employer welfare benefit funds exempt from the limits of §§419 and 419A. Identified in IRS Notice 95-34. (See item #21 below regarding collectively bargained welfare benefit funds.)

4. Certain contingent installment sales by partnerships with tax-indifferent partners: Transactions involving contingent installment sales of securities by partnerships in order to accelerate and allocate income to a tax-indifferent partner, such as a tax-exempt entity or foreign person, and to allocate later losses to another partner. Identified as ACM Transactions. See IRS Notice 2009-59.

5. Distributions from charitable remainder trusts: Transactions involving distributions described in Treas. Reg. §1.643(a)-8 from charitable remainder trusts. This transaction uses a §664 charitable remainder trust to convert appreciated assets into cash, while avoiding the gain on the disposition of the assets. See IRS Notice 2009-59.

6. Lease-in, lease-out transactions (LILOs): Transactions in which a taxpayer purports to lease property and then purports to immediately sublease it back to the lessor (that is, lease-in/lease-out or LILO transactions). See IRS Notice 2009-59.

7. Distribution of encumbered property: Transactions involving the distribution of encumbered property in which taxpayers claim tax losses for capital outlays that they have in fact recovered. Identified in IRS Notice 99-59.



Building a better
working world

8. Fast-pay arrangements with corporate stock: Transactions involving fast-pay arrangements as defined in Treas. Reg. §1.7701(l)-3(b) in which a corporation's outstanding stock is structured (in whole or in part) to return the stockholder's investment by distributions treated as dividends. Identified as Fast-pay Arrangements. See IRS Notice 2009-59.

9. Counterbalancing debt instruments: Transactions involving the acquisition of two debt instruments the values of which are expected to change significantly at about the same time in opposite directions. Identified in Rev. Rul. 2000-12.

10. Artificially inflated tax basis of partnership interests: Transactions generating losses resulting from artificially inflating the tax basis of partnership interests. Identified in IRS Notice 2000-44.

11. Employee stock transfer: Transactions involving the purchase of a parent corporation's stock by a subsidiary, a subsequent transfer of the purchased parent stock from the subsidiary to the parent's employees, and the eventual liquidation or sale of the subsidiary. Identified in Notice 2000-60.

12. Guamanian trusts: Transactions purporting to apply §935 to Guamanian trusts. Identified in IRS Notice 2000-61.

13. Intermediary ("Midco") transactions: A broad range of "routine" transactions that happen to include the acquisition, disposition, or movement of stock and assets. The typical Midco transaction is one in which a taxpayer desires to sell stock of a corporation and a buyer desires to purchase the assets. These parties conduct the transaction through an intermediary, with the taxpayer selling the stock to the intermediary and the buyer then purchasing the assets from it and claiming a fair market value basis. The intermediary, having enabled the target corporation to not pay tax on the built-in gain in its assets, usually receives compensation for participating in the transaction. See IRS Notice 2008-111 and IRS Notice 2001-16.

14. Contingent liability transactions: Transactions involving a loss on the sale of stock acquired in a purported §351 transfer of a high basis asset to a corporation and the corporation's assumption of a liability that the transferor has not yet taken into account for federal income tax purposes. Identified in IRS Notice 2001-17.

15. Basis shifting on stock redemptions not subject to US tax: Redemptions of stock in transactions not subject to US tax in which the basis of the redeemed stock is purported to shift to a US taxpayer. Identified in IRS Notice 2001-45.

16. Inflated tax basis: Transactions in which the taxpayer as part of an acquisition of assets also assumes debt exceeding their fair market value. The taxpayer claims a higher basis due to the debt assumption. Upon sale of the assets, the taxpayer claims a loss for basis in excess of the fair market value of the assets. Identified in IRS Notice 2002-21.


Building a better
working world

17. Reporting payments made on notational principal contracts while disregarding offsetting future payments: Transactions using a notional principal contract to claim deductions for periodic payments made by the taxpayer while disregarding the accrual of a right to receive offsetting payments in the future. Identified in IRS Notice 2002-35.

18. Allocation of straddle gain or loss in a common trust fund or pass-through entity: Transactions involving the creation of straddles in a common trust fund or pass-thru entity (i.e., partnership, S corporation, or grantor trust), with the allocation of gain to one party and loss to another party. Identified in IRS Notice 2002-50, IRS Notice 2002-65 and IRS Notice 2003-54.

19. Prohibited ownership of S corporation securities by an employee stock ownership plan (ESOP): Transaction in which an S corporation and an associated employee stock ownership plan (ESOP), which was formed on or before March 14, 2001, is subsequently transferred and the ESOP claims the benefit of a delayed effective date under §409(p). As a result of the delayed effective date, the earnings of the S corporation are not currently taxed. Identified in IRS Rev. Rul. 2003-6. (See item 26 below regarding S corporation ESOPs involving synthetic equity.)

20. Offshore deferred compensation arrangements involving an offshore employment leasing company: Transactions involving an individual taxpayer who purportedly resigns from his or her current employer or professional corporation and enters an employment contract with an offshore employment leasing company. The offshore leasing company leases the individual's services back to the original employer, typically using one or more intermediaries. The participants claim tax benefits in the form of reduced or avoided individual and corporate income and employment taxes. Identified in IRS Notice 2003-22.

21. Collectively bargained welfare benefit funds: Trust arrangements purporting to qualify as collectively-bargained welfare benefit funds exempt from the limits of §§419 and 419A. Identified in IRS Notice 2003-24. (See item #3 above regarding multiple employer plans.)

22. Transfers of compensatory stock options to related persons: Transactions involving an individual, generally an employee, who has been granted a nonstatutory compensatory stock option, and transfers that option to a related person. The individual does not claim compensation income when the related person exercises the stock option or, in cases where the related person pays for the option with a note or other deferred payment, the individual does not claim compensation income until receiving the deferred payments. Identified in IRS Notice 2003-47.

23. Contested liability trusts: Transactions involving transfers to a trust to provide for the satisfaction of contested liabilities in an attempt to accelerate deductions for the contested liabilities under §461(f). Identified in IRS Notice 2003-77.

24. Offsetting foreign currency option contracts: Transactions in which a taxpayer claims a loss upon the assignment of a §1256 foreign currency option contract to a charity but fails to report the



Building a better
working world

recognition of gain when the taxpayer's obligation under an offsetting non-section 1256 foreign currency option contract terminates. Identified in IRS Notice 2003-81.

25. Roth IRA contributions in transactions designed to avoid contribution limits: Transactions designed to avoid the statutory limits on contributions to a Roth IRA contained in §408A using a corporation, substantially all the shares of which are owned or acquired by the Roth IRA. Identified in IRS Notice 2004-8.

26. S corporation ESOP involving synthetic equity: Transaction involving an S corporation that is at least 50% owned by an employee stock ownership plan (ESOP,) designed to avoid current taxation of the S corporation's profits generated by the business activities of a specific individual or individuals. The profits are accumulated and held for the benefit of the individual(s) in a qualified subchapter S subsidiary (QSub) or similar entity (such as a limited liability company), the profits are not paid to the individual(s) as compensation within 2½ months after the end of the year in which earned, and the individual or individuals have rights to acquire stock or similar interests equal to 50% or more of the fair market value of the QSub. Identified in IRS Rev. Rul. 2004-4. (See item #19 above also involving S corporation ESOPs.)

27. Pension plans involving excessive life insurance: Transactions involving a qualified pension plan that includes life insurance contracts on the life of a participant in the plan with a face amount that exceeds the participant's death benefit under the plan by more than $100,000. Upon the death of the covered employee, the life insurance contract proceeds exceeding the death benefit are applied to the premiums under the plan for other participants. Identified in Rev. Rul. 2004-20.

28. Foreign tax credit intermediary transactions: Transactions in which, pursuant to a prearranged plan, a domestic corporation purports to acquire stock in a foreign target corporation and makes an election under §338 before selling all or substantially all of the target corporation's assets in a transaction that triggers foreign tax on built-in gains that are not subject to US tax. The domestic corporation claims foreign tax credits generated with respect to the foreign income tax imposed on the asset sale. Identified in IRS Notice 2004-20. IRS. IRS Notice 2020-19 withdraws Notice 2004-20 effective for transactions entered into after April 6, 2020.

29. S corporation nonvoting stock issued to tax-exempt organization: Transactions in which S corporation shareholders attempt to transfer the incidence of taxation on S corporation income by donating S corporation nonvoting stock to an exempt organization, while retaining the economic benefits associated with that stock (through warrants issued to the S corporation shareholders that would dilute the shares of nonvoting stock held by the exempt organization or agreements to repurchase the nonvoting stock from the exempt organization at a value that is substantially reduced by reason of the warrants). Identified in IRS Notice 2004-30.

30. Intercompany financing through partnerships using guaranteed payments: Transactions in which a corporation that is exempt from US federal income tax, such as a foreign corporation, provides



financing to a domestic subsidiary by investing in the preferred stock of the subsidiary through a partnership in an attempt to convert interest payments that would not be currently deductible under §163(j) into deductible payments. The foreign corporation's return on investment is structured as a guaranteed payment by the partnership, most of which is allocated to, and deducted by, another domestic subsidiary that is a partner in the partnership. In some cases, the guaranteed payments are made to a partner that is unrelated to the foreign corporation and the partnership's obligations to make the guaranteed payments are assured by the foreign corporation or a related party. Identified in IRS Notice 2004-31.

31. Sale-in, lease-out transaction (SILOs) with a tax-indifferent party: Transactions in which a taxpayer/lessor enters into a purported sale-leaseback arrangement with a tax-indifferent person (such as a foreign entity, a domestic tax exempt organization or government, or a company in a net operating loss position or other tax neutral situation) as lessee in which substantially all of the tax-indifferent person's future rental payment obligations and purchase option rights are economically defeased/nullified and the taxpayer's risk of loss from a decline, and opportunity for profit from an increase, in the value of the leased property are substantially limited, and there is an obligation on the lessee to provide to the lessor a service contract arrangement or contingent residual value insurance in the event that the lessee purchase option right is not exercised. These leases are frequently referred to as "lease-to-service contracts" or "QTE leases." Identified in IRS Notice 2005-13.

32. Loss importation transactions: Transactions in which a taxpayer acquires control of a foreign entity treated as a corporation for US tax purposes, and uses the foreign entity's offsetting positions with respect to foreign currency or other property for the purpose of importing losses, but not corresponding gains. Gain is not imported because the taxpayer causes the foreign entity to close out the gain position while the foreign entity is still treated as a foreign corporation. The taxpayer enters into a new offsetting position to lock in the unrealized loss on the loss position and eliminate further economic risk. The taxpayer then imports the unrealized loss into the US, typically by making a check-the-box election with respect to the foreign entity and then closing out the loss position. It may also import the assets of the foreign entity into the US in another type of carryover basis transaction such as a reorganization described in section 368(a). The taxpayer must make the check-the-box election or otherwise dispose of the stock of the foreign entity within 30 days of acquiring it, so that the foreign entity will not qualify as a CFC and the gain it recognizes will not be taxable under subpart F. Identified in IRS Notice 2007-57.

33. Welfare benefit funds utilizing cash value life insurance policies: Trust arrangements purporting to provide employees welfare benefits in the form of cash value life insurance policies. In these arrangements the employer claims deductions for its contributions to the trust per the premium amounts paid, but the employee/policy owners include little if any in corresponding income. These arrangements may involve either a taxable trust or a tax-exempt trust. Identified in IRS Notice 2007-83.



Building a better
working world

**34.** Distressed asset trust: Distressed Asset Trust: Transactions in which trusts are used to shift built-in losses in distressed assets that have been transferred into such trusts by a tax-indifferent party to a beneficiary who is a US taxpayer. The distressed assets are then written off by the US taxpayer under §166 or sold with the US taxpayer claiming a deduction under §165, even though the US taxpayer has not incurred an economic loss. Identified in IRS Notice 2008-34.

**35.** Basket option contract transactions: Transactions in which a taxpayer enters into a contract, denominated as an option with a stated term exceeding one year, to receive a return based on the performance of a basket of assets that qualify as actively traded property. The taxpayer retains the right to change the assets in the basket or the trading algorithm that determines how the assets in the basket are traded. The taxpayer takes the position that any income from the performance of the assets in the basket is deferred until the contract terminates, and the entire amount of income is treated as long-term capital gain if the contract itself is held for more than one year. Identified in IRS Notice 2015-73.

**36.** Syndicated conservation easement transaction: Transactions in which an investor receives promotional materials, oral or written, that offer prospective investors in a pass-through entity the possibility of a charitable contribution deduction that equals or exceeds an amount that significantly exceeds the amount of the investor's investment. The investor purchases an interest, directly or indirectly (through one or more tiers of pass-through entities), in the pass-through entity that holds real property. The pass-through entity that holds the real property contributes a conservation easement encumbering the property to a tax-exempt entity and allocates, directly or through one or more tiers of pass-through entities, a charitable contribution deduction to the investor, which the investor reports on its federal income tax return. Identified in IRS Notice 2017-10.

## Federal Transactions of Interest

**TOI1.** Contribution of a successor member interest to a charity: A transaction in which a taxpayer acquires a successor interest in an LLC or similar entity that directly or indirectly holds real property, transfers the rights more than one year after the acquisition to a charity described in section 170(c), and claims a charitable contribution deduction that is significantly higher than the amount that the taxpayer paid to acquire the rights. Identified in IRS Notice 2007-72.

**TOI2.** Toggling grantor trusts: Transactions in which grantor creates and funds a grantor trust with four options with values that are expected to move inversely in relation to at least one of the other options. The grantor then gives a unitrust interest to a beneficiary while retaining a noncontingent remainder interest and the power to reacquire trust property at a specified future date by substituting other property of equivalent value. Through a series of successive transactions involving the sale of the remainder interest to an unrelated buyer for an amount substantially equal to the fair market value of the options contributed to the trust, the "activation" of the substitution power on its effective date, the close-out of the "loss options," and the sale of the unitrust interest to the unrelated buyer, the grantor trust status of the trust is



purportedly "toggled off" and "toggled on." The grantor claims a tax loss attributable to the close-out of the loss options even though the grantor has not suffered an equivalent economic loss. A variation of the transaction described above involves an initial contribution of liquid assets instead of options, and a subsequent substitution of appreciated property for the liquid assets. This variation is designed to enable the grantor to avoid the recognition of gain upon the disposition of the appreciated assets. Identified in IRS Notice 2007-73.

**TOI3.** Potential for avoidance of tax through sale of charitable remainder trust interests: Transactions involving the sale or other disposition of all interests in a charitable remainder trust (subsequent to the contribution of appreciated assets to the trust but after their sale by the trust). The grantor or other noncharitable claims an increased basis in the annuity or unitrust interest sold based upon the tax basis of assets within the trust (rather than with reference to the tax basis of assets transferred to the trust) thereby recognizing little, if any, gain from such sale or other disposition of the unitrust or annuity interest. Identified in IRS Notice 2008-99.

**TOI4.** Use of domestic partnership with CFC partners to avoid taxable Subpart F inclusions: Transactions involving a US taxpayer owning at least one CFC which is a partner in a domestic partnership (the other partner(s) may or may not also be CFCs). The domestic partnership owns a CFC Opco that earns income of a type which is subpart F income. The US taxpayer claims that the subpart F income of the CFC Opco is not subpart F income in the hands of the CFC partner (or the partner's US owner) because of the interposition of the domestic partnership. Identified in IRS Notice 2009-7.

**TOI5.** Basket contract transactions: Basket Contract Transactions: Transactions in which a taxpayer enters into a contract to receive a return based on the performance of a basket of assets. The contract has a term of more than one year (or overlaps two of the taxpayer's taxable years). The assets in the basket may include securities, commodities, foreign currency, interests in entities that trade in such assets, or similar property. The taxpayer retains the right to change the assets in the basket, change the algorithm that determines the assets, or to request the counterparty to make either of these changes. On the termination of the contract, the taxpayer receives a settlement based on the performance of the assets in the basket. The taxpayer takes the position that any income from the performance of the assets in the basket is deferred until the contract terminates, and the entire amount of income is treated as long-term capital gain if the contract itself is held for more than a year. Identified in IRS Notice 2015-74.

**TOI6.** Micro-captive transactions: Transactions in which a person ("A"), directly or indirectly owns an interest in a trade or business ("Insured"), which purchases insurance from an entity ("Captive") or from an intermediary insurance company that initially accepts the risk and premium then subsequently transfers it to Captive, commonly referred to as a fronting company ("C"). Captive is broadly defined as an insurance company that is at least 20% owned in voting power or value by either A, Insured, or a related party within the meaning of § 267(b) or §707(b). Captive makes an election under section 831(b) to be taxed only on taxable investment income. During a specified "computation period," generally five years,



either (i) Captive's liabilities for losses and claims administrative expenses are less than 70% of premiums less policyholder dividends, or (ii) a portion of the payment under the insurance contract is, or will, be made available to A, Insured, or any related party in a manner that does not result in taxable income or gain (e.g., loan). Participants to the transaction may include A, Insured, Captive, and C. Identified in <u>IRS Notice 2016-66 and IRS Notice 2017-08</u>.

## California Listed Transactions

**CA1.** Real estate investment trust (REIT) consent dividends: Transactions occurring after February 28, 2000, in which a REIT takes a deduction for a consent dividend but the REIT's owners do not report the consent dividend as income. Identified in <u>Cal. FTB Chief Counsel Notice 2003-1</u>.

**CA2.** Wholly owned or controlled regulated investment company (RIC): Transactions occurring after February 28, 2000, in which a corporation forms a wholly owned or controlled entity that registers as a RIC and the parent corporation transfers to the RIC some of its income producing assets. The RIC claims the dividends paid deduction under IRC §852 and the parent corporation claims an intercompany dividend received deduction under the California tax code. Thus, no California income or franchise tax is paid on the income earned by the income producing assets contributed to the RIC. Identified in <u>Cal. FTB Chief Counsel Notice 2003-1</u>.

**CA3.** Sales factor denominator inflation Intercompany transactions occurring after February 28, 2000, between unitary corporate taxpayers and partnerships to inflate the denominator of the California sales factor and thereby reduce the amount of income apportioned to California. The transactions involve the use of the special sales factor rules in California Regulation 25137-1(f)(3) to include intercompany sales in the denominator of the sales factor. The transactions typically involve a group of corporations filing a California combined report with at least one member (the partner-corporation) of the group owning or acquiring an interest in a partnership and with at least one other corporate member (the nonpartner-corporation) of the combined group not owning an interest in the partnership. The partnership's business is unitary with the combined group and its activities were, or could be, performed by a corporate member of the combined group. The partnership sells goods or services to the nonpartner corporation or the nonpartner corporation makes sales to the partnership. The sales are included in the sales factor denominator, but are generally excluded from the sales factor numerator of the unitary group. Identified in <u>Cal. FTB Notice 2011-01</u>.

**CA4.** Circular cash flow with sale of subsidiary: Transaction occurring after February 28, 2000, involving a parent corporation (Parent) that "artificially" increases its basis in the stock of its wholly-owned subsidiary (Subsidiary) through a circular flow of cash from Parent to Subsidiary and back to Parent prior to Parent selling the stock of Subsidiary to a third party. In order to minimize gain on the sale of Subsidiary, Parent contributes a promissory note or other instrument to Subsidiary in a transaction treated as a nontaxable contribution to capital. Parent's contribution to Subsidiary's capital is temporary and is intended to remain with


Building a better
working world

Subsidiary for a short period of time. Subsidiary then generates what it claims are earnings and profits through the sale or transfer of intangible property to a related entity in a manner that avoids the application of California intercompany transaction rules. Parent pays off the promissory note or instrument issued to Subsidiary. Shortly thereafter, Subsidiary distributes cash or other property back to Parent in a distribution claimed to be a nontaxable dividend not requiring Parent to reduce its basis in Subsidiary. As a result, Parent claims an increased basis in Subsidiary for its contribution of the promissory note or other instrument, but the note or instrument does not remain with Subsidiary. Identified in Cal. FTB Notice 2011-04.

## Colorado Listed Transactions

**CO1.** Captive real estate investment trust (REIT): Transactions in any open tax year, between a captive REIT and its more than 50% beneficial owner if there is a Colorado tax benefit. A captive REIT is defined as a REIT in which shares or beneficial interests are not regularly traded on an established securities market and of which more than 50% of the voting power or value of the beneficial interest or shares are owned or controlled directly, indirectly, or constructively, by a single entity that is: (1) treated as an association taxable as a corporation under the Internal Revenue Code; and (2) not exempt from federal income tax under IRC §501(a). For these purposes, an "association taxable as a corporation" does not include any REIT other than a captive REIT, any qualified REIT subsidiary other than a qualified REIT subsidiary of a captive REIT, any listed Australian property trust, or a qualified foreign entity. Identified in Colorado Reg. 39-22-652.

**CO2.** Captive regulated investment company (RIC): Transactions in any open tax year, between a captive RIC and its more than 50% beneficial owner if there is a Colorado tax benefit. A captive RIC is defined as a RIC in which shares or beneficial interests are not regularly traded on an established securities market and of which more than 50% of the voting power or value of the beneficial interest or shares are owned or controlled directly, indirectly, or constructively, by a single entity that is: (1) treated as an association taxable as a corporation under the IRC; and (2) not exempt from federal income tax under IRC section 501(a). Voting stock in a RIC that is held in a segregated asset account of a life insurance corporation (IRC §817) is not taken into account in determining whether the RIC is captive. Identified in Colorado Reg. 39-22-652.

## New York Listed Transaction

**NY1.** Certain charitable contribution deductions involving remainder interests: A transaction occurring on or after January 1, 2006, involving the purchase of a remainder interest in real property by a newly formed pass-through entity, which after holding the remainder interest for one year, contributes it to an exempt organization thereby meeting the federal requirements for computing the charitable contribution deduction based on the fair market value of the remainder interest. The remainder interest is appraised using an income approach that takes



**Building a better working world**

into consideration the amount of lease payments remaining on the long term lease resulting in a value of the remainder interest substantially higher than what the pass-through entity paid for it. Following the contribution, the pass-through entity is dissolved, allowing its members/partners to claim a pro-rata share of the charitable contribution deduction. Identified in New York State Department of Taxation and Finance-Office of Tax Policy Analysis Technical Service Division TSB-M-07.

## Oregon Listed Transactions

**OR1.** Certain real estate investment trust (REIT) transactions: Transactions occurring on or after January 1, 2007 that lack economic substance in which an Oregon taxable corporation that directly or indirectly owns a REIT: (1) transfers income-producing assets to the REIT; and, (2) claims a dividend-received deduction and the REIT claims a dividend-paid deduction. An "Oregon taxable corporation" is a corporation that does business in Oregon, is organized in Oregon, has income from Oregon sources, or is owned by an Oregon income or corporate excise taxpayer. A "transaction without economic substance" is a transaction for which the taxpayer cannot demonstrate a business purpose other than tax savings. See 2015 Oregon Revised Statute 314-307.

**OR2.** Certain regulated investment company (RIC) transactions: Transactions occurring on or after January 1, 2007 that lack economic substance in which an Oregon taxable corporation that directly or indirectly owns a RIC: (1) transfers income-producing assets to the RIC; and, (2) claims a dividend-received deduction and the RIC claims a dividend-paid deduction. An "Oregon taxable corporation" is a corporation that does business in Oregon, is organized in Oregon, has income from Oregon sources, or is owned by an Oregon income or corporate excise taxpayer. A "transaction without economic substance" is a transaction for which the taxpayer cannot demonstrate a business purpose other than tax savings. See 2015 Oregon Revised Statute 314-307.