United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 31, 2022

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) | Case No. 22-90168 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) | **Re: Docket Nos. 52, 173** |
|  | ) |  |

## FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion"),[2] of Cineworld Group plc and its affiliated debtors

in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), as debtors and

debtors in possession (collectively, the "Debtors") seeking entry of an interim order (the "Interim

Order") and a final order (this "Final Order", together with the Interim Order, the "DIP Orders")

pursuant to sections 105, 361, 362, 363, 364(c), 364(d), 364(e), 503, 507, and 552(b) of title 11 of

the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code"), Rules 2002, 4001,

6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

and Rules 2002-1, 4001-1(b), 4002-1, and 9013-1 of the Local Rules of the United States

Bankruptcy Court for the Southern District of Texas and the Southern District of Texas Complex

---

[1]  Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/cineworld/.  The location of the Debtors' service address for the purposes of these chapter 11 cases is: 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion, the Interim Order, or the DIP Credit Agreement, as applicable.

Chapter 11 Case Procedures (together, the "Local Rules"), seeking, among other things, entry of

an order:

(i)     authorizing the Debtors[3] to incur senior secured postpetition obligations on a
superpriority basis in respect of a senior secured superpriority priming U.S. dollar
term loan facility ("DIP Facility") in the aggregate principal amount, of
$1,935,000,000 (the "DIP Commitments" and, all such loans, the "DIP Loans"), in
accordance with, and subject to the terms and conditions set forth in, the DIP Credit
Agreement, dated as of September 9, 2022; (a) $664 million of which Crown
Finance US, Inc. ("Crown Finance" or the "Borrower") shall be permitted to draw,
in accordance with, and subject to the terms and conditions set forth in the DIP
Credit Agreement (as defined below) (the "Working Capital Commitments," and
such loans, the "Working Capital Loans"); (b) $1,000,000,000 (such amount plus
all amounts on account of Prepetition Priming Adequate Protection Payments (as
defined herein) as and when they come due pursuant to this Final Order shall mean,
the "Priming Loan Refinancing Escrow Amount") of which shall be used, together
with all other amounts constituting the Priming Loan Refinancing Escrow Amount
to refinance, in full in cash, all outstanding Prepetition Priming Facility Obligations
(as defined herein) (the "Priming Loan Refinancing"), and (c) $271,000,000 (the
"RoW Debt Purchase Price") to effectuate a "take-out" of the outstanding principal
amount of the EUR 122,910,521.14 and USD 112,500,000 Facilities Agreement,
dated 19 June 2020, as amended by an amendment agreement dated 29 June 2020,
and as further amended by an amendment agreement dated 7 August 2020 and as
further amended by an amendment and restatement agreement dated 24 May 2022
by and among Crown NL Holdco B.V. ("Dutch TopCo"), as Topco, Cinema City
Holding B.V., as Parent, Cinema City Finance (2017) B.V., as Borrower (the "RoW
Borrower"), Kroll Agency Services Limited, as administrative and collateral agent
(the "RoW Agent"), the obligors from time to time party thereto (the "RoW
Obligors"), and the lenders from time to time party thereto (the "RoW Lenders")
(as amended, the "RoW Credit Agreement"), pursuant to which an approximately
EUR 123 million term loan facility and an approximately $112.5 million term loan
facility were made available to RoW Borrower (collectively, the "RoW Credit
Facility," and the loans advanced thereunder, the "RoW Loans," including and
together with any makewhole payments, any accrued and unpaid interest thereon
and any fees and expenses outstanding under the RoW Credit Agreement and
related documents, the "RoW Loan Obligations") (such "take-out", the "RoW Loan
Transaction") pursuant to the terms and conditions of that certain senior
Superpriority Secured Debtor-in-Possession Credit Agreement (as the same may be
amended, restated, supplemented, waived, or otherwise modified from time to time,
the "DIP Credit Agreement"), by and among Crown Finance, as borrower (in such
capacity, the "DIP Borrower"), Crown UK HoldCo Limited, as holdings

---

[3] For the avoidance of doubt, Debtor Cineworld Funding (Jersey) Limited is not currently a guarantor or obligor
under the DIP Facility. All rights of the Committee are preserved to challenge the addition of such entity as a
guarantor or obligor under the DIP Facility, notice of which shall be provided by the Debtors to the Committee.

("Holdings"), the guarantors party thereto (any such guarantors, collectively, the "DIP Guarantors," and any other additional collateral party agreed to by the Debtors and the DIP Lenders, collectively, the "DIP Obligors" and together with the Borrower, the "DIP Loan Parties"), Barclays Bank PLC, as administrative agent and collateral agent (in such capacities, the "DIP Agent"), and certain of the Prepetition Legacy Facility Lenders (as defined below) that are members of the ad hoc group represented by Arnold & Porter Kaye Scholer LLP and Houlihan Lokey, Inc. (the "Ad Hoc Group") that execute a backstop commitment agreement, and their respective successors and assigns (collectively, the "Backstop Parties") and certain Prepetition Legacy Facility Lenders (as defined below and other than the Backstop Parties) that, after the Closing Date agree to participate in the DIP Facility, and their respective successors and assigns (the "New DIP Lenders", together with the Backstop Parties, the "DIP Lenders" and the DIP Lenders together with the  DIP Agent, the "DIP Secured Parties"), the terms and conditions as set forth in the DIP Credit Agreement;

(ii)     authorizing the Debtors to execute and deliver the DIP Credit Agreement and any other agreements, instruments, pledge agreements, intercreditor agreements, guarantees, fee letters, control agreements, and other ancillary documents related thereto (including any security agreements, intellectual property security agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time, collectively with the DIP Credit Agreement, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)    [Reserved];

(iv)     subject to the Carve-Out (as defined below) and the Senior Permitted Liens, granting the DIP Facility and all obligations of the Borrower and Grantors owing thereunder and under, or secured by, the DIP Documents, to the DIP Secured Parties (collectively, and including all "Obligations" as described in the DIP Credit Agreement and, without limitation, all principal and accrued interest, premiums, costs, fees, expenses and any other amounts due under the DIP Facility, the "DIP Obligations") allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined herein) pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over all administrative expenses, including those of the kind specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), or 726 or any other provisions of the Bankruptcy Code, and having full recourse against all assets of the DIP Obligors, including proceeds of Avoidance Actions (as defined below), subject only to the Carve-Out;

(v)      subject to the Carve-Out, granting to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, valid, enforceable, nonavoidable, automatically, and fully perfected security interests in and liens on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, including all property constituting Cash Collateral;

(vi)     authorizing and directing the Debtors to pay the principal, interest, premiums, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including the Yield Payment, commitment fees, closing fees, exit fees, audit fees, appraisal fees, valuation fees, liquidator fees, structuring fees, administrative agent's fees, the reasonable and documented fees and disbursements of the DIP Agent's and the other DIP Secured Parties' attorneys, advisors, accountants, and other consultants, all to the extent provided in, and in accordance with, the DIP Documents, the Interim Order, and this Final Order;

(vii)    authorizing the Debtors to use the Prepetition Collateral (as defined below), including the Cash Collateral (as defined below) under the Prepetition First Lien Loan Documents (as defined below), and providing adequate protection to the Prepetition First Lien Secured Parties (as defined below) for, among other things, the diminution in value of their interests in the applicable Prepetition Collateral (including Cash Collateral) from and after the Petition Date to the fullest extent set forth in the Bankruptcy Code and other applicable law ("Diminution in Value") to the extent such Diminution in Value occurs on account of the Debtors' sale, lease, or use of the Prepetition Collateral (including Cash Collateral), the imposition and enforcement of the automatic stay pursuant to section 362 of the Bankruptcy Code, and the priming of the Prepetition Legacy Facility Secured Parties' respective interests in the Prepetition Collateral;

(viii)   in each case except to the extent of the Carve-Out, determining that the Debtors have waived any right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, and determining that (a) the equitable doctrine of marshaling and other similar doctrines, and (b) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply; and

(ix)     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents, the Interim Order, and this Final Order;

The Court having considered the Motion, the exhibits attached thereto, the

*Declaration of Steven Zelin in Support of the Debtors' Emergency Motion for Entry of Interim and*

*Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash*

*Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III)*

*Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay,*

*(V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Zelin Declaration"), the

*Declaration of James Mesterharm in Support of the Debtors' Emergency Motion for Entry of*

*Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and*

*(B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense*

*Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the*

*Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the

"Mesterharm Declaration," together with the Zelin Declaration, collectively, the "DIP

Declarations"), and the evidence submitted and arguments made at the interim hearing held on

September 8, 2022 (the "Interim Hearing"); and the Court having entered the Interim Order on

September 8, 2022 [Docket No. 173]; and the Court having considered the Motion, the exhibits

thereto, the Declarations, and the evidence submitted and arguments made at the final hearing held

on October 31, 2022 (the "Final Hearing"); and notice of the Motion, the relief requested therein

on a final basis, and the Final Hearing having been given in accordance with Bankruptcy Rules

2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Final Hearing having been held

and concluded; and all objections, if any, to the final relief requested in the Motion having been

withdrawn, resolved, or overruled by the Court; and it appearing that approval of the final relief

requested in the Motion is fair and reasonable and in the best interests of the Debtors, their estates,

and all parties-in-interest, and is essential for the continued operation of the Debtors' businesses

and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry

into the DIP Credit Agreement and the other DIP Documents was a sound and prudent exercise of

the Debtors' business judgment; and after due deliberation and consideration, and good and

sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM**

**HEARING AND THE FINAL HEARING, THE COURT MAKES THE FOLLOWING**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW:[4]**

---

[4]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law
      pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To

A.     **Petition Date**.  On September 7, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

B.     **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.     **Jurisdiction and Venue**.  This Court has subject matter jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for the Chapter 11 Cases and proceedings with respect to the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     **Committee Formation**.  On September 23, 2022, the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed the official committee of unsecured creditors in the Chapter 11 Cases (as it may be reconstituted from time to time, the "Committee") pursuant to section 1102 of the Bankruptcy Code [Docket No. 419].

E.     **Notice**.  Notice of the Motion and the Final Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Final Hearing or the entry of this Final Order shall be required.

F.     **Debtors' Stipulations**.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of other parties in interest (other than the Debtors), including the Committee, as set forth in paragraph 32 herein, the Debtors admit, stipulate,

---

the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

6

acknowledge, and agree (paragraphs F, G, and H shall be referred to herein collectively as the "Debtors' Stipulations and Releases") as follows:

### *Prepetition Legacy Facility*

(i)      Pursuant to that certain Credit Agreement, dated as of February 28, 2018 (the "Prepetition Legacy Credit Agreement" and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Legacy Facility Loan Documents"), providing for (A) $3,325,000,000 in U.S. dollar-denominated term loans (the "Initial Legacy USD Term Loans"), (B) €607,643,200 of euro denominated term loans (the "Legacy Euro Term Loans"), (C) $ 462,500,000 in revolving credit commitments (the "Prepetition Legacy Revolving Credit Facility"), and (D) $650,000,000 in incremental U.S. dollar-denominated term loans (the "Incremental Legacy USD Term Loans," and together with the Initial Legacy USD Term Loans and the Legacy Euro Term Loans, the "Prepetition Legacy Term Facilities," and together with the Prepetition Legacy Revolving Credit Facility, collectively, the "Prepetition Legacy Credit Facilities") entered into by and among (a) Holdings, (b) Crown Finance, as Borrower, (c) the lenders party thereto (the "Prepetition Legacy Facility Lenders"), and (d) Barclays Bank PLC, as Administrative Agent (in such capacity, the "Prepetition Legacy Facility Agent" and together with the Prepetition Legacy Facility Lenders, the "Prepetition Legacy Facility Secured Parties"), the Prepetition Legacy Facility Secured Parties agreed to extend loans and other financial accommodations to, and issue letters of credit for the account of, the Borrower pursuant to the Prepetition Legacy Facility Loan Documents.   All obligations of the applicable Debtors arising under the Prepetition Legacy Credit Agreement (including the "Obligations" as defined therein, whether or not arising under the Prepetition

7

Legacy Facility Loan Documents) or the other Prepetition First Lien Loan Documents shall collectively be referred to herein as the "Prepetition Legacy Facility Obligations."

(ii)     **Prepetition Legacy Facility Collateral**.  Pursuant to the Collateral Documents (as defined in the Prepetition Legacy Credit Agreement, and as such documents were amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Legacy Facility Collateral Documents"), by and among Crown Finance and its subsidiaries party thereto (collectively, the "Prepetition Legacy Facility Grantors," and each, a "Prepetition Legacy Facility Grantor") and the Prepetition Legacy Facility Agent, each Prepetition Legacy Facility Grantor granted to the Prepetition Legacy Facility Agent, for the benefit of the Prepetition Legacy Facility Agent and the other Prepetition Legacy Facility Secured Parties, to secure the Prepetition Legacy Facility Obligations, first priority security interests in and continuing Liens (the "Prepetition Legacy Facility Liens") on substantially all of such Prepetition Legacy Facility Grantors' assets and properties and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (other than "Excluded Property," as such term is defined in the Prepetition Legacy Facility Loan Documents and any other assets and properties of the Prepetition Legacy Facility Grantors that are excluded from the security package by virtue of the Prepetition Legacy Facility Loan Documents).  All "Collateral" as defined in the Prepetition Legacy Credit Agreement granted or pledged by such Prepetition Legacy Facility Grantors pursuant to any Prepetition Legacy Facility Collateral Document or any other Prepetition Legacy Facility Loan Document shall collectively be referred to herein as the "Prepetition Legacy Facility Collateral" and, together with the Prepetition Priming Facility Collateral (as defined below), the "Prepetition Collateral" and, the Security Interests (as defined below) thereon and therein, the "Prepetition Liens."  As of the Petition Date, (a) the Prepetition

Legacy Facility Liens (I) are legal, valid, binding, enforceable, unavoidable, and perfected Liens, (II) were granted to, or for the benefit of, the Prepetition Legacy Facility Secured Parties for fair consideration and reasonably equivalent value, (III) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (IV) are subject and subordinate only to (A) the DIP Liens (after giving effect to the Interim Order and  this Final Order), (B) the Carve-Out (after giving effect to the Interim Order and this Final Order), and (C) certain Prepetition Priming Facility Liens (prior to giving effect to the Interim Order); and (b) (I) the Prepetition Legacy Facility Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition Legacy Facility Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (II) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition Legacy Facility Obligations exist, (III) no portion of the Prepetition Legacy Facility Obligations or any payments made to any or all of the Prepetition Legacy Facility Secured Parties are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (IV) the obligations of the Guarantors (as defined in the Prepetition Legacy Credit Agreement) under the Prepetition Legacy Facility Collateral Documents and the other Prepetition Legacy Facility Loan Documents shall continue in full force and effect to unconditionally guaranty the Prepetition Legacy Facility Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Secured Parties to the Debtors pursuant to the terms of the Interim Order, this Final Order, or the DIP Documents.

(iii)     Amounts Owed under Prepetition Legacy Facility Loan Documents. As of the Petition Date, the applicable Debtors were justly and lawfully indebted and liable to the Prepetition Legacy Facility Secured Parties, pursuant to the Prepetition Legacy Facility Loan Documents, without defense, counterclaim, reduction, or offset of any kind, in respect of loans made and other financial accommodations made by the Prepetition Legacy Facility Secured Parties, an aggregate principal amount of approximately $3,939,248,972.20 plus all accrued and unpaid interest thereon and any additional fees, expenses (including any reasonable and documented attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Legacy Facility Loan Documents), and other amounts now or hereafter due under the Prepetition Legacy Facility Loan Documents (the "Prepetition Legacy Facility Debt").  Paragraphs (i) - (iii) above shall be referred to herein as the "Debtors' Legacy Facility Stipulations."

### *Prepetition Priming Facility*

(iv)     Pursuant to that certain Credit Agreement, dated as of November 23, 2020 (the "Prepetition Priming Credit Agreement" and (collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Priming Facility Loan Documents" and together with the Prepetition Legacy Facility Loan Documents, the "Prepetition First Lien Loan Documents"), providing for (A) Initial Term B-1 Loans (as defined in the Prepetition Priming Credit Agreement) in the original principal amount of $450,000,000, (B) Initial Term B- 2 Loans (as defined in the Prepetition Priming Credit Agreement) in the original principal amount of $110,800,000 and (C) 2021 Incremental Term B-1 Loans (as defined in the Prepetition Priming Credit Agreement) in the original principal amount of $200,000,000 (collectively, the "Prepetition Priming Facilities" and,

10

together with the Prepetition Legacy Credit Facilities," the "Prepetition Secured Facilities"),

entered into by and between (a) Holdings, (b) Crown Finance, as borrower, (c) the lenders party

thereto (the "Prepetition Priming Facility Lenders" and, the Prepetition Priming Facility Lenders

together with the Prepetition Legacy Facility Lenders, the "Prepetition First Lien Lenders"), and

(d) Barclays Bank PLC, as Administrative Agent (in such capacity, the "Prepetition Priming

Facility Agent" and the Prepetition Priming Facility Agent together with the Prepetition Priming

Facility Lenders, the "Prepetition Priming Facility Secured Parties" and the Prepetition Priming

Facility Agent, together with the Prepetition Legacy Facility Agent, the "Prepetition First Lien

Agents" and, the Prepetition First Lien Agents together with the Prepetition First Lien Lenders and

any other party to which Prepetition First Lien Secured Obligations (as defined below) are owed,

the "Prepetition First Lien Secured Parties"), the Prepetition Priming Facility Secured Parties

agreed to extend loans and other financial accommodations to the Borrower pursuant to the

Prepetition Priming Facility Loan Documents.  All obligations of the applicable Debtors arising

under the Prepetition Priming Credit Agreement (including the Applicable Premium and all other

"Obligations" as defined therein, whether or not arising under the Prepetition Priming Facility

Loan Documents) or the other Prepetition Priming Facility Loan Documents shall collectively be

referred to herein as the "Prepetition Priming Facility Obligations" (together with the Prepetition

Legacy Facility Obligations, the "Prepetition First Lien Secured Obligations").

          (v)     **Prepetition Priming Facility Collateral**.  Pursuant to the Collateral

Documents (as defined in the Prepetition Priming Credit Agreement, and as such documents were

amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition

Priming Facility Collateral Documents"), by and among Crown Finance and its subsidiaries party

thereto (collectively, the "Prepetition Priming Facility Grantors" and each, a "Prepetition Priming

11

Facility Grantor") and the Prepetition Priming Facility Agent, each Prepetition Priming Facility

Grantor granted to the Prepetition Priming Facility Agent, for the benefit of the Prepetition Priming

Facility Agent and the other Prepetition Priming Facility Secured Parties, to secure the Prepetition

Priming Facility Obligations, first priority security interests in and continuing Liens (the

"Prepetition Priming Facility Liens") on substantially all of such Prepetition Priming Facility

Grantors' assets and properties and all proceeds, products, accessions, rents, and profits thereof,

in each case whether then owned or existing or thereafter acquired or arising (other than "Excluded

Property," as such term is defined in the Prepetition Priming Facility Loan Documents and any

other assets and properties of the Prepetition Priming Facility Grantors that are excluded from the

security package by virtue of the Prepetition Priming Facility Loan Documents).  All "Collateral"

as defined in the Prepetition Priming Credit Agreement granted or pledged by such Prepetition

Priming Facility Grantors pursuant to any Prepetition Priming Facility Collateral Document or any

other Prepetition Priming Facility Loan Documents shall collectively be referred to herein as the

"Prepetition Priming Facility Collateral."   As of the Petition Date, (a) the Prepetition Priming

Facility Liens (I) are legal, valid, binding, enforceable, and perfected Liens, (II) were granted to,

or for the benefit of, the Prepetition Priming Facility Secured Parties for fair consideration and

reasonably equivalent value, (III) are not subject to avoidance, recharacterization, or subordination

pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (IV) are subject and

subordinate only to valid, perfected, and unavoidable liens permitted under the Prepetition Priming

Credit Agreement to the extent that such permitted liens are senior to or *pari passu* with the

Prepetition Priming Facility Liens; and (b) (I) the Prepetition Priming Facility Obligations

constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in

accordance with the terms of the applicable Prepetition Priming Facility Loan Documents (other

than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (II)
no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition Priming
Facility Obligations exist, (III) no portion of the Prepetition Priming Facility Obligations or any
payments made to any or all of the Prepetition Priming Facility Secured Parties are subject to
avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset,
counterclaim, defense, or "claim" (as defined in section 101(5) of the Bankruptcy Code) of any
kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (IV) the obligations
of the Guarantors (as defined in the Prepetition Priming Credit Agreement) under the Prepetition
Priming Facility Collateral Documents and the other Prepetition Priming Facility Loan Documents
shall continue in full force and effect to unconditionally guaranty the Prepetition Priming Facility
Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and
financial accommodations extended by the DIP Secured Parties to the Debtors pursuant to the
terms of the Interim Order, this Final Order, or the DIP Documents.

(vi)    **Amounts Owed under Prepetition Priming Facility Loan
Documents**.  As of the Petition Date, the applicable Debtors were justly and lawfully indebted and
liable to the Prepetition Priming Facility Secured Parties, pursuant to the Prepetition Priming
Facility Loan Documents, without defense, counterclaim, reduction or offset of any kind, in respect
of loans made and other financial accommodations made by the Prepetition Priming Facility
Secured Parties, in an aggregate principal amount of Initial Term B-1 Loans (as defined in the
Prepetition Priming Credit Agreement) of $544,585,631.08, an aggregate principal amount of 2021
Incremental Term B-1 Loans (as defined in the Prepetition Priming Credit Agreement) of
$200,000,000.00 and an aggregate principal amount of Initial Term B-2 Loans (as defined in the
Prepetition Priming Credit Agreement) of $110,800,000.00 *plus* (x) all accrued and unpaid interest

thereon (including all accrued and unpaid PIK Interest Amounts (as defined in the Prepetition Priming Credit Agreement)) in the aggregate amount of $18,500,796.58, (y) the Applicable Premium (as defined in the Prepetition Priming Credit Agreement) (which became due and payable on the Petition Date) and (z) any additional fees, expenses (including any reasonable and documented attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Priming Facility Loan Documents), and other amounts now or hereafter due under the Prepetition Priming Facility Loan Documents.  Paragraphs (iv) - (vi) above shall be referred to herein as the "Debtors' Priming Facility Stipulations."

       G.     **Release of Prepetition First Lien Secured Parties**.  Subject to paragraph 32 hereof, and in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Debtor shall be deemed to have forever waived, discharged, and released each of Arvest (as defined herein), the Prepetition First Lien Secured Parties and their respective affiliates, assigns, or successors and the respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees, and other representatives (all of the foregoing, collectively, the "Prepetition Secured Party Releasees") from any and all obligations and liabilities to the Debtors (and their permitted successors and assigns) and from any and all "claims" (as defined in section 101(5) of the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights, and other rights of disgorgement or recovery against any and all of the Prepetition Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the Prepetition First Lien Secured Obligations, the Prepetition Legacy Facility Liens, or Prepetition Priming Facility Liens (as applicable), or the debtor-creditor relationship between any of the Prepetition First Lien Secured Parties, on the one hand, and any

of the Debtors, on the other hand, arising prior to the date of entry of the Interim Order, including (a) any recharacterization, subordination, avoidance, disallowance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, municipal law, or foreign law and (b) any right or basis to challenge or object to the amount, validity, or enforceability of the Prepetition First Lien Secured Obligations or any payments or other transfers made on account of the Prepetition First Lien Secured Obligations, or the validity, enforceability, priority, or non-avoidability of the Prepetition Legacy Facility Liens or the Prepetition Priming Facility Liens securing the applicable Prepetition First Lien Secured Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the Prepetition Secured Party Releasees.

H.     **Cash Collateral**.  All of the Debtors' cash, including cash and other amounts in deposit accounts, whether as original collateral or proceeds of the Prepetition Collateral, whether existing on the Petition Date or thereafter, constitutes the cash collateral (within the meaning of section 363(a) of the Bankruptcy Code) of the DIP Secured Parties or Prepetition First Lien Secured Parties (the "Cash Collateral").

I.     **Findings Regarding Postpetition Financing and Use of Cash Collateral**.

(i)     **Need for Postpetition Financing and Use of Cash Collateral**.  The Debtors have a continuing need to use Cash Collateral and obtain credit pursuant to the DIP Facility in order to, among other things, enable the orderly continuation of their operations, to administer and preserve the value of their estates, and to consummate (A) the Priming Loan Refinancing and (B) the RoW Loan Transaction.  The ability of the Debtors to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and otherwise

15

finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of which, on an interim basis as contemplated hereunder, would immediately and irreparably harm the Debtors, their estates, and parties-in-interest.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses, maintain their properties in the ordinary course of business, and fund the Chapter 11 Cases without the authorization to use Cash Collateral and to borrow the DIP Loans as contemplated herein .

(ii)     **No Credit Available on More Favorable Terms**.  The Debtors have been and continue to be unable to obtain financing on more favorable terms from sources other than the DIP Secured Parties under the DIP Documents, the Interim Order, and this Final Order.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured credit allowable only under sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code.  The Debtors are unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without (a) granting to the DIP Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Documents, including the DIP Liens and the DIP Superpriority Claims (defined below), (b) allowing the DIP Secured Parties to provide the loans, letters of credit, and other financial accommodations under the DIP Facilities on the terms set forth herein and in the DIP Documents, and (c) granting to the Prepetition First Lien Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Documents, including the First Lien AP Liens (the foregoing described in clauses (a), (b), and (c), collectively, the "DIP Protections").

(iii)     **Priming of the Prepetition Legacy Facility Liens**.  The priming of the Prepetition Legacy Loans under section 364(d) of the Bankruptcy Code, as contemplated by

16

the DIP Documents and as provided herein, will enable the Debtors to obtain the working capital of the DIP Facility and use Cash Collateral needed to continue to operate their business as a growing concern during the pendency of the Chapter 11 Cases in order to preserve and maximize the value of their estates for the benefit of their creditors.  The ability of the Debtors to finance their operations, maintain business relationships with their vendors and suppliers, and pay their employees requires the availability of working capital from the DIP Facility and the use of Cash Collateral.  The Debtors' inability to access the financing under the DIP Facility and use Cash Collateral will harm the Debtors, their estates, their creditors, and the Debtors' chances to successfully reorganize.  The Prepetition Legacy Facility Secured Parties are entitled to receive adequate protection as set forth in the Interim Order and this Final Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, solely to the extent of any Diminution in Value of their respective interests in the Prepetition Legacy Facility Collateral (including Cash Collateral) as a result of the priming of the Prepetition Legacy Facility Liens.  The Prepetition Legacy Facility Secured Parties have either (i) consented to the priming of the Prepetition Legacy Loans, (ii) not objected to the priming of the Prepetition Legacy Loans, or (iii) if any Prepetition Legacy Facility Secured Party has objected to the priming of the Prepetition Legacy Loans, any such objection has been withdrawn or overruled.

(iv)     **Use of Cash Collateral and Proceeds of the DIP Facility**.  As a condition to entry into the DIP Credit Agreement, the extension of credit under the DIP Facility and the authorization to use the Prepetition Collateral, including Cash Collateral, the DIP Agent, the other DIP Secured Parties, and the Prepetition First Lien Secured Parties require, and the Debtors have agreed, that proceeds of the DIP Facility and the Prepetition First Lien Secured Parties' Cash Collateral shall be used solely and exclusively for the purposes set forth in, and in a

manner consistent with, the terms and conditions of the Interim Order, this Final Order, the DIP Documents, and the budget (as the same may be modified from time to time consistent with the terms of the DIP Documents and subject to such exclusions as permitted in the DIP Documents, and as set forth in paragraph 15 hereof, the "Budget," (subject to the Variance Limit and the Financial Covenant (as defined below)),[5] solely for the purposes set forth in the DIP Documents, the Interim Order, this Final Order, and subject to the Carve-Out, including (a) the establishment of the Funding Account (as defined herein), (b) the establishment of an escrow account held by or on behalf of the DIP Agent for purpose of holding the Priming Loan Refinancing Escrow Amount, including the Prepetition Priming Adequate Protection Payments (as defined herein), which may be the Funding Account until the date a segregated escrow account is established (the "Priming Loan Refinancing Escrow"); (c) upon the PTL Challenge Period Termination Date, the Priming Loan Refinancing; (d) the RoW Loan Transaction; (e) ongoing working capital and other general corporate purposes of the Debtors; (f) permitted payment of costs of administration of the Chapter 11 Cases and any ancillary proceedings commenced in jurisdictions outside of the United States, including restructuring charges arising on account of the Chapter 11 Cases, including statutory fees of the U.S. Trustee and allowed professional fees and expenses of the Debtor Professionals (as defined below) and professionals retained by the Committee, subject to the Investigation Budget Amount (as defined herein); (g) payment of interest, premiums, fees, expenses, and other amounts (including, without limitation, legal and other professionals' fees and expenses of the DIP Agent and the other DIP Secured Parties, including for the avoidance of doubt, the fees and expenses of one primary counsel, one local counsel in each relevant jurisdiction, and non-legal

---

[5]    A copy of the initial Budget is attached to the Interim Order as **Schedule 1**. The current Budget is attached hereto as **Schedule 1**.

advisors, for each of the DIP Agent (in the case of counsel and non-legal advisors representing the DIP Agent, as selected by the DIP Agent in its sole discretion) and the DIP Lenders (in the case of counsel and non-legal advisors representing the DIP Lenders, as selected by the DIP Lenders holding greater than 50.0% of the outstanding commitments and/or exposure under the DIP Loans (the "Majority Lenders")) owed under the DIP Documents, including those incurred in connection with the preparation, negotiation, documentation, and Court approval of the DIP Facility, whether incurred before, on, or after the Petition Date; (h) payment of certain adequate protection amounts to the Prepetition First Lien Secured Parties, to the extent and subject to the limitations set forth herein; and (i) payment of obligations arising from or related to the Carve-Out.

(v)     **Refinancing of Prepetition Priming Facility**.  Based on the record presented to the Court, including the Zelin Declaration, refinancing of all outstanding Prepetition Priming Facility Obligations is necessary and beneficial to the Debtors and their estates. Moreover, the DIP Lenders were unable or unwilling to provide the DIP Facility absent the protections provided pursuant to the DIP Documents, the Interim Order, and this Final Order including repayment of the Prepetition Priming Facility Obligations by the DIP Facility upon the PTL Challenge Period Termination Date, as more fully set forth in the Zelin Declaration.

(vi)     **RoW Loan Transaction**.  Based on the record presented to the Court, including the Zelin Declaration, consummation of the RoW Loan Transaction is necessary and beneficial to the Debtors and their estates.  Moreover, the DIP Lenders were unable or unwilling to provide the DIP Facility absent the protections provided pursuant to the DIP Documents, the Interim Order, and this Final Order including consummation of the RoW Loan Transaction, as more fully set forth in the Zelin Declaration

19

(vii)    **No Obligation to Monitor**.  No DIP Lender or the DIP Agent shall have any obligation or responsibility to monitor any DIP Loan Party's use of the DIP Loans and each DIP Lender or the DIP Agent may rely upon each DIP Loan Party's representations that the amount of DIP Loans requested at any time and the use thereof are in accordance with the requirements of the Interim Order, this Final Order, the DIP Documents, and Bankruptcy Rule 4001(c)(2).

(viii)    **Application of Proceeds of DIP Collateral**.  As a condition to entry into the DIP Credit Agreement, the extension of credit under the DIP Facility and authorization to use Cash Collateral, the Debtors, the DIP Agent, the other DIP Secured Parties, and the Prepetition First Lien Secured Parties have agreed that, as of and commencing on the date of the Interim Hearing, the Debtors shall utilize the proceeds of the DIP Collateral solely in accordance with the Interim Order, this Final Order, the DIP Documents, and the Budget.

J.    **Adequate Protection**.  Each of the Prepetition First Lien Secured Parties is entitled to receive adequate protection as set forth in the Interim Order and this Final Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, solely to the extent there is a Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral) as a result of the Debtors' use of the Prepetition Collateral, including Cash Collateral, subject in all respects to the Carve-Out and subject to paragraph 32 of this Final Order.  As adequate protection, the Prepetition First Lien Secured Parties, will receive (a) solely to the extent of any Diminution in Value of their respective interests in the applicable Prepetition Collateral, the First Lien AP Liens (as defined below) and First Lien AP Superpriority Claim (as defined below); (b) current payment of reasonable and documented fees and expenses and other disbursements as set forth in paragraph 14(d) herein, to the extent not duplicative of any other

20

payments made by the Debtors; and (c) financial and other reporting, in each case, as set forth in paragraph 14(e) herein. In addition, Arvest Bank  and LEAF Capital Funding, LLC shall be entitled to adequate protection as set forth in paragraphs 55 – 57 of this Final Order.

        K.      **Sections 506(c), 552(b) and Marshaling**.  In consideration of (i) the DIP Agent's and the DIP Secured Parties' agreement that their liens and superpriority claims shall be subject to the Carve-Out; (ii) the Prepetition First Lien Secured Parties' agreement that their respective Prepetition Liens and claims, including any First Lien AP Liens and claims, including the First Lien AP Superpriority Claim, shall be subject to the Carve-Out; (iii) the DIP Agent's, the other DIP Secured Parties', and the Prepetition First Lien Secured Parties' agreement to the payment (in a manner consistent with the Budget (subject to the Variance Limit and the Financial Covenant and subject to the terms and conditions of the Interim Order, this Final Order, and the DIP Documents)) of certain expenses of administration of these Chapter 11 Cases; and (iv) the Stub Rent Resolution described in paragraph 23 herein: (a) the DIP Agent and the other DIP Secured Parties are entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code and a determination that the equitable doctrine of marshaling and other similar doctrines shall not apply, in each case with respect to the DIP Agent, the DIP Secured Parties, and the DIP Collateral and (b) the Prepetition First Lien Agents and the Prepetition First Lien Secured Parties are entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code, and a determination that any "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply, and the equitable doctrine of marshaling and other similar doctrines shall not apply, in each case with respect to the Prepetition First Lien Agents and the other Prepetition First Lien Secured Parties; *provided*, that the foregoing section 506(c) and section 552(b) waivers shall be without prejudice to the Committee's and any affected landlord's rights solely with respect to enforcing

Stub Rent (as defined below) in accordance with the Stub Rent Resolution as provided for in paragraph 23 of this Final Order.

L. **No Control**. None of the DIP Secured Parties or Prepetition First Lien Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any of the Debtors' operations are conducted, or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Facility, the DIP Documents, and/or the Prepetition First Lien Loan Documents (including by permitting the Debtors to use the Prepetition Collateral (including the Cash Collateral) or in taking any other actions permitted by the Interim Order or this Final Order).

M. **Good Faith of the DIP Agent, the DIP Secured Parties, and the Prepetition First Lien Secured Parties**.

(i) Based upon the pleadings and proceedings of record in the Chapter 11 Cases, (a) the extensions of credit under the DIP Facility are fair and reasonable, are appropriate for secured financing to debtors in possession, are the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (b) the terms and conditions of the DIP Facility and the use of the Cash Collateral have been negotiated in good faith and at arm's-length among the Debtors, the DIP Secured Parties, and the Prepetition First Lien Secured Parties with the assistance and counsel of their respective advisors; (c) the use of Cash Collateral, including, without limitation, pursuant to the Interim Order and this Final Order, has been allowed in "good faith" within the meaning of section 364(e) of the Bankruptcy Code; (d) any credit to be extended, loans to be made, and other financial accommodations to be

extended to the Debtors by the DIP Secured Parties or the Prepetition First Lien Secured Parties, including, without limitation, pursuant to the Interim Order or this Final Order, have been allowed, advanced, extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code by the DIP Secured Parties and the Prepetition First Lien Secured Parties in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code; and (e) the DIP Facility, the DIP Liens (as defined below), the First Lien AP Liens, the First Lien AP Superpriority Claim, and the DIP Superpriority Claims (as defined below) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order, this Final Order, or any provision thereof is vacated, reversed, or modified, on appeal or otherwise.

(ii)     Absent an order of this Court, the consent of the Prepetition First Lien Secured Parties is required for the Debtors' use of Cash Collateral and other Prepetition Collateral.  The Prepetition First Lien Secured Parties have consented, or are deemed pursuant to the Prepetition First Lien Loan Documents to have consented, or have not objected, to the Debtors' use of Cash Collateral and other Prepetition Collateral or to the Debtors' entry into the DIP Documents in accordance with and subject to the terms and conditions in the Interim Order, this Final Order, and the DIP Documents.

N.     **Immediate Entry**.  The Debtors have requested entry of this Final Order pursuant to Bankruptcy Rule 4001(b)(2), (c) and (d) and the Local Rules.  Absent granting the relief sought by this Final Order, the Debtors' estates could be immediately and irreparably harmed.  Thus, sufficient cause exists for immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(b)(2), (c) and (d).

O.   **Final Hearing**.  Notice of the Final Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier, or hand delivery to certain parties in interest, including the parties included in paragraph 92 of the Motion.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances, and no other notice is required in connection with the relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT**:

1.   DIP Facility Approved on a Final Basis. The Motion is granted on a final basis as set forth herein. The DIP Facility, including, without limitation, the Priming Loan Refinancing, is authorized and approved on a final basis, to the extent set forth herein, and the use of Cash Collateral on a final basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents, the Interim Order, and this Final Order.  All objections to the entry of this Final Order, to the extent not withdrawn, waived, settled, or resolved, are hereby denied and overruled.  This Final Order shall become effective immediately upon its entry.

2.   Authorization of the DIP Documents and the DIP Facility.  The DIP Loan Parties'[6] prior execution and delivery of, and their continued performance under, the DIP Documents, is hereby approved on a final basis. The DIP Loan Parties are expressly and immediately authorized and empowered on a final basis to execute and deliver the DIP Documents and incur and to perform all of their obligations in accordance with, and subject to, the terms of the Interim Order, this Final Order, and the DIP Documents, and to deliver all instruments,

---

[6] For the avoidance of doubt, Cineworld Funding (Jersey) Limited is not a DIP Loan Party.

certificates, agreements, and documents that may be required or necessary for the performance by the DIP Loan Parties under the DIP Facility and the creation and perfection of the DIP Liens (as defined below).  The DIP Loan Parties shall pay, to the extent not already paid, in accordance with the Interim Order, this Final Order, and the DIP Documents, the principal, interest, fees, payments, expenses, and other amounts described in the DIP Documents as such amounts become due and without need to obtain further Court approval, including, without limitation, the Yield Payment, the fees and expenses related to the Priming Loan Refinancing Escrow, the Priming Loan Refinancing, amounts payable pursuant to the RoW Loan Transaction, all other fees and other amounts owed to the DIP Secured Parties, and the reasonable fees and disbursements of the DIP Secured Parties, including the reasonable and documented fees and disbursements of counsel and other professionals, in each case whether or not such fees or other amounts arose before, on, and after the Petition Date, and whether or not any of the transactions contemplated hereby are consummated, and to take any other actions that may be necessary or appropriate, all as provided in the Interim Order, this Final Order, or the DIP Documents and in accordance with the Interim Order, this Final Order, or the DIP Documents; *provided* that, the payment of legal and other professionals' fees and expenses of the DIP Agent and the other DIP Secured Parties (other than legal and other professionals' fees and expenses incurred prior to the Closing Date) shall be subject to the requirements of paragraph 12 hereof.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by the Interim Order, this Final Order, and the DIP Documents.  The DIP Documents shall represent valid and binding obligations of the DIP Loan Parties, enforceable against each of the DIP Loan Parties and their estates in accordance with their terms.  All fees and expenses earned, paid, or payable pursuant to the Interim Order or this

Final Order shall be fully earned and non-refundable and shall be paid as specified in the DIP Documents.

       3.     <u>Direction of the Prepetition First Lien Agents</u>.  Pursuant to the terms of the Interim Order and this Final Order, the Prepetition First Lien Agents are authorized and instructed to (i) file, execute, deliver, and perform under any documents in any jurisdiction (including in any foreign jurisdiction), including, without limitation, any intercreditor agreements, lien subordination agreements, security agreements, pledge agreements, amendments, waivers, consents, powers of attorney (solely with respect to foreign jurisdictions), or release agreements, in each case, which may be reasonably necessary to give effect to the Interim Order, this Final Order, the transactions contemplated herein, including, without limitation the Priming Loan Refinancing, and the DIP Credit Agreement; (ii) under local law, to give effect to the priming Liens in favor of the DIP Lenders under the DIP Facility, execute, file, amend, amend and restate, release or replace guarantee or collateral agreements or any other similar documents so that the DIP Agent can act as the collateral agent thereunder and permit the DIP Agent to hold collateral on behalf of the DIP Lenders and/or the Prepetition First Lien Secured Parties, in each case, solely to the extent required to reflect the lien priority expressly set forth in the Interim Order and this Final Order; and (iii) subject to the Interim Order and Final Order, consent and take all reasonably necessary actions to give effect to the priming liens and security interests, use of Cash Collateral, adequate protection arrangements, intercreditor agreements and other documents, instruments and arrangements to give effect to the Interim Order and this Final Order (clauses (i) – (iii) above, collectively, the "<u>Direction</u>"), in each case, subject to the payment of all fees, costs and other expenses (including attorneys', accountants', appraisers' and financial advisors' fees), amounts, charges, costs, indemnities and other obligations in connection therewith.  For purposes of the

foregoing, no further consent, approval or direction of the Prepetition First Lien Lenders or this Court shall be required prior to the performance under or execution of such documents as contemplated in clauses (i) – (iii) above and any such documents necessary to effectuate the actions in clauses (i) – (iii) above shall be in a form acceptable to the Prepetition First Lien Agents.  The Prepetition First Lien Agents are fully protected in conclusively relying upon the Interim Order and this Final Order in connection with the Direction and carrying out any of the foregoing.

4.     <u>Authorization to Borrow and Use Cash Collateral</u>.  To prevent immediate and irreparable harm to the Debtors estates and to enable the Debtors to continue to operate their business and preserve and maximize the value of their estates, from the entry of the Interim Order through and including the DIP Termination Declaration Date (as defined below), in each case unless extended by written agreement of the DIP Agent and each of the Prepetition First Lien Agents, and subject to the terms, conditions, and limitations on availability set forth in the DIP Documents, the Interim Order, and this Final Order, (i) the Debtors were and are hereby authorized to use the Cash Collateral for the purposes described in the Interim Order and this Final Order; and (ii) the DIP Borrower was and is hereby authorized to borrow under the DIP Facility; *provided*, that (a) [Reserved]; (b) on the date of this Final Order, funds held in the Priming Loan Refinancing Escrow shall be used to consummate the Priming Loan Refinancing; (c) $271,000,000 has already been used under the Interim Order to consummate the RoW Loan Transaction[7] (subject to any

---

[7]     Approval of the RoW Loan Transaction includes, without limitation, among other things, approval of transactions associated with the consummation of the RoW Loan Transaction that convert an amount from one currency to another currency (a foreign exchange or FX transaction).  The DIP Agent or its affiliates, on behalf of the Debtors, is authorized to enter into such exchange transactions in connection with the RoW Loan Transaction, and any obligations or expenses owed by Debtors to the DIP Agent or its affiliates in connection with any such transaction shall constitute "Hedging Obligations" as described in the DIP Credit Agreement.  The DIP Agent is authorized pursuant to sections 105 and 362(d)(1) of the Bankruptcy Code to net, setoff, settle or recoup any Hedging Obligations owing by the Debtors to the DIP Agent or its affiliates and to apply DIP Collateral to satisfy any obligations of the Debtors, in accordance with the terms of the applicable Hedging Contract, notwithstanding any limits otherwise imposed by section 553 of the Bankruptcy Code.

terms and conditions set forth in the DIP Documents); and (d) any proposed use of the proceeds of DIP Loans or use of Cash Collateral shall be consistent with the terms and conditions of the Interim Order, this Final Order, and the DIP Documents, including the Budget solely to the extent set forth in the Variance Limit (defined below).  Nothing in the Interim Order or this Final Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in the Interim Order and this Final Order (including with respect to the Carve-Out), the DIP Facility, or the DIP Documents.

5.     <u>Amendment of the DIP Documents</u>.    No waiver, modification, or amendment of any of the provisions of the DIP Documents shall be effective unless set forth in writing, signed by or on behalf of the DIP Borrower and the applicable Debtors, and the DIP Agent (acting at the direction of the Majority Lenders except in the case of amendments, modifications, or waivers requiring consent from all DIP Lenders, all affected DIP Lenders, or the DIP Agent, as specified in the DIP Documents).  The DIP Documents and the Budget may from time to time be amended, modified, waived, or supplemented by the parties thereto, in the case of the DIP Lenders, by the DIP Agent at the direction of the Majority Lenders, in accordance with the terms thereof (and this Final Order) without further order of the Court if the amendment, modification, waiver, or supplement is non-material and in accordance with the DIP Documents or the Budget or are necessary to conform the terms of the DIP Documents or the Budget to the Interim Order or this Final Order, or to agreements reflected on the record at the Interim Hearing and/or Final Hearing. The Debtors shall provide counsel to the Committee copies of any non-material amendment, modification, waiver, or supplement of the DIP Documents or the Budget promptly.  In the case of a material amendment, modification, waiver, or supplement to the DIP Documents, the Debtors

shall provide notice (which may be provided through electronic mail or facsimile) to counsel to the Committee, counsel to the Ad Hoc Group, Davis Polk & Wardwell LLP as counsel to the ad hoc group of Prepetition Priming Facility Lenders (the "Ad Hoc Group of Prepetition Priming Facility Lenders"),[8] the U.S. Trustee, the DIP Agent, the other DIP Secured Parties, the Prepetition First Lien Agents, and the Prepetition First Lien Secured Parties, which parties shall have three (3) days from the date of such notice, except where notice is impracticable or would cause undue delay, in which case as much notice as is practicable under the circumstances shall be provided, within which to object, in writing, to such amendment, modification, waiver, or supplement.  If any such party timely objects to such material amendment, modification, waiver, or supplement to the DIP Documents, such material amendment, modification, waiver, or supplement shall only be permitted pursuant to an order of the Court.  The foregoing shall be without prejudice to the Debtors' right to seek approval from the Court of a material amendment, modification, waiver, or supplement on an expedited basis.  For the avoidance of doubt, the extension of a Milestone (as defined in the DIP Credit Agreement) or waiver of the Variance Limit or Financial Covenant shall not constitute a material amendment, modification, waiver, or supplement to the DIP Documents; *provided however*, the Committee shall have five (5) business days to object to any fees or costs payable to the DIP Lenders or to the DIP Agent for the account of the DIP Lenders (payable or proposed to be paid to the DIP Lenders) associated with an amendment, modification, waiver, or supplement, or any additional fees or costs not otherwise contemplated herein or in the Budget (including, but not limited to, any waiver, extension, or amendment fees) in connection with the DIP Facility, the Prepetition Legacy Credit Facilities, or the Prepetition Priming Credit Facilities,

---

[8]    After the indefeasible payment in full in cash of all outstanding Prepetition Priming Facility Obligations, all notices provided for in this Final Order shall no longer be required to be provided to counsel to the Ad Hoc Group of Prepetition Priming Facility Lenders.

and to the extent the Committee objects to such fee, the disputed portion of such fee shall only be paid (i) pursuant to an order of the Court or (ii) upon agreement by the Committee, Debtors and DIP Secured Parties.

6.      <u>DIP Obligations</u>.  The DIP Documents, the Interim Order, and this Final Order shall constitute and evidence the validity and binding effect of the DIP Obligations, which shall be enforceable against each of the DIP Loan Parties, their estates, and any successors thereto, including, without limitation, against any trustee or any other estate representative elected or appointed in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (collectively, the "<u>Successor Cases</u>" and each a "<u>Successor Case</u>").  Upon entry of the Interim Order and as ratified by this Final Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agent or any of the DIP Secured Parties, in each case, under the DIP Documents, the Interim Order, this Final Order, or secured by the DIP Liens (as defined below), including, without limitation, all principal, accrued and unpaid interest, costs, fees, expenses, indemnities, and other amounts (including any reasonable and documented attorneys', accountants', financial advisors', and other fees, costs, and expenses that are chargeable or reimbursable under the DIP Documents, the Interim Order, and/or this Final Order) owing under the DIP Documents.  Subject to the exceptions specified in the DIP Documents, the DIP Obligors shall be jointly and severally liable for the DIP Obligations.  No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens (as defined below) but excluding any adequate protection provided to the Prepetition First Lien Secured Parties hereunder) shall be stayed, restrained, voidable, avoidable, or

30

recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code, or any other provision with respect to avoidance actions under the Bankruptcy Code or applicable federal, state or foreign law equivalents) or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise, but other than to the Carve-Out), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

7.      DIP Liens.  Effective upon entry of the Interim Order and as ratified by this Final Order, as security for the DIP Obligations (and subject in all respects to the Carve Out and Senior Permitted Liens (as defined herein), pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the other DIP Secured Parties is hereby granted valid, binding, continuing, enforceable, non-avoidable, and automatically and properly perfected security interests and liens on the Priming Loan Refinancing Escrow (and all amounts on deposit therein), Priming Loan Refinancing Escrow Amount, and all assets and properties of the DIP Obligors (whether tangible, intangible, real, personal, or mixed), whether now owned or hereafter acquired and wherever located, before or after the Petition Date, including, without limitation, all cash, cash equivalents, deposit accounts, accounts, inventory, equipment, goods, equity interests or capital stock in domestic and foreign subsidiaries, including without limitation, Busby AssignCo, LLC, investment property, instruments, documents, chattel paper, real property, leasehold interests, fixtures, contracts, patents, copyrights, trademarks and other general intangibles, receivables (including those owed to the DIP Obligors generated by intercompany transactions), all claims or causes of action (including, any commercial tort claims or causes of action, and all products, offspring, profits, and proceeds thereof, and the proceeds of

Avoidance Actions (as defined in the DIP Credit Agreement) (all of the foregoing collateral, collectively, the "DIP Collateral," and, the Security Interests (as defined below) thereon and therein securing the DIP Obligations, the "DIP Liens"); *provided*, that and notwithstanding anything to the contrary herein, the DIP Collateral shall not include Avoidance Actions themselves; and *provided further* that, any DIP Liens, DIP Superpriority Claims, the First Lien AP Liens, and First Lien AP Superpriority Claim may recover from the proceeds of any Avoidance Action and commercial tort claims only after the holder of such DIP Liens, DIP Superpriority Claims, First Lien AP Liens, or First Lien AP Superpriority Claim has made commercially reasonable efforts to seek recovery from other collateral for such liens and claims. For the avoidance of doubt, the DIP Collateral shall include the Prepetition Collateral as set forth in the Interim Order, this Final Order, and the DIP Documents.

(a)      Notwithstanding anything to the contrary in this Final Order, DIP Liens and any adequate protection liens (including any other liens granted in connection with the DIP Facility) shall not encumber and DIP Collateral shall not include (a) leasehold interests of non-residential real property that prohibit or restrict the granting of such liens in the applicable lease except as permitted pursuant to applicable non-bankruptcy law (but shall include the proceeds of the sale or disposition of such leases) and (b) any security deposits (in possession of the landlord) or the Debtors' interests, if any, in pre-paid rent, unless liens on such security deposits or pre-paid rent are expressly permitted pursuant to the underlying lease documents; *provided*, that the DIP Liens and any adequate protection liens shall extend to any such security deposits or pre-paid rent upon reversion thereof to the Debtors, if at all.

(b)      Notwithstanding the foregoing, DIP Liens, adequate protection liens, and any other security interests granted hereunder or in connection with the DIP Facility

shall be junior in priority to any landlord's valid and perfected liens as of the Petition Date (or that were in existence immediately prior to the Petition Date and are properly perfected subsequent to the Petition Date or as permitted by section 546(b) of the Bankruptcy Code) that are senior in priority to the valid, perfected liens securing the Prepetition Secured Facilities as of the Petition Date, and to the extent any landlord's valid and perfected liens as of the Petition Date were junior to the valid, perfected liens securing either of the Prepetition Secured Facilities as of the Petition Date, the DIP Liens will prime all such landlord liens, subject to the landlord's right to seek adequate protection for its prepetition liens.

(c)     Further, notwithstanding anything to the contrary herein, the rights of the DIP Secured Parties and any prepetition agents and lenders under any of the prepetition credit documents to use or occupy any premises subject to a lease of non-residential real property shall be limited to (a) any such rights agreed to in writing by the applicable landlord, (b) any rights of the DIP Secured Parties that are valid and enforceable under applicable non- bankruptcy law, if any, or (c) further order of the Court following notice and a hearing appropriate under the circumstances.

8.     <u>DIP Lien Priority</u>.  The DIP Liens shall be, in all cases, subject to the Carve-Out and the liens (other than the Prepetition Legacy Facility Liens) permitted under section 8.2 of the Prepetition Legacy Credit Agreement solely to the extent any such liens were valid, non-avoidable, and are properly perfected as of the Petition Date (or were in existence immediately prior to the Petition Date and are properly perfected subsequent to the Petition Date or as permitted by section 546(b) of the Bankruptcy Code) and are senior in priority to the Prepetition Liens ("<u>Senior Permitted Liens</u>"), and have the priority set forth as follows:

(a)      pursuant to section 364(c)(2) of the Bankruptcy Code, by valid, binding, continuing, enforceable, fully perfected first priority liens, mortgages, charges, pledges, assignments by way of security, encumbrances or other security interests (the "Security Interests") in all of the assets of the DIP Obligors' that are not otherwise subject to valid, perfected, non-avoidable and enforceable security interests or liens in existence as of the Petition Date or valid security interests or liens granted prior to (but not perfected until after) the Petition Date (to the extent that such perfection in respect of a prepetition claim is expressly permitted under section 546(b) of the Bankruptcy Code);

(b)      pursuant to section 364(d)(1) of the Bankruptcy Code, by valid, binding, continuing, enforceable, fully perfected super-priority priming Security Interests in all of the assets of the DIP Obligors that are subject to valid, perfected, and enforceable security interests or liens in existence as of the Petition Date or valid security interests or liens granted prior to (but not perfected until after) the Petition Date (to the extent that such perfection in respect of a prepetition claim is expressly permitted under section 546(b) of the Bankruptcy Code), except as set forth in subclause (c) below; and

(c)      pursuant to section 364(c)(3) of the Bankruptcy Code, by valid, binding, continuing, enforceable, fully perfected junior-priority Security Interests on those assets securing obligations that are subject to Senior Permitted Liens;

(d)      other than as set forth herein (including with respect to the Carve-Out) and paragraphs 26 and 27 of the Cash Management Orders or permitted under the DIP Documents, the DIP Liens shall not be made subject or subordinate to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or

34

any Successor Cases, upon the conversion of any of the Chapter 11 Cases to any Successor Case,

and/or upon the dismissal or conversion of any of the Chapter 11 Cases or Successor Cases.  The

DIP Liens shall not be subject to any of sections 510, 549, or 550 of the Bankruptcy Code.  No

lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the

Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

9.      <u>Superpriority Claims</u>.  In addition to the DIP Liens granted herein, effective

immediately upon entry of the Interim Order and as ratified by this Final Order, all of the DIP

Obligations and all amounts owing by the DIP Loan Parties in respect thereof at all times, shall

constitute allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the

Bankruptcy Code, which shall have priority, subject and subordinate only to the payment of the

Carve-Out, over all administrative expense claims, adequate protection and other diminution

claims, priority and other unsecured claims, and all other claims against the DIP Loan Parties or

their estates, now existing or hereafter arising, of any kind or nature whatsoever, including

administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections

105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c),

546(d), 726, 1113 or 1114 or any other provisions of the Bankruptcy Code or otherwise, whether

or not such expenses or claims may become secured by a judgment Lien or other non-consensual

lien, levy, or attachment (the "<u>DIP Superpriority Claims</u>").  The DIP Superpriority Claims shall,

for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative

expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each DIP Obligor

on a joint and several basis, and shall be payable from and have recourse to all prepetition and

postpetition property of the DIP Obligors and all proceeds thereof, including the proceeds of

Avoidance Actions; *provided*, that any DIP Superpriority Claims may recover from the proceeds

of any Avoidance Action and commercial tort claims only after the holder of such DIP Superpriority Claims has made commercially reasonable efforts to seek recovery from other collateral for such claims.

10.     Priority of DIP Liens and DIP Superpriority Claims.  Other than as set forth herein, permitted under the DIP Documents, the DIP Liens and the DIP Superpriority Claims: (i) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code, section 506(c) of the Bankruptcy Code, or the "equities of the case" exception of section 552(b) of the Bankruptcy Code, *provided*, that the foregoing section 506(c) and section 552(b) waivers shall be without prejudice to the Committee's and any affected landlord's rights solely with respect to enforcing stub rent payments in accordance with the Stub Rent Resolution as provided for in paragraph 23 of this Final Order; (ii) shall not be subordinate to, or *pari passu* with, (A) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (B) any Liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property; (iii) shall be valid and enforceable against any trustee or any other estate representative elected or appointed in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in a Successor Case, and/or upon the dismissal of any of the Cases; and (iv) notwithstanding anything to the contrary in any First Day Order of this Court in any of the Cases, shall be senior to any administrative claims arising under any such First Day Order; provided, however, that the DIP Liens shall be subordinate only to the Carve-Out and Senior Permitted Liens, and the DIP Superpriority Claims shall be subordinate only to the Carve-Out.

11.     No Obligation to Extend Credit.  The DIP Lenders shall have no obligation to make any loan under the DIP Documents unless (and subject to the occurrence of the Closing

36

Date) all of the conditions precedent to the making of such extension of credit under the DIP Documents, the Interim Order and/or this Final Order, as applicable, have been satisfied in full or waived by the DIP Agent (at the direction of the Majority Lenders) in accordance with the terms of the DIP Credit Agreement.

12.     <u>Use of Proceeds of the DIP Facility</u>.

(a)     From and after the Petition Date, the Debtors shall use proceeds of borrowings under the DIP Facility only for the purposes specifically set forth in the Interim Order, this Final Order, and the DIP Documents, including to (i) pay fees, interest, and expenses associated with the DIP Facility; (ii) (x) establish the Priming Loan Refinancing Escrow, (y) fund the Priming Loan Refinancing Escrow Amount; and (z) upon the PTL Challenge Period Termination Date, consummate the Priming Loan Refinancing; (iii) consummate the RoW Loan Transactions; (iv) provide for the ongoing working capital and capital expenditure needs of the Debtors during the pendency of the Chapter 11 Cases; (v) fund the First Lien Adequate Protection (as defined below) (including the Prepetition Priming Adequate Protection Payments); and (vi) fund the costs of the administration of the Chapter 11 Cases (including the Carve-Out), in each case subject to the Budget and Variance Limit (as defined in the DIP Documents) and the terms and conditions in the Interim Order, this Final Order, and the DIP Documents.

(b)     Except as otherwise specified in the DIP Documents, the proceeds of the DIP Loans, other than with respect to the Priming Loan Refinancing Escrow Amount (which were, in accordance with the Interim Order, funded to the Priming Loan Refinancing Escrow), when made shall be funded or credited to a non-interest bearing account in the name of the DIP Agent and subject to the sole control of the DIP Agent (the "<u>Funding Account</u>");.

(c)      Upon entry of this Final Order, and subject to satisfaction (or waiver) of the additional conditions precedent (as defined in the DIP Documents), the Interim Amount shall have been funded into and credited to the Funding Account; *provided*, that notwithstanding the foregoing, (i) on the Closing Date, (A) $1,000,000,000 of the Interim Amount shall be used to fund the Priming Loan Refinancing Escrow Amount into the Priming Loan Refinancing Escrow, and (B) $271,000,000 of the Interim Amount shall, subject to the terms and conditions of the DIP Documents, be made available to the Debtors to consummate the RoW Loan Transaction, and (ii) up to $100,000,000 may be disbursed to account(s), other than the Funding Account, or directly to one or more payees, in accordance with the terms and conditions of the DIP Documents.

(d)      Upon entry of this Final Order, and subject to satisfaction (or waiver) of the additional conditions precedent (as defined in the DIP Documents) the remaining proceeds of the DIP Loans (the "Final Amount") shall be funded into and credited to the Funding Account.

(e)      The Borrower may, subject to conditions set forth in the Interim Order, this Final Order, and the DIP Documents, withdraw or apply funds from the Funding Account to, as set forth in the DIP Documents, (i) pay one or more disbursements set forth as a line item in the then effective Budget (as defined below) in an amount not to exceed the amount for such line item set forth in the then effective Budget (subject to the Variance Limit), (ii) pay any fees and expenses due to the DIP Lenders or the DIP Agent, or any other professional fees in accordance with the terms of the DIP Documents, (iii) pay an amounts necessary to consummate, or in connection with effectuating, the RoW Loan Transaction, (iv) to pay amounts necessary to consummate the Priming Loan Refinancing, (v) pay fees and expenses incurred by Debtor

Professionals (as defined herein), (vi) to pay amounts necessary to establish the Priming Loan Refinancing Escrow or (vii) to pay such other amounts that are due and payable under the DIP Documents.  For the avoidance of doubt, the DIP Loans shall be outstanding and accrue interest pursuant to the DIP Documents notwithstanding that the proceeds thereof may be held in the Funding Account

              13.     <u>Priming Loan Refinancing Escrow</u>.

              (a)     The Priming Loan Refinancing Escrow shall be established pursuant to the terms of the Interim Order and the DIP Documents. The existing DIP Facility shall be amended to accommodate the Priming Loan Refinancing Escrow, subject to the extent the Priming Loan Refinancing Escrow is maintained at the DIP Agent, confirmation by the DIP Agent that as an operational, regulatory and legal matter, it is able to execute the transactions and payments contemplated by the Priming Loan Refinancing Escrow. The funds on the deposit in the Priming Loan Refinancing Escrow: (i) shall not be property of the estate; (ii) shall not be used to fund the Carve-Out or the Funded Reserve Account;  and (iii) shall be used only to consummate the Priming Loan Refinancing in accordance with paragraphs 13(b) and 61 hereof. On the Closing Date, the Funding Account shall be deemed the Priming Loan Refinancing Escrow (solely with respect to the amounts held therein in the amount of the Priming Loan Refinancing Escrow Amount) until a separate segregated escrow account is established to hold the Priming Loan Refinancing Escrow Amount. The funds contained in the Priming Loan Refinancing Escrow (including the Prepetition Priming Adequate Protection Payments paid using proceeds of DIP Loans (but excluding any Prepetition Priming Adequate Protection Payments paid in cash into such account using funds from a source other than the proceeds of the DIP Loans)) shall constitute DIP Loans and bear interest as provided in the DIP Facility. Notwithstanding anything to the contrary set forth in the

DIP Facility or any related documentation, funds shall be released from the Priming Loan Refinancing Escrow only following entry of this Final Order.

        (b)     The Court hereby directs the release of the funds in the Priming Loan Refinancing Escrow to the Prepetition Priming Facility Agent for consummation of the Priming Loan Refinancing. To the extent the Prepetition Priming Facility Obligations (including all Prepetition Priming Adequate Protection Payments and all Prepetition Priming Facility Fees and Expenses (as defined below)) exceed the amounts released from the Priming Loan Refinancing Escrow, the Debtors shall pay to the Prepetition Priming Facility Agent cash in an amount equal to such deficiency. Following entry of this Final Order, upon the consummation of the Priming Loan Refinancing, the funds received by the Prepetition Priming Facility Agent from the Priming Loan Refinancing Escrow and the Debtors in accordance with this paragraph 13(b) shall be distributed by the Prepetition Priming Facility Agent in accordance with the terms of the Prepetition Priming Credit Agreement to the parties who are Prepetition Priming Facility Lenders on the registry of the Prepetition Priming Facility Agent as of a record date of October 28, 2022 and the other parties indicated below, as follows: (i) $682,585,965.61 (plus any per diem Prepetition Priming Adequate Protection Payments in the event the Priming Loan Refinancing occurs after October 31, 2022) shall be distributed pro rata to such Prepetition Priming Facility Lenders holding Initial Term B-1 Loans (as defined in the Prepetition Priming Credit Agreement); (ii) $225,184,062.60 (plus any per diem Prepetition Priming Adequate Protection Payments in the event the Priming Loan Refinancing occurs after October 31, 2022) shall be distributed pro rata to such Prepetition Priming Facility Lenders holding 2021 Incremental Term B-1 Loans (as defined in the Prepetition Priming Credit Agreement); (iii) $113,123,871.91 (plus any per diem Prepetition Priming Adequate Protection Payments in the event the Priming Loan Refinancing occurs after

October 31, 2022) shall be distributed pro rata to such Prepetition Priming Facility Lenders holding Initial Term B-2 Loans (as defined in the Prepetition Priming Credit Agreement); and (iv) all accrued and unpaid Prepetition Priming Facility Fees and Expenses shall be paid to the applicable parties to whom such amounts are owed. Any balance of the funds held in the Priming Loan Refinancing Escrow Account not used to consummate the Priming Loan Refinancing shall be deposited in the Funding Account..

14.    Adequate Protection for the Prepetition First Lien Secured Parties.  The Prepetition First Lien Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition Collateral, including Cash Collateral, solely to the extent of any Diminution in Value of their interests in the Prepetition Collateral.  As adequate protection, the Prepetition First Lien Secured Parties are hereby granted the following (the "First Lien Adequate Protection"):

(a)    Prepetition First Lien Adequate Protection Liens.  Subject to the Carve-Out and any Postpetition Intercompany Liens and Claims (as defined below), to the extent there is a Diminution in Value of the Prepetition Collateral (including Cash Collateral) from and after the Petition Date to the fullest extent set forth in the Bankruptcy Code and other applicable law ("Diminution in Prepetition First Lien Collateral Value"), the Prepetition First Lien Agents, for the benefit of all the Prepetition First Lien Secured Parties, is hereby granted subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens on and security interests in the DIP Collateral, including the proceeds of Avoidance Actions (such adequate protection replacement Liens, the "First Lien AP Liens"); provided, that the First Lien AP Liens shall not apply to property of entities which were not obligors under the Prepetition First Lien Loan

41

Documents (other than assets of any such entities that were pledged to secure Prepetition First Lien Secured Obligations); and *provided further*, that any First Lien AP Liens may recover from the proceeds of any Avoidance Actions or commercial tort claims only after the holder of such First Lien AP Lien has made commercially reasonable efforts to seek recovery from other collateral for such liens. The First Lien AP Liens on such DIP Collateral shall be junior and subordinate only to the Carve-Out, the DIP Liens, and the Senior Permitted Liens; The First Lien AP Liens shall otherwise be senior to all other security interests in or liens on any of the DIP Collateral, and continue to be subject to the prepetition intercreditor arrangements governing the relationship between the prepetition secured parties under the Prepetition Priming Credit Agreement and the Prepetition Legacy Credit Agreement (unless and until the Priming Loan Refinancing has occurred).  The First Lien AP Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition First Lien Secured Parties and not in substitution therefor.

(b)   Prepetition First Lien Adequate Protection Superpriority Claims. Subject only to the Carve-Out, the DIP Superpriority Claim, and Postpetition Intercompany Superpriority Claims (as defined below), to the extent of Diminution in Prepetition First Lien Collateral Value, the Prepetition First Lien Secured Parties are hereby further granted an allowed superpriority administrative claim (such adequate protection superpriority claims, the "First Lien AP Superpriority Claim"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority and other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114, or any other provision

42

of the Bankruptcy Code or otherwise, junior only to the Carve-Out and the DIP Superpriority Claims to the extent provided herein and in the DIP Documents, and payable from and having recourse to all prepetition and postpetition property of the Prepetition First Lien Secured Parties and all proceeds thereof (including all proceeds of Avoidance Actions); *provided*, that the First Lien AP Superpriority Claim shall not apply to property of entities which were not obligors under the Prepetition First Lien Loan Documents (other than assets of any such entities that were pledged to secure Prepetition First Lien Secured Obligations); and *provided further*, that any First Lien AP Superpriority Claim may recover from the proceeds of any Avoidance Actions and commercial tort claims only after the holder of such First Lien AP Superpriority Claim has made commercially reasonable efforts to seek recovery from other collateral for such claims.

(c)      Payment and Accrual of Adequate Protection Interest Payments.  As additional adequate protection, on and after the Petition Date, (i) current interest (payable in cash and/or payable in cash or in-kind, as provided in the Prepetition Priming Credit Agreement), at the Default Rate (as defined in the Prepetition Priming Credit Agreement) on all Prepetition Priming Facility Obligations (as accelerated on the Petition Date, including on Prepetition Priming Facility Obligations constituting a make-whole payment and PIK Interest Amounts accruing after the Petition Date that become capitalized and added to the principal balance of the Prepetition Priming Facility Obligations), until full discharge of all Prepetition Priming Facility Obligations (such payments, the "Prepetition Priming Adequate Protection Payments")[9], which shall be funded to the Priming Loan Refinancing Escrow (and shall constitute Priming Loan Refinancing Amounts), the total of such Prepetition Priming Adequate Protection Payments assuming full discharge of the

---

[9]      References to the Prepetition Partially Priming Adequate Protection Payments in the DIP Credit Agreement shall mean the Prepetition Priming Adequate Protection Payments as defined herein.

Prepetition Priming Facility Obligations on October 31, 2022 being $24,228,949.51; and (ii) interest accruing at the non-default rate on all Prepetition Legacy Facility Obligations (as accelerated on the Petition Date), as if all such Prepetition Legacy Facility Obligations were maintained as Base Rate Loans (as defined in the Prepetition Legacy Credit Agreement) in accordance with the Prepetition Legacy Credit Agreement for the duration of the Chapter 11 Cases (calculated as if such interest is compounded on top of the Prepetition Legacy Facility Obligations (as accelerated on the Petition Date)).   Notwithstanding the foregoing, the Prepetition Legacy Facility Agent and Prepetition Legacy Facility Lenders reserve all rights with respect to any claims they are entitled to receive interest at the Default Rate (as defined in the Prepetition Priming Credit Agreement), calculated as if all Prepetition Legacy Facility Obligations were maintained as Base Rate Loans (as defined in the Prepetition Legacy Credit Agreement) in accordance with the Prepetition Legacy Credit Agreement (or otherwise), and all rights of the Debtors and the Committee to contest such claims are reserved..

(d)     Adequate Protection Fees and Expenses.   Following entry of the Interim Order, as adequate protection, the Prepetition Legacy Facility Agent and the Prepetition Priming Facility Agent shall be entitled to reimbursement of its reasonable and documented fees and expenses (including the fees and expenses of one primary counsel, one local counsel in each relevant jurisdiction, and non-legal advisors) regardless of whether such fees and expenses were incurred before or after the commencement of the Chapter 11 Cases, and, to the extent not otherwise paid, the Prepetition Legacy Facility Lenders and the Prepetition Priming Facility Lenders shall each be entitled to reimbursement of their reasonable and documented fees and expenses (including, the fees and expenses of one primary counsel, one local counsel in each relevant jurisdiction, and non-legal advisors, and including, but not limited to, the fees and

44

expenses of Davis Polk & Wardwell LLP as counsel to the Ad Hoc Group of Prepetition Priming Facility Lenders) regardless of whether such fees and expenses were incurred before or after the commencement of the Chapter 11 Cases (such fees and expenses of the Prepetition Priming Facility Agent and the Prepetition Priming Facility Lenders, the "Prepetition Priming Facility Fees and Expenses").

(e)      Information.   The Debtors shall concurrently deliver to the Prepetition First Lien Secured Parties and the Committee all information, reports, documents, and other materials that the Debtors provide to the DIP Agent and the DIP Lenders pursuant to the DIP Documents, the Interim Order, and this Final Order.

(f)      Adequate Protection Reservation.  Subject to the Carve-Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition First Lien Secured Parties hereunder is insufficient to compensate for any Diminution in Prepetition First Lien Collateral Value during the Chapter 11 Cases or any Successor Cases.  The receipt by the Prepetition First Lien Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition First Lien Secured Parties are adequately protected.  Further, this Final Order shall not prejudice or limit the rights of the Prepetition First Lien Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

(g)      Nothing in the Interim Order, this Final Order, or the other DIP Documents shall (i) be construed as the affirmative consent by any of the Prepetition First Lien Secured Parties to the use of Cash Collateral other than on the terms set forth in the Interim Order and this Final Order and solely in the context of the DIP Facility authorized by the Interim Order and this Final Order, (ii) be construed as a consent by any party to the terms of any other financing

or any other lien encumbering the Prepetition Collateral (whether senior or junior) other than as contemplated by the Interim Order or this Final Order, or (iii) prejudice, limit, or otherwise impair the rights of any of the Prepetition First Lien Secured Parties, upon a change in circumstances to seek new, different, or additional adequate protection or assert the interests of any of the Prepetition First Lien Secured Parties, and the rights of any other party in interest, including the DIP Loan Parties and the DIP Secured Parties, to object to such relief are hereby preserved.

15. <u>Budget</u>.

(a)    The Debtors shall use the proceeds of all borrowings under the DIP Facility and Cash Collateral in a manner consistent with the Budget (subject to the Variance Limit and the Financial Covenant (both as defined below)), the DIP Documents, the Interim Order, and this Final Order. The Budget annexed as **<u>Schedule 1</u>** to the Interim Order constituted the initial Budget ("<u>Initial Budget</u>") that reflects on a line-item basis the Debtors' (i) weekly projected cash receipts (including from non-ordinary course assets sales) ("<u>Receipts</u>"), (ii) weekly projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses under the Cases (including the estimated fees and expenses of the advisors to any parties to the Cases paid by the Debtors), capital expenditures, issuances of any letter of credit, including the fees relating thereto, and any other fees and expenses relating to the DIP Facility) ("<u>Disbursements</u>"), and (iii) all other information reasonably requested by the DIP Agent and/or the DIP Lenders.

(b)    Commencing on the fourth full calendar week following the week in which the Petition Date occurs and on each Thursday (or, if such Thursday is not a business day, the immediately succeeding business day) of each fourth calendar week thereafter (each, a "<u>Reporting Date</u>" and such four-week period, the "<u>Reporting Period</u>"), the Debtors will provide to the DIP Secured Parties and Houlihan Lokey, Inc. ("<u>Houlihan Lokey</u>"), as advisor to the Majority

Lenders, a thirteen (13)-week cash flow forecast, containing line items of sufficient detail to reflect the Debtors' (i) Receipts; (ii) Disbursements; and (iii) all other information reasonably requested by the DIP Agent and/or the Majority Lenders, or Houlihan Lokey as advisor to the Majority Lenders, on their behalf, in each case, in form and substance reasonably satisfactory to the Majority Lenders (the "Budget"); *provided*, that if the Majority Lenders, or Houlihan Lokey, as advisor to the Majority Lenders, on their behalf do not object to the Budget within five (5) business days of delivery, the Budget delivered shall govern for the remainder of the 13-week period covered by such Budget. The latest Budget is attached hereto as **Schedule 1**, which includes a revised line item for the Professional Fees of the Committee's professionals.

(c)     By not later than 5:00 p.m. Eastern Time on the Thursday (or, if such Thursday is not a business day, the immediately succeeding business day) of the fourth full calendar week after the Petition Date, and thereafter by not later than 5:00 p.m. Eastern Time on the Thursday (or, if such Thursday is not a business day, the immediately succeeding business day) of every second week thereafter, the Debtors will provide to the DIP Agent a variance report for the immediately preceding four-week period then ended (each such period, a "Testing Period" and each such report, a "Variance Testing Report"), in form and substance reasonably satisfactory to the DIP Agent and the Majority Lenders, detailing the following: (i) the aggregate disbursements of the Debtors and aggregate receipts during the applicable Testing Period; and (ii) any variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements made during such Testing Period by the Debtors against the aggregate disbursements for the Testing Period, as set forth in the applicable Budget (excluding disbursements in respect of professional fees incurred in the Chapter 11 Cases by the Debtors during such Testing Period).

(d)     Starting with the first full Testing Period, and for any Testing Period thereafter, the Debtors shall not allow the aggregate disbursements (excluding disbursements in respect of professional fees incurred in the Chapter 11 Cases by the Debtors, as well as the establishment of the Priming Loan Refinancing Escrow, Priming Loan Refinancing and the RoW Debt Purchase Price, during such Testing Period) made by the Debtors during such Testing Period to be greater than 113.75% of the aggregate disbursements for the Debtors set forth in the Budget for such Testing Period (the "Variance Limit"); *provided*, that the Debtors may carry forward budgeted but unused disbursements set forth in the Budget for a Testing Period for use during only the immediately succeeding four calendar weeks and, to the extent that the Majority Lenders do not approve the Budget, any subsequent weeks until the Budget has been approved.  Additional variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the reasonable written consent of the Majority Lenders, or Houlihan Lokey as advisors and on behalf of the Majority Lenders; *provided*, that if the Majority Lenders, or Houlihan Lokey, Inc., as advisors to the Majority Lenders, on their behalf, do not object to the proposed changes from the Budget within five (5) business days of delivery, the changes from the Budget delivered shall govern for such Reporting Period.  For the avoidance of doubt, any reference to "written consent" hereunder shall include consent granted by email.

(e)     Until the DIP Obligations are Paid in Full, the Debtors shall strictly perform in accordance with the Budget, subject to the Variance Limit, and subject to the following covenant (the "Financial Covenant"):

> As of the last Business Day of each calendar week, the total amount of unrestricted cash held by the Debtors that are DIP Obligors (excluding, for the avoidance of doubt, any cash held by the obligors on the RoW Credit Facility) ("Liquidity") shall be at least $30 million (the "Liquidity Requirement"); it being agreed that (i) any cash that is used to the fund the Carve Out, the Funded Reserve Account, the Priming Loan Refinancing Escrow Amount, or the Priming Loan Refinancing

Escrow shall not be included as Liquidity for purposes of any calculation of the Liquidity Requirement and (ii) all cash held in the Funding Account (other than the Priming Loan Refinancing Escrow Amount) shall be included as Liquidity for purposes of the Liquidity Requirement, except that until the later of (x) the date the Additional Final Amount Conditions are satisfied and (y) January 1, 2023, no portion of the Final Amount that is held in the Funding Account shall be included as Liquidity for purposes of the any calculation of the Liquidity Requirement.

Notwithstanding anything to the contrary in this Final Order, the professional fees, costs, and expenses of the DIP Agent's advisors, the DIP Lender's advisors, the Prepetition Legacy Facility Agent's advisors, the Prepetition Legacy Facility Lender's advisors, the Prepetition Priming Facility Agent's advisors, and the Prepetition Priming Facility Lender's advisors shall be due, payable, and paid in accordance with the terms of this Final Order notwithstanding any budgeted amounts for such fees, costs, and expenses set forth in the Budget, and the Debtors shall not be deemed to have breached the terms of the Budget or the Financial Covenant to the extent the actual amount of such fees, costs, and expenses exceed the applicable budgeted amounts as set forth in the Budget.

16.    <u>Modification of Automatic Stay</u>.  The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Final Order, including, without limitation, to: (i) permit the Debtors to grant the DIP Liens, First Lien AP Liens, DIP Superpriority Claims, and First Lien AP Superpriority Claims; (ii) permit the Debtors to perform such acts as the DIP Agent, the other DIP Secured Parties, or the Prepetition First Lien Agents each may reasonably request to assure the perfection and priority of the liens granted herein; (iii) permit the Debtors to incur all liabilities and obligations to the DIP Agent, the other DIP Secured Parties, and the Prepetition First Lien Secured Parties under the DIP Documents, the DIP Facility, the Interim Order, and this Final Order, as applicable; (iv) authorize the Debtors to pay, and the DIP Agent, the other DIP Secured Parties, and the Prepetition First Lien Secured Parties to retain, disburse and/or apply, payments made in

accordance with the terms of this Final Order; and (v) otherwise to the extent necessary to implement and effectuate the provisions of the Interim Order, this Final Order, and the DIP Documents.

17.    <u>Cash Management</u>.  No pledged bank account will be closed during the Chapter 11 Cases without the prior consent of the applicable secured parties and nothing in the Interim Order or this Final Order will alter or impair any security interest or perfection thereof that existed as of the Petition Date or that arises after the Petition Date.  The Debtors' cash management system, as approved by an interim or final order of this Court (such interim or final order of this Court (such interim or final order, as applicable, the "<u>Cash Management Orders</u>") shall at all times be maintained (i) in accordance with the terms of the DIP Documents and the Cash Management Order and (ii) in a manner which in any event shall be reasonably satisfactory to the DIP Agent and the Required DIP Lenders.  The Debtors shall not transfer any funds (including, without limitation, any proceeds of the DIP Facility, the DIP Collateral or any Cash Collateral) to any of the Debtors' non-Debtor affiliates during the Chapter 11 Cases, except as permitted under the DIP Credit Agreement and the terms of the Cash Management Order upon prior notice to the Committee and the DIP Lenders.  The DIP Agent shall be deemed to have "control" over all cash management accounts for all purposes of perfection under the Uniform Commercial Code.

(a)    All intercompany obligations or indebtedness incurred after the Petition Date in connection with a transfer where any Debtor is the transferor ("<u>Postpetition Intercompany Obligations</u>") shall be secured by an automatically perfected security interest in and lien on, as to any Debtor transferee, all DIP Collateral including all Prepetition Collateral of such transferee for the benefit of the Debtor transferor ("Postpetition Intercompany Liens") junior to the Carve-Out and the DIP Liens and senior to all other liens. Additionally, all Postpetition

Intercompany Obligations shall be entitled to a superpriority administrative expense claim against such Debtor transferee ("Postpetition Intercompany Claims" and, together with the Postpetition Intercompany Liens, the "Postpetition Intercompany Liens and Claims"), subject only to the Carve-Out and DIP Superpriority Claims. To the extent any Debtor transfers funds to a non-Debtor affiliate (to the extent permitted), such Debtor shall take all commercially reasonable steps to obtain a security interest to secure the repayment of such funds.

18. <u>Automatic Perfection of DIP Liens, Postpetition Intercompany Liens, and Adequate Protection Liens</u>.

(a) The Interim Order and this Final Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens, Postpetition Intercompany Liens, and the First Lien AP Liens without the necessity of (i) filing, execution, or recording any financing statement, deed of trust, mortgage, security agreement, pledge agreement, control agreement, or other instrument or document that may otherwise be required under the law of any jurisdiction, obtaining "control" (as defined in any applicable Uniform Commercial Code or other law) over any DIP Collateral, and the DIP Agent, shall be deemed, without any further action, to have control over all the DIP Obligors' deposit accounts, securities accounts, and commodities accounts (within the meaning of such Uniform Commercial Code and other law); (ii) taking any other action to validate or perfect the DIP Liens and the First Lien AP Liens or to entitle the DIP Liens and the First Lien AP Liens to the priorities granted herein; or (iii) the filing or recording any financing statement, deed of trust, mortgage, security agreement, pledge agreement, control agreement, or other instrument or document with respect to security interests in any jurisdiction outside of the United States in assets located in, titled or arising or protected under the laws of a jurisdiction outside of the United States.

(b)      Notwithstanding the foregoing, each of the DIP Agent and Prepetition First Lien Agents (in the latter case, solely with respect to such First Lien AP Liens) may, each in their sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of Liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been entered into, filed, or recorded as of the Petition Date. The applicable Debtors shall execute and deliver to the DIP Agent's and/or the Prepetition First Lien Agents, as applicable, all such financing statements, mortgages, notices, and other documents as such parties may reasonably request to evidence and confirm the contemplated validity, perfection, and priority of the DIP Liens and the First Lien AP Liens, as applicable, granted pursuant hereto.  Without limiting the foregoing, each of the DIP Agent's and each holder of First Lien AP Liens (in the latter case, solely with respect to such First Lien AP Liens) may, in its discretion, file a photocopy of the Interim Order and/or this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction (whether or not located in the United States) in which any Debtor has real or personal property.  Any provision of any lease (other than a lease of non-residential real property), loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of any fees or other monetary obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the

52

Liens on such leasehold interests (other than a lease of non-residential real property) or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Secured Parties in accordance with the terms of the DIP Documents, the Interim Order, or this Final Order or in favor of the Prepetition First Lien Secured Parties in accordance with the Interim Order or this Final Order. Absent a further affirmative written request by the Debtors or DIP Agent to pledge, grant, mortgage, hypothecate or otherwise place a direct lien on a leasehold or fee interest, the entry of this Final Order and approval of the liens granted on the DIP Collateral shall not impose on the Debtors or the DIP Agent the obligation to pay any fee or charges based on provisions of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of fees or other monetary obligations specifically in connection with the grant of such liens to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, or otherwise encumber any fee or leasehold interest in non-residential real property, To the extent that the Prepetition First Lien Agents or any other Prepetition First Lien Secured Party is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, financing statement, or account control agreements, listed as loss payee or additional insured under any of the Debtors' insurance policies, or is the secured party under any of the Prepetition First Lien Loan Documents, the DIP Agent shall also be deemed to be the secured party under such account control agreements, loss payee or additional insured under the Debtors' insurance policies, and the secured party under each Prepetition First Lien Loan Document, shall have all rights and powers attendant to that position (including rights of enforcement); *provided*, however, that the relative rights, obligations, claims and liens of the DIP Secured Parties and the Prepetition First Lien Secured Parties with respect to the foregoing DIP

Collateral and proceeds thereof shall be as set forth in the DIP Documents and such parties shall act in accordance therewith. The Prepetition First Lien Agents shall serve as agent for the DIP Agent for purposes of perfecting the applicable DIP Agent's Liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Final Order, is of a type such that perfection of a Lien therein may be accomplished only by possession or control by a secured party. So long as there are any DIP Obligations outstanding or the DIP Lenders have any outstanding DIP Commitments under the DIP Documents, any proceeds of Prepetition Collateral received by any Prepetition First Lien Agent, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise received by any Prepetition First Lien Agent or any Prepetition First Lien Secured Party, as applicable, other than with respect to the Priming Loan Refinancing, shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agent for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements. The DIP Agent is hereby authorized to make any such endorsements as agent for the Prepetition First Lien Agent or any such Prepetition First Lien Secured Parties. This authorization is coupled with an interest and is irrevocable.

(c)    Subject to the terms of the DIP Documents (including the Guaranty and Security Principles, (as defined in the DIP Credit Agreement), the DIP Agent or the DIP Lenders may require the DIP Loan Parties to enter into non-U.S. security documentation with respect to such DIP Collateral owned by non-U.S. DIP Loan Parties or located in non-U.S. jurisdictions, and each DIP Loan Party and its respective officers are authorized and directed to execute, file and record any documents or instruments as the DIP Agent or the DIP Lenders may reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of the Interim Order.

19.     Protections of Rights of DIP Agent and DIP Secured Parties.

(a)     Unless the DIP Agent, at the direction of the Majority Lenders, shall have provided its prior written consent, or all DIP Obligations have been Paid in Full, it shall be an Event of Default if there shall be entered in any of these Chapter 11 Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation), or the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases seek entry of any order, that authorizes any of the following (unless such order provides for the DIP Obligations to simultaneously be Paid in Full): (i) the obtaining of credit or the incurring of indebtedness pursuant to sections 364(b), 364(c), 364(d) of the Bankruptcy Code that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or that is entitled to administrative priority status, in each such case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, and/or the other DIP Protections, except as expressly set forth in the Interim Order, this Final Order, or the DIP Documents, (ii) the use of Cash Collateral for any purpose other than to fund the Carve-Out or in a manner consistent with the Budget (subject to the Variance Limit), the DIP Documents, the Interim Order, or this Final Order, or (iii) except as provided for herein, any modification of the DIP Agent's or any DIP Secured Party's rights under the Interim Order, this Final Order, or the DIP Documents with respect any DIP Obligations.  In the event that credit is obtained or debt is incurred in accordance with the foregoing clause (i) and in violation of the DIP Documents, the Interim Order, or this Final Order, all the cash proceeds derived from such credit or debt shall immediately be applied to repay Outstanding DIP Obligations and all outstanding DIP Commitments, if any, shall automatically terminate.

(b)     The Debtors will, whether or not the DIP Obligations have been Paid in Full, (i) maintain books, records, and accounts to the extent and as required by the DIP Documents and the Prepetition First Lien Loan Documents; (ii) reasonably cooperate with, consult with, and provide to the DIP Agent and the other DIP Secured Parties all such information and documents that any or all of the Debtors are obligated (including upon reasonable request by any of the DIP Agent or any other DIP Secured Parties) to provide under the DIP Documents, the Prepetition First Lien Loan Documents, or the provisions of the Interim Order or this Final Order; (iii) upon reasonable request, authorize their independent certified public accountants, financial advisors, investment bankers, and consultants, to cooperate and consult with the DIP Agent or any other DIP Secured Parties and their advisors; (iv) upon reasonable advance notice, permit consultants, advisors, and other representatives (including third party representatives) of the DIP Agent or any other DIP Secured Parties reasonable access to any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional advisors (other than legal counsel); and (v) upon reasonable advance notice and during normal business hours, permit the DIP Agent, DIP Lenders, or any of the advisors of the foregoing previously disclosed to the Debtors, to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations, and assets. Notwithstanding anything to the contrary contained herein, the Debtors do not, and shall not be required to, waive any right to attorney-client, work product, or similar privilege.  The Debtors shall not be required to provide the DIP Agent or any other DIP Secured Parties or their respective

counsel and financial advisors with any information subject to, or over which any Debtor in good faith asserts, attorney-client privilege or legal professional privilege or consisting of attorney work product.

20.    Credit Bidding.   In connection with any sale process authorized by the Court, whether effectuated through sections 363, 725 or 1123 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code, (i)  the DIP Agent (at the direction of the Required DIP Lenders), for the benefit of the DIP Secured Parties, shall have the right to credit bid the full amount of the DIP Obligations, and (ii)  the Prepetition First Lien Agents, for the benefit of the Prepetition First Lien Secured Parties, in each case, shall have the right to credit bid all or any portion of its claims and shall not be prohibited or limited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code; provided, that until Challenge Period Termination Date the Committee may seek court intervention pursuant to section 363(k) of the Bankruptcy Code with respect to the Prepetition First Lien Secured Parties' right to credit bid.

21.    Maintenance of DIP Collateral.   Until the DIP Obligations are Paid in Full, the Debtors shall (a) insure the DIP Collateral as required under the DIP Documents and the applicable Prepetition First Lien Loan Documents; (b) maintain the cash management system in effect as of the Petition Date, as modified by the Cash Management Orders; and (c)(i) maintain accurate records of all transfers (including intercompany transactions) within the cash management system so that all postpetition transfers and transactions shall be adequately and promptly documented in, and readily ascertainable from, their books and records, to the same extent maintained by the Debtors before the Petition Date, and (ii) provide reasonable access to such records to the DIP Agent, the other DIP Secured Parties, the Committee, and their advisors.

22.     <u>Disposition of DIP Collateral</u>.  Except as otherwise provided for in the DIP Documents, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral other than in the ordinary course of business without the prior written consent of the DIP Agent (at the direction of the Majority Lenders) and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent or any other DIP Secured Parties.

23.     <u>Stub Rent Resolution</u>. As part of the consensual resolution of the Committee's and certain landlords' objections to the Motion, the Debtors are authorized and directed to pay postpetition Stub Rent[10] to their landlords in the minimum amount of $5 million per month for four months, beginning on the last Business Day of November 2022, and continuing on the last Business Day of each consecutive month thereafter ending on the last Business Day of February 2023, plus upside potential at $3 per person of incremental attendance over the Budget calculated as of the end of each month (the "<u>Attendance Upside</u>"), which incremental amount would be payable by the Debtors to their landlords by the thirtieth (30th) day following the end of each month (or the next successive Business Day); *provided, however,* that in the event that the Debtors' payment of Stub Rent for a single month in accordance with the foregoing exceeds $5 million based on positive Attendance Upside (the "<u>Excess Monthly Stub Rent</u>"), the Excess Monthly Stub Rent shall be deducted on a dollar for dollar basis from the amount of Stub Rent required to be paid by the Debtors. The balance of the postpetition Stub Rent will be paid on the effective date of a chapter 11 plan. Stub Rent when due and payable as set forth hereunder shall be paid on a pro rata basis to each landlord entitled to stub rent. The Budget will reflect the

---

[10]     "Stub Rent" means the postpetition, prerejection portion of regularly accruing monthly rent, expenses, and charges under the terms of Debtors' non-residential real property leases that are due for the period from and including the Petition Date through September 30, 2022.

foregoing Stub Rent payments. In the event that postpetition Stub Rent is not paid as set forth herein, and upon five (5) Business Days' notice to counsel for the Debtors and the DIP Secured Parties that Stub Rent was not paid (which notice may be by electronic mail), and failure of the Debtors to pay such Stub Rent within such notice period, the Committee and the affected landlords shall have standing and the ability to assert a surcharge, by motion, against any and all of the DIP Collateral or Prepetition Legacy Facility Collateral under section 506(c) of the Bankruptcy Code solely for the amount of the unpaid Stub Rent due under the Budget.  The Debtors shall provide the Committee's professionals and the DIP Lenders with reporting, on at least a monthly basis, of actual attendance relative to budgeted attendance, as well as such other information as is reasonably necessary for the Committee and the DIP Lenders to determine compliance with the Debtors' obligations set forth in this paragraph. For the avoidance of doubt, landlords with leases rejected after the Petition Date are entitled to payment of Stub Rent under this provision (unless otherwise agreed).

24.    <u>Marketing Process</u>. The Debtors shall run a marketing process in accordance with the timeline attached hereto as **<u>Schedule 2</u>**  (the "<u>Marketing Process</u>"), which shall seek to obtain interested parties ("<u>Potentially Interested Parties</u>") that may wish to effectuate a value-maximizing transaction  with respect to the Debtors' assets and shall be acceptable to the Debtors and the DIP Lenders.[11]  Unless otherwise waived by the Committee, the Marketing Process shall commence no earlier than one week after the Committee has been provided a copy of a business plan that the DIP Lenders and the Debtors have determined is a substantially final business plan (the "<u>Business Plan</u>").

---

[11]    Such transaction may take the form of a sale transaction, a plan sponsorship transaction, or some other form of value-maximizing transaction.

(a)     The Debtors shall provide the Committee' advisors subsequent iterations of the Business Plan at substantially the same time such iterations are provided to the DIP Lenders' advisors.

(b)     The Committee's advisors shall be given a reasonable opportunity to review and provide reasonable comments to Marketing Process materials to be shared with Potentially Interested Parties.

(c)     The Committee's advisors shall be given reasonably adequate time to review, diligence, and comment on the Business Plan, including by engaging with the Debtors' and DIP Lenders' advisors, within the Milestones existing as of the date of this Final Order.  The Debtors and the DIP Lenders will consult with and agree to reasonably consider, but are not required to incorporate, the Committee's suggestions to the Business Plan.

(d)     Before the commencement of the Marketing Process, the advisors to the Debtors, the DIP Lenders, and the Committee shall confer and consult regarding information that will be reasonably expected or necessary for Potential Interested Parties to diligence the Debtors and submit proposals in accordance with the Marketing Process; *provided*, *however*, that the Debtors shall have commercially reasonable discretion with respect to any information (confidential or otherwise) that is shared with Potential Interested Parties in connection with the Marketing Process.  The advisors to the Debtors will meet with the Committee twice per week (via teleconference or otherwise) to discuss the Marketing Process, with additional meetings to be scheduled as necessary.

(e)     The advisors to the DIP Lenders shall make themselves available to discuss transactions with any Potentially Interested Party.

(f)     The advisors to the Debtors, the DIP Lenders, and the Committee shall also confer and consult regarding the timeline and deadlines of the Marketing Process.

25.     <u>Rights and Remedies Upon Event of Default</u>.

(a)     Without requiring further order from the Court and without the need for filing any motion (except as expressly required by this paragraph 25) for relief from the automatic stay or any other pleading, immediately upon the date of delivery of a written notice (with a copy filed with the Court) (a "<u>Default Notice</u>," and the date of delivery of such Default Notice, the "<u>DIP Termination Date</u>") by the DIP Agent (acting at the direction of the Majority Lenders) to the Debtors, the Committee, counsel to the Ad Hoc Group of Prepetition Priming Facility Lenders, and the U.S. Trustee on the occurrence of an Event of Default (the "<u>Event of Default Occurrence</u>"), the automatic stay shall terminate solely to the extent necessary for one or more (without limitation) of the following to occur to the extent elected by the DIP Agent (acting at the direction of the Majority Lenders): (a) the Debtors' authority to use Cash Collateral shall immediately terminate (subject only to the Carve-Out and except as set forth in this paragraph 25); (b) the DIP Obligations shall (subject only to the Carve-Out) be immediately accelerated and due and payable for all purposes, rights, and remedies, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Debtors; (c) the termination, reduction, or restriction of any further DIP Commitments to the extent any DIP Commitments remain outstanding; (d) the DIP Facility shall be terminated with respect to any future liability or obligation of the DIP Secured Parties, but, for the avoidance of doubt, without affecting any of the DIP Liens, the DIP Superpriority Claims or the DIP Obligations; (e) any and all obligations of the DIP Lenders in connection with the DIP Facility and the Prepetition First Lien Secured Parties with respect to Cash Collateral under the Interim Order, this Final Order, and the DIP Documents,

as applicable, shall immediately terminate, (f) the application of the Carve-Out through the delivery of the Carve-Out Trigger Notice; and (g) the exercise of any other right or remedy with respect to the DIP Collateral or the DIP Liens permitted under the DIP Documents or the Prepetition Collateral or the Prepetition Liens permitted under the Prepetition First Lien Loan Documents; *provided*, however that (i) in the case of the termination of the use of Cash Collateral pursuant to clause (a) above, unless, in the case of an Event of Default Occurrence is cured by the Debtors, as determined by the Majority Lenders, prior to the expiration of five (5) Business Days following the Termination Date (the "Default Notice Period"), and (ii) in the case of the enforcement of DIP Liens or Prepetition Liens or other remedies with respect to the DIP Collateral or Prepetition Collateral pursuant to clause (g) above, the DIP Agent (acting at the direction of the Majority Lenders), shall first file a motion (the "Stay Relief Motion") with the Court seeking emergency relief from the automatic stay to exercise such remedies on at least five (5) Business Days' written notice (the "Remedies Notice Period") to the Debtors, the Committee, counsel to the Ad Hoc Group of Prepetition Priming Facility Lenders, and the U.S. Trustee seeking an emergency hearing before the Court (a "Stay Relief Hearing") and the Debtors agree not to object to the shortening of notice of such Stay Relief Hearing.

(b)     At a Stay Relief Hearing the Court may consider whether an Event of Default Occurrence has occurred and any other appropriate relief and may fashion an appropriate remedy; *provided*, that the Debtors and the Committee  may seek an emergency hearing before the Court, and must provide prompt notice of such hearing to primary counsel to each of the DIP Lenders, to contest whether an Event of Default has occurred and to seek non-consensual use of Cash Collateral; *provided*, *further*, that the Debtors shall be entitled to continue to use Cash Collateral in accordance with the terms of this Final Order and the DIP Documents

during any Default Notice Period or Remedies Notice Period only to make payroll and fund critical expenses necessary to preserve the Prepetition Collateral, in each case in accordance with the terms of the Budget and this Final Order, but shall not be permitted to use Cash Collateral following any Default Notice Period absent further order of the Court.   Notwithstanding the foregoing, and irrespective of the Default Notice Period or Remedies Notice Period, the DIP Lenders shall not be obligated to provide any DIP Loans or advances at any time an Event of Default has occurred and is continuing.   Notwithstanding the occurrence of an Event of Default and/or termination of the DIP Commitments, all of the rights, remedies, benefits, and protections provided to the DIP Agent, the DIP Lenders, and the Prepetition First Lien Secured Parties, as applicable, under the DIP Documents and this Final Order shall survive.

       26.    Carve-Out.

       (i)    Carve Out.  As used in this Final Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $150,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below),

63

whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $12,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the Ad Hoc Group of Prepetition Priming Facility Lenders, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(ii)     Funded Reserve Account.  The Debtors shall establish and fund a segregated account (the "Funded Reserve Account") for purpose of holding funds in trust for the Professional Persons to the extent, and for the further payment, of such Professional Persons' Allowed Professional Fees and for the purposes of funding the Carve-Out.  The Funded Reserve Account will be funded first, from identifiable proceeds of any DIP Collateral, and, solely to the extent that the amount of the identifiable proceeds of any DIP Collateral is insufficient to fund the Funded Reserve Account, the proceeds of the DIP Loans transferred directly from the Funding Account (as defined in the DIP Credit Agreement), excluding, for the avoidance of doubt, any amounts held in the Priming Loan Refinancing Escrow.  Notwithstanding anything to the contrary in the Interim Order, this Final Order, the DIP Documents, or the Prepetition First Lien Credit Documents, in no circumstances (which, for the avoidance of doubt, includes, but is not limited

to, an Event of Default or a termination of the DIP Credit Agreement or DIP Documents) shall the Debtors be prohibited in any way from accessing or drawing upon the Funding Account for the purpose of funding the Funded Reserve Account in accordance with this paragraph 26; *provided*, *however*, that the funds remaining in the Funded Reserve Account after payment, in full, of all Allowed Professional Fees, shall be deemed DIP Collateral, subject to the Carve-Out (and, for the avoidance of doubt, may be used to fund the Carve-Out), provided, however, that the funds remaining in the Funded Reserve Account after payment, in full, of all Allowed Professional Fees, shall be deemed DIP Collateral, subject to the Carve-Out.

(iii)    Commencing on October 1, 2022 (or the first business day thereafter), the Debtors shall have deposited into the Funded Reserve Account an amount equal to the aggregate amount of accrued professional fees and expenses from the Petition Date through September 30, 2022 (the "Initial Period") that are projected to be Allowed Professional Fees (which shall exclude restructuring, sale, financing, or other success fees) (the "Initial Funded Reserve Amount").  Commencing on November 1, 2022 (or the first business day thereafter), and continuing on the first business day of each month thereafter, the Debtors shall deposit in the Funded Reserve Account an amount equal to the aggregate amount of budgeted professional fees and expenses in the prior month (the "Monthly Funded Reserve Amount").  By no later than the 20th of each month, starting in October 2022 (or such other date that may be established in any order authorizing professional compensation procedures), each Professional Person shall deliver to the Debtors a notice of the cumulative total amount of actual fees and expenses incurred in the preceding month ( the "Actual Accrued Prior Month's Fees and Expenses") (each such statement, a "Fee Statement") for which such Professional Person has or will seek payment as Allowed Professional Fees. If a Fee Statement for any month is not delivered by a Professional Person to

the Debtors, then the amount funded to the Funded Reserve Account for such Professional Person shall be the Monthly Funded Reserve Amount  To the extent the amount of Actual Accrued Prior Month's Fees and Expenses exceeds the Initial Funded Reserve Amount (for the Initial Period) or the Monthly Funded Reserve Amount (for each month subsequent to the Initial Period), and such fees and expenses have otherwise not been paid by the Debtors, the Debtors shall, within one (1) business day after receipt of any such Fee Statement, fund additional amounts into the Funded Reserve Account equal to the difference between the Initial Funded Reserve Amount or the Monthly Funded Reserve Amount, as applicable, and the Actual Accrued Prior Month's Fees and Expenses.  For any Professional Person, to the extent fees and expenses, projected to be Allowed Professional Fees, do not become Allowed Professional Fees, or the Monthly Funded Reserve Amount exceeds the Actual Accrued Prior Month's Fees and Expenses, such Professional Person's Monthly Funded Reserve Amount for the following month shall be reduced accordingly.

(iv)    The Funded Reserve Account shall be maintained, and the funds therein (the "Funded Reserve Amount") shall be held in trust, for the benefit of Professional Persons.  Any and all amounts in the Funded Reserve Account shall not be subject to any cash sweep and/or foreclosure provisions in the Prepetition First Lien Credit Documents or the DIP Documents, and neither the Prepetition First Lien Secured Parties nor the DIP Secured Parties shall be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary in the Prepetition First Lien Credit Documents or the DIP Documents.  Notwithstanding the foregoing, any and all payments to Professional Persons shall be paid first from the Funded Reserve Account.

(v)    Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Committee (the

66

"Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date, including cash in the Funded Reserve Account but, for the avoidance of doubt, excluding all amounts held in the Priming Loan Refinancing Escrow Amount, and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition First Lien Secured Parties in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay

the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall be paid to the Prepetition First Lien Secured Parties in accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in the DIP Documents, the Interim Order, or this Final Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 26, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 26, prior to making any payments to the DIP Agent or the Prepetition First Lien Secured Parties, as applicable. Notwithstanding anything to the contrary in the DIP Documents, the Interim Order, or this Final Order following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition First Lien Secured Parties shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents. Further, notwithstanding anything to the contrary in this Final Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the

68

foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Final Order, the DIP Facility, or in any Prepetition Secured Facilities, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the First Lien AP Liens, any superpriority claims, Postpetition Intercompany Liens and Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition First Lien Obligations.

(vi)    <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(vii)    <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Agent, DIP Lenders, or the Prepetition First Lien Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Final Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition First Lien Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(viii)    <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the

protections granted under this Final Order, the DIP Documents, the Bankruptcy Code, and applicable law.

(ix)    Priming Loan Refinancing Escrow Amount.    Notwithstanding anything herein to the contrary, no funds related to the Priming Loan Refinancing Escrow Amount shall be used to fund the Carve-Out or for any purpose other than the Priming Loan Refinancing or repayment of DIP Obligations and payment of Prepetition Priming Adequate Protection Payments to the Prepetition Priming Facility Lenders.

27.    Limitations on Use of DIP Proceeds, Cash Collateral, and Carve-Out.  No proceeds of the DIP Facility, the Carve-Out, or any Cash Collateral may be used by the DIP Loan Parties or any other party in interest, or their representatives, to (or support any other party to) (i) finance any investigation (including discovery proceedings), initiation or prosecution of any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the DIP Agent or the DIP Lenders, the Prepetition First Lien Agents or the Prepetition First Lien Lenders, or their respective rights and remedies under or in respect of the DIP Facility, the credit facilities provided under the Prepetition First Lien Credit Agreements or any interim or final order with respect to the DIP Facility and the adequate protection granted to the Prepetition First Lien Agent and Prepetition First Lien Lenders, except as otherwise provided in the DIP Documents, (ii) in connection with challenging, invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating (other than to the Carve-Out), in whole or in part, or taking or attempting to take any other action to render unenforceable, the liens, claims, interests and adequate protection of the DIP Agent and the DIP Lenders or the Prepetition First Lien Agent or Prepetition First Lien Lenders, including for the avoidance of doubt, (a) objecting to or contesting the validity, extent, amount, perfection, priority, or enforceability of the obligations under the DIP

Facility or the Liens securing the obligations under the DIP Facility, or (b) objecting to or contesting the validity, extent, amount, perfection, priority, or enforceability of the obligations and liens under credit facilities provided under the Prepetition First Lien Credit Agreements, (iii) for any purpose that is prohibited under the Bankruptcy Code, the Interim Order, this Final Order, or the DIP Documents, and (iv) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body, which payment is not provided for in the Budget, without the prior written consent of the Majority Lenders; *provided*, *however*, that the Debtors shall not be precluded from using Cash Collateral and/or proceeds from DIP Loans to contest whether an Event of Default has occurred and is continuing under the DIP Documents, and/or prepare for and participate at any hearing held by the Court regarding any exercise of rights or remedies under the DIP Documents; *provided further*, that up to $500,000 (the "Investigation Budget Amount") shall be made available to the Committee solely for investigation costs to pursue any investigation rights during the Challenge Period.   For the avoidance of doubt, and notwithstanding anything to the contrary contained herein, nothing in this Final Order shall in any way prejudice the rights of professionals retained by the Committee to apply for and receive compensation pursuant to sections 327, 330, 331, 503, and 1103 of the Bankruptcy Code; *provided*, that the Debtors and the DIP Secured Parties reserve any and all rights to object to fee applications filed by Committee Professionals.

      28.    Participation in DIP Term Facility.   Each Prepetition Legacy Facility Lender will have the opportunity to participate in the DIP Facility on a *pro rata* basis (based on such Prepetition Legacy Facility Lender's amount of Prepetition Legacy Loans relative to the aggregate amount of all loans outstanding under the Prepetition Legacy Credit Agreement), following the Closing Date.   The obligations with respect to the DIP Facility will be evidenced by

and be subject to the DIP Credit Agreement, the Interim Order, and this Final Order, as applicable. Each Prepetition Legacy Facility Lenders' ability to participate may be limited by and is subject to applicable securities law and otherwise applicable law. No material changes to the structure of the DIP Facility will be made to accommodate any Prepetition Legacy Facility Lenders. Any Prepetition Legacy Facility Lender that, or has an affiliate or related fund that objects or has objected to all or any portion of the DIP Facility will not be entitled to participate in the DIP Facility.

29.     Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Final Order. Based on the findings set forth in the Interim Order and this Final Order and the record made during the Interim Hearing and Final Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Final Order are hereafter modified, amended, waived, or vacated by a subsequent order of this Court or any other court of competent jurisdiction, each of the DIP Agent, the other DIP Secured Parties, and the Prepetition First Lien Secured Parties are entitled to the full protections provided in section 364(e) of the Bankruptcy Code. Any such modification, amendment, waiver or vacatur shall not affect the validity and enforceability of any advances previously made, including advances made hereunder, or any lien, claim, or priority authorized or created hereby, unless such authorization and the incurring of such debt, or the granting of such priority lien, is stayed pending appeal and the DIP Secured Parties had actual knowledge of such stay. Notwithstanding any such modification, amendment or vacatur, any claim granted to the DIP Secured Parties hereunder arising prior to the effective date of such modification, amendment or vacatur of any DIP Liens or of the DIP Superpriority Claims granted to or for the benefit of the DIP Secured Parties shall be governed in all respects by the original provisions of this Final Order, and the DIP Secured Parties

shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Liens and the DIP Superpriority Claims granted herein, with respect to any such claim. Because the DIP Loans are made in reliance on this Final Order, the DIP Obligations incurred by the Debtors and any other DIP Loan Parties or owed to the DIP Secured Parties prior to the effective date of any stay, modification or vacatur of this Final Order shall not, as a result of any subsequent order in the Chapter 11 Cases or in any Successor Case, be disallowed or subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Secured Parties under this Final Order.

30.      Payment of Fees and Expenses.  The Debtors shall pay all reasonable and documented fees and out-of-pocket expenses of each of the DIP Agent and the other DIP Secured Parties, whether incurred before or after the Petition Date or in connection with the Chapter 11 Cases (in any capacity) and the DIP Facility, including the reasonable and documented out-of-pocket expenses of the DIP Agent and the other DIP Secured Parties associated with the DIP Facility, the Debtors, these Chapter 11 Cases and the transactions contemplated thereby and therein.  Other than in connection with fees and expenses payable as a condition to the occurrence of the Closing Date, any time that professionals of any of the DIP Agent or the other DIP Secured Parties seek payment of fees and expenses from the Debtors, such professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work-product doctrine) by electronic mail to the U.S. Trustee and counsel to the Committee

contemporaneously with the delivery of such fee and expense statements to the Debtors.  The Debtors, the Committee, or the U.S. Trustee may dispute the payment of any portion of such invoiced fees and expenses (the "Disputed Invoiced Fees") if a Debtor, the Committee, or the U.S. Trustee notifies the submitting party in writing, within five (5) days of the receipt of such fee and expense statement or invoice, setting forth the specific objections to the Disputed Invoiced Fees (to be followed by the filing with the Court, if necessary, of a motion or other pleading, with at least twenty-one (21) days prior written notice to the submitting party of any hearing on such motion or other pleading).  The Debtors shall promptly pay in full all such invoiced fees and expenses other than the Disputed Invoiced Fees.  Notwithstanding the foregoing, the Debtors shall pay on or about the Closing Date all reasonable and documented fees, costs, and out-of-pocket expenses of each of the DIP Agent and the other DIP Secured Parties incurred on or prior to such date without the need for any professional engaged by any of the DIP Agent or the other DIP Secured Parties to first deliver a copy of its invoice as provided for herein (other than to the Debtors).  No attorney or advisor to any of the DIP Agent or the other DIP Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.  Any and all fees, costs and expenses paid prior to the Petition Date by any of the Debtors to the DIP Agent or the other DIP Secured Parties in connection with the DIP Facility are hereby approved in full.

31.   Proofs of Claim.  The DIP Agent, the other DIP Secured Parties, and the Prepetition First Lien Secured Parties will not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim allowed herein, including any claims arising under the Prepetition First Lien Documents.  The Debtors' Stipulations and Releases shall be deemed to constitute a timely filed proof of claim for the DIP Agent, the other DIP Secured Parties,

and the Prepetition First Lien Secured Parties upon approval of the Interim Order, and the DIP Agent, the other DIP Secured Parties, and the Prepetition First Lien Secured Parties shall be treated under section 502(a) of the Bankruptcy Code as if they filed a proof of claim. However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce any unnecessary expense to the Debtors' estates, the Prepetition First Lien Agents are each authorized (but not directed), in their sole discretions, to file in the Debtors' lead Chapter 11 Case *In re Cineworld Group, plc*, Case No. 22-90168, a master proof of claim on behalf of their respective Prepetition First Lien Secured Parties on account of any and all of their respective claims arising under their Prepetition First Lien Loan Documents and hereunder (as applicable) (each, a "Master Proof of Claim") against each of the applicable Debtors. Upon the filing of any such Master Proof of Claim, the Prepetition First Lien Agents (and Prepetition First Lien Secured Party, as applicable) shall be deemed to have filed a proof of claim in each of the Chapter 11 Cases of the applicable Prepetition Loan Parties. The Master Proofs of Claim shall not be required to attach any instruments, agreements, or other documents evidencing the obligations owing to the applicable Prepetition First Lien Secured Parties. Any proof of claim filed by any of the Prepetition First Lien Agents shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition First Lien Secured Parties. Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation administrative claims) in any of the Chapter 11 Cases or any Successor Cases shall not apply to (i) the DIP Agent or the other DIP Secured Parties, or (ii) the Prepetition First Lien Secured Parties with respect to any claims arising under the Prepetition First Lien Loan Documents.

32.     Effect of Stipulations on Third Parties.

(a)     *Generally*.   The Debtors' Stipulations and Releases, admissions, agreements, and releases contained in this Final Order, including, without limitations paragraph F, G, and H hereof, shall be binding on the Debtors in all circumstances and for all purposes.   The Debtors' Stipulations and Releases shall be binding upon the Debtors' estates and each party in interest (other than the Debtors), including the Committee  and any chapter 11 trustee (or if the Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (defined below), the chapter 7 trustee in such Successor Case), except to the extent and only to the extent such party in interest with standing *first*, commences, in the case of such adversary proceeding or other contested matter filed by a party in interest with required standing (including the Committee), by the date that shall be (i) except as to any official committee appointed in these chapter 11 cases, sixty (60) days after entry of the Interim Order, and (ii) in the case of the Committee, eighty (80) days after such appointment (*i.e.*, December 12, 2022 for the Committee); and (iii) in the event that (x) the cases convert to chapter 7, or (y) a chapter 11 trustee is appointed, in each case, prior the expiration of the Challenge Period, then, in each such case, the Challenge Period shall be extended for a period of sixty (60) days solely with respect to any such trustee (such time period established by the earlier of clauses (i), (ii), and (iii) as applicable, the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (defined below) is raised during the Challenge Period or (ii) with respect only to those parties who file a Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "Challenge Period Termination Date"; *provided*, that upon the filing of a motion by the Committee seeking standing to commence a Challenge (the "Standing Motion"), the Challenge Period shall automatically toll for twenty-one (21) days (which may be

extended or shortened by order of the Court) with respect to all Challenges asserted in the Standing Motion), a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations and Releases (collectively, the "Challenges" and, each individually, a "Challenge"), and *second*, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "Successful Challenge"); *provided*, that any pleadings filed in any Challenge proceeding shall set forth with specificity the basis for such Challenge (and any Challenges not so specified prior to the Challenge Period Termination Date shall be deemed forever, waived, released, and barred). Upon a Successful Challenge as against any party, including that an obligation to such party is unsecured was undersecured, the Court may fashion an appropriate remedy. Notwithstanding the foregoing, the Challenge Period with respect to the Debtors' Stipulations and Releases related to the Debtors' Priming Facility Stipulations and releases related thereto (the "PTL Challenge Period") shall terminate immediately upon entry of this Final Order and the date this Final Order is entered shall be the "PTL Challenge Period Termination Date".

(b)     Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date, or the PTL Challenge Period Termination Date (as applicable), and for all purposes in these Chapter 11 Cases and any Successor Cases (and after the dismissal of these Chapter 11 Cases or any Successor Cases), (i) the Debtors' Stipulations and Releases shall be binding on all parties in interest, including, without limitation, the Committee (if any), (ii) the Prepetition Legacy Facility Liens, Prepetition Priming Facility Liens, and any other prepetition claims and liens granted under or in connection with the Prepetition First Lien Credit

Agreements, shall be deemed, without further order of the Court, to the extent not theretofore indefeasibly repaid, satisfied, or discharged, as applicable, to be finally allowed for all purposes in the Chapter 11 cases and any subsequent chapter 7 cases and shall not be subject to challenge or objection by any party in interest as to validity, extent, amount, perfection, priority, or non-avoidability; (iii) the Prepetition Legacy Facility Liens and Prepetition Priming Facility Liens on their respective Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense but subject to the priorities described herein; and (iv) Prepetition First Lien Secured Obligations and the Prepetition Legacy Facility Liens and Prepetition Priming Facility Liens on their respective Prepetition Collateral shall not be subject to any other or further claim or challenge by the Committee, any non-statutory committees appointed or formed in the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims, causes of action, counterclaims and offsets, whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition First Lien Secured Parties and their representatives arising out of or relating to any of the Prepetition First Lien Loan Documents, the Interim Order, or this Final Order shall be deemed forever waived, released and barred.

(c)     Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' Stipulations and Releases, and the other provisions in clauses (i) through (iv) in paragraph 32(b) hereof shall nonetheless remain binding and preclusive on the Committee and on any other party in interest from and after the Challenge Period Termination Date, except to

the extent that such Debtors' Stipulations and Releases or the other provisions in clauses (i) through (iv) of paragraph 32(b) hereof were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge.

(d)     The Challenge Period may be extended only with the prior written consent of the Prepetition First Lien Agents in its sole discretion or by this Court, for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Period.

(e)     Nothing in this Final Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee or any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect the Debtors' Stipulations and Releases.

(f)     For the avoidance of doubt, as to the Debtors, upon entry of this Final Order, all Challenges, and any right to assert any Challenge, are hereby irrevocably waived and relinquished as of the Petition Date, and the Debtors' Stipulations and Releases shall be binding in all respects on the Debtors irrespective of the filing of any Challenge.  Any successor to the Debtors (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors or any other estate representative appointed in the Chapter 11 Cases or any Successor Cases) shall be, subject to the expiration of any applicable challenge period, bound by the terms of the Interim Order and this Final Order to the same extent as the Debtors.

(g)     Reservation Regarding Committee Standing. Nothing herein shall limit the Committee's ability to file a timely Standing Motion in respect of any timely Challenge for which it cannot obtain standing as a matter of law because the applicable Debtor is a limited

liability company and applicable non-bankruptcy law prohibits a party other than the Debtors from bringing such claim (an "LLC Challenge Issue"). In the event the Committee files a timely Standing Motion that includes an LLC Challenge Issue, the expiration of the Challenge Period solely for the specific Challenge set forth in the Standing Motion, and solely as to the defendant(s) specifically named therein, shall be tolled until five (5) Business Days after the Court enters an order addressing the relief requested in the Standing Motion, and the Committee, the Debtors and the applicable Prepetition First Lien Secured Parties shall meet and confer with respect to an appropriate process (if any) for the prosecution of any such Challenge to address the LLC Challenge Issue. If a timely Standing Motion that includes an LLC Challenge Issue is filed, the Debtor LLC on behalf of whom the Standing Motion has been filed (or a designated representative thereof) shall, to the extent permitted by applicable law, be deemed to have retained the authority to prosecute the specific Challenge set forth in the Standing Motion solely as to the defendant(s) named in such Standing Motion to the extent that the Standing Motion, including an appropriate resolution of any LLC Challenge Issue, is granted.

33.     No Third-Party Rights.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

34.     Section 506(c) Claims.  Except to the extent of the Carve-Out and so long as the Debtors are in compliance with paragraph 23 herein, the Debtors shall waive and be prohibited from asserting any claim under section 506(c) of the Bankruptcy Code, and no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code shall be charged against or recovered from the DIP Collateral, the DIP Agent, or the DIP Lenders,

the Prepetition Collateral, the Prepetition First Lien Agents and the Prepetition First Lien Lenders pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent (at the direction of the Majority Lenders) or the applicable Prepetition First Lien Agents, as may be applicable, and no such consent shall be implied from any action, inaction, or acquiescence by any party; *provided*, that the foregoing waiver shall be without prejudice to the Committee's and any affected landlord's rights solely with respect to enforcing Stub Rent payments in accordance with the Stub Rent Resolution described in paragraph 23 herein.

35.     No Marshaling/Applications of Proceeds.  Except to the extent of the Carve-Out, in no event shall the DIP Agent, the other DIP Secured Parties, the Prepetition First Lien Agents or the other Prepetition First Lien Secured Parties, be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable; *provided*, that any DIP Liens,  DIP Superpriority Claims, First Lien AP Liens, and First Lien AP Superpriority Claim may recover from the proceeds of any Avoidance Action and commercial tort claims only after the holder of such liens and claims has made commercially reasonable efforts to seek recovery from other collateral for such liens and claims.

36.     Section 552(b).  Except the extent of the Carve-Out, the DIP Agents, the other DIP Secured Parties, the Prepetition First Lien Agents or the other Prepetition First Lien Secured Parties, shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception thereunder shall not apply; *provided*, that the foregoing waiver shall be without prejudice to the Committee's and any affected landlord's rights

solely with respect to enforcing Stub Rent payments in accordance with the Stub Rent Resolution described in paragraph 23 herein..

37.     Releases and Stipulations.  Each of the Debtors' Stipulations and Releases set forth in Paragraphs F, G, and H of this Final Order are authorized and approved to the extent set forth herein.

38.     Limits on Lender Liability.  Nothing in the Interim Order or this Final Order, any of the DIP Documents, any of the Prepetition First Lien Loan Documents, or any other documents related thereto, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the other DIP Secured Parties, or the Prepetition First Lien Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the administration of these Chapter 11 Cases or any Successor Cases.  The DIP Agent, the other DIP Secured Parties and the Prepetition First Lien Secured Parties shall not, solely by reason of having made loans under the DIP Facility or authorizing the use of Cash Collateral, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute).  Nothing in the Interim Order, this Final Order, or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, any of the DIP Secured Parties, or any of the Prepetition First Lien Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

39. <u>Release of DIP Secured Party Claims</u>.  Each Debtor shall forever waive, discharge, and release each of the DIP Secured Parties and their respective affiliates, assigns, or successors and the respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees, and other representatives of the foregoing (all of the foregoing, collectively, the "<u>DIP Secured Party Releasees</u>") from any and all obligations and liabilities to the Debtors (and their permitted successors and assigns) and from any and all "claims" (as defined in section 101(5) of the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights, and other rights of disgorgement or recovery against any and all of the DIP Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the DIP Obligations, the DIP Liens, or the debtor–creditor relationship between any of the DIP Secured Parties, on the one hand, and any of the Debtors, on the other hand, arising prior to the date of entry of this Final Order including (a) any recharacterization, subordination, avoidance, disallowance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, municipal law, or foreign law and (b) any right or basis to challenge or object to the amount, validity, or enforceability of the DIP Obligations or any payments or other transfers made on account of the DIP Obligations, or the validity, enforceability, priority, or non-avoidability of the DIP Liens securing the DIP Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the DIP Secured Party Releasees.

40. <u>Insurance Proceeds and Policies</u>.  As of the date of entry of the Interim Order and as ratified by this Final Order, and notwithstanding anything to the contrary in this Final

Order, the Debtors shall remain in compliance with any insurance-related the terms of the Debtors' leases for non-residential real property. Subject to the terms of the Debtors' leases for non-residential real property and otherwise to the fullest extent provided by applicable law, the DIP Agent (on behalf of itself and the other DIP Secured Parties) and the Prepetition First Lien Agents (on behalf of itself and for the benefit of the applicable Prepetition First Lien Secured Parties, as applicable), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral or any collateral subject to the First Lien AP Liens; *provided,* that the DIP Liens shall not interfere with any rights held by a landlord to insurance proceeds for damage to a landlord's property.

41.     <u>Joint and Several Liability</u>.  Nothing in the Interim Order or this Final Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the DIP Obligors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Documents.

42.     <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of the Interim Order and this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Agent's, the other DIP Secured Parties' and the Prepetition First Lien Secured Parties' rights to seek any other or supplemental relief; (b) any of the rights of any of the DIP Agent, the other DIP Secured Parties and/or the Prepetition First Lien Secured Parties under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to request modification of the automatic stay imposed by section 362 of the Bankruptcy Code; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Agent, the other DIP Secured Parties or the Prepetition First Lien

Secured Parties.  Notwithstanding anything herein to the contrary, the entry of the Interim Order and this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', the Committee's, or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Final Order.

43.    No Waiver by Failure to Seek Relief.  The failure of the DIP Agent, the other DIP Secured Parties, or the Prepetition First Lien Secured Parties to seek relief or otherwise exercise their rights and remedies under the Interim Order, this Final Order, the DIP Documents, the Prepetition First Lien Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent, the other DIP Secured Parties, or the Prepetition First Lien Secured Parties.

44.    Binding Effect of Final Order.  The provisions of this Final Order shall be binding upon and inure to the benefit of the Debtors, the DIP Agent, the other DIP Secured Parties, the Prepetition First Lien Secured Parties, the Committee, all other creditors of any of the Debtors and all other parties in interest and, in each case, their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors).  To the extent permitted by applicable law, this Final Order shall bind any trustee, administrator, (whether under U.S. law or the laws of any other jurisdiction), or equivalent entity or person hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event of the conversion of any of the Chapter 11 Cases, any

Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case, to a liquidation under chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Final Order.

46. <u>No Modification of Final Order</u>.  Until the DIP Obligations have been paid in full, the Debtors shall be prohibited from seeking or consenting to, directly or indirectly, any modification, stay, vacatur, waiver, or amendment to this Final Order or any provision hereof without the prior written consent of the DIP Agent (at the direction of the Majority Lenders) and the Prepetition First Lien Agents (at the direction of the applicable Prepetition First Lien Secured Parties), and no such consent shall be implied by any action or inaction of the DIP Agent or the Prepetition First Lien Agents.

46. <u>Final Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the DIP Documents and this Final Order, the provisions of this Final Order shall control.

47. <u>Discharge</u>.   Subject to the terms and conditions of the DIP Credit Agreement, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been Paid in Full on or before the effective date of such plan of reorganization or the DIP Agent (at the direction of the Majority Lenders has otherwise agreed in writing.

48. <u>Survival</u>.  The provisions of this Final Order and the DIP Documents, any actions taken pursuant hereto or thereto, and all of the protections, rights, remedies, liens, priorities, privileges, and benefits granted to any or all of the DIP Secured Parties and Prepetition First Lien Secured Parties respectively, shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization or liquidation in any

86

of the Chapter 11 Cases, converting any of the Chapter 11 Cases to a chapter 7 case, dismissing any of the Chapter 11 Cases or any Successor Cases, withdrawing of the reference of any of these Chapter 11 Cases, any Successor Cases, or providing for abstention from handling or retaining of jurisdiction of any of these Chapter 11 Cases in this Court, or terminating the joint administration of these Chapter 11 Cases or by any other act or omission.  The terms and provisions of this Final Order shall continue in the Chapter 11 Cases, in any Successor Cases, or following the dismissal of the Chapter 11 Cases or any Successor Cases, notwithstanding the entry of any such order, and such protections, rights, remedies, liens, priorities, privileges, and benefits shall continue in full force and effect in these proceedings and after dismissal of any thereof, and shall maintain their respective priorities as provided by the Interim Order, this Final Order, and the DIP Documents, and to the maximum extent permitted by law, until all of the DIP Obligations are indefeasibly Paid in Full in cash and discharged.

        49.    <u>Replacement Agent</u>.  Notwithstanding the resignation or replacement of any collateral agent or administrative agent, including the DIP Agent and the Prepetition First Lien Agents, the DIP Liens on the DIP Collateral, the Prepetition Liens on the Prepetition Collateral and the First Lien AP Liens shall remain continuously and properly perfected, notwithstanding the transfer of control, possession, or title of any Prepetition Collateral or DIP Collateral to a new collateral or administrative agent.

        50.    <u>National CineMedia, Inc. and National CineMedia, LLC</u>.  Notwithstanding anything in this Final Order, the rights of National CineMedia, Inc. and National CineMedia, LLC are expressly reserved with respect to the extent of the liens granted in the Interim Order and this Final Order on the Debtors' interest in National CineMedia, LLC.

51.    <u>Chubb Reservation of Rights.</u> For the avoidance of doubt, (i) to the extent ACE American Insurance Company and/or any of its U.S.-based affiliates (collectively, and together with each of their successors, "<u>Chubb</u>") had valid and enforceable liens and/or security interests on property (including Cash Collateral) of the Debtors as of the Petition Date, such liens and/or security interests shall be senior to any liens and/or security interests granted pursuant to this Final Order, (ii) this Final Order does not grant the Debtors any right to use any property (or the proceeds thereof) held by Chubb as collateral to secure obligations under insurance policies and related agreements; and (iii) nothing, including the DIP Documents and/or this Final Order, alters or modifies the terms and conditions of any insurance policies issued by Chubb and/or any agreements related thereto.

52.    <u>Broward County, Florida Taxing Authority</u>. Notwithstanding anything else in this order, nothing in this Final Order shall prime any pre- or post-petition statutory property tax liens in favor of Broward County, Florida, only to the extent such liens are valid, senior, perfected, and unavoidable; provided, however, that all parties' rights to object to the priority, validity, amount, and extent of the claims and liens asserted by Broward County, Florida are fully preserved.

53.    <u>Texas Taxing Authorities</u>. Notwithstanding any other provisions of this Final Order, any agreements approved hereby, or any other orders in these Cases, any statutory liens (collectively, the "<u>Tax Liens</u>") held by the Texas Taxing Authorities[12] or prepetition and

---

[12]    The Texas Taxing Authorities shall refer to: Midland County; Potter County Tax Office; Randall County Tax Office; Hale County Appraisal District; Potter County Tax Office; Randall County Tax Office; Eagle Mountain-Saginaw Independent School District; Alief Independent School District; City of Houston; Klein Independent School District; Harris County Municipal Utility District #368; Spring Branch Independent School District; Fort Bend County Municipal Utility District #194; Fort Bend Independent School District; Jefferson Drainage District #6; Tyler Independent School District; Bexar County; Dallas County; Ector CAD; Fort Bend County; Grayson County; Gregg County; Harris County; McLennan County; Montgomery County; Smith County; Tarrant County; and Tom Green CAD.

postpetition taxes shall not be primed by nor made subordinate to any liens granted to any party hereby to the extent such Tax Liens are valid senior, perfected, and unavoidable, and all parties' rights to object to the priority, validity, amount, and extent of the claims and liens asserted by the Taxing Authorities are fully preserved.

54.     [Reserve].

55.     <u>Arvest Bank Stipulations.</u> After consultation with their attorneys and financial advisors, and without prejudice to the rights of other parties in interest (other than the Debtors and DIP Secured Parties), including the Committee, as set forth in paragraph 32 herein, the Debtors stipulate as follows with respect to Arvest Bank ("<u>Arvest</u>"), which shall survive and continue into subsequent cases, including upon conversion or dismissal:

(a)     Pursuant to a loan agreement and note dated July 1, 2021, Arvest loaned $11.9 million to Debtor Regal Entertainment Group ("<u>REG</u>") (the "<u>Midwest City Facility</u>") for the purchase of real property, furniture, fixtures and equipment (including point of sale systems) comprising the movie theater business located in Midwest City, Oklahoma, known as Regal Warren Midwest City (the "<u>Midwest City Business</u>").

(b)     The collateral for the Midwest City Facility consists of the real property together with all the assets of REG and Regal Cinemas, Inc. either located on the real property or used in connection with the Midwest City Business ("the "<u>Midwest City Collateral</u>").

(c)     The Midwest City Facility is purchase money financing of fixed assets permitted under ¶ 8.1(f) of the Prepetition Legacy Credit Agreement in the outstanding principal amount of $11.9 million as of the Petition Date.

(d)     The liens on the fixed assets securing the Midwest City Facility ("Arvest Fixed Asset Liens") are valid, prior, properly perfected, first liens covering the Midwest City Collateral permitted under ¶ 8.2(i) of the Prepetition Legacy Credit Facility.

(e)     The Arvest Fixed Asset Liens are excluded from priming as Senior Permitted Liens under the Interim Order and this Final Order.

(f)     Arvest also holds valid, properly perfected, non-purchase money liens ("Arvest Other Liens") covering all assets used in the operation of the Midwest City Business. Arvest consents to the priming of the Arvest Other Liens upon the terms set forth herein.

(g)     The Midwest City Facility, the Arvest Fixed Asset Liens and the Arvest Other Liens are valid, binding and enforceable and not subject to avoidance, recharacterization or subordination and not subject to set off or recoupment defenses, etc.

56.     Arvest Bank Obligations. For the Debtors' continued use of the Midwest City Collateral and priming of the Arvest Other Liens, and without prejudice to the rights of other parties in interest (other than the Debtors), including the Committee, Arvest shall be provided adequate protection against diminution in the value of Arvest's interest in the Midwest City Collateral at least equal to that granted to the Prepetition First Lien Creditors, including, without limitation, the following, which shall survive and continue into subsequent cases, including upon conversion or dismissal:

(a)     First Lien AP Liens;

(b)     First Lien AP Superpriority Claim;

(c)     Monthly payments of principal and interest at the contract rate will resume effective October 1, 2022;

(d)     Continued insurance of property and loss payee provisions in favor of Arvest;

(e)     Payment of Arvest's reasonable and documented attorney's fees since Petition Date;

(f)     DIP Secured Parties shall have no right to credit bid on Midwest City Collateral without consent of Arvest;

(g)     DIP Secured Parties agree to look first to DIP Collateral other than the Midwest City Collateral to satisfy their claims notwithstanding "no marshaling" provisions in the Interim and Final Orders.

(h)     Monthly P&L reporting for the Midwest City Business to Arvest.

(i)     Release of Arvest from lender liability claims to the same scope and extent as set forth in paragraph G above.

57.     <u>LEAF Capital Funding, LLC</u>. Notwithstanding any other provision to the contrary in this Final Order, no priming liens or super-priority claims in favor of the DIP Secured Parties will be effective, applicable, or imposed on the collateral identified by LEAF Capital Funding, LLC ("<u>LEAF</u>") in its UCC-1 financing statements filed with the Tennessee Secretary of State on February 25, 2022, filing # 436149193 and June 22, 2022, filing # 436858005 (collectively, the "<u>LEAF Collateral</u>").  LEAF's priority in the LEAF Collateral is hereby expressly preserved, and LEAF shall retain its lien priority in the LEAF Collateral as it existed as of the Petition Date.

58.     <u>Fathom Events</u>.  For the avoidance of doubt, the DIP Liens granted hereunder shall not attach to the revenues payable to Fathom Events under the Exhibitor Services Agreement between AC JV, LLC and Regal Entertainment Group dated December 9, 2021.

59.     <u>Governing Law</u>.  The DIP Documents shall be governed by, and construed in accordance with, the laws of the State of New York and applicable United States federal law, without regard to the conflict of law principles.

60.     <u>Headings</u>.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

61.     <u>Retention of Jurisdiction</u>.  This Court retains exclusive jurisdiction to resolve any dispute arising from or related to the interpretation or enforcement of this Final Order.

62.     <u>PTL Challenge Period Termination Date</u>.  Notwithstanding anything in the Interim Order, the PTL Challenge Period shall terminate, and the PTL Challenge Period Termination Date shall be deemed to occur immediately upon entry of this Final Order, and the Debtors are hereby authorized and directed to indefeasibly pay in full in cash all Prepetition Priming Facility Obligations (including all Prepetition Priming Adequate Protection Payments and all Prepetition Priming Facility Fees and Expenses) to consummate the Priming Loan Refinancing. Moreover, this Final Order shall be deemed to be a "Release Order" under the Interim Order and an "Acceptable Release Order" under the DIP Credit Agreement.

63.     <u>Reservation of Rights</u>.  The rights of any party with requisite standing to argue that Cineworld Group plc did not receive a benefit from the DIP Facility are expressly preserved.

Signed: October 31, 2022

_____
Marvin Isgur
United States Bankruptcy Judge

**Schedule 1**

**Budget**

**DIP FORECAST - US & UK ENTITIES**

| ($ 000s) Month | Nov 2022 | Dec 2022 | Jan 2023 | Feb 2023 | Mar 2023 | Apr 2023 | May 2023 | Jun 2023 | Total Period |
|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | |
| 1  Box/Concession | $ 272,832 | $ 411,289 | $ 347,361 | $ 185,282 | $ 265,531 | $ 250,221 | $ 225,238 | $ 390,919 | $ 2,348,673 |
| 2  Pepsi Marketing | - | 13,781 | - | - | 29,000 | - | 15,000 | - | 57,781 |
| 3  NCM / Advertising Revenue | 3,821 | 2,096 | 4,711 | 4,596 | 4,353 | 3,977 | 4,217 | 6,477 | 34,248 |
| 4  Other Receipts | 6,600 | 11,347 | 7,480 | 7,480 | 7,935 | 7,480 | 6,348 | 9,067 | 63,736 |
| 5  **Total Operating Receipts** | **283,253** | **438,513** | **359,552** | **197,358** | **306,819** | **261,678** | **235,803** | **421,463** | **2,504,438** |
| **Operating Disbursements** | | | | | | | | | |
| 6  Film rental | (55,427) | (109,797) | (111,317) | (97,690) | (72,303) | (69,043) | (74,066) | (94,907) | (684,550) |
| 7  Concession vendors | (12,025) | (16,024) | (14,124) | (14,183) | (15,725) | (11,989) | (12,968) | (15,768) | (112,806) |
| 8  Payroll & Benefits | (34,600) | (32,888) | (25,131) | (32,318) | (50,412) | (32,318) | (25,131) | (40,075) | (272,874) |
| 9  Payroll Taxes | (7,945) | (7,063) | (7,063) | (7,063) | (10,594) | (7,063) | (7,063) | (7,063) | (60,914) |
| 10  Rent | (82,068) | (107,880) | (78,401) | (72,906) | (75,396) | (89,543) | (67,955) | (110,476) | (684,625) |
| 11  Utilities | (8,648) | (11,222) | (9,060) | (9,060) | (10,810) | (9,060) | (8,648) | (11,222) | (77,730) |
| 12  Capex | (15,378) | (16,052) | (11,467) | (10,838) | (13,512) | (11,066) | (10,768) | (13,646) | (102,667) |
| 13  Sales Tax | (7,462) | (18,108) | (25,825) | (31,746) | (11,716) | (17,084) | (20,868) | (14,782) | (147,591) |
| 14  Other Vendor Payments | (47,477) | (40,801) | (29,739) | (29,820) | (33,908) | (29,261) | (27,596) | (36,097) | (274,699) |
| 15  Insurance | (160) | (2,753) | (160) | (1,031) | (1,902) | (160) | (349) | (1,176) | (7,692) |
| 16  **Total Operating Disbursements** | **(271,188)** | **(362,588)** | **(312,287)** | **(306,655)** | **(296,277)** | **(276,527)** | **(255,412)** | **(345,213)** | **(2,426,147)** |
| 17  **Net Cash Flow from Operations** | $ 12,065 | $ 75,925 | $ 47,265 | $ (109,297) | $ 10,541 | $ (14,849) | $ (19,609) | $ 76,250 | $ 78,291 |
| **Non- Operating Receipts / (Disbursements)** | | | | | | | | | |
| 18  Asset Sale | - | - | - | - | - | - | - | - | - |
| 19  Debt Principal / Interest Payments | (18,487) | (20,174) | (25,468) | (20,523) | (20,632) | (25,838) | (20,706) | (41,337) | (193,165) |
| 20  Professional Fees | (27,796) | (19,289) | (19,205) | (16,067) | (16,183) | (20,460) | (15,484) | (28,327) | (162,809) |
| 21  Transfer to ROW | 6,000 | 19,018 | 15,000 | 8,000 | 2,018 | 8,500 | - | 5,018 | 63,554 |
| 22  Other | - | 340 | - | - | (2,160) | - | - | (2,160) | (3,980) |
| 23  Adj - Est. Cash flow impact from location closures | 1,321 | 3,303 | 2,642 | 2,642 | 3,303 | 2,642 | 2,642 | 3,303 | 21,799 |
| 24  **Total Non- Operating Receipts / (Disbursements)** | **(38,962)** | **(16,802)** | **(27,030)** | **(25,947)** | **(33,654)** | **(35,155)** | **(33,547)** | **(63,504)** | **(274,602)** |
| 25  **Total Net Cash Flow** | $ (26,897) | $ 59,123 | $ 20,235 | $ (135,244) | $ (23,113) | $ (50,005) | $ (53,156) | $ 12,746 | $ (196,311) |
| **Book Cash Balance** | | | | | | | | | |
| 26  **Beginning Cash Balance** | **49,916** | **99,621** | **158,744** | **178,979** | **75,845** | **130,194** | **80,189** | **67,461** | |
| 27  Net Cash Flow | (26,897) | 59,123 | 20,235 | (135,244) | (23,113) | (50,005) | (53,156) | 12,746 | |
| 28  (+) Transfer - Operational Account | 76,602 | - | - | 32,109 | 77,462 | - | 40,428 | - | |
| 29  (+/-) FX Variation | - | - | - | - | - | - | - | - | |
| 30  **Ending Cash Balance** | **99,621** | **158,744** | **178,979** | **75,845** | **130,194** | **80,189** | **67,461** | **80,207** | |
| 31  (-) Checks Outstanding | (1,132) | (1,132) | (1,132) | (1,132) | (1,132) | (1,132) | (1,132) | (1,132) | |
| 32  **Adj. Cash Balance** | **98,489** | **157,612** | **177,847** | **74,713** | **129,062** | **79,057** | **66,329** | **79,075** | |
| 33  Minimum Liquidity Test | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | |
| 34  **Pass/Fail** | **Pass** | **Pass** | **Pass** | **Pass** | **Pass** | **Pass** | **Pass** | **Pass** | |
| **Memo:** | | | | | | | | | |
| **Funding Account** | | | | | | | | | |
| 35  Beg Balance | 76,602 | (0) | (0) | 150,000 | 117,891 | 40,428 | 40,428 | (0) | |
| 36  (+) Draw | - | - | 150,000 | - | - | - | - | - | |
| 37  (-) Transfer - Operational Account | (76,602) | - | - | (32,109) | (77,462) | - | (40,428) | - | |
| 38  (-) Repayment | - | - | - | - | - | - | - | - | |
| 39  **Ending Balance** | $ - | $ (0) | $ (0) | $ 150,000 | $ 117,891 | $ 40,428 | $ 40,428 | $ (0) | $ (0) |

**Note:** Line 10 (Rent) includes repayment of Stub Rent in the amount of $5 million per month for four months, beginning on the last business day of November 2022 and ending on the last business day of February 2023. The balance will be paid on the effective date. For purpose of this analysis, we assume payment will occur at the end of June 2023.

**Schedule 2**

**Illustrative Marketing Process Timeline**

**Revised Milestone Addendum**
**Illustrative Sale/Restructuring Process Timeline**

| Stage | Timing | Description |
|---|---|---|
| Pre-Marketing Preparation | Weeks Leading up to Initial Outreach for standalone reorganization, third party sale, or plan sponsorship | • Prepare NDA, process letter, teaser and CIM to be shared with prospective parties interested in participating in standalone reorganization, third party sale, or plan sponsorship ("**Interested Parties**").<br>　▪ NDA, process letter, teaser and CIM to be reasonably acceptable to the AHG advisors and UCC advisors<br>• Compile list of Interested Parties to be contacted in the sale/restructuring process<br>　▪ Interested Parties list to be reasonably acceptable to the AHG advisors and UCC advisors<br>• Create and populate virtual data room with customary documentation, analyses and financial detail about the Company<br>• Build, review and stress-test financial model |
| Initial Interested Parties Outreach | Weeks 1-2 | • Contact Interested Parties and provide them with an overview of the opportunity, teaser and NDA<br>• After executing NDAs with Interested Parties, distribute CIM and process letter and provide access to data room<br>• Begin drafting management presentation for potential round 2 process (depending on non-binding indications of interest received) |
| Due Diligence | Weeks 3-6 | • Company and its advisors continue populating data room with additional diligence information and responses to Interested Parties diligence questions<br>• Company and its advisors schedule diligence calls with Interested Parties as appropriate<br>• Maintain ongoing discussions with interested parties<br>• Finalize management presentation for potential round 2 process (depending on non-binding indications of interest received)<br>• AHG advisors and UCC advisors to receive weekly updates on sale/restructuring process |
| Submission of Indication of Interest | End of Week 6 | • Deadline for Interested Parties to provide non-binding indication of interest<br>• In consultation with the AHG advisors and UCC advisors, determine appropriate next steps after reviewing non-binding indications of interest |