**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) Case No. 22-90168 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **RE: Docket No. 1183** |

**DEBTORS' OBJECTION TO**
**MOTION TO COMPEL REJECTION OF LEASE**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")
hereby file this objection (this "Objection") to the *Motion to Compel Rejection of Lease*
[Docket No. 1183] (the "Motion")[2] filed by CAPREF Lloyd Center East LLC ("CAPREF East"),
by and through CFO Solutions, LLC d/b/a Amplēo, its court-appointed receiver (the "Receiver"),
and in support thereof file the *Declaration of Gerald M. Grewe in Support of Debtors' Objection
to Motion to Compel Rejection of Lease* (the "Grewe Declaration"), attached hereto as **Exhibit A**.
In support of this Objection, the Debtors state as follows:

**Preliminary Statement**

1.      The Receiver's Motion is riddled with glaring omissions that are crucial to
contextualize the dispute at hand and the inequitable nature of the relief the Receiver is seeking.
As detailed in the Background section below, the Motion is just the next step in a series of improper
actions by the Receiver—for the benefit of Keystone, the mortgage lender that initiated

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
claims and noticing agent at https://cases.ra.kroll.com/cineworld.  The location of Debtor Cineworld Group plc's
principal place of business and the Debtors' service address in these chapter 11 cases is:  8th Floor Vantage
London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

[2]     Capitalized terms used but not defined herein have the meaning ascribed to them in the Motion.

the Receivership Action—to strip the Debtors of their valuable property rights and obtain a windfall at the Debtors' expense, all in direct contravention of binding contractual obligations and applicable law.  Such misconduct should not be rewarded.  Although the Motion could be denied on those equitable grounds alone, it also fails as a matter of law and fact.

2.      Recognizing that the Debtors require additional time to assess their large and complex lease portfolio, this Court already ruled that the facts and circumstances of these chapter 11 cases warranted an extension of the Debtors' deadline to assume or reject their unexpired leases.  Accordingly, pursuant to the order granting the 365(d)(4) Motion[3] [Docket No. 1171] (the "365(d)(4) Order"), the Court set an outside date of July 5, 2023, for the Debtors to choose whether to assume or reject their leases.

3.      Through its Motion, the Receiver seeks to circumvent the 365(d)(4) Order by forcing the Debtors to reject one of their leases immediately, well before the deadline.  But nothing in the Bankruptcy Code allows a non-debtor to force a debtor to choose to reject a lease, as the Receiver seeks to do here.  Section 365(a) of the Bankruptcy Code provides that it is the "trustee, subject to the court's approval"—not a contract counterparty or other party in interest— that "may assume or reject any . . . unexpired lease of the debtor."

4.      Moreover, if the intent of the Motion is to compel the Debtors to make an immediate assumption or rejection decision, such request is unreasonable and premature.  As detailed in the 365(d)(4) Motion, among the many other urgent demands of these chapter 11 cases and ordinary course business operations, the Debtors are focused on optimizing a portfolio of nearly five hundred leases across the country.  That process is integral to the success of these chapter 11

---

[3]   The "365(d)(4) Motion" refers to the *Debtors' Motion for Entry of an Order (I) Extending the Deadline by Which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property and (II) Granting Related Relief* [Docket No. 1078].

cases and requires substantial time and effort from the Debtors' management and advisors. In parallel, the Debtors are both negotiating a plan of reorganization and administering a robust marketing process.  In connection with the diligence process for both a plan and sale transaction, the Debtors' lenders, potential purchasers, and other key stakeholders are also carefully assessing their lease portfolio and require adequate time to complete such review before assumption and rejection decisions are made.

5.      The Debtors will analyze their options under the Lease in due course in accordance with the 365(d)(4) deadline.  This Court should not grant the extraordinary relief of compelling the Debtors to make an assumption or rejection decision now—let alone a forced rejection decision—before the July 5, 2023, deadline established by this Court's 365(d)(4) Order *and* more than two months before the initial statutory 365(d)(4) deadline of April 5, 2023.

6.      In short, the relief the Receiver is seeking is not available under the Bankruptcy Code, and even if it were, the facts and circumstances of these chapter 11 cases and the bad faith backdrop of the dispute surrounding the Lease do not weigh in favor of such extraordinary relief. Indeed, they weigh heavily in favor of allowing the Debtors to make use of the full time period for the assumption and rejection of unexpired leases set forth in section 365(d)(4) of the Bankruptcy Code, as extended for cause by the 365(d)(4) Order.

7.      Although the Debtors understand that the Receiver is frustrated with the lack of progress in the Receivership Action and accruing expenses, those frustrations cannot trump the Debtors' rights under the Bankruptcy Code, applicable state law, and the Debtors' bargained-for contractual arrangements.  If the Debtors ultimately seek this Court's approval to assume the Lease, the Receiver can object to the assumption of the Lease at that time if it so chooses.  In the interim, the Debtors have reinitiated discussions with the Receiver and stand ready

to work with all parties in interest to maximize value for their estates. The Receiver's requested relief, however, would be value destructive to the Debtors' estates and must be denied.

**Background**

8.      Debtor Eastgate Theatre, Inc. ("Eastgate"), as tenant, and CAPREF East, as landlord, are parties to a lease agreement dated as of November 1, 2017 (the "Lease"), relating to the premises known as "Lloyd Center Stadium 14," 2201 Lloyd Center, Portland, Oregon 97232 (the "Premises"), located within the portion of the Lloyd Center Mall commonly referred to as the East Anchor Parcel (the "East Anchor Parcel"). Grewe Decl. ¶ 3.

**I.      The Superblock Lawsuit, the Settlement Agreement, and the Breach.**

9.      The parties' history concerning the Lease provides important context for understanding the nature of this dispute. In 1985, Eastgate, as tenant, entered into a ground lease (the "1985 Lease") with CAPREF East's predecessor in interest, Lloyd Corporation, Ltd., as landlord, for real property located on what is commonly referred to as the "Superblock," which is located across NE Multnomah Street from the East Anchor Parcel. Id. ¶ 4. Eastgate operated, and for now continues to operate, the "Lloyd Center 10 & IMAX" theater on the Superblock pursuant to the 1985 Lease, but the 1985 Lease is set to expire on December 31, 2026.[4] In 2013, CAPREF Lloyd Center, LLC ("CAPREF Lloyd") purchased the Superblock and became Eastgate's landlord under the 1985 Lease. Id.

10.      In 2014, CAPREF Lloyd entered into a Purchase and Sale Agreement to sell the Superblock, including a parking lot that was used by Eastgate's theater patrons. Id. ¶ 5.

---

[4]      Upon information and belief, Eastgate's current landlord under the 1985 Lease does not intend to renew the 1985 Lease and instead intends to convert the premises to an alternate use. Given the profitability of the existing theater, it is essential that the Debtors maintain a presence at the location, hence their entry into the Settlement Agreement (as defined below). The Debtors would be happy to engage in discussions regarding a long-term renewal of the 1985 Lease with parking rights across the street at the Lloyd Center Mall.

Thereafter, a dispute arose between Eastgate and CAPREF Lloyd relating to Eastgate's valuable parking rights on the Superblock. *Id.* On November 13, 2015, Eastgate filed a lawsuit in the Multnomah County Circuit Court, Case No. 15CV30727, seeking a declaratory judgment and injunction to preserve its parking rights on the Superblock (the "Superblock Lawsuit"). *Id.*

11.     Eastgate, CAPREF Lloyd, and affiliates of CAPREF Lloyd, including CAPREF East, engaged in settlement negotiations during the Superblock Lawsuit, and on or about November 1, 2017, entered into a Settlement Agreement and Release (the "Settlement Agreement").[5] *Id.* ¶ 6. Pursuant to the Settlement Agreement, CAPREF East agreed to undertake the planning, permitting, and construction work necessary to convert a portion of the East Anchor Parcel into a movie theater for the benefit of Eastgate, and to use reasonably diligent efforts to complete that work on or before March 1, 2019. *Id.* ¶ 10. In connection with the foregoing, Eastgate spent a substantial amount of money working with design professionals to design the new theater and attorneys to negotiate the new Lease. *Id.* ¶¶ 6, 10. To further protect its interests, Eastgate negotiated a provision in the new Lease stating that if the construction work on the new theater was not completed by October 1, 2020, then Eastgate, at its option, became entitled to recover liquidated damages in the amount of $10 million. *Id.* ¶ 10.

12.     In exchange, Eastgate agreed not to exercise its option to renew the 1985 Lease and to forgo its rights to parking on the Superblock so that CAPREF Lloyd could complete its sale of the Superblock. *Id.* ¶ 7. The loss of parking rights on the Superblock caused a huge inconvenience

---

[5]     Substantially contemporaneously with the execution of the Settlement Agreement, the parties executed, as applicable, the Lease, the Consent of Lender, the SNDA (as defined below), and certain necessary joinders and other transaction documents. On November 2, 2017, a Memorandum of Lease and the SNDA were recorded in the real property records of Multnomah County. Grewe Decl. ¶ 9, 11.

to Eastgate and its customers—hence the initiation of the Superblock Lawsuit in the first place—but Eastgate believed that the long-term benefits would outweigh the immediate detriment. *Id.*

13.     More specifically, Eastgate agreed to material concessions under the Settlement Agreement based on the anticipated future benefits of operating a new theater in the strategic Portland market. *Id.* The Lloyd Center 10 & IMAX theater location was and remains a high performing theater notwithstanding its age. *Id.* Accordingly, Eastgate's management believed, and continues to believe, that a new premium theater in that location would be far more profitable over the long term.

14.     Ultimately, however, CAPREF East failed to build the new theater before the October 1, 2020 deadline. *Id.* ¶ 13. However, given (a) the challenges associated with the COVID-19 pandemic, (b) the limited likelihood of recovering the $10 million liquidated damages from CAPREF East, and (c) the long-term benefit of maintaining a possessory interest in the Premises, among other considerations, Eastgate chose to reserve its option to terminate the Lease and collect the liquidated damages, and instead continued to negotiate with CAPREF East. *Id.* Eastgate is not in default of the Lease or any other obligation to CAPREF East. *Id.* Accordingly, the Lease remains in effect and grants Eastgate a possessory right to the Premises.

## II.     The SNDA, the Receivership Action, and the Attempted Lease Rejection.

15.     To protect Eastgate's interests under the new Lease, Eastgate required CAPREF East's mortgage lender Keystone Real Estate Lending Fund, L.P. ("Keystone")—which was actively involved in discussions and negotiations concerning the Lease—to execute both a Consent of Lender, which was contained within the Lease itself and provided that Keystone consented to the terms thereof, and a separate Subordination, Non-Disturbance, and Attornment Agreement (the "SNDA"). *Id.* ¶¶ 10, 11. Under the terms of the executed SNDA, Keystone agreed that:

Neither [Eastgate's] right of possession of the Theatre nor any other rights or privileges of Tenant under the Lease … shall be terminated, diminished or disturbed by [Keystone] *for any reason whatsoever, including, without limitation, by virtue of any actions taken by [Keystone] in the exercise of any of its rights or remedies under the Mortgage or the indebtedness secured thereby*.

The *Lease shall not be terminated or affected by the exercise of any right or remedy provided for in the Mortgage*, and [Keystone] hereby covenants and agrees that *any sale of Landlord's title to the property containing the Theatre by Mortgagee pursuant to the exercise of any rights or remedies under the Mortgage or otherwise shall be made subject to the Lease and the rights and privileges of Tenant thereunder*; and

In the event of foreclosure of the Mortgage, deed in lieu of foreclosure *or other transfer* of Landlord's right, title and interest in the property containing the Theatre, such purchaser shall recognize and accept the Lease and Tenant's leasehold right, title and interest in the Theatre.

*Id.* ¶ 11, Ex. 4 (emphasis added). Keystone also agreed to be bound to Eastgate "under all of the terms, covenants and conditions of the Lease," and that Eastgate would "have the same remedies against [Keystone] for the breach of any agreement contained in the Lease that Tenant would have had under the Lease against Landlord if [Keystone] had not succeeded to the interest of Landlord." *Id.*

16.     Despite its binding representations and covenants to Eastgate under the Lease and the SNDA, on March 24, 2022, Keystone initiated a receivership action (the "Receivership Action") by filing its Motion for Appointment of Receiver, along with a proposed Order Appointing Receiver.[6] *Id.* ¶ 14. Keystone is the primary beneficiary of the Receivership Action. *Id.*

---

[6]   For the avoidance of doubt, the Debtors reserve all rights to initiate proceedings and seek discovery against Keystone and other parties in interest in this Court or another forum.

17.     In its moving papers, Keystone failed to disclose to the state court—either in the Complaint, the Motion for Appointment of Receiver, or in the supporting declarations—its contractual obligations under the SNDA or Consent of Lender, which expressly precludes Keystone from exercising its default remedies in a manner that would harm Eastgate's interests under the Lease.  *Id.*  Keystone also initiated the Receivership Action without any notice to Eastgate notwithstanding its knowledge of the Lease and its goal of utilizing the Receivership Action to reject the Lease.  *Id.*  Eastgate only became aware of the Receivership Action after its management caught wind of the proceedings, and by the time Eastgate intervened, over two months had passed since Keystone initiated the proceedings.  *Id.*

18.     Based on the incomplete representations in Keystone's moving papers, on April 15, 2022, the Oregon court entered an order appointing the Receiver to administer the receivership estate, pursuant to the Oregon Receivership Code, ORS Chapter 37.  *Id.*  On June 3, 2022, the Receiver filed a Notice of Intent to Reject Lease (the "Rejection Notice") in the Receivership Action, and on July 11, 2022, Eastgate filed its opposition to the Rejection Notice.  *Id.* ¶ 15.  A hearing on the Rejection Notice was scheduled for September 8, 2022. *Id.*  The action is currently stayed as a result of the commencement of these chapter 11 cases.  *Id.*

19.     Contrary to the Receiver's assertions that Eastgate has refused to engage in meaningful discussions since commencing these chapter 11 cases—and notwithstanding the unscrupulous actions that precipitated the current situation—the Debtors stand ready to listen to any legitimate proposed solutions that might help resolve this dispute.  But no such solutions have been put on the table to date, and the Receiver and Keystone have seemingly not considered any options that would provide fair value to Eastgate, instead only pursuing paths that would result in a windfall for Keystone at Eastgate's expense.  Indeed, it remains unclear to the Debtors what the

Receiver is doing—beyond improperly seeking to reject the Lease through both these chapter 11 cases and the Receivership Action—to try to maximize value and find a viable solution in light of the current impasse.[7]  The Receiver continues to parrot its unsupported rationale that a theater "never will" be built.  *See* Mot. ¶ 1.  That hypothesis, however, must be fully run to ground,[8] and it certainly should not form the basis of the extraordinary relief the Receiver seeks.  The Debtors encourage all parties to work constructively to chart a productive and value maximizing path forward.

### <u>Argument</u>

**III.    The Receiver's Request Extends Beyond the Scope of Relief Available Under the Bankruptcy Code and Must be Denied.**

20.    Section 365 of the Bankruptcy Code provides a debtor with the authority to assume or reject its executory contracts and unexpired leases.  *See* 11 U.S.C. § 365(a).  Such authority is "vital to the basic purpose to a Chapter 11 reorganization."  *See NLRB v. Bildisco & Bidisco*, 465 U.S. 513, 528 (1984).  In the case of non-residential real property leases, such as the Lease, section 365(d)(4)(A) of the Bankruptcy Code requires a debtor to choose to assume or reject a lease "by the earlier of (i) the date that is 210 days after the date of the order for relief"—or April 5, 2022, in this case, "or (ii) the date of the entry of an order confirming a plan."  Pursuant to section 365(d)(4)(B) of the Bankruptcy Code, the 210-day period may be extended for 90 days on motion of the debtor for cause and further extended with the consent of the lease counterparty.  In

---

[7]    Upon information and belief, the Receiver has not run a comprehensive marketing process to determine whether a buyer might be willing to purchase the East Anchor Parcel subject to the Lease.  Moreover, the Receiver has not tried to broker any discussions between the one "ready buyer" it references and the Debtors.  For the avoidance of doubt, the Debtors would be eager to engage with any potential buyers to explain the benefits of maintaining a long-term theater presence on the Premises.  If the ready buyer is unwilling to work with the Debtors, such buyer, although convenient, likely is not the appropriate buyer under the circumstances.

[8]    Indeed, the Debtors would consider building a theater on the parcel when their financial position allows for such expenditures.  The Debtors would seek to offset those expenses against future Lease obligations, a remedy they believe is available under Oregon law.

light of the facts and circumstances of these complex chapter 11 cases, this Court has already extended the 365(d)(4) deadline for cause to July 5, 2023.  *See* Docket No. 1171.

21.     Section 365(d)(2) of the Bankruptcy Code separately provides that a bankruptcy court has discretion to order a debtor to determine within a specified period time whether to assume or reject a contract or lease.  *See Dallas-Fort Worth Reg'l Airport Bd. v. Braniff Airways*, *Inc.*, 26 B.R. 628, 636 (N.D. Tex. 1982) ("11 U.S.C. § 365(d)(2) puts such a request within the discretion of the Court.").

22.     Although this Court has the discretion to order the Debtors to assume or reject a lease within a specified period of time, the Receiver's Motion goes a step too far—it requests that this Court compel the Debtors to immediately reject the Lease.  Mot. ¶ 5.  Contrary to the Receiver's demands, however, such relief is unavailable under the Bankruptcy Code.  *See, e.g.*, *In re GHR Energy Corp.*, 41 B.R. 668, 670 (Bankr. D. Mass. 1984) (***"[A] court may not order a debtor to either assume or reject an unexpired lease."***) (emphasis added); *Matter of Will*, 33 B.R. 843, 843 (Bankr. M.D. Fla. 1983) ("While 11 U.S.C. § 365(d)(2) authorizes the Court to order the Trustee or Debtor-in-Possession to determine within a specified time whether to assume or reject a contract, ***it does not authorize the Court to order either acceptance or rejection of a contract***.") (emphasis added).  The Debtors' right to assume or reject the Lease belongs solely to the Debtors, subject to this Court's approval.  Because the Receiver's request goes beyond the scope of relief available under the Bankruptcy Code, it must be denied.

23.     Furthermore, the requested relief would strip Eastgate of valuable protections it is afforded under Oregon law.  Oregon receivership law provides that "[i]f the receiver rejects an executory contract for . . . the lease of real property under which the owner is the lessor, then: (a) [t]he . . . lessee may . . . (B) [r]emain in possession and continue to perform all obligations

arising under the contract, but offset against any payments any damages occurring on account of the rejection after it occurs." Or. Rev. Stat. Ann. § 37.240(7) (West). Accordingly, in the event the Receiver were to be successful in its improper pursuit of rejecting the Lease, Oregon law—similar to section 365(h) of the Bankruptcy Code—would protect Eastgate's go-forward possessory interest in the Premises. By seeking to force *Eastgate* to reject the Lease instead, however, the Receiver aims to use this Court as a means of subverting Eastgate's valuable state law rights. This Court should not sanction Keystone's use of the Receivership Action as an end-run around its contractual obligations and applicable state law to the detriment of the Debtors' estates.

**IV.    Should the Court Interpret the Receiver's Motion as a Request to Shorten the Time in Which the Debtors May Assume or Reject the Lease, such Request Is Unreasonable Given the Totality of the Circumstances.**

24.    To the extent the Court interprets the Motion as a request to shorten the time in which the Debtors may assume or reject the lease, that request should also be denied. A court in this district has held that "[s]ection 365(d)(2) provides that the court, on request of a party to a contract or lease, may order the [Debtors] to determine within a specified period of time whether to assume or reject." *In re Panaco, Inc.*, No. 02-37811-H3-11, 2002 WL 31990368, at *4 (Bankr. S.D. Tex. Dec. 10, 2002). Generally, when deciding whether to compel a chapter 11 debtor to assume or reject an unexpired lease, bankruptcy courts evaluate whether assumption or rejection will occur within a "reasonable" time based on the totality of the circumstances. *See id.* ("The reasonableness of the specified time period is within the court's discretion and depends upon the facts and circumstances of the particular case."); *In re Adelphia Commc'ns Corp.*, 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003) ("The determination of what constitutes a reasonable time to assume or reject is within the bankruptcy court's discretion based on the particular facts of each

case.").[9]  Such extraordinary relief is rarely granted.  *See* 3 Collier on Bankruptcy ¶ 365.05[2][a] (16th ed. 2022) ("Section 365(d)(2) provides that the court, on request of a party to an executory contract or unexpired lease of nonresidential real property or personal property, may order the trustee to determine within a specified period of time whether to assume or reject.  However, the request is rarely granted.")

25.     As detailed in the 365(d)(4) Motion, the Debtors are evaluating their lease portfolio holistically to determine a value-maximizing path forward for nearly five hundred leases, all while continuing to negotiate with their key stakeholders with respect to the terms of a chapter 11 plan of reorganization and administering a comprehensive marketing process.  Given the scope of the Debtors' lease portfolio and its central importance to their businesses, this Court recognized that the lease optimization process is immensely time consuming and complex, necessitating additional time to make assumption and rejection decisions.  On those grounds alone, the Receiver should not be entitled to jump the line and distract the Debtors' management and advisors from their broader efforts to optimize the lease portfolio as a whole.  Accordingly, the Motion should be denied as unreasonable.

26.     Seeking to distinguish the Lease from the rest of the Debtors' portfolio, however, the Receiver asserts that "[t]here is nothing about the Lease that should require additional time for Eastgate to analyze."  *See* Mot. ¶ 20.  That could not be further from the truth.  As explained above, the Lease presents one of the most complex situations in the Debtors' portfolio.  The Debtors must

---

[9]     The Receiver's Motion lists twelve factors identified in *Adelphia* that some courts use to determine what amounts to a "reasonable" amount of time to make an assumption or rejection decision.  *See* Mot. ¶ 17; *Adelphia*, 291 B.R. at 292-93.  The Motion does not address each of these factors; instead, the Receiver simply lists them and asserts that "applying these factors, the . . . circumstances in this case strongly warrant an order compelling Eastgate to reject the Lease."  *See* Mot. ¶ 18.  Although the Debtors do not believe it is necessary to address each factor in turn, they stand ready to do so at a hearing should the Court view such exercise as useful.  Ultimately, as detailed herein, given the totality of the circumstances, it is clear that shortening the Debtors' deadline to assume or reject the Lease would be unreasonable and premature.

assess a plethora of factors to inform their assumption or rejection decision, including, among others, the following:  (a) the likelihood that a buyer will come forward that will honor the Lease once an appropriate marketing process has been conducted; (b) the possibility of the Debtors building the theater on the Premises in the absence of any such buyer; (c) the projected future profitability of a theater built on the Premises; (d) the likelihood and potential value of an acceptable settlement agreement, including one that might facilitate the long-term operation of the Lloyd Center 10 & IMAX; (e) the value of the liquidated damages claim and any other claims in the Receivership Action; (f) the value of any other claims and causes of action that might be asserted against Keystone or other parties in interest outside of the Receivership Action; and (g) the likelihood of success in Eastgate's opposition to the Rejection Notice under Oregon law.

27.     The Receiver's flawed logic continues that "[u]nlike most of the leases referenced in the Motion to Extend, this Lease does not involve a situation in which the Debtors need to analyze theater attendance numbers or consider whether the property otherwise fits into the Debtors' operations."  Mot. ¶ 20.  That is not accurate, given that the Debtors are evaluating their portfolio with an eye towards future attendance and operations.  Moreover, the Debtors' analysis is by no means limited to any such factors.  Indeed, section 365 of the Bankruptcy Code does not prescribe any specific factors the Debtors must consider when making a decision to assume or reject.  To the contrary, the Fifth Circuit has held that a debtor's decision to assume or reject an unexpired lease is subject to the deferential "business judgement rule."  *See In re J. C. Penney Direct Mktg. Servs., L.L.C.*, 50 F.4th 532, 534 (5th Cir. 2022).  Under the business judgement rule, courts focus their evaluation on whether the debtor's decision to assume or reject enhances the debtor's estate generally—not any specific metric.  *Id.* ("The correct inquiry under the business judgment standard is whether the debtor's decision regarding executory contracts

benefits the debtor, not whether the decision harms third parties.").  It is true that the Debtors may look to attendance numbers and related metrics as part of their evaluation, but the assumption and rejection analysis encompasses many additional factors, especially with respect to the Lease.

28.     While the Debtors appreciate that the Receiver is eager to obtain finality with respect to the Lease, this Court already ruled through the 365(d)(4) Order that the facts and circumstances of these chapter 11 cases warranted an extension of the Debtors' deadline to assume or reject their unexpired leases.  The Debtors require that time to make decisions as to their lease portfolio as a whole and to assess the complexities of this particular Lease.  Granting the Motion would unreasonably disrupt the Debtors' ongoing holistic lease review and negotiation process and cost the Debtors time and expense that could otherwise be put towards driving their lease optimization process forward and maximizing value for the benefit of their estates.

## Conclusion

29.     The Receiver seeks relief that is not available under the Bankruptcy Code and is unreasonable under the totality of the circumstances.  This Court should not condone Keystone and the Receiver's efforts to sidestep their contractual and statutory obligations and deprive the Debtors of valuable rights to the detriment of their estates.  For the foregoing reasons, the Motion should be denied.

Based on the foregoing, the Debtors request that the Motion be denied with prejudice.

Houston, Texas
Dated:  February 3, 2023

/s/  *Matthew D. Cavenaugh*

| | |
|---|---|
| **JACKSON WALKER LLP** | **KIRKLAND & ELLIS LLP** |
| Matthew D. Cavenaugh (TX Bar No. 24062656) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Rebecca Blake Chaikin (TX Bar No. 24133055) | Joshua A. Sussberg, P.C. (admitted *pro hac vice*) |
| Veronica A. Polnick (TX Bar No. 24079148) | Christopher Marcus, P.C. (admitted *pro hac vice*) |
| Vienna Anaya (TX Bar No. 24091225) | Christine Okike, P.C. (admitted *pro hac vice*) |
| 1401 McKinney Street, Suite 1900 | Ciara Foster (admitted *pro hac vice*) |
| Houston, TX 77010 | 601 Lexington Avenue |

JACKSON WALKER LLP
Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Veronica A. Polnick (TX Bar No. 24079148)
Vienna Anaya (TX Bar No. 24091225)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                rchaikin@jw.com
                vpolnick@jw.com
                vanaya@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Christine Okike, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                christopher.marcus@kirkland.com
                christine.okike@kirkland.com
                ciara.foster@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on February 3, 2023, I caused a copy of the forgoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Matthew D. Cavenaugh
_____
Matthew D. Cavenaugh

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>CINEWORLD GROUP PLC, *et al.*,[1]<br><br>                         Debtors. | ) Chapter 11<br>)<br>) Case No. 22-90168 (MI)<br>)<br>) (Jointly Administered)<br>)<br>) **Re: Docket No. 1183** |

───────────────────────────────────────────────

**ORDER DENYING MOTION TO COMPEL REJECTION OF LEASE**

Upon consideration of the *Motion to Compel Rejection of Lease* [Docket No. 1183]

(the "<u>Motion</u>") filed by CAPREF Lloyd Center East LLC, by and through CFO Solutions, LLC

d/b/a Amplēo, its court-appointed receiver, and the Debtors' Objection to the Motion

(the "<u>Objection</u>"), for good cause shown, it is HEREBY ORDERED THAT:

1.     The Debtors' Objection is sustained, and the Motion is hereby DENIED.

It is so ORDERED.

Dated: _____, 2023

────────────────────────────────
MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

───────────────────────────

[1]    A complete list of each of the above-captioned debtors and debtors in possession (the "<u>Debtors</u>") in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/cineworld.  The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is:  8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

## Exhibit A

**Grewe Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) Case No. 22-90168 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **RE:  Docket No. 1183** |

**DECLARATION OF GERALD M. GREWE IN SUPPORT OF
DEBTORS' OBJECTION TO MOTION TO COMPEL REJECTION OF LEASE**

I, Gerald M. Grewe, hereby declare as follows:

1.      I am a Vice President of Real Estate for Debtor Regal Cinemas, Inc. ("Regal"), the parent corporation of Eastgate.  I have served in that role since 1994, originally with Regal's predecessor.  Accordingly, I am knowledgeable and familiar with the Debtors' real estate portfolio, including the Lease.  Moreover, I led the negotiations of the Settlement Agreement and the Lease, and I am knowledgeable and familiar with the terms thereof.  I submit this declaration (this "Declaration") in support of the Objection to which this Declaration is attached.[2]  I have reviewed and am familiar with the Motion and the Objection.

2.      The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have obtained from the Debtors' employees or advisors, or from the Debtors' records maintained in the ordinary course of their

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/cineworld.  The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection.

business.  I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors.

If called upon to testify, I could and would testify competently to the facts set forth herein.

* * * * *

3.      Eastgate, as tenant, and CAPREF East, as landlord, are parties to the Lease.  A true

and correct copy of the Lease is attached hereto as **Exhibit 1**.  The Lease is for the Premises

situated on a portion of the East Anchor Parcel of the Lloyd Center Mall.  The Premises is subject

to the Receivership Action initiated by Keystone.

4.      Prior to executing the Lease, Eastgate, as tenant, and Lloyd Corporation, Ltd., as

landlord, were party to the 1985 Lease for real property located on the Superblock, which is across

NE Multnomah St. from the East Anchor Parcel.  Eastgate currently operates the Lloyd Center 10

& IMAX Theater on the Superblock pursuant to the 1985 Lease, but the 1985 Lease is set to expire

on December 31, 2026.  On or about June 11, 2013, CAPREF Lloyd purchased the Superblock

and became Eastgate's landlord under the 1985 Lease.

5.      On or about October 8, 2014, CAPREF Lloyd entered into a Purchase and Sale

Agreement to sell the Superblock, including the parking lot that was used by Eastgate's theater

patrons.  A dispute then arose between Eastgate and CAPREF Lloyd relating to Eastgate's valuable

parking rights on the Superblock.  On November 13, 2015, Eastgate filed the Superblock Lawsuit,

seeking a declaratory judgement and injunction to preserve its parking rights on the Superblock.

6.      During the pendency of the Superblock Lawsuit, Eastgate, CAPREF Lloyd, and

affiliates of CAPREF Lloyd engaged in settlement discussions and negotiations for a new theater

lease between Eastgate and CAPREF East, an affiliate of CAPREF Lloyd which owned the East

Anchor Parcel.  Eastgate spent a significant amount of money working with attorneys to negotiate

the Settlement Agreement and the Lease.  On or about November 1, 2017, the parties to

2

the Superblock Lawsuit entered into the Settlement Agreement, a copy of which is attached hereto as **Exhibit 2**.

7.      Under the Settlement Agreement, Eastgate agreed to forego its right to parking on the Superblock so that CAPREF Lloyd could complete its sale of the Superblock.  The loss of parking rights on the Superblock created significant inconvenience to Eastgate and its Customers.  However, Eastgate believed that the long-term benefits of the Settlement Agreement would outweigh the immediate determent.  In addition, Eastgate agreed not to exercise its option to renew the 1985 Lease.  In exchange, Eastgate was promised a new theater on the East Anchor Parcel.  Eastgate agreed to the Settlement Agreement because, among other things, the existing Lloyd Center 10 & IMAX theater was profitable notwithstanding its age, and Eastgate believed a new theater in the strategic Portland location would derive substantial long-term value.

8.      On November 1, 2017, in conjunction with entry into the Settlement Agreement, the parties entered into the Lease, the SNDA, and various ancillary documents to establish the parties' rights relating to the real property.  Various CAPREF affiliated entities signed joinder agreements, whereby each entity acknowledged the Lease and Eastgate's rights.  These joinders were necessary because the various CAPREF entities, all of which were related and owned by the same parent company, held title to different parts of the Lloyd Center Mall property.

9.      On November 2, 2017, a Memorandum of Lease was recorded in the real property records of Multnomah County.  A true and correct copy of the recorded Memorandum of Lease is attached hereto as **Exhibit 3**.

10.     Under the terms of the Lease, CAPREF East agreed to undertake the planning, permitting, and construction work necessary to convert a portion of the East Anchor Parcel into a movie theater for the benefit of Eastgate, and to use reasonably diligent efforts to complete that

3

work on or before March 1, 2019.  In preparation, Eastgate spent substantial sums of money working with design professions to design the new theater.  Pursuant to the Lease, if the construction work on the new theater was not completed by October 1, 2020, Eastgate would be entitled to liquidated damages in the amount of $10 million.  At page 89 of the Lease, Keystone executed a Consent of Lender, whereby it consented to the terms of the Lease.

11.    In addition, on November 2, 2017, the SNDA was recorded in the real property records of Multnomah County.  A true and correct copy of the recorded SNDA is attached hereto as **Exhibit 4**.

12.    Under the terms of the SNDA, Keystone agreed that, among other things, Eastgate's rights and privileges under the Lease would not be terminated, diminished, or disturbed by Keystone "for any reason whatsoever, including, without limitation, by virtue of any action taken by [Keystone] in the exercise of any of its rights or remedies" under its mortgage documents with CAPREF East.  In addition, Keystone agreed that, among other things, the Lease "shall not be terminated or affected by the exercise of any right or remedy provided for" in Keystone's mortgage documents with CAPREF East.

13.    CAPREF East did not build Eastgate the new theater on or before October 1, 2020, as required under the Lease, and is therefore in default thereof.  However, given (a) the challenges associated with the COVID-19 pandemic, (b) the limited likelihood of recovering the $10 million liquidated damages from CAPREF East, and (c) the long-term benefit of maintaining a possessory interest in the Premises, among other things, Eastgate chose to reserve its option to terminate the Lease and collect the liquidated damages and instead continued to negotiate with CAPREF East.  Eastgate is not in default of the Lease or any other obligation to CAPREF East.

14.     Upon information and belief, CAPREF East then defaulted under its mortgage with Keystone.  On March 24, 2022, Keystone initiated the Receivership Action.  Keystone—the primary beneficiary of the Receivership Action—did not provide any notice to Eastgate notwithstanding its knowledge of the Lease and its goal of utilizing the Receivership Action to reject the Lease.  Keystone failed to disclose to the state court in its Complaint, Motion of Appointment of Receiver, or any of the supporting declarations that it had contractual obligations under the SNDA and Consent of Lender that precluded Keystone from exercising default remedies in a manner that would harm Eastgate's interests under the lease.  Eastgate only became aware of the Receivership Action after I informally became aware of the proceeding and relayed the information.  Once Eastgate filed its Notice of Appearance and Motion for Leave to Intervene in the Receivership Action, over two months had passed since Keystone had filed its Motion for Appointment of Receiver.  During those two months, Keystone obtained entry of an order appointing the Receiver on April 15, 2022.

15.     On June 3, 2022, the Receiver filed a Rejection Notice related to the Lease.  On July 11, 2022, Eastgate filed its opposition to the Rejection Notice.  A hearing was scheduled for September 8, 2022 on the Rejection Notice but has been stayed since the commencement of these chapter 11 cases.

Dated:  February 3, 2023                    /s/ *Gerald M. Grewe*
                                            _____
                                            Gerald M. Grewe
                                            Vice President of Real Estate
                                            Regal Cinemas, Inc.

**<u>Exhibit 1</u>**

**Lease**

# LEASE

between

**CAPREF LLOYD CENTER EAST LLC,**
a Delaware limited liability company
8333 Douglas Avenue, Suite 975, Dallas, Texas  75225
Attention: Lloyd Center Asset Management

as Landlord

and

**EASTGATE THEATRE, INC.,**
an Oregon corporation,
7132 Regal Lane, Knoxville, Tennessee 37918
Attention:  Real Estate Department
as Tenant

at

Lloyd Center Stadium 14
Lloyd Center,
2201 Lloyd Center, Portland, Oregon  97232,
Portland,
Multnomah County,
Oregon

Dated ~~May~~ November 1, 2017

# TABLE OF CONTENTS

Page

ARTICLE 1 GENERAL DEFINITIONS ......................................................................... 1

ARTICLE 2 PREMISES; TERM; OPTIONS TO EXTEND ........................................ 7

2.1    Lease of Theatre. ....................................................................................... 7
2.2    Options to Extend. ..................................................................................... 7
2.3    Security Deposit. ........................................................................................ 8
2.4    Changes to Center. .................................................................................... 8
2.5    Parking. ....................................................................................................... 9
2.6    Events. ....................................................................................................... 15
2.7    Suitability. ................................................................................................. 16
2.8    Tenant Representations. .......................................................................... 20
2.9    Encroachment Easement. ........................................................................ 21

ARTICLE 3 CONSTRUCTION ................................................................................... 21

3.1    Construction Definitions and Overview. .............................................. 21
3.2    Development Approvals. ......................................................................... 26
3.3    Theatre Plans. ........................................................................................... 27
3.4    Essential Contingencies. ......................................................................... 31
3.5    Landlord's Work. ...................................................................................... 32
3.6    Staging Area. ............................................................................................ 38
3.7    Tenant's Work. ......................................................................................... 38
3.8    Mechanic's Liens. ..................................................................................... 39
3.9    Insurance. .................................................................................................. 40
3.10   Access. ....................................................................................................... 40
3.11   Future Construction. ............................................................................... 40

ARTICLE 4 RENT ........................................................................................................ 41

4.1    Rent. ........................................................................................................... 41
4.2    Certificate of Occupancy. ....................................................................... 41
4.3    Base Rent. .................................................................................................. 41
4.4    Contribution Rent. ................................................................................... 42
4.5    Percentage Rent. ...................................................................................... 43

ARTICLE 5 CO-TENANCY .......................................................................................... 46

5.1    Opening Co-Tenancy. .............................................................................. 46
5.2    Co-Tenancy Deficiency Rent .................................................................. 47
5.3    On-Going Co-Tenancy. ............................................................................ 48

ARTICLE 6 UTILITIES AND SERVICES ................................................................. 48

6.1    Utilities. ............................................................................................................... 48
6.2    Charges for Utility Services. ............................................................................... 49
6.3    Trash Removal. ..................................................................................................... 49

ARTICLE 7 USE OF PREMISES ............................................................................................. 50

7.1    Use and Trade Name. ........................................................................................... 50
7.2    Trade Names ......................................................................................................... 51
7.3    Satellite Dishes; Ticket Machines; Poster Cases. .............................................. 51
7.4    Hours. .................................................................................................................... 52
7.5    Alterations. ........................................................................................................... 53
7.6    Landlord's Covenants............................................................................................ 53
7.7    Prohibited Uses and Restricted Uses. ................................................................. 56
7.8    Covenants, Conditions and Restrictions. ............................................................ 57
7.9    Legal Requirements. ............................................................................................. 57
7.10   Security.................................................................................................................. 57

ARTICLE 8 TAXES AND ASSESSMENTS ............................................................................. 58

8.1    Definitions. ........................................................................................................... 58
8.2    Payment of Center Taxes By Landlord. .............................................................. 58
8.3    Tax Charge. ........................................................................................................... 58

ARTICLE 9 COMMON AREAS ............................................................................................... 59

9.1    Use of Common Areas. ........................................................................................ 59
9.2    CAM Obligation. .................................................................................................. 59
9.3    CAM Expenses...................................................................................................... 60
9.4    CAM Charge. ........................................................................................................ 60

ARTICLE 10 PROMOTION OF THEATRE.............................................................................. 61

ARTICLE 11 INDEMNITY AND INSURANCE....................................................................... 61

11.1   Tenant's Insurance. .............................................................................................. 61
11.2   Indemnity............................................................................................................... 62
11.3   Mutual Waivers. ................................................................................................... 63
11.4   Landlord's Insurance. ........................................................................................... 63
11.5   No Insurance Charge. ........................................................................................... 64

ARTICLE 12 DAMAGE OR DESTRUCTION ......................................................................... 64

12.1   Duty to Reconstruct Following Casualty. ........................................................... 64
12.2   Duty to Repair or Replace Equipment................................................................. 65
12.3   Right to Terminate................................................................................................ 65
12.4   Abatement of Rent................................................................................................ 66

ARTICLE 13 MAINTENANCE ................................................................................................. 66

13.1    Landlord's Maintenance. ................................................................................ 66
13.2    Tenant's Maintenance. ................................................................................. 68
13.3    Right of Access to the Theatre. .................................................................. 68

ARTICLE 14 TENANT'S PROPERTY AND SIGNS ............................................................ 69

14.1    Tenant's Property. ....................................................................................... 69
14.2    Tenant's Signs. ............................................................................................ 69

ARTICLE 15 ASSIGNMENT AND SUBLETTING ............................................................... 70

15.1    Consent Required ........................................................................................ 70
15.2    Permitted Transfers. ................................................................................... 70
15.3    Release. ........................................................................................................ 71

ARTICLE 16 DEFAULTS BY TENANT ............................................................................... 71

16.1    Events of Default. ........................................................................................ 71
16.2    Remedies and Damages. ............................................................................. 72
16.3    Mitigation. ................................................................................................... 73
16.4    Emergencies. ............................................................................................... 73
16.5    Default Rate. ................................................................................................ 74

ARTICLE 17 LIABILITY OF PARTIES ............................................................................... 74

17.1    Landlord. ..................................................................................................... 74
17.2    Tenant. ......................................................................................................... 75
17.3    Guaranty. ..................................................................................................... 76

ARTICLE 18 SUBORDINATION, ATTORNMENT AND NON-DISTURBANCE
            AGREEMENT ................................................................................................ 76

ARTICLE 19 ESTOPPEL CERTIFICATES ........................................................................... 76

ARTICLE 20 QUIET ENJOYMENT ..................................................................................... 77

ARTICLE 21 SURRENDER AND HOLDING OVER ............................................................ 77

21.1    Delivery After Term. .................................................................................. 77
21.2    Effect of Holding Over. .............................................................................. 77

ARTICLE 22 CONDEMNATION .......................................................................................... 78

22.1    All or Any Part of Theatre Taken. .............................................................. 78
22.2    Taking of Parking Spaces. .......................................................................... 78
22.3    Ownership of Award. .................................................................................. 79

ARTICLE 23 HAZARDOUS MATERIAL .............................................................................. 79

23.1    Definitions. ................................................................................................. 79
23.2    Warranties and Representations. ................................................................ 80
23.3    Affirmative Covenants. ............................................................................... 80

ARTICLE 24 MISCELLANEOUS ........................................................................... 81

24.1    Interpretation. ............................................................................................. 81
24.2    Notices. ........................................................................................................ 82
24.3    Successors. .................................................................................................. 83
24.4    Brokers. ....................................................................................................... 83
24.5    Unavoidable Delays. .................................................................................. 84
24.6    Severability. ................................................................................................ 84
24.7    Time of Essence. ......................................................................................... 84
24.8    Applicable Law. .......................................................................................... 84
24.9    Waiver. ......................................................................................................... 84
24.10   Recording. ................................................................................................... 85
24.11   Limited Joinders. ........................................................................................ 85
24.12   Entire Agreement. ....................................................................................... 86
24.13   Attorneys' Fees. .......................................................................................... 86
24.14   Acceptance of Less Than Full Payment. .................................................. 87
24.15   Mutual Execution. ....................................................................................... 87
24.16   Counterparts. .............................................................................................. 87
24.17   Survival of Obligations. ............................................................................. 87

**TABLE OF EXHIBITS**

Exhibit A-1   Legal Description of the East Anchor Parcel

Exhibit A-2   Legal Description of the Enclosed Mall Parcels

Exhibit B-1   Entire Development Site Plan

Exhibit B-2   Center Site Plan

Exhibit C     Theatre Layout Plan

Exhibit D     Work Matrix

Exhibit E     Non-Disturbance Agreement

Exhibit F     Memorandum of Lease

Exhibit G     Theatre Elevation Drawings

Exhibit H     Intentionally Omitted

Exhibit I     Guaranty

Exhibit J     Existing Prohibited Uses and Restricted Uses

Exhibit K     Limited Joinder of CAPREF Lloyd II

Exhibit L     Limited Joinder of CAPREF Lloyd Center Anchor

Exhibit M     Letter of Credit

# TABLE OF DEFINITIONS

Page

Acknowledged Brokers ..................................................................................................... 83
Actual Opening Date ......................................................................................................... 1
Affiliate ............................................................................................................................. 1
Alcohol Approvals ............................................................................................................ 22
Annual Gross Sales Report ............................................................................................... 44
Applicable Exclusions and Deductions ............................................................................ 43
Approved Theatre Change Order ...................................................................................... 30
Approved Theatre Plans .................................................................................................... 22
Assignment Criteria .......................................................................................................... 70
Base Building Plans .......................................................................................................... 22
Base Rent .......................................................................................................................... 42
Box Office Receipts .......................................................................................................... 43
Breakpoint ......................................................................................................................... 44
Business Days .................................................................................................................... 1
CAM Expenses .................................................................................................................. 60
CAM Obligation ............................................................................................................... 59
CAPREF Lloyd Center ..................................................................................................... 1
CAPREF Lloyd Center Anchor ........................................................................................ 1
CAPREF Lloyd II .............................................................................................................. 1
CC&Rs ............................................................................................................................... 1
Center ................................................................................................................................ 2
Center Sign Structure ........................................................................................................ 70
Center Site Plan ................................................................................................................ 2
CERCLA ........................................................................................................................... 79
Certificate of Occupancy .................................................................................................. 2
Claims ............................................................................................................................... 62
Closeout Documentation ................................................................................................... 22
Common Area Plans .......................................................................................................... 22
Common Areas .................................................................................................................. 2
Common Areas Work ........................................................................................................ 22
Comparable Theatre .......................................................................................................... 29
Completion Notice ............................................................................................................ 33
Concession Receipts ......................................................................................................... 44
Concession Use Covenant ................................................................................................. 54
Construction Schedule ...................................................................................................... 33
Contribution Rent .............................................................................................................. 42
Co-Tenancy Deficiency Rent ............................................................................................ 47
Default Rate ...................................................................................................................... 74
Delivery Date .................................................................................................................... 22
Design Review Application ............................................................................................... 22
Design Review Approvals ................................................................................................. 22
Designated Mall Entrance ................................................................................................. 12
Development Approvals .................................................................................................... 22
Development Approvals Date ........................................................................................... 23

East Anchor Parcel..........................................................................................................2
East Anchor Parcel ALTA Survey..................................................................................17
East Anchor Parcel Existing Title Assurance..................................................................16
East Parking Lot.............................................................................................................3
Effective Date ................................................................................................................1
Enclosed Mall Owner.....................................................................................................3
Enclosed Mall Parcels....................................................................................................3
Enclosed Mall Parcels and West Anchor Parcel ALTA Survey ......................................17
Enclosed Mall Parcels and West Anchor Parcel Existing Title Assurance ......................16
Encroachment Easement.................................................................................................3
Encroachment Easement Area.........................................................................................3
Entire Development.........................................................................................................3
Entire Development Site Plan..........................................................................................3
Essential Contingencies.................................................................................................23
Essential Contingencies Date.........................................................................................23
Estimated Restoration Date............................................................................................64
Estoppel Certificate.......................................................................................................76
Event of Default............................................................................................................71
Existing Lender.............................................................................................................18
Existing Restrictions......................................................................................................57
Existing Theatre............................................................................................................32
Expiration Date ..............................................................................................................3
Extension Exercise Notice...............................................................................................7
Extension Non-Receipt Notice.........................................................................................7
Extension Period.............................................................................................................7
Exterior Theatre Signs...................................................................................................69
Final Delivery Deadline.................................................................................................35
Final Delivery Deadline Liquidated Damages Amount...................................................35
Final Delivery Deadline Liquidated Damages Demand...................................................35
Final Punchlist Completion Deadline.............................................................................33
First Class......................................................................................................................3
Force Majeure Event.......................................................................................................3
Future Construction.......................................................................................................40
GLA...............................................................................................................................4
GLA of the Center..........................................................................................................4
GLA of the Theatre.........................................................................................................4
Grand Opening Events.....................................................................................................4
Gross Sales...................................................................................................................44
Gross Sales Information.................................................................................................45
Guaranty.......................................................................................................................76
Hazardous Materials......................................................................................................79
Hazardous Materials Contamination...............................................................................79
Incidental Use...............................................................................................................50
Indemnification Costs....................................................................................................80
KREF..............................................................................................................................4
KREF Loan Encumbrance................................................................................................4

Land ................................................................................................................................ 2
Landlord .......................................................................................................................... 1
Landlord Contribution ................................................................................................... 39
Landlord Parties ............................................................................................................. 81
Landlord's Plans ............................................................................................................ 23
Landlord's Property Insurance ...................................................................................... 63
Landlord's Work ............................................................................................................ 23
Lease ............................................................................................................................... 1
Legal Requirements ......................................................................................................... 4
Limited Joinders ............................................................................................................ 85
Liquidated Damages L/C ............................................................................................... 35
Loan Encumbrance ........................................................................................................ 76
Loan Encumbrance Holder ............................................................................................ 76
Lot Adjustment Application ........................................................................................... 24
Lot Adjustment Approval .............................................................................................. 24
Macy's ............................................................................................................................. 5
Macy's Lease ................................................................................................................... 5
Macy's Parking Management Plan .................................................................................. 5
Macy's Premises .............................................................................................................. 5
Mechanic's Lien ............................................................................................................. 39
Memorandum of Lease ................................................................................................... 85
Monthly Gross Sales Report .......................................................................................... 44
No Change Area ............................................................................................................... 8
North Parcels ................................................................................................................... 5
Northeast Parking Deck ................................................................................................... 5
Notice ............................................................................................................................. 82
Official Records ............................................................................................................... 5
On-Going Co-Tenancy Failure Period .......................................................................... 48
On-Going Co-Tenancy Requirement ............................................................................. 48
On-Going Co-Tenancy Satisfaction Notice ................................................................... 48
Opening Co-Tenancy Failure Period ............................................................................. 46
Opening Co-Tenancy Requirement ................................................................................ 46
Opening Co-Tenancy Satisfaction Notice ..................................................................... 46
Parking Retention Areas .................................................................................................. 9
Parties .............................................................................................................................. 5
Party ................................................................................................................................. 5
Payment Demand ........................................................................................................... 76
Pending Action ............................................................................................................... 37
Percentage Rent .............................................................................................................. 44
Permitted Closures ........................................................................................................... 5
Permitted Parking Development Area ............................................................................ 13
Permitted Punchlist Items .............................................................................................. 24
Permitted Use ................................................................................................................. 50
Primary Use .................................................................................................................... 50
Prohibited Uses .............................................................................................................. 56
Property Tax Year ........................................................................................................... 58

Property Taxes ......................................................................................................... 58
Proximate Sales Area ............................................................................................. 54
Punchlist ................................................................................................................. 33
Punchlist Completion Deadline ............................................................................. 33
Punchlist Completion Reimbursement ................................................................... 34
Qualified L/C Issuer ............................................................................................... 35
Rejected Right of First Offer ................................................................................. 34
Release Criteria ...................................................................................................... 71
Removal Period ....................................................................................................... 77
Rent ......................................................................................................................... 6
Rent Commencement Date ...................................................................................... 6
Rent Taxes .............................................................................................................. 58
Rent Term ................................................................................................................ 6
Rent Year ................................................................................................................ 6
Representative ......................................................................................................... 45
Required Opening Date ........................................................................................... 52
Required Operating Period ..................................................................................... 52
Restricted Change Area .......................................................................................... 8
SARA ...................................................................................................................... 79
Sears ........................................................................................................................ 6
Sears Lease .............................................................................................................. 6
Sears Premises ........................................................................................................ 6
Self-Help Cost Statement ....................................................................................... 67
Self-Help Work ....................................................................................................... 67
South SuperBlock Parcels ...................................................................................... 6
Southeast Parking Deck .......................................................................................... 6
Special Form Property Insurance ........................................................................... 61
Special Rent ............................................................................................................ 55
Staging Area ............................................................................................................ 38
Substantial Completion ........................................................................................... 24
Substantially Complete ........................................................................................... 24
Substantially Completed ......................................................................................... 24
Taking ..................................................................................................................... 78
Target Date .............................................................................................................. 6
Tenant ...................................................................................................................... 1
Tenant Operating Permits ....................................................................................... 6
Tenant Parties ......................................................................................................... 81
Tenant's Architect ................................................................................................... 24
Tenant's Equipment ................................................................................................ 24
Tenant's Permit ....................................................................................................... 38
Tenant's Property .................................................................................................... 69
Tenant's Work ......................................................................................................... 25
Tenant's Work Access Date .................................................................................... 25
Term ........................................................................................................................ 6
Theatre ..................................................................................................................... 7
Theatre Change Order ............................................................................................. 29

Theatre Change Order Approval ................................................................................................ 30
Theatre Change Orders ............................................................................................................. 29
Theatre Construction Contract ................................................................................................. 29
Theatre Construction Costs Notice .......................................................................................... 29
Theatre Construction Hard Costs ............................................................................................. 28
Theatre Construction Work ...................................................................................................... 25
Theatre Plans ............................................................................................................................ 25
Theatre Plans Approval Date .................................................................................................... 25
Theatre Site Work ..................................................................................................................... 25
Theatre Use Covenant ............................................................................................................... 54
Theatre Work Commencement Notice Date ............................................................................. 26
Transfer ..................................................................................................................................... 70
Unacceptable Disruption .......................................................................................................... 26
Vacated NE 15th Avenue ............................................................................................................ 7
Walk-Through ........................................................................................................................... 33
West Anchor Owner .................................................................................................................... 7
West Anchor Parcel ..................................................................................................................... 7
Work Matrix .............................................................................................................................. 22

LEASE

(Lloyd Center Stadium 14, Portland, Oregon)

This Lease (the "<u>Lease</u>") is made and entered into as of ~~May~~ <u>November 1</u>, 2017 (the "<u>Effective Date</u>") between CAPREF LLOYD CENTER EAST LLC, a Delaware limited liability company (herein called "<u>Landlord</u>"), and EASTGATE THEATRE, INC., an Oregon corporation (herein called "<u>Tenant</u>").

ARTICLE 1
GENERAL DEFINITIONS

All initially capitalized terms shall have the meanings ascribed to them below or in the Sections referenced in the Table of Definitions.

1.1.1   "<u>Actual Opening Date</u>" means the day that Tenant initially opens the Theatre for business to the paying public, following and excluding any Grand Opening Events.

1.1.2   "<u>Affiliate</u>" means, with respect to any person or entity, any other person or entity which controls, is controlled by or under common control with the first person or entity.  For the purposes of this definition, control means ownership by a person or entity of more than fifty percent (50%) of the equity or economic interests of an entity.

1.1.3   "<u>Business Days</u>" means all Mondays, Tuesdays, Wednesdays, Thursdays and Fridays, except for each such day which is a federally recognized holiday in the United States of America.

1.1.4   "<u>CAPREF Lloyd II</u>" means CAPREF Lloyd II LLC, a Delaware limited liability company.

1.1.5   "<u>CAPREF Lloyd Center</u>" means CAPREF Lloyd Center LLC, a Delaware limited liability company.

1.1.6   "<u>CAPREF Lloyd Center Anchor</u>" means CAPREF Lloyd Center Anchor LLC, a Delaware limited liability company.

1.1.7   "<u>CC&Rs</u>" means that certain Construction, Operation and Reciprocal Easement Agreement dated July 19, 1990 among CAPREF Lloyd II, as successor-in-interest to SI-Lloyd Associates Limited Partnership, an Indiana limited partnership, as to the Enclosed Mall Parcels (as hereinafter defined) and as Developer (as defined in the CC&Rs), TMT Lloyd Retail, Inc., a Delaware corporation, as successor-in-interest to SI-Lloyd Associates Limited Partnership, an Indiana limited partnership, as to the North Parcels (as hereinafter defined), CAPREF Lloyd Center Anchor, as successor-in-interest to Nordstrom, Inc., a Washington corporation, as to the West Anchor Parcel (as hereinafter defined), Landlord, as successor-in-interest to Sears Roebuck and Co., a New York corporation, as to the East Anchor Parcel (as hereinafter defined), and CAPREF Lloyd Center, as successor-in-interest to SI-Lloyd Associates Limited Partnership, an Indiana limited partnership, as to the South SuperBlock Parcel (as hereinafter defined), recorded on September 5, 1990 in Book 2340, Page 1635 in the Official Records, as amended by that

1

certain unrecorded First Amendment to Construction, Operation and Reciprocal Easement Agreement dated July 6, 1995, by that certain Second Amendment to Construction, Operation and Reciprocal Easement Agreement dated March 2, 1999 and recorded January 6, 2000 as Instrument No. 2000-001863 of the Official Records, and by that certain Third Amendment to Construction, Operation and Reciprocal Easement Agreement dated May 15, 2013 and recorded June 11, 2013 at Instrument No. 2013-079097 of the Official Records.

1.1.8   "Center" means the existing retail center located at 2201 Lloyd Center, Portland, Oregon  97232 in Portland, Oregon and consisting of the Enclosed Mall Parcels (including the Macy's Premises), the West Anchor Parcel and the East Anchor Parcel collectively.  The land on which the Center is located is referred to herein as the "Land."  The legal description of the Land is set forth on Exhibit A-1 and Exhibit A-2 attached hereto.  The anticipated configuration of the Center, as of the Rent Commencement Date, including the location of the Theatre, the Parking Retention Areas and the other Common Areas, is substantially as shown on the site plan attached hereto as Exhibit B-2 (the "Center Site Plan").

1.1.9   "Certificate of Occupancy" means a final and unconditional certificate of occupancy for the Theatre or its equivalent in the applicable jurisdiction .

1.1.10   "Common Areas" means all areas, facilities and improvements, whether or not shown on the Center Site Plan, now or hereafter existing from time to time and operated or provided at or in connection with the Center, which are available for use in common by Landlord and all of the tenants and other permitted occupants of the Center (including Tenant) and their employees, customers, and invitees.  The Common Areas, as the same exist from time to time, shall include the following in the Center to the extent located outside leasable areas of the Center and other than those required to be maintained by tenants of the Center:  (a) the Parking Retention Areas and all other automobile parking areas, (b) ingress and egress ways, (c) driveways, walkways, aisles, sidewalks, curb cuts, access facilities, malls, and landscaped areas, (d) landscaping, planters, irrigation, common sanitary sewer lines, and common storm water lines and drainage, (e) means of vertical transportation, if any, including handicap accessible ramps, and corridors, stairways, escalators and elevators, if any, (f) improvements, equipment and facilities utilized to operate Common Areas, (g) site and parking area lighting, common security systems, and common fire prevention and response equipment and systems as may be required by Legal Requirements, (h) common water, gas, electric, telephone and other utility lines, systems, conduits and facilities, and (i) all other common and service areas that are not leased, licensed, or demised exclusively for the use of any tenant or occupant and that by their nature are not leasable to a tenant or occupant.  Notwithstanding anything to the contrary on the Center Site Plan, all levels of the Southeast Parking Deck and Northeast Parking Deck are included in the Common Areas.

1.1.11   "East Anchor Parcel" means that certain parcel of land designated as such on the Entire Development Site Plan, and the improvements now or hereafter located thereon, being a part of the Center and being a part of the Land, as such East Anchor Parcel is described on Exhibit A-1 attached hereto.  In the event of any conflict between the Entire Development Site Plan and Exhibit A-1, the Entire Development Site Plan shall control.  Following issuance of a Lot Line Approval in accordance with the requirements of this Lease, the East Anchor Parcel shall be modified accordingly.

2

1.1.12   "East Parking Lot" means and refers to the entirety of the existing surface parking lot designated as such on the Center Site Plan.

1.1.13   "Enclosed Mall Owner" means CAPREF Lloyd II and its successors in ownership of the Enclosed Mall Parcels, or any portion of them, subject to Section 2.5.7.

1.1.14   "Enclosed Mall Parcels" means those certain parcels of land designated as such on the Entire Development Site Plan, and the improvements now or hereafter located thereon, being a part of the Center and being a part of the Land, as such Enclosed Mall Parcels are described on Exhibit A-2 attached hereto.  In the event of any conflict between the Center Site Plan and Exhibit A-2, the Center Site Plan shall control.

1.1.15   "Encroachment Easement" means that certain Construction, Encroachment, Use, and Occupancy Easement Agreement dated on or about the date hereof between CAPREF Lloyd II, as grantor, and CAPREF East Anchor Owner, as grantee, together with that certain consent and subordination thereto by KREF Lender, as mortgagee.

1.1.16   "Encroachment Easement Area" means, collectively, those certain areas of land designated as such on the Entire Development Site Plan, and the improvements, or portion thereof, now or hereafter located thereon, being a part of the Center and being a part of the Land, as such Encroachment Easement Area is described in Exhibit D attached to the Encroachment Easement.  In the event of any conflict between the Entire Development Site Plan and Exhibit D to the Encroachment Easement, the Entire Development Site Plan shall control.

1.1.17   "Entire Development" means the North Parcels, the Center and the South SuperBlock Parcels collectively.

1.1.18   "Entire Development Site Plan" means, the site plan of the Entire Development attached hereto as Exhibit B-1, including the location of the boundaries of each legal parcel comprising the Entire Development.

1.1.19   "Expiration Date" means the last day of the Rent Term.

1.1.20   "First Class" means, (a) with respect to the Center, the manner in which existing similarly situated urban regional shopping centers in the Pacific Northwest which are generally considered to be "first class" are operated, and, (b) with respect to the Theatre, a manner in which existing similarly situated movie theaters in urban regional shopping centers in the Pacific Northwest which are generally considered to be "first class" are operated.  For the purposes of this Lease, the term "Pacific Northwest" means the States of Oregon, Idaho and Washington.

1.1.21   "Force Majeure Event" means any matter beyond the reasonable control of Landlord or Tenant, as the case may be, including, but not limited to, interference by governmental authorities (unless due to Landlord's or Tenant's failure, as the case may be, to comply with Legal Requirements), civil disturbance, strikes, lockouts, labor disputes, inability to procure labor or materials, failure of electric power, restrictive governmental laws or regulations, governmental intervention (unless due to Landlord's or Tenant's failure, as the case may be, to comply with Legal Requirements), riots, insurrection, war, fire, casualty, severe weather, acts of terrorism, and acts of God, subject to the provision that such Party's lack of funds, the

3

unavailability of a particular contractor or personnel, the inadequacy of insurance proceeds, the existence of litigation or other disputes, and delays of the delayed Party's contractor(s) shall not be deemed a Force Majeure Event.  For the purposes hereof, severe weather shall be weather patterns or activities that are not reasonably anticipated during the applicable season or period of time in the geographic area in which the Center is located and, at a minimum, must exceed the thirty (30) year return interval for such pattern or activity or event according to the National Oceanic and Atmospheric Administration for such geographic area, if and to the extent such data are available for such geographic area.

1.1.22   "GLA" means the gross leasable floor area in square feet within any buildings and any other structures for which a certificate of occupancy has been issued or is required, together with such floor area otherwise located in the Common Areas that is then occupied by a cart or kiosk under any then-effective lease or occupancy agreement, as the amount of such floor area is set forth in the lease or occupancy agreement for such cart or kiosk.  GLA of buildings and structures shall be measured (a) on each level, from the exterior face of exterior walls at floor level, and (b) from the center of interior walls that separate leasable spaces but shall exclude Common Areas between and/or separating leasable spaces.

1.1.23   "GLA of the Center" means the total GLA of the Center including without limitation the GLA of the Theatre.  For the purposes hereof, GLA of the Center shall include improvements in the Center which are occupied by tenants, or available for occupancy by tenants, or have been occupied by tenants (it being understood that any improvements which have been occupied by tenants, but which are not then occupied for any reason, shall only be excluded from the GLA of the Center effective upon commencement of the demolition thereof). The GLA of the Center shall be increased by the addition of any improvements in the Center, effective upon the later of (a) issuance of a certificate of occupancy for the tenant improvements therein or similar permit therefor and (b) occupancy thereof by a tenant which is either obligated to pay rent or is open for business to the paying public.

1.1.24   "GLA of the Theatre" means the GLA of the Theatre, which for all purposes hereof shall be deemed to be 65,000 square feet.  The GLA of the Theatre shall not be subject to measurement or re-measurement.

1.1.25   "Grand Opening Events" means the initial grand opening parties or events at the Theatre including without limitation those pursuant to which proceeds or profits are donated to one or more non-profit organizations.  Grand Opening Events shall not exceed six calendar days in the aggregate.

1.1.26   "KREF Loan Encumbrance" means that certain deed of trust dated as of October 26, 2015 recorded as Instrument No. 2015-137350 in the Official Records.

1.1.27   "KREF" means KREF Lending I LLC, a Delaware limited liability company, in its capacity as manager of the KREF Loan Encumbrance.

1.1.28   "Legal Requirements" means judicial decisions, statutes, laws, rulings, orders, rules, regulations, permits, directives or ordinances issued by any federal, state, county or municipal governmental body, bureau, department, court or agency in which is binding on and

applicable to Landlord, Tenant, the Theatre or the Land including, without limitation, the Americans with Disabilities Act.

1.1.29   "Macy's" means Macy's West Stores, Inc., as successor to The May Department Store Company, a New York corporation.

1.1.30   "Macy's Lease" means the lease between CAPREF Lloyd II, as landlord, and Macy's, as tenant, as amended or supplemented in any manner at any time, including without limitation the Macy's Parking Management Plan.

1.1.31   "Macy's Parking Management Plan" means that certain undated Parking Management Plan attached as Exhibit E to the Macy's Lease.

1.1.32   "Macy's Premises" means that portion of the Enclosed Mall Parcels leased by Macy's from CAPREF Lloyd II pursuant to the Macy's Lease.

1.1.33   "North Parcels" means those certain parcels of land designated as such on the Entire Development Site Plan, and the improvements now or hereafter located thereon.

1.1.34   "Northeast Parking Deck" means and refers to the entirety of the existing multi-level parking garage designated as such on the Center Site Plan.

1.1.35   "Official Records" means the official real property records of Multnomah County, Oregon.

1.1.36   "Parties" means, collectively, both Landlord and Tenant.  "Party" means either Landlord or Tenant, as the context suggests.

1.1.37   "Permitted Closures" means (a) any good faith discontinuance of operations as a result of any Force Majeure Event, (b) cessation of operations as the result of a permitted or approved assignment or subletting, (c) any discontinuance of operations as may be required to perform any permitted or approved alterations, construction, or remodeling, and (d) during any permitted restoration period following a casualty or Taking.  Notwithstanding anything to the contrary herein, when used in connection with the Existing Theatre, Permitted Closures shall also include any closure resulting from the inability to operate the Existing Theatre, in Tenant's reasonable judgment, because (1) of any breach by the landlord under the lease for the Existing Theatre; (2) any interruption of utilities serving the Existing Theatre; or (3) if access to or from any portion of the Existing Theatre does not satisfy Legal Requirements applicable to Tenant or to Tenant's use of the Existing Theatre, including without limitation emergency ingress or egress or utility access, or if the location of the parking for the Existing Theatre does not satisfy Legal Requirements applicable to Tenant or to Tenant's use of the Existing Theatre.  Nothing contained herein shall be construed as requiring Tenant to operate 24 hours per day at the Existing Theatre.  Tenant may operate at the Existing Theatre during the hours and on the days that Tenant deems appropriate in its sole but commercially reasonable discretion, and may alter and vary its operating hours as it reasonably deems appropriate from time to time.

1.1.38   "Rent" means all rent and any other sums payable by Tenant to Landlord under this Lease, including without limitation Base Rent, Contribution Rent, Percentage Rent, Special Rent, and Co-Tenancy Deficiency Rent, to the extent they are applicable.

1.1.39   "Rent Commencement Date" means, subject to adjustment as otherwise provided herein, the earlier to occur of:  (a) the Actual Opening Date; and (b) the Target Date.

1.1.40   "Rent Term" or "Term" means the period commencing at 12:01 a.m. local time on the Rent Commencement Date and ending at 11:59 p.m. local time on the last date of the fifteenth (15th) Rent Year, unless sooner terminated pursuant to the express terms of this Lease, and including any Extension Period but only to the extent such Extension Period option(s) are duly and properly exercised pursuant to the terms of Section 2.2.

1.1.41   "Rent Year" means each successive twelve (12) month period occurring during the Rent Term commencing with the Rent Commencement Date.  Notwithstanding the foregoing, if the Rent Commencement Date occurs on a day other than the first day of a calendar month, then the first Rent Year extends from the Rent Commencement Date until the last day of the calendar month in which the Rent Commencement Date occurs and then for the next twelve (12) full calendar months.  For example, if the Rent Commencement Date is October 18 of a calendar year, then the first Rent Year will extend from October 18 of such calendar year to and including October 31 of the immediately succeeding calendar year.

1.1.42   "Sears" means Sears Roebuck & Co., a New York corporation.

1.1.43   "Sears Lease" means the lease between Landlord, as landlord, and Sears, as tenant, as amended or supplemented in any manner at any time.

1.1.44   "Sears Premises" means that portion of the East Anchor Parcel leased by Sears from Landlord pursuant to the Sears Lease.

1.1.45   "South SuperBlock Parcels" means those certain parcel of land designated as the "**South Superblock Parcels**" on the Entire Development Site Plan, and the improvements now or hereafter located thereon.

1.1.46   "Southeast Parking Deck" means and refers to the entirety of the existing multi-level parking garage designated as "**Southeast Parking Deck**" on the Center Site Plan.

1.1.47   "Target Date" means the date which is ninety (90) calendar days after the Delivery Date, subject to the provision that one (1) day shall be added thereto for each day (or partial day) of delay in the completion of Tenant's Work after the Delivery Date that is caused solely by Landlord (or by Landlord's employees, contractors, vendors or other representatives) or by a Force Majeure Event.

1.1.48   "Tenant Operating Permits" means any license required from the Multnomah County Department of Environmental Health Services to sell or serve food or beverages in the Premises, specifically not including the Alcohol Approvals, and any business license required from the City of Portland to conduct business generally within the City of Portland.

1.1.49  "Theatre" means the multiple-auditorium motion picture theatre to be constructed at the Center pursuant to this Lease.  The Theatre will contain not fewer than twelve (12) auditoriums and approximately 1,530 seats as of the Actual Opening Date.  A preliminary layout plan, showing the anticipated configuration of the Theatre, has been agreed to by the Parties and is set forth on Exhibit C attached hereto.  The exterior of the Theatre shall be as shown on the building elevation drawings attached hereto as Exhibit G, subject to changes reasonably required by the Design Review Approval.

1.1.50  "Vacated NE 15th Avenue" means that portion of the Center designated as NE 15th Street (Vacated) on the Center Site Plan.

1.1.51  "West Anchor Owner" means CAPREF Lloyd Center Anchor and its successors in ownership of the West Anchor Parcel, or any portion thereof.

1.1.52  "West Anchor Parcel" means that certain parcel of land designated as such on the Entire Development Site Plan, and the improvements now or hereafter located thereon.

ARTICLE 2
PREMISES; TERM; OPTIONS TO EXTEND

2.1   Lease of Theatre.

Landlord hereby grants, demises and leases unto Tenant the Theatre, together with all non-exclusive rights and privileges in and to the Common Areas appurtenant thereto, and Tenant hereby leases and takes from Landlord the Theatre, together with all non-exclusive rights and privileges in and to the Common Areas appurtenant thereto, from and after the Effective Date until the expiration of the Term, at the rent, and upon and subject to the covenants, conditions and other terms set forth herein.

2.2   Options to Extend.

Tenant shall have three (3) options to extend the Rent Term for a corresponding three (3) successive and consecutive periods of five (5) Rent Years each (each such period being herein referred to herein as an "Extension Period") on the same terms, covenants and conditions as set forth in this Lease, including the amounts of Rent as specified for such period in this Lease.  To effectively exercise an option for an Extension Period, Tenant shall deliver to Landlord written notice of Tenant's election to exercise the option (each "Extension Exercise Notice") at least one hundred eighty (180) days, but no more than three hundred sixty-five (365) days prior to the expiration of the then-current Term, as theretofore extended.  If Landlord does not receive an Extension Exercise Notice within such time or in such manner, Landlord shall deliver to Tenant written notice (the "Extension Non-Receipt Notice") at any time prior to the expiration of the then-current Term, which shall include the following statement in conspicuous boldface type: **"LANDLORD HAS NOT RECEIVED AN EXTENSION EXERCISE NOTICE WITHIN THE TIME PROVIDED IN SECTION 2.2 OF THAT CERTAIN LEASE DATED AS OF** November 1, **2017 BETWEEN CAPREF LLOYD CENTER EAST LLC AND EASTGATE THEATRE, INC. FOR PREMISES LOCATED AT 2201 Lloyd Center, Portland, Oregon 97232, Portland, Oregon**."  Notwithstanding anything to the contrary herein, Tenant may deliver to Landlord an Extension Exercise Notice within fifteen (15) calendar days after receipt

7

of the Extension Non-Receipt Notice, and delivery of such notice shall be treated for all purposes as a valid election to exercise the option for the next Extension Period.  If Tenant does not deliver an Extension Exercise Notice within the time provided in this <u>Section 2.2</u>, then Tenant shall be conclusively deemed to have waived any right to further extend the Rent Term.

2.3     <u>Security Deposit.</u>

Tenant shall not be required to place, make or provide to Landlord any advance payment, deposit, letter of credit or other security for performance of Tenant's obligations under this Lease, other than the Guaranty.

2.4     <u>Changes to Center.</u>

2.4.1     <u>No Change Area</u>.  Landlord covenants that neither Landlord nor Enclosed Mall Owner shall make any material change within those portions of the Center designated as "**No Change Area**" on the Center Site Plan (the "<u>No Change Area</u>") from those improvements shown within the No Change Area on the Center Site Plan, either before or after construction of improvements thereon, other than changes within the building envelopes within the No Change Area shown therein, without the prior written consent of Tenant, which consent may be given or withheld in Tenant's sole discretion.

2.4.2     <u>Restricted Change Area</u>.  Landlord covenants that neither Landlord nor CAPREF Lloyd II shall make any material change within those portions of the Center designated as "**Restricted Change Area**" on the Center Site Plan (the "<u>Restricted Change Area</u>") from those improvements shown within the Restricted Change Area on the Center Site Plan, either before or after construction of improvements thereon, other than changes within the building envelopes within the Restricted Change Area shown therein, without the prior written consent of Tenant, which consent shall not be unreasonably withheld, conditioned, or delayed.

2.4.3     <u>Other Areas</u>.  Landlord may freely make or consent to changes within those portions of the Center other than the No Change Area and the Restricted Change Area as Landlord deems appropriate, in Landlord's sole discretion, subject to compliance with <u>Section 2.4.4</u> and any other requirements of this Lease.  Tenant hereby acknowledges and agrees that, except as otherwise expressly provided in this Lease, the Center Site Plan does not itself constitute any covenant, representation, or warranty by Landlord as to the design, occupancy, or size of the Center or any portion thereof or any other matter.  Except as otherwise expressly provide in this Lease, to the extent any owner(s) and/or any tenant(s) of any of floor area is/are identified or depicted on the Center Site Plan, such identification and/or depiction is for ease of reference only is not intended and shall not be construed to be any covenant, representation, or warranty of Landlord as to the actual ownership, occupancy, tenancy, or operation of any portion of the Center either on the Effective Date hereof or at any time thereafter.

2.4.4     <u>General Restrictions</u>.  Notwithstanding anything herein to the contrary, Landlord covenants that neither Landlord nor Enclosed Mall Owner shall suffer or allow changes within the Center from those improvements which are shown on the Center Site Plan which are likely to: (a) materially adversely affect the visibility of the Theatre (including signs thereon) from NE Multnomah Street or from the Common Areas from which the Theatre is visible on the Actual

8

Opening Date (other than (a) development of the Permitted Parking Development Area pursuant to Section 2.5.7 and (b) construction of an addition adjacent to the south side of the building that currently includes the Macy's Premises (the "Macy's Expansion Area") in the area designated as "**Future Development Area**" on the Center Site Plan); (b) materially adversely affect vehicular access to and through the Parking Retention Areas; (c) materially adversely affect pedestrian access to and through the Parking Retention Areas and the Theatre; (d) materially adversely affect the use of the automobile parking spaces, drive ways, lighting, curbs, walkways and other improvements of the Parking Retention Areas for the ordinary and customary uses thereof; or (e) otherwise materially adversely affect Tenant's business operations.  Landlord covenants that Landlord and Enclosed Mall Owner shall maintain landscaping in the Center in a manner that does not obstruct in any material manner the visibility of the Theatre (including Tenant's signs thereon) from NE Multnomah Street or from the Common Areas adjacent to the Theatre from which the Theatre is visible on the Delivery Date except as otherwise required by Legal Requirements, provided that Landlord shall, if and to the extent necessary to comply with the foregoing covenant, use commercially reasonable efforts to negotiate a waiver or interpretation of such Legal Requirements so as to minimize any material obstructions to such visibility with the governmental authorities having jurisdiction.

2.5     Parking.

     2.5.1     Parking Retention Areas.  Landlord covenants that, throughout the Term, Landlord and Enclosed Mall Owner shall provide the following number of parking spaces within the following described areas (the "Parking Retention Areas"):

          2.5.1.1   not fewer than 575 paved automobile parking spaces within the Southeast Parking Deck;

          2.5.1.2   not fewer than 300 paved automobile parking spaces within the Northeast Parking Deck;

          2.5.1.3   not fewer than 60 paved automobile parking spaces within Vacated NE 15th Avenue; and

          2.5.1.4   prior to construction of improvements in the Permitted Parking Development Area pursuant to Section 2.5.7.1, not fewer than 160 paved automobile parking spaces within East Parking Lot.

     Landlord covenants that, throughout the Term, Landlord and Enclosed Mall Owner shall not suffer or allow any improvements within any of the Parking Retention Areas that would reduce the number of parking spaces therein below the number referenced in the preceding sentence, or otherwise suffer or allow any reduction in the number of parking spaces referenced therein.

     2.5.2     Other Parking Areas.

          2.5.2.1   Landlord covenants that, throughout the Term, Landlord and Enclosed Mall Owner shall provide in the Common Areas an aggregate number of paved automobile parking spaces for use by the employees, customers and invitees of all tenants of the Center not

less than the greater of: (a) the number and types of paved automobile parking spaces required by the zoning code of the City of Portland; and (b) 3,000 paved automobile parking spaces.

2.5.2.2   Landlord shall not hereafter suffer or allow any material reduction by Landlord or Enclosed Mall Owner of paved automobile parking spaces within the Common Areas below such minimum unless such reduction occurs outside the Parking Retention Areas and Landlord obtains Tenant's prior written approval thereof, not to be unreasonably withheld, conditioned or delayed.  For the purposes of this Section only, the term "material reduction" shall mean any reduction of more than 50 parking spaces in any 12-month period.  In connection therewith, Landlord shall provide Tenant with reasonable written evidence that such reduction (a) will not cause an increase in the aggregate demand at peak demand intervals for paved automobile parking spaces within the Parking Retention Area above the number and types of spaces required to be maintained by Landlord within the Parking Retention Area by this Lease at any time thereafter; and (b) will not cause a reduction in the number and types of parking spaces within the Common Areas below the aggregate demand at peak demand intervals for paved automobile parking spaces within the Common Areas at any time thereafter.  Landlord shall not add, or suffer or allow Enclosed Mall Owner or CAPREF Lloyd Center Anchor to add, any new material GLA to the Center (whether by building addition or alteration or by new construction), or make, or suffer or allow Enclosed Mall Owner or CAPREF Lloyd Anchor to make, any material change of use within the Center (for example from office to medical office, or from office to retail), unless Landlord obtains Tenant's prior written approval thereof, not to be unreasonably withheld, conditioned or delayed.  For the purposes of this Section only, "material GLA" shall mean more than 15,000 square feet of GLA in any 12-month period and "material change of use" shall mean any change of use of more than 15,000 square of GLA in any 12-month period.  In connection therewith, Landlord shall provide Tenant with reasonable written evidence that such new GLA or change of use (i) will not increase the aggregate demand at peak demand intervals for paved automobile parking spaces within the Parking Retention Area above the number and types of spaces required to be maintained by Landlord within the Parking Retention Area by this Lease at any time thereafter; and (ii) will not increase the aggregate demand at peak demand intervals for paved automobile parking spaces within the Common Areas above the number and types of spaces required to be maintained by Landlord within the Common Areas by this Lease at any time thereafter.  Such written evidence shall include a written report of projected parking demand prepared by a reputable parking consultant retained by Landlord, consistent with reasonable methodologies applied generally in other urbanized areas of the United States, including those set forth in the most recent edition of the publication entitled Shared Parking, published by the Urban Land Institute, and otherwise in form and substance reasonably satisfactory to Tenant.

2.5.2.3   Notwithstanding anything to the contrary herein, Enclosed Mall Owner may at any time after the date hereof suffer and allow the fourth floor of the Macy's Premises to be converted from retail use to office use (not including use by medical/dental/vision practitioners who provide on-site patient services), subject to satisfaction of the following conditions:

(a)   Landlord covenants that Enclosed Mall Owner shall cause each tenant and other occupant of office space on any portion of such floor to execute a written lease which includes the following covenant by such tenant or other occupant: "(tenant)

10

shall use commercially reasonable efforts to cause its employees, customers and guests to park automobiles used by them primarily in the Common Areas other than the Southeast Parking Deck.  If and to the extent such employees, customers and guests park in the Southeast Parking Deck, then (tenant) shall use commercially reasonable efforts to cause them to park only in those parking spaces located within the western 1/3rd of each level of the Southeast Parking Deck, measured on each level from the westernmost interior surface of the eastern wall of the parking area of the Southeast Parking Deck to the easternmost interior surface of the western wall of the parking area of the Southeast Parking Deck."

(b)     Landlord covenants that Enclosed Mall Owner shall use other commercially reasonable efforts to prevent any such employees, customers and guests from parking automobiles used by them in any of the parking spaces located wholly or partially within the eastern 2/3rds of each level of the Southeast Parking Deck, including without limitation posting conspicuous signs in appropriate locations informing such tenants, employees, customers and guests that they may not park within such parking spaces and that Landlord may, from time to time, cause vehicles parked in violation thereof to be cited and/or towed at the expense of the owners thereof.

2.5.3    Non-Exclusive Use of Parking Areas.  Landlord covenants that, throughout the Term, Landlord and Enclosed Mall Owner shall provide each of Tenant's customers, and invitees with the non-exclusive right to use all of the automobile parking spaces within the Parking Retention Areas and Common Areas without charge in any calendar day, at any time during the business hours of Tenant, and for a period not less than one hour before and after such business hours.  Tenant shall keep Landlord reasonably informed of its business hours at the Theatre, as such hours may change from time to time.  If Tenant proposes to operate outside its then-normal business hours, such as in connection with the release of a motion picture for which exhibition at the Theatre outside of normal business hours is anticipated, Tenant shall provide Landlord with not less than 48 hours prior notice thereof.  If a charge is imposed for use of the automobile parking spaces of the Parking Retention Areas or the Common Areas, Landlord covenants that Landlord and Enclosed Mall Owner shall establish a validation system whereby Tenant and its employees, customers, and invitees shall be relieved of any obligation to pay such charge, including any tax, processing fee or other imposition imposed thereon.  Such validation system shall utilize methods, equipment and technologies reasonably approved by Tenant to minimize any unreasonable burden on Tenant and its customers and employees of obtaining and using such validations.  Landlord covenants that as of the Actual Opening Date no persons other than employees, customers and invitees of tenants of the Center and the North Parcels shall have a contractual right to use the paved automobile parking spaces in the Parking Retention Areas.  Landlord covenants that Landlord and Enclosed Mall Owner shall use commercially reasonable effort to prevent any persons other than employees, customers, contractors and invitees of tenants of the Center and the North Parcels from using the paved automobile parking spaces in the Parking Retention Areas or the Common Area after the Actual Opening Date.  Without limiting the generality of the foregoing, Landlord covenants that Landlord and Enclosed Mall Owner shall maintain, repair and replace any signs required to be installed pursuant to Section 2.5.2.3 and Section 2.5.7.7, and shall implement and maintain a commercially reasonable program for identifying and towing vehicles parked in violation thereof.  Contractors of Tenant shall have the same non-exclusive rights to use the Parking Retention Areas as do employees of

11

Tenant, during any period that such contractors are performing work for or on behalf of Tenant at the Theatre.

2.5.4    <u>Employee Use of Parking Areas</u>    Landlord covenants that, throughout the Term, Landlord and Enclosed Mall Owner shall provide each of Tenant's employees with the non-exclusive right to use any of the automobile parking spaces within the Parking Retention Areas and Common Areas without charge, at any time during the business hours of Tenant, and for a period not less than one hour before and after such business hours, subject only to any valid right of Macy's to object to parking by such employees in any such spaces.    Tenant hereby acknowledges that Section 5.2 of the Macy's Parking Management Plan states that "Mall Tenant Stores and department store employees shall not park in the Southeast Parking Deck."    Landlord represents and warrants to Tenant that, at no time during the period that CAPREF Lloyd II has owned the Enclosed Mall Parcels, has (a) CAPREF Lloyd II implemented or enforced the second or third sentences of Section 5.2 of the Macy's Parking Management Plan or (b) Macy's requested that CAPREF Lloyd II implement or enforce the second or third sentences of Section 5.2 of the Macy's Parking Management Plan.    Landlord has consulted with its counsel, and on that basis Landlord covenants that if Macy's requests or demands enforcement of this provision, Enclosed Mall Owner shall take the position and use commercially reasonable efforts to ultimately convince Macy's that the restriction is not applicable to Tenant because Tenant is not a "Mall Tenant Store" or a "department store," as those terms are defined and/or used in the Macy's Parking Management Plan and/or Macy's Lease.    Moreover, Landlord covenants that, in connection with the negotiation of any amendment, modification or waiver by Enclosed Mall Owner of any term or provision of the Macy's Lease, or any other matter affecting the Macy's Lease requiring the consent, approval, waiver or other agreement of Enclosed Mall Owner, Enclosed Mall Owner shall make commercially reasonable efforts to confirm that Section 3.1 and Section 5.2 of the Macy's Parking Management Plan do not and will not be implemented or enforced in a manner inconsistent with any of the rights of Tenant under this Lease. By way of illustration and not limitation, Landlord covenants that, in connection with any agreement pursuant to which the use of the fourth floor of the Macy's Premises is converted from retail use to office use, Enclosed Mall Owner shall use commercially reasonable efforts to cause Macy's to confirm that Section 3.1 and Section 5.2 of the Macy's Parking Management Plan do not and will not be implemented or enforced in a manner inconsistent with any of the rights of Tenant under this Lease.

2.5.5    <u>Maintenance of Parking Areas</u>.    Landlord covenants that, throughout the Term, Landlord and Enclosed Mall Owner shall maintain the Parking Retention Areas and Common Areas in a reasonably lit, secure, and accessible environment, with appropriate cleanliness, striping, traffic controls, and repairs.    Landlord covenants that Landlord and Enclosed Mall Owner shall provide such lighting in the Parking Retention Areas and the walkways and driveways serving the Parking Retention Areas until the later of (a) one (1) hour after completion of the showing of the last motion picture in the Theatre each night and (b) 2:00 a.m. local time.

2.5.6    <u>Interior Mall Access</u>.    Landlord covenants that Landlord and Enclosed Mall Owner shall maintain operable and convenient pedestrian doorways in the locations designated as "**Enclosed Mall Entrance**" on the Center Site Plan (each, a "<u>Designated Mall Entrance</u>") during the business hours of Tenant, and for a period not less than one hour before and after such business hours.    Landlord covenants that Landlord and Enclosed Mall Owner shall maintain

pedestrian access along the route designated as "**Enclosed Mall Access Route**" on the Center Site Plan between each Designated Mall Entrance during the business hours of Tenant, and for a period not less than one hour before and after such business hours, so that Tenant's customers and the general public may move freely through the enclosed mall from the Theatre to the Southeast Parking Deck and the Northeast Parking Deck, and vice versa.

2.5.7    Permitted Parking Development Area.  Notwithstanding anything to the contrary in this Section 2.5, but subject to the other terms and conditions of this Lease, Enclosed Mall Owner may construct improvements within the area designated as the "**Permitted Parking Development Area**" on the Center Site Plan (the "Permitted Parking Development Area") subject to satisfaction by Landlord or Enclosed Mall Owner, at no cost or expense Tenant, of the following terms and conditions:

2.5.7.1    Pursuant to Section 2 of the Limited Joinders, the obligations of Enclosed Mall Owner and the covenants and conditions herein contained shall inure to the benefit of and shall be binding on Landlord if Landlord succeeds to the ownership of the Permitted Parking Development Area.

2.5.7.2    Landlord covenants that Enclosed Mall Owner shall not suffer or allow construction of any improvements within any portion of the Permitted Parking Development Area prior to the date that is six (6) months following the Actual Opening Date.  Landlord shall not suffer or allow construction of any improvements within any portion of the Permitted Parking Development Area to commence (commencement for this purpose shall mean closure of any portion of the Permitted Parking Development Area) during the period from November 15 of any calendar year to January 15 of the succeeding calendar year.  Upon commencement of construction of such improvements within the Permitted Parking Development Area, the Permitted Parking Development Area shall cease to be Parking Retention Area, Common Area or Restricted Change Area, but shall remain subject to the Theatre Use Covenant.  Additionally, the Concession Use Covenant shall remain applicable to any ground floor tenant within the Permitted Parking Development Area whose premises include any area adjacent to NE Multnomah Avenue, regardless of whether such space includes an entrance from NE Multnomah Avenue.

2.5.7.3    such improvements shall be designed and constructed in a manner consistent in quality, materials and appearance with residential and commercial uses, respectively, in a First Class regional retail center that includes residential uses.  Landlord covenants that, once commenced, Enclosed Mall Owner shall complete such construction work within the Permitted Parking Development Area which is visible from the Common Areas as soon as reasonably practicable, but not later than twenty-four (24) months, subject to Force Majeure, after any portion of the Permitted Parking Development Area is closed for such construction.

2.5.7.4    Landlord covenants that Enclosed Mall Owner shall maintain the area of such construction work within the Permitted Parking Development Area in a reasonably clean and orderly condition at all times.  At all times during such construction work, Landlord covenants that Enclosed Mall Owner shall continuously maintain a construction barrier of First Class quality and visual appeal on each side of the perimeter of the Permitted Parking

13

Development Area and shall promptly, but in no instance longer than 24 hours after placement of any graffiti, posters or handbills on the construction barrier, remove, repaint and/or resurface the same (or cause the same to be removed, repainted, and/or resurfaced).  At all times during such construction work, Landlord covenants that Enclosed Mall Owner shall use commercially reasonable efforts to prevent dust and debris from moving by wind, rain or human action from the area of such work to the Theatre.  Landlord covenants that Enclosed Mall Owner shall use commercially reasonable efforts to prevent employees of any contractor, subcontractor or materialman performing work or providing material within the Permitted Parking Development Area to park within any portion of the Parking Retention Area.  Landlord covenants that Enclosed Mall Owner shall use commercially reasonable efforts to prevent any food trucks or other retail or commercial food sales or deliveries within the Center in connection with such construction work.  Landlord covenants that Enclosed Mall Owner shall use commercially reasonable efforts to prevent the staging of trucks or materials in any portion of the Center other than within the Permitted Parking Development Area.

2.5.7.5    Landlord covenants that Enclosed Mall Owner shall use commercially reasonable efforts to prevent such construction work within the Permitted Parking Development Area from:  (a) materially adversely affecting vehicular access to and through the Parking Retention Areas; (b) materially adversely affecting pedestrian access to and through the Parking Retention Areas and the Theatre; (c) materially adversely affecting the automobile parking spaces, drive ways, lighting, curbs, walkways and other improvements of the Parking Retention Areas; or (d) otherwise materially adversely affecting any rights or privileges of Tenant under this Lease.

2.5.7.6    After the commencement of work, and until the last construction activity is occurring in the Permitted Parking Development Area which is visible from the Common Areas, Landlord shall, at Landlord's sole cost and expense, operate a valet parking service for the benefit of Tenant's customers with a pickup and drop off area located in the area shown as "Valet Pickup/Drop Off" on the Center Site Plan.  Notwithstanding the foregoing, Landlord shall only be obligated to operate such valet parking service (a) on all days from November 15 through January 5, (b) during other days of the year, only on Fridays, Saturdays, Sundays and holidays; and (c) up to 20 additional days in any calendar year, provided that Tenant provides, with respect to each such day, not less than 10 calendar days prior written notice.  Moreover, notwithstanding the foregoing, Landlord shall only be obligated to operate such valet service on such days from 3:00 pm local time until one hour after the last showing of such day (which shall include the period after midnight of such day).  Landlord shall cause such service to be operated in a First Class manner by a reputable and experienced valet parking contractor whose identity and contractual terms shall be subject to the prior written approval of Tenant, not to be unreasonably withheld.  Landlord covenants that Enclosed Mall Owner shall provide a parking storage area for such service in the Northeast Parking Deck, and that storage for such service shall be solely in the Northeast Parking Deck.  If a charge is imposed for use of such service, Landlord shall establish a validation system whereby Tenant's customers shall be relieved of any obligation to pay such charge, including any tax, processing fee or other imposition imposed thereon.  Such validation system shall utilize methods, equipment and technologies reasonably approved by Tenant to minimize the burden on Tenant and its customers of obtaining and using such validations.

2.5.7.7   Landlord covenants that Enclosed Mall Owner shall not suffer or allow any person to construct any improvements within the Permitted Parking Development Area, or to operate or use such improvements, unless Enclosed Mall Owner also constructs and maintains a number of paved automobile parking spaces within the Permitted Parking Development Area not less than the number of parking spaces required under applicable zoning requirements for the uses contemplated by such improvements, without giving effect to any variance, waiver or other adjustment.   Landlord covenants that, prior to commencement of construction of any improvements within the Permitted Parking Development Area, (a) Landlord, Enclosed Mall Owner and each other party to the CC&Rs shall execute, deliver and record an amendment to CC&Rs terminating any right under the CC&Rs of any owner, tenant or other occupant of the Permitted Parking Development Area, or their contractors, employees, customers or guests, to use any of the parking areas within the Center other than those entirely within the Permitted Parking Development Area; (b) such amendment to the CC&Rs shall also terminate any rights under the CC&Rs of the owner, tenant or other occupant of the Permitted Parking Development Areas, or their contractors, employees, customers or guests, to use any of the driveways within the Center other than Vacated NE 15th Avenue, which shall be used solely for ingress/egress to the Permitted Parking Development Area, with any such access point(s) located exclusively on the northern one-half of Vacated NE 15th Avenue; (c) Landlord shall post conspicuous signs in appropriate locations informing tenants and occupants of the Permitted Parking Development Area, and their employees, customers and guests, that they may not park within the Center and that Landlord may, from time to time, cause vehicles parked in violation thereof to be cited and/or towed at the expense of the owners thereof.

2.5.7.8   Landlord covenants that neither Landlord nor Enclosed Mall Owner shall suffer or allow any portion of Vacated NE 15th Avenue to be closed to vehicular or pedestrian traffic during the performance of any work contemplated by this Section 2.5.7, or thereafter, at any time during the business hours of Tenant.

2.5.8   Valet Parking.  Notwithstanding anything contained in Section 2.5.3 above to the contrary, Landlord may operate, or allow to be operated, a valet parking service at the Center whereby those who voluntarily use such service (including those of Tenant's customers and invitees who voluntarily use such service) are charged a fee or fees for such service.  Except for the pickup, drop off and storage area for the valet service operated pursuant to Section 2.5.7.6, the pickup and drop off area and the parking storage areas used for any such valet parking service shall not be located within the Parking Retention Areas; provided that Macy's may use pickup and drop off areas and parking storage areas within the Parking Retention Areas if and to the extent permitted under Section 2.2(c) of the Macy's Parking Management Plan.

2.6   Events.

Landlord covenants that Landlord and Enclosed Mall Owner shall not suffer or allow the conduct of any event in the area shown on the Center Site Plan as the "**Event Exclusion Area**". For the purposes hereof, the term "event" shall mean any of the following:  any seasonal sale, outdoor sale, tent sale, farmer's market or other exhibition or sale of services or merchandise, or any entertainment of any kind.

2.7      Suitability.

Landlord represents and warrants to Tenant, to Landlord's actual knowledge, that, as of the Effective Date:

2.7.1      Ownership of East Anchor Parcel.  Landlord is the sole owner of fee simple title to the East Anchor Parcel pursuant to that certain Statutory Special Warranty Deed dated as of August 23, 2016 and recorded August 24, 2016 as Instrument No. 2016-105686 in the Official Record, a true and complete copy of which was attached to that certain email from Joe Fucile to Allen Hubsch transmitted on January 17, 2017 at approximately 11:59 a.m. Pacific time. Landlord's title to the East Anchor Parcel is not subject to any liens, exceptions or encumbrances other than as disclosed in Section 2.7.12 and those specifically identified on Schedule B of that certain title policy issued by First American Title Insurance Company dated as of August 24, 2016 (the "East Anchor Parcel Existing Title Assurance"), a true and complete copy of which was attached to that certain email from Joe Fucile to Allen Hubsch transmitted on January 17, 2017 at approximately 11:59 a.m. Pacific time.  Landlord is the sole holder of grantee's interest in, to and under the Encroachment Easement.  Pursuant to the Encroachment Easement, Landlord has the right to exclusive possession of the Encroachment Easement Area for a period not less than the Term hereof, including any Extension Periods which Tenant may elect to exercise.

2.7.2      Ownership of Enclosed Mall Parcels.  CAPREF Lloyd II is the sole owner of fee simple title to the Enclosed Mall Parcels pursuant to that certain Statutory Special Warranty Deed dated as of October 26, 2015 and recorded October 27, 2015 as Instrument No. 2015-137349 in the Official Record, a true and complete copy of which was attached to that certain email from Joe Fucile to Allen Hubsch transmitted on January 17, 2017 at approximately 11:55 a.m. Pacific time. CAPREF Lloyd II's title to the Enclosed Mall Parcels is not subject to any liens, exceptions or encumbrances other than those specifically identified on Schedule B of that certain title policy issued by First American Title Insurance Company dated as of October 27, 2015 (the "Enclosed Mall Parcels and West Anchor Parcel Existing Title Assurance"), a true and complete copy of which was attached to that certain email from Amy M. Williams to Allen Hubsch transmitted on September 6, 2016 at approximately 7:35 a.m. Pacific time.

2.7.3      Ownership of West Anchor Parcel.  CAPREF Lloyd Center Anchor is the sole owner of fee simple title to the West Anchor Parcel pursuant to that certain Statutory Special Warranty Deed dated as of February 26, 2015 and recorded March 2, 2015 as Instrument No. 2015-022313 in the Official Record, a true and complete copy of which was attached to that certain email from Joe Fucile to Allen Hubsch transmitted on February 5, 2017 at approximately 2:05 p.m. Pacific Time.

2.7.4      Ownership of South SuperBlock Parcel.  CAPREF Lloyd Center is the sole owner of fee simple title to the South SuperBlock Parcel pursuant to that certain Statutory Special Warranty Deed dated as of June 11, 2013 and recorded June 11, 2013 as Instrument No. 2013-079098 in the Official Record, a true and complete copy of which was attached to that certain email from Joe Fucile to Allen Hubsch transmitted on February 5, 2017 at approximately 2:15 p.m. Pacific Time.

2.7.5   <u>KREF Loan Encumbrance</u>.  The only mortgage, deed of trust or other security instrument encumbering the Enclosed Mall Parcels or the West Anchor Parcel is the KREF Loan Encumbrance.  To Landlord's knowledge, the sole holder of the KREF Loan Encumbrance is KREF.

2.7.6   <u>Macy's Lease</u>.  Landlord delivered to Tenant a true and complete copy of the Macy's Parking Management Plan, consisting of 7 pages total including cover and table of contents, pursuant to that certain email from Joe Fucile to Allen Hubsch transmitted on January 20, 2017 at 11:55 pm Pacific time.  The Macy's Parking Management Plan is attached as Exhibit E to the Macy's Lease, and is incorporated in and forms a part of the Macy's Lease.  The Macy's Parking Management Plan has not been amended, supplemented or terminated in any respect.  Except for the right of Macy's to operate a valet parking service pursuant to Section 2.2(c) of the Macy's Parking Management Plan, Macy's has no right or obligation of any kind that would or could, directly or indirectly, restrict, limit or otherwise adversely affect use and enjoyment of the Parking Retention Areas or Common Area by Tenant, its customers, employees, invitees or contractors in accordance with any of the provisions of this Lease at any time or in any manner.

2.7.7   <u>East Anchor Parcel Survey</u>.  The East Anchor Parcel has been surveyed as shown by that certain ALTA/ACSM prepared by Terramark and showing a last revision date of August 12, 2016 (the "<u>East Anchor Parcel ALTA Survey</u>"), a true and complete copy of which was attached to that certain email from Amy M. Williams to Allen Hubsch transmitted on September 6, 2016 at approximately 7:35 a.m. Pacific time.

2.7.8   <u>Enclosed Mall Parcels and West Anchor Parcel Survey</u>.  The Enclosed Mall Parcels and the West Anchor Parcel have been surveyed as shown by that certain ALTA/ACSM prepared by David Evans and Associates and showing a certification date of September 15, 2015 (the "<u>Enclosed Mall Parcels and West Anchor Parcel ALTA Survey</u>"), a true and complete copy of which was attached to that certain email from Amy M. Williams to Allen Hubsch transmitted on September 6, 2016 at approximately 7:35 a.m. Pacific time.

2.7.9   <u>Vacated NE 15th Avenue</u>.  Vacated NE 15th Avenue is not a public street.

2.7.10   <u>Affiliation</u>.  All of the beneficial ownership interests in Landlord are owned, directly or indirectly, by an entity that also owns, directly or indirectly, all of the beneficial ownership interests in CAPREF Lloyd II and CAPREF Lloyd Center Anchor.

2.7.11   <u>Environmental Assessments</u>.

2.7.11.1 Landlord does not have in its possession, custody or control any environmental site assessment or similar environmental report for the East Anchor Parcel which was prepared more recently than that certain Phase I Environmental Site Assessment, EBI Project No. 1116002708, dated as of June 28, 2016 and prepared by EBI Consulting, a true and complete copy of which was transmitted via that certain email from Joe Fucile to Allen Hubsch on January 20, 2017 at approximately 1:08 p.m. Pacific time.

2.7.11.2 Landlord does not have in its possession, custody or control any environmental site assessment or similar environmental report for the Enclosed Mall Parcels which was prepared more recently than that certain Phase I Environmental Site Assessment, EBI

Project No. 13130132, dated as of May 24, 2013 and prepared by EBI Consulting, a true and complete copy of which was transmitted via that certain email from Joe Fucile to Allen Hubsch on January 20, 2017 at approximately 1:08 p.m. Pacific time.

2.7.11.3 Landlord does not have in its possession, custody or control any environmental site assessment or similar environmental report for the West Anchor Parcel which was prepared more recently than that certain Phase I Environmental Site Assessment, EBI Job No. 13140060, dated as of March 19, 2014 and prepared by EBI Consulting, a true and complete copy of which was transmitted via that certain email from Joe Fucile to Allen Hubsch on January 20, 2017 at approximately 1:08 p.m. Pacific time.

2.7.12   Mortgage.   No deed of trust, mortgage or other security instrument encumbers the Land constituting the East Anchor Parcel except that certain Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing in favor of Keystone Real Estate Lending Fund, L.P., a Delaware limited partnership ("Existing Lender") dated as of March 21, 2017 and recorded as Instrument No. 2017-035671.

2.7.13   Entire Development.   The Entire Development Site Plan accurately depicts each of the boundaries of the legal parcels constituting or included in the East Anchor Parcel, the Enclosed Mall Parcels, the West Anchor Parcel, the North Parcels and the South SuperBlock Parcel.

2.7.14   Legal Description.   The legal description attached hereto as Exhibit A-1 is a true and complete legal description of all real property owned by Landlord.   The legal description attached hereto as Exhibit A-2 is a true and complete legal description of all real property owned by CAPREF Lloyd II.   The East Anchor Parcel and Enclosed Mall Parcels are contiguous along each portion of each of the boundaries of the East Anchor Parcel, except where the boundary of the East Anchor Parcel is contiguous to NE Multnomah Street.   Each of the boundaries of the Encroachment Easement Area that face the East Anchor Parcel are contiguous to the boundaries of the East Anchor Parcel.   Neither Landlord nor any Affiliate of Landlord owns or holds any interest in any other real property located within 1,000 linear feet of the exterior boundary of the Entire Development.

2.7.15   No Restrictions.   Except as set forth in Schedule B of the East Anchor Parcel Existing Title Assurance, if at all, Landlord's title to the East Anchor Parcel is free and clear of any present encumbrance, covenant, obligation, limitation or restriction which would prevent or materially interfere with Landlord's Work or with Tenant's possession and use of the Theatre for the Permitted Use or any other rights of Tenant under and in accordance with the terms, conditions, and provisions of this Lease.   Except as set forth in Schedule B of the Enclosed Mall Parcel Existing Title Assurance, if at all, CAPREF Lloyd II's title to the Enclosed Mall Parcel is free and clear of any present encumbrance, covenant, obligation, limitation or restriction which would prevent or materially interfere with Landlord's Work or with Tenant's possession and use of the Theatre for the Permitted Use or any other rights of Tenant under and in accordance with the terms, conditions, and provisions of this Lease.

2.7.16   No Other Lease.   No lease is currently effective for any portion of the East Anchor Parcel or the Encroachment Easement Area other than (a) this Lease and (b) the Sears

Lease.  Landlord has not leased the Theatre to any person other than (a) Tenant, pursuant to this Lease and (b) Sears, pursuant to the Sears Lease.  Under the Sears Lease, Landlord may, at any time after the date hereof, terminate the Sears Lease by delivering to Sears a written notice of termination of the Sears Lease.  Under the Sears Lease, Sears is required to vacate and surrender all of the Sears Premises and the East Anchor Parcel within 90 calendar days after delivery of such notice of termination.  Following the termination of the Sears Lease, Sears will have no right or obligation of any kind that would or could, directly or indirectly, restrict, limit or otherwise adversely affect use and enjoyment of the Center by Tenant, its customers, employees, invitees or contractors in accordance with any of the provisions of this Lease at any time or in any manner.

2.7.17   <u>Landlord Authority</u>.  Landlord has the power to execute, deliver and perform this Lease and the Encroachment Easement.  The execution, delivery and performance by Landlord of this Lease and the Encroachment Easement have been duly authorized by all necessary action of Landlord.  Each of this Lease and the Encroachment Easement has been duly executed and delivered by Landlord and constitutes a valid and binding obligation of East Anchor Owner, enforceable against East Anchor Owner in accordance with its terms.  The Encroachment Easement conveys to Landlord a sufficient estate in the Encroachment Easement Area to form the valid basis for the granting by Landlord to Tenant of a leasehold estate in a portion of the Encroachment Easement Area.  In its capacity as owner of the East Anchor Parcel and as grantee under the Encroachment Easement, Landlord is, and East Anchor Owner shall be, the sole landlord under this Lease, and CAPREF Lloyd II has, and shall have, no right, title or interest in or to this Lease, as landlord or otherwise.

2.7.18   <u>Affiliate Authority</u>.  CAPREF Lloyd II and CAPREF Lloyd Center Anchor have the power to execute, deliver and perform the Limited Joinders.  The execution, delivery and performance by CAPREF Lloyd II and CAPREF Lloyd Center Anchor of the Limited Joinders have been duly authorized by all necessary action of CAPREF Lloyd II and CAPREF Lloyd Center Anchor respectively.  The Limited Joinders have been duly executed and delivered by CAPREF Lloyd II and CAPREF Lloyd Center Anchor and constitute valid and binding obligations of Enclosed Mall Owner and West Anchor Owner, enforceable against Enclosed Mall Owner and West Anchor Owner in accordance with its terms.  CAPREF Lloyd II has the power to execute, deliver and perform the Encroachment Easement.  The execution, delivery and performance by CAPREF Lloyd II of the Encroachment Easement have been duly authorized by all necessary action of CAPREF Lloyd II.  The Encroachment Easement has been duly executed and delivered by CAPREF Lloyd II and constitutes a valid and binding obligation of Enclosed Mall Owner, enforceable against Enclosed Mall Owner in accordance with its terms.

2.7.19   <u>No Conflicts</u>.  The execution, delivery and performance by the Parties of this Lease and the use and enjoyment of the Theatre by Tenant for any of the Permitted Uses do not (a) require any consent or approval of Landlord's constituent shareholders, partners or members which has not been obtained; (b) require any consent or approval of any Loan Encumbrance Holder which has not been obtained; or (c) require any consent or approval, or breach or constitute a default under, or otherwise conflict with (i) the CC&Rs or any lease or other agreement to which Landlord is a party or by which Landlord is bound, (ii) any Development Approval or (iii) any Legal Requirement.  The execution, delivery and performance by Landlord and CAPREF Lloyd II of the Encroachment Easement do not (a) require any consent or approval

of Landlord's or CAPREF Lloyd II's constituent shareholders, partners or members which has not been obtained; (b) require any consent or approval of any Loan Encumbrance Holder which has not been obtained; or (c) require any consent or approval, or breach or constitute a default under, or otherwise conflict with (i) the CC&Rs or any lease or other agreement to which Landlord or CAPREF Lloyd II is a party or by which Landlord or CAPREF Lloyd II is bound, (ii) any Development Approval or (iii) any Legal Requirement.

2.7.20   <u>No Government Approvals</u>.  No government approval is required in connection with the execution, delivery or performance of this Lease and the Encroachment Easement, other than the Development Approvals, the Certificate of Occupancy, the Tenant Operating Permits and the Alcohol Approvals. No design review approvals are required for Landlord's Work other than those for which Landlord has had a pre-application conference with the City of Portland on January 16, 2017.

2.7.21   <u>CC&Rs</u>.  The CC&Rs have not been amended, supplemented or terminated, except for the amendments included in the definition of CC&Rs.  Landlord, in its capacity as owner of the East Anchor Parcel, has succeeded to all of the right, title and interest of Sears under the CC&Rs.  CAPREF Lloyd II has succeeded to all of the right, title and interest of SI-Lloyd Associates Limited Partnership, an Indiana limited partnership, under the CC&Rs. CAPREF Lloyd Center Anchor has succeeded to all of the right, title and interest of Nordstrom, Inc., a Washington corporation, under the CC&Rs.  CAPREF Lloyd II is the Developer (as that term is defined and used in the CC&Rs) under the CC&Rs.  The boundaries of the Entire Development are the same as the boundaries of the Total Development Tract (as that term is defined and used in the CC&Rs).  The exterior boundaries of the East Anchor Parcel, the Enclosed Mall Parcels, the West Anchor Parcel and the South SuperBlock Parcel, collectively, are the same as the boundaries of the Shopping Center (as that term is defined and used in the CC&Rs).  The Enclosed Mall Parcels is the Developer Tract (as that term is defined and used in the CC&Rs).  The West Anchor Parcel is the Nordstrom Tract (as that term is defined and used in the CC&Rs).  The East Anchor Parcel is the Sears Parcel (as that term is defined and used in the CC&Rs).

Landlord acknowledges that each of the representations and warranties made in <u>Section 2.7.1</u> through <u>Section 2.7.21</u> inclusive is material to Tenant's execution, delivery and performance of this Lease.

2.8   <u>Tenant Representations.</u>

Tenant represents and warrants to Landlord, to Tenant's actual knowledge, that, as of the Effective Date:

2.8.1   <u>Tenant Authority</u>.  Tenant has the power to execute, deliver and perform this Lease.  The execution, delivery and performance by Tenant of this Lease have been duly authorized by all necessary action of Tenant.  This Lease has been duly executed and delivered by Tenant and constitutes a valid and binding obligation of Tenant, enforceable against Tenant in accordance with its terms.

2.8.2   <u>Guarantor Authority</u>.  Guarantor has the power to execute, deliver and perform the Guaranty.  The execution, delivery, and performance by Guarantor of the Guaranty have been duly authorized by all necessary action of Guaranty.  The Guaranty has been duly executed and delivered by Guarantor and constitutes a valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms.

Tenant acknowledges that each of the representations and warranties made in <u>Section 2.8.1</u> through <u>Section 2.8.2</u> inclusive is material to Landlord's execution, delivery and performance of this Lease.

2.9   <u>Encroachment Easement.</u>

2.9.1   <u>Recording</u>.   Concurrently herewith, Landlord shall deliver to Tenant the Encroachment Easement, duly executed and acknowledged by Landlord and CAPREF Lloyd II, together with a consent and subordination thereto, duly executed and acknowledged by KREF Lender, and otherwise in recordable form.  Tenant may record the Encroachment Agreement in the Official Records at any time.

2.9.2   <u>City Concurrence</u>.   In connection with its application for Design Review Approval, Landlord shall disclose to the City of Portland the existence of the Encroachment Agreement and this Lease, and the relationship between them, and shall use commercially reasonable efforts to obtain concurrence from the City of Portland that neither execution, delivery nor performance of the Encroachment Easement, nor the relationship between the Encroachment Easement and this Lease, violates or conflicts with Legal Requirements relating to subdivisions, zoning or land use.  If Landlord can demonstrate that the existence and contents of the Encroachment Easement were disclosed to the planning staff of the City of Portland in connection with application for the Development Approvals (by, for example, providing a true and complete copy thereof to the planning staff as a part of an application or submittal to such staff in connection therewith), then such concurrence may be demonstrated by issuance of the Development Approvals, without conditions relating to modification, termination, correction or supplementation of the Encroachment Easement.  If the City of Portland does not so concur, then Landlord shall promptly apply for and diligently pursue to completion a Lot Adjustment Approval.

2.9.3   <u>City or Court Challenge</u>.  If at any time after the date hereof, the City of Portland asserts in writing, or any other person (so long as such other person is unaffiliated with Tenant) asserts in a complaint filed in a court of competent jurisdiction (unless such complaint is dismissed on the pleadings), that the Encroachment Easement, or the relationship between the Encroachment Easement and this Lease, violates or conflicts with Legal Requirements, or is unenforceable, void or voidable in any material respect, then Landlord shall promptly apply for and diligently pursue to completion a Lot Adjustment Approval.

ARTICLE 3
CONSTRUCTION

3.1   <u>Construction Definitions and Overview.</u>

As used in this Lease, the following definitions are applicable:

3.1.1    "Alcohol Approvals" means any licenses, approvals, consents, permits and/or authorizations required for the legal sale or service by Tenant of alcoholic beverages for on-premises consumption at the Theatre.

3.1.2    "Approved Theatre Plans" means the final Theatre Plans which are agreed to by the Parties pursuant to the provisions of this Lease, together with any changes to such plans which are agreed to by the Parties pursuant to the provisions of this Lease.

3.1.3    "Base Building Plans" means the architectural and engineering plans, specifications, schematics and drawings for the base building for both the existing structure and the new cantilevered addition in which the Theatre will be located, including design and development plans, construction drawings and final plans for submission for the building permit, which are prepared by Landlord's architect.  The Base Building Plans shall include the demolition plans, mechanical plans, utility plans, structural plans, elevations and floor plans for such structure.

3.1.4    "Closeout Documentation" means record drawings, as-built drawings and other customary closeout documents required to be delivered by Landlord to Tenant following the Delivery Date pursuant to this Lease.

3.1.5    "Common Area Plans" means the architectural and engineering plans, specifications, schematics and drawings for the Common Areas Work, including design and development plans, construction drawings and final plans for submission for the building permit, which are prepared by Landlord's architect.

3.1.6    "Common Areas Work" means construction of all improvements within the Common Areas which are necessary or appropriate in connection with the Theatre Construction Work, to the extent that such improvements do not exist as of the Effective Date.  Common Areas Work shall include all items set forth under the heading "Common Areas" on Exhibit D (the "Work Matrix").

3.1.7    "Delivery Date" means the date of the Walk-Through on which Landlord and Tenant reasonably and mutually agree in good faith that Substantial Completion has occurred.

3.1.8    "Design Review Application" means that certain application for design review, Case No. EA 16-270604.

3.1.9    "Design Review Approval" means the final non-appealable approvals which Landlord has applied for or will apply for in the Design Review Application.

3.1.10    "Development Approvals" means all discretionary zoning, land use, site plan, architectural, design, environmental impact, construction, utility and other similar discretionary approvals, consents, permits and authorizations that are necessary for Landlord's Work and use and operation of the Theatre by Tenant for the uses included in the definition of Permitted Use, including all zoning approvals for a Theatre use, whether or not such approvals, consents, permits and authorizations are obtainable from governmental authorities, utility providers or under or pursuant to any restrictive covenant, lease or other instrument or agreement.  The Development Approvals include the Design Review Approvals and the Lot Adjustment

Approvals (if Landlord pursues the Lot Adjustment Approvals).  The Development Approvals do not include the building permits, the Certificate of Occupancy, the Tenant Operating Permits or any Alcohol Approvals.

3.1.11   "Development Approvals Date" means the date on which Landlord delivers to Tenant a written notice specifically referencing this Section of this Lease and stating unambiguously and unconditionally that the Design Review Approval have been issued, recorded, executed and delivered, as applicable, together with reasonable evidence thereof. Tenant shall be entitled to rely upon the accuracy of the contents of such notice without duty of inquiry, but shall not be required to act upon such notice if it is inaccurate, and if Tenant notifies Landlord of such inaccuracy and Tenant's intention not to act within a reasonable period after the later of receipt of such notice or discovery of such inaccuracy.

3.1.12   "Essential Contingencies" means the occurrence of each of the following:

3.1.12.1  the Development Approvals Date,

3.1.12.2  evidence reasonably satisfactory to Tenant of concurrence by the City of Portland pursuant to Section 2.9.2.

3.1.12.3  the Theatre Plans Approval Date,

3.1.12.4  the approval of the Common Area Plans and structural plans for the Theatre Construction Work and Common Areas Work,

3.1.12.5  termination of the Sears Lease, and the vacation and surrender by Sears of all areas of the Sears Premises and the East Anchor Parcel necessary for Landlord to perform Landlord's Work, and

3.1.12.6  the Theatre Work Commencement Date.

3.1.13   "Essential Contingencies Date" means the date on which Landlord delivers to Tenant an accurate written notice specifically referencing this Section of this Lease and stating unambiguously and unconditionally that each of the Essential Contingencies has occurred, together with reasonable evidence thereof.  Tenant shall be entitled to rely upon the accuracy of the contents of such notice without duty of inquiry, but shall not be required to act upon such notice if it is inaccurate, and if Tenant notifies Landlord of such inaccuracy and Tenant's intention not to act within a reasonable period after the later of receipt of such notice or discovery of such inaccuracy.

3.1.14   "Landlord's Plans" means, collectively, the Base Building Plans and the Common Area Plans.

3.1.15   "Landlord's Work" means the Common Areas Work, if any, the Theatre Site Work and the Theatre Construction Work, each as designated on the Work Matrix, and all other work designated as Landlord's Work on the Work Matrix and, to the extent applicable, as set forth on the Approved Theatre Plans.

3.1.16   "Lot Adjustment Application" means an application to adjust the lot lines of the East Anchor Parcel from those that exist on the date hereof to lot lines that extend (a) beyond the exterior surfaces of the exterior walls of the Theatre on all sides of the Theatre, and (b) below the bottom of the structural floor of the Theatre, and (b) above the roof the Theatre and all architectural elements and equipment located thereon, so that the area enclosed by such lot lines constitutes a single legal and tax parcel.  In the event of any inconsistency between the terms hereof and any Exhibit, Exhibit C shall control as to the size and dimensions of the Theatre, Exhibit C and the Center Site Plan shall control as to the location of the Theatre within the Center and its relation to other improvements within the Center, and the Center Site Plan and this definition shall control as to the location of the boundary lines of the East Anchor Parcel contemplated by the Lot Adjustment Approval.   Landlord may elect to pursue the Lot Adjustment Application in the form of a lot line adjustment or a re-subdivision of existing parcels into condominium units and/or a combination of ground parcels and air rights parcels.

3.1.17   "Lot Adjustment Approval" means the final non-appealable approvals which Landlord has applied for or will apply for in the Lot Adjustment Application.

3.1.18   "Permitted Punch List Items" means items that are within the customary scope of a punch list, which cannot reasonably be expected to result in Unacceptable Disruption and which can reasonably be expected to be completed within thirty (30) days.

3.1.19   "Substantially Complete" or "Substantially Completed" and "Substantial Completion" means, (a) with respect to the Theatre Construction Work, the full and final completion, except for Permitted Punch List Items, of the Theatre Construction Work and the Theatre Site Work in accordance with the requirements of this Lease, (b) with respect to the Common Areas Work, if any, full and final completion, subject to standard punchlist items, of the Common Areas Work in accordance with the requirements of this Lease; and (c) with respect to any other work expressly required by this Lease, the full and final completion thereof, subject to standard punchlist items, in accordance with the requirements of this Lease and Legal Requirements.

3.1.20   "Tenant's Architect" means the architect(s) and engineer(s) selected by Tenant to prepare the Theatre Plans in Tenant's sole discretion.

3.1.21   "Tenant's Equipment" means seats; screens and related equipment; drapes (but not the insulation behind the drapes and not the trim board); acoustical wall panels; projection and presentation equipment; audio equipment; ticket system; ticket ATM/kiosk, concessions equipment (including drink dispensing equipment, bulk $CO_2$ systems and popcorn poppers); POS devices; telecommunications equipment (except for the line installations that are part of Landlord's Work); change machines; automated ticket or cash dispensing machines or both; game machines; office equipment; menu boards; food service equipment; interior and exterior sign panels and signs; aisle lighting; lighting control systems; marquees; mini-marquees; directories; waste receptacles; satellite dishes and related equipment; keyless locks; safes; planters; lockers; benches; lobby art; cabinets; box office case work; box office window communications equipment; ice machines; poster cases; burglar systems; ropes and poles; ash urns; burglar alarm systems; interior security cameras; background music systems; computer systems, all of which shall be located entirely within the Theatre (except as otherwise expressly

provided herein or as set forth in the Approved Theatre Plans), together with Tenant's trash compactor (but not the pad or structure which will house the trash compactor, the utilities serving such pad or structure, and any trash chute).

3.1.22   "Tenant's Work" means the installation within or about the Theatre of Tenant's Equipment and the items identified as Tenant's Work on the Work Matrix and, to the extent applicable, as set forth on the Approved Theatre Plans.

3.1.23   "Tenant's Work Access Date" means the date on which Landlord delivers to Tenant a written notice specifically referencing this Section of this Lease and stating unambiguously and unconditionally that Landlord has made sufficient progress in the performance of Landlord's Work to make access to the Theatre available to Tenant for performance by Tenant of Tenant's Work, subject to reasonable restrictions by Landlord as to the time or times, or the sequence and manner thereof.

3.1.24   "Theatre Construction Work" means construction of the Theatre in a "turn-key" condition in accordance with the Approved Theatre Plans.  The Theatre Construction Work shall not include Tenant's Work, Common Area Work or Theatre Site Work but shall include the items identified as Landlord's Work on the Work Matrix and to the extent applicable as set forth on the Approved Theatre Plans.

3.1.25   "Theatre Plans" means the architectural and engineering plans, specifications, schematics and drawings for construction of the Theatre, including design and development plans, construction drawings and final plans for submission for the building permit, which are prepared by Tenant's Architect.

3.1.26   "Theatre Plans Approval Date" means the day on which the Parties first reach agreement on the Theatre Plans, resulting in such Theatre Plans being deemed to be the Approved Theatre Plans.

3.1.27   "Theatre Site Work" means the work identified as "Site Work" on the Work Matrix, if any, which may include the following work:

3.1.28   Demolition and removal of any structures or improvements on the East Anchor Parcel if and to the extent required to perform the Theatre Construction Work in accordance with the Approved Theatre Plans, including removal and disposal of all debris.

3.1.29   Excavation, grading, filling, elevations, compaction, soil preparation, structural modifications and other work if and to the extent necessary to prepare the East Anchor Parcel and the improvements thereon for the performance of the Theatre Construction Work.

3.1.29.1 Installation and extension of all lines, conduits and facilities for all utilities to serve the Theatre, including water, sanitary sewer, gas, electric, telephone and storm sewer, with rates of flow, pressure, capacities and specifications as set forth on the Approved Theatre Plans.

3.1.29.2 All necessary environmental cleanup, conditioning and stabilization work on the Theatre Site, including any methane remediation systems (if applicable).

3.1.29.3  Installation of fire prevention and back-flow prevention devices if and to the extent required by Legal Requirements.

3.1.30  "Theatre Work Commencement Date" means the date on which Landlord's Work visibly commences.

3.1.31  "Unacceptable Disruption" means any interference or disruption that amounts to more than a *de minimis* interference with Tenant's Work or disruption of Tenant's business operations.

3.2     Development Approvals.

Landlord represents and warrants to Tenant that, as of the date hereof, Landlord has obtained all of the Development Approvals in form and substance satisfactory to Landlord, other than the Design Review Approval.  Landlord shall pay all impact, development and other governmental fees, assessments, taxes and charges attributable to the Theatre (provided that Tenant shall be responsible for the payment of any deposits required in connection with opening accounts in Tenant's name for utility services exclusively serving the Theatre), including all utility tap fees, utility impact fees, utility connection fees, traffic impact fees, excise taxes, development taxes, and special assessments, if any. Landlord shall not agree to any terms or conditions to the Development Approvals reasonably anticipated to adversely impact the cost or manner of Tenant's operations in and from the Theatre.  If any Development Approval includes any term or condition that would, if accepted, adversely affect Tenant's use of the Theatre or the cost of operation thereof, then Landlord shall not accept such term or condition without the prior written consent of Tenant, which may be granted or withheld in Tenant's sole discretion (those terms or conditions so approved being the "Approved Operational Conditions").   Prior to accepting any such term or condition, Landlord shall deliver written notice to Tenant of any such term or condition, together with a true and complete copy thereof, and Tenant shall then have ten (10) days following receipt of such request to evaluate and consent or withhold consent thereto. Other than Approved Operational Conditions, if any, Landlord shall be solely responsible for complying with, satisfying and performing each and every requirement and condition of the Development Approvals, at Landlord's sole cost and expense.  Tenant shall reasonably cooperate with Landlord in Landlord's efforts to obtain the Development Approvals, at no out-of-pocket cost to Tenant, provided that Tenant shall not be required to (a) waive or modify any provision of this Lease, or (b) agree that any portion of the Theatre will be located on any real property other than the East Anchor Parcel and the Encroachment Easement Area.   Notwithstanding the foregoing, the Parties agree that Exhibit G reflects the exterior design which the parties desire for the Theatre, and which Landlord intends to incorporate in the initial Design Review Application. Landlord shall make commercially reasonable efforts to obtain approval of such exterior design. If Landlord cannot, with the exercise of commercially reasonable efforts, obtain approval of such exterior design, Landlord shall consult with Tenant regarding changes to the exterior design, and if Landlord and Tenant cannot reasonably and promptly agree, then Landlord may incorporate a commercially reasonable exterior design in a subsequent Design Review Application.  As of the date hereof, Landlord intends to submit materials to qualify for the following critical path dates for the Design Review Approval:  "Early Design Advice Hearing" which Landlord anticipates will occur on April 27, 2017; "Type III Design Review Hearing(s)" which Landlord anticipates will occur by December 14, 2017; and "Record Decision" which Landlord anticipates will occur

by January 4, 2018.  These critical path dates will allow construction permits to be issued as follows: "Demolition Permit", which Landlord anticipates will occur by January 18, 2018; and "Building Permit" which Landlord anticipates will occur by March 15, 2018.

3.3     Theatre Plans.

3.3.1     Landlord Delivery of Initial Documents.  Not later than thirty (30) calendar days after the Development Approvals Date, Landlord, at its cost, shall deliver to Tenant a CAD version of the improvements located on the East Anchor Parcel on the date thereof, and a CAD version of the improvements that Landlord anticipates will be located on the East Anchor Parcel after the Theatre Site Work is completed.  Such plans shall be accompanied by structural, utility and engineering reports necessary or appropriate for preparation of the Theatre Plans.

3.3.2     Tenant Delivery of Theatre Plans.  Tenant shall arrange for the preparation of the Theatre Plans by Tenant's Architect and shall work diligently to deliver such Theatre Plans to Landlord no later than one hundred twenty (120) calendar days after delivery of the items required to be delivered by Landlord to Tenant by Section 3.3.1, but not earlier than one hundred twenty (120) calendar days after the Effective Date.  Tenant shall cause the Theatre Plans to:  (a) be in conformity with Legal Requirements, (b) be consistent with Exhibit C attached hereto (including the size and location of the Theatre shown thereon) and Exhibit G attached hereto, subject to changes required by the Design Review Approval, and (c) contain specifications for sound attenuation which Tenant reasonably deems appropriate for the Permitted Use, subject to Landlord's review thereof in light of its covenant in Section 7.7 with respect to sound and vibration.  The Theatre Plans shall include vertical transportation, if any, within the Theatre and may include elements of the Common Areas of the Center adjacent to the Theatre if and to the extent required to be constructed or altered in connection with the Theatre Construction Work. Various segments of the Theatre Plans may be prepared by Tenant's Architect and presented to Landlord for review and incremental approval at various times before the end of the one hundred twenty (120) calendar day period, but the overall requirement is that all of the Theatre Plans shall be prepared and submitted to Landlord no later than such one hundred twenty (120) day period. The Theatre Plans shall also include the list of Closeout Documentation.

3.3.3     Approval of Theatre Plans.  The Theatre Plans shall be subject to Landlord's prior approval, which approval shall be given or withheld by Landlord within fifteen (15) days following Landlord's receipt thereof and which otherwise shall not be unreasonably withheld or conditioned.  If Landlord elects not or otherwise fails to give or withhold such approval within such fifteen (15) day period and such election or failure continues for five (5) additional calendar days following Landlord's receipt of a written notice containing the following in all bold capital letters no smaller than 12-point font "**IN ACCORDANCE WITH SECTION 3.3.3 OF THE LEASE, FAILURE TO REPLY WITHIN FIVE (5) DAYS OF RECEIPT TO THIS REMINDER NOTICE SHALL RESULT IN TENANT'S PLANS BEING DEEMED APPROVED**" from Tenant of Landlord's initial failure to respond to the Theatre Plans, then the Theatre Plans shall be deemed approved by Landlord.  If Landlord delivers to Tenant a written notice of disapproval, such notice shall state each of the reasons for Landlord's disapproval in reasonable detail.  If Landlord delivers a notice of disapproval within the time and in the manner provided herein, then the Parties shall promptly engage diligently and in good faith efforts to resolve all disapproved aspects of the Theatre Plans.  Tenant shall pay all costs for the

27

preparation of the Theatre Plans and any revisions thereto, subject to any provisions of this Lease expressly obligating Landlord to reimburse Tenant for architectural and engineering services on the Plans.

3.3.4   <u>Landlord Delivery of Common Area Plans and Structural Plans</u>.  Landlord shall arrange for the preparation of Landlord's Plans and shall work diligently to deliver such plans to Tenant within the same period of time that Tenant is required to deliver the Theatre Plans to Landlord.   Landlord shall cause Landlord's Plans to:   (a) be in conformity with Legal Requirements, and (b) be consistent with <u>Exhibit C</u> attached hereto (including the size and location of the Theatre shown thereon), <u>Exhibit G</u> attached hereto, subject to changes required by the Design Review Approval.  The Common Area Plans shall include new escalators within the Common Areas near the east end of the enclosed mall, connecting the second level of the enclosed mall with the third level of the enclosed mall, and new elevators within the Common Areas to the southwest of the Theatre, connecting all levels of the Southeast Parking Deck with the Theatre, and shall include other elements of the Common Areas of the Center adjacent to the Theatre if and to the extent required to be constructed or altered in connection with the Theatre Construction Work, if and to the extent not included in the Theatre Plans.

3.3.5   <u>Approval of Common Area Plans and Structural Plans</u>.  Landlord's Plans shall be subject to Tenant's prior approval, which approval shall be given or withheld by Tenant within the same period of time required for Landlord to give or withhold its approval of the Theatre Plans.  If Tenant elects not or otherwise fails to give or withhold such approval within such fifteen (15) day period and such election or failure continues for five (5) additional calendar days following Tenant's receipt of a written notice containing the following in all bold capital letters no smaller than 12-point font "**IN ACCORDANCE WITH SECTION 3.3.5 OF THE LEASE FAILURE TO REPLY TO THIS REMINDER NOTICE SHALL RESULT IN LANDLORD'S PLANS BEING DEEMED APPROVED**" from Landlord of Tenant's initial failure to respond to Landlord's Plans, then Landlord's Plans shall be deemed approved by Tenant.  If Tenant delivers to Landlord a written notice of disapproval, such notice shall state each of the reasons for Tenant's disapproval in reasonable detail.   Notwithstanding the foregoing, Tenant may reasonably withhold its approval of Landlord's Plans if any element thereof would result in or require a material change in the Approved Theatre Plans. If Tenant delivers a notice of disapproval within the time and in the manner provided herein, then the Parties shall promptly engage diligently and in good faith efforts to resolve all disapproved aspects of Landlord's Plans.

3.3.6   <u>Theatre Construction Hard Costs</u>.

3.3.6.1   If, prior to Landlord's approval of the Theatre Plans, Landlord reasonably estimates that the Theatre Construction Hard Costs will exceed $175.00 per square foot of the Theatre, calculated based upon the gross square footage of the Theatre included in the approved Theatre Plans, then, prior to Landlord's approval of the Theatre Plans, Landlord and Tenant shall, upon written request of Landlord, engage in good faith discussions in an effort to reduce the Theatre Construction Hard Costs through so-called "value engineering" to an amount at or below $175.00 per square foot.  As used herein, the term "<u>Theatre Construction Hard Costs</u>" means the actual out-of-pocket direct cost to Landlord of the Theatre Construction Work

(including only those costs commonly understood to be "hard costs", and specifically excluding architectural engineering, permitting, infrastructure, grading and site work).

3.3.6.2   Theatre Construction Hard Costs shall not include the Theatre Site Work, the Common Area Work, any work performed pursuant to the Base Building Plans or any work on or associated with any level of the building below the level of the Theatre. The Parties acknowledge that Theatre Construction Hard Costs may be affected by factors beyond the control of Tenant, and for which Tenant has no practical ability to value engineer, such as increases in costs resulting from compliance with the Design Review Approvals or increases generally or locally in the cost of labor or materials arising between the date hereof and the date that Landlord requests that Tenant engage in good faith discussions. Tenant has not agreed, and does not hereby agree, that the Theatre Construction Hard Costs can or should be reduced to an amount at or below $175.00, but agrees to engage in such good faith discussions in accordance with this Section. Tenant shall have no obligation to waive any provision of this Lease, including any provision of this Lease relating to the size or location of the Theatre. Tenant shall have no obligation to accept or agree to materials or finishes in or on the Theatre of lower quality than those at the Regal Springfield Town Center 12 motion picture theatre at the Springfield Town Center in Alexandria, Virginia (the "Comparable Theatre"). By way of illustration, the Parties agree that the scope of value engineering may include substitution of one elevator for another, where both are of comparable quality and utility, but one is less expensive than the other, but may not include substitution of carpet for tile in places where tile is used in the Comparable Theatre.

3.3.6.3   If Landlord contends that Tenant did not engage in good faith discussions in accordance with this Section, Landlord's sole remedy shall be to proceed with the Theatre Construction Work and, at any time within 180 days following the Delivery Date, to commence an action for damages in an amount equal to the difference between (a) Landlord's reasonable estimate of the Theatre Construction Hard Costs at the time it provided to Tenant a written request to engage in good faith discussions pursuant to this Section (but not more than the amount of the actual Theatre Construction Hard Costs) and (b) the amount that Landlord establishes would have been the actual Theatre Construction Hard Costs if Tenant had engaged in good faith discussions pursuant to this Section.

3.3.7   Theatre Construction Contract.  Landlord shall cause its general contractor to perform all of the Theatre Construction Work pursuant to a written contract (the "Theatre Construction Contract") that is separate from the contract for construction of any other portion of the Center. Landlord shall, within 30 days after Substantial Completion of the Theatre Construction Work, deliver to Tenant a written notice making specific reference to this Section of this Lease (the "Theatre Construction Costs Notice"). The Theatre Construction Costs Notice shall be accompanied by a statement prepared by Landlord in good faith in reasonable detail setting forth each category of actual Theatre Construction Hard Costs and the respective amounts thereof, and the total amount thereof.

3.3.8   Change Orders.  No changes shall be made to the Approved Theatre Plans, the approved Common Area Plans or the approved structural plans or to any construction work based on the Approved Theatre Plans without the prior written approval of such change (each, a "Theatre Change Order" or collectively, the "Theatre Change Orders") by both Landlord and

Tenant (the "Theatre Change Order Approval"), which Theatre Change Order Approval shall not be unreasonably withheld, conditioned or delayed by either Party.   Landlord and Tenant acknowledge that it shall be reasonable for a party to withhold approval of a Theatre Change Order if such change would materially delay the work of the other party.   Landlord and Tenant shall promptly and diligently respond to any request for a Theatre Change Order made by the other party.   After a Theatre Change Order Approval, such Theatre Change Order shall be part of the Approved Theatre Plans, and shall be an "Approved Theatre Change Order."   If there is any conflict or apparent conflict between the Work Matrix and the Approved Theatre Plans regarding allocation of responsibility between Landlord and Tenant, then the Work Matrix shall control.   If there is any conflict or apparent conflict between the Work Matrix and the Approved Theatre Plans regarding the scope of the Theatre Construction Work, then the Approved Theatre Plans shall control.   The increase costs for any work performed pursuant to an approved Theatre Change Order shall be paid by Landlord and Tenant as follows:

3.3.8.1   The net increased cost attributable to any Theatre Change Order related to Landlord's Work arising due to a Landlord request, Legal Requirements, architectural or construction trade coordination, document omission or any other reason other than a direct request by Tenant shall be the responsibility of Landlord.

3.3.8.2   If Tenant directly requests a Theatre Change Order related to Landlord's Work, Landlord shall, within fourteen (14) days after such request, obtain a reasonable estimate of the net increased cost attributable to such Theatre Change Order from Landlord's general contractor, and Landlord shall provide such cost estimate to Tenant for approval.   Within fourteen (14) days after receipt of such cost estimate, Tenant shall either approve such cost estimate or reject such cost estimate.   If approved by Tenant, such Theatre Change Order shall be deemed an Approved Theatre Change Order and Tenant shall reimburse Landlord for the net increased costs attributable to such Approved Theatre Change Order, up to the amount of the cost estimate provided by Landlord's general contractor.   If Tenant rejects the cost estimate provided by Landlord's general contractor, the Theatre Change Order shall be deemed ineffective, provided that Landlord may, in Landlord's sole discretion, elect to proceed with such Theatre Change Order work without Tenant's approval but Landlord shall be solely responsible for the cost of such Theatre Change Order (initially requested by Tenant but then rejected based on estimated cost) as part of Landlord's Work.

3.3.8.3   The net increased cost attributable to any Theatre Change Order related to Tenant's Work arising due to a direct Tenant request, rather than due to a direct request by Landlord, shall be the responsibility of Tenant.

3.3.8.4   If Landlord directly requests a Theatre Change Order related to Tenant's Work, Tenant shall, within fourteen (14) days after such request, obtain a reasonable estimate of the net increased cost attributable to such Theatre Change Order from Tenant's general contractor, and Tenant shall provide such cost estimate to Landlord for approval.   Within fourteen (14) days after receipt of such cost estimate, Landlord shall either approve such cost estimate or reject such cost estimate.   If approved by Landlord, such change order shall be deemed an Approved Theatre Change Order and Landlord shall reimburse Tenant for the net increased costs attributable to such Approved Theatre Change Order, up to the amount of the cost estimate provided by Tenant's general contractor.   If Landlord rejects the cost estimate

provided by Tenant's general contractor, the change order shall be deemed ineffective, provided that if the work provided by the proposed change order proceeds without Landlord's approval, then Tenant shall be solely responsible for the cost of such change order work as part of Tenant's Work.

3.3.8.5   Either Party shall reimburse the other for the net increased cost of change orders which such Party is obligated to pay pursuant to this Lease, within thirty (30) days following the later to occur of the Delivery Date or the delivery to the reimbursing party of satisfactory documentation of the requesting party's incurrence and payment of such costs.

3.3.8.6   If any construction work is performed which is not provided for in the Approved Theatre Plans, the approved Common Area Plans, the approved Base Building Plans, or an Approved Theatre Change Order, or for which the cost is not addressed in any other written agreement between Landlord and Tenant, then the cost of such work shall be paid by the party who requested or authorized performance of such construction work.

3.4     Essential Contingencies.

Landlord shall use reasonably diligent efforts and Tenant shall reasonably cooperate with Landlord (at no material cost to Tenant and no amendment of this Lease or waiver of any rights hereunder) to cause the Essential Contingencies Date to occur on or prior to December 1, 2017. Notwithstanding anything to the contrary in this Lease, if the Essential Contingencies Date has not occurred prior to December 1, 2017, Landlord shall continue to diligently pursue the Essential Contingencies but if the Essential Contingencies Date has not occurred on or prior to the May 1, 2018, subject to any delay caused solely by Tenant or caused by any Force Majeure Event, then, at any time thereafter until the Essential Contingencies Date occurs, Tenant may cease performance and payment of any obligations under this Lease and/or terminate this Lease upon sixty (60) days written notice to Landlord of such termination.  If Tenant so terminates, then, within thirty (30) days after the effective date of such termination, Landlord shall pay to Tenant an amount equal to the actual and reasonable documented out-of-pocket costs incurred by Tenant for architectural and engineering services with respect to the Theatre, subject to the provision that such reimbursement shall not exceed $400,000.00, and the Parties shall have no further obligation to each other except (a) for any obligations that this Lease expressly states survive the termination of this Lease; and (b) that, for a period of two (2) years after such termination, Tenant shall have a right of first offer, but not an obligation, to enter into a theatre lease at the Center.  If at any time during such 2-year period, Landlord, Enclosed Mall Owner or West Anchor Owner desires to market or negotiate a theatre lease for any portion of the Center, Landlord covenants that Landlord, Enclosed Mall Owner or West Anchor Owner, respectively, as landlord, shall deliver a written notice to Tenant thereof.  Such notice shall make specific reference to this Section of this Lease, and shall be unconditional and unambiguous.  Such notice shall constitute an offer by Landlord to lease the Theatre to Tenant on the same terms and conditions in this Lease, subject only to modifications (such as, for illustration not limitation, the description and depiction of the location of the premises within the Center, and the no change, restricted change and permitted sales areas thereunder) as such landlord and Tenant may mutually and reasonably agree.  Within 30 days following Tenant's receipt of such offer, Tenant shall deliver a written notice to such landlord stating whether Tenant accepts or declines the offer contained in the notice.  If Tenant accepts the offer, then the premises shall be leased by such

landlord to Tenant on the terms and conditions of the offer.  If Tenant declines the offer, or fails to respond to the offer within the time set forth above, then such landlord may enter into a lease for the same premises, but such lease:  (i) may not be on terms more favorable in the aggregate to such other person than the terms and conditions of the offer and, (ii) if and for so long as Tenant is open and operating under its current lease for the Existing Theatre, subject to Permitted Closures, as a motion picture theatre in the improvements at 1510 NE Multnomah Street, Portland, OR 97232 (the "Existing Theatre"), then, notwithstanding the termination of this Lease, neither Landlord, Enclosed Mall Owner nor West Anchor Owner shall suffer or allow any portion of the East Anchor Parcel, Enclosed Mall Parcel or West Anchor Parcel to be operated as a motion picture theatre, cinema eatery or similar business.  If Tenant does not so terminate, and if Tenant has ceased performance or payment of any obligations hereunder, then Tenant shall resume performance and payment of such obligations promptly after the Essential Contingencies Date occurs, and the time for performance of any or all of Tenant's obligations hereunder may, at Tenant's election, be extended by up to one day for each day during the period from May 1, 2018 through and including the Essential Contingencies Date.  Tenant may elect, in its sole and absolute discretion, to waive or extend the time for performance of any one or more of the Essential Contingencies, but shall have no obligation to do so, nor shall any extension of the Essential Contingencies Date operate to extend the Delivery Deadline or the Final Delivery Deadline.  Notwithstanding anything herein to the contrary, if Tenant elects to terminate this Lease as provided by this Section 3.4, but Landlord causes the Essential Contingencies Date to occur prior to the effective date of the termination, then the occurrence of the Essential Contingencies Date shall nullify Tenant's termination notice and this Lease shall continue in full force and effect.

3.5     Landlord's Work.

3.5.1     Generally.  Landlord shall retain a general contractor to perform Landlord's Work who has first-hand experience in the construction of state-of-the-art motion picture theatres and who shall also be subject to Tenant's approval, not to be unreasonably withheld, conditioned or delayed.  At the time Landlord requests such approval, Landlord shall provide to Tenant the resume of the general contractor's project manager and construction manager showing their prior experience as project manager and construction manager, respectively, for the construction of motion picture theatres.  If Tenant does not consent to retention of the general contractor submitting the lowest bid for Landlord's Work, then Landlord shall provide to Tenant the same information about the next lowest bidder, and the process shall be repeated until Tenant consents to retention of a general contractor to be retained by Landlord.  Landlord shall cause the Theatre Site Work and the Theatre Construction Work to be performed and completed in accordance with the Approved Theatre Plans and the approved structural plans.  Landlord shall cause the Common Areas Work to be performed and completed in accordance with the approved Common Area Plans.  All of Landlord's Work shall be performed by Landlord's general contractor and in a good and workmanlike manner, with new, high quality materials, consistent with the quality of other first-class motion picture theatres or otherwise as specified in and required by the Approved Theatre Plans, approved Common Area Plans, approved structural plans, the Development Approvals and Legal Requirements.  If and to the extent that any of Landlord's Work will occur outside the East Anchor Parcel or otherwise involves the Enclosed Mall Parcels, Landlord covenants that Enclosed Mall Owner shall take all actions necessary or appropriate to allow Landlord to perform and complete Landlord's Work as provided in this Lease and to allow

Tenant to perform and complete Tenant's Work as provided in this Lease. Landlord shall perform the Theatre Construction Work so that the Theatre is located entirely within the East Anchor Parcel, and no portion thereof encroaches into or onto the Enclosed Mall Parcels.

3.5.2   <u>Completion of Theatre Construction Work</u>.   Promptly after the Theatre Construction Work is Substantially Completed, Landlord shall deliver to Tenant a written notice (the "<u>Completion Notice</u>") signed by Landlord's architect or engineer stating unambiguously and unconditionally that the Substantial Completion of the Theatre Construction Work has occurred.

3.5.3   <u>Tenant's Early Access</u>.   Landlord's Work and Tenant's Work shall be coordinated under a schedule to be devised by the Parties (the "<u>Construction Schedule</u>") to enable the work to be performed efficiently in sequence and simultaneously. Landlord shall use reasonably diligent efforts to cause the Tenant's Work Access Date to occur on or prior to the date which is ninety (90) calendar days prior to the Delivery Date. On and after the Tenant's Work Access Date, Landlord shall make access to the Theatre available to Tenant for performance by Tenant of Tenant's Work, subject to reasonable restrictions by Landlord as to the time or times, or the sequence and manner thereof, so that Tenant may perform Tenant's Work. Tenant shall comply with such restrictions, and shall not otherwise interfere with the completion of Landlord's Work.

3.5.4   <u>Substantial Completion</u>.   As soon after the Completion Notice as reasonably practicable, at a time agreed to by the Parties, Tenant's construction representative, Tenant's Architect, Landlord's construction representative and Landlord's general contractor shall conduct a detailed walk through of the Theatre (the "<u>Walk-Through</u>") on a date and at a time mutually and reasonably agreed by the Parties. At the Walk-Through, the Parties shall mutually and reasonably determine whether Substantial Completion has occurred. If Substantial Completion has not occurred at the time of the Walk-Through, then the Walk-Through shall be re-scheduled to a date and time mutually and reasonably agreed by Landlord and Tenant. If Substantial Completion has occurred, then the Delivery Date shall be the date of the Walk-Through and the Parties shall prepare a list of Permitted Punch List Items (the "<u>Punchlist</u>"). Landlord shall cause the absolute completion of all items identified on the Punchlist within thirty (30) days following the date of the Walk-Through (the "<u>Punchlist Completion Deadline</u>"). After the Punchlist Completion Deadline, Tenant's construction representative, Tenant's Architect, Landlord's construction representative, and Landlord's contractor shall conduct another detailed walk-through of the Theatre on a date and time mutually and reasonably agreed by the Parties to determine if all items on the Punchlist have been completed. If Landlord has caused the completion of a substantial portion of the items identified on the Punchlist and has caused the commencement and diligent pursuit of the completion of the remainder of the items identified on the Punchlist, then the deadline for Landlord's absolute completion of all items identified on the Punchlist shall be extended for an additional fifteen (15) days following the Punchlist Completion Deadline (the "<u>Final Punchlist Completion Deadline</u>"), and Landlord shall cause the absolute completion of the remaining the items identified on the Punchlist on or before the Final Punchlist Completion Deadline. Landlord shall pay all costs for completion of items on the Punchlist, except that Tenant shall pay all costs of repair of damage to Landlord's Work caused solely by Tenant. If all items identified on the Punchlist have not been absolutely completed on or before the Punchlist Completion Deadline or, if applicable, the Final Punchlist Completion Deadline, Tenant shall have the right in the sole and absolute discretion of Tenant to cause the

absolute completion of such work, by a contractor retained by Tenant, and within thirty (30) days after Tenant provides Landlord written notice of the costs incurred by Tenant for such work (which notice shall be accompanied by receipts or other reasonable supporting documentation of such costs), Landlord shall pay to Tenant a full reimbursement of the total amount of such costs (the "Punchlist Completion Reimbursement").    If Landlord fails to make the Punchlist Completion Reimbursement when due, Tenant may recover the unpaid amount together with interest at the Default Rate (accruing from and after the expiration of such thirty (30) days period) by offset against Base Rent.

　　　　3.5.5    Delivery Date.    Landlord shall use reasonably diligent efforts to cause the Delivery Date to occur on or prior to March 1, 2019.  Notwithstanding anything to the contrary in this Lease, if the Delivery Date does not occur on or prior to the October 1, 2019 subject to delay caused solely by Tenant or caused by any Force Majeure Event, then, at any time thereafter until the Delivery Date, Tenant may cease performance and payment of any obligations hereunder and, at any time thereafter until the Delivery Date, Tenant may elect, in its sole and absolute discretion, to terminate this Lease upon sixty (60) days unambiguous written notice to Landlord of such termination.  If Tenant so terminates, then, within thirty (30) days after the effective date of such termination, Landlord shall pay to Tenant an amount equal to the actual and reasonable documented out-of-pocket costs incurred by Tenant for architectural and engineering services with respect to the Theatre, subject to the provision that such reimbursement shall not exceed $400,000.00, and the Parties shall have no further obligation to each other except (a) for any obligations that this Lease expressly states survive the termination of this Lease; and (b) that, for a period of two (2) years after such termination, Tenant shall have a right of first offer, but not an obligation, to enter into a theatre lease for the Center on the same terms and conditions set forth in Section 3.4, except that if Landlord has Substantially Completed Landlord's Work prior to the date that Landlord, Enclosed Mall Owner or West Anchor Owner would otherwise be required to deliver a written notice pursuant to the right of first offer, then Landlord shall deliver such written notice with respect to the Theatre.  If Tenant declines Landlord's offer with respect to the Theatre, or fails to respond to the offer within the time required by Section 3.4 (the "Rejected Right of First Offer"), and if Landlord has paid the Final Delivery Deadline Liquidated Damages Amount in full (if the Final Delivery Deadline Liquidated Damages Amount is payable pursuant to the terms of Section 3.5.6 below), then Landlord may enter into a lease for the Theatre for use as a motion picture theatre (notwithstanding anything in this Lease to the contrary and regardless of whether Tenant is still operating the Existing Theatre), but such lease may not be on terms more favorable in the aggregate to such other person than the terms and conditions of the offer.  Landlord covenants that, if and for so long as Tenant is open and operating under its current lease for the Existing Theatre, subject to Permitted Closures, as a motion picture theatre in the Existing Theatre, then, notwithstanding the termination of this Lease, neither Landlord, Enclosed Mall Owner nor West Anchor Owner shall suffer or allow any portion of the East Anchor Parcel, Enclosed Mall Parcel or West Anchor Parcel to be operated as a motion picture theatre, cinema eatery or similar business, except as provided for above as a consequence of a Rejected Right of First Offer.  If Tenant does not so terminate, and if Tenant has ceased performance or payment of any obligations hereunder, then Tenant shall resume performance and payment of such obligations promptly after the Delivery Date, and the time for performance of any or all of Tenant's obligations hereunder may, at Tenant's election, be extended by up to one day for each day during the period from October 1, 2019 through and including the Delivery Date.  Tenant may

elect, in its sole and absolute discretion, to waive or extend the time for performance of the Delivery Date, but shall have no obligation to do so, nor shall any extension of the Delivery Deadline operate to extend the Final Delivery Deadline.  Notwithstanding anything to the contrary herein, if Tenant elects to terminate this Lease as provided by this Section 3.5.5, but Landlord causes the Delivery Date to occur prior to the effective date of such termination, then the occurrence of the Delivery Date shall nullify Tenant's termination notice and this Lease shall continue in full force and effect.

3.5.6    Termination Amount.

3.5.6.1    Notwithstanding anything to the contrary herein, if the Delivery Date does not occur on or prior to October 1, 2020 (the "Final Delivery Deadline"), then, regardless of any Force Majeure Event or the non-occurrence of any Essential Contingencies, or the failure of any of the representations and warranties made by Landlord herein to be true (including any representations or warranties made by Landlord relating to the Encroachment Easement), Landlord acknowledges that such failure shall constitute a material breach by Landlord of this Lease.  If Tenant terminates this Lease pursuant to Section 3.5.5 on or after the Final Delivery Deadline, then Landlord shall, on or prior to the date which is 15 calendar days after receipt of Tenant's delivery to Landlord of notice of termination specifically referencing Section 3.5.5 and Section 3.5.6 of this Lease and stating unambiguously and unconditionally that Tenant is terminating this Lease and requesting payment of the Final Delivery Deadline Liquidated Damages Amount (such notice being the "Final Delivery Deadline Liquidated Damages Demand"), pay to Tenant an amount equal to $10,000,000.00 (the "Final Delivery Deadline Liquidated Damages Amount") as liquidated damages and Tenant's sole and exclusive remedy for such material breach.  Notwithstanding anything in this Lease to the contrary, upon termination of this Lease and full cash payment to Tenant of the Final Delivery Deadline Liquidated Damages Amount, Landlord, the Enclosed Mall Owner and the West Anchor Owner shall have no further obligation to restrict any portion of the East Anchor Parcel, Enclosed Mall Parcel or West Anchor Parcel from being operated as a motion picture theatre regardless of whether the Existing Theatre is still operating.

3.5.6.2    Landlord may elect to pay the Final Delivery Deadline Liquidated Damages Amount to Tenant (a) in a single lump sum or (b) in five equal annual installments of $2,000,000.00 each, with the first such installment payable within 15 calendar days after Tenant's delivery to Landlord of the notice of termination described in Section 3.5.6.1 and with each subsequent installment payable on or before each anniversary of the Final Delivery Deadline.  If Landlord elects to pay the Final Delivery Deadline Liquidated Damages Amount in five equal installments, then, concurrently with payment of the first installment of the Final Delivery Deadline Liquidated Damages Amount, Landlord shall also deliver to Tenant, as security for the payment of the remaining installments of the Final Delivery Deadline Liquidated Damages Amount, an original, executed, irrevocable letter of credit in the form of Exhibit M attached hereto (the "Liquidated Damages L/C"), issued by a financial institution whose unsecured or uncollateralized long-term debt obligations are, as of the date of issuance of the letter of credit, rated A or its equivalent ("long term credit issuer" rating) or better by Standard & Poor's (a "Qualified L/C Issuer"), with the information highlighted in yellow in Exhibit M properly completed.  Notwithstanding the foregoing, if Landlord is unable, through the use of commercially reasonable efforts, to identify a Qualified L/C Issuer who is willing to issue the

35

Liquidated Damages L/C unless the form (but not substance) of the Liquidated Damages L/C is modified, then Landlord may deliver written notice thereof to Tenant not later than 10 calendar days following receipt of the Final Delivery Deadline Liquidated Damages Demand, together with (a) a true and complete copy of the letter of credit which a Qualified L/C Issuer is willing to issue which is most similar to Exhibit M attached hereto; (b) an unequivocal and unconditional written commitment from such Qualified L/C Issuer to issue such letter of credit immediately upon acceptance by Tenant of such form; and (c) a written statement from Landlord identifying each Qualified L/C Issuer that Landlord has discussed the issuance of the Liquidated Damages L/C at any time during the period 90 days prior to the date thereof, together with the name and contact information of the responsible officer of each such Qualified L/C Issuer, and the reason given by each such Qualified L/C Issuer for not issuing the Liquidated Damages L/C in the form of Exhibit M attached hereto in reasonable detail.  If Landlord delivers such notice, together with the foregoing information, within the time and manner provided herein, and if Landlord thereby demonstrates the use of commercially reasonable efforts as required herein, then Tenant shall not unreasonably withhold its consent to issuance of such letter of credit in such form, provided that if one or more of the Qualified L/C Issuers did not issue the Liquidated Damages L/C because Landlord's credit rating, liquidity, assets or financial statements were not satisfactory, or because Landlord was unable or unwilling to pay fees or post collateral requested or required, then Tenant's withholding of consent shall be deemed reasonable.  Landlord's election to pay the Final Delivery Deadline Liquidated Damages Amount to Tenant in installments notwithstanding, Landlord and Tenant hereby agree that Landlord may at any time thereafter elect to pre-pay all of the Final Delivery Deadline Liquidated Damages Amount to Tenant.

3.5.6.3   If Landlord does not deliver the Liquidated Damages L/C within the time or in the manner provided herein, then Landlord shall be irrevocably and conclusively deemed to have elected to pay the Final Delivery Deadline Liquidated Damages Amount to Tenant in a single lump sum.  If the Liquidated Damages L/C is withdrawn, cancelled or terminated for any reason prior to payment in full of the Final Delivery Liquidated Damages Amount, or if the issuer thereof is no longer a Qualified L/C Issuer, then Landlord shall, within 30 calendar days after such withdrawal, cancellation, termination or failure to qualify, replace the Liquidated Damages L/C with a new Liquidated Damages L/C issued by a Qualified L/C Issuer. If Landlord does not replace the Liquidated Damages L/C within the time or in the manner provided herein, then Landlord shall be irrevocably and conclusively deemed to have elected to pay the remaining balance of the Final Delivery Deadline Liquidated Damages Amount to Tenant in a single lump sum, and shall do so within 30 calendar days after such withdrawal, cancellation, termination or failure to qualify.  Notwithstanding the foregoing, if Landlord receives notice that the Liquidated Damages L/C will be withdrawn, cancelled or terminated prior to the date of such withdrawal, cancellation or termination, and if Landlord does not replace the Liquidated Damages L/C prior to such withdrawal, cancellation or termination, then Tenant may elect to draw upon the Liquidated Damages L/C for the entire unpaid amount of the Final Delivery Deadline Liquidated Damages Amount prior to the withdrawal, cancellation or termination of the Liquidated Damages L/C, provided that if the withdrawal, cancellation or termination is know by Tenant with certainty to be a fixed date and time, then Tenant shall so draw upon the Liquidated Damages L/C within 72 hours prior to the time of withhdrawal, cancellation or termination.

3.5.6.4   Landlord shall pay the Final Delivery Deadline Liquidated Damages Amount, or any installment thereof, to Tenant by wire transfer of immediately available federal funds pursuant to wire instructions to be provided by Tenant.  If Landlord does not pay the Final Delivery Deadline Liquidated Damages Amount, or any installment thereof, to Tenant within the time or in the manner provided herein, then Tenant may elect to draw upon the Liquidated Damages L/C for the entire unpaid amount of the Final Delivery Deadline Liquidated Damages Amount.  In addition, Landlord shall pay to Tenant interest at the Default Rate on the entire unpaid amount of the Final Deadline Liquidated Damages Amount from the date such installment was payable until the date that the entire unpaid amount is actually paid.

3.5.6.5   Tenant shall not assign the Liquidated Damages L/C to any person other than a permitted assignee of this Lease.

3.5.6.6   Landlord acknowledges that Landlord and Tenant negotiated this Lease prior to or simultaneous with the settlement of that certain pending action entitled Eastgate Theatre, Inc. v. Portland Lloyd Center Community, LLC et al., Case No. 15 CV 30727, in the Circuit Court for the County of Multnomah (the "Pending Action").  Tenant is the plaintiff in the Pending Action.  CAPREF Lloyd Center is a defendant in the Pending Action.  As stated previously in this Lease, CAPREF Lloyd Center is an Affiliate of Landlord.  Tenant has dismissed its complaint in the Pending Action.  Tenant's damages following such material breach and termination may include, without limitation, (a) loss of the opportunity to pursue Tenant's claims against CAPREF Lloyd Center in the Pending Action; (b) loss of profits from the Theatre during the Rent Term including any Extension Periods.  Tenant has advised Landlord that, based on Tenant's calculations, Tenant's actual damages may exceed the Final Delivery Date Liquidated Damages Amount.

3.5.6.7   Landlord and Tenant have agreed that Tenant's damages arising from the failure of the Delivery Date to occur on or prior to the Final Delivery Deadline, and the termination of this Lease for such material breach, are impractical or extremely difficult to ascertain under the circumstances existing on the date hereof and that the Final Delivery Deadline Liquidated Damages Amount reflects the Parties' mutually agreed good faith estimate thereof.  The Parties also agree that termination by Tenant of this Lease and payment by Landlord of the Final Delivery Deadline Liquidated Damages Amount are reasonable in light of the anticipated and actual harm caused by such material breach, the difficulties of proof of loss and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy.  Landlord and Tenant acknowledge that the termination of this Lease by Tenant is not an unreasonable remedy and the Final Delivery Deadline Liquidated Damages Amount is not an unreasonably large amount, and is not a penalty, and both have been negotiated over the period of many months by experienced business persons, representing sophisticated parties, with competent and experienced legal counsel, with neither party acting under duress, undue influence or any other compulsion.

3.5.7   Certificate of Occupancy.  Promptly after Substantial Completion of the Theatre Construction Work (and, if and to the extent such completion is a prerequisite therefor, Substantial Completion of Tenant's Work), Landlord shall promptly seek and diligently pursue issuance by the appropriate governmental authority of a Certificate of Occupancy for the Theatre, and shall deliver it to Tenant.  Tenant shall cooperate with Landlord in obtaining the

Certificate of Occupancy, at no out-of-pocket cost to Tenant except for the cost of Tenant's Work.

3.5.8   Closeout Documentation.   Within thirty (30) days after the Delivery Date, Landlord shall cause Landlord's contractor to deliver the Closeout Documentation to Tenant. Tenant shall cause Tenant's Architect to promptly review the Closeout Documentation for consistency with the Approved Theatre Plans.   Promptly following receipt of written confirmation of consistency by Tenant's Architect, Landlord shall cause Landlord's contractor to distribute copies of the Closeout Documentation to Tenant's principal office in Knoxville, Tennessee and to Tenant's on-site representative at the Theatre.

3.5.9   Construction Utilities.   Landlord shall pay all costs for utility services incurred by the Parties during the performance of Landlord's Work and Tenant's Work.

3.6   Staging Area.

As soon as reasonably practicable, but not later than 120 calendar days prior to the Delivery Date, and thereafter until Substantial Completion of Tenant's Work, Landlord covenants and Landlord and Enclosed Mall Owner shall make available to Tenant without charge one or more areas (collectively, the "Staging Area") within the Center for the exclusive use by Tenant for storage of materials, supplies and equipment to be used in performance of Tenant's Work, and for temporary storage of construction debris in dumpsters.   The Staging Area shall have a paved or other all-weather surface that is fenced and proximate to the Theatre Site, and shall include sufficient surface area to place not fewer than 8 full-size storage containers.   The Staging Area shall also include or be situated to provide access and turnaround areas for tractor-trailer trucks.   Notwithstanding the foregoing, the size and location of the Staging Area shall be as shown on the Center Site Plan.   Landlord covenants that Landlord and Enclosed Mall Owner shall also provide Tenant with convenient access between public streets and the Staging Area over one or more routes with unobstructed paved or other all-weather surfaces.   If the Theatre is not on the ground floor, or is not on the same level as the Staging Area, then Landlord shall also provide at no cost to Tenant elevators or other mechanized means of vertical transportation between the Staging Area and the Theatre.   Landlord shall, at no cost to Tenant, maintain reasonable security at the Common Areas in which the Staging Area is located during Tenant's use of the Staging Area.

3.7   Tenant's Work.

3.7.1   Performance.   Tenant may retain a general contractor to perform Tenant's Work. Tenant shall cause Tenant's Work to be performed in accordance with the Approved Theatre Plans in a good and workmanlike manner, with new, high quality materials, and in compliance with the Work Matrix, the Development Approvals and Legal Requirements.   After the Delivery Date, Landlord covenants and Landlord and Enclosed Mall Owner shall provide Tenant with unimpeded access to the East Anchor Parcel for the performance of Tenant's Work.   Except as otherwise provided in Section 3.7.2, Tenant shall pay all costs of Tenant's Equipment and for Tenant's Work.   Tenant shall select the types, quantities and specifications for Tenant's Equipment in Tenant's sole discretion.   If a building or construction permit is required for Tenant's Work ("Tenant's Permit") which is separate from the building permit issued for

Landlord's Work, then Tenant shall, at Tenant's cost, apply for and diligently and in good faith pursue issuance of such Tenant's Permit.  Tenant shall promptly apply for Tenant's Permit and thereafter use commercially reasonable efforts to obtain issuance of the same and to obtain any Tenant Operating Permits as soon as reasonably practicable.  Landlord shall assist and cooperate with Tenant in obtaining any such Tenant's Permit and Tenant Operating Permits at no out-of-pocket expense to Landlord.  If and to the extent that Tenant complies with the requirements of this Section, then the Target Date shall not occur until the Tenant Operating Permits have been issued, provided that the Target Date shall not be delayed by more than 90 calendar days pursuant to this Section.

3.7.2   <u>Landlord Contribution</u>.  Landlord shall contribute an amount up to $5,000,000.00 in the aggregate (the "<u>Landlord Contribution</u>") to Tenant for costs attributable to Tenant's Work, including all so-called hard and soft-costs relating thereto (which shall include without limitation costs incurred by Tenant for architectural and engineering services and permitting costs with respect to the Theatre) by wire transfer of immediately available federal funds, within fifteen (15) business days after all of the following have occurred:  (i) Tenant has completed all or substantially all of Tenant's Work; and (ii) Tenant's delivery to Landlord of a written request for such payment prior to the date which is 90 calendar days after the Actual Opening Date.  Notwithstanding the foregoing, Tenant may elect in such written notice, in its sole and absolute discretion, to request disbursement of any amount less than $5,000,000.00 as Landlord's Contribution.  If Tenant elects disbursement of less than $5,000,000.00, then Landlord shall disburse such lesser amount requested.  The aggregate amount of the payments of Landlord's Contribution actually made by Landlord to Tenant is sometimes referred to herein as the "Landlord's Actual Contribution."

3.7.3   <u>Failure to Pay the Landlord Contribution</u>.  If Landlord fails to pay to Tenant the Landlord Contribution within the time and manner provided herein and in the amount requested by Tenant in accordance with the requirements of <u>Section 3.7.2</u>, and such failure continues for ten (10) days following Landlord's receipt of notice from Tenant of such failure, then Tenant may, but shall not be obligated to, offset the unpaid amount (plus interest at the Default Rate from the date such amount was payable to the date the full unpaid amount has been paid or offset) against the next installments of Base Rent then due, until the unpaid amount (plus such interest) has been paid or offset in full.  Tenant may not so offset during the continuance of an Event of Default, but may resume any offset after an Event of Default has been cured.

3.8   <u>Mechanic's Liens.</u>

If any lien arising out of work done at or materials furnished to the East Anchor Parcel by a contractor or materialman retained by Landlord or Tenant (each being a "<u>Mechanic's Lien</u>") is recorded in the chain of title for the Entire Development or any portion thereof, the Party who retained such contractor or materialman, or is alleged to have done so, or who is otherwise responsible under this Lease for the work or materials furnished, shall cause the same to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction or otherwise within twenty (20) days from and after such Party's receipt of written notice of recording of the lien.

3.9     <u>Insurance.</u>

Each of Landlord and Tenant shall maintain, or cause their respective general contractors to maintain, during the course of Landlord's Work and Tenant's Work, respectively, commercial general liability insurance coverage, property insurance and worker's compensation insurance in the amounts and providing the coverages described in <u>Section 11.4</u> and <u>Section 11.1</u>, respectively.

3.10    <u>Access.</u>

During Landlord's Work and Tenant's Work, both Parties and their respective employees, contractors and other agents, shall have access to the Center and the Theatre for the purpose of observing the work in progress, subject to reasonable restrictions.  Landlord and Tenant shall comply with such restrictions, and shall not otherwise interfere with the completion of Landlord's Work or Tenant's Work, respectively.  Landlord covenants that Enclosed Mall Owner shall take all actions necessary or appropriate to provide such access to the Enclosed Mall Parcels.

3.11    <u>Future Construction.</u>

3.11.1  "<u>Future Construction</u>" means any and all construction performed at the Center that occurs after the Rent Commencement Date (excluding construction within the Permitted Parking Development Area pursuant to <u>Section 2.5.7</u>, it being agreed that such construction shall be governed by <u>Section 2.5.7</u>) including without limitation demolition, unloading and staging, operation of construction equipment, performance of construction and the removal of construction equipment, materials and debris.

3.11.2  Landlord covenants that Landlord and Enclosed Mall Owner shall cause all Future Construction to be performed in a manner that minimizes to the maximum extent reasonably practicable under the circumstance (a) any material adverse effect upon the use by Tenant, its employees, customers, and invitees of the Theatre and the Common Areas, and (b) any cost or risk to Tenant in connection therewith.  Without limiting the generality of the foregoing, Landlord covenants that Landlord and Enclosed Mall Owner shall cause all Future Construction to be performed:

3.11.2.1  to avoid unreasonable perceptible vibration, noise and dust at the Theatre during the operating hours of the Theatre.

3.11.2.2  without material adverse effect on vehicular and pedestrian access to the Theatre and the Parking Retention Area during the operating hours of the Theatre and during the period one hour before and one hour after such operating hours.

3.11.2.3  without material adverse effect on visibility of the Theatre (including signs thereon) from NE Multnomah Street or from the Common Areas adjacent to the Theatre from which the Theatre is visible on the Delivery Date.

3.11.2.4  without material adverse effect on the non-exclusive use of the Parking Retention Area by Tenant, its employees, customers, and invitees.

40

3.11.2.5  without any disruption of utility services to the Theatre during Tenant's business hours.

3.11.2.6  such that all such Future Construction is completed within a reasonable time after visible commencement.

ARTICLE 4
RENT

4.1    Rent.

Beginning on the Rent Commencement Date, Tenant hereby agrees to pay Rent for the lease and the right of use and occupancy of the Theatre and the rights and privileges provided by this Lease, including without limitation the rights and privileges to use the Common Areas, during the Term, at the times and in the manner herein provided, without offset, reduction, deduction or abatement, except as otherwise expressly provided in this Lease.  Tenant shall pay Rent to Landlord either, at Tenant's election, (a) at the physical address of Landlord set forth on the cover page of this Lease, or (b) through the ACH or other electronic payments program then used generally by Tenant for payment of Rent.  Within 30 calendar days of the date hereof, Landlord shall enroll in Tenant's ACH payment program for payment of Rent through Bank of America, N.A., at no cost to Landlord.  If a change of ownership of the East Anchor Parcel occurs, then Landlord may deliver a written notice to Tenant setting forth the name and physical address of the new owner of the East Anchor Parcel, and such new owner shall also deliver a completed W-9, and enroll in or subscribe to Tenant's then-current electronic payment program, at no cost to such new owner, prior to the date any Rent is payable by Tenant to such new owner, prior to the date any Rent is payable by Tenant to such new owner.  Tenant may rely upon and proceed in accordance with any notice of change of ownership of the East Anchor Parcel given by Landlord in accordance with this Lease without duty of inquiry.

4.2    Certificate of Occupancy.

If Tenant initially occupies the Theatre under a certificate of occupancy that is temporary or conditional, and if Tenant's right of use and occupancy of all or any portion of the Theatre is subsequently suspended for any period prior to the date that such temporary or conditional permit is made final or unconditional through no fault, act, or omission of Tenant, then, for the period during which Tenant does not have a right to, and in fact does not, operate all of the Theatre, Tenant's obligation to pay Rent shall equitably abate based on the size and use of the portion of the Theatre which Tenant does not operate (notwithstanding that the Rent Commencement Date has occurred), with Tenant's obligation to pay Rent resuming, once the Certificate of Occupancy is made final and unconditional.

4.3    Base Rent.

Except for any period during which Special Rent or Co-Tenancy Deficiency Rent is payable hereunder, then Tenant shall pay Base Rent to Landlord during the Term.  Base Rent shall be paid in advance, on or before the first calendar day of each calendar month, provided that if the Rent Commencement Date is not the first calendar day of a calendar month, then the Base Rent payable for the first month of the Term shall be prorated based on the number of days

41

within such first partial calendar month of the Term and the actual number of days in such calendar month, and provided further that the Base Rent payable for the first month of the Term shall be payable within ten (10) Business Days after the Rent Commencement Date.  As used herein, the term ("Base Rent") means:

4.3.1    For each of the first (1st) through the fifth (5th) Rent Years, One Million Nine Hundred Seventeen Thousand Five Hundred and 00 Dollars ($1,917,500.00) annually, with one-twelfth of the total amount for each such period payable each month during such period on or before the first day of each calendar month during such period;

4.3.2    For each of the sixth (6th) through the tenth (10th) Rent Years, Two Million Fifty-Two Thousand Fifty and 00 Dollars ($2,052,050.00) annually, with one-twelfth of the total amount for each such Rent Year payable each month during such Rent Year on or before the first day of each calendar month during such Rent Year;

4.3.3    For each of the eleventh (11th) through the fifteenth (15th) Rent Years, Two Million One Hundred Ninety Five Thousand Fifty and 00 Dollars ($2,195,050.00) annually, with one-twelfth of the total amount for each such Rent Year payable each month during such Rent Year on or before the first day of each calendar month during such Rent Year;

4.3.4    If Tenant exercises the first Extension Period option, for each of the sixteenth (16th) through the twentieth (20th) Rent Years, Two Million Three Hundred Forty-Nine Thousand One Hundred and 00 Dollars ($2,349,100.00) annually, with one-twelfth of the total amount for each such Rent Year payable each month during such Rent Year on or before the first day of each calendar month during such Rent Year;

4.3.5    If Tenant exercises the second Extension Period option, for each of the twenty-first (21st) through the twenty-fifth (25th) Rent Years, Two Million Five Hundred Thirteen Thousand Five Hundred Fifty and 00 Dollars ($2,513,550.00) annually, with one-twelfth of the total amount for such Rent Year payable each month during such Rent Year on or before the first day of each calendar month during such Rent Year; and

4.3.6    If Tenant exercises the third Extension Period option, for each of the twenty-sixth (26th) through the thirtieth (30th) Rent Years, Two Million Six Hundred Eighty-Nine Thousand Seven Hundred and 00 Dollars ($2,689,700.00) annually, with one-twelfth of the total amount for such Rent Year payable each month during such Rent Year on or before the first day of each calendar month during such Rent Year.

4.4    Contribution Rent.

In addition to Base Rent, Tenant shall pay Contribution Rent to Landlord in one hundred eighty (180) equal monthly installments, as and when set forth in this Section 4.4.  As used herein, the term "Contribution Rent" means the annual amount required to amortize Landlord's Actual Contribution over 15 years at 7.00% simple interest in equal monthly installments.  If Landlord's Actual Contribution is $5,000,000.00, then Tenant shall pay to Landlord as additional rent an annual amount equal to $44,958.33 per month.  Contribution Rent shall be paid at the same time and in the same manner as Base Rent, commencing on the later of (a) the Rent Commencement Date and (b) the first calendar day of the first calendar month after the Landlord

Contribution is paid by Landlord to Tenant in accordance with <u>Section 3.7.2</u>, and ending after one hundred eighty (180) payments have been made.  Tenant shall pay Contribution Rent each and every month until all one hundred and eighty (180) payments (or their equivalent should Tenant elect to prepay) have been made regardless of whether Tenant is paying Special Rent or Co-Tenancy Deficiency Rent in lieu of Base Rent.  Tenant may elect at any time and from time to time, in its sole discretion, to prepay some or all of the installments of Contribution Rent, and any such prepayment shall be calculated by deducting the interest component thereof, but without any discount of the then-remaining payments to then-present value.  For the purpose of calculating the deduction of interest, the parties hereby confirm that Contribution Rent is calculated to provide for repayment in full of Landlord's Actual Contribution through level monthly payments over 15 years at 7.00% simple interest.  If the Landlord Contribution is paid by Landlord to Tenant, and if this Lease is terminated prior to the payment of each installment of the Contribution Rent (whether by installments or prepayment), then Tenant shall pay to Landlord the remaining balance of the Contribution Rent, which shall be calculated by deducting the interest component thereof, but without any discount of the then-remaining payments to then-present value, no later than thirty (30) days after the effective date of such termination of this Lease.

4.5     <u>Percentage Rent.</u>

        4.5.1     <u>Payment</u>.  Except for any period during the Rent Term during which Special Rent or Co-Tenancy Deficiency Rent is payable, in addition to Base Rent and Contribution Rent, Tenant shall pay Percentage Rent to Landlord.  Percentage Rent for any Rent Year shall be paid in arrears, within one hundred twenty (120) days after the last day of such Rent Year.

        4.5.2     <u>Percentage Rent Definitions</u>.

                4.5.2.1     "<u>Applicable Exclusions and Deductions</u>" means:  (a) all federal, state and local admission, sales, value-added, excise, luxury and gross receipts taxes, and taxes of the same or similar nature now or hereafter imposed on Gross Sales which must be paid, or collected, by Tenant or any subtenant of Tenant and which are paid by Tenant to the applicable governmental authorities, (b) amounts paid to charitable organizations based on or from collections made for them at the Theatre, (c) license, concession, agency and royalty fees paid by Tenant to third persons, including without limitation such fees paid to IMAX Corporation or in respect of IMAX technology relating to the Theatre, (d) discounts, allowances and refunds given or paid by Tenant to third persons relative to the operation of the Theatre, (e) interest, service or service carrying charges or other charges, however denominated, paid by Tenant or customers on sales where those charges are not included in the ticket sales price, (f) proceeds from sales of Tenant's Equipment; and (g) proceeds from sales to Tenant's employees at the Theatre (to the extent that the total amount of such sales to Tenant's employees in a Rent Year does not exceed one percent (1%) of all other Gross Sales for such Rent Year).

                4.5.2.2     "<u>Box Office Receipts</u>" means, for any Rent Year, the aggregate amounts of the actual sale price received by Tenant in such Rent Year for tickets and other admissions to the Theatre except that, with respect to four-wall deals at the Theatre, any rent or other fees received by Tenant will be included in Box Office Receipts.  For the purposes hereof, the term

"four-wall deals" means the rental of one or more auditoriums for a special event, or a limited engagement or purpose.

4.5.2.3  "Breakpoint" means:

(a)  For each of the first (1st) through the fifth (5th) Rent Years, $16,900,000.00;

(b)  For each of the sixth (6th) through the tenth (10th) Rent Years, $18,083,000.00;

(c)  For each of the eleventh (11th) through the fifteenth (15th) Rent Years, $19,348,810.00;

(d)  If Tenant exercises the first Extension Period option, for each of the sixteenth (16th) through the twentieth (20th) Rent Years, $20,703,226.70;

(e)  If Tenant exercises the second Extension Period option, for each of the twenty-first (21st) through the twenty-fifth (25th) Rent Years, $22,152,452.57; or

(f)  If Tenant exercises the third Extension Period option, for each of the twenty-sixth (26th) through the thirtieth (30th) Rent Years, $23,703,124.25.

4.5.2.4  "Concession Receipts" means, for any Rent Year, the proceeds received by Tenant in such Rent Year as a result of the sale of all food and beverages, including, without limitation, any alcoholic beverages.

4.5.2.5  "Gross Sales" means (a) the aggregate in cash or credit received in or from operations at the Theatre during each Rent Year of Box Office Receipts and Concessions Receipts, less (b) Applicable Exclusions and Deductions.

4.5.2.6  "Percentage Rent" means, for any Rent Year, an amount equal to 8.00% of the Gross Sales for such Rent Year, but only if and to the extent that Gross Sales for such Rent Year exceed the Breakpoint for such Rent Year.

4.5.3  Reporting.  Tenant shall deliver to Landlord within thirty (30) days after the end of each calendar month during the Rent Term an informal, unaudited report in Tenant's customary format showing in reasonable detail the amount of Gross Sales (a "Monthly Gross Sales Report"), without any certification as to the accuracy thereof.  Tenant shall deliver to Landlord within ninety (90) days after the end of each Rent Year an accurate statement (an "Annual Gross Sales Report") certified by an officer of Tenant, showing the amount of Gross Sales during such Rent Year and the Percentage Rent, if any, payable for such Rent Year.  Each Monthly Gross Sales Report and Annual Report shall be delivered to Landlord at the notice address of Landlord or to such other person or to such other place as may be designated from time to time by written notice from Landlord to Tenant.  Tenant shall keep at all times during the Rent Term, at the Premises or at the home or regional office of Tenant, as Tenant may elect, reasonable records of Gross Sales for no less than the period of three Rent Years.  Landlord may at any reasonable time, upon no less than fourteen (14) days' prior written notice to Tenant,

cause a review to be made of those records of Gross Sales which Tenant is required to maintain pursuant to this Section. Such review may be performed only by Landlord's employees and personnel or by a qualified third party who is not paid a percentage of any recovery and whose compensation is not contingent on a finding that a recovery is due Landlord. The person or persons performing such review shall prepare a written report in reasonable detail, and Landlord shall provide a true and complete copy thereof to Tenant within 90 calendar days after commencing such review. If a deficiency in payment of Percentage Rent by Tenant has occurred, then Landlord shall have the right to bill Tenant the amount of such deficiency, and, within thirty (30) consecutive days following receipt of such bill together with such report, Tenant shall pay to Landlord the amount of the deficiency plus interest at the Default Rate. If (A) any Annual Gross Sales Report understates the total amount of Gross Sales to the extent of three percent (3%) or more; or (B) Tenant has not kept materially complete records of Gross Sales, as required by this Section; then, in addition to billing Tenant the amount of such deficiency, Landlord shall have the right to bill Tenant the reasonable cost incurred by Landlord of said review, and, within thirty (30) consecutive days following receipt of such bill together with a copy of the review report, Tenant shall pay to Landlord the reasonable cost of such review. If an overpayment of Percentage Rent by Tenant has occurred, then Tenant shall have the right to offset such overpayment plus interest at the Default Rate against the next installments of Rent payable hereunder.

      4.5.4   <u>Calendar or Fiscal Year</u>. Notwithstanding anything to the contrary herein, Tenant may elect at any time during the Rent Term to account for and pay Percentage Rent on a calendar or fiscal year basis, rather than on the basis of Rent Years. If Tenant makes such election, then Tenant shall provide a statement pursuant to this Section within ninety (90) calendar days after each such calendar or fiscal year, and within ninety (90) days after each partial calendar or fiscal year during the Rent Term resulting from such election. In the event of any election by Tenant under this <u>Section 4.5.4</u>, the applicable Breakpoint shall be adjusted for any accounting period containing more or less than twelve (12) full calendar months based on a 365-day period per Rent Year.

      4.5.5   <u>Confidentiality</u>. Landlord shall only disclose Gross Sales Information to those of its officers, employees and Representatives who Landlord determines have a bona fide need to know such Gross Sales Information in connection with the ownership, operation, or financing of the East Anchor Parcel, and then only to the extent of such need to know. Except as otherwise provided by this <u>Section 4.5.5</u>, Landlord shall not, without the prior written consent of Tenant, disclose Gross Sales Information to any person or entity whatsoever, without the prior written consent of Tenant, which consent may be given or withheld in Tenant's sole and absolute discretion. Landlord shall cause each of its officers, employees and Representatives to maintain the confidentiality of all Gross Sales Information in accordance with the terms of this Lease. Landlord shall be responsible for any breach of this Lease by any of its officers, employees and Representatives. As used herein, the term "<u>Gross Sales Information</u>" shall mean any and all information about Gross Sales, including amounts and types thereof, which Tenant provides to Landlord including without limitation any copies, summaries, analyses, compilations, studies, reports or documents prepared by Landlord or its Representatives which contain, in whole or in part, any Gross Sales Information. As used herein, the term "<u>Representative</u>" shall mean any person who is a consultant, attorney, accountant or other representative for Landlord or any mortgagee of Landlord or bona fide prospective purchaser of the East Anchor Parcel.

ARTICLE 5
CO-TENANCY

5.1     Opening Co-Tenancy.

5.1.1     Notwithstanding anything to the contrary in this Lease, so long as Tenant has delivered written notice to Landlord of Tenant's anticipated Actual Opening Date (but only if such Actual Opening Date will precede the Target Date) at least thirty (30) days prior thereto, and if Landlord has not delivered to Tenant the Opening Co-Tenancy Satisfaction Notice on or prior to the date that would otherwise be fifteen (15) calendar days prior to the Rent Commencement Date, then Tenant may elect, in its sole and absolute discretion, to either (a) cause the Rent Commencement Date to be deferred until fifteen (15) calendar days after Landlord has delivered to Tenant the Opening Co-Tenancy Satisfaction Notice, in which case the Required Opening Date shall be deferred until sixty (60) calendar days after Landlord has delivered such notice; or (b) cause the Actual Opening Date to occur on or at any time after the date which would otherwise be the Rent Commencement Date, in which case Tenant may elect to pay Co-Tenancy Deficiency Rent for and in respect of the period (the "Opening Co-Tenancy Failure Period") from the Actual Opening Date through and including the date which is fifteen (15) calendar days after Landlord delivers to Tenant the Opening Co-Tenancy Satisfaction Notice.  If Tenant elects to pay Co-Tenancy Deficiency Rent hereunder, then Co-Tenancy Deficiency Rent shall be payable for such period.  For so long as Tenant does not elect to cause the Actual Opening Date to occur, Tenant shall be deemed to have elected to cause the Rent Commencement Date and the Required Opening Date to be deferred as provided above.  For the purposes hereof, the "Opening Co-Tenancy Satisfaction Notice" shall mean an accurate written notice specifically referencing this Section of this Lease and stating unambiguously and unconditionally that the Opening Co-Tenancy Requirement is fully satisfied, together with reasonable written evidence thereof.  Without limiting the generality of the foregoing, such notice shall state with respect to the two (2) required restaurant tenants, the full legal name of such restaurant tenants and the location of the spaces actually occupied by such restaurant tenants.  Tenant shall be entitled to rely upon the accuracy of the contents of an Opening Co-Tenancy Satisfaction Notice without duty of inquiry, but shall not be required to act upon such notice if it is inaccurate and if Tenant notifies Landlord of such inaccuracy and its intention not to act within a reasonable period after discovery of such inaccuracy.

5.1.2     The term "Opening Co-Tenancy Requirement" means:

5.1.2.1   a minimum of two (2) restaurants must be open and operating at the Center, at least one (1) of which shall be a sit-down restaurant with table service, and at least one (1) of which restaurants shall be on the ground level of the Center in one of the locations designated as "**Co-Tenancy Restaurant Location**" on the Center Site Plan, provided that if such restaurant is located within what is now the Macy's Premises or is in the Macy's Expansion Area, such restaurant shall have a newly-constructed main entrance that opens directly to the exterior of the Center (as opposed to an entrance that opens to the interior of the Enclosed Mall or the Macy's Premises).

5.1.2.2   A minimum of sixty percent (60.00%) of the retail GLA in the Center (exclusive of the East Anchor Parcel and the West Anchor Parcel) is leased to retail, restaurant,

46

and/or entertainment tenants, such tenants occupy space within the Center and such tenants are open for business therein to the paying public.

        5.1.2.3   All exterior construction on the East Anchor Parcel and within the Parking Retention Area, the No Change Area and Restricted Change Area has been Substantially Completed such that no exterior work thereon remains unfinished.

        5.1.2.4   The Common Areas Work has been Substantially Completed, and all vehicular and pedestrian access from all adjacent or nearby public streets and sidewalks to the East Anchor Parcel, the Parking Retention Area, the No Change Area and the Restricted Change Area is open to the public, all interior streets, driveways and sidewalks on the East Anchor Parcel and on any portion of the Enclosed Mall Parcels within 1,000 linear feet of the main entrance to the Theatre are completed and unobstructed and all parking areas within the Common Areas (including without limitation the Parking Retention Area) are in the condition required herein.

        5.1.2.5   The Enclosed Mall Access Route and each Designated Mall Entrance is open to the Tenant's customers and the general public pursuant to <u>Section 2.5.6</u>.

       5.1.3   If the Opening Co-Tenancy Failure Period continues uninterrupted for six (6) consecutive months after the earlier to occur of the anticipated Actual Opening Date specified in Tenant's written notice or the Target Date, then Tenant shall be required to cause the Actual Opening Date to occur on the date immediately following the expiration of such six (6) month period, subject to Tenant's right to pay Co-Tenancy Deficiency Rent from such Actual Opening Date through and including the date which is fifteen (15) calendar days after Landlord delivers to Tenant an Opening Co-Tenancy Satisfaction Notice.  The contractual remedies specified in this <u>Section 5.1.3</u> shall constitute Tenant's sole and exclusive remedies for any Opening Co-Tenancy Failure Period. Landlord covenants that the Opening Co-Tenancy Requirement shall apply as provided herein regardless of any action or inaction of any kind by Enclosed Mall Owner with respect to the Enclosed Mall Parcels.

## 5.2    <u>Co-Tenancy Deficiency Rent</u>

       5.2.1   The term "<u>Co-Tenancy Deficiency Rent</u>" means, for any period, ten percent (10.00%) of all Gross Sales without regard to any Breakpoint during such period in complete substitution of Tenant's obligation to pay Base Rent or Percentage Rent.  Co-Tenancy Deficiency Rent shall be payable in arrears, on or before the twentieth (20th) calendar day of each succeeding calendar month.  If Co-Tenancy Deficiency Rent is payable for all or any portion of a calendar month for which Base Rent was paid in advance, then Tenant shall be entitled to an offset against the next installment of Co-Tenancy Deficiency Rent (or Base Rent, as the case may be) otherwise payable hereunder in an amount equal to the difference between Base Rent so paid for such period and the Co-Tenancy Deficiency Rent payable for such period.  At any time that Co-Tenancy Deficiency Rent is payable hereunder, Tenant shall have no obligation to pay Special Rent, Base Rent, or Percentage Rent, provided that if Special Rent would otherwise be payable hereunder, Tenant may elect to pay Special Rent in lieu of Co-Tenancy Deficiency Rent.

       5.2.2   Landlord and Tenant have agreed that actual damages that Tenant may sustain as a result of the failure of the Opening Co-Tenancy Requirement are impractical or extremely

difficult to ascertain under the circumstances existing on the date hereof and payment of Co-Tenancy Deficiency Rent reflects the Parties' mutually agreed good faith reasonable estimate thereof.  The Parties also agree that payment of Co-Tenancy Deficiency Rent is reasonable in light of the anticipated and actual harm caused by such material breach, the difficulties of proof of loss and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy.

5.3     On-Going Co-Tenancy.

5.3.1     If the On-Going Co-Tenancy Requirement is not satisfied at any time after the Opening Co-Tenancy Requirement is satisfied, then Tenant may elect to pay Co-Tenancy Deficiency Rent for and in respect of the period (the "On-Going Co-Tenancy Failure Period") during which the On-Going Co-Tenancy Requirement is not satisfied, through and including the last day of the calendar month in which the On-Going Co-Tenancy Requirement is fully satisfied.  Only if Tenant elects to pay Co-Tenancy Deficiency Rent hereunder shall Co-Tenancy Deficiency Rent be payable for such period.  Upon termination of an On-Going Co-Tenancy Failure Period, Landlord shall deliver an accurate written notice (an "On-Going Co-Tenancy Satisfaction Notice") to Tenant stating that the On-Going Co-Tenancy Requirement is fully satisfied, together with reasonable written evidence thereof.

5.3.2     The term "On-Going Co-Tenancy Requirement" has the same meaning as Opening Co-Tenancy Requirement less and except Sections 5.1.2.3 and 5.1.2.4.  Landlord covenants that the On-Going Co-Tenancy Requirement shall apply as provided herein regardless of any action or inaction of any kind by Enclosed Mall Owner with respect to the Enclosed Mall Parcels.

5.3.3     Landlord and Tenant have agreed that actual damages that Tenant may sustain as a result of the failure of the On-Going Co-Tenancy Requirement are impractical or extremely difficult to ascertain under the circumstances existing on the date hereof and payment of Co-Tenancy Deficiency Rent reflects the Parties' mutually agreed good faith reasonable estimate thereof.  The Parties also agree that payment of Co-Tenancy Deficiency Rent is reasonable in light of the anticipated and actual harm caused by such material breach, the difficulties of proof of loss and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy.  The contractual remedies specified in this Section 5.3 shall constitute Tenant's sole and exclusive remedies for any On-Going Co-Tenancy Failure Period.

ARTICLE 6
UTILITIES AND SERVICES

6.1     Utilities.

As part of Landlord's Work, all lines, conduits, equipment and facilities for all utilities to serve the Theatre, including water, sanitary sewer, storm sewer, electricity, gas and telephone, and all lines, conduits, equipment and facilities for all utilities to serve the pad or structure which will house Tenant's trash compactor, including water, sanitary sewer, and electricity shall be provided and installed, all as shown on the Approved Theatre Plans.  Where meters are used by the utility provider for measurement of consumption and/or billing, such utility work by Landlord shall include the installation of meters to be owned by the utility provider that measure

only the utility use in the Theatre, so that Tenant will be billed directly by the utility provider only for utility use in the Theatre.  Notwithstanding the foregoing, if a utility provider will not, despite the use of commercially reasonable efforts by Landlord, agree to install its own meter to separately measure only the utility use by Tenant in the Theatre, then Landlord shall, at Landlord's sole cost, install, operate and maintain an accurate sub-meter at a location on or within the Premises reasonably and mutually agreed to by Landlord and Tenant.  Tenant shall have access to such sub-meter at all times, and may test such meter from time to time.  Landlord shall be solely responsible for the payment of any and all taxes, charges and fees imposed with respect to the installation of, or connection to, utility systems, including any tap fees and any taxes, charges and fees based on the impact of the development of the Theatre or the Center on utility services.  Landlord covenants that Enclosed Mall Owner shall take all actions necessary or appropriate to provide such utility service to the Theatre.

6.2     Charges for Utility Services.

During the Term, Tenant shall pay to the utility provider all charges for Tenant's use of sanitary sewer, gas, electricity, water, telephone utility services and any other utility services exclusively serving the Theatre.  Notwithstanding the foregoing, if a utility provider has not, despite the use of commercially reasonable efforts by Landlord, installed its own meter to separately measure only the utility use of Tenant in the Theatre, and if Landlord has installed a sub-meter as provided in Section 6.1, then Landlord may bill Tenant for Tenant's pro rata share of the actual cost of such utility, as actually paid by Landlord to such utility provider, with pro rata share calculated on the basis of reasonably concurrent readings of the utility meter and sub-meter.  Such pro rata share shall be paid by Tenant without markup or added cost of any kind within thirty (30) days of Tenant's receipt of such bill and supporting documentation (as required herein) from Landlord.  In connection with each such billing, Landlord shall provide a true and complete copy of the utility provider's actual invoice for such period, together with a certification by an officer or employee of Landlord stating the dates and times on which the sub-meter was read, the readings on such dates, and the name of the person performing such reading.  Landlord covenants that Enclosed Mall Owner shall take all actions necessary or appropriate to provide such utility billing for the Theatre.

6.3     Trash Removal.

As part of Landlord's Work, Landlord shall construct a pad and structure or enclosure on ground level for the housing of a trash compactor for the sole and exclusive use of Tenant, and for a trash chute for deposit of trash from the Theatre into the trash compactor, with sufficient overhead room to enable reasonable access for removal of trash, and with electric, water and sewer utility services extended and connected thereto, at the location shown on the Center Site Plan.  Tenant shall be responsible for the removal of trash from said trash compactor as Tenant deems reasonably necessary.

ARTICLE 7
USE OF PREMISES

7.1     Use and Trade Name.

The "Permitted Use" means, collectively, the Primary Use and the Incidental Use.  The "Primary Use" means the operation of a First Class, multi-auditorium motion picture theatre presenting motion pictures, movies and films including without limitation the presentation of pre-show entertainment, previews, trailers and advertising, in each case at the times and in the manner designated by Tenant from time to time.  The "Incidental Use" means (a) the operation of mechanical, electronic and video amusement, entertainment and game machines or devices (as all of the foregoing may expand, change or evolve over time through technology or otherwise) within the Theatre provided that there are not more than ten (10) game machines and such machines are in an area that is not separately enclosed from the remainder of the Theatre by a door or otherwise and provided that the area devoted exclusively to the use of such machines does not exceed more than 5.00% of the floor area of the Theatre in the aggregate; (b) the operation of food and beverage concession areas including without limitation the sale of popcorn, hot dogs, candy, ice cream, soda, specialty café items, alcoholic beverages for on-premises consumption and other food and beverage items; (c) the retail sale of DVDs, games, memorabilia and other items customarily sold in 20 or more other motion picture theatres operated by Tenant or its Affiliates provided that any area devoted exclusively to the retail sale of books, magazines, periodicals and newspapers whether in print, on tape, disk, CD-ROM or other technology does not exceed more than 750 square feet of the floor area of the Theatre in the aggregate, and provided that such sale does not include the sale of fireworks or explosives; (d) the presentation of any one or more other forms of entertainment including without limitation concerts, sporting events  and other events, whether live or transmitted via satellite, hard lines or recorded transmissions (as all of the foregoing may expand, change or evolve over time through technology or otherwise) or other presentation of pre-show entertainment; and (e) the conducting of meetings, lectures, church services or other similar public or private events, provided that church services and such meetings for educational purposes or otherwise are sufficiently limited in frequency, scale and duration so as to remain incidental to the Primary Use.  Notwithstanding the foregoing, nothing herein shall be interpreted as allowing the Permitted Use to include operation of any portion of the Theatre as a bowling alley or skating rink.  Tenant may, at its sole cost and expense, but subject to the terms, conditions, and provisions of this Lease, install, operate, maintain, repair, remove or replace equipment necessary or appropriate in Tenant's discretion in connection with the Permitted Use from time to time including, without limitation, satellite dishes, telecommunications equipment, change machines, vending machines and automated teller or ticket machines.  Tenant shall operate the Theatre only for the Permitted Use and for no other use or purpose whatsoever.  Any use of the Theatre other than for the Permitted Use shall be subject to: (i) Landlord's prior consent, which shall not be unreasonably withheld, conditioned or delayed; (ii) any Existing Restricted Uses or Prohibited Uses; provided, however, that Landlord shall not withhold its consent to a change in the Incidental Use not included in the definition of Incidental Use as may become appropriate due to changes in the circumstances of the motion picture theatre business, provided the proposed change in such Incidental Use (i) is a use, as of any date of determination, included in other retail shopping centers; (ii) does not conflict with any then-existing restricted use clause in favor of another tenant to which Landlord is subject; (iii) exists at 20 or more other motion picture theatres operated by Tenant and its

50

affiliates; and (iv) complies with any all Legal Requirements.  If Tenant serves alcoholic beverages at the Theatre, Tenant shall, at Tenant's sole cost and expense, (A) obtain and maintain all Alcohol Approvals, (B) comply with all Legal Requirements applicable to the sale and service of alcoholic beverages at the Theatre, and (C) obtain and maintain the insurance applicable to alcoholic beverages as described in <u>Section 11.1.1.4</u>.  Landlord agrees to reasonably cooperate with Tenant, at no out-of-pocket cost to Landlord, in Tenant's obtaining all Alcohol Approvals. Notwithstanding anything contained in this Lease to the contrary, Tenant shall not use the Theatre generally for display or presentation of motion pictures or telecasts which have been given an MPAA (Motion Picture Association of America) rating of "NC-17" (or if such rating is no longer used, its generally recognized equivalent), although Tenant may show such motion pictures and telecasts occasionally if in Tenant's reasonable business judgment, any such motion picture or telecast has artistic merit or is a so called "legitimate" film and provided that Tenant's display of advertising or promotional materials within the Center but outside the Theatre relating to any such motion picture or telecast are consistent with advertising or promotional materials used generally by exhibitors of such motion picture or telecast at other similarly situated urban regional shopping centers in the Pacific Northwest which are generally considered to be "first class."  Tenant shall not use the Theatre for the display of presentation of any motion picture or telecast which has been given an MPAA rating of "X" (or if such ratings are no longer used, their generally recognized equivalent).  If a motion picture is not rated by the MPAA, then Tenant may display or present the motion picture at the Theatre if Tenant reasonably determines that the motion picture would, if rated in a manner consistent with standards used by the MPAA in rating motion pictures, be rated in a manner that would allow it to be shown at the Theatre pursuant to requirements relating to MPAA ratings in this Section. Without limiting the generality of the foregoing, Tenant may display or present pre-show entertainment which is not rated by the MPAA but which has been approved by the MPAA for display or presentation to audiences of a motion picture that may be shown at the Theatre pursuant to requirements relating to MPAA ratings in this Section.

7.2     <u>Trade Names.</u>

Tenant shall operate in the Theatre under the trade name "Eastgate Theatres," "Regal Cinemas" or "Edwards Theatres", or another trade name incorporating the words "Regal" or "Edwards", or another trade name used by a majority of Tenant's motion picture theatres in Oregon, California, and Washington.

7.3     <u>Satellite Dishes; Ticket Machines; Poster Cases.</u>

Tenant may install, operate, maintain, repair and replace one or more satellite dishes on the roof of the Theatre, using a roof mount reasonably satisfactory to Landlord and utilizing Landlord's roof contractor, provided that Landlord promptly makes its roof contractor available to Tenant at competitive rates for such purpose.  Tenant will be responsible for any negligence or misconduct of the roof contractor retained by Tenant; provided that Tenant shall have no liability for the negligence or misconduct of Landlord's roof contractor.  Tenant may install, operate, maintain, repair and replace poster cases, digital media and automated teller or ticket machines on (a) the exterior sides of the exterior walls of the Theatre facing the direction or directions of pedestrian access to the main entrance to the Theatre, and, (b) if and to the extent included in the Approved Theatre Plans or otherwise approved by Landlord, in the Common Areas immediately

adjacent to the entrance to the Theatre. The particular locations for each of the foregoing shall be as specified in the Approved Theatre Plans or as separately agreed upon by the Parties in writing, each acting in good faith. If the particular locations are on the Enclosed Mall Parcels, Landlord covenants that Enclosed Mall Owner shall take all actions reasonably necessary or appropriate to make such locations available.

7.4    Hours.

7.4.1    Except as otherwise provided in this Lease, including without limitation Section 5.1, Tenant shall open for business at the Theatre to the paying public as a First Class motion picture theatre on or before the date which is sixty (60) calendar days after the Target Date (the "Required Opening Date").

7.4.2    Tenant shall not discontinue use of all or substantially all of the Theatre for the Primary Use for more than ninety (90) consecutive calendar days during the period from the Actual Opening Date through the expiration of the 12th Rent Year (the "Required Operating Period"), subject to Permitted Closures. Notwithstanding the foregoing, Tenant shall not be required to operate in the Theatre (a) at any time that operation of the Theatre is prohibited by or otherwise materially adversely affected by any Legal Requirement through no fault, act, or omission of Tenant; (b) at any time that operation of the Theatre is excused under this Lease, including without limitation pursuant to any termination right hereunder; or (c) on any day or days of the week or year when other motion picture theatres generally do not then operate in the City of Portland or in Multnomah County or on which other retail tenants of the Center generally do not then operate at the Center. Any such closure as described in this Section 7.4.2 or any other Permitted Closures shall not be included in the 90-day period referenced above.

7.4.3    If, at any time after the expiration of the Required Operating Period, Tenant discontinues use of the Theatre for the Primary Use for more than one hundred eighty (180) consecutive calendar days, other than as permitted under Section 7.4.2, then Landlord may elect, in its sole and absolute discretion, as its sole and exclusive remedy, to terminate this Lease by delivering to Tenant a written notice of such termination at any time after the expiration of such 180-day period, but prior to the date on which Tenant resumes operation of the Theatre for the Primary Use in all or substantially all of the Theatre. Such notice of termination shall be unambiguous and unconditional and once given shall be irrevocable. If Landlord delivers such notice of termination in the manner provided herein, then (a) this Lease shall terminate on the effective date designated in such notice of termination, which effective date shall not be more than sixty (60) nor less than thirty (30) calendar days after delivery of such notice of termination, (b) Tenant may remove Tenant's Property during the Removal Period, (c) Tenant shall pre-pay Landlord for any unpaid portion of the Contribution Rent, with the amount of such pre-payment calculated in the manner set forth in Section 4.4, and (d) neither Party shall have any further obligation or liability to the other hereunder, except for those obligations that expressly survive the expiration or earlier termination of this Lease. Notwithstanding the foregoing, Tenant may nullify any such notice of termination by re-opening all or substantially all of the Theatre for the Primary Use within thirty (30) calendar days after delivery of such notice of termination. During the Rent Term, Tenant may nullify any such notice of termination due to an extended closure under this Section 7.4.3 by re-opening no more than once.

7.4.4    Nothing contained herein shall be construed as requiring or allowing Tenant to operate 24 hours per day.  Tenant may operate during the hours and on the days that Tenant deems appropriate in its sole but commercially reasonable discretion, and may alter and vary its operating hours as it reasonably deems appropriate from time to time, subject to notice to Landlord thereof as provided in <u>Section 2.5.3</u>.

7.4.5    Not later than 30 calendar days after the Actual Opening Date, Tenant shall deliver written notice of termination of the lease for the Existing Theatre pursuant to Section 6.1 of the Second Amendment to the lease for the Existing Theatre.

7.5    <u>Alterations.</u>

After the Completion of Tenant's Work, Tenant shall have the right, from time to time, at Tenant's expense, to make such nonstructural alterations to the interior of the Theatre as Tenant deems appropriate; provided that Tenant shall not make structural changes to the Theatre, alterations to utilities or elements of the Theatre other than those which Tenant is required by this Lease to maintain, or alterations to the roof or exterior of the Theatre without the prior written consent of Landlord, not to be unreasonably withheld, conditioned or delayed.  Tenant shall cause such work to be performed in a good and workmanlike manner and in compliance with Legal Requirements.  Such work shall be subject to the provisions of <u>Section 3.8</u> regarding mechanic's or materialman's liens.  Tenant shall deliver as-built drawings to Landlord within thirty (30) days after completion of any alterations to the Theatre for which Landlord's consent is required.  No submission to Landlord of any proposed plans and specifications for any structural, mechanical, or exterior alterations to the Theatre, no approval of any such alteration by Landlord, and no execution of or cooperation with any application in connection therewith shall in any way be deemed to be an agreement of or approval by Landlord that the contemplated alterations comply with Legal Requirements or insurance requirements or is accurate or correct from a design, engineering, or construction perspective.  If any violation of Legal Requirements, the CC&R's, or any other legal obligation arises solely from Tenant's alteration of the Theatre, then Tenant promptly and diligently shall cause such violation to be cured.  Tenant shall cause all alterations to be performed in a manner that minimizes to the maximum extent reasonably practicable under the circumstance any material adverse effect upon the use and enjoyment of the Center by other tenants and their employees, customers, and invitees, or cause Landlord to incur any cost or risk in connection therewith.  Without limiting the generality of the foregoing, Tenant shall use commercially reasonable efforts to cause all alterations to the Theatre to be performed: (a) to avoid unreasonable vibration, noise and dust at the Entire Development, (b) without material adverse effect on vehicular and pedestrian access to and parking within the Common Areas, (c) without material adverse effect on the visibility of signage within the Entire Development from any from any public right of way adjacent thereto, (d) without any material or prolonged disruption of utility services to the Center, or any portion thereof, during the Center's normal business hours, and (e) such that all exterior, structural, and/or mechanical alterations are completed within a reasonable time after commencement.

7.6    <u>Landlord's Covenants.</u>

7.6.1    <u>Landlord's Use Covenant</u>.   Throughout the Term, Landlord covenants that neither Landlord, Enclosed Mall Owner nor West Anchor Owner shall suffer or allow any person

or entity to operate within the Center as a motion picture theatre or to otherwise display motion pictures, movies and films on any media, regardless of the technology involved including without limitation motion pictures, movies and films which include multiple dimension, motion simulation or virtual reality processes (such covenant, the "Theatre Use Covenant").  The Theatre Use Covenant shall not preclude the display of media by any Tenant whose primary use is as a full service sit-down restaurant such as Dave and Buster's, provided that such media does not include more than 25% of the normal running time of any motion picture, movie or film such as, for example, trailers or advertisements or specialty content associated with video games or similar attractions, amusement rides or simulators.  The Theatre Use Covenant shall also not preclude the display of media by a Tenant whose primary (or accessory) use is as an electronics retailer provided that (a) such media does not include any motion picture, movie or film that was first released at any time within five (5) calendar years prior to the date of such display; (b) the portion of any motion picture, movie or film shown does not exceed 25% of the normal running time of such motion picture, movie or film; (c) such media is displayed, connected to or associated with electronics equipment which such retailer offers for sale at such premises; (d) no seating for viewing such media is provided; and (e) no fee, subscriptions, minimum purchase or other amount is charged for admission to such premises.  The Theatre Use Covenant shall also not apply to the display of media by any residential tenant within the residential unit of such tenant, if no fee or other amount is charged for admission to such unit to view such media.  The Theatre Use Covenant shall not preclude the display of motion pictures, movies and films by any tenant under any lease existing on the Effective Date (not including for this purpose any amendments or supplements thereto made after the Effective Date) which permits the display of motion pictures, movies and films or permits a change in use to include the display of motion pictures, movies and films without consent or approval of Landlord, Enclosed Mall Owner or West Anchor Owner, respectively.  Landlord represents and warrants to Tenant that, to its knowledge, based on a review of its own files and those of Enclosed Mall Owner and West Anchor Owner, no lease existing on the Effective Date permits the display of motion pictures, movies and films within the Center or permits a change in use to include the display of motion pictures, movies and films within the Center without consent or approval of Landlord, Enclosed Mall Owner or West Anchor Owner, respectively, except for the leases for space occupied by: (i) Ross Dress for Less; (ii) Verizon Wireless; (iii) H&M; (iv) Old Navy; (v) Starbuck's; (vi) The Gap; (vii) 4G Mobile; (viii); AT&T Mobility; (ix) Barnes & Noble; (x) Best Buy Mobile; (xi) Cellaires; (xii) Forever 21; (xiii) GameStop; (xiv) Hot Topics; (xv) Radio Shack; (xvi) Suncoast Motion Pictures; (xvii) The Children's Place; and (xviii) T-Mobile.

     7.6.2   Landlord's Concession Covenant.  Throughout the Term, Landlord covenants that neither Landlord nor Enclosed Mall Owner shall suffer or allow any person or entity (a) to sell or to serve popped popcorn within the Proximate Sales Area (as defined below)  provided that the foregoing shall not restrict the sale or service of popped popcorn solely for on-premises consumption in any full-service sit-down restaurant within the Center); and (b) to sell or to serve ice cream, frozen yogurt, hot dogs, bulk candy, sodas or colas within the area designated on the Center Site Plan as the "Proximate Sales Area" except for on-premises consumption in any full-service sit-down restaurant (such covenant, the "Concession Use Covenant").  For the purposes hereof, sale or service for on-premises consumption shall mean sale or service by the merchant solely in glass, ceramic, metal or other non-disposable serving containers (not including original retail packaging such as soda cans or soda bottles) which are not intended for single use by customers.  The Concession Use Covenant does not preclude the sale or service of popped

popcorn, ice cream, frozen yogurt, hot dogs, bulk candy, sodas or colas within premises leased by others which are not generally open to the public (e.g. employee only areas, offices or breakrooms) to employees of such premises for consumption within such premises. The Concession Use Covenant does not preclude the sale or service of popped popcorn, ice cream, frozen yogurt, hot dogs, bulk candy, sodas or colas by any tenant under any lease existing on the Effective Date (not including for this purpose any amendments or supplements thereto made after the Effective Date) which permits the sale or service of popped popcorn, ice cream, frozen yogurt, hot dogs, bulk candy, sodas or colas, respectively, or permits a change in use to include the sale or service of popped popcorn, ice cream, frozen yogurt, hot dogs, bulk candy, sodas or colas, respectively, without consent or approval of Landlord or Enclosed Mall Owner, respectively. Landlord represents and warrants to Tenant that, to its knowledge, based on a review of its own files and those of CAPREF Lloyd II, no lease for space within the Proximate Sales Area existing on the Effective Date permits the sale or service of popped popcorn, ice cream, frozen yogurt, hot dogs, bulk candy, sodas or colas or permits a change in use to include the sale or service of popped popcorn, ice cream, frozen yogurt, hot dogs, bulk candy, sodas or colas within the Proximate Sales Area without consent or approval of Landlord or Enclosed Mall Owner, respectively, other than this Lease, except for the leases for space occupied by Marshall's, Old Navy and The Gap.

7.6.3   Remedy.  If a violation of the Theatre Use Covenant occurs, then Tenant may deliver written notice thereof to Landlord at any time after discovery thereof and Tenant may (a) elect to pay Special Rent to Landlord for the period from the date of delivery of such notice through the date on which such violation ends, and (b) if such violation continues for more than 120 calendar days after delivery of such notice, then Tenant may terminate this Lease effective as of the date set forth in such notice, which shall be not less than 30 calendar days after delivery thereof.  If a violation of any one or more of the Concession Use Covenant occurs, then Tenant may deliver written notice thereof to Landlord at any time after discovery thereof and Tenant may elect to pay Special Rent for the period from the date that is 15 calendar days after delivery of such notice (if the violation is continuing on or after such date) through the date on which such violation ends.  Only if Tenant elects to pay Special Rent hereunder shall Special Rent be payable for such period.

7.6.4   "Special Rent" means, for the period of any violation of the Theatre Use Covenant or Concession Use Covenant, ten percent (10.00%) of all Gross Sales, in each case regardless of Breakpoint during such period in complete substitution of Tenant's obligation to pay Base Rent and Percentage Rent.  Special Rent shall be payable in arrears, on or before the twentieth (20th) calendar day of each succeeding calendar month.  If Special Rent is payable for all or any portion of a calendar month for which Base Rent was paid in advance, then Tenant shall be entitled to an offset against the next installment of monthly Special Rent (or Base Rent, as the case may be) otherwise payable hereunder in an amount equal to the difference between Base Rent so paid for such period and Special Rent payable for such period, until the full amount thereof has been offset in full.  At any time that Special Rent is payable hereunder, Tenant shall have no obligation to pay Co-Tenancy Deficiency Rent, Base Rent, or Percentage Rent, provided that if Co-Tenancy Deficiency Rent would otherwise be payable hereunder, Tenant may elect to pay Co-Tenancy Deficiency Rent.

7.6.5    <u>Good Faith Estimate</u>.  Landlord and Tenant have agreed that actual damages that Tenant may sustain as a result of any violation of the Theatre Use Covenant or Concession Use Covenant are impractical or extremely difficult to ascertain under the circumstances existing on the date hereof and payment of Special Rent reflects the Parties' mutually agreed good faith reasonable estimate thereof.  The Parties also agree that payment of Special Rent is reasonable in light of the anticipated and actual harm caused by such material breach, the difficulties of proof of loss and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy.

7.6.6    <u>Further Assurances</u>.  Landlord covenants that, during the Term hereof, each of Landlord, Enclosed Mall Owner and West Anchor Owner shall cause future leases or other occupancy agreements for the Center to be subject to and include the Theatre Use Covenant and the Concessions Use Covenant.  Landlord covenants that neither Landlord, Enclosed Mall Owner nor West Anchor Owner shall (a) consent to or otherwise approve, to the extent that Landlord, Enclosed Mall Owner or West Anchor Owner has the right to withhold or condition its consent to or otherwise disapprove or condition its approval of, any change of use or waive any restriction on use of any portion of the Center which could reasonably be expected to result in a violation of the Theatre Use Covenant or Concession Use Covenant; (b) consent to or otherwise approve, to the extent that Landlord, Enclosed Mall Owner or West Anchor Owner has the right to withhold or condition its consent to or otherwise disapprove or condition its approval of, any assignment or sublease or waive any restriction on assignment or subletting which could reasonably be expected to result in a violation of the Theatre Use Covenant or Concession Use Covenant; (c) consent to or otherwise approve, to the extent that Landlord, Enclosed Mall Owner or West Anchor Owner has the right to withhold or condition its consent to or otherwise disapprove or condition its approval of, any alterations or additions or waive any restriction on alterations or additions which could reasonably be expected to result in a violation of the Theatre Use Covenant or Concession Use Covenant; or (d) otherwise consent to, approve or waive, to the extent that Landlord, Enclosed Mall Owner or West Anchor Owner has the right to withhold its consent to, waiver of or otherwise disapprove condition its approval of, any matter under any lease or under the CC&Rs for any portion of the Center, if such consent, approval or waiver could reasonably be expected to result in a violation of the Theatre Use Covenant or Concession Use Covenant.  Landlord covenants that neither Enclosed Mall Owner nor West Anchor Owner shall enter into any material agreement with any tenant named in <u>Section 7.6.1</u> or <u>Section 7.6.2</u>, or its successor or assign, including without limitation any agreement extending the term of such lease, without making commercially reasonable efforts to include in such agreement a covenant by such tenant that such tenant shall not use its premises in a manner that violates the Theatre Use Covenant or Concessions Use Covenant, if and to the extent Landlord determines, in its reasonable judgment, that it has sufficient bargaining power at the time of negotiating such material agreement to persuade such tenant to include such covenant in such material agreement. The covenants contained in this Section are further assurances with respect to the covenants made in <u>Section 7.6.1</u> and <u>Section 7.6.2</u>, but are not limitations on such covenants.

7.7    <u>Prohibited Uses and Restricted Uses.</u>

Landlord hereby represents, warrants and covenants that, notwithstanding anything to the contrary that may appear on <u>Exhibit J</u>, the Permitted Use does not and will not violate or conflict with the uses described on <u>Exhibit J</u> attached hereto and made a part hereof by reference ("<u>Prohibited Uses</u>") or violate the terms, conditions, provisions, or restrictions of any leases or

occupancy agreement of the Center as the same exist as of the Effective Date ("Existing Restrictions").  Subject to the express rights of tenants and occupants under leases and occupancy agreements of the Center any lease existing on the Effective Date (not including for this purpose any amendments or supplements thereto made after the Effective Date), Landlord covenants that neither Landlord nor Enclosed Mall Owner shall, without the prior written consent of Tenant, which shall not be unreasonably withheld, conditioned or delayed, suffer or allow any of the following uses within the Center: (a) an adult book shop; (b) a secondhand or used goods store, including any pawn shop, but excluding such national and regional resale stores as are customarily operated in retail centers; (c) a dry cleaning facility (other than pick-up and drop-off only); (d) a coin-operated laundry or public laundry-mat; (e) a dance club or dance hall; (f) a massage parlor (except for a reputable multi-location retailer such as Massage Envy); (g) an off-track betting facility, casino, card club, bingo parlor or facility containing gambling equipment; (h) a flea market; (i) an undertaker; (j) a child care center (unless no portion thereof is located less than 1000 feet from the main pedestrian entrance to the Theatre or the appropriate distance so as to not interfere with the application and/or maintenance of the Alcohol Approvals); or (k) a payday lender or cash checking service.  Landlord covenants that neither Landlord nor Enclosed Mall Owner shall suffer or allow any use of the Center outside the Theatre which would result in noise or sound greater than NC 25, or unreasonable and perceptible vibration, within any auditorium of the Theatre at any time during the operating hours of the Theatre.

7.8    Covenants, Conditions and Restrictions.

Notwithstanding anything to the contrary in the CC&Rs, Landlord represents, warrants and covenants that any declaration of, imposition of, or agreements about any covenants, conditions, restrictions and reciprocal easements applicable to the Center do not and shall not in any way adversely affect, eliminate, interfere with or diminish any rights or privileges of Tenant under this Lease or cause Tenant to be obligated to make any expenditure or pay any charge or fee.

7.9    Legal Requirements.

Tenant shall comply with all Legal Requirements with respect to the use or occupancy of the Theatre by Tenant, to the extent relating to the interior of the Theatre and in and for the period after the Delivery Date.  Without limiting the generality of the foregoing, Tenant shall not suffer or allow any unusual fire, explosion or other dangerous hazard (other than the depiction thereof in motion pictures, movies, film and other media at the Theatre) in violation of Legal Requirements.  The covenant made by Tenant in this Section shall be subject in all respects to the obligations of Landlord, Enclosed Mall Owner and West Anchor Owner under this Lease, including without limitation Landlord's covenants made by it and on behalf of Enclosed Mall Owner and West Anchor Owner with respect to the Development Approvals, the Theatre Construction Work, the Certificate of Occupancy, the CAM Obligations and Section 13.1.

7.10    Security.

Tenant shall provide security within the Theatre as Tenant deems commercially reasonable.

ARTICLE 8
TAXES AND ASSESSMENTS

8.1   Definitions.

    8.1.1   As used herein, the following terms shall have the following meanings.

        8.1.1.1   "Property Tax Year" means the tax year of the tax collector of Multnomah County.

        8.1.1.2   "Property Taxes" means real estate taxes and assessments collected by the tax collector of Multnomah County.

8.2   Payment of Center Taxes By Landlord.

    Throughout the Rent Term, Landlord covenants that (i) Landlord shall pay, or cause to be paid, before the same become delinquent, all Property Taxes imposed on the East Anchor Parcel and improvements thereon and (ii) the Enclosed Mall Owner shall pay, or cause to be paid before the same become delinquent, all Property Taxes imposed on the Enclosed Mall Parcels and improvements thereon including, without limitation, Property Taxes which are general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind or nature whatsoever (including assessments for public improvements, benefits and benefit districts [whether for on or off-site improvements], and special or installment tax bills and interest on unpaid installments thereof), and other general governmental assessments and levies charged, assessed or imposed on the East Anchor Parcel or the Enclosed Mall Parcels as applicable.  Landlord shall not suffer or allow Tenant's occupancy of the Theatre or use of the Common Areas to be disturbed or threatened by Landlord's or Enclosed Mall Owner's failure to timely pay any such Property Taxes.  Without limiting the generality of the foregoing, Landlord shall pay:  (a) sales or other taxes that are imposed on the amounts of Rent paid by Tenant to Landlord, and that are assessed against Landlord (collectively, "Rent Taxes"), (b) income, franchise, excise, gift, estate, inheritance, succession, capital gains, documentary transfer, gross receipts, or utility connection taxes or assessments imposed on Landlord, the East Anchor Parcel or the Theatre, and (c) betterment assessments or any special assessments levied to defray development costs or costs to finance construction of any portion of the East Anchor Parcel.

8.3   Tax Charge.

    Tenant shall have no obligation to pay directly or reimburse Landlord or any owner of any portion of the Entire Development directly or indirectly for any Property Taxes imposed on any portion of the Entire Development.  If any Rent Taxes are collected by an applicable taxing authority from Tenant, then Landlord shall reimburse Tenant for the amount of such Rent Taxes within thirty (30) calendar days of written request by Tenant for such reimbursement (accompanied by reasonable evidence of Tenant's payment of such Rent Taxes), and if not so reimbursed within such thirty (30) day period, Tenant shall be entitled to deduct from the next installment of monthly Base Rent payable hereunder the amount of such Rent Taxes plus interest at the Default Rate.

ARTICLE 9
COMMON AREAS

9.1     Use of Common Areas.

Throughout the Term, Tenant and its employees, customers, and invitees shall have a non-exclusive license to use all of the Common Areas for their respective intended purposes in common with the other tenants of the Center and their respective employees, customers, and invitees.  Contractors of Tenant shall have the non-exclusive rights to use the Common Areas for access to and from the Theatre during any period that such contractors are performing work for or on behalf of Tenant at the Theatre.

9.2     CAM Obligation.

Landlord covenants that Landlord, Enclosed Mall Owner and West Anchor Owner shall maintain, operate, repair and replace and control (or cause to be maintained, operated, repaired, replaced and controlled) all of the Common Areas, including without limitation the Parking Retention Areas, in a First Class manner (collectively, the "CAM Obligation").  The CAM Obligation shall include, without limitation, the following:

9.2.1     compliance with and enforcement of the CC&Rs, including without limitation enforcement of all provisions relating to the Common Areas;

9.2.2     maintenance, repair and replacement (as reasonably necessary) of all of the storm water drainage, sanitary sewer facilities, water service, sprinkler system, irrigation systems, electrical systems, gas distribution systems, lighting systems (including, poles, bulbs, and fixtures), audio systems, and other utility systems serving the Common Areas;

9.2.3     operation of utility services for the Common Areas, including providing electricity, water, water quality treatment, water retention and detention basins, sewer service and other utility services;

9.2.4     trash and garbage removal, snow and ice removal (as soon as reasonably practical), litter control, painting (as reasonably necessary), cleaning, and sweeping in the Common Areas;

9.2.5     operation, maintenance, repair and replacement (as reasonably necessary) of all emergency, security, life safety, fire alarm, fire extinguishment, and burglar alarm systems serving the Common Areas;

9.2.6     operation, maintenance, repair and replacement of gazebos, fountains, art features, sculptures, fencing, holiday decorations, fencing, attractions and similar items located within the Common Areas, if any;

9.2.7     planting, replanting, replacing, pruning, trimming, fertilizing,  irrigating, mulching,  and managing of all flowers, shrubbery, plants, trees and other landscaping within the Common Areas, if any and as applicable;

9.2.8    providing security within the Common Areas (including without limitation the Parking Retention Areas) as Landlord deems commercially reasonable;

9.2.9    re-paving, re-striping re-surfacing and cleaning of the paved parking areas of the Common Areas;

9.2.10   repairing and cleaning of sidewalks in the Common Areas;

9.2.11   prevention, control and re-mediation of any mold or other form of contamination in the Common Areas, to the extent such mold or contamination are hazardous to human health or as required by Legal Requirements except to the extent caused by Tenant or Tenant's agents, contractors, employees, licensees, concessionaires or subtenants;

9.2.12   controlling rodents and other pests in the Common Areas;

9.2.13   reasonable prevention and prompt removal of graffiti in the Common Areas;

9.2.14   operation, maintenance, repair and replacement of the pad or structure which will house any trash compactor in the Common Areas, but not the operation, maintenance, repair or replacement of any trash compactor;

9.2.15   operation, maintenance, repair and replacement of all stairways, elevators, escalators and other means of vertical transportation in the Common Areas;

9.2.16   operation, maintenance, repair and replacement of all lighting systems for the Common Areas;

9.2.17   painting and refinishing exterior walls (as reasonably necessary) in the Common Areas, if any;

9.2.18   maintaining the insurance coverage on Common Areas to the extent required of Landlord pursuant to Section 11.4 hereof; and

9.2.19   paying common area maintenance charges, if any, by Landlord to another person under the CC&Rs.

9.3    CAM Expenses.

The term "CAM Expenses" means all sums reasonably incurred by Landlord during the Term (including any Extension Period(s)) for compliance with the CAM Obligation, including any amount paid as fees, interest, attorneys' fees or costs for failure to pay any third party when due.

9.4    CAM Charge.

Tenant shall have no obligation to pay directly or to reimburse Landlord directly or indirectly for any CAM Obligations or CAM Expenses.  Except as otherwise expressly set forth in this Lease including, without limitation, Article 11 hereof, Tenant shall not have any

obligation or liability for payment or maintenance of any kind at any time in respect of Common Areas.

## ARTICLE 10
## PROMOTION OF THEATRE

The Parties agree that any expenditure for advertising Tenant's operation of the Theatre shall be in an amount which Tenant, within its sole discretion, decides is in the best interest of the business of Tenant.  Tenant shall not be required to join, become a member of, or pay any fees or dues to any merchants' association or other organization created for similar purposes, and Tenant shall not be required to participate in or contribute to any promotional, advertising or similar program.

## ARTICLE 11
## INDEMNITY AND INSURANCE

11.1    Tenant's Insurance.

11.1.1    Coverages.  Tenant covenants and agrees that from Tenant's Work Access Date and continuing throughout the Rent Term, Tenant will carry and maintain, at Tenant's sole cost and expense, the following types of insurance coverage, in the amounts specified and in the form hereinafter provided for:

11.1.1.1 Commercial general liability insurance, ISO Form CG0001 1207 or its equivalent, which shall include coverage against risks and be subject to exclusions and limitations normally included in such form, for bodily injury, death and property damage arising from Tenant's use and occupancy of the Theatre, with a limit of not less than Two Million Dollars ($2,000,000.00) per occurrence and Five Million Dollars ($5,000,000.00) in the aggregate, subject to the provision that such limit may be maintained through the use of umbrella or excess coverage.  The policy provided for in this Section 11.1.1.1 shall be primary as and to the extent provided in ISO Form CG0001 1207 or its equivalent.  Tenant shall cause its insurer to waive subrogation against Landlord, its officers, employees, agents and representatives by issuance of an endorsement, ISO Form CG 24 04 05 09 or its equivalent, for any risks covered by such policy.

11.1.1.2 Commercial property insurance, Causes of Loss - Special Form ISO Form CP1030 0607 or its equivalent ("Special Form Property Insurance"), for Tenant's Property, subject to the provision that Tenant may self-insure with respect to such property insurance coverage, so long as Tenant and its Affiliates maintains a net worth of at least $100,000,000 on a consolidated basis as of the most recent fiscal quarter for which such financial statements have been prepared for Tenant.

11.1.1.3 Workers compensation insurance for any employees of Tenant at the Theatre as required to comply with all applicable Legal Requirements.

11.1.1.4 If Tenant serves alcoholic beverages at the Theatre, an endorsement to its commercial general liability insurance for liquor liability coverage, ISO Form CG 00 33 12 07 or its equivalent, for the Theatre.

11.1.2   <u>Blanket Policies</u>.   Any insurance provided for in <u>Section 11.1.1</u> may be maintained by means of a policy or policies of blanket insurance, covering additional items, locations or insured persons or parties.

11.1.3   <u>Insurers</u>.   The policies of insurance provided for in <u>Section 11.1.1</u> shall be issued by insurance companies with a Best's Rating of not less than A- and a Best's Financial Performance Rating of not less than VII as rated in the most current available A.M. Best Company Key Rating Guide and qualified to do business in the State of Oregon. Notwithstanding the foregoing, Landlord agrees that any insurance company providing coverage for a majority of Tenant's properties shall be qualified to provide the insurance required under this Lease.

11.1.4   <u>Certificates</u>.   The policy of insurance provided for in <u>Section 11.1.1</u> shall be primary as and to the extent provided in ISO Form CG0001 1207 or its equivalent and shall be evidenced by an Acord Form 28 for property coverage and an Acord Form 25 for commercial general liability, provided that in the event that either such form is not available for such purpose, such evidence of insurance shall be in a form reasonably satisfactory to Landlord. Tenant shall deliver such certificates to Landlord on or before the Tenant's Work Access Date and thereafter as Landlord may from time to time reasonably request.   Each of the policies of insurance described in <u>Section 11.1.1.1</u> and <u>Section 11.1.1.2</u> shall name Landlord as an "additional insured".   The policies shall also name the holder of the first lien mortgage on the East Anchor Parcel and the property manager of Landlord for the East Anchor Parcel as "additional insureds" within five business days after Landlord delivers to Tenant a written request therefor, making specific reference to this Section of this Lease, together with the names of such persons.

11.2   <u>Indemnity.</u>

11.2.1   <u>By Tenant</u>.   Tenant does hereby agree to and shall defend, indemnify and hold harmless Landlord, Landlord's lender, and Landlord's members, partners, officers, directors, shareholders, agents, contractors and employees (as the case may be) from all claims, actions, demands, obligations, costs, expenses and liability whatsoever, including reasonable attorneys' fees, on account of any claim, demand, obligation, damage or liability ("<u>Claims</u>") arising from (a) the use or possession of the Theatre by Tenant or Tenant's agents, contractors, servants, employees, concessionaires or subtenants   and (b) in whole or in part, the act or omission of Tenant or Tenant's agents, contractors, servants, employees, concessionaires or subtenants.   This defense, indemnification and hold harmless undertaking by Tenant shall not include and Tenant shall not be liable for Claims to the extent arising from the negligence or willful misconduct of Landlord or Landlord's agents, contractors or employees, which is the cause of any such damage or injury.

11.2.2   <u>By Landlord</u>.   Landlord does hereby agree to and shall defend, indemnify and hold harmless Tenant and Tenant's members, partners, officers, directors, shareholders, agents, contractors and employees (as the case may be) from all Claims arising from (a) the ownership or operation of the Common Areas by Landlord, Enclosed Mall Owner or their agents, contractors and employees, and (b) in whole or in part, the act or omission of Landlord, CAPREF Lloyd II or their agents, contractors or employees.   This defense, indemnification and

hold harmless undertaking by Landlord shall not include and Landlord shall not be liable for Claims to the extent arising from the negligence or willful misconduct of Tenant or Tenant's agents, contractors or employees, which is the cause of any such damage or injury.

11.3   Mutual Waivers.

Each of Landlord and Tenant hereby waive any right of recovery it may have against the other, respectively, for any Claims arising from any risk of a type covered by any fire and extended coverage insurance policies required to be maintained by Landlord or Tenant, respectively, hereunder, or by any other insurance policies maintained by Landlord or Tenant, respectively provided that such waiver does not invalidate such policies or prohibit recovery thereunder. Each of Landlord and Tenant, on behalf of their respective insurers, waive any right of subrogation that such insurers may have against Tenant Parties or Landlord Parties, respectively, if and to the extent such waiver is enforceable under such policies. The waivers and releases set forth herein are given on behalf of the waiving party and its successors and assigns and its insurers, and neither party shall have the right to terminate or suspend such waivers and releases.

11.4   Landlord's Insurance.

11.4.1   Coverages.   Landlord covenants and agrees that, throughout the Rent Term, Landlord and Enclosed Mall Owner and West Anchor Owner will carry and maintain, at no cost and expense to Tenant, the following types of insurance coverage, in the amounts specified and in the form hereinafter provided for:

11.4.1.1 Commercial general liability insurance, ISO Form CG0001 1207 or its equivalent, which shall include coverage against risks and be subject to exclusions and limitations normally included in such form, for bodily injury, death and property damage at the Common Areas of the Center, with a limit of not less than Two Million Dollars ($2,000,000.00) per occurrence and Five Million Dollars ($5,000,000.00) in the aggregate, subject to the provision that such limit may be maintained through the use of umbrella or excess coverage. Landlord covenants that Landlord shall cause its insurer to waive subrogation against Tenant, its officers, employees, customers, agents and representatives by issuance of an endorsement, ISO Form CG 24 04 05 09 or its equivalent, for any risks covered by such policy.

11.4.1.2 Special Form Property Insurance for the Center (including without limitation the Theatre and the Common Areas), with a limit not less than full replacement cost ("Landlord's Property Insurance").

11.4.2   Blanket Policies.   Any insurance provided for in Section 11.4 may be maintained by means of a policy or policies of blanket insurance, covering additional items, locations or insured persons or parties.

11.4.3   Insurers.   The policies of insurance provided for in Section 11.4.1 shall be issued by insurance companies with a Best's Rating of not less than A- and a Best's Financial Performance Rating of not less than VII as rated in the most current available A.M. Best Company Key Rating Guide and qualified to do business in the State of Oregon.

11.4.4   <u>Certificates</u>.  The policies of insurance provided for in <u>Section 11.4.1</u> shall be evidenced by an Acord Form 28 for property coverage and an Acord Form 25 for commercial general liability, provided that in the event that either such form is not available for such purpose, such evidence of insurance shall be in a form reasonably satisfactory to Tenant. Landlord covenants that Landlord and Enclosed Mall Owner shall deliver such certificates to Tenant on or before Tenant's Work Access Date and thereafter from time to time as Tenant may reasonably request.  Each of the certificates of insurance for coverage described in <u>Section 11.4.1.1</u> shall name Tenant as an "additional insured."

11.5   <u>No Insurance Charge.</u>

The cost to Landlord and Enclosed Mall Owner of the insurance required to be maintained pursuant to <u>Section 11.4</u> hereof shall be included in the CAM Obligation, and payable solely if and to the extent provided in <u>Section 9.4</u>.  No such cost shall be payable or reimbursable by Tenant in any other manner, and no other insurance maintained by Landlord or Enclosed Mall Owner shall be payable or reimbursable by Tenant.

ARTICLE 12
DAMAGE OR DESTRUCTION

12.1   <u>Duty to Reconstruct Following Casualty.</u>

12.1.1   If all or any portion of the Center (including without limitation the Theatre and/or the Common Areas) is damaged or destroyed by a casualty covered in whole or in part by Landlord's Property Insurance, then, unless this Lease is terminated pursuant to <u>Section 12.3.1</u>, Landlord shall, within sixty (60) days after receipt of any applicable required building permits and approvals but in no instance later than seventy-five (75) days after the date of such casualty, deliver a written notice to Tenant of the estimated date (which shall be a single calendar day) by which Substantial Completion of all repairs and restoration will occur (the "<u>Estimated Restoration Date</u>") in Landlord's reasonable judgment.  If Landlord fails to deliver a notice within the time or in the manner provided herein, then Tenant may deliver a notice to Landlord making specific reference to this Section of this Lease and stating that that if Landlord fails to deliver a notice setting forth the Estimated Restoration Date, then Tenant may elect to deliver such notice.  If Landlord fails to deliver a notice of the Estimated Restoration Date within 15 calendar days of Tenant's notice, then Tenant may deliver a notice to Landlord of the Estimated Restoration Date, in Tenant's reasonable judgment, and such notice shall be binding on Landlord.  If the Estimated Restoration Date is more than 365 days after the date of such casualty, then Tenant may terminate this Lease by written notice to the other delivered within thirty (30) days after delivery of the notice setting forth the Estimated Restoration Date, and effective upon the delivery of such termination notice, this Lease shall terminate, and Tenant may remove Tenant's Property within the Removal Period.  If Tenant does not deliver such termination notice, then Landlord covenants that Landlord or Enclosed Mall Owner and West Anchor Owner shall cause Substantial Completion of all repairs and restoration to the Center (including without limitation the Theatre and the Common Areas) on or prior to the Estimated Restoration Date, subject to any Force Majeure Event, thereafter Tenant shall re-open and operate all or substantially all of the Theatre for at least one (1) day or for the remainder of the Operating Period as set forth in <u>Section 7.4.2</u>, whichever is longer in duration, not later than 120

64

days after Landlord's Substantial Completion of the repair or reconstruction. The repair or reconstruction shall be conducted in compliance with all Legal Requirements and in a good and workmanlike manner. If Tenant does not deliver such termination notice, and Substantial Completion of all repairs and restoration does not occur on or prior to the Estimated Restoration Date, subject to any Force Majeure Event which occurs after notice is given of the Estimated Restoration Date, then, in addition to any other rights and remedies, Tenant may terminate this Lease by written notice to Landlord, at any time prior to Substantial Completion of all repairs and restoration, and effective upon the delivery of such termination notice, this Lease shall terminate, and Tenant may remove Tenant's Property with the Removal Period. The repair or reconstruction of the Theatre shall be (subject to changes required by Legal Requirements) in conformity with the Approved Theatre Plans, and any deviations from the Approved Theatre Plans shall be subject to the prior approval of Tenant, which shall not be unreasonably withheld, conditioned or delayed. Section 3.8 concerning mechanic's liens and Section 3.9 concerning insurance during construction shall be applicable to such repair or reconstruction.

12.2     Duty to Repair or Replace Equipment.

        If all or any portion of Tenant's Property is damaged or destroyed by any casualty, then, unless this Lease is terminated pursuant to Section 12.3 and subject to Landlord fulfilling its obligations under Section 12.1, Tenant shall promptly repair or restore such damaged or destroyed items. Tenant shall pursue all such work diligently to completion at the earliest practicable date. Section 3.8 concerning mechanic's liens and Section 3.9 concerning insurance during construction shall be applicable to such repair or reconstruction.

12.3     Right to Terminate.

        12.3.1   Each of the Parties shall have the option to terminate this Lease upon giving written notice to the other Party of the exercise thereof within ninety (90) days after any of the following:

                12.3.1.1 Uninsured Damage to Theatre. Any material portion of the Theatre is damaged or destroyed by the occurrence of a casualty which is not covered by Landlord's Property Insurance or by other insurance, if the Theatre cannot reasonably be operated, and is not operated by Tenant, and provided that either Tenant or Landlord may negate any such termination by agreeing to pay all repair or reconstruction costs therefor in a written notice delivered to the terminating party within sixty (60) days after the other Party's termination of this Lease.

                12.3.1.2 Uninsured Damage to Center. Any portion of the Center (other than the Theatre), material to the business of the Theatre, without regard to whether the Theatre is damaged or destroyed, is damaged or destroyed by the occurrence of a casualty which is not covered by Landlord's Property Insurance or by other insurance, if the Theatre cannot reasonably be operated, and is not then operated by Tenant, and provided that either Tenant or Landlord may negate any such termination by agreeing to pay all repair or reconstruction costs therefor in a written notice delivered to the terminating party within sixty (60) days after the other Party's termination of this Lease.

12.3.2   <u>If Lease Is Not Terminated</u>.   Unless this Lease is terminated as provided in <u>Section 12.3.1</u>, except as otherwise expressly provided herein, this Lease shall continue in full force and effect, Landlord shall perform all of its obligations under <u>Section 12.1</u> and Tenant shall perform all of its obligations under <u>Section 12.2</u>.

12.3.3   <u>If Lease Is Terminated</u>.   Upon any termination of this Lease under any of the provisions of this <u>Section 12.3</u>, the Rent shall be prorated as of the date of such termination and this Lease shall terminate as if such date were the natural expiration date of the Rent Term, except for items which have theretofore accrued and are then unpaid.   The proceeds of Landlord's Special Form Property Insurance shall be distributed to Landlord, while all insurance proceeds paid on account of Tenant's insurance shall be distributed to Tenant, and neither Party shall have any obligation to repair or restore any portion of the Center.

12.4   <u>Abatement of Rent.</u>

If any portion of the Center material to the business of the Theatre is damaged or destroyed by the occurrence of a casualty, then the Rent payable by Tenant under this Lease prior to Substantial Completion of repairs and restoration, shall be equitably abated to the extent reasonably appropriate under the circumstances of the particular damage or destruction, and its proportionate adverse impact on the business of the Theatre and the payment of full Rent shall resume upon Substantial Completion of repairs and restoration.

ARTICLE 13
MAINTENANCE

13.1   <u>Landlord's Maintenance.</u>

13.1.1   <u>Landlord's Maintenance Items</u>.   From and after the Delivery Date and throughout the Term, in addition to maintenance and repair of the Common Areas, Landlord covenants that Landlord (as to the East Anchor Parcel) and Enclosed Mall Owner (as to the Enclosed Mall Parcels) shall maintain and repair (with replacements as reasonably necessary) in a First Class condition, in compliance with Legal Requirements, at no expense to Tenant (except to the extent that the need for such repair or maintenance is caused by the acts or omissions of Tenant, its employees, agents, or contractors):

13.1.1.1   all structural components of the Theatre, including without limitation foundation, slab or structural floors, structural columns, structural walls, and ceiling trusses and joists.

13.1.1.2   all exterior walls of the Theatre including without limitation the paint or other finishes on the exterior surface of the exterior walls on the exterior walls of the Theatre, and lighting on the exterior side of the exterior walls whose sole or primary purpose is illumination of Common Areas, but excluding Tenant's signs, sign panels, poster cases, digital media and automated teller or ticket machines on the exterior of the Theatre and lighting whose sole or primary purpose is to illuminate the same.

13.1.1.3   the mechanical systems that exclusively serve the Theatre to the extent located (i) on the exterior side of the interior surface of the exterior walls of the Theatre, (ii)

66

above the bottom surface of the ceiling of the Theatre, or (iii) below the finish floor of the Theatre, subject to Tenant's obligations set forth in the final flush paragraph of <u>Section 13.2</u>;

13.1.1.4 any vertical transportation within the Center other than vertical transportation located entirely within the Theatre;

13.1.1.5 the roof, roof membrane and roofing system of the Theatre;

13.1.1.6 all gas, electrical, plumbing and other utility lines, conduits and facilities to the extent located (a) on the exterior side of the interior surface of the exterior walls of the Theatre, (b) above the bottom surface of the ceiling of the Theatre, or (c) below the finish floor of the Theatre,

13.1.1.7 the pad, structure or enclosure which supports and houses Tenant's trash compactor.

Without limiting the generality of the indemnity in <u>Section 11.2</u>, Landlord shall repair any damage to the Theatre, including replacements as necessary, resulting from intrusion of water in or through the roof, roof membrane or roofing system of the Theatre.  However, any need for extraordinary maintenance, repair or replacement caused by Tenant or by Tenant's agents, employees, servants, concessionaires, subtenants or contractors to any element of the Theatre or Center otherwise required to be maintained by Landlord, including without limitation any damage caused by any breach by Tenant of its obligations under this Lease, shall be subject to the indemnity in <u>Section 11.2</u>.

13.1.2 <u>Self-Help</u>.   Tenant may elect, but shall have no obligation, to perform any maintenance and repair which Landlord or Enclosed Mall Owner is obligated under this Lease to perform (the "<u>Self-Help Work</u>") if any of the following apply:

13.1.2.1 a failure to perform such maintenance or repair on an expedited basis, if not performed, is reasonably likely to result in:  (a) material damage to Tenant's Property or any portion of the Theatre for which Tenant has the maintenance and repair responsibility pursuant to <u>Section 13.2</u>; or (b) injury or death to any person; or (c) cessation of business in all or any material part of the Theatre.

13.1.2.2 Landlord or Enclosed Mall Owner fails to commence performance of such maintenance or repair within fifteen (15) days after written notice from Tenant, or thereafter fails to diligently and continuously perform such maintenance or repair to completion, but only if Tenant gives Landlord an additional written notice of such failure and of Tenant's intent to exercise self-help, and such failure by Landlord or Enclosed Mall Owner to perform such maintenance or repair continues for more than five (5) additional days following Landlord's receipt of such second notice.

13.1.3 <u>Self-Help Cost Statement</u>.  Following completion of any permitted Self-Help Work, Tenant may deliver to Landlord a written statement of the actual and reasonable costs incurred by Tenant for the Self-Help Work (the "<u>Self-Help Cost Statement</u>"), together with reasonable evidence thereof.  Within thirty (30) days after delivery of the Self-Help Cost Statement, Landlord shall reimburse Tenant the costs set forth thereon.  If Landlord does not so

reimburse Tenant, then Tenant may offset such costs against the next installment(s) of Base Rent payable hereunder, plus interest thereon at the Default Rate, until the full amount plus interest has been paid or offset in full.

13.2   <u>Tenant's Maintenance.</u>

13.2.1   From and After the Delivery Date and throughout the Term, Tenant shall maintain and repair (with replacements as reasonably necessary), in First Class condition, in compliance with Legal Requirements and the CC&Rs, and at the sole cost and expense of Tenant, subject however to reasonable wear and tear and obsolescence, but at no expense to Landlord (except to the extent that the need for such repair or maintenance is caused by the acts or omissions of Landlord, its employees, agents, or contractors):

13.2.1.1   the non-structural, interior walls of the Theatre and the paint or other finishes on the interior surface of the exterior walls, the finish floor of the Theatre and the dropped ceiling of the Theatre;

13.2.1.2   Tenant's signs, sign panels, poster cases, digital media and automated teller or ticket machines on the exterior of the Theatre, including lighting whose sole or primary purpose is illumination of the same;

13.2.1.3   the HVAC systems that exclusively serve the Theatre;

13.2.1.4   any other mechanical systems that serve the Theatre to the extent located (i) on the interior side of the interior surface of the exterior walls of the Theatre, (ii) below the bottom surface of the ceiling of the Theatre, or (iii) above the finish floor of the Theatre;

13.2.1.5   any vertical transportation located entirely within the Theatre;

13.2.1.6   all gas, electrical, plumbing and other utility lines, conduits and facilities to the extent located (a) on the interior side of the interior surface of the exterior walls of the Theatre, (b) below the bottom surface of the ceiling of the Theatre, and (c) above the finish floor of the Theatre;

13.2.1.7   Tenant's Property; and

13.2.1.8   Tenant's trash compactor.

However, any need for extraordinary maintenance, repair or replacement caused by Landlord or by Landlord's agents, employees, servants, tenants or contractors to any element of the Theatre otherwise required to be maintained by Tenant, including without limitation any damage caused by any breach by Landlord or Enclosed Mall Owner of its obligations under this Lease, shall be subject to the indemnity in <u>Section 11.2</u>.

13.3   <u>Right of Access to the Theatre.</u>

Upon reasonable prior written notice, Landlord may enter the Theatre at any reasonable time during Tenant's normal business hours for the purpose of inspecting the same, performing

any work, maintenance, or repair required of or permitted to be performed by Landlord under the express terms of this Lease, confirming Tenant compliance with the terms and conditions hereof, or showing the same to prospective purchasers or mortgagees of Landlord's interest in the Center.  In addition, Landlord and Landlord's representatives may enter the Theatre outside of Tenant's business hours after reasonable written notice to Tenant for the purposes of Landlord performing any construction, alterations, replacement, renovation, and/or repair outside of Tenant's business hours of any Common Areas and/or GLA located adjacent to or in proximity of the Theatre where such access is reasonably necessary for the performance of such work in a commercially reasonable and cost-effective manner.  If Tenant does not exercise an option for an Extension Period within the time provided in Section 2.2, then, upon not less than 48 hours prior notice, Landlord may enter the Theatre to show it to prospective lessees.   Landlord shall reasonably coordinate with Tenant to allow a representative of Tenant to be present at all times during any entry by Landlord.  Landlord shall conduct any entry in a manner that minimizes disruption to Tenant to the maximum commercially reasonable extent under the circumstances.  In addition, in the event of a bona fide emergency (which involves or reasonably is expected to involve damage to property or injury or death to any person), Landlord may enter the Theatre without notice to Tenant, as necessary or appropriate to mitigate the risk or damage therefrom.

## ARTICLE 14
### TENANT'S PROPERTY AND SIGNS

14.1    Tenant's Property.

As used in this Lease, "Tenant's Property" means all of Tenant's Equipment and any other fixtures, furniture and other personal property of Tenant at the Center.  Upon the expiration of the Rent Term or the earlier termination of the Rent Term, Tenant may remove all of Tenant's Property.  At any time and from time to time, subject to Section 7.4.2, Tenant may remove any or all of Tenant's Property and replace it as Tenant deems appropriate, in Tenant's sole discretion.   Tenant shall promptly repair any physical damage to the Center (inclusive of Common Areas) caused by Tenant's removal of any of Tenant's Property.

14.2    Tenant's Signs.

14.2.1    Theatre Signage.  As part of Landlord's Work, subject to Legal Requirements, Landlord shall install the signs on the exterior of the Theatre shown on Exhibit G, subject to changes required by the Design Review Approval (the "Exterior Theatre Signs"), and provide electrical utilities thereto.  Throughout the Term, subject to Legal Requirements, Tenant shall have the right to install, operate, maintain, repair and replace the Exterior Theatre Signs provided that the same are commercially reasonable and professionally prepared.   Subject to Legal Requirements, Tenant's signs may use illumination such as neon, iLight and up lighting.  Throughout the Term, subject to Legal Requirements, Tenant shall also have the right to install, operate, maintain, repair and replace signs, sign panels, poster cases, digital media and other advertising and marketing materials and devices within the Theatre.

14.2.2    Center Signage.  Throughout the Term, subject to Legal Requirements, if Landlord or Enclosed Mall Owner installs, operates and maintains any pylon or monument sign structures for the purpose of displaying sign panels for occupants of the Center (each, a "Center

Sign Structure"), Tenant shall have the right to display one back-to-back sign panel on each side of each Center Sign Structure.  Tenant shall pay for the cost of fabrication and delivery to the Center of any sign panels to be installed on any Center Sign Structure.  Landlord covenants that Landlord or Enclosed Mall Owner shall cause such sign panels to be installed, at no cost or expense to Tenant.  Tenant's sign panels shall not be smaller or less well-illuminated than the sign panels of any other tenant or occupant whose GLA at the Center is less than the GLA of the Theatre.

14.2.3   Directional Signage.  Throughout the Term, Landlord covenants that Landlord and Enclosed Mall Owner shall install, operate, maintain, repair and replace directional signs in the Common Areas, in size, visibility, numbers and locations reasonably appropriate to indicate to motorists and pedestrians the location of the Theatre.  Such directional signs shall include, without limitation, illuminated directional signs at or above the exterior side of each Designated Mall Entrance.

14.2.4   Maintenance of Center Signage.  Landlord shall, at Landlord's sole cost and expense, subject to Legal Requirements, construct and install directional signs in the Common Areas as part of Landlord's Work (to the extent not otherwise existing as of the Effective Date).  Landlord shall, at Landlord's sole cost and expense, maintain, repair, operate and supply electricity to each Center Sign Structure, if any, each directional sign and each other multi-tenant sign in the Common Areas, if any, as part of the CAM Obligations.

14.2.5   Visibility of Signage.  Landlord shall use commercially reasonable effort not to suffer or allow the visibility of any of Tenant's sign panels on any Center Sign Structure, if any, or any of Tenant's signs or sign panels on the exterior sides of the exterior walls of the Theatre to be obstructed by any improvement or material, including without limitation by any landscaping, except for landscaping expressly permitted by Section 2.4.4.

ARTICLE 15
ASSIGNMENT AND SUBLETTING

## 15.1   Consent Required

Except as otherwise provided herein, Tenant shall not assign or otherwise transfer this Lease or any interest therein or sublet all or any part of the Theatre, without Landlord's consent, which consent shall not be unreasonably withheld.  Landlord's consent to any assignment or subletting (a "Transfer") shall not waive the necessity for consent to any Transfer.

## 15.2   Permitted Transfers.

15.2.1   Assignments.  Tenant may, without Landlord's consent, assign this Lease to any person that satisfies one or more of the following criteria (the "Assignment Criteria"):  (a) is an Affiliate of Tenant, (b) operates directly or through its affiliates movie theaters having a total of two hundred (200) or more auditoriums, (c) is one of the top ten (10) operators of a circuit of motion picture theaters in the United States (ranked by the number of screens in each such circuit), or (d) in connection with the assignment of this Lease, is acquiring a majority of Tenant's motion picture theaters in the Pacific Northwest.  An assignee shall assume the obligations of the assignor under this Lease arising after the date of assignment.  An assignor

shall not be released by any assignment from any obligations under this Lease.  Any assignment shall be subject to the terms and conditions of this Lease.

15.2.2   <u>Subleases</u>.  Tenant may, without Landlord's consent, sublet all or any portion of the Theatre to any person who satisfies one or more of the Assignment Criteria.  Tenant shall not be released by any sublease from any obligations under this Lease.  Any sublease shall be subject to the terms and conditions of this Lease.

15.2.3   <u>Licenses</u>.  Tenant may, without Landlord's consent, enter into licenses and other agreements for the operation of food and beverage concessions, game machines and devises and other Incidental Uses.  Tenant may, without Landlord's consent, also enter into licenses and other agreements with third parties, pursuant to which such third parties are permitted to use all or part of the Theatre on a limited-engagement basis.  Any license shall be subject to the terms and conditions of this Lease.  Tenant shall not be released by any license from any obligations under this Lease.

15.3   <u>Release.</u>

Notwithstanding anything to the contrary herein, if an assignee satisfies one or more of the Assignment Criteria, and such assignee also has a verifiable net worth of at least $100,000,000 on a consolidated basis as of the most recent fiscal quarter for which such financial statements have been prepared (the "<u>Release Criteria</u>"), as determined in accordance with GAAP as of the most recent calendar quarter, then, upon such assignee's written assumption of Tenant's obligations accruing under this Lease after the effective date of such assignment, the assignor shall be automatically released from any liabilities and obligations accruing under this Lease after the effective date of such assignment, but shall remain liable for all obligations that had accrued under this Lease prior to the effective date of such assignment.  An assignor shall not be bound by and shall have no obligation under or in respect of any amendment, modification, supplement, extension or renewal of this Lease made after such assignment unless Tenant consents in writing to such amendment, modification, supplement, extension or renewal of this Lease.

ARTICLE 16
DEFAULTS BY TENANT

16.1   <u>Events of Default.</u>

Each of the following shall constitute an "<u>Event of Default</u>" by Tenant:

16.1.1   each failure of Tenant to pay Landlord any installment or amount of Rent when due for which Landlord provides Tenant written notice of such delinquency, if such delinquent amount is not paid by Tenant to Landlord within ten (10) days after Tenant receives such written notice of delinquency (provided that such notice and opportunity to cure shall not be required of Landlord more than two (2) times during any calendar year with respect to monthly installments of Rent, such third occurrence in any calendar year being an Event of Default without notice or an opportunity to cure);

16.1.2   The taking of Tenant's leasehold estate on execution of a money judgment, except through action taken by or on behalf of the holder of a leasehold mortgage (leasehold deed to secure debt or leasehold deed of trust) of Tenant's leasehold estate;

16.1.3   Tenant breaches the covenant in <u>Section 7.4.2</u> to operate the Theatre during the Required Operating Period, subject to Permitted Closures; and

16.1.4   Each failure of Tenant to comply with or perform any other requirement, covenant, term or condition hereof binding on Tenant for which Landlord provides Tenant written notice of such failure, if such failure is not cured within ten (10) days following such written notice, or if such cure cannot with reasonable diligence be completed within such ten (10) days, then if the cure is not promptly initiated within such ten (10) days and thereafter diligently pursued to completion within a reasonable time but in any event later than eighty (80) days after delivery of such written notice.

16.2   <u>Remedies and Damages.</u>

16.2.1   Except as otherwise expressly provided in this Lease, upon the occurrence of an Event of Default,

16.2.1.1   Landlord shall have the right to commence proceedings against Tenant to collect damages for unpaid Rent or otherwise, provided that Landlord acted reasonably and in a good-faith effort to mitigate its damages;

16.2.1.2   Landlord shall have the right, upon written notice thereof to Tenant, to enforce the performance of Tenant's obligations hereunder by specific performance, injunction or other equitable relief;

16.2.1.3   Landlord shall have the right, upon written notice thereof to Tenant, to terminate this Lease in which event Tenant shall immediately surrender possession of the Theatre so that Landlord may re-enter the Theatre and take possession thereof; and

16.2.1.4   Landlord shall have the right, upon a second written notice which includes the following phrase in bold all capital letters in no smaller than 12-point font "**IF TENANT DOES NOT CURE THE EVENT OF DEFAULT WITHIN 10 CALENDAR DAYS OF DELIVERY OF THIS NOTICE, LANDLORD SHALL BE ENTITLED TO CURE THE EVENT OF DEFAULT AT TENANT'S COST,**" to cure such default at any time after 10 calendar days of delivery thereof, and to incur any reasonable expense in connection therewith. At any time thereafter, Landlord may deliver to Tenant a written statement of the actual and reasonable costs incurred by Landlord for such cure, together with reasonable evidence thereof.   Within thirty (30) days after delivery of such statement, Tenant shall reimburse Landlord the costs set forth thereon.   If Tenant does not so reimburse Landlord, then Landlord may recover such costs, plus interest thereon at the Default Rate, by a proceeding in a court of competent jurisdiction or may offset such costs, plus interest thereon at the Default Rate, against any amounts due from Landlord to Tenant hereunder until the full unpaid amount plus interest has been paid or offset in full.

16.2.2   If Landlord elects to terminate this Lease based on an Event of Default, then Landlord shall be entitled to recover damages pursuant to the following formula:

16.2.2.1   the worth at the time of the award of any unpaid Rent, plus interest from the date when due at the Default Rate, which had been earned prior to the termination of this Lease; plus

16.2.2.2   the worth at the time of the award of the amount by which any unpaid Rent (other than Contribution Rent, which shall be paid as provided in Section 4.4) which would have been earned after termination until the time of the award exceeds the amount of the loss of such Rent that Tenant proves could have been reasonably avoided had Landlord acted reasonably and in a good faith effort to mitigate its damages; plus

16.2.2.3   the worth at the time of the award of the amount by which the unpaid Rent (other than Contribution Rent, which shall be paid as provided in Section 4.4) for the balance of the Term after the time of the award exceeds the amount of the loss of such Rent that Tenant proves could have been reasonably avoided had Landlord acted reasonably and in a good-faith effort to mitigate its damages; plus

16.2.2.4   Contribution Rent, which shall be paid as provided in Section 4.4; plus

16.2.2.5   any other amount necessary to compensate Landlord for all of the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the reasonable costs of remodeling or repairing the Theatre in order to relet the Theatre.

As used in this Section, the "worth at the time of the award" shall be computed by using the discount rate of the Federal Reserve Bank of San Francisco at the time of award, plus one percent (1%).

16.2.3   The rights and remedies herein reserved by or granted to Landlord are distinct, separate and cumulative, and the exercise of any one of them shall not be deemed to preclude, waive or prejudice Landlord's right to exercise any or all others.

16.3   Mitigation.

Each of Landlord and Tenant shall have a duty of reasonable mitigation of its own damages, and such mitigation shall be accounted for in any determination of damages to be awarded to a non-defaulting Party provided, however, that the foregoing agreement shall not shift the burden of proof as to efforts to mitigate damages, which shall be borne in accordance with the common law of the State of Oregon.

16.4   Emergencies.

Notwithstanding anything contained in Section 16.1 or Section 16.2 to the contrary, if a default by Tenant under this Lease creates an imminent risk of death or serious bodily injury to any natural person or material damage to any element of the Theatre which Landlord is required

to maintain, and if Tenant is not already undertaking a cure of such default, and if a reasonable person would conclude that there is insufficient time to give notice of such default to Tenant before material damage, death or bodily injury will occur, then Landlord may take such action as is reasonably necessary under the circumstances to minimize the likelihood of such material damage, death or serious bodily injury prior to giving notice of such default to Tenant.

16.5   Default Rate.

All amounts not paid within the time provided herein and all damages recovered by either Landlord or Tenant due to a default under this Lease shall bear interest at the "Default Rate" which is defined as the "latest" or most recent Prime Rate per annum as published in the Wall Street Journal under the heading of "Bonds, Rates and Yields" (as it may hereafter be re-named) plus three percent (3%) per annum, or if such interest rate is deemed unlawful because it exceeds the highest rate permitted under the laws of the State of Oregon, then the highest rate permitted under the laws of the State of Oregon.

ARTICLE 17
LIABILITY OF PARTIES

17.1   Landlord.

17.1.1   Landlord shall be in default under this Lease if: (a) any of the representations or warranties made by Landlord is not accurate in all material respects as of the date it is made, or (b) Landlord fails to timely perform any covenant of Landlord made herein (including any covenant with respect to Enclosed Mall Owner or West Anchor Owner), and if Landlord does not promptly commence and diligently pursue a cure of such failure to completion as and when otherwise expressly set forth in this Lease.

17.1.2   Except as otherwise expressly provided in this Lease, if a default by Landlord continues for more than ten (10) days following written notice by Tenant to Landlord thereof (or such additional period, if any, as may be reasonably required to cure the failure if the failure cannot reasonably be cured within a ten (10) day period, provided, Landlord promptly commences and diligently pursues such cure to completion but in any event later than eighty (80) days after delivery of such written notice), then:

17.1.2.1   Tenant shall have the right to commence proceedings against Landlord to collect damages, provided that Tenant acted reasonably and in a good-faith effort to mitigate its damages.

17.1.2.2   Tenant shall have the right, upon written notice thereof to Landlord, to enforce the performance of Landlord's obligations hereunder by specific performance, injunction or other equitable relief;

17.1.2.3   Tenant shall have the right, upon written notice thereof to Landlord, to terminate this Lease, and to remove Tenant's Property during the Removal Period.

17.1.2.4   Tenant shall have the right, upon a second written notice which includes the following phrase in bold all capital letters in no smaller than 12-point font "**IF LANDLORD**

74

**DOES NOT CURE THE DEFAULT WITHIN 10 CALENDAR DAYS OF DELIVERY OF THIS NOTICE, TENANT SHALL BE ENTITLED TO CURE THE DEFAULT AT LANDLORD'S COST,"** to cure such default at any time after 10 calendar days of delivery thereof, and to incur any reasonable expense in connection therewith, provided that Tenant shall have no right in connection therewith to enter into the demised premises of any other tenant of the Center.  At any time thereafter, Tenant may deliver to Landlord a written statement of the actual and reasonable costs incurred by Tenant for such cure, together with reasonable evidence thereof.  Within thirty (30) days after delivery of such statement, Landlord shall reimburse Tenant the costs set forth thereon.  If Landlord does not so reimburse Tenant, then Tenant may recover such costs, plus interest thereon at the Default Rate, by a proceeding in a court of competent jurisdiction or may offset such costs, plus interest thereon at the Default Rate, against any installments of Base Rent thereafter payable hereunder until the full unpaid amount plus interest has been paid or offset in full.

17.1.3  The rights and remedies herein reserved by or granted to Tenant are distinct, separate and cumulative, and the exercise of any one of them shall not be deemed to preclude, waive or prejudice Tenant's right to exercise any or all others.

17.1.4  Notwithstanding anything to the contrary herein or under applicable law, Landlord shall have no liability for any special, consequential or punitive damages, except for consequential damages arising from a default or breach by Landlord, Enclosed Mall Owner or West Anchor Owner from any of their obligations with respect to the Common Areas.  If Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed, and if as a consequence of such default Tenant secures a final, non-appealable money judgment against Landlord, then Tenant shall have recourse against Landlord for the monetary liability under such judgment solely by levy and execution of such judgment against Landlord's interest in the Center (including without limitation the Encroachment Easement and any rents or profits thereof and any proceeds from the sale or other disposition thereof) and/or by offsetting the amount of such judgment, plus interest at the Default Rate, against sums payable by Tenant under this Lease.  No obligation or liability of Landlord shall be personally binding on nor shall resort for the enforcement thereof be had to any other property of the Landlord or the property of any of its officers, directors, stockholders, members, partners, employees, brokers, or Affiliates (other than the limited non-monetary remedies available from the Enclosed Mall Owner and West Anchor Owner), regardless of whether such obligation or liability is in the nature of contract, tort or otherwise.

17.2  <u>Tenant.</u>

Notwithstanding anything to the contrary herein or under applicable law, Tenant shall have no liability for any special, consequential or punitive damages except for consequential damages arising from an Event of Default pursuant to <u>Section 7.4.2</u> and <u>Section 16.1.3</u>.  Landlord acknowledges that Tenant is a corporation and that generally, as such, Landlord's recourse against Tenant for any final non-appealable monetary judgment received by Landlord shall be limited to Tenant's assets and that of the Guarantor.  No obligation or liability of Tenant shall be personally binding on nor shall resort for the enforcement thereof be had to any property of any of its officers, directors, stockholders, members, partners, employees or brokers, or

Affiliates (other than Guarantor), regardless of whether such obligation or liability is in the nature of contract, tort or otherwise.

None of the constituent partners, officers, members, principals, stockholders, agents or employees of Tenant shall be personally liable hereunder.

17.3    Guaranty.

Notwithstanding anything to the contrary herein, Tenant shall cause Regal Cinemas, Inc. to execute a guaranty of this Lease in the form attached hereto as Exhibit I (the "Guaranty") and Tenant shall deliver to Landlord such executed Guaranty simultaneous with Tenant's execution and delivery of this Lease.

ARTICLE 18
SUBORDINATION, ATTORNMENT AND NON-DISTURBANCE AGREEMENT

Each first-priority mortgage, deed of trust, deed to secure debt or other lien against Landlord's title to the East Anchor Parcel or the Theatre is referred to in this Lease as a "Loan Encumbrance," and the mortgagee, beneficiary, or holder of each Loan Encumbrance is referred to herein as a "Loan Encumbrance Holder."   Concurrently herewith, Landlord and Tenant are executing a non-disturbance agreement in the same form attached hereto as Exhibit E.  Landlord shall cause Existing Lender to execute a non-disturbance agreement in the same form attached hereto as Exhibit E within 10 calendar days of the date hereof.  Tenant agrees to execute and deliver a non-disturbance agreement in substantially the same form attached hereto as Exhibit E in favor of any future Loan Encumbrance Holder, provided that the Loan Encumbrance Holder executes and delivers the same.  Tenant shall not be obligated to modify or waive any material benefit provided to Tenant by this Lease in any such non-disturbance agreement.  Landlord authorizes Tenant to honor any written demand or notice from any person that identifies itself as a Loan Encumbrance Holder and instructs Tenant to pay Rent or other sums to such Loan Encumbrance Holder or to a designee thereof rather than to Landlord (a "Payment Demand"), regardless of any other or contrary notice or instruction which Tenant may receive from Landlord before or after Tenant's receipt of such Payment Demand.  Tenant may rely upon any Payment Demand from any person that identifies itself as a Loan Encumbrance Holder signed by such Loan Encumbrance Holder and shall have no duty to Landlord to investigate the same or the circumstances under which the same was given.  Any payment made by Tenant to a person that identifies itself as a Loan Encumbrance Holder in response to a Payment Demand shall be deemed proper payment by Tenant of such sum pursuant to this Lease.

ARTICLE 19
ESTOPPEL CERTIFICATES

From time to time and within twenty (20) days after a request in writing therefor from the other Party, Landlord and Tenant shall execute and deliver to the other Party, and to such other addressee or addressees as may be designated by the requesting Party, a written certification in form and substance reasonably satisfactory to both Landlord and Tenant (herein called an "Estoppel Certificate") with respect one or more factual matters reasonably relating to this Lease

and the Theatre.  Neither Landlord nor Tenant shall be entitled to demand, receive or collect any fee or amount in connection with a request or delivery of an Estoppel Certificate.

ARTICLE 20
QUIET ENJOYMENT

Except during the continuance of an Event of Default, during which Landlord may exercise the remedies provided in this Lease, and subject to the terms, conditions, and provisions of this Lease, Tenant shall peaceably and quietly hold and enjoy the Theatre for the Term without molestation, hindrance or interruption by Landlord, or by any person claiming under or through Landlord.  Without limiting the generality of the foregoing, Tenant shall peaceably and quietly hold and enjoy the Theatre for the Term without molestation, hindrance or interruption by Enclosed Mall Owner, in its capacity as grantor of the Encroachment Easement, or by any person claiming under or through Enclosed Mall Owner, in such capacity.

ARTICLE 21
SURRENDER AND HOLDING OVER

21.1   Delivery After Term.

If not sooner terminated as herein provided, this Lease shall terminate at the end of the Expiration Date without the necessity of notice from either Landlord or Tenant to terminate the same.  Prior to the Expiration Date, in the case of the expiration of the Lease on the Expiration Date, or prior to the effective date of the earlier termination of the Lease or the month-to-month tenancy referenced in Section 21.2 (the "Removal Period"), in the case of the earlier termination of the Lease, Tenant may remove from the Center, at Tenant's sole cost, all of Tenant's Property and repair any physical damage caused by such removal.  Upon expiration of the Removal Period, Tenant shall deliver up and surrender to Landlord possession of the Theatre broom clean and in good condition, except for (a) normal wear and tear, (b) any element of the Theatre which Landlord is required to maintain or repair pursuant to this Lease (unless any damage was due to Tenant's removal pursuant to the preceding sentence in which case Tenant shall repair such damage), and (c) the effect of any casualty or Taking.  Landlord shall not interfere with or hinder Tenant's removal of Tenant's Property during the Removal Period.  Subject to the foregoing, any of Tenant's Property remaining at the Theatre following the Removal Period shall be deemed abandoned by Tenant to Landlord, and shall become Landlord's property without any compensation to Tenant.

21.2   Effect of Holding Over.

If Tenant remains in possession of the Theatre or any part thereof after the expiration of the Removal Period, then Tenant shall be deemed to be a tenant of the Theatre pursuant to a month-to-month tenancy, terminable by either Tenant or Landlord upon not less than thirty (30) days' prior written notice to the other, subject to all of the terms and provisions of this Lease, but with Base Rent payable at 125% of the Base Rent payable immediately prior to the Expiration Date or earlier termination of the Rent Term.  Notwithstanding the foregoing, if Landlord and Tenant are engaged in negotiations with one another regarding an amendment or extension of this Lease, or for a new lease for some or all of the Theatre, then the Base Rent during such

negotiations shall be equal to the Base Rent payable immediately prior to the Expiration Date or earlier termination of the Rent Term. Landlord shall have the right, in Landlord's sole discretion, to terminate such negotiations at any time upon written notice to Tenant, and from and after such termination, the Base Rent payable by Tenant shall equal 125% of the Base Rent payable immediately prior to the Expiration Date or earlier termination of the Rent Term.

## ARTICLE 22
## CONDEMNATION

22.1   All or Any Part of Theatre Taken.

22.1.1   As used herein, "Taking" means the taking by right of eminent domain or by agreement or conveyance in lieu thereof by or pursuant to governmental authority either permanently or for a period greater than one hundred eighty (180) consecutive days.

22.1.2   If all or any part material part of the Theatre is the subject of a Taking or if any portion of the Center which is material to operation of the Theatre is the subject of a Taking, this Lease shall terminate as of the day possession thereof is taken, and Tenant shall pay Rent and perform all of its other obligations under this Lease up to that date with a proportionate refund by Landlord of any Rent paid for the period after the day possession is taken. However, Tenant shall have the right, in Tenant's sole and absolute discretion, to negate such automatic termination of this Lease with respect to any Taking for a temporary period of less than three hundred sixty-six (366) days or any Taking of some, but not all, of the auditoriums of the Theatre, with such right exercised by Tenant providing to Landlord written notice of such election to negate the automatic termination of this Lease within sixty (60) days from and after the day possession of the whole Theatre or any material part of the Theatre is taken. In the event Tenant negates the automatic termination of this Lease with respect to any Taking for a temporary period of less than three hundred sixty-six (366) days, Rent shall abate equitably in proportion to the part of the Theatre so taken throughout such period of temporary Taking. In the event Tenant negates the automatic termination of this Lease with respect to any Taking of some, but not all, of the auditoriums of the Theatre, all Rent shall abate equitably in proportion to the part of the Theatre so taken for the duration of the Rent Term following such Taking.

22.2   Taking of Parking Spaces.

If all or any portion of the Parking Retention Areas shall be the subject of a Taking, resulting in a material reduction in the number of parking spaces in the Parking Retention Areas, then Landlord shall make commercially reasonable efforts to replace such parking spaces within the Center with an equal number of parking spaces of the same type and size as those taken within one hundred twenty (120) days following the day possession is taken. The replacement spaces shall be located no further than one thousand (1,000) linear feet from the main pedestrian entrance to the Theatre. The replacement parking spaces may be new parking spaces resulting from the re-striping of the Common Areas or may be newly constructed parking spaces within the Center, so long as in each case such spaces otherwise qualify as Parking Retention Areas under the terms of this Lease and are available to Tenant on a non-exclusive basis as such for the remainder of the Rent Term. Such spaces shall thereafter be deemed included in the Parking Retention Areas. In the event that despite Landlord's commercially reasonable efforts Landlord

is unable to replace such parking spaces within such one hundred twenty (120) day period, Tenant shall have the one-time right, to be exercised within thirty (30) days following the lapse of such 120-day period, to terminate this Lease on account of the Taking of a material number of parking spaces in the Parking Retention Areas, failing which, this Lease shall remain in full force and effect and Tenant shall be deemed to have waived and relinquished any and all rights and remedies under this Lease relating to such Taking and/or its effect on the Parking Retention Areas.

22.3    Ownership of Award.

Upon the occurrence of a Taking of any material portion of the Center, Landlord shall be entitled to compensation for the Land and improvements thereon to the extent attributable to the East Anchor Parcel and Tenant shall be entitled to compensation for Tenant's Property, for the removal thereof, for the relocation of Tenant's business and for any loss of Tenant's business and goodwill.   Tenant may nullify any termination of this Lease until completion of any condemnation proceedings if necessary for the purpose of preserving any recovery to which Tenant would otherwise be entitled, and during such period, neither Landlord nor Tenant shall have any obligations under this Lease, and, except as otherwise expressly provided herein, Landlord shall have the right to re-lease the remaining portion of the Theatre or any part of such remaining portion without any liability to Tenant therefor.

ARTICLE 23
HAZARDOUS MATERIAL

23.1    Definitions.

As used herein, the following terms shall have the following meanings:

23.1.1    "Hazardous Materials" means (a) any "hazardous waste" as defined by the Resource Conservation and Recovery Act of 1976 (42 U.S.C. Section 6901 et seq.) (RECRA), as amended from time to time, and regulations promulgated thereunder; (b) any "hazardous substance" as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. Section 9601 et seq.)   ("CERCLA"); the Superfund Amendments and Re-authorization Act of 1986 ("SARA"), as amended from time to time, and regulations promulgated thereunder; (c) asbestos; (d) polychlorinated biphenyls; (e) any substance the presence of which on the Theatre is prohibited by any Legal Requirement; (f) any other substance which is deemed to be a pollutant or a contaminant, or to be hazardous, toxic, ignitable, reactive, infectious, explosive, corrosive and which is now or becomes regulated in the future by or under any Legal Requirement and/or requires special handling or notification of any federal, state or local governmental entity in its collection, storage, treatment, or disposal; and (g) any item so designated by or pursuant to the Water Pollution Control Act (33 U.S.C. Section 1251 et seq.); Safe Drinking Water Act (42 U.S.C. Section 3000(f) et seq.); or Toxic Substances Control Act (15 U.S.C. Section 2601 et seq.).

23.1.2    "Hazardous Materials Contamination" means the presence (whether presently existing or hereafter occurring) of Hazardous Materials in violation of Legal Requirements in the

79

improvements, facilities, soil, groundwater, air or other elements of all or any portion of the Theatre or the East Anchor Parcel.

23.1.3   "Indemnification Costs," as used in this Article 23, means any and all actual and reasonable costs (including, but not limited to, reasonable fees and expenses of experts, reasonable attorneys' fees and litigation costs) of any investigation, inspection, assessment, legal action, litigation, arbitration, settlement, judgment and/or appeal related thereto, together with any amount (actual, special, punitive or any other form and any interest or surcharges thereon) which Tenant or Landlord is required to pay or incur pursuant to, any claim of any and every kind whatsoever which may now or in the future (whether before or after the termination or expiration of this Lease) be asserted in any way against Tenant or Landlord by any person, entity or governmental authority of any kind for, with respect to, or as a direct or indirect result of, either the presence on, under or about the Theatre and/or the East Anchor Parcel, or the escape, seepage, leakage, spillage, discharge, emission or release from any part of the Theatre and/or the East Anchor Parcel, of any Hazardous Materials or any Hazardous Materials Contamination which either poses a hazard to human health or requires remediation under the requirements or standards of any Legal Requirement (including, without limitation, RECRA, CERCLA, SARA or any federal, state or local so-called "superfund" or "superlien" laws, or any code, rule, regulation, order or decree promulgated thereunder).

23.2   Warranties and Representations.

Landlord hereby warrants and represents to Tenant that, as of the Effective Date:

23.2.1   To Landlord's knowledge, except as disclosed in the body of the environmental assessments identified in Section 2.7.11 (i.e., without regard to the appendices of such environmental assessments), no Hazardous Materials Contamination exists at the Center, and neither Landlord nor any other person has caused or permitted any Hazardous Materials in violation of Legal Requirements to be placed, held, located or disposed of on, under or at the Center;

23.2.2   To Landlord's knowledge, neither Landlord nor any of its Affiliates has received notice of any proposed, threatened, anticipated or existing investigation, administrative order, consent order, litigation, settlement or placement on any federal or state "superfund" or "superlien" list with respect to Hazardous Materials or Hazardous Materials Contamination at the Center.

As used in this Lease, the words "to Landlord's knowledge" or words of similar import shall be deemed to be based solely upon the actual knowledge of Dennis Henderson, who Landlord represents and warrants to Tenant is, as of the date hereof, the Operations Manager for the Lloyd Center.

23.3   Affirmative Covenants.

23.3.1   Notice.   Each of Landlord and Tenant shall deliver notice to the other promptly after acquiring knowledge of the presence of any Hazardous Materials Contamination at the Center, together with a reasonable description thereof.

23.3.2   <u>Indemnification of Tenant</u>.  If Hazardous Materials Contamination has occurred on, at or under the Center prior to Delivery Date, or if Hazardous Material Contamination occurs on, at or about the Center as a result of any act or omission of Landlord, Enclosed Mall Owner, or their agents or employees, Landlord shall defend, indemnify and hold harmless the Tenant Parties from any and all Indemnification Costs and Landlord shall pay (or cause others (who are not Tenant) to pay) all costs for performance of any and all necessary or appropriate removal, control or remediation work related thereto (including, but not limited to, installation and operation of any monitoring wells, vapor barriers and devices).  If the closure of all or any portion of the Theatre during the Term is necessary or reasonably appropriate because of any Hazardous Materials Contamination on, at or about the Center as a result of any act or omission of Landlord, its agents or employees, then Tenant's obligation to pay any Rent pursuant to this Lease shall equitably abate for the duration of such necessary or reasonably appropriate closure.  The representations, covenants, warranties and indemnification contained in this <u>Article 23</u> shall survive the Expiration Date or earlier termination of this Lease.  For the purposes of this <u>Article 23</u>, the term "<u>Tenant Parties</u>" includes, in addition to Tenant, all present and subsequent owners, partners, joint venturers, managers, directors, officers, shareholders, employees and agents of Tenant and each and every Affiliate of Tenant, and all of the directors, officers, shareholders, managers, employees and agents of each and every Affiliate of Tenant.

23.3.3   <u>Indemnification of Landlord</u>:  If any Hazardous Materials Contamination occurs at the Center as the result of an act or omission of Tenant or any subtenant, licensee or concessionaire of Tenant, or any of their respective contractors, agents or employees from the Effective Date until the expiration of or earlier termination of the Term, Tenant shall defend, indemnify and hold harmless the Landlord Parties from any and all Indemnification Costs and Tenant shall pay (or cause others (who are not Landlord) to pay) all costs for performance of any and all necessary or appropriate removal, control or remediation work related thereto (including, but not limited to, installation and operation of any monitoring wells, vapor barriers and devices).  The representations, covenants, warranties and indemnification contained in this <u>Article 23</u> shall survive the Expiration Date or earlier termination of this Lease.  For the purposes of this <u>Article 23</u>, the term "<u>Landlord Parties</u>" includes, in addition to Landlord, all present and subsequent owners, partners, joint venturers, managers, directors, officers, shareholders, lenders, employees and agents of Landlord and each and every Affiliate of Landlord, and the directors, officers, shareholders, managers, employees and agents of each and every Affiliate of Landlord.

ARTICLE 24
MISCELLANEOUS

24.1   <u>Interpretation.</u>

24.1.1   The captions, table of contents and index of defined terms appearing and/or used in this Lease are inserted and used only as a matter of convenience and in no way amplify, define, limit, construe, or describe the scope or intent of this Lease nor in any way affect this Lease.  Except where otherwise expressly provided, each reference in this Lease to a Section or Article may mean the referenced Section or Article in this Lease.  Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all of the exhibits attached hereto as a whole and not to any particular Section or Article hereof.

24.1.2   If more than one person or corporation is named as Landlord or Tenant in this Lease and executes the same as such, or subsequent to execution of this Lease becomes Landlord or Tenant, then and in such event, the words "<u>Landlord</u>" or "<u>Tenant</u>" wherever used in this Lease are intended to refer to all such persons or corporations, and the liability of such persons or corporations for compliance with and performance of all the terms, covenants and provisions of this Lease shall be joint and several.

24.1.3   The neuter, feminine or masculine pronoun when used herein shall each include each of the other genders, and the use of the singular shall include the plural unless the context otherwise requires.

24.1.4   All the provisions of this Lease are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate provision hereof.

24.1.5   This Lease shall not be construed for or against Landlord or Tenant, but this Lease shall be interpreted in accordance with the plain language of the words chosen by the Parties and memorialized in this Lease.

24.1.6   Nothing herein contained shall be deemed or construed by the Parties, or by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the Parties, it being understood and agreed that neither the method of computation of Percentage Rent, Co-Tenancy Deficiency Rent or Special Rent, nor any other provision contained herein, nor any acts of the Parties, shall be deemed to create any relationship between the Parties other than the relationship of lessor and lessee nor cause Landlord to be responsible in any way for the acts, debts or obligations of Tenant.

24.2   <u>Notices.</u>

Any notice, approval, consent, waiver or other communication required or permitted to be delivered upon a Party under this Lease (a "<u>Notice</u>") shall be in writing and shall be personally delivered or sent by reputable overnight delivery service, such as Federal Express, and shall be deemed given:  (a) if personally delivered, when actually delivered or refused; and (b) if sent by reputable overnight delivery service, such as Federal Express, when actually delivered or refused, provided confirmation of delivery or refusal shall be retained by the sender. Notices shall be addressed to the Party to whom the Notice is to be given at the Party's address set forth on the cover page of this Lease and below or as such Party shall otherwise direct in a writing to the other Party delivered or sent in accordance with this Section, which is manually signed by such Party or its attorney, if any, named herein, which is unequivocal and unconditional and which makes specific reference to this Section of this Lease.
Any such notices to Landlord shall also be sent contemporaneously to:

> CAPREF Lloyd Center East LLC
> 2201 Lloyd Center
> Portland, Oregon 97232
> Attention:  Lease Administration

Any such notices to Tenant shall also be sent contemporaneously to:

Regal Cinemas, Inc.
7132 Regal Lane
Knoxville, Tennessee  37918
Attn:  Legal Department

24.3    Successors.

This Lease and the covenants and conditions herein contained shall inure to the benefit of and shall be binding on (a) Landlord and its successors and assigns in ownership of all or any portion of the East Anchor Parcel or its interest under the Encroachment Easement, and to all persons claiming under or through them, and (b) Tenant and its permitted successors and assigns with respect to the leasehold, and to all persons claiming under or through them.  Without limiting the generality of the foregoing, if any one or more parcels of the Land are, at any time after the date hereof, not owned by the person that then owns the portion of the Land on which the Theatre is located, such other person shall nonetheless be bound by the covenants, terms and conditions of this Lease to the extent performance thereof requires possession of the parcel or parcels owned by such other person as a successor in ownership to Landlord, and so shall all persons claiming under or through such successor.  Tenant may elect to enforce such covenants, terms or conditions of this Lease against such other persons, or against the person that then owns the portion of the Land on which the Theatre is located, or both, as Tenant deems appropriate.  Without limiting the generality of the foregoing, no separate ownership shall affect Tenant's rights in respect of violations of either the Theatre Use Covenant or the Concession Use Covenant, the On-Going Co-Tenancy Requirement, the use of the Common Areas, the non-liability for Property Taxes and CAM Expenses, or the effect of any casualty or condemnation, or shall otherwise excuse Landlord's performance of this Lease in strict accordance with the terms hereof.  Landlord (or its successor in ownership of fee title to the East Anchor Parcel) shall provide Tenant with notice upon or immediately after any sale or transfer of Landlord's fee title in and to the East Anchor Parcel, together with a written instrument signed by the transferee pursuant to which the transferee assumes all of the obligations of Landlord whether arising before or after such transfer.  Upon delivery of such notice and such instrument, the Landlord so transferring its interest in the East Anchor Parcel shall cease to be liable to Tenant hereunder from and after the date of such sale or transfer regardless of the date on which Tenant receives notice of such sale or transfer.  Notwithstanding anything to the contrary herein, Landlord may not transfer any of its right, title or interest in, to or under the Encroachment Easement separate from its fee title to the East Anchor Parcel, and may not transfer any of its right, title or interest in or to the East Anchor Parcel separate from its right, title and interest in, to and under the Encroachment Easement.  If Landlord attempts or purports to transfer its right, title or interest in either separately, Tenant may elect, in its sole and absolute discretion, to treat such transfer or attempted or purported transfer as voidable at any time.

24.4    Brokers.

Each Party represents and warrants to the other that no broker, finder or consultant, to whom any monetary compensation is owed, provided any services in connection identification of the Center for Tenant's occupancy or the negotiation, execution or delivery of this Lease, except for Don Edrington of SRS Real Estate Partners and Candace Gray of EnVision Realty Advisors West (the "Acknowledged Brokers"), and each Party agrees to indemnify and hold harmless the

83

other Party from and against any claims, liabilities, costs and expenses (including reasonable attorneys' fees) with respect to its breach of the foregoing representation and warranty. Landlord shall be solely responsible for paying all compensation payable to the Acknowledged Brokers, pursuant to a separate agreement.

24.5   Unavoidable Delays.

If either Party shall be delayed or hindered in or prevented from the performance of any act required hereunder (except for the payment when due of any money) by reason of a Force Majeure Event, then such delayed Party shall give notice to the other Party of such Force Majeure Event, following which performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.

24.6   Severability.

If any term or provision of this Lease is capable of two constructions, one of which would render the provision invalid and the other of which would render the provision valid, then the provision shall have the meaning which renders it valid. If any term or provision, or any portion thereof, of this Lease, or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to the persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

24.7   Time of Essence.

Time is of the essence with respect to the performance of the respective obligations, and exercise of the respective rights, of Landlord and Tenant set forth in this Lease.

24.8   Applicable Law.

The laws of the State of Oregon shall govern the validity, performance and enforcement of this Lease. If either Party institutes legal suit or action for enforcement of any obligation contained herein, it is agreed that venue for such suit or action shall be in the state court of the county, parish or other like jurisdiction of the State of Oregon in which the Theatre is located.

24.9   Waiver.

24.9.1   The waiver by Landlord or by Tenant of any term, covenant, agreement or condition herein contained shall not be deemed to be a waiver of any subsequent breach of the same or any other term, covenant, agreement or condition herein contained. No covenant, term, agreement or condition of this Lease shall be deemed to have been waived by Landlord or Tenant, unless such waiver is in writing and signed by an authorized signatory of either Landlord or Tenant, as the case may be.

24.9.2   No waiver of any covenant, term, agreement or condition of this Lease or legal right or remedy shall be implied by the failure of Landlord or Tenant to take any action or

declare a forfeiture or termination when those rights are given by the terms of this Lease, or for any other reason.  No consent or approval by Landlord or Tenant shall be effective or operate to change any condition, requirement or other provision of this Lease unless made in writing and signed by an authorized signatory of either Landlord or Tenant, as the case may be, unless such consent or approval is expressly deemed to occur by the terms of this Lease.

24.9.3   No agreement to accept a surrender of possession of the Theatre other than at the expiration or earlier termination of the Term shall be valid unless in a writing signed by Landlord.  The delivery of keys, abandonment of the Theatre, and/or any attempt to deliver possession of the Theatre by Tenant to Landlord or any agent or employee of Landlord without Landlord's consent shall not operate as a termination of this Lease or a surrender of the Theatre.

24.10   Recording.

This Lease shall not be recorded.  Concurrently herewith each of Landlord and Tenant shall execute and deliver to the other Party a counterpart memorandum of this Lease that is substantially in the form of Exhibit F attached hereto (a "Memorandum of Lease"), and is otherwise in recordable form.  Either Tenant or Landlord may record a fully-executed Memorandum of Lease in the appropriate public records.  Upon the Expiration Date or earlier termination of this Lease, promptly following written request by a Party, the other Party shall execute and deliver a quitclaim or a termination of the Memorandum of Lease, which either Party may record in the appropriate public records.

24.11   Limited Joinders.

24.11.1 Landlord shall cause CAPREF Lloyd II and CAPREF Lloyd Center Anchor to execute limited joinders in the forms attached hereto as Exhibit K and Exhibit L (the "Limited Joinders"), respectively, together with consents thereto executed by KREF in the forms attached to the Limited Joinders, simultaneous with Landlord's execution and delivery of this Lease. Landlord shall be responsible for the timely performance of the covenants made by Landlord herein, including without limitation those covenants made by Landlord herein with respect to Enclosed Mall Owner and West Anchor Owner.  Neither the execution or existence of the Limited Joinders (or any modification, release or termination thereof), nor the separate ownership of the Enclosed Mall Parcels and the West Anchor Parcel, nor the conveyance of the Enclosed Mall Parcels or West Anchor Parcels to persons who are not Affiliates of Landlord, nor any other circumstance relating thereto, shall affect Tenant's rights against Landlord in respect of violations of the Theatre Use Covenant, the Concession Use Covenant, the On-Going Co-Tenancy Requirement, the use of the Common Areas, the non-liability of Tenant for Property Taxes or CAM Expenses, or the effect of any casualty or condemnation, or shall otherwise excuse Landlord's performance of this Lease in strict accordance with the terms hereof.  Either Tenant or Landlord may record one or both of the Limited Joinders, together with consents, in the appropriate public records.

24.11.2 Prior to naming Enclosed Mall Owner or West Anchor Owner as defendants in a complaint to enforce or interpret the Limited Joinders, Tenant shall first deliver to Landlord a written notice stating the nature of its claims against Enclosed Mall Owner or West Anchor Owner in reasonable detail.  At any time after no less than 5 calendar days thereafter, Tenant

may file a complaint naming Enclosed Mall Owner or West Anchor Owner as defendants to enforce or interpret the Limited Joinders, subject in all events to any other limitations on the remedies available against Enclosed Mall Owner and/or West Anchor Owner set forth in the Limited Joinders.  Nothing contained herein shall limit the recourse of Tenant against Landlord for any breach or default by Landlord, Enclosed Mall Owner or West Anchor Owner under this Lease.  Tenant's remedies against Enclosed Mall Owner and West Anchor Owner shall be limited as provided in Section 3 of each of the Limited Joinders.

24.11.3 Nothing contained herein shall limit the recourse of Landlord against Enclosed Mall Owner or West Anchor Owner for any breach or default by Enclosed Mall Owner or West Anchor Owner under the CC&Rs.  If and to the extent deemed appropriate by Tenant, Tenant may request, but shall have no obligation, at any time prior to the Expiration Date and from time to time, that Landlord assign or delegate some or all of its rights under the CC&Rs against Enclosed Mall Owner and/or West Anchor Owner to Tenant or to pursue such a claim on Tenant's behalf and on Tenant's account.  If Tenant so requests, then Landlord shall either pursue such claim on Tenant's behalf or elect to so assign or delegate such claim within 10 calendar days of such request.  If Landlord elects to pursue such claim it shall do so on Tenant's behalf and on Tenant's account.

24.11.4 Neither Enclosed Mall Owner, West Anchor Owner nor any other Person shall be deemed a third-party beneficiary of this Lease, or any provision hereof.  Without limiting the generality of the foregoing, neither Enclosed Mall Owner nor West Anchor Owner shall be entitled to enforce the terms or conditions of this Lease against Tenant, or to seek damages against Tenant hereunder, or to assert as a defense to Enclosed Mall Owner's or West Anchor Owner's obligations hereunder any default or alleged default of any obligation by Tenant to Landlord hereunder.

24.12   Entire Agreement.

24.12.1 There are no oral agreements between the Parties affecting this Lease, and this Lease supersedes and cancels any and all previous negotiations, arrangements, letters of intent, letters of understanding, lease proposals, brochures, agreements, representations, promises, warranties and understandings between the Parties with respect to the lease of the East Anchor Parcel.

24.12.2 This Lease, including the exhibits hereto, which are incorporated herein by reference, sets forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Theatre and there are no implied conditions or covenants are intended by the Parties or to be construed hereunder.  No alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing, signed by them and mutually delivered between them.

24.13   Attorneys' Fees.

In the event of litigation between the Parties in which it is alleged that one or the other has defaulted under the provisions of this Lease, the ultimate losing Party shall pay the reasonable attorneys' fees and court costs of the ultimate prevailing Party.

24.14   <u>Acceptance of Less Than Full Payment.</u>

Each of Landlord and Tenant shall be entitled to accept any check or other form of payment of any obligation of the other Party, regardless of whether such check or other form of payment constitutes the full amount pursuant to such obligation, without prejudice to the right of the recipient of such check or other form of payment to recover the balance due on such obligation.

24.15   <u>Mutual Execution.</u>

Neither Landlord nor Tenant shall have any obligation or liability to the other whatsoever under this Lease until such time as (a) each of Landlord and Tenant has each executed this Lease and delivered a copy of such executed Lease to the other Party, (b) each of Landlord, Tenant and Existing Lender has executed a non-disturbance agreement in the same form attached hereto as <u>Exhibit E</u>, and delivered a copy of such executed agreement to each other party thereto, and Tenant has received a fully-executed original in recordable form, (c) each of Enclosed Mall Owner and West Anchor Owner has executed the Limited Joinder to which it is a named party, and delivered a copy of such executed consent to both Landlord and Tenant, and Tenant has received a fully-executed original in recordable form, (d) KREF has executed the consent attached hereto to which it is a party, and delivered a copy of such executed consent to both Landlord and Tenant, and Tenant has received a fully-executed original in recordable form, (e) each of Landlord and Tenant have executed the Memorandum of Lease, and delivered a copy of such executed Memorandum of Lease to the other Party, and Tenant has received a fully-executed original in recordable form, and (f) each of CAPREF Lloyd II and Landlord has executed the Encroachment Easement, and delivered a copy of such executed agreement to each other and to Tenant, and Tenant has received a fully-executed original in recordable form. Notwithstanding anything to the contrary, Tenant may elect, but shall not be obligated, to waive or agree to accept later execution or delivery by Landlord or any of its Affiliates, Existing Lender or KREF of any of the foregoing instruments.

24.16   <u>Counterparts.</u>

This Lease may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

24.17   <u>Survival of Obligations.</u>

The obligation to pay any sums due to either Party from the other that by the terms hereof would not be payable or are incapable of calculation until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid.  All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

[signature page follows]

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the date first written above.

LANDLORD:                                  CAPREF LLOYD CENTER EAST LLC, a
                                           Delaware limited liability company

                                           By:_____
                                           Name: _Todd Minnis_
                                           Its:  _Authorized Signatory_

TENANT:                                    EASTGATE THEATRE, INC., an Oregon
                                           corporation

                                           By:_____
                                           Name:
                                           Its:

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the date first written above.

LANDLORD:                           CAPREF LLOYD CENTER EAST LLC, a
                                    Delaware limited liability company

                                    By:_____
                                    Name:
                                    Its:

TENANT:                             EASTGATE THEATRE, INC., an Oregon
                                    corporation

                                    By: _____
                                    Name:  TODD S. BORUFF
                                    Its:   Vice President

## CONSENT OF LENDER

The undersigned, as holder of that certain Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing dated as of March 21, 2017 and recorded as Instrument No. 2017-035671 in the real property records of Multnomah County, State of Oregon, hereby consents to the foregoing.

LENDER:                            KEYSTONE REAL ESTATE LENDING FUND, L.P., a Delaware limited partnership

                                   By:    Keystone Real Estate Lending Fund GP, LLC, a Delaware limited liability company its General Partner

By: _____
Name: _____Brandon Nilsen_____
Title: _____Managing Member_____

89

Exhibit A-1

Legal Description of the East Anchor Parcel

See Section 1.1.8

PARCEL 1:

PARCEL 2, PARTITION PLAT 1999-146, IN THE CITY OF PORTLAND, COUNTY OF MULTNOMAH AND STATE OF OREGON, RECORDED NOVEMBER 1, 1999 AS DOCUMENT NO. 992-01508.

PARCEL 2: (EASEMENT)

EASEMENT RIGHTS AND EASEMENTS CONSTITUTING RIGHTS IN REAL PROPERTY, INCLUDING EASEMENTS FOR INGRESS, EGRESS, PARKING AND UTILITIES, FOR THE BENEFIT OF PARCEL 1, AS CREATED (AND/OR PURPORTED TO BE CREATED), DEFINED AND LIMITED BY (AND SUBJECT TO THE TERMS AND CONDITIONS OF) THAT CERTAIN CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT, DATED JULY 19, 1990, RECORDED SEPTEMBER 5, 1990 IN VOLUME 2340, PAGE 1635 AND AS FEE NO. 90082469, AS AFFECTED BY (1) PARTIAL RELEASE OF CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT RECORDED DECEMBER 23, 1993 IN VOLUME 2806, PAGE 0272 AND AS FEE NO. 93176795, (2) PARTIAL RELEASE OF CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT RECORDED APRIL 29, 1994 AS FEE NO. 94068247, (3) SECOND AMENDMENT TO CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT BY AND BETWEEN GLIMCHER LLOYD VENTURE, LLC, A DELAWARE LIMITED LIABILITY COMPANY, NORDSTROM, INC., A WASHINGTON CORPORATION AND SEARS, ROEBUCK AND CO., A NEW YORK CORPORATION, DATED MARCH 2, 1999, RECORDED JANUARY 6, 2000, AS FEE NO. 2000 001863, AND (4) THIRD AMENDMENT TO CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT BY AND BETWEEN GLIMCHER LLOYD VENTURE, LLC, A DELAWARE LIMITED LIABILITY COMPANY, NORDSTROM, INC., A WASHINGTON CORPORATION AND SEARS, ROEBUCK AND CO., A NEW YORK CORPORATION, DATED MAY 15, 2013, RECORDED JUNE 11, 2013, AS FEE NO. 2013079097, ALL IN THE CLERK'S OFFICE OF MULTNOMAH COUNTY, OREGON, OVER THE FOLLOWING DESCRIBED TRACT A AND TRACT B:

PARCEL 2, TRACT A (EASEMENT):

A TRACT OF LAND SITUATED IN THE NORTHWEST ONE-QUARTER OF SECTION 35, TOWNSHIP 1 NORTH, RANGE 1 EAST OF THE WILLAMETTE MERIDIAN, IN THE CITY OF PORTLAND, COUNTY OF MULTNOMAH AND STATE OF OREGON, SAID TRACT BEING A PORTION OF BLOCKS 114 AND 115 OF HOLLADAY'S ADDITION TO EAST PORTLAND [PLAT BOOK 1, PAGE 0072], AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF SAID BLOCK 114, HOLLADAY'S
ADDITION [PLAT BOOK 1, PAGE 0072],
THENCE NORTH ALONG THE WEST LINE OF SAID BLOCK 114 AND THE WEST LINE
OF A TRACT DEDICATED FOR STREET PURPOSES BY DEED RECORDED IN
VOLUME 1865, PAGE 0292, MULTNOMAH COUNTY DEED RECORDS, A DISTANCE
OF 140.00 FEET;
THENCE EAST PARALLEL WITH THE SOUTH LINE OF SAID BLOCK 114, A
DISTANCE OF 10.00 FEET TO A POINT IN THE EAST LINE OF SAID DEDICATED
TRACT AND THE POINT OF BEGINNING OF THE TRACT HEREIN TO BE DESCRIBED;
THENCE NORTH ALONG THE EAST LINE OF SAID DEDICATED TRACT AND
PARALLEL WITH THE WEST LINE OF SAID BLOCKS 114 AND 115, A DISTANCE OF
324.67 FEET;
THENCE EAST 15.67 FEET;
THENCE SOUTH 15.00 FEET;
THENCE EAST 17.33 FEET TO A POINT OF CURVE;
THENCE ALONG THE ARC OF A 5.17 FOOT RADIUS CURVE TO THE RIGHT
THROUGH A CENTRAL ANGLE OF 90° 00' 00" AN ARC LENGTH OF 8.12 FEET, SAID
CURVE IS SUBTENDED BY A CHORD WHICH BEARS SOUTH 45° 00' 00" EAST 7.31
FEET;
THENCE EAST 116.83 FEET;
THENCE SOUTH 20.42 FEET;
THENCE EAST 23.25 FEET;
THENCE SOUTH 251.08 FEET;
THENCE SOUTH 45° 00' 00" WEST 46.67 FEET;
THENCE WEST 145.25 FEET TO THE POINT OF BEGINNING.

PARCEL 2, TRACT B (EASEMENT)

PARCEL 1, PARTITION PLAT 1999-146, IN THE CITY OF PORTLAND, COUNTY OF
MULTNOMAH AND STATE OF OREGON, RECORDED NOVEMBER 1, 1999 AS
DOCUMENT NO. 992-01508.

PARCEL 3: (EASEMENT)

EASEMENT RIGHTS AND EASEMENTS CONSTITUTING RIGHTS IN REAL PROPERTY
AS CREATED (AND/OR PURPORTED TO BE CREATED), DEFINED AND LIMITED BY
(AND SUBJECT TO THE TERMS AND CONDITIONS OF) THAT CERTAIN EASEMENT
AGREEMENT BY AND BETWEEN GLIMCHER LLOYD VENTURE, LLC, A DELAWARE
LIMITED LIABILITY COMPANY AND SEARS, ROEBUCK AND CO., A NEW YORK
CORPORATION, RECORDED JANUARY 6, 2000 AS FEE NO. 2000 001862, IN THE
CLERK'S OFFICE OF MULTNOMAH COUNTY, OREGON.

Exhibit A-2

Legal Description of the Enclosed Mall Parcels

See Section 1.1.8

PARCEL I:

Parcel 1 of PARTITION PLAT 1999-146, in the City of Portland, County of Multnomah and State of Oregon.

PARCEL II:

A tract of land situated in the Northeast one-quarter of Section 35, Township 1 North, Range 1 East, of the Willamette Meridian, in the City of Portland, County of Multnomah and State of Oregon, and being a portion of Blocks 174 and 175, HOLLADAY'S ADDITION TO EAST PORTLAND, City of Portland.

EXCEPT the East 10 feet of Block 175, and the East 10 feet and the South 10 feet of Block 174, as dedicated for public right-of-way pursuant to instrument recorded on April 4, 1958, in Book 1891, Page 374, and recorded on July 23, 1951, in Book 1488, Page 216, Multnomah County Deed Records.

AND

TOGETHER WITH those portions of N.E. Clackamas Street, NE Wasco Street and N.E. 15th Avenue, inuring thereto as vacated pursuant to Ordinance No. 166704, recorded on December 23, 1993, in Book 2806, Page 281, as amended by instrument recorded on December 23, 1993, in Book 2806, Page 306 Multnomah County Deed Records, and subject to the rights of the public in and to those portions of Blocks 174 and 175 dedicated for public right-of-way pursuant to Ordinance No. 166704 and as further described in Dedication Deeds recorded on December 23, 1993, in Book 2806, Page 262, and Book 2806, Page 277, which instrument was re-recorded on July 15, 1994, in Recorder's Fee No. 94108110, and further re-recorded on August 1, 1994, as Recorder's Fee No. 94-116499. Said Parcel of land being described as follows:

Beginning at a point on the center line of N.E. 15th Avenue and being located North 00°00'00" East, a distance of 40.00 feet from the center line of N.E. Multnomah Street and N.E. 15th Avenue; and running thence North 00°00'00" East on the center line of N.E. 15th Avenue, a distance of 535.79 feet to the Westerly line of relocated N.E. 16th Avenue, the beginning of a non-tangent 293.00 foot radius curve left (radius point bears North 58°09'05" East); thence on said Westerly line, also being the Northeasterly line of Parcels 4708-1e-V1 and 4708-1d-V2 and the Southwesterly line of Parcel 4708-1d-D and the Easterly line of Parcel 4708-1d-V2, Parcel 4708-2a-V and the West line of Parcels 708-2a-D and -1c-D, the following courses: on said curve through a central angle of 29°28'01" (the long chord of which bears South 46°34'52" East, a distance of 149.03 feet), an arc distance of 150.69 feet to the beginning of a tangent 207.00 foot radius curve right; thence on said curve through a central angle of 61°18'52" (the long chord of which bears South 30°39'26" East, a distance of 211.10 feet), an arc distance of 221.52 feet to

92

the end thereof; thence South 00°00'00" West, a distance of 251.76 feet to a point located North 00°00'00" East, a distance of 10.00 feet and South 90°00'00" West, a distance of 14.08 feet from the Southeast corner of Block 174; thence North 90°00'00" West on the North line of property conveyed to the City of Portland for street purposes recorded on July 23, 1951, in Book 1488, Page 216, and recorded on April 4, 1958, in Book 1891, Page 374, a distance of 215.89 feet to the point of beginning.

Exhibit B-1

Entire Development Site Plan

See the following Sections relating to contents:


East Anchor Parcel - 1.1.11

Enclosed Mall Parcels – Section 1.1.11

Encroachment Easement Area – Section 1.1.16

Entire Development - 1.1.14

South SuperBlock Parcel -  1.1.41

West Anchor Parcel - 1.1.45



## LEGEND:

- ENCLOSED MALL PARCELS
- ENTIRE DEVELOPMENT (EXCLUSIVE OF AREAS LOCATED IN PUBLIC RIGHTS-OF-WAY)
- OUTLINE OF THE "CENTER"
- EAST ANCHOR PARCEL
- SOUTH SUPERBLOCK PARCEL
- WEST ANCHOR PARCEL

PARCEL 3
SAFEWAY
NEWPORT BAY
BANK OF AMERICA

PARCEL 2
PIER ONE
LA FITNESS
WELLS FARGO BANK
VITAMIN SHOP
DOLLAR TREE

N.E. HALSEY STREET (ABOVE)

RAMP UP

NORTHWEST PARKING DECK
ROSS DRESS FOR LESS ANC4
NORTHEAST PARKING DECK
MARSHALLS ANC5

WEST ANCHOR ANC3
MALL TENANT STORES
ICE RINK
MALL TENANT STORES
EAST ANCHOR ANC2
EAST PARKING LOT

MACY'S ANC1
SOUTHEAST PARKING DECK
RETAIL D

SOUTHWEST PLAZA
SOUTHWEST PARKING DECK

MULTNOMAH LEVEL
NE MULTNOMAH STREET (5 LANES)

## CENTER SITE PLAN

SUPERBLOCK
EXISTING THEATER

LLOYD CENTER

TYPICAL 90° PARKING          TYPICAL ANGLE PARKING

SCALE: 1" = 90'-0"
ASSUMES 22X34 SHEET SIZE

NOTE:
THIS SURVEY WAS PRODUCED BY DAVID EVAN'S AND ASSOC.
ON 04-11-2003. FOR LAND TRACT DESCRIPTIONS AND UTILITY
LOCATIONS PLEASE REFER TO THIS SURVEY.

All of the tenant names which are indicated on this plan
represent those leases which are executed, out for signature,
in negotiation or proposed. All tenancies specified may not
actually come into existence. All square footages and
dimensions are approximate and subject to field verification.

LLOYD CENTER

Lloyd Center
Portland, Oregon

EXHIBIT B-1

04.20.2017
SITE PLAN



**LEGEND:**

EAST ANCHOR PARCEL

ENCROACHMENT EASEMENT AREA

LLOYD CENTER

Lloyd Center
Portland, Oregon

CENTER
SITE PLAN

NOTE:
THIS SURVEY WAS PRODUCED BY DAVID EVAN'S AND ASSOC.
ON 04-11-2003, FOR LAND TRACT DESCRIPTIONS AND UTILITY
LOCATIONS PLEASE REFER TO THIS SURVEY.

All of the tenant names which are indicated on this plan
represent those leases which are executed, out for signature,
in negotiation or proposed. All tenancies specified may not
actually come into existence. All square footages and
dimensions are approximate and subject to field verification.

SCALE: 1" = 90'-0"
ASSUMES 22X34 SHEET SIZE

EXHIBIT B-1

04.20.2017
SITE PLAN

Exhibit B-2

Center Site Plan

See the following Sections relating to contents:


Common Areas - Sections 1.1.8, 1.1.9, 3.1.10 and 3.5.1

Theatre - Section 1.1.44

No Change Area - Section 2.4.1

Restricted Change Area - Section 2.4.2

Southeast Parking Deck – Section 2.5.1

Northeast Parking Deck – Section 2.5.1

East Parking Lot – Section 2.5.1

Permitted Parking Development Area – Section 2.5.7

Vacated NE 15th Avenue – Section 1.1.33

Enclosed Mall Entrance – Section 2.5.6

Enclosed Mall Access Route – Section 2.5.6

Valet Pickup/Dropoff – Section 2.5.7.5

Event Exclusion Area – Section 2.6

Staging Area – Section 3.6

Co-Tenancy Restaurant Locations – Section 5.1.2.1

Trash Compactor Pad or Structure – Section 6.3

Proximate Sales Area – Section 7.6.1

95



**LEGEND:**

PROPOSED STAGING AREA

VALET PICKUP/DROPOFF

LLOYD CENTER

Lloyd Center
Portland, Oregon

EXHIBIT B-2

04.20.2017
SITE PLAN

**ENLARGED PLAN - 1/64" = 1'-0"**

NOTE:
THIS SURVEY WAS PRODUCED BY DAVID EVAN'S AND ASSOC.
ON 04-11-2003. FOR LAND TRACT DESCRIPTIONS AND UTILITY
LOCATIONS PLEASE REFER TO THIS SURVEY.

All of the tenant names which are indicated on this plan
represent those leases which are executed, out for signature,
in negotiation or proposed. All tenancies specified may not
actually come into existence. All square footages and
dimensions are approximate and subject to field verification.

ROSS DRESS FOR LESS
ANC4

NORTHWEST PARKING DECK
(429 PARKING SPACES)
(351 LOWER INTERMEDIATE LEVEL - ABOVE)

NORTHEAST PARKING DECK
(237 PARKING SPACES)
(56 LOWER INTERMEDIATE LEVEL - ABOVE)

MARSHALLS
ANC5

WEST ANCHOR
ANC3

ICE RINK

MALL TENANT STORES

EAST ANCHOR
ANC2

EAST PARKING LOT

MACY'S
ANC1

SOUTHEAST PARKING DECK
(123 PARKING SPACES)

RETAIL D

SOUTHWEST PLAZA

SOUTHWEST PARKING DECK
(55 PARKING SPACES)

LLOYD CENTER
PERMISSIBLE BUILDING AREA

MULTNOMAH LEVEL

NE MULTNOMAH STREET (5 LANES)

N.E. HALSEY STREET (ABOVE)

N.E. HALSEY STREET (ABOVE)



**LEGEND:**

- SOUTHEAST PARKING DECK
- SOUTHWEST PARKING DECK
- NORTHEAST PARKING DECK
- EAST PARKING LOT

LLOYD CENTER

Lloyd Center
Portland, Oregon

EXHIBIT B-2

SITE PLAN
04.20.2017

**NOTE:**
THIS SURVEY WAS PRODUCED BY DAVID EVAN'S AND ASSOC.
ON 04-11-2003. FOR LAND TRACT DESCRIPTIONS AND UTILITY
LOCATIONS PLEASE REFER TO THIS SURVEY.

All of the tenant names which are indicated on this plan
represent those leases which are executed, out for signature,
in negotiation or proposed. All tenancies specified may not
actually come into existence. All square footages and
dimensions are approximate and subject to field verification.

ENLARGED PLAN - 1/64" = 1'-0"

NORTHWEST PARKING DECK
(420 PARKING SPACES)
(351 LOWER INTERMEDIATE LEVEL - ABOVE)

ROSS DRESS FOR LESS
ANC4

NORTHEAST PARKING DECK
(237 PARKING SPACES)
(56 LOWER INTERMEDIATE LEVEL - ABOVE)

MARSHALLS
ANC5

WEST ANCHOR
ANC3

MALL TENANT STORES

ICE RINK

EAST ANCHOR
ANC2

EAST PARKING LOT

MACY'S
ANC1

SOUTHWEST PARKING DECK
(59 PARKING SPACES)

SOUTHEAST PARKING DECK
(123 PARKING SPACES)

RETAIL D

LLOYD CENTER

MULTNOMAH LEVEL

NE MULTNOMAH STREET (5 LANES)



**LEGEND:**

COMMON AREAS

FUTURE DEVELOPMENT AREA

TRASH COMPACTOR PAD OR STRUCTURE

CO-TENANCY RESTAURANT LOCATION

N.E. HALSEY STREET (ABOVE)

NE HALSEY ST

NE HALSEY STREET (ABOVE)

RAMP UP

RAMP UP

RAMP UP

NORTHWEST PARKING DECK
(429 PARKING SPACES)
(351 LOWER INTERMEDIATE LEVEL - ABOVE)

ROSS DRESS FOR LESS
ANC4

MALL ENTRANCE

NORTHEAST PARKING DECK
(237 PARKING SPACES)
(266 LOWER INTERMEDIATE LEVEL - ABOVE)

MTS

MARSHALLS
ANC5

DOCK

MALL TENANT STORES

MALL TENANT STORES

MALL TENANT STORE(S)

MALL TENANT STORES

WEST ANCHOR
ANC3

ICE RINK

MALL TENANT STORES

MTS

EAST ANCHOR
ANC2

EAST PARKING LOT

MALL TENANT STORES

MTS

MTS

MALL TENANT STORES

MACY'S
ANC1

SOUTHWEST PARKING DECK
(88 PARKING SPACES)

RAMP UP

SOUTHEAST PARKING DECK
(123 PARKING SPACES)

RETAIL D

SOUTHWEST PLAZA

MALL TENANT STORE(S)

NE 9TH AVENUE (4 LANES & PARKING)

PEDESTRIAN BRIDGE (ABOVE)

TRUCK RAMP DN

TRUCK TUNNEL

NE 16TH AVE (5 LANES)

NE MULTNOMAH STREET (5 LANES)

TRAFFIC SIGNAL

TRAFFIC SIGNAL

TRAFFIC SIGNAL

TRAFFIC SIGNAL

TRAFFIC SIGNAL

# CENTER
## MULTNOMAH LEVEL

NOTE:
THIS SURVEY WAS PRODUCED BY DAVID EVAN'S AND ASSOC.
ON 04-11-2003. FOR LAND TRACT DESCRIPTIONS AND UTILITY
LOCATIONS PLEASE REFER TO THIS SURVEY.

All of the tenant names which are indicated on this plan
represent those leases which are executed, out for signature,
in negotiation or proposed.  All square footages and
dimensions are approximate and subject to field verification.
All tenancies specified may not actually come into existence.

LLOYD CENTER

Lloyd Center
Portland, Oregon

EXHIBIT B-2

04.20.2017
MULT - 01



**LEGEND:**

NO CHANGE AREA

RESTRICTED CHANGE AREA

EVENT EXCLUSION AREA

- - ◄--► - - ENCLOSED MALL ACCESS ROUTE

◄ MALL ENTRANCE (PUBLIC ACCESS)

# CENTER
## MULTNOMAH LEVEL

LLOYD CENTER

## Lloyd Center
### Portland, Oregon

EXHIBIT B-2

04.20.2017

MULT - 02

NOTE:
THIS SURVEY WAS PRODUCED BY DAVID EVAN'S AND ASSOC.
ON 04-11-2003. FOR LAND TRACT DESCRIPTIONS AND UTILITY
LOCATIONS PLEASE REFER TO THIS SURVEY.

All of the tenant names which are indicated on this plan
represent those leases which are executed, out for signature,
in negotiation or proposed. All tenancies specified may not
actually come into existence. All square footages and
dimensions are approximate and subject to field verification.



**LEGEND:**

PROXIMATE SALES AREA

LLOYD CENTER

Lloyd Center
Portland, Oregon

# CENTER
# MULTNOMAH LEVEL

NE Halsey Street (Above)

NORTHWEST PARKING DECK

ROSS DRESS FOR LESS
ANC4

NORTHEAST PARKING DECK

MARSHALLS
ANC5

WEST ANCHOR
ANC3

MALL TENANT STORES

ICE RINK

EAST ANCHOR
ANC2

EAST PARKING LOT

MACY'S
ANC1

SOUTHEAST PARKING DECK

SOUTHWEST PARKING DECK

RETAIL D

NE Multnomah Street (5 Lanes)

**NOTE:**
THIS SURVEY WAS PRODUCED BY DAVID EVAN'S AND ASSOC. ON 04-11-2003. FOR LAND TRACT DESCRIPTIONS AND UTILITY LOCATIONS PLEASE REFER TO THIS SURVEY.

All of the tenant names which are indicated on this plan represent those leases which are executed, out for signature, in negotiation or proposed. All tenancies specified may not actually come into existence. All square footages and dimensions are approximate and subject to field verification.

EXHIBIT B-2

04.20.2017
MULT - 03



**LEGEND:**

PERMITTED PARKING DEVELOPMENT AREA

NE 15TH STREET (VACATED)

— · · — · · — PARCEL OUTLINE

LLOYD CENTER

LLOYD CENTER

**Lloyd Center**
Portland, Oregon

N.E. HALSEY STREET (ABOVE)

N.E. HALSEY STREET (ABOVE)

NE HALSEY ST

RAMP UP

RAMP UP

RAMP UP

RAMP ON
RAMP UP

NORTHWEST PARKING DECK
(429 PARKING SPACES)
(361 LOWER INTERMEDIATE LEVEL - ABOVE)

ROSS DRESS FOR LESS
ANC4

MALL ENTRANCE

NORTHEAST PARKING DECK
(237 PARKING SPACES)
(96 LOWER INTERMEDIATE LEVEL - ABOVE)

MARSHALLS
ANC5

MALL TENANT
STORES

MALL TENANT
STORE(S)

MALL TENANT STORES

WEST ANCHOR
ANC3

MALL TENANT STORES

MALL TENANT STORES

ICE RINK

MALL TENANT STORES

EAST ANCHOR
ANC2

EAST PARKING LOT

PEDESTRIAN BRIDGE (ABOVE)

MALL TENANT STORES

MALL TENANT STORES

MACY'S
ANC1

SOUTHWEST PARKING DECK
(50 PARKING SPACES)

RAMP UP

SOUTHEAST PARKING DECK
(123 PARKING SPACES)

RETAIL D

SOUTHWEST PLAZA

MALL TENANT STORE(S)

TRUCK RAMP DN

NE 9TH AVENUE (4 LANES & PARKING)

NE 15TH AVE (VACATED)

NE 16TH AVE (5 LANES)

TRAFFIC SIGNAL

TRAFFIC SIGNAL

NE Multnomah Street (5 LANES)

TRAFFIC SIGNAL

TRAFFIC SIGNAL

# CENTER
# MULTNOMAH LEVEL

**NOTE:**
THIS SURVEY WAS PRODUCED BY DAVID EVAN'S AND ASSOC.
ON 04-11-2003. FOR LAND TRACT DESCRIPTIONS AND UTILITY
LOCATIONS PLEASE REFER TO THIS SURVEY.

All of the tenant names which are indicated on this plan
represent those leases which are executed, out for signature,
in negotiation or proposed. All tenancies specified may not
actually come into existence. All square footages and
dimensions are approximate and subject to field verification.

**EXHIBIT B-2**

04.20.2017
**MULT - 04**



**LEGEND:**

COMMON AREAS

LLOYD CENTER

**Lloyd Center**
Portland, Oregon

# CENTER
# HALSEY LEVEL

**NOTE:**
THIS SURVEY WAS PRODUCED BY DAVID EVAN'S AND ASSOC. ON 04-11-2003. FOR LAND TRACT DESCRIPTIONS AND UTILITY LOCATIONS PLEASE REFER TO THIS SURVEY.

All of the tenant names which are indicated on this plan represent those leases which are executed, out for signature, in negotiation or proposed. All tenancies specified may not actually come into existence. All square footages and dimensions are approximate and subject to field verification.

EXHIBIT B-2

04.20.2017
HALS - 01

# LEGEND:

▨ NO CHANGE AREA

▢ RESTRICTED CHANGE AREA

◁- -▷ ENCLOSED MALL ACCESS ROUTE

⬚ EVENT EXCLUSION AREA

◄ MALL ENTRANCE (PUBLIC ACCESS)

**LLOYD CENTER**

**Lloyd Center**
Portland, Oregon

NE HALSEY ST

N.E. Halsey Street (4 LANES AND PARKING)

NE HALSEY ST

TRAFFIC SIGNAL

NORTHWEST PARKING DECK
(429 PARKING SPACES)
(352 UPPER INTERMEDIATE LEVEL PARKING - ABOVE)

BARNES & NOBLE
D212

ROSS DRESS FOR LESS
ANC4

NORTHEAST PARKING DECK
(344 PARKING SPACES)

OPEN TO BELOW

RAMP DN

OPEN TO BELOW

OPEN TO BELOW

MTS

MTS

MTS

MTS

MTS

MTS

MALL TENANT STORES

MTS

MARSHALLS
ANC5

WEST ANCHOR
ANC3

MALL TENANT STORES

MTS

EAST ANCHOR
ANC2

BRIDGE

MALL TENANT STORES

MALL TENANT STORES

SUNCOAST

MTS

MTS

MTS

MALL TENANT STORES

MALL ENTRANCE

MACY'S
ANC1

PEDESTRIAN BRIDGE

SOUTHEAST PARKING DECK

RETAIL D
(BELOW)

OPEN TO BELOW

SOUTHWEST PARKING DECK
(128 PARKING SPACES)

RAMP DN

OPEN TO BELOW

OPEN TO BELOW

NE 9TH AVENUE (4 LANES & PARKING)

NE 16TH AVE

NE Multnomah Street (5 LANES)

TRAFFIC SIGNAL

TRAFFIC SIGNAL

# CENTER
# HALSEY LEVEL

NOTE:
THIS SURVEY WAS PRODUCED BY DAVID EVAN'S AND ASSOC.
ON 04-11-2003. FOR LAND TRACT DESCRIPTIONS AND UTILITY
LOCATIONS PLEASE REFER TO THIS SURVEY.

All of the tenant names which are indicated on this plan
represent those leases which are executed, out for signature,
in negotiation or proposed. All tenancies specified may not
actually come into existence. All square footages and
dimensions are approximate and subject to field verification.

EXHIBIT B-2

04.20.2017

HALS - 02



LEGEND:

PROXIMATE SALES AREA

LLOYD CENTER

Lloyd Center
Portland, Oregon

CENTER
HALSEY LEVEL

EXHIBIT B-2

04.20.2017

HALS - 03

NOTE:
THIS SURVEY WAS PRODUCED BY DAVID EVAN'S AND ASSOC.
ON 04-11-2003. FOR LAND TRACT DESCRIPTIONS AND UTILITY
LOCATIONS PLEASE REFER TO THIS SURVEY.

All of the tenant names which are indicated on this plan
represent those leases which are executed, out for signature,
in negotiation or proposed.  All tenancies specified may not
actually come into existence.  All square footages and
dimensions are approximate and subject to field verification.



LEGEND:

COMMON AREAS

THEATER

N.E. Halsey Street (BELOW)

BRIDGE

SERVICE DRIVE

CREATIVE OFFICE

NORTHWEST PARKING DECK
(409 PARKING SPACES)

OPEN TO BELOW

RAMP DN

N.E. 9TH AVE (BELOW)

BRIDGE (BELOW)

WEST ANCHOR
ANC3

OFFICES

SERVICE AREA

OFFICES

OFFICES

OFFICES

SERVICE AREA

OFFICES

BALCONY

OFFICES

OFFICE

OPEN TO BELOW

MTS

MTS

MTS

MTS

MTS

PASSENGER ELEVATOR

PASSENGER ELEVATOR

FOOD COURT

UP ESCALATOR

FREIGHT ELEVATOR

FREIGHT ELEVATOR

MACY'S
ANC1

OPEN TO BELOW

PEDESTRIAN BRIDGE

SERVICE ENTRANCE

OFFICES

SERVICE AREA

MALL MANAGEMENT OFFICE

OFFICES

OFFICES

OFFICES

OFFICES

OFFICES

ESCALATOR

MTS

MTS

OFF

OFFICES

OPEN TO BELOW

THEATER ANC2

ELEVATOR LOBBY

OPEN TO BELOW

RAMP DN

RAMP DN

SOUTHEAST PARKING DECK
(123 PARKING SPACES)

OPEN TO BELOW

N.E. MULTNOMAH STREET (BELOW)

NE 16TH AVE (5 LANES)

# CENTER
# OFFICE LEVEL

LLOYD CENTER

Lloyd Center
Portland, Oregon

EXHIBIT B-2

04.20.2017

OFFICE - 01

NOTE:
THIS SURVEY WAS PRODUCED BY DAVID EVAN'S AND ASSOC.
ON 04-11-2003. FOR LAND TRACT DESCRIPTIONS AND UTILITY
LOCATIONS PLEASE REFER TO THIS SURVEY.

All of the tenant names which are indicated on this plan
represent those leases which are executed, out for signature,
in negotiation or proposed.   All tenancies specified may not
actually come into existence.   All square footages and
dimensions are approximate and subject to field verification.



LEGEND:

RESTRICTED CHANGE AREA

EVENT EXCLUSION AREA

MALL ENTRANCE
(PUBLIC ACCESS)

ENCLOSED MALL
ACCESS ROUTE

THEATER

LLOYD CENTER

Lloyd Center
Portland, Oregon

# CENTER
# OFFICE LEVEL

NOTE:
THIS SURVEY WAS PRODUCED BY DAVID EVAN'S AND ASSOC.
ON 04-11-2003. FOR LAND TRACT DESCRIPTIONS AND UTILITY
LOCATIONS PLEASE REFER TO THIS SURVEY.

All of the tenant names which are indicated on this plan
represent those leases which are executed, out for signature,
in negotiation or proposed. All tenancies specified may not
actually come into existence. All square footages and
dimensions are approximate and subject to field verification.

EXHIBIT B-2

04.20.2017

OFFICE - 02



LEGEND:

PROXIMATE SALES AREA

THEATER

LLOYD CENTER

Lloyd Center
Portland, Oregon

# CENTER
# OFFICE LEVEL

NOTE:
THIS SURVEY WAS PRODUCED BY DAVID EVAN'S AND ASSOC.
ON 04-11-2003. FOR LAND TRACT DESCRIPTIONS AND UTILITY
LOCATIONS PLEASE REFER TO THIS SURVEY.

All of the tenant names which are indicated on this plan
represent those leases which are executed, out for signature,
in negotiation or proposed. All tenancies specified may not
actually come into existence. All square footages and
dimensions are approximate and subject to field verification.

EXHIBIT B-2

04.20.2017

OFFICE - 03

Exhibit C

Theatre Layout Plan

<u>See Section 1.1.43</u>

MALL
CONCOURSE

AUDITORIUM 6   AUDITORIUM 7   AUDITORIUM 8

AUDITORIUM 9

AUDITORIUM 5   AUDITORIUM 4   AUDITORIUM 3

AUDITORIUM 10

LINE OF BUILDING BELOW

AUDITORIUM 11

AUDITORIUM 2   AUDITORIUM 1

AUDITORIUM 12

PROPERTY LINE

AUDITORIUM 13

MAX AUDITORIUM 14

OFFICE/STORAGE

STAIRS

LOBBY 2

RESTROOMS

KITCHEN
JANITOR
GUEST SERVICE

BOX OFFICE

WAITING AREA

VESTIBULE

ELEVATOR LOBBY

+173'-8"

VESTIBULE

SEATING

AUDISERVER
OFFICE/STORAGE

GLASS FACADE
GLASS FACADE

+170'-0"

+170'-6"

OPEN TO BELOW

OPEN TO BELOW

CONCEPT 'V'

THEATER SEATING MATRIX

PROJECT DATA

REGAL CINEMAS 14
NORDSTROM LLOYD CENTER
1001 LLOYD CENTER
PORTLAND, OREGON 97232

BB ARCHITECTS INC
1590 SOUTH COAST HWY, SUITE 18, LAGUNA BEACH, CA 92651  PHONE 949 494 8093  FAX 949 494 2772  HOMEBBARCHITECTS.COM

BB Architects
Incorporated

REGAL
ENTERTAINMENT
GROUP

FEBRUARY 3, 2017

FIRST FLOOR REFERENCE PLAN

1st FLR
REFERENCE
PLAN

A050

DATE: FEBRUARY 3, 2017

JOB # 15-0120






MALL
CONCOURSE

+170'-0"

+170'-6"

+173'-8"

AUDITORIUM 6

AUDITORIUM 7

AUDITORIUM 8

AUDITORIUM 5

AUDITORIUM 4

AUDITORIUM 3

AUDITORIUM 1

AUDITORIUM 2

AUDITORIUM 10

AUDITORIUM 9

AUDITORIUM 11

AUDITORIUM 12

AUDITORIUM 13

MAX AUDITORIUM 14

PROJECTOR ROOMS

PROJECTOR ROOMS

EXIT PASSAGEWAY

LINE OF BUILDING BELOW

PROPERTY LINE

OPEN TO LOBBY BELOW

OPEN TO EXIT PASSAGE WAY BELOW

GLASS FACADE

GLASS FACADE

1/S-1

MEZZANINE REFERENCE PLAN
SCALE: 3/32" = 1'-0"

SCREEN SIZE: 60'-0"×28'-0"
BOTTOM OF CEILING AT 134'-0" (120'-0")
AT SCREEN LOCATION

SCREEN SIZE: 38'-2"×56'-0"
BOTTOM OF CEILING AT 134'-0" (120'-0")
AT SCREEN LOCATION

### CONCEPT 'V'

#### THEATER SEATING MATRIX

| AUDITORIUM | TOTAL SEATS | ACC. | AUDITORIUM SIZE | SCREEN SIZE INSTRAIGHT | S. |
|---|---|---|---|---|---|

#### PROJECT DATA

SCREEN:
SEATS:                                                1974 INC. 51 ACCESSIBLE SEATS
SQUARE FOOTAGES:

FEBRUARY 3, 2017



BB Architects
Incorporated

REGAL CINEMAS 14
NORDSTROM LLOYD CENTER
1001 LLOYD CENTER
PORTLAND, OREGON 97232

REGAL
ENTERTAINMENT
GROUP

MEZZANINE
REFERENCE
PLAN

DATE: FEBRUARY 3, 2017

### A060

JOB # 15-0120

Exhibit D

Work Matrix

<u>See Sections 3.1.4, 3.1.14, 3.1.22 and 3.1.27</u>

BUILD-TO-SUIT WORK MATRIX

PROJECT: Standard

**Landlord's Work and Tenant's Work**

*Landlord shall perform Landlord's Work and Tenant shall perform Tenant's Work in accordance with the Lease, including without limitation the Approved Construction Plans defined and described in Section 3.01 of the Lease. Landlord shall perform Landlord's Work at Landlord's expense, and Tenant shall perform Tenant's Work at Tenant's expense.*

| Description | LANDLORD's Work | TENANT's Work |
|---|---|---|
| **DEVELOPMENT COSTS** | | |
| Zoning Approvals (including variances) | X | |
| Site and/or Development Plan Approvals | X | |
| Surveys (Boundary, Topographic, ALTA) | X | |
| Development Fees | X | |
| Traffic Studies | X | |
| Environmental Reports/Remediation | X | |
| Soil/Geotechnical Reports | X | |
| Impact Fees (including environmental impact) | X | |
| Utility assessments, connect fees, meter fees | X | |
| Capacity and tap fees | X | |
| Site permits | X | |
| Building permits | X | |
| Civil drawings | X | |
| | | |
| **SITE WORK** | | |
| Parking lot and/or parking structure | X | |
| Site lighting | X | |
| Ingress and egress roads | X | |
| Paving | X | |
| Drainage | X | |
| Curbing | X | |
| Structural work on existing buildings if Theatre is to be located within, over or under existing structure | X | |
| All weather Roads to site and material lay-down area during Construction period. Lay down area shall be large enough to accommodate up to ten (10) 16 foot by 45 foot trailers adjacent to the theatre building. | X | |
| | | |
| **COMMON AREAS** | | |
| Grading | X | |
| Paving | X | |
| Drainage System (including design and capacity with laterals to handle drainage from all drainage points for building containing the Theatre) | X | |
| Parking Areas (including Parking Retention Areas) | X | |
| Landscaping (including immediately adjacent to building containing the Theatre) | X | |
| Landscape irrigation | X | |
| Utility Lines to Theatre and Trash Compactor facility | X | |
| Roads and Lanes | X | |

| Description | LANDLORD's Work | TENANT's Work |
|---|:---:|:---:|
| Lighting. Per the prevailing building code. | X | |
| Delivery Areas | X | |
| Electrical Transformers | X | |
| Trash compactor Pad and Screening (with hot and cold water, sanitary sewer, electrical utility lines, and storm drainage) | X | |
| Sidewalks (including those immediately adjacent to the building containing the Theatre) | X | |
| Plaza areas | X | |
| Retaining walls/Ramps All | X | |
| Curbs and gutters (including those immediately adjacent to Theatre) | X | |
| Handicap (ADA) Requirements & Signage | X | |
| Mall Connection/Plaza Incl. Walls/Roof/Lighting/Doors & related Hardware, Floors & Floor Covering, if any | X | |
| | | |
| **EARTHWORK** | | |
| Excavation | X | |
| Pad Preparation to within six inches of final grades, testing and certification | X | |
| Fine Grading | X | |
| Termite Control | X | |
| **THEATRE WALKS**, including, without limitation: | | |
| All Theatre sidewalks | X | |
| All Curbs and gutters | X | |
| | | |
| **VERTICAL TRANSPORTATION** | | |
| Elevators | X | |
| Escalators | X | |
| Lifts/Dumb waiters | X | |
| | | |
| **THEATRE BUILDING (per mutually approved plans and specifications)** | | |
| Permits | X | |
| Foundation and Footers | X | |
| Masonry | X | |
| Steel | X | |
| Exterior wall Systems – Block/Steel, Studs, etc., per approved plans and specs. | X | |
| Exterior Finishes (Brick/Block/Dryvit Veneers/Stucco/Metal Panels) | X | |
| Structure | X | |
| Rough Carpentry | X | |
| Finish Carpentry/Blocking & Backing | X | |
| Electrical | X | |
| Plumbing | X | |
| Insulation | X | |
| Stadium seating structure | X | |
| Mezzanine structure | X | |
| Roof structure | X | |
| Doors, Frames & Hardware | X | |
| Interior Finishes | X | |
| All other theatre building work | X | |
| Mechanical Units | X | |
| Mechanical Systems | X | |

| | Description | LANDLORD's Work | TENANT's Work |
|---|---|---|---|
| | Storefront & Glazing | X | |
| | | | |
| | **PLUMBING** | | |
| | Riser into space | X | |
| | Roof and overflow drains and leaders per acoustical requirements | X | |
| | Rooftop equipment, water, gas, and electrical supply from A/C panel as required | X | |
| | Rooftop condensate drains | X | |
| | Exterior courtyard drains, if any | | |
| | Building underground drains | X | |
| | Interior rough-in | X | |
| | Interior trim | X | |
| | "Roto Rooter" sewer lines 2 weeks prior to opening | X | |
| | Utility services into Theatre (at designated points) including SOV, check valves, backflow devices, meters, etc.) | X | |
| | All final connections to Tenant supplied equipment | X | |
| | Freeze-proof hose bibbs in exterior walls | X | |
| | Exterior grease trap, if required by code | X | |
| | Interior grease trap as required by code | X | |
| | Plumbing fixtures (all) | X | |
| | | | |
| | **HVAC (Lennox, Aaon, or Carrier as designated in plans)** | | |
| | HVAC distribution within premises | X | |
| | HVAC equipment and control systems, including HVAC RTU's | X | |
| | Furnish | X | |
| | Install | X | |
| | HVAC control/energy management systems (furnish and install) | X | |
| | Rooftop exhaust fans | X | |
| | Furnish | X | |
| | Install | X | |
| | Curbs for RTU's and rooftop exhaust fans: | X | |
| | Furnish | X | |
| | Install | X | |
| | HVAC screening | X | |
| | | | |
| | **HVAC  SMOKE EQUIPMENT & CONTROLS** including without limitation: | | |
| | Smoke Exhaust if required | X | |
| | Smoke Evacuation System if required | X | |
| | Smoke Control and any adjacent building tie in | X | |
| | | | |
| | **FIRE SPRINKLERS** | | |
| | Riser into space | X | |
| | Piping and heads within premises (based on prevailing code and specifications) | X | |
| | As required by code in exit corridors outside premises | X | |
| | All exterior backflow preventors and meters, PIV, tamper switches, drain lines, detector check, SOV, check valves, if required by code | X | |

| | Description | LANDLORD's Work | TENANT's Work |
|---|---|---|---|
| | All interior backflow preventors and meters, PIV, tamper switches, drain lines, detector check, SOV, check valves, if any | X | |
| | Fire sprinkler layout, shop drawings, and approvals for a complete system conforming to all applicable codes | X | |
| | Deluge system (if required) | X | |
| | Pump system with tank(s) to maintain minimum pressure called in plans & specs | X | |
| | | | |
| | **ELECTRICAL** | | |
| | All meters | X | |
| | As required by code in exit corridors and/or outside premises | X | |
| | Exterior lighting & power.  (Decorative lighting on theatre walls only to be metered from Tenant's meter. ) | X | |
| | Exterior lighting & power.  (All other lighting including without limitation that for parking areas, drives, walks, plazas, and service areas to be on Landlord's meter.)  Tenant's parking retention area to be controlled in Tenant's building but on Landlord's meter. | X | |
| | Fire alarm system (based on performance specification), including shop drawings and approvals | X | |
| | Decorative lighting | X | |
| | Interface to projection automation system | X | |
| | Tie-in of Premises fire alarm system to additional Shopping Center systems only if required by code | X | |
| | Main transformer at location on agreed upon civil plans | X | |
| | Secondary conduit and wire to Tenant's main Electrical Room from Main Transformer) | X | |
| | Main distribution panel(s) | X | |
| | Main switch for premises | X | |
| | Subpanels for premises | X | |
| | Temporary power to Premises and staging area | X | |
| | Temporary lighting | X | |
| | Interior power system conduit and conductors | X | |
| | Interior and specialty lighting including without limitation conduit, conductors, dimmers, fixtures, and lamps | X | |
| | Equipment disconnects | X | |
| | Underground/overhead conduit | X | |
| | Power to rooftop exhaust fans and HVAC units | X | |
| | Interior heat trace system (if required) | X | |
| | Emergency Power System | X | |
| | Theatre inverter or generator including monitoring within premises only | X | |
| | Emergency conduit and wire to Tenant Electrical Room | X | |
| | Power distribution inside Tenant space | X | |
| | Provide pull string in all empty conduits for FF&E Work, Tenant Work, or Tenant use as designated on plans, including without limitation electrical, telephone, data, fiber optic, and security systems | X | |
| | Lighting controls | X | |

| Description | LANDLORD's Work | TENANT's Work |
|---|---|---|
| Dimming System (Auditoriums) | X | |
| Conduits, raceways, control wiring, power wiring | X | |
| Dimmers (closed spec., equipment and vendor to be designated by Tenant) | X | |
| Start-up | X | |
| | | |
| **UTILITIES** | | |
| Temporary utilities (water, sewer, telephone, and electrical [400 amps] to Theatre and to Tenant's Staging Area) | X | |
| Permanent utilities service sized to Tenant's requirements, and brought to locations as provided in Lease and shown on Tenant's plans | X | |
| Permanent utilities service from designated meter room to the premises as shown on Tenant's plans | X | |
| Hot and cold water, electricity, sanitary sewer, storm drain to trash compactor location | X | |
| All meters, apparatus, and facilities | X | |
| Testing and inspection conforming to code and specifications | X | |
| | | |
| **CONCRETE** including, without limitation: | | |
| Foundations / slab on grade / elevated slabs, if any | X | |
| Stadium Seating Steel | X | |
| Stadium Seating Framing/Deck/Systems | X | |
| Stadium seating fill | X | |
| Stadium seating steps | X | |
| Stairs – interior and exterior | X | |
| Stadium stairs | X | |
| Mezzanine | X | |
| Rooftop equipment pads acoustical fill | X | |
| All MEP or housekeeping pads | X | |
| Parking structure and/or parking lot | X | |
| Parking structure and/or parking lot striping/signage | X | |
| All entry canopy and signage structure foundations | X | |
| Acoustical floating slabs (typically required for multi-level projects) | X | |
| Roof | X | |
| Light weight insulating concrete | X | |
| Piers/cassions/structural footings and foundations | X | |
| Trash compactor pad | X | |
| | | |
| **MASONRY** | | |
| Exterior block walls | X | |
| Exterior finishes – Veneers/block/brick/dryvit/stucco/metal panels | X | |
| Interior walls as noted on plans | X | |
| | | |
| **STEEL BACKING AND SUPPORTS** (including, without limitation, for railings, toilet partitions, Tenant-furnished poster cases, signage and speakers) | X | |
| In walls, partitions, or other systems under Base Building | X | |
| In walls, partitions, or other systems under Fitout | X | |
| Restroom steel countertop supports | X | |
| **STRUCTURAL STEEL**, including, without limitation: | | |

| Description | LANDLORD's Work | TENANT's Work |
|---|---|---|
| Stadium seating structure | X | |
| Mezzanine structure | X | |
| Roof structure | X | |
| Roof and mezzanine openings with supplemental framing | X | |
| Embeds for Fitout or FF&E work | X | |
| Embeds for railings | X | |
| MEP curb supports | X | |
| Sign structure – building exterior | X | |
| Sign structure – building interior | X | |
| Entry canopy structure – theatre building | X | |
| Metal grille work and structure | X | |
| Roof screens | X | |
| Stairs | X | |
| Blocking for Signs/Handrails, etc per plans (Interior and Exterior) | X | |
| HVAC screens | X | |
| | | |
| **METAL BAR JOIST** | X | |
| Decking/structural deck | X | |
| | | |
| **MISCELLANEOUS STEEL** | | |
| Header for overhead doors and rolling/sliding grilles | X | |
| Pipe bollards at dock/trash enclosure | X | |
| Roof access ladders (leading from Tenant's space)/Roof Hatch | X | |
| Elevator pit angles and ladder | X | |
| Service elevator to Theatre and projection room | X | |
| Restroom vanity support angles | X | |
| Exterior trash enclosure gates and bollards | X | |
| Auditorium wall railings | X | |
| Stadium seating railing | X | |
| Front of auditorium foot railing | X | |
| Lobby balcony railing | X | |
| Embeds for balcony railings | X | |
| Steel support for atrium storefront (if required) | X | |
| Exterior chain link fencing (if REG) | X | |
| Stairway framing, treads, risers and railings | X | |
| Sleeves and embeds for Fitout or FF&E miscellaneous steel | X | |
| All misc. railings, interior and exterior | X | |
| | | |
| **METAL DECKING**, including, without limitation: | | |
| Entry canopies and roof/mezzanine | X | |
| Auditorium risers | X | |
| Roof structure | X | |
| | | |
| **ROUGH CARPENTRY** | | |
| Blocking or backing including, but not limited to, blocking for railings, toilet partitions, grab bars, hand dryers, draperies, sound panels, Tenant-furnished poster cases, signage and speakers: | X | |
| In walls, partitions or other systems under Base Building or Fitout | X | |
| Curbs for all rooftop equipment/fans | X | |

| | Description | LANDLORD's Work | TENANT's Work |
|---|---|---|---|
| | | | |
| | **FINISH CARPENTRY** within premises, including, without limitation: | | |
| | Interior FRP panels | X | |
| | Restroom counters/sinks (Steel Support by Landlord) | | X |
| | Interior trim and moldings | X | |
| | Furnish projection ports | | X |
| | Install projection ports and digital ports | X | |
| | Miscellaneous shelving | X | |
| | All auditorium trim boards or systems for drapery | X | |
| | | | |
| | **INSULATION** | | |
| | Exterior wall insulation (min. R-19) | X | |
| | Roof insulation (min. R-30) | X | |
| | Acoustical insulation meeting Tenant's sound transmission criteria: | X | |
| | In or on roofs, slabs, walls, partitions, or other systems | X | |
| | | | |
| | **FIREPROOFING** | | |
| | Note: spray applied fireproofing will not be accepted | | |
| | Structural assemblies | X | |
| | Patching due to Tenant's Work | X | |
| | Stadium risers | X | |
| | Fireproofing penetrations (fire safing, fire caulking, etc.) | X | |
| | All other fireproofing | X | |
| | | | |
| | **ROOFING**, including without limitation: | | |
| | Building and canopy roofing | X | |
| | Making penetrations and patching roof for penetrations including without limitation those made to accommodate Fitout or FF&E work as shown on Building Plans | X | |
| | Roof Penetrations for FF&E not shown on Building Plans; | X | |
| | Walking pads.  Note:  for any roof top equipment, whether provided by Landlord or Tenant, Landlord's roof contractor makes roof penetration and provides flashing, curbs and any factory mounted counter-flashing | X | |
| | | | |
| | **SHEET METAL**, including without limitation: | | |
| | All flashing & sheet metal | X | |
| | Roof top equipment screens if required by code | X | |
| | Counter flashing for HVAC roof top equipment and exhaust fans | X | |
| | Factory curbs – provide and install for FF&E (if applicable) | X | |
| | Curbs for units and flashing for other Tenant provided items such as condensers for Tenant's FF&E equipment | X | |
| | Interior Expansion Control | X | |
| | Exterior Expansion Control | X | |
| | | | |
| | **MOISTURE CONTROL** | | |

| Description | LANDLORD's Work | TENANT's Work |
|---|---|---|
| Exterior moisture control | X | |
| Slab-on-grade treatment | X | |
| Caulking including without limitation acoustical sealant | X | |
| In walls, partitions, or other systems | X | |
| Below grade | X | |
| | | |
| | | |
| | | |
| **DOORS/FRAMES/HARDWARE** | | |
| Exterior doors/hardware | X | |
| Stair wells & shaft doors/hardware | X | |
| Exterior Demising partitions doors and hardware | X | |
| Interior Non-demising partitions doors and hardware | X | |
| | | |
| **SPECIALTY DOORS** | | |
| Overhead doors | X | |
| Fire-rated doors/ADA glass at elevator openings | X | |
| Rolling or sliding doors including, without limitation, security grilles | X | |
| All fire shutters, including those for projection ports, both mechanical and digital | X | |
| | | |
| **GLASS & GLAZING** | | |
| Storefront and curtain wall framing/glass | X | |
| Storefront entry doors & glazing, including power assist door for wheelchair access | X | |
| Projection and view ports installation including optical glazing and opening for sound testing | X | |
| Furnish projection port frames | | X |
| Interior mirrors | X | |
| Final cleaning (inside and outside) of exterior walls, doors, storefront systems, curtain walls, etc. | X | |
| Glazing in auditorium entrance doors | X | |
| Box office framing/glass (coordinate with casework installation) | X | |
| Vestibule glass/glazing and doors | X | |
| | | |
| **E.I.F.S./PLASTER/GFRC/GFRP** | | |
| Exterior | X | |
| Interior | X | |
| | | |
| **DRYWALL & METAL FRAMING** | | |
| Exterior/roof/demising wall framing, sheathing, drywall, taping, caulking, sanding, sound proofing, and other work per plans | X | |
| Roof screen wall framing | X | |
| Stadium seating support wall framing | X | |
| Shaft and stairwells | X | |
| Interior walls, bulkheads, soffits & ceilings within premises | X | |
| Canopy framing, sheathing, taping, and sanding | X | |
| Exterior element framing, sheathing, taping, and sanding | X | |
| As required by code in exit corridors outside premises | X | |
| Box office walls, bulkheads, soffits & ceilings: | X | |

| Description | LANDLORD's Work | TENANT's Work |
|---|---|---|
|    If within premises | X | |
|    Otherwise | X | |
| Elevator/lift/dumb waiter/and escalator shafts and soffits whether solely within premises or not | X | |
| Roof drain or MEP enclosures or shafts: | X | |
| Access panels, hatches, or doors: | X | |
|    Within partitions, ceilings, soffits or other systems | X | |
| | | |
| **TILE/PAVER TILE** | | |
| Tile base and corner guards | X | |
| Waterproofing under tile | X | |
| Waterproofing between floors | X | |
| Tile procurement and installation | X | |
| Complete with trim pieces and corners | X | |
| | | |
| **ACOUSTICAL CEILINGS** | | |
| As required by code in exit corridors outside premises | X | |
| Within premises | X | |
| | | |
| **INTERIOR RESILIENT FLOORING WITHIN PREMISES**, including without limitation: | | |
| Interior rubber and vinyl base | X | |
| VCT | X | |
| Specialty flooring, sheet goods, rubber flooring | X | |
| Terrazo if called | X | |
| | | |
| **PAINTING & WALLCOVERING** | | |
| Exterior | X | |
| Canopy | X | |
| Exterior doors/frames | X | |
| Interior within premises | X | |
| Box Office interior & exterior | X | |
| Interior exposed utilities | X | |
| Concrete sealer | X | |
| Concrete polish systems | X | |
| | | |
| **TOILET PARTITIONS/ACCESSORIES** | X | |
| Provide and install | X | |
| | | |
| **FIRE EXTINGUISHERS & CABINETS** | X | |
| | | |
| **CARPET** | | |
| Carpet (furnish and install; closed spec from Tenant selected vendor) | X | |
| Carpet extrusions (all) | X | |
| Carpet protection (carpet masking) & installation | X | |
| Carpet base (see also vinyl base elsewhere in this schedule) if called | X | |
| Carpet base installation, if called | X | |
| Any Carpet Transition Strips | X | |
| Wall carpet, furnish and install | X | |
| | | |
| **AISLE LIGHTING SYSTEM** | | |
| Note:  system and vendor to be specified by Tenant on plans (closed spec) | X | |

| Description | LANDLORD's Work | TENANT's Work |
|---|---|---|
| Conduits, raceways, all rough-in, wiring | X | |
| Furnish and install rough-in for step lights in structure | X | |
| Carpet extrusions (closed vendor) | X | |
| Transformers (closed vendor) | X | |
| Provide and install aisle lighting from selected vendor list in plans and specifications | X | |
| Make final connections (selected vendor) | X | |
| | | |
| **WASTE HANDLING** | | |
| Build trash compactor pad and enclosure | X | |
| Trash chute (If required) | X | |
| Dumpster for Construction | X | |
| Compactor for Theatre Operations | | X |
| Install electrical power, sanitary sewer, hot and cold water, storm drain | X | |
| Drain or grease trap (per local code) | X | |
| Drain or grease trap inside building | X | |
| If exterior grease trap required | X | |
| Roof over enclosure | X | |
| | | |
| **SPECIAL FINISHES** | | |
| Sound attenuation systems Floor/Wall/Ceiling | X | |
| Chair rails or wall reveals or similar systems | X | |
| | | |
| **PNEUMATIC TUBE SYSTEM** | | |
| Furnish all components | X | |
| Install Tubes | X | |
| Install all other components | X | |
| | | |
| **GENERAL CONDITIONS** | | |
| Laydown Area:  Provide and maintain A.) an all weather staging area adjacent to the building through opening date, and B.) an all-weather access road from a public street to Staging Area, C.) an area for tenant to park up to ten 45-ft cargo trailers and/or storage containers containing Tenant's FF&E, D.) storage area for equipment and materials for Tenant's Work (adjacent to the theatre building), and E.) vertical transportation of equipment and materials for Tenant's Work. | X | |
| Building Cleanup (daily rough and final): | X | |
| Provide copies of as built drawings, operation and maintenance manuals, warranties, etc., to Tenant and Tenant's architect | X | |
| Orientation regarding facility systems for Tenant's operational personnel | X | |
| Security Guard for FF&E Equipment (90 days) | X | |
| Office Area for Tenant's use | X | |
| Dumpsters for FF&E Debris (estimated requirement is one and one-half 30 CV dumpsters per auditorium) | X | |
| Foreman standby time on-site for electricians, plumber, mechanical, vertical transportation, and energy management systems and for General Contractor during the Opening Week – 72 hours total each trade.  Schedule as directed by Operations. | X | |

| Description | LANDLORD's Work | TENANT's Work |
|---|---|---|
| Provide access from outside of Premises to any equipment that provides service to the Premises, to allow repair of such equipment without entering the Premises | X | |
| Cleanouts in the Premises must be in an area acceptable to Tenant | X | |
| Landlord & Landlord's GC will provide the labor with the respective union groups and the interface with Tenant's FF&E vendors for the installation of their material where union labor must be used. | X | |
| Landlord shall provide and install all finishes in the corridors / mall common spaces outside the theatre premises as approved by Tenant. | X | |
| | | |
| **THEATRE EQUIPMENT** | | |
| | | |
| **Obtain FF&E work permit (if required)** | | X |
| | | |
| **Projectors** | | |
| Furnish, deliver, and move into position | | X |
| Console riser - metal with adjustable feet | | X |
| Power, conduit, j-boxes, wiring, termination to equipment, etc. | X | |
| Base Building contact to have allowance for projector hook-up by electrical contractors | X | |
| Setup and testing | | X |
| Visqueen temporary protective sheeting for Tenant equipment | | X |
| | | |
| **Projector Automation & Alarm Status Systems**: | | |
| Back boxes and panels | X | |
| Furnish | X | |
| Install | X | |
| Power, conduit, j-boxes, wiring, terminations, hookup, etc. | X | |
| Data:  conduit and j-boxes | X | |
| Data:  cable and terminations | X | |
| From box to box | X | |
| From box to booth equipment | X | |
| Visqueen temporary protecting sheeting for Tenant equipment | | X |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Workbenches and Storage Shelving** | | X |
| furnish, deliver, move into position, install & protect | | X |
| | | |
| **Screens & Frames** | | X |
| Scaffold:  setup account and provide for this scope | | X |
| Frames – Metal tubing or angle | | X |
| Screens | | X |
| Masking and drapes | | X |
| Auditorium Drapes, Panels | | X |

| Description | LANDLORD's Work | TENANT's Work |
|---|---|---|
| | | |
| **Masking Motors (If required)** | | |
|   Furnish | | X |
|   Power and control:  conduit, j-boxes, wiring, terminations, hookup, etc. | X | |
| | | |
| **Video Systems** (if required) | | |
| Conduit and power wiring | X | |
| | | |
| **Sound Equipment** | | |
| Power, conduit, j-boxes, wiring, terminations, hookup, etc. | X | |
| Furnish, deliver and move into position | | X |
| setup and testing | | X |
| Visqueen temporary protective sheeting | | X |
| | | |
| **Stage & Surround Speakers** | | |
| Conduit for speaker wire, j-boxes, etc. | X | |
| Wire, terminal boards and boxes | X | |
|   Furnish according to closed spec | | X |
|   Install | | X |
| Wire terminations: | X | |
| Provide Conduit Raceway as shown on plans for the following: | | |
|   For stage speakers: | X | |
|   For wire between booth terminal board and screen wall terminal board | X | |
|   For wire between screen wall terminal board and stage speakers, and between booth terminal board and sound equipment in booth | X | |
|   For surround speakers, Provide conduit as shown: | X | |
|   For wire between booth terminal board and j-boxes in auditorium | X | |
|   At booth terminal board | X | |
|   At surround speakers | X | |
|   For wire between booth terminal board and sound equipment in booth | X | |
| Provide speakers, hardware, brackets, scaffolding, and rigging | | X |
| All other speaker support work, including without limitation conduit, j-boxes, wire terminations | X | |
| | | |
| | | |
| | | |
| **Background Music Systems** | | |
| Conduit and wire | X | |
| System | | X |
| Rack for BGM equipment: | | X |
| Furnish | | X |
|   Install | | X |
| Amplifier, equipment, terminations at amplifier | | X |
| Conduit, j-boxes, wire, and terminations from BGM rack to each booth audio termination board | X | |
| Within premises: | | |
|   Auditoriums only | X | |
|   Hallways, restrooms, lobbies, all other public spaces, including without limitation speakers, conduit, j-boxes, wire, terminations | X | |

| Description | LANDLORD's Work | TENANT's Work |
|---|:---:|:---:|
| Theatre Plaza—Under Canopy (if required):  TO BE COORDINATED WITH LANDLORD & TENANT | X | |
|    Speakers: | | |
|      Furnish | X | |
|      Install | X | |
|    All other speaker work, including without limitation conduit, j-boxes, wire terminations | X | |
| | | |
| **Cabinets and Casework** | | |
| Millwork for box office, guest services, concessions | | X |
| Delivery and installation of casework and equipment | | X |
| Power:  conduit, j-boxes, wiring, terminations, hookup, etc. | X | |
| Data:  conduit and j-boxes | X | |
| Data:  cable and terminations | X | |
| Plumbing hookup | X | |
| Tile base for casework, as required | X | |
| | | |
| **Box Office** | | |
| Telex Box Office Window Communications – Provided by Tenant, installed by Landlord | | X |
| Box Office LED Signs | | X |
| Power, conduit, j-boxes, wiring, terminations, hookup, etc. | X | |
| Data:  conduit, j-boxes, cable | X | |
| Data:  terminations | X | X |
| LCD signs & associated computers | | X |
| | | |
| **Mini-marquee System (LED)** | | |
| Power:  conduit, j-boxes, wiring, terminations, hookup, etc. | X | |
| Data:  conduit, j-boxes, cable | X | |
| Data:  terminations | X | X |
| Mini-marquees & associated computers | | X |
| | | |
| **Automated Box Office ("ABO") machines** | | |
| For Plaza or other exterior locations: | | X |
|    Power, conduit, j-boxes, wiring, etc. | X | |
|    Data:  conduit and j-boxes | X | |
| For locations within premises: | | X |
|    Power, conduit, j-boxes, wiring, etc. | X | |
|    Data:  conduit and j-boxes | X | |
|    Data cable and wiring | X | |
|    Data cable, and junction boxes | X | |
|    ABO equipment & testing | | X |
| | | |
| **Concession Equipment** | | |
| Delivery, unpacking, setup, and testing | | X |
| | | |
| **Drink Systems** | | |
| Refrigeration lines – drink system | | X |
| Roof/slab penetrations for line sets and subsequent fire caulking | X | |
| Rough-in water, condensate drains & drain lines | X | |

| Description | LANDLORD's Work | TENANT's Work |
|---|:---:|:---:|
| Rough-in for syrup lines (6" PVC w/90° sweep elbows) | X | |
| Conduit and electrical wiring | X | |
| Drink & Icee syrup lines installed | | X |
| Drink equipment & Icee machines | | X |
| Bulk CO2 System | | X |
| Bulk CO2 tanks and lines installed | | X |
| Conduit & rough-in for CO2 lines (note: Landlord to furnish and install conduit and rough-in if it passes through spaces that are not part of premises) | X | |
| CO2 tank area enclosure: | X | |
| Penetrations in slab, floor, and roof and subsequent fire caulking | X | |
| | | |
| **Ice Machines** | | |
| Condenser roof curb (if air-cooled), furnished and installed by Landlord | X | |
| Set condensers on roof (if air-cooled) Furnish by Tenant, install by Landlord | X | |
| Install and connect Condenser on roof | X | |
| Furnish Condensers to Landlord for roof installation | | X |
| Refrigeration lines to remote condenser- Furnish by Tenant, installed by Landlord | X | |
| Refrigeration lines to remote condenser- Install | X | |
| roof/slab penetrations for line sets and subsequent fire caulking | X | |
| provide inlet/outlet plumbing for condenser (if water cooled) | X | |
| provide chilled water to condensers (if water cooled) | X | |
| conduit and electrical wiring | X | |
| rough-in water & drain lines | X | |
| | | |
| | | |
| | | |
| **Popcorn Poppers** | | |
| Exhaust hoods (vented through roof if required by code) | X | |
| Ansel System if required. | X | |
| | X | |
| **Embargio or Garland Grilling Station** | | |
| Exhaust hoods | X | |
| Exhaust duct to roof on vented hood | X | |
| Ansel System if required | X | |
| | X | |
| **Concession Menu Boards** | | |
| Furnish | | X |
| Install | | X |
| Conduit, power wiring, data wiring, and terminations by Landlord, supervised by Tenant | X | |
| | | |
| **Signage – Exterior/Interior/Neon** | | |
| Structure for building mounted exterior signs | X | |
| Conduit from signs to associated electrical panels (note: Landlord to furnish and install conduit if it must pass through spaces that are not part of premises) | X | |

| Description | LANDLORD's Work | TENANT's Work |
|---|---|---|
| Conductors, power, breakers, etc. | X | |
| Conduit, wiring, power, and meter for monument and freestanding pylon signs exclusive for Theatre | X | |
| ID panel for Tenant's sign for shared monument or pylon signs | | X |
| Exterior parking lot and mall directional signage | X | |
| Wayfinding Signage outside theatre premises | X | |
| Wayfinding Signage within theatre premises | | X |
| Backing and blocking for exterior building signage | X | |
| Conduit and electrical for exterior building signage | X | |
| Provide and install Tenant signage and neon affixed to the exterior of the premises | | X |
| Provide and install signage inside the theatre premises | | X |
| Provide structural support and blocking for all Tenant signs, interior and exterior. | X | |
| **Poster Cases, Interior and Exterior** | | |
| Furnish | | X |
| Install (installed by GC and wired by electrical contractor) | X | |
| Conduit and wiring | X | |
|   For poster cases on Base Building walls | X | |
|   For poster cases within premises | X | |
| Code-required interior signage | X | |
| Conduit, electrical wiring and termination | X | |
| | | |
| **Security – Video Cameras** (Sensormatic) | | |
| Power:  conduit, j-boxes, wiring, etc. | X | |
| Data:  conduit and j-boxes, Data Cable | X | |
| Equipment, cameras and final connections | | X |
| Security – Keyless Locks (Sensormatic) | | X |
| Power:  conduit, j-boxes, wiring, etc. | X | |
| Data:  conduit, cable, and j-boxes | X | |
| Equipment, cameras, and final connections | | X |
| | | |
| **Burglar System** (Sensormatic) | | |
| Power:  conduit, j-boxes, wiring, etc. | X | |
| Data:  conduit, cable and j-boxes | X | |
| Equipment, cameras, and final connections | | X |
| | | |
| **Telephone System** | | |
| Lines from pole or terminal to point of demarcation at Premises as designated on Tenant's plans | X | |
| Conduit, backboard, and service into Telephone Room within premises | X | |
| Conduits, raceways, all rough-in with pull string | X | |
| Phone system/cabling | | X |
| Payphones (if used) | | X |
| | | |
| **Seating** | | |
| stud layout and welding (if applicable) | X | |
| unloading, move into position, install & protect | | X |
| disposal of shipping boxes in dumpster | | X |
| dumpster service | X | |
| | | |
| **Office Partitions, Furniture and Equipment** | | |

| | Description | LANDLORD's Work | TENANT's Work |
|---|---|---|---|
| | furnish, deliver, move into position, install, & protect | | X |
| | Count Room Counter and Shelf | | X |
| | | | |
| | | | |
| | **Safes** | | |
| | Furnish, deliver, move into position by Tenant | | X |
| | Install | X | |
| | | | |
| | **Computer Systems** | | |
| | Rough-in conduit | X | |
| | computer cabling as called on plans | X | |
| | data line terminations | | X |
| | | | |
| | **Lobby art** | | |
| | Furnish and install | | X |
| | | | |
| | **Benches – Exterior and Interior** (Portable) | | |
| | Furnish, deliver, move into position, install, & protect | | X |
| | | | |
| | **Freestanding trash receptacles** and ash urns – Exterior and interior | | |
| | Furnish, deliver, move into position, install, & protect | | X |
| | | | |
| | **Planters** – Interior (Portable) | | |
| | Furnish, deliver, move into position, install, & protect | | X |
| | | | |
| | **Ropes and Poles** | | |
| | Furnish, deliver, move into position, install, & protect | | X |
| | | | |
| | **Lockers** | | |
| | Furnish and install | | X |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Exhibit E

See attached

## NON-DISTURBANCE, ATTORNMENT AND SUBORDINATION AGREEMENT

### (Lloyd Center Stadium 14, Portland, Oregon)

This NON-DISTURBANCE, ATTORNMENT AND SUBORDINATION AGREEMENT (this "Agreement") is made as of May ___, 2017 between KEYSTONE REAL ESTATE LENDING FUND, L.P., a Delaware limited partnership ("Mortgagee"), CAPREF LLOYD CENTER EAST LLC, a Delaware limited liability company ("Landlord"), and EASTGATE THEATRE, INC., an Oregon corporation ("Tenant").

### RECITALS

A.     Pursuant to that certain Lease dated on or about the date hereof (the "Lease") between Landlord, as lessor, and Tenant, as lessee, Landlord has leased to Tenant certain premises (the "Theatre") located within a retail center sometimes referred to as  Lloyd Center (the "Center") having a street address at 2201 Lloyd Center, Portland, Oregon  97232 in Portland, Oregon.

B.     The Center as described in the Lease is legally described on Exhibit A attached hereto.

C.     Landlord and Tenant have executed that certain Memorandum of Lease dated on or about the date hereof (the "Memorandum") between Landlord and Tenant, and recorded on or about the date hereof in the official real property records.

D.     Mortgagee is the holder and beneficiary of that certain Deed of Trust dated as of March 21, 2017 (the "Mortgage") between Landlord and Mortgagee, and recorded as Instrument No. 2017-035671 in the official real property records.

F.     Mortgagee, Landlord and Tenant desire to evidence their understanding with respect to the Mortgage and the Lease as hereinafter provided.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, the parties hereby agree as follows:

1.     Meaning of Mortgagee.  As used hereinafter, the term Mortgagee shall include the above identified Mortgagee and any assignees or successors of such Mortgagee with respect to the Mortgage.

2.     Non-Disturbance.  So long as Tenant is not in default (beyond any period given Tenant under the Lease to cure such default) in the payment of rent or other sums payable by Tenant under the Lease or in the performance of any of the terms, covenants or conditions of the Lease on Tenant's part to be performed:

2.1     Neither Tenant's right of possession of the Theatre nor any other rights or privileges of Tenant under the Lease (including the Lease as extended or renewed in accordance

1

with any option afforded Tenant in the Lease) shall be terminated, diminished or disturbed by Mortgagee for any reason whatsoever, including, without limitation, by virtue of any actions taken by Mortgagee in the exercise of any of its rights or remedies under the Mortgage or the indebtedness secured thereby;

2.2     The Lease shall not be terminated or affected by the exercise of any right or remedy provided for in the Mortgage, and Mortgagee hereby covenants and agrees that any sale of Landlord's title to the property containing the Theatre by Mortgagee pursuant to the exercise of any rights or remedies under the Mortgage or otherwise shall be made subject to the Lease and the rights and privileges of Tenant thereunder; and

2.3     In the event of foreclosure of the Mortgage, deed in lieu of foreclosure or other transfer of Landlord's right, title and interest in the property containing the Theatre, such purchaser shall recognize and accept the Lease and Tenant's leasehold right, title and interest in the Theatre.

3.     <u>Attornment</u>.

3.1     <u>Succession by Mortgagee</u>.  If the interest of Landlord shall be transferred to and owned by Mortgagee by reason of foreclosure, conveyance in lieu of foreclosure or other proceeding, or by any other manner, and Mortgagee succeeds to the interest of Landlord under the Lease, Tenant shall be bound to Mortgagee under all of the terms, covenants and conditions of the Lease for the balance of the term thereof remaining and any extension thereof which may be effected in accordance with any option therefore afforded to Tenant in the Lease, with the same force and effect as if Mortgagee were Landlord under the Lease, and Tenant does hereby attorn to Mortgagee as its Landlord, said attornment to be effective and self-operative without the execution of any further instruments on the part of either Party immediately upon Mortgagee succeeding to the interest of Landlord under the Lease.  The respective rights and obligations of Tenant and Mortgagee upon such attornment, to the extent of the then remaining balance of the term of the Lease and any extensions and renewals thereof, shall be and are the same as set forth in the Lease, it being the intention of the parties hereto for this purpose to incorporate the Lease into this Agreement by reference with the same force and effect as if set forth at length herein.

3.2     <u>Limitation of Duties of Mortgagee</u>.  If Mortgagee shall succeed to the interest of Landlord under the Lease, Mortgagee shall be bound to Tenant under all the terms, covenants and conditions of the Lease, and Tenant shall, from and after Mortgagee's succession to the interest of Landlord under the Lease, have the same remedies against Mortgagee for the breach of any agreement contained in the Lease that Tenant would have had under the Lease against Landlord if Mortgagee had not succeeded to the interest of Landlord; provided, however, that Mortgagee shall not: (a) have any monetary liability by offset against rent or otherwise for any act, omission, misrepresentation or default of any prior Landlord arising out of facts and circumstances existing before Mortgagee's succession to the interest of Landlord under the Lease, if such act, omission, misrepresentation or default of the prior Landlord then does not continue in effect, subject to the provision that Mortgagee shall not be relieved in any way from any performance obligation of Landlord under the Lease for the period from and after Mortgagee's succession to the interest of Landlord; or (b) be bound by any rent which Tenant paid to the prior Landlord for more than one (1) month in advance, unless Mortgagee has

received such rent from the prior Landlord; or (c) liable for the return of any security deposit to the extent it has not been received by Mortgagee from Landlord, all subject to the provision that Tenant shall have the right (but not the obligation) to cure any default by Landlord which Landlord or Mortgagee does not cure within the applicable cure period and recover its reasonable costs therefore together with interest at the Default Rate (defined in the Lease) by offset against Rent as it comes due for payment.

4.      <u>Subordination of Lease</u>.  Tenant covenants, stipulates and agrees that the Lease is hereby subordinate in priority to the lien of the Mortgage (including any and all renewals, increases, modifications, extensions, substitutions, replacements and/or consolidations of the Mortgage).

5.      <u>Authorization by Landlord</u>.  Landlord authorizes and directs Tenant to honor any written demand or notice from Mortgagee instructing Tenant to pay rent or other sums to Mortgagee or to a designee of Mortgagee rather than Landlord (a "Payment Demand"), regardless of any other or contrary notice or instruction which Tenant may receive from Landlord before or after Tenant's receipt of such Payment Demand.  Tenant may rely upon any notice, instruction, payment demand, certificate, consent or other document from Mortgagee believed by Tenant to be genuine and signed by Mortgagee and shall have no duty to Landlord to investigate the same or the circumstances under which the same was given.  Any payment made by Tenant to Mortgagee in response to a Payment Demand shall be deemed proper payment by Tenant of such sum pursuant to the Lease.

6.      <u>Miscellaneous</u>.

6.1      <u>Waiver</u>.  No purported waiver by any Party of any default by any other Party of any term or provision contained herein shall be deemed to be a waiver of such term or provision unless the waiver is in writing and signed by the waiving Party.  No such waiver shall in any event be deemed a waiver of any subsequent default under the same or any other term or provision contained herein.

6.2      <u>Entire Agreement</u>.  This Agreement sets forth the entire understanding between the parties concerning the subject matter of this Agreement and incorporates all prior negotiations and understandings.  There are no covenants, promises, agreements, conditions or understandings, either oral or written, between the parties relating to the subject matter of this Agreement other than those set forth herein.  No representation or warranty has been made by or on behalf of any Party (or any officer, director, employee or agent thereof) to induce any other Party to enter into this Agreement or to abide by or consummate any transactions contemplated by any terms of this Agreement, except representations and warranties, if any, expressly set forth herein.  No alteration, amendment, change or addition to this Agreement shall be binding upon any Party unless in writing and signed by the Party to be charged.

6.3      <u>Successors</u>.  Each and all of the provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Tenant's successors and assigns may include any Leasehold Mortgagee if such lender succeeds to the interest of Tenant under the Lease in accordance with the terms of said Leasehold Mortgage.

6.4     Notices.  Any consent, waiver, notice, demand, request or other instrument required or permitted to be given under this Agreement shall be in writing and be sent by certified or registered United States mail, return receipt requested, postage prepaid, or by overnight express delivery service, such as Federal Express, with the charges pre-paid, addressed:

|                 |                                               |
|-----------------|-----------------------------------------------|
| If to Tenant:   | EASTGATE THEATRE, INC.                        |
|                 | 7132 Regal Lane, Knoxville, Tennessee 37918   |
|                 | Attention:  Real Estate Department            |
|                 |                                               |
| If to Mortgagee:| KEYSTONE REAL ESTATE LENDING FUND, L.P.       |
|                 | 280 North 200 West, Suite 250                 |
|                 | Bountiful, Utah  84010                        |
|                 | Attention:  Heston Neilson                    |

Any such consent, wavier, notice, demand, request or other instrument shall be deemed given upon receipt or upon the refusal of the addressee to receive the same as indicated on the return receipt.  Any Party may change its address for notices in the manner set forth above.

6.5     Captions.  The captions and section numbers appearing in this Agreement are inserted only as a matter of convenience, and do not define, limit, construe or describe the scope or intent of the provisions of this Agreement.

6.6     Partial Invalidity.  If any term or provision of this Agreement or the application thereof to any person, firm or corporation, or circumstance, shall be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons, firms or corporations, or circumstances other than those as to which it is held invalid, shall both be unaffected thereby, and each term or provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

6.7     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Oregon applicable to agreements about real property located in the State of Oregon to be performed in the State of Oregon.

6.8     Counterparts.  This Agreement may be executed in counterparts, each of which when executed by the parties hereto shall be deemed an original and all of which together shall be deemed an original and all of which together shall be deemed the same Agreement.

[signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

LANDLORD:                              CAPREF LLOYD CENTER EAST LLC, a
                                       Delaware limited liability company


                                       By:_____
                                       Name:
                                       Its:


STATE OF TEXAS
                              ) ss.
COUNTY OF DALLAS

     I, _____, a Notary Public, in and for said County in said State, hereby certify that _____, whose name as authorized signatory of _____, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he or she, as such authorized signatory and with full authority, executed the same voluntarily for and as the act of said limited liability company.

     Given under my hand and seal this _____ day of May, 2017.


                                       _____
                                       Notary Public

My Commission Expires: _____

TENANT:                                    EASTGATE THEATRE, INC., an Oregon
                                           corporation


                                           By:_____
                                           Name:
                                           Its:


STATE OF TENNESSEE          )
                            ) ss.
COUNTY OF KNOX              )

        Before me, a Notary Public in and for said county and state, personally appeared
_____, personally known to me to be the _____ Vice President of
_____, a _____ and
acknowledged that he, as an officer being authorized so to do, executed the foregoing instrument
for the purposes therein contained, by signing in the name of the corporation by himself as an
officer.

        IN WITNESS WHEREOF I have hereunto set my hand and official seal this the _____
day of _____, 201__.


[SEAL]                                     _____
                                           Notary Public
                                           My commission expires: _____

MORTGAGEE:                        KEYSTONE REAL ESTATE LENDING FUND,
                                  L.P., a Delaware limited partnership

                                  By:   Keystone Real Estate Lending Fund GP,
                                        LLC, a Delaware limited liability company,
                                        its General Partner


                                  By:_____
                                  Name:_____
                                  Title:_____


STATE OF _____

                        ) ss.
COUNTY OF _____

        I, _____, a Notary Public, in and for said County in said State,
hereby certify that _____, whose name as authorized signatory of
_____, is signed to the foregoing instrument and who is known to me,
acknowledged before me on this day that, being informed of the contents of the instrument, he or
she, as such authorized signatory and with full authority, executed the same voluntarily for and
as the act of said limited liability company.

        Given under my hand and seal this _____ day of May, 2017.


                                  _____
                                  Notary Public

My Commission Expires: _____

Exhibit F

See attached

MEMORANDUM OF LEASE

(Lloyd Center Stadium 14, Portland, Oregon)

This Memorandum of Lease is made and entered into as of May ___, 2017 (the "Effective Date") between CAPREF LLOYD CENTER EAST LLC, a Delaware limited liability company , with an address of 8333 Douglas Avenue, Suite 975, Dallas, Texas  75225 (the "Landlord"), and EASTGATE THEATRE, INC., an Oregon corporation, with an address of 7132 Regal Lane, Knoxville, Tennessee 37918 (the "Tenant").

RECITALS

A.      Pursuant to that certain Lease dated as of the date hereof (the "Lease") between Landlord and Tenant, Landlord has leased to Tenant certain premises (the "Theatre") located within a retail center sometimes referred to as  Lloyd Center and more specifically described in the Lease (the "Center") having a street address at 2201 Lloyd Center, Portland, Oregon  97232 in Portland, Oregon.

B.      The Center is legally described on Exhibit A attached hereto.

C.      Landlord represents that as of the Effective Date it owns fee simple title to a portion of the real property on which the Theatre is or will be located pursuant to that certain Statutory Special Warranty Deed dated as of August 23, 2016 and recorded August 24, 2016 as Instrument No. 2016-105686 in the official real property records of Multnomah County, Oregon and has the right to exclusive possession of the remainder of the real property on which the Theatre and related improvements is or will be located pursuant to that certain Construction, Encroachment, Use, and Occupancy Easement Agreement dated on or about the date hereof between CAPREF Lloyd II LLC, a Delaware limited liability company ("CAPREF Lloyd II LLC"), as grantor, and Landlord, as grantee, recorded on or about the date hereof.

AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and mutual covenants set forth in the Lease, and for other good and valuable consideration, the mutuality, receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.      Lease of Theatre.  Subject to the terms, conditions, and provisions of the Lease, Landlord has leased to Tenant, and Tenant has leased from Landlord, the Theatre.

2.      Parking and Common Areas.  Subject to the terms, conditions, and provisions of the Lease, Tenant has the non-exclusive right to use of the common areas of the Center, including without limitation the automobile parking areas, drive lanes, entrance and exit ways.

3.      Term.  The Term of the Lease shall consist of an initial term of fifteen years, plus up to three (3) Extension Periods of five (5) Rent Years each, unless earlier terminated, as set forth more particularly in the Lease.

1

4.      Restrictions.   Landlord has agreed to impose certain restrictions on the Center. CAPREF Lloyd II, on behalf of itself and its successors and assigns ("Enclosed Mall Owner"), and CAPREF Lloyd Center Anchor, a Delaware limited liability company, on behalf of itself and its successors and assigns ("West Anchor Owner"), have joined in such agreement, all as more particularly set forth in the Lease and the limited joinders signed by them.

5.      Theatre Use Covenant and Concession Use Covenant.   Landlord has agreed that Tenant has an exclusive right to operate a motion picture theatre within the Center, as more particularly set forth in the Lease.   Landlord has agreed that Tenant has exclusive rights within certain portions of the center to sell and serve certain food and beverages, as more particularly set forth in the Lease.   Enclosed Mall Owner and West Anchor Owner have joined in such agreements, all as more particularly set forth in the Lease and the limited joinders signed by them.

6.      Constructive Notice.   This Memorandum provides constructive notice of the terms and conditions of the Lease.   This Memorandum provides a description of or excerpts from some of those terms and conditions.   In addition to the provisions described or excerpted herein, the Lease includes, among other things, (a) provisions restricting certain new construction and alterations in the Center; (b) provisions relating to the usage by Tenant of signage within the Center; (c) provisions restricting other uses in the Center, and (d) provisions creating certain non-exclusive rights of Tenant to use the Common Areas of the Center.   All of the terms and conditions of the Lease are hereby incorporated herein by reference as if set forth herein in full. Any person acquiring an interest in the Center or the Theatre shall take subject to all such terms and conditions, including those not set forth herein.   A correct and complete copy of the Lease is available from Landlord or Tenant upon request, subject to reasonable conditions including those relating to confidentiality and proprietary information.    In the event of any inconsistency between the terms and provisions of this Memorandum and the terms and provisions of the Lease, the terms and provisions of the Lease shall control.

7.      Successors.   The Lease and the covenants and conditions therein contained shall inure to the benefit of and shall be binding on (a) Landlord and its successors and assigns in ownership of all or any portion of the Center, and to all persons claiming under or through them, and (b) Tenant and its permitted successors and assigns with respect to the leasehold, and to all persons claiming under or through them.   Without limiting the generality of the foregoing, if any one or more parcels of the Center are, at any time after the date hereof, not owned by the person that then owns the portion of the Center on which the Theatre is located, such other person shall nonetheless be bound by the covenants, terms and conditions of this Lease to the extent relating to the parcel or parcels owned by such other person as a successor in ownership to Landlord, and so shall all persons claiming under or through such successor.   Tenant may elect to enforce covenants, terms or conditions of the Lease against such other persons, or against the person that then owns the portion of the Center on which the Theatre is located, or both, as Tenant deems appropriate in Tenant's sole and absolute discretion.   Without limiting the generality of the foregoing, no separate ownership shall affect Tenant's rights in respect to the Theatre Use Covenant, the Concession Use Covenant, the On-Going Co-Tenancy Requirement, the use of the Common Areas, the non-liability of Tenant for Property Taxes or CAM Expenses, or the effect of any casualty or condemnation, or shall otherwise excuse Landlord's performance of this Lease

2

in strict accordance with the terms hereof.  All terms used in this paragraph shall have the meanings ascribed to them in the Lease.

[signature page follows]

IN WITNESS WHEREOF, Landlord and Tenant have executed this Memorandum of Lease as of the date first above written.

LANDLORD:                                              CAPREF LLOYD CENTER EAST LLC, a
Delaware limited liability company

By:_____

Name:_____

Its:_____

STATE OF TEXAS

) ss.

COUNTY OF DALLAS

I, _____, a Notary Public, in and for said County in said State, hereby certify that _____, whose name as authorized signatory of _____, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he or she, as such authorized signatory and with full authority, executed the same voluntarily for and as the act of said limited liability company.

Given under my hand and seal this \_\_\_\_\_ day of May, 2017.

_____
Notary Public

My Commission Expires: _____

4

TENANT:                              EASTGATE THEATRE, INC., an Oregon
                                     corporation

                                     By:_____
                                     Name:_____
                                     Its:_____


STATE OF TENNESSEE          )
                            ) ss.
COUNTY OF KNOX              )

      Before me, a Notary Public in and for said county and state, personally appeared _____, personally known to me to be the _____ Vice President of _____, a _____ and acknowledged that he, as an officer being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing in the name of the corporation by himself as an officer.

      IN WITNESS WHEREOF I have hereunto set my hand and official seal this the _____ day of _____, 201__.


[SEAL]                              _____
                                    Notary Public
                                    My commission expires: _____

5

Exhibit G

Elevation Drawings for the Theatre

See Section 1.1.43





| 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 |

T.O. Parapet
+222'-6"
New Roof Deck
+218'-6"

(E) PARKING
+173'-8"

Theater Level
+175'-6"
Theater Lobby
+173'-8"

Halsey Level
+153.5'

Entrance Lobby
+144'-08"
Multnomah Level
+138.0'

BRIDGE BTW (E) PARKING STRUCTURE AND (N) THEATER LOBBY

LLOYD CENTER SIGNAGE
4X4 1/2" ACCOYA WOODBATTENS @ 6" O.C.

2X6 HSS BATTENS @ 15" O.C.

2X6 HSS BATTENS @ 6" O.C.

ALUMINUM CURTAIN WALL SYSTEM

12" DEEP ALUMINUM LOUVERS @ 3'-8" O.C.

PRECAST CONCRETE, MIN 15" TALL

METAL AND GLASS CANOPY, 8'-6" DEEP

ALUMINUM ENTRANCE SYSTEM

ALUMINUM STOREFRONT SYSTEM

BRICK MASONRY W/ REVEALS @ 3'-8" O.C.

ALUMINUM CURTAINWALL SYSTEM

# elevation south



| A | B | C | D | E | F | G | H | J | K | L | M | N |

T.O. Parapet
+222'-6"
New Roof Deck
+218'-6"

Theater Level
+175'-6"

Halsey Level
+153.5'

Multnomah Level
+138.0'

ALUM. STOREFRONT SYSTEM

ALUM. CURTAINWALL SYSTEM

METAL AND GLASS CANOPY, 8'-6" DEEP - ALIGN W/ TOP OF (E) CONCRETE BULKHEAD

2X6" HSS METAL BATTENS @ 15" O.C. METAL AND GLASS CANOPY, 6'-0" DEEP

LLOYD CENTER SIGNAGE
4X4 1/2" ACCOYA WOODBATTENS @ 6" O.C.

METAL CANOPY, 8'-6" DEEP

2X6" HSS METAL BATTENS @ 6" O.C.

DRIVE AISLE BEYOND

TERAZZO COLUMN ENCLOSURE, TYP. FOR (9) THIS ELEVATION

BRICK MASONRY PLANTERS

BRICK MASONRY W/ REVEALS @ 3'-8" O.C.

PERFORATED/ CORRUGATED METAL PANEL SCREEN

ALUM. STOREFRONT SYSTEM METAL AND GLASS CANOPY, 6'-0" DEEP BRICK MASONRY EXHAUST ENCLOSURE/ VENT

# elevation east

**east anchor pricing set**
**elevations**
11.07.2016
scale: 1"=20'-0"



0    10'    20'         40'

SCALE:  1" = 20'-0"

original sheet size 22x34

# A3.1

**w a t e r l e a f**

419 SW 11th Ave Suite 200
Portland, Oregon 97205
Phone: 503/228-7571
Fax: 503/273-8891

architecture, interiors & planning





ALUM. CURTAINWALL SYSTEM   PRECAST CONCRETE, 15" TALL   (E) TERRAZZO COLUMNS - REFINISH   ALUM. STOREFRONT SYSTEM   BRICK MASONRY W/ REVEALS @ 3'-8" O.C.   MALL INTERIOR

T.O. Parapet +222'-6"
New Roof Deck +216'-0"
Theater Level +175'-6"
Halsey Level +153.5'
Multnomah Level +138.0'

# elevation north



BLOCK H

BLOCK H

ROOF OF EXISTING BLOCK "H"   BRICK MASONRY W/ REVEALS @ 3'-8" O.C.   ALUMINUM CURTAINWALL SYSTEM   12" DEEP ALUMINUM LOUVERS @ 3'-8" O.C.   BRIDGE   CONCRETE - ENCASED STEEL COLUNS   BRICK MASONRY   METAL AND GLASS CANOPY

T.O. Parapet +222'-6"
New Roof Deck +216'-0"
Theater Level +175'-6"
Theater Lobby +173'-6"
Office Level +172'-0"
Halsey Level +153.5'
Entrance Lobby +144.08'
Multnomah Level +138.0'

# elevation west

east anchor pricing set
elevations
11.07.2016
scale: 1"=20'-0"

0   10'   20'        40'
SCALE:  1" = 20'-0"
original sheet size 22x34



## A3.2

w a t e r l e a f
419 SW 11th Ave Suite 200
Portland, Oregon 97205
Phone: 503/228-7571
Fax: 503/273-8891

architecture, interiors & planning



Exhibit I

Form of Guaranty

See attached

GUARANTY

THIS GUARANTY (this "Guaranty") is made and given as of May ___, 2017 by REGAL CINEMAS, INC., a Tennessee corporation ("Guarantor"), for the benefit of CAPREF LLOYD CENTER EAST LLC, a Delaware limited liability company ("Landlord").

RECITALS

A.    Landlord, as landlord, and Eastgate Theatre, Inc., as tenant ("Tenant") are parties to that certain Lease (the "Lease") dated on or about the date hereof.

B.    Landlord has requested and the Lease requires that as a condition precedent to the effectiveness thereof that Guarantor execute a guaranty on the terms and conditions provided herein.

C.    Guarantor is willing to execute a guaranty on the terms and conditions provided herein.

AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt of which is acknowledged, Guarantor hereby agrees as follows:

1.    Guarantor hereby unconditionally, irrevocably and absolutely guaranties the due and punctual payment, performance and observance by Tenant of each and every obligation of Tenant under the Lease throughout the term of the Lease, as such term may be extended, and agrees that if any Event of Default occurs, Guarantor will cure such Event of Default within five (5) days following Guarantor's receipt of written demand therefor.  This is a guaranty of performance and payment and not of collection.

2.    This Guaranty by Guarantor shall continue for the benefit of Landlord notwithstanding (a) any extension, modification, amendment, or alteration of the Lease, (b) any assignment of the Lease or sublease of the premises demised thereby, in whole or in part, with or without the consent of Landlord, (c) any release, extension, compromise, settlement, waiver, reduction, forbearance, or modification of the liability of Tenant or any other party liable under the Lease or any other guaranty of the Lease, or (d) any dissolution or liquidation of Tenant or change in the composition, arrangement, organization, or reorganization of Tenant including by and through bankruptcy laws or otherwise.  No other agreements or releases between Landlord and Tenant or between Landlord and any other party liable under the Lease or any other guaranty of the Lease (with or without notice to or knowledge of Guarantor) shall in any manner release, discharge, reduce, diminish, or negate the obligations of Guarantor hereunder.  Guarantor does hereby consent to any or all of the foregoing and acknowledges its continuing obligations with regard to any of the foregoing.  Notwithstanding anything to the contrary herein, Guarantor shall not be bound by and shall not have liability or obligation under or in respect of any amendment, modification, supplement, extension or renewal of the Lease after the effective date of an assignment by Tenant unless (a) the assignee is an Affiliate (as defined in the Lease) of Guarantor or (b) Guarantor consents in writing to such amendment, modification, supplement, extension or renewal of the Lease.

1

3.      Guarantor's obligations hereunder shall remain fully binding notwithstanding the institution by or against Tenant of bankruptcy, reorganization, receivership or insolvency proceedings of any nature, or the disaffirmance of said Lease in any such proceedings or otherwise.

4.      Guarantor agrees to promptly pay, fully and completely, in addition to any and all amounts otherwise due hereunder, all reasonable costs, expenses and charges, including reasonable attorneys' fees, actually incurred or expended by Landlord, in collecting or enforcing this Guaranty, including in connection with litigation and including in connection with any bankruptcy filing pursuant to which Guarantor or Tenant is a debtor, and all such sums shall bear interest from the date Landlord provides Guarantor written demand therefor, together with reasonable supporting documentation, until Landlord is reimbursed at the Default Rate (as defined in the Lease).

5.      The term of this Guaranty shall commence on the Delivery Date under the Lease and shall expire at the end of the term of the Lease (including any and all extensions) (the "Guaranty Term Expiration") except to the extent that any of the duties and obligations of Tenant under the Lease survive such term, in which event the Guaranty Term Expiration shall continue as to such duties and obligations and Guarantor's liability and obligations hereunder likewise shall survive for so long as Tenant's obligations survive under the Lease, and provided further that Guarantor's liability for any demand or claim made by Landlord against Guarantor hereunder made within one (1) year following the later to occur of (a) the Guaranty Term Expiration, or (b) the date on which any obligation under the Lease that survives the expiration or earlier termination of the Lease first is known, quantifiable, or accrues as an obligation to and of Tenant, shall continue and be fully enforceable by Landlord against Guarantor until the expiration of such one-year period.

6.      This Guaranty is to be performed in the State of Oregon and shall be governed by and construed in accordance with the laws of the State of Oregon, without reference to its conflict of laws principles.

[signature page follows]

2

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date first written above.

REGAL CINEMAS, INC.,
a Tennessee corporation


By:_____
Name:_____
Its:_____

Exhibit J

Prohibited Uses and Restricted Uses

## Prohibited Uses

### CC&Rs

No use or operation will be made, conducted or permitted which is obnoxious to or out of harmony with the development or operation of a first-class regional shopping center and mixed-use development containing an enclosed air conditioned mall, including but not limited to, the following:

1. any public or private nuisance;
2. emitting of any noise or sound that is objectionable due to intermittence, beat, frequency, shrillness, or loudness;
3. emitting of any obnoxious odor;
4. use of any noxious, toxic, caustic, or corrosive fuel or gas;
5. emitting of any dust, dirt, or fly ash in excessive quantities;
6. involving any unusual fire, explosion, or other damaging or dangerous hazard, including the storage, display or sale of explosive or fireworks;
7. use as a warehouse (but use within any premises of any area for the storage of goods intended to be sold from the premises shall not be deemed to be a warehouse);
8. assembly, manufacture, distillation, refining, smelting, agriculture, or mining operations;
9. operation of any mobile home or trailer court, labor camp, junk yard, stock yard, or animal raising (but the foregoing shall not prohibit pet shops provided that such shops shall be so conducted that there shall be no violation of any other prohibition set forth herein arising from the operation of such pet shops and provided further that no such pet shop shall be located within 150 feet of the West Anchor Parcel);
10. any drilling for and/or removal of subsurface substances;
11. any dumping of garbage or refuse;
12. as a commercial laundry or dry cleaning plant or Laundromat;
13. as a veterinary hospital;
14. as a car washing establishment;
15. as a bowling alley;
16. as a mortuary or similar service establishment;
17. providing any automobile body and fender repair work;

### Barnes & Noble

Landlord shall not lease or permit the use of space in the Entire Development for the following:

1. any mobile home park or trailer court (except that this provision shall not prohibit the temporary use of construction trailers);

1

2.       any dumping, disposing, incineration, or reduction of garbage (exclusive of appropriately screened dumpsters located in the rear of any building);

3.       any living quarters, sleeping apartments, or lodging rooms;

4.       any veterinary hospital, animal raising facilities, or pet shop located adjacent to the Barnes & Noble premises;

5.       any mortuary;

6.       any establishment selling or exhibiting pornographic materials; or

7.       any use which is a public or private nuisance.

9.       Additionally, Landlord shall not lease or permit the use of space in the enclosed mall portion of the Center for the following:

10.     any bowling alley;

11.     any arcade, unless same is not located on the second floor of the enclosed portion of the Center (hereinafter called "Second Floor") or in the entry corridor to the Second Floor;

12.     any bar, except to the extent incidental to a restaurant operated primarily for on-premises consumption, or any tavern unless same is not located on the Second Floor;

13.     any night club or discotheque, unless same is located on the first floor of the enclosed mall portion of the Center; however, same shall not be located in the corridor leading to said first floor;

14.     any health club, spa, or gymnasium within three hundred feet (300') of the Barnes & Noble premises;

15.     any second hand or surplus store;

16.     any fire sale, bankruptcy sale (unless pursuant to a court order), or auction house operation;

17.     any central laundry or dry cleaning plant or laundromat (except that this prohibition shall not be applicable to on-site service provided solely for pickup and delivery by the ultimate consumer, including nominal supporting facilities);

18.     any automobile, truck, trailer, or R.V. sales, leasing, display or repair;

19.     any skating rink unless same is not located on the Second Floor;

20.     any movie theater within three hundred feet (300') of the Barnes & Noble premises;

21.     any separately demised newsstand;

22.     any auto parts store or gas or service station; or

23.     any church, temple, synagogue or other place of worship.

## Macy's

No use or operation will be made, conducted, or permitted on any part of the Center which use or operation is clearly objectionable to or incompatible with the then existing shopping center, development or operation at the Center. Included among the uses or operations that are prohibited because of their obvious detrimental effect upon the general appearance of the Center and conflict with the reasonable standards of appearance and maintenance are uses or operations which produce or are accompanied by the following characteristics, which list is not intended to be all inclusive:

1.       any noise, litter, odor, or other activity which constitutes a public or private nuisance;

2.     any unusual firing, explosion, or other damaging or dangerous hazards;

3.     any assembly (other than incident to a permitted use), manufacturing, refining, smelting, industrial, agricultural, drilling, or mining operation;

4.     any trailer court, mobile home part, lot for the rental or sale of new or used motor vehicles, labor camp, junk yard, stock yard, or animal raising operation (other than pet shops and veterinarians); and

5.     any dumping, disposal, incineration, or reduction of garbage or refuse other than the handling or reducing of waste produced on the Center from authorized uses, provided such handling or reducing is performed in a reasonably clean and sanitary manner.

<u>Ross</u>

The Center shall remain retail in character and no part of the Center shall be used for or as:

1.     office or residential purposes;

2.     a theater, auditorium, or meeting hall;

3.     a school, church, or other place of public assembly;

4.     a flea market;

5.     a gymnasium;

6.     veterinary services or overnight stay pet facilities;

7.     a health club;

8.     a dance hall;

9.     a billiard or pool hall;

10.     a massage parlor;

11.     a video game arcade;

12.     a bowling alley;

13.     a skating rink;

14.     a car wash;

15.     a facility for the sale, display, leasing, or repair of motor vehicles;

16.     a night club;

17.     the sale of adult products, adult books, or adult audio/video products (which are defined as stores in which at least ten percent (10%) of the inventory is not available for sale or rental to children under the age of majority in the state in which the Center is located because such inventory explicitly deals with or depicts human sexuality);

18.     operation of an ATM or similar machine within one hundred (100) feet of the front and side perimeter malls of the Ross premises; or

19.     operation of a restaurant in excess of five thousand (5,000) square feet of floor area or other "High Intensity Parking User" (as hereinafter defined) within three hundred (300) feet of the front and side perimeter walls of the Ross premises, where "High Intensity Parking User" is a tenant or occupant whose use requires more than five (5) parking spaces per one thousand (1,000) square feet of floor area in accordance with governmental regulations.

Additionally, Landlord shall not lease, rent, or permit any other premises in the Center to be used or occupied as:

3

1.      an automobile repairs shop (mechanical or otherwise);
2.      a sales office or showroom for automobiles or other vehicles;
3.      a funeral parlor;
4.      a health spa or similar type business;
5.      an off-track betting establishment;
6.      a so-called "flea market;
7.      for industrial or residential purposes; or
8.      as an adult book store or a store selling or exhibiting pornographic materials, where an adult book store or store selling or exhibiting pornographic materials shall include, without limitation, a store displaying for sale or exhibition books, magazines, or other publications containing any combination of photographs, drawings, or sketches of a sexual nature, which are not primarily scientific or educational, or a store offering for exhibition, sale, or rental video cassettes or other medium capable of projecting, transmitting, or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which has been rated or advertised generally "X" or unrated by the Motion Picture Rating Association, or any successor thereto.

Ulta
The following uses shall not be permitted:

1.      any drive-throughs;
2.      children's recreational, educational, or day-care facility;
3.      restaurants occupying more than 2,500 square feet of floor area;
4.      offices;
5.      professional uses;
6.      schools of any nature, including, but is not limited to, a beauty school, barber college, reading room, place of instruction, or any other operation serving primary students or trainees rather than retail customers; and
7.      hair salons.

## Restricted Uses

AT&T
Landlord shall not place another wireless operator (offering services or accessories) within ten feet (10') of the extended lease line of the premises.

Barnes & Noble

Landlord shall not operate or permit to be operated within the Center (a) any other store selling or displaying for sale or rental any (i) books, magazines, periodicals, and newspapers in print, and (ii) books, magazines, periodicals, and newspapers on tape, disk, CD-ROM, and/or any other media, as well as any items which are technological evolutions of any of the foregoing items, subject to Incidental Sale (as hereinafter defined), (b) any separately demised newsstand or magazine rack, regardless of size (except for a newsstand kiosk of not more than 300 square feet on the first floor of the Center, and a second similarly sized newsstand kiosk on third floor of the Center, kiosks may sell, incidental to the sale of newspapers and magazines, candy and such

4

other non-liquid and non-perishable foodstuffs as are typically sold from newsstands of comparable size), or (c) any coffee or espresso bar or coffee shop or similar operation providing its customers with coffee, tea, and other beverages, pastries, sandwiches, snack, and other pre-prepared or packaged food or beverage items, as well as related merchandise, either for sale or complimentary and for either on-site or take-out consumption; provided, however, that the incidental sale of coffee, tea, or other beverages by a non-coffee shop restaurant operator or tenant as an incidental part of its general restaurant operation is permitted. Incidental Sale means the lesser of six percent (6%) of the aggregate display area of such operator/tenant (inclusive of allocable aisle space), or seven hundred fifty (750) square feet. Tenants occupying the premises now or formerly occupied by Marshall's and Toys R' Us, as well as all premises containing at least 75,000 square feet of contiguous area are exempt from this protective restriction.

Dickey's Barbecue Pit

Landlord shall not lease space in the food court of Landlord's parcel to another tenant whose primary use is the sale of barbecue items similar to those found on tenant's menu as of the Effective Date of the lease, where primary use is defined to mean such other food court tenant derives more than forty percent (40%) of its revenue from the sale of such barbeque menu items.

Footlocker
Landlord shall not permit any retail kiosk or cart operations within the Common Areas located within forty feet (40') from the sidelines of the premises if the same are devoted to the sale of the exact type of merchandise as sold from the premises.

Made in Oregon

Landlord shall not lease space in the Center to a competing tenant whose primary business is the retail sale of general merchandise substantially similar to tenant's current merchandise (i.e., high quality gift products manufactured in Oregon).

Marshall's
Landlord shall not lease space in the enclosed mall to any operator occupying at least 25,000 contiguous square feet primarily offering the sale of brand-name apparel at off-price. Tenants occupying the premises now or formerly occupied by Nordstrom, Macy's, and Sears are exempt from this protective restriction.

McDonald's
Landlord shall not grant to any other tenant the exclusive right to sell any type of hamburger, except for Billy Heartbeats and Broilerworks.

Orange Julius

Landlord shall not lease space in the Center to any tenant that uses a majority of its premises for the sale of hot dogs. All premises containing at least 20,000 square feet of area are exempt from this protective restriction.

Ross
No tenant or occupant of the Center may use, and Landlord, if it has the capacity to do so, shall

5

not permit any other tenant or occupant of the Center to use its premises for the retail sale or display of merchandise on an everyday basis at prices reduced from those charged by full price retailers, such as full price department stores; provided, however, this does not prohibit sales events by retailers at a price discounted from that retailer's every day price.

Things Remembered

Landlord shall not permit any kiosk or carts located within one hundred feet (100') of the premises to have the right to offer engraving or monogramming services.

Ulta

Landlord shall not operate or permit any tenant or other occupant to operate any space in the Center for the sale of cosmetics; provided, however, the incidental sale of cosmetics by a tenant in a selling area no larger than the lesser of 250 square feet or five percent (5%) of such tenant's total floor area is permitted.  Tenants who sell their own branded products and tenants or occupants of premises containing in excess of 25,000 square feet of contiguous area are exempt from this protective restriction.

LA Fitness

Landlord shall not, during the Term (as the same may be extended), enter into any lease or occupancy agreement or allow any other health club or fitness facility (including, without limitation, aerobics, spinning, personal training, basketball, boxing or jazzercise operations) to operate in the Project (and Landlord will not amend the COREA nor grant permission under its rights in the COREA to permit such uses in the Project) (the "Exclusive Use"). The foregoing shall not, however, preclude Landlord from permitting another Project tenant to engage in the retail sale of fitness equipment for off-premises use and shall not apply to the following: (i) any existing Project tenant or their assignees, subtenants or transferees, who is not restricted from using its premises for the Exclusive Use under its lease (provided, however, Landlord shall withhold its consent to any change in use to the Exclusive Use where Landlord is permitted to do so under such lease), (ii) any Project tenant that occupies less than one thousand (1,000) square feet in the Project, (iii) any Project tenant that is permitted to use its premises for the Exclusive Use by operation of law, court order, bankruptcy, or similar action, (iv) any store owned or operated by Tenant, or Tenant's parent, affiliate, subsidiary, franchisee, franchisor, or franchisee of Tenant's franchisor; (iv) during the last three (3) months of the Term, and (v) any space not owned, operated or ground leased by Landlord or otherwise not under Landlord's effective control; provided, however, so long as Tenant is open and operating in at least forty thousand (40,000) square feet in the Premises for the Initial Uses and/or the Ancillary Uses (subject to Excused Closure as such term is defined in Section 4.2 below), Landlord shall not (A) sell, transfer operational control, lease or otherwise convey any portion of the Project (collectively, a "Sale Parcel") to a transferee if Landlord has actual knowledge at the time of any such transfer or lease of the Sale Parcel that such transferee intends to use the Sale Parcel (or otherwise allow the Sale Parcel to be used) in a manner which violates the Exclusive Use (provided, however, that for purposes of this subparagraph (v)(A), a fitness facility located in a residential condominium or residential apartment complex, ·or a hotel or office complex will not be deemed to violate Tenant's Exclusive Use provided that such fitness facility (together with the related condominium, apartment, hotel or office complex) is located on Parcels 38 and/or 44 of the Project (i.e., the parcels on which Regal Cinema and mall parking are respectively currently

located), the fitness facility is limited to a space containing less than 3,000 square feet and the fitness facility is used only by the owners or renters of the units at such condominium or apartment complex and visitors of such owners or renters, or guests, customers or tenants at such hotel or office complex or visitors of such guests, customers or tenants (collectively, a "Residential/Hotel/Office Fitness Facility"), and (B) except with regard to a Residential/Hotel/Office Fitness Facility, amend the COREA nor grant permission under its rights in the COREA to permit the Sale Parcel to be used for the Exclusive Use. Notwithstanding anything to the contrary in this Section 1.9, Landlord may permit any future department store within the Project (provided such department store does not occupy the Project as of the Effective Date) to operate a day spa providing the following services incidental to its primary use(s): skin treatments, waxing, make-up, body treatments, massage therapies, nail salon, hair and hair color services. If Tenant is in Default for longer than three hundred sixty (360) consecutive days or, subject to Excused Closure (as defined in Section 4.2 below), has ceased to use the Premises as a health club and fitness facility for longer than three hundred sixty (360) consecutive days then this exclusive shall upon thirty (30) days' notice to Tenant from Landlord at all times thereafter be deemed null and void, regardless of whether or not Tenant subsequently cures such Default.

Exhibit K

See attached

LIMITED JOINDER OF CAPREF LLOYD II

(Relating to Covenants Pertaining to Portions of Center Owned by Joinder Party)

This LIMITED JOINDER (this "Joinder") is made and entered into as of May ___, 2017 by CAPREF LLOYD II LLC, a Delaware limited liability company (herein called "Joinder Party"), in favor of CAPREF Lloyd Center East LLC, a Delaware limited liability company ("Theatre Landlord"), and Eastgate Theatre, Inc., an Oregon corporation (herein called "Theatre Tenant").

RECITALS

A.    Reference is hereby made to that certain Lease dated on or about the date hereof (the "Lease") between Theatre Landlord, as landlord, and Theatre Tenant, as tenant, to which this Joinder is attached.  All initially capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

B.    Joinder Party acknowledges that Theatre Landlord and Joinder Party are under common ownership, as described more particularly in the Lease.

C.    Joinder Party acknowledges that, in the Lease, Theatre Landlord makes numerous covenants in favor of Theatre Tenant relating to the Center, and elements and areas thereof. Joinder Party acknowledges that Joinder Party owns the Enclosed Mall Parcels.  The Enclosed Mall Parcels constitute a majority of the land area and of the GLA of the Center, and include some or all of the Parking Retention Areas and much of the other Common Areas.  Joinder Party acknowledges that Theatre Landlord will be unable to comply with some of the covenants made in the Lease by Theatre Landlord in favor of Theatre Tenant relating to the Center without the participation and cooperation of Joinder Party.

D.    Theatre Tenant has informed Theatre Landlord and Joinder Party that Theatre Tenant would not enter into the Lease without the execution by Joinder Party of this Joinder.

AGREEMENT

1.    Covenants Relating to Center.  Joinder Party hereby covenants in favor of Theatre Landlord and Theatre Tenant to perform each of the covenants made by Theatre Landlord under the Lease with respect to the Enclosed Mall Parcels (including without limitation the Parking Retention Areas and the Common Area) where Joinder Party is specifically identified in the covenant, including by use of the phrase "Landlord hereby covenants that Enclosed Mall Owner shall . . . ." or the phrase "Landlord shall not suffer or allow Enclosed Mall Owner to . . . ." Joinder Party shall perform such covenants regardless of whether it is, or is not, then an affiliate of Theatre Landlord.

2.    Successors.  This Joinder and the covenants and conditions herein contained shall inure to the benefit of and shall be binding on Joinder Party and its successors and assigns in ownership of all or any portion of the Enclosed Mall Parcels, and to all persons claiming under or through them, and shall be enforceable by either Theatre Tenant or Theatre Landlord against them.  This Joinder shall continue for the benefit of Theatre Tenant and Theatre Landlord

1

notwithstanding (a) any extension, modification, amendment, or alteration of the Lease, (b) any assignment of the Lease or sublease of the premises demised thereby, in whole or in part, (c) any release, extension, compromise, settlement, waiver, reduction, forbearance, or modification of the liability of Theatre Tenant or Theatre Landlord or any other party liable under the Lease or any other joinder, or (d) any dissolution or liquidation of Theatre Tenant or Theatre Landlord or change in the composition, arrangement, organization, or reorganization of Theatre Tenant or Theatre Landlord including by and through bankruptcy laws or otherwise.  No other agreements or releases between Theatre Landlord and Theatre Tenant or between Theatre Tenant and any other party liable under the Lease or any other joinder (with or without notice to or knowledge of Joinder Party) shall in any manner release, discharge, reduce, diminish, or negate the obligations of Joinder Party hereunder.  Joinder Party does hereby consent to any or all of the foregoing and acknowledges its continuing obligations with regard to any of the foregoing.  Notwithstanding anything to the contrary herein, Joinder Party shall not be bound by and shall not have liability or obligation under or in respect of any amendment, modification or supplement of the Lease after the effective date of a transfer of fee title by Joinder Party of the Enclosed Mall Parcels unless (a) the transferee is an Affiliate of Joinder Party or (b) the transferee consents in writing to such amendment, modification or supplement of the Lease.

3.    <u>Joinder Party Liability</u>.  Prior to commencing any proceeding to enforce or interpret this Agreement, Tenant shall deliver written notice to Joinder Party and Mortgagee of its claims against Joinder Party in reasonable detail.  Joinder Party hereby advises Tenant that its address for the purposes of notices is 8333 Douglas Avenue, Suite 975, Dallas, Texas  75225.  Any notice delivered by Joinder Party or Tenant to the other shall be delivered in the manner provided in Section 24.2 of the Lease.  Joinder Party may change its address for such notice only in the manner provided in Section 24.2 of the Lease.  In any proceeding for the interpretation or enforcement of this Joinder, Theatre Tenant's remedies against the Joinder Party for any alleged breach or default by the Joinder Party under the Lease (to the extent joined in by this Limited Joinder) shall be limited to specific performance, injunction and other equitable relief, and in no event shall Theatre Tenant be entitled to seek monetary damages from the Joinder Party, except that the prevailing party in any action against Enclosed Mall Owner or West Anchor Owner for specific performance, injunction or other equitable relief shall be entitled to an award of its reasonable attorneys' fees and court costs.

[signature page follows]

IN WITNESS WHEREOF, Joinder Party has executed this Joinder as of the date first written above.

JOINDER PARTY:                          CAPREF LLOYD CENTER II LLC, a Delaware
                                        limited liability company


                                        By:_____
                                        Name:_____
                                        Its:_____


STATE OF TEXAS
                                    ) ss.
COUNTY OF DALLAS

I, _____, a Notary Public, in and for said County in said State, hereby certify that _____, whose name as authorized signatory of _____, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he or she, as such authorized signatory and with full authority, executed the same voluntarily for and as the act of said limited liability company.

Given under my hand and seal this _____ day of May, 2017.


                                        _____
                                        Notary Public

My Commission Expires: _____

CONSENT OF LENDER

The undersigned, herein referred to as "Lender" as holder of that certain that certain deed of trust dated as of October 26, 2015 recorded as Instrument No. 2015-137350 in the real property records, hereby consents to the foregoing.  Mortgagee hereby advises Tenant that Mortgagee's address for delivery of notices pursuant to Section 3 of the Joinder is 9 West 57th Street, New York, New York  10019.  Any notice delivered by Mortgage or Tenant to the other shall be delivered in the manner provided in Section 24.2 of the Lease.  Mortgagee may change its address for such notice only in the manner provided in Section 24.2 of the Lease.

LENDER:                                     KREF Lending I LLC, a Delaware limited liability
                                            company


                                            By:_____
                                            Name:_____
                                            Its:_____

[NOTE:  ALL SIGNATURES MUST BE PROPERLY NOTARIZED; INSERT NOTARY
BLOCK BELOW]

Exhibit L

See attached

## LIMITED JOINDER OF CAPREF LLOYD CENTER ANCHOR

### (Relating to Covenants Pertaining to Portions of Center Owned by Joinder Party)

This LIMITED JOINDER (this "Joinder") is made and entered into as of May ___, 2017 by CAPREF LLOYD CENTER ANCHOR LLC, a Delaware limited liability company, (herein called "Joinder Party"), in favor of CAPREF Lloyd Center East LLC, a Delaware limited liability company, as landlord ("Theatre Landlord"), and Eastgate Theatre, Inc., an Oregon corporation (herein called "Theatre Tenant").

## RECITALS

A.      Reference is hereby made to that certain Lease dated on or about the date hereof (the "Lease") between Theatre Landlord, as landlord, and Theatre Tenant, as tenant, to which this Joinder is attached.  All initially capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

B.      Joinder Party acknowledges that Theatre Landlord and Joinder Party are under common ownership, as described more particularly in the Lease.

C.      Joinder Party acknowledges that, in the Lease, Theatre Landlord makes numerous covenants in favor of Theatre Tenant relating to the Center, and elements and areas thereof. Joinder Party acknowledges that Joinder Party owns the West Anchor Parcel.  The West Anchor Parcel constitutes a portion of the Center.  Joinder Party acknowledges that Theatre Landlord will be unable to comply with some of the covenants made in the Lease by Theatre Landlord in favor of Theatre Tenant relating to the Center without the participation and cooperation of Joinder Party.

D.      Theatre Tenant has informed Theatre Landlord and Joinder Party that Theatre Tenant would not enter into the Lease without the execution by Joinder Party of this Joinder.

## AGREEMENT

1.      <u>Covenants Relating to Center</u>.  Joinder Party hereby covenants in favor of Theatre Landlord and Theatre Tenant to perform each of the covenants made by Theatre Landlord under the Lease with respect to the West Anchor Parcel where Joinder Party is specifically identified in the covenant, including by use of the phrase "Landlord hereby covenants that West Anchor Owner shall . . . ." or the phrase "Landlord shall not suffer or allow West Anchor Owner to. . . ." Joinder Party shall perform such covenants regardless of whether it is, or is not, then an affiliate of Theatre Landlord.

2.      <u>Successors</u>.  This Joinder and the covenants and conditions herein contained shall inure to the benefit of and shall be binding on Joinder Party and its successors and assigns in ownership of all or any portion of the West Anchor Parcel, and to all persons claiming under or through them, and shall be enforceable by either Theatre Tenant or Theatre Landlord against them.  This Joinder shall continue for the benefit of Theatre Tenant and Theatre Landlord notwithstanding (a) any extension, modification, amendment, or alteration of the Lease, (b) any assignment of the Lease or sublease of the premises demised thereby, in whole or in part, (c) any

1

release, extension, compromise, settlement, waiver, reduction, forbearance, or modification of the liability of Theatre Landlord or any other party liable under the Lease or any other joinder, or (d) any dissolution or liquidation of Theatre Tenant or Theatre Landlord or change in the composition, arrangement, organization, or reorganization of Theatre Tenant or Theatre Landlord including by and through bankruptcy laws or otherwise.  No other agreements or releases between Theatre Landlord and Theatre Tenant or between Theatre Tenant and any other party liable under the Lease or any other joinder (with or without notice to or knowledge of Joinder Party) shall in any manner release, discharge, reduce, diminish, or negate the obligations of Joinder Party hereunder.  Joinder Party hereby consent to any or all of the foregoing and acknowledges its continuing obligations with regard to any of the foregoing.

      3.    <u>Joinder Party Liability</u>.  Prior to commencing any proceeding to enforce or interpret this Agreement, Tenant shall deliver written notice to Joinder Party and Mortgagee of its claims against Joinder Party in reasonable detail.  Joinder Party hereby advises Tenant that its address for the purposes of notices is 8333 Douglas Avenue, Suite 975, Dallas, Texas  75225.  Any notice delivered by Joinder Party or Tenant to the other shall be delivered in the manner provided in Section 24.2 of the Lease.  Joinder Party may change its address for such notice only in the manner provided in Section 24.2 of the Lease.  In any proceeding for the interpretation or enforcement of this Joinder, Theatre Tenant's remedies against the Joinder Party for any alleged breach or default by the Joinder Party under the Lease (to the extent joined in by this Limited Joinder) shall be limited to specific performance, injunction and other equitable relief, and in no event shall Theatre Tenant be entitled to seek monetary damages from the Joinder Party, except that the prevailing party in any action against Enclosed Mall Owner or West Anchor Owner for specific performance, injunction or other equitable relief shall be entitled to an award of its reasonable attorneys' fees and court costs.

IN WITNESS WHEREOF, Joinder Party has executed this Joinder as of the date first written above.

JOINDER PARTY:              CAPREF LLOYD CENTER ANCHOR LLC, a
Delaware limited liability company

By:_____
Name:
Its:

STATE OF TEXAS
                   ) ss.
COUNTY OF DALLAS

I, _____, a Notary Public, in and for said County in said State, hereby certify that _____, whose name as authorized signatory of _____, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he or she, as such authorized signatory and with full authority, executed the same voluntarily for and as the act of said limited liability company.

Given under my hand and seal this \_\_\_\_\_ day of May, 2017.

_____
Notary Public

My Commission Expires: _____

## CONSENT OF LENDER

The undersigned, herein referred to as "Lender" as holder of that certain deed of trust dated as of October 26, 2015 recorded as Instrument No. 2015-137350 in the real property records, hereby consents to the foregoing.  Mortgagee hereby advises Tenant that Mortgagee's address for delivery of notices pursuant to Section 3 of the Joinder is 9 West 57th Street, New York, New York  10019.  Any notice delivered by Mortgage or Tenant to the other shall be delivered in the manner provided in Section 24.2 of the Lease.  Mortgagee may change its address for such notice only in the manner provided in Section 24.2 of the Lease.

LENDER:                                      KREF Lending I LLC, a Delaware limited liability
                                             company


                                             By:_____
                                             Name:
                                             Its:

[NOTE:  ALL SIGNATURES MUST BE PROPERLY NOTARIZED; INSERT NOTARY
BLOCK BELOW]

EXHIBIT M
LETTER OF CREDIT

[DATE]

CLEAN, UNCONDITIONAL AND IRREVOCABLE STANDBY LETTER OF CREDIT NO.

Applicant:

CAPREF LLOYD CENTER EAST LLC,
a Delaware limited liability company
8333 Douglas Avenue, Suite 975
Dallas, Texas  75225

Beneficiary:

EASTGATE THEATRE, INC., an Oregon corporation, and its transferees
7132 Regal Lane
Knoxville, Tennessee 37918

The undersigned (together with its successors and assigns, "Issuer") hereby opens and establishes a clean, unconditional and irrevocable standby letter of credit (this "Letter of Credit") in favor of Beneficiary for an amount not to exceed US$8,000,000, effective immediately and expiring at 5:00 pm Eastern Time on the date which is 30 calendar days after the fourth anniversary of the date hereof (the "Expiration Date").

This Letter of Credit may be drawn upon by Beneficiary, and funds hereunder are available to the Beneficiary, upon presentation of the following documents:

      1.      A certificate, signed by any representative of Beneficiary, in the form of Schedule A attached hereto (the "Certificate").

      2.      A sight draft, drawn on Issuer, in the form attached as Schedule B attached hereto (the "Sight Draft").

Upon such presentation, Issuer will comply with the instructions in the Sight Draft.  Issuer will accept the Certificate as conclusive, binding and accurate in all respects without investigation, and without regard to any contrary contention by Applicant or any other person.  Issuer will accept the signature of any signatory on the Certificate and the Sight Draft as duly authorized, executed and delivered without investigation and without regard to any contrary contention by Applicant or any other person.  Beneficiary shall not have any obligation or liability for payment to Issuer of any fee or other cost associated with any presentation or draw under this Letter of Credit.  Beneficiary may elect, in its sole discretion, to make one or more multiple and partial drawings under this Letter of Credit, up to the aggregate amount of this Letter of Credit.

1

Notwithstanding the foregoing, Beneficiary shall not be entitled to draw an amount in excess of $2,000,000.00 in the aggregate in any 365-day period.

Issuer's obligations under this Letter of Credit shall not be affected by any circumstance, claim, offset or defense, actual or purported, of Applicant or any other person as to the existence, validity or enforceability of any agreement between or among Beneficiary and any Applicant, or any affiliate of either.  The obligations of Issuer under this Letter of Credit are and shall be primary, and not that of a guarantor or surety.

Beneficiary may make presentation hereunder (A) at any one of Issuer's offices or retail branches located in [address or other identification of locations; MUST INCLUDE AT LEAST ONE LOCATION WHOSE STREET ADDRESS IS IN A MAJOR METROPOLITAN CITY IN THE UNITED STATES, SUCH AS NEW YORK CITY OR DALLAS]; (B) by facsimile transmission to [fax number; MUST INCLUDE AT LEAST ONE FUNCTIONING FACSIMILE NUMBER IN THE UNITED STATES], or such other facsimile number identified by Issuer in a written notice to Beneficiary making specific reference to this Letter of Credit by number.  If presented by facsimile, Beneficiary shall provide telephonic notice thereof to Issuer to [phone number; MUST INCLUDE AT LEAST ONE FUNCTIONING PHONE NUMBER IN THE UNITED STATES] prior to or concurrently with the facsimile transmission, provided that Issuer's receipt of such telephonic notice shall not be a condition to payment hereunder.

Beneficiary may assign this Letter of Credit to any person at any time, and from time to time.  This Letter of Credit may be assigned successively.  Any assignment may be effected by execution and delivery by Beneficiary of a transfer in the form of Schedule C attached hereto.  Upon any such assignment, the assignee shall become the Beneficiary hereunder.  Neither Beneficiary nor any such assignee shall have any obligation or liability for payment to Issuer of any fee or other cost associated with any such assignment.

This Letter of Credit contains the entire agreement between Issuer and Beneficiary with respect to the subject matter hereof.  This Letter of Credit is not and shall not be modified, amended, amplified or limited by reference to any document, instrument or agreement referred to herein, or by any document, instrument, or agreement in which this Letter of Credit is referred to, or to which this Letter of Credit relates, and any such reference shall not be deemed to incorporate herein by reference any such document, instrument or agreement.  Any prior agreements, promises, negotiations, or representations other than those referenced herein are superseded by this Letter of Credit, and shall be of no further force or effect.  This Letter of Credit may not be amended, modified or waived except in a writing signed by both Issuer and Beneficiary.

Except as otherwise expressly provided herein, this Letter of Credit is subject to the International Standby Practices, ISPA98, International Chamber of Commerce Publication No. 590, and to the extent not inconsistent therewith, the laws of the District of Columbia, including without limitation, the Uniform Commercial Code in effect therein.

SINCERELY,

[BANK]

2

_____
AUTHORIZED SIGNATURE
[NAME]
[TITLE]

SCHEDULE A

TO LETTER OF CREDIT

CERTIFICATE

[DATE]

Reference is hereby made to that certain Clean, Unconditional and Irrevocable Standby Letter of Credit No. ___ dated as of ___ (the "Letter of Credit") issued to EASTGATE THEATRE, INC., an Oregon corporation, and its transferees ("Beneficiary").  The undersigned hereby certifies that that the amount of the draft accompanying this statement is not greater than the amount which Beneficiary is entitled to draw under the Letter of Credit.

[BENEFICIARY NAME]


By:  _____
Name:  _____
Its:  _____

SCHEDULE B

TO LETTER OF CREDIT

SIGHT DRAFT

[DATE]

[ISSUER NAME]

[ISSUER ADDRESS]

Reference is hereby made to that certain Clean, Unconditional and Irrevocable Standby Letter of Credit Number ___ dated as of ___ (the "Letter of Credit") issued to EASTGATE THEATRE, INC., an Oregon corporation, and its transferees ("Beneficiary").

You are instructed to pay to Beneficiary, upon receipt hereof, an amount equal to US$___ by wire transfer of immediately available federal funds to the following account:

Bank Name: _____

ABA Routing Number: _____

Account Name: _____

Account Number: _____

[BENEFICIARY NAME]

By: _____

Name: _____

Its: _____

SCHEDULE C

TO LETTER OF CREDIT

TRANSFER

[DATE]

[ISSUER NAME]

[ISSUER ADDRESS]

Re:    Clean, Unconditional and Irrevocable Standby Letter of Credit Number ___ dated as of
       ___

The undersigned Beneficiary hereby irrevocably assigns the Letter of Credit referenced above to
the following assignee:

[ASSIGNEE NAME]

[ASSIGNEE ADDRESS]

By this assignment, all the rights of the undersigned Beneficiary in such Letter of Credit
are assigned to the assignee, who shall have the sole rights as Beneficiary thereunder, including
sole rights relating to the approval of any amendments, whether increases or extensions or other
amendments, and whether now existing or hereafter made.  All amendments and notices are to be
advised directly to the assignee.

The original of the Letter of Credit is returned herewith, and the undersigned instructs
you to deliver it to the assignee together with your customary letter of transfer.

[BENEFICIARY NAME]


By:     _____
Name:   _____
Its:     _____

6

## Exhibit 2

**Settlement Agreement**

## SETTLEMENT AGREEMENT AND RELEASE

THIS SETTLEMENT AGREEMENT AND RELEASE ("Agreement") is made and entered into this 1st day of November, 2017 (the "Effective Date") by and among Eastgate Theater, Inc. ("Eastgate"), Portland Lloyd Center Community, LLC ("PLCC"), and CAPREF Lloyd Center LLC ("CAPREF"). Eastgate, PLCC and CAPREF are each also referred to herein individually as a "Party" and in combination or collectively as the "Parties," as the context may so require.

## RECITALS

A. By written lease agreement dated August 26, 1985 (the "Original Lease"), Lloyd Corporation, Ltd., (the "Original Landlord") granted to Eastgate (as Tenant) a ground leasehold estate in and to 66,402 square feet of real property (the "Premises") located on a portion of a "superblock" created by the vacation of various publicly dedicated streets and lying south of NE Multnomah Street, north of NE Holladay Street, and in between NE 13th Street and NE 16th Street in Portland (the "Superblock").

B. Eastgate and the Original Landlord executed an Amendment to Lease dated October 22, 1986 ("Lease Amendment") relating to parking outside of the Premises. The Original Lease and Lease Amendment are collectively referred to as the "Lease," unless specifically stated otherwise herein.

C. On or about June 11, 2013, CAPREF purchased the Superblock and became Eastgate's landlord under the Lease.

D. On October 8, 2014, CAPREF entered into a Purchase and Sale Agreement with PLCC for the Superblock, including the Premises.

E. A dispute arose among the Parties regarding Eastgate's right to parking in portions of the Superblock outside of the Premises and PLCC's ability to develop those portions of the Superblock outside of the Premises.

F. On or about November 13, 2015, Eastgate filed a lawsuit in Multnomah County Circuit Court (the "Court"), case no. 15CV30727 (the "Lawsuit") against PLCC and CAPREF, seeking a declaratory judgment and injunction related to its claimed parking rights under the Lease relative to those portions of the Superblock outside of the Premises. An amended complaint was filed in the Lawsuit on December 18, 2015.

G. During the pendency of the Lawsuit, Eastgate and affiliates of CAPREF engaged in settlement discussions and negotiations for a new theater lease between Eastgate and CAPREF Lloyd Center East LLC, (the owner of the east anchor parcel of Lloyd Center Mall). Eastgate and such CAPREF affiliate have reached agreement on the new lease within premises located in and adjacent to that east anchor parcel (the "New Lease"), with construction of the theater on land adjacent to the east anchor parcel being performed pursuant to the terms of a Construction, Encroachment, Use, and Occupancy Easement Agreement by and between two CAPREF affiliates,

Page 1 - SETTLEMENT AGREEMENT AND RELEASE

namely, CAPREF Lloyd II LLC, as grantor, and CAPREF Lloyd Center East LLC, as grantee (the "Encroachment Agreement").

H.      Additionally, in connection with the settlement of the Lawsuit, the CAPREF and Eastgate have negotiated and agreed to the terms of a Second Amendment to the Lease ("Second Amendment").

I.      Additionally, also in connection with the settlement of the Lawsuit, Eastgate and certain affiliates of CAPREF have reached agreement on the terms of a Supplemental Agreement (the "Supplemental Agreement").

J.      Additionally, also in connection with the settlement of the Lawsuit, Eastgate, CAPREF, and PLCC have reached agreement on the terms of a Construction Covenants Agreement (the "Construction Agreement").

K.      The New Lease, the Encroachment Agreement, the Supplemental Agreement, the Second Amendment, and the Construction Agreement require that the Parties who are signatories thereof, and/or their affiliates or other interested parties, execute and deliver additional documents, including but not limited to joinders, consents, and memoranda for recording (the "Additional Documents") pursuant to the terms of the New Lease, the Supplemental Agreement, the Second Amendment and the Encroachment Agreement as a condition precedent to effectiveness and enforceability of the New Lease, the Supplemental Agreement, the Second Amendment and the Encroachment Agreement.

L.      Based on the foregoing and in order to avoid the cost, expense, delay, and uncertainty of continued litigation, on May 1, 2017, Eastgate, PLCC, and CAPREF notified the Court, which was then prepared to conduct a trial of the Lawsuit, that the Parties had fully and finally settled in principle all issues relating to all disputes and claims between and/or among them as of the that date, whether asserted in the Lawsuit or otherwise, if and to the extent arising out of or relating to the Lease and/or Eastgate's right under the Lease to park within portions of the Superblock located outside of the Premises.

NOW, THEREFORE, in consideration of the mutual terms, conditions, promises, and covenants set forth below, it is agreed as follows:

## TERMS OF SETTLEMENT

1.      <u>No Admission of Liability</u>. This Agreement is entered into in compromise of disputed claims.  All Parties acknowledge and agree that this Agreement is not intended to and shall not be construed in any way as an admission by any other Party of any wrongdoing or liability whatsoever. The Parties intend by their actions pursuant to this Agreement merely to avoid the expense, delay, and burden of further litigation and nothing contained herein shall be deemed to be an admission of liability of any kind as against any Party or in favor of any Party, all such liability being expressly denied.

2.    <u>Lease Amendment, Supplemental Agreement, New Lease, Encroachment Agreement, and Construction Agreement</u>.

     a.    The Parties, as appropriate to each document, will execute and deliver the New Lease, the Encroachment Agreement, the Supplemental Agreement, the Second Amendment, and the Construction Agreement, inclusive of the Additional Documents attached thereto and made a part thereof, on the terms previously mutually agreed pursuant to the process set forth in Section 2(c) below. If any of the agreements and the Additional Documents are not executed and delivered prior to the deadline set forth in Section 2(c) below, then the Parties covenant and agree that each shall be obligated to use best efforts to obtain the signatures of its affiliates and its lenders. To the extent that any Party cannot in good faith obtain all signatures required by any of the agreements and the Additional Documents, then any Party may seek relief from judgment of dismissal pursuant to ORCP 71 to reinstate the Lawsuit for trial at the earliest date available to the Court, and the Parties to this Agreement agree not to contest or object to such motion and the Parties to this Agreement agree not to contest or object to such motion, as long as such motion is not made in bad faith and the opposing party has a good faith basis to file such an opposition.

     b.    The New Lease, Encroachment Agreement, Supplemental Agreement, Second Amendment, Construction Agreement, and the Additional Documents will be executed (acknowledged, as appropriate), and delivered concurrently with this Agreement (collectively, the "Settlement Documents").

     c.    On or before 9:00 am Pacific Standard Time on November 2, 2017, the three attorneys of record for the Parties (or their chosen designees from their respective law firms) shall meet and confer in the office of Eastgate's counsel to confirm the due and proper execution of all Settlement Documents by all required signatories thereto, shall so advise their respective clients, and upon such confirmation and advisement the Parties shall direct their respective legal counsel to exchange fully executed original counterparts of all documents (the "Settlement Closing").

     d.    CAPREF shall record the Encroachment Agreement and thereafter Eastgate shall record the memoranda of the New Lease and Second Amendment, all in the real property records of Multnomah County.

3.    <u>Dismissal with Prejudice of Lawsuit</u>. The Parties have approved, and concurrently with the execution of this Agreement, the Parties (a) will execute and deliver to each other Party to each such agreement originals of the New Lease, the Supplemental Agreement, the Second Amendment, the Construction Agreement, the Encroachment Agreement, the Additional Documents, and all other documents requiring lender approval, and (b) will deliver to each other Party to each such agreement originals of those that are to be recorded in recordable form. In reliance thereon, the Parties shall promptly file a Stipulated Notice of Dismissal and a General Judgment of Dismissal dismissing the Lawsuit with prejudice and without attorneys' fees or costs to any Party.

4.    <u>Releases.</u>

     (a)    <u>Release of CAPREF</u>. With the exception of the obligations under the Settlement Documents, the terms, conditions, and provisions of which shall be binding on and enforceable against the respective parties thereto, but subject to the occurrence of the Settlement Closing,

Eastgate and its principals, members, partners, investors, officers, directors, employees, agents, subsidiaries, affiliates, successors, assigns, and representatives of all kinds, and all other affiliated persons, firms, or corporations, hereby fully and forever release and discharge CAPREF and its principals, members, partners, investors, officers, directors, employees, agents, subsidiaries, affiliates, successors, assigns, and representatives of all kinds, of and from any and all past and present claims, demands, obligations, injuries, damages, or causes of action of any kind, whether known and unknown, in law or equity, whether fixed or contingent, the basis for which now exists or may hereafter become manifest that are directly or indirectly related to the facts which gave rise to the dispute or which relate in any way to the claims asserted against each Party or which could have been asserted arising out of the facts related to the Lawsuit, the Lease and/or Eastgate's claim of parking rights in portions of the Superblock located outside of the Premises.

(b)   <u>Release of PLCC</u>.  With the exception of the obligations under the Settlement Documents, the terms, conditions, and provisions of which shall be binding on and enforceable against the respective parties thereto, but subject to the occurrence of the Settlement Closing, Eastgate and its principals, members, partners, investors, officers, directors, employees, agents, subsidiaries, affiliates, successors, assigns, and representatives of all kinds, and all other affiliated persons, firms, or corporations, hereby fully and forever release and discharge PLCC and its principals, members, partners, investors, officers, directors, employees, agents, subsidiaries, affiliates, successors, assigns, and representatives of all kinds, of and from any and all past and present claims, demands, obligations, injuries, damages, or causes of action of any kind, whether known and unknown, in law or equity, whether fixed or contingent, the basis for which now exists or may hereafter become manifest that are directly or indirectly related to the facts which gave rise to the dispute or which relate in any way to the claims asserted against each Party or which could have been asserted arising out of the facts related to the Lawsuit, the Lease and/or Eastgate's claim of parking rights in portion of the Superblock located outside of the Premises.

(c)   <u>Release of Eastgate</u>.  With the exception of the obligations under the Settlement Documents, the terms, conditions, and provisions of which shall be binding on and enforceable against the respective parties thereto, but subject to the occurrence of the Settlement Closing, both CAPREF and PLCC and their respective principals, members, partners, investors, officers, directors, employees, agents, subsidiaries, affiliates, successors, assigns, and representatives of all kinds, and all other affiliated persons, firms, or corporations, hereby fully and forever release and discharge Eastgate and its principals, members, partners, investors, officers, directors, employees, agents, subsidiaries, affiliates, successors, assigns, and representatives of all kinds, of and from any and all past and present claims, demands, obligations, injuries, damages, or causes of action of any kind, whether known and unknown, in law or equity, whether fixed or contingent, the basis for which now exists or may hereafter become manifest that are directly or indirectly related to the facts which gave rise to the dispute or which relate in any way to the claims asserted against each Party or which could have been asserted arising out of the facts related to the Lawsuit, the Lease and/or Eastgate's claim of parking rights in portion of the Superblock located outside of the Premises.

5.   <u>Full and Independent Knowledge</u>.  The Parties represent and agree that they each have had the opportunity to discuss all aspects of this Agreement with their respective attorneys, that they have carefully read and fully understand all of the provisions of this Agreement, and that they are voluntarily entering into this Agreement.

6.      No Attorneys' Fees or Costs. The Parties acknowledge and agree that they shall each be liable for their own costs and attorneys' fees relating to the Lawsuit and for the preparation and performance of this Agreement.

7.      Ownership of Claims. The Parties represent that they have not assigned or transferred, or purported to assign or transfer, to any person or entity, any claim or any portion thereof, or interest therein, that is or may be subject to any of the releases in paragraph 4 above. Each Party agrees to indemnify, defend, and hold harmless the other Parties against any and all claims based on, arising out of or in connection with any such transfer or assignment, or purported transfer or assignment, of any such claims or any portion thereof or interest therein.

8.      Miscellaneous.

a.      No Third Party Beneficiaries.  The Parties do not intend to confer any right or remedy on any third party except as specifically set forth herein.

b.      No Agency Relationship.  This Agreement does not create an agency relationship between the Parties and does not establish a joint venture or partnership between the Parties.  No Party has the authority to bind other Parties or represent to any person that the Party is an agent of the other Parties.

c.      No Reliance. The Parties execute this Agreement without reliance upon any statement or representation by the other party or their representatives, other than those set forth in this Agreement.  The Parties understand that the facts with respect to which this Agreement is entered into may be different from the facts known or believed by them to be true.  The Parties respectively accept and assume the risk of the facts being different than agreed.  The Parties agree that this Agreement shall be and remain in all respects effective and not subject to termination, rescission, or reformation by virtue of any such difference in facts.

d.      Unknown Claims.  The parties acknowledge that there is a risk that subsequent to the execution of this Agreement they may discover facts, or suffer or incur claims, which are unknown or are unanticipated at the time this Agreement is executed, which, if known prior to the execution of this Agreement may have materially affected their respective decisions to execute this Agreement and give the releases contained in it.  Despite this knowledge and understanding, each of the Parties agrees that it is assuming the risk of such unknown and unanticipated facts and claims, and in connection therewith, each Party is expressly, voluntarily and knowingly waiving any and all rights under common law and statute related to such unknown facts, damages, and claims.  Notwithstanding the foregoing, nothing in this section shall constitute a release or waiver of such claims, unless such claims are otherwise subject to the releases in Paragraph 4 hereof.

e.      Representation and Understanding.  The Parties affirm and acknowledge that they have read and fully appreciate and understand the words, terms, conditions, and provisions of this Agreement, are fully and entirely satisfied with the same, and have executed this Settlement Agreement voluntarily and of their own free will and act.

f.    <u>Governing Law and Venue</u>.  The rights and obligations of the Parties and the interpretation and performance of this Agreement shall be governed by the law of Oregon without giving effect to any conflict-of-law principle that would result in the laws of any other jurisdiction governing this Agreement.  Any action or proceeding arising out of this Agreement will be litigated in courts located in Multnomah County, Oregon.

g.    <u>Construction</u>.  The language in all parts of this Agreement shall in all cases be construed simply, according to its fair meaning, and not strictly for or against any of the Parties hereto.  Without limitation, there shall be no presumption against any Party on the ground that such Party was responsible for drafting this Agreement or any part thereof.

h.    <u>Advice of Counsel</u>.  Each of the Parties affirms that it has obtained advice of legal counsel prior to and for the execution of this Agreement, or has knowingly waived their right to do so, and each Party understands fully the contents hereof.

i.    <u>Entire Agreement</u>.  This Agreement contains the entire understanding of the Parties regarding the subject matter of this Agreement and supersedes all prior and contemporaneous negotiations and agreements, whether written or oral, between the Parties with respect to the subject matter of this Agreement.

j.    <u>Modification</u>.  This Agreement may not be amended or modified except in writing signed by all Parties.

k.    <u>Time of Essence</u>.  Time is of the essence with respect to all dates and time periods in this Agreement.

l.    <u>Waiver</u>.  No waiver will be binding on a Party unless it is in writing and signed by the Party making the waiver.  A Party's waiver of a breach of a provision of this Agreement will not be a waiver of any other provision or a waiver of a subsequent breach of the same provision.

m.    <u>Section Headings</u>.  The headings and titles of this Agreement are for convenience purposes only and are not intended to define, limit or construe the contents of this Agreement.

n.    <u>Saving Clause</u>.  If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid or unenforceable under applicable law, the remainder of this Agreement, or the application of any provision thereof to other persons or circumstances, shall not be affected thereby.

o.    <u>Further Assurances</u>.  The Parties agree to execute and deliver any further documents, instruments, and other agreements as are necessary or convenient to carry out the terms and purposes of this Agreement.

p.    <u>Signatures</u>.  This Agreement may be signed in counterparts.  An electronic transmission of a signature page will be considered an original signature page.

q.    <u>Authority</u>.  The Parties have full power and authority to sign and deliver this Agreement and to perform all of their respective obligations under this Agreement.

**PLEASE READ CAREFULLY.  THIS AGREEMENT INCLUDES A RELEASE OF CERTAIN KNOWN OR UNKNOWN CLAIMS**.

[Here ends this page.]

Page 7 - SETTLEMENT AGREEMENT AND RELEASE

IN WITNESS WHEREOF, each of the Parties has executed this Agreement as of the date set forth below such Party's signature.

**EASTGATE THEATER INC.**                    **CAPREF LLOYD CENTER LLC**

By: _____              By: _____
Name: _Todd S. Burruff_____                Name: _____
Its: _Vice President_____                Its: _____

Date: _____              Date: _____


Reviewed and approved as to form:          Reviewed and approved as to form:

_____              _____
Joel A. Parker, OSB #001633                Bruce H. Cahn, OSB #935450
Attorney for Eastgate Theaters, Inc.       Attorney for CAPREF Lloyd Center LLC


**PORTLAND LLOYD CENTER COMMUNITY, LLC**

By: _____
Name: _____
Its: _____

Date: _____


Reviewed and approved as to form:

_____
Kerry J. Shepherd, OSB #944343
Attorney for Portland Lloyd Center Community, LLC

IN WITNESS WHEREOF, each of the Parties has executed this Agreement as of the date set forth below such Party's signature.

**EASTGATE THEATER INC.**

By: _____
Name: _____
Its: _____

Date: _____

**CAPREF LLOYD CENTER LLC**

By: _____
Name: *Todd Minnis*
Its: *President*

Date: _____

Reviewed and approved as to form:

_____
Joel A. Parker, OSB #001633
Attorney for Eastgate Theaters, Inc.

Reviewed and approved as to form:

_____
Bruce H. Cahn, OSB #935450
Attorney for CAPREF Lloyd Center LLC

**PORTLAND LLOYD CENTER COMMUNITY, LLC**

By: _____
Name: _____
Its: _____

Date: _____

Reviewed and approved as to form:

_____
Kerry J. Shepherd, OSB #944343
Attorney for Portland Lloyd Center Community, LLC

IN WITNESS WHEREOF, each of the Parties has executed this Agreement as of the date set forth below such Party's signature.

**EASTGATE THEATER INC.**                    **CAPREF LLOYD CENTER LLC**

By: _____            By: _____
Name: _____            Name: _____
Its: _____            Its: _____

Date: _____                      Date: _____

Reviewed and approved as to form:            Reviewed and approved as to form:

_____            _____
Joel A. Parker, OSB #001633                  Bruce H. Cahn, OSB #935450
Attorney for Eastgate Theaters, Inc.         Attorney for CAPREF Lloyd Center LLC

**PORTLAND LLOYD CENTER COMMUNITY, LLC**

By: _____
Name: ____DAN S. PALMER JR.____
Its: ____AUTHORIZED REPRESENTATIVE____

Date: ____11/1/17____

Reviewed and approved as to form:

_____
Kerry J. Shepherd, OSB #944343
Attorney for Portland Lloyd Center Community, LLC

**<u>Exhibit 3</u>**

**Memorandum of Lease**

| Multnomah County Official Records<br>M Vaughn, Deputy Clerk | **2017-133200** |
|---|---|
| 11/02/2017 12:52:34 PM | |
| 1R-NTAFFRLP  Pgs=10 Stn=106 MAYBERV<br>$50.00 $11.00 $6.00 $20.00 | **$87.00** |

**Chicago Title Insurance Co.**

**AFTER RECORDING RETURN TO:**
Eastgate Theatre, Inc.
7132 Regal Lane
Knoxville, Tennessee 37918
Attn: Real Estate Department

THIS SPACE RESERVED FOR USE BY
THE COUNTY RECORDING OFFICE

**SEND TAX STATEMENTS TO:**
No change

47XS17006315

**TITLE(S) OF THE TRANSACTION(S) ORS 205.234(a)**
Memorandum of Lease

_____

**DIRECT PARTY(S)** -- (i.e., DEEDS: Seller/Grantor; MORTGAGES: Borrower/Grantor; LIENS; Creditor/Plaintiff)
ORS 205.125(1) (b) and 205.160
CAPREF LLOYD CENTER EAST LLC, a Delaware limited liability company

_____
_____
_____

**INDIRECT PARTY(S)** -- (i.e., DEEDS: Buyer/Grantee; MORTGAGES: Beneficiary/Lender; LIENS: Debtor/Defendant)
ORS 205.125(1) (a) and 205.160
EASTGATE THEATRE, INC., an Oregon corporation

_____
_____
_____

**TRUE AND ACTUAL CONSIDERATION–** (Amount in dollars or other) ORS 93.030(5)
$ n/a

**JUDGMENT AMOUNT–** (obligation imposed by the order or warrant) ORS 205.125(1) (c)
$ n/a

If this instrument is being Re-Recorded, complete the following statement, in accordance with
ORS 205.244:
"RERECORDED AT THE REQUEST OF _____
TO CORRECT _____
_____

PREVIOUSLY RECORDED IN BOOK/PAGE/FEE NUMBER _____

Chicago Title Insurance Co.

47251700431S

**AFTER RECORDING RETURN TO:**
Eastgate Theatre, Inc.
7132 Regal Lane
Knoxville, Tennessee 37918
Attn: Real Estate Department

**SEND TAX STATEMENTS TO:**
No change

THIS SPACE RESERVED FOR USE BY
THE COUNTY RECORDING OFFICE

**TITLE(S) OF THE TRANSACTION(S) ORS 205.234(a)**
Memorandum of Lease

_____

_____

**DIRECT PARTY(S)** -- (i.e., DEEDS: Seller/Grantor; MORTGAGES: Borrower/Grantor; LIENS; Creditor/Plaintiff)
ORS 205.125(1) (b) and 205.160
CAPREF LLOYD CENTER EAST LLC, a Delaware limited liability company

_____

_____

_____

**INDIRECT PARTY(S)** -- (i.e., DEEDS: Buyer/Grantee; MORTGAGES: Beneficiary/Lender; LIENS: Debtor/Defendant)
ORS 205.125(1) (a) and 205.160
EASTGATE THEATRE, INC., an Oregon corporation

_____

_____

_____

**TRUE AND ACTUAL CONSIDERATION–** (Amount in dollars or other) ORS 93.030(5)
$ n/a _____

**JUDGMENT AMOUNT–** (obligation imposed by the order or warrant) ORS 205.125(1) (c)
$ n/a _____

**If this instrument is being Re-Recorded, complete the following statement, in accordance with
ORS 205.244:**
"RERECORDED AT THE REQUEST OF _____
TO CORRECT _____

_____

**PREVIOUSLY RECORDED IN BOOK/PAGE/FEE NUMBER** _____

_____

MEMORANDUM OF LEASE

(Lloyd Center Stadium 14, Portland, Oregon)

This Memorandum of Lease is made and entered into as of May ___November___, 2017 (the "Effective Date") between CAPREF LLOYD CENTER EAST LLC, a Delaware limited liability company , with an address of 8333 Douglas Avenue, Suite 975, Dallas, Texas  75225 (the "Landlord"), and EASTGATE THEATRE, INC., an Oregon corporation, with an address of 7132 Regal Lane, Knoxville, Tennessee 37918 (the "Tenant").

RECITALS

A.      Pursuant to that certain Lease dated as of the date hereof (the "Lease") between Landlord and Tenant, Landlord has leased to Tenant certain premises (the "Theatre") located within a retail center sometimes referred to as  Lloyd Center and more specifically described in the Lease (the "Center") having a street address at 2201 Lloyd Center, Portland, Oregon  97232 in Portland, Oregon.

B.      The Center is legally described on Exhibit A attached hereto.

C.      Landlord represents that as of the Effective Date it owns fee simple title to a portion of the real property on which the Theatre is or will be located pursuant to that certain Statutory Special Warranty Deed dated as of August 23, 2016 and recorded August 24, 2016 as Instrument No. 2016-105686 in the official real property records of Multnomah County, Oregon and has the right to exclusive possession of the remainder of the real property on which the Theatre and related improvements is or will be located pursuant to that certain Construction, Encroachment, Use, and Occupancy Easement Agreement dated on or about the date hereof between CAPREF Lloyd II LLC, a Delaware limited liability company ("CAPREF Lloyd II LLC"), as grantor, and Landlord, as grantee, recorded on or about the date hereof.

AGREEMENT

NOW, THEREFORE, in consideration of the foregoing premises and mutual covenants set forth in the Lease, and for other good and valuable consideration, the mutuality, receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.      Lease of Theatre.  Subject to the terms, conditions, and provisions of the Lease, Landlord has leased to Tenant, and Tenant has leased from Landlord, the Theatre.

2.      Parking and Common Areas.  Subject to the terms, conditions, and provisions of the Lease, Tenant has the non-exclusive right to use of the common areas of the Center, including without limitation the automobile parking areas, drive lanes, entrance and exit ways.

3.      Term.  The Term of the Lease shall consist of an initial term of fifteen years, plus up to three (3) Extension Periods of five (5) Rent Years each, unless earlier terminated, as set forth more particularly in the Lease.

4.  <u>Restrictions</u>.  Landlord has agreed to impose certain restrictions on the Center. CAPREF Lloyd II, on behalf of itself and its successors and assigns ("<u>Enclosed Mall Owner</u>"), and CAPREF Lloyd Center Anchor, a Delaware limited liability company, on behalf of itself and its successors and assigns ("<u>West Anchor Owner</u>"), have joined in such agreement, all as more particularly set forth in the Lease and the limited joinders signed by them.

5.  <u>Theatre Use Covenant and Concession Use Covenant</u>.  Landlord has agreed that Tenant has an exclusive right to operate a motion picture theatre within the Center, as more particularly set forth in the Lease.  Landlord has agreed that Tenant has exclusive rights within certain portions of the center to sell and serve certain food and beverages, as more particularly set forth in the Lease.  Enclosed Mall Owner and West Anchor Owner have joined in such agreements, all as more particularly set forth in the Lease and the limited joinders signed by them.

6.  <u>Constructive Notice</u>.  This Memorandum provides constructive notice of the terms and conditions of the Lease.  This Memorandum provides a description of or excerpts from some of those terms and conditions.  In addition to the provisions described or excerpted herein, the Lease includes, among other things, (a) provisions restricting certain new construction and alterations in the Center; (b) provisions relating to the usage by Tenant of signage within the Center; (c) provisions restricting other uses in the Center, and (d) provisions creating certain non-exclusive rights of Tenant to use the Common Areas of the Center.  All of the terms and conditions of the Lease are hereby incorporated herein by reference as if set forth herein in full. Any person acquiring an interest in the Center or the Theatre shall take subject to all such terms and conditions, including those not set forth herein.  A correct and complete copy of the Lease is available from Landlord or Tenant upon request, subject to reasonable conditions including those relating to confidentiality and proprietary information.  In the event of any inconsistency between the terms and provisions of this Memorandum and the terms and provisions of the Lease, the terms and provisions of the Lease shall control.

7.  <u>Successors</u>.  The Lease and the covenants and conditions therein contained shall inure to the benefit of and shall be binding on (a) Landlord and its successors and assigns in ownership of all or any portion of the Center, and to all persons claiming under or through them, and (b) Tenant and its permitted successors and assigns with respect to the leasehold, and to all persons claiming under or through them.  Without limiting the generality of the foregoing, if any one or more parcels of the Center are, at any time after the date hereof, not owned by the person that then owns the portion of the Center on which the Theatre is located, such other person shall nonetheless be bound by the covenants, terms and conditions of this Lease to the extent relating to the parcel or parcels owned by such other person as a successor in ownership to Landlord, and so shall all persons claiming under or through such successor.  Tenant may elect to enforce covenants, terms or conditions of the Lease against such other persons, or against the person that then owns the portion of the Center on which the Theatre is located, or both, as Tenant deems appropriate in Tenant's sole and absolute discretion.  Without limiting the generality of the foregoing, no separate ownership shall affect Tenant's rights in respect to the Theatre Use Covenant, the Concession Use Covenant, the On-Going Co-Tenancy Requirement, the use of the Common Areas, the non-liability of Tenant for Property Taxes or CAM Expenses, or the effect of any casualty or condemnation, or shall otherwise excuse Landlord's performance of this Lease

in strict accordance with the terms hereof.  All terms used in this paragraph shall have the meanings ascribed to them in the Lease.

[signature page follows]

IN WITNESS WHEREOF, Landlord and Tenant have executed this Memorandum of Lease as of the date first above written.

LANDLORD:                           CAPREF LLOYD CENTER EAST LLC, a
                                    Delaware limited liability company

                                    By:_____
                                    Name: _Todd Minnis_____
                                    Its: _Authorized Signatory_____

STATE OF TEXAS
                              ) ss.
COUNTY OF DALLAS

    I, _Angela J. McCorvey_, a Notary Public, in and for said County in said State, hereby certify that _Todd Minnis_, whose name as authorized signatory of _CAPREF Lloyd Center East LLC_, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he or she, as such authorized signatory and with full authority, executed the same voluntarily for and as the act of said limited liability company.

    Given under my hand and seal this _8th_ day of May, 2017.

ANGELA J. MCCORVEY
My Notary ID # 10357678
Expires November 13, 2019

_____
Notary Public

My Commission Expires: _____

4

TENANT:

EASTGATE THEATRE, INC., an Oregon
corporation

By: _~H S. B~M_____
Name: _TODD S. BORUFF_____
Its: _Vice President_____

STATE OF TENNESSEE ⎫
⎬ ss.
COUNTY OF KNOX ⎭

    Before me, a Notary Public in and for said county and state, personally appeared _Todd S. Boruff_, personally known to me to be the ——— Vice President of _Eastgate Theatre Inc._, a _Oregon corporation_ and acknowledged that he, as an officer being authorized so to do, executed the foregoing instrument for the purposes therein contained, by signing in the name of the corporation by himself as an officer.

    IN WITNESS WHEREOF I have hereunto set my hand and official seal this the _26th_ day of _May_, 201_7_.

[SEAL]

_Melissa Carder_____
Notary Public
My commission expires: _12/4/2018_____

MELISSA CARDER
STATE OF
TENNESSEE
NOTARY
PUBLIC
KNOX COUNTY
MY COMMISSION EXPIRES 12-4-2018

5

Exhibit A-1

Legal Description of the East Anchor Parcel

See Section 1.1.8

PARCEL 1:

PARCEL 2, PARTITION PLAT 1999-146, IN THE CITY OF PORTLAND, COUNTY OF MULTNOMAH AND STATE OF OREGON, RECORDED NOVEMBER 1, 1999 AS DOCUMENT NO. 992-01508.

PARCEL 2: (EASEMENT)

EASEMENT RIGHTS AND EASEMENTS CONSTITUTING RIGHTS IN REAL PROPERTY, INCLUDING EASEMENTS FOR INGRESS, EGRESS, PARKING AND UTILITIES, FOR THE BENEFIT OF PARCEL 1, AS CREATED (AND/OR PURPORTED TO BE CREATED), DEFINED AND LIMITED BY (AND SUBJECT TO THE TERMS AND CONDITIONS OF) THAT CERTAIN CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT, DATED JULY 19, 1990, RECORDED SEPTEMBER 5, 1990 IN VOLUME 2340, PAGE 1635 AND AS FEE NO. 90082469, AS AFFECTED BY (1) PARTIAL RELEASE OF CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT RECORDED DECEMBER 23, 1993 IN VOLUME 2806, PAGE 0272 AND AS FEE NO. 93176795, (2) PARTIAL RELEASE OF CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT RECORDED APRIL 29, 1994 AS FEE NO. 94068247, (3) SECOND AMENDMENT TO CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT BY AND BETWEEN GLIMCHER LLOYD VENTURE, LLC, A DELAWARE LIMITED LIABILITY COMPANY, NORDSTROM, INC., A WASHINGTON CORPORATION AND SEARS, ROEBUCK AND CO., A NEW YORK CORPORATION, DATED MARCH 2, 1999, RECORDED JANUARY 6, 2000, AS FEE NO. 2000 001863, AND (4) THIRD AMENDMENT TO CONSTRUCTION, OPERATION AND RECIPROCAL EASEMENT AGREEMENT BY AND BETWEEN GLIMCHER LLOYD VENTURE, LLC, A DELAWARE LIMITED LIABILITY COMPANY, NORDSTROM, INC., A WASHINGTON CORPORATION AND SEARS, ROEBUCK AND CO., A NEW YORK CORPORATION, DATED MAY 15, 2013, RECORDED JUNE 11, 2013, AS FEE NO. 2013079097, ALL IN THE CLERK'S OFFICE OF MULTNOMAH COUNTY, OREGON, OVER THE FOLLOWING DESCRIBED TRACT A AND TRACT B:

PARCEL 2, TRACT A (EASEMENT):

A TRACT OF LAND SITUATED IN THE NORTHWEST ONE-QUARTER OF SECTION 35, TOWNSHIP 1 NORTH, RANGE 1 EAST OF THE WILLAMETTE MERIDIAN, IN THE CITY OF PORTLAND, COUNTY OF MULTNOMAH AND STATE OF OREGON, SAID TRACT BEING A PORTION OF BLOCKS 114 AND 115 OF HOLLADAY'S ADDITION TO EAST PORTLAND [PLAT BOOK 1, PAGE 0072], AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF SAID BLOCK 114, HOLLADAY'S ADDITION [PLAT BOOK 1, PAGE 0072],
THENCE NORTH ALONG THE WEST LINE OF SAID BLOCK 114 AND THE WEST LINE OF A TRACT DEDICATED FOR STREET PURPOSES BY DEED RECORDED IN VOLUME 1865, PAGE 0292, MULTNOMAH COUNTY DEED RECORDS, A DISTANCE OF 140.00 FEET;
THENCE EAST PARALLEL WITH THE SOUTH LINE OF SAID BLOCK 114, A DISTANCE OF 10.00 FEET TO A POINT IN THE EAST LINE OF SAID DEDICATED TRACT AND THE POINT OF BEGINNING OF THE TRACT HEREIN TO BE DESCRIBED;
THENCE NORTH ALONG THE EAST LINE OF SAID DEDICATED TRACT AND PARALLEL WITH THE WEST LINE OF SAID BLOCKS 114 AND 115, A DISTANCE OF 324.67 FEET;
THENCE EAST 15.67 FEET;
THENCE SOUTH 15.00 FEET;
THENCE EAST 17.33 FEET TO A POINT OF CURVE;
THENCE ALONG THE ARC OF A 5.17 FOOT RADIUS CURVE TO THE RIGHT THROUGH A CENTRAL ANGLE OF 90° 00' 00" AN ARC LENGTH OF 8.12 FEET, SAID CURVE IS SUBTENDED BY A CHORD WHICH BEARS SOUTH 45° 00' 00" EAST 7.31 FEET;
THENCE EAST 116.83 FEET;
THENCE SOUTH 20.42 FEET;
THENCE EAST 23.25 FEET;
THENCE SOUTH 251.08 FEET;
THENCE SOUTH 45° 00' 00" WEST 46.67 FEET;
THENCE WEST 145.25 FEET TO THE POINT OF BEGINNING.

PARCEL 2, TRACT B (EASEMENT)

PARCEL 1, PARTITION PLAT 1999-146, IN THE CITY OF PORTLAND, COUNTY OF MULTNOMAH AND STATE OF OREGON, RECORDED NOVEMBER 1, 1999 AS DOCUMENT NO. 992-01508.

PARCEL 3: (EASEMENT)

EASEMENT RIGHTS AND EASEMENTS CONSTITUTING RIGHTS IN REAL PROPERTY AS CREATED (AND/OR PURPORTED TO BE CREATED), DEFINED AND LIMITED BY (AND SUBJECT TO THE TERMS AND CONDITIONS OF) THAT CERTAIN EASEMENT AGREEMENT BY AND BETWEEN GLIMCHER LLOYD VENTURE, LLC, A DELAWARE LIMITED LIABILITY COMPANY AND SEARS, ROEBUCK AND CO., A NEW YORK CORPORATION, RECORDED JANUARY 6, 2000 AS FEE NO. 2000 001862, IN THE CLERK'S OFFICE OF MULTNOMAH COUNTY, OREGON.

Exhibit A-2

Legal Description of the Enclosed Mall Parcels

See Section 1.1.8

PARCEL I:

Parcel 1 of PARTITION PLAT 1999-146, in the City of Portland, County of Multnomah and State of Oregon.

PARCEL II:

A tract of land situated in the Northeast one-quarter of Section 35, Township 1 North, Range 1 East, of the Willamette Meridian, in the City of Portland, County of Multnomah and State of Oregon, and being a portion of Blocks 174 and 175, HOLLADAY'S ADDITION TO EAST PORTLAND, City of Portland.

EXCEPT the East 10 feet of Block 175, and the East 10 feet and the South 10 feet of Block 174, as dedicated for public right-of-way pursuant to instrument recorded on April 4, 1958, in Book 1891, Page 374, and recorded on July 23, 1951, in Book 1488, Page 216, Multnomah County Deed Records.

AND

TOGETHER WITH those portions of N.E. Clackamas Street, NE Wasco Street and N.E. 15th Avenue, inuring thereto as vacated pursuant to Ordinance No. 166704, recorded on December 23, 1993, in Book 2806, Page 281, as amended by instrument recorded on December 23, 1993, in Book 2806, Page 306 Multnomah County Deed Records, and subject to the rights of the public in and to those portions of Blocks 174 and 175 dedicated for public right-of-way pursuant to Ordinance No. 166704 and as further described in Dedication Deeds recorded on December 23, 1993, in Book 2806, Page 262, and Book 2806, Page 277, which instrument was re-recorded on July 15, 1994, in Recorder's Fee No. 94108110, and further re-recorded on August 1, 1994, as Recorder's Fee No. 94-116499. Said Parcel of land being described as follows:

Beginning at a point on the center line of N.E. 15th Avenue and being located North 00°00'00" East, a distance of 40.00 feet from the center line of N.E. Multnomah Street and N.E. 15th Avenue; and running thence North 00°00'00" East on the center line of N.E. 15th Avenue, a distance of 535.79 feet to the Westerly line of relocated N.E. 16th Avenue, the beginning of a non-tangent 293.00 foot radius curve left (radius point bears North 58°09'05" East); thence on said Westerly line, also being the Northeasterly line of Parcels 4708-1e-V1 and 4708-1d-V2 and the Southwesterly line of Parcel 4708-1d-D and the Easterly line of Parcel 4708-1d-V2, Parcel 4708-2a-V and the West line of Parcels 708-2a-D and -1c-D, the following courses: on said curve through a central angle of 29°28'01" (the long chord of which bears South 46°34'52" East, a distance of 149.03 feet), an arc distance of 150.69 feet to the beginning of a tangent 207.00 foot radius curve right; thence on said curve through a central angle of 61°18'52" (the long chord of which bears South 30°39'26" East, a distance of 211.10 feet), an arc distance of 221.52 feet to

the end thereof; thence South 00°00'00" West, a distance of 251.76 feet to a point located North 00°00'00" East, a distance of 10.00 feet and South 90°00'00" West, a distance of 14.08 feet from the Southeast corner of Block 174; thence North 90°00'00" West on the North line of property conveyed to the City of Portland for street purposes recorded on July 23, 1951, in Book 1488, Page 216, and recorded on April 4, 1958, in Book 1891, Page 374, a distance of 215.89 feet to the point of beginning.

**Exhibit 4**

**SNDA**

Chicago Title Insurance Co.

4-725/7006315

| | |
|---|---|
| Multnomah County Official Records<br>M Vaughn, Deputy Clerk | **2017-133201** |
| | 11/02/2017 12:52:34 PM |
| 1R-NTAFFRLP  Pgs=8 Stn=106 MAYBERV<br>$40.00 $11.00 $6.00 $20.00 | **$77.00** |

**AFTER RECORDING RETURN TO:**
Eastgate Theatre, Inc.
7132 Regal Lane
Knoxville, Tennessee 37918
Attn: Real Estate Department

**SEND TAX STATEMENTS TO:**
No change

THIS SPACE RESERVED FOR USE BY
THE COUNTY RECORDING OFFICE

**TITLE(S) OF THE TRANSACTION(S) ORS 205.234(a)**
Non-Disturbance, Attornment and Subordination Agreement

**DIRECT PARTY(S)** -- (i.e., DEEDS: Seller/Grantor; MORTGAGES: Borrower/Grantor; LIENS; Creditor/Plaintiff)
ORS 205.125(1) (b) and 205.160
CAPREF LLOYD CENTER EAST LLC, a Delaware limited liability company

EASTGATE THEATRE, INC., an Oregon corporation

KEYSTONE REAL ESTATE LENDING FUND, L.P., a Delaware limited partnership

**INDIRECT PARTY(S)** -- (i.e., DEEDS: Buyer/Grantee; MORTGAGES: Beneficiary/Lender; LIENS: Debtor/Defendant)
ORS 205.125(1) (a) and 205.160
CAPREF LLOYD CENTER EAST LLC, a Delaware limited liability company

EASTGATE THEATRE, INC., an Oregon corporation

KEYSTONE REAL ESTATE LENDING FUND, L.P., a Delaware limited partnership

**TRUE AND ACTUAL CONSIDERATION–** (Amount in dollars or other) ORS 93.030(5)
$ n/a

**JUDGMENT AMOUNT–** (obligation imposed by the order or warrant) ORS 205.125(1) (c)
$ n/a

**If this instrument is being Re-Recorded, complete the following statement, in accordance with
ORS 205.244:**
"RERECORDED AT THE REQUEST OF _____
TO CORRECT _____

PREVIOUSLY RECORDED IN BOOK/PAGE/FEE NUMBER _____

NON-DISTURBANCE, ATTORNMENT AND SUBORDINATION AGREEMENT

(Lloyd Center Stadium 14, Portland, Oregon)

This NON-DISTURBANCE, ATTORNMENT AND SUBORDINATION AGREEMENT (this "Agreement") is made as of May 1, 2017 between KEYSTONE REAL ESTATE LENDING FUND, L.P., a Delaware limited partnership ("Mortgagee"), CAPREF LLOYD CENTER EAST LLC, a Delaware limited liability company ("Landlord"), and EASTGATE THEATRE, INC., an Oregon corporation ("Tenant").

RECITALS

A.     Pursuant to that certain Lease dated on or about the date hereof (the "Lease") between Landlord, as lessor, and Tenant, as lessee, Landlord has leased to Tenant certain premises (the "Theatre") located within a retail center sometimes referred to as  Lloyd Center (the "Center") having a street address at 2201 Lloyd Center, Portland, Oregon  97232 in Portland, Oregon.

B.     The Center as described in the Lease is legally described on Exhibit A attached hereto.

C.     Landlord and Tenant have executed that certain Memorandum of Lease dated on or about the date hereof (the "Memorandum") between Landlord and Tenant, and recorded on or about the date hereof in the official real property records, as instrument number 2017-133200

D.     Mortgagee is the holder and beneficiary of that certain Deed of Trust dated as of March 21, 2017 (the "Mortgage") between Landlord and Mortgagee, and recorded as Instrument No. 2017-035671 in the official real property records.

F.     Mortgagee, Landlord and Tenant desire to evidence their understanding with respect to the Mortgage and the Lease as hereinafter provided.

AGREEMENT

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, the parties hereby agree as follows:

1.     Meaning of Mortgagee.  As used hereinafter, the term Mortgagee shall include the above identified Mortgagee and any assignees or successors of such Mortgagee with respect to the Mortgage.

2.     Non-Disturbance.  So long as Tenant is not in default (beyond any period given Tenant under the Lease to cure such default) in the payment of rent or other sums payable by Tenant under the Lease or in the performance of any of the terms, covenants or conditions of the Lease on Tenant's part to be performed:

2.1     Neither Tenant's right of possession of the Theatre nor any other rights or privileges of Tenant under the Lease (including the Lease as extended or renewed in accordance

1

with any option afforded Tenant in the Lease) shall be terminated, diminished or disturbed by Mortgagee for any reason whatsoever, including, without limitation, by virtue of any actions taken by Mortgagee in the exercise of any of its rights or remedies under the Mortgage or the indebtedness secured thereby;

2.2     The Lease shall not be terminated or affected by the exercise of any right or remedy provided for in the Mortgage, and Mortgagee hereby covenants and agrees that any sale of Landlord's title to the property containing the Theatre by Mortgagee pursuant to the exercise of any rights or remedies under the Mortgage or otherwise shall be made subject to the Lease and the rights and privileges of Tenant thereunder; and

2.3     In the event of foreclosure of the Mortgage, deed in lieu of foreclosure or other transfer of Landlord's right, title and interest in the property containing the Theatre, such purchaser shall recognize and accept the Lease and Tenant's leasehold right, title and interest in the Theatre.

3.      Attornment.

3.1     Succession by Mortgagee.  If the interest of Landlord shall be transferred to and owned by Mortgagee by reason of foreclosure, conveyance in lieu of foreclosure or other proceeding, or by any other manner, and Mortgagee succeeds to the interest of Landlord under the Lease, Tenant shall be bound to Mortgagee under all of the terms, covenants and conditions of the Lease for the balance of the term thereof remaining and any extension thereof which may be effected in accordance with any option therefore afforded to Tenant in the Lease, with the same force and effect as if Mortgagee were Landlord under the Lease, and Tenant does hereby attorn to Mortgagee as its Landlord, said attornment to be effective and self-operative without the execution of any further instruments on the part of either Party immediately upon Mortgagee succeeding to the interest of Landlord under the Lease.  The respective rights and obligations of Tenant and Mortgagee upon such attornment, to the extent of the then remaining balance of the term of the Lease and any extensions and renewals thereof, shall be and are the same as set forth in the Lease, it being the intention of the parties hereto for this purpose to incorporate the Lease into this Agreement by reference with the same force and effect as if set forth at length herein.

3.2     Limitation of Duties of Mortgagee.  If Mortgagee shall succeed to the interest of Landlord under the Lease, Mortgagee shall be bound to Tenant under all the terms, covenants and conditions of the Lease, and Tenant shall, from and after Mortgagee's succession to the interest of Landlord under the Lease, have the same remedies against Mortgagee for the breach of any agreement contained in the Lease that Tenant would have had under the Lease against Landlord if Mortgagee had not succeeded to the interest of Landlord; provided, however, that Mortgagee shall not: (a) have any monetary liability by offset against rent or otherwise for any act, omission, misrepresentation or default of any prior Landlord arising out of facts and circumstances existing before Mortgagee's succession to the interest of Landlord under the Lease, if such act, omission, misrepresentation or default of the prior Landlord then does not continue in effect, subject to the provision that Mortgagee shall not be relieved in any way from any performance obligation of Landlord under the Lease for the period from and after Mortgagee's succession to the interest of Landlord; or (b) be bound by any rent which Tenant paid to the prior Landlord for more than one (1) month in advance, unless Mortgagee has

2

received such rent from the prior Landlord; or (c) liable for the return of any security deposit to the extent it has not been received by Mortgagee from Landlord, all subject to the provision that Tenant shall have the right (but not the obligation) to cure any default by Landlord which Landlord or Mortgagee does not cure within the applicable cure period and recover its reasonable costs therefore together with interest at the Default Rate (defined in the Lease) by offset against Rent as it comes due for payment.

4.      Subordination of Lease.  Tenant covenants, stipulates and agrees that the Lease is hereby subordinate in priority to the lien of the Mortgage (including any and all renewals, increases, modifications, extensions, substitutions, replacements and/or consolidations of the Mortgage).

5.      Authorization by Landlord.  Landlord authorizes and directs Tenant to honor any written demand or notice from Mortgagee instructing Tenant to pay rent or other sums to Mortgagee or to a designee of Mortgagee rather than Landlord (a "Payment Demand"), regardless of any other or contrary notice or instruction which Tenant may receive from Landlord before or after Tenant's receipt of such Payment Demand.  Tenant may rely upon any notice, instruction, payment demand, certificate, consent or other document from Mortgagee believed by Tenant to be genuine and signed by Mortgagee and shall have no duty to Landlord to investigate the same or the circumstances under which the same was given.  Any payment made by Tenant to Mortgagee in response to a Payment Demand shall be deemed proper payment by Tenant of such sum pursuant to the Lease.

6.      Miscellaneous.

6.1      Waiver.  No purported waiver by any Party of any default by any other Party of any term or provision contained herein shall be deemed to be a waiver of such term or provision unless the waiver is in writing and signed by the waiving Party.  No such waiver shall in any event be deemed a waiver of any subsequent default under the same or any other term or provision contained herein.

6.2      Entire Agreement.  This Agreement sets forth the entire understanding between the parties concerning the subject matter of this Agreement and incorporates all prior negotiations and understandings.  There are no covenants, promises, agreements, conditions or understandings, either oral or written, between the parties relating to the subject matter of this Agreement other than those set forth herein.  No representation or warranty has been made by or on behalf of any Party (or any officer, director, employee or agent thereof) to induce any other Party to enter into this Agreement or to abide by or consummate any transactions contemplated by any terms of this Agreement, except representations and warranties, if any, expressly set forth herein.  No alteration, amendment, change or addition to this Agreement shall be binding upon any Party unless in writing and signed by the Party to be charged.

6.3      Successors.  Each and all of the provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Tenant's successors and assigns may include any Leasehold Mortgagee if such lender succeeds to the interest of Tenant under the Lease in accordance with the terms of said Leasehold Mortgage.

6.4    Notices.  Any consent, waiver, notice, demand, request or other instrument required or permitted to be given under this Agreement shall be in writing and be sent by certified or registered United States mail, return receipt requested, postage prepaid, or by overnight express delivery service, such as Federal Express, with the charges pre-paid, addressed:

|  |  |
|---|---|
| If to Tenant: | EASTGATE THEATRE, INC.<br>7132 Regal Lane, Knoxville, Tennessee 37918<br>Attention:  Real Estate Department |
| If to Mortgagee: | KEYSTONE REAL ESTATE LENDING FUND, L.P.<br>280 North 200 West, Suite 250<br>Bountiful, Utah  84010<br>Attention:  Heston Neilson |

Any such consent, wavier, notice, demand, request or other instrument shall be deemed given upon receipt or upon the refusal of the addressee to receive the same as indicated on the return receipt.  Any Party may change its address for notices in the manner set forth above.

6.5    Captions.  The captions and section numbers appearing in this Agreement are inserted only as a matter of convenience, and do not define, limit, construe or describe the scope or intent of the provisions of this Agreement.

6.6    Partial Invalidity.  If any term or provision of this Agreement or the application thereof to any person, firm or corporation, or circumstance, shall be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons, firms or corporations, or circumstances other than those as to which it is held invalid, shall both be unaffected thereby, and each term or provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

6.7    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Oregon applicable to agreements about real property located in the State of Oregon to be performed in the State of Oregon.

6.8    Counterparts.  This Agreement may be executed in counterparts, each of which when executed by the parties hereto shall be deemed an original and all of which together shall be deemed an original and all of which together shall be deemed the same Agreement.

[signature page follows]

4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

LANDLORD:                           CAPREF LLOYD CENTER EAST LLC, a
Delaware limited liability company

By: _____

Name: _____

Its: _____

STATE OF TEXAS

                     ) ss.

COUNTY OF DALLAS

I, _Angela J. McCorvey_, a Notary Public, in and for said County in said State, hereby certify that _Todd Minnis_, whose name as authorized signatory of _CAPREF Lloyd Center East LLC_, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he or she, as such authorized signatory and with full authority, executed the same voluntarily for and as the act of said limited liability company.

Given under my hand and seal this 18th day of May, 2017.

ANGELA J. MCCORVEY
My Notary ID # 10357678
Expires November 13, 2019

_____
Notary Public

My Commission Expires: _____

TENANT:                                    EASTGATE THEATRE, INC., an Oregon
                                           corporation


                                           By: _____
                                           Name:  TODD S. BORUFF
                                           Its:   Vice President


STATE OF TENNESSEE          )
                            ) ss.
COUNTY OF KNOX              )


    Before me, a Notary Public in and for said county and state, personally appeared
_Todd S. Boruff_, personally known to me to be the _____ Vice President of
_Eastgate Theatre, Inc_____, a _Oregon corporation___ and
acknowledged that he, as an officer being authorized so to do, executed the foregoing instrument
for the purposes therein contained, by signing in the name of the corporation by himself as an
officer.

    IN WITNESS WHEREOF I have hereunto set my hand and official seal this the _20th_
day of _May_____, 201_7_.


[SEAL]

                                           _Melissa Carder_____
                                           Notary Public
                                           My commission expires: _12/4/2018_

6

MORTGAGEE:

KEYSTONE REAL ESTATE LENDING FUND,
L.P., a Delaware limited partnership

By:    Keystone Real Estate Lending Fund GP,
LLC, a Delaware limited liability company,
its General Partner

By: _____

Name: _Brandon Nielson_____

Title: _Managing Member_____

STATE OF _Utah_

                 ) ss.

COUNTY OF _Davis_

    I, _Michelle Larsen_, a Notary Public, in and for said County in said State,
hereby certify that _Brandon Nielson_, whose name as authorized signatory of
_Keystone Real Estate Lending_ is signed to the foregoing instrument and who is known to me,
acknowledged before me on this day that, being informed of the contents of the instrument, he or
she, as such authorized signatory and with full authority, executed the same voluntarily for and
as the act of said limited liability company.

    Given under my hand and seal this _16_ day of May, 2017.

_____
Notary Public

My Commission Expires: _May 28, 2017_

Notary Public
MICHELLE LARSEN
Commission #686897
My Commission Expires
May 28, 2017
State of Utah