THIS PLAN IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.   THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.   ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THE PLAN IS SUBJECT TO CHANGE.  THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) | Case No. 22-90168 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF CINEWORLD GROUP PLC AND ITS DEBTOR SUBSIDIARIES**

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:            joshua.sussberg@kirkland.com
                     ciara.foster@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Veronica A. Polnick (TX Bar No. 24079148)
Vienna Anaya (TX Bar No. 24091225)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:     (713) 752-4200
Facsimile:      (713) 752-4221
Email:            mcavenaugh@jw.com
                     rchaikin@jw.com
                     vpolnick@jw.com
                     vanaya@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/cineworld.  The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is:  8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
GOVERNING LAW ...................................................................................................................1
    A.    Defined Terms. ............................................................................................1
    B.    Rules of Interpretation. ..............................................................................26
    C.    Computation of Time. ................................................................................27
    D.    Governing Law. .........................................................................................27
    E.    Reference to Monetary Figures. .................................................................27
    F.    Reference to the Debtors or the Reorganized Debtors. ...............................27
    G.    Controlling Document. ..............................................................................27
    H.    Consent Rights. .........................................................................................28

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS,  PRIORITY CLAIMS, AND RESTRUCTURING
EXPENSES ...............................................................................................................................28
    A.    Administrative Claims. ..............................................................................28
    B.    DIP Claims. ...............................................................................................29
    C.    Professional Fee Claims. ...........................................................................29
    D.    Priority Tax Claims. ..................................................................................31
    E.    Payment of Statutory Fees. ........................................................................31
    F.    Payment of Restructuring Expenses. ..........................................................31

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .......................32
    A.    Classification of Claims and Interests. .......................................................32
    B.    Treatment of Claims and Interests. ............................................................33
    C.    Special Provision Governing Unimpaired Claims. ......................................37
    D.    Elimination of Vacant Classes. ..................................................................37
    E.    Voting Classes, Presumed Acceptance by Non-Voting Classes. ..................37
    F.    Intercompany Interests. .............................................................................37
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ..................37
    H.    Controversy Concerning Impairment. ........................................................38
    I.    Subordinated Claims and Interests. ............................................................38

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN .................................................38
    A.    General Settlement of Claims and Interests. ...............................................38
    B.    Restructuring Transactions. .......................................................................39
    C.    Reorganized Debtors. ................................................................................39
    D.    Sources of Consideration for Plan Distributions. ........................................40
    E.    Exemption from Registration Requirements. ..............................................45
    F.    Corporate Existence. ..................................................................................46
    G.    Vesting of Assets in the Reorganized Debtors. ...........................................46
    H.    Cancellation of Existing Securities and Agreements. ..................................47
    I.    Corporate Action. ......................................................................................47
    J.    New Organizational Documents. ...............................................................48
    K.    Managers and Officers of the Reorganized Debtors. ...................................49
    L.    Effectuating Documents; Further Transactions. ..........................................49
    M.    Section 1146 Exemption. ...........................................................................50
    N.    Management Incentive Plan. .......................................................................50
    O.    Employee and Retiree Benefits. .................................................................50
    P.    Preservation of Causes of Action. ..............................................................51
    Q.    Release of Avoidance Actions. ...................................................................52
    R.    Payment of Convertible Bond Trustee Fees. ...............................................52

i

ARTICLE V. LITIGATION TRUST ........................................................................................................52
    A.    Creation and Governance of the Litigation Trust. ...............................................................52
    B.    Purpose of the Litigation Trust. ..........................................................................................53
    C.    Litigation Trust Agreement and Funding the Litigation Trust. ..........................................53
    D.    Valuation of Assets. ............................................................................................................53
    E.    Litigation Trustee. ..............................................................................................................54
    F.    Litigation Trust Interests. ...................................................................................................54
    G.    Cooperation of the Reorganized Debtors. ..........................................................................54
    H.    Fiduciary Duties. ................................................................................................................54
    I.    United States Federal Income Tax Treatment of the Litigation Trust. ...............................55
    J.    Withholding. .......................................................................................................................55
    K.    Dissolution of the Litigation Trust. ....................................................................................56
    L.    Tax Reporting. ....................................................................................................................56
    M.    Transferred Privileges. .......................................................................................................57

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............58
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ......................58
    B.    Indemnification Obligations. ..............................................................................................59
    C.    Claims Based on Rejection of Executory Contracts or Unexpired Leases. ........................60
    D.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. .....................60
    E.    Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases. ...........61
    F.    Insurance Policies. ..............................................................................................................62
    G.    Reservation of Rights. ........................................................................................................62
    H.    Nonoccurrence of Effective Date. ......................................................................................62
    I.    Employee Compensation and Benefits. ..............................................................................62
    J.    Contracts and Leases Entered into after the Petition Date. .................................................63

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS .........................................................63
    A.    Distributions on Account of Claims or Interests Allowed as of the Effective Date. ..........63
    B.    Disbursing Agent. ...............................................................................................................64
    C.    Rights and Powers of Disbursing Agent. ............................................................................64
    D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions. ........................64
    E.    Manner of Payment. ............................................................................................................66
    F.    Indefeasible Distributions. ..................................................................................................66
    G.    Section 1145 Exemption and DTC Matters. .......................................................................66
    H.    Compliance with Tax Requirements. ..................................................................................67
    I.    Allocations. .........................................................................................................................68
    J.    No Postpetition Interest on Claims. ....................................................................................68
    K.    Foreign Currency Exchange Rate. ......................................................................................68
    L.    Setoffs and Recoupment. ....................................................................................................68
    M.    Claims Paid or Payable by Third Parties. ...........................................................................68

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND DISPUTED
CLAIMS .................................................................................................................................................70
    A.    Disputed Claims Process. ....................................................................................................70
    B.    Allowance of Claims. .........................................................................................................70
    C.    Claims Administration Responsibilities. .............................................................................70
    D.    Estimation of Claims and Interests. ....................................................................................71
    E.    Disputed Claims Reserve. ...................................................................................................71
    F.    Adjustment to Claims or Interests without Objection. ........................................................72
    G.    Time to File Objections to Claims. .....................................................................................72
    H.    Disallowance of Claims or Interests. ..................................................................................72
    I.    Amendments to Claims. ......................................................................................................73
    J.    No Distributions Pending Allowance. .................................................................................73
    K.    Distributions After Allowance. ...........................................................................................73
    L.    Single Satisfaction of Claims. ............................................................................................73

ARTICLE IX. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...................................73

    A.    Discharge of Claims and Termination of Interests. ...........................................................73

    **B.**    **Release of Liens.** ............................................................................................................74

    **C.**    **Releases by the Debtors.** ..............................................................................................75

    **D.**    **Releases by the Releasing Parties.** ..............................................................................76

    **E.**    **Exculpation.** .................................................................................................................77

    **F.**    **Injunction.** ...................................................................................................................77

    G.    Gatekeeper Provision. ....................................................................................................78

    H.    Protections Against Discriminatory Treatment. ...............................................................78

    I.    Document Retention. ......................................................................................................79

    J.    Reimbursement or Contribution .....................................................................................79

ARTICLE X. CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN....................................79

    A.    Conditions Precedent to the Effective Date.....................................................................79

    B.    Waiver of Conditions. ....................................................................................................82

    C.    Effect of Failure of Conditions. ......................................................................................82

    D.    Substantial Consummation. ............................................................................................82

ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN................................83

    A.    Modification and Amendments........................................................................................83

    B.    Effect of Confirmation on Modifications.........................................................................83

    C.    Revocation or Withdrawal of Plan. .................................................................................83

ARTICLE XII. RETENTION OF JURISDICTION ...................................................................................83

ARTICLE XIII. MISCELLANEOUS PROVISIONS ..................................................................................85

    A.    Immediate Binding Effect. ..............................................................................................85

    B.    Additional Documents.....................................................................................................86

    C.    Statutory Committee and Cessation of Fee and Expense Payment...................................86

    D.    Reservation of Rights. ....................................................................................................86

    E.    Successors and Assigns....................................................................................................86

    F.    Notices............................................................................................................................86

    G.    Term of Injunctions or Stays. .........................................................................................88

    H.    Entire Agreement............................................................................................................89

    I.    Plan Supplement. ...........................................................................................................89

    J.    Nonseverability of Plan Provisions. ...............................................................................89

    K.    Votes Solicited in Good Faith. ........................................................................................89

    L.    Closing of Chapter 11 Cases. .........................................................................................90

    M.    Waiver or Estoppel. .......................................................................................................90

## INTRODUCTION

Cineworld Group plc and the other above-captioned debtors and debtors in possession (collectively, the "Debtors") propose this joint chapter 11 plan of reorganization (as amended, supplemented, or otherwise modified from time to time, this "Plan") for the resolution of the outstanding Claims against, and Interests in, the Debtors. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A of this Plan. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classification of Claims and Interests set forth in Article III of this Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable and set forth herein. The Plan does not contemplate substantive consolidation of any of the Debtors.

Reference is made, and Holders of Claims or Interests may refer, to the accompanying Disclosure Statement for a discussion on the Debtors' history, businesses, assets, results of operations, historical financial information, valuation, projections, risk factors, a summary and analysis of the Plan, the Restructuring Transactions, and certain related matters.

ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD REVIEW THE SECURITIES LAW RESTRICTIONS AND NOTICES SET FORTH IN THIS PLAN (INCLUDING, WITHOUT LIMITATION, UNDER ARTICLE IV HEREOF) IN FULL.

THE ISSUANCE OF ANY SECURITIES REFERRED TO IN THIS PLAN SHALL NOT CONSTITUTE AN INVITATION OR OFFER TO SELL, OR THE SOLICITATION OF AN INVITATION OR OFFER TO BUY, ANY SECURITIES IN CONTRAVENTION OF APPLICABLE LAW IN ANY JURISDICTION. NO ACTION HAS BEEN TAKEN, NOR WILL BE TAKEN, IN ANY JURISDICTION THAT WOULD PERMIT A PUBLIC OFFERING OF ANY SECURITIES REFERRED TO IN THIS PLAN (OTHER THAN SECURITIES ISSUED PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE IN A DEEMED PUBLIC OFFERING) IN ANY JURISDICTION WHERE SUCH ACTION FOR THAT PURPOSE IS REQUIRED.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*Ad Hoc Group*" means the ad hoc group of Holders of Legacy Facilities Claims represented by Arnold & Porter Kaye Scholer LLP, as primary counsel, Akin Gump Strauss Hauer & Feld LLP, as special counsel, and Houlihan Lokey, Inc., as financial advisor.

2.      "*Ad Hoc Group Professionals*" means Arnold & Porter Kaye Scholer LLP, as primary counsel, Akin Gump Strauss Hauer & Feld LLP, as special counsel, Houlihan Lokey, Inc., as financial advisor, Alvarez & Marsal, LLC, as compensation and transition/consulting services advisor, Hilco Real Estate LLC, as real estate advisor, Korn Ferry, as board search consultant, Faegre Drinker Biddle & Reath

LLP, as UK counsel, Senica (Andersen Global), as foreign counsel, and other professionals retained by the Ad Hoc Group in connection with the Chapter 11 Cases.

3.      "*Administration*" means an administration of any Debtor under Schedule B1 of the Insolvency Act 1986 (United Kingdom).

4.      "*Administrative Claim*" means a Claim against any of the Debtors arising on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through the Effective Date; (b) the Allowed Professional Fee Claims; (c) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code; (d) Claims arising from the First Lien Adequate Protection (as defined in the Final DIP Order); (e) the ERO Backstop Premium (to the extent payable in Cash per the terms of the Financing Commitment and Backstop Agreement Order); and (f) the Exit First Lien Facility Premium (to the extent payable in Cash per the terms of the Financing Commitment and Backstop Agreement Order).

5.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which shall be (a) thirty days after the Effective Date for Administrative Claims other than Professional Fee Claims and (b) forty-five days after the Effective Date for Professional Fee Claims.

6.      "*Administrative Claims Objection Bar Date*" means the deadline for filing objections to requests for payment of Administrative Claims required to file a Proof of Claim form, which shall be the first Business Day that is 180 days following the Effective Date; *provided* that the Administrative Claims Objection Bar Date may be extended by the Bankruptcy Court after notice and a hearing.

7.      "*Administrator*" means any person appointed as an administrator under Schedule B1 of the Insolvency Act 1986 (United Kingdom) to manage the affairs, businesses, and property of any Debtor pursuant to an Administration.

8.      "*Affiliate*" means, with respect to any Person, any other Person that, directly or indirectly, Controls or is Controlled by, or is under common Control with, such Person, and shall include the meaning of "affiliate" set forth in section 101(2) of the Bankruptcy Code as if such Person were a debtor in a case under the Bankruptcy Code.  "*Affiliated*" has a correlative meaning.

9.      "*Affiliated Fund*" means with respect to any Capital Raising Party, (a) any Affiliates (including at the institutional level) of such Capital Raising Party or any fund, account (including any separately managed accounts), or investment vehicle that is controlled, managed, advised, or sub-advised by such Capital Raising Party, an Affiliate of such Capital Raising Party, or by the same investment manager, advisor, or sub-advisor as such Capital Raising Party or an Affiliate of such Capital Raising Party, or any fund, account (including any separately managed accounts), or investment vehicle which is controlled, managed, advised or sub-advised by an Affiliate of a Capital Raising Party's investment manager, advisor or sub-advisor, (b) one or more special purpose vehicles that are wholly owned by such Capital Raising Party and its Affiliates, created for the purpose of holding the Direct Allocation Amount, the Rights Offering Backstop Commitment, and/or the First Lien Allocated Amount (as defined in the Financing Commitment and Backstop Agreement), or (c) any Person or any of its Affiliates that is party to a derivative or participation transaction with such Capital Raising Party pursuant to which there is a transfer of the economics of ownership of any Securities to or from such Person.

10.     "*Agent*" means any administrative agent, collateral agent, or similar Entity under the Priming Facilities Documents, the Legacy Facilities Credit Agreement Documents, the Settlement Facility Documents, the Midwest Facility Documents, the DIP Facility Documents, or the Exit First Lien Facility Documents.

11.     "*Agent Professionals*" means Sullivan & Cromwell LLP, Bracewell LLP, Arthur Cox LLP, Appleby, CMS Cameron McKenna Nabarro Olswang LLP, and Wolf Theiss Faludi Ügyvédi Iroda, each as counsel to Barclays Bank PLC, as Agent, and the other professionals retained by Barclays Bank PLC, as Agent, in connection with the Chapter 11 Cases.

12.     "*Allowed*" means, with respect to a Claim or Interest, any Claim or Interest (or portion thereof) against any Debtor that, except as otherwise provided in the Plan:  (a) is evidenced by a Proof of Claim or Proof of Interest or request for payment of an Administrative Claim, as applicable, that is Filed on or before the applicable Claims Bar Date; (b) is not listed in the Schedules as contingent, unliquidated, or disputed, and for which no contrary or superseding Proof of Claim, as applicable, has been timely Filed; (c) is allowed, compromised, settled, or otherwise resolved pursuant to the terms of the Plan, in a Final Order of the Bankruptcy Court, in any stipulation that is approved by a Final Order of the Bankruptcy Court, or pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (d) solely with respect to General Unsecured Claims, after the Effective Date, has been allowed by written agreement of the Litigation Trustee.  For the avoidance of doubt, any Claim or Interest (or portion thereof), that has been disallowed pursuant to a Final Order shall not be an "Allowed" Claim; *provided* that, with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if, and to the extent that, it is not Disputed or subject to an objection to Allowance and has not been Allowed by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.  Any Claim or Interest that has been or is hereafter categorized as contingent, unliquidated, or Disputed, and for which no Proof of Claim or Proof of Interest, as applicable, is or has been timely Filed, is not considered Allowed, as set forth in this Plan and the Confirmation Order.  For the avoidance of doubt, a Proof of Claim or Proof of Interest Filed after the applicable Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "*Allow*," "*Allowing*," and "*Allowance*" shall have correlative meanings.

13.     "*Ancillary Proceeding*" means, collectively, if determined necessary or appropriate by any of the Debtors' managers, directors, or similar governing body, with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties, such consent not to be unreasonably withheld, ancillary proceedings to any Administration, Scheme of Arrangement, UK Company Voluntary Arrangement, UK Restructuring Plan, the Chapter 11 Cases, or other proceeding seeking recognition of aspects of any such Administration, Scheme of Arrangement, UK Company Voluntary Arrangement, UK Restructuring Plan, or the Chapter 11 Cases, including proceedings under chapter 15 of the Bankruptcy Code or the UK Cross-Border Insolvency Regulations 2006, the appointment of equivalent officeholders (howsoever described) under applicable Law, dissolution proceedings under applicable Law, and liquidations under the Law of any other relevant jurisdiction.

14.     "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims and Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy Law, including Claims, Causes of Action, or remedies arising under chapter 5 of the

3

Bankruptcy Code or under similar or related local, state, federal, or foreign statutes or common Law, including fraudulent transfer Laws or under the UK Insolvency Act 1986 (if invoked).

15. "*Backstop Commitment*" means, with respect to each Equity Capital Raising Party, the product of (a) $400 million and (b) such Equity Capital Raising Party's Backstop Final Allocated Percentage.

16. "*Backstop Final Allocated Percentage*" means the percentage each Equity Capital Raising Party has committed pursuant to the Financing Commitment and Backstop Agreement, on a several and not joint basis, to acquire New Common Stock pursuant to the Direct Equity Allocation and the Rights Offering Backstop Commitment in the respective percentages set forth on the Direct Allocation Schedule, which add up to 100% in the aggregate.

17. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

18. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, presiding over the Chapter 11 Cases, or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of the Judicial Code, the United States District Court for the Southern District of Texas.

19. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

20. "*Bar Date Order*" means the *Order (I) Re-Establishing the Claims Bar Date, (II) Re-Establishing the Governmental Bar Date, (III) Establishing the Rejection Damages Bar Date and the Amended Schedules Bar Date, (IV) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (V) Approving Notice of Bar Dates* [Docket No. 775] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

21. "*Bidding Procedures*" means, if applicable, the bidding procedures attached as an exhibit to the Bidding Procedures Order, as may be amended from time to time, by which parties may submit, and the Debtors will consider, bids for all, substantially all, or a material portion of the assets or Interests of the Debtors (but excluding the Existing Interests), and which shall be in form and substance acceptable to the Required Consenting Creditors, the Required Equity Capital Raising Parties, and, solely with respect to terms and provisions, if any, affecting the rights, duties, obligations, benefits, privileges, protections, indemnities, and immunities of an Agent, the applicable Agent.

22. "*Bidding Procedures Order*" means, if applicable, an order of the Bankruptcy Court approving the Bidding Procedures, which shall be in form and substance acceptable to the Required Consenting Creditors, the Required Equity Capital Raising Parties, and, solely with respect to terms and provisions, if any, affecting the rights, duties, obligations, benefits, privileges, protections, indemnities, and immunities of an Agent, the applicable Agent.

23. "*Business Day*" means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, (a) the State of Texas or the State of New York, or (b) London, the UK.

24. "*Capital Raise*" means a $2.26 billion capital raise as provided for and described in the Restructuring Support Agreement, this Plan, and the Financing Commitment and Backstop Agreement.

25. "*Capital Raise Convenience Election*" has the meaning set forth in <u>Article II.B</u>.

26. "*Capital Raising Party*" means each Equity Capital Raising Party and Sponsored Facility Capital Raising Party. Unless the context otherwise requires, each reference herein to a Capital Raising Party shall be deemed also to include a reference to such Capital Raising Party's Related Purchasers, if applicable.

27. "*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

28. "*Causes of Action*" means, collectively, any and all claims, interests, controversies, actions, proceedings, reimbursement claims, contribution claims, recoupment rights, debts, third-party claims, indemnity claims, damages, remedies, causes of action, demands, rights, suits, obligations, liabilities, accounts, judgments, defenses, offsets, powers, privileges, licenses, franchises, Liens, guaranties, Avoidance Actions, agreements, counterclaims, and cross-claims, of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, direct or indirect, assertable directly or derivatively, choate or inchoate, reduced to judgment or otherwise, secured or unsecured, whether arising before, on, or after the Petition Date, in tort, Law, equity, or otherwise pursuant to any theory of civil Law (whether local, state, or federal U.S. Law or non-U.S. Law). Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by Law or in equity; (b) any Claim (whether under local, state, federal U.S. Law or non-U.S. civil Law) based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, fraudulent transfer or fraudulent conveyance or voidable transaction Law, violation of local, state, or federal non-U.S. Law or breach of any duty imposed by Law or in equity, including securities Laws and negligence; (c) the right to object to or otherwise contest Claims or Interests and any Claim Objections; (d) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

29. "*Challenge Free Effective Date*" means the later of: (a) if no application(s) to challenge the UK Company Voluntary Arrangement is made under section 6(1) of the UK Insolvency Act 1986 or under Rule 15.35 of The Insolvency (England and Wales) Rules 2016, the date falling twenty-eight days following the date on which each of the reports required by sections 4(6) and 4(6A) of the Insolvency Act has been made to the court; and (b) if any application(s) is or are made to challenge the UK Company Voluntary Arrangement before the end of the period referred to in (a) above, the date on which any and all such application(s) as have been made have been refused by the court in a final, non-appealable judgment or order (including any judgment or order in respect of which any right to appeal has expired), fully and finally settled or irrevocably withdrawn without there being a right to make any further such application(s).

30. "*Chapter 11 Cases*" means: (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (b) when used with reference to all the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

31. "*Cineplex Judgment*" means that certain judgment issued by the Ontario Superior Court of Justice (Commercial List) on December 14, 2021, in the matter captioned *Cineplex Inc. v. Cineworld Group plc and 1232743 B.C. Ltd.*, Court File No.: CV-20-00643387-00CL (Can. Ont. Sup. Ct. J. 2020), which judgment remains subject to a pending appeal.

32.    "*Cineplex Judgment Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Cineplex Judgment.

33.    "*Cineworld Funding*" means Debtor Cineworld Funding (Jersey) Limited, a limited company incorporated under the Laws of Jersey.

34.    "*Cineworld Parent*" means Debtor Cineworld Group plc, a public company incorporated under the Laws of England and Wales.

35.    "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

36.    "*Claims Bar Date*" means the applicable deadline by which Proofs of Claim must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

37.    "*Claim Objection*" means an objection to the allowance of a Claim as set forth in section 502 of the Bankruptcy Code, Bankruptcy Rule 3007, and/or any order of the Bankruptcy Court regarding omnibus claims objections.

38.    "*Claims Register*" means the official register of Claims maintained by the Solicitation Agent or the clerk of the Bankruptcy Court.

39.    "*Class*" means a class of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

40.    "*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, wages, compensation, and benefit plans and policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive and retention plans, programs, and payments, life and accidental death and dismemberment insurance plans and programs, for all employees of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and managers, in each case existing with the Debtors as of immediately prior to the Effective Date.

41.    "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

42.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

43.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

44.    "*Confirmation Order*" means the order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance (a) acceptable to the Required Consenting Creditors, the Required Equity Capital Raising Parties, and, solely with respect to terms and provisions, if any, affecting the rights, duties, obligations, benefits, privileges, protections, indemnities, and immunities of an Agent, the applicable Agent, (b) in the event the Sponsored Exit First Lien Facility is the Exit First Lien Facility, reasonably acceptable to the Required Exit Facility Commitment

Parties, solely with respect to provisions related to the Sponsored Exit First Lien Facility (such consent not to be unreasonably withheld), and (c) reasonably acceptable to the Creditors' Committee solely with respect to the Creditors' Committee Settlement.

45.     "*Consenting Creditors*" has the meaning ascribed to such term in the Restructuring Support Agreement.

46.     "*Consulting Agreements*" means the consulting agreements to be entered into by one or more of the Reorganized Debtors with each of the Executive Directors (either directly or indirectly through a controlled company) on the Effective Date, in the applicable form attached to the Restructuring Support Agreement as Exhibit E thereto and included in the Plan Supplement.

47.     "*Consummation*" means the occurrence of the Effective Date.

48.     "*Convertible Bonds*" means the convertible bonds issued by Cineworld Funding pursuant to the Convertible Bonds Documents.

49.     "*Convertible Bonds Claims"* means any Claim against a Debtor arising under, derived from, based on, or related to the Convertible Bonds or the Convertible Bonds Documents.

50.     "*Convertible Bonds Documents*" means, collectively, the Convertible Bonds Trust Deed and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, and other security documents, as amended, supplemented, or modified from time to time.

51.     "*Convertible Bonds Trust Deed*" means that certain trust deed, dated as of April 16, 2021, by and between Cineworld Funding, as issuer, Cineworld Parent, as guarantor, and the Convertible Bond Trustee, as amended, supplemented, or modified from time to time.

52.     "*Convertible Bond Trustee*" means BNY Mellon Corporate Trustee Services Limited, in its capacity as trustee for the Convertible Bonds.

53.     "*Corporate Governance Term Sheet*" means that certain corporate governance term sheet attached as Exhibit C to the Restructuring Support Agreement setting forth the terms of the New Organizational Documents and as may be modified, supplemented, or amended in accordance with the terms hereof and thereof.

54.     "*Creditors' Committee*" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee pursuant to the *United States Trustee's Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 419] on September 23, 2022, as may be reconstituted from time to time.

55.     "*Creditors' Committee Member*" means each Entity that is a member of the Creditors' Committee.

56.     "*Creditors' Committee Settlement*" means the settlement with the Creditors' Committee as set forth in the Restructuring Term Sheet, which settlement is agreed to and supported by the Creditors' Committee.

57.     "*Crown Finance*" means Debtor Crown Finance US, Inc., a Delaware corporation.

58.     "*Crown UK*" means Debtor Crown UK HoldCo Limited, a limited company incorporated under the Laws of England and Wales.

59.     "*Cure*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

60.     "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") covering any of the Debtors' current or former directors', managers', officers', and/or employees' liability and all agreements, documents, or instruments relating thereto.

61.     "*Debt Documents*" shall mean, collectively, the DIP Facility Credit Agreement, the Convertible Bond Trust Deed, the Legacy Facilities Credit Agreement, the Midwest Facility Loan Agreement, the Priming Facilities Credit Agreement, the Settlement Facility Credit Agreement, and any other agreements, instruments, pledge agreements, intercreditor agreements, guarantees, fee letters, control agreements, and other ancillary documents related thereto (including any security agreements, intellectual property security agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time).

62.     "*Debtor Release*" means the release given by the Debtors to the Released Parties as set forth in Article IX.C of the Plan.

63.     "*Debtors*" has the meaning set forth in the preamble.

64.     "*Defaulting Capital Raising Party*" has the meaning ascribed to such term in the Financing Commitment and Backstop Agreement.

65.     "*Definitive Documents*" means all agreements, instruments, pleadings, orders, forms, questionnaires, and other documents (including all exhibits, schedules, supplements, appendices, annexes, instructions, and attachments thereto) that are utilized to implement or effectuate, or that otherwise relate to, the Restructuring, each of which shall be (except as otherwise set forth herein) in form and substance (a) acceptable to (i) the Debtors, (ii) the Required Consenting Creditors, (iii) the Required Equity Capital Raising Parties, and (iv) solely with respect to terms and provisions, if any, affecting the rights, duties, obligations, benefits, privileges, protections, indemnities, and immunities of an Agent, the applicable Agent, (b) reasonably acceptable to the Required Exit Facility Commitment Parties to the extent set forth in the Restructuring Support Agreement or Financing Commitment and Backstop Agreement (any such consent not to be unreasonably withheld), and (c) acceptable to the Creditors' Committee, solely as it pertains to the Creditors' Committee Settlement, including each of the following:  (A) irrespective of Implementation Mechanism:  (1) the Disclosure Statement and any related Solicitation Materials; (2) the Disclosure Statement Order; (3) the Plan; (4) the Confirmation Order; (5) the Rights Offering Documents; (6) the New Organizational Documents; (7) the Plan Supplement; (8) the Exit First Lien Facility Documents; (9) the DIP Orders and the DIP Facility Documents; (10) new, amended, or amended and restated guarantees, security documents, and similar agreements, as applicable; (11) any and all documents required to implement, issue, and distribute the New Common Stock; (12) any other document(s) necessary to implement or consummate the Restructuring Transactions, the Exit First Lien Facility, the Direct Equity Allocation, the Backstop Commitment, the New Money Revolving Credit Facility, or the Rights Offering; (13) the Financing Commitment and Backstop Agreement; (14) the Restructuring Transactions Memorandum; (15) the New Stockholders Agreement; (16) the Registration Rights Agreement; (17) the Consulting Agreements; (18) documentation relating to the Emergence Awards, as applicable; (19) the MIP Documents (if applicable and which shall be acceptable only to the Required Consenting Creditors and the Required Equity Capital

Raising Parties); (20) the Litigation Trust Agreement (which, for the avoidance of doubt, shall be reasonably acceptable to the Debtors, the Creditors' Committee, the Required Consenting Creditors, and the Required Equity Capital Raising Parties); and (21) any and all opinions, certificates, filings, and other deliverables required to satisfy the conditions precedent to the effectiveness of the foregoing documents and agreements; (B) if any Scheme of Arrangement is commenced and not discontinued:  (1) a practice statement letter (to the extent applicable); (2) an explanatory statement (including for the avoidance of doubt, the scheme document constituting the terms of the Scheme of Arrangement itself); (3) a draft order of the relevant court in which the Scheme of Arrangement has been filed, giving orders for directions with respect to, among other things, the convening of the creditor and/or member meetings to vote on the Scheme of Arrangement; (4) a draft order of the relevant court in which the Scheme of Arrangement has been filed sanctioning the relevant Scheme of Arrangement; and (5) any other document, deed, agreement, filing, notification, letter or instrument necessary or desirable (in the opinion of the proponent of the Scheme of Arrangement, acting reasonably) entered into by any Debtor and/or any Consenting Creditor in connection with the implementation of the relevant Scheme of Arrangement (including for the avoidance of doubt, where such documents are referred to or described in the explanatory statement (including the scheme document) described in sub-clause (B)(2) above); (C) if a UK Company Voluntary Arrangement is commenced and not discontinued:  (1) a proposal setting out the terms of the UK Company Voluntary Arrangement; and (2) any other document, deed, agreement, filing, notification, letter, or instrument necessary or desirable (in the opinion of the proponent of the UK Company Voluntary Arrangement, acting reasonably) entered into by any Debtor and/or any Consenting Creditor in connection with the implementation of the UK Company Voluntary Arrangement (including for the avoidance of doubt, where such documents are referred to or described in the proposal set forth in sub-clause (C)(1)); *provided* that this shall not include, without limitation, any report produced by the Nominee for the applicable court in the UK, nor any document, deed, agreement, filing, notification, letter, or instrument required to be issued, produced, or otherwise created by the Nominee pursuant to applicable Law; (D) if a UK Restructuring Plan is commenced and not discontinued:  (1) a practice statement letter (to the extent applicable); (2) an explanatory statement (including, for the avoidance of doubt, the plan document itself); (3) a draft order of the relevant court in which the UK Restructuring Plan has been filed, giving orders for directions with respect to, among other things, the convening of the creditor and/or member meetings to vote on the UK Restructuring Plan; (4) a draft order of the court in which the UK Restructuring Plan has been filed sanctioning the relevant UK Restructuring Plan; and (5) any other document, deed, agreement, filing, notification, letter, or instrument necessary or desirable (in the opinion of the proponent of the UK Restructuring Plan, acting reasonably) entered into by any Debtor and/or any Consenting Creditor in connection with the implementation of the UK Restructuring Plan (including for the avoidance of doubt, where such documents are referred to or described in the explanatory statement set forth in sub-clause (D)(2)); (E) in relation to an Administration: (1) a draft order of the relevant court in which the application for Administration has been filed (if applicable); and (2) any material documents to which the relevant Debtors are party in relation to the Administration process (including in relation to the quantum and structure of funding of the administrators and any sale and purchase agreements and related documents) where such documents are entered into prior to the Effective Date; *provided* that this shall not include, without limitation, any witness statements in respect of the application for Administration (if applicable), any protocol entered into between relevant Debtors and an Administrator where such protocol otherwise complies with this Plan and the Restructuring Support Agreement, nor any document, deed, agreement, filing, notification, letter, or instrument required to be issued, produced or otherwise created by an Administrator pursuant to applicable Law; and (F) in relation to a Shareholder Meeting, any circular, prospectus, or other material document required to be provided to shareholders of Cineworld Parent in connection with such a Shareholder Meeting.

66.    "*DIP Agent*" means Barclays Bank PLC, in its capacity as administrative agent and collateral agent under the DIP Facility Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Facility Credit Agreement.

67.     "*DIP Claim*" means a Claim arising under, relating to, derived from, based upon, or secured pursuant to the DIP Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, indemnification obligations, reimbursement obligations, and any other charges arising thereunder, in each case, with respect to the DIP Facility, including, for the avoidance of doubt, such Claims held by the DIP Lenders or the DIP Agent.

68.     "*DIP Facility*" means the $1.935 billion debtor-in-possession credit facility provided to the Debtors on the terms and conditions set forth in the DIP Facility Credit Agreement and the DIP Orders.

69.     "*DIP Facility Credit Agreement*" means that certain superpriority secured debtor-in-possession credit agreement that governs the DIP Facility (as may be amended, supplemented, or otherwise modified from time to time), dated as of September 9, 2022, by and among Crown Finance, as borrower, Crown UK, certain Debtor guarantors party thereto, the DIP Lenders, and the DIP Agent.

70.     "*DIP Facility Documents*" means, collectively, the DIP Facility Credit Agreement and all other agreements, documents, and instruments delivered or entered into in connection therewith, including, but not limited to, any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

71.     "*DIP Lenders*" means the lenders party to the DIP Facility Credit Agreement.

72.     "*DIP Orders*" means any order entered in the Chapter 11 Cases approving the DIP Facility (whether interim or final) consistent with the DIP Facility Credit Agreement, including, for the avoidance of doubt, the interim order entered by the Bankruptcy Court on September 8, 2022 [Docket No. 173] and the Final DIP Order.

73.     "*Direct Allocation Amount*" means, for each Equity Capital Raising Party, the product of (a) $400 million and (b) such Equity Capital Raising Party's Backstop Final Allocated Percentage.

74.     "*Direct Allocation Schedule*" means Schedule 1 to the Financing Commitment and Backstop Agreement, as amended, supplemented, or otherwise modified from time to time in accordance with the Financing Commitment and Backstop Agreement.

75.     "*Direct Allocation Shares*" means the New Common Stock issued in connection with the Direct Equity Allocation, in accordance with the Financing Commitment and Backstop Agreement.

76.     "*Direct Equity Allocation*" means the Direct Allocation Shares offered by subscription to each Equity Capital Raising Party on a ratable basis based on each such Equity Capital Raising Party's Backstop Final Allocated Percentage and in accordance with the Financing Commitment and Backstop Agreement.

77.     "*Disbursing Agent*" means, as applicable, the Litigation Trustee and the Entity or Entities selected by the Debtors (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) or the Reorganized Debtors to make or to facilitate distributions, allocations, and/or issuances in accordance with, and pursuant to, the Plan. For the avoidance of doubt, the DIP Agent shall not be a Disbursing Agent.

78.     "*Disclosure Statement*" means the disclosure statement relating to this Plan, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto, in each case, as may be amended, supplemented, or modified from time to time, that is prepared and distributed in

accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable Law, to be approved pursuant to the Disclosure Statement Order.

79.     "*Disclosure Statement Order*" means the order (and all exhibits thereto), entered by the Bankruptcy Court, conditionally approving the Disclosure Statement and the Solicitation Materials, and allowing solicitation of the Plan to commence, which shall be in form and substance (a) acceptable to the Required Consenting Creditors, the Required Equity Capital Raising Parties and, solely with respect to terms and provisions, if any, affecting the rights, duties, obligations, benefits, privileges, protections, indemnities, and immunities of an Agent, the applicable Agent, (b) in the event the Sponsored Exit First Lien Facility is the Exit First Lien Facility, reasonably acceptable to the Required Exit Facility Commitment Parties, solely with respect to provisions related to the Sponsored Exit First Lien Facility (such consent not to be unreasonably withheld), and (c) reasonably acceptable to the Creditors' Committee solely with respect to the Creditors' Committee Settlement.

80.     "*Disputed*" means, as to a Claim or an Interest, any Claim or Interest (or portion thereof): (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party in interest has Filed a Proof of Claim or Proof of Interest or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

81.     "*Distributable New Common Stock*" means one-hundred percent (100%) of the New Common Stock to be issued on the Effective Date, subject to dilution from the following as set forth in the Plan: (a) the Direct Allocation Shares, (b) the Rights Offering Shares, (c) the New Common Stock issued on account of the Exit First Lien Facility Premium, (d) the New Common Stock issued on account of the ERO Backstop Premium, and (e) the Management Incentive Plan Pool (including any Emergence Awards).

82.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, subject to the requirements of any Implementation Mechanism, upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims and/or Allowed Interests (as and if applicable) entitled to receive distributions under the Plan.

83.     "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Confirmation Date, or such other date as agreed to by the Debtors, the Required Consenting Creditors, and the Required Equity Capital Raising Parties.  The Distribution Record Date shall not apply to Securities of the Debtors deposited with DTC or another similar securities depository, the Holders of which shall receive a distribution in accordance with Article VII of the Plan and, as applicable, the customary procedures of DTC or another similar securities depository.

84.     "*DTC*" means The Depository Trust Company, a New York corporation.

85.     "*EEA*" means the European Economic Area.

86.     "*Effective Date*" means the first Business Day after the Confirmation Order is entered on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article X.A of the Plan have been satisfied or waived in accordance with Article X.B of the Plan and (b) the Plan is declared effective by the Debtors.

87.    "*Eligible Participants*" has the meaning ascribed to such term in the Financing Commitment and Backstop Agreement.

88.    "*Emergence Awards*" means the awards that may be allocated on or prior to the Effective Date as emergence grants to recruit individuals selected to serve in key senior management positions on or after the Effective Date, subject to the terms and conditions, including, but not limited to, with respect to form, allocated percentage of the Management Incentive Plan Pool, structure, and vesting, determined by, in each case, the Required Consenting Creditors and the Required Equity Capital Raising Parties.

89.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

90.    "*Equity Capital Raising Party*" has the meaning ascribed to such term in the Financing Commitment and Backstop Agreement.

91.    "*ERO Backstop Premium*" has the meaning ascribed to such term in the Financing Commitment and Backstop Agreement.

92.    "*ERO Backstop Premium Shares*" has the meaning ascribed to such term in the Financing Commitment and Backstop Agreement.

93.    "*Estate*" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

94.    "*EU/UK Qualified Investor*" has the meaning given to "qualified investors" as set forth in Article 2(e) of the Prospectus Regulation.

95.    "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) each non-executive director of any Debtor entity; (c) the Creditors' Committee; and (d) the Creditors' Committee Members.

96.    "*Executive Directors*" means each of Mooky Greidinger, Israel Greidinger, Nisan Cohen, and Renana Teperberg.

97.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

98.    "*Existing Interests*" means any Interest in Cineworld Parent, including, for the avoidance of doubt, the common stock of Cineworld Parent, which is traded and quoted on the Main Market of the London Stock Exchange under the symbol "CINE" as of the date hereof, and any and all outstanding and unexercised or unvested warrants, options, or rights to acquire such common stock existing prior to the Effective Date.

99.    "*Exit First Lien Facility*" means the first lien senior secured debt credit facility for the Exit First Lien Facility Amount, to be raised either in the form of the Raised Exit First Lien Facility or the Sponsored Exit First Lien Facility, and which shall be on the terms set forth in the Exit First Lien Facility Documents, as determined by the Debtors, the Required Equity Capital Raising Parties, and the Required Consenting Creditors.

100.    "*Exit First Lien Facility Agent*" means the administrative agent and collateral agent under the Exit First Lien Facility, solely in their respective capacities as such.

101.    "*Exit First Lien Facility Amount*" means an aggregate principal amount of $1.46 billion (net of OID), subject to a dollar-for-dollar downward adjustment for the net cash proceeds, if any, received by the Debtors in connection with a Partial Sale.

102.    "*Exit First Lien Facility Documents*" means, collectively, the applicable credit agreements, collateral documents, mortgages, deeds of trust, Uniform Commercial Code statements, and other loan documents governing the Exit First Lien Facility, the material documents of which shall be included in the Plan Supplement.

103.    "*Exit First Lien Facility Lenders*" means, collectively, the Sponsored Facility Capital Raising Parties and such other financial institutions and other entities that may from time from time become lenders under the Exit First Lien Facility.

104.    "*Exit First Lien Facility Premium*" has the meaning ascribed to such term in the Financing Commitment and Backstop Agreement.

105.    "*Exit First Lien Facility Premium Shares*" has the meaning ascribed to such term in the Financing Commitment and Backstop Agreement.

106.    "*Exit First Lien Facility Secured Parties*" means, collectively, the Exit First Lien Facility Lenders and the Exit First Lien Facility Agent.

107.    "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

108.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

109.    "*Final DIP Order*" means the final order entered by the Bankruptcy Court on October 31, 2022 [Docket No. 676], as corrected and amended by the final order entered by the Bankruptcy Court on November 3, 2022 [Docket No. 722].

110.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing has been timely taken; or as to which, any appeal that has been taken or any petition for certiorari that has been or may be filed has been withdrawn with prejudice, resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought, or the new trial, reargument, or rehearing has been denied, resulted in no stay pending appeal or modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

111.    "*Financing Commitment and Backstop Agreement*" means that certain Financing Commitment and Backstop Agreement, by and among Cineworld Parent, the Capital Raising Parties, and the Debtors party thereto, dated as of April 2, 2023 (as may be amended, supplemented, or otherwise modified from time to time), pursuant to which, among other things, the Capital Raising Parties have agreed to subscribe for the Direct Equity Allocation, backstop the Rights Offering, and, as may be necessary, provide the Sponsored Exit First Lien Facility.

112.    "*Financing Commitment and Backstop Agreement Motion*" means the Debtors' motion seeking approval of the Financing Commitment and Backstop Agreement, which shall be (a) in form and substance acceptable to (i) the Required Consenting Creditors and (ii) the Required Equity Capital Raising Parties, (b) reasonably acceptable to the Required Exit Facility Commitment Parties, and (c) consistent with the Restructuring Support Agreement.

113.    "*Financing Commitment and Backstop Agreement Order*" means the order entered by the Bankruptcy Court (a) approving and authorizing the Debtors' entry into, and performance of all obligations under, the Financing Commitment and Backstop Agreement and the other Rights Offering Documents, including the Debtors' obligation to pay the Exit First Lien Facility Premium and the ERO Backstop Premium, (b) which shall be in form and substance (i) acceptable to the Required Consenting Creditors and the Required Equity Capital Raising Parties and (ii) reasonably acceptable to the Required Exit Facility Commitment Parties, and (c) which shall be consistent with the Restructuring Support Agreement.

114.    "*First Lien Final Allocated Percentage*" means the commitment that each Capital Raising Party has committed to provide pursuant to the Financing Commitment and Backstop Agreement (as amended, supplemented, or otherwise modified from time to time in accordance with the Financing Commitment and Backstop Agreement), as set forth in <u>Schedule 2</u> to the Financing Commitment and Backstop Agreement, with respect to the Sponsored Exit First Lien Facility in the respective percentages set forth therein, which percentages add up to 100% in the aggregate.

115.    "*FPO*" means the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 of the United Kingdom, as now in effect or hereafter amended.

116.    "*FSMA*" means the Financial Services and Markets Act 2000 of the United Kingdom, as now in effect or hereafter amended.

117.    "*General Unsecured Claim*" means any Unsecured Claim against any of the Debtors, other than: (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) a Section 510(b) Claim; (e) an Intercompany Claim; or (f) any other Secured Claim.  For the avoidance of doubt, General Unsecured Claims include (i) Claims resulting from the rejection of Executory Contracts and Unexpired Leases (ii) Unsecured Claims resulting from litigation against one or more of the Debtors, including, for the avoidance of doubt, the Cineplex Judgment Claims, and (iii) the Convertible Bonds Claims.

118.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

119.    "*GUC Litigation Trust Interests*" means interests in the Litigation Trust held by Holders of Allowed General Unsecured Claims representing a right to recovery to (a) the first $5 million of Cash recovery by the Litigation Trust from the Interchange Litigation Claims and (b) 50% of any Cash recovered in excess of $5 million in connection with such claims.

120.    "*GUC Recovery Pool*" means (a) (i) $10 million in Cash and (ii) the GUC Litigation Trust Interests, less (b) any Litigation Trust Expenses.

121.    "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor, as applicable.

122.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

123. "*Implementation Mechanism*" means any implementation mechanism(s) (which, for the avoidance of doubt, may be more than one), which conform to and are consistent with the terms of the Restructuring Support Agreement and in each case subject to the consent (not to be unreasonably withheld) of the Required Consenting Creditors and Required Equity Capital Raising Parties, utilized for the purpose of implementing the Restructuring Transactions (including any Real Estate Plan, as applicable) in a manner that gives effect to, or facilitates, the implementation of the Plan in the UK and, if applicable, Jersey or other jurisdictions, including, but not limited to, (a) an Administration, (b) a Scheme of Arrangement, (c) a Shareholder Meeting, (d) a UK Company Voluntary Arrangement, (e) a UK Restructuring Plan, and/or (f) Ancillary Proceedings.

124. "*Interchange Litigation*" means the class action lawsuit captioned *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL 1720 (MKB) (JO) (E.D.N.Y.) and under any such similar class action against credit card issuers arising from similar allegations as those set forth in the Interchange Litigation as may be identified on or after the Effective Date.

125. "*Interchange Litigation Claims*" means the claims of the Debtors incorporated in the U.S. in the Interchange Litigation.

126. "*Intercompany Claim*" means any Claim held by a Debtor or Affiliate of a Debtor against another Debtor or Affiliate of a Debtor.

127. "*Intercompany Interest*" means, other than an Interest in Cineworld Parent, any Interest in one Debtor held by another Debtor.

128. "*Interests*" means collectively, any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor and American depositary shares, American depositary receipts, options, warrants, rights, restricted stock awards, performance share awards, performance share units, stock appreciation rights, phantom stock rights, stock-settled restricted stock units, cash-settled restricted stock units, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (in each case whether or not arising under or in connection with any employment agreement, separation agreement, or employee incentive plan or program of a Debtor as of the Petition Date and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or similar security); *provided* that, for the avoidance of doubt, Interests does not include the Convertible Bonds.

129. "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 666] (as amended, modified, or supplemented from time to time in accordance with the terms thereof).

130. "*IRS*" means the United States Internal Revenue Service.

131. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

132. "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

133.    "*Legacy Facilities*" means, collectively, the Legacy Revolving Facility and the Legacy Term Loan Facility.

134.    "*Legacy Facilities Agent*" means Barclays Bank PLC, in its capacity as administrative agent under the Legacy Facilities Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the Legacy Facilities Credit Agreement.

135.    "*Legacy Facilities Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Legacy Revolving Facility, the Legacy Term Loan Facility, or the Legacy Facilities Credit Agreement Documents other than the First Lien AP Superpriority Claims (as defined in the Final DIP Order).

136.    "*Legacy Facilities Claims Litigation Trust Interests*" means an interest in the Litigation Trust representing a right to recovery of 50% of any Cash recovered by the Litigation Trust on account of the Interchange Litigation Claims in excess of $5 million (net of Litigation Trust Expenses).

137.    "*Legacy Facilities Credit Agreement*" means that certain credit agreement, dated as of February 28, 2018, by and between Crown UK, as guarantor, Crown Finance, as borrower, the Revolving Credit Borrowers (as defined in the Legacy Facilities Credit Agreement) party thereto, the guarantors party thereto, the lenders and issuers party thereto, and Barclays Bank PLC, as agent, as amended, supplemented, or modified from time to time.

138.    "*Legacy Facilities Credit Agreement Documents*" means, collectively, the Legacy Facilities Credit Agreement and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, and other security documents, as amended, supplemented, or modified from time to time.

139.    "*Legacy Facilities Lenders*" means the lenders party to the Legacy Facilities Credit Agreement.

140.    "*Legacy Revolving Facility*" means that certain revolving credit facility provided for under the Legacy Facilities Credit Agreement.

141.    "*Legacy Term Loan Facility*" means that certain term loan facility provided for under the Legacy Facilities Credit Agreement.

142.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

143.    "*Litigation Trust*" means the liquidating trust established for the benefit of the Litigation Trust Beneficiaries on the Effective Date in accordance with the Plan and the Litigation Trust Agreement.

144.    "*Litigation Trustee*" means the trustee for the Litigation Trust to be selected by the Creditors' Committee.

145.    "*Litigation Trust Agreement*" means the litigation trust agreement, as may be amended, supplemented, restated, or otherwise modified from time to time, substantially in the form to be included in the Plan Supplement, which shall be reasonably acceptable to the Debtors, the Creditors' Committee, the Required Consenting Creditors and the Required Equity Capital Raising Parties.

146.   "*Litigation Trust Assets*" means, collectively, (a) $10 million in Cash, (b) all of the Estates' rights, title, and interest in the Interchange Litigation and the Interchange Litigation Claims, and (c) the Litigation Trust Funding.

147.   "*Litigation Trust Beneficiaries*" means the holders of (a) Allowed General Unsecured Claims to the extent of the GUC Recovery Pool and (b) the Legacy Facilities Claims solely to the extent of Litigation Trust Interests, in accordance with the Plan and the Litigation Trust Agreement; *provided* that, for the avoidance of doubt, the Executive Directors shall not be Litigation Trust Beneficiaries.

148.   "*Litigation Trust Expenses*" means expenses (including, but not limited to, any taxes imposed on or payable by the Litigation Trust or in respect of the Litigation Trust Assets and professional fees) incurred by the Litigation Trust and any additional amount determined to be necessary or appropriate by the Litigation Trustee to adequately reserve for the operating expenses of the Litigation Trust that shall be paid out of the Litigation Trust Assets; *provided* that, for the avoidance of doubt, the Reorganized Debtors shall provide no additional funding for the Litigation Trust other than the Litigation Trust Funding.

149.   "*Litigation Trust Funding*" means $500,000 in Cash, which will be used for the administration of the Litigation Trust, including the disposition of the Interchange Litigation Claims and the reconciliation of General Unsecured Claims that are Litigation Trust Beneficiaries.

150.   "*Litigation Trust Interests*" means, collectively, the GUC Litigation Trust Interests and the Legacy Facilities Claims Litigation Trust Interests.

151.   "*Management Incentive Plan*" means an equity incentive plan, becoming effective on or after the Effective Date, providing for the issuance, from time to time, of equity and equity-based awards with respect to the New Common Stock, as approved by the New Board.

152.   "*Management Incentive Plan Pool*" means a pool of up to 7.5% of the value of the New Common Stock on a fully diluted basis, as of the Effective Date, reserved for issuance pursuant to the Management Incentive Plan, including Emergence Awards, if any.

153.   "*Midwest Facility*" means that certain secured credit facility provided for under the Midwest Facility Loan Agreement.

154.   "*Midwest Facility Claims*" means any Claim against a Debtor arising under, derived from, based on, or related to the Midwest Facility or the Midwest Facility Documents.

155.   "*Midwest Facility Documents*" means, collectively, the Midwest Facility Loan Agreement and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, and other security documents, as amended, supplemented, or modified from time to time.

156.   "*Midwest Facility Loan Agreement*" means that certain loan agreement, dated as of July 1, 2021, by and between Regal Entertainment Group, as borrower, and Arvest Bank, as lender, as amended, supplemented, or modified from time to time.

157.   "*MIP Documents*" means, if applicable, any and all documentation required to implement the terms of the Management Incentive Plan.

158.    "*New Board*" means the new board of directors of Reorganized Cineworld Parent or each of the Reorganized Debtors (if applicable and as the context requires), which shall be selected in accordance with the terms of the Corporate Governance Term Sheet.

159.    "*New Common Stock*" means the common stock, common shares, ordinary shares, or other common Interest or unit, as applicable, of Reorganized Cineworld Parent.

160.    "*New Money Revolving Credit Facility*" means the first out super-senior revolving credit facility in an amount up to $200 million (or a facility of equal quantum), which shall be on the terms set forth in the New Money Revolving Credit Facility Documents.

161.    "*New Money Revolving Credit Facility Agent*" means the administrative agent and collateral agent, under the New Money Revolving Credit Facility, solely in their respective capacities as such.

162.    "*New Money Revolving Credit Facility Documents*" means, collectively, the applicable credit agreements, collateral documents, mortgages, deeds of trust, Uniform Commercial Code statements, and other loan documents governing the New Money Revolving Credit Facility.

163.    "*New Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, shareholders' agreement, or such other applicable formation documents, of each of the Reorganized Debtors; *provided* that nothing herein shall be deemed to require Cineworld Parent or Cineworld Funding to amend such documents in respect of Cineworld Parent and Cineworld Funding.

164.    "*New Stockholders Agreement*" means the definitive stockholders agreement or other applicable agreement (including all annexes, exhibits, and scheduled thereto) governing the New Common Stock, which shall be (a) in form and substance acceptable to (i) the Required Consenting Creditors and (ii) the Required Equity Capital Raising Parties and (b) consistent with the Restructuring Support Agreement, including the Corporate Governance Term Sheet.

165.    "*Nominee*" means the Person named in a UK Company Voluntary Arrangement responsible for, among other things, reporting to the applicable court in the UK on the outcome of the creditors meeting convened to approve such UK Company Voluntary Arrangement and supervising the implementation of such UK Company Voluntary Arrangement that has been approved by requisite creditors.

166.    "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

167.    "*Other Secured Claim*" means any Secured Claim other than:  (a) the DIP Claims; (b) the Legacy Facilities Claims; and (c) the Midwest Facility Claims.

168.    "*Partial Sale*" has the meaning ascribed to such term in the Restructuring Support Agreement.

169.    "*Permitted UK Person*" has the meaning set forth in <u>Article IV.D.1</u> of this Plan.

170.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

171.    "*Petition Date*" means September 7, 2022, the date on which the Debtors commenced the Chapter 11 Cases.

172.     "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims, Allowed Interests, or other eligible Entities in accordance with the Plan.

173.     "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof, the Restructuring Support Agreement, and the Financing Commitment and Backstop Agreement and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors no later than seven days before the deadline set by the Disclosure Statement Order to object to the Plan or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable: (a) the New Organizational Documents, the New Stockholders Agreement, and the Registration Rights Agreement; (b) to the extent known, the identities of the members of the New Board; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) the Schedule of Proposed Cure Amounts; (e) the Schedule of Retained Causes of Action; (f) the material form Exit First Lien Facility Documents; (g) the Restructuring Transactions Memorandum; (h) the UK Implementation Agreement, if applicable; (i) documentation relating to the Emergence Awards, if applicable; (j) the Litigation Trust Agreement; (k) the Consulting Agreements; and (l) any other necessary documentation related to any Restructuring Transactions.  The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement up to the Effective Date as set forth in the Plan, subject, in each case, to the consent rights set forth in the Plan, the Restructuring Support Agreement, and the Financing Commitment and Backstop Agreement.  The Plan Supplement shall be deemed incorporated into and part of the Plan as if set forth herein in full; *provided* that, in the event of a conflict between the Plan and the Plan Supplement, the Plan Supplement shall control in accordance with <u>Article I.G</u>; *provided*, *further,* that each such compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof, the Restructuring Support Agreement, and the Financing Commitment and Backstop Agreement and in accordance with the Bankruptcy Code and the Bankruptcy Rules) shall be in form and substance (i) acceptable to the Required Consenting Creditors, the Required Equity Capital Raising Parties, and, solely with respect to terms and provisions, if any, affecting the rights, duties, obligations, benefits, privileges, protections, indemnities, and immunities of an Agent, the applicable Agent,  and, (ii) to the extent set forth in the Restructuring Support Agreement and the Financing Commitment and Backstop Agreement, reasonably acceptable to the Required Exit Facility Commitment Parties, at the time they are Filed and after any alteration, amendment, modification, or supplement.

174.     "*Premium Shares*" means, collectively, the Exit First Lien Facility Premium Shares and the ERO Backstop Premium Shares.

175.     "*Priming Agent*" means Barclays Bank PLC, in its capacity as administrative agent under the Priming Facilities Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the Priming Facilities Credit Agreement.

176.     "*Priming Facilities*" means the senior secured term loans provided for under the Priming Facilities Credit Agreement.

177.     "*Priming Facilities Credit Agreement*" means that certain credit agreement, dated as of November 23, 2020, by and between Crown UK, as guarantor, Crown Finance, as borrower, the subsidiary guarantors party thereto, the lenders party thereto, and Barclays Bank PLC, as agent, as amended, supplemented, or modified from time to time.

178.     "*Priming Facilities Documents*" means, collectively, the Priming Facilities Credit Agreement and all other agreements, documents, and instruments delivered or entered into in connection

therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, and other security documents, as amended, supplemented, or modified from time to time.

179.     "*Priming Lenders*" means the lenders party to the Priming Facilities Credit Agreement.

180.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

181.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class or the proportion of the Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed Interests under the Plan, unless otherwise indicated.

182.     "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or as of the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

183.     "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.C.3 of the Plan.

184.     "*Professional Fee Claim*" means any Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

185.     "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on the Effective Date in an amount equal to the total estimated Professional Fee Amount.

186.     "*Proof of Claim*" means a proof of Claim against any of the Debtors Filed in the Chapter 11 Cases.

187.     "*Proof of Interest*" means a proof of Interest in any of the Debtors Filed in the Chapter 11 Cases.

188.     "*Prospectus Regulation*" means Regulation (EU) No 2017/1129 of the European Parliament and of the European Council of 14 June 2017, as now in effect or hereafter amended or superseded, and the rules and regulations promulgated thereunder, and such regulation, as it forms part of retained EU Law as defined in the European Union (Withdrawal) Act 2018, as now in effect or hereafter amended or superseded).

189.     "*Raised Exit First Lien Facility*" means a third-party financing alternative to the Sponsored Exit First Lien Facility for the Exit First Lien Facility Amount, which, for the avoidance of doubt, may be in the form of secured or unsecured indebtedness, including secured or unsecured notes, in an amount equal to the Exit First Lien Facility Amount; *provided* that a proposed Raised Exit First Lien Facility may be

selected instead of the Sponsored Exit First Lien Facility only if (a) (i) such Raised Exit First Lien Facility provides for an all-in yield through maturity, as calculated in a manner acceptable to the Required Consenting Creditors and Required Equity Capital Raising Parties and in good faith by the Debtors using an internal rate of return basis after accounting for reasonably expected and associated fees of such Raised Exit First Lien Facility, of at least 250 basis points lower than the Sponsored Exit First Lien Facility and (ii) the Required Consenting Creditors and Required Equity Capital Raising Parties provide written consent or (b) the Supermajority Equity Capital Raising Parties provide written consent.

190.    "*RCI*" means Debtor Regal Cinemas, Inc., a Tennessee corporation.

191.    "*Real Estate Plan*" has the meaning ascribed to such term in the Restructuring Term Sheet.

192.    "*REG*" means Debtor Regal Entertainment Group, a Delaware corporation.

193.    "*Registration Rights Agreement*" means the agreement covering registration of the New Common Stock, which shall be (a) in form and substance acceptable to (i) the Required Consenting Creditors and (ii) the Required Equity Capital Raising Parties, and (b) consistent with the Restructuring Support Agreement.

194.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to a Claim or Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

195.    "*Related Party*" means, collectively, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, shareholders, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of Law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts, or funds, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, fiduciaries, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, restructuring advisors, and other professionals and advisors, and any such person's or Entity's respective predecessors, successors, assigns, heirs, executors, estates, and nominees.

196.    "*Related Purchaser*" means, with respect to any Capital Raising Party, any reasonably creditworthy Affiliate or Affiliated Fund of such Capital Raising Party (other than any portfolio company of such Capital Raising Party or its Affiliates).

197.    "*Released Claims*" means any Claim or Interest that has been released, satisfied, stayed, terminated, discharged, or is subject to compromise and settlement pursuant to the Plan.

198.    "*Released Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each Agent; (d) each Trustee; (e) each Administrator (if any); (f) the DIP Lenders; (g) the Creditors' Committee; (h) each Creditors' Committee Member in its capacity as such; (i) the Capital Raising Parties; (j) the Consenting Creditors; (k) all Releasing Parties; and (l) each Related Party of each Entity in clauses (a) through (k).

199.    "*Releasing Parties*" means collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) each Agent; (d) each Trustee; (e) the DIP Lenders; (f) the Creditors' Committee; (g) each Creditors' Committee Member in its capacity as such; (h) the Capital Raising Parties; (i) the Consenting Creditors; (j) all Holders of Claims or Interests who vote to accept the Plan; (k) all

Holders of Claims or Interests that are deemed to accept the Plan; (l) all Holders of Claims or Interests that are deemed to reject the Plan and who do not opt out of the releases in the Plan; (m) all Holders of Claims or Interests who abstain from voting on the Plan and who do not opt out of the releases in the Plan; (n) all Holders of Claims or Interests who vote to reject the Plan and who do not opt out of the releases in the Plan; and (o) each Related Party of each Entity in clauses (a) through (n); *provided* that, in each case, an Entity shall not be a Releasing Party if it:  (i) elects to opt out of the Third-Party Release; or (ii) timely objects to the Third-Party Release and such objection is not resolved before Confirmation.

200.    "*Reorganized Cineworld Parent*" means, as determined by the Required Consenting Creditors and the Required Equity Capital Raising Parties in their sole discretion and otherwise reasonably acceptable to the Debtors, a new corporation, limited liability company, partnership, or other entity that may be formed to, among other things, directly or indirectly own and hold all or substantially all of the assets and/or stock (including share capital) of the Debtors (other than the share capital of Cineworld Parent), as applicable, in accordance with the Restructuring Support Agreement and this Plan, and issue the New Common Stock to be distributed pursuant to the Restructuring Transactions.

201.    "*Reorganized Crown UK*" means Crown UK, as reorganized pursuant to and under the Plan and the Plan Supplement, on and after the Effective Date, or any successor or assign thereto, including by merger, consolidation, sale, subscription or otherwise, and including any new entity established in connection with the implementation of the Restructuring Transactions.

202.    "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under the Plan and the Plan Supplement, on and after the Effective Date, or any successors or assigns thereto including by merger, consolidation, or otherwise, and including any new entity established in connection with the implementation of the Restructuring Transactions, including, for the avoidance of doubt, Reorganized Cineworld Parent.

203.    "*Required Consenting Creditors*" means, as of the relevant date, Consenting Creditors holding at least a majority of the Legacy Facilities Claims held by all Consenting Creditors.

204.    "*Required Equity Capital Raising Parties*" means the Equity Capital Raising Parties holding at least a majority of (a) the Backstop Commitment and (b) the Direct Allocation Amount, calculated as of the date on which consent or approval is requested (excluding, in each case, any Defaulting Capital Raising Party).

205.    "*Required Exit Facility Commitment Parties*" means the Capital Raising Parties holding at least a majority of the aggregate commitments for the Sponsored Exit First Lien Facility as of the date on which consent or approval is requested (excluding any Defaulting Capital Raising Party).

206.    "*Restructuring Expenses*" means the reasonable and documented fees and expenses of the Ad Hoc Group Professionals accrued since the inception of their respective engagements related to the Chapter 11 Cases and the implementation of the Restructuring Transactions and not previously paid by, or on behalf of, the Debtors.

207.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of April 2, 2023, by and among the Debtors and the Consenting Creditors, including all exhibits, schedules, and other attachments thereto, as such agreement may be amended, modified, or supplemented from time to time, solely in accordance with the terms thereof.

208.    "*Restructuring Term Sheet*" means that certain restructuring term sheet, attached as Exhibit A to the Restructuring Support Agreement.

209.    "*Restructuring Transactions*" means the mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, formations, dissolutions or other corporate transactions described in, approved by, contemplated by, or undertaken to implement the Plan, including those described in Article IV.B hereof, in each case, as applicable, acceptable in form and substance to the Required Consenting Creditors, and the Required Equity Capital Raising Parties.

210.    "*Restructuring Transactions Memorandum*" means the document that sets forth certain steps to be carried out to implement the Restructuring Transactions in accordance with this Plan, which shall be (a) in form and substance acceptable to (i) the Debtors, (ii) the Required Consenting Creditors, and (iii) the Required Equity Capital Raising Parties and (b) consistent with the Restructuring Support Agreement and the related Definitive Documents.

211.    "*Rights Offering*" means a $400 million rights offering of New Common Stock, on the terms and conditions set forth in the Rights Offering Procedures and as further detailed in Article IV.D.2(b) of this Plan.  The Rights Offering will be backstopped by the Capital Raising Parties on the terms set forth in the Financing Commitment and Backstop Agreement.

212.    "*Rights Offering Backstop Commitment*" means the commitment of each Equity Capital Raising Party pursuant to the Financing Commitment and Backstop Agreement, on a several and not joint basis, to purchase in the Rights Offering, based on its Backstop Final Allocated Percentage, its respective number of Rights Offering Shares not subscribed for in the Rights Offering.

213.    "*Rights Offering Documents*" means, collectively, the Financing Commitment and Backstop Agreement Motion, the Financing Commitment and Backstop Agreement Order, the Financing Commitment and Backstop Agreement, and any and all other agreements, documents, and instruments delivered or entered into in connection with, or otherwise governing, the Rights Offering, including the Rights Offering Procedures, subscription forms, and any other materials distributed in connection with the Rights Offering, which, in each case, shall be (a) in form and substance acceptable to (i) the Required Consenting Creditors and (ii) the Required Equity Capital Raising Parties and (b) consistent with the Restructuring Support Agreement and the Financing Commitment and Backstop Agreement.

214.    "*Rights Offering Procedures*" means the procedures governing the Rights Offering, which shall be (a) in form and substance acceptable to (i) the Required Consenting Creditors and (ii) the Required Equity Capital Raising Parties and (b) consistent with the Restructuring Support Agreement and the Financing Commitment and Backstop Agreement.

215.    "*Rights Offering Shares*" means the New Common Stock to be issued pursuant to the Rights Offering.

216.    "*RO Backstop Shares*" means the Rights Offering Shares not subscribed for in the Rights Offering which are to be purchased by the Equity Capital Raising Parties in accordance with the Financing Commitment and Backstop Agreement.

217.    "*RoW Group*" means, collectively, Crown NL Holdco B.V. and Cinema City Holdings B.V., together with their direct and indirect subsidiaries.

218.    "*Sale Transaction*" means, if applicable, a transaction to effectuate the sale of all or substantially all or a material portion of the assets of the Debtors and any non-Debtor direct or indirect subsidiary of the Debtors (including a Partial Sale), free and clear of liabilities (subject to customary exceptions) under section 363 of the Bankruptcy Code, which transaction, if to be pursued, shall be on terms

and conditions acceptable to the Required Equity Capital Raising Parties, the Supermajority Consenting Creditors, and, solely with respect to terms and provisions affecting the rights, duties, obligations, benefits, privileges, protections, indemnities, and immunities of an Agent, the applicable Agent.

219.   "*Schedule of Proposed Cure Amounts*" means any schedule (including any amendments, supplements, or modifications thereto) of the Debtors' proposed Cure amounts (if any) with respect to each of the Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan.

220.   "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments, supplements, or modifications thereto) of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, which schedule shall contain, consistent with the Creditors' Committee Settlement, that certain Antitrust Settlement Contract, dated as of April 2, 2012, by and between Regal Cinemas, Inc. and Financial Recovery Services, Inc. in respect of the Interchange Litigation, among others.

221.   "*Schedule of Retained Causes of Action*" means the schedule of Causes of Action that shall vest in the Reorganized Debtors on the Effective Date, which, for the avoidance of doubt, shall not include any of the Causes of Action that are settled, released, or exculpated under the Plan.

222.   "*Scheme of Arrangement*" means a scheme of arrangement with respect to any Debtor pursuant to Part 26 of the Companies Act 2006, governed by the Law of England & Wales.

223.   "*SEC*" means the United States Securities and Exchange Commission.

224.   "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

225.   "*Secured Claim*" means a Claim that is:  (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable Law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim.

226.   "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time, or any similar federal, state, or local Law.

227.   "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

228.   "*Settlement Facility*" means the unsecured credit facility provided for under the Settlement Facility Documents.

229.   "*Settlement Facility Credit Agreement*" means that certain credit agreement, dated as of September 9, 2021, by and between Crown UK, as guarantor, Crown Finance, as borrower, the subsidiary guarantors party thereto, the lenders party thereto, and Wilmington Trust, National Association, as agent, as amended, supplemented, or modified from time to time.

230.   "*Settlement Facility Documents*" means, collectively, the Settlement Facility Credit Agreement and all other agreements, documents, and instruments delivered or entered into in connection

therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, and other security documents, as amended, supplemented, or modified from time to time.

231.    "*Shareholder Meeting*" means a general meeting convened in accordance with the Companies Act 2006 (United Kingdom), Cineworld Parent's articles of association, and any other applicable rules and legislation, obtaining consent from Cineworld Parent's shareholders for any aspects of the Restructuring Transactions that may require Cineworld Parent's shareholders' consent.

232.    "*Solicitation Agent*" means Kroll Restructuring Administration LLC, the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases [Docket No. 58].

233.    "*Solicitation Materials*" means all materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

234.    "*Sponsored Exit First Lien Facility*" means the Exit First Lien Facility provided by the Sponsored Facility Capital Raising Parties pursuant to the Financing Commitment and Backstop Agreement and on the terms and conditions set forth in the Sponsored Exit First Lien Facility Term Sheet attached to the Restructuring Support Agreement as Exhibit B.

235.    "*Sponsored Facility Capital Raising Party*" has the meaning ascribed to such term in the Financing Commitment and Backstop Agreement.

236.    "*Subscription Rights*" means the rights to purchase the Rights Offering Shares pursuant to the Rights Offering.

237.    "*Supermajority Equity Capital Raising Parties*" means the Equity Capital Raising Parties holding at least 66 2/3% of the aggregate Backstop Commitments and the commitments in respect of the Direct Allocation Shares as of the date on which consent or approval is requested (excluding any Defaulting Capital Raising Parties).

238.    "*Tax Code*" means the United States Internal Revenue Code of 1986, as amended.

239.    "*Third-Party Release*" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article IX.D of the Plan.

240.    "*Treasury Regulations*" means the regulations promulgated under the Internal Revenue Code by the United States Department of the Treasury pursuant to the Tax Code.

241.    "*Trustee*" means any indenture trustee, collateral trustee, or other trustee or similar Entity under the Convertible Bond Documents.

242.    "*UK*" means the United Kingdom of Great Britain and Northern Ireland.

243.    "*UK Company Voluntary Arrangement*" means a company voluntary arrangement with respect to any Debtor pursuant to Part I of the Insolvency Act of 1986, governed by the Laws of England & Wales.

244.    "*UK Implementation Agreement*" means, if applicable, that certain UK Implementation Agreement, a substantially final form of which shall be acceptable in form and substance to the Required Consenting Creditors and the Required Equity Capital Raising Parties and included in the Plan Supplement,

which sets out the actions to be taken in respect of the Implementation Mechanisms (including, where applicable, by the Administrator(s)) to implement the Plan in the UK and, if and as applicable, Jersey or other jurisdictions.

245.     "*UK Restructuring Plan*" means a restructuring plan with respect to any Debtor pursuant to Part 26A of the Companies Act 2006, governed by the Laws of England & Wales.

246.     "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check within 180 calendar days of receipt; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution within 180 calendar days of receipt; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution prior to the deadline included in such request for information; or (d) timely taken any other action necessary to facilitate such distribution.

247.     "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

248.     "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

249.     "*Unsecured Claim*" means any Claim that is not a Secured Claim.

250.     "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

B.     *Rules of Interpretation.*

For purposes of the Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or the Confirmation Order, as applicable; (c) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof; (e) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (f) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) subject to the provisions of any contract, charters, bylaws, partnership agreements, limited liability company agreements, operating agreements, or other organizational documents or shareholders' agreements, as applicable, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable Law, including the Bankruptcy Code and the Bankruptcy Rules; (h) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (i) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (j) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (k) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's Case

Management and Electronic Case Filing system; (l) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (m) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable; (n) captions and headings are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (o) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; and (p) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective Person or Entity that have such consent, acceptance, or approval rights, including by electronic mail.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Subject to the requirements of the Restructuring Transactions Memorandum and any other Definitive Document, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Except to the extent a rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code or the Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the Laws of the State of New York, without giving effect to conflict of Laws principles; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the Laws of the jurisdiction of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable, and matters relating to any Implementation Mechanism shall be governed by the Laws of the jurisdiction in which such Implementation Mechanism takes place (which, for any Administration, any Scheme of Arrangement, any UK Voluntary Company Arrangement, any UK Restructuring Plan, or any Shareholder Meeting shall be the Laws of England and Wales).

E.      *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the

Confirmation Order and the Plan, including the Plan Supplement, or the Disclosure Statement, the Confirmation Order shall control.

H.      *Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the Restructuring Support Agreement set forth therein and of the parties to the Financing Commitment and Backstop Agreement set forth therein with respect to the form and substance of this Plan, any Definitive Document, all exhibits to the Plan, and the Plan Supplement, or any other document with respect to the implementation of the Plan and the Restructuring Transactions, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference and be fully enforceable as if stated in full herein.  Failure to reference in this Plan the rights referred to in the immediately preceding sentence as such rights relate to any document referenced in the Restructuring Support Agreement or the Financing Commitment and Backstop Agreement, as applicable, shall not impair such rights and obligations.  In case of a conflict between the consent rights of the parties to the Restructuring Support Agreement that are set forth in the Restructuring Support Agreement or of the parties to the Financing Commitment and Backstop Agreement that are set forth in the Financing Commitment and Backstop Agreement, as applicable, with those parties' consent rights that are set forth in the Plan or the Plan Supplement, the consent rights in the Restructuring Support Agreement or the Financing Commitment and Backstop Agreement, as applicable, shall control.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS,
## PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Except with respect to the Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtor(s) against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtor on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of such an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims must do so by the Administrative Claims Bar Date. Objections to such requests must be Filed and served on the requesting party and the Debtors (if the Debtors are not the objecting party) by the Administrative Claims Objection Bar Date. Holders of such Claims who do not File and serve such requests by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or the Reorganized Debtors, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and any prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

B.     *DIP Claims.*

The DIP Claims shall be deemed to be Allowed Claims in the full amount outstanding under the DIP Facility Credit Agreement as of the Effective Date (including any unpaid accrued interest and unpaid fees, expenses, and other obligations under the DIP Facility Credit Agreement as of the Effective Date). In full satisfaction, settlement, discharge, and release of, and in exchange for, the DIP Claims, each Holder of an Allowed DIP Claim shall be indefeasibly paid and satisfied in full in Cash on the Effective Date except to the extent that a Holder of a DIP Claim agrees to less favorable treatment; *provided* that, for administrative convenience and in accordance with the Financing Commitment and Backstop Agreement and the Rights Offering Procedures, as applicable, each Holder of an Allowed DIP Claim that is a Capital Raising Party may elect to have Cash that it would be entitled to receive on account of its Allowed DIP Claim be used to satisfy all or a portion of its commitments in respect of the Capital Raise on a dollar-for-dollar basis (the "Capital Raise Convenience Election"). A Capital Raising Party that is a Holder of an Allowed DIP Claim may elect to use the Capital Raise Convenience Election, which shall constitute such Holder of an Allowed DIP Claim's consent that its DIP Claims, to the extent such DIP Claims are used in such election, shall be deemed satisfied for purposes of section 1129(a)(9) of the Bankruptcy Code. Except as otherwise expressly provided in the DIP Facility Credit Agreement or the DIP Orders, upon the indefeasible payment or satisfaction in full of all Allowed DIP Claims, all commitments under the DIP Facility Credit Agreement shall terminate and all Liens and security interests granted to secure the DIP Claims shall be automatically terminated and of no further force and effect, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Notwithstanding anything to the contrary in this Plan or the Confirmation Order, the DIP Facility and the DIP Facility Documents shall continue in full force and effect (other than, for the avoidance of doubt, any Liens or other security interests terminated pursuant to this Article II.B) after the Effective Date with respect to any contingent or unsatisfied obligations thereunder, as applicable, including, but not limited to, those provisions relating to the rights of the DIP Agent and the DIP Lenders to expense reimbursement, indemnification, and any other similar obligations of the Debtors to the DIP Agent and the DIP Lenders (which rights shall be fully enforceable against the Reorganized Debtors) and any provisions thereof that may survive termination or maturity of the DIP Facility in accordance with the terms thereof.

C.     *Professional Fee Claims.*

1.     Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than forty-five days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court, including the

Interim Compensation Order. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows, including from the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan.

2.   Professional Fee Escrow Account.

No later than the Effective Date, the Debtors incorporated in the U.S. shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders and any invoices for fees and expenses incurred after the Effective Date in connection with the final fee applications. Such funds shall not be considered property of the Debtors' Estates. The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Reorganized Debtors (other than to Cineworld Parent or Cineworld Funding) without any further notice to or action, order, or approval of the Bankruptcy Court.

3.   Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or the Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional; *provided, however,* that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided, further,* that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4.   Post-Effective Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Reorganized Debtors or, solely as it pertains to the final fee applications, the Creditors' Committee. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and Reorganized Debtors, as applicable, shall pay, within ten Business Days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors, the Reorganized Debtors, or the Creditors' Committee, as applicable. If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected Professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

D. *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E. *Payment of Statutory Fees.*

All fees due and payable pursuant to 28 U.S.C. § 1930(a) shall be paid by the Debtors, the Reorganized Debtors, or the Disbursing Agent (on behalf of the Reorganized Debtors), as applicable, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

F. *Payment of Restructuring Expenses.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein, in the Restructuring Support Agreement, and the Financing Commitment and Backstop Agreement, without any requirement to File a fee application with the Bankruptcy Court or for Bankruptcy Court review or approval; *provided* that the foregoing shall be subject to the Debtors' receipt of an invoice with reasonable detail (but without the need for itemized time detail) from the applicable Entity entitled to such Restructuring Expenses in accordance with such Entity's applicable engagement letter. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least five days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses (it being understood that any difference in (a) estimated Restructuring Expenses on and including the Effective Date as compared to (b) Restructuring Expenses actually incurred on and including the Effective Date shall be reconciled following the submission of a final invoice by the relevant Entity within thirty days of the Effective Date). On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors and paid within ten Business Days of receipt by the Debtors or the Reorganized Debtors, as applicable. In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course (but no sooner than within ten Business Days of receipt of an invoice), Restructuring Expenses related to implementation, Consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date in accordance with the applicable engagement letter and solely upon receipt of an invoice from any Entity requesting such Restructuring Expenses with reasonable detail (but without the need for itemized time detail).

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.     *Classification of Claims and Interests.*

Except for the Claims addressed in <u>Article II</u> hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors, except as expressly set forth herein.[2] All of the potential Classes for the Debtors are set forth herein.  Voting tabulations for recording acceptances or rejections of the Plan shall be conducted on a Debtor-by-Debtor basis as set forth herein.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Midwest Facility Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 4 | Legacy Facilities Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| Class 8 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| Class 9 | Interests in Cineworld Parent | Impaired | Not Entitled to Vote (Deemed to Reject) |

---

[2]     For the avoidance of doubt, Classes 1, 2, 5, 6, 7, and 8 shall apply to all Debtors, Class 3 shall apply only to REG and RCI, Class 4 shall apply to each Debtor except for Cineworld Funding, and Class 9 shall apply only to Cineworld Parent.

B.      *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, as applicable, except to the extent different treatment is agreed to in writing by the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with such Claim's or Interest's terms in the ordinary course of business) or as soon as reasonably practicable thereafter.

1.  Class 1 – Other Secured Claims

    (a)     *Classification*:  Class 1 consists of all Allowed Other Secured Claims.

    (b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, as determined by the Debtors (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) or the Reorganized Debtors, as applicable, in full and final satisfaction of such Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) or the Reorganized Debtors, as applicable:

        (i)     payment in full in Cash of its Allowed Other Secured Claim;

        (ii)    the collateral securing its Allowed Other Secured Claim;

        (iii)   Reinstatement of its Allowed Other Secured Claim; or

        (iv)    such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (c)     *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.  Class 2 – Other Priority Claims

    (a)     *Classification*:  Class 2 consists of all Allowed Other Priority Claims.

    (b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, as determined by the Debtors (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) or the Reorganized Debtors, as applicable, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor (with the consent of the

Required Consenting Creditors and the Required Equity Capital Raising Parties) or the Reorganized Debtors, as applicable:

(i)      payment in full in Cash of its Allowed Other Priority Claim; or

(ii)     such other treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

(c)     *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.   Class 3 – Midwest Facility Claims

(a)     *Classification:*  Class 3 consists of all Allowed Midwest Facility Claims.

(b)     *Allowance*:  The Midwest Facility Claims are deemed Allowed in an amount equal to the sum of (i) the principal amount outstanding under the Midwest Facility Loan Agreement and (ii) all accrued but unpaid interests, costs, fees, and expenses due and owing under the Midwest Facility Loan Agreement.

(c)     *Treatment*:  In full and final satisfaction of its Allowed Midwest Facility Claims, on the Effective Date, each Holder of an Allowed Midwest Facility Claim shall receive, at the option of the applicable Debtor (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) or the Reorganized Debtors:

(i)      Reinstatement of its Allowed Midwest Facility Claim; or

(ii)     such other treatment that renders its Allowed Midwest Facility Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(d)     *Voting:*  Class 3 is Unimpaired under the Plan.  Holders of Allowed Midwest Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

4.   Class 4 – Legacy Facilities Claims

(a)     *Classification*:  Class 4 consists of all Allowed Legacy Facilities Claims.

*Allowance*: The Legacy Facilities Claims shall be deemed Allowed in the aggregate principal amount of $3,929,651,984.93, plus accrued and unpaid interest on such principal amount and any other premiums, fees, costs, or other amounts due and owing pursuant to the Legacy Facilities Credit Agreement.

(b)     *Treatment*:  In full and final satisfaction of its Allowed Legacy Facilities Claims, on the Effective Date, each Holder of an Allowed Legacy Facilities Claim shall receive its Pro Rata share of:

      (i)      the Distributable New Common Stock;

      (ii)     the Subscription Rights; *provided* that such Holder of an Allowed Legacy Facilities Claim is an Eligible Participant; and

      (iii)    the Legacy Facilities Claims Litigation Trust Interests.

Pursuant to the Creditors' Committee Settlement, Holders of Legacy Facilities Claims shall not receive any recovery on account of any deficiency claims and any adequate protection claims for diminution of value arising under the DIP Orders other than what is set forth in this <u>Article III.B.4</u>.

    (c)    *Voting*:  Class 4 is Impaired under the Plan.  Holders of Allowed Legacy Facilities Claims are entitled to vote to accept or reject the Plan.

5.   Class 5 – General Unsecured Claims

    (a)    *Classification*:  Class 5 consists of all Allowed General Unsecured Claims.

    (b)    *Treatment*:  In full and final satisfaction of its Allowed General Unsecured Claims, on the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive their allocable share of the GUC Recovery Pool.[3]

    (c)    *Voting*:  Class 5 is Impaired under the Plan.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

6.   Class 6 – Section 510(b) Claims

    (a)    *Classification:*  Class 6 consists of all Allowed Section 510(b) Claims.

    (b)    *Allowance:*  Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

    (c)    *Treatment*:  On the Effective Date, all Allowed Section 510(b) Claims, if any, shall be cancelled, released, and extinguished, and will be of no further force or effect.

    (d)    *Voting:*  Class 6 is Impaired under the Plan.  Holders of Allowed Section 510(b) Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

7.   Class 7 – Intercompany Claims

    (a)    *Classification*:  Class 7 consists of all Allowed Intercompany Claims.

---

[3]   Pursuant to the Creditors' Committee Settlement, the Creditors' Committee shall provide an allocation for the GUC Recovery Pool between the Debtors that complies with the Bankruptcy Code no later than three Business Days prior to the date by which objections to the Disclosure Statement are due.

(b) *Treatment*:  In full and final satisfaction of all Allowed Intercompany Claims, on the Effective Date, such Claims shall be, at the option of the Debtors (with the consent of the Required Consenting Creditors and Required Equity Capital Raising Parties (such consent not to be unreasonably withheld)) or the Reorganized Debtors, either:

(i) Reinstated;

(ii) adjusted, converted to equity, otherwise set off, settled, distributed, or contributed; or

(iii) canceled, released, or discharged without any distribution on account of such Claims.

The Plan and the distributions contemplated thereby constitute a global settlement of any and all Intercompany Claims and causes of action by and between any of the Debtors that may exist as of the Effective Date.  The Plan shall be considered a settlement of the Intercompany Claims pursuant to Bankruptcy Rule 9019.

(c) *Voting*:  Class 7 is Unimpaired under the Plan if Allowed Intercompany Claims are Reinstated or Impaired under the Plan if Allowed Intercompany Claims are cancelled.  Holders of Allowed Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

8. **Class 8 – Intercompany Interests**

(a) *Classification:*  Class 8 consists of all Allowed Intercompany Interests.

(b) *Treatment*:  In full and final satisfaction of the Allowed Intercompany Interests, on the Effective Date, all such Allowed Intercompany Interests shall be, at the option of the Debtors (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties (such consent not to be unreasonably withheld)) or the Reorganized Debtors, either:

(i) Reinstated (except that they may be modified or recharacterized as Intercompany Claims); or

(ii) set off, settled, distributed, contributed, merged, diluted, cancelled, released, or otherwise addressed or eliminated, and receive no distribution under the Plan.

(c) *Voting*:  Class 8 is Unimpaired under the Plan if Allowed Intercompany Interests are Reinstated or Impaired under the Plan if Allowed Intercompany Interests are cancelled.  Holders of Allowed Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

9.   Class 9 – Interests in Cineworld Parent

(a)   *Classification:*  Class 9 consists of all Allowed Interests in Cineworld Parent.

(b)   *Treatment*:  The Interests in Cineworld Parent shall be extinguished or otherwise rendered of no force and effect pursuant to the implementation of one or more Implementation Mechanism(s) in England and Wales, and Holders of Interests in Cineworld Parent will not receive any distribution on account of such Interests in Cineworld Parent.

(c)   *Voting:*  Class 9 is Impaired under the Plan.  Holders of Allowed Interests in Cineworld Parent are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

C.   *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan or the Plan Supplement, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

D.   *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.   *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote on the Plan and no Holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.   *Intercompany Interests.*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the Holders of New Common Stock, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.  For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, other than in respect of Intercompany Interests owned by Cineworld Parent immediately prior to the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests immediately prior to the Effective Date.

G.   *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of

the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XI hereof and the terms of the Restructuring Support Agreement and the Financing Commitment and Backstop Agreement (including the consent rights therein) to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests or reclassifying Claims to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

A.      *General Settlement of Claims and Interests.*

As discussed in further detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. Subject to Article VII hereof, all distributions made to Holders of Allowed Claims and Allowed Interests, as applicable, in any Class are intended to be, and shall be, final.

Certain Claims and Causes of Action may exist between one or more of the Debtors and one or more of its Affiliates, which Claims and Causes of Action (other than any such Claims and Causes of Action that are not released pursuant to Article IX, including any obligations arising under business or commercial agreements or arrangements among the Released Parties and any non-Debtor Entity) have been settled, and such settlement is reflected in the treatment of the Intercompany Claims and the Claims against and Interests in each Debtor Entity. The Plan shall be deemed a motion to approve the good faith compromise and settlement of such Claims and Causes of Action pursuant to Bankruptcy Rule 9019.

B.      *Restructuring Transactions.*

On or before the Effective Date, or as soon as reasonably practicable thereafter, the applicable Debtors or the Reorganized Debtors, with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties, consistent with the terms of the Restructuring Support Agreement, shall consummate the Restructuring Transactions and take all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, the Restructuring Support Agreement, and the Plan Supplement and that satisfy the requirements of applicable Law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Restructuring Support Agreement, and the Plan Supplement and having other terms for which the applicable Entities may agree; (c) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial Law, including any applicable New Organizational Documents; (d) such other transactions and/or Bankruptcy Court filings that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations or those conducted pursuant to the Restructuring Transactions Memorandum, the UK Implementation Agreement (including in respect of any Administration, any Scheme of Arrangement, UK Company Voluntary Arrangement, or UK Restructuring Plan), or any other Implementation Mechanism; (e) the execution, delivery, and filing of the Exit First Lien Facility Documents; (f) to the extent applicable, the execution, delivery, and filing of the New Money Revolving Credit Facility Documents; (g) pursuant to the Rights Offering Documents, the implementation of the Rights Offering and the Direct Equity Allocation, the distribution of the Subscription Rights to the Eligible Participants, and the issuance of the Direct Allocation Shares, the Rights Offering Shares, and the Premium Shares; and (h) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with the Plan.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

C.      *Reorganized Debtors.*

On the Effective Date, in accordance with the terms of the Corporate Governance Term Sheet, the New Board shall be appointed, and the Reorganized Debtors (other than Cineworld Parent and Cineworld Funding, each of which will not be part of the corporate structure of the Reorganized Debtors upon the Effective Date) shall adopt the New Organizational Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.  Cash payments to be made pursuant to the Plan will be made by the Debtors or the Reorganized Debtors.  Other than transfers to either Cineworld Parent and/or Cineworld Funding, which shall not be a permitted transfer except to the extent expressly provided for in this Plan or otherwise with the consent of the Required Consenting Creditors and the

Required Equity Capital Raising Parties,[4] the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or the Reorganized Debtors, as applicable, to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

D.    *Sources of Consideration for Plan Distributions.*

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with (a) proceeds from the Exit First Lien Facility, (b) proceeds from the Direct Equity Allocation and Rights Offering, (c) the New Common Stock, and (d) Cash on hand.

1.    Issuance of New Common Stock.

On or prior to the Effective Date, Reorganized Cineworld Parent shall take steps to provide that the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) is issued and/or transferred in accordance with the terms of the Plan, the Plan Supplement, the New Organizational Documents, and applicable Law (including applicable securities Laws), and, to the extent applicable, the Rights Offering Documents.

The Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares will be issued in reliance upon the exemption from registration set forth in Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act), subject to any other applicable securities Laws.  The issuance of the Distributable New Common Stock will be conducted in reliance upon one or more exemptions from registration under the Securities Act, which will include the exemption provided in section 1145 of the Bankruptcy Code to the fullest extent available.  The Rights Offering will be conducted in reliance on an exemption from the requirement to publish a prospectus for the offer of transferable securities to the public in any member state of the EEA or in the UK under Article 1(4) of the Prospectus Regulation and therefore participants that are resident, located, or have a registered office in any member state of the EEA or in the UK will be required to confirm that they are EU/UK Qualified Investors in order to participate in the Rights Offering.

DTC or any other depository, as applicable, may accept and conclusively rely upon the Plan and the Confirmation Order in lieu of a legal opinion regarding the exemption(s) from registration pursuant to which the New Common Stock will be issued under the Plan and/or eligible for DTC's (or another depository's) book-entry delivery, settlement, and depository services.  It is not expected that any shares of the New Common Stock will be eligible for any depository services, including with respect to DTC, on or about the Effective Date.  Further, it is not intended that the New Common Stock will be listed on a national securities exchange (or a comparable non-U.S. securities exchange) on or about the Effective Date.

Any New Common Stock of Reorganized Cineworld Parent offered pursuant to the Management Incentive Plan (including pursuant to any Emergence Awards) shall be exempt from any registration

---

[4]    For the avoidance of doubt, the foregoing shall not prohibit transfers to Cineworld Parent and/or Cineworld Funding to permit payments (a) owed to supplier and commercial counterparties and professional advisor fees in the ordinary course subject to the DIP Order and, (b) subject to prior approval of the Required Consenting Creditors and the Required Equity Capital Raising Parties, for costs incurred in connection with any Implementation Mechanism(s).

requirements under any federal securities Laws to the fullest extent permitted by section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or Rule 701 promulgated thereunder.

The Plan and any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) have been prepared on the basis that any offer of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) issued in connection with the Plan or the Plan Supplement within any member state of the EEA or in the UK will either (a) not form part of any offer or invitation to purchase, acquire, subscribe for, sell, or otherwise dispose of or issue any securities or any solicitation of any offer to purchase, acquire, subscribe for, sell, or otherwise dispose of any security for the purposes of the Prospectus Regulation and/or the FSMA, as applicable, or (b) be made pursuant to an exemption under the Prospectus Regulation and/or the FSMA, as applicable, from the requirement to publish a prospectus for the offer of transferable securities to the public. In relation to each member state of the EEA or the UK, no offer of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) issued in connection with the Plan may be made to the public at any time other than pursuant to an exemption under the Prospectus Regulation and/or the FSMA, as applicable. In any member state of the EEA or in the UK, the Disclosure Statement, the Plan, and the Plan Supplement are only addressed to and directed at: (i) EU/UK Qualified Investors in that EEA member state or the UK; or (ii) any other person if such address or direction does not otherwise constitute an offer of transferable securities to the public within the meaning of the Prospectus Regulation (including in any of the other circumstances set out in Article 1(4) of the Prospectus Regulation) and/or the FSMA (including in any of the other circumstances set out in section 86 of the FSMA). None of the Debtors or any of its Affiliates, Reorganized Cineworld Parent, or any persons acting on any of their behalves has authorized, nor do they authorize, the making of any offer of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) through any financial intermediary, other than as may be contemplated in the Plan and any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement). In any member state of the EEA or in the UK, the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) may not be resold, exchanged, assigned, or otherwise transferred unless such resale, exchange, assignment or transfer is to: (A) an EU/UK Qualified Investor in that EEA member state or the UK; or (B) any other person if such resale, exchange, assignment or transfer does not otherwise constitute an offer of transferable securities to the public within the meaning of the Prospectus Regulation (including in any of the other circumstances set out in Article 1(4) of the Prospectus Regulation) and/or the FSMA (including in any of the other circumstances set out in section 86 of the FSMA).

The Plan and any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) are not, and should not be construed as, an invitation or inducement to engage in any investment activity in relation to any of the transactions described therein or the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) such as would amount to a financial promotion in the UK for the purposes of section 21 of the FSMA. In the UK, the information contained in the Plan or any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) is intended only for use and may only be relied upon in relation to any investment activity by, and any investment activity to which such information relates may only be engaged in by, persons falling within any of the circumstances of Article 1(4) of the Prospectus Regulation who are at the relevant time: (a) investment professionals within the meaning of Article 19(5) of the FPO; (b) high net worth companies within the meaning of Article 49(2)(a) through (d) of the FPO; (c) persons that are existing members or creditors of the issuer of the relevant securities or of an undertaking which at the relevant time is in the same group as the issuer of the relevant securities, falling within Article 43 of the FPO; or (d) persons to whom the

communication may otherwise lawfully be communicated (each, a "Permitted UK Person").  Any person in the UK that is not a Permitted UK Person is not, for the purposes of any investment or investment decision, an intended recipient of the information contained in the Plan or any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) and should not use such information as the basis for taking any investment activity or investment action.  The Plan and any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) should not (insofar as such documents relate to any investment or investment activity) be distributed, communicated to, or directed at the general public in the UK otherwise than as described above.

Each distribution, issuance, or transfer of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) on or around the Effective Date shall be governed by the terms and conditions set forth in the Plan (including the Plan Supplement and, to the extent applicable, the Rights Offering Documents) applicable to such distribution, issuance, or transfer, as applicable, and by the terms and conditions of the agreements and other instruments evidencing or relating to such issuance, as applicable, including, the Plan Supplement, and, to the extent applicable, the Rights Offering Documents, the terms and conditions of which shall bind each Entity receiving such issuance of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares).  On or prior to the Effective Date, except as otherwise provided in the Plan or the Plan Supplement and subject to local Law requirements, the issuance of the New Common Stock shall be authorized without the need for any further corporate action and without any further action by Reorganized Cineworld Parent, the Debtors, or the Reorganized Debtors, as applicable, and without any action by the Holders of Claims or Interests or other parties in interest.  Any Entity's acceptance of the New Common Stock, including with respect to the Distributable New Common Stock, shall be deemed its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms, and to the extent applicable, the Rights Offering Procedures.

The Reorganized Debtors shall be authorized to issue a certain number of shares, units, or Interests of the New Common Stock required to be issued under the Plan and in accordance with the Rights Offering Documents, the Plan Supplement, the New Organizational Documents, and the Restructuring Transactions. All of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) issued or authorized to be issued pursuant to the Plan or, if applicable, the Financing Commitment and Backstop Agreement shall, pursuant to the Restructuring Transactions, be duly authorized, validly issued, fully paid, and non-assessable.

The issuance of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) shall not constitute an invitation or offer to sell, or the solicitation of an invitation or offer to buy, any securities in contravention of any applicable Law in any jurisdiction.  No action has been taken, nor will be taken, in any jurisdiction that would permit a public offering of any of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares, other than securities issued pursuant to section 1145 of the Bankruptcy Code) in any jurisdiction where such action for that purpose is required.

2.  Capital Raise.

(a)  Exit First Lien Facility.

On the Effective Date, the Reorganized Debtors shall enter into the Exit First Lien Facility on the terms set forth in the Exit First Lien Facility Documents.

To the extent not already approved, Confirmation of the Plan shall be deemed approval of the Exit First Lien Facility and the Exit First Lien Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provide for therein and authorization of the Reorganized Debtors to enter into and execute the Exit First Lien Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Exit First Lien Facility.  Execution of the Exit First Lien Facility Documents by the Exit First Lien Facility Agent shall be deemed to bind all Exit First Lien Facility Lenders as if each such Exit First Lien Facility Lender had executed the applicable Exit First Lien Facility Documents with appropriate authorization.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit First Lien Facility Documents, to the extent applicable:  (i) shall be deemed to be granted; (ii) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit First Lien Facility Documents; (iii) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit First Lien Facility Documents; and (iv) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

To the extent applicable, the Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

        (b)       Direct Equity Allocation and Rights Offering.

The Debtors shall offer (i) the Direct Equity Allocation to each Equity Capital Raising Party and (ii) the Rights Offering to each Eligible Participant and which shall be 100% backstopped by the Equity Capital Raising Parties, each in accordance with the terms and conditions of the Financing Commitment and Backstop Agreement.  On or prior to the Effective Date, Reorganized Cineworld Parent shall consummate the Direct Equity Allocation and Rights Offering in accordance with the Rights Offering Documents and any other documents related thereto.  Reorganized Cineworld Parent shall allocate the Subscription Rights to Eligible Participants as set forth in the Plan and the Rights Offering Procedures.  Upon exercise of the Subscription Rights by such Eligible Participants pursuant to the terms of the Rights Offering Documents and the Plan, Reorganized Cineworld Parent shall be authorized to issue the Rights Offering Shares in accordance with the Rights Offering Documents and the Plan.

The Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares will be issued by Reorganized Cineworld Parent in reliance upon the exemption from registration set forth in Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act), subject to any other applicable securities Laws.  The Direct Equity Allocation and the Rights Offering will be conducted in reliance on one or more exemptions from the requirement to publish a prospectus for the offer of transferable securities to the public in any EEA member state or in the UK under the Prospectus Regulation and therefore participants that are resident, located or have a registered office in any EEA member state or in the UK will be required to confirm that they are EU/UK Qualified Investors in order to participate in the Rights Offering.

In addition, on the Distribution Date, the Premium Shares shall be distributed to the applicable Capital Raising Parties under and as set forth in the Financing Commitment and Backstop Agreement. Pursuant to the Financing Commitment and Backstop Agreement, the Equity Capital Raising Parties shall purchase the RO Backstop Shares as set forth in the Financing Commitment and Backstop Agreement.  On the Effective Date, the rights and obligations of the Debtors under the Financing Commitment and Backstop Agreement shall vest in Reorganized Cineworld Parent and the Reorganized Debtors (other than Cineworld Parent and Cineworld Funding).

The Plan and documents related thereto (including, without limitation, the Disclosure Statement, the Plan Supplement, and the Rights Offering Documents) have been prepared on the basis that any Subscription Rights issued in the Rights Offering or the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares issued in connection with the Plan within any EEA member state or in the UK will either (a) not form part of any offer or invitation to purchase, acquire, subscribe for, sell, or otherwise dispose of or issue any securities or any solicitation of any offer to purchase, acquire, subscribe for, sell, or otherwise dispose of any security for the purposes of the Prospectus Regulation and/or the FSMA, as applicable, or (b) be made pursuant to an exemption under the Prospectus Regulation and/or the FSMA, as applicable, from the requirement to publish a prospectus for the offer of transferable securities to the public.  In relation to each member state of the EEA or the UK, no offer of the Subscription Rights issued in connection with the Plan or the Plan Supplement may be made to the public at any time other than pursuant to an exemption under the Prospectus Regulation and/or the FSMA, as applicable.  In any member state of the EEA or in the UK, the Disclosure Statement, the Plan, and the Plan Supplement are only addressed to and directed at:  (i) EU/UK Qualified Investors in that EEA member state or the UK; or (ii) any other person if such address or direction does not otherwise constitute an offer of transferable securities to the public within the meaning of the Prospectus Regulation (including in any of the other circumstances set out in Article 1(4) of the Prospectus Regulation) and/or the FSMA (including in any of the other circumstances set out in section 86 of the FSMA).  None of the Debtors or any of its Affiliates, Reorganized Cineworld Parent, or any persons acting on any of their behalves has authorized, nor do they authorize, the making of any offer of the Subscription Rights through any financial intermediary, other than as may be contemplated in the Plan and any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement).  In any member state of the EEA or in the UK, the New Common Stock (including the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) may not be resold, exchanged, assigned, or otherwise transferred unless such resale, exchange, assignment or transfer is to:  (A) an EU/UK Qualified Investor in that EEA member state or the UK; or (B) any other person if such resale, exchange, assignment, or transfer does not otherwise constitute an offer of transferable securities to the public within the meaning of the Prospectus Regulation (including in any of the other circumstances set out in Article 1(4) of the Prospectus Regulation) and/or the FSMA (including in any of the other circumstances set out in section 86 of the FSMA).

The Plan and any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) are not, and should not be construed as, an invitation or inducement to engage in any investment activity in relation to any of the transactions described therein, including the Rights Offering, such as would amount to a financial promotion in the UK for the purposes of section 21 of the FSMA.  In the UK, the information contained in the Plan or any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) is intended only for use and may only be relied upon in relation to any investment activity by, and any investment activity to which such information relates may only be engaged in by, persons falling within any of the circumstances of Article 1(4) of the Prospectus Regulation who are at the relevant time a Permitted UK Person.  Any person in the UK that is not a Permitted UK Person is not, for the purposes of any investment or investment decision, an intended recipient of the information contained in the Plan or any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) and should not use such information as the basis for taking any investment activity or investment action.  The Plan and any documents related thereto

(including, without limitation, the Disclosure Statement and the Plan Supplement) should not (insofar as they relate to any investment or investment activity) be distributed, communicated to, or directed at the general public in the UK otherwise than as described above.

    3.   New Money Revolving Credit Facility.

The Reorganized Debtors shall use commercially reasonable efforts to (a) obtain commitments for, and, (b) unless otherwise waived by the Required Consenting Creditors and the Required Equity Capital Raising Parties, on the Effective Date enter into, the New Money Revolving Credit Facility on the terms set forth in the New Money Revolving Credit Facility Documents.

To the extent applicable and not already approved, Confirmation of the Plan shall be deemed approval of the New Money Revolving Credit Facility and New Money Revolving Credit Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the New Money Revolving Credit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New Money Revolving Credit Facility.

To the extent applicable, the Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order.

E.    *Exemption from Registration Requirements.*

    1.   The New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) and the Subscription Rights.

The Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and Premium Shares will be issued in reliance upon the exemption from registration set forth in Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder or another available exemption from registration under the Securities Act.

Persons who acquire any shares of Distributable New Common Stock (if such shares cannot be issued in reliance on section 1145 of the Bankruptcy Code), the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares or the Subscription Rights pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act will hold "restricted securities."  Such securities may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and subject to any restrictions in the New Organizational Documents.  Such persons also include the participants under the Management Incentive Plan who receive the New Common Stock of Reorganized Cineworld Parent.  Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable Law.  Holders of restricted securities would, however, be permitted to resell the New Common Stock or the Subscription Rights without registration under federal securities Laws if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act (if available) or any other exemption from registration under the Securities Act, or if such Securities are registered with the SEC, in all cases subject to any restrictions in the New Organizational Documents and other applicable securities Laws.

The issuance of the Distributable New Common Stock will be conducted in reliance upon one or more exemptions from registration under the Securities Act, which will include the exemption provided in section 1145 of the Bankruptcy Code to the fullest extent available.  Securities issued in reliance upon section 1145 of the Bankruptcy Code (including any Distributable New Common Stock, to the extent such exemption is permitted and available) are exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable U.S. state or local Law requiring registration prior to the offering, issuance, distribution, or sale of Securities, to the maximum extent possible, and (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and (b) are freely tradable and transferable by any holder thereof that, at the time of transfer, (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within ninety days of such transfer, (iii) has not acquired such securities from an "affiliate" within one year of such transfer, and (iv) is not an entity that is an "underwriter" (as defined in section 2(a)(11) of the Securities Act). The offering, issuance, distribution, and sale of any securities in accordance with section 1145 of the Bankruptcy Code shall be made without registration under the Securities Act or any similar federal, state, or local Law due to reliance on section 1145(a) of the Bankruptcy Code.

2.   Certain DTC Matters Related to the New Common Stock.

DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the Securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

F.   *Corporate Existence.*

Except as otherwise provided in the Plan, the Plan Supplement, the Confirmation Order, or any agreement, instrument, or other document incorporated therein, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable Law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, in each case, consistent with the Plan, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings, approvals, or consents required under applicable state, provincial, or federal Law). After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.   *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan, the Plan Supplement, the Confirmation Order, or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.

On and after the Effective Date, except as otherwise provided in the Plan, the Plan Supplement, or the Confirmation Order, each Reorganized Debtor may operate its businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

H.      *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except to the extent otherwise provided in the Plan, the Plan Supplement, or the Confirmation Order, or any agreement, instrument, or other document incorporated therein, all notes, instruments, certificates, credit agreements, indentures, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, released, discharged, and of no force and effect without any need for further action or approval of the Bankruptcy Court or for a Holder to take further action, and the Agents shall be released from all duties thereunder.  Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan. Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VII hereof, to the extent cancelled pursuant to this paragraph, the Debt Documents shall continue in effect solely to the extent necessary to:  (a) permit Holders of Claims under Debt Documents to receive their respective Plan Distributions, if any; (b) permit the Disbursing Agent, as applicable, to make Plan Distributions on account of the Allowed Claims under the Debt Documents; (c) preserve any rights of the Agents and Trustees thereunder to maintain, exercise, and enforce any applicable rights of indemnity, reimbursement, or contribution, or subrogation or any other claim or entitlement; *provided* that, for the avoidance of doubt, such rights of the Convertible Bond Trustee shall be limited to the Plan Distributions to be made on account of the Convertible Bond Claims; and (d) permit each Agent and Trustee to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court.  Except as provided in the Plan or the Plan Supplement (including Article VII hereof) or as may be necessary to effectuate the terms of the Plan, on the Effective Date, the Agents and Trustees, and their respective agents, successors, and assigns, shall be automatically and fully discharged of all of their duties and obligations associated with the Debt Documents, as applicable.

Notwithstanding anything to the contrary in the Plan or the Confirmation Order, (a) the Legacy Facilities and the Legacy Facilities Credit Agreement Documents and (b) the Priming Facilities and the Priming Facilities Documents shall continue in full force and effect (other than, for the avoidance of doubt, any Liens or other security interests terminated pursuant to Article II.B) after the Effective Date with respect to any contingent or unsatisfied obligations thereunder, as applicable, including, but not limited to, those provisions relating to the rights of the Legacy Facilities Agent or the Priming Agent, as applicable, to expense reimbursement, indemnification, and other similar obligations of the Debtors to the Legacy Facilities Agent, the Priming Agent, the Legacy Facilities Lenders, and the Priming Lenders (which rights shall be fully enforceable against the Reorganized Debtors) and any provisions thereof that may survive termination or maturity of the Legacy Facilities and the Priming Facilities in accordance with the terms thereof.

I.      *Corporate Action.*

On the Effective Date, or as soon as reasonably practicable thereafter, except as otherwise provided in the Plan, the Plan Supplement, or the Confirmation Order, all actions contemplated under the Confirmation Order, the Plan and the Plan Supplement shall be deemed authorized and approved in all respects, including:  (a) the hiring of a new chief executive officer as determined in the sole discretion of the Required Equity Capital Raising Parties and the execution of an employment agreement with the new chief executive officer on terms and conditions acceptable to the Required Equity Capital Raising Parties;

(b) adoption or assumption, as applicable, of the Compensation and Benefit Programs in accordance with the terms set forth herein; (c) discharge of the duties of, and the dissolution of, the then-existing board of directors of Cineworld Parent and selection of the directors or managers, as applicable, and officers for the Reorganized Debtors, including the appointment of the New Board, which selection, appointment, and election shall be as determined in accordance with the Corporate Governance Term Sheet; (d) the execution and effectiveness of the Consulting Agreements; (e) the issuance and distribution of the New Common Stock (including with respect to the Rights Offering and the Direct Equity Allocation); (f) implementation of the Restructuring Transactions, including any Implementation Mechanisms, and performance of all actions and transactions contemplated hereby and thereby (including, for the avoidance of doubt, causing Reorganized Cineworld Parent to become the new holding company of the Reorganized Debtors on or prior to the Effective Date); (g) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date); (h) adoption, execution, delivery, and/or filing of the New Organizational Documents; (i) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (j) entry into the Exit First Lien Facility and the execution, delivery, and filing of the Exit First Lien Facility Documents; (k) to the extent applicable, entry into the New Money Revolving Credit Facility and the execution, delivery, and filing of the New Money Revolving Credit Facility Documents; (l) adoption of the Management Incentive Plan by the New Board and issuance of any Emergence Awards (each if applicable); (m) the execution of the Litigation Trust Agreement; and (n) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions (whether before, on, or after the Effective Date).

Except as otherwise provided in the Plan or the Plan Supplement, all matters provided for in the Plan and the Plan Supplement involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors, as applicable, in connection with the Plan and the Plan Supplement shall be deemed to have occurred and shall be in effect, without any requirement of further action by the equity holders, members, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable.

On or, as applicable, prior to the Effective Date, except as otherwise provided in the Plan or the Plan Supplement, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the Exit First Lien Facility Documents, the New Money Revolving Credit Facility Documents, the New Organizational Documents, the Plan Supplement, any other Definitive Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this <u>Article IV.I</u> shall be effective notwithstanding any requirements under non-bankruptcy Law.

J.      *New Organizational Documents.*

On or as soon as reasonably practicable after the Effective Date, except as otherwise provided in the Plan or the Plan Supplement and subject to local Law requirements, the New Organizational Documents (which shall be consistent with the Plan and the Plan Supplement) shall be automatically adopted or amended in a manner consistent with the terms and conditions set forth in the Corporate Governance Term Sheet, as may be necessary to effectuate the transactions contemplated by the Plan. To the extent required under the Plan, the Plan Supplement, or applicable non-bankruptcy Law, each of the Reorganized Debtors (other than Cineworld Parent and Cineworld Funding, if applicable) will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable Law of the respective state or

country of organization.  The New Organizational Documents will (a) authorize the issuance of the New Common Stock and (b) prohibit the issuance of non-voting equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.

After the Effective Date, each Reorganized Debtor may amend and restate its respective New Organizational Documents as permitted by Laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

On the Effective Date, Reorganized Cineworld Parent shall enter into and deliver the New Stockholders Agreement and the Registration Rights Agreement with respect to each Holder of New Common Stock, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act, or action under applicable Law, regulation, order, or rule or the vote, consent, authorization, or approval of an Entity (other than the relevant consents required by any Definitive Document).  Holders of New Common Stock shall be deemed to have executed the New Stockholders Agreement and the Registration Rights Agreement and be parties thereto, without the need to deliver signature pages thereto.

K.      *Managers and Officers of the Reorganized Debtors.*

As of the Effective Date, the Executive Directors' Employment Agreements shall be assumed as modified by the Consulting Agreements, and the Executive Directors shall thereafter be deemed to have been terminated by mutual consent from their respective positions with the Debtors and, as applicable, any non-Debtor Affiliate; *provided* that, for the avoidance of doubt, if the Executive Directors do not execute the Consulting Agreements upon the Effective Date and the Consulting Agreements are not in full force and effect on the Effective Date, (a) the Executive Directors' Employment Agreements will be deemed rejected as of such date and (b) subject to execution of a release (in form and substance acceptable to the Debtors, the Required Consenting Creditors, and the Required Equity Capital Raising Parties) against the Released Parties, the Executive Directors will be entitled to only any payments to be made (i) under those certain letter agreements, between Regal Cinemas, Inc., Cineworld Cinemas Limited, Crown Finance US, Inc. , and the Executive Directors, dated September 6, 2022 and (ii) in lieu of notice under the Executive Directors' Employment Agreements.  The members for the New Board shall be appointed in accordance with the Corporate Governance Term Sheet.  The initial members of the New Board of Reorganized Cineworld Parent will be identified in the Plan Supplement, to the extent known at the time of filing.  Each such member and officer of the Reorganized Debtors (including the new chief executive officer as determined by the Required Equity Capital Raising Parties) shall serve from and after the Effective Date pursuant to the terms of any applicable employment agreements and other constituent documents of the Reorganized Debtors, including the New Organizational Documents.

L.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (or other relevant governing body), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Exit First Lien Facility entered into, the New Money Revolving Credit Facility entered into, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan or the Plan Supplement.

M.    *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to (a) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock, the New Money Revolving Credit Facility, and the Exit First Lien Facility, (b) the Restructuring Transactions, (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (d) the making, assignment, or recording of any lease or sublease, (e) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit First Lien Facility or the New Money Revolving Credit Facility or (f) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment (except, in each case, to the extent required under applicable UK Law or any other foreign Law), and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing, other than in respect of any tax imposed under applicable UK Law or any other foreign Law), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

N.    *Management Incentive Plan.*

The Management Incentive Plan Pool shall be established and reserved for grants to be made from time to time from such pool to employees, officers, and directors of the Reorganized Debtors at the discretion of the New Board effective as of the Effective Date.  The terms and conditions (including, without limitation, with respect to participants, allocation, timing, and the form and structure of the equity or equity-based awards) shall be determined at the discretion of the New Board after the Effective Date; *provided* that Emergence Awards may be allocated on or prior to the Effective Date as emergence grants to recruit individuals selected to serve in key senior management positions on or after the Effective Date, subject to the terms and conditions, including, but not limited to, with respect to form, allocated percentage of the Management Incentive Plan Pool, structure, and vesting, determined by, in each case, the Required Consenting Creditors and the Required Equity Capital Raising Parties.

O.    *Employee and Retiree Benefits.*

Except as otherwise provided in this Article IV.O, all Compensation and Benefits Programs shall be assumed by the Reorganized Debtors and the Reorganized Debtors shall continue the Compensation and Benefits Programs according to existing terms and practices as of the effective date of the Restructuring Support Agreement; *provided*, *however*, that the New Board may review, amend, terminate, or modify any of the foregoing programs in accordance with applicable Law.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable Law.

Upon the Effective Date and the satisfaction or waiver of the conditions precedent to the occurrence of the Effective Date set forth in Article X.A, the applicable Reorganized Debtor shall enter into the Consulting Agreements, attached as Exhibit E to the Restructuring Support Agreement and in the Plan Supplement, with each of the Executive Directors.  Subject to entry into the Consulting Agreements between the applicable Reorganized Debtor and the Executive Directors, the Compensation and Benefit Programs for the Executive Directors shall be assumed by the applicable Reorganized Debtor as modified by the Consulting Agreements.

If the Executive Directors do not execute the Consulting Agreements upon the Effective Date, (a) the Compensation and Benefit Programs for the Executive Directors shall be deemed rejected as of the Effective Date and (b) subject to execution of a release (in form and substance acceptable to the Debtors, the Required Consenting Creditors, and the Required Equity Capital Raising Parties) against the Released Parties, the Executive Directors will be entitled to only any payments to be made (i) under those certain letter agreements, between Regal Cinemas, Inc., Cineworld Cinemas Limited, Crown Finance US, Inc., and the Executive Directors, dated September 6, 2022 and (ii) in lieu of notice pursuant to the Executive Directors' Employment Agreements.

P.    *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, each Reorganized Debtor or the Litigation Trust, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Plan to the contrary, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article IX hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.  For the avoidance of doubt, the Schedule of Retained Causes of Action shall include any and all Claims and Causes of Action against National Cinemedia, LLC and National Cinemedia, Inc., including, but not limited to, for damages and/or sanctions for willful violation of the automatic stay.

**The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available retained Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all retained Causes of Action against any Entity.  Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date.  Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**  The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objecting party for thirty days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order (and for the

avoidance of doubt, any Causes of Action on the Schedule of Retained Causes of Action shall not be expressly relinquished, exculpated, released, compromised, or settled in the Plan), the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any retained Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors or the Litigation Trust, as applicable.  The applicable Reorganized Debtors or the Litigation Trust, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors or the Litigation Trust, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court except as otherwise released in this Plan.

Q.      *Release of Avoidance Actions.*

Notwithstanding anything to the contrary in the Plan, on the Effective Date, the Debtors, on behalf of themselves and their Estates, shall release any and all Avoidance Actions (excluding any Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors).

R.      *Payment of Convertible Bond Trustee Fees.*

In connection with the Creditors' Committee Settlement, on or as soon as reasonably practicable after the Effective Date, the Debtors shall pay the reasonable and documented fees and expenses of the Convertible Bond Trustee, in its capacity as such, in an amount not to exceed $700,000.

## ARTICLE V.
## LITIGATION TRUST

A.      *Creation and Governance of the Litigation Trust.*

Unless otherwise determined pursuant to the terms of the Plan, on the Debtors incorporated in the U.S. shall transfer, or cause to be transferred, to the Litigation Trust all of their rights, title, and interest in the Litigation Trust Assets, and the Litigation Trustee shall execute the Litigation Trust Agreement and take all steps necessary to establish the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement.  Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax.  The Litigation Trust shall be governed by the Litigation Trust Agreement and administered by the Litigation Trustee.  In the event of any conflict between the terms of the Plan and the terms of the Litigation Trust Agreement, the terms of the Litigation Trust Agreement shall govern.

The Litigation Trustee shall be the exclusive trustee of the Litigation Trust Assets for purposes of 31 U.S.C. § 3713(b) and section 6012(b)(4) of the Tax Code.  The Litigation Trust, acting by and through the Litigation Trustee, shall be the sole representative of the Estates under section 1123(b)(3) of the Bankruptcy Code with respect to the Litigation Trust Assets, and shall be a party in interest within the meaning of section 1109(b) of the Bankruptcy Code for all purposes under these Chapter 11 Cases.  The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Trust

Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Article V. The Litigation Trustee shall hold and distribute the Litigation Trust Assets in accordance with the provisions of the Plan and the Litigation Trust Agreement.

In connection with the vesting and transfer of the Litigation Trust Assets to the Litigation Trust, any attorney-client, work-product protection, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Litigation Trust shall vest in the Litigation Trust, subject to the terms of the Litigation Trust Agreement and the Plan. The Debtors, the Reorganized Debtors, and the Litigation Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges, protections, and immunities.

Additionally, subject to the prior written consent of the Creditors' Committee, the Required Consenting Creditors, and the Required Equity Capital Raising Parties (such consent not be unreasonably withheld), in lieu of establishing a Litigation Trust, the Debtors and the Reorganized Debtors, as applicable, may employ other structures to transfer the Litigation Trust Assets (or the economic entitlement thereto) to the Litigation Trust Beneficiaries (including through the distribution of a contingent value right (or an economically-equivalent alternatively-structured instrument)) if the Debtors or the Reorganized Debtors, as applicable, determine that such other structure is necessary or more tax-efficient, taking into account all applicable facts and circumstances, as compared to the establishment of a Litigation Trust. Any such alternative structure shall be set forth in the Plan Supplement.

B.    *Purpose of the Litigation Trust.*

The Litigation Trust shall be established for the purpose of liquidating the Litigation Trust Assets, reconciling and objecting, if necessary, to Disputed General Unsecured Claims in Class 5, and distributing the proceeds of the Litigation Trust Assets to the Litigation Trust Beneficiaries in accordance with the terms of the Plan and the Liquidating Trust Agreement. The Litigation Trust is intended to qualify as a liquidation trust pursuant to Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary and consistent with, the purpose of the Litigation Trust.

C.    *Litigation Trust Agreement and Funding the Litigation Trust.*

The Litigation Trust Agreement generally will provide for, among other things: (a) the payment of the Litigation Trust Expenses; (b) the retention of counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; (c) the investment of Cash by the Litigation Trustee within certain limitations, including those specified in the Plan; (d) the orderly liquidation of the Litigation Trust Assets; and (e) the disposition of the Interchange Litigation Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Interchange Litigation Claims.

The Litigation Trust Expenses shall be paid from the Litigation Trust Assets in accordance with the Plan and Litigation Trust Agreement. The Litigation Trustee, on behalf of the Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreement.

D.    *Valuation of Assets.*

As soon as reasonably practicable following the establishment of the Litigation Trust, the Litigation Trustee shall determine the value of the assets transferred to the Litigation Trust, based on the good faith

determination of the Litigation Trustee, and the Litigation Trustee shall apprise, in writing, the Litigation Trust Beneficiaries of such valuation.  The valuation shall be used consistently by all parties (including the Litigation Trustee and the Litigation Trust Beneficiaries) for all applicable U.S. federal, state, and local income tax purposes.

In connection with the preparation of the valuation contemplated by the Plan and the Litigation Trust Agreement, the Litigation Trust shall be entitled to retain such professionals and advisors as the Litigation Trust shall determine to be appropriate or necessary, and the Litigation Trustee shall take such other actions in connection therewith as it determines to be appropriate or necessary.  The Litigation Trust shall bear all of the reasonable costs and expenses incurred in connection with determining such value, including the fees and expenses of any professionals retained in connection therewith.

E.     *Litigation Trustee.*

The Litigation Trustee shall be selected by the Creditors' Committee and shall be appointed on the Effective Date.  The Litigation Trustee shall be a professional person or a financial institution having trust powers with experience administering other litigation trusts.

F.     *Litigation Trust Interests.*

Litigation Trust Interests shall be passive and shall not have voting, consent, or other shareholder-like control rights with respect to the Litigation Trust.  The Litigation Trust Interests shall be uncertificated and shall be reflected only on the records of the Litigation Trustee.  The Litigation Trust Interests shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of Law.

G.     *Cooperation of the Reorganized Debtors.*

The Litigation Trust Agreement shall provide for the Litigation Trust to have reasonable access to copies of the Reorganized Debtors' records and information relating to the Interchange Litigation, including, electronic records, documents, or work product related to the Litigation Claims, to the extent consistent with applicable Law, but shall further provide that any records or information so shared shall continue to be protected by the attorney-client, work product, or common interest privileges, which privileges are being transferred to the Litigation Trust.  The Litigation Trust's access thereto shall not waive any applicable privileges (or similar protections) to which such documents, records, information, and work product may have been subject before such transfer to the Litigation Trust.

The Reorganized Debtors shall preserve all records, documents, or work product (including all electronic records, documents, or work product) related to the Interchange Litigation Claims until the earlier of (a) such time as the Litigation Trustee notifies the Reorganized Debtors in writing that such records are no longer required to be preserved or (b) the termination of the Litigation Trust.

H.     *Fiduciary Duties.*

The Litigation Trustee shall owe fiduciary duties to the holders of Litigation Trust Interests of the type that an official committee of unsecured creditors would owe to unsecured creditors, and shall have in place under the Litigation Trust Agreement applicable indemnity and waiver provisions to protect the Litigation Trustee from being personally liable for any claims or causes of action asserted by the holders of Litigation Trust Interests, except for any clams of fraud, gross negligence, or willful misconduct.

I.      *United States Federal Income Tax Treatment of the Litigation Trust.*

For all Unites States federal income tax purposes, all parties shall treat the transfer of the Litigation Trust Assets to the Litigation Trust for the benefit of the Litigation Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date, including any amounts or other assets subsequently transferred to the Litigation Trust (but only at such time as actually transferred) as (a) a transfer of the Litigation Trust Assets (subject to any obligations relating to such Litigation Trust Assets) to the Litigation Trust Beneficiaries and, to the extent the Litigation Trust Assets are allocable to Disputed Class 5 Claims that are the responsibility of the Litigation Trust to resolve, to the Disputed Claims Reserve, followed by (b) the transfer by the Litigation Trust Beneficiaries to the Litigation Trust of the Litigation Trust Assets (other than the Litigation Trust Assets allocable to the Disputed Claims Reserve) in exchange for Litigation Trust Interests.  Accordingly, the Litigation Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets (other than such Litigation Trust Assets as are allocable to the Disputed Claims Reserve).  The foregoing treatment shall also apply, to the extent permitted by applicable Law, for applicable U.S. state and local income tax purposes.

Subject to contrary definitive guidance from the IRS (as determined by the Litigation Trustee in its reasonable discretion) (including the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee) or the final, unappealable decision of a court of competent jurisdiction, the Litigation Trustee may (a) timely elect to treat any Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (b) to the extent permitted by applicable Law, report consistently with the foregoing for applicable U.S. state and local income tax purposes.  The Litigation Trust, the Litigation Trustee, and the Litigation Trust Beneficiaries shall report for U.S. federal and applicable U.S. state and local income tax purposes consistently with the foregoing.

J.      *Withholding.*

The Litigation Trustee may deduct and withhold and pay to the appropriate taxing authority all amounts required to be deducted or withheld pursuant to the Tax Code or any provision of any state, local, or non-U.S. tax Law with respect to any payment or distribution to the Litigation Trust Beneficiaries. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such Holder by any governmental authority, including income, withholding and other tax obligations, on account of such distribution.  All such amounts deducted or withheld and timely paid to the appropriate taxing authority shall be treated as amounts distributed to such Litigation Trust Beneficiaries for all purposes of this Agreement, to the extent permitted by applicable Law.  The Litigation Trustee shall be authorized to collect such tax information from the Litigation Trust Beneficiaries (including social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order, and the Litigation Trust Agreement and to determine whether any deduction or withholding applies with respect to a payment to such Litigation Trust Beneficiary and the amount of such deduction or withholding.

As a condition to receive distributions under the Plan, all Litigation Trust Beneficiaries may be required to identify themselves to the Litigation Trustee and provide tax information and the specifics of their holdings, to the extent requested by the Litigation Trustee, including an IRS Form W-9 or, in the case of Litigation Trust Beneficiaries that are not U.S. persons for U.S. federal income tax purposes, certification of foreign status on an applicable IRS Form W-8, including all applicable supporting documents.  This identification requirement may, in certain cases, extend to Holders who hold their securities in street name. The Litigation Trustee may refuse to make a distribution to any Litigation Trust Beneficiary that fails to furnish such information in a timely fashion, until such information is delivered; *provided*, *however*, that

upon the delivery of such information by a Litigation Trust Beneficiary, the Litigation Trustee shall make such distribution to which the Litigation Trust Beneficiary is entitled, without interest; *provided*, *further*, that if the Litigation Trustee fails to withhold in respect of amounts received or distributable with respect to any such Holder and the Litigation Trustee is later held liable for the amount of such withholding, such Holder shall reimburse the Litigation Trustee for such liability. If a Litigation Trust Beneficiary fails to comply with such a request for tax information within ninety days, the Litigation Trustee may file a document with the Bankruptcy Court that will provide twenty-one days' notice before such distribution may be deemed an unclaimed distribution. In the event that the Litigation Trustee elects to make distributions through an intermediary (such as DTC), the party who would be the withholding agent with respect to distributions to the Litigation Trust Beneficiary under U.S. federal income tax principles shall be responsible for withholding tax compliance with respect to any such distribution, based on instructions on the character of the income from the Litigation Trustee.

K.      *Dissolution of the Litigation Trust.*

        The Litigation Trustee and the Litigation Trust shall be discharged or dissolved, as the case may be, at such time as (a) the Litigation Trustee determines that the pursuit of additional Interchange Litigation Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such claims and (b) all distributions of Litigation Trust Assets required to be made by the Litigation Trustee have been made, but in no event shall the Litigation Trust be dissolved later than five years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such fifth anniversary (and, in the event of further extension, at least six months before the end of the preceding extension), determines that a fixed-period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Litigation Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Litigation Trust Assets.

        Upon dissolution of the Litigation Trust, any remaining Litigation Trust Assets shall be distributed to all Litigation Trust Beneficiaries in accordance with the Plan and the Litigation Trust Agreement as appropriate; *provided*, *however*, that if the Litigation Trustee reasonably determines that such remaining Litigation Trust Assets are insufficient to render a further distribution practicable, the Litigation Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Litigation Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the Tax Code, (B) exempt from U.S. federal income tax under section 501(a) of the Tax Code, (C) not a "private foundation" as defined in section 509(a) of the Tax Code, and (D) that is unrelated to the Debtors, the Litigation Trust, and any insider of the Litigation Trustee, and (iii) dissolve the Litigation Trust.

L.      *Tax Reporting.*

        The "taxable year" of the Litigation Trust shall be the "calendar year" as such terms are defined in section 441 of the Tax Code. The Litigation Trustee may file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) to the extent permitted by applicable Law. To the extent such treatment applies to the Litigation Trust for U.S. federal income tax purposes, the Litigation Trust Beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. The Litigation Trustee also will annually send to each Litigation Trust Beneficiary or, if applicable, to any intermediary to which it makes a direct payment a separate statement setting forth such holder's share of items of income, gain, loss, deduction or credit (including the receipts and expenditures of the Litigation Trust) as relevant for U.S. federal income tax purposes and will instruct all such Litigation Trust Beneficiaries or intermediaries to use such information in preparing their U.S. federal income tax returns (including, for the avoidance of

doubt, with respect to withholding tax) or to forward the appropriate information to such Litigation Trust Beneficiary's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns; *provided* that if the Litigation Trustee elects to make distributions through an intermediary (such as DTC), it shall provide such statement to such intermediaries for them to provide to such Litigation Trust Beneficiaries.  The Litigation Trustee shall also file (or cause to be filed) any other statement, return, or disclosure relating to the Litigation Trust that is required by any Governmental Unit.

The Litigation Trust also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Litigation Trust that are required by any Governmental Unit.

The Litigation Trustee shall be responsible for payment, out of the Litigation Trust Assets, of any taxes imposed on the Litigation Trust or the Litigation Trust Assets, including the Disputed Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Class 5 Claims, such taxes shall be (a) reimbursed from any subsequent Cash amounts retained on account of Disputed Class 5 Claims or, (b) to the extent such Disputed Class 5 Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Litigation Trustee as a result of the resolution of such Disputed Class 5 Claims.

The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust, including the Disputed Claims Reserve, under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust.

M.      *Transferred Privileges.*

In respect of privileges transferred to the Litigation Trust under the Litigation Trust Agreement (the "Transferred Privileges"), the Litigation Trust Agreement shall contain terms substantially reflecting the following: the Litigation Trust may not waive any Transferred Privileges in respect of records, documents, or information related to the Litigation Claims without first providing to the Reorganized Debtors reasonable advance written notice and an opportunity to protect their respective rights with respect to any subsequent disclosure and the terms of any protective order, confidentiality stipulation, or similar agreement relating to such disclosure.  The Reorganized Debtors may not make disclosure in a manner that could effectuate a waiver of any Transferred Privileges in respect of records, documents, or information related to the Interchange Litigation Claims without first providing to the Litigation Trustee reasonable advance written notice (in no event less than two Business Days) and an opportunity to protect the Litigation Trust's rights with respect to any subsequent disclosure and the terms of any protective order, confidentiality stipulation, or similar agreement relating to such disclosure.  If the Litigation Trustee or the Reorganized Debtors object to an action proposed to be taken by the other with regard to records, documents, or information related to the Interchange Litigation Claims that are covered by the Transferred Privilege (or a disclosure that would result in a waiver), the parties shall be permitted to raise the issue promptly with the Bankruptcy Court.  The party providing advance written notice may take its proposed action unless the Bankruptcy Court determines that (a) such action would cause material adverse harm to the other party, or (b) the harm to the objecting party would substantially outweigh the benefit to the party seeking to take the proposed action.  The objecting party shall bear the burden of proof.  Each of the parties shall bear its own costs and expenses, including attorneys' fees, incurred in connection with such dispute.

## ARTICLE VI.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that:  (a) are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases, which schedule shall be acceptable to the Required Consenting Creditors and the Required Equity Capital Raising Parties; (b) have previously expired or terminated pursuant to their own terms or agreement of the parties thereto; (c) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (d) are, as of the Effective Date, the subject of (i) a motion to reject that is pending or (ii) an order of the Bankruptcy Court that is not yet a Final Order; or (e) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, or the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Proposed Cure Amounts, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, including in accordance with any amendments executed by the Debtors during these Chapter 11 Cases and effective upon assumption by the Debtors, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors with the prior written consent (e-mail being sufficient) of the Required Consenting Creditors and the Required Equity Capital Raising Parties, such consent not to be unreasonably withheld.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by Law, any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan shall be deemed modified such that the transactions contemplated by the Plan shall not constitute a "change of control" or "assignment" (or terms with similar effect) under, or any other transaction, event, or matter that would (A) result in a violation, breach or default under such Executory Contract or Unexpired Lease, (B) increase, accelerate or otherwise alter any obligations, rights or liabilities of the Debtors or the Reorganized Debtors under such Executory Contract or Unexpired Lease, or (C) result in the creation or imposition of a Lien upon any property or asset of the Debtors or the Reorganized Debtors pursuant to the applicable Executory Contract or Unexpired Lease.  Any consent or advance notice required under such Executory Contract or Unexpired Lease shall be deemed satisfied by Confirmation.

Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases and the Schedule of Proposed Cure Amounts at any time up to ninety days after the Effective Date; *provided*, *however*, that for any Executory Contract or Unexpired Lease subject to a dispute with respect to Cure cost as of the Effective Date, the deadline to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases with respect to such Executory Contract or Unexpired Lease shall be the later of (1) ninety days after the Effective Date and (2) five business days after the Bankruptcy Court determines that the Allowed Cure cost with respect to such Executory Contract or Unexpired Lease is greater than the amount set forth in the Schedule of Proposed Cure Amounts. For the avoidance of doubt, at any time prior to the deadline set forth in section 365(d)(4) of the Bankruptcy Code or as otherwise ordered by the Bankruptcy Court, the Debtors may reject any Executory Contract or Unexpired Lease pursuant to a separate motion filed with the Bankruptcy Court or any applicable rejection procedures approved by the Bankruptcy Court in these Chapter 11 Cases.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules require the Debtors to assume or reject an Executory Contract or Unexpired Lease, such requirement shall be satisfied if the Debtors make an election, with the prior written consent (e-mail being sufficient) of the Required Consenting Creditors and the Required Equity Capital Raising Parties, such consent not to be unreasonably withheld, to assume or reject such Executory Contract or Unexpired Lease prior to the deadline set forth by the Bankruptcy Code or the Bankruptcy Rules, as applicable, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

If certain, but not all, of a contract counterparty's Executory Contracts or Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts or Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file an objection on or before the Confirmation Hearing on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing) or at a later date as agreed to by the parties or ordered by the Bankruptcy Court.

B.   *Indemnification Obligations*.

All indemnification provisions, consistent with applicable Law, in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be Reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on the same terms that existed prior to the Effective Date; *provided* that nothing herein shall expand any of the Debtors' indemnification obligations in place as of the Petition Date.

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation

will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors, managers, and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors, managers, and officers remain in such positions after the Effective Date.

C.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Entry of the Confirmation Order shall constitute a Bankruptcy Court Order approving the rejections, if any, of any Executory Contracts or Unexpired Leases on the Schedule of Rejected Executory Contracts and Unexpired Leases. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty days after the later of (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection and (b) the effective date of such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with the applicable Class of General Unsecured Claims as set forth in the Plan. Notwithstanding anything to the contrary in the Plan or the Definitive Documents, the Debtors (with the consent of the Required Consenting Creditors and Required Equity Capital Raising Parties), or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time through and including ninety days after the Effective Date. For the avoidance of doubt, unless otherwise agreed, any property remaining on the premises subject to a rejected Unexpired Lease shall be deemed abandoned by the Debtors or the Reorganized Debtors, as applicable, as of the effective date of the rejection, and the counterparty to such Unexpired Lease shall be authorized to use or dispose of any property left on the premises in its sole and absolute discretion without notice or liability to the Debtors or the Reorganized Debtors, as applicable, or any third party.

D.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, shall, in accordance with the Schedule of Proposed Cure Amounts, pay all Cure costs relating to Executory Contracts and Unexpired Leases that are being assumed under the Plan. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all objections to any Cure amounts set forth in the Schedule of Proposed Cure Amounts must be Filed with the Bankruptcy Court on or before fourteen days after the Filing of the Schedule of Proposed Cure Amounts. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, without the need for any objection by the Debtors or Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure costs shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the applicable Cure costs;

*provided*, *however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure costs despite the failure of the relevant counterparty to file such request for payment of such Cure costs. The Reorganized Debtors also may settle any disputes related to Cure costs without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before the Confirmation Hearing. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely Filed, unless otherwise agreed to by the parties or ordered by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment.

If there is any dispute regarding any Cure costs, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption or assumption and assignment, then payment of any Cure costs shall occur as soon as reasonably practicable after (a) entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment) or (b) as may be agreed upon by the Debtors (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

The Debtors (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) and the Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute. If the Bankruptcy Court determines that the Allowed Cure cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Schedule of Proposed Cure Amounts, the Debtors shall have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date, subject to the applicable counterparty's right to object to such rejection. Notwithstanding the foregoing, the Reorganized Debtors shall be deemed to be entitled to the full benefits of the Executory Contract or Unexpired Lease pending (including, without limitation, any license thereunder) resolution of any dispute, and any subsequent decision to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases shall not cause the Reorganized Debtors to incur any liability thereunder or with respect thereto.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (ii) the effective date of such assumption, or (iii) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

E.      *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any

applicable non-bankruptcy Law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

F.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (a) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

G.      *Reservation of Rights.*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, subject to the consent rights of the Required Consenting Creditors, and the Required Equity Capital Raising Parties, or the Reorganized Debtors, as applicable, shall have forty-five days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

H.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      *Employee Compensation and Benefits.*

1.      Compensation and Benefit Programs.

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

(a)      all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Existing Interests in any of the Debtors;

(b)      Compensation and Benefits Programs that have been rejected pursuant to an order of a Bankruptcy Court;

(c)      any Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any Compensation and Benefits Program; and

(d)      any Compensation and Benefits Programs for the benefit of the Executive Directors, other than to the extent such program is provided for or modified pursuant to any of the Consulting Agreements (it being understood that nothing in this Article VI.I.1

shall impair or otherwise modify the Consulting Agreements, whose terms and conditions shall be controlling with respect to the subject matter set forth therein and in full force and effect in every respect on the Effective Date upon the (a) applicable termination set forth in Article IV.K and (b) execution by the relevant parties of the Consulting Agreements thereafter).

Any assumption of Compensation and Benefits Programs pursuant to the terms herein shall be deemed not to trigger (i) any applicable change of control, immediate vesting, or termination (including, in each case, any similar provisions therein) or (ii) an event of "Good Reason" (or a term of like import), in each case as a result of the consummation of the Restructuring Transactions or any other transactions contemplated by the Plan. No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

2.  *Workers' Compensation Programs.*

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation Laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable Law, including non-bankruptcy Law, with respect to any such contracts, agreements, policies, programs, and plans; *provided, further*, that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state Law.

J.  *Contracts and Leases Entered into after the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order, except as may be agreed to by the counterparties to such contracts and leases.

**ARTICLE VII.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.  *Distributions on Account of Claims or Interests Allowed as of the Effective Date.*

Unless otherwise provided in the Plan, on or as soon as reasonably practicable after the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII hereof. Except as otherwise provided in the Plan,

Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Notwithstanding the foregoing, (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Allowed Priority Tax Claims shall be paid in accordance with Article II.D of the Plan.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy Law or in the ordinary course of business.  Thereafter, a Distribution Date shall occur no less frequently than once in every 180-day period, as necessary, in the discretion of the Reorganized Debtors and the Litigation Trustee, as applicable.

B.      *Disbursing Agent.*

Except as otherwise set forth in this Article VII.B or the Plan Supplement, all distributions under the Plan shall be made by the applicable Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

C.      *Rights and Powers of Disbursing Agent.*

1.    Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.    Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement Claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors or the Litigation Trustee, as applicable.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.    Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions is and shall be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  Unless otherwise provided in a Final Order from the Bankruptcy Court, if a Claim, other than one based on a Security that is traded on a recognized securities exchange, is transferred twenty or fewer days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and, in any event,

only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

      2.    Delivery of Distributions in General.

Except as otherwise provided herein or in the Plan Supplement, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests, as applicable, as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors or the Litigation Trustee, as applicable.

      3.    Minimum Distributions.

The Disbursing Agent shall not make any distributions to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest of Cash where such distribution is valued, in the reasonable discretion of the applicable Disbursing Agent, at less than $250. When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest, as applicable, would otherwise result in the issuance of a number of shares of the New Common Stock that is not a whole number, the actual distribution of shares of the New Common Stock shall be rounded as follows: (a) fractions of one-half or greater shall be rounded to the next higher whole number; and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of the New Common Stock to be distributed under the Plan shall be adjusted as necessary to account for the foregoing rounding. No fractional shares of the New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. Each Allowed Claim or Interest to which these limitations apply shall be discharged pursuant to <u>Article IX.A</u> of the Plan and its Holder shall be forever barred pursuant to <u>Article IX.A</u> of the Plan from asserting that Claim or Interest against the Reorganized Debtors or their property.

Any amounts owed to a Holder of an Allowed Claim that is under $250 shall revest in the applicable Reorganized Debtor automatically (and without need for a further order by the Bankruptcy Court).

      4.    Undeliverable and Unclaimed Distributions.

If any distribution to a Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable, no distribution shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date without interest. Undeliverable distributions shall remain in the possession of the Reorganized Debtors or the Litigation Trust, as applicable, until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or the Litigation Trust or is cancelled pursuant to this <u>Article VII</u>, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

Any distribution under the Plan that is an Unclaimed Distribution or remains undeliverable for a period of 180 days after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution or undeliverable distribution shall revest in the applicable Reorganized Debtor or the Litigation Trust, as applicable, automatically (and without need for a further order by the Bankruptcy Court, notwithstanding any applicable federal, provincial, or estate escheat, abandoned, or unclaimed property Laws to the contrary) and, to the extent such Unclaimed Distribution is comprised of the New Common Stock, such New Common Stock shall be cancelled. Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be cancelled, released, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or

unclaimed property Laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary. The Disbursing Agent shall adjust the distributions of the New Common Stock to reflect any such cancellation.

     5.    Surrender of Cancelled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with <u>Article IV.H</u> hereof shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent. Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

E.     *Manner of Payment.*

Except as otherwise provided in the Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, all distributions of the New Common Stock to the Holders of the applicable Allowed Claims or Allowed Interests, in each case if any, under the Plan shall be made by the Disbursing Agent on behalf of the Debtors or Reorganized Debtors, as applicable.

All distributions of Cash to the Holders of the applicable Allowed Claims or Allowed Interests, in each case if any, under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor or Reorganized Debtor.

At the option of the applicable Disbursing Agent, any Cash payment to be made hereunder may be made by check, Automated Clearing House, or wire transfer or as otherwise required or provided in applicable agreements.

F.     *Indefeasible Distributions.*

Except as otherwise provided in <u>Article VII.M</u>, any and all distributions made under the Plan shall be indefeasible and not subject to clawback or turnover provisions.

G.     *Section 1145 Exemption and DTC Matters.*

The shares of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) being issued under the Plan and the Subscription Rights with respect to the Rights Offering will be issued without registration under the Securities Act or any similar federal, state, or local Law in reliance upon either: (a) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code); or (b) including with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code, pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act).

Securities issued in reliance upon section 1145 of the Bankruptcy Code (including any Distributable New Common Stock, to the extent permitted and available) (a) are exempt from, among other things, the

registration requirements of section 5 of the Securities Act and any other applicable Law requiring registration prior to the offering, issuance, distribution, or sale of Securities, to the maximum extent possible, (b) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (c) are freely tradable and transferable by any holder thereof that, at the time of transfer, (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within ninety days of such transfer, and (iii) is not an entity that is an "underwriter" (as defined in section 2(a)(11) of the Securities Act).  The offering, issuance, distribution, and sale of any securities in accordance section 1145 of the Bankruptcy Code shall be made without registration under the Securities Act or any similar federal, state, or local Law in reliance on section 1145(a) of the Bankruptcy Code.

Any shares of the New Common Stock (including the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) issued in reliance upon the exemption from registration provided by Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act will be "restricted securities."  Such securities may not be resold, exchanged, assigned, or otherwise transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and other applicable Law and subject to any restrictions in the New Organizational Documents.  The offering, issuance, distribution, and sale of such securities shall be made without registration under the Securities Act or any similar federal, state, or local Law in reliance on section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock to be issued under the Plan through the facilities of DTC (or another similar depository), the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock to be issued under the Plan under applicable securities Laws.  DTC (or another similar depository) shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock to be issued under the Plan is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock (including the Direct Allocation Shares, the Rights Offering Shares, and the Premium Shares) to be issued under the Plan is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

H.  *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors, the Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

I.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for United States federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

J.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the DIP Orders, the Plan, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy Law, postpetition interest shall not accrue or be paid on any prepetition Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

K.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Petition Date.

L.      *Setoffs and Recoupment.*

Except as expressly provided in the Plan or the Plan Supplement, each Reorganized Debtor and the Litigation Trustee, as applicable, may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor or the Litigation Trustee may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Reorganized Debtor(s) or the Litigation Trustee and the Holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or the Litigation Trustee or their applicable successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or the Litigation Trustee or their applicable successor may possess against the applicable Holder; *provided*, *further,* that no set off and/or recoupment against Plan Distributions shall be permitted on account of any Allowed Legacy Facilities Claims.  In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors, the Reorganized Debtors, or the Litigation Trustee, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with <u>Article XIII.F</u> hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

M.      *Claims Paid or Payable by Third Parties.*

1.   Claims Paid by Third Parties.

The Debtors, the Reorganized Debtors, or the Litigation Trustee, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim Objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such

Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Reorganized Debtor, or the Litigation Trustee.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor, a Reorganized Debtor, or the Litigation Trustee on account of such Claim, such Holder shall, within fourteen calendar days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor or the Litigation Trustee, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor or the Litigation Trustee annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen-day grace period specified above until the amount is repaid.

2.   Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim Objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  If an applicable insurance policy has a self-insured retention ("SIR") or a deductible, the Holder of an Allowed Claim that is payable pursuant to such insurance policy shall have an Allowed General Unsecured Claim against the applicable Debtor's Estate up to the amount of the SIR or deductible amount that may be established upon the liquidation of the Claim, and such Holder's recovery from the Debtors or the Reorganized Debtors, as applicable, shall be solely in the form of its distribution on account of such Allowed General Unsecured Claim under the Plan.  Such SIR shall be considered satisfied pursuant to the Plan through allowance of the General Unsecured Claim solely in the amount of the applicable SIR, if any; *provided, however* that nothing herein obligates the Debtors, the Reorganized Debtors, or the Litigation Trustee to satisfy any SIR under any insurance policy.  Any recovery on account of the Claim in excess of the SIR or the deductible established upon the liquidation of the Claim shall be recovered solely from the Debtors' insurance coverage, if any, and only to the extent of available insurance coverage and any proceeds thereof.  If an applicable insurance policy has a retroactive premium retention in connection with a Large Risk Alternative Rating Option Endorsement ("Retention"), the Holder of an Allowed Claim that is payable pursuant to such insurance policy shall have a Claim that can be recovered solely from the Debtors' insurance coverage, if any, and only to the extent of available insurance coverage and any proceeds thereof.  To the extent an applicable Retention has not been paid in full, any of the Debtors' insurers shall have an Allowed General Unsecured Claim against the applicable Debtor's Estate up to the amount of the Retention, plus the Debtors' or the Reorganized Debtors', as applicable, *pro rata* share of any expenses in connection therewith, that may be established upon the liquidation of the Claim, and such Holder's recovery from the Debtors or the Reorganized Debtors, as applicable, shall be solely in the form of its distribution on account of such Allowed General Unsecured Claim under the Plan.  Such Retention shall be considered satisfied pursuant to the Plan through allowance of the General Unsecured Claim solely in the amount of the applicable Retention, if any.  Nothing in this Plan shall be construed to limit, extinguish, or diminish the insurance coverage that may exist or shall be construed as a finding that liquidated any Claim payable pursuant to an insurance policy.  **Nothing herein relieves any Entity from the requirement to timely file a Proof of Claim by the applicable Claims Bar Date.**

3.   Applicability of Insurance Policies.

Except as otherwise provided in the Plan or the Plan Supplement, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in

the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VIII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.    *Disputed Claims Process.*

If the Debtors or the Reorganized Debtors, as applicable, dispute any Claim that is not Allowed as of the Effective Date pursuant to Article III.C or a Final Order entered by the Bankruptcy Court (which may include the Confirmation Order), and such Claim is not otherwise automatically Disallowed under the Plan, the Debtors, Reorganized Debtors, or Litigation Trustee, as applicable, shall File an objection with, and the dispute shall be determined, resolved, or adjudicated before, the Bankruptcy Court unless such objection is withdrawn or otherwise resolved between the parties.

**All Proofs of Claim required to be Filed by the Plan that are Filed after the date that they are required to be Filed pursuant to the Plan shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor or the Litigation Trustee, without the need for any objection by the Reorganized Debtors or the Litigation Trustee, as applicable, or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.    *Allowance of Claims.*

After the Effective Date, each of the Reorganized Debtors or the Litigation Trustee, as applicable, shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest, as applicable, is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest.

C.    *Claims Administration Responsibilities.*

1.   Claims and Interests Other than Class 5 General Unsecured Claims.

With respect to all Classes of Claims and Interests other than Class 5 General Unsecured Claims, and except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority to:  (a) File and prosecute Claim Objections; (b) settle, compromise, withdraw, litigate to judgment, or otherwise resolve any and all Claim Objections, regardless of whether such Claims are in a Class or otherwise; (c) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (d) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  After the Effective Date, the Reorganized Debtors shall resolve Disputed Claims in accordance with their fiduciary duties and pursuant to the terms of the Plan.

2.   Class 5 General Unsecured Claims.

With respect to all Class 5 General Unsecured Claims, and except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Litigation Trustee shall have the sole authority to:  (a) File and prosecute objections to Claims; (b) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (c) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (d) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  After the Effective Date, the Litigation Trustee shall resolve Disputed Claims in accordance with its fiduciary duties and pursuant to the terms of the Plan.

D.      *Estimation of Claims and Interests.*

Before, on, or after the Effective Date, the Debtors, the Reorganized Debtors, or the Litigation Trustee, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim or Interest pursuant to applicable Law, including pursuant to section 502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3012, for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim or Interest and does not provide otherwise, such estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors, the Reorganized Debtors, or the Litigation Trustee, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim or Interest that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven days after the date on which such Claim or Interest is estimated.  Each of the foregoing Claims and Interests and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims or Interest may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

E.      *Disputed Claims Reserve.*

On or before the Effective Date, (a) the Reorganized Debtors incorporated in the U.S., subject to the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties, shall establish one or more reserves of the applicable consideration for any Claims against any Debtor that are Disputed Claims as of the Distribution Record Date other than Class 5 General Unsecured Claims, which reserves shall be administered by the Disbursing Agent and (b) the Litigation Trustee may establish one or more reserves of the applicable considerations for any Claims that are Disputed Claims as of the Distribution Record Date for Class 5 General Unsecured Claims.

After the Effective Date, the applicable Disbursing Agent shall hold such consideration in such reserve(s) in trust for the benefit of such Disputed Claims as of the Distribution Record Date, that are ultimately determined to be Allowed after the Distribution Record Date.  The Disbursing Agent shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable

71

on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under <u>Article III</u> of the Plan solely to the extent of the amounts available in the applicable reserve(s).

Upon a Disputed Claim becoming disallowed by a Final Order, the applicable amount of the consideration that was in the disputed claims reserve on account of such Disputed Claim shall be canceled by the Reorganized Debtors or the applicable Disbursing Agent. The Disbursing Agent shall adjust the distributions of the consideration to reflect any such cancellation.

The Debtors may take the position that grantor trust treatment applies in whole or in part to any assets held in a disputed claims reserve. To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations. Accordingly, subject to the immediately foregoing sentence, if such intended U.S. federal income tax treatment applied, then for U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as if such beneficiaries had received an interest in such account or fund's assets and then contributed such interests (in accordance with the Restructuring Transactions Memorandum) to such account or fund. Alternatively, any assets held in a disputed claim reserve may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. To the extent such treatment applies, such assets will be subject to entity-level taxation, and the Reorganized Debtors shall be required to comply with the relevant rules.

F.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged (including pursuant to the Plan) on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, Claim Objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

G.      *Time to File Objections to Claims.*

Any objections to Claims or Interests shall be Filed on or before the later of (1) 180 days after the Effective Date and (2) such other period of limitation as may be specifically fixed by the Bankruptcy Court upon a motion by the Debtors, the Reorganized Debtors, or the Litigation Trustee, as applicable.

H.      *Disallowance of Claims or Interests.*

Except as otherwise expressly set forth herein, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**Except as otherwise provided herein or as agreed to by the Debtors or the Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without the Debtors or the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such**

**Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims shall not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

I.      *Amendments to Claims.*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors or the Litigation Trustee, as applicable, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable Law.

J.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount pending resolution of the dispute.

K.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of such date, without any interest to be paid on account of such Claim or Interest.

L.      *Single Satisfaction of Claims.*

Holders of Allowed Claims or Allowed Interests may assert such Claims against or Interests in the Debtors obligated with respect to such Claims or Interests, and such Claims and Interests shall be entitled to share in the recovery provided for the applicable Claim or Interest against the Debtors based upon the full Allowed amount of such Claims or Interests.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim or Allowed Interest exceed the amount of the Allowed Claim or Allowed Interest.

## ARTICLE IX.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, any other Definitive Document, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan or the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the

Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date.

**B.**     *Release of Liens.*

**Except as otherwise provided herein, in the Exit First Lien Facility Documents, the New Money Revolving Credit Facility Documents, the Plan Supplement, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or Reorganized Debtors, or any other Holder of a Secured Claim.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, and other security interests.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, the Exit First Lien Facility Agent, or the New Money Revolving Credit Facility Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

C.     *Releases by the Debtors*.

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted by or on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates, as applicable, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to or in any manner arising from in whole or in part, the Debtors (including the management, ownership, or operation thereof), any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), the Convertible Bonds, the Legacy Facilities, the Priming Facilities, the Midwest Facility, the Settlement Facility, any intercompany transactions, the Chapter 11 Cases and any related adversary proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility, the Rights Offering, the Financing Commitment and Backstop Agreement, the New Money Revolving Credit Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility, the Rights Offering, the Financing Commitment and Backstop Agreement, the New Money Revolving Credit Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release:   (a) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions; (b) the rights of any Holder of Allowed Claims to receive distributions under the Plan; (c) any Claims for indemnification that are expressly assumed by the Debtors pursuant to the Plan or any document, instrument, or agreement executed to implement the Plan or the Restructuring Transactions; (d) any obligations arising under business or commercial agreements or arrangements among the Released Parties and any non-Debtor Entity; or (e) the Interchange Litigation Claims and any other Claims or Causes of Actions relating to the Interchange Litigation.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the claims or Causes of Action released by the Debtor Release; (iii) in the best interests of the Debtors, the Estates, and all Holders of

Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Estates asserting any claim or Cause of Action released by the Debtor release against any of the Released Parties.

**D.**      *Releases by the Releasing Parties.*

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, the Reorganized Debtors, or their Estates, as applicable, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), the Convertible Bonds, the Legacy Facilities, the Priming Facilities, the Midwest Facility, the Settlement Facility, any intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility, the Rights Offering, the Financing Commitment and Backstop Agreement, the New Money Revolving Credit Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility, the Rights Offering, the Financing Commitment and Backstop Agreement, the New Money Revolving Credit Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release:   (a) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions, including the Exit First Lien Facility Documents and the New Money Revolving Credit Facility Documents; (b) the rights of any Holder of Allowed Claims or Allowed Interests to receive distributions under the Plan; (c) any obligations arising under business or commercial agreements or arrangements among the Released Parties and any non-Debtor Entity; or (d) the Interchange Litigation Claims and any other Claims or Causes of Actions relating to the Interchange Litigation.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (i) consensual; (ii) essential to the Confirmation; (iii) given in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the restructuring and implementing the

Plan; (iv) a good faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

E.    *Exculpation.*

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any claims and Causes of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of prepetition transactions (including with respect to the Debt Documents), the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility Documents, the New Money Revolving Credit Facility Documents, the Rights Offering, the Financing Commitment and Backstop Agreement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility, the Rights Offering, the Financing Commitment and Backstop Agreement, the New Money Revolving Credit Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable Law with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.    *Injunction.*

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold the Released Claims are permanently enjoined from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (a) commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any Released Claims; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any Released Claims; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the Estates of such Entities on

**account of or in connection with or with respect to any Released Claims; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the Estates of such Entities on account of or in connection with or with respect to any Released Claims unless such Entity has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims released or settled pursuant to the Plan.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this <u>Article IX.F</u> hereof.**

G.      *Gatekeeper Provision.*

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Claim or Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to, or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of, a Claim or Cause of Action subject to <u>Article IX.C</u>, <u>Article IX.D</u>, and <u>Article IX.E</u> without first (a) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim against a Debtor, Reorganized Debtor, Exculpated Party, or Released Party and is not a Claim that the Debtors released under the Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (b) obtaining from the Bankruptcy Court specific authorization for such party to bring such Claim or Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party. For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Claims or Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.

H.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

J.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (a) such Claim has been adjudicated as non-contingent or (b) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

## ARTICLE X.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied, in a manner acceptable to the Required Consenting Creditors, the Required Equity Capital Raising Parties, and, solely with respect to Article X.A.10 below as it pertains to the Agent Professionals, the applicable Agents, or waived, with the prior written consent (e-mail being sufficient) of the Required Consenting Creditors, the Required Equity Capital Raising Parties, and, solely with respect to Article X.A.10 below as it pertains to the Agent Professionals, the applicable Agents (or as otherwise indicated), pursuant to the provisions of Article X.B hereof:

1.      the Restructuring Support Agreement shall remain in full force and effect, all conditions shall have been satisfied or waived thereunder (other than any conditions related to the occurrence of the Effective Date), and there shall be no breach thereunder that, after the expiration of any applicable notice or any cure period, would give rise to a right to terminate the Restructuring Support Agreement;

2.      the Financing Commitment and Backstop Agreement shall have been approved pursuant to the Financing Commitment Backstop Agreement Order, which shall be a Final Order and shall remain in full force and effect, all conditions shall have been satisfied thereunder (other than any conditions related to the occurrence of the Effective Date), and there shall be no breach thereunder that, after the expiration of any applicable notice or any cure period, would give rise to a right to terminate the Financing Commitment and Backstop Agreement for which notice has been given in accordance with the terms thereof (including by the requisite parties thereunder);

3.      each document or agreement constituting a Definitive Document shall have been executed and/or effectuated, in form and substance consistent with the Restructuring Support Agreement and (a) acceptable to the Required Consenting Creditors and the Required Equity Capital Raising Parties, (b) if the Sponsored Exit First Lien Facility is the Exit First Lien Facility, reasonably acceptable to the Required Exit Facility Commitment Parties with respect to Definitive Documents or provisions of Definitive Documents that directly impact the Sponsored Exit First Lien Facility (in each case, as applicable) subject to the consent rights set forth in the

Restructuring Support Agreement, and (c) reasonably acceptable to the Creditors' Committee, solely with respect to the Creditors' Committee Settlement, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived in accordance with the terms of the Restructuring Support Agreement (as applicable) and the applicable Definitive Document;

4.     the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, and all applicable regulatory or government-imposed waiting periods shall have expired or been terminated;

5.     the New Organizational Documents shall have been executed and/or effectuated, shall be in form and substance consistent with the Restructuring Support Agreement and subject to any consent rights set forth in the Corporate Governance Term Sheet and the Restructuring Support Agreement, and any conditions precedent related thereto, shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived;

6.     the Exit First Lien Facility Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the Exit First Lien Facility shall have been satisfied or duly waived in writing in accordance with the terms of the Exit First Lien Facility and the closing of the Exit First Lien Facility shall have occurred;

7.     the Rights Offering (including the Rights Offering Procedures) and Direct Equity Allocation shall have been approved by the Bankruptcy Court and Rights Offering and Direct Equity Allocation shall have been consummated in accordance with its terms;

8.     all fees, expenses, and premiums payable pursuant to the Financing Commitment and Backstop Agreement, the Definitive Documents, or pursuant to any order of the Bankruptcy Court shall have been paid by the Debtors or the Reorganized Debtors, as applicable;

9.     all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses in full after the Effective Date have been placed in the professional fee escrow account as set forth in, and in accordance with, the Plan;

10.    all professional fees and expenses of the Ad Hoc Group Professionals and the Agent Professionals shall have been paid in full;

11.    the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance consistent with the Restructuring Support Agreement and (a) acceptable to the Required Consenting Creditors and the Required Equity Capital Raising Parties, (b) if the Sponsored Exit First Lien Facility is the Exit First Lien Facility, acceptable to the Required Exit Facility Commitment Parties (any such consent not to be unreasonably withheld), and (c) reasonably acceptable to the Creditors' Committee, solely in respect of the Creditors' Committee Settlement, and shall be a Final Order;

12.    there shall be no material changes to the business plan delivered to the Ad Hoc Group on March 8, 2023;

13.    if applicable, the Implementation Mechanism(s), including any agreed upon in connection with the Real Estate Plan, are effective in accordance with their terms and, if a UK Company Voluntary Arrangement is pursued, the Challenge Free Effective Date shall have occurred;

14.    the Debtors shall be in compliance with the Real Estate Plan;

15.    unless otherwise waived by the Required Consenting Creditors and the Required Equity Capital Raising Parties, the Debtors shall have obtained approval to enter into the New Money Revolving Credit Facility (or another facility of equal quantum) on terms and conditions (a) acceptable to the Required Consenting Creditors and the Required Equity Capital Raising Parties and, (b) in the event the Sponsored Exit First Lien Facility is the Exit First Lien Facility, acceptable to the Required Exit Facility Commitment Parties (any such consent not to be unreasonably withheld);

16.    the Debtors shall have otherwise substantially consummated the Restructuring Transactions, and all transactions contemplated by the Plan and in the Definitive Documents, in a manner consistent in all respects with the Restructuring Support Agreement and the Plan;

17.    Cure Claims shall not exceed $185 million;

18.    the Required Consenting Creditors and Required Equity Capital Raising Parties shall have consented to (a) the assumption, rejection, or sale of real property leases and/or real property (or the entry into any similar transaction) and (b) Executory Contracts to be assumed (including any Executory Contracts or Unexpired Leases to be assumed or rejected as part of the Plan Supplement);

19.    any and all contracts, agreements, and related documents between (a) any Debtor and any Related Party or (b) any Related Party of any Debtor and another Related Party of any Debtor thereto shall have been identified in writing to, and reviewed by, the Ad Hoc Group Professionals, the Consenting Creditors and the Capital Raising Parties and all terms thereof shall be acceptable to the Required Equity Capital Raising Parties;

20.    the Debtors shall have entered into an agreement with respect to its screen advertising that is acceptable in form and substance to the Required Consenting Creditors and Required Equity Capital Raising Parties;

21.    all "key man," "key person," and clauses of similar effect in any of the Debtors' and any non-Debtor direct or indirect subsidiary of the Debtors' agreements and contracts shall have been identified by the Debtors and removed, amended, modified, or waived, including, with respect to such agreements or contracts of the Debtors, through a Final Order of the Bankruptcy Court, in each case, to the satisfaction of the Required Consenting Creditors and the Required Equity Capital Raising Parties;

22.    all "change of control" and clauses of similar effect in any of the Debtors' and any non-Debtor direct or indirect subsidiary of the Debtors' agreements and contracts shall have been identified by the Debtors and removed, amended, modified, or waived, including, with respect to such agreements or contracts of the Debtors, through a Final Order of the Bankruptcy Court, in each case, to the satisfaction of the Required Consenting Creditors and the Required Equity Capital Raising Parties;

23.    each of the Executive Directors shall have provided a representation that, to the best of his or her knowledge, Schedule 1 to the Consulting Agreements is an accurate and complete schedule

of all contracts, agreements, or other documents relevant to the satisfaction of <u>Article IX.A.19</u>, <u>Article IX.A.21</u>, and <u>Article IX.A.22</u>;

24.    the Consulting Agreements shall have been executed and be in full force and effect;

25.    unless otherwise waived by the Required Equity Capital Raising Parties, the Required Equity Capital Raising Parties shall have designated a new chief executive officer for the Reorganized Debtors, who shall be appointed as the chief executive officer for the Reorganized Debtors as of the Effective Date;

26.    the Reorganized Debtors and the RoW Group, as of the anticipated Effective Date and before the Consummation, shall have minimum unrestricted Cash of no less than the projected ending unrestricted Cash balance with respect to the Reorganized Debtors and the RoW Group for the week in which the Effective Date occurs per the approved DIP budget submitted by the Debtors to the Consenting Creditors on March 23, 2023, inclusive of the Professional Fee Escrow Account, subject to a permitted negative variance equal to 10% of such projected amount;

27.    the Litigation Trust Agreement, in form and substance reasonably acceptable to the Creditors' Committee, the Debtors, the Required Consenting Creditors, and the Required Equity Capital Raising Parties, shall have been executed;

28.    the Litigation Trust Assets shall have been transferred to the Litigation Trust; and

29.    the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein (and any amendment(s) thereto) shall have been Filed.

B.    *Waiver of Conditions.*

Except as otherwise specified in the Plan, any one or more of the conditions to Consummation set forth in this <u>Article X</u> may be waived only if waived in writing by the Debtors and the Required Consenting Creditors, the Required Equity Capital Raising Parties and, solely to the extent applicable, the Required Exit Facility Commitment Parties, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; *provided*, *however*, that no conditions to Consummation set forth in this <u>Article X</u> relating to the Creditors' Committee Settlement may be waived absent the prior written consent of the Creditors' Committee.

C.    *Effect of Failure of Conditions.*

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, the Restructuring Support Agreement, the Financing Commitment and Backstop Agreement, or any other Definitive Document shall: (a) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (b) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity; *provided* that all provisions of the Plan, the Restructuring Support Agreement, the Financing Commitment and Backstop Agreement, or other any Definitive Document that survive termination thereof shall remain in effect in accordance with the terms thereof.

D.    *Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in the Plan, and subject to the Restructuring Support Agreement and the consent rights set forth therein, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan; *provided* that any such modification (whether material or immaterial) shall be (a) acceptable in form and substance to the Required Consenting Creditors and the Required Equity Capital Raising Parties, (b) solely to the extent such modification relates to the Sponsored Exit First Lien Facility, reasonably acceptable to the Required Exit Facility Commitment Parties, and (c) solely to the extent such modification relates to the provisions of the Plan relating to the Creditors' Committee Settlement, reasonably acceptable to the Creditors' Committee. Subject to those restrictions on modifications set forth in the Plan, the Restructuring Support Agreement, and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

To the extent permitted by the Restructuring Support Agreement and subject to any consent rights set forth therein, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of such Debtor or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code (other than those matters administered in any Administration, any Scheme of Arrangement, any UK Company Voluntary Arrangement, any UK Restructuring Plan, any Shareholder Meeting, or other

Implementation Mechanism, as applicable and subject to the Restructuring Transactions Memorandum and UK Implementation Agreement), including jurisdiction to:

a. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

b. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

c. resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article VI hereof, the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

d. ensure that distributions to Holders of Allowed Claims and Holders of Allowed Interests are accomplished pursuant to the provisions of the Plan;

e. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

f. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

g. enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan, the Confirmation Order, or the Disclosure Statement, including the Restructuring Support Agreement;

h. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

i. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

j. issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

k. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article IX hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

l.  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII.M hereof;

m.  enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

n.  determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

o.  enter an order or final decree concluding or closing the Chapter 11 Cases;

p.  adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

q.  adjudicate any and all matters relating to the Litigation Trust or the Litigation Trust Assets;

r.  consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

s.  determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

t.  hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

u.  hear and determine matters concerning U.S. state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

v.  hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article IX hereof, whether occurring prior to or after the Effective Date;

w.  enforce all orders previously entered by the Bankruptcy Court; and

x.  hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XII to the contrary, the New Organizational Documents, the Exit First Lien Facility, and the New Money Revolving Credit Facility and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

A.  *Immediate Binding Effect.*

Subject to Article X.A hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of

doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

B.     *Additional Documents.*

On or before the Effective Date, and consistent in all respects with the terms of the Restructuring Support Agreement, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement; *provided* that any and all such agreements and documents shall be in form and substance acceptable to the Debtors and the Required Consenting Creditors and the Required Equity Capital Raising Parties. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, the Creditors' Committee and any other statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee or any other statutory committees after the Effective Date.

D.     *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor, Consenting Creditor, Capital Raising Party, lender under the New Money Revolving Credit Facility, Agent, or DIP Lender, as applicable, with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor, Agent, or DIP Lender, as applicable, with respect to the Holders of Claims or Interests prior to the Effective Date.

E.     *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.     *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to

have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| If to the Debtors: | If to Counsel to the Debtors: |
|---|---|
| Cineworld Group plc<br>101 E. Blount Avenue<br>Knoxville, Tennessee 37920<br>Attention:  Israel Greidinger<br>E-mail address:  israel.greidinger@cineworld.co.uk | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention:  Joshua A. Sussberg, P.C., Ciara Foster, and Maddison Levine<br>E-mail address:  joshua.sussberg@kirkland.com, ciara.foster@kirkland.com, and maddison.levine@kirkland.com<br><br>-and-<br><br>Kirkland & Ellis LLP<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Attention:  Peter A. Candel<br>E-mail address:  peter.candel@kirkland.com<br><br>-and-<br><br>Jackson Walker LLP<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010<br>Attention:  Matthew D. Cavenaugh, Rebecca Blake Chaikin, Veronica A. Polnick, and Vienna Anaya<br>E-mail address:  mcavenaugh@jw.com, rchaikin@jw.com, vpolnick@jw.com, and vanaya@jw.com |
| **If to the U.S. Trustee:** | **If to Counsel to the DIP Agent:** |
| United States Trustee<br>for the Southern District of Texas<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002 | Sullivan & Cromwell LLP<br>125 Broad Street<br>New York, New York 10014<br>Attention:  James A. Bromley<br>E-mail address:  bromleyj@sullcrom.com |

| If to Counsel to the Creditors' Committee: | If to Counsel to the Consenting Creditors, the Capital Raising Parties, and/or the DIP Lenders: |
|---|---|
| Weil, Gotshal & Manges LLP<br>700 Louisiana Street, Suite 1700<br>Houston, Texas 77002<br>Attention:  Matthew S. Barr, Alfredo R. Pérez, and Theodore S. Heckel<br>Email:  matt.barr@weil.com, alfredo.perez@weil.com, and theodore.heckel@weil.com<br><br>- and –<br><br>Pachulski Stang Ziehl & Jones LLP<br>780 Third Avenue, 34th Floor<br>New York, New York 10017<br>Attention:  Robert J. Feinstein, Bradford J. Sandler, and Shirley S. Cho<br>Email:  rfeinstein@pszjlaw.com, bsandler@pszjlaw.com, and scho@pszjlaw.com<br><br>- and –<br><br>Pachulski Stang Ziehl & Jones LLP<br>440 Louisiana Street, Suite 900<br>Houston, Texas 77002<br>Attention:  Michael D. Warner and Benjamin L. Wallen<br>Email:  mwarner@pszjlaw.com and bwallen@pszjlaw.com | Arnold & Porter Kaye Scholer LLP<br>70 West Madison Street, Suite 4200<br>Chicago, Illinois, 60602<br>Attention:  Michael Messersmith and Brian J. Lohan<br>E-mail address:  michael.messersmith@arnoldporter.com and brian.lohan@arnoldporter.com<br><br>- and -<br><br>Arnold & Porter Kaye Scholer LLP<br>250 West 55th Street<br>New York, New York 10019<br>Attention:  Maja Zerjal Fink<br>E-mail address:  maja.zerjalfink@arnoldporter.com<br><br>- and -<br><br>Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park, Bank of America Tower<br>New York, New York 10036<br>Attention:  Philip C. Dublin, Daniel Fisher, and Meredith Lahaie<br>E-mail address:  pdublin@akingump.com, dfisher@akingump.com, and mlahaie@akingump.com |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, an Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

G.      *Term of Injunctions or Stays.*

**Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

**Notwithstanding anything to the contrary herein, the automatic stay imposed by section 362 of the Bankruptcy Code and the injunctions set forth in Article IX.F of the Plan shall remain applicable to Claims that have the benefit of an applicable insurance policy arising prior to the Effective Date up to the amount of the applicable SIR or deductible, which Claims shall be treated as General Unsecured Claims.**

H.     *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.     *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are an integral part of the Plan and are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at <u>https://cases.ra.kroll.com/cineworld</u> or the Bankruptcy Court's website at <u>www.txs.uscourts.gov/bankruptcy</u>.  To the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the Plan Supplement document or exhibit shall control (unless stated otherwise in such Plan Supplement document or exhibit or in the Confirmation Order).

J.     *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided* that any such alteration shall be consistent with the Restructuring Support Agreement and be in form and substance acceptable to the Required Consenting Creditors and the Required Equity Capital Raising Parties.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (c) nonseverable and mutually dependent.

K.     *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, no such parties nor individuals nor the Reorganized Debtors will have any liability for the violation of any applicable Law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

L.     *Closing of Chapter 11 Cases.*

On and after the Effective Date, the Debtors or the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases of the Debtors except for the Chapter 11 Case of Debtor [●] and any other Debtor identified in the Restructuring Transactions Memorandum as having its Chapter 11 Case remain open following the Effective Date, and all contested matters relating to any of the Debtors, including Claim Objections and any adversary proceedings, shall be administered and heard in the Chapter 11 Case of Debtor [●], irrespective of whether such Claim(s) were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

When all Disputed Claims have become Allowed or disallowed and all distributions have been made in accordance with the Plan, the Reorganized Debtors shall seek authority to close any remaining Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

M.     *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated:  April 10, 2023                    **CINEWORLD GROUP PLC**

                                          on behalf of itself and all other Debtors


                                          _/s/ James A. Mesterharm_
                                          James A. Mesterharm
                                          Chief Restructuring Officer