THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) Case No. 22-90168 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## DISCLOSURE STATEMENT RELATING TO
## THE JOINT CHAPTER 11 PLAN OF REORGANIZATION
## OF CINEWORLD GROUP PLC AND ITS DEBTOR SUBSIDIARIES

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                ciara.foster@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Veronica A. Polnick (TX Bar No. 24079148)
Vienna Anaya (TX Bar No. 24091225)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:          mcavenaugh@jw.com
                rchaikin@jw.com
                vpolnick@jw.com
                vanaya@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated: April 10, 2023

---

[1]     A complete list of each of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/cineworld. The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom. The Debtors together with their non-Debtor affiliates are referred to collectively herein as "Cineworld" or the "Group."

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**[2]

THE DEBTORS ARE PROVIDING THIS DISCLOSURE STATEMENT IN CONNECTION WITH SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN, EACH HOLDER ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS, THE CREDITORS' COMMITTEE, AND THE HOLDERS OF APPROXIMATELY 83% OF THE LEGACY FACILITIES CLAIMS AND THE HOLDERS OF APPROXIMATELY 69% OF DIP CLAIMS THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT. THE DEBTORS URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. A COPY OF THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES IS ATTACHED HERETO AS <u>EXHIBIT A</u>. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR

---

[2] Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the *Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1509] (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>"), a copy of which is attached hereto as <u>**Exhibit A**</u>, the *Restructuring Support Agreement* [Docket No. 1471] (as may be amended, supplemented, or otherwise modified from time to time, and including all exhibits and schedules attached thereto, the "<u>Restructuring Support Agreement</u>" or "<u>RSA</u>"), a copy of which is attached hereto as <u>**Exhibit B**</u>, the *Declaration of Israel Greidinger, Deputy Chief Executive Officer of Cineworld Group plc, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 19] (the "<u>Greidinger First Day Declaration</u>"), or the *Declaration of James A. Mesterharm, Chief Restructuring Officer of Cineworld Group plc, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 80] (the "<u>Mesterharm First Day Declaration</u>," and together with the Greidinger First Day Declaration, the "<u>First Day Declarations</u>"), as applicable. **The summaries of the Plan and the RSA provided herein are qualified in their entirety by reference to the Plan and the RSA, as applicable**. In the case of any inconsistency between this Disclosure Statement and the Plan and the RSA, the Plan and the RSA, as applicable, will govern.

FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN, THE PLAN SUPPLEMENT, AND THE RESTRUCTURING SUPPORT AGREEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD REVIEW THE SECURITIES LAW RESTRICTIONS AND NOTICES SET FORTH IN THIS DISCLOSURE STATEMENT AND THE PLAN (INCLUDING, WITHOUT LIMITATION, UNDER ARTICLE IV THEREOF) IN FULL.

THIS DISCLOSURE STATEMENT AND ANY DOCUMENTS RELATED THERETO (INCLUDING, WITHOUT LIMITATION, THE PLAN AND THE PLAN SUPPLEMENT) ARE NOT, AND SHOULD NOT BE CONSTRUED AS, AN INVITATION OR INDUCEMENT TO ENGAGE IN ANY INVESTMENT ACTIVITY IN

RELATION TO ANY SECURITIES TO WHICH THIS DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, OR ANY DOCUMENTS RELATED THERETO RELATE (INCLUDING THE RIGHTS OFFERING DOCUMENTS) SUCH AS WOULD AMOUNT TO A FINANCIAL PROMOTION IN THE UNITED KINGDOM FOR THE PURPOSES OF SECTION 21 OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 OF ENGLAND AND WALES ("FSMA"). IN THE UNITED KINGDOM, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR ANY DOCUMENTS RELATED THERETO (INCLUDING, WITHOUT LIMITATION, THE PLAN AND THE PLAN SUPPLEMENT) IS INTENDED ONLY FOR USE AND MAY ONLY BE RELIED UPON IN RELATION TO ANY INVESTMENT ACTIVITY BY, AND ANY INVESTMENT ACTIVITY TO WHICH SUCH INFORMATION RELATES MAY ONLY BE ENGAGED IN BY, PERSONS FALLING WITHIN ANY OF THE CIRCUMSTANCES OF ARTICLE 1(4) OF REGULATION (EU) 2017/1129, AS IT FORMS PART OF EU RETAINED LAW, AS DEFINED IN THE EUROPEAN UNION (WITHDRAWAL) ACT 2018 (AS AMENDED OR SUPERSEDED, THE "PROSPECTUS REGULATION") WHO ARE AT THE RELEVANT TIME: (I) INVESTMENT PROFESSIONALS WITHIN THE MEANING OF ARTICLE 19(5) OF THE FPO, (II) HIGH NET WORTH COMPANIES WITHIN THE MEANING OF ARTICLE 49(2)(A) TO (D) OF THE FPO, (III) PERSONS THAT ARE EXISTING MEMBERS OR CREDITORS OF THE ISSUER OF THE RELEVANT SECURITIES, OR OF AN UNDERTAKING WHICH AT THE RELEVANT TIME IS IN THE SAME GROUP AS THE ISSUER OF THE RELEVANT SECURITIES, FALLING WITHIN ARTICLE 43 OF THE FPO, OR (IV) PERSONS TO WHOM THE COMMUNICATION MAY OTHERWISE LAWFULLY BE COMMUNICATED (TOGETHER, THE "PERMITTED U.K. PERSONS"). ANY PERSON IN THE UNITED KINGDOM THAT IS NOT A PERMITTED U.K. PERSON IS NOT, FOR THE PURPOSES OF ANY INVESTMENT OR INVESTMENT DECISION, AN INTENDED RECIPIENT OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR ANY DOCUMENT RELATED THERETO (INCLUDING, WITHOUT LIMITATION, THE PLAN AND THE PLAN SUPPLEMENT) AND SHOULD NOT USE SUCH INFORMATION AS THE BASIS FOR TAKING ANY INVESTMENT ACTIVITY OR INVESTMENT ACTION. THIS DISCLOSURE STATEMENT AND ANY DOCUMENT RELATED THERETO (INCLUDING, WITHOUT LIMITATION, THE PLAN AND THE PLAN SUPPLEMENT) SHOULD NOT (INSOFAR AS THEY RELATE TO ANY INVESTMENT OR INVESTMENT ACTIVITY) BE DISTRIBUTED, COMMUNICATED TO, OR DIRECTED AT THE GENERAL PUBLIC IN THE UNITED KINGDOM OTHERWISE THAN AS DESCRIBED ABOVE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

UPON CONSUMMATION OF THE PLAN, CERTAIN (BUT NOT ALL) OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77a–77aa, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT") OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE EXTENT POSSIBLE. OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS. TO THE EXTENT THE EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE DOES NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD REVIEW THE SECURITIES LAW RESTRICTIONS AND NOTICES SET FORTH IN THIS DISCLOSURE STATEMENT AND THE PLAN (INCLUDING, WITHOUT LIMITATION, UNDER ARTICLE IV THEREOF) IN FULL.

THIS DISCLOSURE STATEMENT AND ANY DOCUMENTS RELATED THERETO (INCLUDING, WITHOUT LIMITATION, THE PLAN AND THE PLAN SUPPLEMENT) HAVE BEEN PREPARED ON THE BASIS THAT ANY OFFER OF THE NEW COMMON STOCK ISSUED IN CONNECTION WITH THE PLAN, THE PLAN SUPPLEMENT, THE RIGHTS OFFERING, OR THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT WITHIN ANY MEMBER STATE OF THE EUROPEAN ECONOMIC AREA (THE "EEA") OR IN THE UNITED KINGDOM (EACH A "RELEVANT STATE") WILL EITHER (I) NOT FORM PART OF ANY OFFER OR INVITATION TO PURCHASE, ACQUIRE, SUBSCRIBE FOR, SELL, OTHERWISE DISPOSE OF, OR ISSUE ANY SECURITIES OR ANY SOLICITATION OF ANY OFFER TO PURCHASE, ACQUIRE, SUBSCRIBE FOR, SELL, OR OTHERWISE DISPOSE OF, ANY SECURITY FOR THE PURPOSES OF THE PROSPECTUS REGULATION AND/OR FSMA (AS APPLICABLE) OR (II) BE MADE PURSUANT TO AN EXEMPTION UNDER THE PROSPECTUS REGULATION AND/OR FSMA (AS APPLICABLE) FROM THE REQUIREMENT TO PUBLISH A PROSPECTUS FOR THE OFFER OF TRANSFERABLE SECURITIES TO THE PUBLIC. IN RELATION TO EACH RELEVANT STATE, NO OFFER OF THE NEW COMMON STOCK ISSUED IN CONNECTION WITH THE PLAN, THE PLAN SUPPLEMENT, THE RIGHTS OFFERING, OR THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT MAY BE MADE TO THE PUBLIC AT ANY TIME OTHER THAN PURSUANT TO AN EXEMPTION UNDER THE PROSPECTUS REGULATION AND/OR FSMA (AS APPLICABLE). IN ANY RELEVANT STATE, THE PLAN, THE

iv

PLAN SUPPLEMENT, THE RIGHTS OFFERING, AND THE RIGHTS OFFERING PROCEDURES ARE ONLY ADDRESSED TO AND DIRECTED AT: (I) "QUALIFIED INVESTORS" IN THAT RELEVANT STATE WITHIN THE MEANING OF THE PROSPECTUS REGULATION OR FSMA (AS APPLICABLE, "QUALIFIED INVESTORS") OR (II) ANY OTHER PERSON IF SUCH ADDRESS OR DIRECTION DOES NOT OTHERWISE CONSTITUTE AN OFFER OF SECURITIES TO THE PUBLIC WITHIN THE MEANING OF THE PROSPECTUS REGULATION (INCLUDING IN ANY OF THE OTHER CIRCUMSTANCES OF ARTICLE 1(4) OF THE PROSPECTUS REGULATION) AND/OR FSMA (INCLUDING IN ANY OF THE OTHER CIRCUMSTANCES OF SECTION 86 OF FSMA). NONE OF THE DEBTORS OR ANY OF THEIR RESPECTIVE AFFILIATES, REORGANIZED CINEWORLD PARENT, OR ANY PERSONS ACTING ON ANY OF THEIR BEHALVES HAS AUTHORIZED, NOR DO THEY AUTHORIZE, THE MAKING OF ANY OFFER OF THE NEW COMMON STOCK, OR IN CONNECTION WITH THE RIGHTS OFFERING THROUGH ANY FINANCIAL INTERMEDIARY, OTHER THAN AS MAY BE CONTEMPLATED IN THIS DISCLOSURE STATEMENT AND ANY DOCUMENTS RELATED THERETO (INCLUDING, WITHOUT LIMITATION, THE PLAN, AND THE PLAN SUPPLEMENT).

THE ISSUANCE OF THE NEW COMMON STOCK (INCLUDING THE RIGHTS OFFERING SHARES, THE RO BACKSTOP SHARES, THE DIRECT ALLOCATION SHARES AND THE PREMIUM SHARES), SUBSCRIPTION RIGHTS IN CONNECTION WITH THE PLAN, THE PLAN SUPPLEMENT, THE RIGHTS OFFERING, OR THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT SHALL NOT CONSTITUTE AN INVITATION OR OFFER TO SELL, OR THE SOLICITATION OF AN INVITATION OR OFFER TO BUY, ANY SECURITIES IN CONTRAVENTION OF ANY APPLICABLE LAW IN ANY JURISDICTION. NO ACTION HAS BEEN TAKEN, NOR WILL BE TAKEN, IN ANY JURISDICTION THAT WOULD PERMIT A PUBLIC OFFERING OF ANY OF THE NEW COMMON STOCK IN ANY JURISDICTION WHERE SUCH ACTION FOR THAT PURPOSE IS REQUIRED.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT:

- THE DEBTORS' PLANS, OBJECTIVES, AND EXPECTATIONS;

- THE DEBTORS' BUSINESS STRATEGY;

- THE IMPACT AND ANY CONTINUED IMPACT OF THE COVID-19 PANDEMIC ON THE DEBTORS AND THE MOTION PICTURE EXHIBITION INDUSTRY GENERALLY, INCLUDING ANY FUTURE BUSINESS INTERRUPTIONS;

- THE DEBTORS' FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- THE SUCCESS OF THE DEBTORS' OPERATIONS;

- THE COSTS OF CONDUCTING THE DEBTORS' OPERATIONS;

- THE DEBTORS' LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- THE LEVEL OF UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;

- THE AMOUNT, NATURE, AND TIMING OF THE DEBTORS' CAPITAL EXPENDITURES;

- THE TERMS OF CAPITAL AVAILABLE TO THE DEBTORS;

- THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS;

- THE RISKS ASSOCIATED WITH CERTAIN OF THE DEBTORS' ACQUISITIONS;

- THE EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- THE DEBTORS' EXPOSURE TO FUTURE CURRENCY EXCHANGE AND INTEREST RATES;

- THE DEBTORS' COUNTERPARTY CREDIT RISK;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION CLAIMS; AND

- GENERAL ECONOMIC AND BUSINESS CONDITIONS.

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION OR PRICE PRESSURE BY CUSTOMERS; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER, INCLUDING ANY INITIATIVES RELATED TO THE DEBTORS' OWNED OR LEASED REAL PROPERTY; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN U.S. AND NON-U.S. LAWS AND REGULATIONS; NATURAL DISASTERS, INCLUDING PANDEMICS, SUCH AS THE COVID-19 PANDEMIC, THAT MAY CAUSE GENERAL BUSINESS DISRUPTIONS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESS.**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................................1

II.     PRELIMINARY STATEMENT ........................................................................................1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT
        AND PLAN .........................................................................................................................4

        A.      What is chapter 11? ................................................................................................4

        B.      Why are the Debtors sending me this Disclosure Statement? ........................5

        C.      What does it mean that the Debtors are seeking conditional approval of this
                Disclosure Statement? ..........................................................................................5

        D.      What is the effect of the Plan on the Debtors' ongoing business? ..................5

        E.      Am I entitled to vote on the Plan? .......................................................................5

        F.      What will I receive from the Debtors if the Plan is consummated? ................6

        G.      What will I receive from the Debtors if I hold an Allowed Administrative
                Claim or Priority Tax Claim? ...........................................................................11

                1.      Administrative Claims. .............................................................................11

                2.      DIP Claims. ...............................................................................................11

                3.      Professional Fee Claims. ..........................................................................12

                4.      Priority Tax Claims. .................................................................................13

                5.      Payment of Statutory Fees. ......................................................................13

                6.      Payment of Restructuring Expenses. ......................................................14

        H.      Are any regulatory approvals required to consummate the Plan? ..............14

        I.      What happens to my recovery if the Plan is not confirmed or does not go
                effective? ..............................................................................................................14

        J.      If the Plan provides that I get a distribution, do I get it upon Confirmation
                or when the Plan goes effective, and what is meant by "Confirmation,"
                "Effective Date," and "Consummation?" .........................................................15

        K.      Is there potential litigation related to the Plan? .............................................15

        L.      How will the preservation of the Causes of Action impact my recovery under
                the Plan? ..............................................................................................................15

        M.      Are there risks to owning the New Common Stock upon emergence from
                Chapter 11? .........................................................................................................16

        N.      Will there be releases, injunction, and exculpation granted to parties in
                interest as part of the Plan? ..............................................................................16

                1.      Release of Liens. .......................................................................................17

                2.      Releases by the Debtors. ..........................................................................18

                3.      Releases by the Releasing Parties. ..........................................................19

                4.      Exculpation. ..............................................................................................20

                5.      Injunction. .................................................................................................21

O.    How will undeliverable distributions and unclaimed property be treated under the Plan? ................................................................................................ 21

P.    Are there minimum distribution restrictions? ................................................ 22

Q.    What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? ................................................................................................................ 22

R.    What is the Marketing Process? ..................................................................... 22

S.    What happens if the Marketing Process leads to an actionable proposal for the purchase of the Debtors' business? ......................................................... 23

T.    What is the deadline to vote on the Plan? ..................................................... 23

U.    How do I vote for or against the Plan? .......................................................... 23

V.    Why is the Bankruptcy Court holding a Confirmation Hearing? .................. 24

W.    When is the Confirmation Hearing set to occur? .......................................... 24

X.    What is the purpose of the Confirmation Hearing? ...................................... 24

Y.    What is the Rights Offering and the Direct Equity Allocation? ................... 24

Z.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? .............................................................. 26

AA.    Do the Debtors recommend voting in favor of the Plan? ............................. 26

BB.    Who supports the Plan? ................................................................................. 26

IV.    THE DEBTORS' DIP FACILITY AND PLAN ......................................................... 26

     A.    The DIP Facility. ............................................................................................ 26

     B.    The Plan. ........................................................................................................ 27

         1.    Sources of Consideration for Plan Distributions. .......................... 27

         2.    Employee-Related Matters. ............................................................ 33

         3.    Treatment of Executory Contracts and Unexpired Leases. ........... 35

         4.    Implementation Mechanisms in England and Wales. .................... 39

V.    SOLICITATION AND VOTING PROCEDURES ..................................................... 39

     A.    Holders of Claims Entitled to Vote on the Plan. ........................................... 39

     B.    Solicitation Agent. ......................................................................................... 40

     C.    Solicitation Package. ..................................................................................... 40

     D.    Voting Record Date. ...................................................................................... 41

     E.    Voting on the Plan. ........................................................................................ 41

     F.    Ballots Not Counted. ..................................................................................... 42

     G.    Dates and Deadlines. ..................................................................................... 43

VI.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ............................................................................................................. 43

     A.    Cineworld's Corporate History. ..................................................................... 43

         1.    Cineworld's Business Operations. .................................................. 44

         2.    Cineworld's Brands. ....................................................................... 45

         3.    Cineworld's Revenue and Income Stream. .................................... 46

         4.    Cineworld's Real Estate Portfolio. ................................................. 46

|     | B.   | Prepetition Capital Structure. ...................................................... | 48 |
|     |      | 1.   Debtor Financing Facilities. .............................................. | 49 |
| VII. |      | EVENTS LEADING TO THE CHAPTER 11 FILINGS ............................... | 51 |
|     | A.   | The COVID-19 Pandemic Devastates the Cinema Industry and Cineworld. ......... | 51 |
|     | B.   | Additional Difficulties Compounding Cineworld's Challenges. ................... | 52 |
|     |      | 1.   Shareholder Appraisal Litigation Stemming from the Regal Acquisition Results in Judgment Against Cineworld. ................... | 52 |
|     |      | 2.   Litigation with Cineplex Over Terminated Arrangement Agreement. ....... | 53 |
|     | C.   | The DIP Negotiations. ............................................................. | 53 |
|     | D.   | Appointment of the Special Committee. ......................................... | 53 |
| VIII. |      | MATERIAL DEVELOPMENTS AND EVENTS IN THE CHAPTER 11 CASES ........... | 56 |
|     | A.   | First Day Relief. ................................................................. | 56 |
|     | B.   | Approval of the DIP Facility. .................................................... | 56 |
|     | C.   | Appointment of Official Committee of Unsecured Creditors. .................... | 57 |
|     | D.   | Retention of the Debtors' Professionals. ........................................ | 57 |
|     | E.   | Schedules of Assets and Liabilities and Statements of Financial Affairs. .......... | 58 |
|     | F.   | Establishment of Claims Bar Dates. ............................................. | 58 |
|     | G.   | The Restructuring Support Agreement and the Financing Commitment and Backstop Agreement. ............................................................ | 59 |
|     | H.   | The Committee Settlement. ....................................................... | 59 |
|     | I.   | RSA Milestones. ................................................................. | 60 |
|     | J.   | Marketing Process. .............................................................. | 62 |
|     | K.   | Litigation Matters. ............................................................... | 63 |
|     |      | 1.   General Litigation. ......................................................... | 63 |
|     |      | 2.   Litigation with Cineplex and Lift-Stay Motion. ......................... | 63 |
|     |      | 3.   Litigation with National CineMedia, LLC and Negotiations with Alternative Screen Advertisers. ......................................... | 63 |
|     |      | 4.   Cineworld Cinemas Limited and Picturehouse Cinemas Limited Winding-Up Petitions. ................................................... | 65 |
|     | L.   | Lease Rejections and Optimization. .............................................. | 65 |
|     | M.   | Procedural and Administrative Motions and Other Relief. ....................... | 68 |
|     | N.   | Corporate Structure Upon Emergence. ........................................... | 69 |
| IX. |      | RISK FACTORS. ..................................................................... | 69 |
|     | A.   | Bankruptcy Law Considerations. ................................................ | 70 |
|     |      | 1.   Parties in Interest May Object to the Plan's Classification of Claims and Interests. .......................................................... | 70 |
|     |      | 2.   The Conditions Precedent to the Effective Date of the Plan May Not Occur. .................................................................... | 70 |
|     |      | 3.   The Conditions Precedent to Consummation of the Capital Raise May Not Occur. ............................................................ | 70 |

|  | 4. | The Debtors May Fail to Satisfy Vote Requirements. | 70 |
|  | 5. | The Debtors May Not Be Able to Secure Confirmation of the Plan. | 71 |
|  | 6. | Nonconsensual Confirmation. | 72 |
|  | 7. | Continued Risk upon Confirmation. | 72 |
|  | 8. | The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code. | 72 |
|  | 9. | The Debtors May Object to the Amount or Classification of a Claim. | 73 |
|  | 10. | Risk that the Implementation Mechanisms in England and Wales May Not Be Approved. | 73 |
|  | 11. | Risk of Non-Occurrence of the Effective Date. | 73 |
|  | 12. | Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan. | 73 |
|  | 13. | Risk that Foreign Courts Will Not Enforce the Confirmation Order | 73 |
|  | 14. | Releases, Injunctions, and Exculpations Provisions May Not Be Approved. | 74 |
| B. | | Risks Related to Recoveries Under the Plan. | 74 |
|  | 1. | The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results. | 74 |
|  | 2. | The Distributable New Common Stock is Subject to Dilution | 74 |
|  | 3. | Certain Tax Implications of the Plan. | 74 |
|  | 4. | The Debtors May Not Be Able to Accurately Report Their Financial Results. | 75 |
|  | 5. | A Liquid Trading Market for the Shares of the New Common Stock May Not Develop | 75 |
|  | 6. | The Trading Price for the Shares of the New Common Stock May Be Depressed Following the Effective Date | 76 |
|  | 7. | Restricted Securities Issued under the Plan May Not be Resold or Otherwise Transferred Unless They Are Registered under the Securities Act or an Exemption from Registration Applies. | 76 |
|  | 8. | Certain Holders of the New Common Stock May be Restricted in their Ability to Transfer or Sell their Securities. | 77 |
|  | 9. | The Rights and Responsibilities of Holders of the New Common Stock Are to Be Governed Largely by Non-U.S. Law. | 77 |
|  | 10. | Because Reorganized Cineworld Parent Is Expected To Be Incorporated Under the Laws of a Jurisdiction Other Than the United States, Holders of the New Common Stock May Face Difficulty Protecting Their Interests, and Their Ability to Protect Their Rights Through Other International Courts, Including the Courts of the United States, May Be Limited | 78 |
| C. | | Risks Related to the Debtors' and the Reorganized Debtors' Business. | 78 |
|  | 1. | The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness | 78 |
|  | 2. | The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases. | 78 |

3.     **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business.** ............................................................. 79

4.     **Financial Results May Be Volatile and May Not Reflect Historical Trends.** ....................................................................................... 79

5.     **The Debtors' Substantial Liquidity Needs May Impact Revenue.** ............. 80

6.     **Trading in the Debtors' Securities During the Pendency of the Chapter 11 Cases is Highly Speculative and Poses Substantial Risks.** ......... 80

7.     **The Debtors' Operations May Be Impacted by the Continuing COVID-19 Pandemic and Its Attendant Effects on the Cinema Industry.** ......................................................................................... 81

8.     **The Debtors Are Exposed to Foreign Currency Exchange Rate Risk that Could Affect Results of Operations and Comparability of Results Between Financial Reporting Periods.** ................................. 81

9.     **The Performance of the Debtors' Business is Directly Linked to Global Macroeconomic Conditions and Other Factors Outside of the Debtors' Control, Which May Adversely Affect Consumer Confidence and/or Consumer Spending Decisions and Which May Therefore Have a Materially Adverse Effect on the Debtors' Business, Financial Condition, Results of Operations, and Prospects.** ......... 82

10.   **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.** ......... 82

11.   **The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.** .................................................................................. 82

X.    **CONFIRMATION OF THE PLAN** ........................................................................ 82

    A.    **The Confirmation Hearing.** ......................................................................... 82

    B.    **Purpose of the Confirmation Hearing.** ........................................................ 83

    C.    **Confirmation Requirements.** ...................................................................... 83

    D.    **Feasibility.** ................................................................................................. 84

    E.    **Acceptance by Impaired Classes.** ............................................................... 84

    F.    **Confirmation Without Acceptance by All Impaired Classes.** ....................... 84

        1.    **No Unfair Discrimination.** ............................................................... 85

        2.    **Fair and Equitable Test.** .................................................................. 85

    G.    **Best Interests of Creditors/Liquidation Analysis.** ....................................... 86

    H.    **Valuation Analysis.** .................................................................................... 86

    I.    **Financial Information and Projections.** ....................................................... 87

    J.    **Additional Information Regarding this Disclosure Statement and Plan.** ....... 87

XI.   **CERTAIN SECURITIES LAW MATTERS** ........................................................... 87

    A.    **Issuance of Securities under the Plan.** ......................................................... 88

    B.    **Subsequent Transfers.** ................................................................................ 88

        1.    **Subsequent Transfers After Reorganized Debtors' issuance of Securities pursuant to section 1145 of the Bankruptcy Code.** ....................... 88

        2.    **Subsequent Transfers After Reorganized Debtors' issuance of Securities pursuant to Section 4(a)(2) of the Securities Act.** ....................... 89

      C.       The New Common Stock & Management Incentive Plan...........................................91

**XII.**    **CERTAIN UNITED STATES FEDERAL INCOME TAX AND U.K. TAX CONSEQUENCES OF THE PLAN**...........................................................................92

      A.       Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors..................................................................................92

              1.       Introduction................................................................................................92

              2.       In General...................................................................................................94

              3.       Effects of the Restructuring Transactions on Tax Attributes of Debtors.........................................................................................................94

              4.       Transfer of Litigation Trust Assets to Litigation Trust. ...................97

      B.       Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims Entitled to Vote. ..............................................................................................99

              1.       Treatment of Debt as a Security....................................................99

              2.       U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Legacy Facilities Claims (Class 4). .......................................99

              3.       U.S. Federal Income Tax Consequences to U.S. Holders of Allowed General Unsecured Claims Against the Debtors Other Than Cineworld Parent (Class 5). ...................................................101

              4.       Distributions Attributable to Accrued Interest (and OID).........102

              5.       Market Discount. ........................................................................102

              6.       Net Investment Income Tax. .......................................................103

              7.       Limitations on Use of Capital Losses. ........................................103

              8.       Ownership and Disposition of New Common Stock.....................103

      C.       Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims. ..................................................................................................................105

      D.       U.S. Information Reporting and Withholding. ..............................................106

      E.       FATCA. .........................................................................................................106

      F.       Certain U.K. Tax Consequences of the Plan to the Debtors and the Reorganized Debtors. .................................................................................107

              1.       Introduction.............................................................................107

               2.       U.K. Corporation Tax. ..............................................................107

**XIII.**    **RECOMMENDATION**..............................................................................................108

**EXHIBIT A**...............................................................................................................................109

**EXHIBIT B**...............................................................................................................................110

**EXHIBIT C**...............................................................................................................................111

**EXHIBIT E**...............................................................................................................................113

**EXHIBITS**[3]

EXHIBIT A      Plan of Reorganization

EXHIBIT B      Restructuring Support Agreement

EXHIBIT C      Financial Projections

EXHIBIT D      Valuation Analysis

EXHIBIT E      Liquidation Analysis

---

[3]      Each Exhibit is incorporated herein by reference.

## I.      INTRODUCTION

The Debtors submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the Plan.  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS AND CERTAIN CONSENTING CREDITORS, INCLUDING HOLDERS OF APPROXIMATELY 83% OF THE LEGACY FACILITIES CLAIMS AND HOLDERS OF APPROXIMATELY 69% OF THE DIP CLAIMS, ENTERED INTO THE RESTRUCTURING SUPPORT AGREEMENT, ATTACHED HERETO AS EXHIBIT B, AND SUPPORT CONFIRMATION OF THE PLAN.  FURTHER, THE CREDITORS' COMMITTEE SUPPORTS CONFIRMATION OF THE PLAN.  THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN AND, WHERE RELEVANT, SEPARATELY VOTE TO APPROVE ANY IMPLEMENTATION MECHANISMS REQUIRED TO IMPLEMENT THE PLAN OUTSIDE OF THE UNITED STATES OF AMERICA.**

## II.     PRELIMINARY STATEMENT

Cineworld is unwavering in its vision to be "The Best Place to Watch a Movie."  As the second-largest cinema chain in the world by number of screens, Cineworld brings its vision to life each day in modern cinemas with cutting-edge technology.  Headquartered in Brentford, United Kingdom, the Group, currently with a premium listing on the Main Market of the London Stock Exchange, operates under five major brands—Cineworld in the U.K. and Ireland, Picturehouse in the U.K., Regal in the U.S., Cinema City in Central and Eastern Europe, and Planet in Israel—and employs a global workforce of approximately 30,000 employees.  As of the Petition Date, Cineworld operated 747 locations with 9,139 screens in 10 countries.

Before the COVID-19 pandemic, Cineworld's business was performing well and growing. The Group had generated its highest revenues in 2018 and 2019.  Revenues were expected to continue growing following the Group's acquisition of Regal Entertainment Group in 2018 as Cineworld realized additional synergies from the further integration of the two companies.  However, the COVID-19 pandemic changed everything about the cinema industry.  Government-mandated shutdowns led to mass theater closures in early 2020, abruptly cutting off the cinema industry's source of revenue and decimating Cineworld's financial performance.  Even after theaters reopened, the Group's business continued to experience significant pressures driven by, among other things, massive film release and production delays and an increase in consumption of home entertainment alternatives.

In response to the COVID-19 pandemic, the Group undertook considerable efforts to preserve and enhance liquidity.  While these measures provided the Group with more than two years of continued runway, Cineworld's business continued to suffer from the lasting impacts of the pandemic, including considerably fewer major film releases in the second half of 2022, particularly in the third quarter of 2022. As of the Petition Date, the Group's liquidity had declined to approximately $4 million in cash on hand.

Recognizing the need to pursue a more comprehensive restructuring solution, in August 2022, the Debtors began preparations for the commencement of these Chapter 11 Cases.  In the lead up to the Petition Date, the Debtors negotiated with certain of their then-current lenders regarding the terms of a

debtor-in-possession financing facility. These negotiations resulted in entry into a $1.935 billion superpriority, senior secured, multi-draw priming term loan facility (the "DIP Facility").

On September 7, 2022 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"). On September 8, 2022, the Bankruptcy Court held a "first day hearing" at which the Bankruptcy Court entered, among other things, the Interim DIP Order.[4] The Interim DIP Order granted the Debtors access to $514 million of the DIP Facility on an interim basis to be used for working capital needs during the pendency of these Chapter 11 Cases, and $271 million to effectuate the purchase of the RoW Facility by Debtor Busby AssignCo, LLC. The Interim DIP Order further provided that $1.0 billion (the "Priming Loan Refinancing Amount") would be placed into an escrow account under the control of the DIP Lenders and, upon entry of a final order approving the DIP Facility, would be used to refinance the Prepetition Priming Facility. Subject to the terms of the Interim DIP Order, the Priming Loan Refinancing Amount was made repayable to the DIP Lenders if the Debtors reached agreement on an alternative debtor-in-possession financing facility with an alternative lender on more favorable terms than the existing DIP Facility. The Debtors did not receive any actionable alternative financing proposals on superior terms to the existing DIP Facility.

In the weeks leading up to the final hearing on the DIP Facility, the Debtors and the DIP Lenders engaged in extensive negotiations with the Creditors' Committee and the Debtors' landlord constituency to resolve their concerns regarding the proposed order approving the DIP Facility on a final basis. Ahead of the hearing, the Debtors reached a deal with the Creditors' Committee which included, among other things, an agreement to pay certain "stub rent" owing to the Debtors' landlords in accordance with an agreed-upon schedule, and to pursue a marketing process for the Debtors' business and operations (but excluding an acquisition of the equity interests in Cineworld Parent itself) (the "Marketing Process"). On October 31, 2022, following an uncontested hearing, the Bankruptcy Court entered the Final DIP Order[5] and, soon thereafter, the Priming Loan Refinancing Amount was disbursed to refinance the Prepetition Priming Facility.

Seeking to build on the consensus established through the DIP Facility negotiations, the Debtors provided the Ad Hoc Group[6] with a proposal setting forth the terms of a comprehensive restructuring transaction. Soon thereafter, the Debtors, with the assistance of their advisors and in coordination with the Ad Hoc Group and the Creditors' Committee, commenced the first phase of Marketing Process. In January 2023, the Debtors' investment banker, PJT Partners LP ("PJT") initiated outreach to potential transaction parties. In total, the Debtors reached out to over forty parties, including various institutional investment firms and strategic bidders in the cinema industry. Fourteen of these parties entered into confidentiality agreements with the Debtors. The Debtors provided those parties that executed a

---

[4]   The "Interim DIP Order" means the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use of Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 173].

[5]   The "Final DIP Order" means the *Corrected and Amended Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use of Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief [ECF No. 676]* [Docket No. 722].

[6]   The "Ad Hoc Group" means that certain ad hoc group of lenders under the Debtors' Prepetition Legacy Credit Facilities currently represented by Arnold & Porter Kaye Scholer LLP as lead counsel, Akin Gump Strauss Hauer & Feld LLP as special counsel, and Houlihan Lokey, Inc. as investment banking advisor.

confidentiality agreement with access to a virtual data room which included: (a) a presentation on the Debtors' go-forward business plan, (b) a process letter, (c) a teaser summary of the business, and (d) a form through which the counterparty could address questions to the Debtors. Interested parties were invited to participate in further discussions with PJT regarding the Debtors' industry, business, and the facts and circumstances of these chapter 11 cases. Subsequently, ahead of the agreed-upon deadline of February 16, 2023, the Debtors received a number of written indications of interest for an acquisition of some or all of the Debtors' assets.

While the Debtors received indicative proposals for strategic transactions involving the Debtors' entire business (including their businesses in the United States, the United Kingdom, and Ireland) (a "WholeCo Transaction"), none of these proposals involved an all-cash bid for the entire business. The Debtors and their advisors held meetings with such bidders and provided the bidders with requested diligence. However, the Debtors and the Ad Hoc Group jointly determined that, absent an all-cash bid significantly in excess of the valuation underpinning the transactions set forth in the Restructuring Support Agreement, the Debtors would not continue the process towards completion of a WholeCo Transaction. After evaluating the indications of interest received through the first phase of the Marketing Process, the Debtors, in conjunction with the Ad Hoc Group, determined that the Marketing Process should continue with a focus on Cineworld's "Rest of World" business encompassing its operations in Bulgaria, Czech Republic, Hungary, Israel, Poland, Romania, and Slovakia. More specifically, the proposals contemplated an acquisition of Debtor Crown UK HoldCo Limited's equity interests in Crown NL Holdco BV (such interests, the "RoW Equity"). Accordingly, the Debtors and PJT initiated a second phase of the Marketing Process with the goal of eliciting binding bids for the sale of the RoW Equity by a deadline of April 10, 2023 (the "Bid Deadline"). If the Debtors and the Required Equity Capital Raising Parties and the Supermajority Consenting Creditors determine to pursue one or more actionable binding bids for the sale of the RoW Equity, the Debtors intend to file a motion seeking to (a) establish bidding procedures and (b) approve entry into a definitive purchase agreement with respect to a sale of the RoW Equity.

In parallel with administering the Marketing Process, the Debtors continued negotiations with the Ad Hoc Group with respect to a standalone restructuring transaction. In early February, following a lengthy diligence process, the Debtors received a response to the standalone restructuring proposal they provided to the Ad Hoc Group. On April 2, 2023, after extensive hard-fought, arm's-length negotiations, the Debtors and the Consenting Creditors entered into the Restructuring Support Agreement, the terms of which are embodied in the Plan and this Disclosure Statement. The Plan provides for a comprehensive restructuring transaction that will (a) reduce the Debtors' funded indebtedness by approximately $4.53 billion through an equitization of the Allowed Legacy Facilities Claims, (b) raise $800 million in aggregate gross proceeds through the Direct Equity Allocation and the Rights Offering, which is fully backstopped by the Equity Capital Raising Parties, to fund the costs associated with the Debtors' emergence from these Chapter 11 Cases with any remainder to be used for general corporate purposes, (c) provide the Debtors with $1.46 billion, net of any original issuance discount (subject to downward adjustment based upon the net sale proceeds realized through any Partial Sale), in exit debt financing, which would be raised either through a comprehensive third-party financing process or through an exit debt facility provided by the Sponsored Facility Capital Raising Parties, and (d) provide the Debtors with the ability to enter into an up to $200 million in exit revolver financing, in each case, to fund the Debtors' go-forward business operations.

Critically, the RSA reflects a global settlement reached between the Debtors, the Ad Hoc Group, the Consenting Creditors, and the Creditors' Committee (the "Committee Settlement"). Among other things, the Committee Settlement provides that the Plan will establish a litigation trust (the "Litigation Trust") consisting of (a) $10 million in Cash, (b) all of the Debtors incorporated in the United States' rights, title, and interest in the Estates' claims under the class action lawsuit captioned *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL 1720 (MKB) (JO) (E.D.N.Y.) and under any such similar class action against credit card issuers arising from similar allegations as those set

forth in the Interchange Litigation (the "Interchange Litigation," and such claims, the "Interchange Litigation Claims") as may be identified on or after the Effective Date, and (c) $500,000 in Cash for the administration of the Litigation Trust.  Holders of Allowed General Unsecured Claims shall, subject to an allocation determined by the Creditors' Committee, receive their allocable share of (a) $10 million in Cash and (b) interests in the Litigation Trust representing a right to recovery of (i) the first $5 million of Cash recovered by the Litigation Trust from the Interchange Litigation Claims and (ii) 50% of any Cash recovered in excess of $5 million in connection with such claims.  In addition, the Plan provides for the payment of the reasonable and documented expenses of BNY Mellon Corporate Trustee Services Limited, in its capacity as indenture trustee for the Convertible Bonds, in an amount not to exceed $700,000.

As the Plan will be filed before it is determined whether a RoW Equity sale will be pursued, the Plan contains a mechanism whereby the amount of the Exit First Lien Facility will be ratably reduced in an amount equal to the proceeds of any RoW Equity sale.

As described in Article IV.B.4 of this Disclosure Statement, entitled "Implementation Mechanisms in England and Wales," as a result of Cineworld Parent's incorporation in England and Wales, implementation of the Plan in England and Wales requires one or more Implementation Mechanisms under English law.

The Restructuring Transactions embodied in the Plan and Restructuring Support Agreement are a significant achievement that will enable the Debtors to continue building back their business in the wake of the devastation caused by the COVID-19 pandemic.  Despite the many challenges that Cineworld faced on the eve of these Chapter 11 Cases, the Debtors are now poised to pursue confirmation of a Plan that will put the Reorganized Debtors on strong financial and operational footing.  Each of the Debtors strongly believes that the Plan is in the best interests of their estates and represents the best available alternative at this time.  The Debtors are confident that they can implement the Restructuring Transactions contemplated by the Plan to ensure their long-term viability and success.  The Debtors strongly recommend that Holders of Claims entitled to vote to accept or reject the Plan vote to accept the Plan.

## III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.   What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of Claims whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.      What does it mean that the Debtors are seeking conditional approval of this Disclosure Statement?**

Pursuant to the Conditional DS Motion,[7]  the Debtors are seeking conditional approval of this Disclosure Statement pursuant to Rule 3016-2 of the Bankruptcy Local Rules for the Southern District of Texas.  Upon entry of an order approving the Conditional DS Motion, the Debtors will commence solicitation of votes on the Plan in accordance with the timeline set forth therein.  The Debtors will subsequently seek final approval of the Disclosure Statement contemporaneously with Confirmation of the Plan at the Confirmation Hearing.

**D.      What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date means that the Debtors will continue to operate their business as a going concern.  Following Confirmation, the Plan will be consummated on the Effective Date, which is the date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan and (b) the Plan is declared effective by the Debtors.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their business and use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**E.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold.  Each category of Holders of Claims as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below: [8]

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

---

[7]    The "Conditional DS Motion" means the *Debtors' Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Scheduling Certain Dates with Respect Thereto, and (VI) Granting Related Relief*, filed contemporaneously herewith.

[8]    For the avoidance of doubt, Classes 1, 2, 5, 6, 7, and 8 shall apply to all Debtors, Class 3 shall apply only to REG and RCI, Class 4 shall apply to each Debtor except for Cineworld Funding, and Class 9 shall apply only to Cineworld Parent.

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Midwest Facility Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 4 | Legacy Facilities Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| Class 8 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| Class 9 | Interests in Cineworld Parent | Impaired | Not Entitled to Vote (Deemed to Reject) |

### F. What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recoveries to Holders of Allowed Claims or Allowed Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[9]**

Except to the extent that the Debtors and a Holder of an Allowed Claim or Interest, as applicable, agrees to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest. Unless otherwise indicated, each Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with its terms in the ordinary course) or as soon as reasonably practicable thereafter.

---

[9]     The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Total Amount of Claims in Class | Estimated % Recovery Under Plan[10] |
|---|---|---|---|---|
| Class 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, as determined by the Debtors (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) or the Reorganized Debtors, as applicable, in full and final satisfaction of such Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) or the Reorganized Debtors, as applicable: <br><br> (i)　payment in full in Cash of its Allowed Other Secured Claim; <br><br> (ii)　the collateral securing its Allowed Other Secured Claim; <br><br> (iii)　Reinstatement of its Allowed Other Secured Claim; or <br><br> (iv)　such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | [●] | 100% |

---

[10]　Recoveries calculated based on equity value set forth in the RSA (approximately $1.475 billion).

| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Total Amount of Claims in Class | Estimated % Recovery Under Plan[10] |
|-------|----------------|------------------------------|-------------------------------------------|--------------------------------------|
| Class 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, as determined by the Debtors (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) or the Reorganized Debtors, as applicable, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) or the Reorganized Debtors, as applicable:<br><br>(i)　　payment in full in Cash of its Allowed Other Priority Claim; or<br><br>(ii)　　such other treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | [●] | 100% |
| Class 3 | Midwest Facility Claims | In full and final satisfaction of their Allowed Midwest Facility Claims, on the Effective Date, each Holder of an Allowed Midwest Facility Claim shall receive, at the option of the applicable Debtor (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) or the Reorganized Debtors:<br><br>(i)　　Reinstatement of its Allowed Midwest Facility Claim; or<br><br>(ii)　　such other treatment that renders its Allowed Midwest Facility Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $11.3 million | 100% |

| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Total Amount of Claims in Class | Estimated % Recovery Under Plan[10] |
|---|---|---|---|---|
| Class 4 | Legacy Facilities Claims | In full and final satisfaction of its Allowed Legacy Facilities Claims, on the Effective Date, each Holder of an Allowed Legacy Facilities Claim shall receive its Pro Rata share of:<br><br>(i)      the Distributable New Common Stock;<br><br>(ii)      the Subscription Rights; provided that such Holder of an Allowed Legacy Facilities Claim is an Eligible Participant; and<br><br>(iii)      the Legacy Facilities Claims Litigation Trust Interests.<br><br>Pursuant to the Creditors' Committee Settlement, Holders of Legacy Facilities Claims shall not receive any recovery on account of any deficiency claims and any adequate protection claims for diminution of value arising under the DIP Orders other than what is set forth in Article III.B.4 of the Plan. | $4.28 billion | 3.4% |
| Class 5 | General Unsecured Claims | In full and final satisfaction of its Allowed General Unsecured Claims, on the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive their allocable share of the GUC Recovery Pool.[11] | $1.34 billion - $2.13 billion | 0.5 - 1.3% |
| Class 6 | Section 510(b) Claims | On the Effective Date, all Allowed Section 510(b) Claims, if any, shall be cancelled, released, and extinguished, and will be of no further force or effect. | [●] | [●]% |

---

[11]   Pursuant to the Creditors' Committee Settlement, the Creditors' Committee shall provide an allocation for the GUC Recovery Pool between the Debtors that complies with the Bankruptcy Code no later than three Business Days prior to the date by which objections to the Disclosure Statement are due.

| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Total Amount of Claims in Class | Estimated % Recovery Under Plan[10] |
|---|---|---|---|---|
| Class 7 | Intercompany Claims | In full and final satisfaction of all Allowed Intercompany Claims, on the Effective Date, such Claims shall be, at the option of the Debtors (with the consent of the Required Consenting Creditors and Required Equity Capital Raising Parties (such consent not to be unreasonably withheld)) or the Reorganized Debtors, either:<br><br>(i)      Reinstated;<br><br>(ii)     adjusted, converted to equity, otherwise set off, settled, distributed, or contributed; or<br><br>(iii)    canceled, released, or discharged without any distribution on account of such Claims. | [●] | [●]% |
| Class 8 | Intercompany Interests | In full and final satisfaction of the Allowed Intercompany Interests, on the Effective Date, all such Allowed Intercompany Interests shall be, at the option of the Debtors (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties (such consent not to be unreasonably withheld)) or the Reorganized Debtors, either:<br><br>(i)      Reinstated (except that they may be modified or recharacterized as Intercompany Claims); or<br><br>(ii)     set off, settled, distributed, contributed, merged, diluted, cancelled, released, or otherwise addressed or eliminated, and receive no distribution under the Plan. | [●] | [●]% |
| Class 9 | Interests in Cineworld Parent | The interests in Cineworld Parent shall be extinguished or otherwise rendered of no force and effect pursuant to the implementation of one or more Implementation Mechanism(s) in England and Wales, and Holders of Interests in Cineworld Parent will not receive any distribution on account of such Interests in Cineworld Parent. | [●] | 0% |

**G.     What will I receive from the Debtors if I hold an Allowed Administrative Claim or Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, Priority Tax Claims, Statutory Fees, and Restructuring Expenses have not been classified and, thus, are excluded from the Classes of Claims or Interests set forth in Article III of the Plan.

1.     **Administrative Claims.**

Except with respect to the Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtor(s) against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtor on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of such an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims must do so by the Administrative Claims Bar Date.  Objections to such requests must be Filed and served on the requesting party and the Debtors (if the Debtors are not the objecting party) by the Administrative Claims Objection Bar Date.  Holders of such Claims who do not File and serve such requests by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or the Reorganized Debtors, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and any prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

2.     **DIP Claims.**

The DIP Claims shall be deemed to be Allowed Claims in the full amount outstanding under the DIP Facility Credit Agreement as of the Effective Date (including any unpaid accrued interest and unpaid fees, expenses, and other obligations under the DIP Facility Credit Agreement as of the Effective Date).  In full satisfaction, settlement, discharge, and release of, and in exchange for, the DIP Claims, each Holder of an Allowed DIP Claim shall be indefeasibly paid and satisfied in full in Cash on the Effective Date except to the extent that a Holder of a DIP Claim agrees to less favorable treatment; *provided* that, for administrative convenience and in accordance with the Financing Commitment and Backstop Agreement and the Rights Offering Procedures, as applicable, each Holder of an Allowed DIP Claim that is a Capital

Raising Party may elect to have Cash that it would be entitled to receive on account of its Allowed DIP Claim be used to satisfy all or a portion of its commitments in respect of the Capital Raise on a dollar-for-dollar basis (the "Capital Raise Convenience Election").  A Capital Raising Party that is a Holder of an Allowed DIP Claim may elect to use the Capital Raise Convenience Election, which shall constitute such Holder of an Allowed DIP Claim's consent that its DIP Claims, to the extent such DIP Claims are used in such election, shall be deemed satisfied for purposes of section 1129(a)(9) of the Bankruptcy Code.  Except as otherwise expressly provided in the DIP Facility Credit Agreement or the DIP Orders, upon the indefeasible payment or satisfaction in full of all Allowed DIP Claims, all commitments under the DIP Facility Credit Agreement shall terminate and all Liens and security interests granted to secure the DIP Claims shall be automatically terminated and of no further force and effect, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Notwithstanding anything to the contrary in this Plan or the Confirmation Order, the DIP Facility and the DIP Facility Documents shall continue in full force and effect (other than, for the avoidance of doubt, any Liens or other security interests terminated pursuant to Article II.B of the Plan) after the Effective Date with respect to any contingent or unsatisfied obligations thereunder, as applicable, including, but not limited to, those provisions relating to the rights of the DIP Agent and the DIP Lenders to expense reimbursement, indemnification, and any other similar obligations of the Debtors to the DIP Agent and the DIP Lenders (which rights shall be fully enforceable against the Reorganized Debtors) and any provisions thereof that may survive termination or maturity of the DIP Facility in accordance with the terms thereof.

3.      **Professional Fee Claims.**

a.      **Final Fee Applications and Payment of Professional Fee Claims.**

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than forty-five days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court, including the Interim Compensation Order.  The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows, including from the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan.

b.      **Professional Fee Escrow Account.**

No later than the Effective Date, the Debtors incorporated in the U.S. shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders and any invoices for fees and expenses incurred after the Effective Date in connection with the final fee applications.  Such funds shall not be considered property of the Debtors' Estates.  The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Reorganized Debtors (other

than to Cineworld Parent or Cineworld Funding) without any further notice to or action, order, or approval of the Bankruptcy Court.

c.      **Professional Fee Amount.**

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases.  If a Professional does not provide an estimate, the Debtors or the Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional; *provided, however,* that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.  The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided, further*, that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

d.      **Post-Effective Fees and Expenses.**

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Reorganized Debtors or, solely as it pertains to the final fee applications, the Creditors' Committee.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and Reorganized Debtors, as applicable, shall pay, within ten Business Days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors, the Reorganized Debtors, or the Creditors' Committee, as applicable.  If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected Professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

4.      **Priority Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

5.      **Payment of Statutory Fees.**

All fees due and payable pursuant to 28 U.S.C. § 1930(a) shall be paid by the Debtors, the Reorganized Debtors, or the Disbursing Agent (on behalf of the Reorganized Debtors), as applicable, for

each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

6.      **Payment of Restructuring Expenses.**

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein, in the Restructuring Support Agreement, and the Financing Commitment and Backstop Agreement, without any requirement to File a fee application with the Bankruptcy Court or for Bankruptcy Court review or approval; *provided* that the foregoing shall be subject to the Debtors' receipt of an invoice with reasonable detail (but without the need for itemized time detail) from the applicable Entity entitled to such Restructuring Expenses in accordance with such Entity's applicable engagement letter.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least five days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses (it being understood that any difference in (a) estimated Restructuring Expenses on and including the Effective Date as compared to (b) Restructuring Expenses actually incurred on and including the Effective Date shall be reconciled following the submission of a final invoice by the Relevant Entity within thirty days of the Effective Date).  On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors and paid within ten Business Days of receipt by the Debtors or the Reorganized Debtors, as applicable.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course (but no sooner than within ten Business Days of receipt of an invoice), Restructuring Expenses related to implementation, Consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date in accordance with the applicable engagement letter and solely upon receipt of an invoice from any Entity requesting such Restructuring Expenses with reasonable detail (but without the need for itemized time detail).

H.      **Are any regulatory approvals required to consummate the Plan?**

Whether any regulatory or other approvals are required to consummate the Plan will depend on the final structure of the Plan (including the Restructuring Transactions and the Rights Offering).  To the extent that any regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained, and the Debtors are engaging as appropriate in order to procure such approvals, authorizations, consents, rulings, or documents (as applicable).

I.      **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses and the most likely outcome is that the Debtors would liquidate under chapter 7 of the Bankruptcy Code and/or similar equivalent bankruptcy processes in other jurisdictions.  It is likely that any alternative would provide Holders of Claims that are unimpaired under the Plan or entitled to vote on the Plan with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of extended chapter 11 cases, or of a liquidation scenario, *see* Article X.G of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis." The Liquidation Analysis is attached to this Disclosure Statement as **Exhibit E**.

**J.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can become effective.  Initial distributions to Holders of Allowed Claims will only be made on the Effective Date or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," for a discussion of the conditions precedent to Consummation of the Plan.

**K.     Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and Confirmation of the Plan, which objections potentially could give rise to litigation.  *See* Article IX.C.8 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases."

The Debtors will seek Confirmation of the Plan notwithstanding the dissent (whether deemed or otherwise) of rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article IX.A.5 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan."

**L.     How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, each Reorganized Debtor or the Litigation Trust, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Plan to the contrary, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article IX of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.  For the avoidance of doubt, the Schedule of Retained Causes of Action shall include any and all Claims and Causes of Action against National Cinemedia, LLC and National Cinemedia Inc., including, but not limited to, for damages and/or sanctions for willful violation of the automatic stay.

**The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available retained Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all retained Causes of Action against any Entity.  Unless otherwise agreed upon in writing by the parties to the applicable**

**Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objecting party for thirty days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order (and for the avoidance of doubt, any Causes of Action on the Schedule of Retained Causes of Action shall not be expressly relinquished, exculpated, released, compromised, or settled in the Plan), the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any retained Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors or the Litigation Trust, as applicable. The applicable Reorganized Debtors or the Litigation Trust, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors or the Litigation Trust, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court except as otherwise released in the Plan.

**M.     Are there risks to owning the New Common Stock upon emergence from Chapter 11?**

Yes, *see* Article IX of this Disclosure Statement, entitled "Risk Factors." Among other things, the ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan will be subject to the issuance of the New Common Stock issued pursuant to the Management Incentive Plan, the ERO Backstop Premium, the Exit First Lien Facility Premium, the Direct Allocation Shares, and the Rights Offering Shares or other securities that may be issued post-emergence.

**N.     Will there be releases, injunction, and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, exculpation, and injunction provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Consenting Creditors in obtaining their support for the Plan.

These provisions are the product of extensive good faith, arm's-length negotiations, were material inducements for the comprehensive settlement embodied in the Plan, and are supported by the Debtors and the Consenting Creditors. Moreover, the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties

16

in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**IMPORTANTLY, ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT VALIDLY OPT OUT OF THE RELEASES WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

Based on the foregoing, the Debtors believe that the release, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit.  More specifically, while their review is ongoing, the Debtors are not aware of any potentially colorable Claims or Causes of Action held by the Debtors or their Estates against the Released Parties that would provide a material benefit to creditor recoveries.  In particular, the Debtors are not aware of any colorable Claims or Causes of Action against current or former directors or officers that would provide a material benefit to creditor recoveries.  Accordingly, as of this time, the Debtors do not believe that they have material Causes of Action against any of the Released Parties, let alone Causes of Action that would justify the risk, expense, and delay attendant to their pursuit and therefore, if the Plan is consummated, all Claims and Causes of Action against the Released Parties will be released pursuant to the Plan.

Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

1.    **Release of Liens.**

**Except as otherwise provided herein, in the Exit First Lien Facility Documents, the New Money Revolving Credit Facility Documents, the Plan Supplement, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or Reorganized Debtors, or any other Holder of a Secured Claim.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, and other security interests.**

17

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, the Exit First Lien Facility Agent, or the New Money Revolving Credit Facility Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

2.     **Releases by the Debtors.**

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted by or on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates, as applicable, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to or in any manner arising from in whole or in part, the Debtors (including the management, ownership, or operation thereof), any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), the Convertible Bonds, the Legacy Facilities, the Priming Facilities, the Midwest Facility, the Settlement Facility, any intercompany transactions, the Chapter 11 Cases and any related adversary proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility, the Rights Offering, the Financing Commitment and Backstop Agreement, the New Money Revolving Credit Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility, the Rights Offering, the Financing Commitment and Backstop Agreement, the New Money Revolving Credit Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release:  (a) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions; (b) the rights of any Holder of Allowed Claims to receive distributions under the Plan; (c) any Claims for indemnification that are expressly assumed by the Debtors pursuant to the Plan or any document, instrument, or agreement executed to

18

implement the Plan or the Restructuring Transactions; (d) any obligations arising under business or commercial agreements or arrangements among the Released Parties and any non-Debtor Entity; or (e) the Interchange Litigation Claims and any other Claims or Causes of Action relating to the Interchange Litigation.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the claims or Causes of Action released by the Debtor Release; (iii) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Estates asserting any claim or Cause of Action released by the Debtor release against any of the Released Parties.

3.  Releases by the Releasing Parties.

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, the Reorganized Debtors, or their Estates, as applicable, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), the Convertible Bonds, the Legacy Facilities, the Priming Facilities, the Midwest Facility, the Settlement Facility, any intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility, the Rights Offering, the Financing Commitment and Backstop Agreement, the New Money Revolving Credit Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility, the Rights Offering, the Financing Commitment and Backstop Agreement, the New Money Revolving Credit Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release:  (a) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions, including the Exit First Lien Facility Documents and the New Money Revolving Credit Facility Documents; (b) the rights of any Holder

of Allowed Claims or Allowed Interests to receive distributions under the Plan; (c) any obligations arising under business or commercial agreements or arrangements among the Released Parties and any non-Debtor Entity; or (d) the Interchange Litigation Claims and any other Claims or Causes of Action relating to the Interchange Litigation.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (i) consensual; (ii) essential to the Confirmation; (iii) given in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (iv) a good faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

4.      Exculpation.

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any claims and Causes of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, including the formulation, preparation, dissemination, negotiation, filing, or termination of prepetition transactions (including with respect to the Debt Documents), the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility Documents, the New Money Revolving Credit Facility Documents, the Rights Offering, the Financing Commitment and Backstop Agreement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility, the Rights Offering, the Financing Commitment and Backstop Agreement, the New Money Revolving Credit Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable Law with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

5.      **Injunction.**

**Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold the Released Claims are permanently enjoined from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (a) commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any Released Claims; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any Released Claims; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the Estates of such Entities on account of or in connection with or with respect to any Released Claims; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the Estates of such Entities on account of or in connection with or with respect to any Released Claims unless such Entity has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims released or settled pursuant to the Plan.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in <u>Article IX.F</u> of the Plan.**

O.      **How will undeliverable distributions and unclaimed property be treated under the Plan?**

If any distribution to a Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable, no distribution shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date without interest.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors or the Litigation Trust, as applicable, until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or the Litigation Trust or is cancelled pursuant to <u>Article VII</u> of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

Any distribution under the Plan that is an Unclaimed Distribution or remains undeliverable for a period of 180 days after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution or undeliverable distribution shall revest in the applicable Reorganized Debtor or the Litigation Trust, as applicable, automatically (and without need for a further order by the Bankruptcy Court, notwithstanding any applicable federal, provincial, or estate escheat, abandoned, or unclaimed property Laws to the contrary) and, to the extent such Unclaimed Distribution is comprised of the New Common Stock, such New Common Stock shall be cancelled.  Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be cancelled, released, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or

unclaimed property Laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.  The Disbursing Agent shall adjust the distributions of the New Common Stock to reflect any such cancellation.

### P.      Are there minimum distribution restrictions?

The Disbursing Agent shall not make any distributions to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest of Cash where such distribution is valued, in the reasonable discretion of the applicable Disbursing Agent, at less than $250.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest, as applicable, would otherwise result in the issuance of a number of shares of the New Common Stock that is not a whole number, the actual distribution of shares of the New Common Stock shall be rounded as follows:  (a) fractions of one-half or greater shall be rounded to the next higher whole number; and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of the New Common Stock to be distributed under the Plan shall be adjusted as necessary to account for the foregoing rounding.  No fractional shares of the New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  Each Allowed Claim or Interest to which these limitations apply shall be discharged pursuant to Article IX.A of the Plan and its Holder shall be forever barred pursuant to Article IX.A of the Plan from asserting that Claim or Interest against the Reorganized Debtors or their property.

### Q.      What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?

As described in the First Day Declarations, prior to the Petition Date, the Debtors evaluated numerous potential alternatives to address their funded indebtedness.  In light of the devastating impact of the COVID-19 pandemic on the Debtors' operations, the Debtors determined in their sound business judgment to pursue a holistic restructuring through a chapter 11 filing.

### R.      What is the Marketing Process?

The Debtors, with the assistance of their advisors and in coordination with the Ad Hoc Group and the Creditors' Committee, commenced the first phase of Marketing Process on January 4, 2023 to determine market interest in a value-maximizing sale of the Debtors' assets.  As discussed elsewhere herein, ahead of the agreed-upon deadline of February 16, 2023 for submission of initial indications of interest, the Debtors received numerous written indications of interest for an acquisition of some or all of the Debtors' assets. After evaluating the indications of interest received through the first phase of the Marketing Process the Debtors, in conjunction with the Ad Hoc Group, determined that the only actionable indications of interest centered on a Partial Sale (specifically, a sale of the RoW Equity) were worth continuing to pursue. Accordingly, the Debtors and PJT initiated a second phase of the Marketing Process with the goal of eliciting binding bids for the acquisition of the RoW Equity by the Bid Deadline.  If the Debtors and the Required Equity Capital Raising Parties and the Supermajority Consenting Creditors determine to pursue one or more actionable binding bids for the Debtors' sale of the RoW Equity, the Debtors intend to file a motion seeking to (a) establish bidding procedures and (b) approve entry into a definitive purchase agreement with respect to a sale of the RoW Equity.  Please be advised that there is no assurance that any Partial Sale may be completed at all.

If the Debtors, the Required Equity Capital Raising Parties, and the Supermajority Consenting Creditors determine to proceed with a Partial Sale, the Marketing Process will proceed in accordance with the timetable set forth below.

| DATE | DESCRIPTION |
|---|---|
| April 10, 2023 | Deadline for submission of binding offers to acquire the RoW Equity. |
| On or before April 24, 2023 | Debtors will file a motion seeking to (a) establish bidding procedures and (b) approve entry into a definitive purchase agreement with respect to a sale of the RoW Equity. |
| May 5, 2023 (subject to Court availability) | The Bankruptcy Court will hold a hearing on authorization of the Sale and Bidding Procedures Motion. |
| May 10, 2023[12] | To the extent the Debtors receive multiple actionable final bids for an acquisition of the RoW Equity, the Debtors will conduct an auction. |
| May 12, 2023 (subject to Court availability)[13] | The Bankruptcy Court will hold a hearing on authorization of the Debtors' entry into a definitive purchase agreement for the sale of the RoW Equity. |

**S.** **What happens if the Marketing Process leads to an actionable proposal for the purchase of the Debtors' business?**

The Restructuring Support Agreement provides that any sale of assets outside of the ordinary course of business by the Debtors and/or their non-Debtor Affiliates, in whole or in part, requires the consent of the Required Equity Capital Raising Parties and the Holders of at least two-thirds of the Legacy Facilities Claims. Furthermore, the Restructuring Support Agreement provides for a milestone of April 20, 2023 for the Debtors, the Supermajority Consenting Creditors, and the Required Equity Capital Raising Parties to have jointly determined whether to pursue a Sale Transaction (which, for the avoidance of doubt, would include a sale of the RoW Equity). A Sale Transaction will not be pursued if the Supermajority Consenting Creditors have not determined that a Sale Transaction shall be pursued. Accordingly, subject to the foregoing considerations, if one or more of the binding offers elicited through the second phase of the Marketing Process represents a potentially value-maximizing proposal and the requisite parties consent, then the Debtors will file the Sale and Bidding Procedures Motion. Through the Sale and Bidding Procedures Motion (if applicable), the Debtors will establish procedures governing the Debtors' entry into a definitive purchase agreement (and related transaction documentation) for the sale of the RoW Equity. Bankruptcy Court approval will be required for any sale transaction that materializes. If the Debtors consummate a sale of the RoW Equity, the net proceeds of the sale will result in a dollar-for-dollar downward adjustment of the commitments under the Exit First Lien Facility. The Debtors believe that the Marketing Process—in conjunction with the parallel Plan confirmation process—will ensure that they are maximizing value for the benefit of their estates and all stakeholders.

**T.** **What is the deadline to vote on the Plan?**

The Voting Deadline is May 23, 2023, at 3:00 p.m., prevailing Central Time.

**U.** **How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the Ballots (as defined in the Conditional DS Motion) distributed to holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot or a master ballot including your vote is **actually received** by the Debtors' solicitation agent, Kroll Restructuring  (the "Solicitation Agent") **on or before the Voting Deadline, _i.e._ May 23, 2023, at**

---

[12]   Date subject to change in accordance with the Sale and Bidding Procedures Motion.

[13]   Date subject to change in accordance with the Sale and Bidding Procedures Motion.

**3:00 p.m., prevailing Central Time**.  *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," for more information.

### V.      Why is the Bankruptcy Court holding a Confirmation Hearing?

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

### W.      When is the Confirmation Hearing set to occur?

Through the Conditional DS Motion, the Debtors have requested that the Bankruptcy Court schedule the Confirmation Hearing for **May 26, 2023, at 8:00 a.m., prevailing Central Time**, or such other date as may be scheduled by the Bankruptcy Court.  The Confirmation Hearing may be adjourned from time to time without further notice.

The Debtors have also requested that objections to Confirmation of the Plan and final approval of the Disclosure Statement must be Filed and served on the Debtors, and certain other parties, by no later than **May 23, 2023, at 5:00 p.m., prevailing Central Time**, in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

### X.      What is the purpose of the Confirmation Hearing?

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

### Y.      What is the Rights Offering and the Direct Equity Allocation?

On or prior to the Effective Date, through the Rights Offering, the Reorganized Cineworld Parent will issue New Common Stock for an aggregate purchase price of $400.0 million.  On or prior to the Effective Date, Reorganized Cineworld Parent will issue the Direct Allocation Shares for an aggregate purchase price of $400.0 million through the Direct Equity Allocation.  In the aggregate, through the Rights Offering and Direct Equity Allocation, Reorganized Cineworld Parent will issue New Common Stock for a purchase price of $800.0 million.

Pursuant to the Direct Equity Allocation, the Direct Allocation Shares will be offered by subscription to each Equity Capital Raising Party on a ratable basis based on each such Equity Capital Raising Party's Backstop Final Allocated Percentage.

Pursuant to the Rights Offering, the Rights Offering Shares will be offered by subscription to each Eligible Participant who may purchase up to each Eligible Participant's Pro Rata share, in each case on, and subject to, the terms and conditions set forth in the Rights Offering Documents.  The Rights Offering will be fully backstopped by the Equity Capital Raising Parties pursuant to the terms of the Financing Commitment and Backstop Agreement with each Equity Capital Raising Party committing, pursuant to the Financing Commitment and Backstop Agreement, on a several and not joint basis, to purchase its respective number of RO Backstop Shares, which are the shares of New Common Stock not subscribed for in the Rights Offering, in accordance with its Backstop Final Allocated Percentage.

As consideration for backstopping the Rights Offering, the Equity Capital Raising Parties (including any Replacing Capital Raising Party, but excluding any Defaulting Capital Raising Party) or their respective designees, as applicable, will receive the ERO Backstop Premium, a non-refundable premium in an amount equal to 20.00% of the Total Shares Outstanding (as defined in the Financing Commitment and Backstop Agreement). Upon consummation of the Restructuring on the Effective Date, the Equity Capital Raising Parties (including any Replacing Capital Raising Party, but excluding any Defaulting Capital Raising Party) or their respective designees, as applicable, will receive the ERO Premium Shares as payment of the ERO Backstop Premium, with each Equity Capital Raising Party (or Replacing Capital Raising Party) entitled to receive its Pro Rata share of the ERO Backstop Premium based on its Backstop Final Allocated Percentage. If the Financing Commitment and Backstop Agreement is terminated under certain circumstances, the ERO Backstop Premium will be paid in cash in an amount equal to $295.0 million.

As consideration for agreeing to provide the Direct Financing Allocation, the Sponsored Facility Capital Raising Parties will receive the Exit First Lien Facility Premium, which is an aggregate non-refundable fee equal to 7.00% of the Total Shares Outstanding. Upon consummation of the Restructuring on the Effective Date, the Sponsored Facility Capital Raising Parties will receive the Exit First Lien Facility Premium Shares as payment of the Exit First Lien Facility Premium, with each Sponsored Facility Capital Raising Party entitled to receive its Pro Rata share of the Exit First Lien Facility Premium Shares based on its First Lien Final Allocated Percentage. If the Financing Commitment and Backstop Agreement is terminated under certain circumstances, the Exit First Lien Facility Premium will be paid in cash in an amount equal to $103.25 million.

The offer of the Subscription Rights and the offer and issuance of the Direct Allocation Shares, the Rights Offering Shares, RO Backstop Shares and Premium Shares will be issued in reliance upon the exemption from registration set forth in Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act), subject to any other applicable securities Laws. In addition, the Rights Offering and the Direct Equity Allocation will be conducted in reliance upon one or more exemptions from the requirement to publish a prospectus in a Relevant State under the Prospectus Regulation, and therefore any participant that is resident, located in or has a registered office in a Relevant State will be required to confirm that they are a qualified investor (as defined in Article 2(e) of the Prospectus Regulation) in order to participate in the Rights Offering and the Direct Equity Allocation.

The procedures and instructions for exercising the Subscription Rights are set forth in the Rights Offering Procedures, which include details regarding relevant eligibility criteria in relation to participation in the Rights Offering.

**TO PARTICIPATE IN THE RIGHTS OFFERING, EACH ELIGIBLE PARTICIPANT MUST COMPLETE ALL THE STEPS OUTLINED IN THE RIGHTS OFFERING PROCEDURES. IF ALL OF THE STEPS OUTLINED IN THE RIGHTS OFFERING PROCEDURES ARE NOT COMPLETED BY THE DEADLINES PROVIDED THEREIN, THE ELIGIBLE PARTICIPANT SHALL BE DEEMED TO HAVE <u>FOREVER AND IRREVOCABLY RELINQUISHED AND WAIVED</u> ITS RIGHT TO PARTICIPATE IN THE RIGHTS OFFERING. ALL HOLDERS OF CLAIMS SHOULD REVIEW THE SECURITIES LAW RESTRICTIONS AND NOTICES SET FORTH IN THIS DISCLOSURE STATEMENT AND THE PLAN IN FULL.**

**TO PARTICIPATE IN THE DIRECT EQUITY ALLOCATION AND THE RIGHTS OFFERING AND TO RECEIVE THE PREMIUM SHARES (AS APPLICABLE), EACH CAPITAL RAISING PARTY MUST STRICTLY FOLLOW THE REQUIREMENTS SET FORTH IN THE**

FINANCING COMMITMENT AND BACKSTOP AGREEMENT AND THE RIGHTS OFFERING PROCEDURES, AS APPLICABLE.

**Z.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Solicitation Agent via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
> Cineworld Group plc Ballot Processing
> c/o Kroll Restructuring Administration LLC
> 850 Third Avenue, Suite 412
> Brooklyn, NY 11232
> *By electronic mail at:*
> cineworldinfo@ra.kroll.com
> *(Please mention "Cineworld Group plc Solicitation" in the subject line)*
>
>
> *By telephone at:*
> (844) 648-5574 (domestic, toll free) *or*
> +1 (845) 295-5705 (for parties outside the U.S.)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Solicitation Agent at https://cases.ra.kroll.com/cineworld (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy (for a fee).  PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

**AA.    Do the Debtors recommend voting in favor of the Plan?**

Yes, the Debtors believe that the Plan provides for a larger distribution to all Holders of Claims than would otherwise result from any other available alternative.  The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and projects them emerging from chapter 11 shortly after the Plan is confirmed, is in the best interest of all Holders of Claims, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**BB.    Who supports the Plan?**

The Plan is supported by the Debtors, the Creditors' Committee, and the Holders of approximately 83 percent of the Legacy Facilities Claims and Holders of approximately 69 percent of the DIP Claims.

## IV.    THE DEBTORS' DIP FACILITY AND PLAN

**A.    The DIP Facility.**

Immediately prior to the Petition Date, the Debtors entered into a $1.935 billion super-senior secured DIP Facility Credit Agreement with the DIP Lenders and Barclays as DIP Agent.  The DIP Facility has provided the Debtors with critical liquidity to meet their obligations in the ordinary course of business during the Chapter 11 Cases.  More specifically, the DIP Facility provided the Debtors with, among other

things, access to $514 million on an interim basis to be used for working capital needs during the pendency of these Chapter 11 Cases, and $271 million to effectuate the purchase of the RoW Facility by Debtor Busby AssignCo, LLC.  The Interim DIP Order further provided that $1.0 billion would be placed into an escrow account under the control of the DIP Lenders and, upon entry of a final order approving the DIP Facility, such amount would be used to refinance the Prepetition Priming Facility (such refinancing, the "Priming Loan Refinancing").  Pursuant to the terms of the Interim DIP Order, the Priming Loan Refinancing Amount was made repayable to the DIP Lenders if the Debtors reached agreement on an alternative debtor-in-possession financing facility with an alternative lender on more favorable terms than the existing DIP Facility.  As described herein, however, the Debtors did not receive any superior financing proposals. Accordingly, the Bankruptcy Court entered the Final DIP Order approving the existing DIP Facility, which provided the Debtors with an additional $110 million to be used for their working capital needs during the pendency of these Chapter 11 Cases, and effectuated the Priming Loan Refinancing.

      **B.**      **The Plan.**

The Plan contemplates the following key terms, among others described herein and therein:

      1.      **Sources of Consideration for Plan Distributions.**

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with (1) proceeds from the Exit First Lien Facility, (2) proceeds from the Direct Equity Allocation and Rights Offering, (3) the New Common Stock, and (4) Cash on hand.

      a.      **Issuance of New Common Stock.**

On or prior to the Effective Date, Reorganized Cineworld Parent shall take steps to provide that the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) is issued and/or transferred in accordance with the terms of the Plan, the Plan Supplement, the New Organizational Documents, and applicable Law (including applicable securities Laws), and, to the extent applicable, the Rights Offering Documents.

The Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares will be issued in reliance upon the exemption from registration set forth in Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act), subject to any other applicable securities Laws. The issuance of the Distributable New Common Stock will be conducted in reliance upon one or more exemptions from registration under the Securities Act, which will include the exemption provided in section 1145 of the Bankruptcy Code to the fullest extent available.  The Rights Offering will be conducted in reliance upon one or more exemptions from the requirement to publish a prospectus for the offer of transferable securities to the public in any member state of the EEA or in the UK under the Prospectus Regulation and therefore participants that are resident, located, or have a registered office in any member state of the EEA or in the UK will be required to confirm that they are EU/UK Qualified Investors in order to participate in the Rights Offering.

DTC or any other depository, as applicable, may accept and conclusively rely upon the Plan and the Confirmation Order in lieu of a legal opinion regarding the exemption(s) from registration pursuant to which the New Common Stock will be issued under the Plan and/or eligible for DTC's (or another depository's) book-entry delivery, settlement, and depository services. It is not expected that any shares of the New Common Stock will be eligible for any depository services, including with respect to DTC, on or

about the Effective Date.  Further, it is not intended that the New Common Stock will be listed on a national securities exchange (or a comparable non-U.S. securities exchange) on or about the Effective Date.

Any New Common Stock of Reorganized Cineworld Parent offered pursuant to the Management Incentive Plan (including pursuant to any Emergence Awards) shall be exempt from any registration requirements under any federal securities laws to the fullest extent permitted by section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or Rule 701 promulgated thereunder.

This Disclosure Statement and any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) have been prepared on the basis that any offer of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) issued in connection with the Plan or the Plan Supplement within any member state of the EEA or in the UK will either (a) not form part of any offer or invitation to purchase, acquire, subscribe for, sell, or otherwise dispose of or issue any securities or any solicitation of any offer to purchase, acquire, subscribe for, sell, or otherwise dispose of any security for the purposes of the Prospectus Regulation and/or the FSMA, as applicable, or (b) be made pursuant to an exemption under the Prospectus Regulation and/or the FSMA, as applicable, from the requirement to publish a prospectus for the offer of transferable securities to the public.  In relation to each member state of the EEA or the UK, no offer of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) issued in connection with the Plan may be made to the public at any time other than pursuant to an exemption under the Prospectus Regulation and/or the FSMA, as applicable.  In any member state of the EEA or in the UK, the Disclosure Statement, the Plan, and the Plan Supplement are only addressed to and directed at:  (i) EU/UK Qualified Investors in that EEA member state or the UK; or (ii) any other person if such address or direction does not otherwise constitute an offer of transferable securities to the public within the meaning of the Prospectus Regulation (including in any of the other circumstances set out in Article 1(4) of the Prospectus Regulation) and/or the FSMA (including in any of the other circumstances set out in section 86 of the FSMA).  None of the Debtors or any of its Affiliates, Reorganized Cineworld Parent, or any persons acting on any of their behalves has authorized, nor do they authorize, the making of any offer of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) through any financial intermediary, other than as may be contemplated in the Plan and any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement).  In any member state of the EEA or in the UK, the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) may not be resold, exchanged, assigned, or otherwise transferred unless such resale, exchange, assignment or transfer is to:  (A) an EU/UK Qualified Investor in that EEA member state or the UK; or (B) any other person if such resale, exchange, assignment or transfer does not otherwise constitute an offer of transferable securities to the public within the meaning of the Prospectus Regulation (including in any of the other circumstances set out in Article 1(4) of the Prospectus Regulation) and/or the FSMA (including in any of the other circumstances set out in section 86 of the FSMA).

The Plan and any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) are not, and should not be construed as, an invitation or inducement to engage in any investment activity in relation to any of the transactions described therein or the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) such as would amount to a financial promotion in the UK for the purposes of section 21 of the FSMA.  In the UK, the information contained in the Plan or any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) is intended only for use and may only be relied upon in relation to any investment activity by, and any investment activity to which such information relates may only be engaged in by, persons

falling within any of the circumstances of Article 1(4) of the Prospectus Regulation who are at the relevant time: (a) investment professionals within the meaning of Article 19(5) of the FPO; (b) high net worth companies within the meaning of Article 49(2)(a) through (d) of the FPO; (c) persons that are existing members or creditors of the issuer of the relevant securities or of an undertaking which at the relevant time is in the same group as the issuer of the relevant securities, falling within Article 43 of the FPO; or (d) persons to whom the communication may otherwise lawfully be communicated (each, a "Permitted UK Person"). Any person in the UK that is not a Permitted UK Person is not, for the purposes of any investment or investment decision, an intended recipient of the information contained in the Plan or any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) and should not use such information as the basis for taking any investment activity or investment action. The Plan and any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) should not (insofar as such documents relate to any investment or investment activity) be distributed, communicated to, or directed at the general public in the UK otherwise than as described above.

Each distribution, issuance, or transfer of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) on or around the Effective Date shall be governed by the terms and conditions set forth in the Plan (including the Plan Supplement and, to the extent applicable, the Rights Offering Documents) applicable to such distribution, issuance, or transfer, as applicable, and by the terms and conditions of the agreements and other instruments evidencing or relating to such issuance, as applicable, including, the Plan Supplement, and, to the extent applicable, the Rights Offering Documents, the terms and conditions of which shall bind each Entity receiving such issuance of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares). On or prior to the Effective Date, except as otherwise provided in the Plan or the Plan Supplement and subject to local law requirements, the issuance of the New Common Stock shall be authorized without the need for any further corporate action and without any further action by Reorganized Cineworld Parent, the Debtors, or the Reorganized Debtors, as applicable, and without any action by the Holders of Claims or Interests or other parties in interest. Any Entity's acceptance of the New Common Stock, including with respect to the Distributable New Common Stock, shall be deemed its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms, and to the extent applicable, the Rights Offering Procedures.

The Reorganized Debtors shall be authorized to issue a certain number of shares, units, or Interests of the New Common Stock required to be issued under the Plan and in accordance with the Rights Offering Documents, the Plan Supplement, the New Organizational Documents, and the Restructuring Transactions. All of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) issued or authorized to be issued pursuant to the Plan or, if applicable, the Financing Commitment and Backstop Agreement shall, pursuant to the Restructuring Transactions, be duly authorized, validly issued, fully paid, and non-assessable.

The issuance of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) shall not constitute an invitation or offer to sell, or the solicitation of an invitation or offer to buy, any securities in contravention of any applicable Law in any jurisdiction. No action has been taken, nor will be taken, in any jurisdiction that would permit a public offering of any of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares, other than securities issued pursuant to section 1145 of the Bankruptcy Code) in any jurisdiction where such action for that purpose is required.

b.      **Capital Raise.**

i.      **Exit First Lien Facility.**

On the Effective Date, the Reorganized Debtors shall enter into the Exit First Lien Facility on the terms set forth in the Exit First Lien Facility Documents.

To the extent not already approved, Confirmation of the Plan shall be deemed approval of the Exit First Lien Facility and the Exit First Lien Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Exit First Lien Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Exit First Lien Facility. Execution of the Exit First Lien Facility Documents by the Exit First Lien Facility Agent shall be deemed to bind all Exit First Lien Facility Lenders as if each such Exit First Lien Facility Lender had executed the applicable Exit First Lien Facility Documents with appropriate authorization.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit First Lien Facility Documents, to the extent applicable: (i) shall be deemed to be granted; (ii) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit First Lien Facility Documents; (iii) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit First Lien Facility Documents; and (iv) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

To the extent applicable, the Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

ii.      **Direct Equity Allocation and Rights Offering.**

The Debtors shall offer (i) the Direct Equity Allocation to each Equity Capital Raising Party and (ii) the Rights Offering to each Eligible Participant and which shall be 100% backstopped by the Equity Capital Raising Parties, each in accordance with the terms and conditions of the Financing Commitment and Backstop Agreement. On or prior to the Effective Date, Reorganized Cineworld Parent shall consummate the Direct Equity Allocation and Rights Offering in accordance with the Rights Offering Documents and any other documents related thereto. Reorganized Cineworld Parent shall allocate the Subscription Rights to Eligible Participants as set forth in the Plan and the Rights Offering Procedures. Upon exercise of the Subscription Rights by such Eligible Participants pursuant to the terms of the Rights Offering Documents and the Plan, Reorganized Cineworld Parent shall be authorized to issue the Rights Offering Shares in accordance with the Rights Offering Documents and the Plan.

The Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares will be issued by Reorganized Cineworld Parent in reliance upon the exemption from registration set forth in Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act), subject to any other applicable securities Laws. The Direct Equity Allocation and the Rights Offering will be conducted in reliance on one or more exemptions from the requirement to publish a prospectus for the offer of transferable securities to the public in any EEA member state or in the UK under the Prospectus Regulation and therefore participants that are resident, located or have a registered office in any EEA member state or in the UK will be required to confirm that they are EU/UK Qualified Investors in order to participate in the Rights Offering.

In addition, on the Distribution Date, the Premium Shares shall be distributed to the applicable Capital Raising Parties under and as set forth in the Financing Commitment and Backstop Agreement. Pursuant to the Financing Commitment and Backstop Agreement, the Equity Capital Raising Parties shall purchase the RO Backstop Shares as set forth in the Financing Commitment and Backstop Agreement. On the Effective Date, the rights and obligations of the Debtors under the Financing Commitment and Backstop Agreement shall vest in Reorganized Cineworld Parent and the Reorganized Debtors (other than Cineworld Parent and Cineworld Funding).

The Plan and documents related thereto (including, without limitation, this Disclosure Statement, the Plan Supplement, and the Rights Offering Documents) have been prepared on the basis that any Subscription Rights issued in the Rights Offering or the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares issued in connection with the Plan within any EEA member state or in the UK will either (a) not form part of any offer or invitation to purchase, acquire, subscribe for, sell, or otherwise dispose of or issue any securities or any solicitation of any offer to purchase, acquire, subscribe for, sell, or otherwise dispose of any security for the purposes of the Prospectus Regulation and/or the FSMA, as applicable, or (b) be made pursuant to an exemption under the Prospectus Regulation and/or the FSMA, as applicable, from the requirement to publish a prospectus for the offer of transferable securities to the public. In relation to each member state of the EEA or the UK, no offer of the Subscription Rights issued in connection with the Plan or the Plan Supplement may be made to the public at any time other than pursuant to an exemption under the Prospectus Regulation and/or the FSMA, as applicable. In any member state of the EEA or in the UK, the Disclosure Statement, the Plan, and the Plan Supplement are only addressed to and directed at: (i) EU/UK Qualified Investors in that EEA member state or the UK; or (ii) any other person if such address or direction does not otherwise constitute an offer of transferable securities to the public within the meaning of the Prospectus Regulation (including in any of the other circumstances set out in Article 1(4) of the Prospectus Regulation) and/or the FSMA (including in any of the other circumstances set out in section 86 of the FSMA). None of the Debtors or any of its Affiliates, Reorganized Cineworld Parent, or any persons acting on any of their behalves has authorized, nor do they authorize, the making of any offer of the Subscription Rights through any financial intermediary, other than as may be contemplated in the Plan and any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement). In any member state of the EEA or in the UK, the New Common Stock (including the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) may not be resold, exchanged, assigned, or otherwise transferred unless such resale, exchange, assignment or transfer is to: (A) an EU/UK Qualified Investor in that EEA member state or the UK; or (B) any other person if such resale, exchange, assignment, or transfer does not otherwise constitute an offer of transferable securities to the public within the meaning of the Prospectus Regulation (including in any of the other circumstances set out in Article 1(4) of the Prospectus Regulation) and/or the FSMA (including in any of the other circumstances set out in section 86 of the FSMA).

The Plan and any documents related thereto (including, without limitation, this Disclosure Statement and the Plan Supplement) are not, and should not be construed as, an invitation or inducement to engage in any investment activity in relation to any of the transactions described therein, including the Rights Offering, such as would amount to a financial promotion in the UK for the purposes of section 21 of the FSMA.  In the UK, the information contained in the Plan or any documents related thereto (including, without limitation, this Disclosure Statement and the Plan Supplement) is intended only for use and may only be relied upon in relation to any investment activity by, and any investment activity to which such information relates may only be engaged in by, persons falling within any of the circumstances of Article 1(4) of the Prospectus Regulation who are at the relevant time a Permitted UK Person.  Any person in the UK that is not a Permitted UK Person is not, for the purposes of any investment or investment decision, an intended recipient of the information contained in the Plan or any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) and should not use such information as the basis for taking any investment activity or investment action.  The Plan and any documents related thereto (including, without limitation, this Disclosure Statement and the Plan Supplement) should not (insofar as they relate to any investment or investment activity) be distributed, communicated to, or directed at the general public in the UK otherwise than as described above.

### iii.    **New Money Revolving Credit Facility.**

The Reorganized Debtors shall use commercially reasonable efforts to (a) obtain commitments for, and (b), unless otherwise waived by the Required Consenting Creditors and the Required Equity Capital Raising Parties, on the Effective Date enter into, the New Money Revolving Credit Facility on the terms set forth in the New Money Revolving Credit Facility Documents.

To the extent applicable and not already approved, Confirmation of the Plan shall be deemed approval of the New Money Revolving Credit Facility and New Money Revolving Credit Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the New Money Revolving Credit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New Money Revolving Credit Facility.

To the extent applicable, the Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order.

2.    **Employee-Related Matters.**

a.    **Compensation and Benefits Programs.**

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

(a)    all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Existing Interests in any of the Debtors;

(b)    Compensation and Benefits Programs that have been rejected pursuant to an order of a Bankruptcy Court;

(c)    any Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any Compensation and Benefits Program; and

(d)    any Compensation and Benefits Programs for the benefit of the Executive Directors, other than to the extent such program is provided for or modified pursuant to any of the Consulting Agreements (it being understood that nothing in Article VI.I.1 of the Plan shall impair or otherwise modify the Consulting Agreements, whose terms and conditions shall be controlling with respect to the subject matter set forth therein and in full force and effect in every respect on the Effective Date upon the (a) applicable termination set forth in Article IV.K of the Plan and (b) execution by the relevant parties of the Consulting Agreements thereafter).

Any assumption of Compensation and Benefits Programs pursuant to the terms of the Plan shall be deemed not to trigger (i) any applicable change of control, immediate vesting, or termination (including, in each case, any similar provisions therein) or (ii) an event of "Good Reason" (or a term of like import), in each case as a result of the consummation of the Restructuring Transactions or any other transactions contemplated by the Plan.  No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

b.    **Workers' Compensation Programs.**

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under:  (a) all applicable workers' compensation Laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable Law, including non-bankruptcy Law, with respect to any such contracts, agreements,

33

policies, programs, and plans; *provided*, *further*, that nothing herein or in the Plan shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state Law.

### c.      **Management Incentive Plan.**

The Management Incentive Plan Pool shall be established and reserved for grants to be made from time to time from such pool to employees, officers, and directors of the Reorganized Debtors at the discretion of the New Board effective as of the Effective Date. The terms and conditions (including, without limitation, with respect to participants, allocation, timing, and the form and structure of the equity or equity-based awards) shall be determined at the discretion of the New Board after the Effective Date; *provided* that Emergence Awards may be allocated on or prior to the Effective Date as emergence grants to recruit individuals selected to serve in key senior management positions on or after the Effective Date, subject to the terms and conditions, including, but not limited to, with respect to form, allocated percentage of the Management Incentive Plan Pool, structure, and vesting, determined by, in each case, the Required Consenting Creditors and the Required Equity Capital Raising Parties.

### d.      **Employee and Retiree Benefits.**

Except as otherwise provided in Article IV.O of the Plan all Compensation and Benefits Programs shall be assumed by the Reorganized Debtors and the Reorganized Debtors shall continue the Compensation and Benefits Programs according to existing terms and practices as of the effective date of the Restructuring Support Agreement; *provided*, *however*, that the New Board may review, amend, terminate, or modify any of the foregoing programs in accordance with applicable Law. For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable Law.

Upon the Effective Date and the satisfaction or waiver of the conditions precedent to the occurrence of the Effective Date set forth in Article X.A of the Plan, the applicable Reorganized Debtor shall enter into the Consulting Agreements, attached as Exhibit E to the Restructuring Support Agreement and in the Plan Supplement, with each of the Executive Directors. Subject to entry into the Consulting Agreements between the applicable Reorganized Debtor and the Executive Directors, the Compensation and Benefit Programs for the Executive Directors shall be assumed by the applicable Reorganized Debtor as modified by the Consulting Agreements.

If the Executive Directors do not execute the Consulting Agreements upon the Effective Date, (a) the Compensation and Benefit Programs for the Executive Directors shall be deemed rejected as of the Effective Date and (b) subject to execution of a release (in form and substance acceptable to the Debtors, the Required Consenting Creditors, and the Required Equity Capital Raising Parties) against the Released Parties, the Executive Directors will be entitled to only any payments to be made (i) under those certain letter agreements, between Regal Cinemas, Inc., Cineworld Cinemas Limited, Crown Finance US, Inc., and the Executive Directors, dated September 6, 2022 and (ii) in lieu of notice pursuant to the Executive Directors' Employment Agreements.

### e.      **Managers and Officers of the Reorganized Debtors.**

As of the Effective Date, the Executive Directors' Employment Agreements shall be assumed as modified by the Consulting Agreements, and the Executive Directors shall thereafter be deemed to have been terminated by mutual consent from their respective positions with the Debtors and, as applicable, any non-Debtor Affiliate; *provided* that, for the avoidance of doubt, if the Executive Directors do not execute the Consulting Agreements upon the Effective Date and the Consulting Agreements are not in full force

and effect on the Effective Date, (a) the Executive Directors' Employment Agreements will be deemed rejected as of such date and (b) subject to execution of a release (in form and substance acceptable to the Debtors, the Required Consenting Creditors, and the Required Equity Capital Raising Parties) against the Released Parties, the Executive Directors will be entitled to only any payments to be made (i) under those certain letter agreements, between Regal Cinemas, Inc., Cineworld Cinemas Limited, Crown Finance US, Inc. , and the Executive Directors, dated September 6, 2022 and (ii) in lieu of notice under the Executive Directors' Employment Agreements.  The members for the New Board shall be appointed in accordance with the Corporate Governance Term Sheet.  The initial members of the New Board of Reorganized Cineworld Parent will be identified in the Plan Supplement, to the extent known at the time of filing.  Each such member and officer of the Reorganized Debtors (including the new chief executive officer as determined by the Required Equity Capital Raising Parties) shall serve from and after the Effective Date pursuant to the terms of any applicable employment agreements and other constituent documents of the Reorganized Debtors, including the New Organizational Documents.

3.       **Treatment of Executory Contracts and Unexpired Leases.**

a.       **Assumption and Rejection of Executory Contracts and Unexpired Leases.**

On the Effective Date, except as otherwise provided herein or in the Plan, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that:  (a) are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases, which schedule shall be acceptable to the Required Consenting Creditors and the Required Equity Capital Raising Parties; (b) have previously expired or terminated pursuant to their own terms or agreement of the parties thereto; (c) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (d) are, as of the Effective Date, the subject of (i) a motion to reject that is pending or (ii) an order of the Bankruptcy Court that is not yet a Final Order; or (e) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, or the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Proposed Cure Amounts, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth in the Plan, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, including in accordance with any amendments executed by the Debtors  during these Chapter 11 Cases and effective upon assumption by the Debtors, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors with the prior written consent (e-mail being sufficient) of the Required Consenting Creditors and the Required Equity Capital Raising Parties, such consent not to be unreasonably withheld.

Except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first

refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by Law, any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan shall be deemed modified such that the transactions contemplated by the Plan shall not constitute a "change of control" or "assignment" (or terms with similar effect) under, or any other transaction, event, or matter that would (A) result in a violation, breach or default under such Executory Contract or Unexpired Lease, (B) increase, accelerate or otherwise alter any obligations, rights or liabilities of the Debtors or the Reorganized Debtors under such Executory Contract or Unexpired Lease, or (C) result in the creation or imposition of a Lien upon any property or asset of the Debtors or the Reorganized Debtors pursuant to the applicable Executory Contract or Unexpired Lease. Any consent or advance notice required under such Executory Contract or Unexpired Lease shall be deemed satisfied by Confirmation.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases and the Schedule of Proposed Cure Amounts at any time up to ninety days after the Effective Date; *provided*, *however*, that for any Executory Contract or Unexpired Lease subject to a dispute with respect to Cure cost as of the Effective Date, the deadline to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases with respect to such Executory Contract or Unexpired Lease shall be the later of (1) ninety days after the Effective Date and (2) five business days after the Bankruptcy Court determines that the Allowed Cure cost with respect to such Executory Contract or Unexpired Lease is greater than the amount set forth in the Schedule of Proposed Cure Amounts.  For the avoidance of doubt, at any time prior to the deadline set forth in section 365(d)(4) of the Bankruptcy Code or as otherwise ordered by the Bankruptcy Court, the Debtors may reject any Executory Contract or Unexpired Lease pursuant to a separate motion filed with the Bankruptcy Court or any applicable rejection procedures approved by the Bankruptcy Court in these Chapter 11 Cases.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules require the Debtors to assume or reject an Executory Contract or Unexpired Lease, such requirement shall be satisfied if the Debtors make an election, with the prior written consent (e-mail being sufficient) of the Required Consenting Creditors and the Required Equity Capital Raising Parties, such consent not to be unreasonably withheld, to assume or reject such Executory Contract or Unexpired Lease prior to the deadline set forth by the Bankruptcy Code or the Bankruptcy Rules, as applicable, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

If certain, but not all, of a contract counterparty's Executory Contracts or Unexpired Leases are assumed pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts or Unexpired Leases that are being rejected pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan.  Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file an objection on or before the Confirmation Hearing on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing) or at a later date as agreed to by the parties or ordered by the Bankruptcy Court.

b.      **Indemnification Obligations.**

All indemnification provisions, consistent with applicable Law, in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements,

other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be Reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on the same terms that existed prior to the Effective Date; *provided* that nothing in the Plan shall expand any of the Debtors' indemnification obligations in place as of the Petition Date.

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors, managers, and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors, managers, and officers remain in such positions after the Effective Date.

      c.      **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

Entry of the Confirmation Order shall constitute a Bankruptcy Court Order approving the rejections, if any, of any Executory Contracts or Unexpired Leases on the Schedule of Rejected Executory Contracts and Unexpired Leases. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty days after the later of (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection and (b) the effective date of such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with the applicable Class of General Unsecured Claims as set forth in the Plan. Notwithstanding anything to the contrary in the Plan or the Definitive Documents, the Debtors (with the consent of the Required Consenting Creditors and Required Equity Capital Raising Parties), or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time through and including ninety days after the Effective Date. For the avoidance of doubt, unless otherwise agreed, any property remaining on the premises subject to a rejected Unexpired Lease shall be deemed abandoned by the Debtors or the Reorganized Debtors, as applicable, as of the effective date of the rejection, and the counterparty to such Unexpired Lease shall be authorized to use or dispose of any property left on

the premises in its sole and absolute discretion without notice or liability to the Debtors or the Reorganized Debtors, as applicable, or any third party.

> d. **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, shall, in accordance with the Schedule of Proposed Cure Amounts, pay all Cure costs relating to Executory Contracts and Unexpired Leases that are being assumed under the Plan. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all objections to any Cure amounts set forth in the Schedule of Proposed Cure Amounts must be Filed with the Bankruptcy Court on or before fourteen days after the Filing of the Schedule of Proposed Cure Amounts. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, without the need for any objection by the Debtors or Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure costs shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the applicable Cure costs; *provided*, *however*, that nothing herein or in the Plan shall prevent the Reorganized Debtors from paying any Cure costs despite the failure of the relevant counterparty to file such request for payment of such Cure costs. The Reorganized Debtors also may settle any disputes related to Cure costs without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before the Confirmation Hearing. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely Filed, unless otherwise agreed to by the parties or ordered by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment.

If there is any dispute regarding any Cure costs, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption or assumption and assignment, then payment of any Cure costs shall occur as soon as reasonably practicable after (1) entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or (2) as may be agreed upon by the Debtors (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

The Debtors (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) and the Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute. If the Bankruptcy Court determines that the Allowed Cure cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Schedule of Proposed Cure Amounts, the Debtors shall have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date, subject to the applicable counterparty's right to object to such rejection. Notwithstanding the foregoing, the Reorganized Debtors shall be deemed to be entitled to the full benefits of the Executory Contract or Unexpired Lease pending (including, without limitation, any license thereunder) resolution of any dispute, and any subsequent decision to add such

Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases shall not cause the Reorganized Debtors to incur any liability thereunder or with respect thereto.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (ii) the effective date of such assumption or (iii) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

4.      **Implementation Mechanisms in England and Wales.**

Under English law, a public limited company, such as the Cineworld Parent, cannot cancel its existing equity interests and issue new shares of a company to creditors solely through a chapter 11 case. As such, full implementation of the restructuring contemplated in the Plan will require additional steps to be taken in England and Wales through one or more Implementation Mechanisms. The Debtors' decision regarding the Implementation Mechanisms will be reflected in the Restructuring Transactions Memorandum and the Plan Supplement. Implementation of the Restructuring Transactions (including the completion of the Implementation Mechanisms in England and Wales) is a condition precedent to the Effective Date of the Plan.

**V.     SOLICITATION AND VOTING PROCEDURES**

This Disclosure Statement is being distributed, along with the applicable Ballot to be used for voting on the Plan, to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, incorporated herein by reference.

> ***The Disclosure Statement Order and the exhibits attached thereto are incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan****.*

<u>**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**</u>. PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER AND THE EXHIBITS ATTACHED THERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

**A.      Holders of Claims Entitled to Vote on the Plan.**

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.D of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 4 and 5 (collectively, the "<u>Voting Classes</u>"). The Holders of Claims in the Voting

Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are **not** soliciting votes from Holders of Claims or Interests in Classes 1, 2, 3, 6, 7, 8, and 9.

### B.      Solicitation Agent.

The Debtors have retained Kroll Restructuring Administration LLC to act as, among other things, the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

### C.      Solicitation Package.[14]

Contemporaneously herewith, the Debtors filed the proposed Disclosure Statement Order. For purposes of this Article V, capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement Order. Pursuant to the Disclosure Statement Order, Holders of Claims in the Voting Classes entitled to vote on the Plan as of the Voting Record Date (as caveated by the Supplemental Voting Record Date) will receive appropriate solicitation materials (in paper or electronic form) including (the following materials, collectively, the "Solicitation Package"):

- the conditionally approved Disclosure Statement (with all exhibits thereto, including the Plan);

- the Disclosure Statement Order (without exhibits);

- the Solicitation Procedures;

- the Cover Letter;

- the Combined Hearing Notice;

- the applicable Ballot for the relevant Class of Claims;

- a pre-addressed, postage pre-paid reply envelope; and

- any additional documents that the Bankruptcy Court has ordered to be made available to Holders of Claims in the Voting Classes.

The Solicitation Package shall provide the Disclosure Statement (with all exhibits thereto, including the Plan), the Disclosure Statement Order (without exhibits) and the Solicitation Procedures in electronic format (flash drive or CD-ROM, or, in the case of Beneficial Holders of Convertible Bonds Claims in Class 5 General Unsecured Claims, in accordance with the customary procedures of the bank or brokerage firm (or that firm's agent) (each, a "Nominee") holding the securities in "street name" for its Beneficial Holder clients, and all other contents of the Solicitation Package, including the Cover Letter, Combined Hearing Notice, and Ballots, shall be provided in paper format. Any Voting Holder, excluding Class 5 Beneficial Holders of the Convertible Bonds Claims, who has not received a Solicitation Package should contact the

---

[14]   Capitalized terms not otherwise defined in this section have the meaning ascribed to them in the Conditional DS Motion.

Solicitation Agent.  Any Class 5 Beneficial Holder of the Convertible Bonds Claims who has not received a Solicitation Package should contact their Nominee for further assistance.

D.    **Voting Record Date.**

**The Voting Record Date is April 18, 2023**.  The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim. For the avoidance of doubt, a holder will only be entitled to receive a Solicitation Package based on a claim arising from a rejected executory contract or unexpired lease if such claim is filed by the Voting Record Date.

E.    **Voting on the Plan.**

**The Voting Deadline is May 23, 2023 at 3:00 p.m., prevailing Central Time**.  In order to be counted as votes to accept or reject the Plan, all Ballots must be:  (a) electronically submitted utilizing the online balloting portal maintained by the Solicitation Agent on or before the Voting Deadline; or (b) properly executed, completed, and delivered (either by using the return envelope provided, or by first class mail, overnight courier, or personal delivery, or by electronic mail, as set forth below) so that the Ballots are **actually received** by the Solicitation Agent on or before the Voting Deadline at the following address:

---

**DELIVERY OF BALLOTS**

**FOR ALL VOTING CLASSES**
**If by First Class Mail, Overnight Courier or Hand Delivery:**

**Cineworld Group plc Ballot Processing**
**c/o Kroll** Restructuring Administration LLC **850 Third Avenue, Suite 412, Brooklyn, NY** 11232

**IF YOU WOULD LIKE TO COORDINATE HAND DELIVERY OF YOUR BALLOT, PRE-VALIDATED BENEFICIAL HOLDER BALLOT OR MASTER BALLOT, PLEASE EMAIL cineworldballots@ra.kroll.com AND PROVIDE THE ANTICIPATED DATE AND TIME OF YOUR DELIVERY.**

**OR**

**FOR CLASSES 4 AND 5 (EXCLUDING PRE-VALIDATED BENEFICIAL HOLDER AND MASTER BALLOTS IN CLASS 5)**

**ONLINE PORTAL AT https://cases.ra.kroll.com/cineworld.  CLICK ON THE "SUBMIT E-BALLOT" SECTION OF THE DEBTORS' WEBSITE AND FOLLOW THE DIRECTIONS TO SUBMIT YOUR E-BALLOT. IF YOU CHOOSE TO SUBMIT YOUR BALLOT VIA KROLL'S E-BALLOT SYSTEM (THE "E-BALLOT PORTAL"), YOU SHOULD NOT ALSO RETURN A HARD COPY OF YOUR BALLOT.**

**VOTING HOLDERS IN CLASS 4 AND CLASS 5 (EXCLUDING BENEFICIAL HOLDERS AND NOMINEES IN CLASS 5) ARE STRONGLY ENCOURAGED TO SUBMIT THEIR BALLOTS VIA THE E-BALLOT PLATFORM.**

**B**ALLOTS WILL NOT BE ACCEPTED BY TELECOPY, FACSIMILE, EMAIL, OR OTHER

---

---

**ELECTRONIC MEANS OF TRANSMISSION.**

**FOR CLASS 5 BENEFICIAL HOLDERS OF THE CONVERTIBLE BONDS CLAIMS AND NOMINEES ONLY (PREFERRED METHOD)**

**MASTER AND PRE-VALIDATED BENEFICIAL HOLDER BALLOTS**
Via E-mail:  cineworldballots@ra.kroll.com (Please reference "Cineworld Master Ballot" or "Cineworld Pre-Validated Ballot" in the subject line, as applicable)

If you received an envelope addressed to your Nominee, please return your ballot to your Nominee, allowing enough time for your Nominee to cast your vote on a Master Ballot before the Voting Deadline.  Class 5 Beneficial Holders should vote in accordance with the instructions provided by their Nominee.

---

**PLEASE SELECT JUST ONE OPTION TO SUBMIT YOUR VOTE:**

**FOR CLASSES 4 AND 5 (EXCLUDING PRE-VALIDATED BENEFICIAL HOLDER AND MASTER BALLOTS IN CLASS 5)**

**EITHER RETURN A PROPERLY EXECUTED PAPER BALLOT WITH YOUR VOTE**

**OR**

**VOTE ELECTRONICALLY THROUGH THE CUSTOMIZED, ONLINE BALLOTING PORTAL ON THE DEBTORS' CASE WEBSITE MAINTAINED BY KROLL ("E-BALLOT")**

**OR, FOR CLASS 5 MASTER AND PRE-VALIDATED BENEFICIAL HOLDER BALLOTS ONLY**

RETURN A PROPERLY EXECUTED MASTER OR PRE-VALIDATED BALLOT WITH YOUR VOTE VIA E-MAIL AT CINEWORLDBALLOTS@RA.KROLL.COM AND REFERENCING "CINEWORLD MASTER BALLOT" OR "CINEWORLD PRE-VALIDATED BALLOT" IN THE SUBJECT LINE, AS APPLICABLE. CLASS 5 BENEFICIAL HOLDERS SHOULD SUBMIT THE BALLOT IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY THEIR NOMINEE.

**Holders of Claims who cast a Ballot via E-Ballot should NOT also submit a paper ballot.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT AT 844-648-5574 (DOMESTIC, TOLL FREE) OR +1 845-295-5705 (INTERNATIONAL).  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED EXCEPT AS OTHERWISE PROVIDED FOR IN THE SOLICITATION PROCEDURES OR IN THE SOLE AND ABSOLUTE DISCRETION OF THE DEBTORS**.

F.      **Ballots Not Counted.**

<u>**No Ballot will be counted toward Confirmation if, among other things**</u>:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the Ballots; (3) it was cast by an Entity that is not entitled to vote on the Plan; (4) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order);

(5) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), the administrative agents under the Debtors' credit facilities, or the Debtors' financial or legal advisors instead of the Solicitation Agent; (6) it lacks a signature; or (7) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

### G.    Dates and Deadlines.

The following table sets forth important dates and deadlines relating to voting and confirmation of the Plan.[15]

| EVENT | DATE |
|---|---|
| **Voting Record Date** | April 18, 2023 |
| **Solicitation Mailing Date** | Three Business Days following the entry of the Disclosure Statement Order  (or as soon as reasonably practicable thereafter) |
| **Publication Deadline** | Five Business Days following the entry of the Disclosure Statement Order (or as soon as reasonably practicable thereafter) |
| **Plan Supplement Filing Deadline** | May 16, 2023 |
| **Voting Deadline** | May 23, 2023 at 3:00 p.m. (prevailing Central Time) |
| **3018 Motion Deadline** | May 23, 2023 at 3:00 p.m. (prevailing Central Time) |
| **Plan and Disclosure Statement Objection Deadline** | May 23, 2023 at 5:00 p.m. (prevailing Central Time) |
| **Deadline to File Voting Report** | May 25, 2023 |
| **Confirmation Hearing Date** | May 26, 2023 at 8:00 a.m. (prevailing Central Time), or such other date as may be scheduled by the Bankruptcy Court |

## VI.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    Cineworld's Corporate History.

Cineworld is a multinational cinema operator headquartered in Brentford, United Kingdom that traces its roots back nearly 100 years.  In 1930, Moshe Greidinger—the grandfather of the Group's current Chief Executive Officer, Moshe "Mooky" Greidinger, and Deputy Chief Executive Officer, Israel Greidinger—opened a cinema in Haifa, Israel.  Over the next few decades, he grew his first cinema into

---

[15]    These dates and deadlines are subject to the Bankruptcy Court's entry of the Debtors' proposed *Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection therewith, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Scheduling Certain Dates with Respect thereto, and (VI) Granting Related Relief* (the "Disclosure Statement Order"), filed contemporaneously herewith.

one of the largest cinema chains in Israel, forming the precursor to the Group's present day Planet and Rav Chen cinema brands.

Recognizing the need for a modern cinema option in Central and Eastern Europe, in 1997 the Group expanded under the Cinema City International brand into Hungary, opening a multiplex in Budapest.  From there, expansion continued into the Czech Republic in 1999, and Poland in 2000, where the Group opened the region's first IMAX theater.  After accomplishing nearly a decade of growth and success in Central and Eastern Europe, Cinema City International's next big step was its initial public offering on the Warsaw Stock Exchange in 2006 (the "Warsaw IPO").  The Warsaw IPO, which valued the company at $343 million, gave it access to the public markets to fuel its continued growth.  That same year, the company expanded into Bulgaria, and the next year to Romania.  In 2011, Cinema City International acquired Palace Cinemas for $38 million, which provided access to the Slovakian market in addition to further bolstering the company's offerings in the Czech Republic and Hungary.  By the time of its merger with Cineworld, Cinema City International operated 99 multiplexes with 966 screens in seven countries.

Cine-UK, trading under the "Cineworld" brand name, was founded in 1995 by longtime Warner Brothers Europe executive Steve Wiener.  In 2005, the company became the U.K.'s second-largest theater circuit when it acquired the U.K. and Ireland operations of the French cinema chain UGC, which operated 408 screens across 42 cinemas, for a reported $400 million.  Two years later, Cineworld completed an initial public offering on the London Stock Exchange (the "LSE IPO").  In the years following the LSE IPO, the chain was modernized, with one-third of its screens upgraded to digital technology instead of traditional film reels.  The company was also a market leader in diversified cinematic offerings, including showing live events, such as opera and ballet, as well as rugby in 3D.  In addition, it pioneered the U.K.'s only cinema subscription service, the Unlimited Card, which remains a staple of Cineworld's U.K. operations to this day.  The next major milestone for Cineworld was the acquisition of Picturehouse Cinemas in December 2012 for £47.3 million.  The twenty-one Picturehouse locations further diversified the Cineworld chain as Picturehouse catered to an older audience through a carefully curated selection of independent and foreign arthouse films.

In 2014, legacy Cineworld merged with Cinema City International, with Cineworld paying Cinema City International shareholders just over $828 million in cash and shares, forming the second-largest cinema circuit in Europe with 1,852 screens across 201 cinemas.  Through the merger, Cineworld gained access to the emerging markets Cinema City International had cultivated in Central and Eastern Europe.  Following the merger, Mooky Greidinger became Chief Executive Officer and Israel Greidinger became Deputy Chief Executive Officer of the combined company.

Most recently, in 2018, Cineworld merged with Regal Entertainment Group—the U.S. cinema giant operating under the Regal, Edwards, and United Artists brands—in a transaction based on an implied enterprise value of $5.8 billion to form the second-largest cinema chain in the world.  In 2017, Regal generated over $3 billion in revenue through operations at 560 cinemas with 7,322 screens in 43 states and territories.  Regal was an ideal target for Cineworld given the companies' similar focus on cinema modernization and Cineworld's desire to expand into the U.S. market.  The transaction has been considered highly successful and by the end of 2019 had created $190 million in operational synergies.  Before the onset of the COVID-19 pandemic, the combined company's revenue and other key financial metrics had reached all-time highs.

<ol>
<li><strong>Cineworld's Business Operations.</strong></li>
</ol>

Since its inception, the Group has led the cinema industry through its commitment to a strong film catalogue, superior customer service, premium concessions offerings, and a diverse array of cutting-edge movie-viewing experiences, including IMAX, 4DX, ScreenX, RPX, and other Premium Large Formats.

The Group's strategic partnerships with key industry players have enabled Cineworld to provide its customers with a truly high-quality experience featuring premium viewing experiences and first class concessions offerings at state-of-the-art theaters.

2.    **Cineworld's Brands.**

The Group operates under five primary brands:  Cineworld in the U.K. and Ireland; Picturehouse in the U.K.; Regal in the U.S.; Cinema City in Central and Eastern Europe; and Planet in Israel.

- *Cineworld*.  As of the Petition Date, the Group operated 1,107 screens in 103 theaters in the U.K. and Ireland under the Cineworld brand.  Cineworld's focus is on providing great customer service with high quality technology, stadium seating, and online ticketing services.  Cineworld operates its exclusive premium large format (PLF) Superscreen system, as well as multidimensional sound powered by Dolby Atmos speakers and state-of-the-art projection.  Cineworld also partners with IMAX and CJ 4DPlex (the owner of 4DX and ScreenX).  Cineworld's IMAX auditoriums include integrated sound and speaker systems and outstanding visuals.  Moreover, Cineworld was the first cinema chain to bring 4DX and ScreenX technology to the U.K. and Ireland and remains the sole operator of the technology in the region today.  4DX auditoriums add practical effects such as water, wind, scent, lighting, and motion-programmed seating that are timed and designed to enhance the on-screen action.  Cineworld's ScreenX theatres offer a 270° projection of the film, using additional projectors that extend the picture out onto the side walls of the auditorium.  The Group generated approximately $348.1 million in total revenue (19.3% of its total revenue in 2021) in the U.K. and Ireland, including revenues from both the company's Cineworld and Picturehouse brands.

- *Picturehouse*.  As of the Petition Date, the Group operated 93 screens in 26 theaters in the U.K. and Ireland under the Picturehouse brand.  Picturehouse is the Group's arthouse cinema brand that provides an alternative to multiplex theaters operating under the Cineworld brand through a cozy atmosphere and contemporary restaurants and bars.  Picturehouse offers an expanded range of movies from those shown at standard theaters.

- *Regal*.  As of the Petition Date, the Group operated 6,787 screens in 505 theaters in the U.S. under the Regal, United Artists, and Edwards brands.  Regal operates multi-screen complexes that include features like immersive sound, wall-to-wall and floor-to-ceiling screens, Sony Digital Cinema 4K projections systems, three-dimensional digital projection screens, IMAX, PLF Regal Premium Experience (RPX), digital stereo surround-sound, and interiors featuring video game and party room areas.  Since the acquisition of Regal was completed, the combined company has had a number of achievements, including realizing $190 million in operational synergies by the end of 2019, the refurbishment of several sites, the expansion of reserved seating across Regal's platform, a new website and applications for online access, an enhanced concession offering, a new partnership with PepsiCo, and technological improvements that include the expansion of ScreenX technology, opening 23 additional 4DX screens, and increased use of laser projections.  The Group generated approximately $1.22 billion in total revenue (67.6% of its total revenue in 2021) in the U.S.

- *Cinema City*.  As of the Petition Date, the Group operated 1,022 screens in 102 theaters across Central and Eastern Europe, including Bulgaria, Czech Republic, Hungary, Poland, Romania, and Slovakia.  Cinema City theaters in Poland feature IMAX, ScreenX, and 4DX technologies.  Cinema City was the first to offer an "Unlimited" subscription program, which allows users to view an unlimited number of standard format films for a fixed monthly fee.  This program has since been expanded to other Cineworld brands.  The Group generated approximately $236.5 million in total revenue (13.1% of its total revenue in 2021) in Central and Eastern Europe under the Cinema City brand and in Israel under the Planet brand.

45

- **Planet**.  The Group operates 130 screens in 10 theaters in Israel under the Planet and Rav Chen brands.  The Group is the oldest and largest cinema operator in Israel.  Planet's theaters offer a VIP experience, IMAX screens, 4DX screens, ScreenX screens, and banquet halls.

       3.      **Cineworld's Revenue and Income Stream.**

In 2021, Cineworld's operations generated over $1.8 billion in total revenue and approximately $54.4 million of Adjusted EBITDA (after lease payments), with over 95 million admissions.  The Group's revenue is generated from several sources, including box office sales, retail sales, advertisements, and other products and services.  The Group's revenue streams are described below:

- **Box office Sales**.  Box office admissions are Cineworld's largest source of revenue.  In 2021, the Group recognized approximately $955.7 million in total revenue globally from ticket sales, making up approximately 53% of its total revenue that year.  The Group generates additional revenue from admissions by offering premium viewing formats, such as IMAX, ScreenX, 4DX, and RPX, which are priced above general admissions.

- **Retail Sales**.  Retail offerings are Cineworld's second largest revenue stream.  In 2021, retail accounted for approximately $552.3 million in total revenue globally, making up approximately 30% of the Group's total revenue that year.  The Group's primary retail offerings are concessions and other food and beverage sales.  The reopening of theaters worldwide in 2021 increased the volume of customer purchases and the per-customer spend on retail products increased by at least 25% in each of the Group's geographic segments.

- **Advertising**.  Advertising revenue is predominantly generated by on-screen advertisements during the period before the showing of a feature presentation.  As of the date hereof, the Group's advertising is facilitated by Digital Cinema Media Limited in the U.K. and Ireland, National CineMedia in the U.S., and directly by the Debtors in Central and Eastern Europe and Israel.

- **Film Distribution**.  Cineworld operates a film distribution business, Forum Film, in Central and Eastern Europe and Israel, as well as in the U.K.  Forum Film distributes films on behalf of major film studios, including Disney and Universal.  It also distributes independent films in Central and Eastern Europe, Israel, and the U.K.  Picturehouse is the Group's distribution arm in the U.K.

- **Other operations**.  Cineworld has additional diversified revenue streams, including advanced ticket booking fees, vendor rebates, arcade and game rooms, special events and private bookings, and proceeds of other investments.

       4.      **Cineworld's Real Estate Portfolio.**

The Group has an extensive real estate portfolio, which as of the Petition Date consisted of 505 theaters in the U.S., 129 theaters in the U.K. and Ireland, and 113 theaters across Central and Eastern Europe and Israel.  Cineworld regularly assesses which locations may be advantageous to open a new theater and which existing theaters may benefit from further investment.  These assessments have resulted in an expansion and refurbishment program, through which the company has opened ten new locations since 2021.

In addition, Cineworld continually assesses the performance of its existing locations.  An important aspect of the Group's multi-faceted response to the challenges caused by the COVID-19 pandemic was to negotiate with landlords, in many cases with respect to underperforming locations, on the terms of potential lease restructurings, including rent deferrals, abatements, and other concessions that helped preserve Cineworld's liquidity while it navigated the pandemic.  The Debtors have continued discussions with

landlords during the Chapter 11 Cases to further assess and right-size their U.S. lease portfolio with the assistance of their advisors.  As further described in Article VIII of this Disclosure Statement, as of the date hereof, the Debtors have rejected or filed a motion to reject certain theater leases.  The Debtors continue to assess their real estate portfolio vis-à-vis their go-forward business plan and ongoing negotiations with their landlords with respect to lease concessions.  In addition, the Debtors continue to assess optionality with respect to their U.K. lease portfolio, which analysis remains ongoing.

B.       Prepetition Capital Structure.

As of the Petition Date, the Group had approximately $5.35 billion in total funded debt obligations, approximately $5.0 billion of which were obligations of Debtor entities.  The relative priorities of each debt obligation are as follows:

| DEBTOR FINANCING FACILITIES | | |
|---|---|---|
| Facility | Maturity | Outstanding Principal Amount as of the Petition Date[16] |
| Secured Debt | | |
| Facilities Under Prepetition Priming Credit Agreement | | |
| Initial Priming Term B-1 Loan | May 23, 2024 | $544,553,219.00 |
| Initial Priming Term B-2 Loan | May 23, 2024 | $110,800,000.00 |
| Incremental Legacy Priming Term B-1 Loan | May 23, 2024 | $200,000,000.00 |
| Facilities Under Prepetition Legacy Credit Agreement | | |
| Legacy USD Term Loan | Feb. 28, 2025 | $2,655,731,471.10 |
| Legacy EUR Term Loan | Feb. 28, 2025 | $195,285,555.50 |
| Incremental Legacy USD Term Loan | Sept. 30, 2026 | $633,601,236.90 |
| Revolving Credit Facility | Feb. 28, 2023 | $456,570,870.60 |
| Other Secured Facility | | |
| Midwest City Facility | July 1, 2041 | $11,900,000.00 |
| Unsecured Debt | | |
| Unsecured Facilities | | |
| Settlement Facility | September 30, 2022 | $56,843,757.50 |
| Convertible Bonds | April 16, 2025 | $213,000,000.00 |
| Total Debtor Debt: | | $5,078,286,110.60 |
| NON-DEBTOR FINANCING FACILITIES | | |
| Facility | Maturity | Outstanding Principal Amount |
| RoW Credit Facility | Dec. 30, 2023 | $249,211,682.50 |
| Israeli Loan | June 30, 2025 | $2,700,000.00 |
| Polish Bank Overdraft | N/A | $10,500,000.00 |
| Total Non-Debtor Debt: | | $262,411,682.50 |
| Total Debtor and Non-Debtor Funded Debt: | | $5,340,697,793.10 |

1.      **Debtor Financing Facilities.**

a.      **Prepetition Legacy Credit Facilities.**

Crown Finance US, Inc. ("Crown Finance US"), as U.S. term borrower, Crown UK HoldCo Limited, as holdings ("Crown UK HoldCo"), each of Crown Finance US and Crown UK HoldCo, as revolving credit borrowers, Barclays Bank PLC ("Barclays") as administrative and collateral agent, and the lenders and issuers from time to time party thereto (such lenders having advanced term loans, the "Prepetition Legacy Term Lenders" and such lenders having advanced revolving loans, the "Prepetition Revolving Lenders"), are party to that certain credit agreement, dated as of February 28, 2018 (as amended, restated or otherwise modified from time to time, the "Prepetition Legacy Credit Agreement"), relating to (a) the Initial Legacy USD Term Loan issued in the initial aggregate principal amount of $3.325 billion; (b) the Legacy Euro Term Loan, a Euro denominated term loan facility issued in the initial aggregate principal amount of €607.6 million; (c) a fully-drawn Revolving Credit Facility issued in the aggregate principal amount of $462.5 million; and (d) an Incremental Legacy USD Term Loan in the aggregate principal amount of $650 million (the Incremental Legacy USD Term Loan, and together with the Initial Legacy USD Term Loan and the Legacy Euro Term Loan, the "Prepetition Legacy Term Facilities," and together with the Revolving Credit Facility, the "Prepetition Legacy Credit Facilities").

The Prepetition Legacy Credit Facilities are guaranteed by each of the Debtors (with the exception of (a) Cineworld Group plc, (b) Cineworld Funding (Jersey) Limited, and (c) certain other Specified Immaterial Subsidiaries (as defined the Prepetition Legacy Credit Agreement) that are also Debtors) (collectively, the "Legacy Facility Guarantors," and together with Crown Finance US and Crown UK HoldCo, the "Legacy Facility Obligors"). The Prepetition Legacy Credit Facilities are secured by first priority liens on substantially all of the assets of the Legacy Facility Obligors and junior liens on certain Specified Priming Collateral. The Prepetition Legacy Facility Lenders issued the Prepetition Legacy Credit Facilities to help facilitate the company's acquisition of Regal Cinemas in February 2018, as further discussed in the First Day Declarations.

The Initial Legacy USD Term Loan bears interest at a rate of LIBOR plus 2.50 percent and matures on February 28, 2025. As of the Petition Date, the outstanding principal amount of the Initial Legacy USD Term Loan was approximately $2.655 billion. The Legacy Euro Term Loan bears interest at a rate of LIBOR plus 2.63 percent and matures on February 28, 2025. As of the Petition Date, the outstanding principal amount of the Legacy Euro Term Loan was approximately $195.3 million. The Revolving Credit Facility bears interest at the rate of LIBOR plus 3.00 percent and matures on February 28, 2023. As of the Petition Date, the outstanding principal amount of the Revolving Credit Facility is approximately $456.6 million. The Incremental Legacy USD Term Loan bears interest at the rate of LIBOR plus 2.75 percent and matures on September, 2026. As of the Petition Date, the outstanding principal amount of the Incremental Legacy USD Term Loan was approximately $633.6 million.

b.      **Prepetition Priming Facilities.**

Crown Finance US as borrower, Crown UK HoldCo as holdings, Barclays as administrative agent, and each of the lenders party thereto (the "Prepetition Priming Facility Lenders"), are each party to that certain credit agreement (the "Prepetition Priming Credit Agreement") dated November 23, 2020 (and the facilities thereunder, as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Priming Facilities"). The Prepetition Priming Facilities are guaranteed by the Legacy

---

[16]   The amounts herein reflect the amounts listed in the Debtors' schedules and statements and not any Proofs of Claim that may be filed.

Facility Guarantors and are secured by a first priority lien on the Specified Priming Collateral, as well as first priority liens on substantially all of the assets of the Legacy Facility Obligors, ranking pari passu with the liens granted under the Prepetition Legacy Credit Facilities.

The Prepetition Priming Facilities are comprised of three tranches of term loans: (a) an Initial Term B-1 Loan issued upon entry into the Prepetition Priming Legacy Facilities in the aggregate principal amount of $450 million; (b) an Initial Term B-2 Loan issued pursuant to an amendment to the Prepetition Priming Facilities in May 2020 in the aggregate principal amount of $110.8 million; and (c) an Incremental Priming Term B-1 Loan issued pursuant to a further amendment to the Prepetition Priming Facilities in July 2021 in the aggregate principal amount of $200 million. The Initial Term B-2 Loans were provided to the Debtors as consideration in connection with the retirement of a then-existing revolving credit facility issued by the Prepetition Priming Facility Lenders.

A drafting error in the loan documents for the Initial Term B-1 Loan inadvertently resulted in the inclusion of a 1% LIBOR floor on the interest rate for the term loan facility. Cineworld reserved rights and made the disputed interest payments. Cineworld and its advisors also engaged in extensive discussions with both Barclays Bank PLC, as the administrative agent, and counsel for a group of Prepetition Priming Facility Lenders in an effort to reach an agreement on steps to correct the mistake. Subsequently, K&E entered into a confidential settlement agreement with Cineworld which resolved and eliminated any dispute between Cineworld and K&E resulting from the drafting error. The Initial Term B-1 Loan bears interest at the rate of 7.00% payable in cash, plus 8.25% payable-in-kind by being capitalized and added to the principal balance of the loan. As of the Petition Date, the outstanding principal amount of the Initial Term B-1 Loan is approximately $544.6 million. The Initial Term B-2 Loan bears interest at the rate of LIBOR plus 5.00%. As of the Petition Date, the outstanding principal amount of the Initial Term B-2 Loan is approximately $110.8 million.

As of the Petition Date, the outstanding principal amount of the Incremental Priming Term B-1 Loan was approximately $200.0 million. The Incremental Priming B-1 Term Loan bears interest at the LIBOR base rate plus 8.25%. The Prepetition Priming Facilities mature on May 23, 2024.

c.   <strong>Midwest City Facility.</strong>

Regal, as borrower, and Arvest Bank, as lender, are party to that certain loan agreement, dated as of July 1, 2021 (the "Midwest City Loan Agreement"). Pursuant to the Midwest City Loan Agreement, Regal issued the Midwest City Note to Arvest Bank in the principal face amount of approximately $12 million. The Midwest City Note is secured by a first priority mortgage lien over the Debtors' Midwest Property located in Midwest City, Oklahoma, as well as a security interest in all of Regal's and Regal Cinemas, Inc.'s assets and proceeds deriving from the Midwest Property. The Midwest City Note bears interest at the Treasury Rate plus 3.00 percent and matures in 2041. As of the Petition Date, the outstanding principal amount of the Midwest City Note was approximately $11.9 million.

d.   <strong>Settlement Facility.</strong>

The company reached a settlement (the "Regal Settlement Agreement") with respect to its litigation against the dissenting shareholders of Regal Entertainment Group arising out of the company's acquisition of Regal Cinemas. Pursuant to the Regal Settlement Agreement, the Debtors agreed to pay approximately $92 million to the dissenting shareholders. To finance the Debtors' obligations under the Regal Settlement Agreement, Crown UK HoldCo, as holdings, and Crown Finance US as borrower, Wilmington Trust, National Association as administrative agent, and the lenders party thereto (the "Settlement Lenders") entered into that certain credit agreement (the "Settlement Credit Agreement", and the term loan facility thereunder, as amended, restated, supplemented, or otherwise modified from time to time, the "Settlement

Facility"). Pursuant to the Settlement Facility, the Settlement Lenders issued unsecured term loans in the aggregate principal amount of approximately $92 million bearing interest at the rate of 20.00% payable as payment-in-kind. The Settlement Facility is guaranteed by the Legacy Guarantors and it matures on September 30, 2022. As of the Petition Date, the outstanding principal amount of the Settlement Facility was approximately $56.8 million.

### e. Convertible Bonds.

In April 2021, the Debtor Cineworld Funding (Jersey) Limited (the "Convertible Bonds Issuer") issued $213 million in aggregate principal amount of convertible bonds (the "Convertible Bonds") pursuant to that certain subscription agreement dated as of March 24, 2021 (the "Convertible Bond Subscription Agreement"), by and among the Convertible Bonds Issuer, Cineworld Group plc, as guarantor (the "Convertible Bonds Guarantor"), and the various direct investors thereto. The Convertible Bonds are constituted by a trust deed, dated as of April 16, 2021 (the "Trust Deed"), by and between the Convertible Bonds Issuer, the Convertible Bonds Guarantor, and BNY Mellon Corporate Trustee Services Limited, as trustee. The Convertible Bonds bear interest at a rate of 7.50 percent per annum, payable semi-annually in arrears in equal installments on October 16 and April 16 of each year. The Convertible Bonds mature on April 16, 2025. The Convertible Bonds are unsecured obligations of the Convertible Bonds Issuer and the guarantee in respect thereof is an unsecured obligation of the Convertible Bonds Guarantor.

As of the Petition Date, there was approximately $213.0 million in aggregate principal outstanding under the Convertible Bonds. Subject to the terms of the Trust Deed, the Convertible Bonds are, in certain circumstances, convertible into fully paid-up ordinary shares of £0.01 each in the capital of the Convertible Bonds Guarantor at a conversion price calculated in accordance with the Trust Deed.

## VII.   EVENTS LEADING TO THE CHAPTER 11 FILINGS[17]

### A.   The COVID-19 Pandemic Devastates the Cinema Industry and Cineworld.

Before the COVID-19 pandemic, Cineworld's business was performing well and growing. Cineworld had generated record-breaking revenues in 2018 and 2019. Following the Regal acquisition, Cineworld was realizing even greater than expected synergies as the global organization grew fully integrated. The future looked brighter than ever.

---

[17]   This Article VII provides a summary of the main drivers of the commencement of these Chapter 11 Cases. A detailed overview of the events leading to the commencement of the Chapter 11 Cases can be found in the Greidinger First Day Declaration, which is incorporated herein by reference.

The COVID-19 pandemic profoundly impacted the cinema and motion picture exhibition industry. In early 2020, government-mandated shutdowns led to mass theater closures, abruptly cutting off the industry's revenue source. As 2020 progressed, it proved to be a year of unique and unprecedented challenges for cinemas, and the Debtors were no exception. The global health crisis and associated public health and safety measures caused a sharp, industry-wide decline in box office sales, causing stock prices and virtually every key financial metric to crater. In the four months from December 3, 2019, to April 3, 2020, for example, Cineworld Parent's common stock price dropped from 197.95 GBX to 38.76 GBX, erasing 80.4% in shareholder value.

Even as the immediate effects of the COVID-19 pandemic began to subside, the cinema industry and Cineworld continued to experience losses. One key driver was a massive delay in film release and production schedules. Following the reopening of theaters in 2020 after months of closures, after seeing the poor performance of films that proceeded with scheduled release dates, in many instances studios chose to withhold their blockbusters from theatrical release in an effort to preserve revenue pending a broader return of audiences to theaters. These issues were exacerbated by delays in production caused by pandemic restrictions on production sets that set back anticipated release dates by months or years. These massive delays caused a multi-year ripple effect that continues to plague the industry today and was a core driver of the Debtors' liquidity constraints in the lead up to these Chapter 11 Cases.

Further compounding the industry's challenges, the COVID-19 pandemic catalyzed the already-growing influence of streaming, diverting essential cinema revenue towards home entertainment alternatives. Large corporations like Amazon, Apple, Disney, Paramount, and others entered the home entertainment space or expanded their existing offerings and were able to offer studios lucrative deals to release their films directly onto their streaming platforms, either skipping the cinema entirely or significantly shortening the cinema exclusivity window. Shortened cinema exclusivity periods led to decreased revenue. Between 2019 and 2021, the share of the combined theatrical and home/mobile entertainment market attributable cinema dropped from approximately 42% to just 21%.

## B. Additional Difficulties Compounding Cineworld's Challenges.

### 1. Shareholder Appraisal Litigation Stemming from the Regal Acquisition Results in Judgment Against Cineworld.

In 2018, Cineworld acquired Regal, which was publicly traded at the time. Cineworld agreed to pay Regal shareholders $23.00 per share. Over 90% of Regal shareholders approved the transaction, but certain dissenting shareholders (the "Dissenting Shareholders") brought an appraisal action in the Delaware Court of Chancery (the "Delaware Court") claiming that the fair value of Regal was $33.83 per share. Cineworld argued that the fair price was $18.02 per share (deal value of $23 minus synergies, which Cineworld valued at $4.98 per share). The Delaware Court held that the fair value at the time of signing was $23.60 per share based on the deal price of $23.00 minus $3.77 of synergies per share that the Court credited after an analysis of the proffered synergies plus $4.37 per share resulting from the corporate tax reforms. A judgement was entered against Cineworld on May 13, 2021, requiring Cineworld to pay the deal price plus $0.60 per share plus statutory interest to the Dissenting Shareholders.

Following entry of the judgment, in light of Cineworld's ongoing liquidity challenges that rendered immediate payment in full unfeasible, Cineworld engaged in good-faith, arm's length negotiations with the Dissenting Shareholders regarding the terms of a potential settlement agreement. On September 10, 2021, Cineworld announced that it reached a deal with the Dissenting Shareholders (the "Regal Settlement Agreement") pursuant to which Cineworld agreed to pay $170 million of the judgment to the Dissenting Shareholders up front with another $92 million placed into an escrow to be available to Cineworld as

additional liquidity under certain circumstances, and otherwise to be paid to the Dissenting Shareholders no later than March 31, 2022.

In February 2022, Cineworld engaged in further discussions with the Dissenting Shareholders to reschedule the $92 million payment obligations. A deal was reached on February 2, 2022, pursuant to which Cineworld agreed that the remaining obligations would be paid to the Dissenting Shareholders in installments, with a final payment due on June 30, 2022—a three-month extension from the original March deadline.

### 2.   Litigation with Cineplex Over Terminated Arrangement Agreement.

In December 2019, Cineworld and Cineplex, a leading Canadian cinema chain, entered into an Arrangement Agreement pursuant to which Cineworld agreed to acquire Cineplex in exchange for $2.8 billion. The parties agreed that the deal would close before June 30, 2020. On June 5, 2020, however, Cineworld sent Cineplex a notice asserting that Cineplex had defaulted on the Arrangement Agreement because it breached a number of the covenants therein, including by failing to operate in the ordinary course. Litigation ensued in the Ontario Supreme Court of Justice (Commercial List) (the "Canadian Court"). Cineplex claimed the termination was a repudiation of the Arrangement Agreement and argued that it was entitled to damages for Cineworld's purportedly unjustified action. Cineworld denied Cineplex's claims and asserted that Cineplex violated the deal because it operated outside the ordinary course of its business by deferring certain payments and reducing capital expenditures during the pandemic.

After 20 days of hearings, the Canadian Court found in favor of Cineplex, awarding expectation damages in the amount of CAD $1.24 billion and transaction costs of CAD $5.5 million to Cineplex. Cineworld vigorously disagrees with both the Canadian Court's judgment and method of calculation of damages. Cineworld has appealed the judgment, which is currently stayed during these Chapter 11 Cases.[18]

While no payment has been required or made by Cineworld to Cineplex based on the pendency of the appeal, the Canadian Court's judgment has already had a significant negative impact on Cineworld. Among other things, in the lead up to these Chapter 11 Cases, prospective financing sources cited the judgment in refusing to provide the Group with additional liquidity or flexibility.

### C.   The DIP Negotiations.

As further described herein, in August 2022, in light of their increasingly dire liquidity outlook, the Debtors initiated discussions with the DIP Lenders regarding a comprehensive restructuring transaction. Immediately prior to the Petition Date, the Debtors and the DIP Lenders reached an agreement resulting in a $1.935 billion DIP Facility, which provided essential liquidity to the Debtors' estates during the Chapter 11 Cases. As described elsewhere herein, in the weeks leading up to a final hearing on the DIP Facility, the Debtors, the DIP Lenders, and the Creditors' Committee engaged in productive negotiations to resolve the Creditors Committees' concerns and establish an agreed-upon timetable for a marketing process of the Debtors' assets.

### D.   Appointment of the Special Committee.

Prior to the Petition Date, the Debtors appointed Messrs. Gary Begeman, Michael Leffell, and John Dionne, three experienced independent and disinterested directors (collectively, the "Independent Directors"), as independent directors or managers of Crown Finance US and sixty-eight of its direct and

---

[18]   On September 28, 2022, the Court denied Cineplex's *Emergency Motion of Cineplex Inc. to Modify the Automatic Stay* [Docket No. 218] on the record. *See Transcript for Motion Hearing*, at 47 [Docket No. 437].

indirect subsidiaries that have commenced chapter 11 cases (each such entity, a "Designated Subsidiary," and each board thereof, a "Subsidiary Board").  The Independent Directors do not have any relationships that would compromise their impartiality and their compensation is not contingent upon taking or approving any particular action.

The Independent Directors retained and are represented by Willkie Farr & Gallagher LLP ("Willkie") as independent counsel.[19]  On August 31, 2022, each Subsidiary Board established a special committee (each, a "Special Committee" and collectively, the "Special Committees") comprised of the Independent Directors that is vested with the authority to, among other things:

- determine, in the Special Committee's business judgment, whether any matter constitutes a claim held by or against a Designated Subsidiary, on the one hand, and the Designated Subsidiaries or any of their respective affiliates, subsidiaries, directors, managers, officers, major debtholders or controlling equityholders (each a "Related Party," and collectively, the "Related Parties") on the other hand and (b) investigate, prosecute, negotiate, review, settle, and approve any such claims (the "Related Party Claims");

- conduct all investigations and analyses related to any Related Party Claims necessary or desirable in order to be fully advised with regard to such Related Party Claims, in the Special Committee's business judgment, and to act on behalf of each Designated Subsidiary and bind each Designated Subsidiary in connection therewith, including, but not limited to:

  - (a) any investigation into each Designated Subsidiary's past or current cash flow, liquidity, general financial condition, and related financing;

  - (b) any request for documentation and information regarding each Designated Subsidiary's business, assets, properties, liabilities and business dealings;

  - (c) any release or settlement of potential claims or causes of action of each Designated Subsidiary, if any, against that Designated Subsidiary or any of their Related Parties; and

  - (d) any other transaction implicating each Designated Subsidiary in which a Related Party has an interest;

- discuss, negotiate, consider, and review any financing transactions and/or other strategic alternatives for the Designated Subsidiaries and their stakeholders, including the possibilities of undertaking a restructuring, reorganization, and/or other recapitalization transaction involving the Designated Subsidiaries and/or one or more of its subsidiaries and/or affiliates (each of the foregoing and any combination of the foregoing, a "Potential Restructuring Transaction");

- take any and all actions with respect to any review, discussion, negotiation, consideration, deliberation, examination, investigation, analysis, assessment, evaluation, and exploration on behalf of each Designated Subsidiary of the terms and

---

[19]   The Bankruptcy Court approved Willkie's retention application on October 31, 2022.

conditions of any Potential Restructuring Transaction, including, without limitation, to:

- (a) review and evaluate any Potential Restructuring Transaction and consider whether or not it is fair to and in the best interests of each Designated Subsidiary, its subsidiaries, and their respective stakeholders to proceed with a Potential Restructuring Transaction;

- (b) consult with management and each Designated Subsidiary's advisors with respect to discussions and negotiations regarding the terms and conditions of a Potential Restructuring Transaction and other communications regarding any Potential Restructuring Transaction; and

- (c) consider such other matters as may be requested by each Designated Subsidiary or each Subsidiary Board or take such further actions or consider such other matters as it may deem advisable in connection with the foregoing.

Shortly after their appointment, the Independent Directors commenced a multifaceted independent investigation into the Debtors' prepetition history, including their financial condition, financing agreements, corporate governance, and accounting practices, among other things. At the direction of the Independent Directors, Willkie issued ten written document requests to the Debtors via email correspondence in addition to numerous written and verbal requests. Willkie's written document requests covered thirty-five categories of documents related to the various branches of the Independent Directors' investigation. The Debtors provided tens of thousands of documents in response to these requests, including access to documents provided to the Creditors' Committee and to certain of the Prepetition Legacy Term Lenders and Prepetition Priming Facility Lenders. In addition, Willkie and the Independent Directors held numerous meetings with the Debtors and their advisors.

Willkie also interviewed Moshe (Mooky) Greidinger (Chief Executive Officer), Israel Greidinger (Deputy Chief Executive Officer), Nisan Cohen (Chief Financial Officer), Renana Teperberg (Chief Commercial Officer), Nigel Kravitz (General Counsel), Richard Bell (Head of UK & CEE Tax), Michael Aumann (VP, Group Financial Controller), Tal Soudry (VP, US Finance), and the members of Cineworld's Audit Committee. The Special Committees also met with representatives of the Ad Hoc Group and the Creditors' Committee throughout the cases to understand their perspectives and concerns.

To date, the Special Committees have not identified or become aware of, any evidence that would lead the Special Committees to conclude that any Related Party Claims exist. On March 22, 2023, Willkie presented to the Special Committees regarding the Restructuring Support Agreement and related transaction documents, including the proposed Plan releases, and the Special Committees' investigation. Following the presentation and a discussion between the Special Committees and Willkie, the Special Committees unanimously approved the proposed terms of the Restructuring Documents, including the proposed releases, subject to the finalization of the Restructuring Documents. To the extent circumstances require, the Special Committees expressly reserve their right to conduct further inquiries or investigations within the scope of their authority as they deem necessary and will continue to act in accordance with their fiduciary duties.

## VIII.   MATERIAL DEVELOPMENTS AND EVENTS IN THE CHAPTER 11 CASES

### A.   First Day Relief.

Each of the Debtors Filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petitions") on the Petition Date.  Shortly thereafter, the Debtors Filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations by, among other things, easing the strain on the Debtors' relationships with employees, vendors and service providers, and other third parties following the commencement of the Chapter 11 Cases.  A list of each of the First Day Motions is set forth in the Mesterharm First Day Declaration.  Following a hearing held on September 7, 2022, the Bankruptcy Court entered orders approving the First Day Motions on either an interim or final basis, as applicable.  Only the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) 503(B)(9) Claimants, (B) Lien Claimants, (C) Foreign Claimants, (D) Critical Vendors, and (E) HSE Suppliers, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* [Docket No. 57] (the "Vendors Motion") and the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintain Existing Business Forms and Books and Records and (II) Granting Related Relief* [Docket No. 62] (the "Cash Management Motion") were filed on an interim and final basis.

The Bankruptcy Court's first interim order approving the Vendors Motion authorized the Debtors to pay certain vendors in an aggregate amount not to exceed $137.6 million [Docket No. 295].  On October 6, 2022, the Bankruptcy Court entered a second interim order approving the Vendors Motion, authorizing the Debtors to use an additional $20 million with which to pay certain vendors [Docket No. 505].  On October 21, 2022, the Bankruptcy Court entered its final order approving the Vendors Motion, authorizing the Debtors to pay certain vendors in the ordinary course of business in an aggregate amount not to exceed $222 million [Docket No. 571].

The Debtors received certain informal objections to the Cash Management Motion, which the Debtors consensually resolved with the objecting parties.  On November 14, 2022, the Bankruptcy Court entered its final order approving the Cash Management Motion [Docket No. 1000].  The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.ra.kroll.com/cineworld.

### B.   Approval of the DIP Facility.

On the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 52] (the "DIP Motion"), requesting that the Bankruptcy Court approve the DIP Facility.

Pursuant to the DIP Motion, the Debtors requested, among other things, access to: (a) $514 million of the DIP Facility on an interim basis to be used for working capital needs during the pendency of these Chapter 11 Cases; (b) $271 million to effectuate the purchase of the RoW Facility by Debtor Busby AssignCo, LLC; and (c) $1.0 billion to effectuate the refinancing of the Prepetition Priming Facility. Following comments on the record from the Bankruptcy Court, the Debtors, the DIP Agent, and the DIP Lenders agreed to amend the proposed Interim DIP Order.  The entered Interim DIP Order provided that the Priming Loan Refinancing Amount would be placed into an escrow account under the control of the DIP

Lenders and, upon entry of a final order approving the DIP Facility, would be used to effectuate the Priming Loan Refinancing. Subject to the terms of the Interim DIP Order, the Priming Loan Refinancing Amount would be repayable to the DIP Lenders if the Debtors reached agreement on an alternative debtor-in-possession financing facility with an alternative lender on more favorable terms than the existing DIP Facility. On September 8, 2022, the Bankruptcy Court entered the Interim DIP Order approving the DIP Motion on interim basis.

On September 28, 2022, the Debtors received an alternative debtor-in-possession financing proposal from a group of potential lenders represented by White & Case LLP (such lenders, the "Alternative DIP Lenders"). The Debtors and their advisors carefully considered the proposal provided by the Alternative DIP Lenders and engaged in substantive communications with White & Case LLP. However, following these discussions, the Alternative DIP Lenders withdrew their proposal.

In the weeks leading up to the final hearing on the DIP Facility, the Debtors received a number of formal and informal objections from parties in interest, including the Creditors' Committee. Among other concerns, the Creditors Committee and certain of the Debtors' landlords sought to establish a formal marketing process for the Debtors' business (but excluding an acquisition of Cineworld Parent itself) on an expedited timeline, and to ensure that "stub rent" would be paid during the duration of these chapter 11 cases. Following hard-fought, arm's-length negotiations, the Debtors, the DIP Lenders, and the Creditors' Committee reached a deal which established an agreed-upon timetable for the Debtors' Marketing Process and provided for the payment of certain stub rent prior to the Debtors' emergence from chapter 11. Accordingly, the Debtors proceeded to the October 31, 2022 hearing on an uncontested basis, and the Bankruptcy Court entered the Final DIP Order.

### C.        Appointment of Official Committee of Unsecured Creditors.

The official committee of unsecured creditors (the "Creditors' Committee") was appointed on September 23, 2022 to represent the interests of unsecured creditors in these Chapter 11 Cases [Docket No. 419]. The Creditors' Committee selected Weil, Gotshal & Manges LLP and Pachulski Stang Ziehl & Jones LLP to serve as its legal counsel, FTI Consulting to serve as financial advisor, and Perella Weinberg Partners to serve as investment banker. The Creditors' Committee currently consists of ten members: Cineplex Inc., Bank of New York Mellon, Paramount Pictures Corporation, Simon Property Group, Inc., Pepsico Sales, Inc., CJ 4Dplex Americas, LLC and CJ 4Dplex Co Ltd., Land Securities Properties Limited, EPR Properties (and its affiliates), Realty Income Corporation, and Intertrust Technologies Corporation.

### D.        Retention of the Debtors' Professionals.

To assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed applications requesting that the Bankruptcy Court authorize the Debtors to retain and employ the following advisors pursuant to sections 327 and 328 of the Bankruptcy Code: (a) Kirkland & Ellis, LLP and Kirkland & Ellis International, LLP, as counsel to the Debtors; (b) Jackson Walker LLP, as co-counsel and conflicts counsel to the Debtors; (c) PJT, as investment banker to the Debtors; (d) AlixPartners, LLP, as restructuring advisor to the Debtors; (e) Slaughter and May, as special corporate counsel to the Debtors; (f) Kramer Levin Naftalis & Frankel LLP, as independent counsel to the Board of Directors of Debtor Cineworld Group plc; (g) Willkie Farr & Gallagher LLP, as counsel to the independent directors of Crown Finance US, Inc.; (h) Ashurst LLP, as special counsel to the Board of Directors of Cineworld Group plc; (i) A&G Realty Partners, LLC, as real estate consultant and advisor to the Debtors; (j) Ernst & Young LLP, as tax services provider to the Debtors; (k) PricewaterhouseCoopers LLP, as audit services provider to the Debtors; and (l) Tran Singh LLP, as special conflicts counsel. Concurrently with the application requesting authorization to retain AlixPartners, LLP, the Debtors sought entry of an order designating James A. Mesterharm, Managing Director of

AlixPartners, LLP, as the Debtors' Chief Restructuring Officer. The Bankruptcy Court entered orders approving the retention of these advisors from October 28, 2022, through January 6, 2023 [Docket Nos. 635–640, 669–672, 723, 1196].

### E.    Schedules of Assets and Liabilities and Statements of Financial Affairs.

On September 7, 2022, the Debtors Filed the *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, (D) Statements of Financial Affairs, and (E) Rule 2015.3 Financial Reports and (II) Granting Related Relief* [Docket No. 24] (the "SOFA Motion"), seeking an extension of the time within which the Debtors must File their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules") until November 7, 2022 for a total of 59 days from the Petition Date. The Bankruptcy Court entered an order granting the relief requested in the SOFA Motion on September 8, 2022 [Docket No. 157]. The Debtors Filed their Schedules on November 7, 2022 [Docket Nos. 761–767, 769–773, 777–902, 904–976].

### F.    Establishment of Claims Bar Dates.

On November 7, 2022, the Bankruptcy Court entered the *Order (I) Re-Establishing the Claims Bar Date, (II) Re-Establishing the Governmental Bar Date, (III) Establishing the Rejection Damages Bar Date and the Amended Schedules Bar Date, (IV) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (V) Approving Notice of Bar Dates* [Docket No. 775] (the "Bar Date Order"), setting bar dates by which certain entities holding Claims against Debtors that arose (or that are deemed to have arisen) prior to the Petition Date must file Proofs of Claim. The Bar Date Order established the following bar dates:

- **Claims Bar Date**: establishing **January 17, 2023, at 5:00 p.m., prevailing Central Time** as the last date and time for each entity to file a Proof of Claim based on a prepetition claim, including requests for payment under section 503(b)(9) of the Bankruptcy Code against any Debtor (the "Claims Bar Date");

- **Governmental Bar Date**: establishing **March 6, 2023 at 5:00 p.m., prevailing Central Time** as the last date and time for each governmental unit to file a Proof of Claim against any Debtor (the "Governmental Bar Date");

- **Rejection Damages Bar Date**: Solely as to claims arising from the Debtors' rejection of executory contracts and unexpired leases, **establishing the later of (a) the Claims Bar Date or the Governmental Bar Date, as applicable, (b) 5:00 p.m., prevailing Central Time, on the date that is thirty (30) days following entry of the order approving such rejection of the applicable executory contract or unexpired lease of the Debtors, and (c) 5:00 p.m., prevailing Central Time, on the date that is thirty (30) days following the effective date of such rejection of the applicable executory contract or unexpired lease of the Debtors** as the last date and time by which each claimant holding a claim based upon such rejection must file a Proof of Claim against any Debtor (the "Rejection Damages Bar Date); and

- **Amended Schedules Bar Date**: In the event that the Debtors amend their Schedules, **establishing the later of (a) the Claims Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m., prevailing Central Time, on the date that is thirty (30) days from the date on which the Debtors serve notice of the amendment to the Schedules, a**s the last date and time by which each claimant holding a claim

affected by such amendment must file a Proof of Claim against any Debtor (such later date, the "Amended Schedules Bar Date").

In accordance with Bankruptcy Rule 3003(c)(2), if any person or entity that is required, but fails, to file a proof of claim on or before the applicable Bar Date: (a) such person or entity may be forever barred, estopped, and enjoined from asserting such Claim against the Debtors (or filing a proof of claim with respect thereto); (b) the Debtors and their property may be forever discharged from any and all indebtedness or liability with respect to or arising from such Claim; (c) such person or entity may not receive any distribution in the Chapter 11 Cases on account of that Claim; and (d) such person or entity may not be permitted to vote on any plan or plans of reorganization for the Debtors on account of these barred Claims or receive further notices regarding such Claim.

G.     **The Restructuring Support Agreement and the Financing Commitment and Backstop Agreement.**

Through the Debtors' efforts to facilitate consensus around the terms of proposed restructuring transactions, the Debtors and Holders of approximately 83 percent of the Legacy Facilities Claims and Holders of approximately 69 percent of the DIP Claims entered into the Restructuring Support Agreement, dated as of April 2, 2023. The Restructuring Support Agreement memorializes such parties' commitment to support the Plan. The Restructuring Support Agreement contains a full "fiduciary out" provision as to each Debtor, which may be exercised if, among other things, a Debtor's fiduciaries determine, pursuant to their fiduciary duties or to applicable Law, to pursue an alternative restructuring transaction as opposed to the Plan.

Also on April 2, 2023, the Debtors and the Capital Raising Parties executed the Financing Commitment and Backstop Agreement. The Financing Commitment and Backstop Agreement is an essential component of the Restructuring Transactions contemplated by the Restructuring Support Agreement and memorialized in the Plan. Specifically, the Financing Commitment and Backstop Agreement ensures that through the commitments of the Capital Raising Parties, on emergence from chapter 11, the Reorganized Debtors will have access to $2.26 billion in capital through the proceeds of the Exit First Lien Facility, the Rights Offering and the Direct Equity Allocation. The Debtors need the liquidity offered by the Financing Commitment and Backstop Agreement in order to fund the distributions under the Plan and operate their business post-emergence.

On April 10, 2023, the Debtors filed the Financing Commitment and Backstop Agreement Motion, by which, among other things, the Debtors sought the Bankruptcy Court's authorization to enter into, and perform all obligations under, the Financing Commitment and Backstop Agreement. A hearing to consider approval of the Financing Commitment and Backstop Agreement Motion is currently scheduled for April 20, 2023.

H.     **The Committee Settlement.**

The Restructuring Support Agreement reflects a global settlement reached between the Debtors, the Ad Hoc Group, and the Creditors' Committee (the "Committee Settlement"). As set forth in greater detail in the Restructuring Support Agreement, the Committee Settlement provides that the Plan will establish the Litigation Trust consisting of (a) $10 million in Cash, (b) all of the Debtors incorporated in the United States' rights, title, and interest in the Estates' claims under the class action lawsuit captioned *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL 1720 (MKB) (JO) (E.D.N.Y.) and under any such similar class action against credit card issuers arising from similar allegations as those set forth in the Interchange Litigation), and (c) $500,000 in Cash for the administration of the Litigation Trust. Holders of General Unsecured Claims shall receive their allocable share of (a) $10

million in Cash and (b) interests in the Litigation Trust representing a right to recovery to (i) the first $5 million of Cash recovered by the Litigation Trust from the Interchange Litigation Claims and (ii) 50% of any Cash recovered in excess of $5 million in connection with such claims.

Pursuant to the Committee Settlement, the Creditors' Committee agreed to support the Plan and the Restructuring Transactions and the releases and exculpation provisions set forth in the Plan.

I.      **RSA Milestones.**

The RSA contains certain milestones in relation to the Chapter 11 Cases that apply unless extended or waived in accordance with the terms of the RSA, including:

(a)   no later than April 3, 2023, the Debtors shall commence a marketing process for a third party to provide a New Money Revolving Credit Facility (which shall be subject to the terms set forth in the Restructuring Term Sheet, the Sponsored Exit First Lien Facility Term Sheet, and, to the extent applicable, the Financing Commitment and Backstop Agreement);

(b)   no later than April 3, 2023, the Debtors, the Required Consenting Creditors and the Required Equity Capital Raising Parties shall have mutually agreed upon a work plan to prepare for any Implementation Mechanisms required to implement the Real Estate Plan, including the estimated budget, timing, scope of work, and steps necessary to initiate such Implementation Mechanisms (if required) as soon as reasonably practicable after May 1, 2023;

(c)   no later than April 10, 2023, the Debtors, the Required Consenting Creditors, and the Required Equity Capital Raising Parties shall have mutually agreed upon an acceptable process for selecting a party to provide screen advertising;

(d)   no later than April 10, 2023, the Debtors shall have filed with the Bankruptcy Court the Plan and related Disclosure Statement and the Financing Commitment and Backstop Agreement Motion;

(e)   no later than 26 days after filing of the Financing Commitment and Backstop Agreement Motion, and subject to the Bankruptcy Court's availability, the Bankruptcy Court shall have entered the Financing Commitment and Backstop Agreement Order;

(f)   no later than April 20, 2023, the Debtors, the Supermajority Consenting Creditors, and the Required Equity Capital Raising Parties shall have jointly determined whether to pursue a Sale Transaction; *provided* that a Sale Transaction will not be pursued if the Supermajority Consenting Creditors have not determined that a Sale Transaction shall be pursued;

(g)   if applicable, not later than April 28, 2023, the Debtors shall have filed a sale motion and bidding procedures motions for a Sale Transaction (which motions and procedures, including dates and deadlines therein, shall be acceptable to the Required Consenting Creditors and the Required Equity Capital Raising Parties) (the "Sale and Bidding Procedures Motion");[20]

(h)   no later than May 1, 2023, the Debtors, the Required Consenting Creditors and the Required Equity Capital Raising Parties shall have mutually agreed upon (i) any foreign or ancillary proceedings to implement the transactions contemplated in the Restructuring Term Sheet and any other related agreement and (ii) the provisional and estimated budget, timing, and steps necessary

---

[20]   For the avoidance of doubt, a Sale and Bidding Procedures Motion will not be filed if actionable indications of interest are not received in connection with the Debtors' marketing process, as determined by the Debtors in consultation with the Ad Hoc Group and the Creditors' Committee.

to initiate such proceeding(s) and to implement the transactions contemplated in the Restructuring Term Sheet;

(i)    no later than May 1, 2023, the Debtors, the Required Consenting Creditors, and the Required Equity Capital Raising Parties shall have mutually agreed upon whether any Implementation Mechanism is required to implement the Real Estate Plan;

(j)    in the event that the Debtors, the Required Consenting Creditors, and the Required Equity Capital Raising Parties agree that one or more Implementation Mechanism(s) is required to implement the Real Estate Plan, the relevant Debtors shall initiate such Implementation Mechanism(s) as soon as reasonably practicable after May 1, 2023 and by no later than May 15, 2023 (which date may be extended by agreement between the Company Parties, the Required Consenting Creditors, and the Required Equity Capital Raising Parties, acting in good faith);

(k)    (i) no later than the earlier of (A) June 15, 2023 and (B) ten Business Days prior to the Confirmation Date (the earlier of clause (A) and (B) being referred to herein as the "RSA 2022 Crown UK Audited Financial Statement Delivery Date"), the Debtors shall deliver to the Consenting Creditors the audited consolidated financial statements of Crown UK and its subsidiaries for the twelve-fiscal-month period ended December 30, 2022 (and, for the avoidance of doubt, such audited consolidated financial statements of Crown UK shall be for the twelve-fiscal-month period ended December 30, 2022, regardless of whether the fiscal year of Cineworld Parent or any of its subsidiaries is changed to a date later than December 30, 2022) and (ii) no later than 150 days after the last day of the fiscal year of Cinema City Holding B.V. ended December 31, 2022, the Debtors shall deliver to the Consenting Creditors audited consolidated financial statements of Cinema City Holding B.V. and its subsidiaries for such 2022 fiscal year; it being agreed that in the case of each of the foregoing clauses (i) and (ii), concurrently with the delivery of such financial statements to the Consenting Creditors, the Company shall make them generally available to the public; provided that such financial statements made generally available to the public shall not be required to include the audit opinion of the relevant auditor in respect thereof in the event such auditor does not consent to allow its audit opinion to be made generally available to the public;

(l)    no later than May 30, 2023 (the "Exit Facility Date"), (i) either (A) the Raised Exit First Lien Facility shall have priced or (B) the Debtors shall have obtained a signed commitment letter in respect of the Raised Exit First Lien Facility, and (ii) all requisite consents for such Raised Exit First Lien Facility as provided for in the RSA (including this Term Sheet) and the Financing Commitment and Backstop Agreement; provided, however, that if the foregoing is not obtained by the Exit Facility Date, then the Exit First Lien Facility shall be the Sponsored Exit First Lien Facility; provided, further, that if (A) prior to the Exit Facility Date, the Debtors, the Required Consenting Creditors, and the Required Equity Capital Raising Parties extend the Confirmation Milestone (as defined below) from the date set forth in this Term Sheet as of the RSA Effective Date and (B) the Supermajority Consenting Creditors have not otherwise determined that the Exit Facility Date should not be extended as of the date by which the extension of the Confirmation Milestone becomes effective, then the Exit Facility Date shall be automatically extended by the number of days equal to the agreed number of days by which the Confirmation  Milestone is so extended;

(m)    if the Debtors, with the consent of the Supermajority Consenting Creditors and the Required Equity Capital Raising Parties, file a Sale and Bidding Procedures Motion:

    1.    a hearing to consider approval of the Sale and Bidding Procedures Motion shall be held not later than May 8, 2023;

61

2. the deadline for bidding under the Bidding Procedures Order shall be a date not later than June 20, 2023;

3. any auction contemplated by the Bidding Procedures Order, if necessary, shall be conducted not later than June 27, 2023; and

4. the sale hearing shall be scheduled for July 3, 2023.

(n) with respect to the Plan and Disclosure Statement:

(a) the hearing on the Disclosure Statement shall occur by May 12, 2023;

(b) an order approving the Disclosure Statement shall be entered by May 15, 2023; and

(o) the Bankruptcy Court shall have entered the Confirmation Order by a date that is no later than July 7, 2023.

No assurances can be made that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors or that certain conditions precedent to the Effective Date will have occurred by the outside date under the Restructuring Support Agreement.

### J.   Marketing Process.

As discussed elsewhere herein, the Debtors, with the assistance of their advisors and in coordination with the Ad Hoc Group and the Creditors' Committee, commenced the first phase of Marketing Process on January 4, 2023 to determine market interest in a value-maximizing acquisition of the Debtors' assets. As discussed elsewhere herein, ahead of the agreed-upon deadline of February 16, 2023 for submission of initial indications of interest, the Debtors received a number of written indications of interest for the sale of some or all of the Debtors' assets. After evaluating the indications of interest received through the first phase of the Marketing Process the Debtors, in conjunction with the Ad Hoc Group, determined that the Marketing Process should continue with a focus on the sale of the RoW Equity. Accordingly, the Debtors and PJT initiated a second phase of the Marketing Process with the goal of eliciting binding bids for the sale of the RoW Equity by the Bid Deadline. If the Debtors and the Required Equity Capital Raising Parties and the Supermajority Consenting Creditors determine to pursue one or more actionable binding bids for the sale of the RoW Equity, the Debtors intend to file a motion seeking to (a) establish bidding procedures and (b) approve entry into a definitive purchase agreement with respect to a sale of the RoW Equity. Please be advised that there is no assurance that any Partial Sale may be completed at all.

If the Debtors, the Required Equity Capital Raising Parties, and the Supermajority Consenting Creditors determine to proceeds with a sale of the RoW Equity, the Debtors expect that the Marketing Process will proceed in accordance with the timetable set forth below.

| DATE | DESCRIPTION |
|---|---|
| April 10, 2023 | Deadline for submission of binding offers to acquire the RoW Equity. |
| On or before April 24, 2023 | Debtors will file a motion seeking to (a) establish bidding procedures and (b) approve entry into a definitive purchase agreement with respect to a sale of the RoW Equity. |
| May 5, 2023 (subject to Court availability) | The Bankruptcy Court will hold a hearing on authorization of the Sale and Bidding Procedures Motion. |

| May 10, 2023[21] | To the extent the Debtors receive multiple actionable final bids for an acquisition of the RoW Equity, the Debtors will conduct an auction. |
| May 12, 2023 (subject to Court availability)[22] | The Bankruptcy Court will hold a hearing on authorization of the Debtors' entry into a definitive purchase agreement for the sale of the RoW Equity. |

### K.  Litigation Matters.

#### 1.  General Litigation.

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

#### 2.  Litigation with Cineplex and Lift-Stay Motion.

As discussed in Article VII.B herein, the Debtors have been engaged in litigation with Cineplex over alleged breaches related to an Arrangement Agreement pursuant to which Cineworld agreed to acquire Cineplex.  On September 9, 2022, Cineplex filed an emergency motion seeking to modify the automatic stay to complete Canadian appellate proceedings [Docket No. 218].  During a hearing held on September 28, 2022, the Bankruptcy Court denied Cineplex's motion on the basis that it was filed prematurely [Docket No. 437].

#### 3.  Litigation with National CineMedia, LLC and Negotiations with Alternative Screen Advertisers.

Debtor Regal CineMedia, Inc. ("RCI") and National CineMedia, LLC ("NCM LLC") are party to that certain Exhibitor Services Agreement, dated as of February 13, 2007, and amended and restated as of December 26, 2013 (as further amended, amended and restated, modified, or otherwise supplemented from time to time, the "NCM ESA") whereby RCI provides NCM LLC exclusive access to RCI's screens and audiences in exchange for NCM LLC's payment of theater access fees and provision of advertising services and content.  As of the Petition Date, the Debtors, through RCI and Debtor Regal Cinemas, Inc. held an approximately 23.7% interest in NCM LLC.

On September 27, 2022, NCM LLC and its sole member manager, National CineMedia, Inc. ("NCMI," and together with NCM LLC, "NCM") filed *National CineMedia, LLC's Emergency Motion for Entry of Interim and Final Orders Granting Adequate Protection Pursuant to 11 U.S.C. §§ 105, 361, and 363* [Docket No. 433] (the "NCM Adequate Protection Motion").  Pursuant to the NCM Adequate Protection Motion, NCM seeks entry of an order providing, among other things, adequate protection with

---

[21]  Date subject to change in accordance with the Sale and Bidding Procedures Motion.

[22]  Date subject to change in accordance with the Sale and Bidding Procedures Motion.

respect to certain purported setoff rights that NCM contends NCM LLC would have in the event the Debtors reject the NCM ESA.  Following negotiations with NCM, on September 28, 2022, the Debtors and NCM entered into a stipulation and agreed order pursuant to which (a) the hearing on the NCM Adequate Protection Motion was continued to a date to be mutually agreed upon by NCM and the Debtors and (b) NCM deposited $2.068 million into an escrow account maintained by a mutually agreed escrow agent.  The escrow amount represented amounts NCM asserted to be outstanding and owed to the Debtors under the NCM ESA as of the date of the stipulation and agreed order.  The Bankruptcy Court entered the stipulation and agreed order on September 29, 2022 [Docket No. 443].  A hearing on the NCM Adequate Protection Motion in the Bankruptcy Court was scheduled for November 28, 2022, but was subsequently adjourned by agreement of the Debtors and NCM [Docket No. 1034].

Following entry of the stipulation and agreed order, the Debtors engaged with NCM on a potential renegotiation of the NCM ESA.  Out of an abundance of caution, in light of the financial condition of NCM and the progress of such negotiations, on October 21, 2022, the Debtors filed *Debtors' Motion for Entry of an Order (I) Authorizing the Rejection of a Certain Exhibitor Services Agreement, and (II) Granting Related Relief* [Docket No. 276] (the "Rejection Motion") seeking Bankruptcy Court authority to reject the NCM ESA.  On November 13, 2022, NCM filed an objection to the Rejection Motion [Docket No. 997], asserting, *inter alia*, that the Rejection Motion may not be granted before resolution of the NCM Adversary and that, if the NCM Adversary is resolved in favor of NCM, there will be no business justification for granting the Rejection Motion.

On October 21, 2022, NCM commenced an adversary proceeding against the Debtors seeking declaratory and injunctive relief from the Bankruptcy Court, *National CineMedia, LLC v. Regal Cinemas, Inc.* (Adv. Proc. 22-03307) [Docket No. 1] (the "NCM Adversary"), generally seeking to enforce exclusivity, non-competition, and non-negotiation provisions of the NCM ESA.  On October 31, 2022, the Debtors commenced an adversary proceeding against NCM seeking to enforce the automatic stay (Adv. Proc. 22-03313) [Docket Nos. 1-2] (the "Cineworld Adversary").  On November 1, 2022, the Bankruptcy Court entered a Temporary Restraining Order against NCM for its attempts to contravene the Debtors' efforts to explore value-maximizing options [Docket No. 7].  On November 14, 2022, by agreement of the parties, the Bankruptcy Court extended the Temporary Restraining Order through November 28, 2022 [Docket No. 20].  On November 28, 2022, the Bankruptcy Court held a status conference where it entered a preliminary injunction (the "Preliminary Injunction"), agreed to by NCM LLC, barring NCM LLC from interfering with the Debtors' negotiations with alternative screen advertising providers.

On December 20, 2022, the Debtors filed an emergency motion seeking authorization to exercise certain contractual redemption rights under that certain Limited Liability Company Operating Agreement of National CineMedia, LLC (as amended, restated, or amended and restated, the "NCM LLCA").  On December 27, 2022, the Court granted that certain *Corrected Order (I) Authorizing the Debtors to Exercise Contractual Redemption Rights and (II) Granting Related Relief* [Docket No. 1166] (the "Share Redemption Order.").  Pursuant to the Share Redemption Order, the Debtors were authorized to redeem their interests in NCM LLC in exchange for shares in National CineMedia, Inc., the publicly-traded member manager of NCM LLC.  Soon after entry of the Share Redemption Order, the Debtors exercised such rights.  Accordingly, the Debtors no longer hold any membership interests in NCM LLC.

The Debtors continue to solicit alternative screen advertising proposals in an effort to restructure their U.S. screen advertising arrangement, for the benefit of their stakeholders.  The Debtors have engaged in advanced negotiations with multiple alternative screen advertising counterparties.  The Debtors hope to file a motion seeking entry into a new screen advertising arrangement in the coming weeks.

4. **Cineworld Cinemas Limited and Picturehouse Cinemas Limited Winding-Up Petitions.**

Cineworld Cinemas Limited ("Cineworld Cinemas") and Picturehouse Cinemas Limited ("Picturehouse Cinemas") are the subjects of winding up petitions served by the landlord of the Picturehouse Central cinema site, London Trocadero (2015) LLP ("London Trocadero"). These winding-up petitions relate to an underlying dispute regarding the requirement to pay rent due under the relevant lease during the COVID-19 lockdown period in the UK, which was decided against Cineworld Cinemas and Picturehouse Cinemas by the English Court of Appeal on July 27, 2022. Picturehouse Cinemas is the tenant under the relevant lease, and Cineworld Cinemas has guaranteed Picturehouse Cinemas' obligations.

Cineworld Cinemas and Picturehouse Cinemas were not able to pay the judgment debt by the relevant deadline and so, in spite of communication between Cineworld Cinemas, Picturehouse Cinemas and their legal advisers and London Trocadero and its legal advisers in the period leading up to this deadline, London Trocadero served winding-up petitions on Cineworld Cinemas and Picturehouse Cinemas on August 25, 2022. In response, Cineworld Cinemas and Picturehouse Cinemas applied for a stay or adjournment of the winding-up petitions until March 31, 2023.

At a hearing on October 5, 2022, the High Court of Justice of England and Wales approved consent orders agreed to by Cineworld Cinemas, Picturehouse Cinemas and London Trocadero to adjourn the hearing of the winding-up petitions until October 31, 2022, being the date originally scheduled for a directions hearing in respect of Cineworld Cinemas' and Picturehouse Cinemas' applications to stay or adjourn the winding-up petitions. Cineworld Cinemas, Picturehouse Cinemas and London Trocadero subsequently agreed to vacate the hearing on October 31, 2022 and obtained an order from the High Court of Justice of England and Wales confirming this on October 26, 2022. The substantive hearing to consider both the winding-up petitions and the stay/adjournment applications is due to take place on July 28, 2023.

## L. Lease Rejections and Optimization.

In the period leading up to the Petition Date, the Debtors analyzed their unexpired U.S. leases to implement a lease optimization strategy consistent with their go-forward business plan, which analysis remains ongoing. The Debtors—which are parties to hundreds of leases for their movie theater locations— have taken critical steps since the onset of COVID-19 to ease the financial burden caused by underperforming theaters—many of which are subject to above-market lease terms. The Debtors' U.S. theater portfolio is a significant contributing factor to their current financial challenges. Primarily due to the impact of deferred rent payments, the Debtors estimate that the average monthly rent obligations per theater increased by almost 30% year-to-date through July 2022 compared to full-year 2019.

In light of the foregoing, the Debtors, with the assistance of their advisors and in conjunction with the Consenting Creditors, have commenced active negotiations with many of the Debtors' landlords to obtain valuable lease concessions that will obviate the need for rejection and enable additional theater sites to remain open. In many cases, such negotiation efforts have been successful, resulting in the execution of favorable lease amendments and significant go-forward savings. In other cases, either as a result of the inability of the parties to reach acceptable terms or where a location is particularly underperforming or otherwise undesirable, the Debtors have determined that, in their business judgment, certain leases are unnecessary and burdensome to the Debtors' estates, and it is in the best interests of their estates to reject those leases.

A summary of the Debtors' lease rejection progress to date is provided below:

- On September 7, 2022, the *Debtors Filed the Debtors' First Omnibus Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases of Non-Residential Real Property and (B) Abandonment of Certain Personal Property, If Any, Each Effective as of the Rejection Date, and (II) Granting Related Relief* [Docket No. 26] (the "First Omnibus Lease Rejection Motion"), seeking authorization to reject twenty unexpired leases for certain U.S. theater sites.  After filing the First Omnibus Lease Rejection Motion, the Debtors subsequently removed two locations from the schedule of rejected theaters to continue ongoing lease negotiations.  On October 21, 2022, the Bankruptcy Court entered an order granting the relief requested in the First Omnibus Lease Rejection Motion [Docket No. 570].[23]

- On September 30, 2022, the Debtors Filed the *Debtors' Second Omnibus Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases of Non-Residential Real Property and (B) Abandonment of Certain Personal Property, If Any, Each Effective As of the Rejection Date, and (II) Granting Related Relief* [Docket No. 468] (the "Second Omnibus Lease Rejection Motion"), seeking authorization to reject six additional unexpired leases for certain U.S. theater sites.  On October 25, 2022, the Bankruptcy Court entered an order rejecting five leases as requested in the Second Omnibus Lease Rejection Motion [Docket No. 594].[24]

- On October 21, 2022, the Debtors filed the *Stipulation and Agreed Order Between the Debtors and Phillips Place Owner, LLC* [Docket No. 579], providing for the agreed termination and rejection of the "Regal Phillips Place" theater as of October 31, 2022.  On October 24, 2022, the Bankruptcy Court entered the stipulation and agreed order [Docket No. 584].

- On November 7, 2022, the Debtors Filed the *Debtors' Third Omnibus Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases of Non-Residential Real Property and (B) Abandonment of Certain Personal Property, If Any, Each Effective as of the Rejection Date, and (II) Granting Related Relief* [Docket No. 759] (the "Third Omnibus Lease Rejection Motion"), seeking authorization to reject twenty additional unexpired leases for certain U.S. theater sites.  On November 29, 2022, the Bankruptcy Court entered an order rejecting an initial five leases from the Third Omnibus Lease Rejection Motion [Docket No. 1059], with the remaining locations subject to ongoing negotiations.  On February 16, 2023, the Bankruptcy Court entered a supplemental order rejecting an additional five leases from the Third Omnibus Lease Rejection Motion [Docket No. 1326]. The Debtors are still negotiating with their landlord counterparties or otherwise assessing their options with respect to the remaining leases that have not been rejected from the Third Omnibus Lease Rejection Motion and expressly reserve all rights to seek entry of one or more supplemental orders rejecting such leases at a later date.

- On December 8, 2022, the Debtors Filed the *Debtors' Fourth Omnibus Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases of Non-Residential Real Property and (B) Abandonment of Certain Personal Property, If Any, Each Effective as of the Rejection Date, and*

---

[23]   An objection to the First Omnibus Lease Rejection Motion was filed by Readco Stonington II, LLC with respect to the "Stonington 10" theater lease [Docket No. 472].  Such objection was subsequently withdrawn [Docket No. 757].  On November 7, 2022, the Bankruptcy Court entered a supplemental order [Docket No. 758] to the First Omnibus Lease Rejection Motion authorizing the rejection of the "Stonington 10" theater lease.

[24]   An objection to the Second Omnibus Lease Rejection Motion was filed by Harrisburg Investors GP, LLC with respect to the "Great Escape Harrisburg Mall Stadium 14" theater lease [Docket No. 540].  After discussions with the objecting party, the Debtors agreed to remove the lease from the rejection schedule.

*(II) Granting Related Relief* [Docket No. 1093] (the "Fourth Omnibus Lease Rejection Motion"), seeking authorization to reject twenty-three additional unexpired leases for certain U.S. theater sites. On February 16, 2022, the Bankruptcy Court entered an order rejecting an initial five leases from the Fourth Omnibus Lease Rejection Motion [Docket No. 1327], with the remaining locations subject to ongoing negotiations. The Debtors are still negotiating with their landlord counterparties or otherwise assessing their options with respect to the remaining leases that have not been rejected from the Fourth Omnibus Lease Rejection Motion and expressly reserve all rights to seek entry of one or more supplemental orders rejecting such leases at a later date.

- On January 17, 2023, the Debtors Filed the *Debtors' Fifth Omnibus Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases of Non-Residential Real Property and (B) Abandonment of Certain Personal Property, If Any, Each Effective as of the Rejection Date, and (II) Granting Related Relief* [Docket No. 1221] (the "Fifth Omnibus Lease Rejection Motion"), seeking authorization to reject thirty-nine additional unexpired leases for certain U.S. theater sites. On February 16, 2022, the Bankruptcy Court entered an order rejecting an initial nine leases from the Fifth Omnibus Lease Rejection Motion [Docket No. 1325], with the remaining locations subject to ongoing negotiations. The Debtors are still negotiating with their landlord counterparties or otherwise assessing their options with respect to the remaining leases that have not been rejected from the Fifth Omnibus Lease Rejection Motion and expressly reserve all rights to seek entry of one or more supplemental orders rejecting such leases at a later date.

- On March 14, 2023, the Debtors Filed the *Debtors' Sixth Omnibus Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases of Non-Residential Real Property and (B) Abandonment of Certain Personal Property, If Any, Each Effective as of the Rejection Date, and (II) Granting Related Relief* [Docket No. 1408] (the "Sixth Omnibus Lease Rejection Motion"), seeking authorization to reject twenty-two additional unexpired leases for certain U.S. theater sites. As of the date hereof, the Debtors have not obtained entry of an order rejecting any of the leases from the Sixth Omnibus Rejection Motion. The Debtors are still negotiating with their landlord counterparties or otherwise assessing their options with respect to the leases from the Sixth Omnibus Lease Rejection Motion and expressly reserve all rights to seek entry of one or more orders rejecting such leases at a later date.

The Debtors, with the assistance of their advisors and in conjunction with the Consenting Creditors, continue to evaluate their lease portfolio and the status of ongoing negotiations with their landlord counterparties and will make decisions regarding the rejection or assumption of their unexpired leases and other executory contracts on a rolling basis during the course of the Chapter 11 Cases, and with respect to unexpired nonresidential real property leases, no later than the 365(d)(4) Deadline (as defined below) and consistent with the terms and conditions set forth in Article VI of the Plan. On December 2, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Extending the Deadline by which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property and (II) Granting Related Relief* [Docket No. 1078], seeking to extend the deadline within which they must choose to assume or reject unexpired nonresidential real property leases pursuant to section 365(d)(4) of the Bankruptcy Code (the "365(d)(4) Deadline"). On December 28, 2022, the Bankruptcy Court entered an order [Docket No. 1171] establishing the earlier of (a) July 5, 2023, and (b) the date of entry of an order confirming a plan as the 365(d)(4) Deadline.

Furthermore, as part of their lease optimization efforts, the Debtors continue to evaluate unique, strategic opportunities to further enhance the value of their lease portfolio. On December 17, 2022, the Debtors filed a motion [Docket No. 1127] seeking authority to enter into a new lease agreement and guaranty for a fully equipped and operational theater in Los Angeles, California. On January 11, 2023, the Bankruptcy Court entered an order [Docket No. 1209] approving the Debtors' entry into such lease.

On March 31, 2023, the Debtors filed a motion [Docket No. 1470] seeking authority to enter into a new lease agreement and guaranty for a fully equipped and operational theater in Pasadena, California. As of the date hereof, such motion remains pending. In each case, and with respect to any other new lease opportunities that might arise during these Chapter 11 Cases, the Debtors determined in their business judgment that such leases were entered into on favorable lease terms and will be value-accretive to their go-forward lease portfolio.

In addition, pursuant to the Restructuring Support Agreement, the Debtors have agreed to the Real Estate Plan for the Debtors' lease portfolio in the United Kingdom. The Real Estate Plan requires that the Debtors and their advisors continue consensual discussions with certain landlords for the Debtors' leases located in the United Kingdom. By May 1, 2023, the Debtors, the Required Consenting Creditors, and the Required Equity Capital Raising Parties shall have mutually agreed whether any Implementation Mechanism (which may include, among others, a UK Restructuring Plan) is necessary to implement the Real Estate Plan. In the event it is determined to initiate an Implementation Mechanism for the Real Estate Plan, under the Restructuring Support Agreement, the Debtors must do so as soon as reasonably practicable after May 1, 2023, and by no later than May 15, 2023, unless otherwise extended.

## M.   Procedural and Administrative Motions and Other Relief.

The Debtors Filed certain additional motions which will further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Interim Compensation Motion: On October 6, 2022, the Debtors Filed the *Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 504] (the "Interim Compensation Motion"). The Interim Compensation Motion sought to establish procedures for the allowance and payment of compensation and reimbursement of expenses for attorneys and other professionals whose retentions are approved by the Bankruptcy Court pursuant to sections 327 or 1103 of the Bankruptcy Code, and who will be required to File applications for allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code. On October 31, 2022, the Bankruptcy Court entered an order granting the relief requested in the Interim Compensation Motion [Docket No. 666].

- Ordinary Course Professionals Motion: On October 6, 2022, the Debtors Filed the *Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 503] (the "OCP Motion"). The OCP Motion sought to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses. On October 31, 2022, the Bankruptcy Court entered an order granting the relief requested in the OCP Motion [Docket No. 668].

- Sales of Estate Assets:

    - On October 20, 2022, the Debtors Filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing (A) the Sale of Certain of the Debtors' Real Property Free and Clean or Liens, Claims, and Encumbrances, and (B) the Debtors to Enter Into and Perform Under the Purchase Agreement and (II) Granting Related Relief* [Docket No. 565], requesting authority to sell certain property located in Union City, Georgia to Garner Group Acquisitions LLC (the "Shannon Sale"). On November 7, 2022, the Bankruptcy Court entered an order authorizing the Shannon Sale [Docket No. 774].

- On November 22, 2022, the Debtors Filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing (A) the Sale of Certain of the Debtors' Real Property Free and Clean or Liens, Claims, and Encumbrances, and (B) the Debtors to Enter Into and Perform Under the Purchase Agreement and (II) Granting Related Relief* [Docket No. 1037], requesting authority to sell certain property located in Morrow, Georgia to Cameron LR Development, LLC (the "Southlake Sale"). On November 30, 2022, the Bankruptcy Court entered an order authorizing the Southlake Sale [Docket No. 1061].

- On December 30, 2022, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing (A) the Sale of Certain of the Debtors' Real Property Free and Clean or Liens, Claims, and Encumbrances, and (B) the Debtors to Enter Into and Perform Under the Purchase Agreement and (II) Granting Related Relief* [Docket No. 1177], requesting authority to sell certain property located in Fort Walton Beach, Florida to Valparaiso Realty Company (the "Sun Plaza Sale"). On January 24, 2023, the Bankruptcy Court entered an order authorizing the Sun Plaza Sale [Docket No. 1236].

- Plan Exclusivity: On January 5, 2023, the Bankruptcy Court entered an order extending the Debtors' exclusive period to file a chapter 11 plan to April 5, 2023, and to solicit acceptances thereof to June 5, 2023 [Docket No. 1192]. On April 5, 2023, the Bankruptcy Court entered an order further extending such periods to June 5, 2023, and August 4, 2023, respectively [Docket No. 1490].

- Removal of Actions: On December 19, 2022, the Bankruptcy Court entered an order extended the period in which the Debtors may seek removal of actions pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027 through and including April 5, 2023. On April 5, 2023, the Bankruptcy Court entered an order further extending such period through and including July 5, 2023 [Docket No. 1489].

### N.    Corporate Structure Upon Emergence.

Except as otherwise provided in the Plan or the Plan Supplement or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous governing documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous governing documents) are amended under the Plan or otherwise, in each case, consistent with the Plan, and to the extent such document is amended in accordance therewith, such documents are deemed to be amended pursuant to the Plan and require no further action or approval. On or prior to the Effective Date, Reorganized Cineworld Parent will become the new holding company of the Reorganized Debtors and Cineworld Parent and Cineworld Funding will not be part of the corporate structure of the Reorganized Debtors upon the Effective Date.

After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## IX.    RISK FACTORS.

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not

be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

**THE DEBTORS HAVE PROVIDED THE FOLLOWING RISK FACTOR DESCRIPTIONS TO SATISFY THE DISCLOSURE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE. DISCLOSURE AND DISCUSSION OF ADDITIONAL RISK FACTORS RELATED TO THE DEBTORS' BUSINESS MAY BE FOUND IN PUBLICLY AVAILABLE SECURITIES FILINGS, INCLUDING IN CINEWORLD PARENT'S ANNUAL REPORT AND ACCOUNTS 2021, AVAILABLE AT CINEWORLD PARENT'S WEBSITE, WWW.CINEWORLDPLC.COM.**

A.    **Bankruptcy Law Considerations.**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.    **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.    **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent, which may include the completion of Implementation Mechanism(s) in jurisdictions outside the United States. If such conditions precedent are not waived or not met, the Effective Date will not take place.

3.    **The Conditions Precedent to Consummation of the Capital Raise May Not Occur.**

As more fully set forth in the Rights Offering Documents, Exit First Lien Facility Documents, and, to the extent applicable, the New Money Revolving Credit Facility Documents, the Capital Raise is subject to a number of conditions precedent. If these conditions precedent are not satisfied or waived, one or more parts of the Capital Raise may not be consummated, and because consummation of each part of the Capital raise is itself a condition precedent to the Effective Date, the Effective Date may not take place.

4.    **The Debtors May Fail to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests as those proposed in

the Plan.  As such, the most likely outcome is that the Debtors would liquidate under chapter 7 of the Bankruptcy Code and/or similar equivalent bankruptcy processes in other jurisdictions.  In any event, the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates or Holders of Claims than the Plan.

5.      **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Interests and Allowed Claims would ultimately receive.  As such, the most likely outcome is that the Debtors would liquidate under chapter 7 of the Bankruptcy Code and/or similar equivalent bankruptcy processes in other jurisdictions.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class of Allowed Claims or Allowed Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

6.      **Nonconsensual Confirmation.**

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

7.      **Continued Risk upon Confirmation.**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, and increasing expenses.  See Article IX.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Business."  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Further, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

8.      **The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, would be generated during the

liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

9. **The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

10. **Risk that the Implementation Mechanisms in England and Wales May Not Be Approved.**

To implement the Restructuring Transactions (which is a condition precedent to the Effective Date), one or more Implementation Mechanisms will be required in England and Wales.  While the Debtors are confident that they will determine and pursue the best available path with respect to the Implementation Mechanisms, there is a risk associated with implementation, which may affect the Debtors' ability to effectuate their reorganization.  Such risks include, without limitation, (i) if a UK Restructuring Plan is proposed by Cineworld Parent, the court of competent jurisdiction in England and Wales may not sanction the UK Restructuring Plan or (ii) that if an Administration is pursued, a court of competent jurisdiction in England and Wales may not order the appointment of administrators in respect of the Cineworld Parent (albeit that administrators may also be appointed without an order of such court).

11. **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

12. **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

13. **Risk that Foreign Courts Will Not Enforce the Confirmation Order.**

After the Effective Date, the Reorganized Debtors will maintain business operations in certain Non-U.S. jurisdictions, including the United Kingdom, where many of the Debtors are incorporated. Additionally, implementation of the Plan and the Restructuring Transactions contemplated thereunder may require certain actions to be taken by and/or with respect to certain of the Debtors or Reorganized Debtors incorporated in certain foreign jurisdictions, including in England and Wales.  There is a risk that the courts

in these jurisdictions will not enforce the Confirmation Order, which may affect the Reorganized Debtors' ability to effectuate certain relief granted pursuant to the Confirmation Order.

14.    **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganization efforts and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions.  The Plan's release and exculpation provisions are an inextricable component of the Plan and the significant deleveraging and financial benefits that they embody.

B.    **Risks Related to Recoveries Under the Plan.**

1.    **The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results.**

The Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections attached hereto as **Exhibit C** represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.  If the Debtors do not achieve their projected financial results, the value of the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

2.    **The Distributable New Common Stock is Subject to Dilution.**

The ownership percentage represented by the Distributable New Common Stock will be subject to dilution by the shares of New Common Stock issued pursuant to the Management Incentive Plan, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares, or other securities that may be issued substantially concurrently with or after the Effective Date.

3.    **Certain Tax Implications of the Plan.**

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement, entitled "Certain United States Federal Income Tax and U.K. Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of certain Claims.

4.        **The Debtors May Not Be Able to Accurately Report Their Financial Results.**

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting that may be required upon the registration of the New Common Stock with the SEC under SEC rules and regulations (or similar rules and regulations in other applicable jurisdictions) and the terms of the agreements governing the Debtors' indebtedness and securities.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.  Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' business, results of operations, and financial condition.

5.        **A Liquid Trading Market for the Shares of the New Common Stock May Not Develop.**

The New Common Stock will be a new issuance of securities, and there is no established trading market for the New Common Stock. The Reorganized Debtors do not intend to apply to list the New Common on a recognized U.S. securities exchange (or comparable non-U.S. securities exchange) on or about the Effective Date. Although the Reorganized Debtors may apply to list the New Common Stock on a recognized securities exchange in the future, the Debtors make no assurance that they will be able to obtain such a registration or listing for the New Common Stock in the future. Even if the Debtors do, a liquid trading markets for shares of New Common Stock may not develop. The liquidity of any market for shares of the New Common Stock will depend upon, among other things, the number of holders of shares of the New Common Stock, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that an active trading market for the New Common Stock will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell the New Common Stock may be substantially limited and the price for shares of the New Common Stock may decline or may be considered unfavorable.  You may be required to bear the financial risk of your ownership of the New Common Stock indefinitely.

6. **The Trading Price for the Shares of the New Common Stock May Be Depressed Following the Effective Date.**

On the Effective Date, it is expected that Reorganized Cineworld Parent will issue the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and Premium Shares as well as potentially shares of New Common Stock issued pursuant to the Management Incentive Plan, including Emergence Awards. Following the Effective Date, shares of the New Common Stock may be sold to satisfy withholding tax requirements, to the extent necessary to fund such requirements. In addition, Holders of the New Common Stock may seek to sell such securities in an effort to obtain liquidity. These sales and the volume of the New Common Stock available for trading could cause the trading price for the shares of the New Common Stock to be depressed, particularly in the absence of an established trading market for the New Common Stock.

7. **Restricted Securities Issued under the Plan May Not be Resold or Otherwise Transferred Unless They Are Registered under the Securities Act or an Exemption from Registration Applies.**

To the extent that securities issued pursuant to the Plan (including the Distributable New Common Stock) are not covered by section 1145 of the Bankruptcy Code, such securities shall be issued in reliance upon the exemption from registration set forth in Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act), subject to any other applicable securities Laws. Any securities issued pursuant to Section 4(a)(2) under the Securities Act, including certain shares of the New Common Stock (including the Rights Offering Shares, the Direct Allocation Shares, the RO Backstop Shares and the Premium Shares as well as the Distributable New Common Stock, with respect to any issuances of such shares that may not be issued in reliance on section 1145 of the Bankruptcy Code), and the Subscription Rights, will be deemed "restricted securities" (as defined under the Securities Act and the rules promulgated thereunder) that may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be entitled to have their restricted securities registered under the Securities Act and may not resell them except in accordance with an available exemption from registration under the Securities Act. Under Rule 144 of the Securities Act, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144. A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period. Such current public information is not expected to be available on or about the Effective Date. An affiliate may resell restricted securities after a six-month holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. In any event, holders of restricted securities may be required to hold their restricted securities for at least one year and potentially indefinitely.

Whether any particular person would be an underwriter or an affiliate would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors make no representation concerning the ability of a person to dispose of the Securities issued under the Plan. Persons who receive Securities under the Plan are urged to consult their own legal advisor with respect to the restrictions applicable under the federal, state, or non-U.S. securities laws and the circumstances under which securities may be sold in reliance on such laws.

8.      **Certain Holders of the New Common Stock May be Restricted in their Ability to Transfer or Sell their Securities.**

To the extent that the New Common Stock issued under the Plan may be issued pursuant to section 1145(a)(1) of the Bankruptcy Code (including the Distributable New Common Stock, to the extent such exemption is permitted and available for such Distributable New Common Stock), such securities may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; *provided*, *however*, shares of such New Common Stock may not be freely resold under the Securities Act if, at the time of transfer, the Holder is an "affiliate", as defined in Rule 144(a)(1), of the Reorganized Debtors, or has been such an "affiliate" within 90 days of such transfer. Further, resales by Holders of Claims or Interests (as applicable) who receive such securities pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such holders would only be permitted to sell such securities without registration under the Securities Act if they can comply with an applicable exemption from registration under the Securities Act. For the avoidance of doubt, the Rights Offering Shares, Direct Allocation Shares, the RO Backstop Shares and the Premium Shares will not be issued in reliance of section 1145(a)(1) of the Bankruptcy Code.

To the extent that the New Common Stock (including the Rights Offering Shares, the Direct Allocation Shares, the RO Backstop Shares and the Premium Shares) is issued pursuant to Section 4(a)(2) under the Securities Act (or another exemption from registration), such securities will be deemed "restricted securities" (as defined under the Securities Act and the rules promulgated thereunder). Such securities may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. In addition, the New Common Stock is not expected to be registered under any local or state securities Laws. The Debtors make no representation regarding the right of any holder of Subscription Rights or New Common Stock (including the Distributable New Common Stock, the Rights Offering Shares, the Direct Allocation Shares, the RO Backstop Shares and the Premium Shares) to freely transfer or resell the Subscription Rights or the New Common Stock (including the Distributable New Common Stock, the Rights Offering Shares, the Direct Allocation Shares, the RO Backstop Shares and the Premium Shares). Resale restrictions and other restrictions on transfer are discussed in more detail in the Rights Offering Documents and in Article XI of this Disclosure Statement, entitled "Certain Securities Law Matters." Further, the New Organizational Documents and, with respect to the Capital Raising Parties, the Financing Commitment and Backstop Agreement also may impose certain restrictions on transfer of the New Common Stock.

9.      **The Rights and Responsibilities of Holders of the New Common Stock Are to Be Governed Largely by Non-U.S. Law.**

The rights and responsibilities of Holders of the New Common Stock will be governed largely by the law of a non-U.S. jurisdiction and differ in some respects from the rights and responsibilities of shareholders for a company incorporated in the United States. The Holders of the New Common Stock may have more difficulty in protecting their interests in the face of actions by Reorganized Cineworld Parent's board of directors than if Reorganized Cineworld Parent were incorporated in the United States.

10.     **Because Reorganized Cineworld Parent Is Expected To Be Incorporated Under the Laws of a Jurisdiction Other Than the United States, Holders of the New Common Stock May Face Difficulty Protecting Their Interests, and Their Ability to Protect Their Rights Through Other International Courts, Including the Courts of the United States, May Be Limited.**

Reorganized Cineworld Parent is expected to be incorporated under the laws of a non-U.S. jurisdiction, and, as a result, it may be difficult for investors to effect service of process within the United States upon Reorganized Cineworld Parent or to enforce both in the United States and outside the United States judgments against it obtained in the United States courts in any action, including actions predicated upon the civil liability provisions of the federal securities laws of the United States.  In addition, a majority of Reorganized Cineworld Parent's directors may be residents of jurisdictions other than the United States, and all or a substantial portion of the assets of those Persons may be located outside the United States.  As a result, it may be difficult for investors to effect service of process within the United States on certain of these directors or to enforce against them judgments obtain in the United States courts, including judgments predicated upon the civil liability provisions of the federal securities laws of the United States.  There is uncertainty as to whether the legal systems of any non-U.S. jurisdiction would (a) enforce judgments of the United States courts obtained against Reorganized Cineworld Parent predicated upon the civil liability provisions of the federal securities laws of the United States or (b) entertain original actions brought in such a non-U.S. jurisdiction against Reorganized Cineworld Parent predicated upon the federal securities laws of the United States.

C.     **Risks Related to the Debtors' and the Reorganized Debtors' Business.**

1.     **The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.**

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit First Lien Facility upon emergence.

2.     **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  the (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' business and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3.      **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business.**

The Debtors' future results will depend upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Further, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

4.      **Financial Results May Be Volatile and May Not Reflect Historical Trends.**

The Financial Projections attached hereto as **<u>Exhibit C</u>** are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the New Common Stock and the ability of the Debtors to make payments with respect to their indebtedness. Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract and lease terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result,

the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.  In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Lastly, the business plan was developed by the Debtors with the assistance of their advisors.  There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan.  Any deviations from the Debtors' existing business plan would necessarily cause a deviation.

5.      **The Debtors' Substantial Liquidity Needs May Impact Revenue.**

The Debtors operate in a capital-intensive industry.  If the Debtors' cash flow from operations remains depressed or decreases, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources.  In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases.  The Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things:  (a) their ability to comply with the terms and condition of the DIP Orders; (b) their ability to maintain adequate cash on hand; (c) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (d) the cost, duration, and outcome of the Chapter 11 Cases.  In the event that cash on hand, cash flow from operations, and cash provided through access to cash collateral are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing.  The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms.  The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all.  In addition, the Debtors' ability to consummate the Plan is dependent on, among other things, their ability to satisfy the conditions precedent to the Exit First Lien Facility.  The Debtors can provide no assurance that such conditions will be satisfied.  The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

6.      **Trading in the Debtors' Securities During the Pendency of the Chapter 11 Cases is Highly Speculative and Poses Substantial Risks.**

Holders of the Interests in Cineworld Parent will not receive any distribution on account of such Interests in Cineworld Parent.  Accordingly, any trading in the Debtors' securities during the pendency of the Chapter 11 Cases is highly speculative and poses substantial risks to purchasers of common stock. In particular, trading prices for Cineworld Parent's ordinary shares are very volatile.  In addition, the Financial

Conduct Authority may seek to suspend the listing of Cineworld Parent, preventing holders of such Interests from trading in the relevant Securities.

7.     **The Debtors' Operations May Be Impacted by the Continuing COVID-19 Pandemic and Its Attendant Effects on the Cinema Industry.**

The COVID-19 pandemic has had and could continue to have a long-lasting and significant impact on the Debtors' business, both in the context of consumer demand for cinema admissions and concessions and the distribution of available films from third-party film producers. The initial impact COVID-19 had on the cinema industry, including the Debtors, has been profound, severely limiting the Debtors' operations and disrupting the motion picture exhibition industry generally. Structural changes to the cinema industry caused by the COVID-19 pandemic may impact the Debtors' operations moving forward. The Debtors' largest source of revenue, ticket sales, still have not returned to pre-pandemic levels. In 2021, the Debtors' revenue, which is largely comprised of box office sales, rebounded from a low of $11.8 billion in 2020 to $21.3 billion. However, this amount is only 50% of the Debtors' pre-pandemic total revenue of $42.3 billion in 2019. The COVID-19 pandemic's impact has been compounded by continued delays in film releases—the number of new feature films in 2020 was just 319, an almost two-thirds decrease from the 860 feature films released in 2019. In 2021, that number increased slightly to 370, but that still represents 57% fewer feature films when compared to 2019. The slowed timeline of film releases is expected to continue into 2023, continuing to impact the Debtors' revenue stream. Furthermore, the COVID-19 pandemic spurred the already-growing influence of streaming services and diverted essential cinema revenue. The continued growth of releasing and viewing films through an internet streaming distribution model is likely to divert further revenue and may compress or negatively alter the "cinematic window," which is the timeframe between a film's release at the cinema and that same film's release through other film delivery methods. Delays, reduced film production targeted for cinemas and trends towards streaming may result in continued impacts on the Debtors' operations and may have a materially adverse effect on the Group's businesses, financial condition, results of operations, and prospects.

8.     **The Debtors Are Exposed to Foreign Currency Exchange Rate Risk that Could Affect Results of Operations and Comparability of Results Between Financial Reporting Periods.**

The Debtors' business operations are subject to risks associated with fluctuations in currency exchange rates. The Reorganized Debtors' expected reporting currency will be U.S. dollars. A large portion of the Debtors' revenue, assets, and liabilities is currently denominated in currencies other than the U.S. dollar, including Pound Sterling, euro, Israeli shekel, Polish złoty, Hungarian forint, Bulgarian lev, Romanian leu, and Czech koruna. Such portion is expected to continue if a sale of RoW Equity does not occur, and a significant portion of the Debtors' revenues, assets, and liabilities will continue to be denominated in Pound Sterling even if a sale of the RoW Equity does not occur. Changes in exchange rates will affect the value of the reported earnings and the value of those assets and liabilities denominated in foreign currencies and may also impact operating expenses where such operating expenses are in a currency other than that currency in which financing is obtained or in which revenue is generated.

9.      **The Performance of the Debtors' Business is Directly Linked to Global Macroeconomic Conditions and Other Factors Outside of the Debtors' Control, Which May Adversely Affect Consumer Confidence and/or Consumer Spending Decisions and Which May Therefore Have a Materially Adverse Effect on the Debtors' Business, Financial Condition, Results of Operations, and Prospects.**

The Debtors operate in the broader leisure industry, which means that their sales and profitability have strong correlation with consumer confidence and consumer discretionary spending.  The prevailing global economic climate, inflation, levels of employment, real disposable income, salaries, wage rates, interest rates, consumer confidence, and consumer perception of economic conditions can all adversely influence customer spending decisions.  While admissions to the Debtors' cinemas have not historically been materially adversely affected by downturns in the global economic climate, there can be no assurance that the foregoing events or factors will not adversely impact admissions levels and the businesses, financial condition, results of operations, and prospects of the Debtors in the future.  Additionally, the COVID-19 pandemic has had, and continues to have, particularly with respect to the cinema industry, a significant impact on consumer sentiment, general economic conditions, and the political climate.  Should economic conditions deteriorate, cost of living pressures accelerate, or political uncertainty increase, customers may choose to reduce their discretionary spending on cinemas, which may have a materially adverse effect on the Group's businesses, financial condition, results of operations, and prospects.

10.      **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.**

In the future, the Reorganized Debtors may become parties to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims or Interests under the Plan.  It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' business and financial stability, however, could be material.

11.      **The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.**

The Debtors' operations are dependent on a relatively small group of key management personnel and a skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  As a result, the Debtors have experienced, and may continue to experience, increased levels of employee attrition.  Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' business and the results of operations.

## X.      CONFIRMATION OF THE PLAN

### A.      The Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan. The Debtors have requested that the Bankruptcy Court schedule the Confirmation Hearing on **May 26,**

**2023, at 8:00 a.m., prevailing Central Time**.  The Confirmation Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to confirmation.  The Debtors have requested that the deadline to object to confirmation be set for **May 23, 2023, at 5:00 p.m. (prevailing Central Time)**.  An objection to confirmation of the Plan must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the requirements set forth in the Disclosure Statement Order so that the objection is actually received on or before the deadline to File such objections as set forth therein.

### B.       Purpose of the Confirmation Hearing.

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

### C.       Confirmation Requirements.

Among the requirements for confirmation of a plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the plan is accepted by all impaired classes of claims or interests,[25] or if rejected by an impaired class, the plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting impaired class; (2) the plan is feasible; and (3) the plan is in the "best interests" of holders of claims or interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

---

[25]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

### D.      Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections").  Creditors and other interested parties should review Article IX of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit C** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### E.      Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each Impaired Class of Claims or Interests accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that actually vote on the Plan cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that actually vote on the Plan cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### F.      Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it, provided that the plan has been accepted by at least one impaired class of claims.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

1. **No Unfair Discrimination.**

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of similarly situated creditors differently without unfairly discriminating against either class.

2. **Fair and Equitable Test.**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receives more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

G.      **Best Interests of Creditors/Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7 on such date.

The Debtors believe that the Plan provides Holders of Allowed Claims and Interests the same or greater recovery as would be achieved if the Debtors were to liquidate under chapter 7 of the Bankruptcy Code.  This belief is based on a number of considerations, including:  (a) that the Debtors' primary assets likely would have to be sold on a piecemeal basis in a chapter 7 liquidation; (b) the additional Administrative Claims that would be incurred if the cases were converted to a chapter 7 along with the other costs associated therewith; and (c) that there would not be a robust market to liquidate the Debtors' assets and services.

The Debtors, with the assistance of their restructuring advisor, AlixPartners, LLP, have prepared an unaudited liquidation analysis, which is attached hereto as **Exhibit E** (the "Liquidation Analysis"), to assist Holders of Claims and Interests in evaluating the Plan.  The Liquidation Analysis compares the projected recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan.  The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.  Further, the Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions as well as legal rulings. Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the Liquidation Analysis.

H.      **Valuation Analysis.**

The Plan provides for Holders of Claims in Class 4 to receive shares of the New Common Stock in the Reorganized Debtors, upon Consummation of the Plan.  Accordingly, PJT performed an analysis of the estimated implied value of the Debtors on a going-concern basis as of [●] (the "Valuation Analysis") at the Debtors' request, which is attached hereto as **Exhibit D**.  Based on the Valuation Analysis, the Reorganized Debtors will have an implied equity value at emergence of approximately $[●] million at the midpoint.

The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken, should be read in conjunction with Article IX of this Disclosure Statement entitled "Risk Factors."  The Valuation Analysis performed by PJT is based on data and information as of [●].  PJT makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

**THE VALUATION ANALYSIS REPRESENTS A HYPOTHETICAL VALUATION OF THE REORGANIZED DEBTORS AND THEIR ASSETS AND BUSINESSES, WHICH ASSUMES THAT THE REORGANIZED DEBTORS CONTINUE AS AN OPERATING BUSINESS IN SUBSTANTIALLY THE SAME CORPORATE STRUCTURE.  THE ESTIMATED VALUE SET FORTH IN THE VALUATION ANALYSIS DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTORS, THEIR SECURITIES OR THEIR ASSETS, WHICH MAY BE MATERIALLY DIFFERENT THAN THE ESTIMATES SET FORTH IN THE VALUATION ANALYSIS.  ACCORDINGLY, SUCH ESTIMATED VALUE IS NOT NECESSARILY INDICATIVE OF THE PRICES AT**

**WHICH ANY SECURITIES OF THE REORGANIZED DEBTORS MAY TRADE AFTER GIVING EFFECT TO THE RESTRUCTURING TRANSACTIONS SET FORTH IN THE PLAN. ANY SUCH PRICES MAY BE MATERIALLY DIFFERENT THAN INDICATED BY THE VALUATION ANALYSIS.**

  **I.**  **Financial Information and Projections.**

  In connection with developing the Plan, the Debtors, with the assistance of their advisors, prepared the Financial Projections for fiscal years 2023 through 2027, which are attached hereto as **Exhibit C**, including management's assumptions related thereto.  For purposes of the Financial Projections, the Debtors have assumed an illustrative emergence date of June 30, 2023.  The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.  The Debtors are unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Financial Projections due to a material change in the Debtors' prospects.

  The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes, and/or a variety of other factors, including the factors listed in this Disclosure Statement. Accordingly, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to significant business, economic, and competitive uncertainties.  Therefore, such projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.  The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement.

  **J.**  **Additional Information Regarding this Disclosure Statement and Plan.**

  If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent, Kroll Restructuring Administration LLC, by emailing cineworldinfo@ra.kroll.com, or by calling (844) 648-5574 (toll free) or +1 845) 295-5705 (international).

  Copies of the Plan and the Disclosure Statement:  (a) are available on the Debtors' restructuring website, free of charge, at https://cases.ra.kroll.com/cineworld; (b) may be obtained upon request of the Debtors' proposed counsel at the address specified above; (c) are on file with the Clerk of the Bankruptcy Court, 4th Floor, 515 Rusk Street, Houston, Texas 77002, where they are available for review between the hours of 8:30 a.m. to 5:00 p.m., prevailing Central Time; and (d) are available for inspection for a fee on PACER at https://ecf.txsb.uscourts.gov.

**XI.**  **CERTAIN SECURITIES LAW MATTERS**

  Except as otherwise provided herein, in the Plan, and in the Plan Supplement, the shares of the New Common Stock issued under the Plan (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares and the Premium Shares) and the Subscription Rights with respect to the Rights Offering will be issued without registration under the Securities Act or any other similar U.S. federal, state, or local Law in reliance upon either (a) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (b) including with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code, pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act), subject to, in each case, other applicable securities Laws.  The Debtors believe the shares of the New Common Stock, the options, or other equity awards (including any New Common Stock underlying such awards) to be issued pursuant to the post-emergence

Management Incentive Plan will be issued pursuant to Section 4(a)(2) under the Securities Act, Regulation D promulgated thereunder and/or another available exemption from registration under the Securities Act, subject to other applicable securities Laws.  In addition, the issuance of shares of the New Common Stock under the Plan will be conducted in reliance upon one or more exemptions from the requirement to publish a prospectus in a Relevant State under the Prospectus Regulation, and therefore any participant that is resident or located in a Relevant State will be required to confirm that they are a qualified investor (as defined in Article 2(e) of the Prospectus Regulation) in order to participate in the Rights Offering.

### A.    Issuance of Securities under the Plan.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local securities laws if three principal requirements are satisfied:  (a) the securities must be offered and sold under a plan of reorganization and must be securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (b) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or "principally" in exchange for such claim or interest and "partly" for cash or property.

The Debtors believe that the issuance of the Distributable New Common Stock should satisfy the requirements of section 1145(a) of the Bankruptcy Code, to the extent permitted and available with respect to any respective Holder, while the issuance of the Subscription Rights, the Rights Offering Shares, the Direct Allocation Shares, the RO Backstop Shares and the Premium Shares will be issued in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act),   subject to other applicable securities Law. No registration statement will be filed under the Securities Act or any local or state securities laws.  Recipients of the New Common Stock (including the Distributable New Common Stock, the Rights Offering Shares, the Direct Allocation Shares, the RO Backstop Shares and the Premium Shares) and the Subscription Rights are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act, any applicable state Blue Sky Law, other local law. As discussed below, the exemptions provided for in section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

### B.    Subsequent Transfers.

#### 1.    Subsequent Transfers After Reorganized Debtors' issuance of Securities pursuant to section 1145 of the Bankruptcy Code.

Subject to the limitations in the New Organization Documents, any Distributable New Common Stock, to the extent that such issuance is exempt under section 1145 of the Bankruptcy Code (collectively, the "Section 1145 Securities"), may be freely transferred in compliance with the Securities Act by recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the Section 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" or an "affiliate" with respect to such securities.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer:"  (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities, and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the

offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the Section 1145 Securities by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, holders of the Section 1145 Securities who are deemed to be "underwriters" may be entitled to resell their Section 1145 Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the Section 1145 Securities would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such Section 1145 Securities and, in turn, whether any Person may freely trade such Section 1145 Securities.

Further, even if issued pursuant section 1145 of the Bankruptcy Code, the Section 1145 Securities may not be freely resold if, at the time of transfer, the Holder is an "affiliate", as defined in Rule 144(a)(1), of the Reorganized Debtors, or has been such an "affiliate" within 90 days of such transfer.

You should confer with your own legal advisors to determine whether or not you are an "underwriter" or an "affiliate."  Affiliate considerations are discussed further below.

> 2. **Subsequent Transfers After Reorganized Debtors' issuance of Securities pursuant to Section 4(a)(2) of the Securities Act.**

Unlike any shares of New Common Stock that may be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, the Rights Offering Shares, the Direct Allocation Shares, the RO Backstop Shares and the Premium Shares as well as the Subscription Rights will be issued in reliance upon Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act) (collectively, "4(a)(2) Securities"), subject to, in each case, other applicable securities Laws. Such 4(a)(2) Securities will be deemed "restricted securities"

that may not be offered, sold, exchanged, assigned, or otherwise transferred under the Securities Act unless they are registered under the Securities Act or an exemption from registration under the Securities Act is available, including under Rule 144 or Rule 144A promulgated under the Securities Act.

Rule 144 provides a limited safe harbor for the resale of restricted securities if certain conditions are met.  These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer.  Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is available certain current public information regarding the issuer, and may sell the securities after a one-year holding period whether or not there is current public information regarding the issuer.  Adequate current public information is available for a reporting issuer if the issuer has filed all periodic reports required under section 13 or 15(d) of the Securities Exchange Act of 1934 (as amended, the "Exchange Act") during the twelve months preceding the sale of the restricted securities.  If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available. It is not expected that Reorganized Cineworld Parent will have adequate current public information on or about the Effective Date.

An affiliate of an issuer that is not subject to the reporting requirements of section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available.  An affiliate must also comply with the volume, manner of sale, and notice requirements of Rule 144.  First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144, or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker.  Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144).  Third, if the amount of securities sold under Rule 144 in any three-month period exceeds 5,000 shares or has an aggregate sale price greater than $50,000, an affiliate must file or cause to be filed with the SEC three copies of a notice of proposed sale on Form 144, and provide a copy to any exchange on which the securities are traded.

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date, assuming certain public information regarding the issuer will not be available.  Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, Holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year and potentially longer. Thereafter, such holders may only sell them in accordance with the applicable requirements of Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

**** 

*Legend*.  Each certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2) Security shall, upon issuance, be stamped or otherwise imprinted with a restrictive legend substantially consistent with the following form:

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], AND SUCH SECURITIES [AND THE COMMON STOCK, IF ANY, ISSUABLE UPON EXERCISE OF SUCH SECURITIES] HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."**

The Reorganized Debtors reserve the right to reasonably require certification, legal opinions, or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. The Reorganized Debtors also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 of the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described above. The Reorganized Debtors reserve the right to include a customary legend for any Securities issued pursuant to section 1145 as well. The Reorganized Debtors reserve the right to stop the transfer of any shares of New Common Stock if such transfer would be prohibited by the New Organizational Documents.

Any persons receiving restricted securities under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT, AND RULE 144 UNDER THE SECURITIES ACT OR OTHER APPLICABLE LOCAL OR STATE LAW, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN, INCLUDING THE RIGHTS OFFERING SHARES, DIRECT ALLOCATION SHARES AND PREMIUM SHARES. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT WITH THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRANSFER SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY TRANSFER, INCLUDING RESELL, SUCH SECURITIES.**

C.     **The New Common Stock & Management Incentive Plan.**

The Confirmation Order shall authorize the board of directors of the Reorganized Debtors to adopt the Management Incentive Plan. Awards issued under the Management Incentive Plan that include the New Common Stock will dilute all of the New Common Stock outstanding. The New Common Stock is also subject to dilution in connection with the conversion of any other options, convertible securities or other securities that may be issued post-emergence.

The New Common Stock of Reorganized Cineworld Parent issued pursuant to the Management Incentive Plan shall be 4(a)(2) Securities (as defined herein) and exempt from any registration requirements under any federal securities laws to the fullest extent permitted by Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or Rule 701 promulgated thereunder.

## XII.   CERTAIN UNITED STATES FEDERAL INCOME TAX AND U.K. TAX CONSEQUENCES OF THE PLAN

### A.   Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors.

#### 1.   Introduction.

The discussion in Sections XII(A) - (E) (the "U.S. Tax Discussion") is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, Reorganized Debtors, and to certain holders of Allowed Claims.  The U.S. Tax Discussion does not address the U.S. federal income tax consequences to holders of Claims or Interests not entitled to vote to accept or reject the Plan or the potential sale of the RoW Equity.

This summary of the U.S. federal income tax consequences of the consummation of the Plan is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained.  The Debtors have not requested and do not intend to request a ruling from the IRS or any other taxing authority regarding any of the other tax consequences of the Plan discussed below.  The U.S. Tax Discussion below is not binding upon the IRS, the courts, or any other tax authority.  No assurance can be given that the IRS or any other tax authority would not assert, or that a court would not sustain, a different position than any position discussed herein.

Unless specifically provided for in the U.S. Tax Discussion, such discussion does not purport to address all aspects of U.S. federal income tax that may be relevant to the Debtors, Reorganized Debtors, or to certain holders of Allowed Claims in light of their individual circumstances.  Such discussion does not address tax issues with respect to such holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax exempt organizations, small business investment companies, non-U.S. taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons using a mark-to-market method of accounting, Persons subject to alternative minimum tax or subject to special accounting rules under section 451(b) of the IRC, holders of Claims that hold 10.0 percent or more of the equity of the Debtors or that will hold 10.0 percent or more of the equity of the Reorganized Debtors after receiving the distributions contemplated by the Plan, holders of Claims who are themselves in bankruptcy, regulated investment companies or funds and those holding, or who will hold, Claims, or the New Common Stock, Exit First Lien Facility or any other consideration to be received under the Plan, as part of a hedge, straddle, conversion, or other integrated transaction).  No aspect of U.S. state, local, estate, or gift, or non-U.S. taxation is addressed in the U.S. Tax Discussion.  Furthermore, this summary assumes that holders of Claims hold only Claims in a single Class and hold such Claims as "capital assets" (within the meaning of section 1221 of the IRC).  This summary does not address any special arrangements or contractual rights that are not being received or entered into in respect of an underlying Claim, including the tax treatment of any backstop fees or similar arrangements (including any ramifications such arrangements may have on the treatment of a Holder under the Plan) or

the treatment of the Sponsored Exit First Lien Facility.  This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

For purposes of the U.S. Tax Discussion, a "U.S. Holder" is a holder of a Claim that is:  (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons has authority to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of the U.S. Tax Discussion, a "Non-U.S. Holder" is any holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or pass-through entity for U.S. federal income tax purposes) is a holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) of such entity generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are holders of Claims or Interest should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The U.S. Tax Discussion assumes that the final Restructuring Transactions as ultimately consummated do not result in a new U.S. parent entity or cause the Reorganized Cineworld Parent to be subject to U.S. federal income tax in connection with an "inversion" under section 7874 of the IRC.  If the final restructuring transactions do result in an inversion under section 7874 of the IRC, then the U.S. federal income tax consequences could materially differ from the following summary, including for holders of Claims, the Debtors and the Reorganized Debtors.

**ACCORDINGLY, THE FOLLOWING SUMMARY ADDRESSING CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  IN ADDITION, ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U. S. FEDERAL, STATE, AND LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

2.      **In General.**

As a general matter, Crown Finance US and its subsidiaries are currently subject to U.S. federal income tax and the Debtors expect that they will continue to be subject to U.S. federal income tax following the Restructuring Transactions.  Crown UK Holdco and Cineworld Parent (the Debtors that are the direct and indirect owners of Crown Finance US) are not currently subject to U.S. federal income tax, and the Debtors expect that such Debtors (and, in the case of Cineworld Parent, any successor thereto) will not be subject to U.S. federal income tax immediately following the Restructuring Transactions, though that conclusion is not free from doubt in light of the U.S. "inversion" rules under section 7874 of the IRC and the Treasury Regulations thereunder.

The following discussion also assumes that the Plan will not be structured as a taxable transaction for U.S. federal income tax purposes with respect to the assets of the U.S. consolidated tax group.  In the event that any transaction (including any transaction resulting from any sale or marketing process) results in a taxable transaction with respect to the assets of the U.S. consolidated tax group, the tax consequences of the Plan to the Debtors and Holders of Claims would be materially different from what is described below.

3.      **Effects of the Restructuring Transactions on Tax Attributes of Debtors.**

(a)      **Preservation of Tax Attributes and Cancellation of Indebtedness Income ("COD Income").**

As a result of the Restructuring Transactions, the U.S. tax attributes of Crown Finance US and its subsidiaries may, depending on certain factors, be reduced by the amount of their COD Income excluded from U.S. federal taxable income under section 108 of the IRC.

In general, absent an exception, a debtor will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, <u>over</u> (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness issued by the debtor, and (iii) the fair market value of any new consideration, in each case, given in satisfaction of such indebtedness at the time of the satisfaction.  Unless an exception or exclusion applies, COD Income constitutes U.S. federal taxable income like any other item of taxable income.

Pursuant to section 108 of the IRC, a debtor is not required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of indebtedness occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC.  In general, the tax attributes of a debtor will be reduced in the following order: (a) net operating losses ("<u>NOLs</u>") and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers (d) capital loss carryovers; (e) tax basis in assets (subject to the Asset Tax Basis Floor, as described below); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.  A debtor with COD Income may elect to first reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC (which can include a reduction in the basis of a partnership interest, but only if the "inside" basis of assets in the partnership are also reduced), though it has not been determined whether the Debtors will make this election.  The reduction in tax attributes occurs only after the taxable income (or loss) for the taxable year of the debt discharge has been determined. Any

excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The aggregate tax basis of Crown Finance US and its subsidiaries in their assets is not required to be reduced below the amount of indebtedness (determined on an entity-by-entity basis) that the relevant entity will be subject to immediately after the cancellation of debt giving rise to COD Income (the "Asset Tax Basis Floor").  Generally, all of an entity's obligations that are treated as debt under general U.S. federal income tax principles (including intercompany debt treated as debt for U.S. federal income tax purposes) are taken into account in determining an entity's Asset Tax Basis Floor.

The exact amount of the COD Income (if any) that will be realized by the Debtors will not be determinable until after the consummation of the Plan.  Accordingly, the Debtors are currently unable to determine the precise effect that the COD Income exclusion rules will have on the U.S. federal income tax attributes of Crown Finance US and its subsidiaries.

### (b) Limitation of NOL Carryforwards and Other Tax Attributes under Sections 382 and 383 of the IRC.

After giving effect to the reduction in tax attributes from excluded COD Income, the ability of Crown Finance US and its subsidiaries to use any tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

### (i) General Sections 382 and 383 Annual Limitations.

Under sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and NOL carryforwards, disallowed business interest carryovers under section 163(j) of the IRC ("163(j) Carryovers"), tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future U.S. federal taxable income generally are subject to an annual limitation.  For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) and deductions recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of sections 382 and 383 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock pursuant to the Plan will result in one or more "ownership changes" of the Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of sections 382 and 383 of the IRC applies.

### (ii) General Section 382 Annual Limitation.

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject (the "382 Limitation") is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the three-calendar-month period ending with the calendar month in which the "ownership change" occurs: 3.04 percent for April, 2023).  The 382 Limitation may be increased, up to the amount of any net unrealized built-in gain (if any) at the time of the ownership change, to the extent that the Debtors

95

recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.[26] Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  The 382 Limitation may apply to a consolidated group which includes members of a prior consolidated group, to both the consolidated group as a whole and also separately to the members that were previously a separate consolidated group, resulting in the simultaneous application of more than one 382 Limitation.  As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

The Debtors face a particularly complicated situation under these rules.  In certain circumstances, a consolidated tax group can be simultaneously subject to the net unrealized built-in gain and net unrealized built-in loss rules.  The Debtors believe that they will be in that situation and, as a result, may face particularly restrictive limitations on the ability to claim certain, but not all, Pre-Change Losses.

Notwithstanding the rules described above, if subsequent to an ownership change, a debtor corporation and its subsidiaries do not continue the debtor corporation's historic business or use a significant portion of its historic business assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero, precluding utilization of the debtor corporation's Pre-Change Losses (other than increases in such limitation for recognized built-in gain).

The rules of section 382 of the IRC are complicated, but an ownership change is expected to occur as a result of the Restructuring Transactions.  If such an ownership change occurs, the ability of Crown Finance US and its subsidiaries to use the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the IRC applies.

### (iii)     Special Bankruptcy Rules.

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOLs, NOL carryforwards, and 163(j) Carryovers will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.  If the Reorganized Debtors were to undergo another "ownership change" after the expiration of this two-year period, the resulting 382 limitation would be determined under the regular rules for ownership changes.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for the 382(l)(5) Exception or the debtor otherwise elects not to utilize

---

[26]   Treasury Regulations have been proposed that would significantly change the application of the rules relating to built-in gains and losses for purposes of computing the 382 Limitation.  However, proposed Treasury Regulations have also been released that would "grandfather" companies that undergo an "ownership change" pursuant to an order entered in a bankruptcy case that was commenced prior to, or within 30 days of, the publication of the finalized new rules in this area.  Accordingly, the Debtors do not expect the proposed Treasury Regulations to apply to them or to the Reorganized Debtors with respect to the "ownership change" that will occur pursuant to the Plan.

the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the 382 Limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule for determining the 382 Limitation, which requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the ownership change.   The 382(l)(6) Exception also differs from the 382(l)(5) Exception because the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period; Further, the debtor may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses.  Rather, the resulting limitation from a subsequent ownership change would be determined under the regular rules for ownership changes.

The Debtors do not currently know whether they are eligible for the 382(l)(5) Exception and, regardless of whether the 382(l)(5) Exception is available, the Reorganized Debtors may decide to affirmatively elect out of the 382(l)(5) Exception so that the 382(l)(6) Exception instead applies.  Whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, though, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if a subsequent "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date.

### 4.  Transfer of Litigation Trust Assets to Litigation Trust.

To the extent the Debtors establish the Litigation Trust, the Litigation Trust may be treated as a "grantor trust" for U.S. federal income tax purposes, to the extent permitted by applicable law, of which the Litigation Trust Beneficiaries would be treated as the grantors and owners thereof.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors believe the Litigation Trust, if formed, should be treated as a "liquidation trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and that the trustee of the Litigation Trust will take such position on the Litigation Trust's U.S. federal income tax return. Under such treatment, any transfer of assets to the Litigation Trust will be deemed to occur, for U.S. federal income purposes, as (a) a first-step transfer of the Litigation Trust Assets to the Litigation Trust Beneficiaries and (b) a second-step transfer by such Holders to the Litigation Trust of such portion of the Litigation Trust Assets in exchange for the Litigation Trust Interests.

No request for a ruling from the IRS will be sought on the classification of the Litigation Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Litigation Trust.  If the IRS were to challenge successfully the classification of the Litigation Trust as a grantor trust, the U.S. federal income tax consequences to the Litigation Trust and the Litigation Trust Beneficiaries could vary from those discussed in the Plan and this U.S. Tax Discussion (including the potential for an entity-level tax).  For example, the IRS could characterize the Litigation Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Litigation Trust Assets to the Litigation Trust, the trustee(s) of the Litigation Trust shall make a good faith valuation of the Litigation Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee of the Litigation Trust, and the Holders of Claims receiving interests in the Litigation Trust shall take consistent positions with respect to the valuation of the Litigation Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income of the Litigation Trust among the Litigation Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all its assets (valued at their tax book value) to the Litigation Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Litigation Trust Assets. The tax book value of the Litigation Trust Assets shall equal their fair market value on the date of the transfer of the Litigation Trust Assets to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Litigation Trust shall in no event be dissolved later than five years from the creation of such Litigation Trust unless the bankruptcy court, upon motion within the six month period prior to the fifth anniversary (or within the six month period prior to the end of an extension period), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Litigation Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Litigation Trust Assets.

The Litigation Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Litigation Trust Assets (e.g., income, gain, loss, deduction and credit), to the extent required by applicable law. Each Litigation Trust Beneficiary holding a beneficial interest in the Litigation Trust will receive a copy of any such information returns and must report on its U.S. federal income tax return its share of all such items. The information provided by the Litigation Trust will pertain to Litigation Trust Beneficiaries who received their interests in the Litigation Trust in connection with the Plan.

Subject to contrary definitive guidance from the IRS or a court of competent jurisdiction (including the receipt by the Litigation Trustee of an IRS private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), the Litigation Trustee may (A) elect to treat any Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for U.S. federal, state and local income tax purposes.

Accordingly, any Disputed Claims Reserve may be subject to tax annually on a separate entity basis on any net income earned with respect to the Litigation Trust Assets in such reserve, and all distributions from such reserve (which distributions will be net of the related expenses of the reserve) will be treated as received by Holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Litigation Trustee and the Litigation Trust Beneficiaries) will be required to report for U.S. federal, state and local income tax purposes consistently with the foregoing. To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, such U.S. Holders should not recognize any gain or loss with respect to such property on the date that the property is so transferred. Instead gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

Subject to the above discussion regarding any Disputed Claims Reserve, the U.S. federal income tax obligations of U.S. Holders with respect to their beneficial interest in the Litigation Trust are not dependent on the Litigation Trust distributing any Cash or other proceeds. Holders of the Allowed Legacy

Facilities Claims will be required to report on their U.S. federal income tax returns their share of the Litigation Trust's items of income, gain, loss, deduction, and credit in the year recognized by the Litigation Trust. This requirement may result in such U.S. Holders being subject to tax on their allocable share of the Litigation Trust's taxable income prior to receiving any cash distributions from the Litigation Trust. In general, except with respect to the Disputed Claims Reserve, a distribution of Cash by the Litigation Trust will not be separately taxable to a holder of a beneficial interest in the Litigation Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Litigation Trust).

Notwithstanding the foregoing, in lieu of establishing a Litigation Trust, subject to the prior written consent of the Creditors' Committee, Required Consenting Creditors and the Required Equity Capital Raising Parties (such consent not to be unreasonably withheld) the Debtors and the Reorganized Debtors, as applicable, may employ other structures to transfer the Litigation Trust Assets (or the economic entitlement thereto) to the Litigation Trust Beneficiaries (including through the distribution of a contingent value right (or an economically-equivalent alternatively-structured instrument)) if the Debtors or the Reorganized Debtors, as applicable, determine that such other structure is necessary or more tax-efficient, taking into account all applicable facts and circumstances, as compared to the establishment of a Litigation Trust and pursuant to the terms described in the Plan. The U.S. federal income tax consequences of any such other structure could differ substantially from that of a Litigation Trust.

### B. Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims Entitled to Vote.

#### 1. Treatment of Debt as a Security.

In certain cases discussed below, the treatment of the consummation of the Plan to U.S. Holders of Allowed Claims will depend on whether a Claim constitutes a "security" of the Debtor issuing consideration in exchange for such a Claim. Neither the IRC nor the Treasury Regulations define the term "security." Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. U.S. Holders should consult their tax advisors regarding the status of their Claims as "securities".

#### 2. U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Legacy Facilities Claims (Class 4).

Pursuant to the Plan, certain U.S. Holders will receive, as consideration in full and final satisfaction of their Allowed Legacy Facilities Claims, their Pro Rata share of: (i) the New Common Stock, (ii) the Subscriptions Rights and (iii) the Legacy Facilities Claims Litigation Trust Interests (or such other equivalent interest).

The contribution of Allowed Legacy Facilities Claims to Reorganized Cineworld Parent or such other applicable new parent company in exchange for New Common Stock is expected to qualify as an exchange under section 351 of the IRC. Accordingly, subject to the discussion below, a U.S. Holder of such a Claim generally should recognize gain, but not loss, for U.S. federal income tax purposes with

respect to such contribution pursuant to sections 351 and 367(a) of the IRC. The amount of any such gain recognized by a U.S. Holder of a Claim who is subject to this treatment should equal the excess of (i) the fair market value of the New Common Stock, the Subscription Rights of the Litigation Trust Assets (or such other equivalent interest) deemed received (as described below) over (ii) such U.S. Holder's adjusted tax basis in the Claims contributed in exchange for such New Common Stock, Subscription Rights and the Litigation Trust Assets deemed received (or such other equivalent interest). Importantly, however, a U.S. Holder of a Claim should be able to avoid current recognition of gain under section 367 of the IRC with respect to the receipt of New Common Stock if the Claims contributed in exchange for New Common Stock are considered "securities" and if such U.S. Holder either (x) owns less than 5 percent of the New Common Stock immediately after the transfer, or (y) if a U.S. Holder owns 5 percent or more of the New Common Stock immediately after the transfer, such U.S. Holder enters into a "gain recognition agreement" that meets the requirements set forth in the Treasury Regulations promulgated under section 367 of the IRC (as long as certain other conditions are met).

Regardless of whether an exception applies with respect to the application of section 367 of the IRC, a U.S. Holder of such Claim should recognize gain (but not loss) with respect to the receipt of Subscription Rights and the fair market value of the Litigation Trust Assets (or such other equivalent interest). Gain (if any) on the Claim shall be recognized in an amount not exceeding the fair market value of such property. This treatment is subject to the discussion below regarding the uncertainty regarding the treatment of the exchange of Claims for Subscription Rights.

Although not free from doubt, the Debtors intend to take the position that a U.S. Holder who receives Subscription Rights and elects to exercise such rights should be treated as purchasing Rights Offering Shares in exchange for its Subscription Rights and the amount of Cash (if any) paid by or on behalf of the U.S. Holder to exercise such rights. Such a purchase should generally be treated as the exercise of an option under general U.S. federal income tax principles, and such U.S. Holder should not recognize income, gain, or loss for U.S. federal income tax purposes when it exercises the Subscription Rights. A U.S. Holder's aggregate tax basis in the Rights Offering Shares should equal the sum of (a) the amount of Cash (if any) paid by or on behalf of the U.S. Holder to exercise the Subscription Rights, plus (b) such U.S. Holder's tax basis in the relevant rights immediately before such rights are exercised. A U.S. Holder's holding period for the Rights Offering Shares received pursuant to such exercise should begin on the day following the Effective Date.

A U.S. Holder that elects not to exercise the rights may be entitled to claim a loss (likely a short-term capital loss) equal to the amount of tax basis allocated to such rights, subject to any limitation on such U.S. Holder's ability to utilize capital losses. U.S. Holders electing not to exercise their rights should consult with their own tax advisors as to the tax consequences of such decision.

As noted above, the foregoing treatment of the Subscription Rights is not free from doubt. A potential alternative characterization could be that Holders of Claims are treated as exchanging a portion of their Claims and cash directly for the Rights Offering Shares. If that characterization applied, the foregoing discussion, and the discussion above regarding the treatment of the exchange of a portion of Claims for, among other things, Subscription Rights, would be different. U.S. Holders of Claims should consult their own tax advisors regarding these matters.

As discussed above, to the extent the Debtors establish the Litigation Trust, the Litigation Trust may be treated as a grantor trust, to the extent permitted by applicable law, of which the Litigation Trust Beneficiaries (including the Holders of the Allowed Legacy Facilities Claims) would be treated as the grantors and owners thereof. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors believe the Litigation Trust, if formed, should be treated as a "liquidation trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and that the trustee of the Litigation Trust will take such position on the Litigation Trust's U.S. federal

income tax return. Under such treatment, any transfer of assets to the Litigation Trust will be deemed to occur, for U.S. federal income tax purposes, as (a) a first-step transfer of the Litigation Trust Assets to the Holders of Allowed Legacy Facilities Claims and other Litigation Trust Beneficiaries and (b) a second-step transfer by such Holders to the Litigation Trust of such portion of the Litigation Trust Assets in exchange for the Litigation Trust Interests.

Holders of the Allowed Legacy Facilities Claims should obtain a tax basis in their Pro Rata share of each of the Litigation Trust Assets equal to the amount of gain recognized with respect to receipt of the Legacy Facilities Claims Litigation Trust Interests, as described above, based on the fair market value of such Holder's Pro Rata share of each of the Litigation Trust Assets as of the date such property is treated as having been distributed to the Holder pursuant to (a) above. The holding period for the beneficial interest in these assets should begin on the day following the Effective Date.

3.   **U.S. Federal Income Tax Consequences to U.S. Holders of Allowed General Unsecured Claims Against the Debtors Other Than Cineworld Parent (Class 5).**

Pursuant to the Plan, in full and final satisfaction of their Allowed General Unsecured Claims against the Debtors other than Cineworld Parent, Holders of such Claims shall receive their Pro Rata share of Cash and the GUC Litigation Trust Interests.

As discussed above, to the extent the Debtors establish the Litigation Trust, the Litigation Trust may be treated as a grantor trust, to the extent permitted by applicable law, of which the Litigation Trust Beneficiaries (including the holders of Allowed General Unsecured Claims) would be treated as the grantors and owners thereof.   Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors believe the Litigation Trust, if formed, should be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and that the trustee of the Litigation Trust will take such position on the Litigation Trust's U.S. federal income tax return. Under such treatment, any transfer of assets to the Litigation Trust will be deemed to occur, for U.S. federal income tax purposes, as (a) a first-step transfer of the Litigation Trust Assets to the Litigation Trust Beneficiaries (including the Holders of Allowed General Unsecured Claims) and (b) a second-step transfer by such Holders to the Litigation Trust of such portion of the Litigation Trust Assets in exchange for the Litigation Trust Interests.

Holders of the Allowed General Unsecured Claims should obtain a tax basis in their Pro Rata share of each of the Litigation Trust Assets equal to the amount of gain recognized with respect to receipt of the GUC Litigation Trust Interests, as described above, based on the fair market value of such Holder's Pro Rata share of each of the Litigation Trust Assets as of the date such property is treated as having been distributed to the Holder pursuant to (a) above. The holding period for the beneficial interest in these assets should begin on the day following the Effective Date.

The Debtors expect that the transactions in which the U.S. Holders of Claims exchange such Claims for Cash will be treated as a fully taxable exchange under section 1001 of the IRC.  A U.S. Holder of a Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the amount of Cash and the fair market value of the Litigation Trust Assets deemed received (or such other equivalent interest) that is not allocable to accrued but unpaid interest and (ii) such U.S. Holder's adjusted tax basis in the Claim exchanged therefor.  A U.S. Holder's adjusted tax basis in its Unsecured Claim exchanged would be equal to the amount paid therefor, increased by any accrued original issue discount ("OID") and any market discount that has been included in such holder's gross income and reduced by any amortizable bond premium previously taken into account.  Assuming a U.S. Holder of a Claim holds such Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding

period in the Claim at the time of the Restructuring Transactions exceeds one year.  The Treatment of accrued interest and market discount is discussed below.

### 4.      Distributions Attributable to Accrued Interest (and OID).

To the extent that any amount received by a U.S. Holder of a Claim exchanged under the Plan is attributable to accrued but untaxed interest (or OID) on the debt instruments constituting the exchanged Claim, such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already included in income by the U.S. Holder).  Conversely, a U.S. Holder of an exchanged Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.  The tax basis of any non-Cash consideration treated as received in satisfaction of accrued but untaxed interest (or OID) should equal the amount of such accrued but untaxed interest (or OID).  The holding period for such non-Cash consideration should begin on the day following the receipt of such property.

The extent to which the consideration received by a U.S. Holder of an exchanged Claim will be attributable to accrued interest on the debt constituting the exchanged Claim is unclear.  Certain legislative history and case law indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest.  The Plan provides that amounts paid to U.S. Holders of Claims will be allocated first to unpaid principal and then to unpaid interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.  U.S. Holders of Claims are urged to consult their tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

### 5.      Market Discount.

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the exchanged Claim.

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of a Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debt instrument was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include such market discount in its income as the market discount accrued).  To the extent that a U.S. Holder exchanged Claims that were acquired by the U.S. Holder with market discount in exchange for other property pursuant to a tax-free or other reorganization transaction (other than a transaction described in section 351 of the IRC) for other property, any market discount that accrued on such exchanged Claims and was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized by the U.S. Holder on the subsequent sale, exchange, redemption, or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged Claim.  Additionally, to the extent that a U.S. Holder exchanged Claims that were acquired by the U.S. Holder with market discount in exchange for other property pursuant to an exchange described in section 351 of the IRC, such U.S. Holder

may be required to recognize gain treated as ordinary income on such exchange to the extent of the accrued but unrecognized market discount with respect to the exchanged Claim.

6.     **Net Investment Income Tax.**

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, interest, dividends, and gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of debt of, and equity interests in, the Debtors and Reorganized Debtors.

7.     **Limitations on Use of Capital Losses.**

A U.S. Holder of a Claim who recognizes capital losses as a result of the exchanges under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 annually ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

8.     **Ownership and Disposition of New Common Stock.**

(a)     **Dividends on New Common Stock.**

Subject to the discussion below regarding the passive foreign investment company ("PFIC") rules, any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the applicable Reorganized Debtors, as determined under U.S. federal income tax principles. Any such dividend income recognized by a U.S. Holder generally will be foreign source income.  Certain qualified dividends received by a U.S. Holder that is a non-corporate taxpayer are taxed at preferential rates. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares.  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.  The Debtors anticipate that dividends will be "qualified dividend income" so long as Reorganized Cineworld Parent or the applicable new parent company (depending on the finalized Plan) (the "Parent Company") remains a U.K. tax resident (regardless of whether it is actually organized in the U.K.) eligible for the benefits of the U.S.-U.K. tax treaty.  If, however, the Reorganized Cineworld Parent or the applicable new parent company is not a U.K. tax resident, it is unclear whether dividends will

constitute "qualified dividend income," which determination would depend on multiple factors. The Debtors currently have not determined the tax residency of Reorganized Cineworld Parent.

Distributions that constitute dividends for U.S. federal income tax purposes which are paid to U.S. Holders that are corporations should not be eligible for the dividends-received deduction generally applicable to U.S. corporations with respect to dividends received from other U.S. corporations.

**(b)**     **Sale, Redemption, or Repurchase of New Common Stock.**

Unless a non-recognition provision of the IRC applies, and subject to the discussion below regarding the PFIC rules, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of New Common Stock received pursuant to the Plan. Any such capital gain recognized by a U.S. Holder generally will be U.S. source income. Such capital gain will be long-term capital gain if at the time of the sale, exchange, redemption, or other taxable disposition, the U.S. Holder held the applicable New Common Stock for more than one year. Long-term capital gains of a non-corporate taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described above. Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on such dispositions of the New Common Stock as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Claim or recognized an ordinary loss on the exchange of its Claim for New Common Stock.

**(c)**     **PFIC Status**

The Cineworld Parent or Reorganized Cineworld Parent would be classified as a PFIC for any taxable year if, after the application of certain look-through rules, either: (1) 75 percent or more of its gross income for such year is "passive income" as defined in the relevant provisions of the IRC, or (2) 50 percent or more of the value of its assets, determined on the basis of a quarterly average, during such year is attributable to assets that produce or are held for the production of passive income. In determining whether the Cineworld Parent or Reorganized Cineworld Parent is a PFIC, such person will be treated as owning its proportionate share of the assets, and earning its proportionate share of the income (which may be reduced in each case by certain intercompany transactions pursuant to reliance upon Proposed Treasury Regulations section 1.1297-2(c)), of any other corporation in which it owns, directly or indirectly, 25 percent or more (by value) of the stock. However, the Cineworld Parent or Reorganized Cineworld Parent's status as a PFIC in any taxable year requires a factual determination that depends on, among other things, the composition of its income, assets, and activities in each year, and can only be made annually after the close of each taxable year. Therefore, there can be no assurance that the Cineworld Parent (or any Reorganized Debtor that is a non-U.S. corporation, including Reorganized Cineworld Parent) will not be classified as a PFIC for the taxable year in which the Restructuring Transactions occur, or for any future taxable year after the Restructuring Transactions. Moreover, the determination of whether the Cineworld Parent or any other Reorganized Debtor that is a non-U.S. corporation, including Reorganized Cineworld Parent will be classified as a PFIC for the taxable year in which the Restructuring Transactions occur or any other year in which the New Common Stock is not publicly traded for the entirety of such year may depend in substantial part on whether such Cineworld Parent or Reorganized Cineworld Parent is classified as a "controlled foreign corporation" (a "CFC") for U.S. federal income tax purposes for those years. The Debtors do not currently know whether the Cineworld Parent or the other Reorganized Debtors which are non-U.S. corporations, including Reorganized Cineworld Parent, will be classified as CFCs for U.S. federal income tax purposes. However, based on certain estimates of the Reorganized Debtors' gross income, the value of their assets, and the adjusted tax basis of their assets (including goodwill), the Debtors do not expect any of the Reorganized Debtors to be considered PFICs for the taxable year in which the Restructuring Transactions occur.

If the Cineworld Parent or Reorganized Cineworld Parent is treated as a PFIC for any taxable year during which a U.S. Holder owns the New Common Stock, the U.S. Holder would be subject to additional U.S. information return filing requirements. Additionally, if the Cineworld Parent or Reorganized Cineworld Parent is treated as a PFIC for any taxable year during which a U.S. Holder owns the New Common Stock, such U.S. Holder may be subject to adverse tax consequences upon a sale, exchange, or other disposition of such New Common Stock, or upon the receipt of distributions in respect of the New Common Stock. Under the "default PFIC regime," in general, an "excess distribution" is any distribution to a U.S. Holder that is greater than 125 percent of the average annual distributions received by the U.S. Holder (including return of capital distributions) during the three preceding taxable years or, if shorter, a U.S. Holder's holding period. If the Cineworld Parent or Reorganized Cineworld Parent is classified as a PFIC for any taxable year during which a U.S. Holder owns the New Common Stock, gains from the sale or other disposition of, and "excess distributions" with respect to, the New Common Stock should be allocated ratably over a U.S. Holder's entire holding period and taxed at the highest ordinary income tax rate in effect for each such taxable year (subject to certain exceptions). Moreover, interest should be charged retroactively at the rate applicable to underpayments of tax (with respect to each such tax year's ratable allocation) through the date of gains from the sale or other disposition of, and "excess distributions" with respect to, the New Common Stock.

The Debtors cannot provide any assurances that they will assist U.S. Holders in determining whether the Cineworld Parent or any Reorganized Debtor, including the Reorganized Cineworld Parent is a PFIC for any taxable year. Additionally, the tax consequences that would apply if the Cineworld Parent or Reorganized Cineworld Parent is classified as a PFIC would also be different from those described above if a U.S. Holder that holds New Common Stock, as applicable, were able to make a valid election to treat the Cineworld Parent or Reorganized Cineworld Parent, as applicable, as a "qualified electing fund" (such election, a "QEF Election"). At this time, the Debtors do not expect to provide U.S. Holders with the information necessary to make and maintain a valid QEF Election and therefore U.S. Holders should assume that a QEF Election will not be available. U.S. Holders should consult their tax advisors about the potential application of the PFIC rules to their ownership of New Common Stock. A U.S. Holder can also avoid certain of the adverse rules described above where a mark-to-market election is available with respect to its New Common Stock, as applicable. The mark-to-market election is only available where the New Common Stock is "marketable." The New Common Stock will be marketable if it is "regularly traded" on a "qualified exchange" or other market within the meaning of applicable Treasury Regulations. The New Common Stock will not be "regularly traded" on a "qualified exchange" for this purpose and therefore, the mark-to-market election would not be available to a U.S. Holder of the New Common Stock if the Cineworld Parent or Reorganized Cineworld Parent becomes a PFIC.

The rules relating to PFICs are extremely complex and U.S. Holders are urged to consult their tax advisors regarding the tax considerations of owning New Common Stock in the event that Cineworld Parent or Reorganized Cineworld Parent is treated as a PFIC during any taxable year during which a U.S. Holder will own New Common Stock.

### C.    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims.

The Debtors do not anticipate that there will be material U.S. federal income tax consequences to Non-U.S. Holders of Claims, because neither Cineworld Parent nor Reorganized Cineworld Parent is domiciled in the United States. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences to such Non-U.S. Holder and the ownership and disposition of non-Cash consideration.

### D.     U.S. Information Reporting and Withholding.

The Debtors, Reorganized Debtors, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements.  The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident.  In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the U.S. federal backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that such number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders of Claims subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

### E.     FATCA.

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or could be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends.  FATCA withholding could apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that were previously scheduled to take effect on January 1, 2019 would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends.  However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final Treasury Regulations become effective.  Nonetheless, there can be no assurance that a similar rule will not go into effect in the future.  Each Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Holder.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS**

CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY U.S. STATE OR LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

     **F.**    **Certain U.K. Tax Consequences of the Plan to the Debtors and the Reorganized Debtors.**

     1.    **Introduction.**

The following discussion is a summary of certain United Kingdom corporation tax consequences of the consummation of the Plan to the Debtors and the Reorganized Debtors. It does not address the U.K. tax consequences to holders of Claims or Interests, whether or not they are entitled to vote to accept or reject the Plan, or the potential sale of the RoW Equity.

The summary set out below is based on current U.K. legislation, case law, and published HM Revenue and Customs ("HMRC") practice (which may not be binding on HMRC), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. No opinion of counsel has been obtained. The Debtors have not requested, and there is no guarantee that they will request, any ruling or clearance from HMRC, or any other taxing authority, regarding any of the tax consequences of the Plan discussed below. The discussion below is not binding upon HMRC, the courts, or any other tax authority. No assurance can be given that HMRC, or any other tax authority, would not assert, or that a court would not sustain, a different position than any position discussed herein. The comments set out in this section are intended as a general guide, and do not constitute tax or legal advice.

Unless specifically provided for in this summary, this discussion does not purport to address all aspects of U.K. tax that may be relevant to the Debtors or the Reorganized Debtors, nor does it purport to be a complete analysis of all tax considerations relating to the Plan. No aspect of non-U.K. taxation, or any U.K. taxation other than U.K. corporation tax, is addressed. This summary does not address any special arrangements or contractual rights that are not being received or entered into in respect of an underlying Claim, including the tax treatment of any backstop fees or similar arrangements (including any ramifications such arrangements may have on the treatment of a Debtor or Reorganized Debtor under the Plan) or the treatment of the Sponsored Exit First Lien Facility, Rights Offering, or Direct Rights Allocation. This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.K. tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY ADDRESSING CERTAIN U.K. TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. IN ADDITION, ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.K. AND NON-U.K. TAX CONSEQUENCES OF THE PLAN.**

     2.    **U.K. Corporation Tax.**

     a.    **Releases and Acquisitions of Liabilities (including Debt).**

A release or partial release of indebtedness or other liabilities (each a "Release") can give rise to a taxable receipt for a U.K. tax resident Debtor (including Cineworld Group plc and Crown UK Holdco Limited) in certain circumstances. However, where such indebtedness represents (or is deemed to represent) a "loan relationship" for U.K. corporation tax purposes, the potential charge to U.K. corporation

tax on such Releases is subject to a wide range of exemptions, including where the Releases happen as part of a statutory insolvency arrangement.

The acquisition of creditor rights in respect of indebtedness (a "**Debt Acquisition**") by a company that is "connected" for the purposes of the "loan relationships" regime with the relevant debtor can also give rise to a taxable receipt for a U.K. tax resident Debtor in certain circumstances.  Where such creditor rights are acquired in an arm's length transaction, and the consideration given by the acquirer for those rights consists only of shares forming part of the ordinary share capital of the acquirer, or a connected company, or an entitlement to such shares, an exception may be available.

A Debt Acquisition by a company that is not connected for the purposes of the loan relationships regime with the relevant debtor, but which, following the Debt Acquisition, becomes so connected with the relevant debtor, can also give rise to a taxable receipt for a U.K. tax resident Debtor in certain circumstances.

It is expected that the Plan will be implemented in such a manner so that any Releases or Debt Acquisitions effected as part of the Plan (including pursuant to an Implementation Mechanism as reflected in the Restructuring Transactions Memorandum) will fall within the scope of an exception or otherwise not give rise to a taxable receipt for the relevant U.K. tax resident Debtor. However, the steps to be taken as part of the Plan have not yet been finalized, and there is no guarantee that any Releases of U.K. tax resident Debtors or Debt Acquisitions of debt owed by such Debtors, as part of the Plan (including pursuant to an Implementation Mechanism as reflected in the Restructuring Transactions Memorandum) will fall within the scope of such exceptions.

### b.   Other U.K. Tax Consequences

The steps to be taken as part of the Plan have not yet been finalized, however it is expected Cineworld Group plc would, amongst other things, directly or indirectly transfer certain of its assets and liabilities to Crown UK HoldCo Limited. Depending on the exact steps taken, and the precise assets and liabilities transferred, this may result in tax charges for Cineworld Group plc and/or Crown UK HoldCo Limited, including in respect of UK corporation tax or U.K. stamp duties.

Additional steps taken as part of the Plan may also result in tax charges for the Debtors or Reorganized Debtors, including in respect of U.K. corporation tax or U.K. stamp duties.

## XIII.   RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: April 10, 2023                                CINEWORLD GROUP PLC


                                                     /s/ James A. Mesterharm
                                                     _____

                                                     James A. Mesterharm
                                                     Chief Restructuring Officer
                                                     CINEWORLD GROUP PLC

**<u>Exhibit A</u>**

**Plan of Reorganization**

Filed at Docket No. 1509

**<u>Exhibit B</u>**

**Restructuring Support Agreement**

Filed at Docket No. 1471

**<u>Exhibit C</u>**

**Financial Projections**

[*To come*]

**Exhibit D**

**Valuation Analysis**

[*To come*]

**<u>Exhibit E</u>**

**Liquidation Analysis**

[*To come*]