**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) | Case No. 22-90168 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR
ENTRY OF AN ORDER (I) AUTHORIZING
ENTRY INTO THE FINANCING COMMITMENT AND
BACKSTOP AGREEMENT, (II) APPROVING THE PAYMENT OF FEES
AND EXPENSES RELATED THERETO, AND (III) GRANTING RELATED RELIEF**

---

**Emergency relief has been requested. Relief is requested not later than 1:30 p.m. (prevailing Central Time) on April 20, 2023.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court (as defined herein) may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on April 20, 2023, at 1:30 p.m. (prevailing Central Time) in Courtroom 404, 4th floor, 515 Rusk Street, Houston, Texas 77002. You may participate in the hearing either in person or by an audio and video connection. Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Isgur's conference room number is 954554. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Isgur's homepage. The meeting code is "Judge Isgur". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Isgur's homepage. Select the case name, complete the required fields and click "Submit" to complete your appearance. requested.**

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/cineworld.  The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is:  8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state as follows in support of this motion (this "<u>Motion</u>"):[2]

## Relief Requested

1.      The Debtors seek entry of an order, substantially in the form attached hereto (the "<u>Financing Commitment and Backstop Agreement Order</u>"): (a) authorizing entry into the Financing Commitment and Backstop Agreement, a copy of which is attached to the *Notice of Entry Into Restructuring Support Agreement, Financing Commitment and Backstop Agreement, and Related Documents* [Docket No. 1471] as <u>Exhibit D</u> (the "<u>Financing Commitment and Backstop Agreement</u>"), (b) authorizing the payment and allowance of the fees and expenses related thereto as administrative expenses, and (c) granting related relief.[3]

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors confirm their consent to the entry of a final order.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a), 363(b), 503(b), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>"), rule 2002 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and

---

[2]     The facts and circumstances supporting this Motion are set forth in (a) the *Declaration of Israel Greidinger, Deputy Chief Executive Officer of Cineworld Group plc, in Support of the Debtors' Chapter 11 Petitions* [Docket No. 19] (the "<u>Greidinger First Day Declaration</u>"*),* and the *Declaration of James A. Mesterharm, Chief Restructuring Officer of Cineworld Group plc, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 80] (together with the Greidinger First Day Declaration, the "<u>First Day Declarations</u>"*),* each incorporated by reference herein.

[3]     In support of this Motion, the Debtors will submit a declaration from PJT Partners LP (the "<u>PJT Declaration</u>").

rule 2002-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "<u>Bankruptcy Local Rules</u>").

## Background

5.      On September 7, 2022, the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Petition Date</u>").

6.      On the Petition Date, the Court entered an order authorizing the joint administration and procedural consolidation of these chapter 11 cases pursuant to rule 1015(b) of the Bankruptcy Rules and rule 1015-1 of the Local Rules [Docket No. 32].   The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On September 23, 2022, the Office of the United States Trustee for the Southern District of Texas (the "<u>U.S. Trustee</u>") appointed an official committee of unsecured creditors (the "<u>Committee</u>") [Docket No. 419].  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

7.      Additional factual background regarding the Debtors, including their business operations, capital structure, and the events leading to the filing of these Chapter 11 Cases, is set forth in detail in the First Day Declarations, which are fully incorporated into this Motion by reference.

## The Financing Commitment and Backstop Agreement

8.      As discussed in greater detail in the Disclosure Statement,[4] during the last several months, the Debtors and their advisors engaged in extensive negotiations with their major creditor constituencies—including the Ad Hoc Group and the Creditors' Committee—on the terms of a comprehensive restructuring that would strengthen the Debtors' balance sheet and help position

---

[4]   "<u>Disclosure Statement</u>" shall mean the *Disclosure Statement Relating to the Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and its Debtor Subsidiaries*, filed contemporaneously herewith.

the Debtors' business for long-term success.   After months of good faith, arm's-length negotiations, on April 2, 2023, these negotiations culminated in the execution of a restructuring support agreement (the "Restructuring Support Agreement")[5] between the Debtors and the Consenting Creditors, including the Ad Hoc Group of lenders holding approximately 83% of the Debtors' outstanding indebtedness under the Legacy Facilities and 69% of the Debtors' outstanding indebtedness under the DIP Facility.

9.      The transactions contemplated in the Restructuring Support Agreement, and memorialized in the Plan (collectively, the "Restructuring Transactions"), will allow the Debtors to emerge from these Chapter 11 Cases as a going concern with a deleveraged capital structure and sufficient liquidity to fund the Debtors' post-emergence business plan.   The Restructuring Transactions include, among other things, a $2.26 billion capital raise (the "Capital Raise"), pursuant to which the Debtors will (a) enter into the Exit First Lien Facility (as defined below) and (b) offer 72.3% of New Common Stock with aggregate gross proceeds equal to $800 million (the "Issued Shares"), 50.00% of which (the "Direct Allocation Shares") will be directly allocated to each Equity Capital Raising Party in accordance with the terms of the Financing Commitment and Backstop Agreement (the "Direct Equity Allocation") in consideration for the commitment of each Equity Capital Raising Party to backstop the Rights Offering (as defined below) pursuant to the Backstop Commitment (as defined below) and the remaining 50.00% of which (the "Rights Offering Shares") will be offered pursuant to a rights offering (the "Rights Offering") for cash to Eligible Participants[6] on a ratable basis based on such holder's amount of Legacy Facilities Claims

---

[5]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Financing Commitment and Backstop Agreement, the Restructuring Support Agreement [Docket No. 1471], or the *Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1509] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"), as applicable.

[6]     As defined in the Financing Commitment and Backstop Agreement, "Eligible Participant" means (a) a holder of record of Legacy Facilities Claims as of the Rights Offering Record Date (as defined in the Rights Offering

relative to the aggregate principal amount of all Legacy Facilities Claims as of the Rights Offering Record Date (as defined in the Rights Offering Procedures). To ensure the success of the Rights Offering and the Direct Equity Allocation, the Equity Capital Raising Parties have agreed to purchase the Direct Allocation Shares and to fully backstop the Rights Offering through their commitment to purchase the RO Backstop Shares, which are the shares of New Common Stock not subscribed for by Eligible Participants in the Rights Offering (the "Backstop Commitment"), pursuant to the terms set forth in the Financing Commitment and Backstop Agreement.

10. The Exit First Lien Facility will be raised through either (a) a comprehensive marketing process conducted by the Debtors and their advisors resulting in a third-party financing on terms acceptable to (i) the Required Equity Capital Raising Parties and the Required Consenting Creditors, if the facility provides for an all-in yield through maturity of at least 250 basis points lower than the Sponsored Exit First Lien Facility (as defined below) or (ii) the Supermajority Equity Capital Raising Parties, as further set forth in the Restructuring Term Sheet (the "Raised Exit First Lien Facility") or (b) the Capital Raising Parties (the "Sponsored Exit First Lien Facility" and, together with the Raised Exit First Lien Facility, the "Exit First Lien Facility") on substantially the terms set forth in the Exit First Lien Facility Term Sheet attached to the Financing Commitment and Backstop Agreement as Exhibit A (the "Financing Term Sheet").

11. As consideration for their agreement to backstop the Rights Offering and undertake the other commitments in the Financing Commitment and Backstop Agreement, the Equity Capital Raising Parties will receive, among other things, a non-refundable premium (the "ERO Backstop

---

Procedures); (b) either (i) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act, (ii) a non-U.S. person as defined under Regulation S under the Securities Act, or (iii) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3), (7), (8), (9), (12) or (13) under the Securities Act; and (c) if such holder of record of a Legacy Facilities Claim is resident, located or has a registered office in any member state of the European Economic Area or the United Kingdom, such holder must be an EU/UK Qualified Investor.

Premium") in an amount equal to 20.00% of the total number of shares of New Common Stock outstanding on the Plan Effective Date after giving effect to the consummation of the transactions contemplated by the Plan, excluding any issuances of New Common Stock pursuant to the Management Incentive Plan (the "ERO Backstop Premium Shares"). Upon consummation of the Restructuring, on the Plan Effective Date, the Equity Capital Raising Parties will receive ERO Backstop Premium Shares as payment of the ERO Backstop Premium, with each Capital Raising Party entitled to receive its Pro Rata share of the ERO Backstop Premium based on its Backstop Final Allocated Percentage as determined in accordance with the Financing Commitment and Backstop Agreement.

12.    As consideration for agreeing to enter into and provide as needed the Sponsored Exit First Lien Facility, the Sponsored Facility Capital Raising Parties will receive a non-refundable premium (the "Exit First Lien Facility Premium") of 7.00% of the total number of shares of New Common Stock outstanding on the Plan Effective Date after giving effect to the consummation of the transactions contemplated by the Plan, excluding any issuances of New Common Stock pursuant to the Management Incentive Plan (the "Exit First Lien Facility Premium Shares"). Upon consummation of the Restructuring on the Plan Effective Date, the Sponsored Facility Capital Raising Parties will receive the Exit First Lien Facility Premium Shares as payment of the Exit First Lien Facility Premium, with each Sponsored Facility Capital Raising Party entitled to receive its Pro Rata share of the Exit First Lien Facility Premium Shares based on its First Lien Final Allocated Percentage.

13.    If the Financing Commitment and Backstop Agreement is terminated under certain circumstances, the ERO Backstop Premium will be paid in cash in an amount equal to $295.00 million and the Exit First Lien Facility Premium will be paid in cash in an amount equal to $103.25 million.

14.     In addition, pursuant to the terms set forth in the Financing Commitment and Backstop Agreement, the Debtors shall pay all reasonable and documented out-of-pocket fees and expenses of the Capital Raising Parties and the Consenting Creditors' Advisors incurred in connection with the negotiation, preparation, and implementation of the Transaction Agreements (the "Expense Reimbursement").  The Debtors are to pay the Expense Reimbursement regardless of whether the transactions contemplated by the Financing Commitment and Backstop Agreement are consummated.

15.     The Financing Commitment and Backstop Agreement also requires the Debtors to indemnify and hold harmless each Capital Raising Party from and against any and all losses, claims, damages, liabilities, costs, and expenses (other than taxes of the Capital Raising Parties) that the Capital Raising Parties may incur arising out of or in connection with the Financing Commitment and Backstop Agreement, subject to certain exceptions (collectively, the "Indemnification Obligations").  The Indemnification Obligations shall apply regardless of the termination of the Financing Commitment and Backstop Agreement or the consummation of any alternative transaction.  The proposed Financing Commitment and Backstop Agreement Order provides that the ERO Backstop Premium, the Exit First Lien Facility Premium, the Expense Reimbursement, and the Indemnification Obligations shall constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code and shall not be subject to setoff, recharacterization, avoidance, or disallowance.

16.     The provisions for the incurrence of the ERO Backstop Premium, the Exit First Lien Facility Premium, the Expense Reimbursement, and the Indemnification Obligations are an integral part of the transactions contemplated by the Financing Commitment and Backstop Agreement and, without these provisions, the Capital Raising Parties would not have entered into the Financing Commitment and Backstop Agreement.

17.     Obtaining approval of the Debtors' entry into the Financing Commitment and Backstop Agreement is a key component of the Restructuring Support Agreement and the global deal contemplated therein, and obtaining authority to satisfy the obligations thereunder is critical to the Debtors' ability to consummate the Rights Offering through the Backstop Commitment and to have the Exit First Lien Facility available and provided.  Additionally, approval of the Debtors' entry into the Financing Commitment and Backstop Agreement is a milestone under the Restructuring Support Agreement.  As such, failure to enter into the Financing Commitment and Backstop Agreement would jeopardize the comprehensive deal that the Debtors secured with stakeholders across their capital structure.

18.     Importantly, the Debtors need the liquidity provided by the Capital Raise to fund Plan payments and operate their business post-emergence.  The Debtors' ability to consummate the Direct Equity Allocation and the Rights Offering and to obtain the Backstop Commitment for the Rights Offering provides significant value to the Debtors' estates as there is no guarantee that the Debtors would be able to secure similarly sized financing commitments at a later point in these cases.  Simply put, without having secured the Direct Equity Allocation and the Backstop Commitment and the ability to enter into the Sponsored Exit First Lien Facility, the Debtors would become subject to the uncertainty and turbulence of the market, a market which has yielded no other viable alternative restructuring transactions.  As such, absent the Direct Equity Allocation and Backstop Commitment and the ability to enter into the Sponsored Exit First Lien Facility, the Debtors would be left without a clear path to confirm a plan of reorganization and exit these Chapter 11 Cases.

19.     With the Direct Equity Allocation, the Backstop Commitment, and the Sponsored Exit First Lien Facility in hand, the Debtors will have assurance that they will obtain the funds necessary to successfully emerge from chapter 11 and continue their business operations post-

8

emergence.  The risk of the Debtors not being able to secure exit funding in the form of debt funding through the Exit First Lien Facility and in the form of equity funding through the Direct Equity Allocation and Rights Offering, significantly outweighs the cost of the ERO Backstop Premium, the Exit First Lien Facility Premium, the Expense Reimbursement, and the Indemnification Obligations.  Entry into the Financing Commitment and Backstop Agreement and incurrence of the ERO Backstop Premium, the Exit First Lien Facility Premium, the Expense Reimbursement, and the Indemnification Obligations will secure the Direct Equity Allocation, the Backstop Commitment, and the Exit First Lien Facility for the benefit of the Debtors' go-forward business and all parties in interest and strengthen the Debtors' prospects of exiting from chapter 11.

20.     The following table summarizes the ERO Backstop Premium, the Exit First Lien Facility Premium, the Expense Reimbursement, and the Indemnification Obligations, and certain other material terms of the Financing Commitment and Backstop Agreement:

| Summary of Principal Terms of the Financing Commitment and Backstop Agreement[7] | |
| --- | --- |
| **The Exit First Lien Facility**<br><br>*See* Financing Commitment and Backstop Agreement § 2.1 | The Debtors will use their reasonable best efforts to commence a comprehensive marketing process acceptable to the Required Equity Capital Raising Parties and the Required Consenting Creditors with respect to the Raised Exit First Lien Facility. The Debtors agree (i) to provide periodic progress reports as well as updates to such reports as and when relevant information is available with respect to the marketing of the Raised Exit First Lien Facility to the Consenting Creditors' Advisors and otherwise keep the Consenting Creditors' Advisors informed in all material respects with respect to such proposed facility, (ii) that the terms of the Raised Exit First Lien Facility must be acceptable in the sole discretion of the Required Equity Capital Raising Parties and the Required Consenting Creditors and (iii) that the Debtors will use their reasonable best efforts to secure the Raised Exit First Lien Facility on such terms as approved by the Required Equity Capital Raising Parties and the Required Consenting Creditors in their sole discretion. A proposed Raised Exit First Lien Facility may be selected instead of the Sponsored Exit First Lien Facility only if (x)(1) such Raised Exit First Lien Facility provides for an all-in yield through maturity, as calculated in a manner acceptable to the Required Consenting Creditors and Required Equity Capital Raising Parties and in good faith by the Debtors using an internal rate of return basis after accounting for all reasonably expected and |

---

[7]   This summary is provided for the Court's convenience and is subject in all respects to the terms of the Financing Commitment and Backstop Agreement.  In the event of any inconsistency or conflict between the terms of this summary and the Financing Commitment and Backstop Agreement, the terms of the Financing Commitment and Backstop Agreement shall control.  All terms capitalized but not defined herein shall have the meanings ascribed to them in the Financing Commitment and Backstop Agreement.

| | |
|---|---|
| | associated fees and expenses of such Raised Exit First Lien Facility, of at least 250 basis points lower than the Sponsored Exit First Lien Facility and (2) the Required Consenting Creditors and Required Equity Capital Raising Parties provide written consent or (y) the Supermajority Equity Capital Raising Parties provide written consent. |
| | If the Debtors fail to obtain a Raised Exit First Lien Facility acceptable (i) to the Required Equity Capital Raising Parties and the Required Consenting Creditors or (ii) the Supermajority Equity Capital Raising Parties, as applicable, on or prior to May 30, 2023 (as such date may be extended in accordance with the Restructuring Term Sheet), the Debtors agree to enter into the Sponsored Exit First Lien Facility (the "Sponsored Exit First Lien Facility Event") and each Sponsored Facility Capital Raising Party commits, on a several and not joint basis, to provide the Sponsored Exit First Lien Facility to the Debtors on the terms set forth on Exhibit A to the Financing Commitment and Backstop Agreement; provided, that, no Capital Raising Party shall be required to provide a commitment with respect to the Sponsored Exit First Lien Facility in excess of its First Lien Final Allocated Amount. |
| **The Direct Equity Allocation; The Rights Offering; The Rights Offering Shares**<br><br>*See* Financing Commitment and Backstop Agreement § 2.2 | In consideration for the commitment of each Equity Capital Raising Party to backstop the Rights Offering pursuant to the Rights Offering Backstop Commitment on the terms and conditions of the Financing Commitment and Backstop Agreement, the Issuer shall conduct the Direct Equity Allocation pursuant to which the Issuer shall issue and sell to each Equity Capital Raising Party, and each Equity Capital Raising Party hereby agrees, severally and not jointly, to purchase from the Issuer, its respective Direct Allocation Shares based on its respective Backstop Final Allocated Percentage at the Closing at the Per Share Subscription Price. |
| | The Company shall conduct the Rights Offering pursuant to and in accordance with the Rights Offering Procedures, the Financing Commitment and Backstop Agreement, the Restructuring Support Agreement and the Plan Solicitation Order, as applicable, in all material respects. |
| | Each (i) Rights Offering Participant that exercises its Subscription Rights to fund Rights Offering Shares, shall be entitled to elect to receive up to its Pro Rata Share of the number of Rights Offering Shares and (ii) Equity Capital Raising Party shall exercise its Subscription Rights to purchase its Pro Rata Share of the number of Rights Offering Shares, in each case, at the Per Share Subscription Price. |
| | If reasonably requested by the Required Equity Capital Raising Parties from time to time prior to the Subscription Expiration Deadline, the Company shall use its commercially reasonable efforts to notify, or use its commercially reasonable efforts to cause the Rights Offering Subscription Agent to notify, within forty-eight (48) hours of receipt of such request by the Company, the Capital Raising Parties of the aggregate number of Subscription Rights known by the Company or the Rights Offering Subscription Agent to have been exercised pursuant to the Rights Offering as of the most recent practicable time before such notification. |
| | The Direct Allocation Shares, Rights Offering Shares, RO Backstop Shares and the Premium Shares issued to the Capital Raising Parties pursuant to the Financing Commitment and Backstop Agreement, will be exempt from the registration requirements of the Securities Act pursuant to Rule 506(b) of Regulation D promulgated under the Securities Act or Section 4(a)(2) of the Securities Act, Regulation S under the Securities Act or another available exemption under the Securities Act. |
| **The Rights Offering Backstop Commitment** | Each Equity Capital Raising Party agrees, severally and neither jointly nor jointly and severally, to purchase, and the Issuer agrees to issue to such Equity Capital Raising Party, on the Closing Date at the Per Share Subscription Price, the number of RO Backstop Shares determined based on such Equity Capital Raising Party's |

| | |
|---|---|
| *See* Financing Commitment and Backstop Agreement §2.3 | Commitment Amount as set forth on such Equity Capital Raising Party's Funding Notice pursuant to Section 2.6 of the Financing Commitment and Backstop Agreement (such obligation to purchase the RO Backstop Shares, the "Rights Offering Backstop Commitment"). |
| **ERO Backstop Premium and Exit First Lien Facility Premium Payable by the Debtors**<br><br>*See* Financing Commitment and Backstop Agreement §§ 3.1–3.2 | Subject to Section 3.2, in consideration for the Rights Offering Backstop Commitments and the other agreements and undertakings of the Equity Capital Raising Parties in respect of the Rights Offering and the Direct Equity Allocation under the Financing Commitment and Backstop Agreement, and pursuant to and in accordance with the Rights Offering Procedures, the Financing Commitment and Backstop Agreement, the Restructuring Support Agreement and the Plan Solicitation Order, the Debtors shall pay or cause to be paid a non-refundable premium (the "ERO Backstop Premium") in the amount of 20.00% of the Total Shares Outstanding (the "ERO Backstop Premium Shares"), payable in accordance with Section 3.2, to the Equity Capital Raising Parties (including any Replacing Capital Raising Party, but excluding any Defaulting Capital Raising Party) or their respective designees, as applicable, based upon each Equity Capital Raising Party's (or Replacing Capital Raising Party's) respective Backstop Final Allocated Percentage at the time such payment is made (as the same may be reduced in accordance with Section 2.4(b)); and<br><br>Subject to Section 3.2, in consideration for the Sponsored Facility Capital Raising Parties agreeing to provide the Direct Financing Allocation, and pursuant to and in accordance with the Financing Commitment and Backstop Agreement, the Restructuring Support Agreement and the Plan Solicitation Order, the Debtors shall pay or cause to be paid a non-refundable premium (the "Exit First Lien Facility Premium") in the amount of 7.00% of the Total Shares Outstanding ("Exit First Lien Facility Premium Shares" and, together with the ERO Backstop Premium Shares, the "Premium Shares"), payable in accordance with Section 3.2, to the Sponsored Facility Capital Raising Parties (including any Replacing Capital Raising Party, but excluding any Defaulting Capital Raising Party) or their respective designees, as applicable, based upon each Sponsored Facility Capital Raising Party's (or Replacing Capital Raising Party's) respective First Lien Final Allocated Percentages at the time such payment is made (as the same may be reduced in accordance with Section 2.4(b)).<br><br>Subject to Section 9.4(b) and Section 9.4(c), the Issuer shall cause the ERO Backstop Premium and the Exit First Lien Facility Premium to be paid to the applicable Capital Raising Parties on (and as a condition to) the Plan Effective Date.<br><br>The ERO Backstop Premium, the Exit First Lien Facility Premium and the Expense Reimbursement shall, pursuant to the Financing Commitment and Backstop Agreement Order, constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code and shall not be subject to set-off, recharacterization, avoidance or disallowance.<br><br>The ERO Backstop Premium and the Exit First Lien Facility Premium shall be fully earned, non-refundable and non-avoidable upon entry of the Financing Commitment and Backstop Agreement Order and shall be paid by the Debtors, free and clear of any withholding or deduction for any applicable Taxes, on the Closing Date. |
| **Expense Reimbursement**<br><br>*See* Financing Commitment and Backstop Agreement § 3.3 | Whether or not the transactions contemplated in the Financing Commitment and Backstop Agreement are consummated, in accordance with and subject to the Financing Commitment and Backstop Agreement Order, the terms and conditions of the existing fee letters between the Debtors and certain advisors to the Capital Raising Parties, including the Consenting Creditors' Advisors, and any applicable provisions of the Plan (which shall govern in the event of any inconsistency), the Debtors agree to pay, in accordance with Section 3.3(b), (i) all reasonable and |

11

| | |
|---|---|
| | documented out-of-pocket fees and expenses (including travel costs and expenses) of the Capital Raising Parties and all of the Consenting Creditors' Advisors incurred on behalf of the Capital Raising Parties in connection with the Chapter 11 Cases and/or the Restructuring Transactions (whether incurred before or after the Petition Date), including the negotiation, preparation and implementation of the Transaction Agreements and the other agreements and transactions contemplated by the Financing Commitment and Backstop Agreement and thereby (the "Advisor Fees") and (ii) any applicable filing or other similar fees required to be paid by the Capital Raising Parties in all applicable jurisdictions (such payment obligations, the "Expense Reimbursement"). The Expense Reimbursement shall, pursuant to the Financing Commitment and Backstop Agreement Order, constitute allowed administrative expenses against each of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code and shall not be subject to set-off, recharacterization, avoidance or disallowance. For the avoidance of doubt, the amount payable pursuant to Section 3.3 shall be determined without duplication of recovery under the Restructuring Support Agreement. |
| | The Expense Reimbursement accrued through the date on which the Financing Commitment and Backstop Agreement Order is entered shall be paid in accordance with the Financing Commitment and Backstop Agreement Order as promptly as reasonably practicable after the date of entry of the Financing Commitment and Backstop Agreement Order. The Expense Reimbursement shall thereafter be payable in accordance with the procedures set forth in the Financing Commitment and Backstop Agreement Order; provided, that the Debtors' final payment shall be made contemporaneously with the Closing or the earlier termination of the Financing Commitment and Backstop Agreement pursuant to Article IX. |
| **Indemnification Obligations**<br><br>*See* Financing Commitment and Backstop Agreement § 8.1 | Following the entry of the Financing Commitment and Backstop Agreement Order, the Company and the other Debtors (the "Indemnifying Parties" and each, an "Indemnifying Party") shall, to the maximum extent permitted by law, jointly and severally, indemnify and hold harmless each Capital Raising Party and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective Representatives and controlling persons (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than any Taxes of the Capital Raising Parties or any other Indemnified Person) arising out of a claim asserted by a third-party (collectively, "Losses") that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with the Financing Commitment and Backstop Agreement, including the Rights Offering Backstop Commitment, the Direct Allocation Amount, the Rights Offering, the Direct Equity Allocation, or the First Lien Allocated Amount, the payment of the ERO Backstop Premium, the Exit First Lien Facility Premium or the use of the proceeds of the Direct Equity Allocation, the Rights Offering or the Exit First Lien Facility, or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, the other Debtors, their respective equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable documented (with such documentation subject to redaction to preserve attorney client and work product privileges) legal or other third-party expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by the Financing Commitment and Backstop Agreement or the Plan are consummated or whether or not the Financing Commitment and Backstop Agreement is terminated; provided, |

| | |
|---|---|
| | that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (a) as to a Defaulting Capital Raising Party, its Related Parties or any Indemnified Person related thereto, caused by a Capital Raising Party Default by such Capital Raising Party, or (b) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the fraud, bad faith or willful misconduct of such Indemnified Person. |
| **Termination**<br><br>*See* Financing Commitment and Backstop Agreement §§ 9.1–9.4, 10.6 | Section 9.1 Consensual Termination. The Financing Commitment and Backstop Agreement may be terminated and the transactions contemplated thereby may be abandoned at any time prior to the Closing Date by mutual written consent of the Debtors and the Required Equity Capital Raising Parties.<br><br>Section 9.2 Automatic Termination. (a) Notwithstanding anything to the contrary in the Financing Commitment and Backstop Agreement, unless and until there is an unstayed Order of the Bankruptcy Court providing that the giving of notice under and/or termination of the Financing Commitment and Backstop Agreement in accordance with its terms is not prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code, and except as otherwise provided in this Section 9.2, at which point the Financing Commitment and Backstop Agreement may be terminated by the Required Equity Capital Raising Parties and the Required Exit Facility Commitment Parties, if such facility is the Sponsored Exit First Lien Facility (such consent not to be unreasonably withheld), as applicable, upon written notice to the Debtors upon the occurrence of any of the following Events (unless otherwise provided herein), the Financing Commitment and Backstop Agreement shall terminate automatically without any further action or notice by any Party at 5:00 p.m., New York City time, on the same date upon the occurrence of any of the following Events; provided, that, the Required Equity Capital Raising Parties and the Required Exit Facility Commitment Parties, if such facility is the Sponsored Exit First Lien Facility (such consent not to be unreasonably withheld), as applicable, may waive such termination or extend any applicable dates in accordance with Section 10.8:<br><br>(i) the Closing Date has not occurred by 11:59 p.m., New York City time, on the Long Stop Date (as it may be extended pursuant to Section 2.4(a)), unless prior thereto the Plan Effective Date occurs and the Direct Allocation and the Rights Offering have been consummated and, if a Sponsored Exit First Lien Facility Event has occurred, the Sponsored Exit Lien Facility shall have been funded; and<br><br>(ii) the Restructuring Support Agreement is terminated as to all parties thereto in accordance with its terms.<br><br>(b) The Financing Commitment and Backstop Agreement may be terminated by the Required Equity Capital Raising Parties, upon written notice to the Company upon the occurrence of any of the following Events, provided, that such Events have not been cured by the Company or the other Debtors by 5:00 p.m., New York City time, on the fifth (5th) Business Day following the receipt of such notice by the Debtors:<br><br>(i) (A) the Company or any of the other Debtors shall have breached any representation, warranty, covenant or other agreement made by the Company or any of the other Debtors in the Financing Commitment and Backstop Agreement or any such representation or warranty shall have become inaccurate and such breach or inaccuracy would, individually or in the aggregate, cause a condition set forth in Section 7.1(j) (Representations and Warranties), Section 7.1(k) (Covenants) or Section 7.1(l) (Material Adverse Effect) not to be satisfied, (B) the Capital Raising Parties shall have delivered written notice of such breach or inaccuracy to the Debtors, (C) notwithstanding anything to the contrary in Section 9.2(b), such breach or inaccuracy is not cured by the Issuer or the Debtors by the tenth (10th) Business Day after receipt of such notice, and (D) as a result of such failure to cure, any condition set forth in Section 7.1(j) (Representations and Warranties), Section |

7.1(j)(i) (Covenants), or Section 7.1(l) (Material Adverse Effect) is not capable of being satisfied; provided, that, the Financing Commitment and Backstop Agreement shall not terminate pursuant to this Section 9.2(b)(i) if (i) the Capital Raising Parties are then in willful or intentional breach of the Financing Commitment and Backstop Agreement or (ii) if one or more Capital Raising Parties making up the Required Equity Capital Raising Parties is then in breach of any representation, warranty, covenant or other agreement hereunder that would result in the failure of any condition set forth in Section 7.3(h) or Section 7.3(i) being satisfied;

(ii) any Law or final and non-appealable Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by the Financing Commitment and Backstop Agreement or the other Transaction Agreements, in each case, on substantially the terms provided for therein, in a way that cannot be remedied in all material respects by the Debtors in a manner satisfactory to the Required Equity Capital Raising Parties (provided, that to the extent inconsistent with the Restructuring Support Agreement or the Financing Commitment and Backstop Agreement, any economic treatment provided thereunder shall be reasonably acceptable to the Debtors and the Required Equity Capital Raising Parties in their sole discretion);

(iii) the Issuer or any Debtor (A) amends or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documents in a manner that is materially inconsistent with the Financing Commitment and Backstop Agreement; (B) suspends or revokes the Transaction Agreements; or (C) publicly announces its intention to take any such action listed in sub-clauses (A) or (B) of this subsection;

(iv) any of the Financing Commitment and Backstop Agreement Order, Plan Solicitation Order or Confirmation Order is terminated, reversed, stayed, dismissed, vacated, or reconsidered, or any such Order is modified or amended after entry with the prior written consent of the Required Equity Capital Raising Parties, the Required Consenting Creditors and the Required Exit Facility Commitment Parties, if the Exit First Lien Facility is the Sponsored Exit First Lien Facility, as applicable, in a manner that prevents or prohibits the consummation of the transactions contemplated by the Financing Commitment and Backstop Agreement or the other Transaction Agreements in each case, on substantially the terms provided for therein, in a way that cannot be remedied in all material respects by the Debtors in a manner satisfactory to the Required Equity Capital Raising Parties, the Required Consenting Creditors and the Required Exit Facility Commitment Parties, if the Exit First Lien Facility is the Sponsored Exit First Lien Facility, as applicable;

(v) the entry of an Order by any court of competent jurisdiction invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the enforceability, priority, or validity of the claims and liens of the Consenting Creditors under the DIP Facility, the Legacy Revolving Facility, or the Legacy Term Loan Facility without the written consent of the Required Equity Capital Raising Parties and the Required Consenting Creditors;

(vi) any of the Orders approving the Financing Commitment and Backstop Agreement, the Restructuring Support Agreement, the Rights Offering Procedures, the Plan or the Disclosure Statement or the Confirmation Order are reversed, stayed, dismissed, vacated or reconsidered or modified or amended without the acquiescence or written consent of the Required Equity Capital Raising Parties, the Required Consenting Creditors and the Required Exit Facility Commitment Parties, if the Exit First Lien Facility is the Sponsored Exit First Lien Facility, as applicable, (and such action has not been reversed or vacated within thirty (30) calendar days after its issuance) in a manner that prevents or prohibits the consummation of the Restructuring Transactions contemplated in the Financing Commitment and Backstop Agreement or any of the Definitive Documents in each case, on

substantially the terms provided for therein, in a way that cannot be remedied in all material respects by the Debtors satisfactory to the Required Equity Capital Raising Parties, the Required Consenting Creditors and the Required Exit Facility Commitment Parties, if the Exit First Lien Facility is the Sponsored Exit First Lien Facility, as applicable;

(vii) the Company or any of the other Debtors files any motion, application or adversary proceeding (or any of the Company or any of the other Debtors supports any such motion, application, or adversary proceeding filed or commenced by any third party) challenging the validity or enforceability, or seeking avoidance or subordination, of the Legacy Facilities Claims, provided, that, in the event that the Financing Commitment and Backstop Agreement is to be terminated by the Required Equity Capital Raising Parties under this subsection upon written notice to the Debtors in accordance with this Section 9.2(b)(vii), the Company or any of the other Debtors shall have until 5:00 p.m., New York City time, on the fifth (5th) Business Day following receipt of such notice to withdraw such motion, application or adversary proceeding or otherwise cure before the Required Equity Capital Raising Parties are permitted to terminate pursuant to this Section 9.2(b)(vii);

(viii) (A) the Bankruptcy Court approves or authorizes an Alternative Restructuring Proposal; or (B) any Debtor enters into any Contract providing for the consummation of any Alternative Restructuring Proposal or files any motion or application seeking authority to propose, join in or participate in the formation of, any actual or proposed Alternative Restructuring Proposal;

(ix) an acceleration of the obligations or termination of commitments under the DIP Facilities; or

(x) any of the Milestones have not been achieved, extended, or waived within three (3) Business Days after the date of such Milestone as set forth in the Restructuring Support Agreement.

Section 9.3 Termination by the Debtors. The Financing Commitment and Backstop Agreement may be terminated by the Debtors upon written notice to each Capital Raising Party upon the occurrence of any of the following Events, subject to the rights of the Debtors to fully and conditionally waive, in writing, on a prospective or retroactive basis the occurrence of such Event:

(a) any Law or final and non-appealable Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by the Financing Commitment and Backstop Agreement or the other Transaction Agreements, in each case, on substantially the terms provided for therein, in a way that cannot be remedied in all material respects by the Debtors in a manner satisfactory to the Required Equity Capital Raising Parties and the Required Exit Facility Commitment Parties, if the Exit First Lien Facility is the Sponsored Exit First Lien Facility (such consent not to be unreasonably withheld), as applicable;

(b) subject to the right of the Capital Raising Parties to arrange a Capital Raising Party Replacement in accordance with Section 2.4(a) (which will be deemed to cure any breach by the replaced Capital Raising Party for purposes of this subsection (b)), (i) any Capital Raising Party shall have breached any representation, warranty, covenant or other agreement made by such Capital Raising Party in the Financing Commitment and Backstop Agreement or any such representation or warranty shall have become inaccurate and such breach or inaccuracy would, individually or in the aggregate, cause a condition set forth in Section 7.3(h) (Representations and Warranties) or Section 7.3(i) (Covenants) not to be satisfied, (ii) the Debtors shall have delivered written notice of such breach or inaccuracy to such Capital Raising Party, (iii) such breach or inaccuracy is not cured by such Capital Raising Party by the tenth (10th) Business Day after receipt of such notice, and (iv) as a result of such

failure to cure, any condition set forth in Section 7.3(h) (Representations and Warranties) or Section 7.3(i) (Covenants) is not capable of being satisfied; provided, that the Debtors shall not have the right to terminate the Financing Commitment and Backstop Agreement pursuant to this Section 9.3(b) if any Debtor is then in willful or intentional breach of the Financing Commitment and Backstop Agreement;

(c) the Financing Commitment and Backstop Agreement Order, Plan Solicitation Order or Confirmation Order is terminated, reversed, stayed, dismissed, vacated, or reconsidered, or any such Order is modified or amended after entry without the prior acquiescence or written consent (not to be unreasonably withheld, conditioned or delayed) of the Debtors in a manner that prevents or prohibits the consummation of the Restructuring Transactions contemplated in the Financing Commitment and Backstop Agreement or any of the Definitive Documents in a way that cannot be remedied by the Capital Raising Parties subject to the reasonable satisfaction of the Debtors;

(d) the Restructuring Support Agreement is terminated as to all parties in accordance with its terms; or

(e) any of the Orders approving any Exit Financing, the Financing Commitment and Backstop Agreement, the Restructuring Support Agreement, the Rights Offering Procedures, the Plan or the Disclosure Statement or the Confirmation Order are reversed, stayed, dismissed, vacated or reconsidered or modified or amended without the acquiescence or consent (not to be unreasonably withheld, conditioned or delayed) of the Debtors (and such action has not been reversed or vacated within thirty (30) calendar days after its issuance) in a manner that prevents or prohibits the consummation of the Restructuring Transactions contemplated in the Financing Commitment and Backstop Agreement or any of the Definitive Documents in a way that cannot be remedied by the Capital Raising Parties subject to the reasonable satisfaction of the Debtors.

Section 9.4 Effect of Termination.

(a) Upon termination of the Financing Commitment and Backstop Agreement pursuant to Article IX, the Financing Commitment and Backstop Agreement shall forthwith become void and there shall be no further obligations or liabilities on the part of the Parties; provided, that (i) the obligations of the Debtors to pay the Expense Reimbursement pursuant to Article III and to satisfy their indemnification obligations pursuant to Article VIII shall survive the termination of the Financing Commitment and Backstop Agreement and shall remain in full force and effect, in each case, until such obligations have been satisfied, (ii) the provisions set forth in Article VIII, this Section 9.4 and Article X shall survive the termination of the Financing Commitment and Backstop Agreement in accordance with their terms, (iii) subject to Section 10.11 (Damages), nothing in this Section 9.4 shall relieve any Party from liability for its fraud, gross negligence or any willful or intentional breach of the Financing Commitment and Backstop Agreement and (iv) all amounts deposited by the Capital Raising Parties in the Escrow Account shall be returned to the Capital Raising Parties in accordance with the terms of the Escrow Agreement. For purposes of the Financing Commitment and Backstop Agreement, "willful or intentional breach" means a breach of the Financing Commitment and Backstop Agreement that is a consequence of an act undertaken by the breaching Party with the knowledge that the taking of such act would, or would reasonably be expected to, cause a breach of the Financing Commitment and Backstop Agreement.

(b) If the Financing Commitment and Backstop Agreement is terminated other than (i) due to the Bankruptcy Court (1) issuing an Order denying confirmation of the Plan and (2) an amended, modified or alternative Plan that is approved by the Required Equity Capital Raising Parties and the Required Consenting Creditors is confirmed by the Bankruptcy Court within ninety (90) calendar days of the Order

denying confirmation of the Plan which provides for payment of the ERO Backstop Premium and Exit First Lien Facility Premium in New Common Stock on terms at least as favorable to the Capital Raising Parties as those provided for in the Financing Commitment and Backstop Agreement and such amended, modified or alternative Plan becomes effective within sixty (60) days thereafter or (ii) pursuant to Section 9.3(b), then the ERO Backstop Cash Premium (in satisfaction of the ERO Backstop Premium) and the Exit First Lien Facility Cash Premium (in satisfaction of the Exit First Lien Facility Premium) will become payable by the Debtors on the date of termination in cash to the Capital Raising Parties or their designees based upon their respective Backstop Final Allocated Percentage and First Lien Final Allocated Percentage, respectively, and the Debtors will pay the ERO Backstop Cash Premium and the Exit First Lien Facility Cash Premium, by wire transfer of immediately available funds to such accounts as the Capital Raising Parties may designate within three (3) Business Days following such termination; if the Financing Commitment and Backstop Agreement is terminated pursuant to Section 9.3(b), then the ERO Backstop Cash Premium and the Exit First Lien Facility Cash Premium will become payable on the date of termination in cash to the non-breaching Capital Raising Parties or their designees based upon their respective Backstop Final Allocated Percentage and First Lien Final Allocated Percentage, respectively, and the Debtors shall pay the ERO Backstop Cash Premium and Exit First Lien Facility Cash Premium by wire transfer of immediately available funds to such accounts as the non-breaching Capital Raising Parties may designate within three (3) Business Days following such termination.

(c)  To the extent that all amounts due in respect of the ERO Backstop Cash Premium and the Exit First Lien Facility Cash Premium pursuant to Section 9.4(b) have actually been paid by the Debtors to the Capital Raising Parties in connection with a termination of the Financing Commitment and Backstop Agreement, then (without limitation of any rights or remedies under the Restructuring Support Agreement), the Capital Raising Parties shall not have any additional recourse, including with respect to the ERO Backstop Premium and Exit First Lien Facility Premium, against the Debtors for any obligations or liabilities relating to or arising from the Financing Commitment and Backstop Agreement (other than obligations and liabilities pursuant to Section 8.1, any Expense Reimbursement and any other obligation or liability that expressly survives the termination of the Financing Commitment and Backstop Agreement) except for liability for intentional fraud, gross negligence or willful or intentional breach of the Financing Commitment and Backstop Agreement pursuant to Section 9.4(a).  The ERO Backstop Cash Premium and the Exit First Lien Facility Cash Premium payable pursuant to this Section 9.4 shall constitute an allowed administrative expense claim of the Debtors' estates pursuant to sections 503(b) and 507 of the Bankruptcy Code and shall not be subject to set-off, recharacterization, avoidance or disallowance.

(d) The Parties intend, and shall take the position and use all reasonable efforts to ensure that it is accepted, that no VAT arises in respect of the payment of (y) the ERO Backstop Cash Premium and (z) the Exit First Lien Facility Cash Premium (each of (y) and (z), a "Cash Premium"). If, however, any Cash Premium is treated in whole or in part as the consideration for a taxable supply for the purposes of VAT then the Parties agree that the Cash Premium shall be exclusive of all applicable VAT and the Debtors shall be obliged to pay, within 5 Business Days of receipt of each and every valid VAT invoice issued by a relevant Party, an amount equal to all applicable VAT for which such relevant Party is required to account to a Tax authority in respect of such Cash Premium.

21.     Obtaining approval of the Financing Commitment and Backstop Agreement and the authority to satisfy the obligations thereunder is critical to secure the Direct Equity Allocation, the Backstop Commitment, and the Exit First Lien Facility.  Pursuant to the terms of the Restructuring Support Agreement, the Debtors are required to obtain entry of the Financing Commitment and Backstop Agreement Order no later than twenty-six (26) days after the filing of this Motion.  The Debtors' ability to obtain the Direct Equity Allocation, the Backstop Commitment and, to the extent needed, the Sponsored Exit First Lien Facility at this stage of these chapter 11 cases provides significant value to the Debtors' estates and it is unclear whether the Debtors would be able to secure similarly sized equity commitments and debt financing at a later point in these cases.  The risk of the Debtors not being able to secure equity commitments at a later date due to continued market volatility significantly outweighs the cost of the incurrence of the ERO Backstop Premium, the Expense Reimbursement, and the Indemnification Obligations. Entry into the Financing Commitment and Backstop Agreement and the incurrence of the ERO Backstop Premium, the Exit First Lien Facility Premium, the Expense Reimbursement, and the Indemnification Obligations will secure the Direct Equity Allocation, the Backstop Commitment, and the Exit First Lien Facility for the benefit of the Debtors' go-forward business and all parties in interest and de-risk the Debtors' prospects of exiting from chapter 11.

22.     The Direct Equity Allocation, the Backstop Commitment and the Exit First Lien Facility are integral to the contemplated restructuring set forth in the Restructuring Support Agreement, which will delever the Debtors' capital structure by approximately $4.53 billion and has the support of an overwhelming majority of the Debtors' secured lenders.  The Direct Equity Allocation and the Backstop Commitment will work in tandem with, and are both necessary for and a condition to securing the exit debt facility contemplated by the Restructuring Support Agreement and the Financing Commitment and Backstop Agreement.  The proceeds of the Direct

Equity Allocation, the Rights Offering and the Exit First Lien Facility (whether ultimately in the form of the Raised Exit First Lien Facility or the Sponsored Exit First Lien Facility) will fund distributions under the Debtors' plan of reorganization and support the future working capital needs of the reorganized business.  Thus, entry into the Financing Commitment and Backstop Agreement and the incurrence of the ERO Backstop Premium, the Exit First Lien Facility Premium, the Expense Reimbursement, and the Indemnification Obligations are in the best interests of the Debtors and all stakeholders.

23.     Given the benefits to the Debtors and their estates from securing the Direct Equity Allocation, the Backstop Commitment, and the Exit First Lien Facility and the risk of losing such commitments if the requested relief is not granted, (a) entry into the Financing Commitment and Backstop Agreement is in the best interest of the Debtors' estates and (b) the incurrence of the ERO Backstop Premium, the Exit First Lien Facility Premium, the Expense Reimbursement, and the Indemnification Obligations are appropriate under the circumstances and should be approved.

## Basis for Relief

**I.     Entry into the Financing Commitment and Backstop Agreement Is a Sound Exercise of the Debtors' Sound Business Judgment and Is in the Best Interests of Their Estates and All Parties in Interest**.

24.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  The Fifth Circuit has held that debtors must articulate a "business justification" for using, selling, or leasing property outside of the ordinary course of business.  *See, e.g.*, *In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) ("'[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.'") (quoting *In re Continental Air Lines*,

780 F.2d 1223, 1226 (5th Cir. 1986)).  "The business judgment standard in section 363 is flexible and encourages discretion."  *In re ASARCO, L.L.C.*, 650 F.3d at 601.

25.     Section 105(a) of the Bankruptcy Code gives the Court vast equitable powers. *See In re Davis*, 170 F.3d 475, 492 (5th Cir. 1999) ("The basic purpose of § 105 is to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of its jurisdiction.") (internal quotations omitted).  Further, determining the appropriate method for carrying out the provisions of the Bankruptcy Code is left to the discretion of the court. *See In re Rojas*, No. 07-70058, 2009 WL 2496807, at *7 (Bankr. S.D. Tex. Aug. 12, 2009) ("Section 105 does not require a court to use the least restrictive means to carry out the requirements of the Code.  Section 105(a) of the Bankruptcy Code does not say that the Court's authority is limited to orders or judgments *necessary* to carry out the Code.  Rather, Congress explicitly added to the statute deferential, discretionary language with 'or appropriate.'") (quoting 11 U.S.C. § 105(a)) (emphasis in original).  The Court is given these vast equitable powers to ensure that the Debtors are "not unduly denied benefits" provided to them under the Bankruptcy Code.  *In re Exquisito Servs., Inc.*, 823 F.2d 151, 155 (5th Cir. 1987).

26.     Here, the Debtors' entry into the Financing Commitment and Backstop Agreement is a reasonable exercise of their business judgment.  The security offered by the Financing Commitment and Backstop Agreement provides a stable platform for emergence and preserves estate assets for the benefit of all of the Debtors' stakeholders.  The terms of the Financing Commitment and Backstop Agreement were ultimately required to secure (a) the agreement of the Equity Capital Raising Parties to backstop the Rights Offering that will provide $800 million of new money to the Reorganized Debtors through the sale and issuance of New Common Stock upon exit to support the Debtors' go-forward business, and (b) the agreement of the Sponsored Facility Capital Raising Parties to enter into the Sponsored Exit First Lien Facility, in the event

that the Debtors fail to obtain an acceptable Raised Exit First Lien Facility.  The Financing Commitment and Backstop Agreement will increase the likelihood that the Debtors will emerge from these Chapter 11 Cases by ensuring that the Rights Offering will be fully funded and that the Debtors will be provided either a Raised Exit First Lien Facility or the Sponsored Exit First Lien Facility.  The consideration provided to the Capital Raising Parties in exchange for securing the Direct Equity Allocation and Backstop Commitment, including the incurrence of the ERO Backstop Premium, the Exit First Lien Facility Premium, the Expense Reimbursement, and the Indemnification Obligations is integral to the Financing Commitment and Backstop Agreement and the Plan as a whole.

27.     The Capital Raise is currently the best available source of liquidity for the Debtors to fund distributions under the Plan, successfully emerge from bankruptcy, and continue their operations as a going concern.  Without the benefits provided by the Capital Raise, the Debtors would be unable to consummate the Plan, would lose the benefits afforded by the settlement embodied in the Restructuring Support Agreement and the Plan (including the global settlement with the Creditors' Committee), and would face a prolonged and value-destructive stay in chapter 11, or conversion to a chapter 7 liquidation, to the detriment of all stakeholders.  The Debtors have not received any more favorable financing commitments than those contemplated in the Financing Commitment and Backstop Agreement.

28.     The Financing Commitment and Backstop Agreement is the product of extensive hard-fought, arm's-length negotiations that included the active involvement of the Debtors' management team, PJT, and the Debtors' other legal and financial advisors.  The Debtors believe that they have obtained the best financing available, and that the pricing and fees provided in the Financing Commitment and Backstop Agreement, taken as a whole, are reasonable under the facts and circumstances of these Chapter 11 Cases.  The terms of the Financing Commitment and

Backstop Agreement were ultimately the most favorable terms the Debtors could negotiate to secure the agreement of the Capital Raising Parties to provide the commitments embodied in the Financing Commitment and Backstop Agreement and thereby assist in the funding of the Debtors' exit from chapter 11.

29.     For these reasons, the Debtors' entry into the Financing Commitment and Backstop Agreement and agreement to the terms set forth therein, including the incurrence of the ERO Backstop Premium, the Exit First Lien Facility Premium, the Expense Reimbursement, and the Indemnification Obligations, are a sound exercise of the Debtors' business judgment and should be approved.

**II.     The ERO Backstop Premium, the Exit First Lien Facility Premium, the Expense Reimbursement, and the Indemnification Obligations Should Be Granted Administrative Expense Priority Because They Are Reasonable, Market-Based, and Essential Components of the Financing Commitment and Backstop Agreement**.

30.     Bankruptcy Code section 503(b)(1)(A) provides that there shall be allowed administrative expenses for "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A).  The ERO Backstop Premium, the Exit First Lien Facility Premium, the Expense Reimbursement, and the Indemnification Obligations are essential components of the Financing Commitment and Backstop Agreement.  They were heavily negotiated, are market-based compensation and obligations necessary to secure the Direct Equity Allocation, the Backstop Commitment, and the Exit First Lien Facility, and compensate the applicable Capital Raising Parties for the substantial resources they have committed pursuant to the Financing Commitment and Backstop Agreement as well as the time, effort, and costs incurred in negotiating the terms thereof and the Restructuring Support Agreement.  The Capital Raising Parties face numerous economic, market, and commercial risks during the period that their commitments remain in place that may reduce the attractiveness of the investment in the Debtors' Capital Raise, but the terms

of the Financing Commitment and Backstop Agreement may still require them to provide and backstop the Capital Raise.  Given the current economic environment, with high inflation rates and rising interest rates, committed financing is particularly valuable to the Debtors and all of their stakeholders.  Without this consideration, the Equity Capital Raising Parties would not have been willing to provide the Direct Equity Allocation and the Backstop Commitment, while the Sponsored Exit Capital Raising Parties would not have been willing to provide the Sponsored Exit First Lien Facility in the event that the Debtors fail to obtain an acceptable Raised Exit First Lien Facility.  Therefore, without agreeing to pay the ERO Backstop Premium, the Exit First Lien Facility Premium, the Expense Reimbursement, and the Indemnification Obligations, the Debtors would lose a critical component of the Plan and the Debtors may not be able to restructure effectively.

31.     The Direct Equity Allocation and the Backstop Commitment are key components of the Restructuring Transactions that will provide the Debtors with $800 million of new equity capital on the Effective Date of the Plan to help deleverage the Debtors' balance sheet by approximately $4.53 billion.  Likewise, the Sponsored Exit First Lien Facility ensures that the Debtors will be provided with $1.46 billion, net of any original issuance discount, in first-lien financing, in the event that the Debtors fail to obtain an acceptable Raised Exit First Lien Facility. As such, the Capital Raising Parties are conferring a material benefit to the Debtors' estates by ensuring that the Debtors have access to sufficient liquidity to successfully emerge from bankruptcy and continue their operations as a going concern.   Moreover, the Expense Reimbursement provision in the Financing Commitment and Backstop Agreement is a reasonable use of estate resources given the substantial benefits provided to the Debtors' estates by the Direct Equity Allocation, the Backstop Commitment, and the Sponsored Exit First Lien Facility.

32.     For these reasons, the ERO Backstop Premium, the Exit First Lien Facility Premium, the Expense Reimbursement, and the Indemnification Obligations should be accorded administrative expense priority under sections 503(b) and 507 of the Bankruptcy Code.   The Debtors' chosen exit path maximizes value for all creditors by, among other things, providing for an efficient emergence from chapter 11.   The Debtors anticipate that their emergence with a significantly deleveraged balance sheet will provide them a competitive advantage within the industry.   Further, the ERO Backstop Premium, the Exit First Lien Facility Premium, the Expense Reimbursement, and the Indemnification Obligations are actual and necessary costs of preserving the Debtors' estates and it is customary for debtors to pay fees and expenses to parties that have committed funding to a debtor's estate, such as by backstopping a rights offering, and especially where execution of a backstop commitment agreement is dependent upon the inclusion of such terms.   The Debtors believe that the ERO Backstop Premium, the Exit First Lien Facility Premium, the Expense Reimbursement, and the Indemnification Obligations, taken as a whole, are reasonable under the facts and circumstances of these Chapter 11 Cases.   It is also customary for debtors to compensate parties for expending substantial time and resources to negotiate the terms of, and commit to, providing funding for a debtor's restructuring, such as the funding that will be provided under the Financing Commitment and Backstop Agreement.

33.     The Debtors have considered all the risks and weighed the costs of the ERO Backstop Premium, the Exit First Lien Facility Premium, the Expense Reimbursement, and the Indemnification Obligations against the uncertainty and expense of a non-consensual plan process, and they have determined that entry into the Financing Commitment and Backstop Agreement and performing the obligations thereunder minimizes risk and maximizes value for all stakeholders. Additionally, the Debtors negotiated a full "fiduciary out" in the event that an alternative proposal is received by the Debtors that the board of directors of any of the Debtors believe, in the exercise

of their fiduciary duties, presents a superior alternative to the Restructuring Transactions.  For these reasons, the Debtors determined, in their business judgment and in consultation with their advisors, that paying the ERO Backstop Premium, the Exit First Lien Facility Premium, the Expense Reimbursement, and the Indemnification Obligations is essential and necessary to secure the Direct Equity Allocation, the Backstop Commitment, and the Exit First Lien Facility and proceed toward confirming the Plan, and therefore each should be granted administrative expense priority.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

34.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen (14)-day stay period under Bankruptcy Rule 6004(h).

### Emergency Consideration

35.     The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Local Rule 9013-1(i).  As set forth above, the Debtors believe that the Court's immediate approval of the Financing Commitment and Backstop Agreement is critical to assuring the Debtors an expeditious path toward emergence.  Any delay could hinder the Debtors' ability to effectively and efficiently move these Chapter 11 Cases to their successful conclusion. Accordingly, the Debtors request that the Court approve the relief requested herein on an emergency basis.

### Reservation of Rights

36.     Nothing contained herein is intended or shall be construed as (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute any claim; (c) an approval or assumption of any agreement under

section 365 of the Bankruptcy Code; (d) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (e) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (f) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.  Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim at a later date.

### Notice

37.     The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Committee; (d) the agent under the Prepetition Priming Facility, and counsel thereto; (e) the agent under the Prepetition Legacy Term Facilities, and counsel thereto; (f) the agent under the Revolving Credit Facility, and counsel thereto; (g) counsel to the ad hoc group of Prepetition Revolving Lenders; (h) counsel to the Ad Hoc Term Loan Group; (i) the agent under the Settlement Facility, and counsel thereto; (j) counsel to lenders under the Settlement Facility; (k) the trustee under the Convertible Bonds, and counsel thereto; (l) counsel to the ad hoc group of holders of Convertible Bonds; (m) the agent under the DIP Facility, and counsel thereto; (n) the Office of the United States Attorney for the Southern District of Texas; (o) the state attorneys general for states in which the Debtors conduct business; (p) the Internal Revenue Service; (q) the Securities and Exchange Commission; (r) the Environmental Protection Agency; (s) other governmental agencies having a regulatory or

statutory interest in these cases; and (t) any party that has requested notice pursuant to Bankruptcy

Rule 2002.  In light of the nature of the relief sought, no further notice is needed.

WHEREFORE, the Debtors request that the Court enter the Financing Commitment and

Backstop Agreement Order, granting the relief requested herein and granting such other relief as

the Court deems appropriate under the circumstances.

Houston, Texas
April 11, 2023

*/s/ Matthew D. Cavenaugh*

| | |
|---|---|
| **JACKSON WALKER LLP** | **KIRKLAND & ELLIS LLP** |
| Matthew D. Cavenaugh (TX Bar No. 24062656) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Rebecca Blake Chaikin (TX Bar No. 24133055) | Joshua A. Sussberg, P.C. (admitted *pro hac vice*) |
| Veronica A. Polnick (TX Bar No. 24019148) | Christopher Marcus, P.C. (admitted *pro hac vice*) |
| Vienna Anaya (TX Bar No. 24091225) | Christine Okike, P.C. (admitted *pro hac vice*) |
| 1401 McKinney Street, Suite 1900 | Ciara Foster (admitted *pro hac vice*) |
| Houston, Texas 77010 | 601 Lexington Avenue |
| Telephone:     (713) 752-4200 | New York, New York 10022 |
| Facsimile:     (713) 752-4221 | Telephone:     (212) 446-4800 |
| Email:          mcavenaugh@jw.com | Facsimile:     (212) 446-4900 |
|                     rchaikin@jw.com | Email:          joshua.sussberg@kirkland.com |
|                     vpolnick@jw.com |                     christopher.marcus@kirkland.com |
|                     vanaya@jw.com |                     christine.okike@kirkland.com |
| |                     ciara.foster@kirkland.com |
| *Co-Counsel to the Debtors* | *Co-Counsel to the Debtors* |
| *and Debtors in Possession* | *and Debtors in Possession* |

**<u>Certificate of Service</u>**

I certify that on April 11, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh