**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re:<br><br>CINEWORLD GROUP PLC, *et al.*,[1]<br><br>Debtors. | ) Chapter 11<br>)<br>) Case No. 22-90168 (MI)<br>)<br>) (Jointly Administered)<br>)<br>) **Re: Docket No. 1512** |

**ORDER (I) CONDITIONALLY APPROVING
THE ADEQUACY OF THE DISCLOSURE STATEMENT,
(II) APPROVING THE SOLICITATION PROCEDURES WITH
RESPECT TO CONFIRMATION OF THE DEBTORS' PROPOSED
CHAPTER 11 PLAN, (III) APPROVING THE FORMS OF BALLOTS AND
NOTICES IN CONNECTION THEREWITH, (IV) APPROVING THE RIGHTS
OFFERING PROCEDURES AND RELATED MATERIALS, (V) SCHEDULING
CERTAIN DATES WITH RESPECT THERETO, AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"):  (a) conditionally approving the adequacy of the Disclosure Statement; (b) approving (i) the Solicitation Procedures, (ii) the Ballots, (iii) the Cover Letter, (iv) the Non-Voting Status Notices and Opt-Out Forms, (v) the Combined Hearing Notice, (vi) the Plan Supplement Notice, (vii) the Assumption Notice and the Rejection Notice, (viii) the Solicitation Packages, and (ix) the Rights Offering Procedures and the Rights Offering Materials; (c) scheduling certain dates and deadlines related to the foregoing; and (d) granting related relief, each as more fully set forth in the Motion; and this Bankruptcy Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Bankruptcy Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b);

---

[1]   A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/cineworld.  The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these Chapter 11 Cases is 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

and this Bankruptcy Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Bankruptcy Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§1408 and 1409; and this Bankruptcy Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Bankruptcy Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Bankruptcy Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Bankruptcy Court (the "Hearing"); and this Bankruptcy Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Bankruptcy Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

## I.      Conditional Approval of the Disclosure Statement.

1.      The Disclosure Statement, attached hereto as **Exhibit 1**, is conditionally approved as containing adequate information within the meaning of section 1125(a)(1) of the Bankruptcy Code and its use in the Debtors' solicitation of votes to accept or reject the Plan is approved.

2.      The Disclosure Statement (including all applicable exhibits thereto) provides Holders of Claims and Interests and other parties in interest with sufficient notice of the injunction, exculpation, and release provisions contained in Article IX of the Plan, in satisfaction of the requirements of Bankruptcy Rules 2002(c)(3) and 3016(b) and (c).

## II.     Approval of the Procedures, Materials, and Timeline for Soliciting Votes on and Confirming the Plan.

### A.     Approval of the Solicitation Procedures.

3.     The Debtors are authorized to solicit, receive, and tabulate votes to accept or reject the Plan in accordance with the Solicitation Procedures, substantially in the form attached hereto as **<u>Exhibit 2</u>**, which are hereby approved in their entirety.

4.     The Solicitation Procedures utilized by the Debtors for distribution of the Solicitation Packages as set forth in the Motion for soliciting acceptances and rejections of the Plan satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and any other applicable rules, laws, and regulations, including any applicable registration requirements under the Securities Act, and any exemptions from registration under any applicable state Blue Sky Law.

### B.     Approval of Certain Dates and Deadlines with Respect to the Plan and the Disclosure Statement.

5.     The following dates are hereby established (subject to modification as necessary by the Debtors, in consultation with the Required Consenting Creditors, the Required Equity Capital Raising Parties, and the Committee) and approved with respect to the solicitation of votes to accept or reject the Plan, voting on the Plan, filing objections to the Plan and the Disclosure Statement, and approving the adequacy of the Disclosure Statement and confirming the Plan:

| Event | Date |
|---|---|
| Voting Record Date | April 18, 2023 |
| Solicitation Mailing Deadline | April 28, 2023, or as soon as reasonably practicable thereafter |
| Publication Deadline | April 28, 2023, or as soon as reasonably practicable thereafter |
| Plan Supplement Filing Deadline | May 26, 2023 |
| Voting Deadline | June 2, 2023, at 5:00 p.m. (prevailing Central Time) |

3

| Event | Date |
|---|---|
| 3018 Motion Deadline | June 2, 2023, at 5:00 p.m. (prevailing Central Time) |
| Plan and Disclosure Statement Objection Deadline | June 2, 2023, at 5:00 p.m. (prevailing Central Time) |
| Deadline to File Voting Report | June 9, 2023 |
| Combined Hearing Date | June 12, 2023, at 8:00 a.m. (prevailing Central Time), or such other date as may be scheduled by the Bankruptcy Court |

**C.      Approval of the Form and Distribution of Solicitation Packages to Parties Entitled to Vote on the Plan.**

6.      The Solicitation Packages to be transmitted on or before the Solicitation Mailing Deadline, or as soon as reasonably practicable thereafter, to those Holders of Claims entitled to vote on the Plan as of the Voting Record Date, shall include the following, the form of each of which is hereby approved:

a.      this Order (excluding the exhibits hereto, except as set forth below);

b.      the conditionally-approved Disclosure Statement and all exhibits attached thereto, including the Plan, attached hereto as **Exhibit 1**;

c.      the Solicitation Procedures attached hereto as **Exhibit 2**;

d.      the applicable forms of Ballot, substantially in the forms of Ballots attached hereto as **Exhibits 3A**, **3B**, **3C**, **3D**, and **3E** including voting instructions with respect thereto and the opportunity to opt out of the release as set forth in Article IX.D of the Plan;

e.      the Cover Letter, substantially in the form attached hereto as **Exhibit 4**;

f.      the Combined Hearing Notice, substantially in the form attached hereto as **Exhibit 8**;

g.      a pre-addressed, postage prepaid reply envelope; and

h.      any additional documents that the Bankruptcy Court has ordered to be made available to Holders of Claims in the Voting Classes.

7.      The Solicitation Packages provide Holders of Claims entitled to vote on the Plan with adequate information to make informed decisions with respect to voting on the Plan in

accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code, and the Bankruptcy Local Rules.

8.    The Debtors shall distribute Solicitation Packages to all Holders of Claims entitled to vote on the Plan on or before the Solicitation Mailing Deadline, or as soon as reasonably practicable thereafter.  Such service shall satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.

9.    The Debtors are authorized, but not directed or required, to distribute the Plan, the Disclosure Statement, and this Order (without exhibits) to Holders of Claims entitled to vote on the Plan in electronic format (*i.e.*, on a CD-ROM or flash drive) only.  Any party that receives materials in electronic format, but would prefer to receive materials in paper format, may contact the Solicitation Agent and request paper copies of the materials previously received in electronic format (to be provided at the Debtors' expense).  ***Only*** the Ballots, the Solicitation Procedures, the Cover Letter, and the Combined Hearing Notice must be provided in paper form.  On or before the Solicitation Mailing Deadline, the Debtors shall provide complete Solicitation Packages (excluding the Ballots, the Cover Letter, and prepaid reply envelope) to the U.S. Trustee and all parties on the 2002 List as of the Voting Record Date.

10.    Holders of transferred Claims entitled to vote on the Plan shall receive Solicitation Packages ***only if*** all actions necessary to effectuate the transfer of the Claim pursuant to Bankruptcy Rule 3001(e) have been completed by the Voting Record Date.  In the event a Claim is transferred after the Voting Record Date, the transferee of such Claim shall be bound by any vote on the Plan, distribution election, or opt-out election made by the Holder of such Claim as of the Voting Record Date.  Where any portion of a single Claim has been transferred to a transferee, all Holders of any portion of such single Claim may be (a) treated as a single creditor for purposes

of the numerosity requirements in section 1126(c) of the Bankruptcy Code and (b) required to vote every portion of such Claim collectively to accept or reject the Plan.  In the event that (x) a Ballot, (y) a group of Ballots within one Voting Class received from a single creditor, or (z) a group of Ballots received from the various Holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots may not be counted in the Debtors' discretion, and the Debtors' treatment of such Ballots will be set forth in the Voting Report.

11.    The Solicitation Agent is authorized to assist the Debtors in (a) distributing the Solicitation Packages, (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by Holders of Claims against the Debtors, (c) responding to inquiries from Holders of Claims and Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Solicitation Packages (including the Ballots), and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan or the adequacy of the Disclosure Statement, (d) soliciting votes on the Plan, and (e) if necessary, contacting Holders of Claims and Interests regarding the Plan and/or the Disclosure Statement.  The Solicitation Agent is further authorized, but not directed or required, to contact Holders of Claims to reconcile discrepancies or cure defects with their submitted Ballot(s), and neither the Debtors nor the Solicitation Agent will incur any liability for failure to provide notice of such discrepancies or defects.

12.    The Solicitation Agent is also authorized to accept Ballots and opt-out forms via electronic online transmission, solely through customized online balloting and document submission portals on the Debtors' case website.  The encrypted data and audit trail created by such electronic submission shall become part of the record of any Ballot or opt-out form submitted in this manner, and the applicable Holder's electronic signature will be deemed to be immediately

legally valid and effective.  Nominees submitting Master Ballots on behalf of their Beneficial Holder clients are authorized to submit such Master Ballots to the Solicitation Agent via electronic mail to cineworldballots@ra.kroll.com (with "Cineworld Solicitation Ballot Submission" in the subject line).

13.    Nominees are not required to forward paper copies of the Solicitation Packages and Beneficial Holder Ballots to their Beneficial Holder clients and are instead authorized to employ such Nominees' customary practice of providing notice of the terms thereof to their Beneficial Holder clients.  Nominees are also authorized, but not directed, to send a voting instruction form in lieu of, or in addition to, a Beneficial Holder Ballot to their Beneficial Holder clients and/or to provide an electronic link to the Solicitation Materials (including, but not limited to, the Disclosure Statement and Plan) in lieu of forwarding a flash drive or paper copies containing the Disclosure Statement and Plan.  In connection with the solicitation of votes on the Plan, Kroll Issuer Services is authorized to submit a Master Ballot on behalf of (and at the direction of) Euroclear and/or Clearstream following customary practices, reflecting votes received from Holders of Allowed Convertible Bond Claims in Class 5A General Unsecured Claims Against the Class 5A Debtors.

**D.    Approval of the Form of Non-Voting Class Notice and Opt-Out Form.**

14.    Except to the extent the Debtors determine otherwise, the Debtors are not required to provide Solicitation Packages to Holders of Claims or Interests in Non-Voting Classes,[3] as such Holders are not entitled to vote on the Plan.  Instead, on or before the Solicitation Mailing Deadline, or as soon as reasonably practicable thereafter, the Solicitation Agent shall mail (first-class postage prepaid) the Combined Hearing Notice and the applicable form of Non-Voting Status Notice and

---

[3]    "Non-Voting Classes" means, collectively, Classes 1, 2, 3, 6, 7, 8, and 9.

Opt-Out Form in lieu of Solicitation Packages, the form of each of which is approved, to Holders of Claims or Interests in Non-Voting Classes:

| Class(es) | Status | Treatment |
|-----------|--------|-----------|
| 1, 2, 3 | Unimpaired—Presumed to Accept | Will receive a Non-Voting Status Notice and Opt-Out Form, substantially in the form attached hereto as **Exhibit 5**, in lieu of a Solicitation Package. |
| 6, 9 | Impaired—Deemed to Reject | Will receive a Non-Voting Status Notice and Opt-Out Form, substantially in the form attached hereto as **Exhibit 6**, in lieu of a Solicitation Package. |
| N/A | Disputed Claims | Holders of Claims that are subject to a pending objection by the Debtors are not entitled to vote the disputed portion of their Claim.  As such, Holders of such Claims will receive a Non-Voting Status Notice and Opt-Out Form, substantially in the form attached to this Order as **Exhibit 7**. |

15.     The Solicitation Agent is authorized to rely on the address information for all Classes as compiled, updated, and maintained by the Solicitation Agent as of the Voting Record Date.  Where the Combined Hearing Notice, Solicitation Packages, and/or any other notices described in the Motion are returned as undeliverable, the Solicitation Agent will attempt to redistribute such materials where an accurate address is provided for such entities at least seven days prior to the Voting Deadline.  However, failure to distribute documents to such entities does not constitute inadequate notice of the Combined Hearing Notice, the Solicitation Package, the Voting Deadline, and/or any other notices described in the Motion and/or a violation of the Bankruptcy Rules.

16.     The Debtors are not required to mail Solicitation Packages, other solicitation materials, or a Non-Voting Status Notice and Opt-Out Form to:  (a) Holders of Claims that have already been paid in full during the Chapter 11 Cases; (b) any party to whom the notice of

the Motion was sent but was subsequently returned as undeliverable without a forwarding address; and (c) the Holders of Class 7 Intercompany Claims and Class 8 Intercompany Interests.

17.     The Non-Voting Status Notice and Opt-Out Form, and service thereof as described in the Motion, and the Voting Deadline comply with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules and are approved.

### E.     Approval of the Combined Hearing Notice.

18.     The Combined Hearing Notice, substantially in the form attached hereto as **Exhibit 8**, is approved and constitutes adequate and sufficient notice of the hearing to consider approval of the adequacy of the Disclosure Statement and confirmation of the Plan, the manner in which a copy of the Plan and the Disclosure Statement can be obtained, and the time fixed for filing objections thereto, in satisfaction of the requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.  The Combined Hearing Notice shall be filed by the Debtors and served upon parties in interest in these Chapter 11 Cases by April 28, 2023 (or as soon as reasonably practicable thereafter).  The Debtors shall conform the Combined Hearing Notice into a publishable format, which will serve as the Publication Notice.  The Publication Notice shall be published on one occasion in *The New York Times* (U.S. national edition), *The Telegraph* (the British national edition), and the *Financial Times* (global edition), and any such other local publications that the Debtors deem appropriate no later than five business days after entry of this Order, or as soon as reasonably practicable thereafter.

### F.     Approval of the Procedures for Filing Objections to the Disclosure Statement and the Plan.

19.     Objections to the adequacy of the Disclosure Statement or confirmation of the Plan will not be considered by the Bankruptcy Court unless such objections are timely filed and properly

9

served in accordance with this Order.  Specifically, all objections to the adequacy of the Disclosure Statement and confirmation of the Plan or requests for modifications to the Plan, if any, ***must***: (a) be in writing; (b) comply with the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Bankruptcy Court; (c) state the name and address of the objecting party and the amount and nature of the Claim or Interest beneficially owned by such entity; (d) state, with particularity, the legal or factual basis for such objections, and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objections; and (e) be filed with the Bankruptcy Court by **June 2, 2023, at 5:00 p.m. (prevailing Central Time)**.

### G. Approval of the Plan Supplement Notice.

20.     The Debtors are authorized to send notice of the filing of the Plan Supplement to parties in interest, substantially in the form attached hereto as **Exhibit 9**.  Notwithstanding the foregoing, the Debtors may amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with the Plan.

### H. Approval of Notices to Contract and Lease Counterparties.

21.     The Debtors are authorized to mail the Assumption Notice or Rejection Notice, substantially in the forms attached hereto as **Exhibit 10** and **Exhibit 11**, respectively, to the applicable counterparties to the Executory Contracts and Unexpired Leases that will be assumed or rejected pursuant to the Plan, at the notice address specified in the applicable Executory Contract or Unexpired Lease (or other address known to the Debtors) and upon their counsel of record, if known (via email, if known); *provided* that with respect to any Executory Contract or Unexpired Lease that is removed from the Schedule of Rejected Executory Contracts or Unexpired Leases in accordance with the terms of the Plan after such schedule is initially filed, the Debtors shall provide for such notice to be served on the applicable counterparties as soon as reasonably practicable after the applicable Executory Contract or Unexpired Lease is removed from the Schedule of Rejected

Executory Contracts and Unexpired Leases.  Unless a counterparty has consented in writing (email being sufficient) to the removal of the applicable Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases, such counterparty shall have fourteen days following service of the applicable notice to object to the assumption, assumption and assignment, and/or rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and/or any cure amount(s), as applicable.

22.     Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, or this Order, the Debtors shall cause a Ballot for Class 5A General Unsecured Claims Against the Class 5A Debtors or Class 5B General Unsecured Claims Against the Class 5B Debtors, as applicable, to be served on any party entitled to receive a Rejection Notice at the same time that the relevant Rejection Notices are served.  Any such party shall be eligible to vote to accept or reject the Plan by the Voting Deadline on account of Claims in an amount equal to the greater of (a) $1.00 and (b) the amount asserted on any Proof of Claim Filed no later than five business days before the Voting Deadline (subject to the Debtors' ability to object to the asserted amount).

23.     The Debtors shall cause a *Notice of Non-Voting Status to Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan and Important Information Regarding Third-Party Releases and Notice of Opt-Out Rights* to be served on any party entitled to receive an Assumption Notice at the same time that such Assumption Notices are served.

**I.     Approval of the Rights Offering Procedures and Related Dates and Deadlines.**

24.     The Rights Offering Procedures, substantially in the form attached hereto as **Exhibit 12**, are approved.

25.     The Non-Capital Raising Party Subscription Form, substantially in the form attached hereto as **Exhibit 13**, is approved.

26.     The Capital Raising Party Subscription Form, substantially in the form attached hereto as **Exhibit 14**, is approved.

27.     The Debtors may modify the Rights Offering Procedures, the Capital Raising Party Subscription Form, or the Non-Capital Raising Party Subscription Form or adopt any additional detailed procedures, consistent with the provisions of the Rights Offering Procedures, to effectuate the Rights Offering and Direct Equity Allocation and to issue the Rights Offering Shares and the Direct Allocation Shares.

28.     The following dates and deadlines regarding the Rights Offering are hereby established, subject to the right of the Debtors to modify the following dates, in consultation with the Required Consenting Creditors and the Required Equity Capital Raising Parties:

| Event | Date |
|---|---|
| Rights Offering Record Date | **May 9, 2023** |
| Subscription Commencement Date | **May 11, 2023 (or as soon as reasonably practicable thereafter)** |
| Subscription Expiration Deadline | **June 8, 2023, at 4:00 p.m., prevailing Central Time** |
| Subscription Funding Deadline | **June 8, 2023, at 4:00 p.m., prevailing Central Time** |

**J.      Non-Substantive Modifications.**

29.     The Debtors are authorized to make non-substantive or immaterial changes to the Plan, the Disclosure Statement, the Solicitation Procedures, the Ballots, the Cover Letter, the Solicitation Packages, any notice attached to this Order, the Rights Offering Procedures, the Non-Capital Raising Party Subscription Form, the Capital Raising Party Subscription Form and any related documents without further order of this Bankruptcy Court, including formatting changes, changes to correct typographical and grammatical errors, and conforming changes among the Plan, the Disclosure Statement, any other materials in the Solicitation Packages, and related documents (including the appendices thereto) where, in the Debtors' reasonable discretion, doing

12

so would better facilitate the solicitation process.  Subject to the foregoing, the Debtors are authorized to solicit, receive, and tabulate votes to accept or reject the Plan in accordance with this Order, without further order of the Bankruptcy Court.

### III.  Miscellaneous.

30.     Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the Restructuring Support Agreement set forth therein and of the parties to the Financing Commitment and Backstop Agreement set forth therein with respect to the Plan, any Definitive Document, all exhibits to the Plan, and the Plan Supplement, or any other document with respect to the implementation of the Plan and the Restructuring Transactions, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference and be fully enforceable as if stated in full herein.  Failure to reference the rights referred to in the immediately preceding sentence as such rights relate to any document referenced in the Restructuring Support Agreement or the Financing Commitment and Backstop Agreement, as applicable, shall not impair such rights and obligations.  In case of a conflict between the consent rights of the parties to the Restructuring Support Agreement that are set forth in the Restructuring Support Agreement or of the parties to the Financing Commitment and Backstop Agreement that are set forth in the Financing Commitment and Backstop Agreement, as applicable, with those parties' consent rights that are set forth in the Plan or the Plan Supplement, the consent rights in the Restructuring Support Agreement or the Financing Commitment and Backstop Agreement, as applicable, shall control.

31.     The Debtors' rights are reserved to modify the Plan without further order of the Bankruptcy Court in accordance with Article XI of the Plan, including the right to withdraw the Plan as to an individual Debtor at any time before the Combined Hearing Date.

32.     The Solicitation Agent is required to retain all paper copies of Ballots and all solicitation-related correspondence for one year following the Effective Date (as defined in the Plan), whereupon the Solicitation Agent is authorized to destroy and/or otherwise dispose of: (a) all paper copies of Ballots; (b) printed solicitation materials including unused copies of the Solicitation Package; and (c) all solicitation-related correspondence (including undeliverable mail), in each case unless otherwise directed by the Debtors or the Clerk of the Bankruptcy Court in writing within such one year period.

33.     Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim after the Voting Record Date.

34.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

35.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of the Bankruptcy Rules and the Bankruptcy Local Rules are satisfied by such notice.

36.     Notwithstanding anything in the Bankruptcy Rules or the Local Bankruptcy Rules to the contrary, the terms and conditions of this Order are immediately effective and enforceable upon its entry.

37.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

38.     This Bankruptcy Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: _____, 2023

_____
MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**Disclosure Statement**

THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) | Case No. 22-90168 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DISCLOSURE STATEMENT RELATING TO
## THE AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
## OF CINEWORLD GROUP PLC AND ITS DEBTOR SUBSIDIARIES

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                 ciara.foster@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated: April 19, 2023

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Veronica A. Polnick (TX Bar No. 24079148)
Vienna Anaya (TX Bar No. 24091225)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:          mcavenaugh@jw.com
                 rchaikin@jw.com
                 vpolnick@jw.com
                 vanaya@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

---

[1]    A complete list of each of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/cineworld.  The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.  The Debtors together with their non-Debtor affiliates are referred to collectively herein as "Cineworld" or the "Group."

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT[2]

THE DEBTORS ARE PROVIDING THIS DISCLOSURE STATEMENT IN CONNECTION WITH SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN, EACH HOLDER ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS, THE CREDITORS' COMMITTEE, AND THE HOLDERS OF APPROXIMATELY 83% OF THE LEGACY FACILITIES CLAIMS AND THE HOLDERS OF APPROXIMATELY 69% OF DIP CLAIMS THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT. THE DEBTORS URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. A COPY OF THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES IS ATTACHED HERETO AS <u>EXHIBIT A</u>. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR

---

[2] Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the *Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1509] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"), a copy of which is attached hereto as <u>**Exhibit A**</u>, the *Restructuring Support Agreement* [Docket No. 1471] (as may be amended, supplemented, or otherwise modified from time to time, and including all exhibits and schedules attached thereto, the "Restructuring Support Agreement" or "RSA"), a copy of which is attached hereto as <u>**Exhibit B**</u>, the *Declaration of Israel Greidinger, Deputy Chief Executive Officer of Cineworld Group plc, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 19] (the "Greidinger First Day Declaration"), or the *Declaration of James A. Mesterharm, Chief Restructuring Officer of Cineworld Group plc, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 80] (the "Mesterharm First Day Declaration," and together with the Greidinger First Day Declaration, the "First Day Declarations"), as applicable. **The summaries of the Plan and the RSA provided herein are qualified in their entirety by reference to the Plan and the RSA, as applicable**. In the case of any inconsistency between this Disclosure Statement and the Plan and the RSA, the Plan and the RSA, as applicable, will govern.

FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN, THE PLAN SUPPLEMENT, AND THE RESTRUCTURING SUPPORT AGREEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD REVIEW THE SECURITIES LAW RESTRICTIONS AND NOTICES SET FORTH IN THIS DISCLOSURE STATEMENT AND THE PLAN (INCLUDING, WITHOUT LIMITATION, UNDER ARTICLE IV THEREOF) IN FULL.

THIS DISCLOSURE STATEMENT AND ANY DOCUMENTS RELATED THERETO (INCLUDING, WITHOUT LIMITATION, THE PLAN AND THE PLAN SUPPLEMENT) ARE NOT, AND SHOULD NOT BE CONSTRUED AS, AN INVITATION OR INDUCEMENT TO ENGAGE IN ANY INVESTMENT ACTIVITY IN

RELATION TO ANY SECURITIES TO WHICH THIS DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, OR ANY DOCUMENTS RELATED THERETO RELATE (INCLUDING THE RIGHTS OFFERING DOCUMENTS) SUCH AS WOULD AMOUNT TO A FINANCIAL PROMOTION IN THE UNITED KINGDOM FOR THE PURPOSES OF SECTION 21 OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 OF ENGLAND AND WALES ("FSMA").  IN THE UNITED KINGDOM, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR ANY DOCUMENTS RELATED THERETO (INCLUDING, WITHOUT LIMITATION, THE PLAN AND THE PLAN SUPPLEMENT) IS INTENDED ONLY FOR USE AND MAY ONLY BE RELIED UPON IN RELATION TO ANY INVESTMENT ACTIVITY BY, AND ANY INVESTMENT ACTIVITY TO WHICH SUCH INFORMATION RELATES MAY ONLY BE ENGAGED IN BY, PERSONS FALLING WITHIN ANY OF THE CIRCUMSTANCES OF ARTICLE 1(4) OF REGULATION (EU) 2017/1129, AS IT FORMS PART OF EU RETAINED LAW, AS DEFINED IN THE EUROPEAN UNION (WITHDRAWAL) ACT 2018 (AS AMENDED OR SUPERSEDED, THE "PROSPECTUS REGULATION") WHO ARE AT THE RELEVANT TIME: (I) INVESTMENT PROFESSIONALS WITHIN THE MEANING OF ARTICLE 19(5) OF THE FPO, (II) HIGH NET WORTH COMPANIES WITHIN THE MEANING OF ARTICLE 49(2)(A) TO (D) OF THE FPO, (III) PERSONS THAT ARE EXISTING MEMBERS OR CREDITORS OF THE ISSUER OF THE RELEVANT SECURITIES, OR OF AN UNDERTAKING WHICH AT THE RELEVANT TIME IS IN THE SAME GROUP AS THE ISSUER OF THE RELEVANT SECURITIES, FALLING WITHIN ARTICLE 43 OF THE FPO, OR (IV) PERSONS TO WHOM THE COMMUNICATION MAY OTHERWISE LAWFULLY BE COMMUNICATED (TOGETHER, THE "PERMITTED U.K. PERSONS").  ANY PERSON IN THE UNITED KINGDOM THAT IS NOT A PERMITTED U.K. PERSON IS NOT, FOR THE PURPOSES OF ANY INVESTMENT OR INVESTMENT DECISION, AN INTENDED RECIPIENT OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR ANY DOCUMENT RELATED THERETO (INCLUDING, WITHOUT LIMITATION, THE PLAN AND THE PLAN SUPPLEMENT) AND SHOULD NOT USE SUCH INFORMATION AS THE BASIS FOR TAKING ANY INVESTMENT ACTIVITY OR INVESTMENT ACTION.  THIS DISCLOSURE STATEMENT AND ANY DOCUMENT RELATED THERETO (INCLUDING, WITHOUT LIMITATION, THE PLAN AND THE PLAN SUPPLEMENT) SHOULD NOT (INSOFAR AS THEY RELATE TO ANY INVESTMENT OR INVESTMENT ACTIVITY) BE DISTRIBUTED, COMMUNICATED TO, OR DIRECTED AT THE GENERAL PUBLIC IN THE UNITED KINGDOM OTHERWISE THAN AS DESCRIBED ABOVE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

UPON CONSUMMATION OF THE PLAN, CERTAIN (BUT NOT ALL) OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77a–77aa, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT") OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE EXTENT POSSIBLE.  OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS.  TO THE EXTENT THE EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE DOES NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD REVIEW THE SECURITIES LAW RESTRICTIONS AND NOTICES SET FORTH IN THIS DISCLOSURE STATEMENT AND THE PLAN (INCLUDING, WITHOUT LIMITATION, UNDER ARTICLE IV THEREOF) IN FULL.

THIS DISCLOSURE STATEMENT AND ANY DOCUMENTS RELATED THERETO (INCLUDING, WITHOUT LIMITATION, THE PLAN AND THE PLAN SUPPLEMENT) HAVE BEEN PREPARED ON THE BASIS THAT ANY OFFER OF THE NEW COMMON STOCK ISSUED IN CONNECTION WITH THE PLAN, THE PLAN SUPPLEMENT, THE RIGHTS OFFERING, OR THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT WITHIN ANY MEMBER STATE OF THE EUROPEAN ECONOMIC AREA (THE "EEA") OR IN THE UNITED KINGDOM (EACH A "RELEVANT STATE") WILL EITHER (I) NOT FORM PART OF ANY OFFER OR INVITATION TO PURCHASE, ACQUIRE, SUBSCRIBE FOR, SELL, OTHERWISE DISPOSE OF, OR ISSUE ANY SECURITIES OR ANY SOLICITATION OF ANY OFFER TO PURCHASE, ACQUIRE, SUBSCRIBE FOR, SELL, OR OTHERWISE DISPOSE OF, ANY SECURITY FOR THE PURPOSES OF THE PROSPECTUS REGULATION AND/OR FSMA (AS APPLICABLE) OR (II) BE MADE PURSUANT TO AN EXEMPTION UNDER THE PROSPECTUS REGULATION AND/OR FSMA (AS APPLICABLE) FROM THE REQUIREMENT TO PUBLISH A PROSPECTUS FOR THE OFFER OF TRANSFERABLE SECURITIES TO THE PUBLIC.  IN RELATION TO EACH RELEVANT STATE, NO OFFER OF THE NEW COMMON STOCK ISSUED IN CONNECTION WITH THE PLAN, THE PLAN SUPPLEMENT, THE RIGHTS OFFERING, OR THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT MAY BE MADE TO THE PUBLIC AT ANY TIME OTHER THAN PURSUANT TO AN EXEMPTION UNDER THE PROSPECTUS REGULATION AND/OR FSMA (AS APPLICABLE).  IN ANY RELEVANT STATE, THE PLAN, THE

PLAN SUPPLEMENT, THE RIGHTS OFFERING, AND THE RIGHTS OFFERING PROCEDURES ARE ONLY ADDRESSED TO AND DIRECTED AT: (I) "QUALIFIED INVESTORS" IN THAT RELEVANT STATE WITHIN THE MEANING OF THE PROSPECTUS REGULATION OR FSMA (AS APPLICABLE, "QUALIFIED INVESTORS") OR (II) ANY OTHER PERSON IF SUCH ADDRESS OR DIRECTION DOES NOT OTHERWISE CONSTITUTE AN OFFER OF SECURITIES TO THE PUBLIC WITHIN THE MEANING OF THE PROSPECTUS REGULATION (INCLUDING IN ANY OF THE OTHER CIRCUMSTANCES OF ARTICLE 1(4) OF THE PROSPECTUS REGULATION) AND/OR FSMA (INCLUDING IN ANY OF THE OTHER CIRCUMSTANCES OF SECTION 86 OF FSMA). NONE OF THE DEBTORS OR ANY OF THEIR RESPECTIVE AFFILIATES, REORGANIZED CINEWORLD PARENT, OR ANY PERSONS ACTING ON ANY OF THEIR BEHALVES HAS AUTHORIZED, NOR DO THEY AUTHORIZE, THE MAKING OF ANY OFFER OF THE NEW COMMON STOCK, OR IN CONNECTION WITH THE RIGHTS OFFERING THROUGH ANY FINANCIAL INTERMEDIARY, OTHER THAN AS MAY BE CONTEMPLATED IN THIS DISCLOSURE STATEMENT AND ANY DOCUMENTS RELATED THERETO (INCLUDING, WITHOUT LIMITATION, THE PLAN, AND THE PLAN SUPPLEMENT).

THE ISSUANCE OF THE NEW COMMON STOCK (INCLUDING THE RIGHTS OFFERING SHARES, THE RO BACKSTOP SHARES, THE DIRECT ALLOCATION SHARES AND THE PREMIUM SHARES), SUBSCRIPTION RIGHTS IN CONNECTION WITH THE PLAN, THE PLAN SUPPLEMENT, THE RIGHTS OFFERING, OR THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT SHALL NOT CONSTITUTE AN INVITATION OR OFFER TO SELL, OR THE SOLICITATION OF AN INVITATION OR OFFER TO BUY, ANY SECURITIES IN CONTRAVENTION OF ANY APPLICABLE LAW IN ANY JURISDICTION. NO ACTION HAS BEEN TAKEN, NOR WILL BE TAKEN, IN ANY JURISDICTION THAT WOULD PERMIT A PUBLIC OFFERING OF ANY OF THE NEW COMMON STOCK IN ANY JURISDICTION WHERE SUCH ACTION FOR THAT PURPOSE IS REQUIRED.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT:

- THE DEBTORS' PLANS, OBJECTIVES, AND EXPECTATIONS;

- THE DEBTORS' BUSINESS STRATEGY;

- THE IMPACT AND ANY CONTINUED IMPACT OF THE COVID-19 PANDEMIC ON THE DEBTORS AND THE MOTION PICTURE EXHIBITION INDUSTRY GENERALLY, INCLUDING ANY FUTURE BUSINESS INTERRUPTIONS;

- THE DEBTORS' FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- THE SUCCESS OF THE DEBTORS' OPERATIONS;

- THE COSTS OF CONDUCTING THE DEBTORS' OPERATIONS;

- THE DEBTORS' LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- THE LEVEL OF UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;

- THE AMOUNT, NATURE, AND TIMING OF THE DEBTORS' CAPITAL EXPENDITURES;

- THE TERMS OF CAPITAL AVAILABLE TO THE DEBTORS;

- THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS;

- THE RISKS ASSOCIATED WITH CERTAIN OF THE DEBTORS' ACQUISITIONS;

- THE EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- THE DEBTORS' EXPOSURE TO FUTURE CURRENCY EXCHANGE AND INTEREST RATES;

- THE DEBTORS' COUNTERPARTY CREDIT RISK;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION CLAIMS; AND

- GENERAL ECONOMIC AND BUSINESS CONDITIONS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION OR PRICE PRESSURE BY CUSTOMERS; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER, INCLUDING ANY INITIATIVES RELATED TO THE DEBTORS' OWNED OR LEASED REAL PROPERTY; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN U.S. AND NON-U.S. LAWS AND REGULATIONS; NATURAL DISASTERS, INCLUDING PANDEMICS, SUCH AS THE COVID-19 PANDEMIC, THAT MAY CAUSE GENERAL BUSINESS DISRUPTIONS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESS.

# TABLE OF CONTENTS

**Page**

I.     **INTRODUCTION**.................................................................................................... 1

II.    **PRELIMINARY STATEMENT** ......................................................................... 1

III.   **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN** ........................................................................................................... 4

    A.     **What is chapter 11?** ..................................................................... 4

    B.     **Why are the Debtors sending me this Disclosure Statement?** ....................................... 5

    C.     **What does it mean that the Debtors are seeking conditional approval of this Disclosure Statement?** ....................................... 5

    D.     **What is the effect of the Plan on the Debtors' ongoing business?** ................................ 5

    E.     **Am I entitled to vote on the Plan?** ................................................................ 5

    F.     **What will I receive from the Debtors if the Plan is consummated?** ............................. 6

    G.     **What will I receive from the Debtors if I hold an Allowed Administrative Claim or Priority Tax Claim?** ....................................... 11

         1.     **Administrative Claims.** ........................................................... 11

         2.     **DIP Claims.** ....................................................................... 11

         3.     **Professional Fee Claims.** ......................................................... 12

         4.     **Priority Tax Claims.** ............................................................. 13

         5.     **Payment of Statutory Fees and Reporting to the U.S. Trustee.** ...................... 14

         6.     **Payment of Restructuring Expenses.** ............................................. 14

    H.     **Are any regulatory approvals required to consummate the Plan?** ............................. 14

    I.     **What happens to my recovery if the Plan is not confirmed or does not go effective?** ....................................... 15

    J.     **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"** ....................................... 15

    K.     **Is there potential litigation related to the Plan?** .......................................... 15

    L.     **How will the preservation of the Causes of Action impact my recovery under the Plan?** ....................................... 15

    M.     **Are there risks to owning the New Common Stock upon emergence from Chapter 11?** ....................................... 16

    N.     **Will there be releases, injunction, and exculpation granted to parties in interest as part of the Plan?** ....................................... 17

         1.     **Release of Liens.** .................................................................. 17

         2.     **Releases by the Debtors.** ........................................................... 18

         3.     **Releases by the Releasing Parties.** ................................................ 19

         4.     **Exculpation.** ...................................................................... 20

         5.     **Injunction.** ....................................................................... 21

|     | O. | How will undeliverable distributions and unclaimed property be treated under the Plan? | 21 |
|     | P. | Are there minimum distribution restrictions? | 22 |
|     | Q. | What steps did the Debtors take to evaluate alternatives to a chapter 11 filing? | 22 |
|     | R. | What is the Marketing Process? | 22 |
|     | S. | What is the deadline to vote on the Plan? | 23 |
|     | T. | How do I vote for or against the Plan? | 23 |
|     | U. | Why is the Bankruptcy Court holding a Confirmation Hearing? | 23 |
|     | V. | When is the Confirmation Hearing set to occur? | 23 |
|     | W. | What is the purpose of the Confirmation Hearing? | 23 |
|     | X. | What is the Rights Offering and the Direct Equity Allocation? | 23 |
|     | Y. | Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? | 25 |
|     | Z. | Do the Debtors recommend voting in favor of the Plan? | 25 |
|     | AA. | Who supports the Plan? | 26 |
| IV. | | THE DEBTORS' DIP FACILITY AND PLAN | 26 |
|     | A. | The DIP Facility. | 26 |
|     | B. | The Plan. | 26 |
|     | | 1. Sources of Consideration for Plan Distributions. | 26 |
|     | | 2. Employee-Related Matters. | 32 |
|     | | 3. Treatment of Executory Contracts and Unexpired Leases. | 34 |
|     | | 4. Implementation Mechanisms in England and Wales. | 38 |
| V.  | | SOLICITATION AND VOTING PROCEDURES | 38 |
|     | A. | Holders of Claims Entitled to Vote on the Plan. | 38 |
|     | B. | Solicitation Agent. | 39 |
|     | C. | Solicitation Package. | 39 |
|     | D. | Voting Record Date. | 40 |
|     | E. | Voting on the Plan. | 40 |
|     | F. | Ballots Not Counted. | 41 |
|     | G. | Dates and Deadlines. | 42 |
| VI. | | THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW | 42 |
|     | A. | Cineworld's Corporate History. | 42 |
|     | | 1. Cineworld's Business Operations. | 43 |
|     | | 2. Cineworld's Brands. | 44 |
|     | | 3. Cineworld's Revenue and Income Stream. | 45 |
|     | | 4. Cineworld's Real Estate Portfolio. | 45 |
|     | B. | Prepetition Capital Structure. | 47 |
|     | | 1. Debtor Financing Facilities. | 48 |

VII.  EVENTS LEADING TO THE CHAPTER 11 FILINGS..................................................50

    A.  The COVID-19 Pandemic Devastates the Cinema Industry and Cineworld. ..........50

    B.  Additional Difficulties Compounding Cineworld's Challenges................................51

        1.  Shareholder Appraisal Litigation Stemming from the Regal
           Acquisition Results in Judgment Against Cineworld. ................................51

        2.  Litigation with Cineplex Over Terminated Arrangement Agreement. ........52

    C.  The DIP Negotiations...............................................................................................52

    D.  Appointment of the Special Committee. ..................................................................52

VIII.  MATERIAL DEVELOPMENTS AND EVENTS IN THE CHAPTER 11 CASES ..............55

    A.  First Day Relief. ......................................................................................................55

    B.  Approval of the DIP Facility....................................................................................55

    C.  Appointment of Official Committee of Unsecured Creditors....................................56

    D.  Retention of the Debtors' Professionals...................................................................56

    E.  Schedules of Assets and Liabilities and Statements of Financial Affairs.................57

    F.  Establishment of Claims Bar Dates..........................................................................57

    G.  The Restructuring Support Agreement and the Financing Commitment and
        Backstop Agreement.................................................................................................58

    H.  The Committee Settlement.......................................................................................58

    I.  RSA Milestones. ......................................................................................................59

    J.  Marketing Process. ..................................................................................................61

    K.  Litigation Matters. ..................................................................................................61

        1.  General Litigation. ...................................................................................61

        2.  Litigation with Cineplex and Lift-Stay Motion.........................................62

        3.  Litigation with National CineMedia, LLC and Negotiations with
           Alternative Screen Advertisers..................................................................62

        4.  Cineworld Cinemas Limited and Picturehouse Cinemas Limited
           Winding-Up Petitions. ..............................................................................63

    L.  Lease Rejections and Optimization. .........................................................................64

    M.  Procedural and Administrative Motions and Other Relief.......................................67

    N.  Corporate Structure Upon Emergence. ....................................................................68

IX.  RISK FACTORS...............................................................................................................68

    A.  Bankruptcy Law Considerations..............................................................................69

        1.  Parties in Interest May Object to the Plan's Classification of Claims
           and Interests. ............................................................................................69

        2.  The Conditions Precedent to the Effective Date of the Plan May Not
           Occur. ......................................................................................................69

        3.  The Conditions Precedent to Consummation of the Capital Raise
           May Not Occur.........................................................................................69

        4.  The Debtors May Fail to Satisfy Vote Requirements. ...............................69

        5.  The Debtors May Not Be Able to Secure Confirmation of the Plan. ..........69

        6.  Nonconsensual Confirmation....................................................................70

7. Continued Risk upon Confirmation.............................................................70

8. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code. ...................................................................71

9. The Debtors May Object to the Amount or Classification of a Claim..........71

10. Risk that the Implementation Mechanisms in England and Wales May Not Be Approved. ...............................................................71

11. Risk of Non-Occurrence of the Effective Date. ........................................72

12. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan. ...........................................................72

13. Risk that Foreign Courts Will Not Enforce the Confirmation Order..........72

14. Releases, Injunctions, and Exculpations Provisions May Not Be Approved. ...........................................................72

B. Risks Related to Recoveries Under the Plan. ........................................72

 1. The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results..................................................72

 2. The Distributable New Common Stock is Subject to Dilution.....................73

 3. Certain Tax Implications of the Plan. .......................................73

 4. The Debtors May Not Be Able to Accurately Report Their Financial Results. ...........................................................73

 5. A Liquid Trading Market for the Shares of the New Common Stock May Not Develop..................................................73

 6. The Trading Price for the Shares of the New Common Stock May Be Depressed Following the Effective Date.....................................74

 7. Restricted Securities Issued under the Plan May Not be Resold or Otherwise Transferred Unless They Are Registered under the Securities Act or an Exemption from Registration Applies. .....................74

 8. Certain Holders of the New Common Stock May be Restricted in their Ability to Transfer or Sell their Securities. ...........................75

 9. The Rights and Responsibilities of Holders of the New Common Stock Are to Be Governed Largely by Non-U.S. Law. ...........................75

 10. Because Reorganized Cineworld Parent Is Expected To Be Incorporated Under the Laws of a Jurisdiction Other Than the United States, Holders of the New Common Stock May Face Difficulty Protecting Their Interests, and Their Ability to Protect Their Rights Through Other International Courts, Including the Courts of the United States, May Be Limited....................76

C. Risks Related to the Debtors' and the Reorganized Debtors' Business.....................76

 1. The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.....................................76

 2. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases. ...........................................76

 3. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business...........................................................77

 4. Financial Results May Be Volatile and May Not Reflect Historical Trends. ...........................................................77

5.      The Debtors' Substantial Liquidity Needs May Impact Revenue. ............... 78

6.      Trading in the Debtors' Securities During the Pendency of the Chapter 11 Cases is Highly Speculative and Poses Substantial Risks. ......... 79

7.      The Debtors' Operations May Be Impacted by the Continuing COVID-19 Pandemic and Its Attendant Effects on the Cinema Industry. ................................................................................................ 79

8.      The Debtors Are Exposed to Foreign Currency Exchange Rate Risk that Could Affect Results of Operations and Comparability of Results Between Financial Reporting Periods. ................................. 79

9.      The Performance of the Debtors' Business is Directly Linked to Global Macroeconomic Conditions and Other Factors Outside of the Debtors' Control, Which May Adversely Affect Consumer Confidence and/or Consumer Spending Decisions and Which May Therefore Have a Materially Adverse Effect on the Debtors' Business, Financial Condition, Results of Operations, and Prospects. ......... 80

10.     The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases ........... 80

11.     The Loss of Key Personnel Could Adversely Affect the Debtors' Operations. ............................................................................................ 80

X.      CONFIRMATION OF THE PLAN ............................................................................. 80

A.      The Confirmation Hearing. ............................................................................. 80

B.      Purpose of the Confirmation Hearing. ............................................................ 81

C.      Confirmation Requirements. ........................................................................... 81

D.      Feasibility. ...................................................................................................... 82

E.      Acceptance by Impaired Classes. ................................................................... 82

F.      Confirmation Without Acceptance by All Impaired Classes. ........................... 82

1.      No Unfair Discrimination. ................................................................. 83

2.      Fair and Equitable Test. .................................................................... 83

G.      Best Interests of Creditors/Liquidation Analysis. ........................................... 84

H.      Valuation Analysis. ......................................................................................... 84

I.      Financial Information and Projections. ............................................................ 85

J.      Additional Information Regarding this Disclosure Statement and Plan. ........... 85

XI.     CERTAIN SECURITIES LAW MATTERS ................................................................. 85

A.      Issuance of Securities under the Plan .............................................................. 86

B.      Subsequent Transfers. .................................................................................... 86

1.      Subsequent Transfers After Reorganized Debtors' issuance of Securities pursuant to section 1145 of the Bankruptcy Code. ....................... 86

2.      Subsequent Transfers After Reorganized Debtors' issuance of Securities pursuant to Section 4(a)(2) of the Securities Act. .......................... 87

C.      The New Common Stock & Management Incentive Plan. ................................. 89

**XII.**  **CERTAIN UNITED STATES FEDERAL INCOME TAX AND U.K. TAX CONSEQUENCES OF THE PLAN** ........................................................................... 90

    **A.**    **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors.** ............................................................ 90

        **1.**    **Introduction.** ..................................................................................... 90

        **2.**    **In General.** ......................................................................................... 92

        **3.**    **Effects of the Restructuring Transactions on Tax Attributes of Debtors.** ............................................................................................. 92

        **4.**    **Transfer of Litigation Trust Assets to Litigation Trust.** .............. 95

    **B.**    **Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims Entitled to Vote.** ............................................................................ 97

        **1.**    **Treatment of Debt as a Security.** ................................................... 97

        **2.**    **U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Legacy Facilities Claims (Class 4).** ................................. 97

        **3.**    **U.S. Federal Income Tax Consequences to U.S. Holders of Allowed General Unsecured Claims Against the Debtors (Class 5A and 5B).** ............ 99

        **4.**    **Distributions Attributable to Accrued Interest (and OID).** ......... 100

        **5.**    **Market Discount.** .............................................................................. 100

        **6.**    **Net Investment Income Tax.** ........................................................... 101

        **7.**    **Limitations on Use of Capital Losses.** .......................................... 101

        **8.**    **Ownership and Disposition of New Common Stock.** ..................... 101

    **C.**    **Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims.** ..................................................................................................... 103

    **D.**    **U.S. Information Reporting and Withholding.** .......................................... 104

    **E.**    **FATCA.** ........................................................................................................ 105

    **F.**    **Certain U.K. Tax Consequences of the Plan to the Debtors and the Reorganized Debtors.** ........................................................................... 105

        **1.**    **Introduction.** ..................................................................................... 105

        **2.**    **U.K. Corporation Tax.** .................................................................... 106

**XIII.**  **RECOMMENDATION** ......................................................................................... 107

**EXHIBIT A** ............................................................................................................................ 108

**EXHIBIT B** ............................................................................................................................ 109

**EXHIBIT C** ............................................................................................................................ 110

**EXHIBIT D** ............................................................................................................................ 112

**EXHIBIT E** ............................................................................................................................ 112

**EXHIBITS**[3]

EXHIBIT A     Plan of Reorganization

EXHIBIT B     Restructuring Support Agreement

EXHIBIT C     Financial Projections

EXHIBIT D     Valuation Analysis

EXHIBIT E     Liquidation Analysis

---

[3]     Each Exhibit is incorporated herein by reference.

## I.     INTRODUCTION

The Debtors submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the Plan.  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS AND CERTAIN CONSENTING CREDITORS, INCLUDING HOLDERS OF APPROXIMATELY 83% OF THE LEGACY FACILITIES CLAIMS AND HOLDERS OF APPROXIMATELY 69% OF THE DIP CLAIMS, ENTERED INTO THE RESTRUCTURING SUPPORT AGREEMENT, ATTACHED HERETO AS EXHIBIT B, AND SUPPORT CONFIRMATION OF THE PLAN.  FURTHER, THE CREDITORS' COMMITTEE SUPPORTS CONFIRMATION OF THE PLAN.  THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN AND, WHERE RELEVANT, SEPARATELY VOTE TO APPROVE ANY IMPLEMENTATION MECHANISMS REQUIRED TO IMPLEMENT THE PLAN OUTSIDE OF THE UNITED STATES OF AMERICA.**

## II.     PRELIMINARY STATEMENT

Cineworld is unwavering in its vision to be "The Best Place to Watch a Movie."  As the second-largest cinema chain in the world by number of screens, Cineworld brings its vision to life each day in modern cinemas with cutting-edge technology.  Headquartered in Brentford, United Kingdom, the Group, currently with a premium listing on the Main Market of the London Stock Exchange, operates under five major brands—Cineworld in the U.K. and Ireland, Picturehouse in the U.K., Regal in the U.S., Cinema City in Central and Eastern Europe, and Planet in Israel—and employs a global workforce of approximately 30,000 employees.  As of the Petition Date, Cineworld operated 747 locations with 9,139 screens in 10 countries.

Before the COVID-19 pandemic, Cineworld's business was performing well and growing. The Group had generated its highest revenues in 2018 and 2019.  Revenues were expected to continue growing following the Group's acquisition of Regal Entertainment Group in 2018 as Cineworld realized additional synergies from the further integration of the two companies.  However, the COVID-19 pandemic changed everything about the cinema industry.  Government-mandated shutdowns led to mass theater closures in early 2020, abruptly cutting off the cinema industry's source of revenue and decimating Cineworld's financial performance.  Even after theaters reopened, the Group's business continued to experience significant pressures driven by, among other things, massive film release and production delays and an increase in consumption of home entertainment alternatives.

In response to the COVID-19 pandemic, the Group undertook considerable efforts to preserve and enhance liquidity.  While these measures provided the Group with more than two years of continued runway, Cineworld's business continued to suffer from the lasting impacts of the pandemic, including considerably fewer major film releases in the second half of 2022, particularly in the third quarter of 2022. As of the Petition Date, the Group's liquidity had declined to approximately $4 million in cash on hand.

Recognizing the need to pursue a more comprehensive restructuring solution, in August 2022, the Debtors began preparations for the commencement of these Chapter 11 Cases.  In the lead up to the Petition Date, the Debtors negotiated with certain of their then-current lenders regarding the terms of a

debtor-in-possession financing facility. These negotiations resulted in entry into a $1.935 billion superpriority, senior secured, multi-draw priming term loan facility (the "DIP Facility").

On September 7, 2022 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"). On September 8, 2022, the Bankruptcy Court held a "first day hearing" at which the Bankruptcy Court entered, among other things, the Interim DIP Order.[4] The Interim DIP Order granted the Debtors access to $514 million of the DIP Facility on an interim basis to be used for working capital needs during the pendency of these Chapter 11 Cases, and $271 million to effectuate the purchase of the RoW Facility by Debtor Busby AssignCo, LLC. The Interim DIP Order further provided that $1.0 billion (the "Priming Loan Refinancing Amount") would be placed into an escrow account under the control of the DIP Lenders and, upon entry of a final order approving the DIP Facility, would be used to refinance the Prepetition Priming Facility. Subject to the terms of the Interim DIP Order, the Priming Loan Refinancing Amount was made repayable to the DIP Lenders if the Debtors reached agreement on an alternative debtor-in-possession financing facility with an alternative lender on more favorable terms than the existing DIP Facility. The Debtors did not receive any actionable alternative financing proposals on superior terms to the existing DIP Facility.

In the weeks leading up to the final hearing on the DIP Facility, the Debtors, the Creditors' Committee, the DIP Lenders, and the Debtors' landlord constituency engaged in extensive negotiations to achieve a consensual proposed order approving the DIP Facility on a final basis. The consensual proposed order approving the DIP Facility on a final basis incorporated a deal between the Creditors' Committee and the DIP Lenders, which the Debtors supported, providing for, among other things, (i) an agreement to pay at least $20 million in "stub rent" owing to the Debtors' landlords in accordance with an agreed-upon schedule, (ii) liens and superpriority administrative expense claims for postpetition intercompany transfers, (iii) no adequate protection liens against entities that are not obligors of the debt, and (iv) the Debtors' agreement to pursue a marketing process for the Debtors' business and operations (but excluding an acquisition of the equity interests in Cineworld Parent itself) in accordance with certain agreed upon milestones (the "Marketing Process"). On October 31, 2022, following an uncontested hearing, the Bankruptcy Court entered the Final DIP Order[5] and, soon thereafter, the Priming Loan Refinancing Amount was disbursed to refinance the Prepetition Priming Facility.

Seeking to build on the consensus established through the DIP Facility negotiations, the Debtors provided the Ad Hoc Group[6] with a proposal setting forth the terms of a comprehensive restructuring transaction. Soon thereafter, the Debtors, with the assistance of their advisors and in coordination with the Ad Hoc Group and the Creditors' Committee, commenced the first phase of Marketing Process. In January 2023, the Debtors' investment banker, PJT Partners LP ("PJT") initiated outreach to potential

---

[4]   The "Interim DIP Order" means the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use of Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 173].

[5]   The "Final DIP Order" means the *Corrected and Amended Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use of Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief [ECF No. 676]* [Docket No. 722].

[6]   The "Ad Hoc Group" means that certain ad hoc group of lenders under the Debtors' Prepetition Legacy Credit Facilities currently represented by Arnold & Porter Kaye Scholer LLP as lead counsel, Akin Gump Strauss Hauer & Feld LLP as special counsel, and Houlihan Lokey, Inc. as investment banking advisor.

transaction parties. In total, the Debtors reached out to over forty parties, including various institutional investment firms and strategic bidders in the cinema industry. Fourteen of these parties entered into confidentiality agreements with the Debtors. The Debtors provided those parties that executed a confidentiality agreement with access to a virtual data room which included: (a) a presentation on the Debtors' go-forward business plan, (b) a process letter, (c) a teaser summary of the business, and (d) a form through which the counterparty could address questions to the Debtors. Interested parties were invited to participate in further discussions with PJT regarding the Debtors' industry, business, and the facts and circumstances of these chapter 11 cases. Subsequently, ahead of the agreed-upon deadline of February 16, 2023, the Debtors received a number of written indications of interest for an acquisition of some or all of the Debtors' assets.

While the Debtors received indicative proposals for strategic transactions involving the Debtors' entire business (including their businesses in the United States, the United Kingdom, and Ireland) (a "WholeCo Transaction"), none of these proposals involved an all-cash bid for the entire business. The Debtors and their advisors held meetings with such bidders and provided the bidders with requested diligence. However, the Debtors and the Ad Hoc Group jointly determined that, absent an all-cash bid significantly in excess of the valuation underpinning the transactions set forth in the Restructuring Support Agreement, the Debtors would not continue the process towards completion of a WholeCo Transaction. After evaluating the indications of interest received through the first phase of the Marketing Process, the Debtors, in conjunction with the Ad Hoc Group, determined that the Marketing Process should continue with a focus on Cineworld's "Rest of World" business encompassing its operations in Bulgaria, Czech Republic, Hungary, Israel, Poland, Romania, and Slovakia. More specifically, the proposals contemplated an acquisition of Debtor Crown UK HoldCo Limited's equity interests in Crown NL Holdco BV (such interests, the "RoW Equity"). Accordingly, the Debtors and PJT initiated a second phase of the Marketing Process with the goal of eliciting binding bids for the sale of the RoW Equity by a deadline of April 10, 2023 (the "Bid Deadline"). While the Debtors received several bids ahead of the Bid Deadline, the proposals received did not reach the value required by the Ad Hoc Group to pursue a sale of the RoW Equity. Accordingly, the Debtors and the Ad Hoc Group have jointly terminated the Marketing Process.

In parallel with administering the Marketing Process, the Debtors continued negotiations with the Ad Hoc Group with respect to a standalone restructuring transaction. In early February, following a lengthy diligence process, the Debtors received a response to the standalone restructuring proposal they provided to the Ad Hoc Group. On April 2, 2023, after extensive hard-fought, arm's-length negotiations, the Debtors and the Consenting Creditors entered into the Restructuring Support Agreement, the terms of which are embodied in the Plan and this Disclosure Statement. The Plan provides for a comprehensive restructuring transaction that will (a) reduce the Debtors' funded indebtedness by approximately $4.53 billion through an equitization of the Allowed Legacy Facilities Claims, (b) raise $800 million in aggregate gross proceeds through the Direct Equity Allocation and the Rights Offering, which is fully backstopped by the Equity Capital Raising Parties, to fund the costs associated with the Debtors' emergence from these Chapter 11 Cases with any remainder to be used for general corporate purposes, (c) provide the Debtors with $1.46 billion, net of any original issuance discount (subject to downward adjustment based upon the net sale proceeds realized through any Partial Sale), in exit debt financing, which would be raised either through a comprehensive third-party financing process or through an exit debt facility provided by the Sponsored Facility Capital Raising Parties, and (d) provide the Debtors with the ability to enter into an up to $200 million in exit revolver financing, in each case, to fund the Debtors' go-forward business operations.

Critically, the RSA reflects a global settlement reached between the Debtors, the Ad Hoc Group, the Consenting Creditors, and the Creditors' Committee (the "Committee Settlement"). Among other things, the Committee Settlement provides that the Plan will establish a post-Plan effective date litigation trust (the "Litigation Trust"). In accordance with the Committee Settlement, on the Plan Effective Date, the Debtors incorporated in the United States will transfer, or will cause to be transferred, to the Litigation

Trust (a) $10 million in Cash, (b) all of their rights, title, and interests in the Estate's claims under the class action lawsuit captioned *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL 1720 (MKB) (JO) (E.D.N.Y.) and under any such similar class action against credit card issuers arising from similar allegations as those set forth in the Interchange Litigation (the "Interchange Litigation," and such claims, the "Interchange Litigation Claims") as may be identified on or after the Effective Date, and (c) $500,000 in Cash for the administration of the Litigation Trust, including the disposition of the Interchange Litigation Claims and the reconciliation of General Unsecured Claims held by beneficiaries of the Litigation Trust for purposes of distributions. Holders of Allowed General Unsecured Claims shall, in accordance with the allocation determined by the Creditors' Committee, receive their allocable share of (a) $10 million in Cash and (b) interests in the Litigation Trust representing a right to recovery of (i) the first $5 million of Cash recovered by the Litigation Trust from the Interchange Litigation Claims and (ii) 50% of any Cash recovered in excess of $5 million in connection with such claims. In addition, the Plan provides for the payment of the reasonable and documented expenses of BNY Mellon Corporate Trustee Services Limited, in its capacity as indenture trustee for the Convertible Bonds, in an amount not to exceed $700,000. Further, as part of the Committee Settlement, (a) the Holders of Legacy Facilities Claims will not receive any recovery on account of their deficiency claims and any adequate protection claims for diminution of value beyond what is set forth in Article III.F of this Disclosure Statement for "Class 4 Legacy Facilities Claims" and (b) all Avoidance Actions will be released and waived under the Plan.

As described in Article IV.B.4 of this Disclosure Statement, entitled "Implementation Mechanisms in England and Wales," as a result of Cineworld Parent's incorporation in England and Wales, implementation of the Plan in England and Wales requires one or more Implementation Mechanisms under English law.

The Restructuring Transactions embodied in the Plan and Restructuring Support Agreement are a significant achievement that will enable the Debtors to continue building back their business in the wake of the devastation caused by the COVID-19 pandemic. Despite the many challenges that Cineworld faced on the eve of these Chapter 11 Cases, the Debtors are now poised to pursue confirmation of a Plan that will put the Reorganized Debtors on strong financial and operational footing. Each of the Debtors strongly believes that the Plan is in the best interests of their estates and represents the best available alternative at this time. The Debtors are confident that they can implement the Restructuring Transactions contemplated by the Plan to ensure their long-term viability and success. The Debtors strongly recommend that Holders of Claims entitled to vote to accept or reject the Plan vote to accept the Plan.

## III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.   What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor

or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of Claims whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.      What does it mean that the Debtors are seeking conditional approval of this Disclosure Statement?**

Pursuant to the Conditional DS Motion,[7]  the Debtors are seeking conditional approval of this Disclosure Statement pursuant to Rule 3016-2 of the Bankruptcy Local Rules for the Southern District of Texas.  Upon entry of an order approving the Conditional DS Motion, the Debtors will commence solicitation of votes on the Plan in accordance with the timeline set forth therein.  The Debtors will subsequently seek final approval of the Disclosure Statement contemporaneously with Confirmation of the Plan at the Confirmation Hearing.

**D.      What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date means that the Debtors will continue to operate their business as a going concern. Following Confirmation, the Plan will be consummated on the Effective Date, which is the date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan and (b) the Plan is declared effective by the Debtors.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their business and use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**E.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold.  Each category of Holders of Claims as set forth in Article III of the Plan pursuant to section

---

[7]    The "Conditional DS Motion" means the *Debtors' Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Scheduling Certain Dates with Respect Thereto, and (VI) Granting Related Relief*, filed contemporaneously herewith.

1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below: [8]

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Midwest Facility Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 4 | Legacy Facilities Claims | Impaired | Entitled to Vote |
| Class 5A | General Unsecured Claims Against the Class 5A Debtors | Impaired | Entitled to Vote |
| Class 5B | General Unsecured Claims Against the Class 5B Debtors | Impaired | Entitled to Vote |
| Class 6 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| Class 8 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| Class 9 | Interests in Cineworld Parent | Impaired | Not Entitled to Vote (Deemed to Reject) |

    **F.**       **What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recoveries to Holders of Allowed Claims or Allowed Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[9]**

Except to the extent that the Debtors and a Holder of an Allowed Claim or Interest, as applicable, agrees to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest.  Unless otherwise indicated, each Holder of an Allowed Claim or

---

[8]    For the avoidance of doubt, Classes 1, 2, 5A, 5B, 6, 7, and 8 shall apply to all Debtors, Class 3 shall apply only to REG and RCI, Class 4 shall apply to each Debtor except for Cineworld Funding, and Class 9 shall apply only to Cineworld Parent.

[9]    The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with its terms in the ordinary course) or as soon as reasonably practicable thereafter.

| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Total Amount of Claims in Class | Estimated % Recovery Under Plan[10] |
|-------|----------------|------------------------------|-------------------------------------------|--------------------------------------|
| Class 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, as determined by the Debtors (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) or the Reorganized Debtors, as applicable, in full and final satisfaction of such Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) or the Reorganized Debtors, as applicable: <br><br>(i)      payment in full in Cash of its Allowed Other Secured Claim; <br><br>(ii)     the collateral securing its Allowed Other Secured Claim; <br><br>(iii)    Reinstatement of its Allowed Other Secured Claim; or <br><br>(iv)     such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $3.8 million | 100% |

---

[10]    Recoveries calculated based on equity value set forth in the RSA (approximately $1.475 billion).

| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Total Amount of Claims in Class | Estimated % Recovery Under Plan[10] |
|-------|----------------|------------------------------|------------------------------------------|-------------------------------------|
| Class 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, as determined by the Debtors (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) or the Reorganized Debtors, as applicable, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) or the Reorganized Debtors, as applicable:<br><br>(i)   payment in full in Cash of its Allowed Other Priority Claim; or<br><br>(ii)   such other treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | $0.01 million - $1.1 million | 100% |
| Class 3 | Midwest Facility Claims | In full and final satisfaction of their Allowed Midwest Facility Claims, on the Effective Date, each Holder of an Allowed Midwest Facility Claim shall receive, at the option of the applicable Debtor (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) or the Reorganized Debtors:<br><br>(i)   Reinstatement of its Allowed Midwest Facility Claim; or<br><br>(ii)   such other treatment that renders its Allowed Midwest Facility Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $11.8 million | 100% |

| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Total Amount of Claims in Class | Estimated % Recovery Under Plan[10] |
|---|---|---|---|---|
| Class 4 | Legacy Facilities Claims | In full and final satisfaction of its Allowed Legacy Facilities Claims, on the Effective Date, each Holder of an Allowed Legacy Facilities Claim shall receive its Pro Rata share of:<br><br>(i)      the Distributable New Common Stock;<br><br>(ii)     the Subscription Rights; provided that such Holder of an Allowed Legacy Facilities Claim is an Eligible Participant; and<br><br>(iii)    the Legacy Facilities Claims Litigation Trust Interests.<br><br>Pursuant to the Creditors' Committee Settlement, Holders of Legacy Facilities Claims shall not receive any recovery on account of any deficiency claims and any adequate protection claims for diminution of value arising under the DIP Orders other than what is set forth in Article III.B.4 of the Plan. | $4.28 billion | 3.4% |
| Class 5A | General Unsecured Claims Against the Class 5A Debtors | In full and final satisfaction of its Allowed General Unsecured Claims in Class 5A, on the Effective Date, each Holder of an Allowed General Unsecured Claim in Class 5A shall receive its applicable share of the GUC Recovery Pool. | $1.41 billion - $1.45 billion | 0.3 - 0.5% |
| Class 5B` | General Unsecured Claims Against the Class 5B Debtors | In full and final satisfaction of its Allowed General Unsecured Claims in Class 5B, on the Effective Date, each Holder of an Allowed General Unsecured Claim in Class 5B shall receive its Pro Rata share of 60% of the GUC Recovery Pool. | $224.4 million - $916.4 million | 0.7 - 4.8% |
| Class 6 | Section 510(b) Claims | On the Effective Date, all Allowed Section 510(b) Claims, if any, shall be cancelled, released, and extinguished, and will be of no further force or effect. | N/A | 0% |

| Class | Claim/Interest | Treatment of Claim/ Interest | Projected Total Amount of Claims in Class | Estimated % Recovery Under Plan[10] |
|---|---|---|---|---|
| Class 7 | Intercompany Claims | In full and final satisfaction of all Allowed Intercompany Claims, on the Effective Date, such Claims shall be, at the option of the Debtors (with the consent of the Required Consenting Creditors and Required Equity Capital Raising Parties (such consent not to be unreasonably withheld)) or the Reorganized Debtors, either:<br><br>(i)      Reinstated;<br><br>(ii)      adjusted, converted to equity, otherwise set off, settled, distributed, or contributed; or<br><br>(iii)      canceled, released, or discharged without any distribution on account of such Claims. | $364.9 million | 0% or 100% |
| Class 8 | Intercompany Interests | In full and final satisfaction of the Allowed Intercompany Interests, on the Effective Date, all such Allowed Intercompany Interests shall be, at the option of the Debtors (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties (such consent not to be unreasonably withheld)) or the Reorganized Debtors, either:<br><br>(i)      Reinstated (except that they may be modified or recharacterized as Intercompany Claims); or<br><br>(ii)      set off, settled, distributed, contributed, merged, diluted, cancelled, released, or otherwise addressed or eliminated, and receive no distribution under the Plan. | N/A | 0% or 100% |
| Class 9 | Interests in Cineworld Parent | The interests in Cineworld Parent shall be extinguished or otherwise rendered no force and effect pursuant to the implementation of one or more Implementation Mechanism(s) in England and Wales, and Holders of Interests in Cineworld Parent will not receive any distribution on account of such Interests in Cineworld Parent. | $0.1 million | 0% |

> **G.    What will I receive from the Debtors if I hold an Allowed Administrative Claim or Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, Priority Tax Claims, Statutory Fees, and Restructuring Expenses have not been classified and, thus, are excluded from the Classes of Claims or Interests set forth in Article III of the Plan.

> **1.    Administrative Claims.**

Except with respect to the Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtor(s) against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtor on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of such an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided below in the next paragraph, Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims must do so by the Administrative Claims Bar Date.  Objections to such requests must be Filed and served on the requesting party and the Debtors (if the Debtors are not the objecting party) by the Administrative Claims Objection Bar Date.  Holders of such Claims who do not File and serve such requests by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or the Reorganized Debtors, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and any prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

HOLDERS OF ADMINISTRATIVE CLAIMS FOR UNPAID INVOICES THAT ARISE IN THE ORDINARY COURSE OF THE DEBTORS' BUSINESS AND WHICH ARE NOT DUE AND PAYABLE ON OR BEFORE THE EFFECTIVE DATE SHALL BE PAID IN THE ORDINARY COURSE OF BUSINESS IN ACCORDANCE WITH THE TERMS THEREOF AND NEED NOT FILE ADMINISTRATIVE CLAIMS.

> **2.    DIP Claims.**

The DIP Claims shall be deemed to be Allowed Claims in the full amount outstanding under the DIP Facility Credit Agreement as of the Effective Date (including any unpaid accrued interest and unpaid

fees, expenses, and other obligations under the DIP Facility Credit Agreement as of the Effective Date). In full satisfaction, settlement, discharge, and release of, and in exchange for, the DIP Claims, each Holder of an Allowed DIP Claim shall be indefeasibly paid and satisfied in full in Cash on the Effective Date except to the extent that a Holder of a DIP Claim agrees to less favorable treatment; *provided* that, for administrative convenience and in accordance with the Financing Commitment and Backstop Agreement and the Rights Offering Procedures, as applicable, each Holder of an Allowed DIP Claim that is a Capital Raising Party may elect to have Cash that it would be entitled to receive on account of its Allowed DIP Claim be used to satisfy all or a portion of its commitments in respect of the Capital Raise on a dollar-for-dollar basis (the "Capital Raise Convenience Election"). A Capital Raising Party that is a Holder of an Allowed DIP Claim may elect to use the Capital Raise Convenience Election, which shall constitute such Holder of an Allowed DIP Claim's consent that its DIP Claims, to the extent such DIP Claims are used in such election, shall be deemed satisfied for purposes of section 1129(a)(9) of the Bankruptcy Code. Except as otherwise expressly provided in the DIP Facility Credit Agreement or the DIP Orders, upon the indefeasible payment or satisfaction in full of all Allowed DIP Claims, all commitments under the DIP Facility Credit Agreement shall terminate and all Liens and security interests granted to secure the DIP Claims shall be automatically terminated and of no further force and effect, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Notwithstanding anything to the contrary in this Plan or the Confirmation Order, the DIP Facility and the DIP Facility Documents shall continue in full force and effect (other than, for the avoidance of doubt, any Liens or other security interests terminated pursuant to Article II.B of the Plan) after the Effective Date with respect to any contingent or unsatisfied obligations thereunder, as applicable, including, but not limited to, those provisions relating to the rights of the DIP Agent and the DIP Lenders to expense reimbursement, indemnification, and any other similar obligations of the Debtors to the DIP Agent and the DIP Lenders (which rights shall be fully enforceable against the Reorganized Debtors) and any provisions thereof that may survive termination or maturity of the DIP Facility in accordance with the terms thereof.

3. **Professional Fee Claims.**

a. **Final Fee Applications and Payment of Professional Fee Claims.**

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than forty-five days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court, including the Interim Compensation Order. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows, including from the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan.

b. **Professional Fee Escrow Account.**

No later than the Effective Date, the Debtors incorporated in the U.S. shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders and any invoices for fees and expenses incurred after the Effective Date in connection with the final fee

applications.  Such funds shall not be considered property of the Debtors' Estates.  The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Reorganized Debtors (other than to Cineworld Parent or Cineworld Funding) without any further notice to or action, order, or approval of the Bankruptcy Court.

### c. Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases.  If a Professional does not provide an estimate, the Debtors or the Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional; *provided, however,* that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.  The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided, further*, that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

### d. Post-Effective Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Reorganized Debtors or, solely as it pertains to the final fee applications, the Creditors' Committee.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 363, and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and the Reorganized Debtors, as applicable, shall pay, within ten Business Days after submission of a detailed invoice to the Debtors or the Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors, the Reorganized Debtors, or the Creditors' Committee, as applicable.  If the Debtors or the Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or the Reorganized Debtors, as applicable, or the affected Professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

### 4. Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

5.        **Payment of Statutory Fees and Reporting to the U.S. Trustee.**

All fees due and payable pursuant to 28 U.S.C. § 1930(a) shall be paid by the Debtors, the Reorganized Debtors, or the Disbursing Agent (on behalf of the Reorganized Debtors), as applicable, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.  All monthly reports shall be filed, and all fees due and payable pursuant to section 1930(a) of title 28 of the United States Code, shall be paid by the Debtors or the Reorganized Debtors (or the Distribution Agent on behalf of the Reorganized Debtors), as applicable, on the Effective Date. Following the Effective Date, the Reorganized Debtors (or the Distribution Agent on behalf of the Reorganized Debtors) shall (a) pay such fees as such fees are assessed and come due for each quarter (including any fraction thereof) and (b) file quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay such quarterly fees to the U.S. Trustee and to file quarterly reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

6.        **Payment of Restructuring Expenses.**

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms set forth herein, in the Restructuring Support Agreement, and the Financing Commitment and Backstop Agreement, without any requirement to File a fee application with the Bankruptcy Court or for Bankruptcy Court review or approval; *provided* that the foregoing shall be subject to the Debtors' receipt of an invoice with reasonable detail (but without the need for itemized time detail) from the applicable Entity entitled to such Restructuring Expenses in accordance with such Entity's applicable engagement letter. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least five days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses (it being understood that any difference in (a) estimated Restructuring Expenses on and including the Effective Date as compared to (b) Restructuring Expenses actually incurred on and including the Effective Date shall be reconciled following the submission of a final invoice by the Relevant Entity within thirty days of the Effective Date).  On the Effective Date, invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors and paid within ten Business Days of receipt by the Debtors or the Reorganized Debtors, as applicable.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay, when due and payable in the ordinary course (but no sooner than within ten Business Days of receipt of an invoice), Restructuring Expenses related to implementation, Consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date in accordance with the applicable engagement letter and solely upon receipt of an invoice from any Entity requesting such Restructuring Expenses with reasonable detail (but without the need for itemized time detail).

H.        **Are any regulatory approvals required to consummate the Plan?**

Whether any regulatory or other approvals are required to consummate the Plan will depend on the final structure of the Plan (including the Restructuring Transactions and the Rights Offering).  To the extent that any regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained, and the Debtors are engaging as appropriate in order to procure such approvals, authorizations, consents, rulings, or documents (as applicable).

**I.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses and the most likely outcome is that the Debtors would liquidate under chapter 7 of the Bankruptcy Code and/or similar equivalent bankruptcy processes in other jurisdictions.  It is likely that any alternative would provide Holders of Claims that are unimpaired under the Plan or entitled to vote on the Plan with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of extended chapter 11 cases, or of a liquidation scenario, *see* Article X.G of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis." The Liquidation Analysis is attached to this Disclosure Statement as **Exhibit E**.

**J.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can become effective.  Initial distributions to Holders of Allowed Claims will only be made on the Effective Date or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," for a discussion of the conditions precedent to Consummation of the Plan.

**K.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and Confirmation of the Plan, which objections potentially could give rise to litigation.  *See* Article IX.C.8 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases."

The Debtors will seek Confirmation of the Plan notwithstanding the dissent (whether deemed or otherwise) of rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article IX.A.5 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan."

**L.      How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, each Reorganized Debtor or the Litigation Trust, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Plan to the contrary, other than the Avoidance Actions or any other Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article IX of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.  For the

avoidance of doubt, the Schedule of Retained Causes of Action shall include any and all Claims and Causes of Action against National Cinemedia, LLC and National Cinemedia Inc., including, but not limited to, for damages and/or sanctions for willful violation of the automatic stay.

**The Reorganized Debtors or the Litigation Trust, as applicable, may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Reorganized Debtors, or the Litigation Trust, as applicable, will not pursue any and all available retained Causes of Action of the Debtors against it. The Debtors, the Reorganized Debtors, and the Litigation Trust expressly reserve all rights to prosecute any and all retained Causes of Action against any Entity (other than Avoidance Actions). Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor or the Litigation Trust, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors or the Litigation Trust, as applicable, may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or the Reorganized Debtors, as applicable, and the objecting party for thirty days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order (and for the avoidance of doubt, any Causes of Action on the Schedule of Retained Causes of Action shall not be expressly relinquished, exculpated, released, compromised, or settled in the Plan), the Reorganized Debtors or the Litigation Trust, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors and the Litigation Trust, as applicable, reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any retained Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors or the Litigation Trust, as applicable. The applicable Reorganized Debtors or the Litigation Trust, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors or the Litigation Trust, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court except as otherwise released in the Plan.

### M.    Are there risks to owning the New Common Stock upon emergence from Chapter 11?

Yes, *see* Article IX of this Disclosure Statement, entitled "Risk Factors." Among other things, the ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan will be subject to the issuance of the New Common Stock issued pursuant to the Management Incentive Plan, the ERO Backstop Premium, the Exit First Lien Facility Premium, the Direct Allocation Shares, and the Rights Offering Shares or other securities that may be issued post-emergence.

16

**N.      Will there be releases, injunction, and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, exculpation, and injunction provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Consenting Creditors in obtaining their support for the Plan.

These provisions are the product of extensive good faith, arm's-length negotiations, were material inducements for the comprehensive settlement embodied in the Plan, and are supported by the Debtors and the Consenting Creditors.  Moreover, the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**IMPORTANTLY, ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT VALIDLY OPT OUT OF THE RELEASES WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

Based on the foregoing, the Debtors believe that the release, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit.  More specifically, while their review is ongoing, the Debtors are not aware of any potentially colorable Claims or Causes of Action held by the Debtors or their Estates against the Released Parties that would provide a material benefit to creditor recoveries.  In particular, the Debtors are not aware of any colorable Claims or Causes of Action against current or former directors or officers that would provide a material benefit to creditor recoveries.  Accordingly, as of this time, the Debtors do not believe that they have material Causes of Action against any of the Released Parties, let alone Causes of Action that would justify the risk, expense, and delay attendant to their pursuit and therefore, if the Plan is consummated, all Claims and Causes of Action against the Released Parties will be released pursuant to the Plan.

Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

1.      **Release of Liens.**

**Except as otherwise provided herein, in the Exit First Lien Facility Documents, the New Money Revolving Credit Facility Documents, the Plan Supplement, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any**

further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, or any other Holder of a Secured Claim.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, and other security interests.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, the Exit First Lien Facility Agent, or the New Money Revolving Credit Facility Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

2.      Releases by the Debtors.

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted by or on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates, as applicable, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to or in any manner arising from in whole or in part, the Debtors (including the management, ownership, or operation thereof), any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, the Convertible Bonds, the Legacy Facilities, the Priming Facilities, the Midwest Facility, the Settlement Facility, any intercompany transactions, the Chapter 11 Cases and any related adversary proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility, the Rights Offering, the Financing Commitment and Backstop Agreement, the New Money Revolving Credit Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility, the Rights Offering, the Financing Commitment and Backstop Agreement, the New Money Revolving Credit Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the

distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release:  (a) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions; (b) the rights of any Holder of Allowed Claims to receive distributions under the Plan; (c) any Claims for indemnification that are expressly assumed by the Debtors pursuant to the Plan or any document, instrument, or agreement executed to implement the Plan or the Restructuring Transactions; (d) any obligations arising under business or commercial agreements or arrangements among the Released Parties and any non-Debtor Entity; or (e) the Interchange Litigation Claims and any other claims or causes of action of the Estates relating to the Interchange Litigation.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the claims or Causes of Action released by the Debtor Release; (iii) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Estates asserting any claim or Cause of Action released by the Debtor release against any of the Released Parties.

3.      Releases by the Releasing Parties.

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, the Reorganized Debtors, or their Estates, as applicable, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, the Convertible Bonds, the Legacy Facilities, the Priming Facilities, the Midwest Facility, the Settlement Facility, any intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility, the Rights Offering, the Financing Commitment and Backstop Agreement, the New Money Revolving Credit Facility, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility, the Rights Offering, the Financing Commitment and Backstop Agreement, the New Money Revolving Credit Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or

distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release:  (a) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions, including the Exit First Lien Facility Documents and the New Money Revolving Credit Facility Documents; (b) the rights of any Holder of Allowed Claims or Allowed Interests to receive distributions under the Plan; (c) any obligations arising under business or commercial agreements or arrangements among the Released Parties and any non-Debtor Entity; or (d) the Interchange Litigation Claims and any other claims or causes of action of the Estates relating to the Interchange Litigation.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (i) consensual; (ii) essential to the Confirmation; (iii) given in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (iv) a good faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for hearing; and (viii) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

4.       **Exculpation.**

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any claims and Causes of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, including the formulation, preparation, dissemination, negotiation, filing, or termination of prepetition transactions (including with respect to the Debt Documents), the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility Documents, the New Money Revolving Credit Facility Documents, the Rights Offering, the Financing Commitment and Backstop Agreement, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility, the Rights Offering, the Financing Commitment and Backstop Agreement, the New Money Revolving Credit Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross

negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable Law with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

     5.    **Injunction.**

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold the Released Claims are permanently enjoined from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any Released Claims; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any Released Claims; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the Estates of such Entities on account of or in connection with or with respect to any Released Claims; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the Estates of such Entities on account of or in connection with or with respect to any Released Claims unless such Entity has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in <u>Article IX.F</u> of the Plan.

    **O.**    **How will undeliverable distributions and unclaimed property be treated under the Plan?**

If any distribution to a Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable, no distribution shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date without interest. Undeliverable distributions shall remain in the possession of the Reorganized Debtors or the Litigation Trust, as applicable, until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or the Litigation Trust or is cancelled pursuant to <u>Article VII</u> of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

Any distribution under the Plan that is an Unclaimed Distribution or remains undeliverable for a period of 180 days after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution or undeliverable distribution shall revest in the applicable Reorganized Debtor or the Litigation Trust, as applicable, automatically (and without need for a further order by the Bankruptcy Court, notwithstanding any applicable federal, provincial, or estate escheat, abandoned, or unclaimed property Laws to the contrary) and, to the extent such Unclaimed Distribution is comprised of the New Common Stock, such New Common Stock shall be cancelled.  Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be cancelled, released, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.  The Disbursing Agent shall adjust the distributions of the New Common Stock to reflect any such cancellation.

**P.     Are there minimum distribution restrictions?**

The Disbursing Agent shall not make any distributions to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest of Cash where such distribution is valued, in the reasonable discretion of the applicable Disbursing Agent, at less than $250.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest, as applicable, would otherwise result in the issuance of a number of shares of the New Common Stock that is not a whole number, the actual distribution of shares of the New Common Stock shall be rounded as follows:  (a) fractions of one-half or greater shall be rounded to the next higher whole number; and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of the New Common Stock to be distributed under the Plan shall be adjusted as necessary to account for the foregoing rounding.  No fractional shares of the New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  Each Allowed Claim or Interest to which these limitations apply shall be discharged pursuant to <u>Article IX.A</u> of the Plan and its Holder shall be forever barred pursuant to <u>Article IX.A</u> of the Plan from asserting that Claim or Interest against the Reorganized Debtors or their property.

**Q.     What steps did the Debtors take to evaluate alternatives to a chapter 11 filing?**

As described in the First Day Declarations, prior to the Petition Date, the Debtors evaluated numerous potential alternatives to address their funded indebtedness.  In light of the devastating impact of the COVID-19 pandemic on the Debtors' operations, the Debtors determined in their sound business judgment to pursue a holistic restructuring through a chapter 11 filing.

**R.     What is the Marketing Process?**

The Debtors, with the assistance of their advisors and in coordination with the Ad Hoc Group and the Creditors' Committee, commenced the first phase of Marketing Process on January 4, 2023 to determine market interest in a value-maximizing sale of the Debtors' assets.  As discussed elsewhere herein, ahead of the agreed-upon deadline of February 16, 2023 for submission of initial indications of interest, the Debtors received numerous written indications of interest for an acquisition of some or all of the Debtors' assets.  After evaluating the indications of interest received through the first phase of the Marketing Process the Debtors, in conjunction with the Ad Hoc Group, determined that the only actionable indications of interest centered on a Partial Sale (specifically, a sale of the RoW Equity) were worth continuing to pursue.  Accordingly, the Debtors and PJT initiated a second phase of the Marketing Process with the goal of eliciting binding bids for the acquisition of the RoW Equity by the Bid Deadline.  While the Debtors received several bids ahead of the Bid Deadline, the proposals received did not reach the value required by

the Ad Hoc Group to pursue a sale of the RoW Equity.  Accordingly, the Debtors and the Ad Hoc Group have jointly terminated the Marketing Process.

**S.      What is the deadline to vote on the Plan?**

The Voting Deadline is June 2, 2023, at 3:00 p.m., prevailing Central Time.

**T.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the Ballots (as defined in the Conditional DS Motion) distributed to holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot or a master ballot including your vote is **actually received** by the Debtors' solicitation agent, Kroll Restructuring  (the "Solicitation Agent") **on or before the Voting Deadline,** *i.e.* **June 2, 2023, at 3:00 p.m., prevailing Central Time**.  *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," for more information.

**U.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**V.      When is the Confirmation Hearing set to occur?**

Through the Conditional DS Motion, the Debtors have requested that the Bankruptcy Court schedule the Confirmation Hearing for **June 12, 2023, at 8:00 a.m., prevailing Central Time**, or such other date as may be scheduled by the Bankruptcy Court.  The Confirmation Hearing may be adjourned from time to time without further notice.

The Debtors have also requested that objections to Confirmation of the Plan and final approval of the Disclosure Statement must be Filed and served on the Debtors, and certain other parties, by no later than **June 2, 2023, at 5:00 p.m., prevailing Central Time**, in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

**W.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**X.      What is the Rights Offering and the Direct Equity Allocation?**

On or prior to the Effective Date, through the Rights Offering, the Reorganized Cineworld Parent will issue New Common Stock for an aggregate purchase price of $400.0 million.  On or prior to the Effective Date, Reorganized Cineworld Parent will issue the Direct Allocation Shares for an aggregate purchase price of $400.0 million through the Direct Equity Allocation.  In the aggregate, through the Rights Offering and Direct Equity Allocation, Reorganized Cineworld Parent will issue New Common Stock for a purchase price of $800.0 million.

Pursuant to the Direct Equity Allocation, the Direct Allocation Shares will be offered by subscription to each Equity Capital Raising Party on a ratable basis based on each such Equity Capital Raising Party's Backstop Final Allocated Percentage.

Pursuant to the Rights Offering, the Rights Offering Shares will be offered by subscription to each Eligible Participant who may purchase up to each Eligible Participant's Pro Rata share, in each case on, and subject to, the terms and conditions set forth in the Rights Offering Documents. The Rights Offering will be fully backstopped by the Equity Capital Raising Parties pursuant to the terms of the Financing Commitment and Backstop Agreement with each Equity Capital Raising Party committing, pursuant to the Financing Commitment and Backstop Agreement, on a several and not joint basis, to purchase its respective number of RO Backstop Shares, which are the shares of New Common Stock not subscribed for in the Rights Offering, in accordance with its Backstop Final Allocated Percentage.

As consideration for backstopping the Rights Offering, the Equity Capital Raising Parties (including any Replacing Capital Raising Party, but excluding any Defaulting Capital Raising Party) or their respective designees, as applicable, will receive the ERO Backstop Premium, a non-refundable premium in an amount equal to 20.00% of the Total Shares Outstanding (as defined in the Financing Commitment and Backstop Agreement). Upon consummation of the Restructuring on the Effective Date, the Equity Capital Raising Parties (including any Replacing Capital Raising Party, but excluding any Defaulting Capital Raising Party) or their respective designees, as applicable, will receive the ERO Premium Shares as payment of the ERO Backstop Premium, with each Equity Capital Raising Party (or Replacing Capital Raising Party) entitled to receive its Pro Rata share of the ERO Backstop Premium based on its Backstop Final Allocated Percentage. If the Financing Commitment and Backstop Agreement is terminated under certain circumstances, the ERO Backstop Premium will be paid in cash in an amount equal to $295.0 million.

As consideration for agreeing to provide the Direct Financing Allocation, the Sponsored Facility Capital Raising Parties will receive the Exit First Lien Facility Premium, which is an aggregate non-refundable fee equal to 7.00% of the Total Shares Outstanding. Upon consummation of the Restructuring on the Effective Date, the Sponsored Facility Capital Raising Parties will receive the Exit First Lien Facility Premium Shares as payment of the Exit First Lien Facility Premium, with each Sponsored Facility Capital Raising Party entitled to receive its Pro Rata share of the Exit First Lien Facility Premium Shares based on its First Lien Final Allocated Percentage. If the Financing Commitment and Backstop Agreement is terminated under certain circumstances, the Exit First Lien Facility Premium will be paid in cash in an amount equal to $103.25 million.

The offer of the Subscription Rights and the offer and issuance of the Direct Allocation Shares, the Rights Offering Shares, RO Backstop Shares and Premium Shares will be issued in reliance upon the exemption from registration set forth in Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act), subject to any other applicable securities Laws. In addition, the Rights Offering and the Direct Equity Allocation will be conducted in reliance upon one or more exemptions from the requirement to publish a prospectus in a Relevant State under the Prospectus Regulation, and therefore any participant that is resident, located in or has a registered office in a Relevant State will be required to confirm that they are a qualified investor (as defined in Article 2(e) of the Prospectus Regulation) in order to participate in the Rights Offering and the Direct Equity Allocation.

The procedures and instructions for exercising the Subscription Rights are set forth in the Rights Offering Procedures, which include details regarding relevant eligibility criteria in relation to participation in the Rights Offering.

**TO PARTICIPATE IN THE RIGHTS OFFERING, EACH ELIGIBLE PARTICIPANT MUST COMPLETE ALL THE STEPS OUTLINED IN THE RIGHTS OFFERING PROCEDURES.   IF ALL OF THE STEPS OUTLINED IN THE RIGHTS OFFERING PROCEDURES ARE NOT COMPLETED BY THE DEADLINES PROVIDED THEREIN, THE ELIGIBLE PARTICIPANT SHALL BE DEEMED TO HAVE <u>FOREVER AND IRREVOCABLY RELINQUISHED AND WAIVED</u> ITS RIGHT TO PARTICIPATE IN THE RIGHTS OFFERING. ALL HOLDERS OF CLAIMS SHOULD REVIEW THE SECURITIES LAW RESTRICTIONS AND NOTICES SET FORTH IN THIS DISCLOSURE STATEMENT AND THE PLAN IN FULL.**

**TO PARTICIPATE IN THE DIRECT EQUITY ALLOCATION AND THE RIGHTS OFFERING AND TO RECEIVE THE PREMIUM SHARES (AS APPLICABLE), EACH CAPITAL RAISING PARTY MUST STRICTLY FOLLOW THE REQUIREMENTS SET FORTH IN THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT AND THE RIGHTS OFFERING PROCEDURES, AS APPLICABLE.**

**Y.**     **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Solicitation Agent via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
> Cineworld Group plc Ballot Processing
> c/o Kroll Restructuring Administration LLC
> 850 Third Avenue, Suite 412
> Brooklyn, NY 11232
> *By electronic mail at:*
> <u>cineworldinfo@ra.kroll.com</u>
> *(Please mention "Cineworld Group plc Solicitation" in the subject line)*
>
> *By telephone at:*
> (844) 648-5574 (domestic, toll free) *or*
> +1 (845) 295-5705 (for parties outside the U.S.)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Solicitation Agent at <u>https://cases.ra.kroll.com/cineworld</u> (free of charge) or the Bankruptcy Court's website at <u>http://www.txs.uscourts.gov/bankruptcy</u> (for a fee).   PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

**Z.**     **Do the Debtors recommend voting in favor of the Plan?**

Yes, the Debtors believe that the Plan provides for a larger distribution to all Holders of Claims than would otherwise result from any other available alternative.   The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and projects them emerging from chapter 11 shortly after the Plan is confirmed, is in the best interest of all Holders of Claims, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

### AA.    Who supports the Plan?

The Plan is supported by the Debtors, the Creditors' Committee, and the Holders of approximately 83 percent of the Legacy Facilities Claims and Holders of approximately 69 percent of the DIP Claims.

## IV.    THE DEBTORS' DIP FACILITY AND PLAN

### A.    The DIP Facility.

Immediately prior to the Petition Date, the Debtors entered into a $1.935 billion super-senior secured DIP Facility Credit Agreement with the DIP Lenders and Barclays as DIP Agent.  The DIP Facility has provided the Debtors with critical liquidity to meet their obligations in the ordinary course of business during the Chapter 11 Cases.  More specifically, the DIP Facility provided the Debtors with, among other things, access to $514 million on an interim basis to be used for working capital needs during the pendency of these Chapter 11 Cases, and $271 million to effectuate the purchase of the RoW Facility by Debtor Busby AssignCo, LLC.  The Interim DIP Order further provided that $1.0 billion would be placed into an escrow account under the control of the DIP Lenders and, upon entry of a final order approving the DIP Facility, such amount would be used to refinance the Prepetition Priming Facility (such refinancing, the "Priming Loan Refinancing").  Pursuant to the terms of the Interim DIP Order, the Priming Loan Refinancing Amount was made repayable to the DIP Lenders if the Debtors reached agreement on an alternative debtor-in-possession financing facility with an alternative lender on more favorable terms than the existing DIP Facility.  As described herein, however, the Debtors did not receive any superior financing proposals. Accordingly, the Bankruptcy Court entered the Final DIP Order approving the existing DIP Facility, which provided the Debtors with an additional $110 million to be used for their working capital needs during the pendency of these Chapter 11 Cases, and effectuated the Priming Loan Refinancing.

### B.    The Plan.

The Plan contemplates the following key terms, among others described herein and therein:

#### 1.    Sources of Consideration for Plan Distributions.

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with (1) proceeds from the Exit First Lien Facility, (2) proceeds from the Direct Equity Allocation and Rights Offering, (3) the New Common Stock, and (4) Cash on hand.

##### a.    Issuance of New Common Stock.

On or prior to the Effective Date, Reorganized Cineworld Parent shall take steps to provide that the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) is issued and/or transferred in accordance with the terms of the Plan, the Plan Supplement, the New Organizational Documents, and applicable Law (including applicable securities Laws), and, to the extent applicable, the Rights Offering Documents.

The Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares will be issued in reliance upon the exemption from registration set forth in Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act), subject to any other applicable securities Laws. The issuance of the Distributable New Common Stock will be conducted in reliance upon one or more exemptions from registration under the Securities Act, which will include the exemption provided in section 1145 of the Bankruptcy Code to the fullest extent available.  The Rights Offering will be conducted in

reliance upon one or more exemptions from the requirement to publish a prospectus for the offer of transferable securities to the public in any member state of the EEA or in the UK under the Prospectus Regulation and therefore participants that are resident, located, or have a registered office in any member state of the EEA or in the UK will be required to confirm that they are EU/UK Qualified Investors in order to participate in the Rights Offering.

DTC or any other depository, as applicable, may accept and conclusively rely upon the Plan and the Confirmation Order in lieu of a legal opinion regarding the exemption(s) from registration pursuant to which the New Common Stock will be issued under the Plan and/or eligible for DTC's (or another depository's) book-entry delivery, settlement, and depository services. It is not expected that any shares of the New Common Stock will be eligible for any depository services, including with respect to DTC, on or about the Effective Date. Further, it is not intended that the New Common Stock will be listed on a national securities exchange (or a comparable non-U.S. securities exchange) on or about the Effective Date.

Any New Common Stock of Reorganized Cineworld Parent offered pursuant to the Management Incentive Plan (including pursuant to any Emergence Awards) shall be exempt from any registration requirements under any federal securities laws to the fullest extent permitted by section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or Rule 701 promulgated thereunder.

This Disclosure Statement and any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) have been prepared on the basis that any offer of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) issued in connection with the Plan or the Plan Supplement within any member state of the EEA or in the UK will either (a) not form part of any offer or invitation to purchase, acquire, subscribe for, sell, or otherwise dispose of or issue any securities or any solicitation of any offer to purchase, acquire, subscribe for, sell, or otherwise dispose of any security for the purposes of the Prospectus Regulation and/or the FSMA, as applicable, or (b) be made pursuant to an exemption under the Prospectus Regulation and/or the FSMA, as applicable, from the requirement to publish a prospectus for the offer of transferable securities to the public. In relation to each member state of the EEA or the UK, no offer of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) issued in connection with the Plan may be made to the public at any time other than pursuant to an exemption under the Prospectus Regulation and/or the FSMA, as applicable. In any member state of the EEA or in the UK, the Disclosure Statement, the Plan, and the Plan Supplement are only addressed to and directed at: (i) EU/UK Qualified Investors in that EEA member state or the UK; or (ii) any other person if such address or direction does not otherwise constitute an offer of transferable securities to the public within the meaning of the Prospectus Regulation (including in any of the other circumstances set out in Article 1(4) of the Prospectus Regulation) and/or the FSMA (including in any of the other circumstances set out in section 86 of the FSMA). None of the Debtors or any of its Affiliates, Reorganized Cineworld Parent, or any persons acting on any of their behalves has authorized, nor do they authorize, the making of any offer of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) through any financial intermediary, other than as may be contemplated in the Plan and any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement). In any member state of the EEA or in the UK, the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) may not be resold, exchanged, assigned, or otherwise transferred unless such resale, exchange, assignment or transfer is to: (A) an EU/UK Qualified Investor in that EEA member state or the UK; or (B) any other person if such resale, exchange, assignment or transfer does not otherwise constitute an offer of transferable securities to the public within the meaning of the Prospectus Regulation (including in any of the other

circumstances set out in Article 1(4) of the Prospectus Regulation) and/or the FSMA (including in any of the other circumstances set out in section 86 of the FSMA).

The Plan and any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) are not, and should not be construed as, an invitation or inducement to engage in any investment activity in relation to any of the transactions described therein or the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) such as would amount to a financial promotion in the UK for the purposes of section 21 of the FSMA.  In the UK, the information contained in the Plan or any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) is intended only for use and may only be relied upon in relation to any investment activity by, and any investment activity to which such information relates may only be engaged in by, persons falling within any of the circumstances of Article 1(4) of the Prospectus Regulation who are at the relevant time:  (a) investment professionals within the meaning of Article 19(5) of the FPO; (b) high net worth companies within the meaning of Article 49(2)(a) through (d) of the FPO; (c) persons that are existing members or creditors of the issuer of the relevant securities or of an undertaking which at the relevant time is in the same group as the issuer of the relevant securities, falling within Article 43 of the FPO; or (d) persons to whom the communication may otherwise lawfully be communicated (each, a "Permitted UK Person").  Any person in the UK that is not a Permitted UK Person is not, for the purposes of any investment or investment decision, an intended recipient of the information contained in the Plan or any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) and should not use such information as the basis for taking any investment activity or investment action.  The Plan and any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) should not (insofar as such documents relate to any investment or investment activity) be distributed, communicated to, or directed at the general public in the UK otherwise than as described above.

Each distribution, issuance, or transfer of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) on or around the Effective Date shall be governed by the terms and conditions set forth in the Plan (including the Plan Supplement and, to the extent applicable, the Rights Offering Documents) applicable to such distribution, issuance, or transfer, as applicable, and by the terms and conditions of the agreements and other instruments evidencing or relating to such issuance, as applicable, including, the Plan Supplement, and, to the extent applicable, the Rights Offering Documents, the terms and conditions of which shall bind each Entity receiving such issuance of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares).  On or prior to the Effective Date, except as otherwise provided in the Plan or the Plan Supplement and subject to local law requirements, the issuance of the New Common Stock shall be authorized without the need for any further corporate action and without any further action by Reorganized Cineworld Parent, the Debtors, or the Reorganized Debtors, as applicable, and without any action by the Holders of Claims or Interests or other parties in interest.  Any Entity's acceptance of the New Common Stock, including with respect to the Distributable New Common Stock, shall be deemed its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms, and to the extent applicable, the Rights Offering Procedures.

The Reorganized Debtors shall be authorized to issue a certain number of shares, units, or Interests of the New Common Stock required to be issued under the Plan and in accordance with the Rights Offering Documents, the Plan Supplement, the New Organizational Documents, and the Restructuring Transactions. All of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) issued or authorized

to be issued pursuant to the Plan or, if applicable, the Financing Commitment and Backstop Agreement shall, pursuant to the Restructuring Transactions, be duly authorized, validly issued, fully paid, and non-assessable.

The issuance of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) shall not constitute an invitation or offer to sell, or the solicitation of an invitation or offer to buy, any securities in contravention of any applicable Law in any jurisdiction. No action has been taken, nor will be taken, in any jurisdiction that would permit a public offering of any of the New Common Stock (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares, other than securities issued pursuant to section 1145 of the Bankruptcy Code) in any jurisdiction where such action for that purpose is required.

   b.   **Capital Raise.**

      i.   **Exit First Lien Facility.**

On the Effective Date, the Reorganized Debtors shall enter into the Exit First Lien Facility on the terms set forth in the Exit First Lien Facility Documents.

To the extent not already approved, Confirmation of the Plan shall be deemed approval of the Exit First Lien Facility and the Exit First Lien Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Exit First Lien Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Exit First Lien Facility. Execution of the Exit First Lien Facility Documents by the Exit First Lien Facility Agent shall be deemed to bind all Exit First Lien Facility Lenders as if each such Exit First Lien Facility Lender had executed the applicable Exit First Lien Facility Documents with appropriate authorization.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit First Lien Facility Documents, to the extent applicable: (i) shall be deemed to be granted; (ii) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit First Lien Facility Documents; (iii) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit First Lien Facility Documents; and (iv) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

To the extent applicable, the Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

ii.      **Direct Equity Allocation and Rights Offering.**

The Debtors shall offer (i) the Direct Equity Allocation to each Equity Capital Raising Party and (ii) the Rights Offering to each Eligible Participant and which shall be 100% backstopped by the Equity Capital Raising Parties, each in accordance with the terms and conditions of the Financing Commitment and Backstop Agreement.  On or prior to the Effective Date, Reorganized Cineworld Parent shall consummate the Direct Equity Allocation and Rights Offering in accordance with the Rights Offering Documents and any other documents related thereto.  Reorganized Cineworld Parent shall allocate the Subscription Rights to Eligible Participants as set forth in the Plan and the Rights Offering Procedures. Upon exercise of the Subscription Rights by such Eligible Participants pursuant to the terms of the Rights Offering Documents and the Plan, Reorganized Cineworld Parent shall be authorized to issue the Rights Offering Shares in accordance with the Rights Offering Documents and the Plan.

The Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares will be issued by Reorganized Cineworld Parent in reliance upon the exemption from registration set forth in Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act), subject to any other applicable securities Laws.  The Direct Equity Allocation and the Rights Offering will be conducted in reliance on one or more exemptions from the requirement to publish a prospectus for the offer of transferable securities to the public in any EEA member state or in the UK under the Prospectus Regulation and therefore participants that are resident, located or have a registered office in any EEA member state or in the UK will be required to confirm that they are EU/UK Qualified Investors in order to participate in the Rights Offering.

In addition, on the Distribution Date, the Premium Shares shall be distributed to the applicable Capital Raising Parties under and as set forth in the Financing Commitment and Backstop Agreement. Pursuant to the Financing Commitment and Backstop Agreement, the Equity Capital Raising Parties shall purchase the RO Backstop Shares as set forth in the Financing Commitment and Backstop Agreement.  On the Effective Date, the rights and obligations of the Debtors under the Financing Commitment and Backstop Agreement shall vest in Reorganized Cineworld Parent and the Reorganized Debtors (other than Cineworld Parent and Cineworld Funding).

The Plan and documents related thereto (including, without limitation, this Disclosure Statement, the Plan Supplement, and the Rights Offering Documents) have been prepared on the basis that any Subscription Rights issued in the Rights Offering or the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares issued in connection with the Plan within any EEA member state or in the UK will either (a) not form part of any offer or invitation to purchase, acquire, subscribe for, sell, or otherwise dispose of or issue any securities or any solicitation of any offer to purchase, acquire, subscribe for, sell, or otherwise dispose of any security for the purposes of the Prospectus Regulation and/or the FSMA, as applicable, or (b) be made pursuant to an exemption under the Prospectus Regulation and/or the FSMA, as applicable, from the requirement to publish a prospectus for the offer of transferable securities to the public.  In relation to each member state of the EEA or the UK, no offer of the Subscription Rights issued in connection with the Plan or the Plan Supplement may be made to the public at any time other than pursuant to an exemption under the Prospectus Regulation and/or the FSMA, as applicable.  In any member state of the EEA or in the UK, the Disclosure Statement, the Plan, and the Plan Supplement are only addressed to and directed at: (i) EU/UK Qualified Investors in that EEA member state or the UK; or (ii) any other person if such address or direction does not otherwise constitute an offer of transferable securities to the public within the meaning of the Prospectus Regulation (including in any of the other circumstances set out in Article 1(4) of the Prospectus Regulation) and/or the FSMA (including in any of the other circumstances set out in section 86 of the FSMA).  None of the Debtors or any of its

Affiliates, Reorganized Cineworld Parent, or any persons acting on any of their behalves has authorized, nor do they authorize, the making of any offer of the Subscription Rights through any financial intermediary, other than as may be contemplated in the Plan and any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement).  In any member state of the EEA or in the UK, the New Common Stock (including the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares) may not be resold, exchanged, assigned, or otherwise transferred unless such resale, exchange, assignment or transfer is to:  (A) an EU/UK Qualified Investor in that EEA member state or the UK; or (B) any other person if such resale, exchange, assignment, or transfer does not otherwise constitute an offer of transferable securities to the public within the meaning of the Prospectus Regulation (including in any of the other circumstances set out in Article 1(4) of the Prospectus Regulation) and/or the FSMA (including in any of the other circumstances set out in section 86 of the FSMA).

The Plan and any documents related thereto (including, without limitation, this Disclosure Statement and the Plan Supplement) are not, and should not be construed as, an invitation or inducement to engage in any investment activity in relation to any of the transactions described therein, including the Rights Offering, such as would amount to a financial promotion in the UK for the purposes of section 21 of the FSMA.  In the UK, the information contained in the Plan or any documents related thereto (including, without limitation, this Disclosure Statement and the Plan Supplement) is intended only for use and may only be relied upon in relation to any investment activity by, and any investment activity to which such information relates may only be engaged in by, persons falling within any of the circumstances of Article 1(4) of the Prospectus Regulation who are at the relevant time a Permitted UK Person.  Any person in the UK that is not a Permitted UK Person is not, for the purposes of any investment or investment decision, an intended recipient of the information contained in the Plan or any documents related thereto (including, without limitation, the Disclosure Statement and the Plan Supplement) and should not use such information as the basis for taking any investment activity or investment action.  The Plan and any documents related thereto (including, without limitation, this Disclosure Statement and the Plan Supplement) should not (insofar as they relate to any investment or investment activity) be distributed, communicated to, or directed at the general public in the UK otherwise than as described above.

### iii.    **New Money Revolving Credit Facility.**

The Reorganized Debtors shall use commercially reasonable efforts to (a) obtain commitments for, and (b), unless otherwise waived by the Required Consenting Creditors and the Required Equity Capital Raising Parties, on the Effective Date enter into, the New Money Revolving Credit Facility on the terms set forth in the New Money Revolving Credit Facility Documents.

To the extent applicable and not already approved, Confirmation of the Plan shall be deemed approval of the New Money Revolving Credit Facility and New Money Revolving Credit Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the New Money Revolving Credit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the New Money Revolving Credit Facility.

To the extent applicable, the Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order.

2.    **Employee-Related Matters.**

a.    **Compensation and Benefits Programs.**

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

(a)    all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Existing Interests in any of the Debtors;

(b)    Compensation and Benefits Programs that have been rejected pursuant to an order of a Bankruptcy Court;

(c)    any Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any Compensation and Benefits Program; and

(d)    any Compensation and Benefits Programs for the benefit of the Executive Directors, other than to the extent such program is provided for or modified pursuant to any of the Consulting Agreements (it being understood that nothing in Article VI.I.1 of the Plan shall impair or otherwise modify the Consulting Agreements, whose terms and conditions shall be controlling with respect to the subject matter set forth therein and in full force and effect in every respect on the Effective Date upon the (i) applicable termination set forth in Article IV.K of the Plan and (ii) execution by the relevant parties of the Consulting Agreements thereafter).

Any assumption of Compensation and Benefits Programs pursuant to the terms of the Plan shall be deemed not to trigger (i) any applicable change of control, immediate vesting, or termination (including, in each case, any similar provisions therein) or (ii) an event of "Good Reason" (or a term of like import), in each case as a result of the consummation of the Restructuring Transactions or any other transactions contemplated by the Plan.  No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to the Plan other than those applicable immediately prior to such assumption.

b.    **Workers' Compensation Programs.**

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under:  (a) all applicable workers' compensation Laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance.  All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or the Reorganized Debtors' defenses, Causes of Action, or other rights under applicable Law, including non-bankruptcy Law, with respect to any such contracts, agreements,

policies, programs, and plans; *provided*, *further*, that nothing herein or in the Plan shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state Law.

c.      **Management Incentive Plan.**

The Management Incentive Plan Pool shall be established and reserved for grants to be made from time to time from such pool to employees, officers, and directors of the Reorganized Debtors at the discretion of the New Board effective as of the Effective Date.  The terms and conditions (including, without limitation, with respect to participants, allocation, timing, and the form and structure of the equity or equity-based awards) shall be determined at the discretion of the New Board after the Effective Date; *provided* that Emergence Awards may be allocated on or prior to the Effective Date as emergence grants to recruit individuals selected to serve in key senior management positions on or after the Effective Date, subject to the terms and conditions, including, but not limited to, with respect to form, allocated percentage of the Management Incentive Plan Pool, structure, and vesting, determined by, in each case, the Required Consenting Creditors and the Required Equity Capital Raising Parties.

d.      **Employee and Retiree Benefits.**

Except as otherwise provided in <u>Article IV.O</u> of the Plan all Compensation and Benefits Programs shall be assumed by the Reorganized Debtors and the Reorganized Debtors shall continue the Compensation and Benefits Programs according to existing terms and practices as of the effective date of the Restructuring Support Agreement; *provided*, *however*, that the New Board may review, amend, terminate, or modify any of the foregoing programs in accordance with applicable Law.  For the avoidance of doubt, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable Law.

Upon the Effective Date and the satisfaction or waiver of the conditions precedent to the occurrence of the Effective Date set forth in <u>Article X.A</u> of the Plan, the applicable Reorganized Debtor shall enter into the Consulting Agreements, attached as <u>Exhibit E</u> to the Restructuring Support Agreement and in the Plan Supplement, with each of the Executive Directors.  Subject to entry into the Consulting Agreements between the applicable Reorganized Debtor and the Executive Directors, the Compensation and Benefit Programs for the Executive Directors shall be assumed by the applicable Reorganized Debtor as modified by the Consulting Agreements.

If the Executive Directors do not execute the Consulting Agreements upon the Effective Date, (a) the Compensation and Benefit Programs for the Executive Directors shall be deemed rejected as of the Effective Date and (b) subject to execution of a release (in form and substance acceptable to the Debtors, the Required Consenting Creditors, and the Required Equity Capital Raising Parties) against the Released Parties, the Executive Directors will be entitled to only any payments to be made (i) under those certain letter agreements, between Regal Cinemas, Inc., Cineworld Cinemas Limited, Crown Finance US, Inc., and the Executive Directors, dated September 6, 2022 and (ii) in lieu of notice pursuant to the Executive Directors' Employment Agreements.

e.      **Managers and Officers of the Reorganized Debtors.**

As of the Effective Date, the Executive Directors' Employment Agreements shall be assumed as modified by the Consulting Agreements, and the Executive Directors shall thereafter be deemed to have been terminated by mutual consent from their respective positions with the Debtors and, as applicable, any non-Debtor Affiliate; *provided* that, for the avoidance of doubt, if the Executive Directors do not execute the Consulting Agreements upon the Effective Date and the Consulting Agreements are not in full force

and effect on the Effective Date, (a) the Executive Directors' Employment Agreements will be deemed rejected as of such date and (b) subject to execution of a release (in form and substance acceptable to the Debtors, the Required Consenting Creditors, and the Required Equity Capital Raising Parties) against the Released Parties, the Executive Directors will be entitled to only any payments to be made (i) under those certain letter agreements, between Regal Cinemas, Inc., Cineworld Cinemas Limited, Crown Finance US, Inc. , and the Executive Directors, dated September 6, 2022 and (ii) in lieu of notice under the Executive Directors' Employment Agreements.  The members for the New Board shall be appointed in accordance with the Corporate Governance Term Sheet.  The initial members of the New Board of Reorganized Cineworld Parent will be identified in the Plan Supplement, to the extent known at the time of filing.  Each such member and officer of the Reorganized Debtors (including the new chief executive officer as determined by the Required Equity Capital Raising Parties) shall serve from and after the Effective Date pursuant to the terms of any applicable employment agreements and other constituent documents of the Reorganized Debtors, including the New Organizational Documents.

3.     **Treatment of Executory Contracts and Unexpired Leases.**

a.     **Assumption and Rejection of Executory Contracts and Unexpired Leases.**

On the Effective Date, except as otherwise provided herein or in the Plan, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that:  (a) are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases, which schedule shall be acceptable to the Required Consenting Creditors and the Required Equity Capital Raising Parties; (b) have previously expired or terminated pursuant to their own terms or agreement of the parties thereto; (c) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (d) are, as of the Effective Date, the subject of (i) a motion to reject that is pending,or (ii) an order of the Bankruptcy Court that is not yet a Final Order; or (e) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, or the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Proposed Cure Amounts, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth in the Plan, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Notwithstanding anything herein or in the Plan to the contrary, with respect to any Unexpired Lease that is listed on the Schedule of Rejected Executory Contracts and Unexpired Leases, assumptions or rejections of such Unexpired Leases pursuant to the Plan are as of the Effective Date; *provided* that the effective date of the rejection of any such Unexpired Lease shall be the later of (A) the Effective Date and (B) the date upon which the Debtors notify the landlord in writing (email being sufficient) that they have surrendered the premises to the landlord and returned the keys, key code, or security codes, as applicable.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, including in accordance with any amendments executed by the Debtors and the counterparties to the applicable Executory Contract or Unexpired Lease during these Chapter 11 Cases and effective upon assumption by the Debtors, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors with the prior written consent (e-mail being sufficient) of the

Required Consenting Creditors and the Required Equity Capital Raising Parties, such consent not to be unreasonably withheld.

Except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by Law, any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan shall be deemed modified such that the transactions contemplated by the Plan shall not constitute a "change of control" or "assignment" (or terms with similar effect) under, or any other transaction, event, or matter that would (A) result in a violation, breach or default under such Executory Contract or Unexpired Lease, (B) increase, accelerate or otherwise alter any obligations, rights or liabilities of the Debtors or the Reorganized Debtors under such Executory Contract or Unexpired Lease, or (C) result in the creation or imposition of a Lien upon any property or asset of the Debtors or the Reorganized Debtors pursuant to the applicable Executory Contract or Unexpired Lease. Any consent or advance notice required under such Executory Contract or Unexpired Lease shall be deemed satisfied by Confirmation.

Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases and the Schedule of Proposed Cure Amounts at any time up to forty-five days after the Effective Date; *provided, however*, that for any Executory Contract or Unexpired Lease subject to a dispute with respect to Cure cost as of the Effective Date, the deadline to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases with respect to such Executory Contract or Unexpired Lease shall be the later of (1) forty-five days after the Effective Date and (2) five business days after the Bankruptcy Court determines that the Allowed Cure cost with respect to such Executory Contract or Unexpired Lease is greater than the amount set forth in the Schedule of Proposed Cure Amounts.

For the avoidance of doubt, at any time prior to the deadline set forth in section 365(d)(4) of the Bankruptcy Code or as otherwise ordered by the Bankruptcy Court, the Debtors may reject any Executory Contract or Unexpired Lease pursuant to a separate motion filed with the Bankruptcy Court.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules require the Debtors to assume or reject an Executory Contract or Unexpired Lease, such requirement shall be satisfied if the Debtors make an election, with the prior written consent (e-mail being sufficient) of the Required Consenting Creditors and the Required Equity Capital Raising Parties, such consent not to be unreasonably withheld, to assume or reject such Executory Contract or Unexpired Lease prior to the deadline set forth by the Bankruptcy Code or the Bankruptcy Rules, as applicable, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

b.      **Indemnification Obligations.**

All indemnification provisions, consistent with applicable Law, in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants,

investment bankers, and other professionals of the Debtors, as applicable, shall be Reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on the same terms that existed prior to the Effective Date; *provided* that nothing in the Plan shall expand any of the Debtors' indemnification obligations in place as of the Petition Date.

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors, managers, and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors, managers, and officers remain in such positions after the Effective Date.

c.     **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

Entry of the Confirmation Order shall constitute a Bankruptcy Court Order approving the rejections, if any, of any Executory Contracts or Unexpired Leases on the Schedule of Rejected Executory Contracts and Unexpired Leases. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty days after the later of (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection and (b) the effective date of such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, the Litigation Trust, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** Notwithstanding anything to the contrary in the Plan or the Definitive Documents, the Debtors (with the consent of the Required Consenting Creditors and Required Equity Capital Raising Parties), or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time through and including forty-five days after the Effective Date. For the avoidance of doubt, unless otherwise agreed, any property remaining on the premises subject to a rejected Unexpired Lease shall be deemed abandoned by the Debtors or the Reorganized Debtors, as applicable, as of the effective date of the rejection, and the counterparty to such Unexpired Lease shall be authorized to use or dispose of any property left on the premises in its sole and absolute discretion without notice or liability to the Debtors or the Reorganized Debtors, as applicable, or any third party.

d. **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, shall, in accordance with the Schedule of Proposed Cure Amounts, pay all Cure costs relating to Executory Contracts and Unexpired Leases that are being assumed under the Plan. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all objections to any Cures set forth in the Schedule of Proposed Cure Amounts must be Filed with the Bankruptcy Court on or before fourteen days after the service of the Schedule of Proposed Cure Amounts on affected counterparties. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, without the need for any objection by the Debtors or Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure costs shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the applicable Cure costs; *provided*, *however*, that nothing herein or in the Plan shall prevent the Reorganized Debtors from paying any Cure costs despite the failure of the relevant counterparty to file such request for payment of such Cure costs. The Reorganized Debtors also may settle any disputes related to Cure costs without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before fourteen days after the service of notice of assumption on affected counterparties. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or at the Debtors' or the Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely Filed, unless otherwise agreed to by the parties or ordered by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment.

If there is any dispute regarding any Cure costs, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption or assumption and assignment, then payment of any Cure costs shall occur as soon as reasonably practicable after (1) entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or (2) as may be agreed upon by the Debtors (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

The Debtors (with the consent of the Required Consenting Creditors and the Required Equity Capital Raising Parties) and the Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute. If the Bankruptcy Court determines that the Allowed Cure cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Schedule of Proposed Cure Amounts, the Debtors shall have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date, subject to the applicable counterparty's right to object to such rejection. Notwithstanding the foregoing, the Reorganized Debtors shall be deemed to be entitled to the full benefits of the Executory Contract or Unexpired Lease pending (including, without limitation, any license thereunder) resolution of any dispute, and any subsequent decision to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases shall not cause the Reorganized Debtors to incur any liability with respect thereunder.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption, upon the payment of all applicable Cures. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (ii) the effective date of such assumption or (iii) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

4.    **Implementation Mechanisms in England and Wales.**

Under English law, a public limited company, such as the Cineworld Parent, cannot cancel its existing equity interests and issue new shares of a company to creditors solely through a chapter 11 case. As such, full implementation of the restructuring contemplated in the Plan will require additional steps to be taken in England and Wales through one or more Implementation Mechanisms. The Debtors' decision regarding the Implementation Mechanisms will be reflected in the Restructuring Transactions Memorandum and the Plan Supplement. Implementation of the Restructuring Transactions (including the completion of the Implementation Mechanisms in England and Wales) is a condition precedent to the Effective Date of the Plan.

## V.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement is being distributed, along with the applicable Ballot to be used for voting on the Plan, to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, incorporated herein by reference.

> ***The Disclosure Statement Order and the exhibits attached thereto are incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan****.*

<u>**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**</u>. PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER AND THE EXHIBITS ATTACHED THERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.    Holders of Claims Entitled to Vote on the Plan.

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.D of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 4, 5A, and 5B (collectively, the "<u>Voting Classes</u>"). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are ***not*** soliciting votes from Holders of Claims or Interests in Classes 1, 2, 3, 6, 7, 8, and 9.

**B.     Solicitation Agent.**

The Debtors have retained Kroll Restructuring Administration LLC to act as, among other things, the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

**C.     Solicitation Package.[11]**

Contemporaneously herewith, the Debtors filed the proposed Disclosure Statement Order. For purposes of this Article V, capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement Order. Pursuant to the Disclosure Statement Order, Holders of Claims in the Voting Classes entitled to vote on the Plan as of the Voting Record Date (as caveated by the Supplemental Voting Record Date) will receive appropriate solicitation materials (in paper or electronic form) including (the following materials, collectively, the "Solicitation Package"):

- the conditionally approved Disclosure Statement (with all exhibits thereto, including the Plan);

- the Disclosure Statement Order (without exhibits);

- the Solicitation Procedures;

- the Cover Letter;

- the Combined Hearing Notice;

- the applicable Ballot for the relevant Class of Claims;

- a pre-addressed, postage pre-paid reply envelope; and

- any additional documents that the Bankruptcy Court has ordered to be made available to Holders of Claims in the Voting Classes.

The Solicitation Package shall provide the Disclosure Statement (with all exhibits thereto, including the Plan), the Disclosure Statement Order (without exhibits) and the Solicitation Procedures in electronic format (flash drive or CD-ROM, or, in the case of Beneficial Holders of Convertible Bonds Claims in Class 5A, in accordance with the customary procedures of the bank or brokerage firm (or that firm's agent) (each, a "Nominee") holding the securities in "street name" for its Beneficial Holder clients, and all other contents of the Solicitation Package, including the Cover Letter, Combined Hearing Notice, and Ballots, shall be provided in paper format. Any Voting Holder, excluding Class 5A Beneficial Holders of the Convertible Bonds Claims, who has not received a Solicitation Package should contact the Solicitation Agent. Any Class 5A Beneficial Holder of the Convertible Bonds Claims who has not received a Solicitation Package should contact their Nominee for further assistance.

---

[11]   Capitalized terms not otherwise defined in this section have the meaning ascribed to them in the Conditional DS Motion.

### D.     Voting Record Date.

**The Voting Record Date is April 18, 2023**.  The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim. For the avoidance of doubt, a holder will only be entitled to receive a Solicitation Package based on a claim arising from a rejected executory contract or unexpired lease if such claim is filed by the Voting Record Date.

### E.     Voting on the Plan.

**The Voting Deadline is June 2, 2023 at 3:00 p.m., prevailing Central Time**.  In order to be counted as votes to accept or reject the Plan, all Ballots must be:  (a) electronically submitted utilizing the online balloting portal maintained by the Solicitation Agent on or before the Voting Deadline; or (b) properly executed, completed, and delivered (either by using the return envelope provided, or by first class mail, overnight courier, or personal delivery, or by electronic mail, as set forth below) so that the Ballots are **actually received** by the Solicitation Agent on or before the Voting Deadline at the following address:

---

**DELIVERY OF BALLOTS**

**FOR ALL VOTING CLASSES**
**If by First Class Mail, Overnight Courier or Hand Delivery:**

**Cineworld Group plc Ballot Processing**
**c/o Kroll** Restructuring Administration LLC **850 Third Avenue, Suite 412, Brooklyn, NY** 11232

**IF YOU WOULD LIKE TO COORDINATE HAND DELIVERY OF YOUR BALLOT, PRE-VALIDATED BENEFICIAL HOLDER BALLOT OR MASTER BALLOT, PLEASE EMAIL cineworldballots@ra.kroll.com AND PROVIDE THE ANTICIPATED DATE AND TIME OF YOUR DELIVERY.**

**OR**

**FOR CLASSES 4, 5A, and 5B (EXCLUDING PRE-VALIDATED BENEFICIAL HOLDER AND MASTER BALLOTS IN CLASS 5A)**

**ONLINE PORTAL AT https://cases.ra.kroll.com/cineworld.  CLICK ON THE "SUBMIT E-BALLOT" SECTION OF THE DEBTORS' WEBSITE AND FOLLOW THE DIRECTIONS TO SUBMIT YOUR E-BALLOT. IF YOU CHOOSE TO SUBMIT YOUR BALLOT VIA KROLL'S E-BALLOT SYSTEM (THE "E-BALLOT PORTAL"), YOU SHOULD NOT ALSO RETURN A HARD COPY OF YOUR BALLOT.**

**VOTING HOLDERS IN CLASS 4, CLASS 5A, AND CLASS 5B (EXCLUDING BENEFICIAL HOLDERS AND NOMINEES IN CLASS 5A) ARE STRONGLY ENCOURAGED TO SUBMIT THEIR BALLOTS VIA THE E-BALLOT PLATFORM.**

**BALLOTS WILL NOT BE ACCEPTED BY TELECOPY, FACSIMILE, EMAIL, OR OTHER ELECTRONIC MEANS OF TRANSMISSION.**

**FOR CLASS 5 BENEFICIAL HOLDERS OF THE CONVERTIBLE BONDS CLAIMS AND NOMINEES ONLY (PREFERRED METHOD)**

---

---

**MASTER AND PRE-VALIDATED BENEFICIAL HOLDER BALLOTS**
Via E-mail:  cineworldballots@ra.kroll.com (Please reference "Cineworld Master Ballot" or "Cineworld Pre-Validated Ballot" in the subject line, as applicable)

If you received an envelope addressed to your Nominee, please return your ballot to your Nominee, allowing enough time for your Nominee to cast your vote on a Master Ballot before the Voting Deadline.  Class 5A Beneficial Holders should vote in accordance with the instructions provided by their Nominee.

---

**PLEASE SELECT JUST ONE OPTION TO SUBMIT YOUR VOTE:**

**FOR CLASSES 4, 5A, AND 5B (EXCLUDING PRE-VALIDATED BENEFICIAL HOLDER AND MASTER BALLOTS IN CLASS 5A)**

**EITHER RETURN A PROPERLY EXECUTED PAPER BALLOT WITH YOUR VOTE**

**OR**

**VOTE ELECTRONICALLY THROUGH THE CUSTOMIZED, ONLINE BALLOTING PORTAL ON THE DEBTORS' CASE WEBSITE MAINTAINED BY KROLL ("E-BALLOT")**

**OR, FOR CLASS 5A MASTER AND PRE-VALIDATED BENEFICIAL HOLDER BALLOTS ONLY**

RETURN A PROPERLY EXECUTED MASTER OR PRE-VALIDATED BALLOT WITH YOUR VOTE VIA E-MAIL AT CINEWORLDBALLOTS@RA.KROLL.COM AND REFERENCING "CINEWORLD MASTER BALLOT" OR "CINEWORLD PRE-VALIDATED BALLOT" IN THE SUBJECT LINE, AS APPLICABLE. CLASS 5 BENEFICIAL HOLDERS SHOULD SUBMIT THE BALLOT IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY THEIR NOMINEE.

**Holders of Claims who cast a Ballot via E-Ballot should NOT also submit a paper ballot.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT AT 844-648-5574 (DOMESTIC, TOLL FREE) OR +1 845-295-5705 (INTERNATIONAL).  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED EXCEPT AS OTHERWISE PROVIDED FOR IN THE SOLICITATION PROCEDURES OR IN THE SOLE AND ABSOLUTE DISCRETION OF THE DEBTORS.**

    **F.**    **Ballots Not Counted.**

    **No Ballot will be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the Ballots; (3) it was cast by an Entity that is not entitled to vote on the Plan; (4) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (5) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), the administrative agents under the Debtors' credit facilities, or the Debtors' financial or legal advisors instead of the Solicitation Agent; (6) it lacks a signature; or (7) it is not clearly marked to either accept or reject

the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

### G. Dates and Deadlines.

The following table sets forth important dates and deadlines relating to voting and confirmation of the Plan.[12]

| EVENT | DATE |
|---|---|
| **Voting Record Date** | April 18, 2023 |
| **Solicitation Mailing Date** | April 28, 2023 |
| **Publication Deadline** | April 28, 2023 |
| **Plan Supplement Filing Deadline** | May 26, 2023 |
| **Voting Deadline** | June 2, 2023 at 3:00 p.m. (prevailing Central Time) |
| **3018 Motion Deadline** | June 2, 2023 at 3:00 p.m. (prevailing Central Time) |
| **Plan and Disclosure Statement Objection Deadline** | June 2, 2023 at 5:00 p.m. (prevailing Central Time) |
| **Deadline to File Voting Report** | June 11, 2023 |
| **Confirmation Hearing Date** | June 12, 2023 at 8:00 a.m. (prevailing Central Time), or such other date as may be scheduled by the Bankruptcy Court |

## VI.   THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.   Cineworld's Corporate History.

Cineworld is a multinational cinema operator headquartered in Brentford, United Kingdom that traces its roots back nearly 100 years. In 1930, Moshe Greidinger—the grandfather of the Group's current Chief Executive Officer, Moshe "Mooky" Greidinger, and Deputy Chief Executive Officer, Israel Greidinger—opened a cinema in Haifa, Israel. Over the next few decades, he grew his first cinema into one of the largest cinema chains in Israel, forming the precursor to the Group's present day Planet and Rav Chen cinema brands.

Recognizing the need for a modern cinema option in Central and Eastern Europe, in 1997 the Group expanded under the Cinema City International brand into Hungary, opening a multiplex in Budapest. From there, expansion continued into the Czech Republic in 1999, and Poland in 2000, where the Group opened the region's first IMAX theater. After accomplishing nearly a decade of growth and success in Central and

---

[12]   These dates and deadlines are subject to the Bankruptcy Court's entry of the Debtors' proposed *Order (I) Conditionally Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection therewith, (IV) Approving the Rights Offering Procedures and Related Materials, (V) Scheduling Certain Dates with Respect thereto, and (VI) Granting Related Relief* (the "Disclosure Statement Order"), filed contemporaneously herewith.

Eastern Europe, Cinema City International's next big step was its initial public offering on the Warsaw Stock Exchange in 2006 (the "Warsaw IPO").  The Warsaw IPO, which valued the company at $343 million, gave it access to the public markets to fuel its continued growth.  That same year, the company expanded into Bulgaria, and the next year to Romania.  In 2011, Cinema City International acquired Palace Cinemas for $38 million, which provided access to the Slovakian market in addition to further bolstering the company's offerings in the Czech Republic and Hungary.  By the time of its merger with Cineworld, Cinema City International operated 99 multiplexes with 966 screens in seven countries.

Cine-UK, trading under the "Cineworld" brand name, was founded in 1995 by longtime Warner Brothers Europe executive Steve Wiener.  In 2005, the company became the U.K.'s second-largest theater circuit when it acquired the U.K. and Ireland operations of the French cinema chain UGC, which operated 408 screens across 42 cinemas, for a reported $400 million.  Two years later, Cineworld completed an initial public offering on the London Stock Exchange (the "LSE IPO").  In the years following the LSE IPO, the chain was modernized, with one-third of its screens upgraded to digital technology instead of traditional film reels.  The company was also a market leader in diversified cinematic offerings, including showing live events, such as opera and ballet, as well as rugby in 3D.  In addition, it pioneered the U.K.'s only cinema subscription service, the Unlimited Card, which remains a staple of Cineworld's U.K. operations to this day.  The next major milestone for Cineworld was the acquisition of Picturehouse Cinemas in December 2012 for £47.3 million.  The twenty-one Picturehouse locations further diversified the Cineworld chain as Picturehouse catered to an older audience through a carefully curated selection of independent and foreign arthouse films.

In 2014, legacy Cineworld merged with Cinema City International, with Cineworld paying Cinema City International shareholders just over $828 million in cash and shares, forming the second-largest cinema circuit in Europe with 1,852 screens across 201 cinemas.  Through the merger, Cineworld gained access to the emerging markets Cinema City International had cultivated in Central and Eastern Europe.  Following the merger, Mooky Greidinger became Chief Executive Officer and Israel Greidinger became Deputy Chief Executive Officer of the combined company.

Most recently, in 2018, Cineworld merged with Regal Entertainment Group—the U.S. cinema giant operating under the Regal, Edwards, and United Artists brands—in a transaction based on an implied enterprise value of $5.8 billion to form the second-largest cinema chain in the world.  In 2017, Regal generated over $3 billion in revenue through operations at 560 cinemas with 7,322 screens in 43 states and territories.  Regal was an ideal target for Cineworld given the companies' similar focus on cinema modernization and Cineworld's desire to expand into the U.S. market.  The transaction has been considered highly successful and by the end of 2019 had created $190 million in operational synergies.  Before the onset of the COVID-19 pandemic, the combined company's revenue and other key financial metrics had reached all-time highs.

1.    **Cineworld's Business Operations.**

Since its inception, the Group has led the cinema industry through its commitment to a strong film catalogue, superior customer service, premium concessions offerings, and a diverse array of cutting-edge movie-viewing experiences, including IMAX, 4DX, ScreenX, RPX, and other Premium Large Formats. The Group's strategic partnerships with key industry players have enabled Cineworld to provide its customers with a truly high-quality experience featuring premium viewing experiences and first class concessions offerings at state-of-the-art theaters.

2.      **Cineworld's Brands.**

The Group operates under five primary brands:  Cineworld in the U.K. and Ireland; Picturehouse in the U.K.; Regal in the U.S.; Cinema City in Central and Eastern Europe; and Planet in Israel.

- *Cineworld*.  As of the Petition Date, the Group operated 1,107 screens in 103 theaters in the U.K. and Ireland under the Cineworld brand.  Cineworld's focus is on providing great customer service with high quality technology, stadium seating, and online ticketing services.  Cineworld operates its exclusive premium large format (PLF) Superscreen system, as well as multidimensional sound powered by Dolby Atmos speakers and state-of-the-art projection.  Cineworld also partners with IMAX and CJ 4DPlex (the owner of 4DX and ScreenX).  Cineworld's IMAX auditoriums include integrated sound and speaker systems and outstanding visuals.  Moreover, Cineworld was the first cinema chain to bring 4DX and ScreenX technology to the U.K. and Ireland and remains the sole operator of the technology in the region today.  4DX auditoriums add practical effects such as water, wind, scent, lighting, and motion-programmed seating that are timed and designed to enhance the on-screen action.  Cineworld's ScreenX theatres offer a 270° projection of the film, using additional projectors that extend the picture out onto the side walls of the auditorium.  The Group generated approximately $348.1 million in total revenue (19.3% of its total revenue in 2021) in the U.K. and Ireland, including revenues from both the company's Cineworld and Picturehouse brands.

- *Picturehouse*.  As of the Petition Date, the Group operated 93 screens in 26 theaters in the U.K. and Ireland under the Picturehouse brand.  Picturehouse is the Group's arthouse cinema brand that provides an alternative to multiplex theaters operating under the Cineworld brand through a cozy atmosphere and contemporary restaurants and bars.  Picturehouse offers an expanded range of movies from those shown at standard theaters.

- *Regal*.  As of the Petition Date, the Group operated 6,787 screens in 505 theaters in the U.S. under the Regal, United Artists, and Edwards brands.  Regal operates multi-screen complexes that include features like immersive sound, wall-to-wall and floor-to-ceiling screens, Sony Digital Cinema 4K projections systems, three-dimensional digital projection screens, IMAX, PLF Regal Premium Experience (RPX), digital stereo surround-sound, and interiors featuring video game and party room areas.  Since the acquisition of Regal was completed, the combined company has had a number of achievements, including realizing $190 million in operational synergies by the end of 2019, the refurbishment of several sites, the expansion of reserved seating across Regal's platform, a new website and applications for online access, an enhanced concession offering, a new partnership with PepsiCo, and technological improvements that include the expansion of ScreenX technology, opening 23 additional 4DX screens, and increased use of laser projections.  The Group generated approximately $1.22 billion in total revenue (67.6% of its total revenue in 2021) in the U.S.

- *Cinema City*.  As of the Petition Date, the Group operated 1,022 screens in 102 theaters across Central and Eastern Europe, including Bulgaria, Czech Republic, Hungary, Poland, Romania, and Slovakia.  Cinema City theaters in Poland feature IMAX, ScreenX, and 4DX technologies.  Cinema City was the first to offer an "Unlimited" subscription program, which allows users to view an unlimited number of standard format films for a fixed monthly fee.  This program has since been expanded to other Cineworld brands.  The Group generated approximately $236.5 million in total revenue (13.1% of its total revenue in 2021) in Central and Eastern Europe under the Cinema City brand and in Israel under the Planet brand.

- *Planet*.  The Group operates 130 screens in 10 theaters in Israel under the Planet and Rav Chen brands.  The Group is the oldest and largest cinema operator in Israel.  Planet's theaters offer a VIP experience, IMAX screens, 4DX screens, ScreenX screens, and banquet halls.

3.      **Cineworld's Revenue and Income Stream.**

In 2021, Cineworld's operations generated over $1.8 billion in total revenue and approximately $54.4 million of Adjusted EBITDA (after lease payments), with over 95 million admissions. The Group's revenue is generated from several sources, including box office sales, retail sales, advertisements, and other products and services. The Group's revenue streams are described below:

- **Box office Sales**. Box office admissions are Cineworld's largest source of revenue. In 2021, the Group recognized approximately $955.7 million in total revenue globally from ticket sales, making up approximately 53% of its total revenue that year. The Group generates additional revenue from admissions by offering premium viewing formats, such as IMAX, ScreenX, 4DX, and RPX, which are priced above general admissions.

- **Retail Sales**. Retail offerings are Cineworld's second largest revenue stream. In 2021, retail accounted for approximately $552.3 million in total revenue globally, making up approximately 30% of the Group's total revenue that year. The Group's primary retail offerings are concessions and other food and beverage sales. The reopening of theaters worldwide in 2021 increased the volume of customer purchases and the per-customer spend on retail products increased by at least 25% in each of the Group's geographic segments.

- **Advertising**. Advertising revenue is predominantly generated by on-screen advertisements during the period before the showing of a feature presentation. As of the date hereof, the Group's advertising is facilitated by Digital Cinema Media Limited in the U.K. and Ireland, National CineMedia in the U.S., and directly by the Debtors in Central and Eastern Europe and Israel.

- **Film Distribution**. Cineworld operates a film distribution business, Forum Film, in Central and Eastern Europe and Israel, as well as in the U.K. Forum Film distributes films on behalf of major film studios, including Disney and Universal. It also distributes independent films in Central and Eastern Europe, Israel, and the U.K. Picturehouse is the Group's distribution arm in the U.K.

- **Other operations**. Cineworld has additional diversified revenue streams, including advanced ticket booking fees, vendor rebates, arcade and game rooms, special events and private bookings, and proceeds of other investments.

4.      **Cineworld's Real Estate Portfolio.**

The Group has an extensive real estate portfolio, which as of the Petition Date consisted of 505 theaters in the U.S., 129 theaters in the U.K. and Ireland, and 113 theaters across Central and Eastern Europe and Israel. Cineworld regularly assesses which locations may be advantageous to open a new theater and which existing theaters may benefit from further investment. These assessments have resulted in an expansion and refurbishment program, through which the company has opened ten new locations since 2021.

In addition, Cineworld continually assesses the performance of its existing locations. An important aspect of the Group's multi-faceted response to the challenges caused by the COVID-19 pandemic was to negotiate with landlords, in many cases with respect to underperforming locations, on the terms of potential lease restructurings, including rent deferrals, abatements, and other concessions that helped preserve Cineworld's liquidity while it navigated the pandemic. The Debtors have continued discussions with landlords during the Chapter 11 Cases to further assess and right-size their U.S. lease portfolio with the assistance of their advisors. As further described in Article VIII of this Disclosure Statement, as of the date hereof, the Debtors have rejected or filed a motion to reject certain theater leases. The Debtors continue to

assess their real estate portfolio vis-à-vis their go-forward business plan and ongoing negotiations with their landlords with respect to lease concessions.  In addition, the Debtors continue to assess optionality with respect to their U.K. lease portfolio, which analysis remains ongoing.

B.        **Prepetition Capital Structure.**

As of the Petition Date, the Group had approximately $5.35 billion in total funded debt obligations, approximately $5.0 billion of which were obligations of Debtor entities.  The relative priorities of each debt obligation are as follows:

| DEBTOR FINANCING FACILITIES | | |
|---|---|---|
| **Facility** | **Maturity** | **Outstanding Principal Amount as of the Petition Date[13]** |
| *Secured Debt* | | |
| *Facilities Under Prepetition Priming Credit Agreement* | | |
| **Initial Priming Term B-1 Loan** | May 23, 2024 | $544,553,219.00 |
| **Initial Priming Term B-2 Loan** | May 23, 2024 | $110,800,000.00 |
| **Incremental Legacy Priming Term B-1 Loan** | May 23, 2024 | $200,000,000.00 |
| *Facilities Under Prepetition Legacy Credit Agreement* | | |
| **Legacy USD Term Loan** | Feb. 28, 2025 | $2,655,731,471.10 |
| **Legacy EUR Term Loan** | Feb. 28, 2025 | $195,285,555.50 |
| **Incremental Legacy USD Term Loan** | Sept. 30, 2026 | $633,601,236.90 |
| **Revolving Credit Facility** | Feb. 28, 2023 | $456,570,870.60 |
| *Other Secured Facility* | | |
| **Midwest City Facility** | July 1, 2041 | $11,900,000.00 |
| *Unsecured Debt* | | |
| *Unsecured Facilities* | | |
| **Settlement Facility** | September 30, 2022 | $56,843,757.50 |
| **Convertible Bonds** | April 16, 2025 | $213,000,000.00 |
| **Total Debtor Debt:** | | **$5,078,286,110.60** |
| NON-DEBTOR FINANCING FACILITIES | | |
| **Facility** | **Maturity** | **Outstanding Principal Amount** |
| **RoW Credit Facility** | Dec. 30, 2023 | $249,211,682.50 |
| **Israeli Loan** | June 30, 2025 | $2,700,000.00 |
| **Polish Bank Overdraft** | N/A | $10,500,000.00 |
| **Total Non-Debtor Debt:** | | **$262,411,682.50** |
| **Total Debtor and Non-Debtor Funded Debt:** | | **$5,340,697,793.10** |

1.     **Debtor Financing Facilities.**

a.     **Prepetition Legacy Credit Facilities.**

Crown Finance US, Inc. ("Crown Finance US"), as U.S. term borrower, Crown UK HoldCo Limited, as holdings ("Crown UK HoldCo"), each of Crown Finance US and Crown UK HoldCo, as revolving credit borrowers, Barclays Bank PLC ("Barclays") as administrative and collateral agent, and the lenders and issuers from time to time party thereto (such lenders having advanced term loans, the "Prepetition Legacy Term Lenders" and such lenders having advanced revolving loans, the "Prepetition Revolving Lenders"), are party to that certain credit agreement, dated as of February 28, 2018 (as amended, restated or otherwise modified from time to time, the "Prepetition Legacy Credit Agreement"), relating to (a) the Initial Legacy USD Term Loan issued in the initial aggregate principal amount of $3.325 billion; (b) the Legacy Euro Term Loan, a Euro denominated term loan facility issued in the initial aggregate principal amount of €607.6 million; (c) a fully-drawn Revolving Credit Facility issued in the aggregate principal amount of $462.5 million; and (d) an Incremental Legacy USD Term Loan in the aggregate principal amount of $650 million (the Incremental Legacy USD Term Loan, and together with the Initial Legacy USD Term Loan and the Legacy Euro Term Loan, the "Prepetition Legacy Term Facilities," and together with the Revolving Credit Facility, the "Prepetition Legacy Credit Facilities").

The Prepetition Legacy Credit Facilities are guaranteed by each of the Debtors (with the exception of (a) Cineworld Group plc, (b) Cineworld Funding (Jersey) Limited, and (c) certain other Specified Immaterial Subsidiaries (as defined the Prepetition Legacy Credit Agreement) that are also Debtors) (collectively, the "Legacy Facility Guarantors," and together with Crown Finance US and Crown UK HoldCo, the "Legacy Facility Obligors"). The Prepetition Legacy Credit Facilities are secured by first priority liens on substantially all of the assets of the Legacy Facility Obligors and junior liens on certain Specified Priming Collateral. The Prepetition Legacy Facility Lenders issued the Prepetition Legacy Credit Facilities to help facilitate the company's acquisition of Regal Cinemas in February 2018, as further discussed in the First Day Declarations.

The Initial Legacy USD Term Loan bears interest at a rate of LIBOR plus 2.50 percent and matures on February 28, 2025. As of the Petition Date, the outstanding principal amount of the Initial Legacy USD Term Loan was approximately $2.655 billion. The Legacy Euro Term Loan bears interest at a rate of LIBOR plus 2.63 percent and matures on February 28, 2025. As of the Petition Date, the outstanding principal amount of the Legacy Euro Term Loan was approximately $195.3 million. The Revolving Credit Facility bears interest at the rate of LIBOR plus 3.00 percent and matures on February 28, 2023. As of the Petition Date, the outstanding principal amount of the Revolving Credit Facility is approximately $456.6 million. The Incremental Legacy USD Term Loan bears interest at the rate of LIBOR plus 2.75 percent and matures on September, 2026. As of the Petition Date, the outstanding principal amount of the Incremental Legacy USD Term Loan was approximately $633.6 million.

b.     **Prepetition Priming Facilities.**

Crown Finance US as borrower, Crown UK HoldCo as holdings, Barclays as administrative agent, and each of the lenders party thereto (the "Prepetition Priming Facility Lenders"), are each party to that certain credit agreement (the "Prepetition Priming Credit Agreement") dated November 23, 2020 (and the facilities thereunder, as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Priming Facilities"). The Prepetition Priming Facilities are guaranteed by the Legacy

---

[13]    The amounts herein reflect the amounts listed in the Debtors' schedules and statements and not any Proofs of Claim that may be filed.

Facility Guarantors and are secured by a first priority lien on the Specified Priming Collateral, as well as first priority liens on substantially all of the assets of the Legacy Facility Obligors, ranking pari passu with the liens granted under the Prepetition Legacy Credit Facilities.

The Prepetition Priming Facilities are comprised of three tranches of term loans: (a) an Initial Term B-1 Loan issued upon entry into the Prepetition Priming Legacy Facilities in the aggregate principal amount of $450 million; (b) an Initial Term B-2 Loan issued pursuant to an amendment to the Prepetition Priming Facilities in May 2020 in the aggregate principal amount of $110.8 million; and (c) an Incremental Priming Term B-1 Loan issued pursuant to a further amendment to the Prepetition Priming Facilities in July 2021 in the aggregate principal amount of $200 million. The Initial Term B-2 Loans were provided to the Debtors as consideration in connection with the retirement of a then-existing revolving credit facility issued by the Prepetition Priming Facility Lenders.

A drafting error in the loan documents for the Initial Term B-1 Loan inadvertently resulted in the inclusion of a 1% LIBOR floor on the interest rate for the term loan facility. Cineworld reserved rights and made the disputed interest payments. Cineworld and its advisors also engaged in extensive discussions with both Barclays Bank PLC, as the administrative agent, and counsel for a group of Prepetition Priming Facility Lenders in an effort to reach an agreement on steps to correct the mistake. Subsequently, K&E entered into a confidential settlement agreement with Cineworld which resolved and eliminated any dispute between Cineworld and K&E resulting from the drafting error. The Initial Term B-1 Loan bears interest at the rate of 7.00% payable in cash, plus 8.25% payable-in-kind by being capitalized and added to the principal balance of the loan. As of the Petition Date, the outstanding principal amount of the Initial Term B-1 Loan is approximately $544.6 million. The Initial Term B-2 Loan bears interest at the rate of LIBOR plus 5.00%. As of the Petition Date, the outstanding principal amount of the Initial Term B-2 Loan is approximately $110.8 million.

As of the Petition Date, the outstanding principal amount of the Incremental Priming Term B-1 Loan was approximately $200.0 million. The Incremental Priming B-1 Term Loan bears interest at the LIBOR base rate plus 8.25%. The Prepetition Priming Facilities mature on May 23, 2024.

c.  **Midwest City Facility.**

Regal, as borrower, and Arvest Bank, as lender, are party to that certain loan agreement, dated as of July 1, 2021 (the "Midwest City Loan Agreement"). Pursuant to the Midwest City Loan Agreement, Regal issued the Midwest City Note to Arvest Bank in the principal face amount of approximately $12 million. The Midwest City Note is secured by a first priority mortgage lien over the Debtors' Midwest Property located in Midwest City, Oklahoma, as well as a security interest in all of Regal's and Regal Cinemas, Inc.'s assets and proceeds deriving from the Midwest Property. The Midwest City Note bears interest at the Treasury Rate plus 3.00 percent and matures in 2041. As of the Petition Date, the outstanding principal amount of the Midwest City Note was approximately $11.9 million.

d.  **Settlement Facility.**

The company reached a settlement (the "Regal Settlement Agreement") with respect to its litigation against the dissenting shareholders of Regal Entertainment Group arising out of the company's acquisition of Regal Cinemas. Pursuant to the Regal Settlement Agreement, the Debtors agreed to pay approximately $92 million to the dissenting shareholders. To finance the Debtors' obligations under the Regal Settlement Agreement, Crown UK HoldCo, as holdings, and Crown Finance US as borrower, Wilmington Trust, National Association as administrative agent, and the lenders party thereto (the "Settlement Lenders") entered into that certain credit agreement (the "Settlement Credit Agreement", and the term loan facility thereunder, as amended, restated, supplemented, or otherwise modified from time to time, the "Settlement

<u>Facility</u>").  Pursuant to the Settlement Facility, the Settlement Lenders issued unsecured term loans in the aggregate principal amount of approximately $92 million bearing interest at the rate of 20.00% payable as payment-in-kind.  The Settlement Facility is guaranteed by the Legacy Guarantors and it matures on September 30, 2022.  As of the Petition Date, the outstanding principal amount of the Settlement Facility was approximately $56.8 million.

e. **Convertible Bonds.**

In April 2021, the Debtor Cineworld Funding (Jersey) Limited (the "<u>Convertible Bonds Issuer</u>") issued $213 million in aggregate principal amount of convertible bonds (the "<u>Convertible Bonds</u>") pursuant to that certain subscription agreement dated as of March 24, 2021 (the "<u>Convertible Bond Subscription Agreement</u>"), by and among the Convertible Bonds Issuer, Cineworld Group plc, as guarantor (the "<u>Convertible Bonds Guarantor</u>"), and the various direct investors thereto.  The Convertible Bonds are constituted by a trust deed, dated as of April 16, 2021 (the "<u>Trust Deed</u>"), by and between the Convertible Bonds Issuer, the Convertible Bonds Guarantor, and BNY Mellon Corporate Trustee Services Limited, as trustee.  The Convertible Bonds bear interest at a rate of 7.50 percent per annum, payable semi-annually in arrears in equal installments on October 16 and April 16 of each year.  The Convertible Bonds mature on April 16, 2025.  The Convertible Bonds are unsecured obligations of the Convertible Bonds Issuer and the guarantee in respect thereof is an unsecured obligation of the Convertible Bonds Guarantor.

As of the Petition Date, there was approximately $213.0 million in aggregate principal outstanding under the Convertible Bonds.  Subject to the terms of the Trust Deed, the Convertible Bonds are, in certain circumstances, convertible into fully paid-up ordinary shares of £0.01 each in the capital of the Convertible Bonds Guarantor at a conversion price calculated in accordance with the Trust Deed.

## VII.  EVENTS LEADING TO THE CHAPTER 11 FILINGS[14]

### A.  The COVID-19 Pandemic Devastates the Cinema Industry and Cineworld.

Before the COVID-19 pandemic, Cineworld's business was performing well and growing.  Cineworld had generated record-breaking revenues in 2018 and 2019.  Following the Regal acquisition, Cineworld was realizing even greater than expected synergies as the global organization grew fully integrated.  The future looked brighter than ever.

---

[14]   This Article VII provides a summary of the main drivers of the commencement of these Chapter 11 Cases.  A detailed overview of the events leading to the commencement of the Chapter 11 Cases can be found in the Greidinger First Day Declaration, which is incorporated herein by reference.

The COVID-19 pandemic profoundly impacted the cinema and motion picture exhibition industry. In early 2020, government-mandated shutdowns led to mass theater closures, abruptly cutting off the industry's revenue source. As 2020 progressed, it proved to be a year of unique and unprecedented challenges for cinemas, and the Debtors were no exception. The global health crisis and associated public health and safety measures caused a sharp, industry-wide decline in box office sales, causing stock prices and virtually every key financial metric to crater. In the four months from December 3, 2019, to April 3, 2020, for example, Cineworld Parent's common stock price dropped from 197.95 GBX to 38.76 GBX, erasing 80.4% in shareholder value.

Even as the immediate effects of the COVID-19 pandemic began to subside, the cinema industry and Cineworld continued to experience losses. One key driver was a massive delay in film release and production schedules. Following the reopening of theaters in 2020 after months of closures, after seeing the poor performance of films that proceeded with scheduled release dates, in many instances studios chose to withhold their blockbusters from theatrical release in an effort to preserve revenue pending a broader return of audiences to theaters. These issues were exacerbated by delays in production caused by pandemic restrictions on production sets that set back anticipated release dates by months or years. These massive delays caused a multi-year ripple effect that continues to plague the industry today and was a core driver of the Debtors' liquidity constraints in the lead up to these Chapter 11 Cases.

Further compounding the industry's challenges, the COVID-19 pandemic catalyzed the already-growing influence of streaming, diverting essential cinema revenue towards home entertainment alternatives. Large corporations like Amazon, Apple, Disney, Paramount, and others entered the home entertainment space or expanded their existing offerings and were able to offer studios lucrative deals to release their films directly onto their streaming platforms, either skipping the cinema entirely or significantly shortening the cinema exclusivity window. Shortened cinema exclusivity periods led to decreased revenue. Between 2019 and 2021, the share of the combined theatrical and home/mobile entertainment market attributable cinema dropped from approximately 42% to just 21%.

## B. Additional Difficulties Compounding Cineworld's Challenges.

### 1. Shareholder Appraisal Litigation Stemming from the Regal Acquisition Results in Judgment Against Cineworld.

In 2018, Cineworld acquired Regal, which was publicly traded at the time. Cineworld agreed to pay Regal shareholders $23.00 per share. Over 90% of Regal shareholders approved the transaction, but certain dissenting shareholders (the "Dissenting Shareholders") brought an appraisal action in the Delaware Court of Chancery (the "Delaware Court") claiming that the fair value of Regal was $33.83 per share. Cineworld argued that the fair price was $18.02 per share (deal value of $23 minus synergies, which Cineworld valued at $4.98 per share). The Delaware Court held that the fair value at the time of signing was $23.60 per share based on the deal price of $23.00 minus $3.77 of synergies per share that the Court credited after an analysis of the proffered synergies plus $4.37 per share resulting from the corporate tax reforms. A judgement was entered against Cineworld on May 13, 2021, requiring Cineworld to pay the deal price plus $0.60 per share plus statutory interest to the Dissenting Shareholders.

Following entry of the judgment, in light of Cineworld's ongoing liquidity challenges that rendered immediate payment in full unfeasible, Cineworld engaged in good-faith, arm's length negotiations with the Dissenting Shareholders regarding the terms of a potential settlement agreement. On September 10, 2021, Cineworld announced that it reached a deal with the Dissenting Shareholders (the "Regal Settlement Agreement") pursuant to which Cineworld agreed to pay $170 million of the judgment to the Dissenting Shareholders up front with another $92 million placed into an escrow to be available to Cineworld as

additional liquidity under certain circumstances, and otherwise to be paid to the Dissenting Shareholders no later than March 31, 2022.

In February 2022, Cineworld engaged in further discussions with the Dissenting Shareholders to reschedule the $92 million payment obligations.  A deal was reached on February 2, 2022, pursuant to which Cineworld agreed that the remaining obligations would be paid to the Dissenting Shareholders in installments, with a final payment due on June 30, 2022—a three-month extension from the original March deadline.

2. **Litigation with Cineplex Over Terminated Arrangement Agreement.**

In December 2019, Cineworld and Cineplex, a leading Canadian cinema chain, entered into an Arrangement Agreement pursuant to which Cineworld agreed to acquire Cineplex in exchange for $2.8 billion.  The parties agreed that the deal would close before June 30, 2020.  On June 5, 2020, however, Cineworld sent Cineplex a notice asserting that Cineplex had defaulted on the Arrangement Agreement because it breached a number of the covenants therein, including by failing to operate in the ordinary course.  Litigation ensued in the Ontario Supreme Court of Justice (Commercial List) (the "Canadian Court").  Cineplex claimed the termination was a repudiation of the Arrangement Agreement and argued that it was entitled to damages for Cineworld's purportedly unjustified action.  Cineworld denied Cineplex's claims and asserted that Cineplex violated the deal because it operated outside the ordinary course of its business by deferring certain payments and reducing capital expenditures during the pandemic.

After 20 days of hearings, the Canadian Court found in favor of Cineplex, awarding expectation damages in the amount of CAD $1.24 billion and transaction costs of CAD $5.5 million to Cineplex.  Cineworld vigorously disagrees with both the Canadian Court's judgment and method of calculation of damages.  Cineworld has appealed the judgment, which is currently stayed during these Chapter 11 Cases.[15]

While no payment has been required or made by Cineworld to Cineplex based on the pendency of the appeal, the Canadian Court's judgment has already had a significant negative impact on Cineworld.  Among other things, in the lead up to these Chapter 11 Cases, prospective financing sources cited the judgment in refusing to provide the Group with additional liquidity or flexibility.

C. **The DIP Negotiations.**

As further described herein, in August 2022, in light of their increasingly dire liquidity outlook, the Debtors initiated discussions with the DIP Lenders regarding a comprehensive restructuring transaction.  Immediately prior to the Petition Date, the Debtors and the DIP Lenders reached an agreement resulting in a $1.935 billion DIP Facility, which provided essential liquidity to the Debtors' estates during the Chapter 11 Cases.  As described elsewhere herein, in the weeks leading up to a final hearing on the DIP Facility, the Debtors, the DIP Lenders, and the Creditors' Committee engaged in productive negotiations to resolve the Creditors Committees' concerns and establish an agreed-upon timetable for a marketing process of the Debtors' assets.

D. **Appointment of the Special Committee.**

Prior to the Petition Date, the Debtors appointed Messrs. Gary Begeman, Michael Leffell, and John Dionne, three experienced independent and disinterested directors (collectively, the "Independent Directors"), as independent directors or managers of Crown Finance US and sixty-eight of its direct and

---

[15]   On September 28, 2022, the Court denied Cineplex's *Emergency Motion of Cineplex Inc. to Modify the Automatic Stay* [Docket No. 218] on the record.  *See Transcript for Motion Hearing*, at 47 [Docket No. 437].

indirect subsidiaries that have commenced chapter 11 cases (each such entity, a "Designated Subsidiary," and each board thereof, a "Subsidiary Board"). The Independent Directors do not have any relationships that would compromise their impartiality and their compensation is not contingent upon taking or approving any particular action.

The Independent Directors retained and are represented by Willkie Farr & Gallagher LLP ("Willkie") as independent counsel.[16] On August 31, 2022, each Subsidiary Board established a special committee (each, a "Special Committee" and collectively, the "Special Committees") comprised of the Independent Directors that is vested with the authority to, among other things:

- determine, in the Special Committee's business judgment, whether any matter constitutes a claim held by or against a Designated Subsidiary, on the one hand, and the Designated Subsidiaries or any of their respective affiliates, subsidiaries, directors, managers, officers, major debtholders or controlling equityholders (each a "Related Party," and collectively, the "Related Parties") on the other hand and (b) investigate, prosecute, negotiate, review, settle, and approve any such claims (the "Related Party Claims");

- conduct all investigations and analyses related to any Related Party Claims necessary or desirable in order to be fully advised with regard to such Related Party Claims, in the Special Committee's business judgment, and to act on behalf of each Designated Subsidiary and bind each Designated Subsidiary in connection therewith, including, but not limited to:

  - (a) any investigation into each Designated Subsidiary's past or current cash flow, liquidity, general financial condition, and related financing;

  - (b) any request for documentation and information regarding each Designated Subsidiary's business, assets, properties, liabilities and business dealings;

  - (c) any release or settlement of potential claims or causes of action of each Designated Subsidiary, if any, against that Designated Subsidiary or any of their Related Parties; and

  - (d) any other transaction implicating each Designated Subsidiary in which a Related Party has an interest;

- discuss, negotiate, consider, and review any financing transactions and/or other strategic alternatives for the Designated Subsidiaries and their stakeholders, including the possibilities of undertaking a restructuring, reorganization, and/or other recapitalization transaction involving the Designated Subsidiaries and/or one or more of its subsidiaries and/or affiliates (each of the foregoing and any combination of the foregoing, a "Potential Restructuring Transaction");

- take any and all actions with respect to any review, discussion, negotiation, consideration, deliberation, examination, investigation, analysis, assessment, evaluation, and exploration on behalf of each Designated Subsidiary of the terms and

---

[16]   The Bankruptcy Court approved Willkie's retention application on October 31, 2022.

conditions of any Potential Restructuring Transaction, including, without limitation, to:

- (a) review and evaluate any Potential Restructuring Transaction and consider whether or not it is fair to and in the best interests of each Designated Subsidiary, its subsidiaries, and their respective stakeholders to proceed with a Potential Restructuring Transaction;

- (b) consult with management and each Designated Subsidiary's advisors with respect to discussions and negotiations regarding the terms and conditions of a Potential Restructuring Transaction and other communications regarding any Potential Restructuring Transaction; and

- (c) consider such other matters as may be requested by each Designated Subsidiary or each Subsidiary Board or take such further actions or consider such other matters as it may deem advisable in connection with the foregoing.

Shortly after their appointment, the Independent Directors commenced a multifaceted independent investigation into the Debtors' prepetition history, including their financial condition, financing agreements, corporate governance, and accounting practices, among other things. At the direction of the Independent Directors, Willkie issued ten written document requests to the Debtors via email correspondence in addition to numerous written and verbal requests. Willkie's written document requests covered thirty-five categories of documents related to the various branches of the Independent Directors' investigation. The Debtors provided tens of thousands of documents in response to these requests, including access to documents provided to the Creditors' Committee and to certain of the Prepetition Legacy Term Lenders and Prepetition Priming Facility Lenders. In addition, Willkie and the Independent Directors held numerous meetings with the Debtors and their advisors.

Willkie also interviewed Moshe (Mooky) Greidinger (Chief Executive Officer), Israel Greidinger (Deputy Chief Executive Officer), Nisan Cohen (Chief Financial Officer), Renana Teperberg (Chief Commercial Officer), Nigel Kravitz (General Counsel), Richard Bell (Head of UK & CEE Tax), Michael Aumann (VP, Group Financial Controller), Tal Soudry (VP, US Finance), and the members of Cineworld's Audit Committee. The Special Committees also met with representatives of the Ad Hoc Group and the Creditors' Committee throughout the cases to understand their perspectives and concerns.

To date, the Special Committees have not identified or become aware of, any evidence that would lead the Special Committees to conclude that any Related Party Claims exist. On March 22, 2023, Willkie presented to the Special Committees regarding the Restructuring Support Agreement and related transaction documents, including the proposed Plan releases, and the Special Committees' investigation. Following the presentation and a discussion between the Special Committees and Willkie, the Special Committees unanimously approved the proposed terms of the Restructuring Documents, including the proposed releases, subject to the finalization of the Restructuring Documents. To the extent circumstances require, the Special Committees expressly reserve their right to conduct further inquiries or investigations within the scope of their authority as they deem necessary and will continue to act in accordance with their fiduciary duties.

## VIII.  MATERIAL DEVELOPMENTS AND EVENTS IN THE CHAPTER 11 CASES

### A.  First Day Relief.

Each of the Debtors Filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petitions") on the Petition Date.  Shortly thereafter, the Debtors Filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations by, among other things, easing the strain on the Debtors' relationships with employees, vendors and service providers, and other third parties following the commencement of the Chapter 11 Cases.  A list of each of the First Day Motions is set forth in the Mesterharm First Day Declaration.  Following a hearing held on September 7, 2022, the Bankruptcy Court entered orders approving the First Day Motions on either an interim or final basis, as applicable.  Only the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) 503(B)(9) Claimants, (B) Lien Claimants, (C) Foreign Claimants, (D) Critical Vendors, and (E) HSE Suppliers, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* [Docket No. 57] (the "Vendors Motion") and the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintain Existing Business Forms and Books and Records and (II) Granting Related Relief* [Docket No. 62] (the "Cash Management Motion") were filed on an interim and final basis.

The Bankruptcy Court's first interim order approving the Vendors Motion authorized the Debtors to pay certain vendors in an aggregate amount not to exceed $137.6 million [Docket No. 295].  On October 6, 2022, the Bankruptcy Court entered a second interim order approving the Vendors Motion, authorizing the Debtors to use an additional $20 million with which to pay certain vendors [Docket No. 505].  On October 21, 2022, the Bankruptcy Court entered its final order approving the Vendors Motion, authorizing the Debtors to pay certain vendors in the ordinary course of business in an aggregate amount not to exceed $222 million [Docket No. 571].

The Debtors received certain informal objections to the Cash Management Motion, which the Debtors consensually resolved with the objecting parties.  On November 14, 2022, the Bankruptcy Court entered its final order approving the Cash Management Motion [Docket No. 1000].  The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.ra.kroll.com/cineworld.

### B.  Approval of the DIP Facility.

On the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 52] (the "DIP Motion"), requesting that the Bankruptcy Court approve the DIP Facility.

Pursuant to the DIP Motion, the Debtors requested, among other things, access to: (a) $514 million of the DIP Facility on an interim basis to be used for working capital needs during the pendency of these Chapter 11 Cases; (b) $271 million to effectuate the purchase of the RoW Facility by Debtor Busby AssignCo, LLC; and (c) $1.0 billion to effectuate the refinancing of the Prepetition Priming Facility. Following comments on the record from the Bankruptcy Court, the Debtors, the DIP Agent, and the DIP Lenders agreed to amend the proposed Interim DIP Order.  The entered Interim DIP Order provided that the Priming Loan Refinancing Amount would be placed into an escrow account under the control of the DIP

Lenders and, upon entry of a final order approving the DIP Facility, would be used to effectuate the Priming Loan Refinancing. Subject to the terms of the Interim DIP Order, the Priming Loan Refinancing Amount would be repayable to the DIP Lenders if the Debtors reached agreement on an alternative debtor-in-possession financing facility with an alternative lender on more favorable terms than the existing DIP Facility. On September 8, 2022, the Bankruptcy Court entered the Interim DIP Order approving the DIP Motion on interim basis.

On September 28, 2022, the Debtors received an alternative debtor-in-possession financing proposal from a group of potential lenders represented by White & Case LLP (such lenders, the "Alternative DIP Lenders"). The Debtors and their advisors carefully considered the proposal provided by the Alternative DIP Lenders and engaged in substantive communications with White & Case LLP. However, following these discussions, the Alternative DIP Lenders withdrew their proposal.

In the weeks leading up to the final hearing on the DIP Facility, the Debtors received a number of formal and informal objections from parties in interest, including the Creditors' Committee. Among other concerns, the Creditors Committee and certain of the Debtors' landlords sought to establish a formal marketing process for the Debtors' business (but excluding an acquisition of Cineworld Parent itself) on an expedited timeline, and to ensure that "stub rent" would be paid during the duration of these chapter 11 cases. Following hard-fought, arm's-length negotiations, the DIP Lenders and the Creditors' Committee reached a deal, which the Debtors supported, establishing, among other things, an agreed-upon timetable for the Debtors' Marketing Process and provided for the payment of certain stub rent prior to the Debtors' emergence from chapter 11. Accordingly, the Debtors proceeded to the October 31, 2022 hearing on an uncontested basis, and the Bankruptcy Court entered the Final DIP Order.

### C.    Appointment of Official Committee of Unsecured Creditors.

The official committee of unsecured creditors (the "Creditors' Committee") was appointed on September 23, 2022 to represent the interests of unsecured creditors in these Chapter 11 Cases [Docket No. 419]. The Creditors' Committee selected Weil, Gotshal & Manges LLP and Pachulski Stang Ziehl & Jones LLP to serve as its legal counsel, FTI Consulting to serve as financial advisor, and Perella Weinberg Partners to serve as investment banker. The Creditors' Committee currently consists of ten members: Cineplex Inc., Bank of New York Mellon, Paramount Pictures Corporation, Simon Property Group, Inc., Pepsico Sales, Inc., CJ 4Dplex Americas, LLC and CJ 4Dplex Co Ltd., Land Securities Properties Limited, EPR Properties (and its affiliates), Realty Income Corporation, and Intertrust Technologies Corporation.

### D.    Retention of the Debtors' Professionals.

To assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed applications requesting that the Bankruptcy Court authorize the Debtors to retain and employ the following advisors pursuant to sections 327 and 328 of the Bankruptcy Code: (a) Kirkland & Ellis, LLP and Kirkland & Ellis International, LLP, as counsel to the Debtors; (b) Jackson Walker LLP, as co-counsel and conflicts counsel to the Debtors; (c) PJT, as investment banker to the Debtors; (d) AlixPartners, LLP, as restructuring advisor to the Debtors; (e) Slaughter and May, as special corporate counsel to the Debtors; (f) Kramer Levin Naftalis & Frankel LLP, as independent counsel to the Board of Directors of Debtor Cineworld Group plc; (g) Willkie Farr & Gallagher LLP, as counsel to the independent directors of Crown Finance US, Inc.; (h) Ashurst LLP, as special counsel to the Board of Directors of Cineworld Group plc; (i) A&G Realty Partners, LLC, as real estate consultant and advisor to the Debtors; (j) Ernst & Young LLP, as tax services provider to the Debtors; (k) PricewaterhouseCoopers LLP, as audit services provider to the Debtors; and (l) Tran Singh LLP, as special conflicts counsel. Concurrently with the application requesting authorization to retain AlixPartners, LLP, the Debtors sought entry of an order designating James A. Mesterharm, Managing Director of

AlixPartners, LLP, as the Debtors' Chief Restructuring Officer. The Bankruptcy Court entered orders approving the retention of these advisors from October 28, 2022, through January 6, 2023 [Docket Nos. 635–640, 669–672, 723, 1196].

### E.   Schedules of Assets and Liabilities and Statements of Financial Affairs.

On September 7, 2022, the Debtors Filed the *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, (D) Statements of Financial Affairs, and (E) Rule 2015.3 Financial Reports and (II) Granting Related Relief* [Docket No. 24] (the "SOFA Motion"), seeking an extension of the time within which the Debtors must File their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules") until November 7, 2022 for a total of 59 days from the Petition Date. The Bankruptcy Court entered an order granting the relief requested in the SOFA Motion on September 8, 2022 [Docket No. 157]. The Debtors Filed their Schedules on November 7, 2022 [Docket Nos. 761–767, 769–773, 777–902, 904–976].

### F.   Establishment of Claims Bar Dates.

On November 7, 2022, the Bankruptcy Court entered the *Order (I) Re-Establishing the Claims Bar Date, (II) Re-Establishing the Governmental Bar Date, (III) Establishing the Rejection Damages Bar Date and the Amended Schedules Bar Date, (IV) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (V) Approving Notice of Bar Dates* [Docket No. 775] (the "Bar Date Order"), setting bar dates by which certain entities holding Claims against Debtors that arose (or that are deemed to have arisen) prior to the Petition Date must file Proofs of Claim. The Bar Date Order established the following bar dates:

- **Claims Bar Date**:  establishing **January 17, 2023, at 5:00 p.m., prevailing Central Time** as the last date and time for each entity to file a Proof of Claim based on a prepetition claim, including requests for payment under section 503(b)(9) of the Bankruptcy Code against any Debtor (the "Claims Bar Date");

- **Governmental Bar Date**:  establishing **March 6, 2023 at 5:00 p.m., prevailing Central Time** as the last date and time for each governmental unit to file a Proof of Claim against any Debtor (the "Governmental Bar Date");

- **Rejection Damages Bar Date**:  Solely as to claims arising from the Debtors' rejection of executory contracts and unexpired leases, **establishing the later of (a) the Claims Bar Date or the Governmental Bar Date, as applicable, (b) 5:00 p.m., prevailing Central Time, on the date that is thirty (30) days following entry of the order approving such rejection of the applicable executory contract or unexpired lease of the Debtors, and (c) 5:00 p.m., prevailing Central Time, on the date that is thirty (30) days following the effective date of such rejection of the applicable executory contract or unexpired lease of the Debtors** as the last date and time by which each claimant holding a claim based upon such rejection must file a Proof of Claim against any Debtor (the "Rejection Damages Bar Date); and

- **Amended Schedules Bar Date**:  In the event that the Debtors amend their Schedules, **establishing the later of (a) the Claims Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m., prevailing Central Time, on the date that is thirty (30) days from the date on which the Debtors serve notice of the amendment to the Schedules, a**s the last date and time by which each claimant holding a claim

affected by such amendment must file a Proof of Claim against any Debtor (such later date, the "Amended Schedules Bar Date").

In accordance with Bankruptcy Rule 3003(c)(2), if any person or entity that is required, but fails, to file a proof of claim on or before the applicable Bar Date:  (a) such person or entity may be forever barred, estopped, and enjoined from asserting such Claim against the Debtors (or filing a proof of claim with respect thereto); (b) the Debtors and their property may be forever discharged from any and all indebtedness or liability with respect to or arising from such Claim; (c) such person or entity may not receive any distribution in the Chapter 11 Cases on account of that Claim; and (d) such person or entity may not be permitted to vote on any plan or plans of reorganization for the Debtors on account of these barred Claims or receive further notices regarding such Claim.

G.    **The Restructuring Support Agreement and the Financing Commitment and Backstop Agreement.**

Through the Debtors' efforts to facilitate consensus around the terms of proposed restructuring transactions, the Debtors and Holders of approximately 83 percent of the Legacy Facilities Claims and Holders of approximately 69 percent of the DIP Claims entered into the Restructuring Support Agreement, dated as of April 2, 2023.  The Restructuring Support Agreement memorializes such parties' commitment to support the Plan.  The Restructuring Support Agreement contains a full "fiduciary out" provision as to each Debtor, which may be exercised if, among other things, a Debtor's fiduciaries determine, pursuant to their fiduciary duties or to applicable Law, to pursue an alternative restructuring transaction as opposed to the Plan.

Also on April 2, 2023, the Debtors and the Capital Raising Parties executed the Financing Commitment and Backstop Agreement.  The Financing Commitment and Backstop Agreement is an essential component of the Restructuring Transactions contemplated by the Restructuring Support Agreement and memorialized in the Plan.  Specifically, the Financing Commitment and Backstop Agreement ensures that through the commitments of the Capital Raising Parties, on emergence from chapter 11, the Reorganized Debtors will have access to $2.26 billion in capital through the proceeds of the Exit First Lien Facility, the Rights Offering and the Direct Equity Allocation.  The Debtors need the liquidity offered by the Financing Commitment and Backstop Agreement in order to fund the distributions under the Plan and operate their business post-emergence.

On April 10, 2023, the Debtors filed the Financing Commitment and Backstop Agreement Motion, by which, among other things, the Debtors sought the Bankruptcy Court's authorization to enter into, and perform all obligations under, the Financing Commitment and Backstop Agreement.  A hearing to consider approval of the Financing Commitment and Backstop Agreement Motion is currently scheduled for April 20, 2023.

H.    **The Committee Settlement.**

The Restructuring Support Agreement reflects a global settlement reached between the Debtors, the Ad Hoc Group, and the Creditors' Committee (the "Committee Settlement").  As set forth in greater detail in the Restructuring Support Agreement, the Committee Settlement provides, among other things, that the Plan will establish the Litigation Trust and, on the Plan Effective Date, the Debtors incorporated in the United States will transfer, or will cause to be transferred, to the Litigation Trust (a) $10 million in Cash, (b) all of their rights, title, and interests in the Estate's claims under the class action lawsuit captioned *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL 1720 (MKB) (JO) (E.D.N.Y.) and under any such similar class action against credit card issuers arising from similar allegations as those set forth in the Interchange Litigation, and (c) $500,000 in Cash for the administration

of the Litigation Trust, including the disposition of the Interchange Litigation Claims and the reconciliation of General Unsecured Claims held by beneficiaries of the Litigation Trust for purposes of distributions. Holders of Allowed General Unsecured Claims shall, in accordance with the allocation determined by the Creditors' Committee, receive their allocable share of (a) $10 million in Cash and (b) interests in the Litigation Trust representing a right to recovery of (i) the first $5 million of Cash recovered by the Litigation Trust from the Interchange Litigation Claims and (ii) 50% of any Cash recovered in excess of $5 million in connection with such claims.  In addition, the Plan provides for the payment of the reasonable and documented expenses of BNY Mellon Corporate Trustee Services Limited, in its capacity as indenture trustee for the Convertible Bonds, in an amount not to exceed $700,000.  Further, as part of the Committee Settlement, (a) the Holders of Legacy Facilities Claims will not receive any recovery on account of their deficiency claims and any adequate protection claims for diminution of value beyond what is set forth in Article III.F of this Disclosure Statement for "Class 4 Legacy Facilities Claims" and (b) all Avoidance Actions will be released and waived under the Plan.

Pursuant to the Committee Settlement, the Creditors' Committee agreed to support the Plan and the Restructuring Transactions and the releases and exculpation provisions set forth in the Plan.

## I.    RSA Milestones.

The RSA contains certain milestones in relation to the Chapter 11 Cases that apply unless extended or waived in accordance with the terms of the RSA, including:

(a)    no later than April 3, 2023, the Debtors shall commence a marketing process for a third party to provide a New Money Revolving Credit Facility (which shall be subject to the terms set forth in the Restructuring Term Sheet, the Sponsored Exit First Lien Facility Term Sheet, and, to the extent applicable, the Financing Commitment and Backstop Agreement);

(b)    no later than April 3, 2023, the Debtors, the Required Consenting Creditors and the Required Equity Capital Raising Parties shall have mutually agreed upon a work plan to prepare for any Implementation Mechanisms required to implement the Real Estate Plan, including the estimated budget, timing, scope of work, and steps necessary to initiate such Implementation Mechanisms (if any) as soon as reasonably practicable after May 1, 2023;

(c)    no later than April 10, 2023, the Debtors, the Required Consenting Creditors, and the Required Equity Capital Raising Parties shall have mutually agreed upon an acceptable process for selecting a party to provide screen advertising;

(d)    no later than April 10, 2023, the Debtors shall have filed with the Bankruptcy Court the Plan and related Disclosure Statement and the Financing Commitment and Backstop Agreement Motion;

(e)    no later than 26 days after filing of the Financing Commitment and Backstop Agreement Motion, and subject to the Bankruptcy Court's availability, the Bankruptcy Court shall have entered the Financing Commitment and Backstop Agreement Order;

(f)    no later than April 20, 2023, the Debtors, the Supermajority Consenting Creditors, and the Required Equity Capital Raising Parties shall have jointly determined whether to pursue a Sale Transaction; *provided* that a Sale Transaction will not be pursued if the Supermajority Consenting Creditors have not determined that a Sale Transaction shall be pursued;

(g)    if applicable, not later than April 28, 2023, the Debtors shall have filed a sale motion and bidding procedures motions for a Sale Transaction (which motions and procedures, including dates and

deadlines therein, shall be acceptable to the Required Consenting Creditors and the Required Equity Capital Raising Parties) (the "Sale and Bidding Procedures Motion");[17]

(h)    no later than May 1, 2023, the Debtors, the Required Consenting Creditors and the Required Equity Capital Raising Parties shall have mutually agreed upon (i) any foreign or ancillary proceedings to implement the transactions contemplated in the Restructuring Term Sheet and any other related agreement and (ii) the provisional and estimated budget, timing, and steps necessary to initiate such proceeding(s) and to implement the transactions contemplated in the Restructuring Term Sheet;

(i)    no later than May 1, 2023, the Debtors, the Required Consenting Creditors, and the Required Equity Capital Raising Parties shall have mutually agreed upon whether any Implementation Mechanism is required to implement the Real Estate Plan;

(j)    in the event that the Debtors, the Required Consenting Creditors, and the Required Equity Capital Raising Parties agree that one or more Implementation Mechanism(s) is required to implement the Real Estate Plan, the relevant Debtors shall initiate such Implementation Mechanism(s) as soon as reasonably practicable after May 1, 2023 and by no later than May 15, 2023 (which date may be extended by agreement between the Company Parties, the Required Consenting Creditors, and the Required Equity Capital Raising Parties, acting in good faith);

(k)    (i) no later than the earlier of (A) June 15, 2023 and (B) ten Business Days prior to the Confirmation Date (the earlier of clause (A) and (B) being referred to herein as the "RSA 2022 Crown UK Audited Financial Statement Delivery Date"), the Debtors shall deliver to the Consenting Creditors the audited consolidated financial statements of Crown UK and its subsidiaries for the twelve-fiscal-month period ended December 30, 2022 (and, for the avoidance of doubt, such audited consolidated financial statements of Crown UK shall be for the twelve-fiscal-month period ended December 30, 2022, regardless of whether the fiscal year of Cineworld Parent or any of its subsidiaries is changed to a date later than December 30, 2022) and (ii) no later than 150 days after the last day of the fiscal year of Cinema City Holding B.V. ended December 31, 2022, the Debtors shall deliver to the Consenting Creditors audited consolidated financial statements of Cinema City Holding B.V. and its subsidiaries for such 2022 fiscal year; it being agreed that in the case of each of the foregoing clauses (i) and (ii), concurrently with the delivery of such financial statements to the Consenting Creditors, the Company shall make them generally available to the public; provided that such financial statements made generally available to the public shall not be required to include the audit opinion of the relevant auditor in respect thereof in the event such auditor does not consent to allow its audit opinion to be made generally available to the public;

(l)    no later than May 30, 2023 (the "Exit Facility Date"), (i) either (A) the Raised Exit First Lien Facility shall have priced or (B) the Debtors shall have obtained a signed commitment letter in respect of the Raised Exit First Lien Facility, and (ii) all requisite consents for such Raised Exit First Lien Facility as provided for in the RSA (including this Term Sheet) and the Financing Commitment and Backstop Agreement; provided, however, that if the foregoing is not obtained by the Exit Facility Date, then the Exit First Lien Facility shall be the Sponsored Exit First Lien Facility; provided, further, that if (A) prior to the Exit Facility Date, the Debtors, the Required Consenting Creditors, and the Required Equity Capital Raising Parties extend the Confirmation Milestone (as defined below) from the date set forth in this Term Sheet as of the RSA Effective Date and (B) the Supermajority Consenting Creditors have not otherwise determined that the Exit

---

[17]    For the avoidance of doubt, a Sale and Bidding Procedures Motion will not be filed if actionable indications of interest are not received in connection with the Debtors' marketing process, as determined by the Debtors in consultation with the Ad Hoc Group and the Creditors' Committee.

Facility Date should not be extended as of the date by which the extension of the Confirmation Milestone becomes effective, then the Exit Facility Date shall be automatically extended by the number of days equal to the agreed number of days by which the Confirmation Milestone is so extended;

(m)  if the Debtors, with the consent of the Supermajority Consenting Creditors and the Required Equity Capital Raising Parties, file a Sale and Bidding Procedures Motion:

   1.  a hearing to consider approval of the Sale and Bidding Procedures Motion shall be held not later than May 8, 2023;

   2.  the deadline for bidding under the Bidding Procedures Order shall be a date not later than June 20, 2023;

   3.  any auction contemplated by the Bidding Procedures Order, if necessary, shall be conducted not later than June 27, 2023; and

   4.  the sale hearing shall be scheduled for July 3, 2023.

(n)  with respect to the Plan and Disclosure Statement:

   (a)  the hearing on the Disclosure Statement shall occur by May 12, 2023;

   (b)  an order approving the Disclosure Statement shall be entered by May 15, 2023; and

(o)  the Bankruptcy Court shall have entered the Confirmation Order by a date that is no later than July 7, 2023.

No assurances can be made that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors or that certain conditions precedent to the Effective Date will have occurred by the outside date under the Restructuring Support Agreement.

## J.   Marketing Process.

As discussed elsewhere herein, the Debtors, with the assistance of their advisors and in coordination with the Ad Hoc Group and the Creditors' Committee, commenced the first phase of Marketing Process on January 4, 2023 to determine market interest in a value-maximizing acquisition of the Debtors' assets. As discussed elsewhere herein, ahead of the agreed-upon deadline of February 16, 2023 for submission of initial indications of interest, the Debtors received a number of written indications of interest for the sale of some or all of the Debtors' assets. After evaluating the indications of interest received through the first phase of the Marketing Process the Debtors, in conjunction with the Ad Hoc Group, determined that the Marketing Process should continue with a focus on the sale of the RoW Equity. Accordingly, the Debtors and PJT initiated a second phase of the Marketing Process with the goal of eliciting binding bids for the sale of the RoW Equity by the Bid Deadline. While the Debtors received several bids ahead of the Bid Deadline, the proposals received did not reach the value required by the Ad Hoc Group to pursue a sale of the RoW Equity. Accordingly, the Debtors and the Ad Hoc Group have jointly terminated the Marketing Process.

## K.   Litigation Matters.

### 1.   General Litigation.

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

        2.      **Litigation with Cineplex and Lift-Stay Motion.**

As discussed in Article VII.B herein, the Debtors have been engaged in litigation with Cineplex over alleged breaches related to an Arrangement Agreement pursuant to which Cineworld agreed to acquire Cineplex. On September 9, 2022, Cineplex filed an emergency motion seeking to modify the automatic stay to complete Canadian appellate proceedings [Docket No. 218]. During a hearing held on September 28, 2022, the Bankruptcy Court denied Cineplex's motion on the basis that it was filed prematurely [Docket No. 437].

        3.      **Litigation with National CineMedia, LLC and Negotiations with Alternative Screen Advertisers.**

Debtor Regal CineMedia, Inc. ("RCI") and National CineMedia, LLC ("NCM LLC") are party to that certain Exhibitor Services Agreement, dated as of February 13, 2007, and amended and restated as of December 26, 2013 (as further amended, amended and restated, modified, or otherwise supplemented from time to time, the "NCM ESA") whereby RCI provides NCM LLC exclusive access to RCI's screens and audiences in exchange for NCM LLC's payment of theater access fees and provision of advertising services and content. As of the Petition Date, the Debtors, through RCI and Debtor Regal Cinemas, Inc. held an approximately 23.7% interest in NCM LLC.

On September 27, 2022, NCM LLC and its sole member manager, National CineMedia, Inc. ("NCMI," and together with NCM LLC, "NCM") filed *National CineMedia, LLC's Emergency Motion for Entry of Interim and Final Orders Granting Adequate Protection Pursuant to 11 U.S.C. §§ 105, 361, and 363* [Docket No. 433] (the "NCM Adequate Protection Motion"). Pursuant to the NCM Adequate Protection Motion, NCM seeks entry of an order providing, among other things, adequate protection with respect to certain purported setoff rights that NCM contends NCM LLC would have in the event the Debtors reject the NCM ESA. Following negotiations with NCM, on September 28, 2022, the Debtors and NCM entered into a stipulation and agreed order pursuant to which (a) the hearing on the NCM Adequate Protection Motion was continued to a date to be mutually agreed upon by NCM and the Debtors and (b) NCM deposited $2.068 million into an escrow account maintained by a mutually agreed escrow agent. The escrow amount represented amounts NCM asserted to be outstanding and owed to the Debtors under the NCM ESA as of the date of the stipulation and agreed order. The Bankruptcy Court entered the stipulation and agreed order on September 29, 2022 [Docket No. 443]. A hearing on the NCM Adequate Protection Motion in the Bankruptcy Court was scheduled for November 28, 2022, but was subsequently adjourned by agreement of the Debtors and NCM [Docket No. 1034].

Following entry of the stipulation and agreed order, the Debtors engaged with NCM on a potential renegotiation of the NCM ESA. Out of an abundance of caution, in light of the financial condition of NCM and the progress of such negotiations, on October 21, 2022, the Debtors filed *Debtors' Motion for Entry of an Order (I) Authorizing the Rejection of a Certain Exhibitor Services Agreement, and (II) Granting Related Relief* [Docket No. 276] (the "Rejection Motion") seeking Bankruptcy Court authority to reject the NCM ESA. On November 13, 2022, NCM filed an objection to the Rejection Motion [Docket No. 997], asserting, *inter alia*, that the Rejection Motion may not be granted before resolution of the NCM Adversary

and that, if the NCM Adversary is resolved in favor of NCM, there will be no business justification for granting the Rejection Motion.

On October 21, 2022, NCM commenced an adversary proceeding against the Debtors seeking declaratory and injunctive relief from the Bankruptcy Court, *National CineMedia, LLC v. Regal Cinemas, Inc.* (Adv. Proc. 22-03307) [Docket No. 1] (the "NCM Adversary"), generally seeking to enforce exclusivity, non-competition, and non-negotiation provisions of the NCM ESA. On October 31, 2022, the Debtors commenced an adversary proceeding against NCM seeking to enforce the automatic stay (Adv. Proc. 22-03313) [Docket Nos. 1-2] (the "Cineworld Adversary"). On November 1, 2022, the Bankruptcy Court entered a Temporary Restraining Order against NCM for its attempts to contravene the Debtors' efforts to explore value-maximizing options [Docket No. 7]. On November 14, 2022, by agreement of the parties, the Bankruptcy Court extended the Temporary Restraining Order through November 28, 2022 [Docket No. 20]. On November 28, 2022, the Bankruptcy Court held a status conference where it entered a preliminary injunction (the "Preliminary Injunction"), agreed to by NCM LLC, barring NCM LLC from interfering with the Debtors' negotiations with alternative screen advertising providers.

On December 20, 2022, the Debtors filed an emergency motion seeking authorization to exercise certain contractual redemption rights under that certain Limited Liability Company Operating Agreement of National CineMedia, LLC (as amended, restated, or amended and restated, the "NCM LLCA"). On December 27, 2022, the Court granted that certain *Corrected Order (I) Authorizing the Debtors to Exercise Contractual Redemption Rights and (II) Granting Related Relief* [Docket No. 1166] (the "Share Redemption Order"). Pursuant to the Share Redemption Order, the Debtors were authorized to redeem their interests in NCM LLC in exchange for shares in National CineMedia, Inc., the publicly-traded member manager of NCM LLC. Soon after entry of the Share Redemption Order, the Debtors exercised such rights. Accordingly, the Debtors no longer hold any membership interests in NCM LLC.

On April 11, 2023, NCM LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas. NCM LLC's chapter 11 case is pending before the Honorable David R. Jones [Case No. 23-90291 (DRJ)]. On April 13, 2023, the Court held a hearing in the NCM Adversary and, thereafter, entered the *Mediation Order* (Adv. Pro. No. 22-03307) [Docket No. 40], which directed RCI and NCM LLC to attend mediation and appointed the Honorable Christopher M. Lopez to serve as mediator in his capacity as a United States Bankruptcy Judge. A further hearing in the NCM Adversary is scheduled for **May 1, 2023 at 3:00 p.m. (Prevailing Central Time)**.

The Debtors continue to solicit alternative screen advertising proposals in an effort to restructure their U.S. screen advertising arrangement, for the benefit of their stakeholders. The Debtors have engaged in advanced negotiations with multiple alternative screen advertising counterparties. The Debtors hope to file a motion seeking entry into a new screen advertising arrangement in the coming weeks.

4.    **Cineworld Cinemas Limited and Picturehouse Cinemas Limited Winding-Up Petitions.**

Cineworld Cinemas Limited ("Cineworld Cinemas") and Picturehouse Cinemas Limited ("Picturehouse Cinemas") are the subjects of winding up petitions served by the landlord of the Picturehouse Central cinema site, London Trocadero (2015) LLP ("London Trocadero"). These winding-up petitions relate to an underlying dispute regarding the requirement to pay rent due under the relevant lease during the COVID-19 lockdown period in the UK, which was decided against Cineworld Cinemas and Picturehouse Cinemas by the English Court of Appeal on July 27, 2022. Picturehouse Cinemas is the tenant under the relevant lease, and Cineworld Cinemas has guaranteed Picturehouse Cinemas' obligations.

63

Cineworld Cinemas and Picturehouse Cinemas were not able to pay the judgment debt by the relevant deadline and so, in spite of communication between Cineworld Cinemas, Picturehouse Cinemas and their legal advisers and London Trocadero and its legal advisers in the period leading up to this deadline, London Trocadero served winding-up petitions on Cineworld Cinemas and Picturehouse Cinemas on August 25, 2022.  In response, Cineworld Cinemas and Picturehouse Cinemas applied for a stay or adjournment of the winding-up petitions until March 31, 2023.

At a hearing on October 5, 2022, the High Court of Justice of England and Wales approved consent orders agreed to by Cineworld Cinemas, Picturehouse Cinemas and London Trocadero to adjourn the hearing of the winding-up petitions until October 31, 2022, being the date originally scheduled for a directions hearing in respect of Cineworld Cinemas' and Picturehouse Cinemas' applications to stay or adjourn the winding-up petitions. Cineworld Cinemas, Picturehouse Cinemas and London Trocadero subsequently agreed to vacate the hearing on October 31, 2022 and obtained an order from the High Court of Justice of England and Wales confirming this on October 26, 2022. The substantive hearing to consider both the winding-up petitions and the stay/adjournment applications is due to take place on July 28, 2023.

**L.      Lease Rejections and Optimization.**

In the period leading up to the Petition Date, the Debtors analyzed their unexpired U.S. leases to implement a lease optimization strategy consistent with their go-forward business plan, which analysis remains ongoing.  The Debtors—which are parties to hundreds of leases for their movie theater locations—have taken critical steps since the onset of COVID-19 to ease the financial burden caused by underperforming theaters—many of which are subject to above-market lease terms.  The Debtors' U.S. theater portfolio is a significant contributing factor to their current financial challenges.  Primarily due to the impact of deferred rent payments, the Debtors estimate that the average monthly rent obligations per theater increased by almost 30% year-to-date through July 2022 compared to full-year 2019.

In light of the foregoing, the Debtors, with the assistance of their advisors and in conjunction with the Consenting Creditors, have commenced active negotiations with many of the Debtors' landlords to obtain valuable lease concessions that will obviate the need for rejection and enable additional theater sites to remain open.  In many cases, such negotiation efforts have been successful, resulting in the execution of favorable lease amendments and significant go-forward savings.  In other cases, either as a result of the inability of the parties to reach acceptable terms or where a location is particularly underperforming or otherwise undesirable, the Debtors have determined that, in their business judgment, certain leases are unnecessary and burdensome to the Debtors' estates, and it is in the best interests of their estates to reject those leases.

A summary of the Debtors' lease rejection progress to date is provided below:

- On September 7, 2022, the *Debtors Filed the Debtors' First Omnibus Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases of Non-Residential Real Property and (B) Abandonment of Certain Personal Property, If Any, Each Effective as of the Rejection Date, and (II) Granting Related Relief* [Docket No. 26] (the "First Omnibus Lease Rejection Motion"), seeking authorization to reject twenty unexpired leases for certain U.S. theater sites.  After filing the First Omnibus Lease Rejection Motion, the Debtors subsequently removed two locations from the schedule of rejected theaters to continue ongoing lease negotiations.  On October 21, 2022, the Bankruptcy Court

entered an order granting the relief requested in the First Omnibus Lease Rejection Motion [Docket No. 570].[18]

- On September 30, 2022, the Debtors Filed the *Debtors' Second Omnibus Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases of Non-Residential Real Property and (B) Abandonment of Certain Personal Property, If Any, Each Effective As of the Rejection Date, and (II) Granting Related Relief* [Docket No. 468] (the "Second Omnibus Lease Rejection Motion"), seeking authorization to reject six additional unexpired leases for certain U.S. theater sites.  On October 25, 2022, the Bankruptcy Court entered an order rejecting five leases as requested in the Second Omnibus Lease Rejection Motion [Docket No. 594].[19]

- On October 21, 2022, the Debtors filed the *Stipulation and Agreed Order Between the Debtors and Phillips Place Owner, LLC* [Docket No. 579], providing for the agreed termination and rejection of the "Regal Phillips Place" theater as of October 31, 2022.  On October 24, 2022, the Bankruptcy Court entered the stipulation and agreed order [Docket No. 584].

- On November 7, 2022, the Debtors Filed the *Debtors' Third Omnibus Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases of Non-Residential Real Property and (B) Abandonment of Certain Personal Property, If Any, Each Effective as of the Rejection Date, and (II) Granting Related Relief* [Docket No. 759] (the "Third Omnibus Lease Rejection Motion"), seeking authorization to reject twenty additional unexpired leases for certain U.S. theater sites.  On November 29, 2022, the Bankruptcy Court entered an order rejecting an initial five leases from the Third Omnibus Lease Rejection Motion [Docket No. 1059], with the remaining locations subject to ongoing negotiations.  On February 16, 2023, the Bankruptcy Court entered a supplemental order rejecting an additional five leases from the Third Omnibus Lease Rejection Motion [Docket No. 1326].  The Debtors are still negotiating with their landlord counterparties or otherwise assessing their options with respect to the remaining leases that have not been rejected from the Third Omnibus Lease Rejection Motion and expressly reserve all rights to seek entry of one or more supplemental orders rejecting such leases at a later date.

- On December 8, 2022, the Debtors Filed the *Debtors' Fourth Omnibus Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases of Non-Residential Real Property and (B) Abandonment of Certain Personal Property, If Any, Each Effective as of the Rejection Date, and (II) Granting Related Relief* [Docket No. 1093] (the "Fourth Omnibus Lease Rejection Motion"), seeking authorization to reject twenty-three additional unexpired leases for certain U.S. theater sites.  On February 16, 2022, the Bankruptcy Court entered an order rejecting an initial five leases from the Fourth Omnibus Lease Rejection Motion [Docket No. 1327], with the remaining locations subject to ongoing negotiations.  The Debtors are still negotiating with their landlord counterparties or otherwise assessing their options with respect to the remaining leases that have not been rejected from the Fourth Omnibus Lease Rejection Motion and expressly reserve all rights to seek entry of one or more supplemental orders rejecting such leases at a later date.

---

[18]   An objection to the First Omnibus Lease Rejection Motion was filed by Readco Stonington II, LLC with respect to the "Stonington 10" theater lease [Docket No. 472].  Such objection was subsequently withdrawn [Docket No. 757].  On November 7, 2022, the Bankruptcy Court entered a supplemental order [Docket No. 758] to the First Omnibus Lease Rejection Motion authorizing the rejection of the "Stonington 10" theater lease.

[19]   An objection to the Second Omnibus Lease Rejection Motion was filed by Harrisburg Investors GP, LLC with respect to the "Great Escape Harrisburg Mall Stadium 14" theater lease [Docket No. 540].  After discussions with the objecting party, the Debtors agreed to remove the lease from the rejection schedule.

- On January 17, 2023, the Debtors Filed the *Debtors' Fifth Omnibus Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases of Non-Residential Real Property and (B) Abandonment of Certain Personal Property, If Any, Each Effective as of the Rejection Date, and (II) Granting Related Relief* [Docket No. 1221] (the "Fifth Omnibus Lease Rejection Motion"), seeking authorization to reject thirty-nine additional unexpired leases for certain U.S. theater sites. On February 16, 2022, the Bankruptcy Court entered an order rejecting an initial nine leases from the Fifth Omnibus Lease Rejection Motion [Docket No. 1325], with the remaining locations subject to ongoing negotiations. The Debtors are still negotiating with their landlord counterparties or otherwise assessing their options with respect to the remaining leases that have not been rejected from the Fifth Omnibus Lease Rejection Motion and expressly reserve all rights to seek entry of one or more supplemental orders rejecting such leases at a later date.

- On March 14, 2023, the Debtors Filed the *Debtors' Sixth Omnibus Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases of Non-Residential Real Property and (B) Abandonment of Certain Personal Property, If Any, Each Effective as of the Rejection Date, and (II) Granting Related Relief* [Docket No. 1408] (the "Sixth Omnibus Lease Rejection Motion"), seeking authorization to reject twenty-two additional unexpired leases for certain U.S. theater sites. As of the date hereof, the Debtors have not obtained entry of an order rejecting any of the leases from the Sixth Omnibus Rejection Motion. The Debtors are still negotiating with their landlord counterparties or otherwise assessing their options with respect to the leases from the Sixth Omnibus Lease Rejection Motion and expressly reserve all rights to seek entry of one or more orders rejecting such leases at a later date.

The Debtors, with the assistance of their advisors and in conjunction with the Consenting Creditors, continue to evaluate their lease portfolio and the status of ongoing negotiations with their landlord counterparties and will make decisions regarding the rejection or assumption of their unexpired leases and other executory contracts on a rolling basis during the course of the Chapter 11 Cases, and with respect to unexpired nonresidential real property leases, no later than the 365(d)(4) Deadline (as defined below) and consistent with the terms and conditions set forth in Article VI of the Plan. On December 2, 2022, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Extending the Deadline by which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property and (II) Granting Related Relief* [Docket No. 1078], seeking to extend the deadline within which they must choose to assume or reject unexpired nonresidential real property leases pursuant to section 365(d)(4) of the Bankruptcy Code (the "365(d)(4) Deadline"). On December 28, 2022, the Bankruptcy Court entered an order [Docket No. 1171] establishing the earlier of (a) July 5, 2023, and (b) the date of entry of an order confirming a plan as the 365(d)(4) Deadline.

Furthermore, as part of their lease optimization efforts, the Debtors continue to evaluate unique, strategic opportunities to further enhance the value of their lease portfolio. On December 17, 2022, the Debtors filed a motion [Docket No. 1127] seeking authority to enter into a new lease agreement and guaranty for a fully equipped and operational theater in Los Angeles, California. On January 11, 2023, the Bankruptcy Court entered an order [Docket No. 1209] approving the Debtors' entry into such lease. On March 31, 2023, the Debtors filed a motion [Docket No. 1470] seeking authority to enter into a new lease agreement and guaranty for a fully equipped and operational theater in Pasadena, California. As of the date hereof, such motion remains pending. In each case, and with respect to any other new lease opportunities that might arise during these Chapter 11 Cases, the Debtors determined in their business judgment that such leases were entered into on favorable lease terms and will be value-accretive to their go-forward lease portfolio.

In addition, pursuant to the Restructuring Support Agreement, the Debtors have agreed to the Real Estate Plan for the Debtors' lease portfolio in the United Kingdom. The Real Estate Plan requires that the

Debtors and their advisors continue consensual discussions with certain landlords for the Debtors' leases located in the United Kingdom. By May 1, 2023, the Debtors, the Required Consenting Creditors, and the Required Equity Capital Raising Parties shall have mutually agreed whether any Implementation Mechanism (which may include, among others, a UK Restructuring Plan) is necessary to implement the Real Estate Plan. In the event it is determined to initiate an Implementation Mechanism for the Real Estate Plan, under the Restructuring Support Agreement, the Debtors must do so as soon as reasonably practicable after May 1, 2023, and by no later than May 15, 2023, unless otherwise extended.

### M. Procedural and Administrative Motions and Other Relief.

The Debtors Filed certain additional motions which will further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Interim Compensation Motion: On October 6, 2022, the Debtors Filed the *Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 504] (the "Interim Compensation Motion"). The Interim Compensation Motion sought to establish procedures for the allowance and payment of compensation and reimbursement of expenses for attorneys and other professionals whose retentions are approved by the Bankruptcy Court pursuant to sections 327 or 1103 of the Bankruptcy Code, and who will be required to File applications for allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code. On October 31, 2022, the Bankruptcy Court entered an order granting the relief requested in the Interim Compensation Motion [Docket No. 666].

- Ordinary Course Professionals Motion: On October 6, 2022, the Debtors Filed the *Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 503] (the "OCP Motion"). The OCP Motion sought to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses. On October 31, 2022, the Bankruptcy Court entered an order granting the relief requested in the OCP Motion [Docket No. 668].

- Sales of Estate Assets:

  - On October 20, 2022, the Debtors Filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing (A) the Sale of Certain of the Debtors' Real Property Free and Clean or Liens, Claims, and Encumbrances, and (B) the Debtors to Enter Into and Perform Under the Purchase Agreement and (II) Granting Related Relief* [Docket No. 565], requesting authority to sell certain property located in Union City, Georgia to Garner Group Acquisitions LLC (the "Shannon Sale"). On November 7, 2022, the Bankruptcy Court entered an order authorizing the Shannon Sale [Docket No. 774].

  - On November 22, 2022, the Debtors Filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing (A) the Sale of Certain of the Debtors' Real Property Free and Clean or Liens, Claims, and Encumbrances, and (B) the Debtors to Enter Into and Perform Under the Purchase Agreement and (II) Granting Related Relief* [Docket No. 1037], requesting authority to sell certain property located in Morrow, Georgia to Cameron LR Development, LLC (the "Southlake Sale"). On November 30, 2022, the Bankruptcy Court entered an order authorizing the Southlake Sale [Docket No. 1061].

  - On December 30, 2022, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Authorizing (A) the Sale of Certain of the Debtors' Real Property Free and Clean or Liens,*

*Claims, and Encumbrances, and (B) the Debtors to Enter Into and Perform Under the Purchase Agreement and (II) Granting Related Relief* [Docket No. 1177], requesting authority to sell certain property located in Fort Walton Beach, Florida to Valparaiso Realty Company (the "Sun Plaza Sale").  On January 24, 2023, the Bankruptcy Court entered an order authorizing the Sun Plaza Sale [Docket No. 1236].

- Plan Exclusivity:  On January 5, 2023, the Bankruptcy Court entered an order extending the Debtors' exclusive period to file a chapter 11 plan to April 5, 2023, and to solicit acceptances thereof to June 5, 2023 [Docket No. 1192].  On April 5, 2023, the Bankruptcy Court entered an order further extending such periods to June 5, 2023, and August 4, 2023, respectively [Docket No. 1490].

- Removal of Actions:  On December 19, 2022, the Bankruptcy Court entered an order extended the period in which the Debtors may seek removal of actions pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027 through and including April 5, 2023.  On April 5, 2023, the Bankruptcy Court entered an order further extending such period through and including July 5, 2023 [Docket No. 1489].

### N.    Corporate Structure Upon Emergence.

Except as otherwise provided in the Plan or the Plan Supplement or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous governing documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous governing documents) are amended under the Plan or otherwise, in each case, consistent with the Plan, and to the extent such document is amended in accordance therewith, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.  On or prior to the Effective Date, Reorganized Cineworld Parent will become the new holding company of the Reorganized Debtors and Cineworld Parent and Cineworld Funding will not be part of the corporate structure of the Reorganized Debtors upon the Effective Date.

After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## IX.    RISK FACTORS.

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

**THE DEBTORS HAVE PROVIDED THE FOLLOWING RISK FACTOR DESCRIPTIONS TO SATISFY THE DISCLOSURE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE.  DISCLOSURE AND DISCUSSION OF ADDITIONAL RISK FACTORS RELATED TO THE DEBTORS' BUSINESS MAY BE FOUND IN PUBLICLY AVAILABLE SECURITIES FILINGS, INCLUDING IN CINEWORLD PARENT'S ANNUAL REPORT AND ACCOUNTS 2021, AVAILABLE AT CINEWORLD PARENT'S WEBSITE, WWW.CINEWORLDPLC.COM.**

A.      **Bankruptcy Law Considerations.**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.      **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.      **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent, which may include the completion of Implementation Mechanism(s) in jurisdictions outside the United States.  If such conditions precedent are not waived or not met, the Effective Date will not take place.

3.      **The Conditions Precedent to Consummation of the Capital Raise May Not Occur.**

As more fully set forth in the Rights Offering Documents, Exit First Lien Facility Documents, and, to the extent applicable, the New Money Revolving Credit Facility Documents, the Capital Raise is subject to a number of conditions precedent.  If these conditions precedent are not satisfied or waived, one or more parts of the Capital Raise may not be consummated, and because consummation of each part of the Capital raise is itself a condition precedent to the Effective Date, the Effective Date may not take place.

4.      **The Debtors May Fail to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests as those proposed in the Plan.  As such, the most likely outcome is that the Debtors would liquidate under chapter 7 of the Bankruptcy Code and/or similar equivalent bankruptcy processes in other jurisdictions.  In any event, the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates or Holders of Claims than the Plan.

5.      **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial

reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Interests and Allowed Claims would ultimately receive. As such, the most likely outcome is that the Debtors would liquidate under chapter 7 of the Bankruptcy Code and/or similar equivalent bankruptcy processes in other jurisdictions.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class of Allowed Claims or Allowed Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 6.    Nonconsensual Confirmation.

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 7.    Continued Risk upon Confirmation.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, and increasing expenses. See Article IX.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Business." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Further, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 8.     The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 9.     The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 10.     Risk that the Implementation Mechanisms in England and Wales May Not Be Approved.

To implement the Restructuring Transactions (which is a condition precedent to the Effective Date), one or more Implementation Mechanisms will be required in England and Wales.  While the Debtors are confident that they will determine and pursue the best available path with respect to the Implementation Mechanisms, there is a risk associated with implementation, which may affect the Debtors' ability to effectuate their reorganization.  Such risks include, without limitation, (i) if a UK Restructuring Plan is proposed by Cineworld Parent, the court of competent jurisdiction in England and Wales may not sanction the UK Restructuring Plan or (ii) that if an Administration is pursued, a court of competent jurisdiction in England and Wales may not order the appointment of administrators in respect of the Cineworld Parent (albeit that administrators may also be appointed without an order of such court).

11.     **Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

12.     **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

13.     **Risk that Foreign Courts Will Not Enforce the Confirmation Order.**

After the Effective Date, the Reorganized Debtors will maintain business operations in certain Non-U.S. jurisdictions, including the United Kingdom, where many of the Debtors are incorporated. Additionally, implementation of the Plan and the Restructuring Transactions contemplated thereunder may require certain actions to be taken by and/or with respect to certain of the Debtors or Reorganized Debtors incorporated in certain foreign jurisdictions, including in England and Wales. There is a risk that the courts in these jurisdictions will not enforce the Confirmation Order, which may affect the Reorganized Debtors' ability to effectuate certain relief granted pursuant to the Confirmation Order.

14.     **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganization efforts and have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Plan and the significant deleveraging and financial benefits that they embody.

B.     **Risks Related to Recoveries Under the Plan.**

1.     **The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results.**

The Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections attached hereto as **Exhibit C** represent the Debtors' management team's best

estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, the value of the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

2. **The Distributable New Common Stock is Subject to Dilution.**

The ownership percentage represented by the Distributable New Common Stock will be subject to dilution by the shares of New Common Stock issued pursuant to the Management Incentive Plan, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and the Premium Shares, or other securities that may be issued substantially concurrently with or after the Effective Date.

3. **Certain Tax Implications of the Plan.**

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement, entitled "Certain United States Federal Income Tax and U.K. Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of certain Claims.

4. **The Debtors May Not Be Able to Accurately Report Their Financial Results.**

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting that may be required upon the registration of the New Common Stock with the SEC under SEC rules and regulations (or similar rules and regulations in other applicable jurisdictions) and the terms of the agreements governing the Debtors' indebtedness and securities. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' business, results of operations, and financial condition.

5. **A Liquid Trading Market for the Shares of the New Common Stock May Not Develop.**

The New Common Stock will be a new issuance of securities, and there is no established trading market for the New Common Stock. The Reorganized Debtors do not intend to apply to list the New Common on a recognized U.S. securities exchange (or comparable non-U.S. securities exchange) on or about the Effective Date. Although the Reorganized Debtors may apply to list the New Common Stock on a recognized securities exchange in the future, the Debtors make no assurance that they will be able to obtain such a registration or listing for the New Common Stock in the future. Even if the Debtors do, a

liquid trading markets for shares of New Common Stock may not develop. The liquidity of any market for shares of the New Common Stock will depend upon, among other things, the number of holders of shares of the New Common Stock, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that an active trading market for the New Common Stock will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell the New Common Stock may be substantially limited and the price for shares of the New Common Stock may decline or may be considered unfavorable.  You may be required to bear the financial risk of your ownership of the New Common Stock indefinitely.

6.  **The Trading Price for the Shares of the New Common Stock May Be Depressed Following the Effective Date.**

On the Effective Date, it is expected that Reorganized Cineworld Parent will issue the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares, and Premium Shares as well as potentially shares of New Common Stock issued pursuant to the Management Incentive Plan, including Emergence Awards.  Following the Effective Date, shares of the New Common Stock may be sold to satisfy withholding tax requirements, to the extent necessary to fund such requirements.  In addition, Holders of the New Common Stock may seek to sell such securities in an effort to obtain liquidity.  These sales and the volume of the New Common Stock available for trading could cause the trading price for the shares of the New Common Stock to be depressed, particularly in the absence of an established trading market for the New Common Stock.

7.  **Restricted Securities Issued under the Plan May Not be Resold or Otherwise Transferred Unless They Are Registered under the Securities Act or an Exemption from Registration Applies.**

To the extent that securities issued pursuant to the Plan (including the Distributable New Common Stock) are not covered by section 1145 of the Bankruptcy Code, such securities shall be issued in reliance upon the exemption from registration set forth in Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act), subject to any other applicable securities Laws. Any securities issued pursuant to Section 4(a)(2) under the Securities Act, including certain shares of the New Common Stock (including the Rights Offering Shares, the Direct Allocation Shares, the RO Backstop Shares and the Premium Shares as well as the Distributable New Common Stock, with respect to any issuances of such shares that may not be issued in reliance on section 1145 of the Bankruptcy Code), and the Subscription Rights, will be deemed "restricted securities" (as defined under the Securities Act and the rules promulgated thereunder) that may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act.  Holders of such restricted securities may not be entitled to have their restricted securities registered under the Securities Act and may not resell them except in accordance with an available exemption from registration under the Securities Act.  Under Rule 144 of the Securities Act, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144.  A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period. Such current public information is not expected to be available on or about the Effective Date. An affiliate may resell restricted securities after a six-month holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144.  In any

event, holders of restricted securities may be required to hold their restricted securities for at least one year and potentially indefinitely.

Whether any particular person would be an underwriter or an affiliate would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors make no representation concerning the ability of a person to dispose of the Securities issued under the Plan. Persons who receive Securities under the Plan are urged to consult their own legal advisor with respect to the restrictions applicable under the federal, state, or non-U.S. securities laws and the circumstances under which securities may be sold in reliance on such laws.

8.     **Certain Holders of the New Common Stock May be Restricted in their Ability to Transfer or Sell their Securities.**

To the extent that the New Common Stock issued under the Plan may be issued pursuant to section 1145(a)(1) of the Bankruptcy Code (including the Distributable New Common Stock, to the extent such exemption is permitted and available for such Distributable New Common Stock), such securities may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; *provided*, *however*, shares of such New Common Stock may not be freely resold under the Securities Act if, at the time of transfer, the Holder is an "affiliate", as defined in Rule 144(a)(1), of the Reorganized Debtors, or has been such an "affiliate" within 90 days of such transfer. Further, resales by Holders of Claims or Interests (as applicable) who receive such securities pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such holders would only be permitted to sell such securities without registration under the Securities Act if they can comply with an applicable exemption from registration under the Securities Act. For the avoidance of doubt, the Rights Offering Shares, Direct Allocation Shares, the RO Backstop Shares and the Premium Shares will not be issued in reliance of section 1145(a)(1) of the Bankruptcy Code.

To the extent that the New Common Stock (including the Rights Offering Shares, the Direct Allocation Shares, the RO Backstop Shares and the Premium Shares) is issued pursuant to Section 4(a)(2) under the Securities Act (or another exemption from registration), such securities will be deemed "restricted securities" (as defined under the Securities Act and the rules promulgated thereunder). Such securities may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. In addition, the New Common Stock is not expected to be registered under any local or state securities Laws. The Debtors make no representation regarding the right of any holder of Subscription Rights or New Common Stock (including the Distributable New Common Stock, the Rights Offering Shares, the Direct Allocation Shares, the RO Backstop Shares and the Premium Shares) to freely transfer or resell the Subscription Rights or the New Common Stock (including the Distributable New Common Stock, the Rights Offering Shares, the Direct Allocation Shares, the RO Backstop Shares and the Premium Shares). Resale restrictions and other restrictions on transfer are discussed in more detail in the Rights Offering Documents and in Article XI of this Disclosure Statement, entitled "Certain Securities Law Matters." Further, the New Organizational Documents and, with respect to the Capital Raising Parties, the Financing Commitment and Backstop Agreement also may impose certain restrictions on transfer of the New Common Stock.

9.     **The Rights and Responsibilities of Holders of the New Common Stock Are to Be Governed Largely by Non-U.S. Law.**

The rights and responsibilities of Holders of the New Common Stock will be governed largely by the law of a non-U.S. jurisdiction and differ in some respects from the rights and responsibilities of

shareholders for a company incorporated in the United States. The Holders of the New Common Stock may have more difficulty in protecting their interests in the face of actions by Reorganized Cineworld Parent's board of directors than if Reorganized Cineworld Parent were incorporated in the United States.

10.     **Because Reorganized Cineworld Parent Is Expected To Be Incorporated Under the Laws of a Jurisdiction Other Than the United States, Holders of the New Common Stock May Face Difficulty Protecting Their Interests, and Their Ability to Protect Their Rights Through Other International Courts, Including the Courts of the United States, May Be Limited.**

Reorganized Cineworld Parent is expected to be incorporated under the laws of a non-U.S. jurisdiction, and, as a result, it may be difficult for investors to effect service of process within the United States upon Reorganized Cineworld Parent or to enforce both in the United States and outside the United States judgments against it obtained in the United States courts in any action, including actions predicated upon the civil liability provisions of the federal securities laws of the United States.  In addition, a majority of Reorganized Cineworld Parent's directors may be residents of jurisdictions other than the United States, and all or a substantial portion of the assets of those Persons may be located outside the United States.  As a result, it may be difficult for investors to effect service of process within the United States on certain of these directors or to enforce against them judgments obtain in the United States courts, including judgments predicated upon the civil liability provisions of the federal securities laws of the United States.  There is uncertainty as to whether the legal systems of any non-U.S. jurisdiction would (a) enforce judgments of the United States courts obtained against Reorganized Cineworld Parent predicated upon the civil liability provisions of the federal securities laws of the United States or (b) entertain original actions brought in such a non-U.S. jurisdiction against Reorganized Cineworld Parent predicated upon the federal securities laws of the United States.

C.     **Risks Related to the Debtors' and the Reorganized Debtors' Business.**

1.     **The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.**

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential borrowings under the Exit First Lien Facility upon emergence.

2.     **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  the (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the

Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' business and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

3. **Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business.**

The Debtors' future results will depend upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Further, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

4. **Financial Results May Be Volatile and May Not Reflect Historical Trends.**

The Financial Projections attached hereto as **Exhibit C** are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the New Common Stock and the ability of the Debtors to make payments with respect to their indebtedness. Because the actual results achieved may vary from projected results, perhaps

significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract and lease terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Lastly, the business plan was developed by the Debtors with the assistance of their advisors. There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan. Any deviations from the Debtors' existing business plan would necessarily cause a deviation.

5.        **The Debtors' Substantial Liquidity Needs May Impact Revenue.**

The Debtors operate in a capital-intensive industry. If the Debtors' cash flow from operations remains depressed or decreases, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources. In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to comply with the terms and condition of the DIP Orders; (b) their ability to maintain adequate cash on hand; (c) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (d) the cost, duration, and outcome of the Chapter 11 Cases. In the event that cash on hand, cash flow from operations, and cash provided through access to cash collateral are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. In addition, the Debtors' ability to consummate the Plan is dependent on, among other things, their ability to satisfy the conditions precedent to the Exit First Lien Facility. The Debtors can provide no assurance that such conditions will be satisfied. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

6.      **Trading in the Debtors' Securities During the Pendency of the Chapter 11 Cases is Highly Speculative and Poses Substantial Risks.**

Holders of the Interests in Cineworld Parent will not receive any distribution on account of such Interests in Cineworld Parent.  Accordingly, any trading in the Debtors' securities during the pendency of the Chapter 11 Cases is highly speculative and poses substantial risks to purchasers of common stock. In particular, trading prices for Cineworld Parent's ordinary shares are very volatile.  In addition, the Financial Conduct Authority may seek to suspend the listing of Cineworld Parent, preventing holders of such Interests from trading in the relevant Securities.

7.      **The Debtors' Operations May Be Impacted by the Continuing COVID-19 Pandemic and Its Attendant Effects on the Cinema Industry.**

The COVID-19 pandemic has had and could continue to have a long-lasting and significant impact on the Debtors' business, both in the context of consumer demand for cinema admissions and concessions and the distribution of available films from third-party film producers.  The initial impact COVID-19 had on the cinema industry, including the Debtors, has been profound, severely limiting the Debtors' operations and disrupting the motion picture exhibition industry generally.  Structural changes to the cinema industry caused by the COVID-19 pandemic may impact the Debtors' operations moving forward.  The Debtors' largest source of revenue, ticket sales, still have not returned to pre-pandemic levels.  In 2021, the Debtors' revenue, which is largely comprised of box office sales, rebounded from a low of $11.8 billion in 2020 to $21.3 billion.  However, this amount is only 50% of the Debtors' pre-pandemic total revenue of $42.3 billion in 2019.  The COVID-19 pandemic's impact has been compounded by continued delays in film releases—the number of new feature films in 2020 was just 319, an almost two-thirds decrease from the 860 feature films released in 2019.  In 2021, that number increased slightly to 370, but that still represents 57% fewer feature films when compared to 2019.  The slowed timeline of film releases is expected to continue into 2023, continuing to impact the Debtors' revenue stream.  Furthermore, the COVID-19 pandemic spurred the already-growing influence of streaming services and diverted essential cinema revenue.  The continued growth of releasing and viewing films through an internet streaming distribution model is likely to divert further revenue and may compress or negatively alter the "cinematic window," which is the timeframe between a film's release at the cinema and that same film's release through other film delivery methods.  Delays, reduced film production targeted for cinemas and trends towards streaming may result in continued impacts on the Debtors' operations and may have a materially adverse effect on the Group's businesses, financial condition, results of operations, and prospects.

8.      **The Debtors Are Exposed to Foreign Currency Exchange Rate Risk that Could Affect Results of Operations and Comparability of Results Between Financial Reporting Periods.**

The Debtors' business operations are subject to risks associated with fluctuations in currency exchange rates.  The Reorganized Debtors' expected reporting currency will be U.S. dollars.  A large portion of the Debtors' revenue, assets, and liabilities is currently denominated in currencies other than the U.S. dollar, including Pound Sterling, euro, Israeli shekel, Polish złoty, Hungarian forint, Bulgarian lev, Romanian leu, and Czech koruna.  Such portion is expected to continue if a sale of RoW Equity does not occur, and a significant portion of the Debtors' revenues, assets, and liabilities will continue to be denominated in Pound Sterling even if a sale of the RoW Equity does not occur.  Changes in exchange rates will affect the value of the reported earnings and the value of those assets and liabilities denominated in foreign currencies and may also impact operating expenses where such operating expenses are in a currency other than that currency in which financing is obtained or in which revenue is generated.

9.   **The Performance of the Debtors' Business is Directly Linked to Global Macroeconomic Conditions and Other Factors Outside of the Debtors' Control, Which May Adversely Affect Consumer Confidence and/or Consumer Spending Decisions and Which May Therefore Have a Materially Adverse Effect on the Debtors' Business, Financial Condition, Results of Operations, and Prospects.**

The Debtors operate in the broader leisure industry, which means that their sales and profitability have strong correlation with consumer confidence and consumer discretionary spending.  The prevailing global economic climate, inflation, levels of employment, real disposable income, salaries, wage rates, interest rates, consumer confidence, and consumer perception of economic conditions can all adversely influence customer spending decisions.  While admissions to the Debtors' cinemas have not historically been materially adversely affected by downturns in the global economic climate, there can be no assurance that the foregoing events or factors will not adversely impact admissions levels and the businesses, financial condition, results of operations, and prospects of the Debtors in the future.  Additionally, the COVID-19 pandemic has had, and continues to have, particularly with respect to the cinema industry, a significant impact on consumer sentiment, general economic conditions, and the political climate.  Should economic conditions deteriorate, cost of living pressures accelerate, or political uncertainty increase, customers may choose to reduce their discretionary spending on cinemas, which may have a materially adverse effect on the Group's businesses, financial condition, results of operations, and prospects.

10.   **The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.**

In the future, the Reorganized Debtors may become parties to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims or Interests under the Plan.  It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' business and financial stability, however, could be material.

11.   **The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.**

The Debtors' operations are dependent on a relatively small group of key management personnel and a skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  As a result, the Debtors have experienced, and may continue to experience, increased levels of employee attrition.  Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' business and the results of operations.

## X.   CONFIRMATION OF THE PLAN

### A.   The Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan. The Debtors have requested that the Bankruptcy Court schedule the Confirmation Hearing on **May 26,**

**2023, at 8:00 a.m., prevailing Central Time**.  The Confirmation Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to confirmation.  The Debtors have requested that the deadline to object to confirmation be set for **May 23, 2023, at 5:00 p.m. (prevailing Central Time)**.  An objection to confirmation of the Plan must be Filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the requirements set forth in the Disclosure Statement Order so that the objection is actually received on or before the deadline to File such objections as set forth therein.

### B.    Purpose of the Confirmation Hearing.

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

### C.    Confirmation Requirements.

Among the requirements for confirmation of a plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the plan is accepted by all impaired classes of claims or interests,[20] or if rejected by an impaired class, the plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting impaired class; (2) the plan is feasible; and (3) the plan is in the "best interests" of holders of claims or interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

---

[20]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

D.        **Feasibility.**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections").  Creditors and other interested parties should review Article IX of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit C** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

E.        **Acceptance by Impaired Classes.**

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each Impaired Class of Claims or Interests accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that actually vote on the Plan cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that actually vote on the Plan cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.        **Confirmation Without Acceptance by All Impaired Classes.**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it, provided that the plan has been accepted by at least one impaired class of claims.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

      1.      **No Unfair Discrimination.**

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of similarly situated creditors differently without unfairly discriminating against either class.

      2.      **Fair and Equitable Test.**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receives more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

**G.     Best Interests of Creditors/Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if in the debtors liquidated under chapter 7 on such date.

The Debtors believe that the Plan provides Holders of Allowed Claims and Interests the same or greater recovery as would be achieved if the Debtors were to liquidate under chapter 7 of the Bankruptcy Code. This belief is based on a number of considerations, including: (a) that the Debtors' primary assets likely would have to be sold on a piecemeal basis in a chapter 7 liquidation; (b) the additional Administrative Claims that would be incurred if the cases were converted to a chapter 7 along with the other costs associated therewith; and (c) that there would not be a robust market to liquidate the Debtors' assets and services.

The Debtors, with the assistance of their restructuring advisor, AlixPartners, LLP, have prepared an unaudited liquidation analysis, which is attached hereto as **Exhibit E** (the "Liquidation Analysis"), to assist Holders of Claims and Interests in evaluating the Plan. The Liquidation Analysis compares the projected recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan. The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, the Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions as well as legal rulings. Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the Liquidation Analysis.

**H.     Valuation Analysis.**

The Plan provides for Holders of Claims in Class 4 to receive shares of the New Common Stock in the Reorganized Debtors, upon Consummation of the Plan. Accordingly, PJT performed an analysis of the estimated implied value of the Debtors on a going-concern basis as of June 30, 2023 (the "Valuation Analysis") at the Debtors' request, which is attached hereto as **Exhibit D**. Based on the Valuation Analysis, the estimated range of the Enterprise Value of the Reorganized Debtors is approximately $2.8 billion to $3.4 billion.

The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken, should be read in conjunction with Article IX of this Disclosure Statement entitled "Risk Factors." The Valuation Analysis performed by PJT is based on data and information as of April 19, 2023. PJT makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

**THE VALUATION ANALYSIS REPRESENTS A HYPOTHETICAL VALUATION OF THE REORGANIZED DEBTORS AND THEIR ASSETS AND BUSINESSES, WHICH ASSUMES THAT THE REORGANIZED DEBTORS CONTINUE AS AN OPERATING BUSINESS IN SUBSTANTIALLY THE SAME CORPORATE STRUCTURE. THE ESTIMATED VALUE SET FORTH IN THE VALUATION ANALYSIS DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTORS, THEIR SECURITIES OR THEIR ASSETS, WHICH MAY BE MATERIALLY DIFFERENT THAN THE ESTIMATES SET FORTH IN THE VALUATION ANALYSIS. ACCORDINGLY,**

**SUCH ESTIMATED VALUE IS NOT NECESSARILY INDICATIVE OF THE PRICES AT WHICH ANY SECURITIES OF THE REORGANIZED DEBTORS MAY TRADE AFTER GIVING EFFECT TO THE RESTRUCTURING TRANSACTIONS SET FORTH IN THE PLAN. ANY SUCH PRICES MAY BE MATERIALLY DIFFERENT THAN INDICATED BY THE VALUATION ANALYSIS.**

### I.        Financial Information and Projections.

In connection with developing the Plan, the Debtors, with the assistance of their advisors, prepared the Financial Projections for fiscal years 2023 through 2027, which are attached hereto as **Exhibit C**, including management's assumptions related thereto. For purposes of the Financial Projections, the Debtors have assumed an illustrative emergence date of June 30, 2023. The Financial Projections assume that the Plan will be implemented in accordance with its stated terms. The Debtors are unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Financial Projections due to a material change in the Debtors' prospects.

The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes, and/or a variety of other factors, including the factors listed in this Disclosure Statement. Accordingly, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to significant business, economic, and competitive uncertainties. Therefore, such projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein. The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement.

### J.        Additional Information Regarding this Disclosure Statement and Plan.

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent, Kroll Restructuring Administration LLC, by emailing cineworldinfo@ra.kroll.com, or by calling (844) 648-5574 (toll free) or +1 845) 295-5705 (international).

Copies of the Plan and the Disclosure Statement: (a) are available on the Debtors' restructuring website, free of charge, at https://cases.ra.kroll.com/cineworld; (b) may be obtained upon request of the Debtors' proposed counsel at the address specified above; (c) are on file with the Clerk of the Bankruptcy Court, 4th Floor, 515 Rusk Street, Houston, Texas 77002, where they are available for review between the hours of 8:30 a.m. to 5:00 p.m., prevailing Central Time; and (d) are available for inspection for a fee on PACER at https://ecf.txsb.uscourts.gov.

## XI.     CERTAIN SECURITIES LAW MATTERS

Except as otherwise provided herein, in the Plan, and in the Plan Supplement, the shares of the New Common Stock issued under the Plan (including the Distributable New Common Stock, the Direct Allocation Shares, the Rights Offering Shares, the RO Backstop Shares and the Premium Shares) and the Subscription Rights with respect to the Rights Offering will be issued without registration under the Securities Act or any other similar U.S. federal, state, or local Law in reliance upon either (a) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (b) including with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code, pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act), subject to, in each case, other applicable securities Laws. The Debtors believe the shares of the New Common Stock, the options, or other equity awards

(including any New Common Stock underlying such awards) to be issued pursuant to the post-emergence Management Incentive Plan will be issued pursuant to Section 4(a)(2) under the Securities Act, Regulation D promulgated thereunder and/or another available exemption from registration under the Securities Act, subject to other applicable securities Laws.  In addition, the issuance of shares of the New Common Stock under the Plan will be conducted in reliance upon one or more exemptions from the requirement to publish a prospectus in a Relevant State under the Prospectus Regulation, and therefore any participant that is resident or located in a Relevant State will be required to confirm that they are a qualified investor (as defined in Article 2(e) of the Prospectus Regulation) in order to participate in the Rights Offering.

### A.      Issuance of Securities under the Plan.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state or local securities laws if three principal requirements are satisfied:  (a) the securities must be offered and sold under a plan of reorganization and must be securities issued by the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan; (b) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or "principally" in exchange for such claim or interest and "partly" for cash or property.

The Debtors believe that the issuance of the Distributable New Common Stock should satisfy the requirements of section 1145(a) of the Bankruptcy Code, to the extent permitted and available with respect to any respective Holder, while the issuance of the Subscription Rights, the Rights Offering Shares, the Direct Allocation Shares, the RO Backstop Shares and the Premium Shares will be issued in reliance upon Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act),   subject to other applicable securities Law. No registration statement will be filed under the Securities Act or any local or state securities laws.  Recipients of the New Common Stock (including the Distributable New Common Stock, the Rights Offering Shares, the Direct Allocation Shares, the RO Backstop Shares and the Premium Shares) and the Subscription Rights are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act, any applicable state Blue Sky Law, other local law. As discussed below, the exemptions provided for in section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

### B.      Subsequent Transfers.

#### 1.      Subsequent Transfers After Reorganized Debtors' issuance of Securities pursuant to section 1145 of the Bankruptcy Code.

Subject to the limitations in the New Organization Documents, any Distributable New Common Stock, to the extent that such issuance is exempt under section 1145 of the Bankruptcy Code (collectively, the "Section 1145 Securities"), may be freely transferred in compliance with the Securities Act by recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the Section 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" or an "affiliate" with respect to such securities.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer:"  (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities, and

(ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the Section 1145 Securities by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, holders of the Section 1145 Securities who are deemed to be "underwriters" may be entitled to resell their Section 1145 Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the Section 1145 Securities would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such Section 1145 Securities and, in turn, whether any Person may freely trade such Section 1145 Securities.

Further, even if issued pursuant section 1145 of the Bankruptcy Code, the Section 1145 Securities may not be freely resold if, at the time of transfer, the Holder is an "affiliate", as defined in Rule 144(a)(1), of the Reorganized Debtors, or has been such an "affiliate" within 90 days of such transfer.

You should confer with your own legal advisors to determine whether or not you are an "underwriter" or an "affiliate."  Affiliate considerations are discussed further below.

      2.      **Subsequent Transfers After Reorganized Debtors' issuance of Securities pursuant to Section 4(a)(2) of the Securities Act.**

Unlike any shares of New Common Stock that may be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, the Rights Offering Shares, the Direct Allocation Shares, the RO Backstop Shares and the Premium Shares as well as the Subscription Rights will be issued in reliance upon Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act) (collectively, "4(a)(2) Securities"), subject to,

in each case, other applicable securities Laws. Such 4(a)(2) Securities will be deemed "restricted securities" that may not be offered, sold, exchanged, assigned, or otherwise transferred under the Securities Act unless they are registered under the Securities Act or an exemption from registration under the Securities Act is available, including under Rule 144 or Rule 144A promulgated under the Securities Act.

Rule 144 provides a limited safe harbor for the resale of restricted securities if certain conditions are met.  These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer.  Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is available certain current public information regarding the issuer, and may sell the securities after a one-year holding period whether or not there is current public information regarding the issuer.  Adequate current public information is available for a reporting issuer if the issuer has filed all periodic reports required under section 13 or 15(d) of the Securities Exchange Act of 1934 (as amended, the "<u>Exchange Act</u>") during the twelve months preceding the sale of the restricted securities.  If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available. It is not expected that Reorganized Cineworld Parent will have adequate current public information on or about the Effective Date.

An affiliate of an issuer that is not subject to the reporting requirements of section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available.  An affiliate must also comply with the volume, manner of sale, and notice requirements of Rule 144.  First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144, or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker.  Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144).  Third, if the amount of securities sold under Rule 144 in any three-month period exceeds 5,000 shares or has an aggregate sale price greater than $50,000, an affiliate must file or cause to be filed with the SEC three copies of a notice of proposed sale on Form 144, and provide a copy to any exchange on which the securities are traded.

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date, assuming certain public information regarding the issuer will not be available. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, Holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year and potentially longer. Thereafter, such holders may only sell them in accordance with the applicable requirements of Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

**** 

*Legend*. Each certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2) Security shall, upon issuance, be stamped or otherwise imprinted with a restrictive legend substantially consistent with the following form:

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], AND SUCH SECURITIES [AND THE COMMON STOCK, IF ANY, ISSUABLE UPON EXERCISE OF SUCH SECURITIES] HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."**

The Reorganized Debtors reserve the right to reasonably require certification, legal opinions, or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. The Reorganized Debtors also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 of the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described above. The Reorganized Debtors reserve the right to include a customary legend for any Securities issued pursuant to section 1145 as well. The Reorganized Debtors reserve the right to stop the transfer of any shares of New Common Stock if such transfer would be prohibited by the New Organizational Documents.

Any persons receiving restricted securities under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT, AND RULE 144 UNDER THE SECURITIES ACT OR OTHER APPLICABLE LOCAL OR STATE LAW, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN, INCLUDING THE RIGHTS OFFERING SHARES, DIRECT ALLOCATION SHARES AND PREMIUM SHARES. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT WITH THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRANSFER SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY TRANSFER, INCLUDING RESELL, SUCH SECURITIES.**

C.      **The New Common Stock & Management Incentive Plan.**

The Confirmation Order shall authorize the board of directors of the Reorganized Debtors to adopt the Management Incentive Plan. Awards issued under the Management Incentive Plan that include the New Common Stock will dilute all of the New Common Stock outstanding. The New Common Stock is also subject to dilution in connection with the conversion of any other options, convertible securities or other securities that may be issued post-emergence.

89

The New Common Stock of Reorganized Cineworld Parent issued pursuant to the Management Incentive Plan shall be 4(a)(2) Securities (as defined herein) and exempt from any registration requirements under any federal securities laws to the fullest extent permitted by Section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or Rule 701 promulgated thereunder.

## XII.   CERTAIN UNITED STATES FEDERAL INCOME TAX AND U.K. TAX CONSEQUENCES OF THE PLAN

### A.   Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors.

#### 1.   Introduction.

The discussion in Sections XII(A) - (E) (the "U.S. Tax Discussion") is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, Reorganized Debtors, and to certain holders of Allowed Claims.  The U.S. Tax Discussion does not address the U.S. federal income tax consequences to holders of Claims or Interests not entitled to vote to accept or reject the Plan or the potential sale of the RoW Equity.

This summary of the U.S. federal income tax consequences of the consummation of the Plan is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained.  The Debtors have not requested and do not intend to request a ruling from the IRS or any other taxing authority regarding any of the other tax consequences of the Plan discussed below.  The U.S. Tax Discussion below is not binding upon the IRS, the courts, or any other tax authority.  No assurance can be given that the IRS or any other tax authority would not assert, or that a court would not sustain, a different position than any position discussed herein.

Unless specifically provided for in the U.S. Tax Discussion, such discussion does not purport to address all aspects of U.S. federal income tax that may be relevant to the Debtors, Reorganized Debtors, or to certain holders of Allowed Claims in light of their individual circumstances.  Such discussion does not address tax issues with respect to such holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax exempt organizations, small business investment companies, non-U.S. taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons using a mark-to-market method of accounting, Persons subject to alternative minimum tax or subject to special accounting rules under section 451(b) of the IRC, holders of Claims that hold 10.0 percent or more of the equity of the Debtors or that will hold 10.0 percent or more of the equity of the Reorganized Debtors after receiving the distributions contemplated by the Plan, holders of Claims who are themselves in bankruptcy, regulated investment companies or funds and those holding, or who will hold, Claims, or the New Common Stock, Exit First Lien Facility or any other consideration to be received under the Plan, as part of a hedge, straddle, conversion, or other integrated transaction).  No aspect of U.S. state, local, estate, or gift, or non-U.S. taxation is addressed in the U.S. Tax Discussion.  Furthermore, this summary assumes that holders of Claims hold only Claims in a single Class and hold such Claims as "capital assets" (within the meaning of section 1221 of the IRC).  This summary does not address any special arrangements or contractual rights that are not being received or entered into in respect of an underlying Claim, including the tax treatment of any backstop fees or similar arrangements (including any ramifications such arrangements may have on the treatment of a Holder under the Plan) or

the treatment of the Sponsored Exit First Lien Facility.  This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

For purposes of the U.S. Tax Discussion, a "U.S. Holder" is a holder of a Claim that is:  (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons has authority to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of the U.S. Tax Discussion, a "Non-U.S. Holder" is any holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or pass-through entity for U.S. federal income tax purposes) is a holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) of such entity generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are holders of Claims or Interest should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The U.S. Tax Discussion assumes that the final Restructuring Transactions as ultimately consummated do not result in a new U.S. parent entity or cause the Reorganized Cineworld Parent to be subject to U.S. federal income tax in connection with an "inversion" under section 7874 of the IRC.  If the final restructuring transactions do result in an inversion under section 7874 of the IRC, then the U.S. federal income tax consequences could materially differ from the following summary, including for holders of Claims, the Debtors and the Reorganized Debtors.

**ACCORDINGLY, THE FOLLOWING SUMMARY ADDRESSING CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  IN ADDITION, ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U. S. FEDERAL, STATE, AND LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

2.      **In General.**

As a general matter, Crown Finance US and its subsidiaries are currently subject to U.S. federal income tax and the Debtors expect that they will continue to be subject to U.S. federal income tax following the Restructuring Transactions.  Crown UK Holdco and Cineworld Parent (the Debtors that are the direct and indirect owners of Crown Finance US) are not currently subject to U.S. federal income tax, and the Debtors expect that such Debtors (and, in the case of Cineworld Parent, any successor thereto) will not be subject to U.S. federal income tax immediately following the Restructuring Transactions, though that conclusion is not free from doubt in light of the U.S. "inversion" rules under section 7874 of the IRC and the Treasury Regulations thereunder.

The following discussion also assumes that the Plan will not be structured as a taxable transaction for U.S. federal income tax purposes with respect to the assets of the U.S. consolidated tax group.  In the event that any transaction (including any transaction resulting from any sale or marketing process) results in a taxable transaction with respect to the assets of the U.S. consolidated tax group, the tax consequences of the Plan to the Debtors and Holders of Claims would be materially different from what is described below.

3.      **Effects of the Restructuring Transactions on Tax Attributes of Debtors.**

(a)      **Preservation of Tax Attributes and Cancellation of Indebtedness Income ("COD Income").**

As a result of the Restructuring Transactions, the U.S. tax attributes of Crown Finance US and its subsidiaries may, depending on certain factors, be reduced by the amount of their COD Income excluded from U.S. federal taxable income under section 108 of the IRC.

In general, absent an exception, a debtor will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness issued by the debtor, and (iii) the fair market value of any new consideration, in each case, given in satisfaction of such indebtedness at the time of the satisfaction.  Unless an exception or exclusion applies, COD Income constitutes U.S. federal taxable income like any other item of taxable income.

Pursuant to section 108 of the IRC, a debtor is not required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of indebtedness occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC.  In general, the tax attributes of a debtor will be reduced in the following order: (a) net operating losses ("NOLs") and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers (d) capital loss carryovers; (e) tax basis in assets (subject to the Asset Tax Basis Floor, as described below); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.  A debtor with COD Income may elect to first reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC (which can include a reduction in the basis of a partnership interest, but only if the "inside" basis of assets in the partnership are also reduced), though it has not been determined whether the Debtors will make this election.  The reduction in tax attributes occurs only after the taxable income (or loss) for the taxable year of the debt discharge has been determined. Any

excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The aggregate tax basis of Crown Finance US and its subsidiaries in their assets is not required to be reduced below the amount of indebtedness (determined on an entity-by-entity basis) that the relevant entity will be subject to immediately after the cancellation of debt giving rise to COD Income (the "Asset Tax Basis Floor"). Generally, all of an entity's obligations that are treated as debt under general U.S. federal income tax principles (including intercompany debt treated as debt for U.S. federal income tax purposes) are taken into account in determining an entity's Asset Tax Basis Floor.

The exact amount of the COD Income (if any) that will be realized by the Debtors will not be determinable until after the consummation of the Plan. Accordingly, the Debtors are currently unable to determine the precise effect that the COD Income exclusion rules will have on the U.S. federal income tax attributes of Crown Finance US and its subsidiaries.

### (b) Limitation of NOL Carryforwards and Other Tax Attributes under Sections 382 and 383 of the IRC.

After giving effect to the reduction in tax attributes from excluded COD Income, the ability of Crown Finance US and its subsidiaries to use any tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

#### (i) General Sections 382 and 383 Annual Limitations.

Under sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and NOL carryforwards, disallowed business interest carryovers under section 163(j) of the IRC ("163(j) Carryovers"), tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future U.S. federal taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) and deductions recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of sections 382 and 383 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock pursuant to the Plan will result in one or more "ownership changes" of the Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of sections 382 and 383 of the IRC applies.

#### (ii) General Section 382 Annual Limitation.

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject (the "382 Limitation") is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the three-calendar-month period ending with the calendar month in which the "ownership change" occurs: 3.04 percent for April, 2023). The 382 Limitation may be increased, up to the amount of any net unrealized built-in gain (if any) at the time of the ownership change, to the extent that the Debtors

recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.[21] Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  The 382 Limitation may apply to a consolidated group which includes members of a prior consolidated group, to both the consolidated group as a whole and also separately to the members that were previously a separate consolidated group, resulting in the simultaneous application of more than one 382 Limitation.  As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

The Debtors face a particularly complicated situation under these rules.  In certain circumstances, a consolidated tax group can be simultaneously subject to the net unrealized built-in gain and net unrealized built-in loss rules.  The Debtors believe that they will be in that situation and, as a result, may face particularly restrictive limitations on the ability to claim certain, but not all, Pre-Change Losses.

Notwithstanding the rules described above, if subsequent to an ownership change, a debtor corporation and its subsidiaries do not continue the debtor corporation's historic business or use a significant portion of its historic business assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero, precluding utilization of the debtor corporation's Pre-Change Losses (other than increases in such limitation for recognized built-in gain).

The rules of section 382 of the IRC are complicated, but an ownership change is expected to occur as a result of the Restructuring Transactions.  If such an ownership change occurs, the ability of Crown Finance US and its subsidiaries to use the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the IRC applies.

### (iii)     Special Bankruptcy Rules.

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOLs, NOL carryforwards, and 163(j) Carryovers will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.  If the Reorganized Debtors were to undergo another "ownership change" after the expiration of this two-year period, the resulting 382 limitation would be determined under the regular rules for ownership changes.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for the 382(l)(5) Exception or the debtor otherwise elects not to utilize

---

[21]     Treasury Regulations have been proposed that would significantly change the application of the rules relating to built-in gains and losses for purposes of computing the 382 Limitation.  However, proposed Treasury Regulations have also been released that would "grandfather" companies that undergo an "ownership change" pursuant to an order entered in a bankruptcy case that was commenced prior to, or within 30 days of, the publication of the finalized new rules in this area.  Accordingly, the Debtors do not expect the proposed Treasury Regulations to apply to them or to the Reorganized Debtors with respect to the "ownership change" that will occur pursuant to the Plan.

the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the 382 Limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule for determining the 382 Limitation, which requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the ownership change.   The 382(l)(6) Exception also differs from the 382(l)(5) Exception because the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period; Further, the debtor may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses.  Rather, the resulting limitation from a subsequent ownership change would be determined under the regular rules for ownership changes.

The Debtors do not currently know whether they are eligible for the 382(l)(5) Exception and, regardless of whether the 382(l)(5) Exception is available, the Reorganized Debtors may decide to affirmatively elect out of the 382(l)(5) Exception so that the 382(l)(6) Exception instead applies.  Whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, though, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if a subsequent "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date.

### 4.      Transfer of Litigation Trust Assets to Litigation Trust.

The Litigation Trust is structured to qualify as a "grantor trust" for U.S. federal income tax purposes, to the extent permitted by applicable law, of which the Litigation Trust Beneficiaries would be treated as the grantors and owners thereof.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors believe the Litigation Trust should be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and the Plan provides that the trustee of the Litigation Trust will so treat the Litigation Trust as a liquidating trust on the Litigation Trust's U.S. federal income tax return. The Plan further provides that all parties shall treat any transfer of assets to the Litigation Trust, for U.S. federal income tax purposes, as (a) a first-step transfer of the Litigation Trust Assets (subject to any obligations relating to such Litigation Trust Assets) to the Litigation Trust Beneficiaries and, to the extent the Litigation Trust Assets are allocable to Disputed Class 5A or 5B Claims that are the responsibility of the Litigation Trust to resolve, to the LT Disputed Claims Reserve followed by (b) a second-step transfer by such Holders to the Litigation Trust of such portion of the Litigation Trust Assets in exchange for the Litigation Trust Interests (other than the Litigation Trust Assets allocable to the LT Disputed Claims Reserve).

No ruling from the IRS has been or will be requested regarding the classification of the Litigation Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Litigation Trust.  If the IRS were to challenge successfully the classification of the Litigation Trust as a grantor trust, the U.S. federal income tax consequences to the Litigation Trust and the Litigation Trust Beneficiaries could vary from those discussed in the Plan and this U.S. Tax Discussion (including the potential for an entity-level tax).  For example, the IRS could characterize the Litigation Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as reasonably practicable after the transfer of the Litigation Trust Assets to the Litigation Trust, the trustee(s) of the Litigation Trust shall make a good faith valuation of the Litigation Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee of the Litigation Trust, and the Holders of Claims receiving interests in the Litigation

Trust shall take consistent positions with respect to the valuation of the Litigation Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income of the Litigation Trust among the Litigation Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all its assets (valued at their tax book value) to the Litigation Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Litigation Trust Assets. The tax book value of the Litigation Trust Assets shall equal their fair market value on the date of the transfer of the Litigation Trust Assets to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Litigation Trust shall in no event be dissolved later than five years from the creation of such Litigation Trust unless the bankruptcy court, upon motion within the six month period prior to the fifth anniversary (or within the six month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or based on advice or an opinion of counsel satisfactory to the trustee(s) of the Litigation Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Litigation Trust Assets.

The Litigation Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Litigation Trust Assets (e.g., income, gain, loss, deduction and credit), to the extent required by applicable law.  The Litigation Trust trustee will annually send or make available to each Litigation Trust Beneficiary of record, in accordance with applicable law, a separate statement setting forth such beneficiary's share of items of income, gain, loss, deduction or credit (including the receipts and expenditures of the Litigation Trust) as relevant for U.S. federal income tax purposes. Each Litigation Trust Beneficiary must report on its U.S. federal income tax return its share of all such items.  The information provided by the Litigation Trust will pertain to Litigation Trust Beneficiaries who received their interests in the Litigation Trust in connection with the Plan.

Subject to contrary definitive guidance from the IRS or a court of competent jurisdiction (including the receipt by the Litigation Trustee of an IRS private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), the Litigation Trustee may (A) elect to treat any LT Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (B) to the extent permitted by applicable law, report consistently with the foregoing for U.S. federal, state and local income tax purposes.

Accordingly, any LT Disputed Claims Reserve may be subject to tax annually on a separate entity basis on any net income earned with respect to the Litigation Trust Assets in such reserve (including any gain recognized by the reserve with respect to such Litigation Trust Assets if and to the extent such assets is actually or deemed distributed from the reserve, due to the treatment of such distribution as a sale or exchange), and all distributions from such reserve (which distributions will be net of the related expenses of the reserve) will be treated as received by Holders in respect of their Claims as if distributed by the Debtors.  All parties (including, without limitation, the Debtors, the Litigation Trustee and the Litigation Trust Beneficiaries) will be required to report for U.S. federal, state and local income tax purposes consistently with the foregoing. To the extent property is not distributed to U.S. Holders of applicable

Claims on the Effective Date but, instead is transferred to any such account, although not free from doubt, such U.S. Holders should not recognize any gain or loss with respect to such property on the date that the property is so transferred. Instead, gain or loss should be recognized when and to the extent property is actually or deemed distributed to such U.S. Holders from the LT Disputed Claims Reserve.

Subject to the above discussion regarding any Disputed Claims Reserve, the U.S. federal income tax obligations of U.S. Holders with respect to their beneficial interest in the Litigation Trust are not dependent on the Litigation Trust distributing any Cash or other proceeds. As described above, holders of the Allowed Legacy Facilities Claims and Allowed General Unsecured Claims will be required to report on their U.S. federal income tax returns their share of the Litigation Trust's items of income, gain, loss, deduction, and credit in the year recognized by the Litigation Trust. This requirement may result in such U.S. Holders being subject to tax on their allocable share of the Litigation Trust's taxable income prior to receiving any cash distributions from the Litigation Trust. In general, except with respect to distributions from the LT Disputed Claims Reserve, a distribution of Cash by the Litigation Trust will not be separately taxable to a holder of a beneficial interest in the Litigation Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Litigation Trust).

### B.   Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims Entitled to Vote.

#### 1.   Treatment of Debt as a Security.

In certain cases discussed below, the treatment of the consummation of the Plan to U.S. Holders of Allowed Claims will depend on whether a Claim constitutes a "security" of the Debtor issuing consideration in exchange for such a Claim.  Neither the IRC nor the Treasury Regulations define the term "security." Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. U.S. Holders should consult their tax advisors regarding the status of their Claims as "securities".

#### 2.   U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Legacy Facilities Claims (Class 4).

Pursuant to the Plan, certain U.S. Holders will receive, as consideration in full and final satisfaction of their Allowed Legacy Facilities Claims, their Pro Rata share of: (i) the New Common Stock, (ii) the Subscriptions Rights and (iii) the Legacy Facilities Claims Litigation Trust Interests (or such other equivalent interest).

The contribution of Allowed Legacy Facilities Claims to Reorganized Cineworld Parent or such other applicable new parent company in exchange for New Common Stock is expected to qualify as an exchange under section 351 of the IRC.  Accordingly, subject to the discussion below, a U.S. Holder of such a Claim generally should recognize gain, but not loss, for U.S. federal income tax purposes with respect to such contribution pursuant to sections 351 and 367(a) of the IRC.  The amount of any such gain recognized by a U.S. Holder of a Claim who is subject to this treatment should equal the excess of (i) the

fair market value of the New Common Stock, the Subscription Rights and the Litigation Trust Assets (or such other equivalent interest) deemed received (as described below) over (ii) such U.S. Holder's adjusted tax basis in the Claims contributed in exchange for such New Common Stock, Subscription Rights and the Litigation Trust Assets deemed received (or such other equivalent interest).  Importantly, however, a U.S. Holder of a Claim should be able to avoid current recognition of gain under section 367 of the IRC with respect to the receipt of New Common Stock if the Claims contributed in exchange for New Common Stock are considered "securities" and if such U.S. Holder either (x) owns less than 5 percent of the New Common Stock immediately after the transfer, or (y) if a U.S. Holder owns 5 percent or more of the New Common Stock immediately after the transfer, such U.S. Holder enters into a "gain recognition agreement" that meets the requirements set forth in the Treasury Regulations promulgated under section 367 of the IRC (as long as certain other conditions are met).

Regardless of whether an exception applies with respect to the application of section 367 of the IRC, a U.S. Holder of such Claim should recognize gain (but not loss) with respect to the receipt of Subscription Rights and the fair market value of the Litigation Trust Assets (or such other equivalent interest).  Gain (if any) on the Claim shall be recognized in an amount not exceeding the fair market value of such property.  This treatment is subject to the discussion below regarding the uncertainty of the treatment of the exchange of Claims for Subscription Rights.

Although not free from doubt, the Debtors intend to take the position that a U.S. Holder who receives Subscription Rights and elects to exercise such rights should be treated as purchasing Rights Offering Shares in exchange for its Subscription Rights and the amount of Cash (if any) paid by or on behalf of the U.S. Holder to exercise such rights.  Such a purchase should generally be treated as the exercise of an option under general U.S. federal income tax principles, and such U.S. Holder should not recognize income, gain, or loss for U.S. federal income tax purposes when it exercises the Subscription Rights. A U.S. Holder's aggregate tax basis in the Rights Offering Shares should equal the sum of (a) the amount of Cash (if any) paid by or on behalf of the U.S. Holder to exercise the Subscription Rights, plus (b) such U.S. Holder's tax basis in the relevant rights immediately before such rights are exercised. A U.S. Holder's holding period for the Rights Offering Shares received pursuant to such exercise should begin on the day following the Effective Date.

A U.S. Holder that elects not to exercise the rights may be entitled to claim a loss (likely a short-term capital loss) equal to the amount of tax basis allocated to such rights, subject to any limitation on such U.S. Holder's ability to utilize capital losses. U.S. Holders electing not to exercise their rights should consult with their own tax advisors as to the tax consequences of such decision.

As noted above, the foregoing treatment of the Subscription Rights is not free from doubt.  A potential alternative characterization could be that Holders of Claims are treated as exchanging a portion of their Claims and cash directly for the Rights Offering Shares.  If that characterization applied, the foregoing discussion, and the discussion above regarding the treatment of the exchange of a portion of Claims for, among other things, Subscription Rights, would be different.  U.S. Holders of Claims should consult their own tax advisors regarding these matters.

As discussed above in Article XII.A.4 (*Transfer of Litigation Trust Assets to Litigation Trust*), the Litigation Trust is intended to qualify as a grantor trust, to the extent permitted by applicable law, of which the Litigation Trust Beneficiaries (including the Holders of the Allowed Legacy Facilities Claims) would be treated as the grantors and owners thereof.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors believe the Litigation Trust should be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and that the trustee of the Litigation Trust will report consistently with such position on the Litigation Trust's U.S. federal income tax return. So treated, any transfer of assets to the Litigation Trust will be deemed to occur, for U.S. federal income tax purposes, as (a) a first-step transfer of the Litigation Trust

Assets (subject to any obligations relating to such Litigation Trust Assets) to the Holders of Allowed Legacy Facilities Claims and other Litigation Trust Beneficiaries followed by (b) a second-step transfer by such Holders to the Litigation Trust of such portion of the Litigation Trust Assets in exchange for the Litigation Trust Interests. For additional discussion of the U.S. federal income tax consequences to a holder of Litigation Trust Interests (including current inclusion of income and the treatment of distributions), see Article XII.A.4 above.

Holders of the Allowed Legacy Facilities Claims should obtain a tax basis in their Pro Rata share of each of the Litigation Trust Assets equal to the fair market value of such Holder's Pro Rata share of each of the Litigation Trust Assets as of the date such property is treated as having been distributed to the Holder pursuant to (a) above. The holding period for the beneficial interest in these assets should begin on the day following the Effective Date.

3.   **U.S. Federal Income Tax Consequences to U.S. Holders of Allowed General Unsecured Claims Against the Debtors (Class 5A and 5B).**

Pursuant to the Plan, in full and final satisfaction of their Allowed General Unsecured Claims against the Debtors, Holders of such Claims shall receive their Pro Rata share of Cash and the GUC Litigation Trust Interests.

As discussed above Article XII.A.4 (*Transfer of Litigation Trust Assets to Litigation Trust*), the Litigation Trust is intended to qualify as a grantor trust, to the extent permitted by applicable law, of which the Litigation Trust Beneficiaries (including the holders of Allowed General Unsecured Claims) would be treated as the grantors and owners thereof.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors believe the Litigation Trust should be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and that the trustee of the Litigation Trust will report consistently with such position on the Litigation Trust's U.S. federal income tax return. So treated, any transfer of assets to the Litigation Trust will be deemed to occur, for U.S. federal income tax purposes, as (a) a first-step transfer of the Litigation Trust Assets (subject to any obligations relating to such Litigation Trust Assets) to the Litigation Trust Beneficiaries (including the Holders of Allowed General Unsecured Claims) and, to the extent the Litigation Trust Assets are allocable to Disputed Class 5A or 5B Claims that are the responsibility of the Litigation Trust to resolve, to the LT Disputed Claims Reserve followed by (b) a second-step transfer by such Holders to the Litigation Trust of such portion of the Litigation Trust Assets in exchange for the Litigation Trust Interests (other than the Litigation Trust Assets allocable to the LT Disputed Claims Reserve). For additional discussion of the U.S. federal income tax consequences to a holder of Litigation Trust Interests (including current inclusion of income and the treatment of distributions), see Article XII.A.4 above.

Holders of the Allowed General Unsecured Claims should obtain a tax basis in their Pro Rata share of each of the Litigation Trust Assets equal to the fair market value of such Holder's Pro Rata share of each of the Litigation Trust Assets as of the date such property is treated as having been distributed to the Holder pursuant to (a) above. The holding period for the beneficial interest in these assets should begin on the day following the Effective Date.

A U.S. Holder of a Claim should recognize gain or loss under section 1001 of the IRC equal to the difference between (i) the amount of Cash and the fair market value of the Litigation Trust Assets deemed received (or such other equivalent interest) that is not allocable to accrued but unpaid interest and (ii) such U.S. Holder's adjusted tax basis in the Claim exchanged therefor.  A U.S. Holder's adjusted tax basis in its Unsecured Claim exchanged would be equal to the amount paid therefor, increased by any accrued original issue discount ("OID") and any market discount that has been included in such holder's gross income and reduced by any amortizable bond premium previously taken into account.  Assuming a U.S. Holder of a

Claim holds such Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claim at the time of the Restructuring Transactions exceeds one year. The treatment of accrued but unpaid interest and market discount is discussed below in Article XII.B.4 (*Distributions Attributable to Accrued Interest (and OID)*) and Article XII.B.5. (*Market Discount*).

In the event of the subsequent disallowance of any Disputed Class 5A or 5B Claims, it is possible that a U.S. Holder of a previously Allowed General Unsecured Claim may receive additional distributions in respect of its Claim. Accordingly, it is possible that the recognition of any loss realized by a U.S. Holder with respect to an Allowed General Unsecured Claim may be deferred until all General Unsecured Claims for which the Holders are receiving the GUC Recovery Pool are Allowed or Disallowed. Alternatively, it is possible that a U.S. Holder will have additional gain in respect of any such additional distributions received. In addition, a portion of any distributions received may be treated as interest income under the imputed interest provisions of the IRC. The discussion herein assumes that the installment method does not apply, either because the exchange is not eligible or because the U.S. Holder of Allowed General Unsecured Claims elects out of such treatment.

### 4.    Distributions Attributable to Accrued Interest (and OID).

To the extent that any amount received by a U.S. Holder of a Claim exchanged under the Plan is attributable to accrued but untaxed interest (or OID) on the debt instruments constituting the exchanged Claim, such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already included in income by the U.S. Holder). Conversely, a U.S. Holder of an exchanged Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point. The tax basis of any non-Cash consideration treated as received in satisfaction of accrued but untaxed interest (or OID) should equal the amount of such accrued but untaxed interest (or OID). The holding period for such non-Cash consideration should begin on the day following the receipt of such property.

The extent to which the consideration received by a U.S. Holder of an exchanged Claim will be attributable to accrued interest on the debt constituting the exchanged Claim is unclear. Certain legislative history and case law indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The Plan provides that amounts paid to U.S. Holders of Claims will be allocated first to unpaid principal and then to unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims are urged to consult their tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

### 5.    Market Discount.

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the exchanged Claim.

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of a Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debt instrument was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include such market discount in its income as the market discount

accrued).  To the extent that a U.S. Holder exchanged Claims that were acquired by the U.S. Holder with market discount in exchange for other property pursuant to a tax-free or other reorganization transaction (other than a transaction described in section 351 of the IRC) for other property, any market discount that accrued on such exchanged Claims and was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized by the U.S. Holder on the subsequent sale, exchange, redemption, or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged Claim.  Additionally, to the extent that a U.S. Holder exchanged Claims that were acquired by the U.S. Holder with market discount in exchange for other property pursuant to an exchange described in section 351 of the IRC, such U.S. Holder may be required to recognize gain treated as ordinary income on such exchange to the extent of the accrued but unrecognized market discount with respect to the exchanged Claim.

### 6. Net Investment Income Tax.

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, interest, dividends, and gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of debt of, and equity interests in, the Debtors and Reorganized Debtors.

### 7. Limitations on Use of Capital Losses.

A U.S. Holder of a Claim who recognizes capital losses as a result of the exchanges under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 annually ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### 8. Ownership and Disposition of New Common Stock.

#### (a) Dividends on New Common Stock.

Subject to the discussion below regarding the passive foreign investment company ("PFIC") rules, any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the applicable Reorganized Debtors, as determined under U.S. federal income tax principles. Any such dividend income recognized by a U.S. Holder generally will be foreign source income.  Certain qualified dividends received by a U.S. Holder that is a non-corporate taxpayer are taxed at preferential rates. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares.  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.  The Debtors anticipate that dividends will be "qualified dividend income" so long as Reorganized Cineworld Parent or the applicable new parent company (depending on the finalized Plan) (the "Parent Company") remains a U.K. tax resident (regardless of whether it is actually organized in the U.K.) eligible for the benefits of the U.S.-U.K. tax treaty.  If, however, the Reorganized Cineworld Parent or the applicable new parent company is not a U.K. tax resident, it is unclear whether dividends will

constitute "qualified dividend income," which determination would depend on multiple factors. The Debtors currently have not determined the tax residency of Reorganized Cineworld Parent.

Distributions that constitute dividends for U.S. federal income tax purposes which are paid to U.S. Holders that are corporations should not be eligible for the dividends-received deduction generally applicable to U.S. corporations with respect to dividends received from other U.S. corporations.

**(b)     Sale, Redemption, or Repurchase of New Common Stock.**

Unless a non-recognition provision of the IRC applies, and subject to the discussion below regarding the PFIC rules, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of New Common Stock received pursuant to the Plan. Any such capital gain recognized by a U.S. Holder generally will be U.S. source income. Such capital gain will be long-term capital gain if at the time of the sale, exchange, redemption, or other taxable disposition, the U.S. Holder held the applicable New Common Stock for more than one year. Long-term capital gains of a non-corporate taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described above. Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on such dispositions of the New Common Stock as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Claim or recognized an ordinary loss on the exchange of its Claim for New Common Stock.

**(c)     PFIC Status**

The Cineworld Parent or Reorganized Cineworld Parent would be classified as a PFIC for any taxable year if, after the application of certain look-through rules, either: (1) 75 percent or more of its gross income for such year is "passive income" as defined in the relevant provisions of the IRC, or (2) 50 percent or more of the value of its assets, determined on the basis of a quarterly average, during such year is attributable to assets that produce or are held for the production of passive income. In determining whether the Cineworld Parent or Reorganized Cineworld Parent is a PFIC, such person will be treated as owning its proportionate share of the assets, and earning its proportionate share of the income (which may be reduced in each case by certain intercompany transactions pursuant to reliance upon Proposed Treasury Regulations section 1.1297-2(c)), of any other corporation in which it owns, directly or indirectly, 25 percent or more (by value) of the stock. However, the Cineworld Parent or Reorganized Cineworld Parent's status as a PFIC in any taxable year requires a factual determination that depends on, among other things, the composition of its income, assets, and activities in each year, and can only be made annually after the close of each taxable year. Therefore, there can be no assurance that the Cineworld Parent (or any Reorganized Debtor that is a non-U.S. corporation, including Reorganized Cineworld Parent) will not be classified as a PFIC for the taxable year in which the Restructuring Transactions occur, or for any future taxable year after the Restructuring Transactions. Moreover, the determination of whether the Cineworld Parent or any other Reorganized Debtor that is a non-U.S. corporation, including Reorganized Cineworld Parent will be classified as a PFIC for the taxable year in which the Restructuring Transactions occur or any other year in which the New Common Stock is not publicly traded for the entirety of such year may depend in substantial part on whether such Cineworld Parent or Reorganized Cineworld Parent is classified as a "controlled foreign corporation" (a "CFC") for U.S. federal income tax purposes for those years. The Debtors do not currently know whether the Cineworld Parent or the other Reorganized Debtors which are non-U.S. corporations, including Reorganized Cineworld Parent, will be classified as CFCs for U.S. federal income tax purposes. However, based on certain estimates of the Reorganized Debtors' gross income, the value of their assets, and the adjusted tax basis of their assets (including goodwill), the Debtors do not expect any of the Reorganized Debtors to be considered PFICs for the taxable year in which the Restructuring Transactions occur.

102

If the Cineworld Parent or Reorganized Cineworld Parent is treated as a PFIC for any taxable year during which a U.S. Holder owns the New Common Stock, the U.S. Holder would be subject to additional U.S. information return filing requirements. Additionally, if the Cineworld Parent or Reorganized Cineworld Parent is treated as a PFIC for any taxable year during which a U.S. Holder owns the New Common Stock, such U.S. Holder may be subject to adverse tax consequences upon a sale, exchange, or other disposition of such New Common Stock, or upon the receipt of distributions in respect of the New Common Stock. Under the "default PFIC regime," in general, an "excess distribution" is any distribution to a U.S. Holder that is greater than 125 percent of the average annual distributions received by the U.S. Holder (including return of capital distributions) during the three preceding taxable years or, if shorter, a U.S. Holder's holding period. If the Cineworld Parent or Reorganized Cineworld Parent is classified as a PFIC for any taxable year during which a U.S. Holder owns the New Common Stock, gains from the sale or other disposition of, and "excess distributions" with respect to, the New Common Stock should be allocated ratably over a U.S. Holder's entire holding period and taxed at the highest ordinary income tax rate in effect for each such taxable year (subject to certain exceptions). Moreover, interest should be charged retroactively at the rate applicable to underpayments of tax (with respect to each such tax year's ratable allocation) through the date of gains from the sale or other disposition of, and "excess distributions" with respect to, the New Common Stock.

The Debtors cannot provide any assurances that they will assist U.S. Holders in determining whether the Cineworld Parent or any Reorganized Debtor, including the Reorganized Cineworld Parent is a PFIC for any taxable year. Additionally, the tax consequences that would apply if the Cineworld Parent or Reorganized Cineworld Parent is classified as a PFIC would also be different from those described above if a U.S. Holder that holds New Common Stock, as applicable, were able to make a valid election to treat the Cineworld Parent or Reorganized Cineworld Parent, as applicable, as a "qualified electing fund" (such election, a "QEF Election"). At this time, the Debtors do not expect to provide U.S. Holders with the information necessary to make and maintain a valid QEF Election and therefore U.S. Holders should assume that a QEF Election will not be available. U.S. Holders should consult their tax advisors about the potential application of the PFIC rules to their ownership of New Common Stock. A U.S. Holder can also avoid certain of the adverse rules described above where a mark-to-market election is available with respect to its New Common Stock, as applicable. The mark-to-market election is only available where the New Common Stock is "marketable." The New Common Stock will be marketable if it is "regularly traded" on a "qualified exchange" or other market within the meaning of applicable Treasury Regulations. The New Common Stock will not be "regularly traded" on a "qualified exchange" for this purpose and therefore, the mark-to-market election would not be available to a U.S. Holder of the New Common Stock if the Cineworld Parent or Reorganized Cineworld Parent becomes a PFIC.

The rules relating to PFICs are extremely complex and U.S. Holders are urged to consult their tax advisors regarding the tax considerations of owning New Common Stock in the event that Cineworld Parent or Reorganized Cineworld Parent is treated as a PFIC during any taxable year during which a U.S. Holder will own New Common Stock.

### C.     Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims.

Non-U.S. Holders of Allowed Legacy Facilities Claims and Allowed General Unsecured Claims will receive, in part, Litigation Trust Interests. As discussed above in Article XII.A.4 (*Transfer of Litigation Trust Assets to Litigation Trust*), the Litigation Trust is structured to qualify as a "grantor trust" for U.S. federal income tax purposes, to the extent permitted by applicable law, of which the Litigation Trust Beneficiaries would be treated as the grantors and owners thereof. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors believe the Litigation Trust should be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d), and that the trustee of the Litigation Trust will report consistently with such position on the

Litigation Trust's U.S. federal income tax return. The Plan provides that any transfer of assets to the Litigation Trust will be deemed to occur, for U.S. federal income purposes, as (a) a first-step transfer of the Litigation Trust Assets (subject to any obligations relating to such Litigation Trust Assets) to the Litigation Trust Beneficiaries and, to the extent the Litigation Trust Assets are allocable to Disputed Class 5A or 5B Claims that are the responsibility of the Litigation Trust to resolve, to the LT Disputed Claims Reserve followed by (b) a second-step transfer by such Holders to the Litigation Trust of such portion of the Litigation Trust Assets in exchange for the Litigation Trust Interests (other than the Litigation Trust Assets allocable to the LT Disputed Claims Reserve). The Litigation Trustee will comply with all applicable governmental withholding requirements. With respect to any Litigation Trust Beneficiaries that are Non-U.S. Holders, the Litigation Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate and appropriate documentation or other support has been provided by such Non-U.S. Holder that establishes that such Non-U.S. Holder is eligible for such reduced rate of withholding). Non-U.S. Holders receiving Litigation Trust Interests should consult their tax advisors concerning the U.S. federal income tax consequences to them of holding Litigation Trust Interests, including that such Non-U.S. Holders would be treated as owning direct interests in the Litigation Trust Assets.

The Debtors do not otherwise anticipate that there will be material U.S. federal income tax consequences to Non-U.S. Holders of Claims, because neither Cineworld Parent nor Reorganized Cineworld Parent is domiciled in the United States. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences to such Non-U.S. Holder and the ownership and disposition of non-Cash consideration.

### D. U.S. Information Reporting and Withholding.

The Debtors, Reorganized Debtors, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the U.S. federal backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that such number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims subject to the Plan are urged

to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

### E.    FATCA.

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or could be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends.  FATCA withholding could apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that were previously scheduled to take effect on January 1, 2019 would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends.  However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final Treasury Regulations become effective.  Nonetheless, there can be no assurance that a similar rule will not go into effect in the future.  Each Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Holder.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY U.S. STATE OR LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

### F.    Certain U.K. Tax Consequences of the Plan to the Debtors and the Reorganized Debtors.

#### 1.    Introduction.

The following discussion is a summary of certain United Kingdom corporation tax consequences of the consummation of the Plan to the Debtors and the Reorganized Debtors.  It does not address the U.K. tax consequences to holders of Claims or Interests, whether or not they are entitled to vote to accept or reject the Plan, or the potential sale of the RoW Equity.

The summary set out below is based on current U.K. legislation, case law, and published HM Revenue and Customs ("HMRC") practice (which may not be binding on HMRC), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  No opinion of counsel has been obtained.  The Debtors have not requested, and there is no guarantee that they will request, any ruling or clearance from HMRC, or any other taxing authority, regarding any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon HMRC, the courts, or any other tax authority.  No assurance can be given that HMRC, or any other tax authority, would not assert, or that a court would not sustain, a different position than any position

discussed herein. The comments set out in this section are intended as a general guide, and do not constitute tax or legal advice.

Unless specifically provided for in this summary, this discussion does not purport to address all aspects of U.K. tax that may be relevant to the Debtors or the Reorganized Debtors, nor does it purport to be a complete analysis of all tax considerations relating to the Plan. No aspect of non-U.K. taxation, or any U.K. taxation other than U.K. corporation tax, is addressed. This summary does not address any special arrangements or contractual rights that are not being received or entered into in respect of an underlying Claim, including the tax treatment of any backstop fees or similar arrangements (including any ramifications such arrangements may have on the treatment of a Debtor or Reorganized Debtor under the Plan) or the treatment of the Sponsored Exit First Lien Facility, Rights Offering, or Direct Rights Allocation. This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.K. tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY ADDRESSING CERTAIN U.K. TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. IN ADDITION, ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.K. AND NON-U.K. TAX CONSEQUENCES OF THE PLAN.**

2. **U.K. Corporation Tax.**

a. **Releases and Acquisitions of Liabilities (including Debt).**

A release or partial release of indebtedness or other liabilities (each a "<u>Release</u>") can give rise to a taxable receipt for a U.K. tax resident Debtor (including Cineworld Group plc and Crown UK Holdco Limited) in certain circumstances. However, where such indebtedness represents (or is deemed to represent) a "loan relationship" for U.K. corporation tax purposes, the potential charge to U.K. corporation tax on such Releases is subject to a wide range of exemptions, including where the Releases happen as part of a statutory insolvency arrangement.

The acquisition of creditor rights in respect of indebtedness (a "**Debt Acquisition**") by a company that is "connected" for the purposes of the "loan relationships" regime with the relevant debtor can also give rise to a taxable receipt for a U.K. tax resident Debtor in certain circumstances. Where such creditor rights are acquired in an arm's length transaction, and the consideration given by the acquirer for those rights consists only of shares forming part of the ordinary share capital of the acquirer, or a connected company, or an entitlement to such shares, an exception may be available.

A Debt Acquisition by a company that is not connected for the purposes of the loan relationships regime with the relevant debtor, but which, following the Debt Acquisition, becomes so connected with the relevant debtor, can also give rise to a taxable receipt for a U.K. tax resident Debtor in certain circumstances.

It is expected that the Plan will be implemented in such a manner so that any Releases or Debt Acquisitions effected as part of the Plan (including pursuant to an Implementation Mechanism as reflected in the Restructuring Transactions Memorandum) will fall within the scope of an exception or otherwise not give rise to a taxable receipt for the relevant U.K. tax resident Debtor. However, the steps to be taken as part of the Plan have not yet been finalized, and there is no guarantee that any Releases of U.K. tax resident Debtors or Debt Acquisitions of debt owed by such Debtors, as part of the Plan (including pursuant to an Implementation Mechanism as reflected in the Restructuring Transactions Memorandum) will fall within the scope of such exceptions.

b.      **Other U.K. Tax Consequences**

The steps to be taken as part of the Plan have not yet been finalized, however it is expected Cineworld Group plc would, amongst other things, directly or indirectly transfer certain of its assets and liabilities to Crown UK HoldCo Limited. Depending on the exact steps taken, and the precise assets and liabilities transferred, this may result in tax charges for Cineworld Group plc and/or Crown UK HoldCo Limited, including in respect of UK corporation tax or U.K. stamp duties.

Additional steps taken as part of the Plan may also result in tax charges for the Debtors or Reorganized Debtors, including in respect of U.K. corporation tax or U.K. stamp duties.

## XIII.   RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: April 19, 2023                           CINEWORLD GROUP PLC


_/s/ James A. Mesterharm_

James A. Mesterharm
Chief Restructuring Officer
CINEWORLD GROUP PLC

## <u>Exhibit A</u>

**Plan of Reorganization**

Filed at Docket No. 1566

**<u>Exhibit B</u>**

**Restructuring Support Agreement**

Filed at Docket No. 1471

**Exhibit C**

**Financial Projections**

## FINANCIAL PROJECTIONS[1]

In connection with the Disclosure Statement, the Debtors' management team ("Management") prepared financial projections (the "Financial Projections") for Cineworld Group plc and its debtor affiliates (collectively, the "Debtors," and together with their non-Debtor affiliates, the "Company") for fiscal years 2023 through 2027 (the "Projection Period"). The Financial Projections were prepared by Management with the assistance of the Debtors' advisors and are based upon several assumptions made by Management with respect to the future performance of the Debtors' operations.

IN PREPARING THE FINANCIAL PROJECTIONS, MANAGEMENT RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND OTHER AVAILABLE SOURCES AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS, AS SET FORTH HEREIN. ALTHOUGH MANAGEMENT BELIEVES THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS ARE REASONABLE, NO REPRESENTATIONS OR WARRANTIES AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN NOR ANY ASSURANCES THAT THE ASSUMPTIONS WILL BE REALIZED ARE MADE BY MANAGEMENT, THE DEBTORS, OR ANY OTHER PERSON.

ALTHOUGH MANAGEMENT HAS PREPARED THE FINANCIAL PROJECTIONS IN GOOD FAITH, ANY ESTIMATES AND FORECASTS CONTAINED IN THE FINANCIAL PROJECTIONS INHERENTLY INVOLVE SIGNIFICANT ELEMENTS OF SUBJECTIVE JUDGMENT AND ANALYSIS THAT MAY OR MAY NOT BE CORRECT. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE FINANCIAL PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE RISK FACTORS SET FORTH IN THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

The Debtors believe that the Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of the Plan and for the purposes of determining whether the Plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

THE FINANCIAL PROJECTIONS, AND THE INFORMATION AND ESTIMATES INCLUDED THEREIN, WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION ("SEC") OR THE U.K. FINANCIAL CONDUCT AUTHORITY ("FCA"), THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES ("GAAP"), OR THE INTERNATIONAL FINANCIAL REPORTING STANDARDS ("IFRS"). AN INDEPENDENT AUDITOR HAS NOT EXAMINED, COMPILED, OR PERFORMED ANY

---

[1]   Capitalized terms use but not otherwise defined herein shall have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

PROCEDURES WITH RESPECT TO THE PROSPECTIVE FINANCIAL INFORMATION CONTAINED IN THIS EXHIBIT AND, ACCORDINGLY, IT DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE ON SUCH INFORMATION OR ITS ACHIEVABILITY. THE FINANCIAL PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH THE ASSUMPTIONS, QUALIFICATIONS, AND NOTES SET FORTH BELOW AND IN THE DISCLOSURE STATEMENT. THE DEBTORS' INDEPENDENT AUDITOR ASSUMES NO RESPONSIBILITY FOR, AND DENIES ANY ASSOCIATION WITH, THE PROSPECTIVE FINANCIAL INFORMATION.

## I.    PRINCIPAL ASSUMPTIONS FOR THE FINANCIAL PROJECTIONS

The Financial Projections are based upon, and assume the successful implementation of, the Debtors' business plan (the "Business Plan"). Both the Business Plan and the Financial Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Debtors, industry performance, general business, economic, and regulatory conditions, and other matters. Many of these conditions are beyond the control of the Debtors or their advisors, and each assumption is subject to inherent uncertainties. Moreover, events and circumstances occurring after the date on which Management prepared the Financial Projections may be different from those assumed, or alternatively, may have been unanticipated, and thus the occurrence of such events may affect financial results in a materially adverse or materially beneficial manner. In addition, the assumptions do not consider the uncertainty and disruption of business that may accompany a restructuring pursuant to the Bankruptcy Code.

Therefore, although the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period will likely vary from the projected results. These variations may be material. Accordingly, no definitive representation or warranty can be or is being made with respect to the accuracy of the Financial Projections (including any financial data related to any non-GAAP or non-IFRS measurements or similar measurements) or the ability of the Reorganized Debtors to achieve the projected results of operations. *See* Article IX of the Disclosure Statement entitled "*Risk Factors*."

The Debtors do not, as a matter of course, publish their projections, strategies, or forward-looking projections of their financial position, results of operations or cash flows. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated projections to the Holders of Claims or Interests after the date of this Disclosure Statement, or to include such information in documents required to be filed with the SEC, if any, and/or FCA or to otherwise make such information public.

Although the Debtors are of the opinion that these assumptions are reasonable under current circumstances, such assumptions are subject to inherent uncertainties, including but not limited to:

(i)    lack of access to high quality, diverse and well-publicized movie product; and general lack of control over distributors of films;

(ii)    increased use of alternative film delivery methods including premium video, on-demand, or other forms of entertainment;

(iii)    shrinking exclusive theatrical release windows or release of movies to theatrical exhibition and streaming platforms on the same date, and the theatrical release of fewer movies;

(iv)    general and international economic, political, regulatory, social, and financial market conditions, including potential economic recession, inflation, and other risks that may

negatively impact discretionary income and the Reorganized Debtors' operating revenues and attendance levels; and

(v)      recurring and/or continued impact of responses to the COVID-19 pandemic related to interruptions of operations at theaters, personnel reductions and other cost-cutting measures and actions to maintain necessary liquidity, and increases in expenses relating to precautionary measures at facilities to protect the health and well-being of customers and employees.

In deciding whether to vote to accept or reject the Plan, Holders of Claims entitled to vote to accept or reject the Plan must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections and are encouraged to consult with their own advisors in making such determinations. *See* Article IX of the Disclosure Statement entitled "*Risk Factors*."

Moreover, the Financial Projections were prepared solely in connection with the restructuring pursuant to the Plan.

**AS THE DEBTORS' HISTORIC FINANCIAL STATEMENTS ARE PREPARED IN ACCORDANCE WITH IFRS, THE FINANCIAL PROJECTIONS DO NOT REFLECT THE IMPACT OF FRESH START REPORTING IN ACCORDANCE WITH AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS STATEMENT OF ACCOUNTING STANDARDS CODIFICATION (ASC) 852, FINANCIAL REPORTING BY ENTITIES IN REORGANIZATION UNDER THE BANKRUPTCY CODE, OR SIMILAR IMPACTS THAT MIGHT BE ANALYZED IF VALID UNDER IFRS.**

## II.    CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

The Financial Projections contain certain forward-looking statements with respect to the financial condition, results of operations, and business of the Debtors and certain plans and objectives with respect thereto. These forward-looking statements can be identified by the fact that they do not relate only to historical or current facts. Forward-looking statements often use words such as "anticipate", "target", "expect", "estimate", "intend", "plan", "goal", "believe", "hope", "aims", "continue", "will", "may", "should", "would", "could", or other words of similar meaning. These statements are based on assumptions and assessments made by Management, with the assistance of the Debtors' advisors, in light of their experience and their perception of historical trends, current conditions, future developments, and other factors Management believes appropriate. By their nature, forward-looking statements involve risk and uncertainty because they relate to events and depend on circumstances that will occur in the future, and the factors described in the context of such forward-looking statements in these notes to the Financial Projections could cause actual results and developments to differ materially from those expressed in or implied by such forward-looking statements. No assurance can be given that such expectations will prove to have been correct, and you are therefore cautioned not to place undue reliance on these forward-looking statements which speak only as at the date on which they are made. The Debtors do not assume any obligation to update or correct the information contained in this document (whether as a result of new information, future events, or otherwise), except as required by applicable law.

There are several factors which could cause actual results to differ materially from those expressed or implied in forward-looking statements. Among the factors that could cause actual results to differ materially from those described in the forward-looking statements are changes in the global, political, economic, business, competitive, market and regulatory forces, future exchange and interest rates, changes in tax rates, future business combinations or dispositions, the risks, uncertainties, and costs related to

the Chapter 11 Cases, including, among others, the timing of any emergence from the Chapter 11 Cases, and such other factors as discussed in Article IX of the Disclosure Statement entitled "*Risk Factors*."

Nothing in the Financial Projections is intended to be a reliable prediction of future events for any period, and no statement herein should be interpreted to mean that the actual financial metrics or results for the Debtors for any current or future financial year will necessarily match or exceed the Financial Projections.

## III.   SELECT RISK FACTORS RELATED TO THE FINANCIAL PROJECTIONS

The Financial Projections and estimates contained therein are subject to inherent risks and significant economic and competitive uncertainties and contingencies, most of which are difficult or impossible to predict accurately and many of which are beyond the control of the Debtors.  Many factors could cause actual results, performance, or achievements to differ materially from any future results, performance or achievements expressed or implied by these forward-looking statements.  A description of the risk factors associated with the Plan, the Disclosure Statement, and the Financial Projections is included in Article IX of the Disclosure Statement.

## IV.   FINANCIAL PROJECTION GENERAL ASSUMPTIONS

### A.   Basis of Presentation (Non-GAAP and Non-IFRS)

The Financial Projections consist of the following unaudited pro forma financial statements:

(i)      Consolidated Unaudited Projected Income Statement,

(ii)     Consolidated Unaudited Projected Balance Sheet; and,

(iii)    Consolidated Unaudited Projected Statement of Cash Flows.

The Debtors evaluate operating performance based on several non-GAAP and non-IFRS financial measures, including:

(i)      Operating income before interest, taxes, depreciation, and amortization, rent, and administrative expenses, historically adjusted for (a) gains on debt repurchases, (b) impairment charges, (c) gain on sale of assets, net, and (d) restructuring charges and other nonrecurring items including transaction-related costs ("Cinema-Level EBITDAR").

The above-stated financial measure is not a measurement of operating performance computed in accordance with GAAP or IFRS and should not be considered as a substitute for net income (loss) prepared in conformity with GAAP or IFRS.  In addition, the above-stated measure may not be comparable to similarly titled measures of other companies, including those in the Company's industry.  Management believes that these non-GAAP and non-IFRS financial measures are an important indicator of the Debtors' operations because (i) this measures excludes items that may not be indicative of, or related to, the Debtors' core operating results, and provides a better baseline for analyzing the Debtors' underlying business and (ii) revenue and cost recognition for GAAP or IFRS accounting purposes differ greatly across the Debtors' different business segments, which creates problems of comparability across certain financial metrics. Cinema-Level EBITDAR broadly defined is a metric used by Management and similar metrics are frequently used by the financial community to provide insight into a business' operating trends and to facilitate comparisons between peer businesses, since interest, taxes, depreciation, and amortization can differ greatly between organizations because of differing capital structures and tax strategies.

4

The Financial Projections are presented on a consolidated and on a *pro forma* basis on the assumption that the Debtors will emerge from chapter 11 on or about June 30, 2023 (the "Emergence Date").  If the Emergence Date is significantly delayed, additional expenses, including professional fees, may be incurred and operating results may be negatively affected.

### B.        Business Description and Financial Reporting Segments

The Company engages in the theatrical exhibition business and operates and reports using three key business segments:  (i) the United States ("U.S."); (ii) the United Kingdom and Ireland ("UK&I"); and (iii) rest of world ("RoW"), including Central and Eastern Europe (Bulgaria, Czech Republic, Hungary, Israel, Poland, Romania, and Slovakia) and Israel.  The U.S. segment operates three cinema chain brands, Regal, United Artists, and Edwards Theaters.  UK&I operates two cinema chain brands, Cineworld and Picturehouse.  The RoW operating segment operates three cinema chain brands, Cinema City in Central and Eastern Europe and Yes Planet and Rav-Chen in Israel.

The Financial Projections are presented on a consolidated basis, reflecting the combination of all three reporting segments.

As of the Petition Date, the Company operated 751 locations with 9,189 screens in 10 countries.  The Company leases, owns, operates, and/or has interests in theaters located throughout its operating regions.  The Company's theatrical exhibition revenues are generated primarily from box office admissions ("Box Office Revenue") and theater food and beverage sales ("Concession Revenue").  The balance of the Company's revenues ("Other Income") is generated from ancillary sources, including on-screen and concession vendor advertising, rental of theater auditoriums, income from gift cards, gaming and bulk ticket programs, and online ticketing fees.

Box Office Revenue is the Company's largest source of revenue.  The Company predominantly licenses theatrical films from distributors owned by major film production companies and from independent distributors on a film-by-film and theater-by-theater basis.  In both the Company's domestic and international locations, film rental fees are based on a film's box office receipts.  The majority of film rental rates ("Film Rental Costs") are negotiated on a sliding scale formula, under which the rate is based on a standard rate matrix that is established prior to a film's theatrical run.  The Company negotiates other Film Rental Costs on a firm terms formula, a percentage of Box Office Revenue negotiated prior to a film's theatrical run, or a rate that is negotiated after a film's theatrical run.

Concession Revenue is the Company's second largest source of revenue after Box Office Revenue.  The Company's core concession products offered at its theaters include various sizes and types of popcorn, soft drinks, coffees, non-carbonated drinks, alcohol, candy, and quickly prepared or pre-prepared food.

The Company generates advertising revenue from advertising during pre- and post-showtime as well as advertising revenue from concession vendors.  As of the date hereof, the Company's advertising is facilitated by Digital Cinema Media Limited in UK&I, National CineMedia ("NCM") in the U.S., and directly by the Debtors in RoW.  The Debtors are currently in discussions with NCM as well as various third parties regarding the go-forward advertising contracts.

The Company's revenues are highly dependent upon the timing of motion picture releases by distributors.  The most marketable motion pictures are often released during the summer and the year-end holiday seasons.  Therefore, the Company's business is seasonal, with higher attendance and revenues generally occurring during the summer months and holiday seasons.

C.      **Income Statement Assumptions**

(i)      Box Office Revenue and Film Rental Costs:

**Box Office Revenue** is calculated as the product of attendance and the Average Ticket Price ("ATP").  Box Office Revenue for Financial Year 2023 is forecasted based on an estimated attendance level reflective of the Company's movie-slate forecast and ATP assumptions.  After Financial Year 2023, Box Office Revenue is forecasted based on an attendance level recovery factor relative to 2019 as well as ATP assumptions.

**Film Rental Costs** are assumed to remain largely consistent with historical costs on a margin basis. The Financial Projections do include some reduction in margin reflecting a higher mix of blockbuster movies which generally have higher Film Rental Costs.

(ii)      Concession Revenue and Concession Costs:

**Concession Revenue** is calculated as the product of attendance and the Spend Per Person ("SPP"). Concession Revenue is calculated using the same estimated attendance used in the Box Office Revenue calculation.  SPP assumptions reflect the Company's pricing strategies relative to competitors as well as input factor cost increases.

**Concession Costs** are assumed to remain largely consistent with historical costs on a margin basis. The Financial Projections include some reduction in margin reflecting inflationary pressures.

(iii)      Other Income and Other Direct Costs:

**Advertising Revenue** for the U.S. segment is calculated as (a) the product of attendance and an assumed Advertising Revenue per Person ("ARP"), plus (b) the product of the screen count and an assumed per screen advertising rate.  For the UK&I and RoW segments, Advertising Revenue is calculated as the product of attendance and an assumed ARP.  The Financial Projections reflect the economics with the Company's existing advertising providers.

The balance represents Other Income from multiple sources such as online booking fees, special events rental fees and managed locations.  Other Income is forecasted based on forecasted attendance multiplied by Financial Year 2022 run rate per attendance adjusted for an assumed escalation over time.

**Royalty Costs** are paid on premium formats such as IMAX and are calculated as the product of a fixed percentage and Box Office Revenue.  The fixed percentage is estimated based on historical trends.

Lastly, **Tickets, Credit Cards, and Unlimited Program Costs** represents costs and fees associated with credit card purchases and other third-party fees associated with online bookings. Tickets, Credit Cards, and Unlimited Program Costs are calculated as a product of a fixed percentage and Box Office Revenue. The fixed percentage is estimated based on historical trends.

(iv)      Operating Expenses:

**Labor** represents personnel costs at a theater level, including floor and janitorial staff, team leads, and theater managers.  Labor Cost is viewed as largely fixed in nature for salaried employees, with some variability due to change in attendance levels for hourly-waged employees.  Annual escalation factors are assumed in the Projection Period to reflect inflation.

**Repairs and Maintenance Costs** primarily represents theater-level maintenance costs for facilities repairs (*e.g.*, heating, ventilation, and air conditioning ("HVAC"), building and grounds, carpets and floors, electrical, etc.) and projectors and lamps maintenance. Repairs and Maintenance Costs are forecasted as (a) Financial Year 2022 actual lamp repairs and maintenance costs, adjusted annually for inflation, plus (b) the product of cinema and retail repairs and maintenance costs per person, adjusted annually for inflation, and forecasted attendance.

**Utilities Costs** primarily represents theater-level utility costs for power, gas, and water. Power and gas costs (c. >90% of Utilities Costs) are largely fixed costs related to HVAC delivery during a fixed number of scheduled showtimes. Utilities Costs are forecasted based on Financial Year 2022 actuals, adjusted annually for inflation.

**Marketing Costs** represents costs incurred for theater-level marketing and bulk ticket sales program costs. Marketing Costs are largely under the control of the Company, and therefore the Company has the discretion to adjust the costs as needed. Marketing Costs are forecasted based on Financial Year 2022 actuals, adjusted annually for inflation.

**Rates and Service Charges** represents theater-level variable common area maintenance ("CAM") charges and real estate and personal property taxes, as well as business license and franchise taxes allocated to theaters. Rates and Service Charges are forecasted based on Financial Year 2022 actuals (excluding non-recurring payments), adjusted annually for inflation.

**Other Operating Expenses** represents miscellaneous theater-level expenses such as insurance, waste disposal, staff uniforms, and cleaning supplies and services. Other Operating Expenses are forecasted based on Financial Year 2022 actuals, adjusted annually for inflation.

(v)     Other Operating Income:

**Other Non-Cinema Income** represents the assumed incremental value from (a) on-going negotiations with current and/or potential 3rd party advertising providers and (b) operational cost savings associated with the newly proposed screen advertising format. Although the Company is still in active negotiations with NCM and other third parties, the Financial Projections reflect the economics that are reasonable and the likely outcome of negotiations.

(vi)    Administrative Expenses:

**Operating General and Administrative ("G&A") Expenses** largely represents expenses related to salaries for administrative personnel, legal costs, audit and other professional fees, insurance, travel and entertainment costs, and IT costs. Operating G&A expenses are forecasted based on historical run-rate of normalized costs excluding non-recurring costs, adjusted annually for inflation. Additionally, the Financial Projections include the impact of various costs savings initiatives that the Company plans to implement over the Projection Period.

**Exceptional Goods** expenses reflect non-recurring expenses primarily related to professional and legal fees incurred over the course of the Chapter 11 Cases.

**Depreciation and Amortization** includes charges related to Property, Plant, and Equipment ("PPE") as well as charges related to the depreciation of Right-of-Use ("ROU") Assets, as reported under IFRS 16.

(vii)   Total Financial Income and Expenses:

**Financial Income** represents interest income received from the structuring of the Rest of World Loan Facility ("RoW Loan").

**Financial Expenses** represents interest expenses associated with the *pro forma* exit capital structure debt financing ("Exit Facilities") as well as the interest charges associated with the Lease Liabilities (as defined below) as reported under IFRS 16.

No assumptions regarding currency exchange gains or losses have been included in the Financial Projections.

### D.   Balance Sheet Assumptions

(i)   Trade and Other Receivables:

**Trade and Other Receivables** include amounts due from customers for previously recognized sales or services billed, reduced by an allowance for doubtful accounts. The Financial Projections assume that changes in Trade and Other Receivables correlate closely with changes in attendance. Additionally, the Financial Projections assume that Days of Sales Outstanding ("DSO") remain consistent with historical performance.

(ii)   Inventories:

**Inventories** consist primarily of goods for resale and equipment and spare parts, which is valued at the lower of cost or net realizable value determined on the first-in, first-out method. The Financial Projections assume that Days of Inventory on Hand ("DIO") remain consistent with historical performance.

(iii)   Other Current Assets:

**Other Current Assets** consists of assets classified as held for sale and Current Tax Receivable.

(iv)   Property, Plant, and Equipment:

**PPE** consists primarily of land, buildings and improvements, leasehold improvements and furniture, fixtures, and equipment. PPE is stated at cost less accumulated depreciation and impairment losses. The Financial Projections assume that the useful life and associated depreciation expenses remain consistent with historical results.

(v)   Right of Use Assets:

Under IFRS 16, leases are recognized as a **ROU Asset** and a corresponding Lease Liability on the date at which the leased asset is available for use by the Company. The depreciation charge recognized on the ROU Asset is being charged to Administrative Expenses in the Income Statement. The Financial Projections assume a lease useful life and associated ROU Asset depreciation charge consistent with historical results.

(vi)   Other Receivables:

**Other Receivables** consists primarily of the RoW Loan held by the U.S. segment and under which the RoW segment is a borrower.

(vii)   Other Intangible Assets and Goodwill:

**Other Intangible Assets** consists of brand assets and customer and studio relationships.  Finite lived intangible assets are amortized over the useful life and an amortization charge is recognized in the Administrative Expense line item in the Income Statement.

(viii)    Other Non-Current Assets:

**Investment in Equity Accounted Investees** historically primarily consisted of the Company's equity interest in NCM, Deferred Revenue under the Exhibitor Services Agreement ("ESA"), and Tax Receivable Agreement.  The Financial Projections, as part of various emergence accounting adjustments, writes-off the amount associated with the NCM interest and related Deferred Revenue.

The balance of Other Non-Current Assets consists of **Deferred Tax Assets** as well as nominal Financial Assets held using **Fair Value through Other Comprehensive Income ("FVOCI").**

(ix)    Trade and Other Payables:

**Trade and Other Payables** consist of Trade Payables, Accrued Real Estate and Property Taxes, Employee and Payroll accruals, and other miscellaneous accruals.  The Financial Projections assume that changes in Trade and Other Payables correlate closely with changes in attendance.  Additionally, the Financial Projections assume that Days of Payables Outstanding ("DPO") remain consistent with historical performance.

(x)    Lease Liabilities:

Under IFRS 16, Leases are recognized as a ROU Asset and a corresponding **Lease Liability** on the date at which the leased asset is available for use by the Company on the Balance Sheet.  Each lease payment is allocated between the liability and finance cost.  The finance cost is charged to the Income Statement over the lease period to produce a constant periodic rate of interest on the remaining balance of the liability for each period.  Both principal and finance cost elements of lease payments are recognized within financing cash flows within the Cash Flow Statement under "Principal Elements of Lease Payments" for ordinary course lease payments and "Exceptional Lease Payments" for deferred lease payments.  The Financial Projections include assumed go-forward rent savings from the rejection and renegotiation of leases.  Additionally, the Financial Projections include assumptions on savings and payment schedules on payments of prepetition deferred rent on leases that have been or will be assumed during the course of the Chapter 11 Cases.

(xi)    Deferred Revenue:

**Current Deferred Revenue** consists largely of gift cards, unlimited program annual fees and tickets, loyalty program points, and Other Deferred Revenue.  The Financial Projections assume Deferred Revenue to remain consistent with historical performance.

**Non-Current Deferred Revenue** consists mainly of Revenue Amortizing under the ESA with NCM.  The full balance is written off as part of emergence adjustments for illustrative purposes.

(xii)    Other Miscellaneous Current Liabilities:

**Provisions** for contracts with suppliers relate to claims from suppliers against contractual obligations.  The Financial Projections assume no change in provisions.

**Fair Value of Financial Derivative** held by the Company relate to convertible bonds issued in the year and equity warrants issued. The Financial Projections include emergence adjustments for illustrative purposes.

(xiii)   Loans and Borrowings:

The Financial Projections reflect a *pro forma* exit capital structure and the related adjustments on the assumed Emergence Date. Below follows a summary of assumed go-forward debt financing assumptions:

- $1,622 million Original Issue Discount ("OID") Exit First Lien Facility with an assumed interest rate of S+850;

- $200 million Exit Revolving Credit Facility ("RCF") that is assumed to be undrawn at Emergence;

- $12 million Midwest City Loan with an assumed interest rate of T+300;

- $8 million Bank Overdraft; and

- $4 million Israeli Loan Facility.

All interest is assumed to be paid quarterly.

(xiv)   Other Payables:

Other Payables consist primarily of RoW Loan facility under which the RoW segment is a borrower. The U.S. segment is the current owner of the RoW Loan facility and has the Asset recorded as part of Other Receivables. The principal amount due under the RoW Loan is assumed to be approximately $246 million.[2]

**E.    Cash Flow Statement Assumptions**

(i)   Changes in Working Capital:

Change in Working Capital driven by ordinary course movement in trade and other receivables, trade and other payables, inventory, provisions, and employee benefit obligations.

(ii)   Cash Taxes:

Cash Taxes reflect the actual taxes paid in Cash at an assumed effective tax rate applicable to each business segment for the Projection Period. Cash Taxes are adjusted to reflect deductibility limitations such as interest in the U.S. segment.

(iii)   Capital Expenditures:

---

[2]   The actual balance of the RoW Loan may vary based on changes in foreign currency exchange rates, as a portion of the loan is denominated in Euros.

Acquisition of PPE reflects Capital Expenditures in the Financial Projections.  Capital Expenditures consist of refurbishments, enhancements, new builds, and maintenance expenditures.

(iv) Interest Received:

Interest Received includes cash interest received under the RoW Loan facility payable by the RoW segment and received by the U.S. segment.

(v) Interest Paid:

Interest Paid includes cash interest paid to external creditors over the Projection Period, as well as cash interest paid under the RoW Loan facility from the RoW segment to the U.S. segment.

(vi) Debt issuances and repayments:

Repayment and receipt of bank loans include borrowings and principal repayment of loans and borrowings.

(vii) Equity Rights Offering:

The Financial Projections assume an up to $800 million new money equity capital raise as part of the Emergence sources and uses.

(viii) Lease Cash Payments:

Under IFRS 16, principal and finance cost elements of lease payments are recognized within financing cash flows under "Principal Elements of Lease Payments" for ordinary course lease payments and "Exceptional Lease Payments" for deferred lease payments.

**Consolidated Unaudited Projected Income Statement**

| Fiscal Year | FY23 | FY24 | FY25 | FY26 | FY27 |
|---|---|---|---|---|---|
| Type ($Million) | Forecast | Forecast | Forecast | Forecast | Forecast |
| Box Office - Total | 2,066 | 2,322 | 2,432 | 2,543 | 2,626 |
| Concession | 1,182 | 1,332 | 1,401 | 1,472 | 1,527 |
| Other Income | 390 | 431 | 446 | 461 | 470 |
| **Total Revenue** | **3,639** | **4,086** | **4,279** | **4,476** | **4,623** |
| Total Film Rental | (1,057) | (1,187) | (1,244) | (1,302) | (1,346) |
| Total Royalty cost | (23) | (26) | (27) | (29) | (30) |
| Total Concession/Retail | (208) | (235) | (247) | (259) | (269) |
| Ticket, Credit card & Unlimited | (88) | (101) | (108) | (114) | (120) |
| Distribution | (21) | (23) | (24) | (24) | (25) |
| **Total Cost of Sales** | **(1,397)** | **(1,572)** | **(1,650)** | **(1,729)** | **(1,789)** |
| **Gross Margin** | **2,241** | **2,514** | **2,629** | **2,747** | **2,834** |
| Labour | (540) | (574) | (595) | (616) | (636) |
| Repairs & Maintenance | (76) | (84) | (89) | (93) | (97) |
| Utilities | (131) | (138) | (144) | (149) | (155) |
| Marketing | (29) | (31) | (32) | (33) | (34) |
| Other Operational Expenses | (138) | (145) | (152) | (158) | (165) |
| Rates and Service Charge | (180) | (187) | (195) | (202) | (210) |
| **Total Operating Expenses** | **(1,095)** | **(1,161)** | **(1,206)** | **(1,252)** | **(1,297)** |
| **Cinema-Level EBITDAR** | **1,146** | **1,353** | **1,424** | **1,495** | **1,537** |
| Total Other Operating Income | 30 | 46 | 46 | 46 | 47 |
| Total Administrative Expenses | (838) | (642) | (644) | (657) | (671) |
| **Operating Profit** | **338** | **757** | **826** | **885** | **912** |
| Total Financial Income | 34 | 27 | 27 | 27 | 27 |
| Total Financial Expense | (1,062) | (654) | (644) | (637) | (634) |
| **Total Financial - Net** | **(1,028)** | **(627)** | **(617)** | **(610)** | **(607)** |
| Impact of Emergence / Fresh Start | 2,965 | - | - | - | - |
| **Net Income Before Tax** | **2,275** | **129** | **209** | **274** | **305** |
| Income Taxes | (39) | (80) | (89) | (97) | (100) |
| **Net Income** | **2,236** | **49** | **121** | **177** | **205** |

**Consolidated Unaudited Projected Balance Sheet**

| Fiscal Year | FY23 | FY24 | FY25 | FY26 | FY27 |
|---|---|---|---|---|---|
| Type ($Million) | Forecast | Forecast | Forecast | Forecast | Forecast |
| Property, Plant and Equipment | 1,424 | 1,306 | 1,175 | 1,031 | 874 |
| Right-of-Use Assets | 1,819 | 1,780 | 1,761 | 1,758 | 1,768 |
| Goodwill | 2,627 | 2,627 | 2,627 | 2,627 | 2,627 |
| Other Intangible Assets | 417 | 395 | 372 | 350 | 328 |
| Investment in Equity-Accounted Investee | 22 | 22 | 22 | 22 | 22 |
| Financial Assets at FVOCI | 6 | 6 | 6 | 6 | 6 |
| Deferred Tax Assets | 336 | 336 | 336 | 336 | 336 |
| Other Receivables | 246 | 246 | 246 | 246 | 246 |
| **Total Non-Current Assets** | **6,896** | **6,717** | **6,545** | **6,376** | **6,205** |
| Assets Classified as Held for Sale | 2 | 2 | 2 | 2 | 2 |
| Inventories | 20 | 30 | 32 | 33 | 34 |
| Trade and Other Receivables | 255 | 297 | 303 | 309 | 314 |
| Cash and Cash Equivalents | 92 | 337 | 629 | 990 | 1,388 |
| **Total Current Assets** | **369** | **667** | **965** | **1,334** | **1,738** |
| **Total Assets** | **7,266** | **7,383** | **7,510** | **7,710** | **7,943** |
| Loans and Borrowings | 1,500 | 1,532 | 1,563 | 1,595 | 1,627 |
| Fair Value of Financial Derivatives | 0 | 0 | 0 | 0 | 0 |
| Lease Liabilities | 412 | 463 | 507 | 546 | 594 |
| Trade and Other Payables | 490 | 576 | 590 | 606 | 619 |
| Deferred Revenue | 170 | 170 | 170 | 176 | 170 |
| Current Taxes Payable | 29 | 29 | 29 | 29 | 29 |
| Provisions | 7 | 7 | 7 | 7 | 7 |
| **Total Current Liabilities** | **2,608** | **2,777** | **2,867** | **2,959** | **3,046** |
| Lease Liabilities | 2,998 | 2,898 | 2,814 | 2,744 | 2,685 |
| Other Payables | 256 | 256 | 256 | 256 | 256 |
| Provisions | 1 | 1 | 1 | 1 | 1 |
| Employee Benefits | 4 | 4 | 4 | 4 | 4 |
| **Total Non-Current Liabilities** | **3,258** | **3,158** | **3,074** | **3,004** | **2,945** |
| **Total Liabilities** | **5,866** | **5,935** | **5,940** | **5,963** | **5,991** |
| **Net Equity/(Liabilities)** | **1,400** | **1,449** | **1,570** | **1,747** | **1,952** |

**Consolidated Unaudited Projected Cash Flow Statement**

| Fiscal Year<br>Type ($Million) | FY23<br>Forecast | FY24<br>Forecast | FY25<br>Forecast | FY26<br>Forecast | FY27<br>Forecast |
|---|---|---|---|---|---|
| Profit / (Loss) for the period | 2,236 | 49 | 121 | 177 | 205 |
| Adjustments for: | | | | | |
| Financial Income | (34) | (27) | (27) | (27) | (27) |
| Financial expenses | 1,062 | 654 | 644 | 637 | 634 |
| Taxation | 39 | 80 | 89 | 97 | 100 |
| (+/-) Impact of Emergence / Fresh Start | (2,965) | - | - | - | - |
| **Operating (Loss) / Profit** | **338** | **757** | **826** | **885** | **912** |
| Depreciation and Amortisation | 509 | 517 | 527 | 540 | 555 |
| Movement in Trade and Other Receivables | (20) | (42) | (6) | (6) | (4) |
| Movements in Inventories | 8 | (10) | (1) | (2) | (1) |
| Movement in Trade and Other Payables | (177) | 86 | 14 | 22 | 7 |
| Movement in Provisions and Employee Benefit Obligations | - | - | - | - | - |
| **Cash (Used) / Generated from Operations** | **658** | **1,308** | **1,360** | **1,439** | **1,468** |
| Tax Received / (Paid) | (47) | (80) | (89) | (97) | (100) |
| **Net Cash Flows from Operating Activities** | **611** | **1,227** | **1,271** | **1,342** | **1,368** |
| Interest Received | 34 | 27 | 27 | 27 | 27 |
| Acquisition of Property, Plant and Equipment | (149) | (150) | (152) | (153) | (154) |
| Acquisition of Dist. Rights and Other Intangibles | - | - | - | - | - |
| **Net Cash Flows from Investing Activities** | **(116)** | **(123)** | **(125)** | **(126)** | **(127)** |
| Dividends Paid to Shareholders | 800 | - | - | - | - |
| Interest Paid | (315) | (230) | (224) | (222) | (221) |
| Repayment of Bank Loans | (1,945) | (1) | (1) | (1) | (1) |
| Receipt of Bank Loans | 1,471 | - | - | - | - |
| Exceptional Lease Payments | (198) | (46) | (37) | (28) | (7) |
| Principal Elements of Lease Payments | (569) | (583) | (594) | (604) | (614) |
| **Net Cash Flows from Financing Activities** | **(755)** | **(859)** | **(855)** | **(855)** | **(843)** |
| Net (Decrease) / Increase in Cash and Cash Equivalents | (260) | 245 | 291 | 361 | 398 |
| Effect of Exchange Rate Fluctuations on Cash Held | - | - | - | - | - |
| Cash and Cash Equivalents at Start of the Period | 352 | 92 | 337 | 629 | 990 |
| **Cash and Cash Equivalents at the End of Period** | **92** | **337** | **629** | **990** | **1,388** |

**<u>Exhibit D</u>**

**Valuation Analysis**

## VALUATION ANALYSIS[1]

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES AND/OR FUNDED DEBT TO BE ISSUED PURSUANT TO THE PLAN.  THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS OR ANY OF THEIR AFFILIATES.

Solely for the purposes of the Plan and the Disclosure Statement, PJT Partners LP ("PJT"), as investment banker to the Debtors, has estimated a potential range of total enterprise value (the "Enterprise Value") and implied equity value (the "Equity Value") for the Reorganized Debtors *pro forma* upon consummation of the Restructuring Transactions contemplated by the Plan (the "Valuation Analysis").  The Valuation Analysis utilizes certain financial and other information provided by the Debtors' management and third-party advisors, as well as the Financial Projections, attached to the Disclosure Statement as **Exhibit C**, and information provided by other sources.  The Valuation Analysis is as of April 19, 2023, with an assumed Effective Date of June 30, 2023.  The valuation estimates set forth herein represent valuation analyses of the Reorganized Debtors utilizing customary valuation techniques deemed appropriate by PJT.

THE ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DETERMINED BY PJT REPRESENT ESTIMATED ENTERPRISE AND EQUITY VALUES AND MAY NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS.  THE IMPUTED ESTIMATE OF THE RANGE OF THE EQUITY VALUE OF THE REORGANIZED DEBTORS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE.  ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH PJT'S VALUATION ANALYSIS.

The estimated values set forth in the Valuation Analysis:  (a) assume the Plan and the Restructuring Transactions contemplated thereby are consummated; (b) do not constitute an opinion as to the terms and provisions of the Plan, the fairness from a financial point of view of the consideration to be received by any Person under the Plan, or with respect to any other matter; (c) do not constitute a recommendation to any Holder of Allowed Claims as to how such Holder should vote or otherwise act with respect to the Plan; and (d) do not necessarily reflect the actual market value or future results that might be realized through a sale or liquidation of the Debtors or their assets.

---

[1]   All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Disclosure Statement, as applicable.

The summary of the Valuation Analysis set forth herein does not purport to be a complete description of the Valuation Analysis performed by PJT.  The preparation of a valuation analysis is a complex analytical process involving subjective determinations about which methodologies of financial analysis are most appropriate and relevant to the subject company and the application of those methodologies to particular facts and circumstances in a manner that is not readily susceptible to summary description.  Accordingly, in preparing the Valuation Analysis, PJT considered a variety of factors and evaluated a variety of financial analyses, including: (a) comparable companies analysis based on EBITDA and EBITDAR multiples; (b) discounted cash flow analysis; (c) precedent transaction analysis and (d) the Marketing Process.  PJT deemed the precedent transaction analysis to be of limited relevance given, among other factors, the (i) lack of recent and relevant transactions, (ii) inherent changes in industry dynamics, and (iii) outlook for the industry following the global COVID-19 pandemic.

Based on the aforementioned analyses and other information described herein, and solely for purposes of the Plan, the estimated range of Enterprise Value of the Reorganized Debtors, collectively, as of June 30, 2023, is approximately $2.8 billion to approximately $3.4 billion. The Plan is premised on an implied Enterprise Value of the Reorganized Debtors of approximately $3.0 billion.

In addition, based on the estimated range of Enterprise Value of the Reorganized Debtors and other information described herein, and solely for purposes of the Plan, PJT estimated a potential range of total Equity Value of the Reorganized Debtors, which consists of the Enterprise Value, less indebtedness, plus balance sheet cash on the assumed Effective Date of the Plan.  As of the Effective Date, the Reorganized Debtors' indebtedness is expected to be approximately $1.8 billion, including deferred rent obligations and OID on the Exit First Lien Facility. The excess balance sheet cash is expected to be approximately $0.2 billion.  Accordingly, PJT estimated that the potential range of Equity Value for the Reorganized Debtors, collectively, as of June 30, 2023 is between approximately $1.3 billion and approximately $1.9 billion. The Plan is premised on an Equity Value for the Reorganized Debtors of $1.475 billion.

For purposes of the Valuation Analysis, PJT assumed that no material changes that would affect estimated value will occur between the date of the Disclosure Statement and the assumed Effective Date.  In addition, PJT assumed that, as of the assumed Effective Date, there will be no material change in economic, monetary, market, industry, regulatory, and other conditions that would impact any of the material information made available to PJT.  PJT makes no representation as to the achievability or reasonableness of such assumptions.  The Debtors undertake no obligation to update or revise statements to reflect events or circumstances that arise after the date of the Disclosure Statement or to reflect the occurrence of unanticipated events.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY PJT ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESSES AND ASSETS OF THE DEBTORS AVAILABLE TO PJT AS OF APRIL 19, 2023.  IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY HAVE AFFECTED OR MAY AFFECT PJT'S CONCLUSIONS SET FORTH IN THE VALUATION ANALYSIS, NEITHER PJT NOR THE DEBTORS HAVE ANY OBLIGATION TO UPDATE,

REVISE, OR REAFFIRM THE VALUATION ANALYSIS AND DO NOT INTEND TO DO SO, EXCEPT AS REQUIRED BY APPLICABLE LAW.

PJT DID NOT INDEPENDENTLY VERIFY THE FINANCIAL PROJECTIONS OR OTHER INFORMATION THAT PJT USED TO PREPARE THE VALUATION ANALYSIS, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS OR THEIR ASSETS OR LIABILITIES WERE SOUGHT OR OBTAINED IN CONNECTION THEREWITH.  THE VALUATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE PLAN AND THE ANALYSIS OF POTENTIAL RELATIVE RECOVERIES TO CREDITORS THEREUNDER.  THE VALUATION ANALYSIS REFLECTS THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, LIQUIDATION VALUE, OR ESTIMATE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES OR FUNDED DEBT TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH IN THE VALUATION ANALYSIS.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS.  AS A RESULT, THE VALUATION ANALYSIS IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NONE OF THE DEBTORS OR THEIR MANAGEMENT, PJT, OR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY.  IN ADDITION, THE POTENTIAL VALUATION OF NEWLY ISSUED SECURITIES AND/OR FUNDED DEBT IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.  ACTUAL MARKET PRICES OF SUCH SECURITIES OR FUNDED DEBT AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES OR DEBT HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT IMMEDIATELY RATHER THAN HOLD THEIR INVESTMENT ON A LONG-TERM BASIS, THE POTENTIALLY DILUTIVE IMPACT OF CERTAIN EVENTS, INCLUDING THE ISSUANCE OF EQUITY SECURITIES PURSUANT TO ANY MANAGEMENT INCENTIVE PLAN ESTABLISHED, AND ALL OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF SECURITIES AND/OR FUNDED DEBT.

The Debtors' management advised PJT that the Financial Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' best estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. The Valuation Analysis assumes that the actual performance of the Reorganized Debtors will correspond to the Financial Projections in all material respects. If the Debtors' business performs at levels that differ from those set forth in the Financial Projections, such performance may have either a materially

negative or positive impact on the Valuation Analysis, estimated potential ranges of valuation of the Reorganized Debtors, and the Enterprise Value and Equity Value thereof.

In preparing the Valuation Analysis, PJT, among other things:  (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain financial and operating data of the Debtors, including the Financial Projections; (c) discussed the Debtors' performance, future prospects, and industry observations with members of the Debtors' management; (d) considered feedback received in the Marketing Process; (e) reviewed certain publicly available financial data for, and considered the market value of, public companies that PJT deemed generally relevant in analyzing the value of the Reorganized Debtors; and (f) considered certain economic and industry information that PJT deemed generally relevant to the Reorganized Debtors.  PJT assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management and other parties as well as publicly available information.

The Valuation Analysis does not constitute a recommendation to any Holder of Allowed Claims or any other Person as to how such Holder should vote or such Person should act with respect to the Plan.  PJT has not been requested to, and does not express any view as to, the potential trading value of the Reorganized Debtors' securities and/or funded debt on issuance or at any other time.

For purposes of the Valuation Analysis, for several reasons, including the application of the cancellation of indebtedness rules and the application of section 382 of the IRC, PJT has assumed that none of the Debtors' existing U.S. tax attributes (such as net operating losses, capital losses, or carryforwards under section 163(j) of the IRC) will be usable after the restructuring.  Additionally, PJT has not estimated any changes to protected tax depreciation or amortization that will result from the implementation of the Restructuring Transactions.  Any changes to these assumptions, or a change in the structure utilized to consummate the reorganization, could materially impact the conclusions reached in the Valuation Analysis.

PJT IS ACTING AS INVESTMENT BANKER TO THE DEBTORS, AND HAS NOT BEEN AND WILL NOT BE RESPONSIBLE FOR, AND HAS NOT AND WILL NOT PROVIDE, ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE TO THE DEBTORS OR ANY OTHER PARTY IN CONNECTION WITH THE DEBTORS' CHAPTER 11 CASES, THE PLAN, OR OTHERWISE.

**<u>Exhibit E</u>**

**Liquidation Analysis**

# LIQUIDATION ANALYSIS[1]

## Introduction

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of an allowed claim or interest that does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the Plan satisfies the best interests of creditors test, the Debtors, with the assistance of their restructuring advisors, AlixPartners, LLP, have prepared a hypothetical liquidation analysis (the "Liquidation Analysis"), which is based upon certain assumptions discussed in the Disclosure Statement and the accompanying notes to the Liquidation Analysis.

The Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests upon disposition of assets pursuant to a hypothetical chapter 7 liquidation.  As illustrated by this Liquidation Analysis, Holders of Claims or Interests in Impaired Classes and Holders of Claims in certain Unimpaired Classes that would receive a full recovery under the Plan would receive a lower recovery in a hypothetical liquidation than they would under the Plan. Further, no Holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such Holder would receive in a chapter 7 liquidation.  Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

## Statement of Limitations

The preparation of a liquidation analysis is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive risks, uncertainties, and contingencies, most of which are difficult to predict and many of which are beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.  The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated, and the potential recoveries that would result, if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code.  The Liquidation Analysis is not intended and should not be used for any other purpose.  The underlying financial information in the Liquidation

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Disclosure Statement, as applicable.

Analysis and the values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm. In addition, the various liquidation decisions upon which certain assumptions are based are subject to change. As a result, the actual amount of Claims that would ultimately be Allowed against the Debtors' Estates could vary significantly from the estimates stated herein, depending on the nature and amount of Claims asserted during the pendency of a chapter 7 case. Similarly, the value of the Debtors' assets in a liquidation scenario is uncertain and could vary significantly from the values set forth in the Liquidation Analysis.

The cessation of business operations in a chapter 7 liquidation is likely to trigger certain Claims that otherwise would not exist under the Plan. The amount of additional Claims could be significant, and some may be entitled to treatment as Administrative Claims, while others may be entitled to priority in payment over General Unsecured Claims. The Liquidation Analysis does not include estimates for such additional Claims, including, but not limited to: (a) the tax consequences, either foreign or domestic, that may be triggered upon the liquidation and sale of assets, (b) potential employee Claims, (c) recoveries resulting from any potential preference, fraudulent transfer, or other litigation or Avoidance Actions, (d) Claims that may be entitled to priority under the Bankruptcy Code, including Administrative Claims under sections 503(b) and 507(b) of the Bankruptcy Code, (e) environmental or other governmental Claims arising from the shut down or sale of the Debtors' assets, and (f) additional unsecured and contract and lease breakage claims arising from a chapter 7 liquidation. More specific assumptions are detailed in the notes below. Additionally, certain factors, such as an inability by the Debtors or a chapter 7 trustee (the "Trustee") to maintain the Debtors' operations during the Liquidation Process (as defined below), a seizure of collateral by secured creditors, significant employee attrition, and/or delays in the Liquidation Process may limit the amount of proceeds generated by the liquidation of the assets. These factors could materially reduce the value of the liquidation proceeds and yield significantly lower recoveries than those estimated in the Liquidation Analysis.

ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED HEREIN. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES PROVIDED HEREIN.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' financial statements to account for other known liabilities, as necessary. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, and chapter 7 administrative claims such as wind-down costs and trustee and legal fees (together, the "Wind-Down Expenses"). To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes

of preparing this Liquidation Analysis.  Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan.  NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS.  THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THESE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

### Basis of Presentation

The Liquidation Analysis has been prepared assuming that the Debtors would convert their current Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code on or about June 30, 2023 (the "Liquidation Date").  Except as otherwise noted herein, the Liquidation Analysis is based upon the unaudited financial statements of the Debtors as of December 31, 2022, and those values, in total, are assumed to be representative of the Debtors' assets and liabilities as of the Liquidation Date.  The Debtors, in consultation with their advisors, believe that the December 31, 2022 book value of assets and certain liabilities are a proxy for such book values as of the Liquidation Date. It is assumed that on the Liquidation Date, the Bankruptcy Court would appoint a Trustee to oversee the liquidation of the Debtors' Estates, during which time all of the assets of the Debtors would be sold and the Cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with applicable law: (i) *first*, for payment of liquidation, wind-down expenses, and Trustee fees attributable to the Wind-Down Expenses; (ii) *second*, to pay the secured portions of the DIP Claims and the Midwest Facility Claims, from their respective collateral; (iii) *third*, to pay the secured portions of the Legacy Facilities Claims; and (iv) *fourth*, any remaining net cash would be distributed to creditors holding Unsecured Claims against the Debtors, including, for the avoidance of doubt, to pay amounts on General Unsecured Claims and any deficiency Claims that arise to the extent of the unsecured portion of the Allowed Secured Claims.

The Liquidation Analysis assumes operations of the Debtors and their non-Debtor Affiliates (the "Liquidating Entities") will cease on the Liquidation Date, and the related individual assets will be sold during a three-month liquidation process (the "Liquidation Process") under the direction of the Trustee, utilizing the Debtors' resources and third-party advisors, to allow for the orderly wind down of the Debtors' Estates.  There can be no assurance that the liquidation would be completed in such a limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized.  Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally in a distressed process) as is compatible with the best interests of parties-in-interest.  The Liquidation Analysis is also based on the assumptions that:  (a) the Debtors have continued access to cash collateral during the course of the Liquidation Process to fund Wind-Down Expenses and (b) operations, accounting, treasury, IT, and other management services needed to wind down

the Estates continue.  The Liquidation Analysis was prepared on a regional basis (*i.e.*, U.S., U.K. and Ireland, and Rest of World) for all Liquidating Entities and is displayed below on a consolidated basis for all Debtors for convenience.  Asset Recoveries accrue first to satisfy creditor claims at the legal entity level (or region).  To the extent any remaining value exists, it flows as equity to the applicable Liquidating Entity's parent or appropriate equity holder, as applicable.

## DETAILED LIQUIDATION ANALYSIS

The Liquidation Analysis for the Liquidation Entities was analyzed on a regional basis. The following summary of the Liquidation Analysis of the consolidated Debtors should be reviewed in conjunction with the associated notes.

| Liquidation Analysis - Summary of Debtors | | | | | | |
|---|---|---|---|---|---|---|
| *In $Thousands* | Note: | Book Value | Recovery % Low | Recovery % High | Recovery $ Low | Recovery $ High |
| Cash and Cash Equivalents | [A] | $ 127,537 | 100.0% | 100.0% | $ 127,537 | 127,537 |
| Accounts Receivable | [B] | 81,807 | 50.0% | 70.0% | 40,904 | 57,265 |
| Inventory | [C] | 21,277 | 3.1% | 24.2% | 662 | 5,146 |
| Prepaid Expenses | [D] | 30,564 | 28.1% | 50.7% | 8,583 | 15,499 |
| Other Current Assets | [E] | 32,799 | 63.9% | 77.2% | 20,966 | 25,311 |
| Property, Plant, and Equipment | [F] | 545,652 | 54.7% | 73.2% | 298,283 | 399,472 |
| Leasehold Assets | [G] | 2,583,352 | 1.4% | 2.7% | 35,401 | 70,801 |
| Other Non-Current Assets | [H] | 797,166 | 1.4% | 3.5% | 11,517 | 27,694 |
| Recovery from Rest of World Credit Facility | [I] | n/a | n/a | n/a | 73,041 | 100,938 |
| Intercompany Receivables from Non-Debtors | [J] | n/a | n/a | n/a | n/a | n/a |
| **Total Assets** | | $ 4,220,153 | 14.6% | 19.7% | $ 616,893 | $ 829,662 |
| | | | | | | |
| **Wind-Down Expenses** | | | | | | |
| Wind-Down Expenses | [K] | | | | $ 163,969 | $ 171,364 |
| Wind-Down Expenses Recovery $ | | | | | 163,969 | 171,364 |
| *Priority Recovery %* | | | | | *100.0%* | *100.0%* |
| | | | | | | |
| **Net Proceeds from Liquidation** | | | | | $ 452,924 | $ 658,298 |
| | | | | | | |
| **DIP Claims** | [L] | | | | $ 1,959,883 | $ 1,959,883 |
| DIP Recovery | | | | | 441,481 | 646,835 |
| *DIP Recovery %* | | | | | *22.5%* | *33.0%* |
| | | | | | | |
| **Midwest Facility Claims** | [M] | | | | $ 11,362 | $ 11,362 |
| Midwest Facility Recovery | | | | | 11,362 | 11,362 |
| *Midwest Facility Recovery %* | | | | | *100.0%* | *100.0%* |
| | | | | | | |
| **Legacy Facilities Claims** | [N] | | | | $ 4,275,596 | $ 4,275,596 |
| Legacy Facilities Recovery | | | | | - | - |
| Legacy Facilities Deficiency Recovery | | | | | - | - |
| *Legacy Facilities Recovery %* | | | | | *0.0%* | *0.0%* |
| | | | | | | |
| **Class 5A - General Unsecured Claims Against the Class 5A Debtors** | [O] | | | | $ 1,449,065 | $ 1,413,971 |
| Class 5A - General Unsecured Recovery | | | | | 81 | 101 |
| Class 5A - General Unsecured Deficiency Recovery | | | | | - | - |
| *Class 5A - General Unsecured Recovery %* | | | | | *0.0%* | *0.0%* |
| | | | | | | |
| **Class 5B - General Unsecured Claims Against the Class 5B Debtors** | [P] | | | | $ 916,400 | $ 224,413 |
| Class 5B - General Unsecured Recovery | | | | | - | - |
| Class 5B - General Unsecured Deficiency Recovery | | | | | - | - |
| *Class 5B - General Unsecured Recovery %* | | | | | *0.0%* | *0.0%* |
| | | | | | | |
| Remaining Value to Equity Interests | | | | | $ - | $ - |
| | | | | | | |
| **Total Creditor Recovery** | | | | | $ 452,924 | $ 658,298 |

**Notes to the Liquidation Analysis**

[A] <u>Cash and Cash Equivalents</u>:  The Cash balance represents the estimated balance as of the Liquidation Date.  A 100% recovery on Cash and Cash equivalents has been estimated for both the low and high projected recoveries.

[B] <u>Accounts Receivable</u>:  The Accounts Receivable balance represents accounts receivable net of any reserves for trade and other miscellaneous accounts receivables.  The other miscellaneous receivables (*e.g.*, accrued vendor rebates) represent the majority of the overall balance.  A blended recovery of 50% to 70% has been estimated for the Debtors' receivables based on the high likelihood of recoverability of credit card receivables and the more limited recoverability of other miscellaneous receivables.

[C] <u>Inventory</u>:  Inventory consists of various food, concession items and other inventory.  A low likelihood of recoverability exists for these assets based on both the ability to re-sell foodstuffs and the dispersed nature of the assets at various locations.  A blended recovery of 3% to 24% has been estimated for the Debtors' inventory based on individual recoveries assigned to different inventory categories.

[D] <u>Prepaid Expenses</u>:  Prepaid expenses have been evaluated by type and assigned recoveries based on the likelihood that the prepaid amounts can be recovered.  On a blended basis, a 28% to 51% recovery has been estimated.

[E] <u>Other Current Assets</u>:  Other current assets consist of accruals that are expected to be largely unrecoverable and certain assets (*e.g.*, tax receivables) that are expected to yield higher levels of recovery.  On a blended basis, a 64% to 77% recovery has been estimated.

[F] <u>Property, Plant and Equipment, Net</u>:  Property, Plant and Equipment consists of tangible assets such as real property, buildings, machinery, theater and office equipment, and construction-in-progress.  On a blended basis, a recovery of 55% to 73% of the net book value has been estimated.

[G] <u>Leasehold Assets</u>: Leasehold assets, including leasehold improvements, fixtures, and fittings located at individual theaters leased by the Debtors, are expected to yield little value as the leases in question are expected to be rejected after salable and separable assets are liquidated.  On a blended basis, leasehold assets are expected to yield 1% to 3%.

[H] <u>Other Non-Current Assets</u>:  Other Assets are almost entirely accounting and accrual assets that are expected to yield no recovery.  A blended recovery of 1% to 4% has been estimated for these assets.

[I] <u>Recovery from Rest of World Credit Facility</u>:  The Debtors are the holders of the Rest of World Credit Facility debt owed by certain Rest of World entities.   A recovery on that debt is shown as

an asset to the Debtors and are funds available to satisfy creditors of the Debtors subject to the order of priority discussed above.

[J] <u>Intercompany Receivables from Non-Debtors</u>:  Intercompany receivables represent claims on other, non-Debtor entities.  The Rest of World liquidation was assessed on a consolidated basis and all recovery from the liquidation of Rest of World assets, after satisfying Wind-Down Expenses, has been assigned to the Rest of World Credit Facility, which represents an asset to the Debtors.

[K] <u>Wind-Down Expenses</u>:  Wind-Down Expenses represent the expenses associated with administering the chapter 7 liquidation and existing chapter 11 administrative expenses.  A 2% trustee fee and a 2% cost for related legal and professional fees has been applied to non-cash asset recovery values.  Additionally, rent (and related expenses) at leased facilities (totaling approximately $61 million) has been included to allow the Debtors time to remove saleable assets from leased locations.  Further, an estimated $87 million of combined operating expenses and certain priority liabilities (e.g., accrued salary) have been included in the estimated Wind-Down Expenses.  A full recovery is estimated for Wind-Down Expenses.

[L] <u>DIP Claims</u>:  DIP Claims represent the estimated Claims for the DIP.  DIP Claims are estimated to receive a 23% to 33% recovery.

[M] <u>Midwest Facility Claims</u>:  Based on the available proceeds from collateral associated with the Midwest Facility Claims, a full recovery has been estimated.

[N] <u>Legacy Facilities Claims</u>:  No recovery is estimated for the Legacy Facilities Claims.

[O] <u>Class 5A – General Unsecured Claims Against the Class 5A Debtors</u>:  The sole source of recovery on account of the Class 5A – General Unsecured Claims Against the Class 5A Debtors derives from assets held at Cineworld Funding (Jersey) Limited, which would be used to provide a recovery to holders of Convertible Bonds Claims.

[P] <u>Class 5B – General Unsecured Claims Against the Class 5B Debtors:</u> No recovery is estimated for the Class 5B – General Unsecured Claims Against the Class 5B Debtors.

**<u>Exhibit 2</u>**

**Solicitation Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) Case No. 22-90168 (MI) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) **Re: Docket No.  [●]** |

## SOLICITATION PROCEDURES

**PLEASE TAKE NOTICE THAT** on [●], 2023, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"), (a) conditionally approving the adequacy of the *Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1567] (as may be amended, supplemented, or modified from time to time, and including all exhibits thereto, the "Disclosure Statement"), (b) approving these solicitation procedures (the "Solicitation Procedures") with respect to confirmation of the *Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1566] (as may be amended, supplemented, or modified from time to time, the "Plan"),[2] (c) approving the forms of ballots and notices in connection therewith, (d) scheduling certain dates with respect thereto, and (e) granting related relief.

### A.                     The Voting Record Date.

The Court has established April 18, 2023, as the record date to determine which Holders of Claims in Class 4 (Legacy Facilities Claims), Class 5A (General Unsecured Claims Against the Class 5A Debtors), and Class 5B (General Unsecured Claims Against the Class 5B Debtors) are entitled to vote to accept or reject the Plan (the "Voting Record Date").

### B.                     The Voting Deadline.

The Court has established **June 2, 2023, at 5:00 p.m.** (prevailing Central Time) as the voting deadline (the "Voting Deadline") for the Plan.  The Debtors may extend the Voting Deadline, in their discretion, without further notice or order of the Court.  To be counted as votes to accept or reject the Plan, all ballots (the "Ballots") must be properly executed, completed, and

---

[1]     A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/cineworld.  The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these Chapter 11 Cases is 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement Order or the Plan, as applicable.

delivered pursuant to the instructions set forth on the applicable Ballot so as to be ***actually received*** by Kroll Restructuring Administration LLC (the "<u>Solicitation Agent</u>") no later than the Voting Deadline.  Delivery of a Ballot or an opt-out form to the Solicitation Agent by e-mail, facsimile, or other electronic means shall not be valid with the following exceptions:  (a) Ballots submitted by voters who are not Beneficial Holders[3] of Convertible Bonds Claims and opt-out forms submitted via electronic, online transmissions, solely through a customized online balloting portal (the "<u>E-Ballot Portal</u>") on the Debtors' case website to be maintained by the Solicitation Agent (each, an "<u>E-Ballot</u>");[4] *provided* that Holders of Class 9 Interests  in Cineworld Parent electing to submit an electronic opt-out form should submit such opt-out form by using the E-Ballot Portal or a customized online document submission portal located on the left-hand navigation panel of the Debtors' restructuring website to be maintained by the Solicitation Agent (the "<u>Opt-Out Portal</u>"), as applicable, in accordance with the *Notice of Non-Voting Status to Holders of Impaired Claims and Interests Conclusively Presumed to Reject the Plan and Important Information Regarding Third-Party Releases and Notice of Opt-Out Rights,* attached to the Disclosure Statement Order as <u>Exhibit 6</u>; and (b) Master Ballots (as defined herein) submitted by brokers, banks, or other nominees holding Class 5A General Unsecured Claims Against the Class 5A Debtors[5] in "street name" on behalf of the underlying Beneficial Holders (the "<u>Nominees</u>")[6] submitted via e-mail to cineworldballots@ra.kroll.com with "Cineworld Solicitation Ballot Submission" in the subject line.

To have their votes to accept or reject the Plan counted, Beneficial Holders must properly submit their vote to the appropriate Nominee, in sufficient time so that such Nominee can verify, tabulate, and include such Ballots in a Master Ballot and timely return such Master Ballot, so that it is ***actually received*** by the Solicitation Agent no later than the Voting Deadline.  In the case of the Beneficial Holders of the Class 5A General Unsecured Claims Against the Class 5A Debtors who hold their position through a Nominee, such Beneficial Holders will be instructed to comply with the return instructions provided by such Nominee.

---

[3]   A "<u>Beneficial Holder</u>" means a beneficial owner of publicly-traded securities whose Claims have not been satisfied prior to the Voting Record Date pursuant to Court order or otherwise, as reflected in the records maintained by Nominees or other applicable depository, including, but not limited to Euroclear and Clearstream.

[4]   For the avoidance of doubt, votes submitted through an E-Ballot and votes submitted through Master Ballots by Nominees and Beneficial Holder Ballots (as defined herein) via e-mail shall be the only electronic votes accepted by the Solicitation Agent.

[5]   For the avoidance of doubt, any procedures set forth herein with respect to Beneficial Holders shall apply to Holders of Convertible Bonds Claims within Class 5A General Unsecured Claims Against the Class 5A Debtors.

[6]   The defined term "<u>Nominee</u>" shall include each Nominee's agents, including, but not limited to, mailing agents and any other applicable depository, including, but not limited to Euroclear and Clearstream.

C.                         **Form, Content, and Manner of Notices.**

*1.      The Solicitation Package.*

The following materials shall constitute the solicitation package (the "Solicitation Package"):

a.      the entered Disclosure Statement Order (excluding the exhibits, except as set forth below);

b.      the conditionally approved Disclosure Statement (attached as Exhibit 1 to the Disclosure Statement Order) and the exhibits attached thereto, including the Plan;

c.      these Solicitation Procedures (attached as Exhibit 2 to the Disclosure Statement Order);

d.      the applicable form of Ballot, in substantially the form of the Ballots attached as Exhibits 3A, 3B, 3C, 3D, and 3E to the Disclosure Statement Order (including voting instructions with respect thereto and the opportunity to opt out of the release set forth in Article IX.D of the Plan);

e.      the Cover Letter, in substantially the form attached as Exhibit 4 to the Disclosure Statement Order;

f.      the *Notice of Hearing to Consider (I) the Adequacy of the Disclosure Statement and Confirmation of the Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries and (II) Related Voting and Objection Procedures*, substantially in the form attached as Exhibit 8 to the Disclosure Statement Order (the "Combined Hearing Notice");

g.      a pre-addressed, postage pre-paid reply envelope; and

h.      any additional documents that the Court has ordered to be made available to Holders of Claims in the Voting Classes.

*2.      Distribution of the Solicitation Packages.*

The Solicitation Package shall provide the Plan, the Disclosure Statement, and the Disclosure Statement Order (without exhibits) in electronic format (*i.e.*, CD-ROM or flash drive format), and all other contents of the Solicitation Package, including the Solicitation Procedures, the Ballots, the Combined Hearing Notice, and the Cover Letter, shall be provided in paper format. Any party that receives the materials in electronic format but would prefer paper format may contact the Solicitation Agent and request paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense) by: (a) writing to Cineworld Group plc c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn,

3

NY 11232; (b) calling the restructuring hotline at (844) 648-5574 (domestic, toll free) or +1 (845) 295-5705 (international); or (c) emailing cineworldinfo@ra.kroll.com.

The Debtors shall serve, or cause to be served, all of the materials in the Solicitation Package (excluding the Ballots and the Cover Letter) on the U.S. Trustee and all parties who have requested service of papers in this case pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 2002-1 as of the Voting Record Date. In addition, the Debtors shall mail, or cause to be mailed, the Solicitation Package to all Holders of Claims in the Voting Classes who are entitled to vote, as described in section D below, by **April 28, 2023** (or as soon as reasonably practicable thereafter).

To avoid duplication and reduce expenses, the Debtors will use commercially reasonable efforts to ensure that any Holder of a Claim who has filed duplicative Proofs of Claim against a Debtor (whether against the same or multiple Debtors) that are classified under the Plan in the same Voting Class receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claims and with respect to that Class as against that Debtor.

3. *Non-Voting Status Notices and Opt-Out Forms for Unimpaired Classes and Classes Deemed to Reject the Plan.*

    a. Holders of Claims and Interests that are not classified in accordance with section 1123(a)(1) of the Bankruptcy Code or who are not entitled to vote because they are Unimpaired or otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code will receive only the *Notice of Non-Voting Status to Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan and Important Information Regarding Third-Party Releases and Notice of Opt-Out Rights*, substantially in the form attached as Exhibit 5 to the Disclosure Statement Order. Such notice will instruct these Holders as to how they may obtain copies of the documents contained in the Solicitation Package (***excluding*** Ballots), as well as how they may opt out of the third-party release provided by the Plan (the "Third-Party Release").

    b. Holders of Claims and Interests who are not entitled to vote because they are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code will receive only the *Notice of Non-Voting Status to Holders of Impaired Claims and Interests Conclusively Presumed to Reject the Plan and Important Information Regarding Third-Party Releases and Notice of Opt-Out Rights*, substantially in the form attached as Exhibit 6 to the Disclosure Statement Order. Such notice will instruct these Holders as to how they may obtain copies of the documents contained in the Solicitation Package (***excluding*** Ballots), as well as how they may opt out of the Third-Party Release.

4

c.      Holders of Claims that are subject to a pending objection by the Debtors are not entitled to vote the disputed portion of their Claims and will receive only the *Notice of Non-Voting Status with Respect to Disputed Claims and Important Information Regarding Third-Party Releases and Notice of Opt-Out Rights* (a "Disputed Claim Notice"), substantially in the form attached as Exhibit 7 to the Disclosure Statement Order.  Such notice will instruct these Holders as to how they may obtain copies of the documents contained in the Solicitation Package (***excluding*** Ballots), as well as how they may opt out of the Third-Party Release.

d.      Delivery of an opt-out form to the Solicitation Agent by email, facsimile, or other electronic means shall not be valid, with the following exceptions:

    i.      Holders of Claims or Interests entitled to submit an opt-out form may elect to electronically cast, sign, and submit such opt-out form by using the E-Ballot Portal; *provided* that  Holders of Class 9 Interests in Cineworld Parent electing to submit an opt-out form should submit an electronic version of the opt-out form through the E-Ballot Portal or the Opt-Out Portal, as applicable, in accordance with the *Notice of Non-Voting Status to Holders of Impaired Claims and Interests Conclusively Presumed to Reject the Plan and Important Information Regarding Third-Party Releases and Notice of Opt-Out Rights*, attached to the Disclosure Statement Order as Exhibit 6.

**4.**     ***Notices in Respect of Executory Contracts and Unexpired Leases.***

Counterparties to Executory Contracts and Unexpired Leases that receive a *Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtors Pursuant to the Plan, (II) Cure Amounts, if any, and (III) Related Procedures in Connection Therewith*, substantially in the form attached as Exhibit 10 to the Disclosure Statement Order or a *Notice Regarding Executory Contracts and Unexpired Leases to be Rejected Pursuant to the Plan*, substantially in the form attached as Exhibit 11 to the Disclosure Statement Order, respectively, may file an objection to the Debtors' proposed assumption, assumption and assignment, rejection, and/or cure amount(s), as applicable.  Such objections must comply with the procedures set forth in the applicable notice and must be filed with the Court so as to be ***actually received*** on or before **fourteen days after the Filing or service, as applicable, of the Assumption Notice, the Rejection Notice, or the Schedule of Proposed Cure Amounts, as applicable**.

D.                                **Voting and Tabulation Procedures.**

*1.       Holders of Claims Entitled to Vote.*

Only the following Holders of Claims in the Voting Classes shall be entitled to vote on the Plan with regard to such Claims:

a.       Holders of Claims who, on or before the Voting Record Date, have timely filed a Proof of Claim that (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Record Date and (ii) is not the subject of a pending objection filed by the Debtors with the Court at least seven days prior to the Voting Deadline, pending a Resolution Event (as defined herein); *provided* that a Holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall be entitled to vote such Claim in the reduced amount contained in such objection absent a further order of the Court;

b.       Holders of Claims that are listed in the Schedules; *provided* that Claims that are scheduled as wholly contingent, unliquidated, or disputed (excluding such scheduled contingent, unliquidated, or disputed Claims that have been paid or superseded by a timely Filed Proof of Claim) shall be disallowed for voting purposes;

c.       Holders whose Claims arise (i) pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Court, (ii) in an order entered by the Court, or (iii) in a document executed by the Debtors pursuant to authority granted by the Court, in each case regardless of whether a Proof of Claim has been filed;

d.       Holders of any Disputed Claim that have been temporarily allowed to vote on the Plan pursuant to Bankruptcy Rule 3018; and

e.       the assignee of any Claim that was transferred on or before the Voting Record Date by any Entity described in subparagraphs (a) through (d) above; *provided* that such transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date.

*2.       Establishing Claim Amounts for Voting Purposes.*

**Legacy Facilities Claims**.  The Claims amount of Legacy Facilities Claims for voting purposes only will be established based on the amount of the applicable positions held by such Holder, as of the Voting Record Date, as evidenced by the applicable books and records provided, or to be provided, by the applicable administrative agent(s) in electronic Microsoft Excel format

to the Debtors or the Solicitation Agent no later than one Business Day following the Voting Record Date.

**General Unsecured Claims**.  Each Holder of a General Unsecured Claim as of the Voting Record Date shall be entitled to vote the amount of its Claim established in accordance with the procedures set forth below for Filed and Scheduled Claims.

**Filed and Scheduled Claims**.  The Claim amount established herein shall control for voting purposes only and shall not constitute the Allowed amount of any Claim.  Moreover, any amounts filled in on Ballots by the Debtors through the Solicitation Agent, as applicable, are not binding for purposes of allowance and distribution.  In tabulating votes, the following hierarchy shall be used to determine the amount of the Claim associated with each Holder's vote:

a.  the Claim amount (i) settled and/or agreed upon by the Debtors, as reflected in a document filed with the Court, (ii) set forth in an order of the Court, or (iii) set forth in a document executed by the Debtors pursuant to authority granted by the Court;

b.  the Claim amount Allowed (temporarily or otherwise) pursuant to a Resolution Event under section D.3.d of these Solicitation Procedures;

c.  the Claim amount contained in a valid Proof of Claim that has been timely filed by the applicable Claims Bar Date (or deemed timely filed by the Court), except for any amounts asserted on account of any interest accrued after the Petition Date; *provided* that any Ballot cast by a Holder of a Claim who timely files a Proof of Claim in respect of (i) a contingent Claim or a Claim in a wholly unliquidated or unknown amount (based on a reasonable review by the Debtors and/or the Solicitation Agent) that is not the subject of an objection will count toward satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count as a Ballot for a Claim in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code and (ii) a partially liquidated and partially unliquidated Claim will be Allowed for voting purposes only in the liquidated amount; *provided, further*, that to the extent the Claim amount contained in the Proof of Claim is different from the Claim amount set forth in a document filed with the Court as referenced in subparagraph (a) above, the Claim amount in the document filed with the Court shall supersede the Claim amount set forth on the respective Proof of Claim for voting purposes;

d.  the Claim amount listed in the Schedules (to the extent such Claim is not superseded by a timely filed Proof of Claim); *provided* that such Claim is not scheduled as wholly contingent, disputed, or unliquidated and/or has not been paid; *provided, further*, that if the

applicable Claims Bar Date has not expired prior to the Voting Record Date, a Claim listed in the Schedules as contingent, disputed, or unliquidated shall be disallowed for voting purposes;

e.    Proofs of Claim filed for $0.00 are not entitled to vote;

f.    notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased duplicate Claims within the same voting Class shall be provided with only one Solicitation Package and one Ballot for voting a single Claim in such Class, regardless of whether the Debtors have objected to such duplicate Claims;

g.    if a Proof of Claim has been amended by a later Proof of Claim that is filed on or before the Voting Record Date, the later-filed amended Claim shall be entitled to vote in a manner consistent with these Solicitation Procedures, and the earlier-filed Claim shall be disallowed for voting purposes, regardless of whether the Debtors have objected to such amended Claim.  Except as otherwise ordered by the Court, any amendments to Proofs of Claim after the Voting Record Date shall not be considered for purposes of these Solicitation Procedures; and

h.    in the absence of any of the foregoing, such Claim shall be disallowed for voting purposes.

**3.**    ***Resolution of Disputed Claims for Voting Purposes; Resolution Event.***

a.    Absent a further order of the Court or a Resolution Event, the Holder of a Claim in a Voting Class that is the subject of a pending objection by the Debtors on a "reduce and allow" basis that is filed with the Court on or prior to seven days before the Voting Deadline shall be entitled to vote such Claim in the reduced amount contained in such objection.

b.    If a Claim in a Voting Class is subject to an objection by the Debtors (other than a "reduce and allow" objection) that is filed with the Court on or prior to seven days before the Voting Deadline:  (i) the Debtors shall cause the applicable Holder to be served with a Disputed Claim Notice substantially in the form attached as <u>Exhibit 7</u> to the Disclosure Statement Order; and (ii) the applicable Holder shall not be entitled to vote to accept or reject the Plan on account of such Claim unless a Resolution Event occurs as provided herein.

c.    If a Claim in a Voting Class is subject to an objection by the Debtors (other than a "reduce and allow" objection) that is filed with the Court less than seven days before the Voting Deadline, the

applicable Claim shall be deemed temporarily allowed for voting purposes only, without further action by the Holder of such Claim and without further order of the Court, unless the Court orders otherwise.

d.    A "Resolution Event" means the occurrence of one or more of the following events no later than two Business Days prior to the Voting Deadline:

      i.    an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

      ii.    an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

      iii.    a stipulation or other agreement is executed between the Holder of such Claim and the Debtors resolving the objection and allowing such Claim in an agreed-upon amount;[7] or

      iv.    the Debtors' pending objection is voluntarily withdrawn by the objecting party.

e.    No later than two Business Days following the occurrence of a Resolution Event, the Debtors shall cause the Solicitation Agent to distribute via email, hand delivery, or overnight courier service a Solicitation Package and a pre-addressed, postage pre-paid envelope to the relevant Holder to the extent such Holder has not already received a Solicitation Package containing a Ballot that reflects the outcome of the Resolution Event.

### 4.    *Tabulation of Ballots.*

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for

---

[7]    It is not necessary that such stipulation or other agreement be filed with the Court in order for the Solicitation Agent to make corresponding adjustments to tabulation. It will be sufficient for the Debtors' professionals to inform the Solicitation Agent via e-mail of the existence of such stipulation or other agreement, which e-mail shall also include instructions on tabulation of the applicable vote. Debtors' counsel must copy the counterparty to the stipulation or agreement and/or such counterparty's counsel.

completion and submission of Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Local Rules:

a. except as otherwise provided in the Solicitation Procedures, unless the Ballot being furnished is timely submitted and ***actually received*** by the Solicitation Agent on or prior to the Voting Deadline (as the same may be extended by the Debtors), the Debtors shall reject such Ballot as invalid and, therefore, shall not count it in connection with Confirmation of the Plan;

b. the Debtors will file with the Court, by no later than one Business Day prior to the Combined Hearing, a voting report (the "Voting Report"). The Voting Report shall, among other things, indicate the tabulation of acceptances and rejections of the Plan. The Voting Report shall further delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or necessary information, sent by improper means, or damaged (collectively, in each case, the "Irregular Ballots"). The Voting Report shall indicate the Debtors' intentions with regard to each Irregular Ballot;

c. the method of delivery of Ballots to be sent to the Solicitation Agent is at the election and risk of each Holder, and except as otherwise provided, a Ballot will be deemed delivered only when the Solicitation Agent ***actually receives*** the executed and completed Ballot;

d. an executed and completed Ballot is required to be submitted by the Entity submitting such Ballot. Delivery of a Ballot to the Solicitation Agent by facsimile, or any electronic means other than as expressly approved by the Disclosure Statement Order or these Solicitation Procedures, including any exceptions set forth in section B hereof, will not be valid;[8]

e. no Ballot should be sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), or the Debtors' financial or legal advisors, and if so sent, such Ballot will not be counted;

f. if multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last properly

---

[8]   For the avoidance of doubt, Ballots for Class 4, Class 5A, and Class 5B (excluding Master Ballots in Class 5A) may be submitted via the E-Ballot Portal and, solely for Nominees submitting Master Ballots, via electronic mail to the Solicitation Agent at cineworldballots@ra.kroll.com with a reference to "Cineworld Solicitation Ballot" in the subject line.

executed, timely, valid Ballot received by the Solicitation Agent will be deemed to reflect that voter's intent and will supersede and revoke any prior received Ballot;

g. Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split any votes. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted.  Further, to the extent there are multiple Claims within the same Class, the Debtors may, in their discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes;

h. a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a Holder of Claims should indicate such capacity when signing;

i. the Debtors, subject to a contrary order of the Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report;

j. neither the Debtors nor any other Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification;

k. unless waived or as ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the Voting Deadline or such Ballots will not be counted;

l. any Class that contains Claims entitled to vote but for which no votes are returned shall be deemed to have accepted the Plan;

m. in the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

n. subject to any order of the Court, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided* that any such rejections will be documented in the Voting Report;

11

o.      if a Claim has been estimated or otherwise Allowed only for voting purposes by order of the Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

p.      if an objection to a Claim is filed, such Claim shall be treated in accordance with the procedures set forth herein;

q.      the following Ballots shall not be counted in determining the acceptance or rejection of the Plan:  (i) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (iii) any unsigned Ballot or Ballot lacking a signature (for the avoidance of doubt, a Ballot submitted via the E-Ballot Portal shall be deemed to contain a signature); (iv) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan;[9] (v) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein; and (vi) any Ballot submitted by improper means;

r.      after the Voting Deadline, no Ballot may be withdrawn or modified without the prior written consent (email being sufficient) of the Debtors; *provided* that any such withdrawal or modification will be disclosed in the Voting Report;

s.      the Debtors are authorized to enter into stipulations with the Holder of any Claim agreeing to the amount of a Claim for voting purposes;

t.      where any portion of a single Claim has been transferred to a transferee, all Holders of any portion of such single Claim may be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other voting and solicitation procedures set forth herein) and (ii) required to vote every portion of such Claim collectively to accept or reject the Plan.  In the event that (x) a Ballot, (y) a group of Ballots within a Voting Class received from a single creditor, or (z) a group of Ballots received from the various Holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots may not be counted in the Debtors' discretion; and

---

[9]     For the avoidance of doubt, a Holder's election, if any, to opt out of the Third-Party Release will be counted even if such Holder abstains from voting to accept or reject the Plan in the Ballot.

u.    for purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single Holder in a particular Class may be aggregated and treated as if such creditor held one Claim in such Class, and all votes related to such Claim may be treated as a single vote to accept or reject the Plan; *provided, however*, that if separate affiliated Entities, including any funds or accounts that are advised or managed by the same Entity or by affiliated Entities, hold Claims in a particular Class, these Claims will not be aggregated and will not be treated as if such creditor held one Claim in such Class, and the vote of each affiliated Entity or managed fund or account will be counted separately as a vote to accept or reject the Plan.

5.    *Tabulation of Ballots by Holders of Convertible Bonds Claims.*

In addition to the foregoing generally applicable voting and tabulation procedures, the following procedures shall apply with respect to the tabulation of (a) Ballots cast by Nominees for Beneficial Holders of Class 5A General Unsecured Claims Against the Class 5A Debtors (the "Master Ballots") and (b) Ballots directly cast by Beneficial Holders of Class 5A General Unsecured Claims Against the Class 5A Debtors:

a.    the Solicitation Agent shall distribute or cause to be distributed through a Nominee or its agent the appropriate number of copies of Ballots to each Beneficial Holder (a "Beneficial Holder Ballot") of a Convertible Bonds Claim as of the Voting Record Date;[10]

b.    Nominees identified by the Solicitation Agent as Entities through which Beneficial Holders hold their Claims will be provided with (i) Solicitation Packages for each Beneficial Holder represented by the Nominee as of the Voting Record Date, which will contain, among other things, a Beneficial Holder Ballot for each Beneficial Holder, and (ii) a Master Ballot;

c.    any Nominee that is a Holder of record with respect to a Convertible Bonds Claim shall vote on behalf of a Beneficial Holder of such Claim by:  (i) immediately, and in any event within five Business

---

[10]   In accordance with standard procedures for noticing and soliciting Beneficial Holders of Euro-denominated publicly-traded securities, the Solicitation Agent will distribute electronic copies of the Solicitation Packages to Euroclear and Clearstream.  The Solicitation Agent will then direct Euroclear and Clearstream to launch the solicitation of the Euro-denominated Convertible Bonds Claims in Class 5A and disseminate (or cause to be disseminated) to the underlying Beneficial Holders of the Euro-denominated Convertible Bonds electronic versions of the materials in the Solicitation Packages.  The Solicitation Agent will also direct Euroclear and Clearstream to collect the votes of the applicable Beneficial Holders and, in accordance with the Solicitation Procedures, convey such votes to the Solicitation Agent's affiliate in Europe, Kroll Issuer Services, which, in turn, will then forward such voting results to the Solicitation Agent via a Master Ballot.

Days after its receipt of the Solicitation Packages,[11] distributing to all such Beneficial Holders the Solicitation Packages, including Beneficial Holder Ballots, it receives from the Solicitation Agent and a pre-paid return envelope provided by and addressed to the Nominee; (ii) Beneficial Holders then must return the Beneficial Holder Ballots to the Nominees in the manner and by the deadline directed by the Nominee in its instructions[12] accompanying the Beneficial Holder Ballots; (iii) upon receipt of the completed Beneficial Holder Ballots (or other customary and accepted communication conveying a vote), the Nominee will compile and validate the votes and other relevant information of all such Beneficial Holders on the Master Ballot; and (iv) Nominee shall transmit the Master Ballot so that it is ***actually received*** by the Solicitation Agent on or before the Voting Deadline;

d.      any Beneficial Holder Ballot returned to a Nominee by a Beneficial Holder shall not be counted for purposes of accepting or rejecting the Plan until such Nominee properly completes and delivers to the Solicitation Agent a Master Ballot that reflects the vote of such Beneficial Holders on or before the Voting Deadline or otherwise validates the Beneficial Holder Ballot in a manner acceptable to the Solicitation Agent.  Nominees shall retain all Beneficial Holder Ballots returned by Beneficial Holders for a period of one year after the Effective Date of the Plan;

e.      if a Beneficial Holder holds a Convertible Bonds Claim through more than one Nominee or through multiple accounts, such Beneficial Holder may receive more than one Beneficial Holder Ballot and each such Beneficial Holder should execute a separate Beneficial Holder Ballot for each block of Convertible Bonds Claims that it holds through any Nominee and must return each such Beneficial Holder Ballot to the appropriate Nominee;

---

[11]   Solicitation Packages may be sent by the Solicitation Agent to Nominees in paper format or via electronic transmission in accordance with the customary requirements of each Nominee.  Each Nominee will then distribute the Solicitation Packages, as appropriate, in accordance with their customary practices and obtain votes to accept or to reject the Plan also in accordance with their customary practices.  If it is the Nominee's customary and accepted practice to submit a "voting instruction form" to the Beneficial Holders for the purpose of recording the Beneficial Holder's vote, the Nominee will be authorized to send the voting instruction form in lieu of, or in addition to, a Beneficial Holder Ballot.  Moreover, if it is the Nominee's (or Nominee's agent's) customary practice to provide to Beneficial Holders an electronic link to solicitation materials or to otherwise convey the information included therein, the Nominee (or Nominee's agent) is entitled to follow such customary practice in lieu of forwarding the flash drive or paper copies containing the Disclosure Statement and the Plan.  In such instances, the Nominee (or Nominee's agent) may return any excess or unused flash drives or paper copies to the Solicitation Agent.

[12]   The Nominees should provide information regarding the manner and deadline for submission of such Ballots.

f.      votes cast by Beneficial Holders through a Master Ballot submitted by a Nominee (or its agent) will be applied against the positions held by such Nominee in the securities as of the Voting Record Date, as evidenced by the record and depository listings.  Votes submitted by a Nominee (or its agent) will not be counted in excess of the record amount of such securities held by such Nominee; *provided* that the Solicitation Agent may adjust such record amount to reflect the amount in accordance with subparagraph (j) below;

g.      if conflicting votes or "over-votes" are submitted by a Nominee, the Debtors, with the assistance of the Solicitation Agent, will use reasonable efforts to reconcile discrepancies with the Nominee;

h.      if over-votes on a Master Ballot are not reconciled prior to the preparation of the Voting Report, the Debtors shall apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted on the Master Ballot that contained the over-vote, but only to the extent of the Nominee's position, as of the Voting Record Date, of Convertible Bonds Claims;

i.      for the purposes of tabulating votes, each Beneficial Holder shall be deemed (regardless of whether such Holder includes interest in the amount counted on its Ballot) to have voted only the principal amount of its position in the applicable Convertible Bonds Claim; *provided, however*, that the Solicitation Agent may be requested to adjust the principal amount to reflect the corresponding Claim amount;

j.      a single Nominee may complete and deliver to the Solicitation Agent multiple Master Ballots.  Votes reflected on multiple Master Ballots will be counted, except to the extent that they are duplicative of other Master Ballots.  If two or more Master Ballots are inconsistent, the last-dated valid Master Ballot received prior to the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior dated Master Ballot; and

k.      for the avoidance of doubt, (i) the Convertible Bond Trustee is not a Nominee, (ii) the Debtors shall not distribute the Solicitation Packages (or any Ballots) to the Convertible Bond Trustee, and (iii) the Convertible Bond Trustee shall not be responsible for the distribution, completion, tabulation, or return of any such Ballots.

**E.**                  **Amendments to the Plan and Solicitation Procedures.**

The Debtors reserve the right to make non-substantive changes to the Plan, the Disclosure Statement, the Solicitation Procedures, the Ballots, the Cover Letter, the Solicitation Packages,

any notice attached to the Disclosure Statement Order, the Rights Offering Procedures, the Eligible Participant Subscription Form, the Capital Raising Party Subscription Form, and any related documents without further order of the Court, including, without limitation, formatting changes, changes to correct typographical and grammatical errors, if any, and to make conforming changes to the Plan, the Disclosure Statement, and any other materials in the Solicitation Packages prior to distribution.

* * *

**Exhibit 3A**

**Form of Ballot for Holders of Legacy Facilities Claims (Class 4)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) | Case No. 22-90168 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**BALLOT FOR VOTING TO ACCEPT OR REJECT**
**THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**CINEWORLD GROUP PLC AND ITS DEBTOR SUBSIDIARIES**

**BALLOT FOR HOLDERS OF CLASS 4 LEGACY FACILITIES CLAIMS**

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE SOLICITATION AGENT BY JUNE 2, 2023, AT 5:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE"), IN ACCORDANCE WITH THE FOLLOWING:**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1566] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") as set forth in the *Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1567] (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Court") has conditionally approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code by entry of an order on [●], 2023 [Docket No. [●]] (the "Disclosure Statement Order"). The Court's conditional approval of the Disclosure Statement does not indicate approval of the Plan by the Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan or Disclosure Statement Order, as applicable.

You are receiving this ballot (this "Class 4 Ballot") because you are a Holder of a Legacy Facilities Claim (a "Legacy Facilities Claim") as of April 18, 2023 (the "Voting Record Date"). Accordingly, you have a right to execute this Class 4 Ballot and to vote to accept or reject the Plan.

**YOUR VOTE ON THIS CLASS 4 BALLOT WILL BE APPLIED TO EACH DEBTOR AGAINST WHOM YOU HAVE LEGACY FACILITIES CLAIMS.**

Your rights are described in the Disclosure Statement, which is included in the package (the "Solicitation Package") you are receiving with this Class 4 Ballot (as well as the Plan, the Disclosure Statement, the Disclosure Statement

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/cineworld. The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

Order, and certain other materials).  If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them (a) for a fee via PACER at https://ecf.txsb.uscourts.gov/ or (b) at no charge from Kroll Restructuring Administration LLC (the "Solicitation Agent") by:  (i) accessing the Solicitation Agent's website at https://cases.ra.kroll.com/cineworld; (ii) writing to Cineworld Group plc, Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (iii) emailing cineworldinfo@ra.kroll.com; or (iv) calling the Solicitation Agent at (844) 648-5574 (domestic, toll free) or +1 (845) 295-5705 (international).

This Class 4 Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Class 4 Ballot in error, or if you believe you have received the wrong ballot, please contact the Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement, the Plan, and the instructions contained herein before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Legacy Facilities Claim has been placed in Class 4 under the Plan.  If you hold Claims in more than one Class, you will receive a Ballot for each Class in which you are entitled to vote.

**Item 1.**          **Aggregate Amount of Legacy Facilities Claims and Vote on Plan.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of a Legacy Facilities Claim in Class 4.  You may vote to accept or reject the Plan.  You must check the applicable box in the right-hand column below to "accept" or "reject" the Plan for Class 4 in order to have your vote counted.

Please note that you must vote all of your Claims in Class 4 either to accept or reject the Plan.  You may not split your vote.  If you do not indicate that you either accept or reject the Plan by checking the applicable box below, your vote in Class 4 will not be counted.  If you indicate that you both accept and reject the Plan for your Class 4 Claims by checking both boxes below, your Class 4 vote will not be counted.

The Plan, though proposed jointly, constitutes a separate Plan proposed by each Debtor.  Accordingly, your vote cast below will be applied in the same manner and in the same amount against each applicable Debtor.

The Holder of Legacy Facilities Claims in Class 4 votes to (*please check one and only one box*):

| Voting Class | Description | Amount | Vote to Accept or Reject the Plan |
|---|---|---|---|
| Class 4 | Legacy Facilities Claims | $_____ | ☐  ACCEPT (VOTE FOR) THE PLAN ☐  REJECT (VOTE AGAINST) THE PLAN |

**Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated above.**

**Item 2.**          **Important information regarding the Third-Party Release and Opt-Out Rights Under the Plan.**

**Article IX.D of the Plan contains the following provision:**

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, AND RELEASED PARTY FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, AS APPLICABLE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR**

RELATING TO OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS, THE CONVERTIBLE BONDS, THE LEGACY FACILITIES, THE PRIMING FACILITIES, THE MIDWEST FACILITY, THE SETTLEMENT FACILITY, ANY INTERCOMPANY TRANSACTIONS, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, SOLICITATION, NEGOTIATION, ENTRY INTO, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE:  (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, ANY DEFINITIVE DOCUMENT, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR THE RESTRUCTURING TRANSACTIONS, INCLUDING THE EXIT FIRST LIEN FACILITY DOCUMENTS AND THE NEW MONEY REVOLVING CREDIT FACILITY DOCUMENTS; (B) THE RIGHTS OF ANY HOLDER OF ALLOWED CLAIMS OR ALLOWED INTERESTS TO RECEIVE DISTRIBUTIONS UNDER THE PLAN; (C) ANY OBLIGATIONS ARISING UNDER BUSINESS OR COMMERCIAL AGREEMENTS OR ARRANGEMENTS AMONG THE RELEASED PARTIES AND ANY NON-DEBTOR ENTITY; OR (D) THE INTERCHANGE LITIGATION CLAIMS AND ANY OTHER CLAIMS OR CAUSES OF ACTION OF THE ESTATES RELATING TO THE INTERCHANGE LITIGATION.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS:  (I) CONSENSUAL; (II) ESSENTIAL TO THE CONFIRMATION; (III) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS OR CAUSES OF ACTION RELEASED BY THE THIRD-PARTY RELEASE; (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (VI) FAIR, EQUITABLE, AND REASONABLE; (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

**IMPORTANT INFORMATION REGARDING THE RELEASES AND NOTICE OF OPT-OUT RIGHTS:**

**UNDER THE PLAN, "RELEASED PARTIES" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH AGENT; (D) EACH TRUSTEE; (E) EACH ADMINISTRATOR (IF ANY); (F) THE DIP LENDERS; (G) THE CREDITORS' COMMITTEE; (H) EACH CREDITORS' COMMITTEE MEMBER IN ITS CAPACITY AS SUCH; (I) THE CAPITAL RAISING PARTIES; (J) THE CONSENTING CREDITORS; (K) ALL RELEASING PARTIES; AND (L) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (K).**

**UNDER THE PLAN, "RELEASING PARTIES" MEANS COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH AGENT; (D) EACH TRUSTEE; (E) THE DIP LENDERS; (F) THE CREDITORS' COMMITTEE; (G) EACH CREDITORS' COMMITTEE MEMBER IN ITS CAPACITY AS SUCH; (H) THE CAPITAL RAISING PARTIES; (I) THE CONSENTING CREDITORS; (J) ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO ACCEPT THE PLAN; (K) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN; (L) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (M) ALL HOLDERS OF CLAIMS OR INTERESTS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (N) ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO REJECT THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; AND (O) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (N); *PROVIDED* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT:  (I) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (II) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION.**

**NOTWITHSTANDING THE FOREGOING, AN ENTITY SHALL BE NEITHER A RELEASING PARTY NOR A RELEASED PARTY IF IT VALIDLY OPTS OUT OF THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN.**

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN, AS SET FORTH ABOVE.  YOU MAY ELECT NOT TO GRANT THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN <u>ONLY IF</u> YOU (A) CHECK THE BOX BELOW OR (B) TIMELY FILE WITH THE COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN ARTICLE IX OF THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION, SUBJECT TO ANY OBLIGATION YOU MAY HAVE UNDER THE RESTRUCTURING SUPPORT AGREEMENT.  BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.  PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU OPT OUT.

<u>**The Holder of the Class 4 Legacy Facilities Claims identified in Item 1 elects to:**</u>

> ☐  <u>**OPT OUT of the Third-Party Release**</u>

<u>Item 3</u>.          **Certifications.**

By signing this Class 4 Ballot, the undersigned certifies to the Court and the Debtors that:

      (a)        as of the Voting Record Date, either:  (i) the Entity is the Holder of the Legacy Facilities Claims being voted pursuant to this Class 4 Ballot; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Legacy Facilities Claims being voted pursuant to this Class 4 Ballot;

      (b)        the Entity (or in the case of an authorized signatory, the Holder) has received the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

      (c)        the Entity has cast the same vote with respect to all its Class 4 Legacy Facilities Claims; and

      (d)        no other Class 4 Ballots with respect to the amount of the Legacy Facilities Claims identified in Item 1 have been cast or, if any other Class 4 Ballots have been cast with respect to such Legacy Facilities Claims, then any such earlier Class 4 Ballots are hereby revoked.

| | |
|---|---|
| Name of Holder: | _____ |
| | (Print or Type) |
| Signature: | _____ |
| Name of Signatory: | _____ |
| | (If other than the Holder) |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone Number: | _____ |
| Email: | _____ |
| Date Completed: | _____ |

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS BALLOT ON OR BEFORE JUNE 2, 2023, AT 5:00 P.M., PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS, SUBJECT TO DISCLOSURE THEREOF IN THE VOTING REPORT.**

**PLEASE SUBMIT YOUR BALLOT BY ONE OF THE FOLLOWING TWO METHODS:**

<u>Via Paper Ballot</u>.  Complete, sign, and date this Ballot and return it (with a signature) promptly via first class mail (or in the enclosed reply envelope provided), overnight courier, or hand delivery to:

**Cineworld Group plc**
**Ballot Processing**
**c/o Kroll Restructuring Administration LLC**
**850 Third Avenue,**
**Suite 412**
**Brooklyn, NY 11232**

<u>**If you would like to coordinate hand delivery of your Ballot, please**
**email cineworldballots@ra.kroll.com and provide the anticipated date**
**and time of your delivery.**</u>

*-OR-*

<u>Via E-Ballot Portal</u>.   Submit your Ballot via the Solicitation Agent's online portal, by visiting <u>https://cases.ra.kroll.com/cineworld</u> (the "<u>E-Ballot Portal</u>").  Click on the "E-Ballot" section of the website and follow the instructions to submit your Ballot.

**IMPORTANT NOTE:**  You will need the following information to retrieve and submit your customized electronic Ballot:

**Unique E-Ballot ID#:**_____

The Solicitation Agent's E-Ballot Portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims or Interests described in Item 1 of your electronic Ballot.  Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the E-Ballot Portal should NOT also submit a paper Ballot.

---

IF THE CLAIMS AND NOTICE AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 4 BALLOT ON OR BEFORE JUNE 2, 2023, AT 5:00 P.M., PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 4 BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS, SUBJECT TO DISCLOSURE THEREOF IN THE VOTING REPORT.

---

## INSTRUCTIONS FOR COMPLETING THIS CLASS 4 BALLOT

1.      The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as Exhibit A to the Disclosure Statement.  Capitalized terms used in the Class 4 Ballot or in these instructions but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 4 Ballot, or the Disclosure Statement Order, as applicable.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.      The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one Class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3.      To ensure that your Class 4 Ballot is counted, you *must* complete and submit this Ballot as instructed herein. **Ballots will not be accepted by electronic mail or facsimile.**

4.      **Use of Ballot.**  To ensure that your Class 4 Ballot is counted, you must:  (a) complete your Class 4 Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 1 of the Class 4 Ballot; and (c) clearly sign and submit your Class 4 Ballot as instructed herein.

5.      Your Class 4 Ballot *must* be returned to the Solicitation Agent so as to be *actually received* by the Solicitation Agent on or before the Voting Deadline.  **The Voting Deadline is June 2, 2023, at 5:00 p.m., prevailing Central Time.**

6.      If a Class 4 Ballot is received after the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the sole and absolute discretion of the Debtors.  Additionally, **the following Class 4 Ballots will *not* be counted**:

        (a)     any Class 4 Ballot that partially rejects and partially accepts the Plan;

        (b)     any Class 4 Ballot sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), any agent, indenture trustee, or the Debtors' financial or legal advisors;

        (c)     any Class 4 Ballot sent by electronic mail or facsimile;

        (d)     any Class 4 Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

        (e)     any Class 4 Ballot cast by an Entity that does not hold a Legacy Facilities Claim as of the Voting Record Date;

        (f)     any Class 4 Ballot submitted by a Holder not entitled to vote pursuant to the Plan;

        (g)     any unsigned Class 4 Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed signed); and/or

        (i)     any Class 4 Ballot not marked to accept or reject the Plan or any Class 4 Ballot marked both to accept and reject the Plan.[2]

---

[2]     For the avoidance of doubt, your election, if any, to opt out of the Third-Party Release will be counted even if you abstain from voting to accept or reject the Plan in this Ballot.  The election to withhold consent to grant the Third-Party Release is at your option, subject to any obligation you may have under the Restructuring Support

7.  The method of delivery of Class 4 Ballots to the Solicitation Agent is at the election and risk of each Holder of a Legacy Facilities Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Solicitation Agent *actually receives* the originally executed Class 4 Ballot.  In all cases, Holders should allow sufficient time to assure timely delivery.

8.  If multiple Class 4 Ballots are received from the same Holder of Legacy Facilities Claims with respect to the same Legacy Facilities Claim prior to the Voting Deadline, the latest, timely received, and properly completed Class 4 Ballot will supersede and revoke any earlier received Class 4 Ballots.

9.  You must vote all of your Legacy Facilities Claims within Class 4 either to accept or reject the Plan and may *not* split your vote.

10. This Class 4 Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

11. **Please be sure to sign and date your Class 4 Ballot**.  If you are signing a Class 4 Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Solicitation Agent, the Debtors, or the Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 4 Ballot.

12. If you hold Claims in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes **only** your Claims indicated on that ballot, so please complete and return each ballot that you receive.

## PLEASE SUBMIT YOUR CLASS 4 BALLOT PROMPTLY

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 4 BALLOT,
THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE RESTRUCTURING HOTLINE AT:**

**TOLL FREE:  (844) 648-5574**

**INTERNATIONAL:  +1 (845) 295-5705**

**OR EMAIL:  cineworldinfo@ra.kroll.com (please reference "Cineworld" in the subject line)**

> **IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS ON JUNE 2, 2023, AT 5:00 P.M., PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE DEBTORS, SUBJECT TO DISCLOSURE THEREOF IN THE VOTING REPORT.**

---

Agreement (as defined in the Plan).

**Exhibit 3B**

**Form of Ballot for Holders of General Unsecured Claims
Against the Class 5A Debtors (Class 5A)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) | Case No. 22-90168 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**BALLOT FOR VOTING TO ACCEPT OR REJECT**
**THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**CINEWORLD GROUP PLC AND ITS DEBTOR SUBSIDIARIES**

**BALLOT FOR HOLDERS OF CLASS 5A GENERAL**
**UNSECURED CLAIMS AGAINST THE CLASS 5A DEBTORS**

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE SOLICITATION AGENT BY JUNE 2, 2023, AT 5:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE"), IN ACCORDANCE WITH THE FOLLOWING:**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1566] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") as set forth in the *Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1567] (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Court") has conditionally approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code by entry of an order on [●], 2023 [Docket No. [●]] (the "Disclosure Statement Order"). The Court's conditional approval of the Disclosure Statement does not indicate approval of the Plan by the Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan or Disclosure Statement, as applicable.

You are receiving this ballot (this "Class 5A Ballot") because you are a Holder of a General Unsecured Claim against a Class 5A Debtor (a "Class 5A General Unsecured Claim") as of April 18, 2023 (the "Voting Record Date"). Accordingly, you have a right to execute this Class 5A Ballot and to vote to accept or reject the Plan.

**YOUR VOTE ON THIS CLASS 5A BALLOT WILL BE APPLIED TO EACH DEBTOR AGAINST WHOM YOU HAVE CLASS 5A GENERAL UNSECURED CLAIMS.**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/cineworld. The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

Your rights are described in the Disclosure Statement, which is included in the package (the "Solicitation Package") you are receiving with this Class 5A Ballot (as well as the Plan, the Disclosure Statement, the Disclosure Statement Order, and certain other materials).  If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them (a) for a fee via PACER at https://ecf.txsb.uscourts.gov/ or (b) at no charge from Kroll Restructuring Administration LLC (the "Solicitation Agent") by:  (i) accessing the Solicitation Agent's website at https://cases.ra.kroll.com/cineworld; (ii) writing to Cineworld Group plc, Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (iii) emailing cineworldinfo@ra.kroll.com; or (iv) calling the Solicitation Agent at (844) 648-5574 (domestic, toll free) or +1 (845) 295-5705 (international).

This Class 5A Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Class 5A Ballot in error, or if you believe you have received the wrong ballot, please contact the Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement, the Plan, and the instructions contained herein before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Class 5A General Unsecured Claim has been placed in Class 5A under the Plan.  If you hold Claims in more than one Class, you will receive a Ballot for each Class in which you are entitled to vote.

**Item 1.  Aggregate Amount of Class 5A General Unsecured Claims and Vote on Plan.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of a Class 5A General Unsecured Claim.  You may vote to accept or reject the Plan.  You must check the applicable box in the right-hand column below to "accept" or "reject" the Plan for Class 5A in order to have your vote counted.

Please note that you must vote all of your Claims in Class 5A either to accept or reject the Plan.  You may not split your vote.  If you do not indicate that you either accept or reject the Plan by checking the applicable box below, your vote in Class 5A will not be counted.  If you indicate that you both accept and reject the Plan for your Class 5A Claims by checking both boxes below, your Class 5A vote will not be counted.

The Plan, though proposed jointly, constitutes a separate Plan proposed by each Debtor.  Accordingly, your vote will be applied against the applicable Debtor referenced below.

The Holder of Class 5A General Unsecured Claims in Class 5A votes to (*please check one and only one box*):

| Voting Class | Description | Amount | Debtor | Vote to Accept or Reject the Plan |
|---|---|---|---|---|
| Class 5A | Class 5A General Unsecured Claims | $_____ | _____ | ☐  ACCEPT (VOTE FOR) THE PLAN<br>☐  REJECT (VOTE AGAINST) THE PLAN |

**Item 2.        Important information regarding the Third-Party Release and Opt-Out Rights Under the Plan.**

**Article IX.D of the Plan contains the following provision:**

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, AND RELEASED PARTY FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, AS APPLICABLE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS**

(INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS, THE CONVERTIBLE BONDS, THE LEGACY FACILITIES, THE PRIMING FACILITIES, THE MIDWEST FACILITY, THE SETTLEMENT FACILITY, ANY INTERCOMPANY TRANSACTIONS, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, SOLICITATION, NEGOTIATION, ENTRY INTO, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE:  (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, ANY DEFINITIVE DOCUMENT, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR THE RESTRUCTURING TRANSACTIONS, INCLUDING THE EXIT FIRST LIEN FACILITY DOCUMENTS AND THE NEW MONEY REVOLVING CREDIT FACILITY DOCUMENTS; (B) THE RIGHTS OF ANY HOLDER OF ALLOWED CLAIMS OR ALLOWED INTERESTS TO RECEIVE DISTRIBUTIONS UNDER THE PLAN; (C) ANY OBLIGATIONS ARISING UNDER BUSINESS OR COMMERCIAL AGREEMENTS OR ARRANGEMENTS AMONG THE RELEASED PARTIES AND ANY NON-DEBTOR ENTITY; OR (D) THE INTERCHANGE LITIGATION CLAIMS AND ANY OTHER CLAIMS OR CAUSES OF ACTION OF THE ESTATES RELATING TO THE INTERCHANGE LITIGATION.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS:  (I) CONSENSUAL; (II) ESSENTIAL TO THE CONFIRMATION; (III) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS OR CAUSES OF ACTION RELEASED BY THE THIRD-PARTY RELEASE; (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (VI) FAIR, EQUITABLE, AND REASONABLE; (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

4

**IMPORTANT INFORMATION REGARDING THE RELEASES AND NOTICE OF OPT-OUT RIGHTS:**

**UNDER THE PLAN, "RELEASED PARTIES" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH AGENT; (D) EACH TRUSTEE; (E) EACH ADMINISTRATOR (IF ANY); (F) THE DIP LENDERS; (G) THE CREDITORS' COMMITTEE; (H) EACH CREDITORS' COMMITTEE MEMBER IN ITS CAPACITY AS SUCH; (I) THE CAPITAL RAISING PARTIES; (J) THE CONSENTING CREDITORS; (K) ALL RELEASING PARTIES; AND (L) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (K).**

**UNDER THE PLAN, "RELEASING PARTIES" MEANS COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH AGENT; (D) EACH TRUSTEE; (E) THE DIP LENDERS; (F) THE CREDITORS' COMMITTEE; (G) EACH CREDITORS' COMMITTEE MEMBER IN ITS CAPACITY AS SUCH; (H) THE CAPITAL RAISING PARTIES; (I) THE CONSENTING CREDITORS; (J) ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO ACCEPT THE PLAN; (K) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN; (L) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (M) ALL HOLDERS OF CLAIMS OR INTERESTS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (N) ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO REJECT THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; AND (O) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (N); *PROVIDED* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT:  (I) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (II) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION.**

**NOTWITHSTANDING THE FOREGOING, AN ENTITY SHALL BE NEITHER A RELEASING PARTY NOR A RELEASED PARTY IF IT VALIDLY OPTS OUT OF THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN.**

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN, AS SET FORTH ABOVE.  YOU MAY ELECT NOT TO GRANT THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN <u>ONLY IF</u> YOU (A) CHECK THE BOX BELOW OR (B) TIMELY FILE WITH THE COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN ARTICLE IX OF THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION.  BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.  PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU OPT OUT.

<u>**The Holder of the Class 5A General Unsecured Claims identified in Item 1 elects to:**</u>

> ☐  <u>**OPT OUT of the Third-Party Release**</u>

**Item 3**.           **Certifications.**

By signing this Class 5A Ballot, the undersigned certifies to the Court and the Debtors that:

(a)        as of the Voting Record Date, either:  (i) the Entity is the Holder of the Class 5A General Unsecured Claims being voted pursuant to this Class 5A Ballot; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Class 5A General Unsecured Claims being voted pursuant to this Class 5A Ballot;

(b)        the Entity (or in the case of an authorized signatory, the Holder) has received the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c)        the Entity has cast the same vote with respect to all its Class 5A General Unsecured Claims; and

(d)        no other Class 5A Ballots with respect to the amount of the Class 5A General Unsecured Claims identified in Item 1 have been cast or, if any other Class 5A Ballots have been cast with respect to such Class 5A General Unsecured Claims, then any such earlier Class 5A Ballots are hereby revoked.

| | |
|---|---|
| Name of Holder: | _____ |
| | (Print or Type) |
| Signature: | _____ |
| Name of Signatory: | _____ |
| | (If other than the Holder) |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone Number: | _____ |
| Email: | _____ |
| Date Completed: | _____ |
| | |

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS BALLOT ON OR BEFORE JUNE 2, 2023, AT 5:00 P.M., PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS, SUBJECT TO DISCLOSURE THEREOF IN THE VOTING REPORT.**

**PLEASE SUBMIT YOUR BALLOT BY ONE OF THE FOLLOWING TWO METHODS:**

**Via Paper Ballot**.  Complete, sign, and date this Ballot and return it (with a signature) promptly via first class mail (or in the enclosed reply envelope provided), overnight courier, or hand delivery to:

**Cineworld Group plc**
**Ballot Processing**
**c/o Kroll Restructuring Administration LLC**
**850 Third Avenue,**
**Suite 412**
**Brooklyn, NY 11232**

**If you would like to coordinate hand delivery of your Ballot, please**
**email cineworldballots@ra.kroll.com and provide the anticipated date**
**and time of your delivery.**

*-OR-*

**Via E-Ballot Portal**.   Submit your Ballot via the Solicitation Agent's online portal, by visiting **https://cases.ra.kroll.com/cineworld** (the "**E-Ballot Portal**").  Click on the "E-Ballot" section of the website and follow the instructions to submit your Ballot.

**IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:_____**

**The Solicitation Agent's E-Ballot Portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.**

**Each E-Ballot ID# is to be used solely for voting only those Claims or Interests described in Item 1 of your electronic Ballot.  Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.**

**Creditors who cast a Ballot using the E-Ballot Portal should NOT also submit a paper Ballot.**

---

IF THE CLAIMS AND NOTICE AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 5A BALLOT ON OR BEFORE JUNE 2, 2023, AT 5:00 P.M., PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 5A BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS, SUBJECT TO DISCLOSURE THEREOF IN THE VOTING REPORT.

---

## INSTRUCTIONS FOR COMPLETING THIS CLASS 5A BALLOT

1.  The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as Exhibit A to the Disclosure Statement.  Capitalized terms used in the Class 5A Ballot or in these instructions but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 5A Ballot, or the Disclosure Statement Order, as applicable.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.  The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one Class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3.  To ensure that your Class 5A Ballot is counted, you *must* complete and submit this Ballot as instructed herein. **Ballots will not be accepted by electronic mail or facsimile.**

4.  **Use of Ballot.**  To ensure that your Class 5A Ballot is counted, you must:  (a) complete your Class 5A Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 1 of the Class 5A Ballot; and (c) clearly sign and submit your Class 5A Ballot as instructed herein.

5.  Your Class 5A Ballot *must* be returned to the Solicitation Agent so as to be *actually received* by the Solicitation Agent on or before the Voting Deadline.  **The Voting Deadline is June 2, 2023, at 5:00 p.m., prevailing Central Time.**

6.  If a Class 5A Ballot is received after the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the sole and absolute discretion of the Debtors.  Additionally, **the following Class 5A Ballots will *not* be counted**:

    (a)  any Class 5A Ballot that partially rejects and partially accepts the Plan;

    (b)  any Class 5A Ballot sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), any agent, indenture trustee, or the Debtors' financial or legal advisors;

    (c)  any Class 5A Ballot sent by electronic mail or facsimile;

    (d)  any Class 5A Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

    (e)  any Class 5A Ballot cast by an Entity that does not hold a Class 5A General Unsecured Claim as of the Voting Record Date;

    (f)  any Class 5A Ballot submitted by a Holder not entitled to vote pursuant to the Plan;

    (g)  any unsigned Class 5A Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed signed); and/or

    (i)  any Class 5A Ballot not marked to accept or reject the Plan or any Class 5A Ballot marked both to accept and reject the Plan.[2]

---

[2]  For the avoidance of doubt, your election, if any, to opt out of the Third-Party Release will be counted even if you abstain from voting to accept or reject the Plan in this Ballot.

7.      The method of delivery of Class 5A Ballots to the Solicitation Agent is at the election and risk of each Holder of a Class 5A General Unsecured Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Solicitation Agent ***actually receives*** the originally executed Class 5A Ballot.  In all cases, Holders should allow sufficient time to assure timely delivery.

8.      If multiple Class 5A Ballots are received from the same Holder of Class 5A General Unsecured Claims with respect to the same Class 5A General Unsecured Claim prior to the Voting Deadline, the latest, timely received, and properly completed Class 5A Ballot will supersede and revoke any earlier received Class 5A Ballots.

9.      You must vote all of your Class 5A General Unsecured Claims within Class 5A either to accept or reject the Plan and may ***not*** split your vote.

10.     This Class 5A Ballot does ***not*** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

11.     **Please be sure to sign and date your Class 5A Ballot**.  If you are signing a Class 5A Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Solicitation Agent, the Debtors, or the Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 5A Ballot.

12.     If you hold Claims in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes **only** your Claims indicated on that ballot, so please complete and return each ballot that you receive.

**PLEASE SUBMIT YOUR CLASS 5A BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 5A BALLOT,**
**THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING,**
**PLEASE CALL THE RESTRUCTURING HOTLINE AT:**

**TOLL FREE:  (844) 648-5574**

**INTERNATIONAL:  +1 (845) 295-5705**

**OR EMAIL:  cineworldinfo@ra.kroll.com (please reference "Cineworld" in the subject line)**

---

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS ON JUNE 2, 2023, AT 5:00 P.M., PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE DEBTORS, SUBJECT TO DISCLOSURE THEREOF IN THE VOTING REPORT.**

---

**Exhibit 3C**

**Form of Master Ballot for Holders of Class 5A General Unsecured Claims (Class 5A)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| | ) |
| In re: | )    Chapter 11 |
| | ) |
| CINEWORLD GROUP PLC, *et al.*,[1] | )    Case No. 22-90168 (MI) |
| | ) |
| Debtors. | )    (Jointly Administered) |
| | ) |

**MASTER BALLOT FOR VOTING TO ACCEPT OR
REJECT THE JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF CINEWORLD GROUP PLC AND ITS DEBTOR SUBSIDIARIES**

**MASTER BALLOT FOR HOLDERS OF CLASS 5A GENERAL UNSECURED CLAIMS**

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS MASTER BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE SOLICITATION AGENT BY JUNE 2, 2023, AT 5:00 P.M., PREVAILING CENTRAL TIME (THE "<u>VOTING DEADLINE</u>"), IN ACCORDANCE WITH THE FOLLOWING:**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), are soliciting votes with respect to the *Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1566] (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>") as set forth in the *Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1567] (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Disclosure Statement</u>").  The Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has conditionally approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code by entry of an order on [●], 2023 [Docket No. [●]] (the "<u>Disclosure Statement Order</u>").  The Court's conditional approval of the Disclosure Statement does not indicate approval of the Plan by the Court.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan or the Disclosure Statement, as applicable.

You are receiving this master ballot (this "<u>Master Ballot</u>") because you are the Nominee (as defined herein) of a Beneficial Holder[2] of the Class 5A General Unsecured Claims indicated on **<u>Schedule A</u>** hereto as of April 18, 2023 (the "<u>Voting Record Date</u>").

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/cineworld.  The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

[2]    A "<u>Beneficial Holder</u>" means a beneficial owner of publicly-traded securities whose Claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Court order or otherwise, as reflected in the records maintained by the Nominees or other applicable depository, including, but not limited to, Euroclear and Clearstream.

**This Master Ballot is to be used by you as a broker, bank, or other nominee; or as the agent of a broker, bank, other nominee, or other applicable depository, including, but not limited to Euroclear and Clearsteam (each of the foregoing, a "Nominee"); or as the proxy holder of a Nominee for certain Beneficial Holders of Claims indicated on Schedule A hereto, to transmit to the Solicitation Agent (as defined below) the votes of such Beneficial Holders in respect of their Claims to accept or reject the Plan.  This Master Ballot is also to be used by the Solicitation Agent's affiliate, Kroll Issuer Services, to forward the results of voting as collected through the non-U.S. Securities depositaries, such as Euroclear and Clearstream, to the Solicitation Agent pursuant to the Solicitation Procedures.**

The rights and treatment for each Class are described in the Disclosure Statement, which is included in the package (the "Solicitation Package") you are receiving with this Master Ballot (as well as the Plan, the Disclosure Statement, the Disclosure Statement Order, and certain other materials).  If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them (a) for a fee via PACER at https://ecf.txsb.uscourts.gov/ or (b) at no charge from Kroll Restructuring Administration LLC (the "Solicitation Agent") by:  (i) accessing the Solicitation Agent's website at https://cases.ra.kroll.com/cineworld; (ii) writing to Cineworld Group plc, Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (iii) emailing cineworldinfo@ra.kroll.com; or (iv) calling the Solicitation Agent at (844) 648-5574 (domestic, toll free) or +1 (845) 295-5705 (international).

This Master Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Master Ballot in error, or if you believe you have received the wrong ballot, please contact the Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

**The votes transmitted on this Master Ballot for certain Beneficial Holders of Claims in the Classes indicated on Schedule A shall be applied to each Debtor against whom such Beneficial Holders have a Claim.**

You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot (as defined below), and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.

You should review the Disclosure Statement, the Plan, and the instructions contained herein before you transmit votes. You or the Beneficial Holders of the Claims for whom you are the Nominee may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of such Claims.

The Court may confirm the Plan and thereby bind all Holders of Claims or Interests.  To have the votes of your Beneficial Holders count as either an acceptance or rejection of the Plan, you must complete and return this Master Ballot so that the Solicitation Agent *actually receives* it on or before the Voting Deadline.

**The Voting Deadline is on June 2, 2023, at 5:00 p.m., prevailing Central Time.**

**Item 1.        Certification of Authority to Vote.**

The undersigned certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

☐   Is a broker, bank, or other nominee for the Beneficial Holders of the aggregate principal amount of the Claims listed in Item 2 below, and is the record holder of such bonds; or

☐   Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by a broker, bank, or other nominee that is the registered holder of the aggregate principal amount of Claims listed in Item 2 below; or

☐ Has been granted a proxy (an original of which is attached hereto) from a broker, bank, or other nominee, or a beneficial owner, that is the registered holder of the aggregate principal amount of Claims listed in Item 2 below;

and accordingly has full power and authority to vote to accept or reject the Plan, on behalf of the Beneficial Holders of the Claims described in Item 2.

<u>**Item 2.**</u>          **Claims Vote on Plan:**

The undersigned transmits the following votes of Beneficial Holders of Class 5A General Unsecured Claims in Class 5A indicated on <u>**Schedule A**</u> hereto and certifies that the following Beneficial Holders of such Claims, as identified by their respective customer account numbers set forth below, are the Beneficial Holders of such Claims as of the Voting Record Date and have delivered to the undersigned, as Nominee, properly executed ballots (the "<u>Beneficial Holder Ballots</u>") casting such votes as indicated and containing instructions for the casting of those votes on their behalf.  For purposes of this Master Ballot, accrued or unmatured interest should not be included.

Indicate in the appropriate column below the aggregate principal amount voted for each account or attach such information to this Master Ballot in the form of the following table.  Please note that each Holder must vote all such Beneficial Holder's Claims to accept or reject the Plan and may not split such vote.  Any Beneficial Holder Ballot executed by the Beneficial Holder that does not indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

The Plan, though proposed jointly, constitutes a separate Plan proposed by each Debtor.  Accordingly, any Beneficial Holder's vote cast below will be applied in the same manner and in the same amount against each applicable Debtor.

(Please complete the information requested below.  Attach additional sheets if necessary.)

| **Your Customer Account Number for Each Beneficial Holder of Claims** | **Principal Amount Held as of Voting Record Date** | <u>**Item 2**</u> **Indicate the vote cast on the Beneficial Holder Ballot by checking the appropriate box below.** | | | <u>**Item 3**</u> <u>**Check the box below if the Beneficial Holder checked the box in Item 2 of their Ballot**</u> |
|---|---|---|---|---|---|
| | | **Accept the Plan** | **or** | **Reject the Plan** | **Opt Out of the Third-Party Release** |
| 1 | $ | ☐ | | ☐ | ☐ |
| 2 | $ | ☐ | | ☐ | ☐ |
| 3 | $ | ☐ | | ☐ | ☐ |
| 4 | $ | ☐ | | ☐ | ☐ |
| 5 | $ | ☐ | | ☐ | ☐ |
| 6 | $ | ☐ | | ☐ | ☐ |
| **TOTALS** | $ | | | | |

<u>**Item 3.**</u>          **Other Ballots Submitted by Beneficial Holders in the Same Class.**

The undersigned certifies that it has transcribed in the following table the information, if any, provided by the Beneficial Holders in Item 3 of the Beneficial Holder Ballot:

(Please complete the information requested below.  Attach additional sheets if necessary.)

3

| Customer Account Number and/or Customer Name for Each Beneficial Holder who completed Item 3 of the Beneficial Holder Ballot | Transcribe from Item 3 of the Beneficial Holder Ballot | | | | |
|---|---|---|---|---|---|
| | Your Name or Customer Account Number for Other Account for Which a Ballot Has Been Submitted | Name of Registered Holder or Nominee (if applicable) | Principal Amount of Other Class 5A Claims Voted | ISIN of Other Class Claim Votes | Vote (Accept or Reject) |
| 1. | | | $ | | |
| 2. | | | $ | | |
| 3. | | | $ | | |
| 4. | | | $ | | |
| 5. | | | $ | | |

**Item 4.**        **Important information regarding the Third-Party Release and Opt-Out Rights Under the Plan.**

**Article IX.D of the Plan contains the following provision**:

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, AND RELEASED PARTY FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, AS APPLICABLE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS, THE CONVERTIBLE BONDS, THE LEGACY FACILITIES, THE PRIMING FACILITIES, THE MIDWEST FACILITY, THE SETTLEMENT FACILITY, ANY INTERCOMPANY TRANSACTIONS, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, SOLICITATION, NEGOTIATION, ENTRY INTO, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.**

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE:  (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, ANY DEFINITIVE DOCUMENT, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR THE RESTRUCTURING TRANSACTIONS, INCLUDING THE EXIT FIRST LIEN FACILITY DOCUMENTS AND THE NEW MONEY REVOLVING CREDIT FACILITY DOCUMENTS; (B) THE RIGHTS OF ANY HOLDER OF ALLOWED CLAIMS OR ALLOWED INTERESTS TO RECEIVE DISTRIBUTIONS UNDER THE PLAN; (C) ANY OBLIGATIONS ARISING UNDER BUSINESS OR COMMERCIAL AGREEMENTS OR ARRANGEMENTS AMONG THE RELEASED PARTIES AND ANY NON-DEBTOR ENTITY; OR (D) THE INTERCHANGE LITIGATION CLAIMS AND ANY OTHER CLAIMS OR CAUSES OF ACTION OF THE ESTATES RELATING TO THE INTERCHANGE LITIGATION.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS:  (I) CONSENSUAL; (II) ESSENTIAL TO THE CONFIRMATION; (III) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS OR CAUSES OF ACTION RELEASED BY THE THIRD-PARTY RELEASE; (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (VI) FAIR, EQUITABLE, AND REASONABLE; (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

IMPORTANT INFORMATION REGARDING THE RELEASES AND NOTICE OF OPT-OUT RIGHTS:

UNDER THE PLAN, "RELEASED PARTIES" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH AGENT; (D) EACH TRUSTEE; (E) EACH ADMINISTRATOR (IF ANY); (F) THE DIP LENDERS; (G) THE CREDITORS' COMMITTEE; (H) EACH CREDITORS' COMMITTEE MEMBER IN ITS CAPACITY AS SUCH; (I) THE CAPITAL RAISING PARTIES; (J) THE CONSENTING CREDITORS; (K) ALL RELEASING PARTIES; AND (L) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (K).

UNDER THE PLAN, "RELEASING PARTIES" MEANS COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH AGENT; (D) EACH TRUSTEE; (E) THE DIP LENDERS; (F) THE CREDITORS' COMMITTEE; (G) EACH CREDITORS' COMMITTEE MEMBER IN ITS CAPACITY AS SUCH; (H) THE CAPITAL RAISING PARTIES; (I) THE CONSENTING CREDITORS; (J) ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO ACCEPT THE PLAN; (K) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN; (L) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (M) ALL HOLDERS OF CLAIMS OR INTERESTS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (N) ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO REJECT THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; AND (O) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (N); *PROVIDED* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT:  (I) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (II) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION.

**NOTWITHSTANDING THE FOREGOING, AN ENTITY SHALL BE NEITHER A RELEASING PARTY NOR A RELEASED PARTY IF IT VALIDLY OPTS OUT OF THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN.**

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN, AS SET FORTH ABOVE.  YOU MAY ELECT NOT TO GRANT THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN <u>ONLY IF</u> YOU (A) CHECK THE BOX BELOW OR (B) TIMELY FILE WITH THE COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN ARTICLE IX OF THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION.  BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.  PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU OPT OUT.

<u>Item 5</u>.　　　　**Certifications.**

By signing this Master Ballot, the undersigned certifies to the Court and the Debtors that:

(a)　　it has received a copy of the Disclosure Statement, the Plan, the Master Ballot, the Beneficial Holder Ballots, and the remainder of the Solicitation Package and has delivered the same to the Beneficial Holders of the Claims listed in Item 2 above;

(b)　　it has received a completed and signed Beneficial Holder Ballot (or other accepted and customary method of communicating a vote) from each Beneficial Holder listed in Item 2 of this Master Ballot;

(c)　　it is the registered holder of all the Claims listed in Item 2 above being voted, or it has been authorized by each Beneficial Holder of the Claims listed in Item 2 above to vote on the Plan;

(d)　　no other Master Ballots with respect to the same Claims identified in Item 2 have been cast or, if any other Master Ballots have been cast with respect to such Claims, then any such earlier received Master Ballots are hereby revoked;

(e)　　it has properly disclosed:　 (i) the number of Beneficial Holders of Claims who completed the Beneficial Holder Ballots; (ii) the respective amounts of the Claims owned, as the case may be, by each Beneficial Holder of the Claims who completed a Beneficial Holder Ballot; (iii) each such Beneficial Holder's respective vote concerning the Plan; (iv) each such Beneficial Holder's certification as to other Claims voted in the same Class; and (v) the customer account or other identification number for each such Beneficial Holder; and

(f)　　it will maintain Beneficial Holder Ballots and evidence of separate transactions returned by Beneficial Holders of Claims (whether properly completed or defective) for at least one year after the Effective Date of the Plan and disclose all such information to the Court or the Debtors, if so ordered.

| | |
|---|---|
| Name of Nominee: | |
| | *(Print or Type)* |
| Name of Proxy Holder or Agent for Nominee (if applicable): | |
| | |
| | *(Print or Type)* |
| Signature: | |
| Name of Signatory: | |
| Title: | |
| Address | |
| | |
| | |
| Date Completed: | |
| Email Address: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS MASTER BALLOT AND
RETURN IT (WITH A SIGNATURE)** *PROMPTLY* **IN THE ENVELOPE PROVIDED VIA FIRST CLASS
MAIL, OVERNIGHT COURIER, HAND DELIVERY, OR VIA ELECTRONIC MAIL SERVICE TO:**

**PREFERRED METHOD**

**cineworldballots@ra.kroll.com**
**(Please reference "Cineworld Master Ballot" in the subject line)**

*-OR-*

**If by First Class mail, overnight courier, or hand delivery:**

**Cineworld Group plc**
**Ballot Processing**
**c/o Kroll Restructuring Administration LLC**
**850 Third Avenue,**
**Suite 412**
**Brooklyn, NY 11232**

**If you would like to coordinate hand delivery of your Master Ballot,
please email Cineworldballots@ra.kroll.com and provide the
anticipated date and time of your delivery.**

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS MASTER BALLOT ON OR BEFORE JUNE 2, 2023, AT 5:00 P.M., PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED BY THIS MASTER BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS, SUBJECT TO DISCLOSURE THEREOF IN THE VOTING REPORT, SUBJECT TO DISCLOSURE THEREOF IN THE VOTING REPORT.**

**<u>INSTRUCTIONS FOR COMPLETING THIS CLASS 5A MASTER BALLOT</u>**

1. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as <u>Exhibit A</u> to the Disclosure Statement. Capitalized terms used in the Master Ballot or in these instructions but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Master Ballot, or the Disclosure Statement Order, as applicable. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS MASTER BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one Class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. You should immediately distribute the Beneficial Holder Ballots and the Solicitation Package to all Beneficial Holders of Claims and take any action required to enable each such Beneficial Holder to vote timely the Claims that it holds. You may distribute the Solicitation Packages to Beneficial Holders, as appropriate, in accordance with your customary practices. You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means. Any Beneficial Holder Ballot returned to you by a Beneficial Holder of a Claim shall not be counted for purposes of accepting or rejecting the Plan until you properly complete and deliver, to the Solicitation Agent, a Master Ballot that reflects the vote of such Beneficial Holders by **June 2, 2023, at 5:00 p.m.**, prevailing Central Time or otherwise validate the Master Ballot in a manner acceptable to the Solicitation Agent.

4. If you are transmitting the votes of any Beneficial Holder of Claims other than yourself, you should immediately after receipt by the Nominee of the Solicitation Package, forward the Solicitation Package to the Beneficial Holder of the Claim for voting along with a return envelope provided by and addressed to the Nominee, with the Beneficial Holder then returning the individual Beneficial Holder Ballot to the Nominee. In such case, the Nominee will tabulate the votes of its respective owners on a Master Ballot that will be provided to the Nominee separately by the Solicitation Agent, in accordance with any instructions set forth in the instructions to the Master Ballot, and then return the Master Ballot to the Solicitation Agent. The Nominee should advise the Beneficial Holder to return their individual Beneficial Holder Ballots (or otherwise transmit their vote) to the Nominee by a date calculated by the Nominee to allow it to prepare and return the Master Ballot to the Solicitation Agent so that the Master Ballot is actually received by the Solicitation Agent on or before the Voting Deadline.

5. With regard to any Beneficial Holder Ballots returned to you by a Beneficial Holder, you must: (a) compile and validate the votes and other relevant information of each such Beneficial Holder on the Master Ballot using the customer name or account number assigned by you to each such Beneficial Holder; (b) execute the Master Ballot; (c) transmit such Master Ballot to the Solicitation Agent by the Voting Deadline; and (d) retain such Beneficial Holder Ballots from Beneficial Holders, whether in hard copy or by electronic direction, in your files for a period of one year after the Effective Date of the Plan. You may be ordered to produce the Beneficial Holder Ballots (or evidence of the vote transmitted to you) to the Debtors or the Court.

    (i) The Master Ballot **must** be returned to the Solicitation Agent so as to be **actually received** by the Solicitation Agent on or before the Voting Deadline. **The Voting Deadline is June 2, 2023, at 5:00 p.m., prevailing Central Time.**

    (ii) If a Master Ballot is received **after** the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the Debtors. Additionally, **the following Master Ballots will not be counted**:

        (a) any Master Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

(b)     any Master Ballot cast by a party that does not hold a Claim in a Class that is entitled to vote on the Plan;

(c)     any Master Ballot sent by facsimile or any electronic means other than electronic mail;

(d)     any unsigned Master Ballot (for the avoidance of doubt, Master Ballots validly submitted via electronic mail will be deemed signed);

(f)     any Master Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan;[3] and/or

(g)     any Master Ballot submitted by any party not entitled to cast a vote with respect to the Plan.

8.     The method of delivery of Master Ballots to the Solicitation Agent is at the election and risk of each Nominee. Except as otherwise provided herein, such delivery will be deemed made only when the Solicitation Agent **actually receives** the executed Master Ballot.  In all cases, Beneficial Holders and Nominees should allow sufficient time to assure timely delivery.

9.     If a Beneficial Holder or Nominee holds a Claim in a Voting Class against multiple Debtors, a vote on their Beneficial Holder Ballot will apply to all applicable Classes and Debtors against whom such Beneficial Holder or Nominee has such Claim, as applicable, in that Voting Class.

10.    If multiple Master Ballots are received from the same Nominee with respect to the same Claims voted on a Beneficial Holder Ballot prior to the Voting Deadline, the latest, timely received, and properly completed Master Ballot will supersede and revoke any earlier received Master Ballots.

11.    The Master Ballot does **not** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

12.    **Please be sure to sign and date the Master Ballot**.  You should indicate that you are signing the Master Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Solicitation Agent, the Debtors, or the Court, must submit proper evidence to the requesting party to so act on behalf of such Beneficial Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Master Ballot.

13.    If you are both the Nominee and the Beneficial Holder of any of the Claims indicated on **Schedule A** of the Master Ballot or Beneficial Holder Ballot, as applicable, and you wish to vote such Claims, you may return a Beneficial Holder Ballot or Master Ballot for such Claims and you must vote all of your Claims in the same Class to either accept or reject the Plan and may not split your vote.  Accordingly, a Beneficial Holder Ballot, other than a Master Ballot with the votes of multiple Beneficial Holders that partially rejects and partially accepts the Plan will not be counted.

14.    For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, the Debtors and the Solicitation Agent shall use reasonable efforts to aggregate separate Claims held by a single creditor in a particular Class and treat such creditor as if such creditor held one Claim in such Class, and all votes related to such Claim will be treated as a single vote to accept or reject the Plan; *provided* that if separate affiliated entities hold Claims in a particular Class, these Claims will not be aggregated and will not be treated as if

---

[3]   For the avoidance of doubt, a Holder's election, if any, to opt out of the Third-Party Release will be counted even if such Holder abstains from voting to accept or reject the Plan.

10

such creditor held one Claim in such Class, and the vote of each affiliated entity may be counted separately as a vote to accept or reject the Plan.

15.     The following additional rules shall apply to Master Ballots:

(a)     Votes cast by Beneficial Holders through a Nominee will be applied against the positions held by such entities in the Claims as of the Voting Record Date, as evidenced by the record and depository listings.

(b)     Votes submitted by a Nominee pursuant to a Master Ballot will not be counted in excess of the record amount of the Claims held by such Nominee;

(c)     To the extent that conflicting votes or "over-votes" are submitted by a Nominee pursuant to a Master Ballot, the Solicitation Agent will attempt to reconcile discrepancies with the Nominee;

(d)     To the extent that over-votes on a Master Ballot are not reconcilable prior to the preparation of the vote certification, the Solicitation Agent will apply the votes to accept and reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot that contained the over-vote, but only to the extent of the Nominee's position in the Claims; and

(e)     For purposes of tabulating votes, each Holder holding through a particular account will be deemed to have voted the principal amount relating its holding in that particular account, although the Solicitation Agent may be asked to adjust such principal amount to reflect the Claim amount.

**PLEASE SUBMIT YOUR MASTER BALLOT PROMPTLY**

**BALLOTS SHOULD NOT BE SENT TO THE DEBTORS, THE CREDITORS' COMMITTEE, OR TO ANY INDENTURE TRUSTEE OR THEIR RESPECTIVE ATTORNEYS.  BALLOTS SHOULD NOT BE SENT TO THE COURT.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS MASTER BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE EMAIL THE SOLICITATION AGENT:**

**cineworldinfo@ra.kroll.com**
**(Please reference "Cineworld Master Ballot" in the subject line)**

---

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS MASTER BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS JUNE 2, 2023, AT 5:00 P.M., PREVAILING CENTRAL TIME, AND IF THE VOTING DEADLINE IS NOT EXTENDED, THE VOTES TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE DEBTORS, SUBJECT TO DISCLOSURE IN THE VOTING REPORT, SUBJECT TO DISCLOSURE THEREOF IN THE VOTING REPORT.**

<u>**Schedule A**</u>

**Below please find the Plan Class and ISIN to which this Master Ballot pertains:**

| Class 5A (Class 5A General Unsecured Claims) | | ISIN |
|---|---|---|
| ☐ | Convertible 7.50% Senior Secured Notes due 4/16/2025 | ISIN XS2334036287 |

## Exhibit 3D

**Form of Beneficial Holder Ballot for Class 5A General Unsecured Claims (Class 5A)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) Case No. 22-90168 (MI) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

**BENEFICIAL HOLDER BALLOT FOR VOTING TO ACCEPT**
**OR REJECT THE JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF CINEWORLD GROUP PLC AND ITS DEBTOR SUBSIDIARIES**

**BENEFICIAL HOLDER BALLOT FOR HOLDERS OF CLASS 5A GENERAL UNSECURED CLAIMS**

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BENEFICIAL HOLDER BALLOT.**

**IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE, IN ORDER FOR YOUR VOTE TO BE COUNTED, YOU MUST FOLLOW THE DIRECTIONS OF YOUR NOMINEE AND ALLOW SUFFICIENT TIME FOR YOUR NOMINEE TO RECEIVE YOUR VOTE AND TRANSMIT SUCH VOTE ON A MASTER BALLOT, WHICH MASTER BALLOT MUST BE RETURNED TO THE SOLICITATION AGENT BY JUNE 2, 2023, AT 5:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1566] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") as set forth in the *Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1567] (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement").  The Bankruptcy Court for the Southern District of Texas (the "Court") has conditionally approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code by entry of an order on [●], 2023 [Docket No. [●]] (the "Disclosure Statement Order").  Court approval of the Disclosure Statement does not indicate approval of the Plan by the Court.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Ballot for Beneficial Holders[2] (this "Beneficial Holder Ballot") because you are a Beneficial Holder of Class 5A General Unsecured Claims in Class 5A as indicated on **Schedule A** hereto as of April 18, 2023 (the "Voting Record Date").  Accordingly, you have a right to vote to accept or reject the Plan.  You can cast your

---

1    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/cineworld.  The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

2    A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose Claims or Interests have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Court order or otherwise, as reflected in the records maintained by the Nominees or other applicable Depository, including, but not limited to, Euroclear and Clearstream.

vote through this Beneficial Holder Ballot and return it to your broker, bank, or other nominee, or the agent of a broker, bank, other nominee, or other applicable depository, including, but not limited to, Euroclear and Clearstream (each of the foregoing, a "Nominee"), in accordance with the instructions provided by your Nominee, who will then submit a master ballot (the "Master Ballot") on behalf of the Beneficial Holders of the Claims within the Classes indicated on **Schedule A** hereto.

Your rights are described in the Disclosure Statement, which is included in the package (the "Solicitation Package") you are receiving with this Beneficial Holder Ballot (as well as the Plan, the Disclosure Statement, the Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them (a) for a fee via PACER at https://ecf.txsb.uscourts.gov/ or (b) at no charge from Kroll Restructuring Administration LLC (the "Solicitation Agent") by: (i) accessing the Solicitation Agent's website at https://cases.ra.kroll.com/cineworld; (ii) writing to Cineworld Group plc, Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (iii) emailing cineworldinfo@ra.kroll.com; or (iv) calling the Solicitation Agent at (844) 648-5574 (domestic, toll free) or +1 (845) 295-5705 (international).

This Beneficial Holder Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Beneficial Holder Ballot in error, or if you believe you have received the wrong ballot, please contact your Nominee immediately.

You should review the Disclosure Statement, the Plan, and the instructions contained herein before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claims. Your Claims have been placed in the Classes of Claims indicated on **Schedule A** hereto, under the Plan. This Beneficial Holder Ballot accounts for all Claims you hold in Class 5A. If you hold other Claims in other Classes, you will receive a ballot for each Class in which you are entitled to vote.

In order for your vote to count, your Nominee must receive this Beneficial Holder Ballot in sufficient time for your Nominee to include your vote on a Master Ballot that must be received by the Solicitation Agent on or before the Voting Deadline, which is **June 2, 2023, at 5:00 p.m.**, prevailing Central Time. Please allow sufficient time for your vote to be included on the Master Ballot completed by your Nominee. If a Master Ballot recording your vote is not received by the Voting Deadline, and if the Voting Deadline is not extended, your vote will not count.

**Item 1. Beneficial Holder of Class 5A General Unsecured Claims.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Beneficial Holder of Class 5A General Unsecured Claims in Class 5A indicated on **Schedule A** hereto. You must check the applicable box in the right-hand column below to "accept" or "reject" the Plan for Class 5A in order to have your vote counted.

Please note that you must vote all of your Claims in Class 5A either to accept or reject the Plan. You may not split your vote. If you do not indicate that you either accept or reject the Plan by checking the applicable box below, your vote in Class 5A will not be counted. If you indicate that you both accept and reject the Plan for your Claims in Class 5A by checking both boxes below, your vote for your Claims in Class 5A will not be counted.

The Plan, though proposed jointly, constitutes a separate Plan proposed by each Debtor. Accordingly, your vote cast below will be applied in the same manner and in the same amount against each applicable Debtor.

The Holder of Class 5A General Unsecured Claims in Class 5A votes to (*please check one and only one box*):

| Voting Class | Description | Amount | Vote to Accept or Reject the Plan |
|---|---|---|---|
| Class 5A | Class 5A General Unsecured Claims | $_____ | ☐ ACCEPT (VOTE FOR) THE PLAN<br>☐ REJECT (VOTE AGAINST) THE PLAN |

**Item 2.**            **Important information regarding the Third-Party Release and Opt-Out Rights Under the Plan.**

**Article IX.D of the Plan contains the following provision:**

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, AND RELEASED PARTY FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, AS APPLICABLE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS, THE CONVERTIBLE BONDS, THE LEGACY FACILITIES, THE PRIMING FACILITIES, THE MIDWEST FACILITY, THE SETTLEMENT FACILITY, ANY INTERCOMPANY TRANSACTIONS, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, SOLICITATION, NEGOTIATION, ENTRY INTO, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE:  (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, ANY DEFINITIVE DOCUMENT, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR THE RESTRUCTURING TRANSACTIONS, INCLUDING THE EXIT FIRST LIEN FACILITY DOCUMENTS AND THE NEW MONEY REVOLVING CREDIT FACILITY DOCUMENTS; (B) THE RIGHTS OF ANY HOLDER OF ALLOWED CLAIMS OR ALLOWED INTERESTS TO RECEIVE DISTRIBUTIONS UNDER THE PLAN; (C) ANY OBLIGATIONS ARISING UNDER BUSINESS OR COMMERCIAL AGREEMENTS OR ARRANGEMENTS AMONG THE RELEASED PARTIES AND ANY NON-DEBTOR ENTITY; OR (D) THE INTERCHANGE LITIGATION CLAIMS AND ANY OTHER CLAIMS OR CAUSES OF ACTION OF THE ESTATES RELATING TO THE INTERCHANGE LITIGATION.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S

4

**FINDING THAT THE THIRD-PARTY RELEASE IS:  (I) CONSENSUAL; (II) ESSENTIAL TO THE CONFIRMATION; (III) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS OR CAUSES OF ACTION RELEASED BY THE THIRD-PARTY RELEASE; (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (VI) FAIR, EQUITABLE, AND REASONABLE; (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.**

**IMPORTANT INFORMATION REGARDING THE RELEASES AND NOTICE OF OPT-OUT RIGHTS:**

**UNDER THE PLAN, "RELEASED PARTIES" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH AGENT; (D) EACH TRUSTEE; (E) EACH ADMINISTRATOR (IF ANY); (F) THE DIP LENDERS; (G) THE CREDITORS' COMMITTEE; (H) EACH CREDITORS' COMMITTEE MEMBER IN ITS CAPACITY AS SUCH; (I) THE CAPITAL RAISING PARTIES; (J) THE CONSENTING CREDITORS; (K) ALL RELEASING PARTIES; AND (L) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (K).**

**UNDER THE PLAN, "RELEASING PARTIES" MEANS COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH AGENT; (D) EACH TRUSTEE; (E) THE DIP LENDERS; (F) THE CREDITORS' COMMITTEE; (G) EACH CREDITORS' COMMITTEE MEMBER IN ITS CAPACITY AS SUCH; (H) THE CAPITAL RAISING PARTIES; (I) THE CONSENTING CREDITORS; (J) ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO ACCEPT THE PLAN; (K) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN; (L) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (M) ALL HOLDERS OF CLAIMS OR INTERESTS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (N) ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO REJECT THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; AND (O) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (N); *PROVIDED* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT:  (I) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (II) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION.**

**NOTWITHSTANDING THE FOREGOING, AN ENTITY SHALL BE NEITHER A RELEASING PARTY NOR A RELEASED PARTY IF IT VALIDLY OPTS OUT OF THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN.**

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN, AS SET FORTH ABOVE.  YOU MAY ELECT NOT TO GRANT THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN ONLY IF YOU (A) CHECK THE BOX BELOW OR (B) TIMELY FILE WITH THE COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN ARTICLE IX OF THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION.  BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.  PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU OPT OUT.

**The Holder of the Class 5A General Unsecured Claims identified in Item 1 elects to:**

┌─────────────────────────────────────────────────────────┐
│                                                         │
│   ☐   **OPT OUT of the Third-Party Release**            │
│                                                         │
└─────────────────────────────────────────────────────────┘

**Item 3**.          **Other Beneficial Holder Ballots Submitted.**

By returning this Beneficial Holder Ballot, the Holder of the Claims identified in Item 1 certifies that (a) this Beneficial Holder Ballot is the only Beneficial Holder Ballot submitted for Claims identified in Item 1 owned by such Holder, except as identified in the following table, and (b) all Beneficial Holder Ballots submitted by the Holder in the same Class indicate the same vote to accept or reject the Plan that the Beneficial Holder has indicated in Item 1 of this Beneficial Holder Ballot (please use additional sheets of paper if necessary):

**ONLY COMPLETE THIS TABLE IF YOU HAVE VOTED OTHER CLAIMS IN THE SAME CLASS ON OTHER BENEFICIAL HOLDER BALLOTS**

| Your Name or Customer Account Number for Other Account for Which a Ballot Has been Submitted | Name of Registered Holder or Nominee (if applicable) | Principal Amount of Other Class 5A Claims Voted | ISIN of Other Claims Voted | Vote (Accept or Reject) |
|---|---|---|---|---|
|  |  | $ |  |  |
|  |  | $ |  |  |
|  |  | $ |  |  |

**Item 4**.          **Certifications.**

By signing this Beneficial Holder Ballot, the undersigned certifies to the Court and the Debtors that:

(a)     as of the Voting Record Date, either:  (i) the Entity is the Holder of the Claims being voted on this Beneficial Holder Ballot; or (ii) the Entity is an authorized signatory for the Entity that is the Holder of the Claims being voted on this Beneficial Holder Ballot;

(b)     the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c)     the Entity has cast the same vote with respect to all Claims in a single Class; and

(d)     no other Beneficial Holder Ballots with respect to the amount of the Claims identified in Item 1 have been cast or, if any other Beneficial Holder Ballots have been cast with respect to such Claims, then any such earlier received Beneficial Holder Ballots are hereby revoked.

| | |
|---|---|
| Name of Holder: | _____ |
| | (Print or Type) |
| | |
| Signature: | _____ |
| Name of Signatory: | _____ |
| | (If other than the Beneficial Holder) |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone Number: | _____ |
| Email: | _____ |
| Date Completed: | _____ |
| | |

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND
RETURN IT (WITH A SIGNATURE) *PROMPTLY* <u>IN ACCORDANCE WITH THE INSTRUCTIONS
PROVIDED BY YOUR NOMINEE.</u>**

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THE MASTER BALLOT SUBMITTED ON YOUR BEHALF WHICH REFLECTS YOUR VOTE ON OR BEFORE THE VOTING DEADLINE, WHICH IS JUNE 2, 2023, AT 5:00 P.M., PREVAILING CENTRAL TIME, AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED BY THIS BENEFICIAL HOLDER BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS, SUBJECT TO DISCLOSURE THEREOF IN THE VOTING REPORT.**

## INSTRUCTIONS FOR COMPLETING THIS CLASS 5A BENEFICIAL HOLDER BALLOT

1.  The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as Exhibit A to the Disclosure Statement.  Capitalized terms used in the Class 5A Ballot or in these instructions but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 5A Ballot, or the Disclosure Statement Order, as applicable.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.  The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one Class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3.  Unless otherwise instructed by your Nominee, to ensure that your vote is counted, you must submit your Beneficial Holder Ballot to your Nominee in sufficient time to allow your Nominee to process your vote and submit a Master Ballot so that the Master Ballot is actually received by the Solicitation Agent by the Voting Deadline.  You may instruct your Nominee to vote on your behalf in the Master Ballot as follows: (a) complete the Beneficial Holder Ballot; (b) indicate your decision either to accept or reject the Plan in the boxes provided in Item 1 of the Beneficial Holder Ballot; and (c) sign and return the Beneficial Holder Ballot to your Nominee in accordance with the instructions provided by your Nominee.  The Voting Deadline for the receipt of Master Ballots by the Solicitation Agent is **June 2, 2023, at 5:00 p.m.**, prevailing Central Time.  Your completed Beneficial Holder Ballot must be received by your Nominee in sufficient time to permit your Nominee to deliver your votes to the Solicitation Agent on or before the Voting Deadline.

4.  **The following Beneficial Holder Ballots will not be counted**:

    (a)  any Beneficial Holder Ballot that partially rejects and partially accepts the Plan;

    (b)  any Beneficial Holder Ballot sent to the Debtors, the Debtors' agents, any indenture trustee, or the Debtors' financial or legal advisors;

    (c)  any Beneficial Holder Ballot returned to a Nominee not in accordance with the Nominee's instructions;

    (d)  any Beneficial Holder Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;

    (e)  any Beneficial Holder Ballot cast by an Entity that does not hold a Claim in the Class indicated on **Schedule A** hereto as of the Voting Record Date;

    (f)  any Beneficial Holder Ballot submitted by a Holder not entitled to vote pursuant to the Plan;

    (g)  any unsigned Beneficial Holder Ballot (except in accordance with the Nominee's instructions); and/or

    (i)  any Beneficial Holder Ballot not marked to accept or reject the Plan or any Beneficial Holder Ballot marked both to accept and reject the Plan.[3]

---

[3]   For the avoidance of doubt, your election, if any, to opt out of the Third-Party Release will be counted even if you abstain from voting to accept or reject the Plan in this Ballot.

5.  If your Beneficial Holder Ballot is not received by your Nominee in sufficient time to be included on a timely submitted Master Ballot, it will not be counted unless the Debtors determine otherwise.  In all cases, Beneficial Holders should allow sufficient time to assure timely delivery of your Beneficial Holder Ballot to your Nominee.  No Beneficial Holder Ballot should be sent to any of the Debtors, the Debtors' agents, the Debtors' financial or legal advisors, and if so sent will not be counted.

6.  If you deliver multiple Beneficial Holder Ballots to your Nominee with respect to the same Claims prior to the Voting Deadline, the last-received valid Beneficial Holder Ballot timely received will supersede and revoke any earlier received Beneficial Holder Ballots.

7.  You must vote all of your Claims within the same Class either to accept or reject the Plan and may **not** split your vote.  Further, if a Holder has multiple Claims within the same Class, the Debtors may, in their discretion, aggregate the Claims of any particular Holder with multiple Claims within the same Class for the purpose of counting votes.

8.  This Beneficial Holder Ballot does **not** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

9.  **Please be sure to sign and date your Beneficial Holder Ballot**.  If you are signing a Beneficial Holder Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Solicitation Agent, the Debtors, or the Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Beneficial Holder Ballot.

10.  If you hold Claims in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes **only** your Claims indicated on that ballot, so please complete and return each ballot that you receive.

11.  The Beneficial Holder Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan. Accordingly, at this time, Holders of Claims should not surrender certificates or instruments representing or evidencing their Claims, and neither the Debtors nor the Solicitation Agent will accept delivery of any such certificates or instruments surrendered together with a ballot.

**PLEASE SUBMIT YOUR BENEFICIAL HOLDER BALLOT *PROMPTLY* IN THE ENVELOPE PROVIDED OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.**

**BALLOTS SHOULD NOT BE SENT TO THE DEBTORS, THE CREDITORS' COMMITTEE, OR TO ANY INDENTURE TRUSTEE OR THEIR RESPECTIVE ATTORNEYS.  BALLOTS SHOULD NOT BE SENT TO THE COURT.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BENEFICIAL HOLDER BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CALL THE RESTRUCTURING HOTLINE AT:**

**DOMESTIC, TOLL FREE:  (844) 648-5574**

**INTERNATIONAL:   +1 (845) 295-5705**

**OR EMAIL:  cineworldinfo@ra.kroll.com (please reference "Cineworld" in the subject line)**

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THE MASTER BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS JUNE 2, 2023, AT 5:00 P.M., PREVAILING CENTRAL TIME, AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED BY THIS BENEFICIAL HOLDER BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS, SUBJECT TO DISCLOSURE THEREOF IN THE VOTING REPORT.**

**Schedule A**

**Below please find the Plan Class and ISIN to which this Beneficial Holder Ballot pertains:**

| Class 5A (Class 5A General Unsecured Claims) | | ISIN |
|---|---|---|
| ☐ | Convertible 7.50% Senior Secured Notes due 4/16/2025 | ISIN XS2334036287 |

**<u>Exhibit 3E</u>**

**Form of Ballot for Holders of General Unsecured Claims**
**Against the Class 5B Debtors (Class 5B)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) | Case No. 22-90168 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**BALLOT FOR VOTING TO ACCEPT OR REJECT
THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
CINEWORLD GROUP PLC AND ITS DEBTOR SUBSIDIARIES**

**BALLOT FOR HOLDERS OF CLASS 5B GENERAL
UNSECURED CLAIMS AGAINST THE CLASS 5B DEBTORS**

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS
CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED,
AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE SOLICITATION AGENT BY
JUNE 2, 2023, AT 5:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE"), IN
ACCORDANCE WITH THE FOLLOWING:**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect
to the *Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket
No. 1566] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan") as set forth in the
*Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and
Its Debtor Subsidiaries* [Docket No. 1567] (as may be amended, supplemented, or otherwise modified from time to
time, the "Disclosure Statement").  The Bankruptcy Court for the Southern District of Texas (the "Court") has
conditionally approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the
Bankruptcy Code by entry of an order on [●], 2023 [Docket No. [●]] (the "Disclosure Statement Order").  The Court's
conditional approval of the Disclosure Statement does not indicate approval of the Plan by the Court.  Capitalized
terms used but not otherwise defined herein shall have the meanings set forth in the Plan or Disclosure Statement, as
applicable.

You are receiving this ballot (this "Class 5B Ballot") because you are a Holder of a General Unsecured Claim against
a Class 5B Debtor (a "Class 5B General Unsecured Claim") as of April 18, 2023 (the "Voting Record Date").
Accordingly, you have a right to execute this Class 5B Ballot and to vote to accept or reject the Plan.

**YOUR VOTE ON THIS CLASS 5B BALLOT WILL BE APPLIED TO EACH DEBTOR AGAINST WHOM
YOU HAVE CLASS 5B GENERAL UNSECURED CLAIMS.**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
      claims and noticing agent at https://cases.ra.kroll.com/cineworld.  The location of Debtor Cineworld Group plc's
      principal place of business and the Debtors' service address in these chapter 11 cases is 8th Floor Vantage London,
      Great West Road, Brentford, England, TW8 9AG, United Kingdom.

2

Your rights are described in the Disclosure Statement, which is included in the package (the "Solicitation Package") you are receiving with this Class 5B Ballot (as well as the Plan, the Disclosure Statement, the Disclosure Statement Order, and certain other materials).  If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them (a) for a fee via PACER at https://ecf.txsb.uscourts.gov/ or (b) at no charge from Kroll Restructuring Administration LLC (the "Solicitation Agent") by:  (i) accessing the Solicitation Agent's website at https://cases.ra.kroll.com/cineworld; (ii) writing to Cineworld Group plc, Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (iii) emailing cineworldinfo@ra.kroll.com; or (iv) calling the Solicitation Agent at (844) 648-5574 (domestic, toll free) or +1 (845) 295-5705 (international).

This Class 5B Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Class 5B Ballot in error, or if you believe you have received the wrong ballot, please contact the Solicitation Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement, the Plan, and the instructions contained herein before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Class 5B General Unsecured Claim has been placed in Class 5B under the Plan.  If you hold Claims in more than one Class, you will receive a Ballot for each Class in which you are entitled to vote.

<u>Item 1</u>.  **Aggregate Amount of Class 5B General Unsecured Claims and Vote on Plan.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of a Class 5B General Unsecured Claim.  You may vote to accept or reject the Plan.  You must check the applicable box in the right-hand column below to "accept" or "reject" the Plan for Class 5B in order to have your vote counted.

Please note that you must vote all of your Claims in Class 5B either to accept or reject the Plan.  You may not split your vote.  If you do not indicate that you either accept or reject the Plan by checking the applicable box below, your vote in Class 5B will not be counted.  If you indicate that you both accept and reject the Plan for your Class 5B Claims by checking both boxes below, your Class 5B vote will not be counted.

The Plan, though proposed jointly, constitutes a separate Plan proposed by each Debtor.  Accordingly, your vote will be applied against the applicable Debtor referenced below.

The Holder of Class 5B General Unsecured Claims in Class 5B votes to (*please check <u>one and only one box</u>*):

| Voting Class | Description | Amount | Debtor | Vote to Accept or Reject the Plan |
|---|---|---|---|---|
| Class 5B | Class 5B General Unsecured Claims | $_____ | _____ | ☐ ACCEPT (VOTE FOR) THE PLAN<br>☐ REJECT (VOTE AGAINST) THE PLAN |

<u>Item 2</u>.        **Important information regarding the Third-Party Release and Opt-Out Rights Under the Plan.**

**<u>Article IX.D of the Plan contains the following provision</u>:**

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, AND RELEASED PARTY FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, AS APPLICABLE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS**

(INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS, THE CONVERTIBLE BONDS, THE LEGACY FACILITIES, THE PRIMING FACILITIES, THE MIDWEST FACILITY, THE SETTLEMENT FACILITY, ANY INTERCOMPANY TRANSACTIONS, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, SOLICITATION, NEGOTIATION, ENTRY INTO, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE:  (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, ANY DEFINITIVE DOCUMENT, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR THE RESTRUCTURING TRANSACTIONS, INCLUDING THE EXIT FIRST LIEN FACILITY DOCUMENTS AND THE NEW MONEY REVOLVING CREDIT FACILITY DOCUMENTS; (B) THE RIGHTS OF ANY HOLDER OF ALLOWED CLAIMS OR ALLOWED INTERESTS TO RECEIVE DISTRIBUTIONS UNDER THE PLAN; (C) ANY OBLIGATIONS ARISING UNDER BUSINESS OR COMMERCIAL AGREEMENTS OR ARRANGEMENTS AMONG THE RELEASED PARTIES AND ANY NON-DEBTOR ENTITY; OR (D) THE INTERCHANGE LITIGATION CLAIMS AND ANY OTHER CLAIMS OR CAUSES OF ACTION OF THE ESTATES RELATING TO THE INTERCHANGE LITIGATION.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS:  (I) CONSENSUAL; (II) ESSENTIAL TO THE CONFIRMATION; (III) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS OR CAUSES OF ACTION RELEASED BY THE THIRD-PARTY RELEASE; (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (VI) FAIR, EQUITABLE, AND REASONABLE; (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

**IMPORTANT INFORMATION REGARDING THE RELEASES AND NOTICE OF OPT-OUT RIGHTS:**

UNDER THE PLAN, "RELEASED PARTIES" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH AGENT; (D) EACH TRUSTEE; (E) EACH ADMINISTRATOR (IF ANY); (F) THE DIP LENDERS; (G) THE CREDITORS' COMMITTEE; (H) EACH CREDITORS' COMMITTEE MEMBER IN ITS CAPACITY AS SUCH; (I) THE CAPITAL RAISING PARTIES; (J) THE CONSENTING CREDITORS; (K) ALL RELEASING PARTIES; AND (L) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (K).

UNDER THE PLAN, "RELEASING PARTIES" MEANS COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH AGENT; (D) EACH TRUSTEE; (E) THE DIP LENDERS; (F) THE CREDITORS' COMMITTEE; (G) EACH CREDITORS' COMMITTEE MEMBER IN ITS CAPACITY AS SUCH; (H) THE CAPITAL RAISING PARTIES; (I) THE CONSENTING CREDITORS; (J) ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO ACCEPT THE PLAN; (K) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN; (L) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (M) ALL HOLDERS OF CLAIMS OR INTERESTS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (N) ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO REJECT THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; AND (O) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (N); *PROVIDED* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT:  (I) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (II) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION.

NOTWITHSTANDING THE FOREGOING, AN ENTITY SHALL BE NEITHER A RELEASING PARTY NOR A RELEASED PARTY IF IT VALIDLY OPTS OUT OF THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN.

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN, AS SET FORTH ABOVE.  YOU MAY ELECT NOT TO GRANT THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN <u>ONLY IF</u> YOU (A) CHECK THE BOX BELOW OR (B) TIMELY FILE WITH THE COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN ARTICLE IX OF THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION. THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION.  BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.  PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU OPT OUT.

<u>The Holder of the Class 5B General Unsecured Claims identified in Item 1 elects to:</u>

| |
|---|
| ☐  **<u>OPT OUT of the Third-Party Release</u>** |

__Item 3__.          __Certifications.__

By signing this Class 5B Ballot, the undersigned certifies to the Court and the Debtors that:

(a)      as of the Voting Record Date, either:  (i) the Entity is the Holder of the Class 5B General Unsecured Claims being voted pursuant to this Class 5B Ballot; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Class 5B General Unsecured Claims being voted pursuant to this Class 5B Ballot;

(b)      the Entity (or in the case of an authorized signatory, the Holder) has received the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c)      the Entity has cast the same vote with respect to all its Class 5B General Unsecured Claims; and

(d)      no other Class 5B Ballots with respect to the amount of the Class 5B General Unsecured Claims identified in Item 1 have been cast or, if any other Class 5B Ballots have been cast with respect to such Class 5B General Unsecured Claims, then any such earlier Class 5B Ballots are hereby revoked.

| | |
|---|---|
| Name of Holder: | _____ |
| | (Print or Type) |
| Signature: | _____ |
| Name of Signatory: | _____ |
| | (If other than the Holder) |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone Number: | _____ |
| Email: | _____ |
| Date Completed: | _____ |
| | |

__IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS BALLOT ON OR BEFORE JUNE 2, 2023, AT 5:00 P.M., PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS, SUBJECT TO DISCLOSURE THEREOF IN THE VOTING REPORT.__

**PLEASE SUBMIT YOUR BALLOT BY ONE OF THE FOLLOWING TWO METHODS:**

<u>Via Paper Ballot</u>.  Complete, sign, and date this Ballot and return it (with a signature) promptly via first class mail (or in the enclosed reply envelope provided), overnight courier, or hand delivery to:

**Cineworld Group plc**
**Ballot Processing**
**c/o Kroll Restructuring Administration LLC**
**850 Third Avenue,**
**Suite 412**
**Brooklyn, NY 11232**

<u>**If you would like to coordinate hand delivery of your Ballot, please
email cineworldballots@ra.kroll.com and provide the anticipated date
and time of your delivery.**</u>

*-OR-*

<u>Via E-Ballot Portal</u>.  Submit your Ballot via the Solicitation Agent's online portal, by visiting <u>https://cases.ra.kroll.com/cineworld</u> (the "<u>E-Ballot Portal</u>").  Click on the "E-Ballot" section of the website and follow the instructions to submit your Ballot.

**IMPORTANT NOTE:  You will need the following information to retrieve and submit your customized electronic Ballot:**

Unique E-Ballot ID#:_____

The Solicitation Agent's E-Ballot Portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims or Interests described in Item 1 of your electronic Ballot.  Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

Creditors who cast a Ballot using the E-Ballot Portal should NOT also submit a paper Ballot.

---

IF THE CLAIMS AND NOTICE AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 5B BALLOT ON OR BEFORE JUNE 2, 2023, AT 5:00 P.M., PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 5B BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS, SUBJECT TO DISCLOSURE THEREOF IN THE VOTING REPORT.

---

## INSTRUCTIONS FOR COMPLETING THIS CLASS 5B BALLOT

1. The Debtors are soliciting the votes of Holders of Claims with respect to the Plan attached as Exhibit A to the Disclosure Statement. Capitalized terms used in the Class 5B Ballot or in these instructions but not otherwise defined therein or herein shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 5B Ballot, or the Disclosure Statement Order, as applicable. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of at least two-thirds in amount and more than one-half in number of Claims in at least one Class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. To ensure that your Class 5B Ballot is counted, you **must** complete and submit this Ballot as instructed herein. **Ballots will not be accepted by electronic mail or facsimile.**

4. **Use of Ballot.** To ensure that your Class 5B Ballot is counted, you must: (a) complete your Class 5B Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 1 of the Class 5B Ballot; and (c) clearly sign and submit your Class 5B Ballot as instructed herein.

5. Your Class 5B Ballot **must** be returned to the Solicitation Agent so as to be **actually received** by the Solicitation Agent on or before the Voting Deadline. **The Voting Deadline is June 2, 2023, at 5:00 p.m., prevailing Central Time.**

6. If a Class 5B Ballot is received after the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the sole and absolute discretion of the Debtors. Additionally, **the following Class 5B Ballots will not be counted:**

    (a) any Class 5B Ballot that partially rejects and partially accepts the Plan;

    (b) any Class 5B Ballot sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), any agent, indenture trustee, or the Debtors' financial or legal advisors;

    (c) any Class 5B Ballot sent by electronic mail or facsimile;

    (d) any Class 5B Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

    (e) any Class 5B Ballot cast by an Entity that does not hold a Class 5B General Unsecured Claim as of the Voting Record Date;

    (f) any Class 5B Ballot submitted by a Holder not entitled to vote pursuant to the Plan;

    (g) any unsigned Class 5B Ballot (for the avoidance of doubt, Ballots validly submitted through the E-Ballot Portal will be deemed signed); and/or

    (i) any Class 5B Ballot not marked to accept or reject the Plan or any Class 5B Ballot marked both to accept and reject the Plan.[2]

---

[2] For the avoidance of doubt, your election, if any, to opt out of the Third-Party Release will be counted even if you abstain from voting to accept or reject the Plan in this Ballot.

7.  The method of delivery of Class 5B Ballots to the Solicitation Agent is at the election and risk of each Holder of a Class 5B General Unsecured Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Solicitation Agent *actually receives* the originally executed Class 5B Ballot.  In all cases, Holders should allow sufficient time to assure timely delivery.

8.  If multiple Class 5B Ballots are received from the same Holder of Class 5B General Unsecured Claims with respect to the same Class 5B General Unsecured Claim prior to the Voting Deadline, the latest, timely received, and properly completed Class 5B Ballot will supersede and revoke any earlier received Class 5B Ballots.

9.  You must vote all of your Class 5B General Unsecured Claims within Class 5B either to accept or reject the Plan and may *not* split your vote.

10. This Class 5B Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

11. **Please be sure to sign and date your Class 5B Ballot**.  If you are signing a Class 5B Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Solicitation Agent, the Debtors, or the Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 5B Ballot.

12. If you hold Claims in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes **only** your Claims indicated on that ballot, so please complete and return each ballot that you receive.

### PLEASE SUBMIT YOUR CLASS 5B BALLOT PROMPTLY

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 5B BALLOT,
THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING,
PLEASE CALL THE RESTRUCTURING HOTLINE AT:**

**TOLL FREE:  (844) 648-5574**

**INTERNATIONAL:  +1 (845) 295-5705**

**OR EMAIL:  cineworldinfo@ra.kroll.com (please reference "Cineworld" in the subject line)**

---

**IF THE SOLICITATION AGENT DOES NOT *ACTUALLY RECEIVE* THIS BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS ON JUNE 2, 2023, AT 5:00 P.M., PREVAILING CENTRAL TIME (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE DEBTORS, SUBJECT TO DISCLOSURE THEREOF IN THE VOTING REPORT.**

---

**Exhibit 4**

**Form of Cover Letter**

[●], 2023

RE:     **In re Cineworld Group plc, *et al.*,**
        **Chapter 11 Case No. 22-90168 (MI) (Jointly Administered)**

TO ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN:

Cineworld Group plc and its affiliated debtors and debtors in possession (collectively, the "Debtors")[1] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court") on September 7, 2022.

You have received this letter and the enclosed materials because you are entitled to vote on the *Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1566] (as modified, amended, or supplemented from time to time, the "Plan").[2]  On **[●], 2023**, the Court entered an order [Docket No. [●]] (the "Disclosure Statement Order"):  (a) conditionally approving the adequacy of the *Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1567] (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"); (b) approving the solicitation procedures (the "Solicitation Procedures") with respect to the Plan; (c) approving the forms of ballots and notices in connection therewith; (d) approving the rights offering procedures and related materials; (e) scheduling certain dates with respect thereto; and (f) granting related relief.

> **YOU ARE RECEIVING THIS LETTER BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN. THEREFORE, YOU SHOULD READ THIS LETTER CAREFULLY AND DISCUSS IT WITH YOUR ATTORNEY.  IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.**

In addition to this cover letter, the enclosed materials comprise your Solicitation Package, and were approved by the Court for distribution to Holders of Claims in connection with the solicitation of votes to accept the Plan. The Solicitation Package consists of the following:

    a.      the Disclosure Statement Order (excluding exhibits, except as set forth below);

    b.      the conditionally approved Disclosure Statement (attached as Exhibit 1 to the Disclosure Statement Order) including the Plan and the other exhibits thereto, which together with the Disclosure Statement Order, will be provided in electronic format (*i.e.*, CD-ROM or flash drive);

    c.      the Solicitation Procedures (attached as Exhibit 2 to the Disclosure Statement Order);

    d.      the applicable form of Ballot, in substantially the form of the Ballots attached as Exhibits 3A, 3B, 3C, 3D, and 3E to the Disclosure Statement Order;

    e.      this Cover Letter;

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/cineworld.  The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan, the Disclosure Statement (as defined herein), or the Disclosure Statement Order (as defined herein), as applicable.

     f.      the *Notice of Hearing to Consider (I) the Adequacy of the Disclosure Statement and Confirmation of the Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries and (II) Related Voting and Objection Procedures*, substantially in the form attached as <u>Exhibit 8</u> to the Disclosure Statement Order (the "<u>Combined Hearing Notice</u>");

     h.      a pre-addressed, postage pre-paid reply envelope; and

     i.      any additional documents that the Court has ordered to be made available.

Cineworld Group plc (on behalf of itself and each of the other Debtors) has approved the filing of the Plan and the solicitation of votes to accept the Plan. The Debtors believe that the acceptance of the Plan is in the best interests of their Estates, Holders of Claims and Interests, and all other parties in interest. Moreover, the Debtors believe that any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses, which, in turn, likely would result in smaller distributions (or no distributions) on account of Claims or Interests in the Chapter 11 Cases.

> **THE DEBTORS STRONGLY URGE YOU TO PROPERLY AND TIMELY SUBMIT YOUR BALLOT CASTING A VOTE TO ACCEPT THE PLAN. BALLOTS SHOULD BE SUBMITTED IN ACCORDANCE WITH THE INSTRUCTIONS INDICATED ON YOUR BALLOT.**
>
> **THE VOTING DEADLINE IS AT 5:00 P.M., PREVAILING CENTRAL TIME, ON JUNE 2, 2023.**

The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions, however, please feel free to contact Kroll Restructuring Administration LLC, the solicitation agent retained by the Debtors in the Chapter 11 Cases (the "<u>Solicitation Agent</u>"), by: (a) accessing the Debtors' restructuring website at <u>https://cases.ra.kroll.com/cineworld</u>; (b) writing to Cineworld Group plc, Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) emailing <u>cineworldinfo@ra.kroll.com</u> (with "Cineworld Solicitation" in the subject line); or (d) calling the Solicitation Agent at (844) 648-5574 (domestic, toll free) or +1 (845) 295-5705 (international). You may also obtain copies of any pleadings filed in the Chapter 11 Cases, including materials in the Solicitation Package, free of charge, at the Debtors' restructuring website: <u>https://cases.ra.kroll.com/cineworld</u> or for a fee via PACER at: <u>https://ecf.txsb.uscourts.gov/</u>.

Please be advised that the Solicitation Agent is authorized to answer questions about, and provide additional copies of, the solicitation materials, but may ***not*** advise you as to whether you should vote to accept or reject the Plan or provide any legal advice.

                Sincerely,

                Cineworld Group plc, on its own behalf and for each of the Debtors

                /s/ []
                [●]
                [●]

### Exhibit 5

**Form of Unimpaired Non-Voting Status Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|                                    |   |                              |
|------------------------------------|---|------------------------------|
| In re:                             | ) | Chapter 11                   |
|                                    | ) |                              |
| CINEWORLD GROUP PLC, *et al.*,[1]  | ) | Case No. 22-90168 (MI)       |
|                                    | ) |                              |
| Debtors.                           | ) | (Jointly Administered)       |
|                                    | ) |                              |

**NOTICE OF NON-VOTING STATUS TO HOLDERS OF UNIMPAIRED
CLAIMS CONCLUSIVELY PRESUMED TO ACCEPT THE PLAN AND IMPORTANT
INFORMATION REGARDING THIRD-PARTY RELEASES AND NOTICE OF OPT-OUT RIGHTS**

**PLEASE TAKE NOTICE THAT** on **[●], 2023**, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) conditionally approving the adequacy of the *Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1567] (the "Disclosure Statement"); (b) approving the solicitation procedures (the "Solicitation Procedures") with respect to confirmation of the *Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1566] (the "Plan");[2] (c) approving the forms of ballots and notices in connection therewith; (d) approving the rights offering procedures and related materials; (e) scheduling certain dates with respect thereto; and (f) granting related relief.

**PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim under the Plan, ***you are not entitled to vote on the Plan***. Specifically, under the terms of the Plan, as a Holder of a Claim (as currently asserted against the Debtors) that is not Impaired and conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, you are *not* entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider the adequacy of the Disclosure Statement and Confirmation of the Plan, and related voting and objection procedures (the "Combined Hearing"), will commence on **June 12, 2023, at 8:00 a.m.**, prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Avenue, Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan and the Disclosure Statement is **June 2, 2023, at 5:00 p.m.**, prevailing Central Time (the "Plan and Disclosure Statement Objection Deadline"). Any objection to the Plan or the Disclosure Statement ***must***: (a) be in writing; (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court; (c) state the name and address of the objecting party and the amount and nature of the Claim or Interest beneficially owned by such entity; (d) state, with particularity, the basis and nature of any objection to the Plan or the Disclosure Statement and, if practicable, a proposed modification to the Plan or the Disclosure Statement that would resolve such objection; and (e) be filed with

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the Debtors' restructuring website at https://cases.ra.kroll.com/cineworld. The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable.

the Court (contemporaneously with a proof of service) on or before the Plan and Disclosure Statement Objection Deadline.

       **PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement Order, the Disclosure Statement, the Plan, the Plan Supplement, or related documents, free of charge, you may:  (a) access the Debtors' restructuring website at https://cases.ra.kroll.com/cineworld; (b) write to Cineworld Group plc Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) email cineworldinfo@ra.kroll.com (with "Cineworld Solicitation" in the subject line); or (d) call the Solicitation Agent at (844) 648-5574 (domestic, toll free) or +1 (845) 295-5705 (international).  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at:  https://ecf.txsb.uscourts.gov/.

---

**ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE IX.D CONTAINS A THIRD-PARTY RELEASE.  PURSUANT TO THE PLAN YOU ARE DEEMED TO ACCEPT THE PLAN AND THEREFORE ARE DEEMED TO HAVE CONSENTED TO THE RELEASES SET FORTH IN ARTICLE IX.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

**ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE IX OF THE PLAN USING THE ENCLOSED OPT-OUT FORM OR BY FILING AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  BY ELECTING TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

---

Houston, Texas
Dated:  [●], 2023

/s/
_____

**JACKSON WALKER LLP**

Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Veronica A. Polnick (TX Bar No. 24079148)
Vienna Anaya (TX Bar No. 24091225)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:    (713) 752-4200
Facsimile:    (713) 752-4221
Email:        mcavenaugh@jw.com
              rchaikin@jw.com
              vpolnick@jw.com
              vanaya@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        joshua.sussberg@kirkland.com
              ciara.foster@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**OPTIONAL:  RELEASE OPT-OUT FORM**

You are receiving this opt-out form (the "Opt-Out Form") because you are a Holder of a Claim that is not entitled to vote on the *Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").

**Article IX.D of the Plan contains the following provision:**

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, AND RELEASED PARTY FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, AS APPLICABLE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS, THE CONVERTIBLE BONDS, THE LEGACY FACILITIES, THE PRIMING FACILITIES, THE MIDWEST FACILITY, THE SETTLEMENT FACILITY, ANY INTERCOMPANY TRANSACTIONS, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, SOLICITATION, NEGOTIATION, ENTRY INTO, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE:  (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, ANY DEFINITIVE DOCUMENT, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR THE RESTRUCTURING TRANSACTIONS, INCLUDING THE EXIT FIRST LIEN FACILITY DOCUMENTS AND THE NEW MONEY REVOLVING CREDIT FACILITY DOCUMENTS; (B) THE RIGHTS OF ANY HOLDER OF ALLOWED CLAIMS OR ALLOWED INTERESTS TO RECEIVE DISTRIBUTIONS UNDER THE PLAN; (C) ANY OBLIGATIONS ARISING UNDER BUSINESS OR COMMERCIAL AGREEMENTS OR ARRANGEMENTS AMONG THE RELEASED PARTIES AND ANY NON-DEBTOR ENTITY; OR (D) THE INTERCHANGE LITIGATION CLAIMS AND ANY OTHER CLAIMS OR CAUSES OF ACTION OF THE ESTATES RELATING TO THE INTERCHANGE LITIGATION.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS: (I) CONSENSUAL; (II) ESSENTIAL TO THE CONFIRMATION; (III) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS OR CAUSES OF ACTION RELEASED BY THE THIRD-PARTY RELEASE; (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (VI) FAIR, EQUITABLE, AND REASONABLE; (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.**

**IMPORTANT INFORMATION REGARDING THE RELEASES AND NOTICE OF OPT-OUT RIGHTS:**

**UNDER THE PLAN, "RELEASED PARTIES" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH AGENT; (D) EACH TRUSTEE; (E) EACH ADMINISTRATOR (IF ANY); (F) THE DIP LENDERS; (G) THE CREDITORS' COMMITTEE; (H) EACH CREDITORS' COMMITTEE MEMBER IN ITS CAPACITY AS SUCH; (I) THE CAPITAL RAISING PARTIES; (J) THE CONSENTING CREDITORS; (K) ALL RELEASING PARTIES; AND (L) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (K).**

**UNDER THE PLAN, "RELEASING PARTIES" MEANS COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH: (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH AGENT; (D) EACH TRUSTEE; (E) THE DIP LENDERS; (F) THE CREDITORS' COMMITTEE; (G) EACH CREDITORS' COMMITTEE MEMBER IN ITS CAPACITY AS SUCH; (H) THE CAPITAL RAISING PARTIES; (I) THE CONSENTING CREDITORS; (J) ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO ACCEPT THE PLAN; (K) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN; (L) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (M) ALL HOLDERS OF CLAIMS OR INTERESTS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (N) ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO REJECT THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; AND (O) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (N); *PROVIDED* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT: (I) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (II) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION.**

**NOTWITHSTANDING THE FOREGOING, AN ENTITY SHALL BE NEITHER A RELEASING PARTY NOR A RELEASED PARTY IF IT VALIDLY OPTS OUT OF THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN.**

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN, AS SET FORTH ABOVE. YOU MAY ELECT NOT TO GRANT THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN ONLY IF YOU (A) CHECK THE BOX BELOW OR (B) TIMELY FILE WITH THE COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN ARTICLE IX OF THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION. THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION, SUBJECT TO ANY OBLIGATION YOU MAY HAVE UNDER THE RESTRUCTURING SUPPORT AGREEMENT. BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX

OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.  PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU OPT OUT.

**OPTIONAL RELEASE ELECTION.  YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE IX.D OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW:**

> ☐  **The undersigned Holder of the Claim elects to OPT OUT of the Third-Party Release**

**Certifications.**

By signing this Opt-Out Form, the undersigned certifies to the Court and the Debtors that:

(a)     as of the Voting Record Date, either:  (i) the Entity is the Holder of a Claim; or (ii) the Entity is an authorized signatory for the Entity that is a Holder of the Claim;

(b)     the Entity (or in the case of an authorized signatory, the holder) has received a copy of the *Notice of Non-Voting Status to Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan and Important Information Regarding Third-Party Releases and Notice of Opt-Out Rights* and that this Opt-Out Form is made pursuant to the terms and conditions set forth therein;

(c)     the Entity has submitted the same respective election concerning the releases with respect to all Claims in a single Class; and

(d)     no other Opt-Out Form has been submitted or, if any other Opt-Out Forms have been submitted with respect to such Claims, then any such earlier Opt-Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than the Holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

***IF YOU HAVE MADE THE OPTIONAL OPT-OUT ELECTION, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-OUT FORM AND RETURN IT PROMPTLY BY ONLY ONE OF THE METHODS BELOW.***

If by First Class mail, overnight courier, or hand delivery:

Cineworld Group plc
Ballot Processing
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412,
Brooklyn, NY 11232

If you would like to coordinate hand delivery of your Opt-Out Form, please email cineworldballots@ra.kroll.com (with 'Cineworld Solicitation' in the subject line) and provide the anticipated date and time of your delivery

By electronic, online submission:

Please visit https://cases.ra.kroll.com/cineworld.  Click on the "E-Ballot" section of the Debtors' website and follow the directions to submit the electronic version of your Opt-Out Form.  If you choose to submit your Opt-Out Form via Kroll Restructuring Administration LLC's E-Ballot system, you should not also return a hard copy of your Opt-Out Form.

**IMPORTANT NOTE:  You will need the following information to retrieve and submit the electronic version of your Opt-Out Form:**

**Unique E-Ballot ID#: _____**

"E-Balloting" is the sole manner in which this Opt-Out Form will be accepted via electronic or online transmission.  Opt-Out Forms submitted by facsimile or email will not be counted.

---

**THE VOTING DEADLINE IS JUNE 2, 2023, AT 5:00 P.M.**, PREVAILING CENTRAL TIME.
THE SOLICITATION AGENT MUST ***ACTUALLY RECEIVE*** YOUR OPT-OUT ELECTION
ON OR BEFORE THE VOTING DEADLINE.

**<u>Exhibit 6</u>**

**Form of Impaired Non-Voting Status Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) | Case No. 22-90168 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### NOTICE OF NON-VOTING STATUS TO HOLDERS OF IMPAIRED CLAIMS AND INTERESTS CONCLUSIVELY PRESUMED TO REJECT THE PLAN AND IMPORTANT INFORMATION REGARDING THIRD-PARTY RELEASES AND NOTICE OF OPT-OUT RIGHTS

**PLEASE TAKE NOTICE THAT** on **[●], 2023**, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) conditionally approving the adequacy of the *Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1567] (the "Disclosure Statement"); (b) approving the solicitation procedures (the "Solicitation Procedures") with respect to confirmation of the *Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1566] (the "Plan");[2] (c) approving the forms of ballots and notices in connection therewith; (d) approving the rights offering procedures and related materials; (e) scheduling certain dates with respect thereto; and (f) granting related relief.

**PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim or Interest under the Plan, *you are not entitled to vote on the Plan*. Specifically, under the terms of the Plan, as a Holder of a Claim or Interest (as currently asserted against the Debtors) that is Impaired and conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, you are *not* entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider the adequacy of the Disclosure Statement and Confirmation of the Plan, and related voting and objection procedures (the "Combined Hearing"), will commence on **June 12, 2023, at 8:00 a.m.**, prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Avenue, Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan and the Disclosure Statement is **June 2, 2023, at 5:00 p.m.**, prevailing Central Time (the "Plan and Disclosure Statement Objection Deadline"). Any objection to the Plan or the Disclosure Statement *must*: (a) be in writing; (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court; (c) state the name and address of the objecting party and the amount and nature of the Claim or Interest beneficially owned by such entity; (d) state, with particularity, the basis and nature of any objection to the Plan or the Disclosure Statement and, if practicable, a

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the Debtors' restructuring website at https://cases.ra.kroll.com/cineworld. The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable.

proposed modification to the Plan or Disclosure Statement that would resolve such objection; and (e) be filed with the Court (contemporaneously with a proof of service) on or before the Plan and Disclosure Statement Objection Deadline.

**PLEASE TAKE FURTHER NOTICE THAT**, if you would like to obtain a copy of the Disclosure Statement Order, the Disclosure Statement, the Plan, the Plan Supplement, or related documents, free of charge, you may:  (a) access the Debtors' restructuring website at https://cases.ra.kroll.com/cineworld; (b) write to Cineworld Group plc Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) email cineworldinfo@ra.kroll.com (with "Cineworld Solicitation" in the subject line); or (d) call the Solicitation Agent at (844) 648-5574 (domestic, toll free) or +1 (845) 295-5705 (international).  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at:  https://ecf.txsb.uscourts.gov/.

---

**ARTICLE IX OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND ARTICLE IX.D CONTAINS A THIRD-PARTY RELEASE.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.**

**ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE IX OF THE PLAN USING THE ENCLOSED OPT-OUT FORM OR BY FILING AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  BY ELECTING TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

---

Houston, Texas
Dated: [●], 2023

/s/ _____

**JACKSON WALKER LLP**

Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Veronica A. Polnick (TX Bar No. 24079148)
Vienna Anaya (TX Bar No. 24091225)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                rchaikin@jw.com
                vpolnick@jw.com
                vanaya@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                ciara.foster@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**OPTIONAL:  RELEASE OPT-OUT FORM**

You are receiving this opt-out form (the "Opt-Out Form") because you are a Holder of a Claim or an Interest that is not entitled to vote on the *Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").

**Article IX.D of the Plan contains the following provision:**

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, AND RELEASED PARTY FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, AS APPLICABLE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS, THE CONVERTIBLE BONDS, THE LEGACY FACILITIES, THE PRIMING FACILITIES, THE MIDWEST FACILITY, THE SETTLEMENT FACILITY, ANY INTERCOMPANY TRANSACTIONS, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, SOLICITATION, NEGOTIATION, ENTRY INTO, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE:  (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, ANY DEFINITIVE DOCUMENT, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR THE RESTRUCTURING TRANSACTIONS, INCLUDING THE EXIT FIRST LIEN FACILITY DOCUMENTS AND THE NEW MONEY REVOLVING CREDIT FACILITY DOCUMENTS; (B) THE RIGHTS OF ANY HOLDER OF ALLOWED CLAIMS OR ALLOWED INTERESTS TO RECEIVE DISTRIBUTIONS UNDER THE PLAN; (C) ANY OBLIGATIONS ARISING UNDER BUSINESS OR COMMERCIAL AGREEMENTS OR ARRANGEMENTS AMONG THE RELEASED PARTIES AND ANY NON-DEBTOR ENTITY; OR (D) THE INTERCHANGE LITIGATION CLAIMS AND ANY OTHER CLAIMS OR CAUSES OF ACTION OF THE ESTATES RELATING TO THE INTERCHANGE LITIGATION.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS:  (I) CONSENSUAL; (II) ESSENTIAL TO THE CONFIRMATION; (III) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS OR CAUSES OF ACTION RELEASED BY THE THIRD-PARTY RELEASE; (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (VI) FAIR, EQUITABLE, AND REASONABLE; (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

IMPORTANT INFORMATION REGARDING THE RELEASES AND NOTICE OF OPT-OUT RIGHTS:

UNDER THE PLAN, "RELEASED PARTIES" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH AGENT; (D) EACH TRUSTEE; (E) EACH ADMINISTRATOR (IF ANY); (F) THE DIP LENDERS; (G) THE CREDITORS' COMMITTEE; (H) EACH CREDITORS' COMMITTEE MEMBER IN ITS CAPACITY AS SUCH; (I) THE CAPITAL RAISING PARTIES; (J) THE CONSENTING CREDITORS; (K) ALL RELEASING PARTIES; AND (L) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (K).

UNDER THE PLAN, "RELEASING PARTIES" MEANS COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH AGENT; (D) EACH TRUSTEE; (E) THE DIP LENDERS; (F) THE CREDITORS' COMMITTEE; (G) EACH CREDITORS' COMMITTEE MEMBER IN ITS CAPACITY AS SUCH; (H) THE CAPITAL RAISING PARTIES; (I) THE CONSENTING CREDITORS; (J) ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO ACCEPT THE PLAN; (K) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN; (L) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (M) ALL HOLDERS OF CLAIMS OR INTERESTS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (N) ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO REJECT THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; AND (O) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (N); *PROVIDED* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT:  (I) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (II) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION.

NOTWITHSTANDING THE FOREGOING, AN ENTITY SHALL BE NEITHER A RELEASING PARTY NOR A RELEASED PARTY IF IT VALIDLY OPTS OUT OF THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN.

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN, AS SET FORTH ABOVE.  YOU MAY ELECT NOT TO GRANT THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN ONLY IF YOU (A) CHECK THE BOX BELOW OR (B) TIMELY FILE WITH THE COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN ARTICLE IX OF THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION.  BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.  PLEASE BE ADVISED THAT YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU OPT OUT.

**OPTIONAL RELEASE ELECTION.  YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE IX.D OF THE PLAN <u>ONLY IF</u> YOU CHECK THE BOX BELOW:**

> ☐ **The undersigned Holder of the Claim or Interest elects to <u>OPT OUT of the Third-Party Release</u>**

**Certifications.**

By signing this Opt-Out Form, the undersigned certifies to the Court and the Debtors that:

(a)     as of the Voting Record Date, either:  (i) the Entity is the Holder of a Claim or Interest; or (ii) the Entity is an authorized signatory for the Entity that is a Holder of the Claim or Interest;

(b)     the Entity (or in the case of an authorized signatory, the holder) has received a copy of the *Notice of Non-Voting Status to Holders of Impaired Claims and Interests Conclusively Presumed to Reject the Plan and Important Information Regarding Third-Party Releases and Notice of Opt-Out Rights* and that this Opt-Out Form is made pursuant to the terms and conditions set forth therein;

(c)     the Entity has submitted the same respective election concerning the releases with respect to all Claims or Interests in a single Class; and

(d)     no other Opt-Out Form has been submitted or, if any other Opt-Out Forms have been submitted with respect to such Claims or Interests, then any such earlier Opt-Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | _____ |
| | (Print or Type) |
| Signature: | _____ |
| Name of Signatory: | _____ |
| | (If other than the Holder) |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone Number: | _____ |
| Email: | _____ |
| Date Completed: | _____ |

***<u>IF YOU HAVE MADE THE OPTIONAL OPT-OUT ELECTION</u>, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-OUT FORM AND RETURN IT <u>PROMPTLY</u> BY <u>ONLY ONE</u> OF THE METHODS BELOW.***

If by First Class mail, overnight courier, or hand delivery:

Cineworld Group plc
Ballot Processing
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412,
Brooklyn, NY 11232

If you would like to coordinate hand delivery of your Opt-Out Form, please email cineworldballots@ra.kroll.com (with 'Cineworld Solicitation' in the subject line) and provide the anticipated date and time of your delivery

---

By electronic, online submission:

Please visit https://cases.ra.kroll.com/cineworld.  Click on the "E-Ballot" section of the Debtors' website and follow the directions to submit the electronic version of your Opt-Out Form.  If you choose to submit your Opt-Out Form via Kroll Restructuring Administration LLC's E-Ballot system, you should <u>not</u> also return a hard copy of your Opt-Out Form.

**IMPORTANT NOTE:  You will need the following information to retrieve and submit the electronic version of your Opt-Out Form:**

**Unique E-Ballot ID#: _____**

"E-Balloting" is the sole manner in which this Opt-Out Form will be accepted via electronic or online transmission.  Opt-Out Forms submitted by facsimile or email will not be counted.

| | CUSIP/ISIN |
|---|---|
| **<u>Please note that if you are a Holder of Class 9 - Interests in Cineworld Parent and hold a position in one of the securities described in the chart below through DTC or another similar securities depository, you may not submit your Opt-Out Form via E-Ballot and must click on the Opt-Out Form link located on the left hand navigation panel of the Debtors' restructuring website at https://cases.ra.kroll.com/cineworld to submit an electronic version of your Opt-Out Form Class 9 (Interests in Cineworld Parent)</u>** | |
| Common Stock | ISIN XS2334036287 |
| American Depository Receipt | CUSIP 17248A103 / ISIN US17248A1034 |
| Warrants | ISIN GB00BN47HF16 |
| Warrants | CUSIP 17248A111 / ISIN US17248A1117 |

**<u>THE VOTING DEADLINE IS JUNE 2, 2023, AT 5:00 P.M.</u>**, PREVAILING CENTRAL TIME.
THE SOLICITATION AGENT MUST ***ACTUALLY RECEIVE*** YOUR OPT-OUT ELECTION
ON OR BEFORE THE VOTING DEADLINE.

**<u>Exhibit 7</u>**

**Form of Disputed Non-Voting Status Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) | Case No. 22-90168 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF NON-VOTING STATUS WITH RESPECT TO DISPUTED CLAIMS AND
IMPORTANT INFORMATION REGARDING THIRD-PARTY RELEASES AND OPT-OUT RIGHTS**

**PLEASE TAKE NOTICE THAT** on **[●], 2023**, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) conditionally approving the adequacy of the *Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1567] (the "Disclosure Statement"); (b) approving the solicitation procedures (the "Solicitation Procedures") with respect to confirmation of the *Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1566] (the "Plan");[2] (c) approving the forms of ballots and notices in connection therewith; (d) approving the rights offering procedures and related materials; (e) scheduling certain dates with respect thereto; and (f) granting related relief.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because you are the Holder of a Claim that is subject to a pending objection by the Debtors. *You are not entitled to vote any disputed portion of your Claim unless one or more of the following events has taken place by May 31, 2023 (the date that is two Business Days before the Voting Deadline)* (each, a "Resolution Event"):

1. an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

2. an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

3. a stipulation or other agreement is executed between the Holder of such Claim and the Debtors resolving the objection and allowing the Holder of such Claim to vote its Claim in an agreed-upon amount; or

4. the pending objection to such Claim is voluntarily withdrawn by the objecting party.

Accordingly, this notice is being sent to you for informational purposes only.

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the Debtors' restructuring website at https://cases.ra.kroll.com/cineworld. The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** the Court shall hold a hearing on **[●], 2023, at [●]:00 [a./p.]m., prevailing Central Time**, to consider all requests for temporary allowance for voting purposes.  An oral ruling at this hearing shall constitute a Resolution Event under the Solicitation Procedures.  Parties wishing to be heard at this hearing must file their motion and request for temporary allowance pursuant to Bankruptcy Rule 3018(a) by **June 2, 2023, at 5:00 p.m., prevailing Central Time**.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider the adequacy of the Disclosure Statement and Confirmation of the Plan, and related voting and objection procedures (the "Combined Hearing"), will commence on **June 12, 2023, at 8:00 a.m.**, prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Avenue, Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement Order, the Disclosure Statement, the Plan, the Plan Supplement, or related documents, free of charge, you may:  (a) access the Debtors' restructuring website at https://cases.ra.kroll.com/cineworld; (b) write to Cineworld Group plc Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) email cineworldinfo@ra.kroll.com (with "Cineworld Solicitation" in the subject line); or (d) call the Solicitation Agent at (844) 648-5574 (domestic, toll free) or +1 (845) 295-5705 (international).  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: https://ecf.txsb.uscourts.gov/.

**PLEASE TAKE FURTHER NOTICE THAT** if a timely Resolution Event occurs, then no later than one business day thereafter, the Solicitation Agent shall distribute a ballot, and a pre-addressed, postage pre-paid envelope to you, which must be returned to the Solicitation Agent no later than the Voting Deadline, which is on **June 2, 2023, at 5:00 p.m.**, prevailing Central Time.

**PLEASE TAKE FURTHER NOTICE THAT** if you have any questions about the status of any of your Claims, you should contact the Solicitation Agent in accordance with the instructions provided above.

> **ARTICLE IX** OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE IX.D** CONTAINS A THIRD-PARTY RELEASE.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.
>
> ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE IX OF THE PLAN USING THE ENCLOSED OPT-OUT FORM OR BY FILING AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  BY ELECTING TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.
>
> THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.

Houston, Texas
Dated: [●], 2023

/s/
_____

**JACKSON WALKER LLP**

Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Veronica A. Polnick (TX Bar No. 24079148)
Vienna Anaya (TX Bar No. 24091225)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:       (713) 752-4200
Facsimile:       (713) 752-4221
Email:           mcavenaugh@jw.com
                 rchaikin@jw.com
                 vpolnick@jw.com
                 vanaya@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900
Email:           joshua.sussberg@kirkland.com
                 ciara.foster@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**OPTIONAL:  RELEASE OPT-OUT FORM**

You are receiving this opt-out form (the "Opt-Out Form") because you are a Holder of a Claim that is not entitled to vote on the *Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").

**Article IX.D of the Plan contains the following provision:**

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, AND RELEASED PARTY FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, AS APPLICABLE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS, THE CONVERTIBLE BONDS, THE LEGACY FACILITIES, THE PRIMING FACILITIES, THE MIDWEST FACILITY, THE SETTLEMENT FACILITY, ANY INTERCOMPANY TRANSACTIONS, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, SOLICITATION, NEGOTIATION, ENTRY INTO, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE:  (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, ANY DEFINITIVE DOCUMENT, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR THE RESTRUCTURING TRANSACTIONS, INCLUDING THE EXIT FIRST LIEN FACILITY DOCUMENTS AND THE NEW MONEY REVOLVING CREDIT FACILITY DOCUMENTS; (B) THE RIGHTS OF ANY HOLDER OF ALLOWED CLAIMS OR ALLOWED INTERESTS TO RECEIVE DISTRIBUTIONS UNDER THE PLAN; (C) ANY OBLIGATIONS ARISING UNDER BUSINESS OR COMMERCIAL AGREEMENTS OR ARRANGEMENTS AMONG THE RELEASED PARTIES AND ANY NON-DEBTOR ENTITY; OR (D) THE INTERCHANGE LITIGATION CLAIMS AND ANY OTHER CLAIMS OR CAUSES OF ACTION OF THE ESTATES RELATING TO THE INTERCHANGE LITIGATION.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS:  (I) CONSENSUAL; (II) ESSENTIAL TO THE CONFIRMATION; (III) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS OR CAUSES OF ACTION RELEASED BY THE THIRD-PARTY RELEASE; (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (VI) FAIR, EQUITABLE, AND REASONABLE; (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

   IMPORTANT INFORMATION REGARDING THE RELEASES AND NOTICE OF OPT-OUT RIGHTS:

UNDER THE PLAN, "RELEASED PARTIES" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH AGENT; (D) EACH TRUSTEE; (E) EACH ADMINISTRATOR (IF ANY); (F) THE DIP LENDERS; (G) THE CREDITORS' COMMITTEE; (H) EACH CREDITORS' COMMITTEE MEMBER IN ITS CAPACITY AS SUCH; (I) THE CAPITAL RAISING PARTIES; (J) THE CONSENTING CREDITORS; (K) ALL RELEASING PARTIES; AND (L) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (K).

UNDER THE PLAN, "RELEASING PARTIES" MEANS COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH AGENT; (D) EACH TRUSTEE; (E) THE DIP LENDERS; (F) THE CREDITORS' COMMITTEE; (G) EACH CREDITORS' COMMITTEE MEMBER IN ITS CAPACITY AS SUCH; (H) THE CAPITAL RAISING PARTIES; (I) THE CONSENTING CREDITORS; (J) ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO ACCEPT THE PLAN; (K) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN; (L) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (M) ALL HOLDERS OF CLAIMS OR INTERESTS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (N) ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO REJECT THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; AND (O) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (N); *PROVIDED* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT:  (I) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (II) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION.

NOTWITHSTANDING THE FOREGOING, AN ENTITY SHALL BE NEITHER A RELEASING PARTY NOR A RELEASED PARTY IF IT (A) VALIDLY OPTS OUT OF THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN OR (B) TIMELY FILES WITH THE COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN ARTICLE IX OF THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN, AS SET FORTH ABOVE.  YOU MAY ELECT NOT TO GRANT THE RELEASES CONTAINED IN ARTICLE IX.D OF THE PLAN ONLY IF YOU (A) CHECK THE BOX BELOW OR (B) TIMELY FILE WITH THE COURT ON THE DOCKET OF THE CHAPTER 11 CASES AN OBJECTION TO THE RELEASES CONTAINED IN ARTICLE IX OF THE PLAN THAT IS NOT RESOLVED BEFORE CONFIRMATION.  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION.  BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE IX.D OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE IX OF THE PLAN

2

IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH. PLEASE BE ADVISED YOUR RECOVERY UNDER THE PLAN WILL BE THE SAME IF YOU OPT OUT.

**OPTIONAL RELEASE ELECTION. YOU MAY ELECT TO OPT OUT OF THE RELEASE CONTAINED IN ARTICLE IX.D OF THE PLAN <u>ONLY IF</u> YOU CHECK THE BOX BELOW:**

> ☐ **The undersigned Holder of the Claim elects to <u>OPT OUT OF</u> <u>the Third-Party Release</u>**

**Certifications.**

By signing this Opt-Out Form, the undersigned certifies to the Court and the Debtors that:

(a)     as of the Voting Record Date, either:  (i) the Entity is the Holder of a Claim; or (ii) the Entity is an authorized signatory for the Entity that is a Holder of the Claim;

(b)     the Entity (or in the case of an authorized signatory, the holder) has received a copy of the *Notice of Non-Voting Status with Respect to Disputed Claims and Important Information Regarding Third-Party Releases and Notice of Opt-Out Rights* and that this Opt-Out Form is made pursuant to the terms and conditions set forth therein;

(c)     the Entity has submitted the same respective election concerning the releases with respect to all Claims in a single Class; and

(d)     no other Opt-Out Form has been submitted or, if any other Opt-Out Forms have been submitted with respect to such Claims, then any such earlier Opt-Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | _____ |
| | (Print or Type) |
| Signature: | _____ |
| Name of Signatory: | _____ |
| | (If other than the Holder) |
| Title: | _____ |
| Address: | _____ |
| | _____ |
| | _____ |
| Telephone Number: | _____ |
| Email: | _____ |
| Date Completed: | _____ |

***IF YOU HAVE MADE THE OPTIONAL OPT-OUT ELECTION*, PLEASE COMPLETE, SIGN, AND DATE THIS OPT-OUT FORM AND RETURN IT *PROMPTLY* BY *ONLY ONE* OF THE METHODS BELOW.**

<u>If by First Class mail, overnight courier, or hand delivery</u>:

Cineworld Group plc
Ballot Processing
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412,
Brooklyn, NY 11232
If you would like to coordinate hand delivery of your Opt-Out Form, please email
<u>cineworldballots@ra.kroll.com</u> (with 'Cineworld Solicitation' in the subject line) and provide the anticipated date and time of your delivery

<u>By electronic, online submission</u>:

Please visit <u>https://cases.ra.kroll.com/cineworld</u>.  Click on the "Submit E-Ballot" section of the Debtors' restructuring website and follow the directions to submit the electronic version of your Opt-Out Form.  If you choose to submit your Opt-Out Form via Kroll Restructuring Administration LLC's E-Ballot system, you should <u>not</u> also return a hard copy of your Opt-Out Form.

**IMPORTANT NOTE:  You will need the following information to retrieve and submit the electronic version of your Opt-Out Form:**

**Unique E-Ballot ID#: _____**

"E-Balloting" is the sole manner in which this Opt-Out Form will be accepted via electronic or online transmission.  Opt-Out Forms submitted by facsimile or email will not be counted.

---

**<u>THE VOTING DEADLINE IS JUNE 2, 2023, AT 5:00 P.M.</u>, PREVAILING CENTRAL TIME.<br>THE SOLICITATION AGENT MUST *ACTUALLY RECEIVE* YOUR OPT-OUT ELECTION<br>ON OR BEFORE THE VOTING DEADLINE.**

4

## **Exhibit 8**

**Form of Combined Hearing Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) | Case No. 22-90168 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF HEARING TO CONSIDER (I) THE ADEQUACY OF
THE DISCLOSURE STATEMENT AND CONFIRMATION OF THE JOINT
CHAPTER 11 PLAN OF REORGANIZATION OF CINEWORLD GROUP PLC AND
ITS DEBTOR SUBSIDIARIES AND (II) RELATED VOTING AND OBJECTION PROCEDURES**

       **PLEASE TAKE NOTICE THAT** on [●], 2023, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order") that, among other things:  (a) conditionally approved the *Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1567] (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"); and (b) authorized the above-captioned debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances for the *Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No.1566] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[2]

       **PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider the adequacy of the Disclosure Statement and Confirmation of the Plan, and related voting and objection procedures (the "Combined Hearing"), will commence on **June 12, 2023, at 8:00 a.m.**, prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Avenue, Houston, Texas 77002.

> **PLEASE BE ADVISED:  THE COMBINED HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS WITHOUT FURTHER NOTICE OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.**

**CRITICAL INFORMATION REGARDING VOTING ON THE PLAN**

       **Voting Record Date**.  The voting record date is **April 18, 2023**, which is the date for determining which Holders of Claims in Classes 4 and 5 are entitled to vote on the Plan.

       **Voting Deadline**.  The deadline for voting on the Plan is **June 2, 2023, at 5:00 p.m.**, prevailing Central Time (the "Voting Deadline").  If you received a Solicitation Package, including a Ballot, and intend to vote on the Plan you *must*:  (a) follow the instructions carefully; (b) complete *all* of the required information on the Ballot; and

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the Debtors' restructuring website at https://cases.ra.kroll.com/cineworld.  The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable.

(c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is **actually received** by the Debtors' solicitation agent, Kroll Restructuring Administration LLC (the "Solicitation Agent") on or before the Voting Deadline.  **A failure to follow such instructions may disqualify your vote**.

**Plan and Disclosure Statement Objection Deadline**.  The deadline for filing objections to the Plan and the Disclosure Statement, including with regard to the treatment of Executory Contracts and Unexpired Leases thereunder, is **June 2, 2023, at 5:00 p.m.**, prevailing Central Time (the "Plan and Disclosure Statement Objection Deadline").  Any objection to the relief sought at the Combined Hearing **must**:  (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure, the Bankruptcy Local Rules for the Southern District of Texas, and any orders of the Court; (c) state, with particularity, the name and address of the objecting party, the basis and nature of any objection to the Plan, and, if practicable, a proposed modification to the Plan that would resolve such objection; and (d) be filed with the Court on or before the Plan Objection Deadline.

## CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN

> **ARTICLE IX** OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE IX.D** CONTAINS A THIRD-PARTY RELEASE.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

Please be advised that Article IX of the Plan contains the following release, exculpation, and injunction provisions:

### RELEASES BY THE DEBTORS.

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THEIR ESTATES FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED BY OR ON BEHALF OF THE DEBTORS, THAT THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, AS APPLICABLE, WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST OR INTEREST IN A DEBTOR OR OTHER ENTITY, OR THAT ANY HOLDER OF ANY CLAIM AGAINST OR INTEREST IN A DEBTOR OR OTHER ENTITY COULD HAVE ASSERTED ON BEHALF OF THE DEBTORS, BASED ON OR RELATING TO OR IN ANY MANNER ARISING FROM IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS, THE CONVERTIBLE BONDS, THE LEGACY FACILITIES, THE PRIMING FACILITIES, THE MIDWEST FACILITY, THE SETTLEMENT FACILITY, ANY INTERCOMPANY TRANSACTIONS, THE CHAPTER 11 CASES AND ANY RELATED ADVERSARY PROCEEDINGS, THE FORMULATION, PREPARATION, DISSEMINATION, SOLICITATION, NEGOTIATION, ENTRY INTO, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT

FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE:  (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, ANY DEFINITIVE DOCUMENT, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR THE RESTRUCTURING TRANSACTIONS; (B) THE RIGHTS OF ANY HOLDER OF ALLOWED CLAIMS TO RECEIVE DISTRIBUTIONS UNDER THE PLAN; (C) ANY CLAIMS FOR INDEMNIFICATION THAT ARE EXPRESSLY ASSUMED BY THE DEBTORS PURSUANT TO THE PLAN OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT EXECUTED TO IMPLEMENT THE PLAN OR THE RESTRUCTURING TRANSACTIONS; (D) ANY OBLIGATIONS ARISING UNDER BUSINESS OR COMMERCIAL AGREEMENTS OR ARRANGEMENTS AMONG THE RELEASED PARTIES AND ANY NON-DEBTOR ENTITY; OR (E) THE INTERCHANGE LITIGATION CLAIMS AND ANY OTHER CLAIMS OR CAUSES OF ACTION OF THE ESTATES RELATING TO THE INTERCHANGE LITIGATION.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS:  (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (II) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS OR CAUSES OF ACTION RELEASED BY THE DEBTOR RELEASE; (III) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES, AND ALL HOLDERS OF CLAIMS AND INTERESTS; (IV) FAIR, EQUITABLE AND REASONABLE; (V) GIVEN AND MADE AFTER REASONABLE INVESTIGATION BY THE DEBTORS AND AFTER NOTICE AND OPPORTUNITY FOR HEARING; AND (VI) A BAR TO ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED BY THE DEBTOR RELEASE AGAINST ANY OF THE RELEASED PARTIES.

<u>RELEASES BY HOLDERS OF CLAIMS AND INTERESTS</u>

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR, AND RELEASED PARTY FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, AS APPLICABLE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP, OR OPERATION THEREOF), ANY SECURITIES ISSUED BY THE DEBTORS AND THE OWNERSHIP THEREOF, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, ANY AVOIDANCE ACTIONS, THE CONVERTIBLE BONDS, THE LEGACY FACILITIES, THE PRIMING FACILITIES, THE MIDWEST FACILITY, THE SETTLEMENT FACILITY, ANY INTERCOMPANY TRANSACTIONS, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, SOLICITATION, NEGOTIATION, ENTRY INTO, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE

RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE:  (A) ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, ANY DEFINITIVE DOCUMENT, OR ANY OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN OR THE RESTRUCTURING TRANSACTIONS, INCLUDING THE EXIT FIRST LIEN FACILITY DOCUMENTS AND THE NEW MONEY REVOLVING CREDIT FACILITY DOCUMENTS; (B) THE RIGHTS OF ANY HOLDER OF ALLOWED CLAIMS OR ALLOWED INTERESTS TO RECEIVE DISTRIBUTIONS UNDER THE PLAN; (C) ANY OBLIGATIONS ARISING UNDER BUSINESS OR COMMERCIAL AGREEMENTS OR ARRANGEMENTS AMONG THE RELEASED PARTIES AND ANY NON-DEBTOR ENTITY; OR (D) THE INTERCHANGE LITIGATION CLAIMS AND ANY OTHER CLAIMS OR CAUSES OF ACTION OF THE ESTATES RELATING TO THE INTERCHANGE LITIGATION.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS:  (I) CONSENSUAL; (II) ESSENTIAL TO THE CONFIRMATION; (III) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING AND IMPLEMENTING THE PLAN; (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS OR CAUSES OF ACTION RELEASED BY THE THIRD-PARTY RELEASE; (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (VI) FAIR, EQUITABLE, AND REASONABLE; (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

 IMPORTANT INFORMATION REGARDING THE RELEASES AND NOTICE OF OPT-OUT RIGHTS:

UNDER THE PLAN, "*RELEASED PARTIES*" MEANS, COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH AGENT; (D) EACH TRUSTEE; (E) EACH ADMINISTRATOR (IF ANY); (F) THE DIP LENDERS; (G) THE CREDITORS' COMMITTEE; (H) EACH CREDITORS' COMMITTEE MEMBER IN ITS CAPACITY AS SUCH; (I) THE CAPITAL RAISING PARTIES; (J) THE CONSENTING CREDITORS; (K) ALL RELEASING PARTIES; AND (L) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (K).

UNDER THE PLAN, "*RELEASING PARTIES*" MEANS COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS; (B) THE REORGANIZED DEBTORS; (C) EACH AGENT; (D) EACH TRUSTEE; (E) THE DIP LENDERS; (F) THE CREDITORS' COMMITTEE; (G) EACH CREDITORS' COMMITTEE MEMBER IN ITS CAPACITY AS SUCH; (H) THE CAPITAL RAISING PARTIES; (I) THE CONSENTING CREDITORS; (J) ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO ACCEPT THE PLAN; (K) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO ACCEPT THE PLAN; (L) ALL HOLDERS OF CLAIMS OR INTERESTS THAT ARE DEEMED TO REJECT THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (M) ALL HOLDERS OF CLAIMS OR INTERESTS WHO ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; (N) ALL HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO REJECT THE PLAN AND WHO DO NOT OPT OUT OF THE RELEASES IN THE PLAN; AND (O) EACH RELATED PARTY OF EACH ENTITY IN CLAUSES (A) THROUGH (N); *PROVIDED* THAT, IN EACH CASE, AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT:  (I) ELECTS TO OPT OUT OF THE THIRD-PARTY RELEASE; OR (II) TIMELY OBJECTS TO THE THIRD-PARTY RELEASE AND SUCH OBJECTION IS NOT RESOLVED BEFORE CONFIRMATION.

**EXCULPATION.**

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, NO EXCULPATED PARTY SHALL HAVE OR INCUR LIABILITY FOR, AND EACH EXCULPATED PARTY SHALL BE RELEASED AND EXCULPATED FROM ANY CLAIMS AND CAUSES OF ACTION FOR ANY CLAIM RELATED TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, FILING, OR TERMINATION OF PREPETITION TRANSACTIONS (INCLUDING WITH RESPECT TO THE DEBT DOCUMENTS), THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY DOCUMENTS, THE NEW MONEY REVOLVING CREDIT FACILITY DOCUMENTS, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE PLAN, THE PLAN SUPPLEMENT, THE EXIT FIRST LIEN FACILITY, THE RIGHTS OFFERING, THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT, THE NEW MONEY REVOLVING CREDIT FACILITY, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER RELATED ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN.

THE EXCULPATED PARTIES HAVE, AND UPON CONFIRMATION SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAW WITH REGARD TO THE SOLICITATION OF VOTES AND DISTRIBUTION OF CONSIDERATION PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO

THE PLAN.

### INJUNCTION.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER OR FOR OBLIGATIONS OR DISTRIBUTIONS ISSUED OR REQUIRED TO BE PAID PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD THE RELEASED CLAIMS ARE PERMANENTLY ENJOINED FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE EXCULPATED PARTIES, OR THE RELEASED PARTIES:  (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION, SUIT, OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED CLAIMS; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED CLAIMS; (C) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED CLAIMS; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED CLAIMS UNLESS SUCH ENTITY HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF ON OR BEFORE THE EFFECTIVE DATE, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (E) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY RELEASED CLAIMS RELEASED OR SETTLED PURSUANT TO THE PLAN.

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND THEIR RESPECTIVE CURRENT AND FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, AND DIRECT AND INDIRECT AFFILIATES, IN THEIR CAPACITIES AS SUCH, SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN.  EACH HOLDER OF AN ALLOWED CLAIM OR ALLOWED INTEREST, AS APPLICABLE, BY ACCEPTING, OR BEING ELIGIBLE TO ACCEPT, DISTRIBUTIONS UNDER OR REINSTATEMENT OF SUCH CLAIM OR INTEREST, AS APPLICABLE, PURSUANT TO THE PLAN, SHALL BE DEEMED TO HAVE CONSENTED TO THE INJUNCTION PROVISIONS SET FORTH IN THIS ARTICLE IX.F OF THE PLAN.

### ADDITIONAL INFORMATION

**Obtaining Solicitation Materials**.  The materials in the Solicitation Package are intended to be self-explanatory.  If you should have any questions or if you would like to obtain a copy of the Disclosure Statement Order, the Disclosure Statement, the Plan, the Plan Supplement, or related documents, free of charge, you may: (a) access the Debtors' restructuring website at https://cases.ra.kroll.com/cineworld; (b) write to Cineworld Group plc, Ballot Processing Center, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) email cineworldinfo@ra.kroll.com (with "Cineworld Solicitation" in the subject line); or (d) call the Solicitation Agent at (844) 648-5574 (domestic, toll free) or +1 (845) 295-5705 (international).  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at:  https://ecf.txsb.uscourts.gov/.  Please be advised that the Solicitation Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may **not** advise you as to whether you should vote to accept or reject the Plan or provide legal advice.

**The Plan Supplement**.  The Debtors will file the Plan Supplement (as defined in the Plan) on or before **May 26, 2023**, and will serve notice on parties in interest, which will:  (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement.

---

**BINDING NATURE OF THE PLAN**

**IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

---

Houston, Texas
Dated: [●], 2023

/s/
_____

**JACKSON WALKER LLP**

Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Veronica A. Polnick (TX Bar No. 24079148)
Vienna Anaya (TX Bar No. 24091225)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                rchaikin@jw.com
                vpolnick@jw.com
                vanaya@jw.com


*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                ciara.foster@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Exhibit 9</u>**

**Form of Plan Supplement Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) | Case No. 22-90168 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF FILING OF PLAN SUPPLEMENT**

     **PLEASE TAKE NOTICE THAT** on [●], 2023, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order") that, among other things: (a) conditionally approved the adequacy of the *Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1567] (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"); and (b) authorized the above-captioned debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances for the *Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1566] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[2]

     **PLEASE TAKE FURTHER NOTICE THAT** as contemplated by the Plan and the Disclosure Statement Order, the Debtors filed the Plan Supplement with the Court on [●], 2023 [Docket No. [●]].  The Plan Supplement is comprised of the following:  (a) the New Organizational Documents, the New Stockholders Agreement, and the Registration Rights Agreement; (b) to the extent known, the identities of the members of the New Board; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) the Schedule of Proposed Cure Amounts; (e) the Schedule of Retained Causes of Action; (f) the material form Exit First Lien Facility Documents; (g) the Restructuring Transactions Memorandum; (h) the UK Implementation Agreement, if applicable; (i) documentation relating to the Emergence Awards, if applicable; (j) the Litigation Trust Agreement; (k) the Consulting Agreements; and (l) any other necessary documentation related to any Restructuring Transactions.  The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan.

     **PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider the adequacy of the Disclosure Statement and Confirmation of the Plan, and related voting and objection procedures (the "Combined Hearing"), will commence on **June 12, 2023, at 8:00 a.m.**, prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Avenue, Houston, Texas 77002.

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the Debtors' restructuring website at https://cases.ra.kroll.com/cineworld.  The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable.

PLEASE TAKE FURTHER NOTICE THAT the deadline for filing objections to the Plan is **June 2, 2023, at 5:00 p.m.**, prevailing Central Time (the "Plan Objection Deadline").  Any objection to the Plan *must*:  (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure, the Bankruptcy Local Rules for the Southern District of Texas, and any order of the Court; (c) state the name and address of the objecting party and the amount and nature of the Claim or Interest beneficially owned by such entity; (d) state, with particularity, the name and address of the objecting party, the basis and nature of any objection to the Plan, and, if practicable, a proposed modification to the Plan that would resolve such objection; and (e) be filed with the Court on or before the Plan Objection Deadline.

PLEASE TAKE FURTHER NOTICE THAT the deadline for filing objections to the Debtors' proposed assumption, assumption and assignment, rejection, and/or cure amount(s) with respect to Executory Contracts and Unexpired Leases shall be **fourteen days after the filing or service, as applicable, of the Assumption Notice, the Rejection Notice, or the Schedule of Proposed Cure Amounts, as applicable**

PLEASE TAKE FURTHER NOTICE THAT if you would like to obtain a copy of the Disclosure Statement Order, the Disclosure Statement, the Plan, the Plan Supplement, or related documents, free of charge, you may:  (a) access the Debtors' restructuring website at https://cases.ra.kroll.com/cineworld; (b) write to Cineworld Group plc Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) email cineworldinfo@ra.kroll.com (with "Cineworld Solicitation" in the subject line); or (d) call the Solicitation Agent at (844) 648-5574 (domestic, toll free) or +1 (845) 295-5705 (international).  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: https://ecf.txsb.uscourts.gov/.

---

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

Houston, Texas
Dated:  [●], 2023

/s/
_____

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Veronica A. Polnick (TX Bar No. 24079148)
Vienna Anaya (TX Bar No. 24091225)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:         mcavenaugh@jw.com
               rchaikin@jw.com
               vpolnick@jw.com
               vanaya@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         joshua.sussberg@kirkland.com
               ciara.foster@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**Exhibit 10**

**Form of Notice of Assumption of Executory Contracts and Unexpired Leases**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) | Case No. 22-90168 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF (I) EXECUTORY CONTRACTS
AND UNEXPIRED LEASES TO BE ASSUMED BY THE
DEBTORS PURSUANT TO THE PLAN, (II) CURE AMOUNTS,
IF ANY, AND (III) RELATED PROCEDURES IN CONNECTION THEREWITH**

**PLEASE TAKE NOTICE THAT** on **[●], 2023**, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order") that, among other things: (a) conditionally approved the adequacy of the *Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1567] (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"); and (b) authorized the above-captioned debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances for the *Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1566] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors filed the *Schedule of Proposed Cure Amounts* [Docket No. [●]] (the "Assumption Schedule") with the Court as part of the Plan Supplement on **[●], 2023** (the "Service Date"), as contemplated under the Plan. The Debtors' determination to assume the agreements identified on the Assumption Schedule is subject to revision. The deadline for filing objections to (a) the assumption of an Executory Contract or Unexpired Lease as contemplated in the Plan Supplement and/or (b) Cure amounts set forth in the Assumption Schedule is **fourteen days after the Service Date**.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider the adequacy of the Disclosure Statement and Confirmation of the Plan, and related voting and objection procedures (the "Combined Hearing") will commence on **June 12, 2023, at 8:00 a.m.**, prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Avenue, Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because the Debtors' records reflect that you are a party to a contract that is listed on the Assumption Schedule. Therefore, you are advised to review carefully the information contained in this notice and the related provisions of the Plan, including the Assumption Schedule.

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the Debtors' restructuring website at https://cases.ra.kroll.com/cineworld. The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable.

PLEASE TAKE FURTHER NOTICE THAT the Debtors are proposing to assume the Executory Contract(s) and Unexpired Lease(s) listed in **Schedule A** attached hereto to which you are a party.[3]

PLEASE TAKE FURTHER NOTICE THAT section 365(b)(1) of title 11 of the United States Code (the "Bankruptcy Code") requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption. Accordingly, the Debtors have conducted a thorough review of their books and records and have determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in the table on **Schedule A** attached hereto. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtors believe that there is no cure amount outstanding for such contract or lease.

PLEASE TAKE FURTHER NOTICE THAT absent any pending dispute, the monetary amounts required to cure any existing defaults arising under the Executory Contract(s) and Unexpired Lease(s) identified on **Schedule A** attached hereto will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by the Debtors in Cash on the Effective Date or as soon as reasonably practicable thereafter. In the event of a dispute, however, payment of the cure amount would be made following the entry of a final order(s) resolving the dispute and approving the assumption. If an objection to the proposed assumption or related cure amount is sustained by the Court, however, the Debtors may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

PLEASE TAKE FURTHER NOTICE THAT the deadline for filing objections to the Plan and the Disclosure Statement is **June 2, 2023, at 5:00 p.m.**, prevailing Central Time (the "Plan and Disclosure Statement Objection Deadline"). Any objection to the Plan or the Disclosure Statement **must**: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure, the Bankruptcy Local Rules for the Southern District of Texas, and any orders of the Court; (c) state the name and address of the objecting party and the amount and nature of the Claim or Interest beneficially owned by such entity; (d) state, with particularity, the name and address of the objecting party, the basis and nature of any objection to the Plan or the Disclosure Statement, and, if practicable, a proposed modification to the Plan or the Disclosure Statement that would resolve such objection; and (e) be filed with the Court **on or before the Plan and Disclosure Statement Objection Deadline**.

PLEASE TAKE FURTHER NOTICE THAT any objections to Plan in connection with the assumption of the Executory Contract(s) and Unexpired Lease(s) proposed in connection with the Plan that remain unresolved as of the Combined Hearing will be heard at the first omnibus hearing following the Combined Hearing (or such other date as fixed by the Court).

---

[3]   Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumption Schedule, nor anything contained in the Plan or each Debtor's schedule of assets and liabilities, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease capable of assumption, that any Reorganized Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement. Further, the Debtors expressly reserve the right to: (a) contest any Claim (or cure amount) asserted in connection with assumption of any Executory Contract or Unexpired Lease; and (b) alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases and the Schedule of Proposed Cure Amounts at any time up to forty-five days after the Effective Date; *provided*, *however*, that for any Executory Contract or Unexpired Lease subject to a dispute with respect to Cure cost as of the Effective Date, the deadline to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases with respect to such Executory Contract or Unexpired Lease shall be the later of (1) forty-five days after the Effective Date and (2) five business days after the Bankruptcy Court determines that the Allowed Cure cost with respect to such Executory Contract or Unexpired Lease is greater than the amount set forth in the Schedule of Proposed Cure Amounts. For the avoidance of doubt, at any time prior to the Effective Date, the Debtors may reject any Executory Contract or Unexpired Lease pursuant to a separate motion filed with the Bankruptcy Court or any applicable rejection procedures approved by the Bankruptcy Court in these Chapter 11 Cases.

—

**PLEASE TAKE FURTHER NOTICE THAT ANY COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT FAILS TO OBJECT TIMELY TO THE PROPOSED ASSUMPTION OR CURE AMOUNT WILL BE DEEMED TO HAVE ASSENTED TO SUCH ASSUMPTION AND CURE AMOUNT.**

**PLEASE TAKE FURTHER NOTICE THAT ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE THE DEBTORS OR REORGANIZED DEBTORS ASSUME SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE.  ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE COURT.**

**PLEASE TAKE FURTHER NOTICE THAT**, if you would like to obtain a copy of the Disclosure Statement Order, the Disclosure Statement, the Plan, the Plan Supplement, or related documents, free of charge, you may: (a) access the Debtors' restructuring website at https://cases.ra.kroll.com/cineworld; (b) write to Cineworld Group plc Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) email cineworldinfo@ra.kroll.com (with "Cineworld Solicitation" in the subject line); or (d) call the Solicitation Agent at (844) 648-5574 (domestic, toll free) or +1 (845) 295-5705 (international).  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at:  https://ecf.txsb.uscourts.gov/.

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

Houston, Texas
Dated: [●], 2023

/s/

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Veronica A. Polnick (TX Bar No. 24079148)
Vienna Anaya (TX Bar No. 24091225)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                rchaikin@jw.com
                vpolnick@jw.com
                vanaya@jw.com


*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                ciara.foster@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**Schedule A**

**Schedule of Assumed Contracts and Leases and Proposed Cure Cost**

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure Cost |
|--------|--------------|--------------------------------------------|-----------|
|        |              |                                            |           |

## <u>Exhibit 11</u>

**Form of Notice of Rejection of Executory Contracts and Unexpired Leases**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CINEWORLD GROUP PLC, *et al.*,[1] | ) | Case No. 22-90168 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE REGARDING EXECUTORY CONTRACTS**
**AND UNEXPIRED LEASES TO BE REJECTED PURSUANT TO THE PLAN**

**PLEASE TAKE NOTICE THAT** on [●], 2023, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order") that, among other things:  (a) conditionally approved the adequacy of the *Disclosure Statement Relating to the Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1567] (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"); and (b) authorized the above-captioned debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances for the *Amended Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1566] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors filed the *Rejected Executory Contract and Unexpired Lease List* [Docket No. [●]] (the "Rejection Schedule") with the Court as part of the Plan Supplement on [●], 2023 (the "Service Date"), as contemplated under the Plan.  The Debtors' determination to reject the agreements identified on the Rejection Schedule is subject to revision.  The deadline for filing objections to the rejection of an Executory Contract or Unexpired lease as contemplated in the Plan Supplement is **fourteen days after the Service Date**.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider the adequacy of the Disclosure Statement and Confirmation of the Plan, and related voting and objection procedures (the "Combined Hearing") will commence on **June 12, 2023, at 8:00 a.m.**, prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Avenue, Houston, Texas 77002.

---

**PLEASE TAKE FURTHER NOTICE THAT YOU ARE RECEIVING THIS NOTICE BECAUSE THE DEBTORS' RECORDS REFLECT THAT YOU ARE A PARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT WILL BE REJECTED PURSUANT TO THE PLAN, SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE BEING LISTED IN SCHEDULE A ATTACHED HERETO. THEREFORE, YOU ARE ADVISED TO REVIEW CAREFULLY THE INFORMATION CONTAINED IN THIS NOTICE AND THE RELATED PROVISIONS OF THE PLAN.[3]**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the Debtors' restructuring website at https://cases.ra.kroll.com/cineworld.  The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable.

[3]   Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the

**PLEASE TAKE FURTHER NOTICE THAT** all Proofs of Claim with respect to Claims arising from the rejection of the Executory Contract(s) or Unexpired Leases identified on <u>**Schedule A**</u> attached hereto, if any, must be Filed within 30 days after the later of:  (a) the date of entry of an order of the Court (including an order confirming the Plan) approving such rejection; and (b) the effective date of such rejection.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.**

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan and the Disclosure Statement is <u>**June 2, 2023, at 5:00 p.m.**</u>, prevailing Central Time (the "<u>Plan and Disclosure Statement Objection Deadline</u>").  Any objection to the Plan or the Disclosure Statement *must*: (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure, the Bankruptcy Local Rules for the Southern District of Texas, and any orders of the Court; (c) state, the name and address of the objecting party and the amount and nature of the Claim or Interest beneficially owned by such entity; (d) state, with particularity, the name and address of the objecting party, the basis and nature of any objection to the Plan or the Disclosure Statement, and, if practicable, a proposed modification to the Plan or the Disclosure Statement that would resolve such objection; and (e) be filed with the Court **<u>on or before the Plan and Disclosure Statement Objection Deadline</u>**.

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan in connection with the rejection of the Executory Contract(s) and Unexpired Lease(s) identified above and/or related rejection damages proposed in connection with the Plan that remain unresolved as of the Combined Hearing will be heard at the first omnibus hearing following the Combined Hearing (or such other date as fixed by the Court).

**PLEASE TAKE FURTHER NOTICE THAT**, if you would like to obtain a copy of the Disclosure Statement Order, the Disclosure Statement, the Plan, the Plan Supplement, or related documents, free of charge, you may:  (a) access the Debtors' restructuring website at https://cases.ra.kroll.com/cineworld; (b) write to Cineworld Group plc Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; (c) email cineworldinfo@ra.kroll.com (with "Cineworld Solicitation" in the subject line); or (d) call the Solicitation Agent at (844) 648-5574 (domestic, toll free) or +1 (845) 295-5705 (international).  You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at:  https://ecf.txsb.uscourts.gov/.

---

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY.  IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE SOLICITATION AGENT.**

---

Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  Further, the Debtors expressly reserve the right to: (a) contest any Claim (or cure amount) asserted in connection with assumption of any Executory Contract or Unexpired Lease; and (b) alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases and the Schedule of Proposed Cure Amounts at any time up to forty-five days after the Effective Date; *provided*, *however*, that for any Executory Contract or Unexpired Lease subject to a dispute with respect to Cure cost as of the Effective Date, the deadline to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases with respect to such Executory Contract or Unexpired Lease shall be the later of (1) forty-five days after the Effective Date and (2) five business days after the Bankruptcy Court determines that the Allowed Cure cost with respect to such Executory Contract or Unexpired Lease is greater than the amount set forth in the Schedule of Proposed Cure Amounts.  For the avoidance of doubt, at any time prior to the Effective Date, the Debtors may reject any Executory Contract or Unexpired Lease pursuant to a separate motion filed with the Bankruptcy Court or any applicable rejection procedures approved by the Bankruptcy Court in these Chapter 11 Cases.

Houston, Texas
Dated: [●], 2023

/s/

| **JACKSON WALKER LLP** | **KIRKLAND & ELLIS LLP** |
|---|---|
| Matthew D. Cavenaugh (TX Bar No. 24062656) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Rebecca Blake Chaikin (TX Bar No. 24133055) | Joshua A. Sussberg, P.C. (admitted *pro hac vice*) |

Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Veronica A. Polnick (TX Bar No. 24079148)
Vienna Anaya (TX Bar No. 24091225)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                rchaikin@jw.com
                vpolnick@jw.com
                vanaya@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
                ciara.foster@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## Schedule A

**Schedule of Rejected Contracts and Leases**

| Debtor | Counterparty | Description of Rejected Contracts or Leases |
|--------|--------------|---------------------------------------------|
|        |              |                                             |

## Exhibit 12

**Rights Offering Procedures**

**CINEWORLD GROUP PLC ET AL.**

**RIGHTS OFFERING PROCEDURES**

The Rights Offering Shares (as defined below) are being distributed and issued by Reorganized Cineworld Parent[1] without registration under the Securities Act of 1933, as amended (the "Securities Act"), pursuant to section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S of the Securities Act (or another applicable exemption under the Securities Act). None of the rights to purchase the Rights Offering Shares (the "Subscription Rights"), which Reorganized Cineworld Parent will issue to the Holders of Allowed Legacy Facilities Claims or the Equity Capital Raising Parties (as defined below) pursuant to the Plan, or the Rights Offering Shares issuable upon exercise of such Subscription Rights distributed pursuant to these rights offering procedures (the "Rights Offering Procedures"), have been or will be registered under the Securities Act, nor any state or local Law requiring registration for the offer and sale of a security.

The Subscription Rights are not detachable from the Allowed Legacy Facilities Claims and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated, or otherwise encumbered or disposed of, directly or indirectly, separately from the Allowed Legacy Facilities Claims (including through derivatives, options, swaps, forward sales, or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights). No Subscription Rights or the Rights Offering Shares as a result of being issued pursuant to section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S of the Securities Act (or another applicable exemption under the Securities Act) may be sold or otherwise transferred absent registration under the Securities Act or pursuant to an exemption from registration under the Securities Act. Please see Section 5 hereof (Transfer Restriction; Revocation) for additional information related to the transfer of the Subscription Rights. Resale restrictions related to the Rights Offering Shares are discussed in more detail in Article XI of the Disclosure Statement (as defined below), entitled "Certain Securities Law Matters."

The Disclosure Statement has previously been or is being distributed in connection with the Debtors' solicitation of votes to accept or reject the Plan, and such document sets forth important information, including risk factors, that should be carefully read and considered by each Eligible Participant (as defined below) prior to deciding to participate in the Rights Offering (as defined below). Additional copies of the Disclosure Statement are available upon request from Kroll Issuer Services (US) (the "Rights Offering Subscription Agent").

The Rights Offering Shares issued upon exercise of a Subscription Right as a result of being issued pursuant to section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S of the Securities Act, and each book entry position or certificate issued in exchange for or upon the sale, assignment, or transfer of any such Rights Offering Shares, shall be deemed to contain or be stamped or otherwise imprinted with, as applicable, a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the *Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1509] (as may be amended, modified, or supplemented from time to time, the "Plan") or the Financing Commitment and Backstop Agreement (as defined in the Plan).

SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

The Rights Offering is being conducted by the Company[2] on behalf of the Debtors in good faith and in compliance with the Bankruptcy Code.  In accordance with section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participate, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable Law, rule, or regulation governing the offer, issuance, sale, or purchase of securities.

The distribution or communication of these Rights Offering Procedures and the issuance of the Rights Offering Shares in certain jurisdictions may be restricted by Law.  No action has been taken or will be taken to permit the distribution or communication of these Rights Offering Procedures in any jurisdiction where any action for that purpose may be required.  Accordingly, these Rights Offering Procedures may not be distributed or communicated, and the Rights Offering Shares may not be subscribed for or issued, in any jurisdiction except in circumstances where such distribution, communication, subscription, or issuance would comply with all applicable Laws without the need for the Company or the other Debtors to take any action or obtain any consent, approval, or authorization therefor except for any notice filings required under United States federal and applicable state securities Laws.  Further, Reorganized Cineworld Parent's securities have not been approved or disapproved by the United States Securities and Exchange Commission or any other state securities commission or any other regulatory or governmental authority, nor have any of the foregoing passed upon the accuracy or adequacy of the information presented, and any representation to the contrary is a criminal offense.

These Rights Offering Procedures have been prepared on the basis that any offer of the Rights Offering Shares or the Subscription Rights within any member state of the European Economic Area or in the United Kingdom (each, a "Relevant State") will be made pursuant to an exemption under Regulation (EU) No 2017/1129 of the European Parliament and of the European Council of 14 June 2017 and such regulation as it forms part of UK retained law as defined in the European Union (Withdrawal) Act 2018 (the "Prospectus Regulation") and/or the Financial Services and Markets Act 2000 of the United Kingdom (the "FSMA"), as applicable, from the requirement to publish a prospectus for the offer of transferable securities to the public.  In relation to each Relevant State, no offer of the Rights Offering Shares or the Subscription Rights may be made to the public at any time other than pursuant to an exemption under the Prospectus Regulation and/or the FSMA, as applicable.  In any Relevant State, the Rights Offering and the Rights Offering Procedures are only addressed to and directed at: (a) "qualified investors" in that Relevant State (as defined in Article

---

[2]     The term "Company" as used herein, means (i) prior to the Issuer Transfer Date (including, without limitation, in the context of any reference to any right of the Company which is to be exercised, or any obligation or action which is to be undertaken by the Company, prior to the Issuer Transfer Date), Cineworld Parent and (ii) on or after the Issuer Transfer Date (including, without limitation, in the context of any reference to any right of the Company which is to be exercised, or any obligation or action which is to be undertaken by the Company, on or after the Issuer Transfer Date), Reorganized Cineworld Parent. The term "Issuer Transfer Date" as used herein, means the date on which Reorganized Cineworld Parent becomes the new holding company of the Debtors (other than the Cineworld Parent).

2(e) of the Prospectus Regulation) (the "<u>Qualified Investors</u>"); or (b) any other person if such address or direction does not otherwise constitute an offer of securities to the public within the meaning of the Prospectus Regulation (including in any of the other circumstances set out in Article 1(4) of the Prospectus Regulation) and/or the FSMA (including in any of the other circumstances set out in section 86 of the FSMA). None of the Debtors or any of its Affiliates, Cineworld Parent, Reorganized Cineworld Parent, or any persons acting on behalf of any of them has authorized, nor do they authorize, the making of any offer of the Rights Offering Shares or the Subscription Rights through any financial intermediary, other than as may be contemplated in the Rights Offering Procedures. In relation to any Relevant State, the Subscription Rights or the Rights Offering Shares may not be sold or otherwise transferred other than to (a) a Qualified Investor in that Relevant State; or (b) any other person if such sale or transfer does not otherwise constitute an offer of securities to the public within the meaning of the Prospectus Regulation (including in any of the other circumstances set out in Article 1(4) of the Prospectus Regulation) and/or the FSMA (including in any of the other circumstances set out in section 86 of the FSMA). Please see <u>Section 5</u> hereof (Transfer Restriction; Revocation) for additional information related to the transfer of the Subscription Rights.

These Rights Offering Procedures are not and should not be construed as an invitation or inducement to engage in any investment activity in relation to any Rights Offering Shares such as would amount to a financial promotion in the United Kingdom for the purposes of section 21 of the FSMA. In the United Kingdom, the information contained in these Rights Offering Procedures is intended only for use and may only be relied upon in relation to any investment activity by, and any investment activity to which such information relates may only be engaged in by, persons falling within any of the circumstances of Article 1(4) of the Prospectus Regulation who are at the relevant time: (a) investment professionals within the meaning of Article 19(5) of the United Kingdom Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "<u>FPO</u>"); (b) high net worth companies within the meaning of Article 49(2)(a) through (d) of the FPO; (c) persons that are existing members or creditors of the issuer of the Rights Offering Shares, or of an undertaking which at the relevant time is in the same group as the issuer of the Rights Offering Shares, falling within Article 43 of the FPO; or (d) persons to whom the communication may otherwise lawfully be communicated (collectively, the "<u>Permitted UK Persons</u>"). Any person in the United Kingdom that is not a Permitted UK Person is not, for the purposes of any investment or investment decision, an intended recipient of the information contained in these Rights Offering Procedures and should not use such information as the basis for taking any investment activity or investment action. These Rights Offering Procedures should not (insofar as they relate to any investment or investment activity) be distributed, communicated to, or directed at the general public in the United Kingdom otherwise than as described above.

## IMPORTANT DATES

**Eligible Participants that are <u>not</u> Equity Capital Raising Parties (the "<u>Non-Equity Capital Raising Parties</u>") should note the following important dates and times relating to the Rights Offering when considering whether or not to participate in the Rights Offering:**

| Date | Calendar Date | Event |
|---|---|---|
| Rights Offering Record Date | May 9, 2023 | The date for the determination of the Holders of Allowed Legacy Facilities Claims, including for the Equity Capital Raising Parties, that may be entitled to participate in the Rights Offering (the "<u>Rights Offering Record Date</u>"). |
| Subscription Commencement Date | May 11, 2023 (or as soon as reasonably practicable thereafter) | The date for the commencement of the Rights Offering (the "<u>Subscription Commencement Date</u>"). |
| Subscription Expiration Deadline (only for Non-Equity Capital Raising Parties) | 4:00 p.m., Central Time, on June 8, 2023, unless extended as described herein. | The deadline for Eligible Participants who are Non-Equity Capital Raising Parties to subscribe for Rights Offering Shares (the "<u>Subscription Expiration Deadline</u>"). The Rights Offering Subscription Agent must <u>actually</u> receive each Eligible Participant's (who is a Non-Equity Capital Raising Party) Subscription Form(s) (as defined below) (with an accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) by the Subscription Expiration Deadline. |
| Subscription Funding Deadline (only for Non-Equity Capital Raising Parties) | 4:00 p.m., Central Time, on June 8, 2023, unless extended as described herein. | The date on which payment of each Eligible Participant's applicable Purchase Price, by wire transfer of immediately available funds, for all exercised Subscription Rights is due (other than those exercised by the Equity Capital Raising Parties) (the "<u>Subscription Funding Deadline</u>"). |
| Settlement Date | Substantially contemporaneously with the Effective Date. | The date on which Eligible Participants (including the Equity Capital Raising Related Parties) that participate in the Rights Offering will receive the Rights Offering Shares (the "<u>Settlement Date</u>"). |

For the avoidance of doubt, each Equity Capital Raising Party must subscribe for its Rights Offering Shares, deliver its respective Capital Raising Party Subscription Form, and fund, or have caused funding of, its applicable Purchase Price in accordance with the Financing Commitment and Backstop Agreement and the Capital Raising Party Subscription Form. For the avoidance of doubt, for the Rights Offering, the Capital Raising Party Subscription Expiration Deadline will be at 4:00 p.m., prevailing Central Time on the date that is eight (8) Business Days before the Closing Date, which shall be substantially contemporaneously with the Effective Date.

To Eligible Participants:

On April 11, 2023, the Debtors filed the Plan and the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Cineworld Group plc and Its Debtor Subsidiaries* [Docket No. 1509] (as may be amended from time to time in accordance with its terms, the "<u>Disclosure Statement</u>") with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "<u>Bankruptcy Court</u>"). Pursuant to the Plan, each Holder of an Allowed Legacy Facilities Claim as of the Rights Offering Record Date that is: (a) a holder of record as of the Rights Offering Record Date; (b) either (i) a "qualified institutional buyer," as such term is defined in Rule 144A under the Securities Act, (ii) a non-U.S. person as defined under Regulation S under the Securities Act, or (iii) an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3), (7), (8), (9), (12) or (13) under the Securities Act; and (c) if a resident, located or has a registered office in any member state of the European Economic Area or in the United Kingdom, such Holder must be a "Qualified Investor" (as defined in Article 2(e) of, respectively, the Regulation (EU) No 2017/1129 of the European Parliament and of the European Council of 14 June 2017 (as amended) or such regulation as it forms part of United Kingdom retained law as defined in the European Union (Withdrawal) Act 2018), as applicable (any persons meeting the criteria of clauses (b) through (c), a "<u>Permitted Investor</u>") (such persons meeting the criteria of clauses (a) through (c) collectively, the "<u>Eligible Participants</u>" and each such holder, an "<u>Eligible Participant</u>") has a Subscription Right to participate in the Rights Offering in accordance with the terms and conditions of these Rights Offering Procedures.

Pursuant to the Plan and as discussed in the Disclosure Statement, Reorganized Cineworld Parent will issue shares of New Common Stock (the "<u>Rights Offering Shares</u>") for an aggregate purchase price of $800.0 million (the "<u>Rights Offering Amount</u>") through a rights offering (the "<u>Rights Offering</u>"). The Rights Offering consists of two elements:

- First, pursuant to the terms and conditions of these Rights Offering Procedures, each Eligible Participant who is not an Equity Capital Raising Party (as defined below) may participate up to its *pro rata* portion of its Allowed Legacy Facilities Claims and each Equity Capital Raising Party must participate for its *pro rata* portion of its Allowed Legacy Facilities Claims, in each case, as compared to the aggregate amount of Allowed Legacy Facilities Claims, in an offering (the "<u>General Rights Offering</u>") of 50% of the Rights Offering Shares (the "<u>General Rights Offering Shares</u>") in an amount up to $400.0 million (the "<u>General Rights Offering Amount</u>").

- Second, pursuant to the Financing Commitment and Backstop Agreement and these Rights Offering Procedures, certain Eligible Participants (the "<u>Equity Capital Raising Parties</u>") have committed (i) to fully backstop the General Rights Offering by purchasing any Rights Offering Shares that are unsubscribed for and not purchased by an Eligible Participant entitled thereto (the "<u>RO Backstop Shares</u>") and (ii) purchase 50% of the Rights Offering Shares (the "<u>Direct Allocation Shares</u>") in an offering (the "<u>Direct Rights Offering</u>") in an amount equal to $400.0 million (the "<u>Direct Rights Offering Amount</u>").

Failure to validly complete, execute, and return the Subscription Form(s) on a timely basis will result in forfeiture of an Eligible Participant's rights to participate in the Rights Offering in respect of the Rights Offering Shares.  None of Cineworld Parent, Reorganized Cineworld Parent, the Debtors, the Rights Offering Subscription Agent, or any of the Equity Capital Raising Parties will have any liability for any such failure.

No Eligible Participant shall be entitled to participate in the Rights Offering unless: (a) in the case of each Non-Equity Capital Raising Party, the Purchase Price for the General Rights Offering Shares that it subscribes for is received by the Rights Offering Subscription Agent at or before Subscription Funding

Deadline; and (b) in the case of each Equity Capital Raising Party, the Purchase Price for its Rights Offering Shares (including any amount such Equity Capital Raising Party is required to pay for RO Backstop Shares (as defined below) pursuant to the Financing Commitment and Backstop Agreement, such Equity Capital Raising Party's "Funding Amount") is paid or arranged to be paid by such Equity Capital Raising Party in accordance with the Financing Commitment and Backstop Agreement at or prior to the deadline set forth in the Financing Commitment and Backstop Agreement (the "Backstop Funding Deadline").

No interest is payable on any advanced funding of any Purchase Price. If the Rights Offering is terminated for any reason, any Purchase Price or Funding Amount, as applicable, previously received by the Rights Offering Subscription Agent will be returned to Eligible Participants or Equity Capital Raising Parties, as applicable, as provided in Section 6 hereof (Termination/Return of Payment). No interest will be paid on any returned Purchase Price. Any Non-Equity Capital Raising Party submitting payment via the Rights Offering Subscription Agent must coordinate with the Rights Offering Subscription Agent to ensure that the Rights Offering Subscription Agent receives such payment by the Subscription Funding Deadline.

**To participate in the Rights Offering, an Eligible Participant must complete all of the steps outlined below. If all of the steps outlined below are not completed by the Subscription Expiration Deadline or the Subscription Funding Deadline (or the deadlines as set forth in the Financing Commitment and Backstop Agreement with respect to Equity Capital Raising Parties), as applicable, subject to the terms and conditions of the Financing Commitment and Backstop Agreement for Eligible Participants that are Equity Capital Raising Parties, an Eligible Participant shall be deemed to have forever and irrevocably relinquished and waived its right to participate in the Rights Offering in respect of the Rights Offering Shares, subject to the Financing Commitment and Backstop Agreement with respect to the Equity Capital Raising Parties.**

1. **Rights Offering**

Each Eligible Participant shall receive rights to subscribe for its *pro rata* portion of the General Rights Offering Shares. Non-Equity Capital Raising Parties have the right, but not the obligation, to participate in the General Rights Offering up to their *pro rata* portion of their respective Allowed Legacy Facilities Claims, while each Equity Capital Raising Party must subscribe for a number of General Rights Offering Shares equal to 100% of its *pro rata* portion of Allowed Legacy Facilities Claims. Only Equity Capital Raising Parties may participate in the Direct Rights Offering and must subscribe for the Direct Allocation Shares in accordance with the Financing Commitment and Backstop Agreement.

Subject to the terms and conditions set forth in the Plan and these Rights Offering Procedures, each Eligible Participant is entitled to subscribe for the General Rights Offering Shares with an aggregate purchase price (the "Maximum Aggregate Purchase Price") equal to the product of (a) such Eligible Participant's *pro rata* portion of its Allowed Legacy Facilities Claims, as compared to the aggregate amount of Allowed Legacy Facilities Claims and (b) the General Rights Offering Amount. The purchase price to be paid by an Eligible Participant for the General Rights Offering Shares (the "Purchase Price") equals the portion of the Maximum Aggregate Purchase Price that corresponds to the portion of the General Rights Offering Shares that such Eligible Participant elects to purchase in accordance with these Rights Offering Procedures. The number of General Rights Offering Shares that an Eligible Participant shall receive in exchange for such Eligible Participant's Purchase Price shall be equal to the resulting number obtained by dividing (i) such Purchase Price by (ii) the Per Share Subscription Price (as determined under the Financing Commitment and Backstop Agreement in accordance with the Plan). For the avoidance of doubt, the Per Share Subscription Price for the General Rights Offering Shares and the Direct Allocation Shares is the same.

Each Non-Equity Capital Raising Party must deliver, or have caused to be delivered, its Purchase Price to the Rights Offering Subscription Agent by the Subscription Funding Deadline.  Each Equity Capital Raising Party or an Equity Capital Raising Related Party (as defined below) must deliver, or cause to be delivered, its Purchase Price to the Rights Offering Subscription Agent by the deadline for such funding set forth in the Financing Commitment and Backstop Agreement.  Further, any "Equity Capital Raising Related Party" means (i) an Equity Capital Raising Party, (ii) a Related Purchaser of any Equity Capital Raising Party, or (iii) any Person who (A) is an Eligible Participant and (B) has entered into any trade, agreement or other arrangement to sell or otherwise transfer any Allowed Legacy Facilities Claims to an Equity Capital Raising Party or a Related Purchaser of an Equity Capital Raising Related Party and exercises the related Subscription Rights in the name of such Person, but on behalf of such Equity Capital Raising Party or such Affiliate, solely in such Person's capacity as described in this clause (iii).

There will be no over-subscription privilege in the Rights Offering.  Any RO Backstop Shares will not be offered to other Eligible Participants but will be purchased by the Equity Capital Raising Parties in accordance with the Financing Commitment and Backstop Agreement.  Subject to the terms and conditions of the Financing Commitment and Backstop Agreement, each Equity Capital Raising Party will agree to purchase (on a several and not joint basis) a certain portion of the RO Backstop Shares based upon the allocations set forth in the Financing Commitment and Backstop Agreement.

Resale restrictions related to the Rights Offering Shares are discussed in more detail in Article XI of the Disclosure Statement, entitled "Certain Securities Law Matters."

**SUBJECT TO THE TERMS AND CONDITIONS OF THE RIGHTS OFFERING PROCEDURES AND THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT IN THE CASE OF ANY EQUITY CAPITAL RAISING PARTY, INCLUDING WITH RESPECT TO DESIGNATIONS BY NON-EQUITY CAPITAL RAISING PARTIES TO EQUITY CAPITAL RAISING RELATED PARTIES, ALL SUBSCRIPTIONS SET FORTH IN THE SUBSCRIPTION FORM(S) ARE IRREVOCABLE.**

### 2.    Subscription Period for Non-Equity Capital Raising Parties

For Non-Equity Capital Raising Parties, the Rights Offering will commence on the Subscription Commencement Date and will expire at the Subscription Expiration Deadline.  Each Non-Equity Capital Raising Party intending to purchase the General Rights Offering Shares in the General Rights Offering must affirmatively elect to exercise its respective Subscription Rights in the manner set forth in the Non-Equity Capital Raising Party Subscription Form by the Subscription Expiration Deadline. Each Non-Equity Capital Raising Party may exercise all or any portion of its respective Subscription Rights, but subject to the terms and conditions contained in these Rights Offering Procedures.

Except as set forth in Section 5 hereof (Transfer Restriction; Revocation), any exercise of Subscription Rights by a Non-Equity Capital Raising Party after the Subscription Expiration Deadline will not be allowed and any purported exercise received by the Rights Offering Subscription Agent after the Subscription Expiration Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored. Notwithstanding the foregoing, the Debtors shall have the discretion, with the prior written consent of the Required Equity Capital Raising Parties in their sole discretion, to allow any exercise of Subscription Rights by any Non-Equity Capital Raising Party after the Subscription Expiration Deadline, or as required by Law.

The Subscription Expiration Deadline may be extended with the consent of the Required Equity Capital Raising Parties, the Required Consenting Creditors and the Debtors. Any such extension will be

followed by an announcement via the Subscription Agent's electronic portal on and during the next Business Day after the day on which the previously scheduled Subscription Expiration Deadline occurred.

3.      **Exercise of Subscription Rights**

(a)      To validly exercise its Subscription Rights for General Rights Offering Shares, each Non-Equity Capital Raising Party must:

(i)      return a duly completed and executed Non-Equity Capital Raising Party Subscription Form(s) attached hereto as <u>Annex A</u> (the "<u>Non-Equity Capital Raising Party Subscription Form</u>" and, together with the Capital Raising Party Subscription Form, each a "<u>Subscription Form</u>") (with an accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) so that such documents are *actually* received by the Rights Offering Subscription Agent by the Subscription Expiration Deadline; and

(ii)      at the same time you return the Non-Equity Capital Raising Party Subscription Form(s) to the Rights Offering Subscription Agent, but in no event later than the Subscription Funding Deadline, pay, or have paid, the applicable Purchase Price to the Rights Offering Subscription Agent for the General Rights Offering Shares by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in the Non-Equity Capital Raising Party Subscription Form(s).

(b)      For each **Equity Capital Raising Party** to validly exercise its Subscription Rights, each such Equity Capital Raising Party in connection with this Rights Offering must:

(i)      return duly completed and executed applicable Capital Raising Party Subscription Form(s) (with an accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable), so that such documents are actually received by the Rights Offering Subscription Agent at or before the deadline set forth in the Financing Commitment and Backstop Agreement; and

(ii)      no later than the Backstop Funding Deadline, pay, have paid, or arranged to have paid, the applicable Funding Amount to the Escrow Account (as defined by the Financing Commitment and Backstop Agreement) by (A) wire transfer **ONLY** of immediately available funds in accordance with the wire instructions included in the Funding Notice (as defined in the Financing Commitment and Backstop Agreement) and/or (B) electing to have cash in the amount of all or any portion of such Equity Capital Raising Party's DIP Claim to be used to satisfy all or a portion of the Funding Amount in accordance with the Financing Commitment and Backstop Agreement and, to the extent applicable, the procedures for the Capital Raise Convenience Election set forth in the Capital Raising Party Subscription Form.

Please be advised that the execution and delivery by a Designee (as defined below) of a signature page to the New Stockholders Agreement shall relieve any requirement or obligation of the applicable Eligible Participant to execute and deliver a signature page to the New Stockholders Agreement if no Rights Offering Shares will be received by such Eligible Participant.

**ALL EQUITY CAPITAL RAISING RELATED PARTIES MUST PAY THEIR APPLICABLE FUNDING AMOUNT DIRECTLY TO THE ESCROW ACCOUNT, EXCEPT TO THE EXTENT THE CAPITAL RAISE CONVENIENCE ELECTION IS AVAILABLE TO THEM IN ACCORDANCE WITH THE TERMS OF THE FINANCING COMMITMENT AND BACKSTOP AGREEMENT.**

(c)     Subject to <u>Section 6</u> hereof (Termination/Return of Payment), the cash paid by Non-Equity Capital Raising Parties to the Rights Offering Subscription Agent in accordance with these Rights Offering Procedures will be deposited and held by the Rights Offering Subscription Agent in the Escrow Account established pursuant to the terms of the Financing Commitment and Backstop Agreement until released to Reorganized Cineworld Parent in connection with the settlement of the Rights Offering on the Effective Date. The Rights Offering Subscription Agent may not use such cash for any other purpose prior to the Effective Date and may not encumber or permit such cash to be encumbered with any lien or similar encumbrance. Subject to <u>Section 6</u> hereof (Termination/Return of Payment), the cash deposited and held in the Escrow Account hereunder shall not be deemed part of the Debtors' bankruptcy estates.

4.     **Subscription Payments by Non-Equity Capital Raising Parties**

(a)     **Overpayment**: In the event that the funds received from any Non-Equity Capital Raising Party are for **more** than the Purchase Price elected to be paid by such Non-Equity Capital Raising Party in such Non-Equity Capital Raising Party's applicable Non-Equity Capital Raising Party Subscription Form (i.e., an overpayment), the number of General Rights Offering Shares deemed to be purchased by such Non-Equity Capital Raising Party will be equal to the number of General Rights Offering Shares that can be purchased with the Purchase Price elected to be paid by such Non-Equity Capital Raising Party in its respective Non-Equity Capital Raising Party Subscription Form, up to the number of General Rights Offering Shares that can be purchased with such Non-Equity Capital Raising Party's *pro rata* portion of the General Rights Offering Amount.

(b)     **Underpayment**: In the event that the funds received from any Non-Equity Capital Raising Party are **less** than the Purchase Price elected to be paid by such Non-Equity Capital Raising Party in such Non-Equity Capital Raising Party's applicable Non-Equity Capital Raising Party Subscription Form (i.e., an underpayment), the Debtors, with the consent of the Required Equity Capital Raising Parties, may accept such underpayment and Reorganized Cineworld Parent may issue the number of General Rights Offering Shares that can be purchased with the funds received from such Non-Equity Capital Raising Party.

For the avoidance of doubt, for each Equity Capital Raising Party, any overpayment or underpayment by such Equity Capital Raising Party for its Rights Offering Shares will be resolved in accordance with the Financing Commitment and Backstop Agreement.

5.     **Transfer Restriction; Revocation**

The Subscription Rights are not detachable from the Allowed Legacy Facilities Claims and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated, or otherwise encumbered or disposed of, directly or indirectly, separately from the Allowed Legacy Facilities Claims (including through derivatives, options, swaps, forward sales, or other transactions in which any Person receives the right to own or acquire any current or future interest in the Subscription Rights).

Notwithstanding the foregoing, any Non-Equity Capital Raising Party may transfer or assign any Subscription Rights to an Affiliate of such Non-Equity Capital Raising Party that is a Permitted Investor

(together with the related Allowed Legacy Facilities Claims) after the Rights Offering Record Date in order to exercise the Subscription Rights in accordance with the Non-Equity Capital Raising Party Subscription Form by designating such General Rights Offering Shares for delivery to such Person.  See Section 12 hereof (Registration Information and Designation of Affiliates to Receive Rights Offering Shares) for more information on designating Rights Offering Shares for delivery.  Following any such transfer or assignment to an Affiliate of an Non-Equity Capital Raising Party that is also a Permitted Investor, such Affiliate shall be, and shall be deemed to be, the Non-Equity Capital Raising Party with respect to such Subscription Rights, including for purposes of making the applicable certifications in the applicable Subscription Form(s) (which shall include certifications with respect to the amount of its Allowed Legacy Facilities Claims to which such Subscription Rights relate). For the avoidance of doubt, all designations and Permitted Transfers by the Equity Capital Raising Parties shall be in compliance with the Financing Commitment and Backstop Agreement. Please see the Capital Raising Party Subscription Form and Capital Raising Party Transfer Form for more procedural information for Equity Capital Raising Parties in order to process designations and Permitted Transfers, respectively.

In addition, any transfer of Subscription Rights or Rights Offering Shares shall be prohibited if such transfer, upon consummation, would otherwise result in Reorganized Cineworld Parent (i) becoming a reporting company under the Exchange Act or (ii) having, in the aggregate, either (A) 1,900 or more holders of record (as such concept is understood for purposes of Section 12(g) of the Securities Exchange Act of 1934, as amended and including any rule or regulation promulgated thereunder (the "Exchange Act")) or (B) in the aggregate, more than 450 holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) who do not satisfy the definition of an "accredited investor" within the meaning of Rule 501(a) under Regulation D of the Securities Act (determined, in each case, in the Company's reasonable discretion) of any class of equity securities of Reorganized Cineworld Parent, including the New Common Stock.

In addition, if any Equity Capital Raising Party or any Equity Capital Raising Related Party of such Equity Capital Raising Party initiates or enters into any trade, agreement or other arrangement to purchase or otherwise acquire any Allowed Legacy Facilities Claims from any Non-Equity Capital Raising Party, then such Non-Equity Capital Raising Party shall be permitted to exercise the Subscription Rights with respect to its General Rights Offering Shares applicable to such Allowed Legacy Facilities Claims in the name of such Eligible Participant, but on behalf of such Equity Capital Raising Party or such Equity Capital Raising Related Party.  In connection with such an exercise, the Non-Equity Capital Raising Party must submit its Non-Equity Capital Raising Party Subscription Form to the Rights Offering Subscription Agent by the Subscription Expiration Deadline, except that the Debtors shall have the discretion, with the prior written consent of the Required Equity Capital Raising Parties in their sole discretion, to allow any exercise of Subscription Rights after the Subscription Expiration Deadline.  In any such case, such Equity Capital Raising Party or such Equity Capital Raising Related Party shall be permitted to pay on behalf of such Non-Equity Capital Raising Party the Purchase Price in connection with the exercise of such Subscription Rights and such payment shall be made by the deadline for such funding set forth in the Financing Commitment and Backstop Agreement.

Once a Non-Equity Capital Raising Party has properly exercised its Subscription Rights subject to the terms and conditions contained in these Rights Offering Procedures, such exercise will be irrevocable and deemed an irrevocable election. Equity Capital Raising Parties must exercise their Subscription Rights in accordance with the Financing Commitment and Backstop Agreement, which includes, among other things, submitting a Capital Raising Party Subscription Form with respect to the Rights Offering.

6.      **Termination/Return of Payment**

Unless the Effective Date has occurred, the Rights Offering will be deemed automatically terminated without any action of any party upon the earlier of: (a) termination of the Plan or rejection of the Plan by all classes entitled to vote and (b) termination of the Financing Commitment and Backstop Agreement in accordance with its terms.  In the event the Rights Offering is terminated, any payments received pursuant to these Rights Offering Procedures will be returned, without interest, to the applicable Eligible Participant as soon as reasonably practicable, but in any event within ten (10) Business Days, or as soon as reasonably practicable thereafter, of the date on which the final refund instructions are received by the Company.

**7.      Settlement of the Rights Offering**

The settlement of the Rights Offering will occur on the Settlement Date and is conditioned on confirmation of the Plan by the Bankruptcy Court, compliance by the Company and the Debtors with these Rights Offering Procedures, the fulfillment of certain obligations under the Financing Commitment and Backstop Agreement and the simultaneous occurrence of the Effective Date.

**8.      Rights Offering Shares**

The Debtors anticipate allocating the Rights Offering Shares to Eligible Participants, including the Equity Capital Raising Parties, by book-entry interests on Reorganized Cineworld Parent's books and records on or about the Effective Date, which is administered by the transfer agent. The Debtors currently do not anticipate allocating the Rights Offering Shares to Eligible Participants, including the Equity Capital Raising Parties, through DTC on or about the Effective Date but may do so in the future in Reorganized Cineworld Parent's sole discretion.

**9.      Fractional Shares**

No fractional Subscription Rights or Rights Offering Shares will be issued in the Rights Offering. All allocations of Rights Offering Shares (including each Eligible Participant's General Rights Offering Shares) will be calculated and rounded up or down to the nearest whole share (with .5 of a share being rounded up).

**10.      Validity of Exercise of Subscription Rights and Delivery of Rights Offering Materials**

Beginning on the Subscription Commencement Date, the Subscription Form(s) and these Rights Offering Procedures will be sent to each Holder of Allowed Legacy Facilities Claims as of the Rights Offering Record Date, which include appropriate instructions for the proper completion, due execution and timely delivery of the executed Subscription Form(s) and the payment of the applicable Purchase Price for its Rights Offering Shares.  Delivery of the Subscription Form(s), these Rights Offering Procedures and instructions are being made to all Holders of Allowed Legacy Facilities Claims as of the Rights Offering Record Date for administrative convenience.  Notwithstanding such delivery, only Eligible Participants shall be permitted to participate in the Rights Offering, subject to the terms and conditions of these Rights Offering Procedures.

Except as otherwise provided herein, all questions concerning the timeliness, viability, form, and eligibility of any exercise of Subscription Rights will be determined in good faith by Reorganized Cineworld Parent with the prior written consent of the Required Equity Capital Raising Parties, and, if necessary, subject to a final and binding determination by the Bankruptcy Court.  Except as otherwise provided herein, the Company, in consultation with the advisors to the Required Equity Capital Raising Parties, may waive or reject any defect or irregularity in, or permit such defect or irregularity to be corrected

within such time as the Company may determine in good faith in connection with, the purported exercise of any Subscription Rights.  Except as otherwise provided herein, Subscription Form(s) will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Company determines in good faith in consultation with the advisors to the Required Equity Capital Raising Parties.

*Before exercising any Subscription Rights, Eligible Participants should read the Disclosure Statement and the Plan for information relating to Cineworld Parent and Reorganized Cineworld Parent, including the risk factors therein.*

All calculations, including, to the extent applicable, the calculation of (a) the value of any Eligible Participant's Allowed Legacy Facilities Claims for the purposes of the Rights Offering and (b) any Eligible Participant's General Rights Offering Shares, shall be made in good faith by the Company or the DIP Agent, to the extent applicable, in consultation with the Consenting Creditors' Advisors and in each case in accordance with any Claim amounts included in the Plan, and any disputes regarding such calculations shall be subject to a final and binding determination by the Bankruptcy Court. The amount of a Capital Raising Party's DIP Claim with respect to the Capital Raise Convenience Election shall be made by the DIP Agent and such calculation shall be conclusive and binding absent manifest error. Any disputes regarding such calculations shall be subject to a final and binding determination by the Bankruptcy Court.

### 11.    Modification of Procedures

With the prior written consent of the Required Equity Capital Raising Parties and the Required Consenting Creditors, the Company reserves the right to modify these Rights Offering Procedures, or adopt additional procedures consistent with these Rights Offering Procedures, to effectuate the Rights Offering and to issue the Rights Offering Shares; <u>provided</u>, however, the Company shall provide prompt written notice (email being sufficient) to each Eligible Participant of any material modification to these Rights Offering Procedures prior to the Settlement Date.  In so doing, and subject to the consent of the Required Equity Capital Raising Parties, the Company and the Debtors may execute and enter into agreements and take further action that the Company and the Debtors determine in good faith is necessary and appropriate to effect and implement the Rights Offering and the issuance of the Rights Offering Shares.

### 12.    Registration Information and Designation of Affiliates to Receive Rights Offering Shares

- **Non-Equity Capital Raising Parties**: The Company and the Debtors intend that the Rights Offering Shares will be issued by Reorganized Cineworld Parent to the Non-Equity Capital Raising Parties, to any Affiliate of such Non-Equity Capital Raising Party or an Equity Capital Raising Related Party (an "<u>Non-ECRP Designee</u>"), in book-entry form on the books and records of Reorganized Cineworld Parent, which is administered by the transfer agent.  In accordance with the Non-Equity Capital Raising Party Subscription Form, any Non-ECRP Designee must (a) certify to its status as a Permitted Investor, by completing the questionnaire included with the Non-Equity Capital Raising Party Subscription Form, (b) complete and execute the IRS Form W-9 that accompanies the Non-Equity Capital Raising Party Subscription Form or an appropriate IRS Form W-8, as applicable, and (c) execute a signature page to the New Stockholders Agreement.  Please be advised that each Non-Equity Capital Raising Party may only designate its respective General Rights Offering Shares to be delivered to Affiliates of such Non-Equity Capital Raising Party or an Equity Capital Raising Related Party.

- **Equity Capital Raising Parties**: If you are an Equity Capital Raising Party and wish to have any Rights Offering Shares designated in the name of any other Person (including any other Equity

Capital Raising Party or any Affiliate of an Equity Capital Raising Party) that is a Permitted Investor (a "ECRP Designee," together with any Non-ECRP Designees, the "Designees"), such ECRP Designee must (i) certify to its status as a Permitted Investor by completing the questionnaire included with the Capital Raising Party Subscription Form, (ii) complete and execute the IRS Form W-9 that accompanies the Capital Raising Party Subscription Form or an appropriate IRS Form W-8, as applicable, and (iii) execute a signature page to the New Stockholders Agreement.  Designations by Equity Capital Raising Related Parties shall be made no later than the deadline for such designations set forth in the Financing Commitment and Backstop Agreement.

The execution and delivery by a Designee of a signature page to the New Stockholders Agreement shall relieve any requirement or obligation of the applicable Eligible Participant to execute and deliver a signature page to the New Stockholders Agreement if no Rights Offering Shares will be received by such Eligible Participant, including any Equity Capital Raising Related Party.

The Debtors shall reserve the right to confirm that any participant in the Rights Offering is in fact an Eligible Participant, an Equity Capital Raising Party, a Non-ECRP Designee or an ECRP Designee, as applicable, including, but not limited to, requiring additional certifications by such participant to that effect and other diligence measures, if any, as the Debtors deem reasonably necessary.

### 13.    Inquiries And Transmittal of Documents; Rights Offering Subscription Agent

The Rights Offering Instructions for Non-Equity Capital Raising Related Parties attached hereto should be carefully read and strictly followed by the Non-Equity Capital Raising Related Parties. The Equity Capital Raising Parties should carefully read and strictly follow the Capital Raising Party Subscription Form and the Financing Commitment and Backstop Agreement.

Questions relating to the Rights Offering should be directed to the Rights Offering Subscription Agent via email to CineworldIssuerServices@is.kroll.com (please reference "Cineworld Rights Offering" in the subject line) or at the following phone number: 844.648.5574 (Toll-free) and 845.295.5705 (International).

The risk of non-delivery/non-receipt of all documents and payments to the Rights Offering Subscription Agent or the Escrow Account rests completely with the Eligible Participant electing to exercise its Subscription Rights and not Cineworld Parent, Reorganized Cineworld Parent, the Debtors, the Rights Offering Subscription Agent, or the Equity Capital Raising Parties, including any of their designees or permitted transferees, if different.

### 14.    Failure to Exercise Subscription Rights by Non-Equity Capital Raising Parties

Except as set forth in Section 5 hereof (Transfer Restriction; Revocation), unexercised Subscription Rights by Non-Equity Capital Raising Parties in respect of the Rights Offering Shares will be relinquished on the Subscription Expiration Deadline.  If, on or prior to the Subscription Expiration Deadline, the Rights Offering Subscription Agent for any reason does not receive from any Non-Equity Capital Raising Party its duly completed and executed applicable Non-Equity Capital Raising Party Subscription Form (with an accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable), such Non-Equity Capital Raising Party shall be deemed to have irrevocably relinquished and waived its right to participate in the General Rights Offering in respect of the General Rights Offering Shares.

Any attempt to exercise Subscription Rights after the Subscription Expiration Deadline in respect of the General Rights Offering Shares shall be null and void and the Company and the Debtors shall not be

obligated to honor any such purported exercise received by the Rights Offering Subscription Agent after the Subscription Expiration Deadline regardless of when the documents relating thereto were sent.

**The method of delivery of the applicable Subscription Form and any other required documents is at each Eligible Participant's option and sole risk, and delivery will be considered made only when actually received by the Rights Offering Subscription Agent.**

**A NON-EQUITY CAPITAL RAISING PARTY MUST COMPLETE AND SUBMIT ITS NON-EQUITY CAPITAL RAISING PARTY SUBSCRIPTION FORM VIA THE RIGHTS OFFERING SUBSCRIPTION AGENT'S ELECTRONIC PORTAL.  TO ACCESS THE E-PORTAL, VISIT HTTPS://CASES.RA.KROLL.COM/CINEWORLD, CLICK ON THE ["SUBMIT RIGHTS OFFERING SUBSCRIPTION FORM"] SECTION OF THE WEBSITE AND FOLLOW THE INSTRUCTIONS TO COMPLETE AND SUBMIT THE FORM.  PLEASE ALLOW SUFFICIENT TIME TO ENSURE TIMELY DELIVERY BY 4:00 P.M. (PREVAILING CENTRAL TIME) ON THE SUBSCRIPTION EXPIRATION DEADLINE.**

**PLEASE DO <u>NOT</u> FOLLOW UP WITH HARD COPIES OR EMAILED COPIES OF THE RIGHTS OFFERING DOCUMENTS.  THE E-PORTAL IS THE ONLY VALID METHOD OF SUBMISSION.  NO OTHER METHODS WILL BE ACCEPTED.**

**CINEWORLD GROUP PLC ET AL.**

**RIGHTS OFFERING INSTRUCTIONS FOR
NON-EQUITY CAPITAL RAISING PARTIES**

Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Plan. For the avoidance of doubt, the Equity Capital Raising Parties should carefully read and strictly follow the Capital Raising Party Subscription Form and the Financing Commitment and Backstop Agreement.

To elect to participate in the General Rights Offering, Non-Equity Capital Raising Parties must follow the instructions set out below:

1.     **Insert** in Item 1a of your Non-Equity Capital Raising Party Subscription Form the amount of Allowed Legacy Facilities Claims held by you as of the Rights Offering Record Date.

2.     **Complete** the calculation in Item 1b of your Non-Equity Capital Raising Party Subscription Form, which calculates your *pro rata* portion of the General Rights Offering. Your *pro rata* portion shall be rounded up or down to the nearest one-hundredth decimal place (with .005 being rounded up).

3.     **Complete** the calculation in Item 2a of your Non-Equity Capital Raising Party Subscription Form, which calculates the Maximum Aggregate Purchase Price for which you are entitled to pay for the Rights Offering Shares.  Such amount must be rounded up or down to the nearest whole cent (with $.005 being rounded up).

4.     **Insert** in Item 2b of your Non-Equity Capital Raising Party Subscription Form the Purchase Price you are electing to pay for the General Rights Offering Shares.

5.     **Read and complete** the certification in Item 2c and Exhibit A of your Non-Equity Capital Raising Party Subscription Form certifying that you are a Permitted Investor.

6.     **Insert** your wire information in Item 4 of your Non-Equity Capital Raising Party Subscription Form, which will be used to refund any Purchase Price if and as warranted.

7.     **Read, complete and sign** the certification in Item 5 of your Non-Equity Capital Raising Party Subscription Form.  Such execution shall indicate your acceptance and approval of the terms and conditions set forth in these Rights Offering Procedures.

8.     **Read, complete and sign** an IRS Form W-9 if you are a U.S. person.  If you are a non-U.S. person, read, complete, and sign an appropriate IRS Form W-8.  These forms may be obtained from the IRS Internal Revenue Service at its website:  www.irs.gov.

9.     **Return** your complete, signed signature page to the New Stockholders Agreement and Non-Equity Capital Raising Party Subscription Form (with an accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Rights Offering Subscription Agent by the Subscription Expiration Deadline.

10.    **Arrange for full payment** of the applicable Purchase Price, as applicable, by wire transfer of immediately available funds, calculated in accordance with Item 3 of your Non-Equity Capital Raising Party Subscription Form. A Non-Equity Capital Raising Party must transmit and deliver the payment for its respective Purchase Price to the Rights Offering Subscription Agent by the

Subscription Funding Deadline. For the avoidance of doubt, any Equity Capital Raising Party should follow the payment instructions that will be provided in the Funding Notice for the payment of the Funding Amount.

---

**For Non-Equity Capital Raising Parties, the Subscription Expiration Deadline is June 8, 2023 at 4:00 p.m., prevailing Central Time. The Subscription Funding Deadline is June 8, 2023 at 4:00 p.m., prevailing Central Time.**

**For Non-Equity Capital Raising Parties, please note that the Non-Equity Capital Raising Party Subscription Form(s) (with an accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) must be received by the Rights Offering Subscription Agent by the Subscription Expiration Deadline, along with the appropriate funding by the Subscription Funding Deadline. Otherwise, the subscription represented by your applicable Subscription Form(s) will not be counted and you will be deemed forever to have relinquished and waived your right to participate in the Rights Offering.**

**Non-Equity Capital Raising Parties exercising on behalf of an Equity Capital Raising Party or its Affiliates may deliver the Non-Equity Capital Raising Party Subscription Form and appropriate funding no later than the deadline set forth in the Financing Commitment and Backstop Agreement.**

**Equity Capital Raising Parties must deliver their respective Capital Raising Party Subscription Forms and appropriate funding directly to the Escrow Account pursuant to the Funding Notice no later than the deadline set forth in the Financing Commitment and Backstop Agreement.**

---

Please deliver your completed Non-Equity Capital Raising Party Subscription Form or Capital Raising Party Subscription Form, as applicable, with an accompanying IRS Forms W-9 or appropriate IRS Form W-8, as applicable, to the Rights Offering Subscription Agent via the its electronic portal. To access the electronic portal, visit https://cases.ra.kroll.com/cineworld/, click on the ["Submit Subscription Form"] section of the website and follow the instructions to submit your respective Non-Equity Capital Raising Party Subscription Form or the Capital Raising Party Subscription Form, as applicable, and any related documentation.

**ELECTRONIC FORM: THE INFORMATION AGENT WILL ONLY ACCEPT NON-EQUITY CAPITAL RAISING PARTY SUBSCRIPTION FORM(S) OR CAPITAL RAISING PARTY SUBSCRIPTION FORM(S) AND ACCOMPANYING DOCUMENTS IF PROPERLY COMPLETED THROUGH ITS ELECTRONIC PORTAL.**

**YOUR COMPLETED SUBSCRIPTION FORM SHOULD ONLY BE SUBMITTED VIA THE RIGHTS OFFERING SUBSCRIPTION AGENT'S ELECTRONIC PORTAL. TO ACCESS THE E-PORTAL, VISIT HTTPS://CASES.RA.KROLL.COM/CINEWORLD, CLICK ON THE "[SUBMIT SUBSCRIPTION FORM]" SECTION OF THE WEBSITE AND FOLLOW THE INSTRUCTIONS TO SUBMIT YOUR FORM.**

**PLEASE DO NOT FOLLOW UP WITH HARD COPIES OR EMAILED COPIES OF THE RIGHTS OFFERING DOCUMENTS. THE E-PORTAL IS THE ONLY VALID METHOD OF SUBMISSION. NO OTHER METHODS WILL BE ACCEPTED**.

## <u>Annex A</u>

**Non-Equity Capital Raising Party Subscription Form**

## **Annex B**

**Capital Raising Party Subscription Form**

## Exhibit 13

**Non-Capital Raising Party Subscription Form**

**CINEWORLD GROUP PLC ET AL.**

**NON-EQUITY CAPITAL RAISING PARTY
SUBSCRIPTION FORM**

**FOR USE WITH
RIGHTS OFFERING**

**IN CONNECTION WITH THE DEBTORS'
DISCLOSURE STATEMENT DATED
[●], 2023**

**SUBSCRIPTION EXPIRATION DEADLINE**

**For Non-Equity Capital Raising Parties, the Subscription Expiration Deadline is [●], 2023 at 4:00 p.m., prevailing Central Time, and the Subscription Funding Deadline is on [●], 2023 at 4:00 p.m., Central Time.**

**Please note that your Non-Equity Capital Raising Party Subscription Form (with an accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and your Permitted Investor Questionnaire attached as <u>Exhibit A</u> to this Non-Equity Capital Raising Party Subscription Form (the "<u>Permitted Investor Questionnaire</u>") must be received by Kroll Issuer Services (US) (the "<u>Rights Offering Subscription Agent</u>"), along with a wire transfer of your Purchase Price for the General Rights Offering Shares to the Rights Offering Subscription Agent, at or before the Subscription Expiration Deadline or the Subscription Funding Deadline, as applicable.   Otherwise, the subscription represented by your Non-Equity Capital Raising Party Subscription Form will not be counted and will be deemed forever relinquished and waived.**

**Capital Raising Parties (including, for the avoidance of doubt, the Sponsored Facility Capital Raising Parties) must complete the separate Capital Raising Party Subscription Form and deliver the appropriate funding directly to the Escrow Account no later than the deadline specified in the Funding Notice in accordance with the Financing Commitment and Backstop Agreement (the "<u>Backstop Funding Deadline</u>").**

***DO <u>NOT</u> COMPLETE THIS FORM IF YOU ARE A <u>CAPITAL RAISING PARTY</u>, INCLUDING AN EQUITY CAPITAL RAISING PARTY.***

**The Rights Offering Shares, including the General Rights Offering Shares, are being distributed and issued by Reorganized Cineworld Parent without registration under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), in reliance upon the exemption provided by section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S of the Securities Act (or another applicable exemption under the Securities Act) and in compliance with any applicable state or local Laws pursuant to a registration or an exemption therefrom.**

**None of the Rights Offering Shares, including the General Rights Offering Shares, have been registered under the Securities Act, nor any state or local Law requiring registration for the offer or sale of a security.**

**The Rights Offering Procedures and Non-Equity Capital Raising Party Subscription Form have been prepared on the basis that any offer of the Rights Offering Shares, including the General Rights Offering Shares, or the Subscription Rights within any member state of the European Economic Area**

or in the United Kingdom (each, a "Relevant State") will be made pursuant to an exemption under Regulation (EU) No 2017/1129 of the European Parliament and of the European Council of 14 June 2017 and such regulation as it forms part of United Kingdom retained law as defined in the European Union (Withdrawal) Act 2018 (the "Prospectus Regulation") and/or the Financial Services and Markets Act 2000 of the United Kingdom (the "FSMA"), as applicable, from the requirement to publish a prospectus for the offer of transferable securities to the public.  In relation to each Relevant State, no offer of the Rights Offering Shares, including the General Rights Offering, or the Subscription Rights may be made to the public at any time other than pursuant to an exemption under the Prospectus Regulation and/or the FSMA, as applicable.  In any Relevant State, the Rights Offering, the Rights Offering Procedures and the Non-Equity Capital Raising Party Subscription Form are only addressed to and directed at: (a) "qualified investors" in that Relevant State (as defined in Article 2(e) of the Prospectus Regulation) (the "Qualified Investors"); or (b) any other person if such address or direction does not otherwise constitute an offer of securities to the public within the meaning of the Prospectus Regulation (including in any of the other circumstances set out in Article 1(4) of the Prospectus Regulation) and/or the FSMA (including in any of the other circumstances set out in section 86 of the FSMA).  None of the Debtors or any of its Affiliates, Cineworld Parent, Reorganized Cineworld Parent, or any persons acting on behalf of any of them has authorized, nor do they authorize, the making of any offer of the Rights Offering Shares, including the General Rights Offering Shares, or the Subscription Rights through any financial intermediary, other than as may be contemplated in the Rights Offering Procedures and Non-Equity Capital Raising Party Subscription Form.

The Rights Offering Procedures and the Non-Equity Capital Raising Party Subscription Form are not and should not be construed as an invitation or inducement to engage in any investment activity in relation to any Rights Offering Shares, including the General Rights Offering Shares, such as would amount to a financial promotion in the United Kingdom for the purposes of section 21 of the FSMA.  In the United Kingdom, the information contained in the Rights Offering Procedures and the Non-Equity Capital Raising Party Subscription Form is intended only for use and may only be relied upon in relation to any investment activity by, and any investment activity to which such information relates may only be engaged in by, persons falling within any of the circumstances of Article 1(4) of the Prospectus Regulation who are at the relevant time: (a) investment professionals within the meaning of Article 19(5) of the United Kingdom Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "FPO"); (b) high net worth companies within the meaning of Article 49(2)(a) through (d) of the FPO; (c) persons that are existing members or creditors of the issuer of the Rights Offering Shares, including the General Rights Offering Shares, or of an undertaking which at the relevant time is in the same group as the issuer of the Rights Offering Shares, including the General Rights Offering Shares, falling within Article 43 of the FPO; or (d) persons to whom the communication may otherwise lawfully be communicated (collectively, the "Permitted UK Persons").  Any person in the United Kingdom that is not a Permitted UK Person is not, for the purposes of any investment or investment decision, an intended recipient of the information contained in the Rights Offering Procedures and the Non-Equity Capital Raising Party Subscription Form and should not use such information as the basis for taking any investment activity or investment action.  The Rights Offering Procedures and the Non-Equity Capital Raising Party Subscription Form should not (insofar as they relate to any investment or investment activity) be distributed, communicated to, or directed at the general public in the United Kingdom otherwise than as described above.

Please consult the Plan, the Disclosure Statement, and the Rights Offering Procedures (including the Rights Offering Instructions attached thereto) for additional information with respect to this Non-Equity Capital Raising Party Subscription Form.  Any terms capitalized but not otherwise defined

herein shall have the meanings assigned to them in the Plan, Disclosure Statement or the Rights Offering Procedures.

If you have any questions, please contact the Rights Offering Subscription Agent via email at CineworldIssuerServices@is.kroll.com (please reference "<u>Cineworld Rights Offering</u>" in the subject line), or at the following applicable phone number: 844.648.5574 (Toll-free) and 845.295.5705 (International).

The record date for the Rights Offering is [●], 2023 (the "<u>Rights Offering Record Date</u>").

To subscribe:

- Complete Items 1 and 2, read Item 3, and read and complete Items 4 and 5 below.

- Complete the Permitted Investor Questionnaire attached as <u>Exhibit A</u>, including with respect to any Non-ECRP Designees.

- Execute the signature page to the New Stockholders Agreement attached as <u>Exhibit B</u>, including with respect to any Non-ECRP Designees.

- Complete <u>Exhibit C</u> (the Special Delivery Instructions) in order for a Non-ECRP Designee to receive the General Rights Offering Shares.

**This form is only for Non-Equity Capital Raising Parties.**

If you are a Non-Equity Capital Raising Party and you wish to have any General Rights Offering Shares delivered in the name of (1) an Affiliate of such Non-Equity Capital Raising Party or (2) an Equity Capital Raising Related Party (each, an "<u>Non-ECRP Designee</u>", as defined in the Rights Offering Procedures), both such Non-Equity Capital Raising Party and Non-ECRP Designee shall complete the Permitted Investor Questionnaire attached as <u>Exhibit A</u> hereto. In addition, such Non-ECRP Designee must also (a) complete and execute the IRS Form W-9 that accompanies the Non-Equity Capital Raising Party Subscription Form or an appropriate IRS Form W-8, as applicable, and (b) execute a signature page to the New Stockholders Agreement.

**Item 1. Amount of Allowed Legacy Facilities Claims and *Pro Rata* portion.**

      **1a.**      **Amount of Allowed Legacy Facilities Claims.**

      The undersigned certifies that the undersigned holds Allowed Legacy Facilities Claims, as the holder of record, in the aggregate principal amounts as of the Rights Offering Record Date (the "<u>Allowed Legacy Facilities Principal Amount</u>") as set forth below with respect to each of its Allowed Claims under (i) the Initial Legacy USD Term Loan, (ii) the Incremental Legacy USD Term Loan, (iii) the Legacy Euro Term Loan, and (iv) the Revolving Credit Facility (insert amounts on the lines below) or that the undersigned is the authorized signatory of such Person. For purposes of this Non-Equity Capital Raising Party Subscription Form, do **not** adjust your Allowed Legacy Facilities Principal Amount for any accrued or unmatured interest.[1] With respect to subscribing for its General Rights Offering Shares, **any beneficial**

---

[1]    To calculate an Eligible Participant's aggregate Pro Rata portion of its Allowed Legacy Facilities Claims with respect to the General Rights Offering, such Eligible Participant must provide the **aggregate principal amount**, as reflected on the lender register as of the Rights Offering Record Date, with respect to its Allowed Claims for **each** of (i) the Initial Legacy USD Term Loan, (ii) the Incremental Legacy USD Term Loan, (iii) the Legacy Euro Term Loan, and (iv) the Revolving Credit Facility (the "<u>Prepetition Facilities</u>"). Accrued interest, unmatured fees

owner of Allowed Legacy Facilities Claims must have its _**holder of record**_ for each of such beneficial owner's Allowed Legacy Facilities Claims complete this form on its behalf.

**(i) Initial Legacy USD Term Loan:**

Principal amount of Initial Legacy USD Term Loan held as of the Rights Offering Record Date:

_____

Name of holder of record of Initial Legacy USD Term Loan
as of the Rights Offering Record Date:

_____

**(ii) Incremental Legacy USD Term Loan:**

Principal amount of Incremental Legacy USD Term Loan held as of the Rights Offering Record Date:

_____

Name of holder of record of Incremental Legacy USD Term Loan
as of the Rights Offering Record Date:

_____

**(iii) Legacy Euro Term Loan:**

Principal amount (**denominated in euros**) of Legacy Euro Term Loan held
as of the Rights Offering Record Date:

_____

Name of holder of record of Legacy Euro Term Loan
as of the Rights Offering Record Date:

_____

**(iv) Revolving Credit Facility:**

Principal amount of Revolving Credit Facility held as of the Rights Offering Record Date:

_____

Name of holder of record of Revolving Credit Facility
as of the Rights Offering Record Date:

_____

---

and any other dollar amounts that may be classified as part of such Eligible Participant's Allowed Legacy Facilities Claims with regard to each of the Prepetition Facilities are then taken into account in determining the allocation of the General Rights Offering Shares among the Allowed Legacy Facilities Claims with regard to each of the Prepetition Facilities and each Eligible Participant's Maximum Aggregate Purchase Price for the General Rights Offering Shares.

**1b.** **Calculation of Pro Rata Portion.** Your *Pro Rata* portion of the General Rights Offering Shares is calculated using your principal amounts with respect to your Allowed Claims under (i) the Initial Legacy USD Term Loan, (ii) the Incremental Legacy USD Term Loan, (iii) the Legacy Euro Term Loan, and (iv) the Revolving Credit Facility. When combined with the calculations in Item 2, this yields the maximum percentage of the General Rights Offering Shares that you can purchase in the General Rights Offering**:**

**(i) Initial Legacy USD Term Loan:**

| | | | | |
|---|---|---|---|---|
| _____<br>(Insert principal amount from Item 1a(i) above) | / | $[●] | = | _____%<br>(Initial Legacy USD Term Loan Maximum *Pro Rata* Portion) (Round up or down to the nearest one-ten thousandth decimal place (with .00005 of a percent being rounded up)) |

**(ii) Incremental Legacy USD Term Loan:**

| | | | | |
|---|---|---|---|---|
| _____<br>(Insert principal amount from Item 1a(ii) above) | / | $[●] | = | _____%<br>(Incremental Legacy USD Term Loan Maximum *Pro Rata* Portion) (Round up or down to the nearest one-ten thousandth decimal place (with .00005 of a percent being rounded up)) |

**(iii) Legacy Euro Term Loan:**[2]

| | | | | |
|---|---|---|---|---|
| _____<br>(Insert principal amount from Item 1a(iii) above) | / | €[●] | = | _____%<br>(Legacy Euro Term Loan Maximum *Pro Rata* Portion) (Round up or down to the nearest one-ten thousandth decimal place (with .00005 of a percent being rounded up)) |

---

[2]   With respect to calculating the allocation of the General Rights Offering Amount to Holders of Claims with respect to the Euro Term Loan, an exchange rate for euros to dollars was used. This exchange rate was calculated based on the [ten (10)] trading day volume-weighted average price of the exchange rate for euros to U.S. dollars (as reflected on as displayed under the heading "Bloomberg VWAP" on Bloomberg page V <[●]> VWAP (or any equivalent successor page) in respect of the period from 9:30 am EST to 4:00 pm EST on any given trading day) immediately prior to the Rights Offering Record Date.

**(iv) Revolving Credit Facility:**

| | | | | |
|---|---|---|---|---|
| _____<br>(Insert principal amount from Item 1a(iv) above) | / | $[●] | = | _____%<br>(Revolving Credit Facility Maximum *Pro Rata* Portion) (Round up or down to the nearest one-ten thousandth decimal place (with .00005 of a percent being rounded up)) |

**Item 2. Rights.**

       **2a.**      **Calculation of Maximum Aggregate Purchase Price**. The Maximum Aggregate Purchase Price for which you are entitled to pay for the General Rights Offering Shares (set forth in box (v) below) is calculated as follows based on the sum of your principal amounts with respect to your Allowed Claims under (i) the Initial Legacy USD Term Loan, (ii) the Incremental Legacy USD Term Loan, (iii) the Legacy Euro Term Loan, and (iv) the Revolving Credit Facility:

**(i) Initial Legacy USD Term Loan:**

| | | | | |
|---|---|---|---|---|
| _____%<br>(Initial Legacy USD Term Loan Maximum *Pro Rata* Portion from Item 1b(i) above) | X | $[●] | = | $_____<br>(Initial Legacy USD Term Loan Maximum Aggregate Purchase Price) (Round up or down to nearest whole cent (with $.005 being rounded up)) |

**(ii) Incremental Legacy USD Term Loan:**

| | | | | |
|---|---|---|---|---|
| _____%<br>(Incremental Legacy USD Term Loan Maximum *Pro Rata* Portion from Item 1b(ii) above) | X | $[●] | = | $_____<br>(Incremental Legacy USD Term Loan Maximum Aggregate Purchase Price) (Round up or down to nearest whole cent (with $.005 being rounded up)) |

**(iii) Legacy Euro Term Loan:**

| | | | | |
|---|---|---|---|---|
| _____%<br>(Legacy Euro Term Loan Maximum *Pro Rata* Portion from Item 1b(iii) above) | X | $[●] | = | $_____<br>(Legacy Euro Term Loan Maximum Aggregate Purchase Price) (Round up or down to |

| | | | | nearest whole cent (with $.005 being rounded up)) |
|---|---|---|---|---|

**(iv) Revolving Credit Facility:**

| _____% (Revolving Credit Facility Maximum *Pro Rata* Portion from Item 1b(iv) above) | X | $[●] | = | $_____ (Revolving Credit Facility Maximum Aggregate Purchase Price) (Round up or down to nearest whole cent (with $.005 being rounded up)) |
|---|---|---|---|---|

**(v) Maximum Aggregate Purchase Price:**

| $_____ (Initial Legacy USD Term Loan Maximum Aggregate Purchase Price from Item 2a(i) above) | + | $_____ (Incremental Legacy USD Term Loan Maximum Aggregate Purchase Price from Item 2a(ii) above) | + | $_____ (Legacy Euro Term Loan Maximum Aggregate Purchase Price from Item 2a(iii) above) | + | $_____ (Revolving Credit Facility Maximum Aggregate Purchase Price from Item 2a(iv) above) | = | $_____ (Maximum Aggregate Purchase Price) |
|---|---|---|---|---|---|---|---|---|

**2b.      Purchase Price for General Rights Offering Shares**.  The undersigned hereby elects to purchase the General Rights Offering Shares for a Purchase Price equal to $_____ (such amount not to exceed the Maximum Aggregate Purchase Price from Item 2a(iv) above), on the terms and subject to the conditions set forth in the Rights Offering Procedures.

*[Rest of Page Intentionally Blank]*

**2c.    Investor Certification**.  To participate in the General Rights Offering, you must read and (if appropriate) check *both* boxes below.  By checking *both* boxes below, you are indicating that the undersigned is:

☐    Either (a) a "qualified institutional buyer" (as defined in Rule 144A of the Securities Act), (b) not a "U.S. person" (as defined in Regulation S of the Securities Act), or (c) an "institutional" Accredited Investor within the meaning of Rule 501(a) (1), (2), (3), (7), (8), (9), (12), or (13) of the Securities Act, in each case, having (or is a, direct or indirect, wholly-owned subsidiary of any entity having) total assets of in excess of $10 million and, in each case, is acquiring the Rights Offering Shares for its own account and has completed (or has had its authorized signatory complete on its behalf) the Permitted Investor Questionnaire attached as <u>Exhibit A</u> to this Non-Equity Capital Raising Party Subscription Form.

**AND**

☐    Either (a) not resident or located, nor has a registered office, in a Relevant State (being any member state of the European Economic Area or the United Kingdom) or (b) if resident, located or has a registered office in a Relevant State, a Qualified Investor as defined in Article 2(e) of, respectively, Regulation (EU) No 2017/1129 of the European Parliament and of the European Council of 14 June 2017 or such regulation as it forms part of United Kingdom retained law as defined in the European Union (Withdrawal) Act 2018, as applicable.

### Item 3. Payment and Delivery Instructions for Non-Equity Capital Raising Parties

Payment of the Purchase Price calculated pursuant to Item 2b above shall be made by wire transfer ONLY of immediately available funds in accordance with wire instructions that will be provided to you before the Subscription Funding Deadline.  **One wire should be sent** per Non-Equity Capital Raising Party Subscription Form submission on behalf of each Non-Equity Capital Raising Party.

Please deliver your completed Non-Equity Capital Raising Party Subscription Form (with an accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and fund your Purchase Price to the Rights Offering Subscription Agent at or before the Subscription Funding Deadline.

Payment of the Purchase Price calculated in Item 2b above shall be made by wire transfer ONLY in accordance with the following instructions:

*Wire Instructions:*

| Bank Name: | [●] |
|---|---|
| Bank Address: | [●] |
| ABA/Routing No.: | [●] |
| SWIFT (for international wires): | [●] |
| Account Name: | [●] |
| Account No.: | [●] |
| Reference: | [*Insert Form Number in memo field*][3] |

**Item 4.  Wire Refund for Non-Capital Raising Party.**

Please provide the wire information with respect to the **Non-Equity Capital Raising Party** in the event a refund is needed:

**Insert Amount being funded by Non-ECRP Designees:**
**$**_____

**One wire should be sent** per Non-Equity Capital Raising Party Subscription Form submission on behalf of each Non-Equity Capital Raising Party. *Please note that Capital Raising Parties, including Equity Capital Raising Related Parties, should submit wires in accordance with the Financing Commitment and Backstop Agreement. Please see* Exhibit C *hereto with respect to any Non-ECRP Designee and Related Purchaser who is an Equity Capital Raising Related Party.*

For reconciliation purposes with respect to a wire by a **Non-Equity Capital Raising Party,** insert name of entity that will send the wire:

_____

| Account Name: | |
|---|---|
| Bank Account No.: | |
| ABA Routing No.: | |

---

[3] Upon submission of your Non-Equity Capital Raising Party Subscription Form, the Rights Offering Subscription Agent will provide you with a unique "Form Number" that must be included in the wire reference section.  Please note that the failure to include the claimant name or form number in the reference field of any domestic or international wire payment may result in the rejection of the corresponding rights offering submission.  If an Non-ECRP Designee is wiring all or part of the Purchase Price, such Non-ECRP Designee(s) must also include the unique Form Number in the wire reference section.

| Bank Name: | |
|---|---|
| Bank Address: | |
| Reference: | |
| Dollar amount wired: | |

Please be advised that any de minimis amounts less than $100.00 will not be refunded.

> **PLEASE NOTE: FOR NON-EQUITY CAPITAL RAISING PARTIES, NO SUBSCRIPTION WILL BE VALID UNLESS THIS NON-EQUITY CAPITAL RAISING PARTY SUBSCRIPTION FORM IS VALIDLY SUBMITTED ALONG WITH THE PURCHASE PRICE TO THE RIGHTS OFFERING SUBSCRIPTION AGENT AT OR BEFORE THE SUBSCRIPTION EXPIRATION DEADLINE OR THE SUBSCRIPTION FUNDING DEADLINE, AS APPLICABLE.**

**Item 5. Certification.**

The undersigned hereby certifies that (a) the undersigned has received a copy of the Plan, the Disclosure Statement, and the Rights Offering Procedures (including the Rights Offering Instructions attached thereto) and (b) the undersigned understands that the exercise of any Subscription Rights under the Rights Offering, including with respect to the General Rights Offering, is subject to all the terms and conditions set forth in the Plan and the Rights Offering Procedures.

**The undersigned (or the authorized signatory on behalf of the undersigned) acknowledges that, by executing this Non-Equity Capital Raising Party Subscription Form, the Non-Equity Capital Raising Party named below has elected to subscribe for the General Rights Offering Shares for the Purchase Price listed in Item 2b and will be bound to pay such Purchase Price for the Rights Offering Shares and that it will be liable to the Company and the Debtors to the extent of any nonpayment.**

Date: _____

Name of Eligible Participant (i.e., Non-Equity Capital Raising Party):

_____

U.S. Federal Tax EIN/SSN (optional): _____

      If non-U.S. person, check here and attach appropriate IRS Form W- 8 ☐

      If U.S. person, check here and attach IRS Form W- 9 ☐

Purchase Price for General Rights Offering Shares (*See Item 2b*):_____

Signature: _____

Name of Signatory: _____

Title: _____

Telephone Number: _____

Fax: _____

Email: _____

**PLEASE COMPLETE THE <u>THREE SECTIONS BELOW.</u> PLEASE COMPLETE <u>EXHIBIT C</u> IF YOU ARE DESIGNATING A NON-ECRP DESIGNEE TO RECEIVE ALL OR A PORTION OF THE GENERAL RIGHTS OFFERING SHARES.**

***<u>The General Rights Offering Shares will be directly registered with the Transfer Agent.</u>***

A.      **Please indicate on the lines provided below the registration name of the Non-Equity Capital Raising Party in whose name the General Rights Offering Shares should be issued (it is strongly recommended that the below information be typed to ensure that it is legible).**

Registration Name: _____

Address: _____

City, State, Postal Code: _____

Telephone: _____

Email: _____

B.      **Account Type**

Please indicate the "account type" that may be used in connection with registration of your General Rights Offering Shares.  Please check <u>**only one**</u> box:

INDIVIDUAL ACCOUNT;

IRA ACCOUNT;

CORPORATIONS (S-CORP): (ASSOCIATED, ASSOCIATES, ASSOCIATION, CO, CO. COMPANY, CORP, CORPORATE/PARTNER, ENTERPRISE(S), FUND, GROUP, INCORPORATED, INC, INTERNATIONAL, INTL, LIMITED, LTD, LIFETIME LIMITED COMPANY, LLC, L.L.C., PARTNER, PARTNERS, PLC, PUBLIC LIMITED COMPANY);

PARTNERSHIP: (LP, L P, L.P., LLP, LIMITED PARTNERSHIP, LIFETIME LIMITED PARTNERSHIP);

BANK;

NOMINEE ACCOUNTS;

C-CORP;

NON-PROFIT: (CEMETERY, CHURCH, COLLEGE, COMMISSION FOR CHILDREN WITH, COMMISSION FOR HANDICAPPED, COMMISSION MINISTRIES INC, COMMISSION OF PUBLIC WORKS, COMMISSION OF BANKING & FOUNDATIONS, HOSPITAL, SCHOOL, SYNAGOGUE, UNIVERSITY);

FIDUCIARY ACCOUNT: (CUSTODIAN, CO-TRUSTEE, ESTATE, EXECUTOR, EXECUTRIX, FBO, F/B/O, FAO, FIDUCIARY TRUST, ITF, LIFE TEN, PENSION PLAN, INDIVIDUAL NAME PROFIT SHARING PLAN, RETIREMENT PLAN, 401K PLAN, SELL TRANSFER PLEDGE, STATE UNIFORM TRANSFER TO MINOR'S ACT, TTEE, TTEES, UW, UTMA, UGMA, USUFRUCT, UNIFIED, UNIF GIFT MIN ACT, UNIF TRUST MIN ACT, UNIFIED GIFT TO MINORS ACT, UNIFORM GIFT TO MINORS, UNIFORM TRANSFER TO MINORS, GRANT (GRANTOR ANNUITY TRUST));

TENANTS IN COMMON;

TENANTS BY ENTIRETY: (TEN ENT, TENANTS ENT, TENANTS ENTIRETY, TENANTS BY ENTIRETY, TENANTS BY ENTIRETIES);

JOINT TENANTS: (JT TEN, JT TEN WROS, JT WROS, J/T/W/R/S, JOINT TENANCY, JOINT TENANTS WITH RIGHT OF SURVIVORSHIP, JT OWNERSHIP, IF JT ACCOUNT WITH TOD); or

COMMUNITY PROPERTY: (COM PROP, COMM PROP, COM PROPERTY, COMM PROPERTY, MARITAL PROPERTY, HWACP, HUSBAND & WIFE AS COMMUNITY PROPERTY).

Please deliver your completed Non-Equity Capital Raising Party Subscription Form (with an accompanying IRS Forms W-9 or appropriate IRS Form W-8, as applicable) to the Rights Offering Subscription Agent via its electronic portal.   To access the electronic portal, visit https://cases.ra.kroll.com/cineworld/, click on the "[Submit Subscription Form]" section of the website and follow the instructions to submit your Non-Equity Capital Raising Party Subscription Form.

**YOUR COMPLETED NON-EQUITY CAPITAL RAISING PARTY SUBSCRIPTION FORM SHOULD <u>ONLY</u> BE SUBMITTED VIA THE RIGHTS OFFERING SUBSCRIPTION AGENT'S ELECTRONIC PORTAL.  TO ACCESS THE ELECTRONIC PORTAL, VISIT HTTPS://CASES.RA.KROLL.COM/CINEWORLD, CLICK ON THE "[SUBMIT SUBSCRIPTION FORM]" SECTION OF THE WEBSITE AND FOLLOW THE INSTRUCTIONS TO SUBMIT YOUR FORM. PLEASE DO NOT FOLLOW UP WITH HARD COPIES OR EMAILED COPIES OF THE RIGHTS OFFERING DOCUMENTS.  THE E-PORTAL IS THE ONLY VALID METHOD OF SUBMISSION.  NO OTHER METHODS WILL BE ACCEPTED.**

**PLEASE REVIEW AND COMPLETE THE <u>PERMITTED INVESTOR QUESTIONNAIRE</u> ATTACHED AS <u>EXHIBIT</u> A BELOW. PLEASE COMPLETE <u>EXHIBIT C</u> IF YOU ARE DESIGNATING ANY OTHER PERSON TO RECEIVE ALL OR A PORTION OF THE GENERAL RIGHTS OFFERING SHARES.**

**EXHIBIT A**

**IMPORTANT:**
**PERMITTED INVESTOR QUESTIONNAIRE**

NON-EQUITY CAPITAL RAISING PARTIES AND ANY NON-ECRP DESIGNEES

TO PARTICIPATE IN THE GENERAL RIGHTS OFFERING, NON-EQUITY CAPITAL RAISING PARTIES AND THEIR NON-ECRP DESIGNEE(S) (IF ANY) MUST EACH COMPLETE THIS PERMITTED INVESTOR QUESTIONNAIRE, INCLUDING THE ADDITIONAL CERTIFICATIONS.

- ANY NON-EQUITY CAPITAL RAISING PARTY OR NON-ECRP DESIGNEE THAT INDICATES "NO" TO QUESTIONS 1, 2 AND 3 BELOW IS NOT ELIGIBLE TO PARTICIPATE IN THE RIGHTS OFFERING OR RECEIVE SECURITIES THEREUNDER.

- ANY NON-EQUITY CAPITAL RAISING PARTY OR NON-ECRP DESIGNEE THAT INDICATES "YES" TO QUESTION 4 BELOW AND "NO" TO QUESTION 5 BELOW IS NOT ELIGIBLE TO PARTICIPATE IN THE GENERAL RIGHTS OFFERING OR RECEIVE SECURITIES THEREUNDER.

IF THERE IS MORE THAN ONE NON-ECRP DESIGNEE, THE NON-EQUITY CAPITAL RAISING PARTY (THE "DESIGNATING PARTY") MUST COMPLETE A SEPARATE EXHIBIT B SIGNATURE PAGE FOR EACH SUCH NON-ECRP DESIGNEE AND A SEPARATE FORM OF EXHIBIT C (INCLUDING THE ATTACHED SPECIAL DELIVERY INSTRUCTIONS).

PLEASE SEE APPENDIX A BELOW FOR CERTAIN DEFINED OR CAPITALIZED TERMS USED HEREIN.

**Questions**

1.　As of the Rights Offering Record Date, is the holder submitting this Non-Equity Capital Raising Party Subscription Form a "qualified institutional buyer" (as defined in Rule 144A under the Act) and is the holder acquiring the General Rights Offering Shares for its own account?

□ Yes
□ No

2.　As of the Rights Offering Record Date, is the holder submitting this Non-Equity Capital Raising Party Subscription Form an Accredited Investor and is the holder acquiring the General Rights Offering Shares for its own account?

□ Yes
□ No

If Yes, please indicate which category (e.g., (1) through (13) of the definition of institutional "Accredited Investor" below) the Eligible Participant (i.e., the Non-Equity Capital Raising Party) falls under.

Please be advised that to be an Eligible Participant (i.e., including being a Non-Equity Capital Raising Party) you must be an "institutional" Accredited Investor within the meaning of Rule

501(a) (1), (2), (3), (7), (8), (9), (12), or (13) of the Securities Act, in each case, having (or is a, direct or indirect, wholly-owned subsidiary of any entity having) total assets of in excess of $10 million.

Category: _____

3. As of the Rights Offering Record Date, is the holder submitting this Non-Equity Capital Raising Party Subscription Form a "Non-U.S. Person"?

☐ Yes
☐ No

4. As of the Rights Offering Record Date, is the holder submitting this Non-Equity Capital Raising Party Subscription Form resident, located or has a registered office in any member state of the European Economic Area or in the United Kingdom?

☐ Yes
☐ No

5. If the answer to Question 4 above is "Yes," as of the Rights Offering Record Date, is the holder submitting this Non-Equity Capital Raising Party Subscription Form a "Qualified Investor"?

☐ Yes
☐ No

## <u>ADDITIONAL CERTIFICATIONS</u>

**IF ANY NON-EQUITY CAPITAL RAISING PARTY AND ITS NON-ECRP DESIGNEES FAILS TO CERTIFY (BY FAILING TO CHECK EACH OF THE BOXES BELOW) THAT IT IS A PERMITTED INVESTOR AND THE OTHER MATTERS SPECIFIED THEREIN, SUCH PERSON RISKS FORFEITING ITS RIGHTS TO PARTICIPATE IN THE RIGHTS OFFERING.**

☐ The undersigned is not purchasing any General Rights Offering Shares as a result of any advertisement, article, notice or other communication regarding the General Rights Offering Shares published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or, to such Person's knowledge, any other general solicitation or general advertisement.  Neither the undersigned nor any Person acting on its behalf has engaged, or will engage, in any form of general solicitation or general advertising (within the meaning of Rule 502(c) under the Securities Act) in connection with the offering of the General Rights Offering Shares in violation of the federal securities laws or any applicable state securities laws.

☐ The undersigned understands and acknowledges that the General Rights Offering Shares are being offered in reliance upon an exemption from the registration requirements of the Securities Act provided by section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder and/or Regulation S of the Securities Act (or another applicable exemption under the Securities Act) and that the Rights Offering Shares purchased hereby will be "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, and that the undersigned (or any of its affiliates) may not resell such General Rights

Offering Shares except in a transaction that is registered under the Securities Act or that is subject to an exemption from such registration.

☐   The undersigned understands and acknowledges that the General Rights Offering Shares are being offered pursuant to an exemption from the requirement to publish a prospectus for the offer of transferable securities to the public in any member state of the European Economic Area or in the United Kingdom (each, a "Relevant State") under Article 1(4)(a) of the Prospectus Regulation, and that in each Relevant State the undersigned (or any of its affiliates) may not resell the General Rights Offering Shares unless such resale is to: (i) a "Qualified Investor" in that Relevant State; or (ii) any other person if such resale would not otherwise constitute an offer of transferable securities to the public within the meaning of the Prospectus Regulation (including in any of the other circumstances set out in Article 1(4) of the Prospectus Regulation) and/or the FSMA (including in any of the other circumstances set out in section 86 of the FSMA).

☐   The undersigned understands and acknowledges that, if the undersigned receives the General Rights Offering Shares, then the undersigned shall become a party to and shall be bound by the terms and conditions of the New Stockholders Agreement.  *See* <u>Exhibit B</u> for the signature page to the New Stockholders Agreement to be delivered in connection with any receipt of New Common Stock, including the General Rights Offering Shares.

A-3

## APPENDIX A: CERTAIN DEFINED OR CAPITALIZED TERMS

**With respect to Question 2 above:**

"Accredited Investor" (pursuant to clause (a) of Rule 501 promulgated under the Securities Act of 1933, as amended (the "Act")) means any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

1.  Any bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any investment adviser registered pursuant to Section 203 of the Investment Advisers Act of 1940 or registered pursuant to the laws of a state; any investment adviser relying on the exemption from registering with the Securities and Exchange Commission (the "Commission") under Section 203(l) or (m) of the Investment Advisers Act of 1940; any insurance company as defined in Section 2(a)(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any Rural Business Investment Company as defined in Section 384A of the Consolidated Farm and Rural Development Act; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000, or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

2.  Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

3.  Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, partnership, or limited liability company, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

4.  Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

5.  Any natural person whose individual net worth, or joint net worth with that person's spouse or spousal equivalent, exceeds $1,000,000;

    (a)    Except as provided in clause (ii) paragraph (5), for purposes of calculating net worth under this paragraph (5):

        (i)    The person's primary residence shall not be included as an asset;

        (ii)    Indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence

at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and

      (iii)    Indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability;

    (b)    Clause (i) of this paragraph (5) will not apply to any calculation of a person's net worth made in connection with a purchase of securities in accordance with a right to purchase such securities, provided that:

      (i)    such right was held by the person on July 20, 2010;

      (ii)    the person qualified as an Accredited Investor on the basis of net worth at the time the person acquired such right; and

      (iii)    the person held securities of the same issuer, other than such right, on July 20, 2010.

6.    Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse or spousal equivalent in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

7.    Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the Act;

8.    Any entity in which all of the equity owners are Accredited Investors.

9.    Any entity, of a type not listed in paragraphs (1), (2), (3), (7), or (8) above, not formed for the specific purpose of acquiring the securities offered, owning investments in excess of $5,000,000;

10.    Any natural person holding in good standing one or more professional certifications or designations or credentials from an accredited educational institution that the Commission has designated as qualifying an individual for accredited investor status.  In determining whether to designate a professional certification or designation or credential from an accredited educational institution for purposes of this paragraph (10), the Commission will consider, among others, the following attributes:

    (a)    The certification, designation, or credential arises out of an examination or series of examinations administered by a self-regulatory organization or other industry body or is issued by an accredited educational institution;

    (b)    The examination or series of examinations is designed to reliably and validly demonstrate an individual's comprehension and sophistication in the areas of securities and investing;

(c)      Persons obtaining such certification, designation, or credential can reasonably be expected to have sufficient knowledge and experience in financial and business matters to evaluate the merits and risks of a prospective investment; and

(d)      An indication that an individual holds the certification or designation is either made publicly available by the relevant self-regulatory organization or other industry body or is otherwise independently verifiable.

11.    Any natural person who is a "knowledgeable employee," as defined in rule 3c5(a)(4) under the Investment Company Act of 1940 (17 CFR 270.3c-5(a)(4)), of the issuer of the securities being offered or sold where the issuer would be an investment company, as defined in section 3 of such act, but for the exclusion provided by either section 3(c)(1) or section 3(c)(7) of such act;

12.    Any "family office," as defined in rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940 (17 CFR 275.202(a)(11)(G)-1):

(a)      with assets under management in excess of $5,000,000,

(b)      that is not formed for the specific purpose of acquiring the securities offered, and

(c)      whose prospective investment is directed by a person who has such office is capable of evaluating the merits and risks of the prospective investment; and

13.    Any "family client," as defined in rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940 (17 CFR 275.202(a)(11)(G)-1), of a family office meeting the requirements in paragraph (12) of this definition and whose prospective investment in the issuer is directed by such family office pursuant to paragraph (12)(iii).

**With respect to Question 3 above:**

"U.S. person" means:

1.    Any natural person resident in the United States;

2.    Any partnership or corporation organized or incorporated under the laws of the United States;

3.    Any estate of which any executor or administrator is a U.S. person;

4.    Any trust of which any trustee is a U.S. person;

5.    Any agency or branch of a foreign entity located in the United States;

6.    Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person;

7.    Any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; and

8.    Any partnership or corporation if:

(a)      Organized or incorporated under the laws of any foreign jurisdiction; and

    (b)        Formed by a U.S. person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) under the Act) who are not natural persons, estates or trusts.

The following are not "U.S. persons":

1.        Any discretionary account or similar account (other than an estate or trust) held for the benefit or account of a non-U.S. person by a dealer or other professional fiduciary organized, incorporated, or (if an individual) resident in the United States;

2.        Any estate of which any professional fiduciary acting as executor or administrator is a U.S. person if:

    (a)        An executor or administrator of the estate who is not a U.S. person has sole or shared investment discretion with respect to the assets of the estate; and

    (b)        The estate is governed by foreign law;

3.        Any trust of which any professional fiduciary acting as trustee is a U.S. person, if a trustee who is not a U.S. person has sole or shared investment discretion with respect to the trust assets, and no beneficiary of the trust (and no settlor if the trust is revocable) is a U.S. person;

4.        An employee benefit plan established and administered in accordance with the law of a country other than the United States and customary practices and documentation of such country;

5.        Any agency or branch of a U.S. person located outside the United States if:

    (a)        The agency or branch operates for valid business reasons; and

    (b)        The agency or branch is engaged in the business of insurance or banking and is subject to substantive insurance or banking regulation, respectively, in the jurisdiction where located; and

    (c)        The International Monetary Fund, the International Bank for Reconstruction and Development, the Inter-American Development Bank, the Asian Development Bank, the African Development Bank, the United Nations, and their agencies, affiliates and pension plans, and any other similar international organizations, their agencies, affiliates and pension plans.

**With respect to Question 5 and the Additional Certifications above:**

1.        The "FSMA" means the United Kingdom Financial Services and Markets Act 2000;

2.        The "Prospectus Regulation" means Regulation (EU) No 2017/1129 of the European Parliament and of the European Council of 14 June 2017 and such regulation as it forms part of United Kingdom retained law as defined in the European Union (Withdrawal) Act 2018;

3.        "Qualified Investor" has the meaning ascribed in Article 2(e) of the Prospectus Regulation and includes (in summary) a person that is:

(1)     an entity required to be authorized or regulated to operate in financial markets, such as (among others) an investment firm or a credit institution;

(2)     a large undertaking meeting the requisite quantitative thresholds;

(3)     a national or regional government, a public body that manages public debt, a central bank or an international or supranational institution;

(4)     any other institutional investor whose main activity is to invest in financial instruments; or

(5)     a person or entity who does not fall within any of the descriptions at (i) to (iv) above but who is, on request, treated as a "professional client" in accordance with Section II of Annex II to Directive 2014/65/EU or, in respect of the United Kingdom, in accordance with paragraph 5 of Annex 1 Part 3 of Regulation (EU) No 600/2014 as it forms part of United Kingdom retained law as defined in the European Union (Withdrawal) Act 2018.

**EXHIBIT B**

**SIGNATURE PAGE TO THE NEW STOCKHOLDERS AGREEMENT**

**[HOLDER OF NEW COMMON STOCK]**

NAME:

By: _____
Name:
Title:

**EXHIBIT C**

**Special Delivery Instructions**

**IF THERE IS MORE THAN ONE NON-ECRP DESIGNEE, COMPLETE A SEPARATE FORM FOR EACH NON-ECRP DESIGNEE.**
**YOU MUST SPECIFY THE PERCENTAGE OF RIGHTS OFFERING SHARES TO BE DELIVERED TO EACH NON-ECRP DESIGNEE.**

**Please complete ONLY if the Rights Offering Shares are to be issued in the name of someone OTHER than the Non-Equity Capital Raising Party. A Non-Equity Capital Raising Party may only designate to (1) an Affiliate of such Non-Equity Capital Raising Party OR (2) an Equity Capital Raising Related Party AND only if the Permitted Investor Questionnaire, IRS Form W-8 or IRS Form W-9, as applicable, and signature page to the New Stockholders Agreement are received for such Non-ECRP Designee. All percentages should be specified to the nearest .01%. Any percentage that is specified to a further decimal place will be rounded to the nearest .01%.**

**A.**     **If you are designating the General Rights Offering Shares for delivery to an Affiliate of a Non-Equity Capital Raising Party, please check here** ☐

1)   Name of Designating Party (i.e., the Non-Equity Capital Raising Party):
_____

2)   Percentage of **General Rights Offering Shares** being designated.

*This percentage must be expressed as a whole percentage with no decimals. The sum of the percentage totals in this Box 2 and Box 5 cannot be more than 100% . The amount in Box 2 shall be reduced such that sum shall equal 100% if any discrepancy.*

| Name(s) of Non-ECRP Designee(s) (i.e., Affiliate of a Non-Equity Capital Raising Party) | Percentage of General Rights Offering Shares You are Designating to each such Non-ECRP Designee(s) |
|---|---|
| 1. | % |
| 2. | % |
| 3. | % |
| 4. | % |
| 5. | % |
| Percentage Total: | % |
| Total Funding Amount (in dollars): | $ |

C-1

For each such Designee, U.S. Federal Tax EIN/SSN (optional for non-U.S. persons):
_____

      If non-U.S. person, check here and attach appropriate IRS Form W-8 ☐

      If U.S. person, check here and attach IRS Form W-9 ☐

**B.**     **If you are designating the General Rights Offering Shares for delivery to an <u>Equity Capital Raising Related Party</u>, please check here** ☐

*For the avoidance of doubt, Non-Equity Capital Raising Parties exercising on behalf of an Equity Capital Raising Party or its Affiliates may deliver the Non-Equity Capital Raising Party Subscription Form and appropriate funding no later than the deadline set forth in the Financing Commitment and Backstop Agreement.*

3)   Name of Designating Party (i.e., the Non-Equity Capital Raising Party):
     _____

4)   For reconciliation purposes, please insert legal entity name of Equity Capital Raising Party. *Please complete this section for each Equity Capital Raising Party receiving General Rights Offering Shares.*
     _____

5)   Percentage of **<u>General Rights Offering Shares</u>** being designated:

*This percentage must be expressed as a whole percentage with no decimals. The sum of the percentage totals in this Box 2 and Box 5 cannot be more than 100%. The amount in Box 2 shall be reduced such that sum shall equal 100% if any discrepancy.*

| Name(s) of Non-ECRP Designee(s) (i.e., **Equity Capital Raising Related Parties**) | Name of each **Related Purchaser** with respect to such Designee | **<u>Dollar amount</u>** wired by **each** Related Purchaser with respect to each such Designee | Percentage of **<u>General Rights Offering Shares</u>** You are Designating to <u>each</u> such Designee(s) |
|---|---|---|---|
| 1. | 1.<br>2. | 1.$_____<br>2.$_____ | % |
| 2. | 1.<br>2. | 1.$_____<br>2.$_____ | % |
| 3. | 1.<br>2. | 1.$_____<br>2.$_____ | % |
| 4. | 1.<br>2. | 1.$_____<br>2.$_____ | % |

| 5. | 1.<br>2. | 1.$ _____<br>2.$ _____ | % |
|---|---|---|---|
| **Percentage Total:** | | | % |
| **Total Funding Amount:** | | | $ |

For each such Designee, U.S. Federal Tax EIN/SSN (optional for non-U.S. persons):

_____

     If non-U.S. person, check here and attach appropriate IRS Form W-8 ☐

     If U.S. person, check here and attach IRS Form W-9 ☐

**C.**     **Please indicate on the lines provided below the registration name of the Non-ECRP Designee in whose name the General Rights Offering Shares should be issued (it is strongly recommended that the below information be _typed_ for legibility). With respect to each Non-ECRP Designee that is an Equity Capital Raising Related Party, please complete the below for _each_ such Designee.**

Registration Name Line 1 (Maximum 35 Characters): _____

Registration Name Line 2 (Maximum 35 Characters): _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Address 4: _____

Telephone: _____

Email: _____

**D.**     **Account Type**.  Please indicate the "account type" that may be used in connection with registration of your Rights Offering Securities. **With respect to each Non-ECRP Designee that is an Equity Capital Raising Related Party, please complete the below for _each_ such Designee.**

     Please check **only one** box:

       INDIVIDUAL ACCOUNT;

       IRA ACCOUNT;

CORPORATIONS (S-CORP): (ASSOCIATED, ASSOCIATES, ASSOCIATION, CO, CO. COMPANY, CORP, CORPORATE/PARTNER, ENTERPRISE(S), FUND, GROUP, INCORPORATED, INC, INTERNATIONAL, INTL, LIMITED, LTD, LIFETIME LIMITED COMPANY, LLC, L.L.C., PARTNER, PARTNERS, PLC, PUBLIC LIMITED COMPANY);

PARTNERSHIP: (LP, L P, L.P., LLP, LIMITED PARTNERSHIP, LIFETIME LIMITED PARTNERSHIP);

BANK;

NOMINEE ACCOUNTS;

C-CORP;

NON-PROFIT: (CEMETERY, CHURCH, COLLEGE, COMMISSION FOR CHILDREN WITH, COMMISSION FOR HANDICAPPED, COMMISSION MINISTRIES INC, COMMISSION OF PUBLIC WORKS, COMMISSION OF BANKING & FOUNDATIONS, HOSPITAL, SCHOOL, SYNAGOGUE, UNIVERSITY);

FIDUCIARY ACCOUNT: (CUSTODIAN, CO-TRUSTEE, ESTATE, EXECUTOR, EXECUTRIX, FBO, F/B/O, FAO, FIDUCIARY TRUST, ITF, LIFE TEN, PENSION PLAN, INDIVIDUAL NAME PROFIT SHARING PLAN, RETIREMENT PLAN, 401K PLAN, SELL TRANSFER PLEDGE, STATE UNIFORM TRANSFER TO MINOR'S ACT, TTEE, TTEES, UW, UTMA, UGMA, USUFRUCT, UNIFIED, UNIF GIFT MIN ACT, UNIF TRUST MIN ACT, UNIFIED GIFT TO MINORS ACT, UNIFORM GIFT TO MINORS, UNIFORM TRANSFER TO MINORS, GRANT (GRANTOR ANNUITY TRUST));

TENANTS IN COMMON;

TENANTS BY ENTIRETY: (TEN ENT, TENANTS ENT, TENANTS ENTIRETY, TENANTS BY ENTIRETY, TENANTS BY ENTIRETIES);

JOINT TENANTS: (JT TEN, JT TEN WROS, JT WROS, J/T/W/R/S, JOINT TENANCY, JOINT TENANTS WITH RIGHT OF SURVIVORSHIP, JT OWNERSHIP, IF JT ACCOUNT WITH TOD); or

COMMUNITY PROPERTY: (COM PROP, COMM PROP, COM PROPERTY, COMM PROPERTY, MARITAL PROPERTY, HWACP, HUSBAND & WIFE AS COMMUNITY PROPERTY).

E.      **Wire Refund**

**If a Non-ECRP Designee <u>who is an Affiliate of the Non-Equity Capital Raising Party</u> wired the Purchase Price, please provide the wire information for the Non-ECRP Designee in the event a refund is needed:**

| | |
|---|---|
| Account Name: | |
| Bank Account No.: | |
| ABA Routing No.: | |
| Bank Name: | |
| Bank Address: | |
| Reference: | |
| Name of Non-Equity Capital Raising Party: | |

**If any <u>Related Purchasers of an Equity Capital Raising Party</u> wired the Purchase Price (or any portion thereof) on behalf of an Equity Capital Raising Related Party who is a Non-ECRP Designee, please provide (1) the wire information, (2) the funding amount for such Related Purchaser and (3) for reconciliation purposes, the name of the Non-ECRP Designee in the event a refund is needed.**

**Please complete the below table for each Related Purchaser that has provided funding on behalf of any Non-ECRP Designee.**

| | |
|---|---|
| Account Name: | |
| Bank Account No.: | |
| ABA Routing No.: | |
| Bank Name: | |
| Bank Address: | |
| Reference: | |

| | |
|---|---|
| Name of Non-ECRP Designee: | |
| Funding Amount for Related Purchaser with respect to such Non-ECRP Designee in dollars: | $ |

Please be advised that any de minimis amounts less than $100.00 will not be refunded.

**F.      Non-ECRP Designee Certification:**

The undersigned Non-ECRP Designee certifies that the undersigned is (1) an Affiliate of a Non-Equity Capital Raising Party with respect to the Rights Offering or (2) an Equity Capital Raising Related Party and hereby agrees to be bound by the terms of the Rights Offering Procedures (including those set forth in the Non-Equity Capital Raising Party Subscription Form) as though the Non-ECRP Designee were an Eligible Participant, including, without limitation, the obligations to deliver completed and executed documents to subscribe for the General Rights Offering Shares (other than the Non-Equity Capital Raising Party Subscription Form), including **delivery of a Permitted Investor Questionnaire by such Non-ECRP Designee** and all other required documentation to the Rights Offering Subscription Agent:

Name of Non-ECRP Designee: _____

Signature: _____

Name of Signatory: _____

Title: _____

Address: _____

Telephone Number: _____

Email: _____

**YOUR COMPLETED NON-EQUITY CAPITAL RAISING PARTY SUBSCRIPTION FORM SHOULD <u>ONLY</u> BE SUBMITTED VIA THE AGENT'S ELECTRONIC PORTAL.  TO ACCESS THE E-PORTAL, VISIT HTTPS://CASES.RA.KROLL.COM/CINEWORLD, CLICK ON THE "[SUBMIT SUBSCRIPTION FORM]" SECTION OF THE WEBSITE AND FOLLOW THE INSTRUCTIONS TO SUBMIT YOUR FORM.**

**PLEASE DO NOT FOLLOW UP WITH HARD COPIES OR EMAILED COPIES OF THE RIGHTS OFFERING DOCUMENTS.  THE E-PORTAL IS THE ONLY VALID METHOD OF SUBMISSION.  NO OTHER METHODS WILL BE ACCEPTED.**

## Exhibit 14

**Capital Raising Party Subscription Form**

**CINEWORLD GROUP PLC ET AL.**

**CAPITAL RAISING PARTY**
**SUBSCRIPTION FORM**

**FOR USE WITH**
**THE RIGHTS OFFERING AND**
**EXIT FIRST LIEN FACILITY**

**IN CONNECTION WITH THE DEBTORS'**
**DISCLOSURE STATEMENT DATED**
**[●], 2023**

**<u>SUBSCRIPTION EXPIRATION DEADLINE</u>**

**For the Rights Offering, including for the Premium Shares, the Capital Raising Party Subscription Expiration Deadline will be at 4:00 p.m., prevailing Central Time on the date that is eight (8) Business Days before the Closing Date.**

**Please note that your Capital Raising Party Subscription Form (with an accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and your Permitted Investor Questionnaire attached as <u>Exhibit A</u> to this Capital Raising Party Subscription Form (the "<u>Permitted Investor Questionnaire</u>") must be received by Kroll Issuer Services (US) (the "<u>Rights Offering Subscription Agent</u>"), at or before the Capital Raising Party Subscription Expiration Deadline.  You may not receive your Rights Offering Shares, including your Premium Shares, promptly if you fail to complete these forms no later than the Capital Raising Party Subscription Deadline.**

- **Each <u>Equity Capital Raising Party</u> must be an Eligible Participant with respect to the Rights Offering.  Equity Capital Raising Parties must deliver, or have caused to be delivered, the appropriate funding directly to the Escrow Account and/or elected to have cash in the amount of all or any portion of such Equity Capital Raising Party's DIP Amount be used to satisfy such funding, by the Escrow Account Funding Date.  See Item 5 for more information.**

- **Each <u>Sponsored Facility Capital Raising Party</u> must be listed on the First Lien Final Allocated Percentage Schedule.  At or prior to the Closing, if a Sponsored Exit First Lien Facility Event shall have occurred, each Sponsored Facility Capital Raising Party shall fund, or provide for the funding of, an amount equal to such Sponsored Facility Capital Raising Party's First Lien Allocated Amount, by (A) wire transfer of immediately available funds in U.S. dollars, to the agent under the Sponsored Exit First Lien Facility to be disbursed in accordance with the terms of the Sponsored Exit First Lien Facility and/or (B) electing to have cash in the amount of all or any portion of such Equity Capital Raising Party's DIP Amount be used to satisfy such funding.**

**The Rights Offering Shares, including the Premium Shares, are being distributed and issued by Reorganized Cineworld Parent without registration under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), in reliance upon the exemption provided by section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder and/or Regulation S of the Securities Act (or another applicable exemption under the Securities Act) and in compliance with any applicable state or local Laws pursuant to a registration or an exemption therefrom.**

**None of the Rights Offering Shares, including the Premium Shares, have been registered under the Securities Act, nor any state or local Law requiring registration for the offer or sale of a security.**

1

The Rights Offering Procedures and the Capital Raising Party Subscription Form (including with respect to the Premium Shares issued and offered in accordance with the Financing Commitment and Backstop Agreement) have been prepared on the basis that any offer of the Rights Offering Shares or the Subscription Rights within any member state of the European Economic Area or in the United Kingdom (each, a "Relevant State") will be made pursuant to an exemption under Regulation (EU) No 2017/1129 of the European Parliament and of the European Council of 14 June 2017 and such regulation as it forms part of United Kingdom retained law as defined in the European Union (Withdrawal) Act 2018 (the "Prospectus Regulation") and/or the Financial Services and Markets Act 2000 of the United Kingdom (the "FSMA"), as applicable, from the requirement to publish a prospectus for the offer of transferable securities to the public.  In relation to each Relevant State, no offer of the Rights Offering Shares, including the Premium Shares, or the Subscription Rights may be made to the public at any time other than pursuant to an exemption under the Prospectus Regulation and/or the FSMA, as applicable.  In any Relevant State, the Rights Offering, the Rights Offering Procedures, the offering and issuance of the Premium Shares in accordance with the Financing Commitment and Backstop Agreement, and the Capital Raising Party Subscription Form are only addressed to and directed at: (a) "qualified investors" in that Relevant State (as defined in Article 2(e) of the Prospectus Regulation) (the "Qualified Investors"); or (b) any other person if such address or direction does not otherwise constitute an offer of securities to the public within the meaning of the Prospectus Regulation (including in any of the other circumstances set out in Article 1(4) of the Prospectus Regulation) and/or the FSMA (including in any of the other circumstances set out in section 86 of the FSMA).  None of the Debtors or any of its Affiliates, Cineworld Parent, Reorganized Cineworld Parent, or any persons acting on behalf of any of them has authorized, nor do they authorize, the making of any offer of the Rights Offering Shares, including the Premium Shares, or the Subscription Rights through any financial intermediary, other than as may be contemplated in the Rights Offering Procedures and Capital Raising Party Subscription Form (including with respect to the Premium Shares issued and offered in accordance with the Financing Commitment and Backstop Agreement).

The Rights Offering Procedures and the Capital Raising Party Subscription Form are not and should not be construed as an invitation or inducement to engage in any investment activity in relation to any Rights Offering Shares (including with respect to the Premium Shares issued and offered in accordance with the Financing Commitment and Backstop Agreement) such as would amount to a financial promotion in the United Kingdom for the purposes of section 21 of the FSMA.  In the United Kingdom, the information contained in the Rights Offering Procedures and the Capital Raising Party Subscription Form (including with respect to the Premium Shares issued and offered in accordance with the Financing Commitment and Backstop Agreement) is intended only for use and may only be relied upon in relation to any investment activity by, and any investment activity to which such information relates may only be engaged in by, persons falling within any of the circumstances of Article 1(4) of the Prospectus Regulation who are at the relevant time: (a) investment professionals within the meaning of Article 19(5) of the United Kingdom Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "FPO"); (b) high net worth companies within the meaning of Article 49(2)(a) through (d) of the FPO; (c) persons that are existing members or creditors of the issuer of the Rights Offering Shares (including with respect to the Premium Shares issued and offered in accordance with the Financing Commitment and Backstop Agreement) or of an undertaking which at the relevant time is the same group as the issuer of the Rights Offering Shares (including with respect to the Premium Shares issued and offered in accordance with the Financing Commitment and Backstop Agreement) falling within Article 43 of the FPO; or (d) persons to whom the communication may otherwise lawfully be communicated (collectively, the "Permitted UK Persons").  Any person in the United Kingdom that is not a Permitted UK Person is not, for the purposes of any investment or investment decision, an intended recipient of the information contained in the Rights Offering Procedures and the Capital Raising Party Subscription Form

**(including with respect to the Premium Shares issued and offered in accordance with the Financing Commitment and Backstop Agreement) and should not use such information as the basis for taking any investment activity or investment action.  The Rights Offering Procedures and the Capital Raising Party Subscription Form (including with respect to the Premium Shares issued and offered in accordance with the Financing Commitment and Backstop Agreement) should not (insofar as they relate to any investment or investment activity) be distributed, communicated to, or directed at the general public in the United Kingdom otherwise than as described above.**

**Please consult the Plan, the Disclosure Statement, the Rights Offering Procedures (including the Rights Offering Instructions attached thereto) and the Financing Commitment and Backstop Agreement for additional information with respect to this Capital Raising Party Subscription Form. Any terms capitalized but not otherwise defined herein shall have the meanings assigned to them in the Plan, Disclosure Statement, the Rights Offering Procedures or the Financing Commitment and Backstop Agreement, as applicable.**

**If you have any questions, please contact the Rights Offering Subscription Agent via email at CineworldIssuerServices@is.kroll.com (please reference "Cineworld Rights Offering" in the subject line), or at the following applicable phone number: 844.648.5574 (Toll-free) and 845.295.5705 (International).**

**The record date for the Rights Offering is [●], 2023 (the "Rights Offering Record Date").**

To subscribe:

- Identify if you are completing this form either in your capacity as (1) an **Equity Capital Raising Party** or (2) a **Sponsored Facility Capital Raising Party**.

- Complete Items 1 and 2, read Item 3, and read and complete Items 4, 5 (with respect to any Capital Raise Convenience Election) and 6 below.

- Complete the Permitted Investor Questionnaire attached as Exhibit A, including with respect to any Designee.

- Execute the signature page to the New Stockholders Agreement attached as Exhibit B, including execution by each Designee.

- Complete Exhibit C (the Special Delivery Instructions) in order for a Designee to receive the Rights Offering Shares, including the Premium Shares.

     **This form is only for Capital Raising Parties and their Designees (as defined below).**  If a Capital Raising Party wishes to have any Rights Offering Shares delivered in the name of any other Person that is a Permitted Investor (including a Capital Raising Party or any Affiliate of any Capital Raising Party) (each, a "Designee") in accordance with the Financing Commitment and Backstop Agreement, such Capital Raising Party and such Designee shall complete the Permitted Investor Questionnaire attached as Exhibit A hereto.  Such Capital Raising Party and Capital Raising Related Party Designee must each certify to their respective status as a Permitted Investor and complete the certification included in Exhibit A hereto.  In addition, such Designee must also (i) complete and execute the IRS Form W-9 that accompanies the Capital Raising Party Subscription Form or an appropriate IRS Form W-8, as applicable, and (ii) execute a signature page to the New Stockholders Agreement.

**IF YOU REQUIRE A NON-CAPITAL RAISING PARTY TO EXERCISE THEIR SUBSCRIPTION RIGHTS FOR GENERAL RIGHTS OFFERING SHARES ON YOUR BEHALF, PLEASE HAVE THE NON-CAPITAL RAISING PARTY COMPLETE AND SUBMIT THE NON-CAPITAL RAISING PARTY SUBSCRIPTION FORM.**

**Identification**:

☐    Please check this box if you are an **Equity Capital Raising Party**.

☐    Please check this box if you are a **Sponsored Facility Capital Raising Party**.

Please be advised that if you are BOTH an Equity Capital Raising Party and a Sponsored Facility Capital Raising Party, you must submit **separate** Capital Raising Party Subscription Forms in each such capacity.

*[Remainder of page intentionally blank]*

4

**Item 1. Amount of Allowed Legacy Facilities Claims and *Pro Rata* portion.**

      **1a.**      <u>EQUITY CAPITAL RAISING PARTIES ONLY</u>: Amount of Allowed Legacy Facilities Claims.

      The undersigned Equity Capital Raising Party certifies that it holds Allowed Legacy Facilities Claims, as the holder of record, in the aggregate principal amounts as of the Rights Offering Record Date (the "<u>Allowed Legacy Facilities Principal Amount</u>") as set forth below with respect to each of its Allowed Claims under (i) the Initial Legacy USD Term Loan, (ii) the Incremental Legacy USD Term Loan, (iii) the Legacy Euro Term Loan, and (iv) the Revolving Credit Facility (insert amounts on the lines below) or that the undersigned is the authorized signatory of such Person.  For purposes of this Capital Raising Party Subscription Form, do not adjust your Allowed Legacy Facilities Principal Amount for any accrued or unmatured interest.[1] With respect to subscribing for its General Rights Offering Shares,  **any beneficial owner of Allowed Legacy Facilities Claims must have its *<u>holder of record</u>* for each of such beneficial owner's Allowed Legacy Facilities Claims complete this form on its behalf.**

**(i) Initial Legacy USD Term Loan:**

    Principal amount of Initial Legacy USD Term Loan held as of the Rights Offering Record Date:

              _____

Name of holder of record of Initial Legacy USD Term Loan<br>as of the Rights Offering Record Date:

              _____

**(ii) Incremental Legacy USD Term Loan:**

    Principal amount of Incremental Legacy USD Term Loan held as of the Rights Offering Record Date:

              _____

Name of holder of record of Incremental Legacy USD Term Loan<br>as of the Rights Offering Record Date:

              _____

---

[1]   To calculate an Eligible Participant's aggregate Pro Rata portion of its Allowed Legacy Facilities Claims with respect to the General Rights Offering, such Eligible Participant must provide the **aggregate principal amount**, as reflected on the lender register as of the Rights Offering Record Date, with respect to its Allowed Claims for **each** of (i) the Initial Legacy USD Term Loan, (ii) the Incremental Legacy USD Term Loan, (iii) the Legacy Euro Term Loan, and (iv) the Revolving Credit Facility (the "<u>Prepetition Facilities</u>"). Accrued interest, unmatured fees and any other dollar amounts that may be classified as part of such Eligible Participant's Allowed Legacy Facilities Claims with regard to each of the Prepetition Facilities are then taken into account in determining the allocation of the General Rights Offering Shares among the Allowed Legacy Facilities Claims with regard to each of the Prepetition Facilities and each Eligible Participant's Aggregate Purchase Price for the General Rights Offering Shares.

**(iii) Legacy Euro Term Loan:**

Principal amount (**denominated in euros**) of Legacy Euro Term Loan held
as of the Rights Offering Record Date:

_____

Name of holder of record of Legacy Euro Term Loan
as of the Rights Offering Record Date:

_____

**(iv) Revolving Credit Facility:**

Principal amount of Revolving Credit Facility held as of the Rights Offering Record Date:

_____

Name of holder of record of Revolving Credit Facility
as of the Rights Offering Record Date:

_____

**1b.     EQUITY CAPITAL RAISING PARTIES ONLY: You are required to purchase your full *Pro Rata* portion in the General Rights Offering.  Your *Pro Rata* portion of the General Rights Offering Shares is calculated based on the sum of your principal amounts with respect to your Allowed Claims under (i) the Initial Legacy USD Term Loan, (ii) the Incremental Legacy USD Term Loan, (iii) the Legacy Euro Term Loan, and (iv) the Revolving Credit Facility as follows:**

**(i) Initial Legacy USD Term Loan:**

| | | | | |
|---|---|---|---|---|
| _____<br>(Insert principal amount from Item 1a(i) above) | / | $[●] | = | _____%<br>(Initial Legacy USD Term Loan *Pro Rata* Portion) (Round up or down to the nearest one-ten thousandth decimal place (with .00005 of a percent being rounded up)) |

**(ii) Incremental Legacy USD Term Loan:**

| _____<br>(Insert principal amount from Item 1a(ii) above) | / | $[●] | = | _____%<br>(Incremental Legacy USD Term Loan *Pro Rata* Portion) (Round up or down to the nearest one-ten thousandth decimal place (with .00005 of a percent being rounded up)) |
|---|---|---|---|---|

**(iii) Legacy Euro Term Loan:[2]**

| _____<br>(Insert principal amount from Item 1a(iii) above) | / | €[●] | = | _____%<br>(Legacy Euro Term Loan *Pro Rata* Portion) (Round up or down to the nearest one-ten thousandth decimal place (with .00005 of a percent being rounded up)) |
|---|---|---|---|---|

**(iv) Revolving Credit Facility:**

| _____<br>(Insert principal amount from Item 1a(iv) above) | / | $[●] | = | _____%<br>(Revolving Credit Facility *Pro Rata* Portion) (Round up or down to the nearest one-ten thousandth decimal place (with .00005 of a percent being rounded up)) |
|---|---|---|---|---|

       **1c.**    **EQUITY CAPITAL RAISING PARTIES**: You must purchase, or cause to be purchased, (1) the number of General Rights Offering Shares equal to your full Pro Rata Portion of the General Rights Offering Shares based on the sum of your principal amounts with respect to your Allowed Claims under (i) the Initial Legacy USD Term Loan, (ii) the Incremental Legacy USD Term Loan, (iii) the Legacy Euro Term Loan, and (iv) the Revolving Credit Facility as set forth above **and** (2) the number of Direct Allocation Shares equal to your Direct Allocation Amount divided by the Per Share Subscription Price, in each case pursuant to the terms of the Financing Commitment and Backstop Agreement and as set forth in the Funding Notice to be provided to you on the Funding Notice Date.

---

[2]    With respect to calculating the allocation of the General Rights Offering Amount to Holders of Claims with respect to the Euro Term Loan, an exchange rate for euros to dollars was used. This exchange rate was calculated based on the [ten (10)] trading day volume-weighted average price of the exchange rate for euros to U.S. dollars (as reflected on as displayed under the heading "Bloomberg VWAP" on Bloomberg page V <[●]> VWAP (or any equivalent successor page) in respect of the period from 9:30 am EST to 4:00 pm EST on any given trading day) immediately prior to the Rights Offering Record Date.

**1c.A.** For reconciliation purposes, insert below your Backstop Final Allocated Percentage (as listed on the Direct Allocation Schedule).

_____

**1c.B. Calculation of Aggregate Purchase Price for General Rights Offering Shares.** The Aggregate Purchase Price which you are required to pay for the General Rights Offering Shares (set forth in box (v) below) is calculated based on the sum of your principal amounts with respect to your Allowed Claims under (i) the Initial Legacy USD Term Loan, (ii) the Incremental Legacy USD Term Loan, (iii) the Legacy Euro Term Loan, and (iv) the Revolving Credit Facility as follows:

**(i) Initial Legacy USD Term Loan:**

| _____%<br>(Initial Legacy USD Term Loan *Pro Rata* Portion from Item 1b(i) above) | X | $[●] | = | $_____<br>(Initial Legacy USD Term Loan Aggregate Purchase Price)<br>(Round up or down to nearest whole cent (with $.005 being rounded up)) |
|---|---|---|---|---|

**(ii) Incremental Legacy USD Term Loan:**

| _____%<br>(Incremental Legacy USD Term Loan *Pro Rata* Portion from Item 1b(ii) above) | X | $[●] | = | $_____<br>(Incremental Legacy USD Term Loan Aggregate Purchase Price)<br>(Round up or down to nearest whole cent (with $.005 being rounded up)) |
|---|---|---|---|---|

**(iii) Legacy Euro Term Loan:**

| _____%<br>(Legacy Euro Term Loan *Pro Rata* Portion from Item 1b(iii) above) | X | $[●] | = | $_____<br>(Legacy Euro Term Loan Aggregate Purchase Price)<br>(Round up or down to nearest whole cent (with $.005 being rounded up)) |
|---|---|---|---|---|

**(iv) Revolving Credit Facility:**

| _____%<br>(Revolving Credit Facility *Pro Rata* Portion from Item 1b(iv) above) | X | $[●] | = | $_____<br>(Revolving Credit Facility Aggregate Purchase Price)<br>(Round up or down to nearest whole cent (with $.005 being rounded up)) |
|---|---|---|---|---|

**(v) Aggregate Purchase Price:**

| $_____ (Initial Legacy USD Term Loan Aggregate Purchase Price from Item 2a(i) above) | + | $_____ (Incremental Legacy USD Term Loan Aggregate Purchase Price from Item 2a(ii) above) | + | $_____ (Legacy Euro Term Loan Aggregate Purchase Price from Item 2a(iii) above) | + | $_____ (Revolving Credit Facility Aggregate Purchase Price from Item 2a(iv) above) | = | $_____ (Aggregate Purchase Price for General Rights Offering Shares) |
|---|---|---|---|---|---|---|---|---|

**1d.**    **SPONSORED FACILITY CAPITAL RAISING PARTIES**.  Insert below your Exit First Lien Final Allocated Percentage (as listed on the First Lien Final Allocated Percentage Schedule). This will be used to calculate your respective aggregate number of Exit First Lien Facility Premium Shares in accordance with the Financing Commitment and Backstop Agreement.

_____

**Item 2. Investor Certification**.

To participate in the Rights Offering or to receive the Premium Shares (including the Exit First Lien Facility Premium Shares with respect to Sponsored Facility Capital Raising Parties), you must read and (if appropriate) check *both* boxes below.  By checking *both* boxes below, you are indicating that the undersigned is:

☐    Either (a) a "qualified institutional buyer" (as defined in Rule 144A of the Securities Act), (b) not a "U.S. person" (as defined in Regulation S of the Securities Act), or (c) an "institutional" Accredited Investor within the meaning of Rule 501(a) (1), (2), (3), (7), (8), (9), (12), or (13) of the Securities Act, in each case, having (or is a, direct or indirect, wholly-owned subsidiary of any entity having) total assets of in excess of $10 million and, in each case, is acquiring the Rights Offering Shares for its own account and has completed (or has had its authorized signatory complete on its behalf) the Permitted Investor Questionnaire attached as Exhibit A to this Capital Raising Party Subscription Form.

AND

☐    Either (a) not resident or located nor has a registered office in a Relevant State (being any member state of the European Economic Area or the United Kingdom) or (b) if resident, located or has a registered office in a Relevant State, a Qualified Investor as defined in Article 2(e) of, respectively, Regulation (EU) No 2017/1129 of the European Parliament and of the European Council of 14 June 2017 or such regulation as it forms part of United Kingdom retained law as defined in the European Union (Withdrawal) Act 2018, as applicable.

**Item 3. Payment and Delivery Instructions.**

For Equity Capital Raising Parties, payment of the Funding Amount shall be made by (a) wire transfer ONLY of immediately available funds directly to the Escrow Account pursuant to the Financing Commitment and Backstop Agreement, in accordance with the information set forth in the Funding Notice and/or (b) electing to have cash in the amount of all or any portion of such Equity Capital Raising Party's

DIP Amount be used to satisfy such funding.  Please note that payments cannot be aggregated, and one wire should be sent per Capital Raising Party Subscription Form submission.

Please deliver your completed Capital Raising Party Subscription Form (with an accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable, and a Permitted Investor Questionnaire).

**Item 4.  Wire Refund.**

**For _each_ of the Direct Allocation Shares, General Rights Offering Shares, RO Backstop Shares and Exit Facility Amount, please provide your wire information in the event a refund is needed.** *Please be advised that any de minimis amounts less than $100.00 will not be refunded.*

**Equity Capital Raising Party:**

| | |
|---|---|
| Account Name: | |
| Bank Account No.: | |
| ABA Routing No.: | |
| Bank Name: | |
| Bank Address: | |
| Reference: | |
| Name of Equity Capital Raising Party: | |
| For General Rights Offering Shares: | Please indicate one: [Yes] or [No] |
| | Please indicate funding amount in dollars: $ |
| For Direct Allocation Shares: | Please indicate one: [Yes] or [No] |
| | Please indicate funding amount in dollars: $ |
| For RO Backstop Shares: | Please indicate one: [Yes] or [No] |
| | Please indicate funding amount in dollars: $ |
| Total Funding Amount by such Equity Capital Raising Party: | Please indicate funding amount in dollars: $ |

**Related Purchaser of Equity Capital Raising Party or Designee (if applicable):**

| | |
|---|---|
| Account Name: | |
| Bank Account No.: | |
| ABA Routing No.: | |
| Bank Name: | |
| Bank Address: | |
| Reference: | |
| Name of Equity Capital Raising Party: | |
| Name of Designee for such Equity Capital Raising Party: | |
| Name of Related Purchaser: | |
| For General Rights Offering Shares: | Please indicate one: [Yes] or [No] |
| | Please indicate funding amount in dollars: $ |
| For Direct Allocation Shares: | Please indicate one: [Yes] or [No] |
| | Please indicate funding amount in dollars: $ |
| For RO Backstop Shares: | Please indicate one: [Yes] or [No] |
| | Please indicate funding amount in dollars: $ |
| Total Funding Amount for Related Purchaser with respect to such Equity Capital Raising Party or Designee for all Rights Offering Shares: | Please indicate funding amount in dollars: $ |

**Sponsored Facility Capital Raising Party:**

| | |
|---|---|
| Account Name: | |

| | |
|---|---|
| Bank Account No.: | |
| ABA Routing No.: | |
| Bank Name: | |
| Bank Address: | |
| Reference: | |
| Name of Sponsored Facility Capital Raising Party: | |
| Funding Amount by such Sponsored Facility Capital Raising Party in dollars: | $ |

**Related Purchaser of Sponsored Facility Capital Raising Party (if applicable):**

| | |
|---|---|
| Account Name: | |
| Bank Account No.: | |
| ABA Routing No.: | |
| Bank Name: | |
| Bank Address: | |
| Reference: | |
| Name of Sponsored Facility Capital Raising Party: | |
| Name of Related Purchaser: | |
| Funding Amount by such Related Purchaser in dollars: | $ |

**PLEASE NOTE:**

**CAPITAL RAISING PARTIES, YOU MAY NOT RECEIVE YOUR RIGHTS OFFERING SHARES PROMPTLY IF YOU FAIL TO SUBMIT THESE FORMS BY THE CAPITAL RAISING PARTY SUBSCRIPTION EXPIRATION DEADLINE.**

**CAPITAL RAISING PARTIES MUST DELIVER THE APPROPRIATE FUNDING DIRECTLY TO THE ESCROW ACCOUNT AND/OR EXERCISE THE CAPITAL RAISE CONVENIENCE ELECTION NO LATER THAN THE ESCROW ACCOUNT FUNDING DATE.**

**Item 5.**

**Item 5a. <u>FOR EQUITY CAPITAL RAISING PARTIES ONLY</u>. Capital Raise Convenience Election for Funding Amount.**

Name of Holder of DIP Claim[3] (as of the date hereof and as reflected on the DIP Agent's records):

_____

Please indicate below the percentage of your **<u>DIP Claim Amount</u>** that you desire to be treated as a Capital Raise Convenience Election pursuant to the Financing Commitment and Backstop Agreement. *For the avoidance of doubt, the elected percentage shall reduce your Funding Amount.*

| |
|---|
| _____ % |

For reconciliation purposes, please indicate below the **<u>aggregate principal outstanding amount</u>** of your DIP Claim Amount, calculated as of [●], 2023, that you desire to be treated as a Capital Raise Convenience Election pursuant to the Financing Commitment and Backstop Agreement.

*For the avoidance of doubt, in addition to your aggregate principal amounts outstanding, your DIP Claim Amount will also include the interest, fees, expenses, costs, and other charges arising thereunder, in each case, with respect to the DIP Facility (as calculated by the DIP Agent under the definition of DIP Claim, which calculation shall be conclusive and binding absent manifest error).*

| |
|---|
| $ _____ |

**Item 5b. <u>FOR SPONSORED FACILITY CAPITAL RAISING PARTIES ONLY</u>. Capital Raise Convenience Election for First Lien Allocated Amount**

Name of Holder of DIP Claim (as of the date hereof and as reflected on the DIP Agent's records):

_____

---

[3] As set forth in the Restructuring Support Agreement, a "DIP Claim" means "a Claim arising under, relating to, derived from, based upon, or secured pursuant to the DIP Facility, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder, in each case, with respect to the DIP Facility, including, for the avoidance of doubt, such Claims held by the DIP Lenders or the DIP Agent."

Please indicate below the percentage of your **DIP Claim Amount** that you desire to be treated as a Capital Raise Convenience Election pursuant to the Financing Commitment and Backstop Agreement. *For the avoidance of doubt, the elected percentage shall reduce your portion of the Exit First Lien Facility required to be funded.*

|  |
|---|
| _____ % |

For reconciliation purposes, please indicate below the **aggregate principal outstanding amount** of your DIP Claim Amount, calculated as of [●], 2023, that you desire to be treated as a Capital Raise Convenience Election pursuant to the Financing Commitment and Backstop Agreement. For the avoidance of doubt, the elected percentage shall reduce your First Lien Allocated Amount.

*For the avoidance of doubt, in addition to your aggregate principal amounts outstanding, your DIP Claim Amount will also include the interest, fees, expenses, costs, and other charges arising thereunder, in each case, with respect to the DIP Facility (as calculated by the DIP Agent under the definition of DIP Claim, which calculation shall be conclusive and binding absent manifest error).*

|  |
|---|
| $ _____ |

**For reconciliation and processing purposes, each Capital Raising Party making a Capital Raise Convenience Election must make such election and indicate the amount of such Capital Raise Convenience Election on the Rights Offering Subscription Agent's electronic portal no later than the Capital Raising Party Subscription Deadline. Such election may be amended until the Escrow Account Funding Date by resubmitting this Capital Raising Party Subscription Form.**

**Item 6. Certification.**

The undersigned hereby certifies that (a) the undersigned has received a copy of the Plan, the Disclosure Statement, and, with respect to the Equity Capital Raising Parties, the Rights Offering Procedures and the Financing Commitment and Backstop Agreement and (b) the undersigned understands that the exercise of any Subscription Rights with respect to the Rights Offering Shares or Premium Shares is subject to all the terms and conditions set forth in the Plan, the Rights Offering Procedures and the Financing Commitment and Backstop Agreement, as applicable.

**The undersigned Capital Raising Party (or the authorized signatory on behalf of the undersigned) acknowledges that, by executing this Capital Raising Party Subscription Form, (1) the undersigned, to the extent an Equity Capital Raising Party and named below, has elected to subscribe for the Rights Offering Shares at the Per Share Subscription Price in accordance with the Financing Commitment and Backstop Agreement and will be bound to pay the Funding Amount as set forth in the Funding Notice for the Rights Offering Shares, including any RO Backstop Shares, and (2) the undersigned, to the extent a Sponsored Facility Capital Raising Party and named below, has elected to subscribe for Exit First Lien Facility Premium Shares.  Each Capital Raising Party acknowledges that it may be liable to the Company and the Debtors to the extent of any nonpayment subject to the Finance Commitment and Backstop Agreement.**

Date: _____

Name of Capital Raising Party: _____


U.S. Federal Tax EIN/SSN (optional): _____

       If non-U.S. person, check here and attach appropriate IRS Form W- 8 ☐

       If U.S. person, check here and attach IRS Form W- 9 ☐

Signature: _____

Name of Signatory: _____

Title: _____

Telephone Number: _____

Fax: _____

Email: _____

**If you are designating <u>all or a portion</u> of your Rights Offering Shares for delivery to a <u>DESIGNEE</u>, please check here ☐. IF BOX IS CHECKED AND YOU ARE DESIGNATING DESIGNEE(S) TO RECEIVE ALL OR A PORTION OF THE RIGHTS OFFERING SHARES, PLEASE COMPLETE <u>EXHIBIT C</u>.**

**If you are planning to directly hold ANY of the Rights Offering Shares, including Premium Shares, or to fund any portion of the Exit First Lien Facility, please check here ☐. IF BOX IS CHECKED, PLEASE COMPLETE THE SECTION IMMEDIATELY BELOW.**

***<u>The Rights Offering Shares, the ERO Backstop Premium Shares and the Exit First Lien Facility Premium Shares Will Be Directly Registered with Transfer Agent.</u>***

**A.     Please indicate on the lines provided below the registration name of the Capital Raising Party in whose name the Rights Offering Shares or any Premium Shares should be issued (it is strongly recommended that the below information be typed to ensure that it is legible).**

Registration Name: _____

Address: _____

City, State, Postal Code: _____

Telephone: _____

Email: _____

    **<u>FOR EQUITY CAPITAL RAISING PARTIES:</u>**

1) Please indicate the percentage of **General Rights Offering Shares (including RO Backstop Shares)** being delivered **directly** to the Equity Capital Raising Party: _____

2) Please indicate the percentage of **Direct Allocation Shares** being delivered **directly** to the Equity Capital Raising Party: _____

3) Please indicate the percentage of **ERO Backstop Premium Shares** being delivered **directly** to the Equity Capital Raising Party: _____

**FOR SPONSORED FACILITY CAPITAL RAISING PARTIES:**

4) Please indicate the percentage of **Exit Facility First Lien Premium Shares** being delivered **directly** to the Equity Capital Raising Party: _____

5) Please indicate the percentage of the **Exit First Lien Facility** being funded **directly** by the Sponsored Facility Capital Raising Party: _____

**B.    Account Type**

Please indicate the "account type" that may be used in connection with registration of your General Rights Offering Shares.  Please check **only one** box:

INDIVIDUAL ACCOUNT;

IRA ACCOUNT;

CORPORATIONS (S-CORP): (ASSOCIATED, ASSOCIATES, ASSOCIATION, CO, CO. COMPANY, CORP, CORPORATE/PARTNER, ENTERPRISE(S), FUND, GROUP, INCORPORATED, INC, INTERNATIONAL, INTL, LIMITED, LTD, LIFETIME LIMITED COMPANY, LLC, L.L.C., PARTNER, PARTNERS, PLC, PUBLIC LIMITED COMPANY);

PARTNERSHIP: (LP, L P, L.P., LLP, LIMITED PARTNERSHIP, LIFETIME LIMITED PARTNERSHIP);

BANK;

NOMINEE ACCOUNTS;

C-CORP;

NON-PROFIT: (CEMETERY, CHURCH, COLLEGE, COMMISSION FOR CHILDREN WITH, COMMISSION FOR HANDICAPPED, COMMISSION MINISTRIES INC, COMMISSION OF PUBLIC WORKS, COMMISSION OF BANKING & FOUNDATIONS, HOSPITAL, SCHOOL, SYNAGOGUE, UNIVERSITY);

FIDUCIARY ACCOUNT: (CUSTODIAN, CO-TRUSTEE, ESTATE, EXECUTOR, EXECUTRIX, FBO, F/B/O, FAO, FIDUCIARY TRUST, ITF, LIFE TEN, PENSION PLAN, INDIVIDUAL NAME PROFIT SHARING PLAN, RETIREMENT PLAN, 401K PLAN, SELL TRANSFER PLEDGE, STATE UNIFORM TRANSFER TO MINOR'S ACT, TTEE, TTEES, UW, UTMA, UGMA, USUFRUCT, UNIFIED, UNIF GIFT MIN ACT, UNIF TRUST MIN ACT, UNIFIED GIFT TO MINORS ACT, UNIFORM GIFT TO MINORS, UNIFORM TRANSFER TO MINORS, GRANT (GRANTOR ANNUITY TRUST));

17

TENANTS IN COMMON;

TENANTS BY ENTIRETY: (TEN ENT, TENANTS ENT, TENANTS ENTIRETY, TENANTS BY ENTIRETY, TENANTS BY ENTIRETIES);

JOINT TENANTS: (JT TEN, JT TEN WROS, JT WROS, J/T/W/R/S, JOINT TENANCY, JOINT TENANTS WITH RIGHT OF SURVIVORSHIP, JT OWNERSHIP, IF JT ACCOUNT WITH TOD); or

COMMUNITY PROPERTY: (COM PROP, COMM PROP, COM PROPERTY, COMM PROPERTY, MARITAL PROPERTY, HWACP, HUSBAND & WIFE AS COMMUNITY PROPERTY).

**EXHIBIT A**

**IMPORTANT:**
**PERMITTED INVESTOR QUESTIONNAIRE**

CAPITAL RAISING PARTIES AND ANY DESIGNEES

   TO PARTICIPATE IN THE RIGHTS OFFERING, CAPITAL RAISING PARTIES AND THEIR DESIGNEE(S) (IF ANY) MUST <u>EACH</u> COMPLETE THIS PERMITTED INVESTOR QUESTIONNAIRE, INCLUDING THE ADDITIONAL CERTIFICATIONS.  ANY CAPITAL RAISING PARTY OR DESIGNEE THEREOF THAT INDICATES "NO" TO QUESTIONS 1, 2 AND 3 BELOW IS NOT ELIGIBLE TO PARTICIPATE IN THE RIGHTS OFFERING OR RECEIVE ANY OTHER SECURITIES, INCLUDING ANY PREMIUM SHARES, AS A DESIGNEE.  ANY CAPITAL RAISING PARTY OR DESIGNEE THEREOF THAT INDICATES "YES" TO QUESTION 4 BELOW AND "NO" TO QUESTION 5 BELOW IS NOT ELIGIBLE TO PARTICIPATE IN THE RIGHTS OFFERING OR RECEIVE ANY OTHER SECURITIES, INCLUDING ANY PREMIUM SHARES.

   IF THERE IS MORE THAN ONE DESIGNEE, THE CAPITAL RAISING PARTY (THE "<u>DESIGNATING PARTY</u>") MUST COMPLETE A SEPARATE <u>EXHIBIT B</u> SIGNATURE PAGE FOR <u>EACH</u> SUCH DESIGNEE AND A SEPARATE FORM OF <u>EXHIBIT C</u> (INCLUDING THE ATTACHED SPECIAL DELIVERY INSTRUCTIONS).

   PLEASE SEE <u>APPENDIX A</u> BELOW FOR CERTAIN DEFINED OR CAPITALIZED TERMS USED BELOW.

**<u>Questions</u>**

1.  As of the Rights Offering Record Date, are you a "qualified institutional buyer" (as defined in Rule 144A under the Act) and are you acquiring the Rights Offering Shares for your own account?

    □ Yes
    □ No

2.  As of the Rights Offering Record Date, are you an Accredited Investor and are you acquiring the Rights Offering Shares or any Premium Shares for your own account?

    □ Yes
    □ No

If Yes, please indicate which category (e.g., (1) through (13) of the definition of institutional "Accredited Investor" below) you fall under.

Please be advised that you must be an "institutional" Accredited Investor to receive any Rights Offering Shares or Premium Shares within the meaning of Rule 501(a) (1), (2), (3), (7), (8), (9), (12), or (13) of the Securities Act, in each case, having (or is a, direct or indirect, wholly-owned subsidiary of any entity having) total assets of in excess of $10 million.

    Category: _____

3.  As of the Rights Offering Record Date, are you a "Non-U.S. Person"?

☐ Yes
☐ No

4.   As of the Rights Offering Record Date, are you a resident or located, or do you have a registered office, in any member state of the European Economic Area or in the United Kingdom?

☐ Yes
☐ No

5.   If the answer to Question 4 above is "Yes," as of the Rights Offering Record Date, are you a "Qualified Investor"?

☐ Yes
☐ No

## ADDITIONAL CERTIFICATIONS

☐   The undersigned is not purchasing any Rights Offering Shares or any Premium Shares as a result of any advertisement, article, notice or other communication regarding the Rights Offering Shares or any Premium Shares published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar or, to such Person's knowledge, any other general solicitation or general advertisement.   Neither the undersigned nor any Person acting on its behalf has engaged, or will engage, in any form of general solicitation or general advertising (within the meaning of Rule 502(c) under the Securities Act) in connection with the offering of the Rights Offering Shares or any Premium Shares in violation of the federal securities laws or any applicable state securities laws.

☐   The undersigned understands and acknowledges that the Rights Offering Shares or any Premium Shares are being offered in reliance upon an exemption from the registration requirements of the Securities Act provided by section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder and/or Regulation S of the Securities Act (or another applicable exemption under the Securities Act) and that the Rights Offering Shares or any Premium Shares purchased hereby will be "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, and that the undersigned (or any of its affiliates) may not resell such Rights Offering Shares or any Premium Shares except in a transaction that is registered under the Securities Act or that is subject to an exemption from such registration.

☐   The undersigned understands and acknowledges that the Rights Offering Shares or any Premium Shares are being offered pursuant to an exemption from the requirement to publish a prospectus for the offer of transferable securities to the public in any member state of the European Economic Area or in the United Kingdom (each, a "Relevant State") under Article 1(4)(a) of the Prospectus Regulation, and that in each Relevant State the undersigned (or any of its affiliates) may not resell the Rights Offering Shares or any Premium Shares unless such resale is to: (i) a "Qualified Investor" in that Relevant State; or (ii) any other person if such resale would not otherwise constitute an offer of transferable securities to the public within the meaning of the Prospectus Regulation (including in any of the other circumstances set out in Article 1(4) of the Prospectus Regulation) and/or the FSMA (including in any of the other circumstances set out in section 86 of the FSMA).

A-2

☐    The undersigned understands and acknowledges that, if the undersigned receives Rights Offering Shares or any Premium Shares, then the undersigned shall become a party to and shall be bound by the terms and conditions of the New Stockholders Agreement.  *See* <u>Exhibit B</u> for the signature page to the New Stockholders Agreement to be delivered in connection with any receipt of Rights Offering Shares or any Premium Shares.

## APPENDIX A: CERTAIN DEFINED OR CAPITALIZED TERMS

**With respect to Question 2 above:**

"Accredited Investor" (pursuant to clause (a) of Rule 501 promulgated under the Securities Act of 1933, as amended (the "Act")) means any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

1.  Any bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any investment adviser registered pursuant to Section 203 of the Investment Advisers Act of 1940 or registered pursuant to the laws of a state; any investment adviser relying on the exemption from registering with the Securities and Exchange Commission (the "Commission") under Section 203(l) or (m) of the Investment Advisers Act of 1940; any insurance company as defined in Section 2(a)(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any Rural Business Investment Company as defined in Section 384A of the Consolidated Farm and Rural Development Act; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000, or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

2.  Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

3.  Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, partnership, or limited liability company, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

4.  Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

5.  Any natural person whose individual net worth, or joint net worth with that person's spouse or spousal equivalent, exceeds $1,000,000;

    (a)  Except as provided in clause (ii) paragraph (5), for purposes of calculating net worth under this paragraph (5):

        (i)   The person's primary residence shall not be included as an asset;

        (ii)  Indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence

A-4

at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and

    (iii)    Indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability;

(b)    Clause (i) of this paragraph (5) will not apply to any calculation of a person's net worth made in connection with a purchase of securities in accordance with a right to purchase such securities, provided that:

    (i)    such right was held by the person on July 20, 2010;

    (ii)    the person qualified as an Accredited Investor on the basis of net worth at the time the person acquired such right; and

    (iii)    the person held securities of the same issuer, other than such right, on July 20, 2010.

6.    Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse or spousal equivalent in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

7.    Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the Act;

8.    Any entity in which all of the equity owners are Accredited Investors.

9.    Any entity, of a type not listed in paragraphs (1), (2), (3), (7), or (8) above, not formed for the specific purpose of acquiring the securities offered, owning investments in excess of $5,000,000;

10.    Any natural person holding in good standing one or more professional certifications or designations or credentials from an accredited educational institution that the Commission has designated as qualifying an individual for accredited investor status.  In determining whether to designate a professional certification or designation or credential from an accredited educational institution for purposes of this paragraph (10), the Commission will consider, among others, the following attributes:

(a)    The certification, designation, or credential arises out of an examination or series of examinations administered by a self-regulatory organization or other industry body or is issued by an accredited educational institution;

(b)    The examination or series of examinations is designed to reliably and validly demonstrate an individual's comprehension and sophistication in the areas of securities and investing;

A-5

      (c)      Persons obtaining such certification, designation, or credential can reasonably be expected to have sufficient knowledge and experience in financial and business matters to evaluate the merits and risks of a prospective investment; and

      (d)      An indication that an individual holds the certification or designation is either made publicly available by the relevant self-regulatory organization or other industry body or is otherwise independently verifiable.

11.      Any natural person who is a "knowledgeable employee," as defined in rule 3c5(a)(4) under the Investment Company Act of 1940 (17 CFR 270.3c-5(a)(4)), of the issuer of the securities being offered or sold where the issuer would be an investment company, as defined in section 3 of such act, but for the exclusion provided by either section 3(c)(1) or section 3(c)(7) of such act;

12.      Any "family office," as defined in rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940 (17 CFR 275.202(a)(11)(G)-1):

      (a)      with assets under management in excess of $5,000,000,

      (b)      that is not formed for the specific purpose of acquiring the securities offered, and

      (c)      whose prospective investment is directed by a person who has such office is capable of evaluating the merits and risks of the prospective investment; and

13.      Any "family client," as defined in rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940 (17 CFR 275.202(a)(11)(G)-1), of a family office meeting the requirements in paragraph (12) of this definition and whose prospective investment in the issuer is directed by such family office pursuant to paragraph (12)(iii).

**With respect to Question 3 above:**

"U.S. person" means:

1.      Any natural person resident in the United States;

2.      Any partnership or corporation organized or incorporated under the laws of the United States;

3.      Any estate of which any executor or administrator is a U.S. person;

4.      Any trust of which any trustee is a U.S. person;

5.      Any agency or branch of a foreign entity located in the United States;

6.      Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person;

7.      Any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; and

8.      Any partnership or corporation if:

      (a)      Organized or incorporated under the laws of any foreign jurisdiction; and

        (b)      Formed by a U.S. person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in Rule 501(a) under the Act) who are not natural persons, estates or trusts.

The following are not "U.S. persons":

1.      Any discretionary account or similar account (other than an estate or trust) held for the benefit or account of a non-U.S. person by a dealer or other professional fiduciary organized, incorporated, or (if an individual) resident in the United States;

2.      Any estate of which any professional fiduciary acting as executor or administrator is a U.S. person if:

        (a)      An executor or administrator of the estate who is not a U.S. person has sole or shared investment discretion with respect to the assets of the estate; and

        (b)      The estate is governed by foreign law;

3.      Any trust of which any professional fiduciary acting as trustee is a U.S. person, if a trustee who is not a U.S. person has sole or shared investment discretion with respect to the trust assets, and no beneficiary of the trust (and no settlor if the trust is revocable) is a U.S. person;

4.      An employee benefit plan established and administered in accordance with the law of a country other than the United States and customary practices and documentation of such country;

5.      Any agency or branch of a U.S. person located outside the United States if:

        (a)      The agency or branch operates for valid business reasons; and

        (b)      The agency or branch is engaged in the business of insurance or banking and is subject to substantive insurance or banking regulation, respectively, in the jurisdiction where located; and

        (c)      The International Monetary Fund, the International Bank for Reconstruction and Development, the Inter-American Development Bank, the Asian Development Bank, the African Development Bank, the United Nations, and their agencies, affiliates and pension plans, and any other similar international organizations, their agencies, affiliates and pension plans.

**With respect to Question 5 and the Additional Certifications above:**

1.      The "FSMA" means the United Kingdom Financial Services and Markets Act 2000;

2.      The "Prospectus Regulation" means Regulation (EU) No 2017/1129 of the European Parliament and of the European Council of 14 June 2017 and such regulation as it forms part of United Kingdom retained law as defined in the European Union (Withdrawal) Act 2018;

3.      "Qualified Investor" has the meaning ascribed in Article 2(e) of the Prospectus Regulation and includes (in summary) a person that is:

(1)     an entity required to be authorized or regulated to operate in financial markets, such as (among others) an investment firm or a credit institution;

(2)     a large undertaking meeting the requisite quantitative thresholds;

(3)     a national or regional government, a public body that manages public debt, a central bank or an international or supranational institution;

(4)     any other institutional investor whose main activity is to invest in financial instruments; or

(5)     a person or entity who does not fall within any of the descriptions at (i) to (iv) above but who is, on request, treated as a "professional client" in accordance with Section II of Annex II to Directive 2014/65/EU or, in respect of the United Kingdom, in accordance with paragraph 5 of Annex 1 Part 3 of Regulation (EU) No 600/2014 as it forms part of United Kingdom retained law as defined in the European Union (Withdrawal) Act 2018.

**EXHIBIT B**

## SIGNATURE PAGE TO THE NEW STOCKHOLDERS AGREEMENT

**[HOLDER OF NEW COMMON STOCK]**

NAME:

By: _____
Name:
Title:

EXHIBIT C

**Special Delivery Instructions**

**IF THERE IS MORE THAN ONE DESIGNEE, COMPLETE A SEPARATE FORM FOR <u>EACH</u> DESIGNEE.**
**YOU MUST SPECIFY THE PERCENTAGE OF RIGHTS OFFERING SHARES APPLICABLE FOR <u>EACH</u> DESIGNEE.**

**Please complete ONLY if the Rights Offering Shares are to be issued in the name of someone OTHER than the Capital Raising Party. A Capital Raising Party may only designate a Designee only if the Permitted Investor Questionnaire, IRS Form W-8 or IRS Form W-9, as applicable, and signature page to the New Stockholders Agreement are received for such Designee. Equity Capital Raising Parties and Sponsored Facility Capital Raising Parties must separately submit Special Delivery Instructions for each of their respective designees. All percentages should be specified to the nearest .01%. Any percentage that is specified to a further decimal place will be rounded to the nearest .01%.**

Name of Designating Party (i.e., Name of Capital Raising Party):

_____

**<u>For Designating Parties That Are Equity Capital Raising Parties:</u>**

1)   Percentage of **General Rights Offering Shares** (including **RO Backstop Shares**) being designated:

| Name of **Designee** | Name of each **Related Purchaser** with respect to such Designee | **Dollar amount** wired by <u>each</u> Related Purchaser with respect to each such Designee | Percentage of **General Rights Offering Shares** You are Designating to <u>each</u> such Designee(s) |
|---|---|---|---|
| 1. | 1.<br>2. | 1.$_____<br>2.$_____ | % |
| 2. | 1.<br>2. | 1.$_____<br>2.$_____ | % |
| 3. | 1.<br>2. | 1.$_____<br>2.$_____ | % |
| 4. | 1.<br>2. | 1.$_____<br>2.$_____ | % |
| 5. | 1.<br>2. | 1.$_____<br>2.$_____ | % |
| **Percentage Total:** | | | % |

For each such Designee, U.S. Federal Tax EIN/SSN (optional for non-U.S. persons): _____

C-1

If non-U.S. person, check here and attach appropriate IRS Form W-8 ☐

If U.S. person, check here and attach IRS Form W-9 ☐

2)   Percentage of **Direct Allocation Shares** being designated:

| Name of **Designee** | Name of each **Related Purchaser** with respect to such Designee | **Dollar amount** wired by _each_ Related Purchaser with respect to each such Designee | Percentage of **Direct Allocation Shares** You are Designating to _each_ such Designee(s) |
|---|---|---|---|
| 1. | 1.<br>2. | 1.$_____<br>2.$_____ | % |
| 2. | 1.<br>2. | 1.$_____<br>2.$_____ | % |
| 3. | 1.<br>2. | 1.$_____<br>2.$_____ | % |
| 4. | 1.<br>2. | 1.$_____<br>2.$_____ | % |
| 5. | 1.<br>2. | 1.$_____<br>2.$_____ | % |
| **Percentage Total:** | | | % |

For each such Designee, U.S. Federal Tax EIN/SSN (optional for non-U.S. persons):_____

If non-U.S. person, check here and attach appropriate IRS Form W-8 ☐

If U.S. person, check here and attach IRS Form W-9 ☐

C-2

3)   Percentage of **ERO Backstop Premium Shares** being designated:

| Name of **Designee** | Percentage of **ERO Backstop Premium Shares** You are Designating to *each* such Designee(s) |
|---|---|
| 1. | % |
| 2. | % |
| 3. | % |
| 4. | % |
| 5. | % |
| **Percentage Total:** | % |

For each such Designee, U.S. Federal Tax EIN/SSN (optional for non-U.S. persons): _____

       If non-U.S. person, check here and attach appropriate IRS Form W-8 ☐

       If U.S. person, check here and attach IRS Form W-9 ☐

**For Designating Parties That Are Sponsored Facility Capital Raising Parties:**

4)   Percentage of **Exit First Lien Facility Premium Shares** being designated:

| Name of **Designee** | Percentage of **Exit First Lien Facility Premium Shares** You are Designating to *each* such Designee(s) |
|---|---|
| 1. | % |
| 2. | % |
| 3. | % |
| 4. | % |
| 5. | % |

| **Percentage Total:** | % |
|---|---|

For each such Designee, U.S. Federal Tax EIN/SSN (optional for non-U.S. persons): _____

    If non-U.S. person, check here and attach appropriate IRS Form W-8 ☐

    If U.S. person, check here and attach IRS Form W-9 ☐

5)   Percentage of **Exit First Lien Facility** being designated:

| Name of **Designee** | Name of each **Related Purchaser** with respect to such Designee | **Dollar amount** wired by each Related Purchaser with respect to each such Designee | Percentage of **Exit First Lien Facility** You are Designating to each such Designee(s) |
|---|---|---|---|
| 1. | 1.<br>2. | 1.$_____<br>2.$_____ | % |
| 2. | 1.<br>2. | 1.$_____<br>2.$_____ | % |
| 3. | 1.<br>2. | 1.$_____<br>2.$_____ | % |
| 4. | 1.<br>2. | 1.$_____<br>2.$_____ | % |
| 5. | 1.<br>2. | 1.$_____<br>2.$_____ | % |
| **Percentage Total:** | | | % |

For each such Designee, U.S. Federal Tax EIN/SSN (optional for non-U.S. persons): _____

     If non-U.S. person, check here and attach appropriate IRS Form W-8 ☐

     If U.S. person, check here and attach IRS Form W-9 ☐

**A.   Please indicate on the lines provided below the registration name of each Designee in whose name the Rights Offering Shares should be issued. It is strongly recommended that the below information be typed to ensure that it is legible.**

Registration Name Line 1 (Maximum 35 Characters): _____

Registration Name Line 2 (Maximum 35 Characters): _____
(if needed)

Address 1: _____

Address 2: _____

Address 3: _____

Address 4: _____

Telephone: _____

Email: _____

**B.** **Account Type**. Please indicate the "account type" that may be used in connection with registration of your Rights Offering Securities. **Please complete the below for each Designee.**

Please check **only one** box:

INDIVIDUAL ACCOUNT;

IRA ACCOUNT;

CORPORATIONS (S-CORP): (ASSOCIATED, ASSOCIATES, ASSOCIATION, CO, CO. COMPANY, CORP, CORPORATE/PARTNER, ENTERPRISE(S), FUND, GROUP, INCORPORATED, INC, INTERNATIONAL, INTL, LIMITED, LTD, LIFETIME LIMITED COMPANY, LLC, L.L.C., PARTNER, PARTNERS, PLC, PUBLIC LIMITED COMPANY);

PARTNERSHIP: (LP, L P, L.P., LLP, LIMITED PARTNERSHIP, LIFETIME LIMITED PARTNERSHIP);

BANK;

NOMINEE ACCOUNTS;

C-CORP;

NON-PROFIT: (CEMETERY, CHURCH, COLLEGE, COMMISSION FOR CHILDREN WITH, COMMISSION FOR HANDICAPPED, COMMISSION MINISTRIES INC, COMMISSION OF PUBLIC WORKS, COMMISSION OF BANKING & FOUNDATIONS, HOSPITAL, SCHOOL, SYNAGOGUE, UNIVERSITY);

FIDUCIARY ACCOUNT: (CUSTODIAN, CO-TRUSTEE, ESTATE, EXECUTOR, EXECUTRIX, FBO, F/B/O, FAO, FIDUCIARY TRUST, ITF, LIFE TEN, PENSION PLAN, INDIVIDUAL NAME PROFIT SHARING PLAN, RETIREMENT PLAN, 401K PLAN, SELL TRANSFER PLEDGE, STATE UNIFORM TRANSFER TO MINOR'S ACT, TTEE, TTEES, UW, UTMA, UGMA, USUFRUCT, UNIFIED, UNIF GIFT MIN ACT, UNIF TRUST MIN ACT, UNIFIED GIFT TO MINORS ACT, UNIFORM GIFT TO MINORS, UNIFORM TRANSFER TO MINORS, GRANT (GRANTOR ANNUITY TRUST));

TENANTS IN COMMON;

TENANTS BY ENTIRETY: (TEN ENT, TENANTS ENT, TENANTS ENTIRETY, TENANTS BY ENTIRETY, TENANTS BY ENTIRETIES);

JOINT TENANTS: (JT TEN, JT TEN WROS, JT WROS, J/T/W/R/S, JOINT TENANCY, JOINT TENANTS WITH RIGHT OF SURVIVORSHIP, JT OWNERSHIP, IF JT ACCOUNT WITH TOD); or

COMMUNITY PROPERTY: (COM PROP, COMM PROP, COM PROPERTY, COMM PROPERTY, MARITAL PROPERTY, HWACP, HUSBAND & WIFE AS COMMUNITY PROPERTY).

**C.**     **Wire Refund for Designees and their Related Purchasers.** Please see Item 4 of this Capital Raising Party Subscription Form.

**D.**     **Designee Certification (*to be completed by _each_ Designee*):**

The undersigned Designee certifies that the undersigned hereby agrees to be bound by the terms of the Rights Offering Procedures and the Financing Commitment and Backstop Agreement, to the extent applicable, as though the Designee were an Equity Capital Raising Party or a Sponsored Facility Capital Raising Party, as applicable, with respect to receipt of the Rights Offering Shares or Premium Shares, including, without limitation, the obligations to deliver completed and executed documents to subscribe for the Rights Offering Shares or Premium Shares, as applicable (other than the Non-Capital Raising Party Subscription Form), including the Permitted Investor Questionnaire and all other required documentation to the Rights Offering Subscription Agent:

Name of Designee: _____

Signature: _____

Name of Signatory: _____

Title: _____

Address: _____

Telephone Number: _____

Email: _____

**YOUR COMPLETED CAPITAL RAISING PARTY SUBSCRIPTION FORM SHOULD ONLY BE SUBMITTED VIA THE RIGHTS OFFERING SUBSCRIPTION AGENT'S ELECTRONIC PORTAL. TO ACCESS THE E-PORTAL, VISIT HTTPS://CASES.RA.KROLL.COM/CINEWORLD, CLICK ON THE "[SUBMIT RIGHTS OFFERING CAPITAL RAISING PARTY SUBSCRIPTION FORM]" SECTION OF THE WEBSITE AND FOLLOW THE INSTRUCTIONS TO SUBMIT YOUR FORM.**

**PLEASE DO NOT FOLLOW UP WITH HARD COPIES OR EMAILED COPIES OF THE RIGHTS OFFERING DOCUMENTS. THE E-PORTAL IS THE ONLY VALID METHOD OF SUBMISSION FOR CAPITAL RAISING PARTIES AND THEIR DESIGNEES. NO OTHER METHODS WILL BE ACCEPTED.**