### UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| CINEWORLD GROUP PLC, *et al.*[1], | ) | Case No. 22-90168 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

### EMERGENCY MOTION OF THE AD HOC GROUP OF NON-INSIDER CINEWORLD GROUP PLC SHAREHOLDERS FOR ENTRY OF AN ORDER DIRECTING THE UNITED STATES TRUSTEE TO APPOINT AN OFFICIAL EQUITY COMMITTEE

> Emergency relief has been requested. Relief is requested not later than June 16, 2023 at 10 AM, the time currently set by the Court for hearing to consider issues raised in this pleading. If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the above hearing, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.

The ad hoc group of non-insider Cineworld plc shareholders (the "**Ad Hoc Shareholder Group**" or the "**Movants**")[2] states as follows in support of this motion for entry of an order directing the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") to appoint an official committee of non-insider equity security holders (an "**Official Equity Committee**") of Cineworld plc (together with its debtor affiliates, "**Cineworld**" or the "**Debtors**") in these chapter 11 cases:

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/cineworld. The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is: 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

[2] The Group is comprised of Ionut-Lucian Grama (546,179 shares), Paul Harper (19,311 shares), and Nicholas Caruk (1,901,863 shares) and owns approximately 2,467,353 shares of Cineworld Group plc stock. As of the filing of this Motion, no less than 90 other non-insider shareholders are in direct contact with the Group and have indicated to them their support for the appointment of an Official Equity Committee. Those shareholders are owners of an additional approximately 20 million shares.

**Preliminary Statement**

1.      The facts of these chapter 11 cases establish that the immediate appointment of an Official Equity Committee is necessary to assure the adequate representation of Cineworld's non-insider stockholders in these chapter 11 cases.

2.      Supporting the Debtors' solvency—and undercutting any suggestion that they appear to be "hopelessly insolvent"—is that demand for the Debtors' goods, brand, and services is on a strong upswing, as the general population returns to movie theaters and re-embraces their love of cinema, and that the purpose of these chapter 11 cases is to address a liquidity shortfall caused by a temporal problem, i.e. the Covid-19 Pandemic ("the **Pandemic**").  To this end, global box office sales have strongly increased year-over-year in each year since 2020 as performance in the movie industry steadily returns to pre-Pandemic levels.  For example, in 2021, box office sales almost doubled from 11.8 billion to 21.4 billion.  Docket No. 19 at ¶¶ 116.  And, in 2022, box office sales were up from 21.4 billion to 25.9 billion[3].  Industry experts expect that 2023 will see a further increase in box office sales from 26 billion to 32 billion[4].  At this rate, pre-Pandemic box office levels can be expected to be met in the foreseeable future as the industry outlook is bright[5].

3.      Cineworld's performance in 2021 also paints a promising picture.  It finished 2021 with $292.9 million of adjusted EBITDA, up $52.8 million or 21.9% from 2020[6].  Total revenue for that year stood at around 1.8 billion, up 112 percent from the 852.3-million-dollar revenue

---

[3] GLOBAL BOX OFFICE NOTCHED 27% GAIN IN 2022 TO HIT 26 BILLION, RESEARCH SHOWS: https://m.imdb.com/news/ni63899899.

[4] CINEMACON: GLOBAL BOX OFFICE RECOVERY ACCELERATED IN FIRST QUARTER; SAYS STUDY: https://variety.com/2023/film/news/cinemacon-global-box-office-1235590739/

[5] MORE MOVIES, MORE MONEY, MORE VARIETY: THE BOX OFFICE IS CATCHING UP TO PRE-COVID LEVELS: https://www.cnbc.com/2023/04/05/box-office-almost-back-to-pre-covid-levels.html

[6] *See* Cineworld Interim Report Dated September 30, 2022:  https://www.cineworldplc.com/sites/cineworld-plc/files/reports-presentation/2022/interim-results-for-the-period-ended-30-june-2022.pdf

from 2020[7].  We emphasize that Debtors have withheld the release of their official 2022 financial results to investors, this Court, key stakeholders, and the public. This is very atypical, considering that in each of the previous years, Cineworld's official financial results were released during the month of March.  On information and belief, Debtors have concealed what is likely a significantly improved and encouraging set of financial results (while also failing to give proper acknowledgement to bullish 2023 and beyond global box office projections), to further the bleak picture of the health of the business and undervalue it; this increases the chances of confirmation of the pending Chapter 11 Plan ("the **Plan**"), as a rather low business valuation has been assigned for the purposes of same.

4.     It is apparent that, despite the pessimistic spin the Debtors have placed on their financial condition, these chapter 11 cases were really filed due to a liquidity shortfall caused by Pandemic-related disruptions to the demand for in-person movie attendance; a long-term issue with the Debtors' business was not a driving factor.  In this regard, the Debtors stated in the First Day Declaration (as defined below) that Cineworld's liquidity position had been significantly constrained due to "government mandated shutdowns and mass theater closures" caused by the Pandemic which in turn "abruptly cut off" the Debtors' revenue source.  Docket No. 19 at ¶¶ 116. This temporary issue—which is being addressed in these chapter 11 cases—does not unequivocally undercut Cineworld's overall equity value much less render the Debtors "hopelessly insolvent".  To the contrary, the Debtors are experiencing rejuvenated sales that will only increase with time as the Pandemic is placed further into our collective rear-view mirrors. Notwithstanding these indications of solvency, the prospect of an equity recovery is at risk absent

---

[7] Published by Statista Research Department, May 17, 2023: https://www.statista.com/statistics/1082003/cineworld-revenue-worldwide/

from the appointment of an Official Equity Committee.  The Bankruptcy Code permits this Court to appoint an Official Equity Committee in cases where, as is the case here, it is necessary to counteract the natural "favoritism to creditors in the plan formulation process."   Coleman & Woodruff, Looking Out for Shareholders: The Role of the Equity Committee in Chapter 11 Reorganization Cases of Large, Publically Held Companies, 68 AM. BANKR. L.J. 295, 301 (1994).  The risk of unwarranted "favoritism" abounds.  For example, the Legacy Lenders Group ("**Legacy Lenders**"), the DIP lender, has significant control through the DIP's case controls and milestones, which may create incentives for the Debtors to align with Legacy (or possibly other lender groups) at the expense of equity. Docket No. 19 at ¶¶ 140.  At the same time, the Legacy Lenders, other lender groups, and the Official Committee of Unsecured Creditors, likewise, owe no fiduciary duties to equity and none of those stakeholders have any incentives to provide value to minority, non-insider equity holders.

5.     Nor should the Court expect Israel Greidinger and Mooky Greidinger, Cineworld's controlling shareholders (collectively the "**Greidingers**"), to adequately represent the interests of minority, non-insider shareholders.  To evidence this, the Court look no further than the pending Plan, one which proposes to eliminate any recovery for minority, non-insider shareholders, all while issuing the Greidingers and the Debtors' directors with newly created, and substantial, "incentivized" equity shares of up to 7.5% in the reorganized Debtors.  Docket No. 1603 at page 17.  It is heart-breaking how the Greidingers support such treatment to the very people that have supported Cineworld through thick and thin, all due to an unforeseeable "act of God".  It would be an even bigger injustice if these very people were denied any seat at the table in determining their fates in these cases.  It must also be emphasized that Israel Greidinger also serves as Chairman of Cineworld's Board of Directors.  In sum, given the different hats that the Greidingers

hold in these cases, they cannot be said to represent the interests of minority, non-insider shareholders nor can any directors of the Debtors who have been appointed by them. This Court must compel the Greidingers to live up to the statement that a "value-maximizing restructuring transaction" is sought in these proceedings.  Docket No. 19 at ¶ 31. The current Plan before the Court does precisely the opposite, presenting the value of the Debtors in minimalistic terms, based on financial data skewed towards the Debtors' performance closer to the Pandemic.  Indeed, omitting the more positive recent trends in the movie industry, and the corresponding financial data and impact on the Debtors, results in unjustly squeezing out minority, non-insider shareholders from any recovery whatever.

6.     Considering the above factors, any suggestion that individual non-insider equity holders acting on their own, without Official Committee status, can otherwise participate meaningfully without disadvantage in these chapter 11 cases ignores the practical complexities and realities of bankruptcy practice, particularly in a case of this size and complexity.  Absent official representation, equity holders will be effectively shut out of the process, through a practical lack of access to management and other necessary resources from the Debtors and/or through simple attrition.  Thus, due to these doubts which raise red flags as to the prejudice being suffered by an important group of stakeholders in this case, the Court should err on the side of caution.  Similarly, the Court should not permit others to gain unjust advantage through the de facto exclusion of non-insider equity holders that will result from a denial of this Motion. Accordingly, it is respectfully requested that this Court direct the U.S. Trustee to appoint an Official Equity Committee.

**<u>Relief Requested</u>**

7.      By this motion, the Ad Hoc Shareholder Group seeks entry of an order, substantially in the form attached hereto (the "**Order**"), directing the U.S. Trustee to appoint an Official Equity Committee comprised of Cineworld's non-insider shareholders pursuant to section 1102(a)(2) of title 11 of the United States Code (the "**Bankruptcy Code**").

### Jurisdiction, Venue and Predicates for Relief

8.      The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction to consider this motion pursuant to 28 USC §§ 157 and 1334.  The Ad Hoc Shareholder Group confirms its consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.      The predicates for relief requested herein are section 1102(a) of the Bankruptcy Code, and Bankruptcy Rules 2020 and 9014.

### Background

**A.      The Chapter 11 Cases**

11.      On September 7, 2022 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.  On September 23, 2022, the U.S. Trustee appointed an Official Committee of Unsecured Creditors (the "**Creditors' Committee**").  The Debtors continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Israel*

*Greidinger, Deputy Chief Executive Officer of Cineworld Group plc in Support of the Debtors'
Petitions and First Day Motions* (the "**First Day Declaration**").  Docket No. 19.

**B.      Prepetition Capital Structure**

12.      As of the Petition Date, Cineworld had approximately $5.35 billion in total funded
debt obligations, approximately $5 billion of which was held by Debtor entities. The following
table depicts the Debtors' prepetition capital structure:

| DEBTOR FINANCING FACILITIES | | |
|---|---|---|
| **Facility** | **Maturity** | **Outstanding Principal Amount** |
| *Secured Debt* | | |
| *Facilities Under Prepetition Priming Credit Agreement* | | |
| **Initial Priming Term B-1 Loan** | May 23, 2024 | $544,553,219.00 |
| **Initial Priming Term B-2 Loan** | May 23, 2024 | $110,800,000.00 |
| **Incremental Legacy Priming Term B-1 Loan** | May 23, 2024 | $200,000,000.00 |
| *Facilities Under Prepetition Legacy Credit Agreement* | | |
| **Legacy USD Term Loan** | Feb. 28, 2025 | $2,655,731,471.10 |
| **Legacy EUR Term Loan** | Feb. 28, 2025 | $195,285,555.50 |
| **Incremental Legacy USD Term Loan** | Sept. 30, 2026 | $633,601,236.90 |
| **Revolving Credit Facility** | Feb. 28, 2023 | $456,570,870.60 |
| *Other Secured Facility* | | |
| **Midwest City Facility** | July 1, 2041 | $11,900,000.00 |
| *Unsecured Debt* | | |
| *Unsecured Facilities* | | |
| **Settlement Facility** | September 30, 2022 | $56,843,757.50 |
| **Convertible Bonds** | April 16, 2025 | $213,000,000.00 |
| **Total Debtor Debt:** | | **$5,078,286,110.60** |
| NON-DEBTOR FINANCING FACILITIES | | |
| **Facility** | **Maturity** | **Outstanding Principal Amount** |
| **RoW Credit Facility** | Dec. 30, 2023 | $249,211,682.50 |
| **Israeli Loan** | June 30, 2025 | $2,700,000.00 |

| **Polish Bank Overdraft** | N/A | $10,500,000.00 |
|---|---|---|
| **Total Non-Debtor Debt:** | | **$262,411,682.50** |
| **Total Debtor and Non-Debtor Funded Debt:** | | **$5,340,697,793.10** |

Moreover, as of the Petition Date, Cineworld's outstanding equity interests consisted of approximately 1.37 billion shares.  At least a portion of these shares were traded on the London Stock Exchange under the symbol "CINE" and the U.S. Stock Exchange under the symbol "CNNWQ" and continue to be traded as such to date.

**C.      The Debtors' Prepetition Refinancing Efforts and Liquidity Improvements**

13.      As detailed in the First Day Declaration, prior to the Petition Date, the Debtors worked with key stakeholders to bolster liquidity during the "down period" caused by the Pandemic. In May 2020, certain lenders under its revolving credit facility agreed to provide (a) a waiver of the upcoming June 2020 net leverage covenant ratio test and an increase of the December 2020 net leverage covenant to 9.0x and (b) an incremental $110.8 million of revolver availability due December 2020.  The next month, the Debtors secured a new $250 million private placement secured debt facility due December 2023 from a group of private institutional investors to be used for the Debtors' rest of world ("RoW") operations outside of the U.S., U.K., and Ireland.

14.      On November 23, 2020, the Debtors reached a deal that provided a new $450 million superpriority delayed-draw term loan facility due May 2024.  As part of this deal, lenders under the $110.8 million incremental revolving credit facility due December 2020 agreed to extend the maturity of that facility until May 2024.

15.      By the end of 2020, Cineworld had raised $810.8 million of additional liquidity. In 2021, the Debtors were able to secure even more liquidity. This additional liquidity included the March 2021 issuance of a $213 million convertible bond due 2025. Then, in July 2021, the Debtors

secured a new $200 million incremental priming term loan facility due May 2024 from certain existing lenders.

16.     Moreover, in September 2021, the Debtors deferred certain obligations owing pursuant to a Settlement Agreement it reached in litigation with Regal Entertainment Group and entered into a Settlement Facility to finance such obligations.  Finally, the Debtors received $200 million in CARES Act tax refund benefits.

17.     In 2022, the movie industry rebounded through massive hits like *Top Gun: Maverick, Black Panther: Wakanda Forever, Dr. Strange in the Multiverse of Madness; Jurassic Park: Dominion, Black Adam, Nope, Minions: Rise of Guru, Thor: Love and Thunder, Sonic the Hedgehog 2, Elvis, Puss in Boots: The Last Wish, Fantastic Beasts: The Secrets of Dumbledore, Bullet Train, Lightyear, Smile, Moon Man, Water Gate Bridge, Unchartered, and The Batman.* Realizing that further restructuring efforts were still needed, the Debtors engaged in efforts to acquire additional rescue financing and began charting their course toward the instant bankruptcy filing. To address the liquidity problems faced by the Debtors, terms of a $1.935 billion superpriority senior secured, multi-draw priming term loan facility (the "DIP Facility") were agreed upon days before the Petition Date.

**Basis for Relief**

18.     Section 1102(a) of the Bankruptcy Code provides the basis for the Ad Hoc Shareholder Group to obtain an order from this Court directing appointment of an Official Equity Committee. Pursuant to section 1102(a), "on request of a party in interest, the court may order the appointment of additional committees . . . of equity security holders if necessary to assure adequate representation of . . . equity security holders." 11 U.S.C. § 1102(a)(2). The Court's determination of the need for an additional committee is unfettered and *de novo*, without regard

to any prior determination of the U.S. Trustee, if applicable. *In re Enron Corp.*, 279 B.R. 671, 684 (Bankr. S.D.N.Y. 2002); *In re Texaco, Inc.*, 79 B.R. 560, 566 (Bankr. S.D.N.Y. 1987).

19.     The legislative history of section 1102 indicates that Congress understood the important purpose an official equity committee could serve.  Once such purpose is "to counteract the natural tendency of a debtor in distress to pacify large creditors, with whom the debtor would expect to do business, at the expense of smaller and/or scattered investors." S. Rep. No. 95-989, at 10 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5796 (noting that "it is essential for [public investors] to have legislative assurance that their interests will be protected" and "[s]uch assurance should not be left to a plan negotiated by a debtor in distress and senior or institutional [creditors] who will have their own best interests to look after").

20.     The analysis of what constitutes "adequate representation" is determined on a case-by-case basis.  *Enron Corp.*, 279 B.R. at 685.  In turn, courts consider a variety of factors, including:

(a)     whether the debtor appears to be "hopelessly insolvent";

(b)     the complexity of the case;

(c)     whether the stock is widely held and actively traded;

(d)     whether the interests of shareholders are otherwise already adequately represented;

(e)     the timing of the request; and

(f)     whether the cost of the additional committee significantly outweighs the concerns for adequate representation.

*In re Pilgrim's Pride Corp.*, 2009 WL 1231251, at *3 (Bankr. N.D. Tex. Apr. 30, 2009) (appointing Official Equity Committee despite monthly operating reports suggesting that the debtors' liabilities likely exceeded the value of their assets); *See also In re Wang Labs., Inc.*, 149 B.R. 1 (Bankr. D. Mass. 1992) (appointing Official Equity Committee over objections of United States

Trustee and Official Committee of Unsecured Creditors even while debtor had negative book equity of several hundred million dollars); *Exide Techs. v. State of Wis. Inv. Bd.*, 2002 WL 32332000, at *1-2 (D. Del. Dec. 23, 2002) (appointing Official Equity Committee over objections of the debtor and Official Committee of Unsecured Creditors). No single factor is dispositive, and the weight attributed to each factor is determined by the facts of each case. In this regard, we must emphasize that this Court, in *In re SandRidge*, Case No. 16-32488 (Bankr. S.D. Tex. Aug. 1, 2016) H'rg Tr. at 94:7–10 advocated for the reasoning in *Pilgrim's Pride*, ("I am a big fan of the thought process that is set forth in *Pilgrim's Pride* and I do think that the Court exhibited a thoughtful analysis and weighing of the various issues.").

21.    The Ad Hoc Shareholder Group has met its burden with respect to numerous relevant factors and the Court should appoint an Official Equity Committee in these cases, as summarized below:

    (a)    ***The Debtors are not "hopelessly insolvent"***.  As shown by impressive and growing global box office tallies in 2021, 2022, and 2023, demand for the Debtors' goods, brand, and services is on a strong upswing, as the general population returns to movie theaters and re-embraces their love of cinema. The official financial statements to support these positive developments are, upon information and belief, being withheld from release by the Debtors at this time to undervalue the Debtors and increase chances of the confirmation of Cineworld's currently pending Plan. Upon information and belief, the Debtors' also fail to give proper acknowledgement to bullish 2023 and beyond global box office projections for this same reason.

    (b)    ***These are complex cases***.  Debtors have operations across the globe in 10 countries, numerous organized creditor groups, and are subject to a complex capital structure. Most importantly, this Court has already assigned complex designation to the Debtors.

    (c)    ***Shares of Cineworld are widely held and actively traded***.  As of June 9, 2023, Cineworld's outstanding equity interests consist of one class of approximately 1.37 billion shares.  The Ad Hoc Shareholder Group owns approximately 2,467,353 shares, with current support from no less than 90 more shareholders, representing an additional 20 million shares. Investors have been actively trading Cineworld shares since the Petition Date, including roughly 7 million in trading volume as recently as June 9, 2023.

(d) ***The interests of minority, non-insider shareholders are not otherwise adequately represented.*** The Debtors and their Board of Directors, the Creditors' Committee and lender groups have engaged various lawyers, financial advisors, real estate consultants, and investment banking firms to represent their interests in these cases, and the Debtors are obligated to pay the fees and expenses of each of those firms during the pendency of these cases. Minority, non-insider shareholders, in contrast, are left to fend for themselves. And, while the Greidingers have engaged counsel, they cannot represent the interests of minority, non-insider stockholders. Among other things, the Greidingers wear many different hats in these cases. Additionally, the Greidingers support a currently pending Plan that effectively eliminates any recovery to minority, non-insider shareholders whatsoever, all while creating new, lucrative "incentivized" shares in the reorganized Debtors for themselves and the Debtors' directors. Finally, no matter how competent and well-intentioned the Debtors' directors may be, the Court should not decline to appoint an Official Equity Committee given every other constituency in these chapter 11 cases has a seat at the table.

(e) ***This request is timely***. The equities and unique facts involved warrant the granting of this request, which comes at a critical juncture in the case, where interested parties are still being heard and no final Plan confirmed. This is important because the Plan is based on data insufficient to place both the Court and key stakeholder groups in a fair position to determine the Debtors' going concern value. Members of the Ad Hoc Shareholder Group have advocated before this Court for several months, one even <u>prior</u> to Debtor filing its Plan. However, due to the logistic constraints in pooling together resources, understanding the complexities of the Bankruptcy Code, and reaching a reasonable consensus due to the sheer breadth of common stockholders scattered across the world, Movants were delayed. The Debtors' withholding of key financial data and projections has also been an obstacle to Movants in their efforts.

(f) ***The cost of the additional committee does not significantly outweigh the concerns for adequate representation***. Any fees for an Official Equity Committee would be relatively small compared to the actual fees for the Debtors, the Creditors' Committee, the Debtors' Board of Directors, and lender professionals. In this regard, the Group would welcome a good faith, arms'-length negotiation to reach common ground regarding a limited scope and Budget that are mutually acceptable to the Group and the Debtors. Such agreements are commonly accepted and encouraged by this Court.

## A.    Cineworld Does Not Appear "Hopelessly Insolvent"

24.     The applicable legal standard on a motion requesting appointment of an Official Equity Committee is not whether Cineworld is insolvent, but rather whether Cineworld "appears to be "hopelessly insolvent."  *In re Williams Commc'ns Grp., Inc.*, 281 B.R. 216, 220-21 (Bankr. S.D.N.Y. 2002); *see also In re Emons Indus.*, 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985).  There is no clear litmus test for determining when a debtor appears "hopelessly insolvent".  *Williams Commc'ns*, 281 B.R. at 221.  "[Insolvency] is not a simple matter of statutory construction where the Court can rest with citation to the balance sheet test of 11 U.S.C. § 101(32)."  *In re Wang Labs., Inc.*, 149 B.R. at 3 (appointing official equity committee even though the company was operating "at a loss," because the debtor was "not hopelessly insolvent").  Instead, the determination is a "practical conclusion, based upon a confluence of factors."  *Williams Commc'ns*, 281 B.R. at 221.  Further, in assessing insolvency for purposes of appointing an Official Equity Committee, the appearance of "hopeless insolvency" does not depend on a full-fledged valuation analysis (which is premature prior to a confirmation hearing).  *Id.*; *See also In re Delphi Corp.*, No. 05-44481 (RDD), Hr'g Tr. at 167-69 (Bankr. S.D.N.Y. Mar. 22, 2006) [Docket No. 3262].  If it appears that a debtor is not "hopelessly insolvent", then shareholders have a meaningful economic interest to protect, and the presumption should be in favor of appointing an Official Equity Committee.  *See* 7 COLLIER ON BANKR. § 1102.03[2][a] (16th ed.).

   i.     *Global Box Office Sales and Cineworld's Most Recently Disclosed Official Financial Performance Suggest The Existence of Positive Shareholder Value*

25.     Supporting the Debtors' solvency—and undercutting any suggestion that they appear to be "hopelessly insolvent"—is that demand for the Debtors' goods, brand, and services is on a strong upswing, as the general population returns to movie theaters and re-embraces their love of cinema, and that the purpose of these chapter 11 cases is to address a liquidity shortfall

caused by a temporal problem, i.e. the Pandemic.  To this end, global box office sales have strongly grown year-over-year in each year since 2020 as movie-goer traffic to theaters steadily returns to pre-Pandemic levels.  For example, in 2021, box office sales almost doubled from 11.8 billion to 21.4 billion.  Docket No. 19 at ¶¶ 116.  And, in 2022, box office sales were up from 21.4 billion to 25.9 billion[8].  Industry experts expect that 2023 will see a further increase in box office sales from 26 billion to at least 32 billion, as numerous blockbusters will hit and/or remain on the market, including, but not limited to: *Avatar: The Way of Water, Ant-Man and the Wasp: Quantumania, John Wick: Chapter 4, Transformers: Rise of the Beasts, Creed III, The Flash, Dune: Part 2, Super Mario Brothers, Scream VI, Peter Pan & Wendy, Insidious: The Red Door, Mission Impossible: Dead Reckoning Part One, The Marvels, Indiana Jones and the Dial of Destiny, Spiderman: Across the Spiderverse, Barbie, Asteroid City, Oppenheimer, Extraction 2, Elemental, The Meg 2: The Trench, Haunted Mansion, Fast X, Teenage Mutant Ninja Turtles: Mutant Mayhem, The Hunger Games: The Ballad of Songbirds and Snakes, Napoleon, The Nun 2, M3GAN, Wish, The Color Purple, Wonka, Aquaman and the Lost Kingdom, Legally Blonde 3, and Ghostbusters: Afterlife 2*[9].  At this rate, pre-Pandemic global box office levels can be expected to be met in the foreseeable future as the industry outlook is bright[10].  Moreover, there are numerous examples of how sales are already exceeding Pre-Pandemic levels.

---

[8]  GLOBAL BOX OFFICE NOTCHED 27% GAIN IN 2022 TO HIT 26 BILLION, RESEARCH SHOWS: https://m.imdb.com/news/ni63899899.

[9]  CINEMACON: GLOBAL BOX OFFICE RECOVERY ACCELERATED IN FIRST QUARTER; SAYS STUDY: https://variety.com/2023/film/news/cinemacon-global-box-office-1235590739/

[10]  MORE MOVIES, MORE MONEY, MORE VARIETY: THE BOX OFFICE IS CATCHING UP TO PRE-COVID LEVELS: https://www.cnbc.com/2023/04/05/box-office-almost-back-to-pre-covid-levels.html

26.     First, *Avatar: The Way of Water*, has grossed at least 2.3 billion at the global office and is the third biggest movie of all time[11].  This performance was so good that at least 4 more Avatar sequels have been greenlit; *Avatar* is widely considered the most lucrative movie franchise currently and the sequels are all but guaranteed multi-billion-dollar hits[12].  Second, *Spider-Man: Across The Spider-Verse*, released on June 2, 2023, has already exceeded the lifetime global box office total of 2018's *Spider-Man: Into The Spider-Verse* after just 12 days of play with a total thus far of $389.9 million[13].  Third, *Transformers: Rise of the Beasts*, this past weekend's major release, enjoyed robust business, with a global total of $170.5 million; this is the franchise's best opening ever in major territories such as Indonesia, Peru, Argentina, Bolivia, Vietnam, Turkey, Egypt and Lebanon[14].  Additionally, *Rise Of The Beasts* has opened 36% above the 2018 opening of *Bumblebee,* the last entry in the franchise[15].  Fourth, the *Little Mermaid*, in just over two weeks, has already overtaken the $353 million lifetime total of Disney's major 2019 pre-Pandemic release *Dumbo*[16].  Fifth, *Guardians Of The Galaxy Vol 3* passed the $800 million milestone this past weekend, and will soon pass its predecessor, which was released in 2017 and had a global

---

[11] AVATAR 2 TOPPING MASSIVE 2.3 BILLION GLOBAL BOX OFFICE:
https://www.forbes.com/sites/markhughes/2023/03/13/avatar-2-topping-massive-23-billion-global-box-office/?sh=7640ef2f7fd1

[12] AN EXHAUSTIVE TIMELINE OF ALL AVATAR SEQUEL ANNOUNCEMENTS:
https://www.vulture.com/2023/01/avatar-sequel-announcements-timeline-james-cameron.html#:~:text=%E2%80%9CFour%20forthcoming%20Avatar%20films%2C%20expanding,5%20on%20December%202017%2C%202027.

[13] TRANSFORMERS: RISE OF THE BEASTS' STOMPS TO $170M GLOBAL BOX OFFICE DE  DEBUT; 'SPIDER-MAN: ACROSS THE SPIDER-VERSE'
SETS FRANCHISE RECORD:  https://www.screendaily.com/news/transformers-rise-of-the-beasts-stomps-to-170m-global-box-office-debut-spider-man-across-the-spider-verse-sets-franchise-record/5183006.article  '

[14] *Id.*

[15] *Id.*

[16] *Id.*

worldwide cume of $863.8 million[17].  Sixth, *Fast X* passed the $650 million milestone this past weekend, and will soon pass its predecessor, which was released in 2021 and had a global worldwide cume of $726.2 million[18].

27.    Cineworld's performance in 2021 also paints a promising picture.  It finished 2021 with $292.9 million of adjusted EBITDA, up $52.8 million or 21.9% from 2020[19].  Total revenue for that year stood at around 1.8 billion, up 112 percent from the 852.3-million-dollar revenue from 2020[20].  We emphasize that Debtors have withheld the release of the official 2022 financial results to investors, key stakeholders, the Court, and the public. This is very atypical, considering that in each of the previous years, Cineworld's official financial results were released during the month of March.  On information and belief, Debtors have withheld what is likely an improved and encouraging set of financial results (and not given proper acknowledgement to bullish 2023 and beyond global box office projections), to further the bleak picture of the health of the business and undervalue it; this increases chances of confirmation of the pending Plan, as a low business valuation has been assigned for the purposes of same.

28.    To this end, both the U.S. Supreme Court and at least one bankruptcy court within the 5th Circuit support the principle that the value of a bankrupt debtor will ultimately be determined based on its ability to generate cash flow.  *See In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216-27 (Bankr. N.D. Tex. 2009); *See also Protective Comm. v. Anderson,* 390 U.S. 414, 442

---

[17] *Id*.

[18] *Id*.

[19] *See* Cineworld Interim Report Dated September 30, 2022:  https://www.cineworldplc.com/sites/cineworld-plc/files/reports-presentation/2022/interim-results-for-the-period-ended-30-june-2022.pdf

[20] Published by Statista Research Department, May 17, 2023: https://www.statista.com/statistics/1082003/cineworld-revenue-worldwide/

(1968) ("commercial value" of a business "consists in the expectation of income from it") (*quoting Consol. Rock Prods. Co. v. Du Bois,* 312 U.S. 510, 526 (1941). The information and data currently before the Court in support of the pending Plan is, as set out above, insufficient to place both the Court and key stakeholder groups in a fair position to determine the Debtors' going concern value.

29.     In sum, the above indications of solvency belie any argument that the Debtors appear to be "hopelessly insolvent" and lend plausibility to Debtors' being solvent.  Were this Court and key stakeholders given a full and more precise accounting of Cineworld's current financial position and the improved performance in the movie industry, it is not unreasonable to envision a positive impact on Cineworld's going concern value, which would bolster the prospect of solvency.

**B.      The Chapter 11 Cases Are Large and Complex**

30.     There is no question that the Debtors' chapter 11 cases are sufficiently large and complex to justify the appointment of an Official Equity Committee.  These jointly administered cases involve 104 filling entities and business operations that span the globe.

31.     These chapter 11 cases involve a global leader in the movie industry, with operations in 10 countries worldwide.  The Debtors' capital structure is quite complex.  As of the Petition Date, Cineworld had approximately $5.35 billion in total funded debt obligations, approximately $5 billion of which is held by Debtor entities.  For these reasons, this Court has already designated this case as "complex".  Docket No. 18.

32.     With such a large and complex business structure, an Official Equity Committee is even more important to ensure adequate representation of common, non-insider equity holders' interests.

**C.      Cineworld's Common Stock Is Widely Held and Actively Traded**

33.     As detailed above, there are doubts regarding the extent to which Israel Greidinger and Mooky Greidinger will look out for the interests of minority, non-insider shareholders considering their family's numerous connections to Cineworld and active efforts to support a Plan that wipes out any recovery to said shareholders.  Furthermore, shares of Cineworld's common stock are widely held and continue to be actively traded.  On June 9, 2023, a trading volume of roughly 7 million was reported.  As of the close of the market on June 9, 2023, Cineworld's outstanding equity interests consist of one class of approximately 1.37 billion shares.

**D.      Minority, Non-Insider Shareholders Are Not Adequately Represented**

34.     This factor is rooted in the fact that a debtor's officers and directors may focus on other priorities, such as "retaining their jobs and maximizing their compensation," at the expense of stockholders.  *Looking Out for Shareholders:  The Role of the Equity Committee in Chapter 11 Reorganization Cases of Large, Publicly Held Companies*, *supra*.  The reason for this conflict is that "[i]f a proposed plan contemplates the distribution of the majority of the equity in the debtor to creditors, the debtor's directors and management will realize that, upon implementation of the plan, their employment will be controlled by these creditors (who, by virtue of the newly obtained equity majority, will control the election of directors and, in turn, the hiring of management by such directors).  This realization may lead to favoritism to creditors in the plan formulation process, to stay in the creditors' good graces." *Id*.

35.     It is hard to imagine a case that more clearly demands the appointment of an Official Equity Committee to counteract the "natural tendency," as Congress feared, of debtors "in distress to pacify large creditors."  S. Rep. No. 95-989, at 10 (1978).  As detailed above, given Cineworld's improved performance in 2021, apparent improved performance in 2022, and expected recovery of the movie industry to pre-Pandemic levels in 2023 and beyond, the real

reason behind the instant bankruptcy filings was the liquidity crisis stemming from the Pandemic, not a fundamental change in the Debtors' operations or prospects for long-term profitability.

36.     The most critical issue in these cases, therefore, is whether the Debtors have sufficient time and resources to address their liquidity challenges.  There are numerous reasons, however, to fear that the Debtors may exhibit "favoritism to creditors in the plan formulation process, in an effort to stay in the creditors' good graces" considering the facts and circumstances of these cases and that minority, non-insider stockholders require representation in these cases through an Official Equity Committee.  68 AM. BANKR. L.J. at 301.  These factors may create incentives for the Debtors or the management team to engage with the Legacy Lenders or other lender groups at the expense of equity. One need look no further than the currently pending Plan, which, in an attempt to eliminate any payment to minority, non-insider stockholders, depends on bleak financial projections and figures caused in large part by, on information and belief, the Debtors' refusal to release the positive, official 2022 financial performance figures (or even give proper acknowledgement to bullish 2023 and beyond global box office projections), to conclude that a dire need for representation exists.

37.     Nor is there is any reason to believe that other constituents will generate value for stockholders.  The Creditors' Committee, for example, is a fiduciary for general unsecured creditors.  *In re Saxon Indus.*, 29 B.R. 320, 321 (Bankr. S.D.N.Y. 1983) (stating that unsecured creditors' committees and equity committees "are separate and distinct entities with the members of the unsecured creditors and equity . . . classes possessing variant priorities and interests with respect to their relationship with the debtor")[21].  Indeed, the Creditors' Committee does not owe

---

[21] *See also In re Pilgrim's Pride Corp.*, 407 B.R. 211, 217 n.17 (Bankr. N.D. Tex. 2009) ("[W]hen it comes to valuation and determination of future capital structure for plan purposes, their agendas are likely to be very much at odds."); *In re Mirant Corp.*, 334 B.R. 800, 815 (Bankr. N.D. Tex. 2005) (noting that it is unlikely that creditors will be disposed to value of the Debtors so liberally that equity may be sure to receive its due); *In re Coram Healthcare Corp.*, 315

any duties to shareholders and, arguably, owes to its creditor constituency an obligation to zealously pursue a maximum recovery, even if that recovery consists, in part, of value rightfully owed to shareholders. The Creditors' Committee is more likely to accept a strategy that provides the maximum recovery for its constituents in the short term than hold out for increased value that inures to the benefit of equity holders over a longer period. In sum, the Creditors' Committee does not represent the interests of equity holders, particularly non-insiders, who, to date, have had no voice or involvement in the formulation of the Debtor's restructuring plans. Similarly, the lender groups do not have fiduciary duties that run to equity; its duties run to their own stockholders. This is already apparent by the currently pending Plan, which wipes out any payment to minority, non-insider shareholders and has the blessing of these three adverse groups of stakeholders.

38. Finally, the Debtors may assert that Cineworld's controlling shareholders, Israel Greidinger and Mooky Greidinger, will represent the interests of minority, non-insider shareholders. Nothing could be farther from the truth. Unlike minority, non-insider stockholders— who are focused solely on retaining their investment in the Debtors— Israel Greidinger and Mooky Greidinger wear many other hats in these cases. Israel Greidinger is Chairman of Cineworld's Board of Directors. Furthermore, they support the pending Plan which proposes to eliminate any recovery for minority, non-insider shareholders, all while issuing the Greidingers and the Debtors' directors with newly created, and substantial, "incentivized" equity shares of up to 7.5% in the reorganized Debtors. Docket No. 1603 at page 17.

39. In circumstances such as these where the interests of the Board of Directors and management do not align with those of the debtors' non-insider equity holders, a statutory Official

_____

B.R. 321, 339 (Bank. D. Del. 2004) ("[W]e recognize each side's incentives to either overvalue or undervalue the Debtors.").

Equity Committee provides a meaningful counterweight and warrants appointment. For example, in *Oneida*, the court determined that it would be "unrealistic" to rely on "the usual presumption that the Board will pay due . . . regard to the interests of shareholders." *In re Oneida Ltd.*, No. 06-10489 (ALG), 2006 WL 1288576 at *2 (Bankr. S.D.N.Y. May 4, 2006). There, as part of restructuring efforts, lenders gained effective control of the debtor's Board through exercising the right to appoint six of the nine directors. *Id.* Even though the court explicitly disclaimed finding any impropriety by the lenders or any Board member, the court determined that the moving equity security holders had carried their burden to show that an equity committee was "necessary" within the meaning of section 1102(a)(2) of the Bankruptcy Code, given that it was the subsequent Board that endorsed a plan of reorganization that wipes out old equity and allocates all of the equity of the reorganized companies to those lenders who are not being paid in full." *Id.* The court reasoned, again disclaiming that any finding of wrongdoing was being made, that the absence of the "usual checks and balances" present in most bankruptcy cases and "due regard for appearances" warranted the appointment of an official equity committee. *Id.* at *3. Thus, if for no other reason than to protect the appearance that justice is being done in these chapter 11 cases, it is imperative that the Court appoint an Official Equity Committee. To date, minority, non-insider shareholders have been completely shut out of the formation of the Debtors' restructuring plans, all while the Debtors and other key stakeholders, all of whom have interests in direct conflict with the Movants, have been actively taking steps that will have an adverse impact on the Movants' futures.

40.    Here, where indicators point to the solvency of the Debtors and every other constituent in these chapter 11 cases is represented and having such representation paid for by the estate, it would be inappropriate and unjust to deny non-insider equity holders equal representation.

E.       **The Request Is Timely**

41.      The procedural background in this case reveals that Debtors have failed to announce a viable reorganization strategy to date, despite numerous attempts, and are not imminently close to achieving Chapter 11 Plan confirmation.  Moreover, as recently as June 5, 2023, this Court granted the Debtors' third motion for an extension of the exclusivity periods. Docket No. 1782.

42.      Beginning on April 11, 2023, the Debtors have filed several iterations of a Chapter 11 Plan, the latest amendment coming on April 24, 2023.  Docket Nos. 1509, 1566, 1589, 1603. This Plan was supplemented as recently as June 6, 2023.  Docket No 1799.  This Plan has been objected to by numerous interested parties, including the Movants.  Docket Nos. 1637, 1651, 1652, 1727, 1731, 1755, 1814, 1815, 1816, 1820.  This is important because the Plan does not consider both the likely positive official 2022 financial figures nor the bullish 2023 and beyond global box office projections that the Debtors continue to withhold from the public, this Court, and interested stakeholders, which in turn leads to depressed projections and valuations, leaving the Movants out in the cold to receive $0; in essence, it is respectfully asserted that such Plan is incomplete and must be disregarded, as it is based on data insufficient to place the Court and key stakeholder groups in a fair position to determine the Debtors' going concern value.  Docket No. 1651. *See also Protective Comm.,* 390 U.S at 442; *Consol. Rock Prods. Co.,* 312 U.S. at 526 (1941); *In re Pilgrim's Pride Corp.*, 407 B.R. at 216-27.  Even more concerning is that there is a likelihood that Debtors' going concern is much higher, which would lead to improved valuations and equity calculations, and denying appointment of an Official Equity Committee would result in manifest injustice; the doubts raised herein as to these issues alone warrant the granting of this request so that Movants can be afforded a seat at the table in the determination of Debtors' true financial state and future restructuring plans.

43.     This request for the appointment of an Official Equity Committee comes at a critical juncture in the case, where interested parties are still being heard and no final Plan confirmed.  *See In re Pilgrim's Pride Corp.*, 407 B.R. 211 at 219-20 (appointing an Official Equity Committee; noting that establishment of an advocate for minority, non-insider shareholders was urgent because denying said equity owners the means to analyze and critique the debtors' restructuring plans would unjustly hinder any later effort to show that the debtors' value was sufficient to justify their participation).

44.     As a Court of equity, Movants respectfully urge Your Honor to consider that members of the Ad Hoc Shareholder Group have advocated before this Court for several months, one prior to Debtors even filing their Plan.  Docket Nos. 151, 1532, 1683.  However, due to the logistic constraints in pooling together resources, understanding the complexities of the U.S. Bankruptcy Code (most shareholders are foreigners unfamiliar with U.S. law), and reaching a reasonable consensus due to the sheer breadth of non-insider shareholders scattered across the world, Movants were delayed in retaining counsel and presenting this Motion.  The Debtors' withholding of key financial data and projections has also been an obstacle to Movants in their efforts.  The equities and unique facts of this case warrant the appointment of an Official Equity Committee.  Movants need adequate representation of their rights and interests as shareholders and are not capable of doing so themselves.  Docket Nos. 151, 1532, 1683.  No delay in presenting this Motion was intentional; Movants have done all that they reasonably could to act in a prudent manner. The Plan was filed roughly two months ago, with the latest Amendment coming roughly six weeks ago.  As recently as last week, numerous Plan objections were filed, and the Debtors were granted an extension to the exclusivity periods.

45.     Movants have undertaken considerable efforts to round-up as many shareholders as possible to reach consensus and undertake meaningful discussions on the status of the case and action plan.  As the Court can appreciate, there are a considerable number of shareholders, scattered all over the world, whose contact information is not generally open to the public.  By way of example, Movants live in various parts of Romania and the United Kingdom, separated by various time zones and thousands of miles.  Despite this, Movants have still managed to galvanize at least 90 additional shareholders, representing an additional 20 million shares, who all agreed that the appointment of an Official Equity Committee to advocate for them is needed for adequate representation. Your Honor is also reminded that, in addressing shareholder Kamal Tiwari[22] during an April 17, 2023 status conference, he encouraged non-insider shareholders to formally address the Court as to Cineworld's solvency (the same is now asserted via the instant Motion).

46.     Without fiduciary representation, non-insider equity holders will not be able to maximize their recovery as a class.  As such, the time is ripe for the appointment of an Official Equity Committee. Moreover, it is critical that the U.S. Trustee appoint an Official Equity Committee as soon as possible given that the Debtors are attempting to push through confirmation on June 28, 2023 a Plan that, on information and belief, and set out above, cites to and depends on inadequate data and projections.

## F.    The Critical Need for an Official Equity Committee Outweighs the Potential Costs

47.     While the Ad Hoc Shareholder Group is mindful of concerns regarding the additional expense associated with the formation of an Official Equity Committee, "[c]ost alone cannot, and should not, deprive . . . security holders of representation." *In re McLean Indus.*, 70

---

[22] Mr. Tawari is not a member of the Group.  Mr. Tawari has been in touch with the Group and supports the request for relief in this Motion.

B.R. 852, 860 (Bankr. S.D.N.Y. 1987); *see also In re Enron Corp.*, 279 B.R. 671, 694 (Bankr. S.D.N.Y. 2002) ("Added cost alone does not justify the denial of appointment of an additional committee where it is warranted.").  Additional cost must be weighed against the need for adequate representation of public shareholders.  *See In re Wang Labs., Inc.*, 149 B.R. 1, 3-4 (Bankr. Mass. 1992); *In re Beker Indus. Corp.*, 55 B.R. 945, 949-51 (Bankr. S.D.N.Y. 1985).  "Essentially, the courts employ a balancing test to weigh the cost of an equity committee versus the 'concern for adequate representation.'"  *Williams Commc'ns*, 281 B.R. at 220.  In this analysis, the court may consider whether other committees are already representing the shareholders' interests.  *Johns-Manville*, 68 B.R. at 160, 162-64; *In re Baldwin-United Corp.*, 45 B.R. 375, 375-76 (Bankr. S.D. Ohio 1983).  Once the need for adequate representation is established, "the burden shifts to the opponent of the motion to show that the cost of the additional committee sought significantly outweighs the concern for adequate representation."  *Beker Indus. Corp.*, 55 B.R. at 949-51.

48.    As set forth above, the interests of the Debtors' shareholders are not adequately represented in these chapter 11 cases within the meaning of section 1102(a)(2) of the Bankruptcy Code.  Accordingly, it would be unjust to permit the Debtors to formulate an exit strategy without any meaningful input from common, minority, non-insider shareholders, who have a meaningful stake in the Debtors' enterprise.  The benefits of committee representation of shareholders' interests far outweigh any relatively modest costs to the Debtors' estates.  Any fees for an Official Equity Committee would be relatively small compared to the actual fees for the Debtors, the Creditors' Committee, and lender professionals[23].

---

[23] As of the date this Motion was filed, a total of roughly $60,000,000 ($60,404,647.30) in professional fees have been submitted by way of applications for compensation from these various firms.  Docket Nos. 1289, 1292, 1319, 1335, 1343, 1344, 1347, 1360, 1376,1378, 1380, 1386, 1397, 1648, 1681, 1689, 1703, 1722, and 1757.

49.     In this regard, Bankruptcy courts have authority to limit the scope and budget of an Official Equity Committee. *See In re Pilgrim's Pride Corp.*, 407 B.R. at 221–22 (requiring the Official Equity Committee to adhere to a budget; although the court chose not to limit the equity committee's scope at the outset, it noted its authority to do so and stated that equity committee professionals should expect a reduction or elimination of fees if they duplicate work done by the creditors' committee); *See also In re. J.C. Penney Co., Inc.*, Case No. 20-20182 (Bankr. S.D. Tex. June 10, 2020) H'rg Tr. at 61:3–12 (suggesting that the debtors consent to the appointment of an Official Equity Committee with a limited budget). The Group would welcome a good faith, arms'-length negotiation to reach common ground regarding a limited scope and Budget that are mutually acceptable to the Group and the Debtors. As this Motion sets out, the issues of valuation and plan negotiation are vitally important to the Group. The Group files this Motion in good faith and with the goal of maximizing value to the Debtors' estates, one which it shares with all key stakeholders in this case.

WHEREFORE, for the above reasons, the Ad Hoc Shareholder Group respectfully requests that the Court enter the Order, substantially in the form attached hereto, directing the U.S. Trustee to appoint an Official Equity Committee.

Dated: June 12, 2023

Respectfully submitted,

**BARRON & NEWBURGER, P.C.**
7320 N. Mopac Expy, Suite 400
Austin, Texas 78731
Phone: (512) 649-3243
Fax: (512) 476-9253

By: */s/ Stephen W. Sather*
Stephen W. Sather, SBN 17657520
Paul J. Hammer, SBN 24089307
Charles Murnane, SBN 24074775

**COUNSEL FOR THE AD HOC
SHAREHOLDER GROUP**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 12th day of June 2023, a true and correct copy of the above and foregoing document was served via the Court's CM/ECF electronic notification for the Southern District of Texas.

<u>/s/ Stephen W. Sather</u>
Stephen W. Sather