```
                    UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                      .
    IN RE:                            .  Case No.  22-90168
                                      .  Chapter 11
    CINEWORLD GROUP, PLC, et al.,     .
                                      .  515 Rusk Street
                   Debtors.           .  Houston, TX 77002
                                      .
                                      .  Wednesday, June 28, 2023
    . . . . . . . . . . . . . . . .   .  9:00 a.m.



                 TRANSCRIPT OF PLAN CONFIRMATION HEARING
                  BEFORE THE HONORABLE MARVIN ISGUR
                  UNITED STATES BANKRUPTCY COURT JUDGE

   APPEARANCES:

    For the Debtors:          Kirkland & Ellis, LLP
                              By:  CIARA FOSTER, ESQ.
                                   JOSHUA A. SUSSBERG, ESQ.
                                   MADDISON LEVINE, ESQ.
                              601 Lexington Avenue
                              New York, NY 10022
                              (212) 446-4829


                              Kirkland & Ellis, LLP
                              By:  WILLIAM E. ARNAULT, ESQ.
                                   PETER A. CANDEL, ESQ.
                              300 North LaSalle
                              Chicago, IL 60654
                              (312) 862-3062

   APPEARANCES CONTINUED.

    Audio Operator:           Courtroom ECRO Personnel

    Transcription Company:    Access Transcripts, LLC
                              10110 Youngwood Lane
                              Fishers, IN 46048
                              (855) 873-2223
                              www.accesstranscripts.com

        Proceedings recorded by electronic sound recording,
   transcript produced by transcription service.
```

1

APPEARANCES (Continued):                                                    2

```
For the Debtors:           Kirkland & Ellis, LLP
                           By:  GAVIN CAMPBELL, ESQ.
                           1301 Pennsylvania Avenue Northwest
                           Washington, DC 20004
                           (202) 389-5000

                           Jackson Walker, LLP
                           By:  VIENNA ANAYA, ESQ.
                                EMILY MERAIA, ESQ.
                           1401 McKinney Street, Suite 1900
                           Houston, TX 77010
                           (713) 752-4413

For National               Latham & Watkins, LLP
CineMedia, LLC:            By:  SUZZANNE UHLAND, ESQ.
                                ADAM S. RAVIN, ESQ.
                           1271 Avenue of the Americas
                           New York, NY 10020
                           (212) 906-1308

For Legacy Lender          Arnold & Porter Kaye Scholer, LLP
Group:                     By:  BRIAN J. LOHAN, ESQ.
                                MICHAEL D. MESSERSMITH, ESQ.
                           70 West Madison Street, Suite 4200
                           Chicago, IL 60602
                           (312) 583-2374

                           Arnold & Porter Kaye Scholer, LLP
                           By:  ZACHARY D. LANIER, ESQ.
                           2300 North Field Street, Suite 1800
                           Dallas, TX 75201-2481
                           (214) 969-2800

                           Arnold & Porter Kaye Scholer, LLP
                           By:  PHILIP C. DUBLIN, ESQ.
                                MAJA ZERJAL FINK, ESQ.
                           One Bryant Park
                           Bank of America Tower
                           New York, NY 10036-6745
                           (212) 872-1000

For Official Committee     Weil, Gotshal & Manges, LLP
of Unsecured               By:  ALFREDO R. PEREZ, ESQ.
Creditors:                      THEODORE S. HECKEL, ESQ.
                           700 Louisiana Street, Suite 1700
                           Houston, TX 77002
                           (713) 546-5000
```

APPEARANCES (Continued):                                                    3

| | |
|---|---|
| For Official Committee of Unsecured Creditors: | Pachulski Stang Ziehl & Jones<br>By:  ROBERT J. FEINSTEIN, ESQ.<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>(212) 561-7700 |
| For the Board of Directors: | Kramer Levin Naftalis & Frankel LLP<br>By:  ANDREW J. CITRON, ESQ.<br>     ADAM C. ROGOFF, ESQ.<br>1177 Avenue of the Americas<br>New York, NY 10036<br>(212) 715-9100 |
| For Williams Magnolia Properties, LLC: | Stoll Keenon Ogden<br>By:  AMELIA M. ADAMS, ESQ.<br>300 West Vine Street, Suite 2100<br>Lexington, KY 40507-1801<br>(859) 231-3022 |
| For HM Theatre Operations LLC: | Spencer Fane LLP<br>By:  MARK A. BOGDANOWICZ, ESQ.<br>511 Union Street, Suite 1000<br>Nashville, TN 37219<br>(615) 687-2765 |
| For 422 Marketplace, Inc.: | Klehr Harrison Harvey<br>By:  CORINNE BRENNAN, ESQ.<br>1835 Market Street, Suite 1400<br>Philadelphia, PA 19103<br>(215) 569-3393 |
| For Financial Recovery Services, Inc. d/b/a Financial Recovery Strategies: | Lowenstein Sandler<br>By:  MICHAEL S. ETKIN, ESQ.<br>One Lowenstein Drive<br>Roseland, NJ 07068<br>(973) 597-2312 |
| | Lowenstein Sandler<br>By:  LINDSAY H. SKLAR, ESQ.<br>1251 6th Avenue, 17th Floor<br>New York, NY 10020<br>(646) 414-6883 |
| For CPT The Landing, LLC and RCI/RMS, LLC CPT Riverside Plaza LLC: | Clark Hill PLC<br>BY:  ROBERT P. FRANKE, ESQ.<br>901 Main Street, Suite 6000<br>Dallas, TX 75202<br>(214) 651-2099 |

APPEARANCES (Continued):                                              4

| | |
|---|---|
| For MGP XI-GPI Laurel Plaza, LLC | Allen Matkins Leck Gamble Mallory & Natsis LLP<br>By:  IVAN GOLD, ESQ.<br>3 Embarcadero Center, 12th Floor<br>San Francisco, CA 94111-4074<br>(415) 273-7431 |
| For Barkley Lifestyle Management and Benderson Development: | Kelley Drye & Warren LLP<br>By:  ROBERT LAHANE, ESQ.<br>     JENNIFER D. RAVIELE, ESQ.<br>3 World Trade Center<br>175 Greenwich Street<br>New York, NY 10007<br>(212) 808-7800 |
| For CJ 4DPlexCo. Ltd. and CJ 4DPlex Americas, LLC: | Munsch Hardt Kopf & Harr P.C.<br>By:  DEBORAH M. PERRY, ESQ.<br>500 North Akard Street, Suite 3800<br>Dallas, TX 75201-6659<br>(214) 855-7565 |
| For Brixmor Operating Partnership LP: | Ballard Spahr LLP<br>By:  LAUREL ROGLEN, ESQ.<br>919 North Market Street, 11th Floor<br>Wilmington, DE 19801-3034<br>(302) 252-4465 |
| For SVCN 5 LLC, et al.: | Goulston & Storrs P.C.<br>By:  DOUGLAS ROSNER, ESQ.<br>400 Atlantic Avenue<br>Boston, MA 02110-3333<br>(617) 574-6517 |
| For Kimco Realty Corporation: | Singer & Levick, P.C.<br>By:  MICHELLE E. SHRIRO, ESQ.<br>16200 Addison Road, Suite 140<br>Addison, TX 75001<br>(972) 380-5533 |
| For 3503 RP Ontario 4th Street LLC: | Spencer Fane LLP<br>By:  ERIC VAN HORN, ESQ.<br>2200 Ross Avenue, Suite 4800 West<br>Dallas, TX 75201<br>(214) 750-3610 |
| For Waterfront (LC) Limite: | Vinson & Elkins<br>By:  WILLIAM L. WALLANDER, ESQ.<br>2001 Ross Avenue, Suite 3900<br>Dallas, TX 75201<br>(214) 220-7905 |

APPEARANCES (Continued):                                    5

```
For the U.S. Trustee:      Office of the United States Trustee
                           By:  JANA WHITWORTH, ESQ.
                           515 Rusk Street, Suite 3516
                           Houston, TX 77002
                           (713) 718-4650


Also Present:              JAMES A. MESTERHARM
                           BRIAN WECKINGTON
                           JUSTIN LUPE
```

<u>I N D E X</u>
<u>6/28/23</u>

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE DEBTORS: | | | | |
| Michael Schlappig | -- | 22 | -- | -- |

| EXHIBITS | ADMITTED |
|---|---|
| ECF Number 1964-2 | 14 |
| ECF Number 1964-3 | 14 |
| ECF Number | 16 |

| | Page |
|---|---|
| Opening Statement by Mr. Perez | 9 |
| Opening Statement by Mr. Lohan | 9 |
| Opening Statement by Mr. Weckington | 10 |
| Closing Argument by Mr. Sussberg | 31 |
| Closing Argument by Mr. Lohan | 36 |
| Closing Argument by Ms. Perry | 37 |

1          (Proceedings commence at 9:00 a.m.)

2              THE COURT:  Good morning.  Please be seated.

3          Good morning.  We're here in the Cineworld Group, PLC

4   case.  It is 22-90168.  The order of presentation today will be

5   as follows.  We're going to being with an opening statement by

6   the debtor.  We'll then take opening statements by any party

7   that supports confirmation of the plan and wishes to make an

8   opening statement.  We'll then take opening statements by any

9   party that opposes confirmation of the plan.  We will then

10  proceed to the evidentiary record, and in the evidentiary

11  record, we will comply with the Federal Rules of Evidence, take

12  in the evidence.  And we'll then have closing arguments, and

13  then the Court will render a decision.

14         So we're going to start with the debtor.

15  Mr. Sussberg, good morning.

16             MR. SUSSBERG:  Good morning, Your Honor.  Joshua

17  Sussberg, Kirkland & Ellis on behalf of Cineworld.  I apologize

18  to the Court for not being in the Houston heat.

19  Notwithstanding the heat, I tried to get down, and all flights

20  have been cancelled because of the weather.  So thank you for

21  allowing me to appear virtually.  I am going to speak in the

22  closing, and my partner, Ms. Foster, is going to handle our

23  opening statement.

24             THE COURT:  Thank you.

25             Ms. Foster.

1          MS. FOSTER:  Good morning, Your Honor.  Ciara Foster,

2     Kirkland & Ellis on behalf of the debtors.  Your Honor, I'm

3     joined in the courtroom today by my partner, Mr. Campbell, as

4     well as my colleague, Mr. Candel, as well as the debtors' chief

5     restructuring officer, Mr. Mesterharm.  As Mr. Sussberg noted,

6     unfortunately certain folks are not here today, including

7     Mr. Sussberg, Mr. Schlappig, the debtors' investment banker, as

8     well as Mr. Daloia, our claims and noticing agent.

9          We're happy to be here today, Your Honor, and

10     thrilled to say that we're proceeding on a entirely consensual

11     basis, with the exception of certain shareholder letters and

12     motions that have been filed on the docket, which we will

13     address in due course.

14          As for how we plan to proceed today, Your Honor, I'm

15     going to cede the podium to Mr. Campbell, who is going to

16     handle the evidentiary record after I finish my opening

17     remarks, as well as Mr. Candel, who will walk you through the

18     order and address any questions you have on the plan or the

19     order language.  And finally, as Mr. Sussberg previewed, he

20     will handle the closing.

21          THE COURT:  Thank you.  Is there any other party that

22     wishes to make any opening statement in support of confirmation

23     of the plan.

24          MR. PEREZ:  Good morning, Your Honor.

25          THE COURT:  Good morning.

1          MR. PEREZ:  Alfredo Perez, I'm here with Theo Heckel

2     on behalf of the Committee.  And, Your Honor, after many rounds

3     of discussions and negotiations, the creditors' committee is

4     fully supportive of the plan.  There have been numerous

5     concessions that were made, and we're very happy to be here and

6     would very much like confirmation of plan.  Thank you.

7          THE COURT:  Thank you.  Mr. Perez, one of the issues

8     in the case is whether there is equity for shareholders.  What

9     is the expected return to the general unsecured creditors in

10    the case?

11         MR. PEREZ:  Your Honor, it depends on the claims, but

12    the return is certainly no more than about 3 percent, at most,

13    assuming that every -- that the claims come in where we think

14    they're going to come in and we are on the high side of the

15    various recoveries.  So I mean we're talking about probably $18

16    million of value at most, going to probably a billion-six of

17    unsecured claims without any deficiency from the secured

18    creditors, so --

19         THE COURT:  Thank you.

20         Yes, sir.

21         MR. LOHAN:  Good morning, Your Honor.  Brian Lohan on

22    behalf of the ad hoc group.  I have nothing substantive to add

23    to what Ms. Foster said, or what Ms. Foster said or Mr. Perez

24    said.  We're happy to be here proceeding with confirmation, and

25    we support entry of the order.

```
 1              THE COURT:  Thank you, Mr. Lohan.

 2              If there's anyone on the phone that wishes to make a

 3   statement in support of confirmation, please press "five star"

 4   one time on your line, and we'll get you recognized.

 5              All right.  Is there anyone in the courtroom that

 6   wishes to oppose confirmation of the plan in an opening

 7   statement?

 8              Is there anyone on the telephone that wishes to

 9   oppose confirmation in an opening statement?  If you do, you

10   need to press "five star" on your line so that we can locate

11   you.  No?  From the United Kingdom, the last digits are 4226.

12   Who do we have on the telephone?  Yes, from 447-931-034-226.

13   Who do we have on the telephone?

14              MR. WECKINGTON:  Good morning.

15              THE COURT:  Good morning.  Tell me your name --

16              MR. WECKINGTON:  Good afternoon.

17              THE COURT:  Tell me your name, please.

18              MR. WECKINGTON:  My name is Brian -- my name is Brian

19   Weckington, I'm an individual shareholder.

20              THE COURT:  Okay.  I can't understand you.  Can you

21   please pick up your phone?

22              MR. WECKINGTON:  Okay.  Can you hear me now?

23              THE COURT:  That is better.  Tell me your name,

24   please.

25              MR. WECKINGTON:  My name is Brian Weckington, I'm an
```

1   individual shareholder.  I'm just --

2          THE COURT:  I'm having trouble -- I'm have a lot of

3   trouble hearing you.  Did you pick up your phone?

4          MR. WECKINGTON:  Yes.

5          THE COURT:  Okay.  You're --

6          MR. WECKINGTON:  My name is Brian Weckington, I'm an

7   individual shareholder of Cineworld.

8          THE COURT:  I cannot understand the words that you're

9   saying.

10          MR. WECKINGTON:  Can you hear me?  Can you hear me?

11          THE COURT:  No.  I mean, I can hear that there are

12   words coming out, but I can't tell what you're saying.

13          MR. WECKINGTON:  For the (indiscernible) -- can you

14   hear me now?

15          THE COURT:  Would you like to dial back in?  We'll

16   wait for you.

17          MR. WECKINGTON:  Okay.  Thank you.

18          THE COURT:  We're going to take a moment, wait for

19   him to get reconnected.  (Pause)  Yes, is this the person that

20   had just disconnected because we couldn't understand you?

21   Someone has just dialed in from 447-443-130-982, but you just

22   hung up the phone.  We'll wait again.  Yes, sir, thank you for

23   dialing back in.

24          MR. WECKINGTON:  Yes, sorry, can you hear me?

25          THE COURT:  Yes, that's much better.  So I think your

1    first name was Brian, but I missed your last name.  So if we

2    can get you to just start over.

3              MR. WECKINGTON:  Yes.

4              THE COURT:  Thank you.

5              MR. WECKINGTON:  It's Brian Weckington, and I really

6    only wanted to question about the possible -- I'm an individual

7    shareholder in Cineworld, invested 10,000 pound I'm going to

8    lose almost the whole of, maybe a few hundred pound left from

9    that.  To do with the valuation, I feel very strongly that the

10   valuation should be done in a more impartial way.  I feel it's

11   a bit one-sided towards the -- the bankers and Cineworld.

12   Quite in the interest of justice, I think we should get another

13   valuation.  I think it's very important.  That's all I've got

14   to ask for.

15             THE COURT:  Thank you.  When we get to the

16   evidentiary record, you should feel free to cross-examine

17   witnesses.  I will leave your line open, and you also can

18   introduce your own evidence if you wish.  All right.

19             MR. WECKINGTON:  Yeah, I don't really have all the

20   evidence.  I have just the evidence from everything and -- and

21   social sites and what have you.  But I just feel strongly that

22   there's not been a proper valuation by a proper professional

23   valuation from -- up to this moment.  I think it's very

24   important that we another evaluation that takes (indiscernible)

25   the recovery.  This is a once-in-a-hundred-years event that

1  took place, people were losing their life savings.

2  (Indiscernible) done fairly and justice -- the courts have the

3  justice for all, even the poor man.  That's all I want to say.

4          THE COURT:  Thank you, sir.

5          MR. WECKINGTON:  Thank you.

6          THE COURT:  All right.

7          MR. WECKINGTON:  Thank you.

8          THE COURT:  Does anyone else wish to make an opening

9  statement in opposition to confirmation?  If so, you'll need to

10 press "five star" one time on your line.

11         All right.  I'm going to show that that concludes the

12 opening statement segment of today's hearing.  We're going to

13 move into the evidentiary record at this point.

14         MR. CAMPBELL:  Good morning, Your Honor.  Gavin

15 Campbell of Kirkland & Ellis on behalf of the debtors.

16         THE COURT:  Good morning, Mr. Campbell.

17         MR. CAMPBELL:  Your Honor, we'd like to start by

18 offering the evidence that is not Mr. Schlappig's opinions and

19 the valuation testimony that we've heard some concerns about

20 and I know was the subject of a motion that hit the docket

21 yesterday afternoon.  So, Your Honor, the debtors filed a

22 witness and exhibit list last night at Docket 1964 that puts

23 all of the exhibits and declarations in a single place.  So

24 first, Your Honor, the declaration of James Mesterharm, the

25 debtors' chief restructuring officer, which is Exhibit 2 on the

1    debtors' list, Docket Number 1964-2, and Mr. Mesterharm is

2    present in the courtroom today.

3          THE COURT:  All right.  Is there anyone that objects

4    to the admission of Mr. Mesterharm's declaration?

5          MR. LOHAN:  No objections Your Honor.

6          THE COURT:  Okay.  1964-2, Mr. Mesterharm's

7    declaration, is admitted.

8        (ECF Number 1964-2 admitted into evidence)

9          THE COURT:  Is there any party that has any

10   cross-examination for Mr. Mesterharm?  All right.  Let's move

11   ahead.

12         MR. CAMPBELL:  Yes, Your Honor.  Next the debtors

13   would offer into evidence the declaration and voting report of

14   James Daloia of Kroll, which is Exhibit 3 on the debtors'

15   exhibit and witness list at Docket Number 1964, and Mr. Daloia

16   should be available on the GoTo Meeting.

17         THE COURT:  Thank you.  Is there any objection to the

18   admission of the voting report?

19         MR. LOHAN:  No objection, Your Honor.

20         THE COURT:  Is there anyone that has any

21   cross-examination for Mr. Daloia?  Okay.  The voting tabulation

22   report is admitted.

23       (ECF Number 1964-3 admitted into evidence)

24         THE COURT:  It's my understanding that the classes

25   that rejected, and I think there were either three or four, I

1   could go back and count, had one vote rejecting, stipulated at

2   a value of a dollar, and no votes accepting, and that all other

3   classes accepted under the Bankruptcy Code.  Is that correct?

4           MR. CAMPBELL:  I believe, Your Honor, that there were

5   a couple classes like that of the four, but I believe there was

6   at least one class where there was a vote to accept, a vote to

7   reject, and I think there was another class where there were a

8   number of rejecting votes, but I can --

9           MR. LOHAN:  I can -- Your Honor, there was a

10  Picturehouse that --

11          THE COURT:  So hold on a second.  For the gentleman

12  from the United Kingdom, you need to put your -- you need to

13  quiet your phone, please, we're getting a lot of background

14  noise from you.

15          Go ahead, please.

16          MR. PEREZ:  Your Honor, Mr. Campbell is correct.

17  There were two classes where there was just a single dollar

18  vote that rejected.  There was a third class which had $4.56, I

19  believe, in favor and $1 against.  So that rejected because of

20  the numerosity.  And then, there was the one single debtor,

21  Picturehouse, which I believe is one of the English debtors

22  that had actual votes -- a couple of votes rejecting.

23          THE COURT:  Thank you.  All right.

24          MR. CAMPBELL:  Yes, Your Honor.  Next, the debtors

25  would offer into evidence the affidavits of solicitation and

1  publication that are Exhibits 10 to 15 on the debtors' exhibit

2  and witness list at Docket Numbers 1964-10, 1964-11, 1964-12,

3  1964-13, 1964-14, and 1964-15.

4          THE COURT:  Is there any objection to the affidavits

5  of publication?

6          MR. PEREZ:  No objection, Your Honor.

7          THE COURT:  All right.  The affidavits of publication

8  are admitted.  They are 1964-10 through 15.

9     (ECF Numbers 1964-10 through 1964-15 admitted into

10 evidence)

11         MR. CAMPBELL:  Thank you, Your Honor.  Then --

12         UNIDENTIFIED:  (Indiscernible).

13         THE COURT:  I'm sorry, who was that?  Do we have an

14 objection?  All right.  Go ahead please.

15         MR. CAMPBELL:  Yes, Your Honor.  Then, the last item

16 of evidence that we had intended to introduce was the

17 declaration of Mr. Schlappig of PJT Partners, which is Exhibit

18 1 on the debtors' witness and exhibit list at 1964-1.

19 Mr. Schlappig should be available on the GoTo Meeting.  But I

20 know that there is the outstanding motion concerning Daubert

21 that was filed yesterday afternoon.  So before I offer that

22 declaration into evidence, I want to briefly address a couple

23 points concerning that motion if that is acceptable to Your

24 Honor.

25         THE COURT:  Go ahead.

1          MR. CAMPBELL:  Yes, Your Honor.  So as you know,

2    Mr. Schlappig testified at the equity committee hearing about

3    the valuation opinions that he holds, about the valuation work

4    that he has performed in this case, and that came in without

5    any Daubert objection.  Mr. Schlappig's declaration that we

6    have filed reiterates that valuation work and the opinions that

7    he expressed at the equity committee hearing, and those were

8    also described in Exhibit D to the disclosure statement.

9          In response to the Daubert objection that we saw

10   yesterday that was, I think, largely a motion to reconsider

11   your reconsideration decision, but also a Daubert motion, there

12   are essentially three points that I wanted to emphasize.  First

13   is that the motion appears to somewhat misapprehend what

14   Mr. Schlappig's opinions and valuation work consists of,

15   because the reports -- or excuse me, the motion specifically

16   says that it would like to have a report where a comparable

17   company's and a discounted cash flow analysis are performed.

18   And as Mr. Schlappig testified at the equity committee hearing,

19   as was reflected in the disclosure statement exhibit and as

20   reflected in his current declaration, those analyses were in

21   fact conducted here.

22         Second, there is no doubt that those valuation

23   methodologies are reliable valuation methodologies for purposes

24   of a Daubert analysis.  Those are bedrock valuation

25   methodologies.  And indeed, the motion itself endorses those

1    methodologies and seeks to have them performed here.  And

2    additionally, the valuation opinions that Mr. Schlappig offered

3    here are bolstered by a marketing process that was conducted on

4    a third-party, arm's-length basis, and extensive marketing

5    process which is, we would submit, perhaps most reliable type

6    of valuation evidence.  And third, there can be no real dispute

7    about Mr. Schlappig's background and his qualifications, which

8    he previously testified to at the equity committee hearing, and

9    which are again set forth in his declaration.  So, Your Honor,

10   we would as a result move Mr. Schlappig's declaration at 1945

11   -- 1964-1 into evidence, and ask that any Daubert objection be

12   overruled.

13          THE COURT:  All right.  Who do we have that wishes to

14   prosecute the Daubert objection?  Please press "five star" one

15   time on your phone, and we're going to get you recognized.  Do

16   we have Mr. Ionut-Lucian Grama on the phone?  If so, please

17   press "five star" on your line.  That's the individual that

18   filed the Daubert objection, I believe.

19          All right.  We have no one here to prosecute the

20   Daubert objection.  I have an independent duty to determine

21   whether expert testimony is admissible under the Supreme

22   Court's Daubert opinion.  Taking into light the objection, and

23   I have reviewed the report, I think that the objection may

24   misunderstand what occurred.  What occurred is appropriate

25   under Daubert.  First, there's no question that the witness

1  himself is qualified to give the opinion.  Second, he gives a

2  report in which he -- I'm going to go ahead and mute the line

3  from UK.  If you wish to speak again in a moment, you're

4  certainly free to do that.  You'll need to press "five star"

5  again, but there's way too much background noise coming in.

6          The report indicates that he has done, in fact, all

7  of the work that is referenced in the objection letter.  And

8  the objection letter I think is correct that that's the kind of

9  work that ought to occur with respect to doing this kind of

10  evaluation.  The report then says, but I don't see the detail,

11  the backup detail -- excuse me, the objection says, I don't see

12  the backup detail that I would expect to have been done.  The

13  report itself doesn't need to include the backup detail.  It

14  needs to describe generally what was done and give the

15  conclusions.  And then, parties are allowed to take discovery

16  or otherwise ask questions about the backup work under a

17  Daubert analysis.  There is nothing in the objection that

18  indicates that there was any formal discovery done so that the

19  person could get the backup data, nor any indication that the

20  backup data was refused.

21          I find that the methodologies that were used based on

22  the witness's testimony that is now being offered meets the

23  requirements of Daubert, and I'm admitting the valuation

24  analysis.  In particular, as I highlighted when Mr. Perez was

25  making his opening statement, in addition to sort of the normal

1    discounted cash flow or comparative analysis, we have what

2    actually happened in this case.  And the evidence shows that

3    there was extensive marketing of the assets, and the Official

4    Committee fully and well-funded with people that could go do

5    competing evaluation has agreed to recommend and support the

6    plan when creditors are going to take a 96 percent loss.  That,

7    more than anything, proves that in the marketplace, the debtor

8    is hopelessly insolvent.  There may be contrary evidence to

9    that, and I'm going to listen to that contrary evidence today.

10   But I'm admitting this -- I'm overruling the Daubert objection.

11   I'm now going to not only admit the declaration, but subject

12   the witness to examination.  So if any party wishes to examine

13   the witness, please press "five star" on your line.

14          All right.  No party apparently wishes to examine the

15   witness.  Go ahead, please, Mr. Campbell.

16          MR. CAMPBELL:  Your Honor, that concludes the

17   debtors' evidentiary presentation in support of confirmation,

18   thank you.

19          THE COURT:  Thank you.  Is there any other party that

20   wishes to introduce any evidence today in support of

21   confirmation of the plan?  Is there any party that wishes to

22   introduce any evidence today in opposition to confirmation of

23   the plan?  I see no one in court.

24          Is there anyone on the phone that wishes to introduce

25   any evidence in opposition to confirmation of the plan?  If so,

1   please press "five star" on your line.  Out of an abundance of

2   caution, I'm going to re-open the line where we were getting

3   all the noise in case that individual wishes to ask any

4   questions.  Give me just a moment.

5          Yes, sir.  Are there any questions for the witness

6   from you, sir?

7          MR. WECKINGTON:  I have really maybe one question,

8   it's not really a question as such, it's more a statement.

9          THE COURT:  If you do have question --

10          MR. WECKINGTON:  What?

11          THE COURT:  -- let me get the witness sworn in so

12   that we can -- we've admitted his declaration, but now I'm

13   going to let you ask him questions under oath.  If the witness

14   would please press "five star" one time on the phone?

15   Mr. Schlappig, I see you there, hold on.  Again, the person

16   from Great Britian, it's really going to help if you pick up

17   your phone.  We get a huge amount of background when we're on a

18   speaking phone, so it's hard to hear you.

19          Mr. Schlappig --

20          MR. WECKINGTON:  (Indiscernible).

21          THE COURT:  -- would you raise your hand please,

22   Mr. Schlappig?

23          MICHAEL SCHLAPPIG, DEBTORS' WITNESS, SWORN

24          THE COURT:  Thank you.  Go ahead, sir.  From Great

25   Britain, please feel free to ask your questions of the witness.

| | |
|---|---|
| 1 | CROSS-EXAMINATION |
| 2 | BY MR. WECKINGTON: |
| 3 | Q    Sorry, I wasn't expecting -- well, I've got -- really I've |
| 4 | only got one question really.  That's -- it's simply just about |
| 5 | this.  There must be a -- is it -- is it -- I would like to ask |
| 6 | you is it a true fact that Mooky Greidinger is going to |
| 7 | receive, and the other people, his brother, are going receive |
| 8 | 35 million?  That cannot be fair?  How is that -- no one's life |
| 9 | is that fair. |
| 10 |           THE COURT:  Okay.  I cannot -- |
| 11 |           MR. WECKINGTON:  Go by God and give it to the |
| 12 | shareholders. |
| 13 |           THE COURT:  I cannot understand what you're saying. |
| 14 | If you could talk a little bit more slowly, please? |
| 15 | BY MR. WECKINGTON: |
| 16 | Q    Yes, I'm questioning the 35 million that Mooky and Israel |
| 17 | and the other two people from the firm are going to get.  How |
| 18 | is that fair to all the shareholders are left bankrupt, but yet |
| 19 | he's going to get 35 million? |
| 20 |           MR. CAMPBELL:  Your Honor, I would object to that |
| 21 | question. |
| 22 |           THE COURT:  Do you have a question for him? |
| 23 | BY MR. WECKINGTON: |
| 24 | Q    I'd like to ask if that's the case?  Is Mooky and Israel |
| 25 | going to receive 35 million? |

```
 1              THE COURT:  What is your question?
 2  BY MR. WECKINGTON:
 3  Q    (Indiscernible).
 4              THE COURT:  Ask him a question.
 5  BY MR. WECKINGTON:
 6  Q    Is Mooky Greidinger and Israel and the other two employees
 7  being keep 35 million between them as a sweetener?
 8              THE COURT:  I'm sorry, I can't understand you.  Can
 9  you talk slowly and ask a question, not a statement, please?
10  BY MR. WECKINGTON:
11  Q    I'm asking -- the question that I'm asking, is it true
12  that Mooky and his brother, Israel, and two other employees are
13  going to receive 35 million between them?
14              THE COURT:  All right.  Go ahead, Mr. Schlappig.
15              THE WITNESS:  Yeah, absolutely.  I'm personally not
16  close to the specific terms of this payment.  What I do
17  understand is that there is a transition services agreement
18  that was entered into with, I believe, four members of
19  management, to ensure a seamless transition to the new
20  management team.
21  BY MR. WECKINGTON:
22  Q    Sorry -- sorry, when you say a seamless transition, you
23  mean seamless for who?  For them?  Or for the shareholders, or
24  for the (indiscernible) --
25  A    For the new --
```

1  Q    (Indiscernible) --

2  A    For the new stakeholders in the business.

3  Q    Right.  Do you think that is morally right for that to

4  happen and the shareholders to be left with nothing?  Why in

5  God's earth don't you spit that between the shareholders?

6           MR. CAMPBELL:  I'll object on relevance grounds, Your

7  Honor.

8           THE COURT:  Overruled.

9           MR. WECKINGTON:  Come on.

10          THE COURT:  Mr. Schlappig --

11          MR. WECKINGTON:  Absolutely --

12          THE COURT:  -- you can answer the question.

13          MR. WECKINGTON:  -- it's immoral.

14          THE COURT:  Mr. Schlappig, you can answer the

15  question.

16          THE WITNESS:  Yeah, it ensures that the business

17  continues to operate in a manner that maximizes value for all

18  stakeholders going forward.

19  BY MR. WECKINGTON:

20  Q    Yeah, and why does he need 35 million?  Why does he need

21  that?

22  A    My understanding -- and I was not part of the negotiation.

23  My understanding was that this was an arm's length negotiation

24  between the stakeholders and the management team.

25  Q    Can I ask you a question?  Do you think that's immoral?

1           MR. CAMPBELL:  I would object on relevance grounds on

2    immorality.

3    BY MR. WECKINGTON:

4    Q    That human beings -- it's immoral.  We all know it's

5    immoral.  Lord knows it's immoral, it's an injustice.

6           THE COURT:  Hang on, hold on a minute.  I have an

7    objection to your question.  I'm going to overrule the

8    objection.  I think that we have a layperson that is

9    cross-examining the witness, and he's asking the question using

10   the term "morality."  I think he wants to know is it fair and

11   equitable, which is going to be the bankruptcy term, to allow

12   management to be paid transition fees while shareholders get

13   wiped out.  And Mr. Schlappig, I want you to answer that

14   question, which is what I think that the examiner is asking to

15   you.

16          THE WITNESS:  Yeah, they are providing direct value

17   to the estate by agreeing to facilitate a transition of the

18   business to a new management team.  So yes.

19   BY MR. WECKINGTON:

20   Q    Yes -- yes what?  Yes, it's immoral?

21   A    Yes, it's -- it's a -- it's an appropriate arrangement to

22   enter into to ensure a value maximizing outcome for all

23   stakeholders.

24   Q    At the expense of the shareholders -- what -- they

25   (indiscernible) the directors, then the shareholders.  They

1  take our (indiscernible), and they wanted money.  We're going

2  to be there for you, we're going to fight this together.  And

3  now all of a sudden when it comes to it, they're taking 35

4  million and leaving shareholders with nothing.  Even if they

5  gave the shareholders half of that now, that would be roughly

6  ten cents a share.  For (indiscernible) sake, we need some

7  justice here.

8          THE COURT:  All right.  Do you have a question for

9  this witness?  I'm going to let you make a closing statement

10 later when we close the evidence.  Do you have a question for

11 Mr. Schlappig about this?

12          MR. WECKINGTON:  I'm just -- I'm just -- I know he's

13 just doing a job.  I'm just a layman, I a normal guy who's

14 called.  So I just wanted to (indiscernible) come together and

15 why don't you split that 35 million and give 18 million to

16 shareholders?  That is the righteous thing to do.  All the

17 self-respect, there must be some self-respect, surely?

18          THE COURT:  All right.  I'm going to go ahead and

19 close the examination.

20          MR. WECKINGTON:  They're (indiscernible) --

21          THE COURT:  I'm going to let you make a --

22          MR. WECKINGTON:  In the morning -- in the morning --

23 (indiscernible).

24          THE COURT:  I'm going to let you make a closing

25 argument, but this isn't the time.  This is the time to ask

1  | Mr. Schlappig questions.  If you have another question for him,

2  | go ahead.

3  | BY MR. WECKINGTON:

4  | Q   Mr. Schlappig, is there any -- any way you could -- you

5  | could help the shareholders, give them -- give them some scraps

6  | from the table?  Something, get your heads together.  That --

7  | and that's (indiscernible) Mooky and his brother, and hold

8  | their heads up high, at least to find something.  That's all

9  | that's happened.  I'm asking you if you can try and -- try

10 | and --

11 |           THE COURT:  All right.  That's a closing argument.

12 | That's not a question for the witness.  Thank you, sir.  Let's

13 | go on with the evidentiary record.

14 |           MR. WECKINGTON:  Thank you.

15 |           THE COURT:  Are there any other questions for

16 | Mr. Schlappig?

17 |           MR. WECKINGTON:  Thank you so much for giving me the

18 | time, I appreciate that.  And I'm glad you're (indiscernible).

19 | Have a good day.

20 |           THE COURT:  Thank you.  All right.  Are there any

21 | further questions for Mr. Schlappig?  All right.  Any further

22 | evidence.

23 |           MR. CAMPBELL:  There was no further evidence from the

24 | debtors, Your Honor.

25 |           THE COURT:  Thank you.  Is there any party that

1  wishes to introduce any evidence that hasn't yet had the

2  opportunity to do so?  We'll take any remaining evidence.  I

3  know that I have a lot of shareholders on the phone, and I want

4  to -- wait, we do have someone.  Hold on.  From the 505 area

5  code.  It's (505) 490-1862.  Who do we have on the line?

6         MR. LUPE:  Yes, Your Honor.  I do have a quick

7  question.

8         THE COURT:  All right.  Tell --

9         MR. LUPE:  What are you -- what is --

10        THE COURT:  Tell me your name please?

11        MR. LUPE:  Justin Lupe, sir.

12        THE COURT:  I'm sorry, I didn't hear you.

13        MR. LUPE:  I -- my name is Justin Lupe.

14        THE COURT:  All right.  Go ahead, please.  Do you

15 wish to introduce some evidence?

16        MR. LUPE:  I just wanted -- because in back in -- in

17 2020 we -- I got released from my job from Regal, and we were

18 still on the payroll, and that we never got an opportunity to

19 come back.  And my question is are we going to be getting my --

20 something because of what happened during COVID?

21        THE COURT:  So there is nothing in the proposed plan

22 that requires the debtor, Regal, to pay you anything in terms

23 of further severance pay.  If you didn't receive your full

24 wages, there is nothing in the plan that would stop you from

25 making a claim for that.  But if you received your full wages,

1   there isn't any transitional money that is made available to

2   employees under the plan.  Does that answer your question?

3               MR. LUPE:  Yes, Your Honor, thank you.

4               THE COURT:  Thank you.  Does any party have any

5   further evidence to introduce?  Okay.  I'm going to address the

6   shareholders just for a moment.

7               The funds that are invested in a business come from a

8   large number of sources.  We have funds that might come from

9   public entities to support the development of facilities.  We

10  have funds that come from public bondholders who invested in

11  the debt of the corporation.  We have secured claims.  We have

12  trade creditors who sold goods and services to the business.

13  And we have shareholders who invested in the equity of the

14  business.  And all of those form the capital structure of the

15  business.  The law requires, it doesn't simply permit, but

16  under Section 1129(b) of the Bankruptcy Code, a plan must be

17  fair and equitable.  And the law requires that those that have

18  capital invested in a business get paid prior to the holders of

19  shares.

20              Shareholders take the first risk of failure of a

21  business.  That is true under the law of every state in the

22  United States.  It's true under the federal law of the United

23  States, and I believe it's true in most Western economies.  I

24  won't say that with absolute certainty.  The expected returns

25  on equity are usually higher than they are on debt because that

1  reflects the greater risk that is taken in a capitalistic

2  society by equity holders.  Fairness is described by the

3  Bankruptcy Code and mandated that fairness requires that we

4  follow that capital structure.  That means that some people are

5  going their life savings.  That means other people that have

6  made investments are going to lose money even if it isn't their

7  life savings.  But people that own shares in this business will

8  not receive a distribution because those that either lent

9  money, or were trade creditors of the business aren't being

10  paid in full under this plan.  There is simply no value there,

11  so the law doesn't allow that payment.

12        And from a fairness point of view under the law, and

13  under just the fundamental principles of capitalism, debt gets

14  paid before equity.  That's what happens.  And that is what is

15  going to happen today.  It's not that I haven't heard the

16  shareholders, it's not that I haven't stayed up at night

17  worrying about the shareholders.  It's that what the

18  shareholders seek to get isn't what the law allows them to get.

19  And I want the shareholders to hear that directly from me.  I

20  know that you're going to make that argument in closing,

21  Mr. Sussberg, and I'm going to certainly let you do that.  I'm

22  going to let the shareholders make their argument.

23        But I just wanted to conclude the evidentiary record

24  by telling them I've read every letter that's been sent in.

25  I've looked hard at whether there is any equity here, and I

1    have to apply the law, and that is what is going on.  This is

2    not an attempt to steal a company from the shareholders.  Your

3    equity was stolen by a disease and a virus that spread around

4    the world.  And that risk was on shareholders and not on the

5    creditors.  The creditors are losing a lot of money, too.  But

6    the first risk goes to shareholders.

7            So with that said, we're going to move to closing

8    arguments.  Mr. Sussberg, go ahead, please.

9            MR. SUSSBERG:  Your Honor, can you hear me okay?

10           THE COURT:  Yes, sir.

11           MR. SUSSBERG:  Thank you, Your Honor.  Bittersweet is

12   how I would describe this because I think you look no further

13   than the Greidinger brothers, who's continued a family business

14   and stands to lose close to a billion of dollars of equity

15   value.  They were the largest equity holders in this company.

16           And unfortunately, because of COVID-19, this company

17   was brought to its knees.  In addition to COVID-19, there have

18   been fundamental changes in the movie business as we know it,

19   and we've talked about that throughout the duration of these

20   cases.  And as a result of those fundamental factors, totally

21   outside of the control of this management team, this business

22   had to be restructured entirely.  And as a result, more than

23   $4 billion of indebtedness will be extinguished from this

24   balance sheet, and the company will be completely recapitalized

25   with new money, both in the form of debt and equity financing.

```
 1              There is no world in which there is value to satisfy
 2     the secured claims, let alone the unsecured claims, and then
 3     finally the equity as you had explained, Your Honor.  The
 4     absolute priority rule guides us all.  I wish it was something
 5     different in these cases because I truly think it is a function
 6     of outside controls that brought this company to where it is.
 7     But we get hired to help realize and effectuate the reality of
 8     the situation we're dealing with, and the situation we were
 9     dealing with, as Your Honor is well aware, is a company that
10     was out of liquidity and had way too much indebtedness.
11              I think the evidence today is uncontroverted,
12     Your Honor, that we satisfied all of the 1129 factors.  This
13     plan is fair and equitable in all respects.
14              As it relates to the management team, and again, you
15     know the bittersweet comments, I would like to address the
16     comments that were made around the transition services
17     agreement.  First and foremost, these management folks have
18     really become, you know, close friends.  And I'd often call
19     them family.  It's been an absolute pleasure and an honor to be
20     able to represent them, and I find them to be of the highest
21     quality and hardest working that I may have seen throughout my
22     20 years doing this.  I truly think that they are the best in
23     the business and the smartest and most capable, and they built
24     an unbelievable company that is going to restructure because of
25     COVID, and continue doing all of the things that it does.
```

1          They did, in fact, negotiate with our secured lenders

2   who are deeply impaired, a transition services agreement that

3   requires them to provide 12 months of service, that requires

4   them not to compete for a period of time, that requires them to

5   dedicate their time to an effort that may result at the end of

6   that period, without a job.

7          I again, think everyone listening should know that

8   these folks are best in class and so maybe there's an

9   opportunity for some or all of them continue working with this

10  business.  But there is no guarantee.

11          And I will tell you when we say hard-fought, that was

12  a hard-fought negotiation with world class advisors and kudos

13  to Arnold & Porter, Akin Gump and Houlihan, and then obviously

14  AlixPartners was our -- Jackson Walker and Kirkland.  But we

15  negotiated something was important to this business and

16  important to the value of this business, and that's the reason

17  for it.  It is 100 percent moral.  It is 100 percent fair and

18  equitable, and I would say it's vital to the continuation and

19  longevity of this business.

20          THE COURT:  So Mr. Sussberg --

21          MR. SUSSBERG:  As far as the valuation, Your Honor --

22          THE COURT:  Mr. Sussberg, my view of it is a little

23  bit different than you.  I accept it was done at an arm's

24  length basis, but the complaints aren't coming from those that

25  would benefit if the $35 million weren't spent.  The complaints

1   need to come from somebody under the Constitution of the United

2   States with standing, meaning that their returns would be

3   different if I struck the $35 million deal.

4          And it's my understanding that if none of the

5   $35 million were paid, it still wouldn't go to the shareholders

6   because they are deeply, deeply, deeply behind all sorts of

7   debt.  So under the Constitution, they don't have standing to

8   raise issues that don't affect their pecuniary interest.

9          Others do.  Others could have raised it.  But on a

10  prima facie base, you've shown what you've shown, and I agree

11  with that, but it won't affect the shareholders one bit.  And

12  the new owners have the right to spend their money, the way

13  they want to spend it.

14         So go ahead, but I wanted to be sure and -- I have to

15  deal with the standing issue under the Constitution and Supreme

16  Court authority.

17         MR. SUSSBERG:  Yes, I totally agree, Your Honor, of

18  course.  And what I was going to say that our secured lenders,

19  who will be the 100 percent owners of this business, have

20  contracted with the executives to provide those services and

21  various terms included in those agreements.  Absent the

22  management team agreeing to the transition services agreement,

23  there is no money that was going to unsecured creditors, let

24  alone the equity owners.  That is clear.  And it's the new

25  owners that bargained for these services.

1          Your Honor, on the valuation, I think without

2   question, this is a proper valuation.  You heard from

3   Mr. Schlappig.  You've heard from Mr. Zelin and throughout

4   these cases, PJT is a world-class organization.  They put their

5   full effort into pulling together a valuation and what's more,

6   they ran a worldwide marketing process that yielded no results

7   anywhere clear being able to hurdle our indebtedness.  And as a

8   result, there is no question that this valuation is appropriate

9   and was done with the highest quality.  And I appreciate

10  Mr. Schlappig's comments today.

11          Finally, Your Honor I wanted to just thank a few

12  people.  And then obviously we'll hear closing argument, and

13  I'll reserve on that.  I want to thank the Kirkland team led by

14  Ms. Foster.  Now, this has been a difficult case over the

15  course of a year but we've persevered through her leadership

16  and everyone's contributions.  And I really appreciate

17  everything she's done.

18          I wanted to thank Mr. Mesterharm, obviously

19  Mr. Zelin, Mr. Schlappig.  I wanted again to thank the

20  management team.  Again, it's been an honor and a privilege.

21  The U.S. Trustee's office who's worked with us closely

22  throughout this case.

23          And finally, Your Honor, I do -- a bittersweet moment

24  for me because I think this will probably be our last

25  confirmation hearing together.  And I did want to just

1    acknowledge that it's been an honor, an absolute privilege, to

2    be able to appear before you.  And again, I apologize for not

3    being there in person.  It was my intention.  But you are

4    someone that I admire and respect and I've really appreciated

5    the opportunity to appear in front of you now for close to a

6    decade.  And I just wanted to thank you.  You are very patient,

7    as we can tell today.  And again, the honor has been all mine.

8    Thank you, Your Honor.

9           THE COURT:  Mr. Sussberg, thank you.  Does anyone

10   else wish to make a closing statement?

11          MR. LOHAN:  Good morning, Your Honor.  Again for the

12   record, Brian Lohan from Arnold & Porter on behalf of the

13   Legacy secured lenders.  I want to take one second to tie

14   together Mr. Perez's response to a question you asked him in

15   opening and Mr. Sussberg's comments just now, as well as the

16   evidence.

17          Just by way of reference, the Legacy secured lenders,

18   the estimated recovery is 3.4 percent and that's in -- you can

19   find that in Docket Number 1946, at Paragraph 9.  That's the

20   only substantive comment I had to make during closing.

21          I did want to make one non-substantive comment.

22   Don't want to presume the outcome of this hearing, but I did

23   want to take a second on behalf of this ad hoc secure lenders

24   and their advisors, including Akin -- our co-counsel, Akin

25   Gump, Mr. Dublin, and Mr. Messersmith who wanted to be here

1    today, but weather prevented them from arriving, as well as

2    Houlihan Lokey and Hilco, to thank the debtors, their

3    management, and their professionals for their hard work in

4    getting to this point today.  I don't think we can overstate

5    the amount of work that went into this case over the almost

6    past year.

7            Also want to thank the Committee and their

8    professionals.  They were constructive and practical throughout

9    these cases.  And in light of the outcome to their

10   constituents, I think they did a great job.

11           Also want to thank Judge Lopez for his time and

12   effort in mediation.  And last but not least, I do want to

13   thank the Court and your staff, and specifically, I want to

14   thank Your Honor for your flexibility, your time, and your

15   guidance throughout these cases and all the other cases that

16   we've done before you.

17           THE COURT:  Mr. Lohan, thank you.

18           MR. LOHAN:  Thank you.

19           THE COURT:  Anyone else in court wish to make a

20   closing statement?

21           All right.  From the 214 area code, who do we have?

22           MS. PERRY:  Good morning, Your Honor.  Deborah Perry

23   with Munsch Hardt Kopf & Harr.  I represent CJ 4Dplex in the

24   bankruptcy case.

25           And the debtors had agreed yesterday to read an

1   agreement into the record today in connection with confirmation

2   and I think because we moved from evidence directly to closing

3   argument without addressing the confirmation order, that just

4   got skipped over.  So I'm happy to read that into the record or

5   the debtors can certainly do that.

6           THE COURT:  So I'm going to get to the confirmation

7   order in a minute.  I want to finish closing arguments first.

8   I'll leave your line open and then we'll go there and take up

9   any issues with the form of order.

10          Any other --

11          MS. PERRY:  Thank you, Your Honor.

12          THE COURT:  Any other closing arguments?  If you're

13  on the phone and you wish to make a closing argument, you'll

14  need to press "five star" one time.

15          All right.  I find that the plan meets all of the

16  requirements of Section 1129 of the Bankruptcy Code.  There has

17  been a proposed order submitted that goes through in detail why

18  it does that.  I have probably a dozen comments on that order,

19  and there may be additional changes that are going to be

20  announced today, which is pretty common in order to have pulled

21  everyone together, as Ms. Perry has suggested.

22          I think this plan, most importantly, is an arm's

23  length plan filed in good faith and intended to preserve jobs

24  and a business and capital into the future out of one of the

25  businesses that operates throughout the world.  I'm going to

1    confirm the plan and we're going to go through the order in

2    detail to see what we need to do.

3              Ms. Whitworth, what comment did you have?  Go ahead,

4    please.

5              MS. WHITWORTH:  Thank you, Your Honor, Jana Whitworth

6    on behalf of the United States Trustee.  I just wanted to go on

7    the record.  It's not really an argument, Judge.  Just wanted

8    to let the Court know that the U.S. Trustee is supportive of

9    the plan and all the issues that we've had with the debtors --

10   the language in the plan has been cured and we're happy with

11   the results, Judge.

12             THE COURT:  Ms. Whitworth, thank you for that

13   announcement.  So I think what I should do is take whoever

14   wants -- whoever's in charge of the confirmation order and let

15   you make announcements as to what additional changes you've

16   agreed to with parties, have you submit those to me this

17   afternoon if possible.  But I want to go through them so that

18   people can hear them on the record, and then I'm going to come

19   back at you with my comments, only one of which I think is

20   really substantive.  But -- and the others I think are just

21   reflecting -- trying to reflect the deal better.

22             The one that's substantive is I'm not seeing a reason

23   to waive the 14-day stay of the order so that an orderly appeal

24   could be taken.  Is there a reason why we're being asked to

25   waive the 14 days?

```
 1              MR. CANDEL:  Yes.  Good morning, Your Honor.  Peter
 2    Candel of Kirkland & Ellis on behalf of the debtors.
 3    Your Honor, the reason that we included the 14-day waiver there
 4    is for two principal reasons.  One, we are assuming various
 5    leases pursuant to the plan.  And we would like the effective
 6    date of that assumption to be at the confirmation date, given
 7    that we do have some agreements with landlords consensually to
 8    make certain payments by month end.  And so we believe if we
 9    delay the effectiveness of the confirmation order, we may be
10    prohibiting the ability to pay those cures in a timely fashion.
11              And second, Your Honor, we would like to send a
12    message of finality to our stakeholders, employees, and
13    vendors, to give them that sense of comfort as well.
14              THE COURT:  I'll -- I'm happy to include language in
15    the confirmation order that says that assumed leases will be
16    assumed effective as of the confirmation date, but I'm not
17    going to waive the 14-day stay.  I mean, that -- the reason
18    you're giving to waive the 14-day stay would be true in every
19    case, everywhere, every time.  And I don't think that I should
20    waive it, especially when I've got a contested confirmation
21    hearing and I want to preserve the right of the shareholders to
22    object.  Other than that, I don't think you're going to hear
23    substantive issues that I'm going to raise with that order.
24              MR. CANDEL:  Understood.  Thank you, Your Honor.
25              THE COURT:  But you can include a provision that
```

1  makes the leases that are assumed, assumed effective as of

2  June 28th, and that's fine.

3        MR. CANDEL:  And just to clarify, Your Honor, so the

4  debtors will also have the authority to pay related cures as of

5  the entry of the order?

6        THE COURT:  You can put all of that in there.  Yeah.

7        MR. CANDEL:  Thank you, Your Honor.

8        THE COURT:  None of that moots -- none of that would

9  moot an appeal.  So yep, you're welcome to do all of that.

10        So I do want to announce what other changes you have.

11  Let me open my order.  My order is filled both with a couple of

12  times where I've edited and more times that I've just made

13  comments to myself.  But for the ease of review by everyone,

14  I'm just going to put it up on the screen, including sort of

15  scribblings to myself.  And again, there aren't that many, but

16  you'll see them.

17        MR. CANDEL:  Your Honor, I was going to offer up a

18  page flip through the 190-page confirmation order, but this

19  seems like a more efficient route to go about the comments.

20        THE COURT:  Yeah, if you'll just tell me I think

21  paragraph numbers.

22        MR. CANDEL:  Yes, Your Honor.

23        THE COURT:  A lot of -- it's actually only about 90

24  pages.  I think the rest is the plan itself --

25        MR. CANDEL:  With the attachments?

1          THE COURT:  Yeah.  So where do you want me to go?

2          MR. CANDEL:  Your Honor, relative to the proposed

3   form of order that we filed Monday evening at Docket Number

4   1948, there's only one change that we would like to add, which

5   is --

6          THE COURT:  Okay.  This is 1948?  That is the one I

7   read?

8          MR. CANDEL:  That's correct.  So we received outreach

9   from one of our studios, Sony Pictures.  And what we would like

10  to do, Your Honor, is Paragraphs 144 to 147 as they relate to

11  Paramount, we are simply going to have that same exact language

12  apply to Sony Pictures.  And so if it works for Your Honor,

13  we're happy to revise and submit a revised form of order

14  shortly after the hearing concludes along with any other

15  changes you may have.

16         THE COURT:  Ms. Perry had indicated that you've

17  agreed to some additional changes for her.

18         MR. CANDEL:  Yes, that is just a statement on the

19  record, Your Honor.  All of the cure disputes that we have

20  outstanding as of today, the entry of the confirmation order

21  will not prejudice the counterparty's rights.  The debtors will

22  hope -- you know, hopefully reconcile those consensually and if

23  needed, we will come back for the Court to adjudicate.  But all

24  parties' rights with respect to any pending cure disputes as of

25  today are preserved and that includes with respect to CJ

1  4Dplex, which is -- as counsel noted, is her client, as well as

2  Vista and any other parties, including landlords, where we are

3  working to reconcile those on a consensual basis.

4        THE COURT:  So probably six or eight of my comments

5  go to that question where I have a confirmation order that's

6  inconsistent with that statement.  I want to put what you just

7  said into the order itself so that I don't have one place that

8  says, we're done, it's assumed, and other places that say it's

9  not.  I want to go through and clean that language up and

10  you'll see.  But on the ones that say, these are assumed, I

11  want it to say "subject to Paragraph X," and X will have

12  effectively the statement that you have made in it.

13        MR. CANDEL:  Of course.

14        THE COURT:  Otherwise, I'm afraid I've got an oral

15  statement that would contradict my written confirmation order,

16  and frankly, I don't think you want that.

17        MR. CANDEL:  That's right, Your Honor.  We're happy

18  to make that change.  That -- that's not our intent to have

19  that inconsistency.

20        THE COURT:  Mr. Etkin, go ahead, please.

21        MR. ETKIN:  Good morning, Your Honor.  This is

22  Michael Etkin from Lowenstein Sandler.  We represent Financial

23  Recovery Services, and my only comment with respect to the

24  order goes to the colloquy that just took place.  We don't have

25  a cure issue.  We have a rejection issue, so whatever that

1  language is that reserves rights as to those, I filed

2  objections, whether it's cure or rejection, that those rights

3  are preserved.  Because just looking at Paragraph 102 of the

4  proposed order, which talks about the confirmation order

5  constituting a final order approving rejections of executory

6  contracts, that just needs to be clarified so those that filed

7  objections as to rejection as well as cure, that those rights

8  are preserved.

9          THE COURT:  I agree with that.  We want to be sure

10  that those are preserved.  I think that I will tell you I've

11  expressed this opinion over the last ten years, three or four

12  times, and let me express it to you so when we get to the

13  argument in the case, you're not going to be surprised by this.

14          The Supreme Court says that rejection is a breach.

15  There's an argument as to whether this contract is executory or

16  not.  Executoriness matters as to the ability to assume, but it

17  doesn't matter as to the ability to reject in my view because a

18  non-executory contract can simply be breached by a plan, which

19  would probably give rise to the same prepetition claim.

20          However, you raise in your argument that you have

21  provided post-petition services that may amount to an

22  administrative claim.  So even if I'm right in my prior

23  statements -- and I'm now speaking to others about this.  To

24  the extent that the evidence shows that they provided post-

25  petition services, they may have an administrative claim for

1  the post-petition services that are provided and the value of

2  those, I don't know.  But I don't think that the fact that

3  post-petition services were provided can transmogrify a

4  prepetition claim into a post-petition one.

5          Having said all that, I want to preserve the rights,

6  but I know it's going to be an argument and I want y'all

7  prepared for it, and I want briefing by both sides to either

8  prove up or disprove the position that I've taken so many times

9  over the years, which is on a contract that is being rejected,

10 it is irrelevant whether it turns out to be executory or not,

11 because it can simply be breached.  And the breach still would

12 give rise only to a prepetition claim, not an administrative

13 one.

14         If I'm wrong about that, this will be the time to

15 brief it.  Mr. Perez?

16         MR. PEREZ:  No.  No, Your Honor, we agree with

17 Mr. Etkin that this is reserved to another day and the

18 Committee did file an objection last night.  I don't know if

19 the Court was aware that.

20         THE COURT:  I did, I read that.  Yep.  Thank you.

21 All right.  Go ahead.

22         MR. CANDEL:  Your Honor, with those two

23 clarifications, the one with respect to Sony Pictures in the

24 order, and the clarification on the record with respect to cure

25 objections, the rest of the order, Your Honor, unless there's

1  any comments that you wish to walk through, is all set from our

2  perspective.

3          THE COURT:  Okay, well then let me go through my

4  comments.  Like I said, I don't think they're very substantive,

5  but --

6          MS. PERRY:  Your Honor, I'm --

7          THE COURT:  Ms. Perry, go ahead.

8          MS. PERRY:  I apologize for interrupting.

9          THE COURT:  No, go ahead Ms. Perry.

10          MS. PERRY:  Thank you.  There was very specific

11  language that we provided to the debtors that they agreed to in

12  connection with CJ 4Dplex.  And part of that is because they

13  have extended my client's objection deadline to both assumption

14  and cures so it's not limited to the cure amount, but also with

15  respect to the assumption any of our contracts.  And so we

16  actually would request that our specific language is included

17  in the confirmation order.  I'm happy to read that into the

18  record now.

19          MR. CANDEL:  And Your Honor, if it's helpful -- and

20  apologies if we misstated the agreement.  Since we're going to

21  submit a revised form of order, given that the agreement -- I

22  believe the language that is being sought is not substantively

23  different with what we're seeking to do.  We're happy to

24  include that language in the revised form of order that we

25  submit to Your Honor after this hearing.

1          THE COURT:  Well, is it going to be identical to what

2    Ms. Perry's getting ready to read or do we need to fight it

3    out?

4          MR. CANDEL:  No, we have -- had reviewed the language

5    and we had -- I had understood that with the clarification I

6    had made, that it resolved that language.  But we have seen it

7    and we do not have any substantive issue with it, so I don't

8    believe there's going to be an issues with including it.  And

9    we will coordinate with Ms. Perry to ensure that it's the

10   language that she is comfortable with.

11         THE COURT:  Is it the language that she last

12   submitted to you or not the language that she last submitted to

13   you?

14         MR. CANDEL:  Yeah.  Yes, Your Honor.  The last

15   language that she submitted to us.

16         THE COURT:  All right.  Ms. Perry, is that okay?

17         MS. PERRY:  That's acceptable, Your Honor.  Thank you

18   very much.

19         THE COURT:  Thank you.  This is going to take a

20   minute.  It's a long order and I'll have to find my comments.

21   So on Paragraph -- Page 15, we're in Paragraph 26.  I am

22   unwilling to find that something that I haven't seen will be

23   fair and will have been negotiated in good faith.  I think this

24   needs to be changed to say -- to take out that sort of

25   forecasting language, and then simply to authorize you to say

1  that you can negotiate the balance of the documents that are

2  consistent with the plan.

3       MR. CANDEL:  Understood, Your Honor.  Of course, no

4  issues with that change.

5       THE COURT:  So this Paragraph 41 was my first

6  attempt -- and you can kind of forget the particular language

7  there -- to say that there's going to be a paragraph coming

8  that preserves all of these lease rights, similar to what

9  Ms. Perry described and what you've described.  And so whenever

10  we have one of these things that says the leases are assumed, I

11  just want to refer and say it's subject to that paragraph

12  you're going to add.

13      MR. CANDEL:  Understood, Your Honor.  And we had

14  discussed with the landlord constituency in terms of ensuring

15  that, to the extent there's any ability to object to assumption

16  and cures, that we wanted to ensure it was preserved so fully

17  aligned with these clarifying edits.

18      THE COURT:  Thank you.  I can't find any listing of

19  the officers in the plan supplement.

20      MR. CANDEL:  Your Honor --

21      THE COURT:  You know, the last night's plan

22  supplement listed I think some directors by name and others in

23  theory, but no officers.

24      MR. CANDEL:  That -- that's correct, Your Honor.  So

25  in the plan settlement that was filed last night, we disclosed

1 the chair of the new board, as well as the parameters that will

2 set forth how the additional members of the new board will be

3 selected.  And those will be disclosed in an amended plan

4 supplement prior to the effective date.  In terms of the

5 officers, that will also be disclosed in due course.

6         As things stand today, you know, the period between

7 confirmation and effective date, the identities of the current

8 management and the current board are known.  So at all times

9 between now and the effective date, it will be disclosed who

10 is -- who holds the manager roles.

11         THE COURT:  I think this is similar to the other one.

12 I can't bless something that doesn't exist, right?  So I don't

13 have a problem that you're -- and in the new disclosures to the

14 board, I think you do describe the process for appointment of

15 the board.  I'm okay with all that.

16         On the officers, I don't think you give that process.

17 And if what you want me to do is to approve names, I can do

18 that.  If you want me to approve process, I can do that, but I

19 can't approve names or processes that you haven't told me

20 about.  And so that's the problem with 62, and it's easy to

21 fix.  I just need it fixed.

22         MR. CANDEL:  Your Honor, would it be helpful if an

23 amended supplement was filed that disclosed how those officers

24 would be selected?

25         THE COURT:  Yeah, that would work.  And if it's

1  easier than doing it in the plan supplement, you can just put

2  it in that paragraph --

3         MR. CANDEL:  Perfect.

4         THE COURT:  -- and just say it's disclosed.  Yeah.

5  In this order, they're going to be selected -- I would presume

6  by a majority of the board, you know, but I -- if you want me

7  to approve it somehow, you got to tell me what it is.

8         MR. CANDEL:  Understood.  Thank you, Your Honor.

9         THE COURT:  Why am I making this finding in Paragraph

10  72?  I think it has nothing to do with any requirement of 1129.

11  And I didn't understand why I'm making that finding.

12         MR. CANDEL:  Your Honor, I believe there was to state

13  that the plan is both fair and equitable and also does not

14  unfairly discriminate.  If Your Honor believes that that is not

15  required for --

16         THE COURT:  Well, take me to 1129 and tell me what

17  are we doing here?  Because I couldn't figure out why this is

18  even here.

19         MR. CANDEL:  Your Honor, I believe it -- it's further

20  support that we're not treating similarly-situated creditors

21  differently.  So it's not a matter of, you know, having

22  different classes of similarly-situated creditors and giving

23  one class different treatment than the other.

24         THE COURT:  No, this is an 1129(b) paragraph.  Why am

25  I -- I just -- I don't even understand the --

 1                MR. SUSSBERG:  You can take this out.

 2                THE COURT:  Just take it out?

 3                MR. SUSSBERG:  Yes.

 4                THE COURT:  Okay.  Thank you.  It always bothers

 5     Mr. Sussberg when I read his orders.

 6                MR. CANDEL:  I also pushed back on that provision,

 7     Your Honor, but I was overruled.

 8                THE COURT:  I didn't understand, "This shall be

 9     immediately effective and enforceable" language.

10                MR. CANDEL:  Your Honor, happy to take that out --

11                THE COURT:  Okay.

12                MR. CANDEL: -- given it is subject to other

13     provisions.

14                THE COURT:  So -- and then the second comment here in

15     that paragraph is the same one about we have executory

16     contracts and leases, et cetera.  So I need this cross-

17     reference again to the new paragraph you're going to put in.

18                MR. CANDEL:  Understood.  Will do.  Thank you,

19     Your Honor.

20                THE COURT:  Same thing in Paragraph 100.  Yeah, I

21     think this is really the same comment.  So if we have a

22     disputed one, we're not approving it today.

23                MR. CANDEL:  Right.

24                THE COURT:  This is the same comment I made earlier

25     that I'm not going to approve documents I haven't seen, but I

1   will authorize you to enter into documents that are consistent

2   with the plan.  That's in Paragraph 103.

3          MR. CANDEL:  Understood.  We'll make that change,

4   Your Honor.

5          THE COURT:  Yeah, this really didn't make sense to

6   me, this, "The later of the effective date and the date on

7   which distributions are made pursuant to the plan."  The shares

8   are canceled now because there is no distribution made on them.

9          I don't have a problem if you want to rewrite this to

10  say that as to claims and interests on which there is a

11  distribution made, they're canceled as of the distribution

12  date.  As to claims and interest on which there is no

13  distribution to be made, they're canceled on the effective date

14  of the plan.  But we shouldn't be linking the cancellation of

15  the shares to a distribution to a non-shareholder.

16         MR. CANDEL:  Understood, Your Honor.  This comment

17  came from the convertible bonds trustee, where they wanted to

18  ensure that the documents still were in effect until the

19  decisions were made.  So we'll clarify that to make clear.

20         THE COURT:  Thank you.  Paragraph 110, the way that

21  the procedures work, it says no distribution made from less

22  than 250, but then it says, however, for unsecured creditors,

23  it won't be -- you need to look, but it basically didn't work.

24  So let me go to Article 7 of the plan.  I'm going to -- I'll

25  pick this up in a minute when I get down to Article 7, but this

1    is a mechanical problem that I didn't think worked.

2              11 doesn't work.  You don't get to reclassify people.

3              MR. CANDEL:  That's right, Your Honor.  I -- in that

4    provision, we're seeking the right to seek to reclassify, not a

5    unilateral right.  So we'll make that change.

6              THE COURT:  Thank you.  I didn't make any changes to

7    your one-on-one deals that you had, and I understand you're

8    going to add the new one.

9              MR. CANDEL:  That's right, Your Honor.  Thank you.

10             THE COURT:  Page -- Paragraph 164 is just one of my

11   own idiosyncrasies, which is never put in a date and a

12   calculation of the date in case they're different.  So I want a

13   fixed date and I want to take out the words "by 90 days."

14             MR. CANDEL:  Perfect.  We'll strike that, Your Honor.

15             THE COURT:  I told you some of these weren't hard,

16   right?

17             177, we've talked about, and you're going to rewrite

18   that --

19             MR. CANDEL:  Yep.

20             THE COURT:  -- to deal with the lease payments.  Let

21   me find now the $250 issue.

22             MR. CANDEL:  Your Honor, I believe it's at Page 159

23   of this docket entry.

24             THE COURT:  Great.  So I think the first paragraph

25   says you never distribute less than 250.  And the second

1    paragraph says it revests in the debtor except with respect to

2    Class 5A and B claims, but then it doesn't say you're going to

3    pay it to the 5A and 5B claimants.  So I think it mechanically

4    fails.

5            MR. CANDEL:  Your Honor, the thought process there is

6    the litigation trust will be making those distributions to

7    holders in Class 5A and Class B --

8            THE COURT:  Okay.

9            MR. CANDEL:  -- 5B.  And so if a holder in that

10   class -- and it comes back to the litigation trust, the

11   litigation trust then does not have the requirement to send it

12   to the organized debtor.  It'll just be dealt with pursuant to

13   litigation trust agreement.  That's how we were viewing it.

14   But if the -- this is -- was of course a provision negotiated

15   with the Committee and so I don't want to overstep and mistake

16   the thought process there, but that's how we were viewing why

17   it wouldn't go back to (indiscernible) debtor.

18           THE COURT:  So the disbursing agent does not make

19   disbursements to 5A or 5B creditors?

20           MR. CANDEL:  The litigation trustee is within the

21   dispersing agent, so it will not need to make distributions

22   less than 250.

23           THE COURT:  But doesn't --

24           MR. CANDEL:  But to the extent it's a holder in Class

25   5A or Class 5B, and it's an unclaimed distribution or it's

1  below that figure, it doesn't go to the reorganized debtors.

2  It would go back to the litigation trust for the benefit of --

3  however the distributions for the litigation trust assets would

4  be governed pursuant to those documents.

5         THE COURT:  Okay.  250 is a lot of money to some

6  trade creditors, right?  I mean, can we just pay it to them?

7  You're the command, right?

8         UNIDENTIFIED:  Yeah, Your Honor, that was the

9  thought, that the money would be paid.

10        THE COURT:  Okay.  Let's just fix the first sentence.

11 Where it says -- the first sentence should say, "Except for

12 class" -- "Except for the holders of an allowed -- distribution

13 to holders and allowed general unsecured claims in Class 5A or

14 B, there won't be a distribution at less than 250."  And then

15 the second paragraph would work.  And I don't want to rewrite

16 the plan, so just put that in the confirmation order if you

17 would, somehow.

18        MR. CANDEL:  Perfect.

19        THE COURT:  It -- I think that works for everybody,

20 right?  Is that -- I don't want to spend more money making a

21 $250 distribution than $250, you know, but --

22        UNIDENTIFIED:  Correct, Your Honor.  There -- there's

23 obviously a point of which it would cost more money to make the

24 distribution than what the person is making and I thought there

25 was some discretion with respect to those if you're getting,

1  you know, a three cent check or something like that.

2  THE COURT:  So look, I mean, the plan was a $250

3  limit for Class 5A and B.  Anybody going to object to a $25

4  minimum distribution limit.  Is that okay?

5  UNIDENTIFIED:  That's fine, Your Honor.  Thank you.

6  THE COURT:  That's probably the -- you know, a fairly

7  high admin cost to write a check, but it does cost something.

8  UNIDENTIFIED:  Right.  Right.

9  THE COURT:  Okay.  If you'll just --

10  UNIDENTIFIED:  $25?

11  THE COURT:  -- fix that in the order, you don't need

12  to redo the plan.  I think that's a hassle not worth it.

13  MR. CANDEL:  Perfect.  We'll incorporate into the

14  revised order that we submit.

15  THE COURT:  Okay.  Are there any of the changes that

16  I am requesting that are problematic other than I know that you

17  don't really like the 14-day stay issue, but you're going to

18  get it?

19  MR. CANDEL:  No, Your Honor.  That covers all the

20  changes we wanted to clarify in the record or include and we'll

21  make sure to incorporate all the comments that you walked us

22  through today and submit a revised form of order shortly after

23  the hearing.

24  THE COURT:  Okay.  Do you think we'll get that done

25  this afternoon or when should I be looking for it?

1           MR. CANDEL:  Yes, Your Honor.  We should have it to

2   you this afternoon.

3           THE COURT:  Okay.  If you'll send a note to Mr. Laws

4   that you filed it.

5           What else do we need to undertake today?

6           MR. CANDEL:  Your Honor, that's all from my

7   perspective.  I'd like to reiterate everyone's thanks not only

8   to Your Honor and the Court, but to all the other parties in

9   interests.  So unless there's any final, final remarks from

10  Mr. Sussberg or Ms. Foster, I believe that all -- that that is

11  all we have for today's hearing.

12          THE COURT:  Thank you.  Anyone else?

13          So, like, I think Mr. Sussberg was right.  This is

14  probably my last major confirmation hearing.  I'm -- it was a

15  hard hearing, but I appreciate that I'm going to leave, having

16  watched a lot of people do their professional duties in the

17  right way.  I'm not leaving the bench.  I'm leaving handling

18  major complex cases for confirmation purposes at least.

19          I thank the lawyers that showed professionalism

20  throughout this case and a really hard case.  This case

21  exhibited compromising and negotiations that were done fairly

22  and professionally.  I always got told the truth by everybody

23  in this case.  I was very appreciative of all the hard work

24  that was done, so it's -- as difficult as this was, and as

25  melancholy as the results might be, it was a pleasure to have

1  this as the last case that I deal with in this context.  And I

2  want to thank everybody.  So thank y'all, and we will go ahead

3  and recess till this afternoon.

4          MR. CANDEL:  Thank you, Your Honor.

5      (Proceedings concluded at 10:23 a.m.)

6                          *  *  *  *  *

7

8

9

10

11

12

13

14              **C E R T I F I C A T I O N**

15

16          I, Alicia Jarrett, court-approved transcriber, hereby

17  certify that the foregoing is a correct transcript from the

18  official electronic sound recording of the proceedings in the

19  above-entitled matter.

20

21

22

23  _____

24  ALICIA JARRETT, AAERT NO. 428      DATE: June 30, 2023

25  ACCESS TRANSCRIPTS, LLC